IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 18-292 |
| ROBERT BOWERS | |

**RESPONSE IN OPPOSITION BY UNITED STATES TO MOTION FOR CORRECTIVE ACTION REGARDING FBI INTERFERENCE WITH DEFENSE ACCESS TO POTENTIAL WITNESSES**

AND NOW comes the United States of America, by its attorneys, Scott W. Brady, United States Attorney for the Western District of Pennsylvania, Troy Rivetti and Soo C. Song, Assistant United States Attorneys for said district, and Julia Gegenheimer, Trial Attorney, Civil Rights Division, and submits this Response in Opposition to Defendant Robert Bowers's Motion for Corrective Action Regarding FBI Interference With Defense Access to Potential Witnesses (Doc. No. 60).

## I.   Introduction

The Local Rules of the United States District Court for the Western District of Pennsylvania contemplate that prior to the filing of any motion with the Court regarding a defendant's access to evidence or discovery, counsel will confer in an effort to address any such issues or concerns. See LCrR 16E (Obligation to Confer). Instead of complying with the spirit of that Rule, and in contravention of the representations by defense counsel at every status conference held to date regarding the parties' ongoing discussions and attempts to resolve any disputes without court intervention, on May 29, 2019, counsel for defendant Robert Bowers ("Bowers") filed a Motion for Corrective Action Regarding FBI Interference With Defense Access to Potential Witnesses, Doc. No. 60.

In the Motion, the defendant asserts – without providing the United States with the factual support for his allegations – that "the FBI has discouraged individuals from communicating with the defense," that the purported interference "undermines the reliability of the proceeding and violates the Eighth Amendment," and that relief from the Court is needed in order to address the alleged "improper interference by the FBI with potential witnesses." Doc. No. 60 at 2, 4. Simultaneous to filing the Motion, Bowers took the highly unusual step of providing the purported factual support for his contentions to the Court under seal and *ex parte*. See Doc. Nos. 61, 62, 64, 65.

The tactics undertaken by the defense subvert the integrity of the adversarial system and threaten to expose sensitive, confidential victim communications to which they are not entitled under the law. There has been no FBI interference with defense access to witnesses. The defendant's Motion is without legal merit and should be denied.

**II.     Bowers's Motion Misconstrues the Governing Legal Standards
and Fails to Acknowledge the Right of Every Witness to Decline
To be Interviewed**

Although the United States is at a disadvantage in responding to the Motion – due primarily to defense counsel's failure to set forth factual allegations – it is clear that the defense Motion should be denied. The Motion rests on the erroneous and speculative assumption that if a witness chooses not to speak with defense counsel, that decision must be the result of nefarious conduct by the United States. See Motion, p. 2 ("[C]ounsel are not aware of the exact language used by the FBI in discussing potential contact with the defense; however counsel know of at least one potential witness who initiated contact with the defense but then suddenly ceased communication …"). The defense further implies that this Court's resolution of this issue should be influenced by

the possibility that this may become a capital case.[1]  Id. at 4 ("In this potential capital case, such interference also undermines the reliability of the proceeding and violates the Eighth Amendment.").  Counsel for Bowers is wrong in both respects.

It is well settled that "witnesses 'belong' neither to the defense nor to the prosecution," and "both must have equal access to witnesses before trial."  United States v. Bryant, 655 F.3d 232, 238 (3d Cir. 2011) (citations omitted).  It is also clearly established that "a defendant's right of access to a witness 'exists co-equally with the witnesses' right to refuse to say anything.'"  United States v. Black, 767 F.2d 1334, 1338 (9th Cir. 1985) (citations omitted).  Accord Workman v. Bell, 178 F.3d 759, 772 (6th Cir. 1998) (A defendant's "right to access is tempered by **a witness' equally strong right to refuse to say anything**") (emphasis added).

