IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 18-292 |
| ROBERT BOWERS | |

**RESPONSE BY UNITED STATES TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER TO PROHIBIT PROSECUTION ACCESS TO DEFENDANT'S PRETRIAL DETENTION RECORDS (Doc. No. 101)**

AND NOW comes the United States of America, by its attorneys, Scott W. Brady, United States Attorney for the Western District of Pennsylvania, Troy Rivetti and Soo C. Song, Assistant United States Attorneys for said district, and Julia Gegenheimer, Special Litigation Counsel, Civil Rights Division, and hereby submits this Response to Defendant's Motion for Protective Order to Prohibit Prosecution Access to Defendant's Pretrial Detention Records, Doc. No. 101.

The crux of the defendant's argument is that the United States should be precluded from obtaining any and all records produced during defendant Robert Bowers's pretrial detention at a local county prison because such records contain privileged information and are attorney work product.  In their motion, defense counsel also broadly assert that such records are shielded from the government's view by various constitutional protections, HIPAA laws, and the rules of discovery.[1]  But, they incorrectly apply limited legal protections to broad swaths of information that are not privileged, confidential, or otherwise protected.  They also move to withhold categories of records that the United States does not seek.

---

[1]  Defense counsel also claim, in the introduction to their motion, that the Eighth Amendment precludes government access to the defendant's pretrial detention records.  They offer no further citation to or explanation of this assertion elsewhere in their motion.

Because defense counsel provides no compelling legal argument for why the detention records that the United States does seek—namely, observations of the defendant's conduct, non-legal visitation logs, and non-legal correspondence—should be treated differently than in any other criminal case involving a defendant in pretrial detention, the Motion should be denied.

I.      Background

Defendant Robert Bowers is currently housed at a local county prison ("the Prison" or "the facility") Restricted Housing Unit, where he is held pending trial on 63 criminal charges stemming from his bias-motivated mass shooting on October 27, 2018.  Upon intake, the Prison provides detainees with access to its Inmate Handbook, which it also reviews with each person.  The Inmate Handbook covers Prison rules and guidelines, including policies for visitation, phone calls, mail, and health care.  As delineated in the Inmate Handbook, the Prison requires detainees to meet with medical personnel upon commitment.  This process includes a preliminary screening with a facility nurse to determine whether the detainee has any medical needs that the facility is not equipped to address.  Should the facility determine that it can accept the detainee, a detention officer will administer a questionnaire during the booking process to further determine any treatment needs. Together, the pre-screening and booking questionnaire help the Prison decide where to house the detainee and whether to develop a medical action plan.  The facility followed these procedures with respect to defendant Bowers.

The Prison also undertakes several security and safety protocols with respect to its detainees.  Those protocols include checks conducted by detention officers on detainees in the Restricted Housing Unit.  Records of those checks include the time of the check, the initials of the officer conducting the check, and a brief description of the officer's observations.  The facility conducts such checks to help maintain Prison security, as well as to ensure the detainee's safety

and the safety of those around him.

For similar safety and security purposes, the Prison maintains records of detainees' non-legal visits, phone calls, and written correspondence. Regarding visitation, non-legal visitors must be listed on a designated visitation form and must sign in upon arrival. Detainees are informed that non-legal visits will be supervised and must be scheduled. In contrast, legal visits are permitted as frequently as necessary, and the details of such visits (to include visitors' identities) are not maintained in the visitation log. Non-legal phone calls can be conducted only with individuals on a pre-approved contact list; they are also recorded and may be restricted. Calls with the defense face no such restrictions. The Prison further advises detainees, in its Inmate Handbook, that both incoming and outgoing non-legal mail is examined. The same notice is issued, via the facility's website, to anyone wishing to send mail to a detainee (warning that "all correspondence will be scanned and inspected for contraband"). Legal correspondence, however, may be sent or received without scanning, review, or other inspection. Instead, that correspondence is sealed or opened by the detainee in the presence of a detention officer who ensures the mail does not contain contraband. The facility treats all mail with elected officials, appointed officials, or lawyers as legal correspondence.

