IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-292 |
| | ) | |
| ROBERT BOWERS | ) | |

## MOTION TO COMPEL PRODUCTION OF DISCOVERY UNDER FED. R. CRIM. P. 16 AND BRADY LINE OF CASES

The defendant, Robert Bowers, through counsel, files this Motion for an Order Compelling the Government to Produce Discovery under Rule 16 and comply with its *Brady* obligations. This Motion also sets forth the defense view of the government's discovery obligations in this capital case and makes specific discovery requests.

## BACKGROUND

To date, the government has produced discovery in multiple, separate productions, each time generally claiming that the productions are pursuant to and exceed the requirements of Rule 16. The productions thus far include 407 numbered documents, containing 5,543 pages and images of an additional twelve (12) hard drives or other electronic items (telephones, computers, flash cards, mobile radio technology and surveillance systems). This discovery also includes eighteen (18) search warrants, extractions from electronic devices, and reports in multiple forensic areas (fingerprints, toolmarks, trace evidence, DNA, serology etc.).[1]

---

[1] The parties remain in communication regarding discovery, with the defense making additional, specific requests as the review of discovery progresses.

We first set forth our view of the law governing discovery, and the government's obligations in the context of this capital case.[2] At its core, the disagreement between the parties concerning the application of Rule 16 and *Brady* arises from differing understandings of the scope of what is required in a capital prosecution, including apparently diverging views of what constitutes *Brady*, and what is "material to preparing the defense" under Rule 16.

> **I. The government's legal duty to produce information that is helpful or useful – and thus favorable to the defense in this capital prosecution – must be interpreted and enforced within the legal framework outlined below.**

    **A. Death is Different.**

The fundamental proposition in capital prosecutions – that the penalty of death is qualitatively different from every other punishment a society imposes and thus requires extraordinary safeguards – has been reinforced time and again by the United States Supreme Court. *See, e.g., Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (because of qualitative difference between the death penalty and all other punishments, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case); *Beck v. Alabama*, 447 U.S. 625, 637 (1980) ("As we have often stated, there is a significant constitutional difference

---

[2] Our view of the government discovery obligations and the legal principles defining those obligations, as well as many of the requests in this motion, were included in a letter to government counsel on March 2, 2019. The remaining requests were included in subsequent letters or meetings with government counsel, unless otherwise noted.

between the death penalty and lesser punishments"); *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) ("In capital proceedings generally, this Court has demanded that fact finding procedures aspire to a heightened standard of reliability … a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different.").

### B. *Brady* and Rule 16 place significant disclosure requirements on the prosecution for trial and penalty phase material.

Due process requires the government to disclose not only evidence that would be favorable to the defense at trial, but also evidence that would be favorable at sentencing, *i.e.*, that would help establish mitigating factors or weaken or counter aggravating ones. *See, e.g., Brady v. Maryland*, 373 U.S. 83, 87-88 (1963) (requiring disclosure of material that "would . . . tend to reduce the penalty" from death to life imprisonment).

Under *Brady* and its progeny "the government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed – with the benefit of hindsight – as affecting the outcome of the trial." *United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005); *see United States v. Carter*, 313 F. Supp. 2d 921, 925 (E.D. Wis. 2004) ("[I]n the pretrial context, the court should require disclosure of favorable evidence under *Brady* and *Giglio* without attempting to analyze its 'materiality' at trial. The judge cannot know what possible effect certain evidence will have on a trial not yet held.").

