# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      )
                                 )
        v.                     )      Criminal No. 18-292
                                 )
ROBERT BOWERS            )

**MOTION TO STRIKE THE DEATH PENALTY ON THE GROUNDS THE FEDERAL DEATH PENALTY ACT IS UNCONSTITUTIONAL UNDER THE SUPREME COURT'S DECISION IN *RING V. ARIZONA* AND THE FIFTH AND EIGHTH AMENDMENTS**

1001 Liberty Avenue
Suite 1500
Pittsburgh, PA 15222
(412) 644-6565

Judy Clarke
Clarke Johnston Thorp & Rice, PC

Michael J. Novara
First Assistant Federal Public Defender

Elisa A. Long
Supervisory Assistant Federal Public Defender

Attorneys for Defendant,
Robert Bowers

## TABLE OF CONTENTS

**SUMMARY OF ARGUMENT** ............................................................... 1

**BACKGROUND** .................................................................................... 2

**ARGUMENT** ......................................................................................... 2

I.  **The Supreme Court's decision in *Ring* has rendered the FDPA unconstitutional, and the Act may not be saved by a judicial construction that creates a new criminal offense whose elements and procedures have neither been considered, nor enacted into law, by Congress.** ...................... 2

II.  **Aggravating factors necessary to a capital verdict are essential elements of the capital offense and must be pleaded in the indictment and proved to a jury beyond a reasonable doubt.** .................... 5

    A.  **The FDPA does not provide for presentation of aggravating factors to a grand jury (and thereby including them in an indictment) but instead vests authority to identify aggravating factors exclusively with the prosecutor.** .................................................. 9

    B.  ***Jackson* and the separation of powers doctrine demonstrate that the FDPA cannot be amended by the prosecutor or the courts to permit presentation of aggravating factors to a grand jury because it is for the legislature to define crimes and punishment, and presentation of aggravating factors to a grand jury is contrary to Congress' unambiguous intent, as expressed in the FDPA.** .................................. 10

        1.  **Congress, not the courts or prosecutors, is vested with legislative authority to define federal criminal offenses and the punishment for such conduct.** .............................................................. 11

        2.  ***Jackson* provides a direct and "all fours" analogy and compels invalidation of the FDPA.** .............................................................. 12

        3.  **The non-delegation doctrine provides further compelling support for the conclusion the FDPA's defects cannot be cured by judicial action.** ............................................................................. 18

        4.  **The grand jury lacks authority to issue "Special Findings."** ....... 20

C.  Circuit Court decisions to the contrary have been wrongly decided, and neither severability analysis nor the post-*Apprendi* drug cases, nor the doctrine of "constitutional avoidance" can save the FDPA ........... 21

    1.  The decisions by the courts of appeal have been wrongly decided................................................................................................. 21

    2.  The post-*Apprendi* drug quantity cases do not authorize presenting the FDPA's aggravating factors to a grand jury. ...... 23

    3.  A severability analysis cannot save the FDPA. ............................ 25

    4.  The doctrine of constitutional avoidance is inapplicable. ............ 26

III.  Even if the FDPA can be rendered constitutional by a finding by the grand jury of gateway and statutory aggravating factors, the Special Findings in the indictment should be stricken and the death notice should be dismissed because the government has not obtained an indictment consistent with the Fifth Amendment ...................................................................................... 29

A.  The grand jury was not given the choice of holding Mr. Bowers to answer for a capital crime because it was (presumably) unaware of the consequences of its "Special Findings." .................................................. 29

B.  The government did not obtain an indictment alleging all elements of a capital crime ................................................................................................. 35

C.  The non-statutory aggravating factors alleged in the death notice must be dismissed because they are not supported by the indictment ......... 37

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-292 |
| | ) | |
| ROBERT BOWERS | ) | |

### MOTION TO STRIKE THE DEATH PENALTY ON THE GROUNDS THE FEDERAL DEATH PENALTY ACT IS UNCONSTITUTIONAL UNDER THE SUPREME COURT'S DECISION IN *RING V. ARIZONA* AND THE FIFTH AND EIGHTH AMENDMENTS

The defendant, Robert Bowers, through counsel, respectfully moves the Court to find the Federal Death Penalty Act ("FDPA") unconstitutional pursuant to the United States Supreme Court decision in *Ring v. Arizona*, 536 U.S. 584 (2002), and the Fifth, Sixth and Eighth Amendments to the United States Constitution.[1]

**Summary of Argument.** The Supreme Court's *Ring* decision has rendered the Federal Death Penalty Act unconstitutional, as there is no legislatively approved process for alleging aggravating factors that comports with the Constitution. The Act may not be saved by a judicial "construction" that creates a new criminal offense whose elements and intertwined procedures have neither been considered, nor enacted into law, by Congress. Even if the FDPA can be rendered constitutional by a finding by the grand jury of gateway and statutory aggravating factors, the "Special Findings" in the indictment should be stricken and the death notice should be dismissed because the government has not obtained an indictment consistent with the requirements of the Fifth Amendment.

---

[1] This is one of three separate Motions challenging the FDPA and the constitutionality of the death penalty being filed by Mr. Bowers.

**Background.** On January 29, 2019, a federal grand jury charged Robert Bowers by superseding indictment with fifty-one counts, all which stem from a shooting at the Tree of Life Synagogue on October 27, 2019. (ECF No. 44.) The Superseding Indictment lists ten "Special Findings" with respect to Mr. Bowers – the age qualification, all four "intent" factors from 18 U.S.C. § 3591, and five of the statutory aggravating factors found in 18 U.S.C. § 3592(c).[2]

The Notice of Intent essentially tracks the allegations of the Special Findings in the superseding indictment regarding the age qualification, the intent factors and the statutory aggravating factors, but adds five non-statutory aggravating factors that were not included in the Special Findings. (ECF No. 86.) [3]

## ARGUMENT

**I.   The Supreme Court's decision in *Ring* has rendered the FDPA unconstitutional, and the Act may not be saved by a judicial construction that creates a new criminal offense whose elements and procedures have neither been considered, nor enacted into law, by Congress.**

In enacting the FDPA in 1994, and the predecessor ADDA scheme in 1988, Congress granted exclusive statutory authority to allege aggravating factors to the prosecution. *See* 18 U.S.C. § 3591 *et seq*. If that aspect of the FDPA is not operative, the

---

[2] A special finding regarding "vulnerable victim" is included twice, one alleging vulnerability due to old age, the other alleging vulnerability due to infirmity.

[3] The government has not provided any information indicating that the grand jurors were advised of the consequences of the return of the Special Findings, or that they were instructed to weigh the aggravating factors to determine if a death sentence was justified.

statute lacks any congressionally approved method of alleging aggravating factors. And that is exactly the case. In the wake of *Ring v. Arizona,* 536 U.S. 584 (2002), the FDPA[4] lacks any legislatively selected method of initiating a capital prosecution. While the Constitution requires that the elements of capital murder be presented to a grand jury and charged in an indictment, Congress, in passing the FDPA, chose another route. As a result, it is up to Congress to make the necessary corrections. Thus, the Federal Death Penalty Act is presently unconstitutional, and this Court should resist and reject the government's efforts to invent a "*Ring* fix."

In *Ring*, the Court held that, with respect to the framework of Arizona's death penalty statute, the "enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense'. . . ." 536 U.S. at 585 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 n. 19 (2000)). That holding, coupled with the earlier holding in *Jones v. United States*, 526 U.S. 227, 251-52 (1999), that all elements of a federal offense "must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable," in effect rendered the FDPA unconstitutional. *See Harris v. United States*, 536 U.S. 545 (2002) ("[T]hose facts setting the outer limits of a sentence and of the judicial power to impose it are elements of the crime for constitutional analysis."). This is because under *Ring*, the FDPA's aggravating factors necessary for a death

---

[4] For purposes of this argument, the abbreviation FDPA is utilized to refer to both the 1988 and 1994 federal death penalty schemes. Although the procedural provisions of the Anti-Drug Abuse Act (ADAA), Pub.L. 100-690, Sec. 7001, 102 Stat. 4181 (Nov. 18, 1988), have been repealed, both statutes are relevant to demonstrate Congressional intent that the prosecution has exclusive authority concerning aggravating factors.

3

sentence – like the factors at issue in the Arizona statute – are elements of the capital offense and must be charged in the indictment and proven to a jury beyond a reasonable doubt. Under the FDPA, and for the purposes of this discussion, the "elements" of capital murder are at least murder plus intent plus one or more statutory aggravating factors.