A defendant's "right of access is not violated when a witness chooses voluntarily not to be interviewed."  United States v. Black, 767 F.2d at 1338 (citations omitted).  Most importantly, "[w]hile the prosecution may not interfere with a witness's free choice to speak with the defense, … merely informing the witness that he may decline the interview is not improper."  Id. (citations omitted).  In Bryant, the Third Circuit clarified that a defendant's due process rights are violated only when the government instructs a witness not to communicate with defense counsel or otherwise impermissibly interferes with the defendant's access to a witness:

> [T]here is an important difference between requesting nondisclosure and discretion on the part of witnesses and artificially restricting defense counsel's access to witnesses by, for example instructing the latter not to communicate with the former.  Merely requesting that witnesses practice discretion does not violate a defendant's due process rights.

---

[1] As has been affirmed in court, the Capital Case Review Process is underway and no determination regarding the death penalty has yet been made by the Attorney General of the United States.

United States v. Bryant, 655 F.3d at 239 (citation omitted);[2] accord United States v. Agostino, 132 F.3d 1183, 1191 (7th Cir. 1997) ("Since a witness is free to decide whether to grant an interview with defense counsel, reversal on the ground of governmental interference with a witness 'requires a clear showing that the government instructed the witness not to cooperate with the defendant.'") (citations omitted); Workman v. Bell, 178 F.3d at 772-73 (Instructions to a witness not to cooperate with the other side or talk to lawyers for the other side is improper, but a defendant's right to access is tempered by a witness' equally strong right to refuse to say anything; "Thus, the prosecution's advising a witness of his right not to submit to the interview [does] not deny the defendant a fair trial." (citations and internal quotations omitted)); United States v. Bittner, 728 F.2d 1038, 1041-42 (8th Cir. 1984) ("Though the prosecution may not without justification interfere with a witness' free choice to speak with a defense attorney, it does not appear in this case that the prosecution impermissibly interfered with [the witness's] free choice. Rather, [the agent] merely advised her of her right to decline interviews with [defense counsel]. Contacts of this nature do not constitute an impermissible interference with the defendant's right of access to witnesses.") (citation omitted); United States v. Black, 767 F.2d at 1338 ("While the prosecution may not interfere with

---

[2] Impermissible interference is found only when the government prevents defense counsel from having access to the witness. See, e.g., Gregory v. United States, 369 F.2d 185, 187 (D.C. Cir. 1966) (prosecutor may not advise a witness not to talk to defense counsel outside the presence of the prosecutor). Bowers's Motion fails to allege anything akin to that.

In Bryant, the defendant argued that the United States Attorney's request that the witness "not disclose the existence of this [grand jury] subpoena" violated due process in that it interfered with defense access to witnesses and "gave an appearance of a judicial imprimatur that suggested to witnesses they were legally obligated to comply with the Government's secrecy request." 655 F.3d at 238-39. The Third Circuit disagreed: "we will not say what occurred here imposed an obligation of secrecy." Bryant, 655 F.3d at 239. The Court acknowledged that the practice of placing non-disclosure requests on all grand jury subpoenas is "not good policy" and "discourage[d] that practice in the future." Id., 655 F.3d at 239 n.4. Here, again, the defendant's Motion fails to allege anything akin to the practice criticized in Bryant (i.e., the use of court process to supplement a request for nondisclosure).

a witness's free choice to speak with the defense, we agree with courts in other circuits that merely informing the witness that he may decline the interview is not improper.").

Viewed in light of the foregoing proper legal standards, it is clear that the defendant's Motion fails as a matter of law.  The cases cited by defendant in his Motion do not support either his allegation of interference or his request for relief.  In fact, not dissimilar to the defendant's request in this case, in Kines v. Butterworth, the defense had asked the trial court to order the prosecution to direct witnesses to speak with defense counsel prior to trial.  The Court of Appeals found no error in the judge's refusal to enter such an order, finding that such court action "would have improperly denied the witnesses their freedom of choice not to talk." Kines, 669 F.2d 6, 11 (1st Cir. 1981).  So, too, in United States v. Medina, the Court of Appeals deemed the trial judge's "admonition" to a witness that he need not speak to defense counsel (unless he wanted to) "altogether proper, for advising a witness of 'his right not to submit to the interview [does] not deny the defendant a fair trial,'" 992 F.2d 573, 579 (6th Cir. 1993) (citing United States v. Matlock, 491 F.2d 504, 506 (6th Cir. 1974)).