The United States has obtained, and continues to seek, certain records generated and maintained by the Prison pursuant to these practices: (1) logs containing notations of the defendant's readily observable behavior, voluntary statements made during those observations, and commissary transactions; (2) visitation logs documenting non-legal visits; and (3) non-legal correspondence and phone calls. Prison policy and governing law permit the United States to obtain such records as part of its ongoing investigative efforts.

At this time, the United States does not seek physical or mental health evaluation or

assessment records.  The bases for defense counsel's argument that such records are legally protected and should not be disclosed, however, is overly broad.  Should the government seek such records—or any other detention records—at a future time, the rules and privileges cited by defense counsel do not bar production.

The United States has also put its own protections in place to ensure that the prosecution team does not encounter even potentially privileged information in the records it obtains.  As discussed in the government's Response to Defendant's Motion to Compel Production of Filter Team Protocol and Procedures, Doc. No. 102, the United States has designated a filter team to review records received from the Prison.  Assuming *arguendo* that any records received contain information subject to attorney-client or psychotherapist-patient privilege, for instance, the filter team reviews and redacts arguably privileged material prior to access by the prosecution team. The use of a filter team is appropriate, and has been approved in similar circumstances.  See, e.g., United States v. Loughner, 782 F. Supp. 2d 829, 833 (D. Ariz. 2011) (approving government's use of filter team to screen BOP records for possible privilege issues).

II.     Records of Defendant's Activity

The United States is permitted to obtain Prison records that document the defendant's activities, including any voluntary statements, while in pretrial detention.  The collection of these records appropriately allows the government to gather evidence relevant to defendant Bowers's past criminal acts, including the acts charged, as well as to investigative potential new criminal conduct involving Bowers and/or others.  The Prison keeps observational records for every person in its Restricted Housing Unit for security purposes and out of concern for detainee and officer safety.  It also keeps records of each detainee's commissary transactions, which include details regarding contributions to commissary funds.  These records are produced and updated by

detention officers and are maintained by the prison in an administrative file kept for each detainee. The Prison routinely discloses such records pursuant to subpoena or court order.

In their motion, defense counsel argue that the observational records must be kept secret, relying on a general reference to "privileged information" and, seemingly, on the idea that Federal Rule of Criminal Procedure 16 allows the defense to decide whether the government may have access to such material.  These arguments fail.

First, defense counsel provide no legal basis for their claim that activity records "may contain privileged information."  Doc. No. 101 at 1.  They do not name or describe the privilege they assert, nor do they articulate how observations of activity (such as sleeping) are protected by any such privilege.  The United States is unaware of a detainee-detention officer privilege.  It is equally unaware of any other recognized privilege demanding that a pretrial detainee's daily activities—made in full view of detention officers and, in some cases, other detainees or inmates— be kept confidential.  A pretrial detainee in this facility has no ownership over, or expectation of, privacy in records of day-to-day activity.  Bell v. Wolfish, 441 U.S. 520, 557 (1979) (holding that "given the realities of institutional confinement, any reasonable expectation of privacy that a detainee retained necessarily would be of a diminished scope[,]" particularly when balanced against institutional needs such as security and order).  And no privilege extends to records of a detainee's activity or of voluntary statements made to, or in the vicinity of, detention officers. Indeed, even a response to "questioning normally attendant to custody . . . does not implicate the defendant's Fifth and Sixth Amendment rights."  Loughner, 787 F. Supp. 2d at 833 (internal quotations omitted) (citing Kemp v. Ryan, 638 F.3d 1245, 155-56 (9th Cir. 2011)); see also Fisher v. United States, 425 U.S. 391, 400 (1976) ("The proposition that the Fifth Amendment protects private information obtained without compelling self-incriminating testimony is contrary to the

clear statements of this Court that under appropriate safeguards private incriminating statements of an accused may be overheard and used in evidence, if they are not compelled at the time they were uttered."). There is no indication that facility staff interrogated the defendant or attempted to discuss substantive case-related matters without his counsel. As a result, there is no legal bar to a detention facility providing observation or activity records to the United States.