The meaning of "favorable" includes any information in the possession of the government that relates to guilt or punishment and tends to *help* the defense by either

3

bolstering the defense case or impeaching potential prosecution witnesses. *Safavian*, 233 F.R.D. at 16.  It covers both exculpatory and impeaching evidence. *United States v. Bagley*, 473 U.S. 667, 676-677 (1985). "'The government is obligated to disclose all evidence relating to guilt or punishment which might be reasonably considered favorable to the defendant's case,' that is, all favorable evidence that is itself admissible or 'that is likely to lead to favorable evidence that would be admissible'. . . ." *Safavian*, 233 F.R.D. at 17 (quoting *United States. v. Sudikoff*, 36 F. Supp. 2d 1196, 1199-1200 (C.D. Cal. 1999)).  "Where doubt exists as to the usefulness of the evidence to the defendant, the government must resolve all such doubts in favor of full disclosure." *Safavian*, 33 F.R.D. at 17 (citing *United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988)); *see Dennis v. Sec., Pennsylvania Dept. of Corrections*, 834 F.3d 263, 293 (3d Cir. 2016) ("All favorable material ought to be disclosed by the prosecution."); *United States v. Olsen*, 704 F.3d 1172, 1183 n. 3 (9th Cir. 2013) ("A trial prosecutor's speculative prediction about the likely materiality of favorable evidence, however, should not limit the disclosure of such evidence, because it is just too difficult to analyze before trial whether particular evidence ultimately will prove to be 'material' after trial.").

### C. Rule 16 is broader than *Brady*.

The disclosure required by Rule 16 is broader than that required by the due process standards of *Brady*.  *See e.g., United States v. Messerlian,* 832 F.2d 778, 795 (3d Cir. 1987) ("[W]e recognize that the disclosure provision of Rule 16 is arguably broader than the *Brady* requirement."); *United States v. Caro*, 597 F.3d 608, 620 (4th Cir. 2010) ("Rule 16 differs from *Brady,* which rests upon due process considerations, and provides

4

the minimum amount of pretrial discovery granted in criminal cases."); *United States v. Conder*, 423 F.2d 904, 911 (6th Cir. 1970) ("[T]he disclosure required by Rule 16 is much broader than that required by the due process standards of *Brady*.").

Under Rule 16, the requirement for disclosure is not limited to evidence favorable or helpful to the defense, but also encompasses evidence that is helpful to **the preparation of** a defense by permitting the accused to conduct an investigation (i) to attempt to discredit evidence the government may present and (ii) to avoid presenting evidence that may be undercut by evidence in the possession of the government. "In other words, it is just as important to the preparation of a defense to know its potential pitfalls as it is to know its strengths." *United States v. Marshall*, 132 F.3d 63, 67-68 (D.C. Cir. 1998); *see United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993) (the materiality standard "'is not a heavy burden,' . . . rather, evidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.").

As with *Brady*, the prosecution is required to disclose evidence pursuant to Rule 16 even if it is not itself admissible. *See United States v. Holihan*, 236 F. Supp. 2d 255, 260 (W.D. N.Y. 2002) ("Discovery is material if the information sought is relevant to the case and will lead to the discovery of admissible evidence.").

### D. *Brady* trumps the Jencks Act.

While the government may not be obligated to produce statements made by prospective witnesses under Rule 16, the government would be required to do so if the

statements constitute *Brady* material.  *See, e.g., United States v. Murphy*, 569 F.2d 771, 774 (3d Cir. 1978) ("[T]he district court was correct in denying defendant's motions to order the government to divulge Jencks material during the suppression hearing. This result, of course, in no way impairs the government's constitutional obligations under *Brady* . . . ."); *United States v. Tarantino*, 846 F.2d 1384, 1414, n. 11 (D.C. Cir. 1988) ("Of course, under *Brady* . . . , the government has additional obligations deriving from the Fifth Amendment to disclose exculpatory material, and the limitations on discovery contained in the Jencks Act do not lessen those obligations.").