The FDPA and Arizona capital schemes are similar in that each establishes death as a possible sentence in the statute defining the offense, and then sets forth the further fact-finding and procedural steps necessary to establish a particular defendant's, and the set of relevant facts', eligibility for a capital sentence. As in the Arizona system addressed and invalidated in *Ring*, under the FDPA, the fact that a jury returns a guilty verdict in a case of capital murder does not, without more, allow for imposition of a death sentence. It is the further fact-finding, and intertwined procedures, that determine, in the post-*Ring* era, what constitute the new elements of "federal capital murder," a crime that presently exists only by judicial fiat.

Later in this motion, Mr. Bowers argues that the elements of capital murder include decisions reached by the jury right up to and including the point where it makes a finding of fact that the aggravating circumstances outweigh the mitigating circumstances. In truth, the final "selection" or ultimate sentencing decision is not made until the jury reaches the final decision-point of determining, factually, "whether all the aggravating factors found to exist **sufficiently outweigh** all the mitigating factors found to exist to justify a sentence of death . . . ." 18 U.S.C. § 3593(e) (emphasis added). A simple "outweighing" is insufficient. Obviously, there are enormous practical difficulties in devising a system where a grand jury can consider and weigh both aggravating and

mitigating factors. That is precisely why the legislature needs to amend this statute, not the courts or the Department of Justice.

The FDPA, of course, nowhere provides for presentation of aggravating factors to a grand jury. But neither is the statute silent on the issue of how such factors are to be alleged. On that score, the FDPA explicitly reserves the selection and notice of aggravating factors to the exclusive discretion of the prosecution. The government cannot rewrite the FDPA to its own liking; instead the FDPA must be declared unconstitutional pending further action by Congress.

In a closely analogous circumstance, the Supreme Court, in *United States v. Jackson*, 390 U.S. 570 (1968), condemned the very practice now at issue, *i.e.*, where a district court was asked to engage in the judicial amendment of a capital statute in order to preserve its constitutionality. In that case, the court declined to do so. As a result, the Supreme Court's admonition in *Jackson* is equally powerful and appropriate here:

> It is unnecessary to decide here whether this conclusion [the Government's proposed "fix" of the death-penalty aspects of the federal kidnapping statute] would follow from the statutory scheme the Government envisions, for it is not the scheme that Congress enacted.

390 U.S. at 573.

## II. Aggravating factors necessary to a capital verdict are essential elements of the capital offense and must be pleaded in the indictment and proved to a jury beyond a reasonable doubt.

In *Ring*, which overruled *Walton v. Arizona,* 497 U.S. 639 (1990), and in subsequent cases, the Supreme Court established beyond dispute that aggravating factors necessary to imposition of the death penalty under the FDPA must be charged in the indictment and proved to the satisfaction of a jury beyond a reasonable doubt. As noted above, the Supreme

Court explained in both *Ring* and *Harris* that facts which increase the maximum penalty faced by the defendant create new, different, and "greater offense[s]." In *Harris,* 536 U.S. at 555-66, the Court noted repeatedly that any "fact" which increases the maximum possible penalty beyond that authorized by the findings implicit in the jury's verdict of guilt is an element of an offense:

> [R]ead together, *McMillan [v. Pennsylvania*, 477 U.S. 79 (1986)] and *Apprendi* mean that those facts setting the outer limits of a sentence and of the judicial power to impose it are elements of the crime for constitutional analysis.

*Harris,* 536 U.S. at 567. Concurring in *Ring*, Justice Scalia observed:

> [All] facts essential to imposition of the level of punishment that the defendant receives – whether the statute calls them elements of the offense, sentencing factors, or Mary Jane – must be found by the jury beyond a reasonable doubt.

*Ring,* 436 U.S. at 610 (Scalia, J., concurring.)

Similarly, in *Apprendi,* the Court observed that "[t]he judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury. Put simply, facts that expose a defendant to a punishment greater than that otherwise legally prescribed [are] by definition 'elements' of a separate legal offense." 530 U.S. at 483, n. 10; *see Harris,* 536 U.S. at 560 (stating that the principle "by which history determined what facts were elements…defined elements as 'fact[s] legally essential to the punishment to be inflicted'") (quoting *United States v. Reese,* 92 U.S. 214, 232 (1876) (Clifford, J., dissenting)).

In *Jones*, the Court had presaged what has since occurred by holding that all elements of a federal offense "must be charged in the indictment, submitted to a jury, and

6

proven by the Government beyond a reasonable doubt." *Jones,* 526 U.S. at 227; *see*

*United States v. Cotton*, 535 U.S. 625 (2002) (in federal prosecutions, any fact increasing

the maximum punishment "must also be charged in the indictment").

Thus, *Ring* and *Harris* have established beyond dispute that the facts alleged

in the "Special Findings" section of the indictment in this case constitute elements of an

offense because they "are facts that expose [this] defendant to a punishment greater than

that otherwise legally prescribed… ," *i.e.,* the death penalty. That conclusion is further

confirmed by the Supreme Court's subsequent decisions in *Blakely* and *Booker,* in which

first state and then federal sentencing guidelines factors, respectively, were held to

constitute the functional equivalent of elements that required proof to a jury beyond a

reasonable doubt. *Blakely v. Washington*, 542 U.S. 296 at 303 (2004); *United States v.*

*Booker,* 543 U.S. 220 at 244 (2005).

Capital cases since *Ring* have continued in the same vein. For example, in

*Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003), the Court considered whether double

jeopardy was a bar to the second prosecution of a capital case when the Commonwealth

of Pennsylvania again sought (and received) a sentence of death after a divided jury at the

first trial had spared the defendant's life and the defendant subsequently succeeded in

having the underlying conviction set aside on appeal. The Court ruled 5-4 that double

jeopardy did not bar a second opportunity to seek a death sentence. Justice Scalia, joined

by the Chief Justice and Justice Thomas, discussed the implications of the Court's

decision in *Ring:*

> [I]n *Ring v. Arizona*, 536 U.S. 584 (2002), we held that aggravating
> circumstances that make a defendant eligible for the death penalty

> "operate as 'the functional equivalent of an element of a **greater offense**.'"... That is to say, for purposes of the Sixth Amendment's jury-trial guarantee, the underlying offense of "murder" is a distinct, lesser included offense of "murder plus one or more aggravating circumstances": Whereas the former exposes a defendant to a maximum penalty of life imprisonment, the latter increases the maximum permissible sentence to death.

*Sattazahn,* 537 U.S. at 111 (internal citations omitted) (emphasis in original).

Most recently, the Supreme Court reaffirmed *Ring*'s rule in *Hurst v. Florida*, 136 S.Ct. 616 (2016). In *Hurst*, the Supreme Court held that Florida's statutory scheme, which authorized a judge to determine whether any aggravating circumstances existed and whether they were "sufficient" to justify death, violated the Sixth Amendment. Thus, the Florida scheme was unconstitutional for the same reason as the Arizona scheme in *Ring*: it allowed a judge, rather than jury, to make "the critical findings necessary to impose the death penalty." *Hurst* at 622. The fact that Florida, unlike Arizona, employed a jury to make an "advisory recommendation" was irrelevant when the judge retained the ultimate fact-finding authority under Florida's statutory scheme. *Hurst* at 622. Notably, the *Hurst* decision made no distinction between "statutory" and "non-statutory" aggravating factors.

As with both the Arizona and Florida schemes, under the FDPA, a jury's verdict finding a defendant guilty of murder cannot support a sentence of death without additional fact finding. It thus follows that the aggravating factors the government has alleged by indictment in this case are viewed by the government, and for purposes of statutory and constitutional analysis, as elements of a greater offense that requires the proof of those elements before a death sentence can be imposed.

8

**A.      The FDPA does not provide for presentation of aggravating factors to a grand jury (and thereby including them in an indictment) but instead vests authority to identify aggravating factors exclusively with the prosecutor.**

With respect to federal capital offenses prosecuted in federal court, *Ring* and the Fifth Amendment's indictment clause require that aggravating factors necessary to a death sentence be presented to a grand jury and included in the indictment.[5] However, the FDPA neither permits nor contemplates affording the grand jury any role in determining which aggravating factors are to be alleged in a federal capital prosecution. Pursuant to the FDPA, a sentence of death may not be sought unless, as set forth in the statute itself, "the attorney for the Government believes that the circumstances of the offense are such that a sentence of death is justified…" 18 U.S.C. § 3593(a). If the "attorney for the government" believes death is warranted, the next step in the legislatively-selected process is for that attorney to serve and file a notice, signed by the attorney for the Government, stating, *inter alia*, that "the Government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified…and that the Government will seek a sentence of death[.]" 18 U.S.C. § 3593(a)(1).