The defense Motion, at footnote 2, acknowledges that the government has, in fact, met its obligation and informed witnesses that they are free to speak with the defense team, but dismisses this advice as "pro forma."  Notwithstanding the defendant's dismissive characterization, such advice is fully compliant with governing law.

Finally, the possible designation of this prosecution as a capital case does not impact the resolution of the defense Motion.  The defense citation to Woodson v. North Carolina, 428 U.S. 280 (1976) ("death is different") is completely misplaced.  The "death is different" concept was introduced by the Supreme Court in Woodson v. North Carolina, 428 U.S. at 305.  Noting the qualitative difference between the penalty of death and a sentence of imprisonment, the Court

struck down North Carolina's mandatory death penalty statute. To satisfy the need for heightened reliability in capital sentencing, the Court reasoned, the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense. Woodson, 428 U.S. at 303-04.

The defendant's suggestion that the "death is different" concept triggers heightened standards of reliability, review, and scrutiny at every stage of a capital case misapprehends the law and superimposes amplified standards on the deliberate procedures prescribed by the Federal Death Penalty Act (FDPA). The FDPA, for instance, dictates a scheme that both narrows the class of offenders eligible *for* the death penalty and provides for precise, enhanced sentencing procedures that ensure heightened reliability is achieved through guided discretion and individualized sentencing. See 18 U.S.C. § 3593. To impose a sentence of death under the FDPA, the jury must (1) find the defendant guilty of a capital-eligible offense; (2) find the defendant eligible for the death penalty by finding, beyond a reasonable doubt, one of the requisite "intent" requirements set forth in § 3591(a)(2)(A)-(D) and at least one of the statutory aggravating factors set forth in § 3592(c)(1)-(16); (3) consider any mitigating factors; and (4) weigh the factors to determine whether death is justified. The concern first expressed by the Court in Woodson regarding individualized sentencing is thus reflected and fulfilled by the various procedural protections built into the federal capital sentencing scheme.

The Supreme Court has never indicated that the qualitative distinction between the death penalty and alternative available sentences confers additional rights upon a defendant. Nor does it mandate that the fundamental levels of scrutiny generally applicable to criminal cases need be either revisited or enhanced. To the contrary, countless aspects of capital trials are indistinguishable from their non-capital counterparts. The nature of the right to counsel, for

instance, is not altered in capital cases, see Strickland v. Washington, 466 U.S. 668, 687 (1984) ("For purposes of describing counsel's duties ... Florida's capital sentencing proceeding need not be distinguished from an ordinary trial."), nor is the analysis for the admissibility of evidence, see Tennard v. Dretke, 542 U.S. 274, 284-85 (2004) ("We established that the 'meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding' than in any other context.") (quoting McKoy v. North Carolina, 494 U.S. 433, 440-41 (1990)). The same holds true with respect to discovery. See United States v. Jelani Solomon, 2007 WL 587805, *2 (W.D. Pa. February 20, 2007) (denying overbroad discovery requests in capital prosecution: "In this request, it appears to the Court that Defendants seek pretrial disclosure of information that goes well beyond the types of discovery permitted in federal criminal cases. As stated supra, the government has acknowledged its responsibilities under the Jencks Act, Brady, Giglio, and Rules 12 and 16 of the Federal Rules of Criminal Procedure. Accordingly, the request is DENIED.").