Second, defense counsel claim that the United States may not access observation records because they "reflect directly on Mr. Bowers' medical, physical and mental condition." Doc 101 at 1. But counsel again provides no legal or factual support for that contention. Bare observations of the defendant's activities (eating, sleeping, etc.) do not necessarily reveal any physical or mental state. Nor would such information be privileged. As explained in detail below, the protections afforded to psychiatric treatment and mental health evaluation are limited, under the psychotherapist-patient privilege, to confidential *communications* between a patient and licensed psychotherapist in the course of treatment and, under Federal Rule of Criminal Procedure 12.2, to competency and mental health *examinations* conducted under that Rule. So, too, are protections under the Health Insurance Portability and Accountability Act ("HIPAA") limited to individually identifiable health information possessed by health plans and health care providers. None of these rules apply to detention officers' observations of the defendant's daily routines, his physical appearance, or voluntary statements.

Third, defense counsel seemingly argue that Federal Rule of Criminal Procedure 16 prevents the United States from obtaining records of the defendant's activity. To this end, counsel say that because they have not proclaimed the defendant's custodial conduct to be in issue, Rule 16 precludes the United States from obtaining records of that conduct from the Prison. Doc. No. 101 at 3.

This argument both misconstrues Rule 16 and incorrectly posits defense counsel as the sole arbiter of what is at issue in this case.  Rule 16 is a rule of discovery and inspection.  As it pertains to a defendant's production obligations, the Rule requires production, under certain circumstances, of documents, data, and objects "within the defendant's possession, custody, or control[.]"  Fed. R. Crim. P. 16(b)(1)(A)(i).  Nowhere in its text does the Rule establish that a defendant has exclusive possession, custody, or control over observations or logs of his activity while in pretrial detention.  In this case, it is Prison staff who produce records of defendant Bowers's activities, and who retain possession, custody, and control over originals of those records.  The entries in those logs are made, and the records are generated, to maintain safety and administrative order in the facility.  The fact that defense counsel may have obtained copies of these records from the facility does not prevent the facility from providing the same to the United States.

Defense counsel extend their Rule 16 argument to claim that the United States should not have access to observational records unless the defense indicates that they intend to introduce those records in the defense case or explicitly place the defendant's detention activity in issue during trial.  Although Rule 16 requires disclosure of documents and objects that the defendant intends to use in his case at trial, that requirement again only applies to items within the defendant's possession, custody, or control.   Fed. R. Crim. P. 16(b)(1)(A)(ii).   It does not limit what information the government may collect during its investigation, and it certainly does not designate the defendant as the only judge of the facts at issue.  The defendant's post-incident behavior is very much at issue in this case.  To give one example: defendant Bowers is charged with 13 counts of bias-motivated violence, in violation of 18 U.S.C. § 249.  To prove the essential elements of those charges, the United States may rely on evidence of the defendant's behavior, activity, and voluntary statements from before, during, or after his criminal conduct.  See, e.g., United States v.

7

<u>Cannon</u>, 750 F.3d 492, 506-07 (5th Cir. 2014) (evidence like use of white supremacist slang before assault, use of racial slurs during assault, and display of white supremacist tattoos were sufficient to prove essential element of racial motivation in § 249 assault case).  The potential relevance of such information does not cease with the defendant's pretrial detention.  The United States should therefore be permitted to continue to collect such evidence during its ongoing investigation in this matter.

    III.    <u>Visitation Records</u>

        The United States also seeks non-legal visitation-related records from the Prison.  The Prison's policies and procedures distinguish between legal and non-legal visits, with restrictions that apply to non-legal visits but not to defense visits (which are recorded simply as "legal visits" without further detail).  The records for non-legal visits list the identities of visitors, dates, times, and durations for those visits.  Those records are neither privileged nor confidential.

        Disclosure to the government of non-legal records is allowed by law and is within the government's right to investigate non-privileged information.  The defendant in this case has espoused violent anti-Semitic and white supremacist ideology.  He is charged with crimes motivated by those violent biases, and his criminal conduct has been cited as the inspiration behind subsequent mass shootings and anti-Semitic attacks.  The United States thus retains a strong interest in investigating the defendant's visits from individuals who are not members of the defense.