### E. The production of *Brady* and Rule 16 materials must be timely.

In addition, both *Brady* and Rule 16 materials must be turned over in a timely manner.  The Third Circuit has long suggested a policy of "prompt compliance" with production of discovery.  *See Government of Virgin Islands v. Ruiz*, 495 F.3d 1175, 1179 (3d. Cir. 1974) ("[W]e take the occasion to suggest that a more meticulous attention to the government's discovery obligations under Rule 16 and *Brady v. Maryland* []is highly desirable…An affirmative policy of prompt compliance would, however, avoid the risk of needlessly causing a mistrial or a reversal.").  *See also United States v. Higgs,* 713 F.2d 39, 44 (3d Cir.1983) (noting that the government must disclose *Brady* exculpatory evidence without undue delay and *Brady* impeachment material "in time for its effective use at trial."); *United States v. Starusko*, 729 F.2d 256, 261 (3d Cir. 1984) (recognizing the Third Circuit's "longstanding policy of encouraging early production.")

The Supreme Court has repeatedly advised prosecutors to err on the side of disclosure.  *See Cone v. Bell*, 556 U.S. 449, 470, n. 15 (2009) ("As we have often

observed, the prudent prosecutor will err on the side of transparency, resolving doubtful questions in favor of disclosure."); *United States v. Agurs*, 427 U.S. 97, 108 (1976)("[T]he prudent prosecutor will resolve doubtful questions in favor of disclosure."); *Kyles v. Whitley*, 115 S. Ct. 1555, 1568 (1995) (citations omitted) (urging resolution of doubtful questions in favor of disclosure).[3]

### F. The government has considerably broad discovery obligations with respect to the penalty phase.

The scope of information relevant to the penalty phase of a capital trial is vast. *See, e.g., Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (capital sentencer must consider "defendant's character or record and **any of the circumstances of the offense** that the defendant proffers as a basis for a sentence less than death") (emphasis added); *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982) ("[V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances.").

The Federal Death Penalty Act sets forth seven statutory mitigating factors and includes an eighth catchall – "other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of a death sentence." 18 U.S.C. § 3592(a)(8). It also provides that a "defendant may present

---

[3] Indeed DOJ policy provides that the *Brady* standard **going into trial** is "any evidence that is inconsistent with any element of any crime charged against the defendant, turn it over; any information that casts doubt upon the accuracy of any evidence, including but not limited to witnesses' testimony, turn it over; and that we tell people, err on the side of disclosure." Statement of Deputy Attorney General James M. Cole before the Senate Judiciary Committee (June 6, 2012), available at http://www.justice.gov/iso/opa/dag/speeches/2012/dag-speech-120606.html."

any information relevant to a mitigating factor… regardless of its admissibility under the rules governing admission of evidence at criminal trials...."  18 U.S.C. § 3593(c).

Evidence does not need a nexus to the crime to be mitigating but rather is "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value."  *Tennard v. Dretke*, 542 U.S. 274, 284-285 (2004). "In order to receive discovery related to mitigation evidence, the requesting party 'need only establish a 'substantial basis for claiming' that a mitigating factor will apply at the penalty phase, in order to invoke the Government's obligation under *Brady* and its progeny to produce any evidence which is material to that mitigating factor.'" *United States v. Con-Ui*, 3:13-CR-123, 2016 WL 4140520, at *2–4 (M.D. Pa. Aug. 4, 2016).

> **II. Mr. Bowers asks the Court to order the government to provide the information outlined below, all of which falls within the purview of *Brady* and Rule 16.**
>
>> **A. Life history records, reports of life history interviews, and reports of eyewitness accounts of the shootings.**

The government has provided some "life history" records, reports (302s) of interviews of several witnesses to Mr. Bowers' life history (*e.g.*, family, friends, co-workers, peers), and called one or more of these witnesses to the grand jury.[4]  This suggests that, in the government's view, information from these "life history" witnesses,

---

[4] "Life history" records include employment, medical, mental health, education, military, vital and social services records for Mr. Bowers and his family members.  "Life history" witnesses include family members, neighbors, friends, acquaintances who knew Mr. Bowers or his family, former teachers, clergy, employers, co-workers, social service providers, doctors, and police.

8

and these materials are relevant to the charges returned against Mr. Bowers, including motive and mental state.