Although not in and of themselves aggravating factors, the pre-*Ring* FDPA also required proof – and allegation in the notice by government attorneys – of one or more of

---

[5] The Fifth Amendment provides in pertinent part that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a Grand Jury," including those accused of felony offenses. *See Stirone v. United States*, 361 U.S. 212, 215 (1960) ("[T]he crime charged here is a felony and the Fifth Amendment requires that prosecution be begun by indictment.").

9

four "gateway" state-of-mind factors. 18 U.S.C. § 3591(2). The notice, in addition, is

required to set forth the aggravating factors, both statutory and non-statutory, it proposes

to prove if the defendant is convicted, which may include victim-impact evidence. 18

U.S.C. § 3593(a).[6]  Consequently, the unambiguous language of the FDPA establishes

that Congress, rightly or wrongly, elected to enact a scheme where the decision to set the

machinery of death in motion would be reserved to the government's attorneys and no

one else – not grand juries, not the court, and not any other individual or entity.

Nonetheless, the government seeks to establish in this case a substitute method for

introducing aggravating factors now that *Ring* has rendered the mechanism prescribed by

Congress constitutionally invalid. Fidelity to the fundamental principle of separation of

powers, embedded deeply in the constitutional form of government our nation has

adopted, and detailed below, is even more important when applied to the government's

efforts to execute one of its citizens, thereby imposing "the most irremediable and

unfathomable of penalties . . . ." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986).


    **B.  *Jackson* and the separation of powers doctrine demonstrate that the FDPA cannot be amended by the prosecutor or the courts to permit presentation of aggravating factors to a grand jury because it is for the legislature to define crimes and punishment, and presentation of aggravating factors to a grand jury is contrary to Congress' unambiguous intent, as expressed in the FDPA.**

This is not an instance in which Congressional silence permits flexibility in

rescuing an otherwise unconstitutional statute from invalidation. Indeed, given the

express and unambiguous language and structure of the FDPA, if, prior to *Ring,* a

---

    [6] The ADAA scheme was similar. *See* 21 U.S.C. § 848(h) (Repealed).

defendant had argued that the aggravating factors could not be applied unless they were presented to and charged by a grand jury in the indictment, the government's response undoubtedly, and correctly, would have been that the statute does not ascribe any such role to the grand jury, and that the statute plainly reserves that authority solely to the prosecutor.

      1.   **Congress, not the courts or prosecutors, is vested with legislative authority to define federal criminal offenses and the punishment for such conduct.**

For centuries of federal criminal jurisprudence, since at least as early as *United States v. Hudson*, 11 U.S. 32 (1812), it has been clear that the Constitution affords Congress the sole power to define and create all offenses against the United States and their punishments. *See United States v. Wiltberger*, 18 U.S. 76, 93 (1820), ("It is the legislature, not the court, which is to define a crime and ordain its punishment."); *Hudson,* 11 U.S. at 34 ("[T]he legislative authority of the Union must first make an act a crime, fix a punishment to it, and declare the Court that shall have jurisdiction of the offense"; and "[t]he power of punishment is vested in the legislative, not in the judicial department."). *See also Bousley v. United States,* 523 U.S. 614, 620-21 (1998) ("Under our federal system it is only Congress, and not the courts, which can make conduct criminal."); *Staples v. United States*, 511 U.S. 600, 604 (1994) ("The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes which are solely creatures of statute.") (citation omitted).

As a result, "[o]ne may be subjected to punishment for crime in the federal courts only for the commission or omission of an act defined by statute, or by regulation having

11

legislative authority, and then only if punishment is authorized by Congress." *Viereck v. United States*, 318 U.S. 236, 241 (1943) (citations omitted); *see also United States v. Lanier,* 520 U.S. 259, 267-68 n. 6 (1997) ("[F]ederal crimes are defined by Congress, not the courts. "); *Logan v. United States,* 144 U.S. 263, 283 (1982) ("[A]lthough the constitution contains no grant, general or specific, to congress of the power to provide for the punishment of crimes, [with certain exceptions] . . . no one doubts the power of congress to provide for the punishment of all crimes and offenses against the United States.").

The Supreme Court applied these principles in *Bouie v. City of Columbia*, 387 U.S. 347 (1964). In *Bouie,* the state courts of South Carolina, in an obvious effort to prosecute civil rights protesters, had construed an existing statute in a manner that created a new crime. The Supreme Court intervened and set aside the statute as interpreted for conflicting with *Wiltberger,* 18 U.S. 76 (1820). *See Crandon v. United States*, 494 U.S. 152, 158 (1990) ("Legislatures, not courts, define criminal liability.").

### 2. *Jackson* provides a direct and "all fours" analogy and compels invalidation of the FDPA.

The Supreme Court's decision in *United States v. Jackson,* 390 U.S. 570 (1968), provides precedent directly and specifically applicable to capital statutes, and to improper attempts to cure them by judicial fiat rather than by legislative action. In *Jackson*, the Court held that when a particular federal sentencing statute is unconstitutional, a court lacks authority to devise its own procedure, unauthorized by statute or rule, simply because the procedure, if properly enacted by Congress, would pass constitutional

muster. In *Jackson,* the Court considered the federal kidnapping statute, which contained a mandatory death penalty when a jury recommended it – thereby making the death penalty possible only for those defendants who exercised their right to trial by jury.

In an effort to salvage the death penalty provision, the government proposed a number of alternative "constructions" of the statute and cited *ad hoc* procedures developed by other district courts as "cures" for the constitutional problems. The Court, after finding the statute unconstitutional, rejected the government's proposed remedy of directing the trial court to convene a special penalty phase jury after a guilty plea, as well as every other approach proposed by the government, because those proposals represented judicial, rather than legislative action. *Id.* at 572–81.[7]

The *Jackson* Court, in analyzing and explicating the limits of judicial authority to construe legislation, even when such construction would "save" the legislation from a declaration of unconstitutionality, pointed out that the kidnapping statute "sets forth no procedure for imposing the death penalty upon a defendant who waives the right to jury trial or one who pleads guilty." *Id.* at 571. The Court declined to read into the statute congressional authority for the courts to develop such a procedure. The *Jackson* Court was concerned principally with overreaching its authority by imposing the alternate

---

[7] For example, the government proposed a "construction" of the statute under which "even if the trial judge accepts a guilty plea or approves a jury waiver, the judge remains free . . . to convene a special jury for the limited purpose of deciding whether to recommend the death penalty." *Id.* at 572. The government also suggested that the court might save the statute by reading it to make imposition of the death penalty discretionary on the part of the sentencing judge. *Id.* at 575. The court rejected these proposed reconstructions and adhered, instead, to the plain language of the statute as the best evidence of Congress' intent.

13

sentencing scheme. According to the Court, "it would hardly be the province of the courts to fashion [such] a remedy" absent "the slightest indication that Congress contemplated any such scheme." *Id.* at 578-79.

Applying *Jackson's* analysis to this case, it is manifest that once the provision allocating to the prosecutor the power to charge aggravating factors is declared unconstitutional, the FDPA "sets forth no procedure" for alleging aggravating factors. As the *Jackson* opinion explained, "[t]o accept the Government's suggestion that the jury's sentencing role be treated as merely advisory would return to the judge the ultimate duty that Congress deliberately placed in other hands." *Id.* at 576.

Here, as in *Jackson*, Congress has "deliberately placed in [the prosecutor's] hands" the responsibility for alleging aggravating factors under the FDPA. Consequently, in this case, "construing" the FDPA to allow the grand jury to assume that responsibility would violate the FDPA and contravene Congressional intent without "the slightest indication that Congress contemplated" according the grand jury such a role in the federal capital decision-making process. Presented with the option, Congress, considering the change of law from *Walton* to *Ring,* might very well enact a comprehensive death penalty scheme that allocated a role to the grand jury. Congress might also choose to enact a wholly new and different scheme, one which fully defined the new offense of "capital murder," specified its elements, and set forth comprehensive procedures for trial of those offenses.[8]

---

[8] Indeed, the dangers of judicial legislation are patently evident from the divergent attempts, following *Ring*, to salvage the FDPA despite the obvious defect in the method of alleging aggravating factors. For example, in *United States v. Jackson*, the

It is understandable that the courts, or prosecutors, would feel compelled to simply fix what is broken. *Jackson,* however, proscribes a court from implementing what Congress might do, or what the prosecutor proposes as a "fix" for a constitutionally deficient statute. Instead, *Jackson,* requires that courts, under such circumstances, invalidate, and not legislate. *Id.* at 573.