In reality, the relief sought by the defendant is an end-run around established legal limitations upon criminal discovery that pertain even in capital-eligible cases. Defense counsel requests that the Court direct the government to "immediately produce to the defense any and all 302's, emails, handwritten notes or other communications created by anyone employed by, or working on behalf of, the FBI or other law enforcement agency regarding potential communications with the defense," and/or "identify all potential witnesses, including potential victim impact witnesses, with whom the FBI or other agency has discussed the topic of communicating with the defense." Doc. No. 60-1 at 1-2. No applicable discovery rule supports this broad disclosure. Absent an independent obligation to produce Jencks Act or Brady materials, a defendant is not entitled to such wholesale disclosure or review. Indeed, Rule 16(a)(2) of the

7

Federal Rules of Criminal Procedure expressly prohibits the disclosure of this material.[3]

### III. Importance of Affording Crime Victims Statutory Protections

The crimes charged in this case necessarily implicate crime victims rights, for the 11 congregants who were killed, as well as their families, and multiple victims who experienced grave injury and harm. The defendant's Motion is an attempt to unduly interfere with the relationship and communications among the FBI and crime victims and violates the letter and spirit of the legal protections for federal crime victims.

Federal crime victims possess enforceable rights that have been consistently upheld by the courts. The primary source of these rights is the Crime Victims' Rights Act (CVRA), enacted in 2004, which affords crime victims rights as to notice, attendance and participation in the federal criminal justice process. 18 U.S.C. § 3771(a). The CVRA guarantees crime victims eight distinct rights and empowers both crime victims, and the United States on their behalf, to enforce them. See 18 U.S.C. § 3771(a), (d)(1); Kenna v. U.S. Dist. Court for C.D. Cal, 435 F.3d 1011, 1013 (9th Cir. 2006). The CVRA was intended to demonstrate that the criminal justice system "can and should care about both the rights of accused and the rights of victims." See 150 Cong. Rec. S4260, S4262 (daily ed. Apr. 22, 2004).

As an overarching entitlement, the CVRA affords crime victims "[t]he right to be treated with **fairness** and with **respect** for the **victim's dignity and privacy**." 18 U.S.C. § 3771(a)(8) (emphasis added). Courts have recognized that Congress intended for this statute to be liberally

---

[3] Fed. R. Crim. P. 16(a)(2), **Information Not Subject to Disclosure** ("Except as permitted by Rule 16(a)(1)(A)-(D), (F), and (G), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case. Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in [the Jencks Act].").

8

interpreted in favor of the victim. See United States v. BP Products North America Inc., 2008 WL 501321, *15 (S.D. Tex. Feb. 21, 2008) (citing United States v. Turner, 367 F. Supp. 2d 319, 335 (E.D.N.Y. 2005)) ("the Senate sponsors of the law were clear in their articulation of the overall import of the provision:  to promote a liberal reading of the statute in favor of interpretations that promote victims' interest in fairness, respect, and dignity").

The additional, specific rights assured to the victims in this case, indeed to all federal crime victims, include:  1) the right to be reasonably protected from the accused; 2) the right to reasonable, accurate and timely notice of any public court proceeding; 3) the right not to be excluded from any such public court proceeding, including those in which the victim will testify as a witness; 4) the right to be reasonably heard at any public court proceeding; 5) the reasonable right to confer with the attorney for the Government in the case; 6) the right to full and timely restitution; and 7) the right to proceedings free from unreasonable delay.  18 U.S.C. § 3771(a); see also 18 U.S.C. § 3510 ("Rights of victims to attend and observe trial").

In addition to prosecutors and employees of the Department of Justice, who may enforce enumerated rights on behalf of crime victims, the statute expressly entrusts the court with the responsibility to protect the victims rights articulated in the CVRA: "[t]he court shall ensure that the crime victim is afforded the rights described in subsection (a)."  18 U.S.C. § 3771(b)(1).  The court may, for example, enter protective orders and no-contact orders against a defendant to assure victims "protection" from the accused, both physical protection and protection from unwanted contact and harassment.  18 U.S.C. § 3771(a)(1); see United States v. Darcy, 2009 WL 1628885 (W.D.N.C. June 10, 2009).

Crime victims include those who are directly and proximately harmed as the result of a federal crime.  18 U.S.C. § 3771(e)(2)(A).  In the case against defendant Bowers, family members

9

of deceased victims "assume the crime victim's rights," 18 U.S.C. § 3771(e)(2)(B), and are simultaneously victims in their own right.  See United States v. Lawrence, 735 F.3d 385, 440 (6th Cir. 2013) ("Each of the family members allowed to attend the trial and sentencing proceedings was a victim in his or her own right … each family member met the definitions of victim under 18 U.S.C. § 3771 and 42 U.S.C. § 10607(e)(2).").