        It is worth noting that the law allows more than what the United States seeks and more than defense counsel's arguments suggest.  Counsel first claim that Rules 12.2 and 16 preclude disclosure of visitation logs that may include visits from expert witnesses.  Both Rules, however, are concerned primarily with the substance of expert services, examinations, and reports, rather

than the mere existence of an expert.   Rule 12.2 requires defense notice of an insanity defense or of expert evidence of a mental disease or defect.  Upon confirmation of the intent to introduce such evidence, the Rule further guides disclosure to and review by the government of defense expert examinations.  This limited scope does not extend to disclosure of expert witness identities or the fact of expert witness prison visitation; the Rule focuses instead on the processes and timing for disclosing the substance of mental health exams related to a noticed defense.  See Loughner, 782 F. Supp. 2d at 833 (finding Rule 12.2 silent on the Government's right of access to detention records and "reject[ing] the argument that because Rule 12.2 regulates disclosure of *some* mental state evidence, it regulates disclosure of *all* such evidence") (emphasis in original).

Rule 16 is similarly silent when it comes to visitor identities or the basic fact of visitation.  It focuses instead on the results or reports of examinations, Fed. R. Crim. P. 16(b)(1)(B), or summaries of expert testimony and qualifications, Fed. R. Crim. P. 16(b)(1)(C).  As discussed above, the Rule governs disclosure of documents in the possession, custody, and control of the defense or "*made by* the defendant, or the defendant's attorney or agent."  Fed. R. Crim. P. 16(b)(2)(A) (emphasis added).  It certainly does not extend to materials, like visitation logs, that are prepared and maintained by third parties like the Prison.

In addition, defense counsel reference 18 U.S.C. §§ 3006A and 3599 to argue that defense expert services, including the fact of visitation, are privileged.  These statutes neither create nor recognize any such privilege.  Section 3006A permits an *ex parte* application for expert services upon an "appropriate inquiry" into necessity and financial need, but also allows for disclosures of the amounts paid for such services.  18 U.S.C. § 3006A(e)(1), (4).  Section 3599 authorizes payment for expert services that a court finds reasonably necessary, even noting that a proper showing must be made to justify an *ex parte* proceeding, communication, or request.  18 U.S.C. §

3599(f).  Because both statutes require judicial findings that expert services are necessary, they assume the provision of substantive information about the need for the expert and justification for associated costs.   These provisions have nothing to do with the expert's identity or the government's access to visitation records.

Finally, defense counsel incorrectly portray the basic fact of prison visitation as attorney work product.  This privilege is not as broad as the defense would have it.  The privilege governs "materials prepared or collected by an attorney 'in the course of preparation for possible litigation.'"  In re Grand Jury Subpoena, 696 F. App'x at 70 (quoting In re Grand Jury Investigation, 599 F.2d 1224, 1228 (3d Cir. 1979), and Hickman v. Taylor, 329 U.S. 495, 505 (1947)).  Although the privilege extends to an attorney's agents, it does so only to "protect *material prepared by* agents for the attorney as well as those prepared by the attorney himself."  United States v. Nobles, 422 U.S. 225, 238-39 (1975) (emphasis added).  The privilege focuses on substance.  It governs documents, reports, and other materials prepared by defense counsel and their agents that reflect analysis and deliberative processes.  It does not encompass every aspect of a case with any remote connection to that analysis or deliberation, such as the mere fact of a communication or visit.

In fact, each of the provisions cited by defense counsel would allow disclosure of all visitors' identities, along with the fact and timing of their visits, while protecting the purpose and substance of any legal team visits, including defense expert witness examinations.  But again, the United States does not seek, nor has it been provided, visitation logs containing the identities of legal team visitors or the purpose and substance of such visits.  What it does seek—logs with information about non-legal visits—is entirely permissible under facility protocol and governing law.

IV.   <u>Correspondence and Phone Call Records</u>

As part of its ongoing investigation, the United States also seeks defendant Bowers's incoming and outgoing non-legal mail, phone calls, and contact list.[2]  The defendant's October 27, 2018, attack was praised by like-minded individuals, including perpetrators of subsequent mass shootings who cited Bowers as an inspiration for their attacks.  The United States thus has a strong law enforcement interest in collecting the defendant's correspondence and phone contacts, not only to investigate his prior criminal conduct but also to detect and prevent future crimes.