The information provided by Mr. Bowers' family members, peers, co-workers, employers, and others who knew him is also relevant to understanding the trajectory of his life. Information about genetic and environmental influences are important to understanding Mr. Bowers' life and mental health, as is information about how Mr. Bowers' complied with rules and interacted with others.

Information regarding Mr. Bowers' psychiatric history as well as that of his family is clearly material and must be disclosed. Information regarding that history, including statements by others and records provided to law enforcement, are important to understanding Mr. Bowers' mental health and should be disclosed as well. This includes information provided by eyewitnesses to the shootings, which may directly or indirectly reflect on Mr. Bowers' mental state during the shootings, as well as his overall mental condition at the time of the shootings. All of this requested information is both "favorable" under *Brady* and "material" under Rule 16.

To the extent not already provided, and to ensure that the government meets its obligations under the law, we ask the Court to compel the government to confirm that it has provided, or direct it to provide:

    i. transcripts of testimony of Mr. Bowers' family members, friends, employers, co-workers, peers, and others questioned about his conduct or life history before the grand jury;

    ii. FBI 302s and other law enforcement reports, including notes, of interviews of Mr. Bowers' family members, employers, co-workers, employers, peers,

9

      instructors and others questioned regarding Mr. Bowers, his conduct, or his family or life history;

  iii.    testimony and reports of eyewitnesses to the shootings, including first responders (regardless of the agency that conducted the interviews);

  iv.    all "life history" records collected by the government (those voluntarily provided and provided in response to a grand jury subpoena), including photographs and employment, medical, mental health, education, social services, financial and military records of Mr. Bowers and his family members; and,

  v.    all pre-trial detention records in the possession of the government.[5]

### B. Unredacted reports of the shooting, surrender, and arrest.

The reports of eyewitness accounts of the shooting, and Mr. Bowers' surrender and arrest are heavily redacted. The essence of what has been provided – statements made by Mr. Bowers prior to or during his arrest, and some observations of his surrender and arrest – are without context given the heavy redactions. Some of the heavily redacted reports have been produced more than once **and with different redactions.** For example:

  i.    Percipient witness 1: two versions of the same 1-page report provided, but with different redactions [DOCS 3 and 266]

  ii.    Percipient witness 2: two versions of the same 10-page report provided, but different pages omitted and different redactions included, *e.g.*, document provided 12/7/18 included pages 1, 7, 10 (page 1 essentially blank, with substantial redactions on the other 2 pages); document provided 3/28/19 included 6 of the 10 pages, and different redactions [DOCS 14 and 268]

---

[5] We have received a few items from the "filter team" as ordered by this Court (ECF 141 at 3). On December 16, 2019 we received a production of Butler County Prison records from the government. The government has declined to advise of the legal authority it relied upon in obtaining these detention records. This issue will be raised by motion once we have completed a review of the records.

    iii.    Percipient witness 3:  two versions of the same 7-page report provided, with same missing pages (pages 2 and 6), but with different redactions [DOCS 271 and 368]

    iv.    Percipient witness 4: two versions of the same 10-page report provided, with the same missing pages but with different redactions [DOCS 14 and 272]

    v.    Percipient witness 5: two versions of the same 8-page report provided, but with different pages missing (one is missing pages 2-5 and 8, the other is missing pages 2-4 and 8), and with different redactions [DOCS 14 and 273]

    vi.    Percipient witness 6: two versions of the same 10-page report, but with different pages missing (one is missing pages 2-4 and 10, the second is missing pages 2-6 and 10) and with different redactions [DOCS 14 and 274]; and,

    vii.    Percipient witness 7:  two versions of the same 9-page document, but with different pages missing (one is missing pages 2-5 and 9, the other is missing pages 4 and 9) and with different redactions [DOCS 14 and 281][6]

From what can be deciphered from the heavily redacted reports, it does not appear that the FBI 302 reports are witness statements (as defined by the Jencks Act or Rule 26.2) of the individuals being interviewed.[7]  Regardless, the heavy redactions and different redactions of the same document suggest a gamesmanship that should have no place in this capital prosecution.