Also, the Court in *Jackson* recognized that the government's proposal "would be fraught with the gravest difficulties." *Id.* at 579. As the Court explained, "it is one thing to fill a minor gap in a statute," but "quite another thing to create from whole cloth a complex and completely novel procedure and thrust it upon unwilling defendants for the sole purpose of rescuing a statute from a charge of unconstitutionality." *Id*. at 580; *see Blount v. Rizzi*, 400 U.S. 410, 419 (1971) (statute that permitted the Postmaster General to determine that material was obscene struck down by the Court which, in the process of rejecting the government's suggestion that Congress's plain language could be "construed to allow a judge to make that determination instead of the Postmaster General, explained that "it is for Congress, not this Court, to rewrite the statute").

The very same type of judicial and prosecutorial restructuring of a statute to conform to constitutional imperatives was rejected by the Court in *United States v. Booker*, 543 U.S. 220 (2005). In the course of invalidating the mandatory nature of the federal sentencing guidelines because they permitted a judge to find, by a preponderance

---

court held that the presentation of but one statutory aggravating factor to the grand jury (and inclusion in the indictment) was sufficient to permit the government to seek death on the basis of several statutory aggravating factors not so included. *United States v. Jackson,* 327 F.3d 273, 284-87 (4ᵗʰ Cir. 2003).

of the evidence, facts necessary to an enhanced punishment, the Court did not create a hybrid system, inconsistent with the Sentencing Reform Act ("SRA"), under which those sentencing factors would be incorporated in indictments and presented to a jury. Rather, a separate majority in *Booker* (in what has generally been denominated the "remedy opinion," *Booker*, 543 U.S. at 245-46) severed the offending section – that which made the guidelines mandatory – but retained the essential character of the remainder of the SRA.

Indeed, in *Blakely* v. *Washington*, *Booker's* predecessor, Justice Breyer, who wrote the remedial opinion in *Booker*, recognized quite clearly the practical and due process concerns attendant to charging sentencing enhancement facts and submitting them to a jury. *Blakely,* 542 U.S. at 334-5 (Breyer, J., dissenting). Justice Breyer's admonition about the practical implications of presenting sentencing factors to a jury absent any legislative or procedural framework is mirrored by the issues raised by the submission of aggravating factors to a grand jury in the similarly barren context of the FDPA. For example, there are questions regarding which aggravating factors must be included in the indictment, whether the defendant must plead to those factors, whether the lessened evidentiary standard of the FDPA remains applicable to some or all aggravating factors, and, if so, to the presentation of mitigating evidence, and any procedural changes in the two phases of the trial.

Here, the government's position, by implication, is that prosecutors can fashion their own remedy independent of both Congress' intent and clear and limiting legislative language. This view, however, mirrors the position taken by the government, and rejected

by the Supreme Court in *Booker*:

> Severing the requirement that judges, not juries, apply the Guidelines would require courts to make the legal and policy decisions necessary to resolve all of those questions. There is no indication that Congress delegated that role to the courts. It is one thing to recharacterize a single factor that increases a statutory maximum and treat it as an element of the crime. It is quite another to take an entire system expressly designed to channel sentencing discretion and treat it as if Congress was attempting to rewrite the criminal code.

*Booker*, 543 U.S at 363.

In *Hurst v. Florida*, the Supreme Court similarly rejected an attempt to "fix" a manifestly unconstitutional sentencing scheme by ignoring the state's law in favor of a new judicial construction. Florida asked the Court to consider the "advisory jury" who heard the case (and in Hurst's case, had recommended death by a 7-5 vote) as the functional equivalent of the aggravator finding required by *Ring. See Hurst*, 136 S.Ct. at 622. Rather than reimagine the jury's role to save the sentencing scheme, the Court looked to what the Florida **statutes** actually contemplated: that the findings would be made by the judge and not the jury. Because this scheme – which the Supreme Court had previously upheld on multiple occasions – was now unconstitutional under *Ring*, Hurst rejected Florida's attempted "fix." *See id.* at 622, 623-24 (dismissing *stare decisis* concerns).

*Jackson* is precisely on point and controls this case, and it is consistent with *Hurst*. In enacting the FDPA, Congress, relying on *Walton*, created a scheme in which the prosecutor was granted the exclusive authority to make the threshold determination whether to seek the death penalty, and, once a decision was made to pursue death, which aggravating factors to allege. Allowing the government to seek indictment of what

17

Congress unambiguously defined as sentencing factors would give "to the [grand jury] the ultimate duty that Congress deliberately placed in other hands," *i.e.*, those of the government attorney – precisely the kind of end-run that *Jackson* forbids.

If the FDPA's treatment of aggravating factors is unconstitutional after *Ring*, then it is undeniable, under *Jackson* and the doctrine of Separation of Powers, that only Congress can cure the problem, and only by enacting – should it choose to do so in light of the changed constitutional landscape augured by *Ring* – a new death penalty scheme.

### 3. The non-delegation doctrine provides further compelling support for the conclusion the FDPA's defects cannot be cured by judicial action.

A corollary to the Separation of Powers problems posed by the prosecution's proposed unilateral *Ring* fix for the FDPA is the non-delegation doctrine's[9] preclusion of action by either the Executive or the Judiciary, whether separately or in tandem, substituting either's judgment for that of Congress in relation to prescribing the elements and the procedures for application of the federal death penalty. As Justice Scalia stated in his dissent in *Mistretta v. United States,* 488 U.S. 361 (1989):

> It is difficult to imagine a principle more essential to democratic Government than that upon which the doctrine of unconstitutional delegation is founded: Except in a few areas constitutionally committed to the Executive Branch, the basic policy decisions governing society are to be made by the Legislature.
>
> * * *
>
> That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of Government ordained by the Constitution.

---

[9] "The non-delegation doctrine originated in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989); *see* U.S. CONST., ART. 1, § 1.

*Id*. at 415 (Scalia, J., dissenting). The majority in *Mistretta* ultimately found that the non-delegation doctrine had not been violated by creation of the United States Sentencing Commission and the guidelines it promulgated because, in constituting the Commission, Congress had "[laid] down by legislative act an intelligible principle to which the [Sentencing Commission] is directed to conform . . ." *Id.* at 372 (quoting *N.W. Hampton, Jr., & Co. v. United States,* 276 U.S. 394, 409 (1928)). Nevertheless, the Court reaffirmed the principle that "'the integrity and maintenance of the system of Government ordained by the Constitution mandate that Congress generally cannot delegate its legislative power to another Branch." *Mistretta,* 488 U.S. at 371-72 (quoting *Field v. Clark*, 143 U.S. 649, 692 (1892)).

Thus, *Mistretta* involved the delegation only of authority to determine sentencing factors within the limits of a legislatively determined "intelligible principle." It did not include the authority to determine the very elements of an offense, as would be the case under a hypothetical post-*Ring* FDPA.[10] Plainly, Congress must have the opportunity to determine, in light of *Ring,* the precise elements of federal capital murder and how *Ring* has affected the legislative balancing that produced the FDPA in the first place.

_____

[10] In *Touby v. United States*, 500 U.S. 160, 164 (1991), the Court upheld Congress' delegation to the Attorney General of the authority to temporarily classify a drug as a controlled substance in order to bring its use and/or distribution within reach of criminal prosecution. This delegation of authority was based on the advent of "designer drugs" which were only marginally different in chemical composition from drugs that were already controlled. The Court held that the intelligible Congressional principle at issue not only meaningfully constrained the Attorney General's discretion to define criminal conduct but that, in addition, "Congress ha[d] placed multiple specific restrictions on the Attorney General's discretion to define criminal conduct . .. ." *Id*. at 167.

Since Congress could not delegate to the Executive Branch the power to rewrite the FDPA to its post-*Ring* liking, *a fortiori* the Executive Branch cannot simply assume that power by attempting to substitute new procedures and elements for those originally provided by Congress, but rendered constitutionally infirm by the *Jones-Ring-Apprendi* trilogy.

### 4.   The grand jury lacks authority to issue "Special Findings."

In this case, the indictment contains a section labeled "Notice of Special Findings." (ECF No. 44, at 12-13.) Grand juries are not, however, permitted to return anything denominated as "Special Findings." The Federal Rules of Criminal Procedure provide that an indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). In 1979, Rule 7 was amended specifically to allow notice of criminal forfeitures to be alleged by indictment. Nothing in the text of the Rule, and nothing in the Indictment Clause of the Fifth Amendment, contemplates or permits a grand jury to make "Special Findings" that serve the function of the triggering requirements of the FDPA that are now invalid in light of *Ring*.