The law is clear that victims and witnesses in this case have absolutely no obligation to communicate with or be interviewed by the defense.  United States v. Scott, 518 F.2d 261, 268 (6th Cir. 1975).  Defense counsel sought direct communications with witnesses, which they may not compel, and did not prevail.  Subsequently, the defendant alleges interference by the FBI, demands invasive discovery to which he is not entitled and implores the court to initiate communications directly with victims, thereby exposing the identity and contact information of victims.  The unprecedented and extreme relief sought by the defendant, in seeking court intervention and the production of confidential, private communications between the United States and crime victims, would violate the rights of victims under the CVRA to be treated with fairness, to be afforded their dignity and privacy, and to be protected, directly or indirectly, from the accused.  In fact, if this Court were to grant the defense motion and accede to the defense request to admonish witnesses that "any official suggestion that a potential witness refrain from contact with the defense is both improper and undermines the fundamental fairness of our system of justice," Doc. No. 60 at 2, the likely impact of such intervention by the court would be to pressure victims to accept defense overtures for contact, whether or not they are genuinely willing.  This would unfairly undermine the rights assured in the CVRA.

### IV. Defense Have Engaged in Confusing Communications with the Victim Community

The United States, particularly the FBI, has been vigilant in its efforts to protect the rights

of the victims in this case, including their rights to privacy, dignity and fairness.  That vigilance includes assuring that crime victims fully understand and can assert their rights.

As regularly noted at status conferences, counsel have been consulting each other in matters related to this case, including, at least on the part of the government, defense communications with witnesses.[4]  The government has learned that the defendant has engaged a Defense-Initiated Victim Outreach (DIVO) Specialist, Ms. Susan Casey, and that Ms. Casey has begun contacting crime victims directly.  See copy of March 29, 2019, letter, attached hereto as Exhibit A.  Ms. Casey's role and motivation can be confusing and easily misapprehended by victims.  In her correspondence, Ms. Casey makes the statement, "my role is not to defend Mr. Bowers in court or elsewhere," and asserts that her work "is complementary to that of the victim advocate in the United States Attorney's Office."  Of concern, Ms. Casey does not disclose or represent anywhere in her letter that she is, in fact, a defense attorney and that she has defended, and advocated for, capital defendants.  Despite drawing a parallel to the U.S. Attorney victim advocates, Ms. Casey cannot offer the types of assistance and services that are required to be offered by victim advocates, such as counseling, crime victims fund compensation or restitution.  Also potentially confusing to crime victims is Ms. Casey's statement that "[a]lthough the duty of the defense attorneys is to represent their client, there are many ways in which they can adjust their efforts in consideration of what is important and helpful to you."  Superficially, this appears to blur the very clear obligation of the defense attorneys to zealously represent their client and to

---

[4] For example, in January 2019, the government learned that an employee of the Federal Public Defender's office was seeking information about crime victims using a personal email address rather than using his clearly identifiable "staff_person@fd.org" email address.  Mindful of the victims' right to privacy, and out of concern that these communications could confuse victims as to the identity and motivation of the person with whom they were corresponding, the government communicated these concerns directly to defense counsel.

11

fulfill their duty of unqualified loyalty.

Given the concerns and questions raised by Ms. Casey's communications, it is the government's intention to consult directly with defense counsel to assure that the United States can continue to meet its obligations to protect the rights of the crime victims in this case. If the government cannot be assured that the rights of victims are being respected, despite conferring with defense counsel, it may then seek the involvement of the court.

### V. An *Ex Parte* Submission in Support of the Motion is Unwarranted and Improper

On the same day that the defendant filed his Motion for Corrective Action Regarding FBI Interference with Defense Access to Potential Witnesses, Doc. No. 60, he also filed a Request to File Supplement to Motion for Corrective Action Regarding FBI Interference with Defense Access to Potential Witnesses Under Seal and *Ex Parte*. Doc. No. 61. The defendant's request for the rare relief of an *ex parte* filing cited no case law nor rule in support of its request, relying instead on a single unsubstantiated sentence. Id.