The Prison, as part of its own efforts to ensure safety and security, and to detect criminal activity, routinely collects, reviews, and retains non-legal correspondence.  It does not review or retain legal mail.  Similar precautions are taken with phone calls, with non-legal calls recorded and maintained while legal calls are not.  Under Prison policy, and as authorized by Pennsylvania law, 18 Pa.C.S. § 5704(14)(i)(C), non-legal phone calls are routinely disclosed to law enforcement; non-legal prison mail is produced upon subpoena or court order.

It is well-established that detention facilities may monitor and disclose records related to written, electronic, and telephonic communications.  Courts have found no constitutional violation where, as here, the review of such communications is supported by rational interests in maintaining security, order, and safety in the detention setting.  <u>See</u> <u>Bell v. Wolfish</u>, 441 U.S. 520, 557 (1979) (describing diminished expectation of privacy in detention setting); <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987) (prison regulation, such as prohibition on correspondence, that may impinge on constitutional rights "is valid if it is reasonably related to legitimate penological interests"); <u>Caldwell v. Beard</u>, 305 F. App'x 1, 4 (3d Cir. 2008) (finding prison employees' inspection of

---

[2]  Although prison correspondence and phone calls were not explicitly addressed in the defense Motion, pursuant to the Court's request that the government identify the records it intends to collect, the United States addresses the issue here.

inmate's outgoing nonprivileged mail permissible and reasonably related to legitimate penological interest in institutional security).  Nor have they barred disclosure to, or use by, the government of non-legal communications records.  See United States v. Ciancia, 2015 WL 13798678, at *1 (C.D. Cal. May 20, 2015) (Fourth Amendment does not prevent the government from using defendant's prison letter as evidence of guilt if letters are voluntary and seized under established prison practice (citing Stroud v. United States, 251 U.S. 15, 21-22 (1919))); id. at *2-3 (declining to find privilege extends to communications with a defendant's family members regarding the substance of his case); United States v. Saipov, Case No. 1:17-cr-722, Doc. 185 (S.D.N.Y.) (court order permitting prosecution team to collect, monitor, and review defendant's communications with family members, and agreeing with Ciancia court that defendant's right to present mitigation evidence did not preclude prosecution review of family member communications).

It bears mention that the universe of material available to the United States in this category is quite small.  In addition to the Prison's routine efforts to screen out legal mail and calls from its own review, the United States has been informed that, at defense counsel's request, the facility has routed all of defendant Bowers's incoming mail through his counsel.  The Prison has also permitted Bowers to place and receive non-legal phone calls in the presence of his counsel, using a telephone line that is not monitored, recorded, or logged.  For the non-legal correspondence and phone calls that are disclosed, any potentially privileged information is further screened by the United States' filter team, thereby removing, out of an abundance of caution, even the specter of any inadvertent disclosure of privileged information.

The Prison's rational interest in safety and security, coupled with the United States' legitimate interest in discovering evidence of past criminal activity and preventing future criminal

conduct, supports the inspection and disclosure of the defendant's non-legal correspondence and call records.

V.     Physical and Mental Health Records

Finally, defense counsel argue that the Prison records "contain legally protected information about [defendant Bowers's] physical and mental health," and thus should not be disclosed unless the defense deems them at issue. Doc. No. 101 at 2. Those records likely include intake assessments, and could also include records of subsequent medical or mental health information generated by facility staff. At this time, the United States does not possess or seek such records. Even so, the records are not entirely precluded from disclosure as defense counsel contends.

Defense counsel argue that the disclosure of records that might contain mental health examinations, observations, or assessments violates the defendant's Fifth and Sixth Amendment rights. The United States is not aware that the facility records contain any compelled statements[3] or attempts to conduct mental health evaluations on trial-related issues outside the presence of counsel.[4] Rather, the government understands the records to contain initial, routine assessments

---

[3]  Should counsel identify a statement in the government's possession that they believe was obtained in violation of defendant Bowers's Fifth Amendment privilege against self-incrimination, they may move to suppress the use of that statement at trial and provide supporting factual and legal bases for such motion. The blanket non-disclosure sought here, based on suspicion and generalized assertions, is premature. Chavez v. Martinez, 538 U.S. 760, 767 (2003) ("Statements compelled by police interrogations of course may not be used against a defendant at trial, but it is not until their use in a criminal case that a violation of the Self–Incrimination Clause occurs.").