Accordingly, the defense asks the Court to compel production of the unredacted law enforcement reports of the shooting, surrender and arrest.

---

[6] The referenced documents were produced on 11/7/18 (DOC 3); 12/17/18 (DOC 14) and 3/28/19 (DOCS 266, 268, 271, 272, 273, 284, 281 and 368).

[7] One of the 302 reports (DOC 390) appears to be a second report – correcting an earlier report that was not produced.

**C. Forensic laboratory related discovery and expert summaries.**

The government resists producing discovery relevant to forensic testing and laboratory procedures (accreditation, competency and proficiency for examiners and analysts, laboratory case files, bench notes, *etc.*) and expert summaries until closer to the time of trial. However, the materials requested (listed below) are material to the preparation of the defense, including determining appropriate experts to retain and whether to challenge the admissibility of the forensic evidence. It is clear under Rule 16 that "results or reports" or any scientific test is discoverable if within the possession of the government, and material to preparing the defense. *See* Rule 16(a)(1)(F). Nothing in the Rule delays production until closer to trial.

In addition, Rule 16(a)(1)(G) provides that the government "must give" a written summary of any testimony it intends to use under FRE 702, 703 or 705 during its case in chief. Again, nothing in the Rule delays such production until closer to trial.

The defense requests the Court to order the government to produce summaries of expert testimony for each of the forensic areas of evidence the government intends to introduce at trial.[8] The defense further requests that the Court order the government to produce, for each laboratory that conducted an examination and each analyst or examiner, the information listed below:

    i.    The results of all competency and proficiency assessments for each of the examiners or analysts over the last five year;

---

[8] We are aware of forensic examinations in the areas of pathology, electronic devices, fingerprints, trace evidence, serology, DNA, and firearms/toolmarks.

ii. The Quality Management System (QMS) documented in a Quality Manual (QM) for each of the laboratories associated with the above areas (or disciplines);

iii. All validation studies and testing completed on all tools, techniques, methods, and procedures utilized in evaluating the items seized and tested in connection with this case;

iv. Equipment Performance Documentation for each item of equipment used in processing the evidence in each of the above areas (or disciplines) in this case, including (a) manufacturer's manuals; (b) calibration logs; (c) performance verification logs; and (d) maintenance logs;

v. Written examination procedures followed by the examiners in each of the areas (or disciplines) referred to above;

vi. The written policies regarding administrative and technical/peer review process of cases for each laboratory conducting an analysis with items related to this case;

vii. Chain of custody logs for all the evidence examined in each of the areas (or disciplines) referred to above (whether written or in digital format);

viii. Copies of the laboratory case file for any scientific test or experiment, including, any bench notes made by each examiner in testing the items listed in the report referenced above;

ix. ASCLD / ANAB accreditation information for each of the laboratories, and copies of any audits, whether internal or external, conducted with respect to any laboratory that performed any scientific test or experiment in this case. Moreover, if items were processed, examined, or analyzed by a non-accredited laboratory, please so indicate;

x. Any correspondence or records of phone calls between examiners, between examiners and crime scene/evidence collectors, and/or any members of the prosecution team;

xi. In house testing or studies that related to testing done in the laboratories;

xii. Laboratory layout, with reference to what is done where and by whom, and specifically identifying who did what and when; and

xiii. Details of storing and routing through the laboratories of each piece of evidence tested.