In addition, while the Supreme Court's decision in *Schriro v. Summerlin*, 542 U.S. 348, 354-55 (2004), held that, for purposes of collateral review, *Ring* involved issues of procedure rather than substantive criminal law, that does not place the method of alleging the FDPA's aggravating factors within the purview of the government's authority or role in a three-branch form of government. Rather, the principles established in *Jackson* continue to apply, and the express language of the statute remains controlling and

20

dispositive. Consequently, the government's attempt to rescue the FDPA via the grand jury's "Special Findings" is void.

C.   **Circuit Court decisions to the contrary have been wrongly decided, and neither a severability analysis nor the post-*Apprendi* drug cases, nor the doctrine of "constitutional avoidance" can save the FDPA.**

1.   **The decisions by the courts of appeal have been wrongly decided.**

While various Courts of Appeals have considered the issues presented here and concluded that there is no constitutional or statutory impediment to presenting the FDPA's aggravating factors to a grand jury in order to avoid unconstitutionality under *Ring*, the cursory reasoning in each case has been fatally flawed for two principal reasons: (1) the decisions all fail to address *Jackson*, and/or to distinguish its clearly applicable holding and principles; and, (2) the decisions ignore the plain language of the FDPA with respect to whether the grand jury is authorized to allege aggravating factors.

For example, in *United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006), the Eleventh Circuit not only failed to even mention *Jackson*, but also joined other circuits in claiming that while "'nothing in the FDPA requires prosecutors to charge aggravating factors in an indictment … there is nothing in that law inhibiting such a charge.'" *Id.* at 1367 (quoting *United States v. Robinson,* 367 F.3d 278, 290 (5th Cir. 2004));[11] *see*

---

[11] In *Brown,* the Court also stated the defendant's argument in a manner different than what Mr. Bowers presents here. In *Brown,* according to the Court, the defendant "argue[d] that the FDPA is facially unconstitutional [] because it does not require [aggravating] factors to be alleged in the indictment." 441 F.3d at 1367. Here, Mr. Bowers states the converse: that the FDPA is unconstitutional because it requires that aggravating factors be alleged exclusively in a manner that precludes presentation to the grand jury.

*United States v. LeCroy*, 441 F.3d 914 (11th Cir. 2006) ("[T]he major flaw in LeCroy's argument is that nothing in the [FDPA] forbids, or is inconsistent with, prosecutors' taking the additional step of including the statutory aggravating factors in the indictment and submitting same to the grand jury. Indeed, a statute will seldom expressly provide for submitting elements of an offense to the grand jury."); *United States v. Allen,* 406 F.3d 940, 949 (8th Cir. 2005) ("While it is true that the FDPA directs the government to charge these factors in a notice of intent to seek the death penalty, nothing in the Act precludes the government from also submitting them to the grand jury for inclusion in the indictment."); *United States v. Barnette*, 390 F.3d 775, 789 (4th Cir. 2004) ("A review of the statute itself reveals no language that restricts the government from submitting aggravating factors to the grand jury. Neither does the legislative history indicate any such intent.")[12] The First Circuit's attempt in *Sampson* to distinguish *Jackson* was likewise flawed in that the reasoning requires ignoring the plain language of the statute which ordains a procedure completely at odds with presentment to a grand jury. *United States v. Sampso*n, 486 F.3d 13 (1st Cir. 2007); *see United States v. McCluskey*, No. CR 10-2734 JCH, 2012 WL 13076173, at * 5 (D. NM. Sept. 14, 2012) (unpublished) (adopting reasoning of *Sampson*).

This is not an instance in which a statute simply does not "expressly provide for submitting elements of an offense to the grand jury;" rather, the FDPA expressly and

---

[12] In both *Allen* and *Barnette*, the defendant's principal (and unsuccessful) argument was that the indictment failed to allege an aggravating factor. *Allen,* 406 F.3d at 940; *Barnette,* 390 F.3d at 775. In both cases, the Courts found any error to be harmless, and in *Barnette* the Court also held that the language of the indictment did, in fact, adequately allege an aggravating factor. *Barnette,* 390 F.3d at 775.

comprehensively provides for another, exclusive method for alleging aggravating factors. Each of these prior decisions, seemingly by failing to recognize its existence in the first place, fails to appreciate the gravity of this important distinction. Thus, these decisions upholding the validity of the FDPA were wrongly decided, and this Court should, consistent with *Jackson* and the clear language of the FDPA, declare the statute unconstitutional as applied to Mr. Bowers. [13]

### 2. The post-*Apprendi* drug quantity cases do not authorize presenting the FDPA's aggravating factors to a grand jury.

The FDPA cannot find refuge in post-*Apprendi* cases that required drug quantity in federal prosecutions previously deemed a sentencing factor to be determined by a judge by a preponderance of evidence, to be pleaded in an indictment and proved to a jury beyond a reasonable doubt. *See, e.g., United States v. Cotton*, 535 U.S. 625 (2002) (government concedes that it was error not to include drug quantity in all post-*Apprendi* federal drug indictments, but conviction affirmed because the defendant failed to object, and omission was harmless error).

The difference between Title 21's treatment of drug quantity and the FDPA's handling of aggravating factors is striking and dispositive. Regarding drug quantity, Congress enacted statutes in which the penalty ranges increase directly with the quantity of the specified drug. For those statutes, though, Congress was silent on whether drug

---

[13] Significantly, neither *Allen*, *Robinson*, *Barnette*, *LeCroy, Brown* discuss or even cite *Jackson*. Thus, none of those decisions can be deemed to have considered the issue sufficiently, or comprehensively. *Contra United States v. Sampson*, 486 F.3d 13 (1st Cir. 2007).

quantities were elements of the offense or sentencing factors. Thus, requiring drug quantities to be alleged by indictment did not alter the structure of the drug laws, or offend Congressional intent.

In fundamental contrast, however, Congress clearly never intended the aggravating factors in the FDPA to constitute **elements of the offense**. Rather, Congress, relying on *Walton*, which permitted such aggravating factors to be treated as **sentencing factors**, patently described them as such, and (impermissibly) directed that they be determined and identified in each case **not** by a grand jury (or any other body or institution), but by the prosecutor alone.

Moreover, when the Supreme Court has been required to determine whether a statute sets forth elements-of-an-offense, as distinct from sentencing factors, it has looked to Congressional intent. Accordingly, in *Castillo v. United States*, 530 U.S. 120 (2000), the Court explained that "[t]he question before us is whether Congress intended the statutory references . . . to define a separate crime or simply to authorize an enhanced penalty." 530 U.S. at 123; *see Jones,* 526 U.S. at 232–39. *See also Almendarez-Torres v. United States,* 523 U.S. 224, 228 (1998); *Harris*, 536 U.S. at 582.

In both *Harris* and *Almendarez-Torres,* the Court found the aspects at issue to be sentencing factors; in *Castillo* and *Jones*, they were found to be elements of the offense. In both sets of cases, the Court conducted by the same exhaustive statutory, not constitutional, analysis, because the Constitution, though it places limits upon Congress' ability to designate certain facts as sentencing factors, does not afford the courts authority to recast statutes so that they fit within those limits. For example, in *Harris,* the Court

24

comprehensively considered "the distinction the law has drawn between the elements of a crime and factors that influence a criminal sentence." 536 U.S. at 549. The Court reaffirmed that the threshold question of statutory construction is whether Congress intended relevant facts to be offense elements or sentencing factors. 536 U.S. at 551. The Court further explained that the distinction is significant because **"[l]egislatures define crimes in terms of the facts that are their essential elements**, and constitutional guarantees attach to these facts." 536 U.S. at 549 (emphasis added).

Here, Congress's intent is plain and unmistakable. Consistent with the state of the law pre-*Ring* (and governed by *Walton*), Congress structured the FDPA so that aggravating factors were sentencing considerations that were within the exclusive province of the prosecutor. As a result, the government is not empowered to subvert Congressional intent (even if ill-advised) and, in effect, create by prosecutorial fiat, a brand new criminal statute.