On May 30, 2019, the Court treated the request as a motion, granted the request, and noted that the Court's "Decision to Unseal Document [is] deferred." ECF notice of Doc. No. 62. Defense counsel thereafter filed two sealed, *ex parte* pleadings. Doc. Nos. 64, 65.

The government did not have an opportunity to, and therefore, did not file a response in opposition to the defendant's "request." The government opposes the granting of such rare relief and urges the Court to strike said supplements. Courts disfavor e*x parte* communications and, here, the scant support for the defendant's request is insufficient.

#### a. The Law

*Ex parte* communications are strongly disfavored and are "anathema in our system of justice." In re Kensington Int'l Ltd., 368 F.3d 289, 309–10 (3d Cir. 2004) (quoting In re Sch.

12

Asbestos Litig., 977 F.2d 764, 789 (3d Cir. 1992), as amended (Oct. 8, 1992)).  This is because the adversarial character of court proceedings is one of the bedrocks of the criminal justice system and *ex parte* communications pose a serious danger to that system.  As explained by the Third Circuit, "[t]he [] problem is that *ex parte* communications run contrary to our adversarial trial system.  The adversary process plays an indispensable role in our system of justice because a debate between adversaries is often essential to the truth-seeking function of trials."  In re Kensington Int'l Ltd., 368 F.3d at 309-10 (referring to *ex parte* communications as "silent facts" because they are often unrecorded verbal communications and noting that these communications are of "great[] concern" because the opposing party "[can]not respond to these 'silent facts.'").  "At the very least, participation in *ex parte* communications will expose the judge to one-sided argumentation." Jeffrey M. Shaman, Steven Lubert & James J. Alfini, Judicial Conduct and Ethics, § 5.01, at 150 (3d ed. 2000).  At worst, the dangers posed by *ex parte* communications include "bias, prejudice, coercion, and exploitation."  In re Kensington Int'l Ltd., 368 F.3d at 310 (quoting Shaman et al., Judicial Conduct and Ethics § 5.03).  By allowing the defendant to file *ex parte* submissions, the protections offered by the adversary system will be lost.  In fact, the only context in which *ex parte* filings are routinely filed without controversy are those made within the non-adversarial, investigative phase of a criminal case.  See e.g., In re Grand Jury Subpoena, 223 F.3d 213, 218 (3d Cir. 2000) (upholding lower court's refusal to order disclosure of *ex parte* affidavit because "this is a criminal [case]," and distinguishable from a case that "involved adversarial proceedings whereas grand jury proceedings are investigative, and the rules of the game are different"); In re Grand Jury Proceedings Impounded, 241 F.3d 308, 318 n. 9 (3d Cir. 2001) (noting the need for secrecy in the grand jury context justifies the use of *ex parte* materials).

Although *ex parte* communications are strongly disfavored, *ex parte* contacts are "tolerated of necessity ... where related to non-merits issues [and] for administrative matters, and in emergency circumstances." See In re Sch. Asbestos Litig., 977 F.2d at 789. Tolerated *ex parte* contacts are "uneasy compromises with some overriding necessity, such as the need to act quickly or to keep sensitive information from the opposing party." United States v. Thompson, 827 F.2d 1254, 1258 (9th Cir. 1987) (footnote omitted), quoted with approval by In re Sch. Asbestos Litig., 977 F.2d at 789. Thus, *ex parte* contacts are tolerated when, for instance, a witness's privacy interests may be in conflict with the defendant's right to discovery. United States v. Wecht, 484 F.3d 194, 214 (3d Cir. 2007), as amended (July 2, 2007) (quoting United States v. Bocra, 623 F.2d 281, 285 (3rd Cir. 1980) ("[T]he submission of discovery materials to the court for an in camera inspection and decision as to which materials are discoverable is commonly used when the Government's need for preserving confidentiality over the materials must be balanced with the defendant's constitutional right to evidence material to his defense") and quoting United States v. Dent, 149 F.3d 180, 191 (3d Cir.1998) ("The district court's in camera inspection of [a police officer's] personnel files fully satisfied Brady's due process requirements.")). However, "[a]bsent such compelling justification, *ex parte* proceedings are anathema in our system of justice[.]" Thompson, 827 F.2d at 1259-60; In re Sch. Asbestos Litig., 977 F.2d at 789.