[4] Defense counsel cite two cases in support of its Fifth and Sixth Amendment arguments that do not apply under these circumstances. Both Estelle v. Smith, 451 U.S. 454 (1981), and Powell v. Texas, 492 U.S. 454 (1981), concerned psychiatric examinations focused explicitly on the sentencing issue of future dangerousness. Those cases found that that the state had improperly ordered psychiatric examination on that issue (which it later used at trial to argue future dangerousness) without first notifying defense counsel. Here, however, the medical assessments and examinations at issue are conducted by the Prison for detention-related purposes and are not undertaken to determine any sentencing factors or the defendant's competency to stand trial.

undertaken by the Prison to determine intake, placement, and programing needs. Statements typically made attendant to custody do not implicate Fifth and Sixth Amendment protections. Loughner, 782 F. Supp. 2d at 833.

Counsel's reliance on Rule 12.2 is similarly misplaced. That Rule governs mental health examinations conducted upon a defendant's notice to assert an insanity or mental defect defense. It contemplates court-ordered examinations or defense expert examinations. Rule 12.2(c)(1) and (c)(3). Rule 12.2's protections thus do not encompass intake assessments, monitoring, or observations of a defendant made by prison medical staff. Loughner, 782 F. Supp. 2d at 833 (finding Rule 12.2 silent on government's right of access to prison records).

Furthermore, the psychotherapist-patient privilege does not preclude disclosure of all mental health records or assessments. That privilege protects only "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment . . .." Jaffee v. Redmond, 518 U.S. 1, 15 (1996). It does not apply to the bare fact of a mental health evaluation, and it does not cover evaluations or monitoring that are not undertaken for diagnosis or treatment. Loughner, 782 F. Supp. 2d at 832 (concluding that intake assessments and continued monitoring of defendant by two Bureau of Prisons psychologists were not intended for diagnosis or treatment and thus not covered by psychotherapist-patient privilege). Moreover, the privilege does not attach to assessments ordered by a third party, such as a prison, and undertaken with an intent or awareness that they will be disclosed to the third party. See Doe v. Ensey, 220 F.R.D. 422, 427 (M.D. Pa. 2004) (privilege waived or did not attach where priests' therapy was conducted upon employer's request and priests "consented to or were at least aware of the fact" that employer would receive reports); Barrett v. Vojtas, 182 F.R.D. 177, 181 (W.D. Pa. 1998) (privilege does not attach when counseling ordered by third party and results of examination would pass back to third

14

party); United States v. Romo, 413 F. 3d 1044, 1048-49 (9th Cir. 2005) (session with prison counselor was not related to therapy or diagnosis and thus not protected by privilege) (citing Barrett, 182 F.R.D. at 181).  Should the United States seek such records at any point, the filter team will screen for potentially privileged information, with any confidential communications provided for diagnosis or treatment filtered from the prosecution team's review.

Defense counsel also briefly mention that the Prison records contain legally protected information about the defendant's physical health.  Doc. No. 101 at 2.  They do not further develop that argument or put forward any legal basis for it, other than in a separate, passing reference to HIPAA protections.  HIPAA does not, however, preclude disclosure to law enforcement or create any privilege.  In fact, the Act expressly provides for such disclosure in response to court orders, warrants, or subpoenas.  45 C.F.R. § 164.512(f)(ii).  Again, while the government does not seek defendant Bowers's in-custody medical records at this time, it will use appropriate process should it seek such records in the future.

VI.      Conclusion

For all of the foregoing reasons, the Motion for Protective Order to Prohibit Prosecution

Access to Defendant's Pretrial Detention Records (Doc. No. 101) finds no support in the law or in

the facts of this case.  The motion should be denied.

Respectfully submitted,

SCOTT W. BRADY
United States Attorney

s/Troy Rivetti
TROY RIVETTI
Assistant U.S. Attorney
PA ID No. 56816

s/Soo C. Song
SOO C. SONG
Assistant U.S. Attorney
DC ID No. 457268

s/Julia Gegenheimer
JULIA GEGENHEIMER
Special Litigation Counsel
Civil Rights Division
NY ID No. 4949475