### D. Agents Notes.

The government has advised that it is "aware of its obligations" regarding retention of "rough notes" and has instructed law enforcement to retain all notes created as part of the instant federal investigation and prosecution. By way of this motion, the defense asks the Court to direct the government to produce all of the rough notes of law enforcement agents required by the Third Circuit to be preserved. *See United States v. Vella*, 562 F.2d 375, 376 (3d Cir. 1977); *United States v. Ammar*, 714 F.2d 238, 259 (3d Cir. 1983). Alternatively, the defense requests that the government produce the notes to this Court for review to determine whether they should be turned over to the defense in accordance with *Brady* or Rule 16.

### E. Data Collected by law enforcement and related agencies.

In correspondence, and with specification regarding potential sources of the data,[9] defense counsel asked government counsel to produce data collected by law enforcement related to:

---

[9] This request included: (a) data maintained by the FBI's Terrorist Screening Database; the Terrorist Identities Data Environment; (b) call and email record data bases (covering incidental US intercepts of international calls) as defined by Section 702 of FISA, reauthorized in 2017; (c) metadata domestic program data as defined by Section 215 of the Patriot Act, restored under the USA Freedom Act; (d) data related to chat room monitoring by non-US governmental counterterrorism agencies which has been shared with US agencies; (e) all internet data and analysis of internet data obtained by law enforcement agencies (as defined above); (f) memos or reports written by law enforcement agencies regarding events prior to October 27, 2018, even if the material, memo, document, summary or analysis was generated after that date; (g) a listing of the

14

      i.    Robert Bowers and/or individuals which the government, or any agency of the government, knew or suspected was associated with or connected to a group or organization with which Mr. Bowers had contact which expressed white supremacist, white nationalist, or anti-Semitic beliefs; and,

      ii.    Robert Bowers and/or individuals which the government, or any agency of the government, knew or suspected Mr. Bowers was connected to, which promoted violence, encouraged others to promote or act violently, or otherwise indicated material support for violence, or promoted ideas which the government assessed to be related to the promotion of violence

The government essentially rejected the request, indicating "at present" it had no relevant material concerning Mr. Bowers' activities or statements as they relate to white supremacist, white nationalist or anti-Semitic beliefs "beyond the categories of such evidence provided" and that "much of the exceedingly broad array of material" requested falls beyond the government's discovery obligations.

The requested data is solely in the possession of the government and is material to establishing contextual and cultural influences on Mr. Bowers that may well have contributed to the actions he took on October 27, 2018. The absence of such data is also material to undermining depth of the alleged motive, and aggravation alleged by the government. Accordingly, Mr. Bowers asks the Court to order the government to produce this material.

---

U.S. law enforcement agencies that tracked the communications and internet activities (email, social media, blogs, *etc.*) of the alt-right alleged violent fringe movement that embraces white nationalism, anti-Semitism, or white supremacy and provide reports of the surveillance activities during calendar year 2017 to and including October 27, 2018.

## CONCLUSION

For the foregoing reasons, Mr. Bowers asks this Court to grant the Motion to Compel Production of Discovery and direct production of the materials listed above.

Date: December 18, 2019				Respectfully submitted,


					*/s/ Judy Clarke*
					Judy Clarke
					Clarke Johnston Thorp & Rice, PC

					*/s/ Michael J. Novara*
					Michael J. Novara
					First Assistant Federal Public Defender

					*/s/ Elisa A. Long*
					Elisa A. Long
					Supervisory Assistant Federal Public Defender

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.    ) | Criminal No. 18-292 |
| ) | |
| ROBERT BOWERS    ) | |

**ORDER**

Upon consideration of the Defendant's Motion to Compel Production of Discovery, it is ordered that the motion is GRANTED. The government is ORDERED to produce the categories of materials, as well as the specific materials, outlined in the Defendant's Motion to Compel Production of Discovery, including (1) life history records, reports of life history interviews, and reports of eyewitness accounts of the shootings; (2) unredacted reports of the shooting, surrender, and arrest; (3) forensic laboratory related discovery and expert summaries; (4) agents notes; and (5) data collected by law enforcement and related agencies.

_____  
Date

_____  
Donetta W. Ambrose  
United States District Judge