### 3.   A severability analysis cannot save the FDPA.

The severability cases also undercut any analogy to the drug cases discussed above. Under the cases setting forth the severability doctrine, the critical question is whether the statute at issue, upon removal of its unconstitutional portion, can function independently.[14] For example, in *Booker,* as noted above, the Supreme Court severed the mandatory provision because that preserved the character of the SRA and Congress's intent in enacting it, as opposed to creating a new system inconsistent with Congressional

---

[14] *See, e.g., Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999); *Leavitt v. Jane,* 518 U.S. 137 (1990); *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678 (1987).

intent.

The structure of the FDPA plainly provides that the government's notice of aggravating factors, and only that mechanism, triggers the entire operation of the FDPA. Absent that enabling act by the prosecutor, the statute cannot function as a capital statute, because without aggravating factors, the government cannot seek the death penalty. The same conclusion was reached in *Jackson*, in which the Court found that severing the unconstitutional death penalty provision of the kidnapping act left an otherwise fully functional criminal statute, albeit one that could not carry with it a potential sentence of death.

Here, deciding what Congress intended in the FDPA is an easy task it is obvious from the FDPA that Congress, relying on *Walton,* believed it was creating sentencing factors. It is equally clear that after *Ring*, aggravating factors constitute elements of an offense. Accordingly, the statute may not be severed; it must be voided.

### 4.  The doctrine of constitutional avoidance is inapplicable.

The doctrine of constitutional avoidance provides that when "a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [a court's] duty is to adopt the latter." *United States ex rel. Attorney General, v. Delaware & Hudson Co.,* 213 U.S. 366, 408 (1909). Here, because the FDPA is, for the reasons set forth *supra*, plainly not "susceptible of two constructions [,]" the simple answer is that the doctrine of constitutional avoidance does not apply.

In *Harris,* for example, the Court found the doctrine of constitutional avoidance

inapplicable because, at the time Congress enacted 18 U.S.C. § 924(c), Supreme Court precedent allowed Congress to label as sentencing factors certain facts which increased the minimum punishment for a crime. As the Court explained:

> The avoidance canon rests upon our "respect for Congress, which we assume legislates in the light of constitutional limitations." *Rust v. Sullivan,* 500 U.S. 173, 191 (1991). The statute at issue in this case was passed when *McMillan [v. Pennsylvania*, 477 U.S. 79 (1986)] provided the controlling instruction, and Congress would have had no reason to believe that it was approaching the constitutional line by following that instruction. We would not further the canon's goal of eliminating friction with our coordinate branch, moreover, if we alleviated our doubt about a constitutional premise we had supplied by adopting a strained reading of a statute that Congress had enacted in reliance on the premise. And if we stretched the text to avoid the question of *McMillan*'s continuing vitality, the canon would embrace a dynamic view of statutory interpretation, under which the text might mean one thing when enacted yet another if the prevailing view of the Constitution later changed. We decline to adopt that approach.

*Harris,* 536 U.S. at 556.

Thus, the doctrine of constitutional avoidance was irrelevant to the Court's analysis, and the Court in *Harris*, in accord with Congress' intent, concluded that "brandishing" was a sentencing factor. *See id.* Here, too, Congress relied on the state of the law existing at the time it enacted the FDPA – in *Walton*, 497 U.S. at 649, the Court had permitted a judge to decide sentencing factors in capital cases – and manifested that reliance in reserving for the prosecutor the exclusive authority to allege aggravating factors. Reconstructing the FDPA based on *Ring's* precedence over *Walton* would constitute the type of "dynamic" statutory interpretation that was precluded by *Harris* and would vitiate Congress' clear intent.

27

Consequently, the doctrine of constitutional avoidance is as inapplicable here as it was in *Harris*. As with 18 U.S.C. § 924(c), with the FDPA, there is no ambiguity about Congress' choice. As stated in *Miller v. French,* 530 U.S. 327 (2000), "Where Congress has made its intent clear, we must give effect to that intent." *Id.* at 341 (quotations omitted). Similarly, in *Commodity Futures Trading Com'n v. Schor*, 478 U.S. 833 (1986), the Court held:

> Federal statutes are to be so construed as to avoid serious doubt of their constitutionality. Where such serious doubts arise, a court should determine whether a construction of the statute is fairly possible by which the constitutional question can be avoided. **It is equally true, however, that this canon of construction does not give a court the prerogative to ignore the legislative will in order to avoid constitutional adjudication; although this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute . . . or judicially rewriting it.**

478 U.S. at 841 (citations and internal quotations omitted) (emphasis added).

Here, Congress made its intent clear in the FDPA: the allegation of aggravating factors is the province solely of government attorneys. The *Jones-Apprendi-Ring* trilogy has now altered the status of the law, and aggravating factors (and other aspects of the FDPA) are now properly, and constitutionally, elements of an offense not yet enacted by Congress and beyond the authority of the courts (or the prosecutor) to create via "construction" that amounts to judicial and executive legislation. Accordingly, the FDPA cannot be rewritten to permit presentation of aggravating factors to the grand jury, and because those aggravating factors are elements pursuant to *Ring,* the FDPA is unconstitutional as applied to Mr. Bowers.

28

III.    **Even if the FDPA can be rendered constitutional by a finding by the grand jury of gateway and statutory aggravating factors, the Special Findings in the indictment should be stricken and the death notice should be dismissed because the government has not obtained an indictment consistent with the Fifth Amendment.**

In this case, the superseding indictment contains "Special Findings." (ECF No. 44 at 12-13.) Nowhere, however, does the indictment state that the "Special Findings" would subject Mr. Bowers to the death penalty or otherwise reveal that the grand jury intended to return an indictment charging a capital offense. The superseding indictment does not allege any non-statutory aggravating factors. Nor does the superseding indictment allege that the aggravating factors present in this case outweigh the mitigating factors and outweigh them to an extent that is sufficient to justify imposition of a sentence of death. Under these circumstances, the indictment does not comport with the Grand Jury Clause of the Fifth Amendment and does not charge a capital offense.

A.    **The grand jury was not given the choice of holding Mr. Bowers to answer for a capital crime because it was (presumably) unaware of the consequences of its "Special Findings."[15]**

The Fifth Amendment provides that "no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. Amend. V. As the Supreme Court has explained:

> [T]he grand jury is a central component of the criminal justice process. The Fifth Amendment requires the Federal Government to use a grand jury to initiate a prosecution.... The grand jury, like the petit jury, 'acts as a vital check against the wrongful exercise

---

[15] This argument is based in part on a law review article on this topic, K. Bren and Tomer, "Ring around the Grand Jury: Informing Grand Jurors of the Capital Consequences of Aggravating Factors," 17 CAP. DEF. J. 61 (2004).

> of power by the State and its prosecutors.' It controls not only the
> initial decision to indict, but also significant decisions such as
> how many counts to charge and whether to charge a greater or
> lesser offense, including the important decision to charge a capital
> crime.

*Campbell v. Louisiana*, 523 U.S. 392, 398-99 (1998) (citations omitted); *see Vasquez v.*

*Hillary,* 474 U.S. 254, 263 (1986) (power to charge capital or noncapital offense lies in

the hands of the grand jury); Fed. R. Crim. P. 7(a).

When Congress adopted the Bill of Rights, only the indicting grand jury, by

choosing the offense to charge, could make an offense punishable by death. In 1789,

Congress sought to ratify the Fifth Amendment and also passed the first federal criminal

laws. Laws that authorized the death penalty mandated it; they left no other sentencing

option. *See generally,* Rory Little, "The Federal Death Penalty: History and Some

Thoughts About the Department of Justice's Role," 26 Fordham Urban L. J. at 361-63

(Mar. 1999).[16] This practice was consistent with that of the states, which at the time the

Bill of Rights was adopted in 1791 "followed the common-law practice of making death

the exclusive and mandatory sentence for certain specified offenses." *Woodson v. North*

*Carolina,* 428 U.S. at 289. Thus, the intent of the framers of the Fifth Amendment was

that the grand jury retain the power to choose which defendants would receive a sentence

of death upon conviction.

The grand jury's historical role in choosing which defendants would receive a

death sentence upon conviction is well documented. *See* LaFave, *W.R.*, *et al.,* 1 *Criminal*

---

[16] An example of one such law provided that "such person or persons on being
thereof convicted [of willful murder] shall suffer death." An Act for the Punishment of
Certain Crimes against the United States, ch. 9, § 3, 1 Stat. 112, 113 (1790).