Sound reasoning supports the general prohibition against *ex parte* communications in an adversarial proceeding. This Court should not consider *ex parte* information from the defendant in considering the contested Motion before it. The defendant's desire to file an *ex parte* submission in support of his Motion in this case is unwarranted, and there is no statute, order, or court rule that would allow for such.

### b. This Court Should Strike the *Ex Parte* Filings

It is clear from the styling of defendant's Motion that it is without legal support. Rather than moving this Court pursuant to a rule or case law, the defendant merely "requests" the relief sought. In keeping with defendant's unconventional "request," the defendant has cited no legal nor factual support for the requested relief. Instead, the defendant conclusorily states that: "Revelation of the supporting document will disclose what was intended to be a non-public communication and risk further potential interference and/or misleading information by the FBI." Doc. No. 61 at 1.

The Court should strike the defendant's submissions because they implicate every policy reason *not* to accept them *ex parte*. This case has progressed into an adversarial pretrial posture. In re Grand Jury Subpoena, 223 F.3d at 218; In re Grand Jury Proceedings Impounded, 241 F.3d at 318 n. 9. Therefore, any *ex parte* submission is viewed with disfavor "because a debate between adversaries is often essential to the truth-seeking function[.]" In re Kensington Int'l Ltd., 368 F.3d at 310. Here, the government has no opportunity to respond to the submissions nor their contents. (The government has no knowledge of the content of the *ex parte* submissions). The government has been denied this crucial aspect of the adversarial system based on a bare assertion.

The *ex parte* submissions also risk depriving the government the opportunity to provide context or clarity to whatever is contained in the unknown submissions. See In re Kensington Int'l Ltd., 368 F.3d at 310-11 (finding that *ex parte* communications by lower court were improper in that "there was no way for [parties] to adequately respond to or counter facts presented by their adversaries because they had no way of knowing what was said during those unrecorded meetings"). Communications are easily taken out of context or can be summarized, whether inadvertently or not, to cast the government in a bad light. Id. at 310 ("evils of *ex parte*

communications" include "bias, prejudice, coercion, and exploitation.") (quoting Shaman et al., Judicial Conduct and Ethics § 5.03).  The government has no opportunity to contextualize nor clarify whatever communications may be within the supplements and hence, the government may be, even subconsciously, prejudiced in the eyes of the Court from henceforth.  <u>In re Kensington Int'l Ltd.</u>, 368 F.3d at 311 (*ex parte* communications were improper because "no opportunity existed for their adversaries to know precisely what was said, when it was said, by whom, and what effect could be drawn from their offerings").

For all of the reasons set forth above, and in light of defense counsel's failure to confer with the government, the United States makes a continuing objection to this and any and all future "requests" or motions to file *ex parte* submissions.  The government requests that, in light of its continuing objection, it be provided an opportunity to respond to any future motions before *ex parte* submissions are accepted by the Court.

## VI. <u>Conclusion</u>

For the foregoing reasons, the Court should deny the Motion for Corrective Action without a hearing and strike the sealed *ex parte* filings by the defendant.

                    Respectfully submitted,

                    SCOTT W. BRADY
                    United States Attorney

                    <u>s/Troy Rivetti</u>
                    TROY RIVETTI
                    Assistant U.S. Attorney
                    PA ID No. 56816

                    <u>s/Soo C. Song</u>
                    SOO C. SONG
                    Assistant U.S. Attorney
                    DC ID No. 457268

                    <u>s/Julia Gegenheimer</u>
                    JULIA GEGENHEIMER
                    Trial Attorney
                    Civil Rights Division
                    NY ID No. 4949475