*Procedure* 1.5(b) (2d Ed.) (noting that grand juries played a critical role in reducing the number of offenses for which capital punishment could be imposed by downgrading charges to non-capital offenses); Andrew Hirsch, *The Rise of the Penitentiary* (1992) ("At the indictment stage, grand juries often refused to charge persons with capital crimes. They simply downgraded indictments to noncapital charges of their own devising . . ."). The Supreme Court has acknowledged this historical role, writing in *Vasquez,* 474 U.S. at 263, that "the Grand Jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of a grand jury lies the power to charge a greater or lesser offense; numerous counts or a single count; and perhaps the most significant of all, a capital offense or a noncapital offense."

In this case, the government presented to the grand jury some of the elements of capital murder so as to make Mr. Bowers "death-eligible" for Eighth Amendment purposes – the intent requirements under 18 U.S.C. § 3591(a)(2) and the alleged statutory aggravating factors under 18 U.S.C. § 3592(c). On information and belief, however, the government did not inform the grand jury of the consequences of those Special Findings, *i.e.,* that by returning the superseding indictment, Mr. Bowers would be held to answer to an offense punishable by death. Certainly nothing on the face of the superseding indictment shows that the grand jury was aware that it was being asked to determine if Mr. Bowers should be held to answer for a capital offense.[17]

---

[17] The model grand jury charge of the Administrative Office of the United States Courts indicates that the jury would not have been told that Mr. Bowers would face the death penalty upon conviction. That charge expressly instructs the jury: "When deciding whether or not to indict, you should not be concerned about punishment in the event of conviction. Judges alone determine punishment." *See* Brendan Tomer, "Ring Around the

The Supreme Court, in a related context, has refused to countenance such disregard for the Fifth Amendment. In *Smith v. United States,* 360 U.S. 1, 9 (1959), the Court reversed a kidnapping conviction initiated by information even though it was a capital offense. The Court stated:

> The Fifth Amendment made the [grand jury indictment] rule mandatory in federal prosecutions in recognition of the fact that the intervention of a grand jury was a substantial safeguard against oppressive and arbitrary proceedings. . .. [T]o permit the use of informations where . . . the charge states a capital offense, would . . . make vulnerable to summary treatment those accused of . . . our most serious crimes.

*Id*. (citations omitted). Similarly, to permit the government to obtain from a grand jury an indictment alleging the elements of a capital offense without requiring the government to inform the grand jury that by finding those elements it holds the defendant to answer to a capital crime, makes vulnerable those accused of the most serious crimes. If the grand jury is not informed of the capital nature of the offense, it cannot express the conscience of the community or perform its constitutionally assigned role as a "barrier . . . between the liberties of the people and the prerogative of the [government])." *Harris v. United States,* 536 U.S. 545, 564 (2002) (grand and petit juries "form a 'strong and two-fold barrier'").

The grand jury's constitutional and historical role in deciding whether a defendant should face the death penalty is perhaps more critical now than ever. Few checks exist on the federal government's power to pursue the ultimate punishment against one of its

---

Grand Jury, 17 CPA. DEF. J. at 61. Presumably, the grand jury that returned the superseding indictment in this case was given this instruction.

citizens and fewer opportunities exist for the local community to express its desires about the appropriateness of the death penalty in any given case. Prosecutorial decision-making in capital cases is centralized at the Department of Justice in Washington, D.C. *See United States v. Navarro-Vargas*, 367 F.3d 896, 902 (9th Cir. 2004) (Kozinski, J., dissenting) ("An independent grand jury – one that interposes the local community's values on prosecutorial decisions that are controlled by policies set in Washington as to the enforcement of laws passed in Washington – seems like an important safeguard that is entirely consistent with the grand jury's traditional function"), rehearing *en banc*, 408 F.3d 1184 (9th Cir. 2005).

Nor is the petit jury in a capital case a meaningful barrier between "the liberties of the people and the prerogative of the [government]." *Harris*, 536 U.S. at 564. This is because petit jurors, to-date, have been "death-qualified." Individuals with disqualifying scruples against the death penalty, no matter how many exist in a given community, have not been permitted to sit in judgment in a capital case. Instead, capital juries consist exclusively of individuals who believe that the death penalty is an appropriate punishment and who express a willingness to impose it. Empirical evidence shows that such "death-qualified" jurors are more prone to believe government witnesses, generally evaluate evidence differently than other jurors, and give little meaning to the presumption of innocence. In other words, death-qualified jurors are more conviction-prone than the average group of community members from which they are drawn.[18] The death-

---

[18] *See* Jesse Nason, "Mandatory Voir Dire Questions in Capital Cases: A Potential Solution to the Biases of Death Qualification," 10 ROGER WILLIAMS U. L. REV. 211, 219 (2004) (summarizing research on how death-qualified jurors may presume guilt,

qualifying process also tends to exclude women and African Americans from jury service. *Id.* The net effect of death qualification is that capital jurors do not represent the conscience of the local community or its rich diversity; at best, they represent only those members of the community who share similar views on the death penalty. Jurors who represent such a small segment of the community are ill-equipped to act as a barrier between the "liberties of the people" and the power of a government, particularly a government so centralized that it can force local prosecutors to take a capital case to trial against their will.

The Constitution and the Bill of Rights set up a carefully crafted system of checks and balances. Under the Fifth Amendment, the grand jury, like the petit jury, is supposed to "act[] as a vital check against the wrongful exercise of power by the State and its prosecutors." *Campbell v. Louisiana*, 523 U.S. at 398 (citations omitted). Unless the grand jury is aware of its capital charging power and the consequences of returning an indictment with "Special Findings" like those in this case, it cannot perform its constitutionally assigned function and make "the important decision to charge a capital crime." *Id.* Because the grand jury presumably was not permitted to perform its constitutionally assigned role of deciding whether Mr. Bowers should be held to answer

---

resolve ambiguities against the defendant, more readily accept the government's version of events, distrust defense witnesses, fill evidentiary gaps with their beliefs that defendant committed the crime; and were more likely to infer premeditation). *See also United States v. Fell*, 224 F.Supp.3d 327, 332-38 (D. VT. 2016) (discussing social science demonstrating conviction bias created by death qualification voir dire); *United States v. Green,* 324 F. Supp. 2d 311, 329 (D. Mass. 2004) (citing studies that note death-qualified juries are more conviction-prone).

for a capital crime, the "Special Findings" in the superseding indictment should be stricken.

## B. The government did not obtain an indictment alleging all elements of a capital crime.

Even if the grand jury had been aware that its "Special Findings" would hold Mr. Bowers to answer for a capital crime, the death notice should be dismissed because the government did not present further elements necessary for the grand jury to make the decision as to whether Mr. Bowers should be subject to the death penalty. That is, the grand jury did not determine whether (1) the aggravating factors outweigh the mitigating factors; and, (2), whether they outweighed the mitigating factors sufficiently to justify a sentence of death. Moreover, as argued earlier, the process followed violated Mr. Bowers' Fifth and Sixth Amendment rights to have all elements of the crime submitted to the grand jury for its consideration. *See Jones v. United States*, 526 U.S. at 251-52.

As noted above, the elements of capital murder include decisions reached by the jury right up to the point where it makes a fact-finding that the aggravating circumstances outweigh the mitigating circumstances to a sufficient degree that a sentence of death is justified. 18 U.S.C. § 3593(e).  A simple "outweighing" is not enough. As a matter of human experience, one can imagine a conscientious juror reaching the conclusion that, although the aggravating circumstances do barely tip the balance in favor of death, the degree to which that balance tips is not sufficient to justify imposition of a death sentence. It is not until the moment that finding is made that the defendant's potential punishment increases to death.

35

Obviously, there are significant practical difficulties in devising a system where a grand jury can consider and weigh both aggravating and mitigating factors. It is not the role of courts and prosecutors to "fix" a statute that no longer reflects what Congress intended. The grand jury's failure to indict on all elements of capital murder – even assuming the viability of a "*Ring* fix" – means the Notice of Intent must be dismissed.

### C. The non-statutory aggravating factors alleged in the death notice must be dismissed because they are not supported by the indictment.

Several published district opinions explain why *Blakely* and *Booker* require non-statutory aggravators to be pled in the indictment. In *United States v. Green*, 372 F. Supp. 2d 168 (D. Mass. 2005), Judge Gertner examined the issue of whether a non-statutory aggravating factor of unadjudicated criminal activity alleged in a death notice should be stricken under the Fifth Amendment because the factor had not been previously found by the grand jury. Holding that the factor must be stricken, she relied primarily on *Blakely*'s mandate that "every defendant [has] the right to insist that the prosecutor prove to a jury **all facts legally essential to the punishment**." *Id.* at 176 (quoting *Blakely*, 124 S. Ct. at 2543) (emphasis added). She reasoned that "any aggravating factor is 'legally essential to punishment' because, while not linearly triggering a higher sentence within the statutory maximum, as Federal Sentencing Guidelines factors do, it may effectively tip the scale from life to death in combination with the other factors at play." 372 F. Supp. 2d at 177-178. Judge Gertner continued:

> The FDPA makes the death penalty jury a sentencing jury, not only conducting fact-finding, as any jury does, but also weighing aggravating and mitigating facts for the purpose of determining punishment, as judges typically do. The penalty jury's unique role

36

muddies the distinction between offense facts, traditionally
screened by grand juries, and sentencing facts, which traditionally
went unscreened.

The trilogy of *Apprendi, Ring,* and *Blakely* further conflates the
line between sentencing facts and offense facts. *Blakely* explicitly
rejected methodical distinctions between formal offense elements
and sentencing factors, holding that all facts "essential" to
punishment must be treated to the formalities of grand jury
presentment and a jury trial. The Supreme Court specifically
deemed it an "absurd result" that "the jury need only find
whatever facts the legislature chooses to label elements of the
crime, and that those it labels sentencing factors – no matter how
much they may increase the punishment – may be found by the
judge." *Blakely,* 124 S.Ct. at 2539. Even the government agrees
that certain "sentencing facts"– here the listed statutory
aggravating factor – must be screened by a grand jury.

Moreover, once a defendant is deemed death-eligible, the FDPA
requires that the penalty jury impose the death penalty only if the
aggravating factors "sufficiently outweigh" the mitigating factor
or factors. 18 U.S.C. § 3593(e). This burden is not optional. Even
if the defendant presents no mitigating factors, to return a
sentence of death after the first two death-eligibility burdens have
been met, the jury must find that the aggravating factors "alone
are sufficient to justify a sentence of death." *Id.* Because we will
never know exactly how each factor influences the jurors'
ultimate punishment determination, logic dictates that all
aggravating factors – together – be considered legally essential to
the punishment. Indeed, the government's argument that non-
statutory factors are not essential is disingenuous; if the
government does not require additional evidence to convince the
jury to vote for death, why is it invoking non-statutory factors at
all?

*Id.* at 177.

Judge Gertner limited her holding to unadjudicated criminal activity, finding based

on Supreme Court precedent that unadjudicated criminal activity, in particular, required

the procedural protection of grand jury screening. *Id.* at 180-182. However, the Court's

logic is obviously applicable to all non-statutory aggravating factors, as is made clear in

37

*United States v. Mill*s, 446 F.Supp.2d 1115 (C.D. Ca. 2006).

In *Mills,* Judge Carter considered whether the Confrontation Clause was applicable to evidence offered to prove non-statutory aggravating factors. He concluded that the Confrontation Clause was applicable based on his analysis that non-statutory aggravating factors were elements under *Apprendi, Ring*, and *Blakely*. He began by noting that "[w]hile the Court finds the reasoning in *Green* [, 372 F. Supp. 2d.,] persuasive, *Green* fails to consider *Booker's* lesson that there are some facts – those which are not binding on the court – that do not rise to the level of constitutional significance. From the Court's perspective, *Booker* and *Blakely* appear to present three potential applications to the issue of confrontation during the selection portion of the penalty phase: (1) pure fact-finding; (2) pure sentencing discretion; and (3) constitutionally significant fact- finding*." Id.* at 1133.

Judge Carter acknowledged that if, as *Green* held, *Booker* and *Blakely* applied to pure fact-finding, then the implication was that non-statutory aggravating factors, as well as the ultimate weighing decision on penalty, were elements under the *Ring* line of cases, as argued above:

> In *Blakely,* the Court relied on *Apprendi* in striking down Washington's sentencing guideline scheme that permitted the judge to impose a sentence higher than the standard range if he found certain aggravating factors justifying a departure. 542 U.S. at 299, 304-05,124 S.Ct. 2531. The Court held: Our precedents make clear . . . that the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. . ..'" In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. When a judge inflicts punishment

38

that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," . . . and the judge exceeds his proper authority. *Id*. at 303-04, 124 S.Ct. 531 (internal citations omitted) . . ..

As to pure fact finding, one could take *Blakely* literally, to mean that the judge may impose the death penalty "solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 542 U.S. at 303, 124 S.Ct. 2531; *see* 18 U.S.C. § 3594 (requiring court to impose sentence on recommendation of jury). Thus, the Sixth Amendment's protections would no longer stop once the jury has found a statutory aggravating factor and a statutory intent factor. Even if these facts have been found, the judge still cannot impose a death sentence under the FDPA until the jury has found that "all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death." *See* 18 U.S.C. §§ 3593(e), 3594. Thus, if steps three through six are fact finding, placement of the weighing after the jury has already engaged in the eligibility determination is not dispositive.

*Id*. at 1131-33.

Instead of reaching this issue, Judge Carter focused on non-statutory aggravating factors, which he reasoned were elements because they involved "constitutionally significant fact finding:"

Under the Act, the jury is required to find these facts unanimously and beyond a reasonable doubt. 18 U.S.C. § 3593(c). The jury may consider only the factors upon which it has rendered such a finding when it weighs the factors in aggravation and mitigation. 18 U.S.C. § 3593(d). Further, a jury renders these findings after a contested adversarial hearing that bears many of the features of a trial. *See* 18 U.S.C. § 3593(b)-(e). The Court finds that these features of the Act render steps three and four significantly different than the judicially found facts that inform a court's calculation of the now non-binding Guidelines. In essence, the FDPA completely limits the jury's discretion until it has rendered its findings on the aggravating factors (whether statutory or non-

statutory). Only upon finding these facts is the jury permitted to move on to the more discretionary task of finding the mitigating factors, and the broadly discretionary task of weighing aggravation against mitigation. 18 U.S.C. § 3593(c)-(e). Because of these fundamental structural differences, findings on the aggravating factors bear many of the hallmarks of constitutionally significant facts falling under the ambit of *Blakely*.

It is possible that the jury could return a verdict of death without finding any additional aggravating facts, provided the proven aggravator alone is sufficient to outweigh whatever mitigation has been found. *See* 18 U.S.C. § 3593(e). However, given the allocation of fact finding and discretionary tasks under the FDPA, the Court finds that this possibility alone is not sufficient to render these facts constitutionally insignificant for the purposes of confrontation.

*Id*. at 1134-35.[19]

The reasoning of *Green* and *Mills* is persuasive and should be followed here. Although *Green* only addressed one particular class of non-statutory aggravating factors, and *Mills* addressed the Sixth Amendment Confrontation Clause, *Green* correctly points out that "[t]he FDPA already complies with *Ring*'s holding in the sense that it requires a jury to find both statutory and non-statutory aggravating factors. Although *Ring* does not address the Fifth Amendment, other Supreme Court and circuit court opinions have paired Fifth and Sixth Amendment protections. And, as *Ring* and some state courts following it have suggested, these procedural protections apply to more than one aggravating factor when the government presents multiple aggravating factors." *Green,*

---

[19] In a footnote, the court noted that "[s]everal state supreme courts have determined that 'weighing' is a factual determination." (citing *State v. Whitfield*, 107 S.W.3d 253, 261 (Mo.2003); *Woldt v. People*, 64 P.3d 256, 265-66 (Colo.2003); *Johnson v. State*, 118 Nev. 787, 802-03, 59 P.3d 450 (2002)).

372 F. Supp. 2d at 179; *see United States v. Barrett*, 496 F. 3d 1079, 1107 (10th Cir. 2007) ("The Court's *Apprendi* line of cases reveals that the reasonable doubt standard is appurtenant to the right to jury trial.")

In this case, as indicated above, the death notice alleges several non-statutory aggravating factors. None of them is alleged in the indictment. Because Mr. Bowers was entitled under the Fifth Amendment Indictment Clause to grand jury screening of these factors, the non- statutory aggravating factors alleged in the death notice must be stricken. *Id*.

## CONCLUSION

For the reasons set forth above, the court should find the FDPA unconstitutional under *Ring* and dismiss the Special Findings in the superseding indictment and the Notice of Intent to seek the death penalty.

Date:  December 23, 2019                  Respectfully submitted,

                                          *s/ Judy Clarke*
                                          Judy Clarke
                                          Clarke Johnston Thorp & Rice, PC

                                          s/ Michael J. Novara
                                          Michael J. Novara
                                          First Assistant Federal Public Defender

                                          s/ Elisa A. Long
                                          Elisa A. Long
                                          Supervisory Assistant Federal Public
                                          Defender

41