✎ AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

DISTRICT OF         VERMONT

| UNITED STATES OF AMERICA | DEFENDANT'S |
|---|---|
| V. | **EXHIBIT AND WITNESS LIST** |
| DONALD FELL | Case Number: 5:01-cr-12-01 |

| PRESIDING JUDGE | PLAINTIFF'S ATTORNEY | DEFENDANT'S ATTORNEY |
|---|---|---|
| Geoffrey W. Crawford | S. Jimenez, R. Burns & W. Darrow | M. Burt, K. DeWolfe & L. Rogers |
| TRIAL DATE (S) | COURT REPORTER | COURTROOM DEPUTY |
| 7/11/2016 - 7/21/2016 | Anne Henry | Pamela Lane |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| | A | | | | Exhibits of Witness Craig Haney |
| | A1 | 7/11/2016 | x | x | Curriculum Vitae of Craig Haney |
| | A2 | 7/11/2016 | x | x | Fed. R. Crim. P. Rule 16 Report, 6/1/2016 |
| | A3 | 7/11/2016 | x | x | Publication (1980): Juries & the Death Penalty: Readdressing Witherspoon Question |
| | A4 | 7/11/2016 | x | x | Publication (1981): Death Qualification as Biasing Legal Progress |
| | A5 | 7/11/2016 | x | x | Publication (1984): Editor's Introduction, Law & Human Behavior, Vol. 8, Nos. 1/2 |
| | A6 | 7/11/2016 | x | x | Publication (1984): Epilogue: Evolving Standards & the Capital Jury |
| | A7 | 7/11/2016 | x | x | Publication (1984): Postscript re: Grigsby v. Mabry (8/5/1983) |
| | A8 | 7/11/2016 | x | x | Publication (1984): Examining Death Qualification: Further Analysis of the Process Effect |
| | A9 | 7/11/2016 | x | x | Publication (1984): Selection of Capital Juries: Biasing Effects of the Death-Qualification Process |
| | A10 | 7/11/2016 | x | x | Publication (1986): Neither Tentative nor Fragmentary:Verdict Preference of Impaneled Felony Jury |
| | A11 | 7/11/2016 | x | x | Publication (1993): Capital Punishment & Values: People's Misgivings & Court's Misperceptions |
| | A12 | 7/11/2016 | x | x | Publication (1994): Modern Death Qualification: New Data on Its Biasing Effects |
| | A13 | 7/11/2016 | x | x | Publication (1996): Life Under Wainright v. Witt: Juror Dispositions & Death Qualification |
| | A14 | 7/11/2016 | x | x | Publication (1998): Impact of Juror Attitudes-Death Penalty on Juror Evaluations of Guilt & Punishm |
| | A15 | 7/11/2016 | x | x | Publication (2000): The Changing Nature of Death Penalty Debates |
| | A16 | 7/11/2016 | x | x | Publication (2003): Mental Health Issues in Long-Term Solitary & Supermax Confinement |
| | A17 | 7/11/2016 | x | x | Publication (2003): Raising Considerations: Public Opinion & Fair Application of Death Penalty |
| | A18 | 7/11/2016 | x | x | Publication (2005): Absolute Certainty and the Death Penalty |
| | A19 | 7/11/2016 | x | x | Publication (2005): Death by Design: Capital Punishment as a Social Psychological System |
| | A20 | 7/11/2016 | x | x | Publication (2005): Tribunals Organized to Convict: Searching for a Lesser Evil (U.S. v. Green) |
| | A21 | 7/11/2016 | x | x | Publication (2007): Reassessing the Racial Divide in Support for Capital Punishment |

\* Include a notation as to the location of any exhibit not held with the case file or not available because of size.

EXHIBIT A

✎AO 187A (Rev. 7/87)                    **EXHIBIT AND WITNESS LIST – CONTINUATION**

| UNITED STATES OF AMERICA | | VS. | DONALD FELL | CASE NO. 5:01-cr-12-01 |
|---|---|---|---|---|

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| | A22 | 7/11/2016 | x | x | Publication (2008): Death Qualification of Juries (Encyclopedia of Law & Psychology) |
| | A23 | 7/11/2016 | x | x | Publication (2011): Impact of Information on Death Penalty Support, Revisited |
| | A24 | 7/11/2016 | x | x | Publication (2007): White Perceptions of Whether African Am. & Hispanics are Prone to Violence |
| | A25 | 7/11/2016 | x | x | Publication (2015): The Death Penalty (APA Handbook of Forensic Psychology) |
| | A26 | 7/11/2016 | x | x | Publication (2015): Hierarchical Models for Estimating State & Demographic Trends |
| | A27 | 7/11/2016 | x | x | Bureau of Prisons Report: Operation & Security of the Special Confinement Unit (6/25/2015) |
| | A28 | 7/11/2016 | x | x | Letter to BOP: Conditions at the Special Confinement Unit (SCU) at USP-Terre Haute (9/18/2012) |
| | A29 | 7/11/2016 | x | x | Photographs of USP-Terre Haute SCU (2/22/2012) re: Roane Incident |
| | A30 | 7/11/2016 | x | x | Publication (2011): Mapping Racial Bias of White Male Capital Juror: Jury Composition |
| | A31 | 7/11/2016 | x | x | Power Point presentation of Craig Haney |
| | A32 | 7/11/2016 | x | x | U.S. DOJ Report & Recommendations Concerning Use of Restrictive Housing (Jan. 2016) |
| | A33 | 7/11/2016 | x | x | U.S. DOJ Report & Recommendations Concerning Use of Restrictive Housing - Final Report |
| | A34 | 7/11/2016 | x | x | U.S. DOJ Letter - Use of Solitary Confinement on Prisoners with MI and/or ID (Feb. 24, 2014) |
| | | | | | |
| | B | | | | Exhibits of Witness Thomas Reidy |
| | B1 | 7/12/2016 | x | x | Curriculum Vitae Thomas Reidy |
| | B2 | 7/12/2016 | x | x | Expert Report - 3/30/2016 |
| | B5 | 7/12/2016 | x | x | Federal Bureau of Prisons - Homicides, Fiscal Years 2002-2013 |
| | B6 | 7/12/2016 | x | x | Master List of Bureau of Prisons - Homicides (CD) |
| | B7 | 7/12/2016 | x | x | Publication (1998): Antisocial Personality Disorder & Psychopathy: Diagnostic Dilemmas |
| | B8 | 7/12/2016 | x | x | Publication (2005): Is Death Row Obsolete:A Decade of Mainstreaming Death-Sentenced Inmates |
| | B9 | 7/12/2016 | x | x | Publication (2007): Assertions of Future Dangerousness at Federal Capital Sentencing |
| | B10 | 7/12/2016 | x | x | Publication (2009): Capital Jury Decisionmaking - Limitations of Predictions of Future Violence |
| | B11 | 7/12/2016 | x | x | Publication (2010): Life & Death in the Lone Star State: Three Decades of Violence Predictions |
| | B12 | 7/12/2016 | x | x | Publication (2012): Community Violence to Prison Assault: Test of Beh. Continuity Hypothesis |
| | B13 | 7/12/2016 | x | x | Publication (2013): Probability of Criminal Acts of Violence: Test of Jury Predictive Accuracy |
| | B14 | 7/12/2016 | x | x | Publication (2015): Wasted Resources & Gratuitous Suffering: Failure of Security Rationale |

✎ AO 187A (Rev. 7/87)                    **EXHIBIT AND WITNESS LIST – CONTINUATION**

| UNITED STATES OF AMERICA | | | vs. | DONALD FELL | CASE NO. 5:01-cr-12-01 |
|---|---|---|---|---|---|

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
|  | B16 | 7/12/2016 | x | x | Power Point presentation of Thomas Reidy |
|  | B17 | 7/12/2016 | x | x | Publication (1979): The Base-Rate Fallacy in Probability Judgments |
|  |  |  |  |  |  |
|  | D |  |  |  | Exhibits of Witness Michael Radelet |
|  | D1 | 7/12/2016 | x | x | Curriculum Vitae of Michael Radelet |
|  | D2 | 7/12/2016 | x | x | Expert Report - 5/30/2016 |
|  | D3 | 7/12/2016 | x | x | Gallup Poll (2010): In U.S. 64% Support Death Penalty in Cases of Murder |
|  | D4 | 7/12/2016 | x | x | Gallup Poll (2006): Two in Three Favor Death Penalty for Convicted Murderers |
|  | D5 | 7/12/2016 | x | x | Gallup Poll (2014): Americans' Support for Death Penalty Stable |
|  | D6 | 7/12/2016 | x | x | Poll (2015): Voters Back S. Ct. for Gay Marriage, Poll Finds Less Support for Death Penalty |
|  | D7 | 7/12/2016 | x | x | Support for Death Penalty Still High, But Down (Washington Post - 6/5/2014) |
|  | D8 | 7/12/2016 | x | x | Letter from Samuel Gross: RAND/UCLA Study of the Federal Death Penalty (4/29/2005) |
|  | D9 | 7/12/2016 | x | x | E-mails re: Review of the Draft Federal Death Penalty Report (2/13/2006) |
|  | D10 | 7/12/2016 | x | x | Report: Review of Race & the Decision to Seek the Death Penalty in Federal Cases (2/19/2006) |
|  | D11 | 7/12/2016 | x | x | Letter (10/9/2006) from Experts re: RAND report on Federal Death Penalty Study of 7/17/2006 |
|  | D12 | 7/12/2016 | x | x | Publication (1985): Homicide & Deterrence: Reexamination of the U.S. Time-Series Evidence |
|  | D13 | 7/12/2016 | x | x | Publication (1987): Miscarriages of Justice in Potentially Capital Cases |
|  | D14 | 7/12/2016 | x | x | Publication (1989): Persistent Flaws in Econometric Studies of Deterrent Effect of Death Penalty |
|  | D15 | 7/12/2016 | x | x | Publication (1996): Policy & Perspective: Deterrence & the Death Penalty: Views of the Experts |
|  | D16 | 7/12/2016 | x | x | Murderous Pardons? (Washington Post 1/20/2002) |
|  | D17 | 7/12/2016 | x | x | Publication (2002): Race, Region & Death Sentencing in Illinois, 1988-1997 |
|  | D18 | 7/12/2016 | x | x | Publication (2003): The Role of the Press in the Clemency Process |
|  | D19 | 7/12/2016 | x | x | Article (2004): Does the Death Penalty, by Risking Execution of Innocent, Violate Due Process? |
|  | D20 | 7/12/2016 | x | x | Publication (2005): New Claims about Executions & General Deterrence: Deja vu All Over Again? |
|  | D21 | 7/12/2016 | x | x | Publication (2005): Uses & Abuses of Empirical Evidence in the Death Penalty Debate |
|  | D22 | 7/12/2016 | x | x | Publication (2005): Impact of Legally Inappropriate Factors on Death Sentencing in Cal. Homicide |
|  | D23 | 7/12/2016 | x | x | Evaluating Fairness & Accuracy in State Death Penalty Systems-Georgia Assessment Report |

✎ AO 187A (Rev. 7/87)                                    **EXHIBIT AND WITNESS LIST – CONTINUATION**

| UNITED STATES OF AMERICA | | vs. | DONALD FELL | | CASE NO. 5:01-cr-12-01 |
|---|---|---|---|---|---|

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| | D24 | 7/12/2016 | x | x | Publication (2006): Death&Deterrence:Science, Law & Causal Reasoning on Capital Punishment |
| | D25 | 7/12/2016 | x | x | Publication (2006): Race & Death Sentencing in Georgia 1989-1998 |
| | D26 | 7/12/2016 | x | x | Publication (2006): Race, Gender, Region & Death Sentencing in Colorado, 1980-1999 |
| | D27 | 7/12/2016 | x | x | Publication (2007): Innocents Convicted: Empirically Justified Factual Wrongful Conviction Rate |
| | D28 | 7/12/2016 | x | x | Publication (2009): Do Executions Lower Homicide Rates?: Views of Leading Criminologists |
| | D29 | 7/12/2016 | x | x | Publication (2011): Death Sentencing in East Baton Rouge Parish, 1990-2008 |
| | D30 | 7/12/2016 | x | x | Publication (2011): Econometric Estimates of Deterrence of the Death Penalty: Facts or Ideology? |
| | D31 | 7/12/2016 | x | x | Publication (2011): Race & Death Sentencing in North Carolina, 1980-2007 |
| | D32 | 7/12/2016 | x | x | Report (2012): Deterrence & the Death Penalty (National Research Council) |
| | D33 | 7/12/2016 | x | x | Publication (2013): Executing the Innocent |
| | D34 | 7/12/2016 | x | x | Publication (2014): Rate of False Conviction of Criminal Defendants Who Are Sentenced to Death |
| | D35 | 7/12/2016 | x | x | Publication (2014): Deterrence & the Death Penalty: Why the Statistics Should be Ignored |
| | D36 | 7/12/2016 | x | x | DOJ Report (2014): Capital Punishment, 2013 - Statistical Tables, Bureau of Justice Statistics |
| | D37 | 7/12/2016 | x | x | Tables (2014): Statistical Tables: Sentencings & Executions by Year, Race, Region & Jurisdiction |
| | D38 | 7/12/2016 | x | x | Publication (2009): Empirical Studies of Race & Geographic Discrim. in Admin. of Death Penalty |
| | D39 | 7/12/2016 | x | x | Publication (2014): Race Discrimination & Death Penalty: An Empirical & Legal Overview |
| | D40 | 7/12/2016 | x | x | Report (1990): Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities |
| | D41 | 7/12/2016 | x | x | DOJ Report (2001): Supplementary Data, Analysis & Revised Protocols for Capital Case Review |
| | D42 | 7/12/2016 | x | x | Report: Death Penalty Information Center: Execution List 2015 |
| | D43 | 7/12/2016 | x | x | Report: Illinois Crime Rates 1960-2014 (Illinois Population & Number of Crimes 1960-2014) |
| | | | | | |
| | E | | | | Exhibits of Witness Carol Steiker |
| | E1 | 7/13/2016 | x | x | Curriculum Vitae of Carol Steiker |
| | E2 | 7/13/2016 | x | x | Expert Report - 5/26/2016 |
| | E3 | 7/13/2016 | x | x | Publication (2002): Things Fall Apart, But the Center Holds: Supreme Court & the Death Penalty |
| | E4 | 7/13/2016 | x | x | Publication (2006): No, Capital Punishment is not Morally Required: Detterrence, Deontology. . . |
| | E5 | 7/13/2016 | x | x | Report of the Council to the Membership of ALI on the Matter of the Death Penalty (2009) |

AO 187A (Rev. 7/87)

# EXHIBIT AND WITNESS LIST – CONTINUATION

| UNITED STATES OF AMERICA | | vs. | | DONALD FELL | CASE NO. 5:01-cr-12-01 |
|---|---|---|---|---|---|

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| | E6 | 7/13/2016 | x | x | Publication: The Road to Abolition? The Future of Capital Punishment in the United States |
| | E7 | 7/13/2016 | x | x | Publication (2010): Capital Punishment: A Century of Discontinuous Debate |
| | E8 | 7/13/2016 | x | x | Publication (2010): Costs & Capital Punishment: A New Consideration Transforms an Old Debate |
| | E9 | 7/13/2016 | x | x | Publication (2010): No More Tinkering: ALI & the Death Penalty Provisions of Model Penal Code |
| | E10 | 7/13/2016 | x | x | Publication: America's Experiment w/Capital Punishment: Reflections on Past, Present & Future. . |
| | E11 | 7/13/2016 | x | x | Book Review (2012): Capital Punishment & Contingency: Death Penalty in an Age of Abolition |
| | E12 | 7/13/2016 | x | x | 2016 Democratic Party Platform (Draft) - 7/1/2016 |
| | E13 | 7/13/2016 | x | x | America's Top 5 Deadliest Prosecutors: How Overzealous Personalities Drive the Death Penalty |
| | E14 | 7/13/2016 | x | x | Article: The Prosecutors Who Aim to Kill (NY Times Opinion Pages, 7/2/2016) |
| | E15 | 7/13/2016 | x | x | Article (2016): Pfizer's Position on Use of Our Products in Lethal Injections for Capital Punishment |
| | | | | | |
| | | | | | |
| | F | | | | Exhibits of Witness Wanda Foglia |
| | F1 | 7/13/2016 | x | x | Curriculum Vitae of Wanda Foglia |
| | F2 | 7/13/2016 | x | x | Expert Report - 5/31/2016 |
| | F3 | 7/13/2016 | x | x | Proposed Expert Testimony in Support of Dispositive Constitutional Motions (U.S. v. Sampson) |
| | F4 | 7/13/2016 | x | x | Publication (1984): Law & Human Behavior: Death Qualification |
| | F5 | 7/13/2016 | x | x | Publication (1994): Modern Death Qualification: New Data on Its Biasing Effects |
| | F6 | 7/13/2016 | x | x | Publication (1998): Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Guilt. . . |
| | F7 | 7/13/2016 | x | x | Publication (1999): Death by Default: Empirical Demonstration of False & Forced Choices. . . |
| | F8 | 7/13/2016 | x | x | Publication (2003): Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital. . . |
| | F9 | 7/13/2016 | x | x | Publication (2010): Jurors' Failure to Understand or Comport w/Constit. Standards in Capital. . . |
| | F10 | 7/13/2016 | x | x | List of Publications at the School of Criminal Justice, SUNY |
| | F11 | 7/13/2016 | x | x | Power Point presentation of Wanda Foglia |
| | F12 | 7/13/2016 | x | x | Publication (1994): Analysis of Capital Jury Decision Making Under Special Issues Sentencing. . . |
| | F13 | 7/13/2016 | x | x | Publication (1994): A Preliminary Study of California's Capital Penalty Instructions |
| | F14 | 7/13/2016 | x | x | Publication (1997): Analysis of Instructional Comprehension & Penalty Phase Closing Arguments |
| | F15 | 7/13/2016 | x | x | Publication: Stacking the Deck for Guilt & Death: Failure of Death Qual. to Ensure Impartiality |

✎ AO 187A (Rev. 7/87)      **EXHIBIT AND WITNESS LIST – CONTINUATION**

| UNITED STATES OF AMERICA | | vs. | DONALD FELL | | | CASE NO. 5:01-cr-12-01 |
|---|---|---|---|---|---|---|

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| | F16 | 7/13/2016 | x | x | Juror Interview Instrument: Nat'l Study of Juror Decision Making in Capital Cases |
| | F17 | 7/13/2016 | x | x | Interviewer's Guide for Capital Jury Project |
| | F18 | 7/14/2016 | x | x | Juror Questionnaire - U.S. v. Donald Fell (5/23/2005) |
| | F19 | 7/14/2016 | x | x | Transcript of Preliminary Jury Instructions re: Sentencing Phase - 6/27/2005 (U.S. v. Donald Fell) |
| | F20 | 7/14/0206 | x | x | U.S. v. Donald Fell - Special Verdict Form (7/14/2005) |
| | | | | | |
| | H | | | | Exhibits of Witness Scott Sundby |
| | H1 | 7/14/2016 | x | x | Curriculum Vitae of Scott Sundby |
| | H2 | 7/14/2016 | x | x | Expert Report - 5/30/2016 |
| | H3 | 7/14/2016 | x | x | Declaration of Scott Sundby (12/11/2014), U.S. v. Gary Sampson (D. Mass.) |
| | H4 | 7/14/2016 | x | x | Publication (1997):  Jury as a Critic: Empirical Look at How Capital Juries Perceive Expert & Lay. . |
| | H5 | 7/14/2016 | x | x | Publication (1998): Jurors' Predispositions, Guilt-Trial Experience & Premature Decision Making |
| | H6 | 7/14/2016 | x | x | Publication (1998): Capital Jury & Absolution: Intersection of Trial Strategy Remorse & Death Pen. |
| | H7 | 7/14/2016 | x | x | Publication (2001): An Empirical Analysis of the Role of Jurors' Race & Jury Racial Composition |
| | H8 | 7/14/2016 | x | x | Publication (2008): Necessity of Knowing & Heeding What Jurors Tell Us About Mitigation |
| | H9 | 7/14/2016 | x | x | Publication (2010): War & Peace in the Jury Room: How Capital Juries Reach Unanimity |
| | H10 | 7/14/2016 | x | x | Publication (2014): True Legacy of Atkins & Roper: Unreliability Principle, Mentally Ill Defendants. . |
| | H11 | 7/14/2016 | x | x | School of Criminal Justice - Publication List (SUNY) |
| | | | | | |
| | C | | | | Exhibits of Witness Lisa Greenman |
| | C1 | 7/14/2016 | x | x | Curriculum Vitae of Lisa Greenman |
| | C2 | 7/14/2016 | x | x | Expert Report |
| | C3 | 7/14/2016 | x | x | Recommendations re: Cost & Quality of Defense Representation (Spencer Report - 1998) |
| | C4 | 7/14/2016 | x | x | Memo re: Release of Update of Spencer Report (11/24/2010) |
| | C5 | 7/14/2016 | x | x | Update on Cost & Quality of Defense Representation in Federal Death Penalty Cases (2010) |
| | C6 | 7/14/2016 | x | x | Power Point Presentation of Lisa Greenberg |

📎 AO 187A (Rev. 7/87)

## EXHIBIT AND WITNESS LIST – CONTINUATION

| UNITED STATES OF AMERICA | | vs. | DONALD FELL | | CASE NO. 5:01-cr-12-01 |
|---|---|---|---|---|---|

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| | G | | | | Exhibits of Witness Richard Dieter |
| | G1 | 7/15/2016 | x | x | Curriculum Vitae of Richard Dieter |
| | G2 | 7/15/2016 | x | x | Expert Report - 5/31/2016 |
| | G3 | 7/15/2016 | x | x | Report (1993): Innocence & the Death Penalty: Assessing the Danger of Mistaken Executions |
| | G4 | 7/15/2016 | x | x | Report (1994): Racial Disparities in Federal Death Penalty Prosecutions, 1988-1994 |
| | G5 | 7/15/2016 | x | x | DOJ Report (2000): The Death Penalty System: A Statistical Survey (1988-2000) |
| | G6 | 7/15/2016 | x | x | Publication (2007): A Crisis in Confidence: Americans' Doubts About the Death Penalty |
| | G7 | 7/15/2016 | x | x | Report (2011): Struck by Lightning: Continuing Arbitrariness of Death Penalty 35 Years After Its. . |
| | G8 | 7/15/2016 | x | x | Publication (2013): The 2% Death Penalty: How a Minority of Counties Produce Most Death. . . |
| | G9 | 7/15/2016 | x | x | Report (2015): Innocence: List of Those Freed From Death Row |
| | G10 | 7/15/2016 | x | x | Report (2015): The Death Penalty in 2015: Year End Report |
| | G11 | 7/15/2016 | x | x | Report (2016): Facts About the Death Penalty |
| | G12 | 7/15/2016 | x | x | Report (2016): List of Death Row Prisoners |
| | G13 | 7/15/2016 | x | x | Report (2016): Executions in the U.S. 1608-2002: The Espy File |
| | G14 | 7/15/2016 | x | x | Report (2016): Future Dangerous Predictions Wrong 95% of the Time: New Study on Capital. . . |
| | G15 | 7/15/2016 | x | x | Report (2016): National Polls & Studies |
| | G16 | 7/15/2016 | x | x | Report (2016): Death Penalty Information Center: Vermont, General Information |
| | | | | | |
| | I | | | | Exhibits of Witness Kevin McNally |
| | I1 | 7/15/2016 | x | x | Expert Report - 6/1/2016 |
| | I2 | 7/15/2016 | x | x | Declaration of Witness re: Geographic Location, Frequency of Death Sentences & Race & Gender |
| | I3 | 7/15/2016 | x | x | Report (2015): The Federal Death Penalty |
| | I4 | 7/15/2016 | x | x | Report: Federal Prosecutions Alleging Three Victims Case Comparison |
| | I5 | 7/15/2016 | x | x | Defense Team Memo (2016) re: Three Victim Federal Death Prosecutions |
| | I6 | 7/15/2016 | x | x | Court Document (2008): Declaration of Expert re: Gender & Race (U.S. v. Friend & Lecco) |
| | I7 | 7/15/2016 | x | x | Court Document (2008): Exhibit B (Chart - Completed "Authorized" Federal Death Penalty Cases |
| | I8 | 7/15/2016 | x | x | Court Document (2008): Exhibit C (Declaration of Lauren Bell, Ph.D.) (U.S. v. Friend & Lecco) |

✎AO 187A (Rev. 7/87)
# EXHIBIT AND WITNESS LIST – CONTINUATION

| UNITED STATES OF AMERICA | vs. | DONALD FELL | CASE NO. 5:01-cr-12-01 |
|---|---|---|---|

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| | I9 | 7/15/2016 | x | x | Chart: Completed Authorized Cases (4/26/2016) |
| | I10 | 7/15/2016 | x | x | Chart: Completed Authorized Cases (8/25/2008 - 4/26/2016) |
| | I11 | 7/15/2016 | x | x | Publication (2004): Race & the Federal Penalty: A Nonexistent Problem Gets Worse |
| | I12 | 7/15/2016 | x | x | Power Point Presentation of Kevin McNally |
| | I13 | 7/15/2016 | x | x | List of Federal Capital Homicides Involving Three or More Victims |
| | I14 | 7/15/2016 | x | x | Curriculum Vitae of Kevin McNally |
| | I15 | 7/15/2016 | x | x | Four Binders: Notices of Intent & Findings |
| | | | | | |
| | K | | | | Exhibits for Government Witness Frank Newport |
| | K1 | 7/18/2016 | x | x | Gallup Death Penalty Results Overview |
| | K2 | 7/18/2016 | x | x | Polling Matters: Why Leaders Must Listen to the Wisdom of the People (Excerpts) |
| | K3 | 7/18/2016 | x | x | In U.S. Support of the Death Penalty Falls to 39-Year Low (2011) |
| | K4 | 7/18/2016 | x | x | U.S. Death Penalty Support Lowest in More than 40 Years (2013) |
| | K5 | 7/18/2016 | x | x | The Trend Line: Approval of Death Penalty Continues to Decline (2013) |
| | K6 | 7/18/2016 | x | x | Americans: "Eye for an Eye" Top Reason for the Death Penalty (2014) |
| | K7 | 7/18/2016 | x | x | Americans' Support for the Death Penalty Morally Stable (2014) |
| | K8 | 7/18/2016 | x | x | Most Americans Continue to Say Death Penalty Morally OK (2015) |
| | K9 | 7/18/2016 | x | x | Americans Continue to Shift Left on Key Moral Issues (2015) |
| | K10 | 7/18/2016 | x | x | Solid Majority Continue to Support Death Penalty (2015) |
| | K11 | 7/18/2016 | x | x | Congressional Report 161: 138 (9/24/2015) |
| | K13 | 7/18/2016 | x | x | Birth Control, Divorce Top List of Morally Acceptable Issues (2016) |
| | K14 | 7/18/2016 | x | x | Gallup Historical Trends, Death Penalty |
| | K15 | 7/18/2016 | x | x | DVD - Video Clips of Frank Newport reporting |
| | K19 | 7/18/2016 | x | x | Sixty-Nine Percent of Americans Support the Death Penalty (2007) |
| | | | | | |
| | M | | | | Exhibits for Government Witness Naci Mocan |
| | M3 | 7/19/2016 | x | x | Who Shall Live & Who Shall Die? Analysis of Prisoners on Death Row in the U.S. (2004) |

✎ AO 187A (Rev. 7/87)                    **EXHIBIT AND WITNESS LIST – CONTINUATION**

| | UNITED STATES OF AMERICA | | vs. | DONALD FELL | CASE NO. 5:01-cr-12-01 | |
|---|---|---|---|---|---|---|

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| | M5 | 7/19/2016 | x | x | Deterrence & Executions: Does the Death Penalty Save Lives? 1977-2006 (2009) |
| | | | | | |
| | L | | | | Exhibit for Government Witness Matthias Schonlau |
| | L9 | 7/19/2016 | x | x | Baldus Ltr. to Senators Feingold & Brownback re: RAND Study of Federal Death Penalty  (2007) |
| | | | | | |
| | O | | | | Exhibits for Government Witness Paul Zimmerman |
| | O1 | 7/20/2016 | x | x | Estimating the Impact of the Death Penalty on Murder (2009) |
| | O3 | 7/20/2016 | x | x | What Do Panel Studies Tell Us About a Deterrent Effect of Capital Punishment? A Critique (2012) |
| | O4 | 7/20/2016 | x | x | Empirical Evaluation of Law: The Dream and the Nightmare (2015) |
| | O5 | 7/20/2016 | x | x | Murders of Passion, Execution Delays, and the Deterrence of Capital Punishment (2004) |
| | O6 | 7/20/2016 | x | x | Deterrence Versus Brutalization: Capital Punishment's Differing Impacts Among States (2005) |
| | O7 | 7/20/2016 | x | x | Crime and Punishment: An Economic Approach (Becker Report) |
| | | | | | |
| | | | | | WITNESSES |
| | 1 | 7/11/2016 | | | Craig Haney, Ph.D., Professor of Psychology, Director of Program Studies, U. California |
| | 2 | 7/12/2016 | | | Thomas Reidy, Ph.D., ABPP, Independent Practice |
| | 3 | 7/12/2016 | | | Michael Radelet, Ph.D., Professor, Dep't of Sociology, University of Colorado-Boulder |
| | 4 | 7/13/2016 | | | Carol Steiker, J.D., Harvard Law School Faculty |
| | 5 | 7/13/2016 | | | Wanda Foglia, Ph.D., J.D., M.S., Professor of Law & Justice Studies, Rowan University |
| | | 7/14/2016 | | | Wanda Foglia (testimony continued from 7/13/2016) |
| | 6 | 7/14/2016 | | | Scott Sundby, J.D., Professor of Law & Associate Dean, University of Miami |
| | 7 | 7/14/2016 | | | Lisa Greenman, J.D., Consulting Attorney |
| | | 7/15/2016 | | | Lisa Greenman (testimony continued from 7/14/2016) |
| | 8 | 7/15/2016 | | | Richard Dieter, J.D., M.S., Principal, RDieter Communications |
| | 9 | 7/15/2016 | | | Kevin McNally, J.D., Director, Federal Death Penalty Resource Counsel Project |
| | | | | | |
| | | | | | |

✎ AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

DISTRICT OF                                    VERMONT

|  | |
|---|---|
| UNITED STATES OF AMERICA | GOVERNMENT'S |
| V. | **EXHIBIT AND WITNESS LIST** |
| DONALD FELL | Case Number: 5:01-cr-12-01 |

| PRESIDING JUDGE | PLAINTIFF'S ATTORNEY | DEFENDANT'S ATTORNEY |
|---|---|---|
| Geoffrey W. Crawford | S. Jimenez, R. Burns, W. Darrow | M. Burt, K. DeWolfe, L. Rogers |
| TRIAL DATE (S) | COURT REPORTER | COURTROOM DEPUTY |
| 7/11/2016 - 7/21/2016 | Anne Henry | Pamela Lane |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| 1a | | 7/18/2016 | x | x | Expert Report of Richard M. Newport, Ph.D. |
| 1b | | 7/18/2016 | x | x | Curriculum Vitae of Richard Newport |
| 1c | | 7/18/2016 | x | x | Gallup Death Polling Reports |
| 2a | | 7/18/2016 | x | x | Expert Report of Matthias Schonlau, Ph.D. |
| 2b | | 7/18/2016 | x | x | Curriculum Vitae of Matthias Schonlau |
| 2c | | 7/18/2016 | x | x | RAND Technical Report: Race & the Decision to Seek the Death Penalty in Federal Cases |
| 3a | | 7/19/2016 | x | x | Expert Report of H. Naci Mocan, Ph.D. |
| 3b | | 7/19/2016 | x | x | Curriculum Vitae of H. Naci Mocan |
| 3c | | 7/19/2016 | x | x | Getting Off Death Row: Commuted Sentences & Deterrent Effect of Capital Punishment (2003) |
| 3d | | 7/19/2016 | x | x | Impact of Incentives on Human Behavior: Can We Make it Disappear? Case of the Death Penalty |
| 4a | | 7/19/2016 | x | x | Expert Report of John Oliver |
| 4b | | 7/19/2016 | x | x | Curriculum Vitae of John Oliver |
| 9 | | 7/19/2016 | x | x | Binder of Federal Bureau of Prisons Documents |
| 9a | | 7/19/2016 | x | x | DOJ Report & Recommendations Concerning Use of Restrictive Housing (2016) |
| 9b | | 7/19/2016 | x | x | BOP Program Statement - Inmate Security Designation & Custody Classification |
| 9c | | 7/19/2016 | x | x | BOP Inmate Discipline Program |
| 9d | | 7/19/2016 | x | x | BOP Categorization of Offenses |
| 9e | | 7/19/2016 | x | x | BOP Program Statement - Control Unit Programs |
| 9f | | 7/19/2016 | x | x | BOP Special Management Units |
| 9g | | 7/19/2016 | x | x | BOP Program Statement - Education, Training & Leisure Time Program Standards |
| 9h | | 7/19/2016 | x | x | BOP Program Statement - Unit Management Manual |
| 9i | | 7/19/2016 | x | x | BOP Statement - Inmate Classification & Program Review |

* Include a notation as to the location of any exhibit not held with the case file or not available because of size.

AO 187A (Rev. 7/87)                    **EXHIBIT AND WITNESS LIST – CONTINUATION**

| UNITED STATES OF AMERICA | vs. | DONALD FELL | CASE NO. 5:01-cr-12-01 |
|---|---|---|---|

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| 9j | | 7/19/2016 | x | x | BOP General Population & Step-Down Unit Operations |
| 5a | | 7/20/2016 | x | x | Expert Report of Paul R. Zimmerman, Ph.D. |
| 5b | | 7/20/2016 | x | x | Curriculum Vitae of Paul R. Zimmerman |
| 5c | | 7/20/2016 | x | x | State Executions, Deterrence & the Incidence of Murder (2004) |
| 5d | | 7/20/2016 | x | x | Estimates of the Deterrent Effect of Alternative Execution Methods in the U.S.: 1978-2000 (2006) |
| 5e | | 7/20/2016 | x | x | Statistical Variability and the Deterrent Effect of the Death Penalty (2009) |
| 5f | | 7/20/2016 | x | x | Handbook on Economics of Crime: Chapter 16: Economics of Capital Punishment & Deterrence |
| 8a | | 7/21/2016 | x | x | Expert Report of David Berkebile |
| 8b | | 7/21/2016 | x | x | Curriculum Vitae of David Berkebile |
| 10 | | 7/11/2016 | x | x | One Year Longitudinal Study of the Psychological Effects of Administration Segregation (2010) |
| 11 | | 7/11/2016 | x | x | The Context & Clarification of a Single Study: Response to Commentaries of Study (exhibit 10) |
| 12 | | 7/11/2016 | x | x | Commentary: Toward an Improved Understanding of Administrative Segregation (2013) |
| 13 | | 7/15/2016 | x | x | DOJ, Offices of the U.S. Attorneys, U.S. Attorneys Manual: Death Penalty Protocol |
| | | | | | |
| | | | | | WITNESSES |
| 1 | | 7/18/2016 | | | Frank Newport, Editor-In-Chief, Gallup Poll |
| 2 | | 7/18/2016 | | | Matthias Schonlau, Ph.D., Professor of Statistics, University of Waterloo, Ontario, Canada |
| 3 | | 7/19/2016 | | | H. Naci Mocan, Ph.D., Chair of Economics, E. J. Ourso College of Business |
| 4 | | 7/19/2016 | | | John Oliver, Senior Warden, Big Spring Correctional Center, Big Spring, Texas |
| -- | | 7/19/2016 | | | Continued Testimony of Matthias Schonlau from 7/18/2016 |
| 5 | | 7/20/2016 | | | Paul R. Zimmerman, Ph.D., Staff Economist, U.S. Federal Trade Commission |
| 6 | | 7/21/2016 | | | David Berkebile, Warden, Adams County Correctional Center, Natchez, Mississippi |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

_____

UNITED STATES OF AMERICA          )

                VS                )   CASE NO:  5:01-cr-12

DONALD FELL                       )

_____)   MOTIONS HEARING


BEFORE:   HONORABLE GEOFFREY W. CRAWFORD
          DISTRICT JUDGE



APPEARANCES:   SONIA V. JIMENEZ, ESQUIRE
               RICHARD E. BURNS, ESQUIRE
               U.S. Department of Justice
               Capital Case Section
               1331 F Street, N.W., 6th Floor
               Washington, DC   20530
               Representing The Government



               WILLIAM B. DARROW, ESQUIRE
               Assistant U.S. Attorney
               P.O. Box 570
               Burlington, Vermont   05402
               Representing The Government



               (Appearances Continued:)



DATE:          July 11, 2016

          TRANSCRIBED BY:  Anne Marie Henry, RPR
                    Official Court Reporter
                    P.O. Box 1932
                    Brattleboro, Vermont   05302

2

```
 1                    APPEARANCES CONTINUED:

 2


 3          MICHAEL N. BURT, ESQUIRE
                 Law Offices of Michael N. Burt
 4               1000 Brannan Street, Suite 400
                 San Francisco, California   94103
 5               Representing the Defendant

 6


 7          KERRY B. DeWOLFE, ESQUIRE
                 38 Calberg Drive
 8               Corinth, Vermont    05039
                 Representing the Defendant

 9


10          LAURA ROGERS, ESQUIRE
                 Law Offices of Laura Rogers
11               115 1/2 Bartlett Street
                 San Francisco, California   94110
12               Representing the Defendant

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2   WITNESS:                                   PAGE:

 3   CRAIG HANEY

 4   Direct Examination by Mr. Burt                13

 5   Cross Examination by Ms. Jimenez             89

 6   Further Examination by Mr. Burt             167

 7   Further Examination by Ms. Jimenez          221

 8

 9

10   GOVERNMENT EXHIBITS:                       SHOWN:

11   10 - Longitudinal Study 2010                118

12   11 - Context & Clarification of Single Study   121

13   12 - Commentary Toward an Improved Understanding 121, 135

14

15

16   DEFENDANT EXHIBITS:                        SHOWN:

17   A1-18 - Volume 1 - Haney                     19

18   A19-28 - Volume 2 - Haney                    19

19   A29-31 - Volume 3 - Haney                    19

20   A2 - Haney Report                           166

21   A3 - 1981 Publication Juries & Death Penalty  193

22   A4 - 1981 Publication Death Qualification    193

23   A8 - 1984 Publication Death Qualification    233

24   A13 - 1996 Publication Wainright v Witt      232

25   A19 - 2005 Publication Death by Design       205
```

1                          INDEX CONTINUED:

2

3    DEFENDANT EXHIBITS:                              SHOWN:

4    A28 - 9-18-12 Letter to BOP                      159

5    A32 - 1/16 US DOJ Report Restrictive Housing     168

6    A33 - US DOJ Final Report                        168

7    A 34 - 2/24/14 DOJ Letter                        175

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              (The Court opened at 9:00 a.m.)
2              THE CLERK:  Your Honor, the matter before the
3    Court is criminal number 01-12, United States of America
4    versus Donald Fell.  Present on behalf of the government are
5    Sonia Jimenez, Richard Burns and William Darrow.  Present on
6    behalf of the defendant are Michael Burt, Kerry DeWolfe and
7    Laura Rogers.  We are here for motions identified on the
8    court docket as documents 668, 669, 670, 673 and 674.  The
9    first order of the Court is to swear in government counsel,
10   Richard Burns.
11             THE COURT:  All right.  Mr. Burns, you've applied
12   and qualified for membership in this Court.  And if you
13   raise your right hand we'll grant your application and swear
14   you in as a member of the district.
15             MR. BURNS:  Thank you, Your Honor.
16             (So sworn)
17             THE COURT:  Welcome.  Glad to have you.
18             MR. BURNS:  Thank you.
19             THE COURT:  Welcome.  Yes, Miss Rogers?
20             MS. ROGERS:  I have not been sworn in either.
21             THE COURT:  Oh, you've got an application pending?
22             MS. ROGERS:  Yes.
23             THE COURT:  Oh, good.  I'm sorry.  I didn't mean
24   to overlook you at all.  And we'll grant it and swear you in
25   as well too.  Thank you.
```

1          THE CLERK:  This is counsel Laura Rogers.

2          (So sworn)

3          THE COURT:  Welcome both of you.  Glad to have

4    you.  I just have a few things to say.

5          I want to welcome everybody whose come today.  I'm

6    extremely grateful for the efforts everyone has made to come

7    here this week and the next, that includes the witnesses and

8    the lawyers.

9          After a rainy weekend I think central Vermont is

10   prepared to put on a show of good weather for you.  And from

11   my part I can't express easily how interested and pleased I

12   am to spend these weeks together with you all on the subject

13   of consuming interest and great importance to everyone in

14   this room.

15         Let me say a couple things to frame our discussion

16   and to set a few ground rules.  The death penalty is one of

17   those handful of topics in the law where morality, our

18   common history, sociology, our views on life and on death

19   and crime and punishment, all seem to come together.

20         Like the Balkans in 1914, the subject is a kind of

21   intellectual tinderbox with an influence on our national

22   discourse, somewhat in disproportion to its actual

23   application and use.

24         For both sides here today these issues are, of

25   course, intensely experienced in the setting of the

individual case.  Arguments about the death penalty also seem to serve as a sort of symbolic language in which both sides are about right and wrong, nature and nurture, determinism and freewill and the consequences of our actions.

So the question is why we're here today.  When I received the defense motions last fall relating to the constitutional questions my first thought Mr. Burt was that these issues were unlikely to suffer from a lack of briefing.  But my second thought was this, the world is hardly waiting for the views of a single trial court judge on issues which have been before the U.S. Supreme Court and the Supreme Courts of many states for more than a century, but there's one thing on which the parties here and the Court holds a virtual monopoly, unlike the judges and justices to whom we all report, this Court can hold a hearing.  We can move past the competing citations to the scholarly literature, for at this point one can find empirical support for almost any reasonable position.

We can hear from the scholars themselves and we can question them and we can create together a rich, factual record for higher courts with broader authority to rule on the larger questions.

So a couple of suggestions, just practical things. Both sides have a lot of ground to cover today and in the

8

1    next two weeks.  I suggest that we stipulate generally to

2    the admission of academic papers and studies and spend our

3    time on the merits of their methodology and their

4    conclusions.

5            All of the witnesses have distinguished CV's.  If

6    these come in we can move quickly through the witnesses'

7    credentials and experience.  Everyone needs an introduction,

8    of course, but there will be no need to cover all of the

9    honors each has received.

10           And, finally, both sides are going to have to be

11   respectful of the other party's need for cross examination.

12   Sometimes I complain that I don't learn much in cross

13   examination in a normal case for a variety of reasons.

14   Direct really seems to be where the heart of the thing is.

15   Here I think the cross examination by both sides is going to

16   be as important as the direct.

17           We'll run from 9 to noon and 1 to 5 with a 15

18   minute break in the morning and the afternoon.  On Wednesday

19   I need to adjust the schedule a little to convene drug

20   court, which meets from 10 to 12.  So we'll start, I'll talk

21   about this so you don't have to remember it now, but we'll

22   start that day at 8:30 break at 10 and commence again at 1.

23   We'll go to 5:30.  So the total loss of time will only be

24   about an hour.

25           And I thought each day we could start with a short

1    description of the witnesses coming that day from the

2    parties whose week it is to call witnesses.

3          So I'll be quiet now and be glad to hear from the

4    defense and from the government about anything else which

5    needs attention before we get going on the merits.

6          MR. BURNS:  Your Honor, I do have one point.

7          THE COURT:  Sure.

8          MR. BURNS:  May I ask first, is it the Court's

9    preference for attorneys to move to the lecturn to make

10   objections?

11         THE COURT:  Objections from the table are fine.

12   You know, it's too much running back and forth.  I think

13   questioning witnesses is a lot easier if you come to the

14   lecturn because we can see each other and you're that much

15   closer to the witness.

16         MR. BURNS:  Thank you, Your Honor.

17         We did want to make a generic objection to the way

18   the defense has provided information and is apparently

19   planning to proceed.  And that is, in lines with what the

20   Court just delineated in terms of how we want to approach

21   the hearing, an opportunity to examine the scholarly

22   articles by the people who actually are responsible for them

23   and to have an opportunity for cross examination of each

24   other's witnesses.

25         When we went through the defendant's witnesses'

1    reports we see that there are citations to 50, 60 different

2    scholarly articles for some of these individual witnesses,

3    the majority of which are citations to work by other people.

4           So I don't know that there really is an ability

5    for the government to adequately assess the validity of

6    scholarly studies that are done by people who are not here

7    actually testifying.  We are limited in our ability to only

8    testify with the one witness who is here.

9           We wanted to lodge an objection to the extent that

10   a witness testifies about studies or articles that are not

11   authored or co-authored by them for purposes of moving

12   through the hearing.

13          THE COURT:  I guess I would say this, you know,

14   unless you're Isaac Newton, everybody's work rests on

15   somebody else's work.  And I'm sensitive to what you say and

16   the point isn't here to bring in someone as a conduit for

17   things they know nothing about.

18          Why don't we take it, you know, case by case and

19   witness by witness, but I would expect that most of these

20   people have, haven't conducted all the studies themselves

21   because no human being could.  We only get what, 40 years in

22   a work life.

23          MR. BURNS:  Exactly.  That is our concern is have

24   a witness who spent 20 to 30 years working in this arena and

25   has knowledge and access to literally a hundred different

1    studies.  The extent to which we can really test the

2    validity of all the studies is impossible.  And even if we

3    limited it to just the studies performed by the particular

4    witnesses testifying it's challenging enough, but at least

5    gives us an opportunity.

6              And I didn't know whether -- we wanted to express

7    our concern about that.  And also to learn, as an

8    administrative matter, whether we should make an objection

9    each time they start talking about a study that is not their

10   own or just is it sufficient that we've made our concerns?

11             THE COURT:  I think you've fairly raised your

12   concerns today.

13             MR. BURNS:  Okay.  Thank you, Your Honor.

14             THE COURT:  Mr. Burt, you have anything that you

15   need to add today before you get going?

16             MR. BURT:  No, Your Honor.  There was some

17   discussion about stipulations.  We could do that at another

18   time.  I'm anxious actually to start with a witness because

19   we have some time limitations with our first witness.  But

20   in terms of the Court's suggestion that we let the Court

21   know whose coming for the day, today we have two witnesses.

22   Dr. Craig Haney will be our first witness.  And he will be

23   followed by Dr. Thomas Reidy.

24             And I suspect that that, those two witnesses will

25   take the entire day.  I'm hoping to get Dr. Haney off no

1    later than 3 o'clock today and then we would start right

2    away with Dr. Reidy.

3              THE COURT:  Sure.  Okay.  I think we're ready to

4    begin.

5              MR. BURT:  Thank you.  We would call Dr. Craig

6    Haney.

7              C R A I G   H A N E Y,   The Witness, after being

8    duly sworn, was examined and testified as follows:

9              THE COURT:  Good morning.  Thank you for making

10   the trip.

11             THE WITNESS:  Good morning, Your Honor.

12             THE COURT:  It wasn't a great weekend for travel.

13   Did you come in okay?

14             THE WITNESS:  I came in fine.  Thank you.

15             THE COURT:  Good.  Good.  Glad to have you here.

16             MR. BURT:  And Your Honor should have before you

17   certain volumes.  There are exhibit volumes for each

18   individual witness.  And those have been pre-marked.  The

19   exhibit volumes relating to Dr. Haney are in three volumes.

20   The first volume is marked A1 through 18.  The second is

21   marked A19 through 28.  And the third is marked A29 through

22   31.

23             THE COURT:  Thank you.  I have all three.

24             MR. BURT:  Thank you.

25             DIRECT EXAMINATION BY MR. BURT:

1    Q.    Sir, could you state your name, for the record, and

2    tell the Court who you are?

3    A.    Yes.  My name is Craig Haney.  I'm a Professor of

4    Psychology at the University of California at Santa Cruz.

5    Q.    And, doctor, in accordance with the Court's instruction

6    about keeping the qualifications fairly brief here, give the

7    Court just a little thumbnail sketch on what you do for a

8    living and what your expertise is in the area of the death

9    penalty?

10   A.    My general area of expertise in psychology is what's

11   generally called psychology and law.  I became interested as

12   a graduate student in this application of psychological

13   principles and theories and data to various legal questions.

14         So got a Ph.D. in psychology at Stanford.  Went to

15   law school at Stanford.  And have been doing research on

16   primarily two very general topics.  One, the topic on which

17   I began work in psychology and law while still a fairly

18   young graduate student is the psychology of imprisonment.

19         And somewhere along the line, after getting into

20   graduate school and starting to connect to the issues in the

21   law school, I became interested in another very general

22   topic, capital punishment, the system of death sentencing in

23   the United States.

24         So over really a 40 year period I've done research

25   almost equally much in both general areas.  The research has

1    taken different forms.  I worked on different topics.  But

2    largely under the rubric of either the psychology of

3    imprisonment or some aspect of the system of death

4    sentencing in the United States; either the manner in which

5    the system of death sentencing unfolds or proceeds in the

6    United States and it's also involved becoming very

7    interested in doing research on the backgrounds and social

8    and institutional histories of people who are charged with

9    or convicted of capital crimes.

10   Q.   And can you tell the Court, just generally, the two

11   topics you're going to discuss today in your testimony?

12   A.   Yes.  You asked me to prepare testimony for the Court

13   on the issue of solitary confinement, the effects of

14   solitary confinement.  And, in particular, the conditions of

15   confinement that exist in the special confinement unit, the

16   federal death row facility at the United States Penitentiary

17   at Terra Haute.

18        And then you also asked me to prepare testimony on

19   a separate issue.  The state of knowledge on the issue of

20   death qualification.  The procedure that is used in capital

21   cases to identify persons who are eligible to serve on a

22   jury, in part, on the basis of their attitudes towards the

23   death penalty.

24   Q.   Now, are those the only two topics that your research

25   and writing has focused on in relation to the death penalty?

1    A.    No.   No.   I've done research on a variety of different

2    aspects having to do with capital punishment.   I wrote a

3    book about the entire system of death sentencing in the

4    United States.

5    Q.    And besides writing a book about the death system in

6    the United States, have you also published a number of

7    articles that are listed in your C.V. about various aspects

8    of capital punishment, as well as various aspects about the

9    effects, psychological effects of long-term incarceration?

10   A.    Yes, I have.

11   Q.    Okay.   You are a social psychologist; correct?

12   A.    I am.

13   Q.    You are not a clinical psychologist; right?

14   A.    Correct.

15   Q.    And how is that field different than say what a

16   clinical psychologist does?

17   A.    Clinical psychologists are trained in the diagnosis and

18   treatment of various forms of mental disorders, mental

19   illness, mental health problems and so on.

20          Social psychologists are trained in how people, in

21   general, react to various conditions, experiences,

22   circumstances.   So social psychologists don't focus

23   exclusively on people who have different forms of mental

24   disorder or emotional distress.

25   Q.    In terms of your experience in assessing the

1    psychological effects of incarceration, give the Court a

2    sense of your experience in that particular field.  Who have

3    you worked for doing that kind of work and how long has that

4    work been going on in your experience?

5    A.   I, it's a topic that I became interested in as a young

6    graduate student.  Phillip Zimbardo and Curtis Banks and I

7    did an experiment when I was a second year graduate student

8    at Stanford that became a very famous experiment.  It's

9    called the Stanford Prison Experiment in which we put

10   college student volunteers in a prison-like environment,

11   randomly assigning half of them to be prisoners and the

12   other half to be guards.

13         We expected that there would be some differences

14   between both groups.  That's why we did the study.  But the

15   results were very dramatic.  The young students were changed

16   and transformed by the experiment almost immediately.

17         As a graduate student I was there for most of it.

18   And I watched these transformations take place.  And it

19   underscored for me the power of institutional environments,

20   particularly prison environments.  And I began, even as a

21   graduate student, to study how people were changed and

22   affected in real prisons, not simulated prisons.

23         Correctional officers, to a certain extent, but I

24   focused my attention primarily on prisoners, mostly in

25   maximum security prisons.  And then over the years, the

1    focus of today's testimony, I began to concentrate on the

2    issue of solitary confinement, an increasingly widespread

3    practice in the United States in the late 1970's and

4    throughout the '80's, and really up to the present time.

5              And I devised a technique for interviewing and

6    understanding the ways in which prisoners were affected by

7    their conditions of confinement.

8              As His Honor said earlier, very -- everybody

9    learns from other people who have gone before them.  So

10   there were already well identified standard ways of

11   assessing people's emotional distress.  And I simply applied

12   those techniques in institutional settings.

13             I've probably been in and accessed the effects of

14   conditions of confinement in dozens of state prison systems

15   and the federal prison system as well.  Scores of prisons

16   around the country.  Many, many solitary confinement units.

17   Over a four year or so year period I've probably interviewed

18   thousands of prisoners, including over a thousand who were

19   confined in solitary confinement type units.

20   Q.   Have you done any work for governmental agencies

21   related to assessing the effects of prison conditions?

22   A.   Yes.  Quite a bit.  I've been a consultant to various

23   Legislative bodies in California and elsewhere.  I was a

24   member of the National Academy of Sciences Committee to

25   which I was appointed in 2012.  It was a committee that was

charged with the responsibility of assessing the causes and the consequences of high rates of incarceration in the United States.

And my job, on the committee, was to bring to bear the most up-to-date scientific knowledge about the effects of imprisonment, what prison conditions did to or how they changed the people who were exposed to them.

We published the results of that, the committee's deliberations, which went on for two years in a book that was published in 2014 on which I and the rest of the committee members were a co-author.

I testified in front of the United States Senate in 2012.  Senator Durbin had a hearing, really a historic hearing.  There had never been a Senate hearing on the issue of solitary confinement.  There were four or five witnesses, expert witnesses who were called to testify.  And my job at the hearing was to talk about the psychological effects of solitary confinement.

In conjunction with the National Academy of Sciences Report I've been a consultant to the White House on several occasions to various Congressional Committees. Basically briefing those bodies on the, the analysis and the conclusions which the National Academy of Sciences Committee reached.  Consulted with Bureau of Justice Statistics, National Institute of Justice, the Justice Department,

1   Homeland Security, all around issues of various aspects of

2   the psychology of prison confinement.

3   Q.   And have you also, on the second topic you're going to

4   talk about here, the effects of death qualification, are you

5   also published fairly extensively in that area?

6   A.   Yes.  It's a topic which I became interested in the

7   1970's.  And I, at the time many of these, the issues I'm

8   going to talk about were being litigated widely in the

9   United States.  And I did, not only some, a number of

10  studies myself, but also testified about these issues in

11  various state and federal courts.

12  Q.   You have a copy of the three binders of exhibits that I

13  referred to earlier?

14  A.   I do.  They are right here.

15  Q.   Okay.  And if you could take a look at the first

16  volume, which is volume one of three, A1 through 18?

17  A.   Yes.

18  Q.   Does tab one contain a current C.V. listing your

19  various qualifications and publications in the areas that

20  you're going to testify about, as well as other areas?

21  A.   It does.

22  Q.   And does tab two contain your expert witness report in

23  this case dated June 1st, 2016?

24  A.   Yes.

25  Q.   And do the remainder of the items in volume one and

```
 1   also volume two and volume three contain copies of the
 2   literature that you either wrote or are going to discuss
 3   during the course of your testimony?
 4   A.   Yes.
 5            MR. BURT:  Judge, I would move into evidence, at
 6   this point, Exhibits A1 through 31.
 7            MS. JIMENEZ:  Your Honor, the government does not
 8   object, given the Court's comments earlier.  I do just want
 9   to note for the record that we received this exhibit list
10   Saturday night.  And that some of the studies listed on this
11   exhibit list are not referenced in Dr. Haney's report.  And
12   so we just learned about them Saturday night.
13            THE COURT:  All right.  I'll admit 1 through 31.
14            MR. BURT:  Thank you, Your Honor.  And, Your
15   Honor, at this point I would offer Dr. Haney as an expert in
16   social psychology and the effects, psychological effects of
17   long-term incarceration and in the death qualification
18   process.
19            MS. JIMENEZ:  No objection.
20            THE COURT:  Noted.  And I welcome his testimony.
21   Q.   Now, doctor, in terms of the substance of your
22   testimony, have you prepared a power point which hopefully
23   will get us through the material in fairly efficient fashion
24   here?
25   A.   Yes, I have.
```

1   Q.    And is a copy of that power point in volume number

2   three of that set of exhibits under tab 31?

3   A.    Yes.

4   Q.    And could we bring that up at this point?  Doctor, does

5   this first slide, which corresponds with tab 31, set forth

6   the two topics you're going to talk about?

7   A.    Yes, exactly.

8   Q.    And in terms of the first topic, let's start there,

9   with the Conditions of Isolated SCU Confinement, tell us

10  what SCU refers to?

11  A.    It's an acronym for this special confinement unit,

12  which is essentially the federal death row facility.  It's

13  an area within the prison at the United States Penitentiary

14  at Terre Haute.

15  Q.    And in terms of framing that particular issue, if I

16  could have the next slide, do you have a portion of Justice

17  Breyer's opinion in Glossip excerpted here?

18  A.    Yes.  It was my understanding that the, at least part

19  of the Court's focus in this proceeding was at least related

20  to some of the issues which Justice Breyer had surfaced in

21  his in Glossip.  And as you all know, one of the issues that

22  he addressed or raised as a constitutional difficulty with

23  the death penalty is the fact that death rows are kept in

24  isolation, death row inmates are kept in isolation in most

25  parts of the country, and certainly, as you'll see in a

1    moment, in the federal system.

2              And so this is one portion or the first portion in

3    the Glossip opinion in which he raises that.  There's a

4    following paragraph I think I've also quoted that --

5    Q.   Okay.  And in this excerpt we have here, Justice Breyer

6    says, it is well documented that such prolonged solitary

7    confinement produces numerous deleterious harms.  And then

8    he cites, see, for example, Haney, Mental Health Issues in

9    Long-term Solitary and Supermax Confinement.  Are you

10   familiar with that cite?

11   A.   Yes.

12   Q.   Did you write that article?

13   A.   I did.

14   Q.   Is that one of the articles you're going to talk about

15   today?

16   A.   It is.

17   Q.   And could I have the next slide, please?  Is this also

18   from the Glossip dissent?

19   A.   It is.  Yes.  It is, I mean, it elaborates a little bit

20   on the issue of the dehumanizing effect of solitary

21   confinement.  But it's an interesting reference because it's

22   one of the few times that the United States Supreme Court

23   has talked directly about the dehumanizing effect of

24   solitary confinement.  It's a 1890 case.  And In re: Medley

25   actually is a death penalty case.

1        So many people like myself, who are scholars on

2   the issue of solitary confinement, cite this case because

3   it's the Court talking about the harms of solitary

4   confinement.  But, in fact, it's solitary confinement that

5   was imposed as the aftermath of a death sentence, not unlike

6   the issue we're talking about now and that Justice Breyer

7   has raised in Glossip.

8   Q.   So looking on the next slide, if we could, you're going

9   to talk, first of all, about the Conditions of Isolated, SCU

10  Confinement, correct?

11  A.   Yes.

12  Q.   And the next slide, could you define for us what you

13  mean by solitary confinement?

14  A.   Yes.  So there are a variety of ways to define it.

15  Most people who study it have settled upon a particular

16  definition.  And that definition I've quoted here.  And it's

17  actually from the United States Department of Justice.

18  They've used the definition that most people who study

19  solitary confinement use.

20       It basically means being confined to one's cell

21  for approximately 22 hours a day or more, alone or with

22  other prisoners, because solitary confinement can apply when

23  prisoners are actually double celled as long as they are

24  confined to their cell in the overwhelming majority of hours

25  in a day.  And it limits their contact with others.

1        And they go on to say that an isolation unit means

2    a unit where all or most of those housed in the unit are

3    subjected to isolation as defined in the preceding

4    paragraph.

5        And this is a kind of operating definition that

6    most of us who study solitary confinement would endorse.

7    I've defined it in essentially the same way in scholarly

8    writing.

9    Q.   And I think you allude in your report to the fact that,

10   or I'll ask you, is there any solitary confinement unit in

11   the country that imposes total solitary confinement in the

12   sense that there is absolutely no contact with any human

13   beings at any point in time?

14   A.   No.   There isn't and there can't be if you reflect on a

15   moment on that notion.   You can't, you can't keep a human

16   being alive without having some contact with other persons.

17   They have to be fed.   They have to get medical attention.

18   They have to be checked in on and so on.

19       So solitary confinement has never meant total and

20   complete isolation from another human being.   It's

21   physically impossible to do that.   It was impossible in the

22   19th century when solitary confinement was in widespread use

23   in the Eastern State Penitentiary in Philadelphia.   It's

24   different now in the sense that we have more modern ways of

25   controlling and monitoring solitary confinement, but it's

1   essentially the same kind of experience that it's always

2   been.  And, as I say, the Justice Department defines it just

3   fine in this quote.

4   Q.   So tell us what the effects are.  Just summarize that

5   for us in terms of the effects of solitary confinement as

6   you've defined it?

7   A.   So there are, there are several kinds of, distinct

8   kinds of effects.  And the first set of effects are what I

9   would call here, immediate symptoms or indices of stress and

10  trauma.  And immediate doesn't mean that they happen in the

11  beginning and then go away.

12          One of the things that I've learned, as a result

13  of studying this widely, is that people are oftentimes

14  traumatized by the experience of being placed in solitary

15  confinement at the outset of their placement.  And that

16  trauma continues.  It does not necessarily, for most people,

17  subside.  It happens early on.  They have to figure out ways

18  to cope with and survive it.  But, as you'll see when we

19  talk a little bit later about long-term confinement, many

20  people who have been in solitary confinement for a long

21  period of time are still suffering as a result of the

22  immediate shock that they felt when they first went into

23  solitary confinement.

24          There are many symptoms and indices of stress and

25  trauma.  And they have been studied by lots of different

1    people.  And I think the next slide actually to, not to

2    dwell on all of them, but just to underscore for the Court

3    how extensively these things have been studied, how many

4    people have looked at these issues, how many different

5    symptoms and indices of stress and trauma have been

6    identified in studies of solitary confinement.

7            So this long string cite, which I will mercifully

8    not go into in detail, basically just summarizes those

9    symptoms, the symptoms that have been documented in

10   empirical studies, the various studies that have documented

11   them.  This is from an article of mine, the article that you

12   cited earlier that Justice Breyer also cited in 2003.  There

13   are more studies that have been done since 2003 that aren't

14   listed here.  But this just gives you a feel for how many of

15   these symptoms there are and how many people have studied

16   them.

17   Q.   And that set of cites comes directly from your paper

18   that is cited in the Glossip dissent?

19   A.   Yes.

20   Q.   Which that full article is tab 16?

21   A.   It is.

22   Q.   Of the volume there?

23   A.   I think this is Page 130 or 131 of that article, but

24   it's just a section of the article where there are citations

25   listed.

1    Q.   In addition to your own writing on that topic, is there

2    support outside yourself for these effects?

3    A.   Yes.   In the next slide cites a couple of comprehensive

4    literature.   Two of them are mine, but they don't cite only

5    my research.   And, in fact, they purposely focus on the

6    research that has been done widely by other researchers.

7    Researchers, it's research really that spans decades, that

8    people have been interested in solitary confinement for a

9    long time.

10        I mentioned a moment ago the in re:   Medley

11   opinion that Justice Breyer cited is from the 19th century.

12   Solitary confinement has been around for a long time.   And

13   people have studied it for a long time.   So there's a vast

14   literature on solitary confinement and related psychological

15   situations or contexts.

16        That second article that's listed here on this

17   slide is the article that we've been talking about that that

18   string cite came from, the 2013 article.   Stewart Grassian,

19   a psychiatry professor at Harvard, has done research on it

20   and written about and has a very good literature view that

21   he's published in the Washington University Journal of Law

22   and Policy.   That's the third listed.

23        And then Peter Shaw Smith, who is a Scandinavian

24   researcher, summarized the research that's been done not

25   only in the United States but also Europe and in Scandinavia

1   where they also have had solitary confinement and studied

2   solitary confinement carefully.  So his literature review,

3   both those last two are 2006 literature reviews.  Again,

4   there's been research even done since 2006 on this topic.

5   Q.   And are the empirical findings, that are set forth in

6   these studies, in terms of the effects of solitary

7   confinement, are they theoretically coherent?

8   A.   Yes.  It's one of the things that has emerged over the

9   last decade and a half.  The notion that there are sound

10  theoretical reasons that explain the harmful or deleterious

11  effects of solitary confinement.

12          A kind of deeper theoretical understanding of what

13  may be obvious, but it's also always nice to have

14  theoretical support for a proposition that seems otherwise

15  obvious or common sense.  And I've listed the two, the two

16  interrelated notions here.

17          In the last 10 or 15 years there has been a

18  tremendous amount of research, broad research in social

19  psychology underscoring the importance of social contact and

20  social connectedness to human health and well-being.  You

21  may, you may be familiar with the phrase, we're social

22  animals.

23          Well, in the last 10 or 15 years social

24  psychologists have actually documented how extensively and

25  intensively we are social animals.  How fundamentally our

1   contact is with other people, not just to derive joy and

2   happiness from contact with other people, but really our

3   sense of self depends on our interactions with other people.

4   Some social psychologists have argued, as a result of this

5   research, that there's a fundamental human need to be able

6   to connect to others.

7           One of my colleagues has written a book called

8   Wired to Connect, by which he means to suggest that human

9   beings are, in fact, innately structured, neurologically

10  wired to connect to other people.

11          And one of the things that underscores the

12  importance of this is what happens when you look at

13  circumstances or situations with where people are denied the

14  opportunity to do that or, for whatever reason, aren't able

15  to connect to other people.

16          So there's been a lot of research on social

17  isolation and social exclusion and loneliness in settings

18  outside of prison.

19          So you're looking now at particularly aging

20  populations where people have lost their connections to

21  other people.  They don't, it's not, they are not as

22  comfortable interacting with other people.  Or people who

23  are placed in settings maybe even or homes or other

24  institutions, but penal institutions, but places where it's

25  difficult for them to have normal social interaction with

others.

          And what researchers find is there is a tremendous
negative cost, both psychologically and physically.  So that
people who are isolated and lonely actually get sick more
often.  And they also have higher mortality rates that
researchers have been able to connect to their social
isolation.

          Now, these are studies that are done outside of
the prison setting.  But it provides a kind of theoretical
framework for what solitary confinement researchers have
uncovered over the decades, which is that because solitary
confinement imposes social exclusion and loneliness in, as
comprehensive and pejorative a way as possible, it's not
surprising that it has the kind of negative effects that
we've been able to identify given what we know about
isolation and loneliness in the world at large under
conditions much less onerous, much less comprehensively
isolating than exists in solitary confinement.

Q.    So that's the way it operates outside of prison.  Have
you tested that theory in the context of the prison
environment, and specifically the environment of prisoners
who have been isolated?

A.    Yes.  I've done really research over -- I started doing
the work in late 1970's.  And I've continued do it up, you
know, up until the present time.

1          I've done it in a variety of different ways, but
2     one of the main ways I've done it is to conduct long,
3     systematic interviews, structured interviews with prisoners
4     who are in isolation units in different parts of the
5     country.
6          Oftentimes, I'm able to select these, the
7     prisoners that I interview randomly so that I can be assured
8     that it's a random or representative sample of the prisoners
9     who are in these units.  And then I'm able to interview them
10    for an hour or so about -- with a specific list of questions
11    designed to understand the nature of the experience, what
12    they are going through, what's happening to them, how
13    they've changed as a result of being in isolated
14    confinement.
15         Not everybody reacts in exactly the same way, but
16    as I've said here, virtually all of the people suffer from
17    some form of distress and psychic pain.  Very, very rarely
18    does someone tell you that they are not bothered by this
19    experience, that it does not hurt them, that they are not
20    feeling distressed or pain of some sort.
21         There are -- the high prevalence of symptoms of
22    severe stress and isolation related trauma, I'll show you
23    some numbers on that in a moment.  So that high prevalence
24    addresses the issue of how many people feel this way.
25         So it's not just, as you'll see in a minute, it's

1      not just a few people, it's the overwhelming majority of

2      people who are suffering from a whole range of these stress

3      related and trauma related symptoms.

4              And then, because solitary confinement has been

5      used in the United States with increasing frequency, really

6      up until relatively recently, at which time, beginning a few

7      years ago, I think there's been a, a reflection on whether

8      or not we've overused this.  But it was unreflectively used

9      for a couple of decades in the United States.

10             And what I began to encounter were people who were

11     in solitary confinement for relatively long periods of time.

12     So we're not talking about people who now are, maybe have

13     spent a month or even a few months or a year in solitary

14     confinement.  But I've encountered populations, or at least

15     individuals within populations in solitary confinement, who

16     have been in there for years, several years.  Sometimes a

17     decade.  Sometimes two decades.

18             And what I have seen in those people is something

19     a little bit different than simply the prevalence of

20     symptoms of stress and trauma.  But, rather, it is the

21     consequence of people trying to adapt to or adjust to living

22     in a world without people.

23             It's the long-term consequence of what happens

24     when we have to -- that wiring to connect that we have,

25     begins to atrophy.  So you have to structure your life, your

1    world without human beings in it.

2           And, again, apropos what you asked me earlier, do

3    I mean literally no one.  I mean no meaningful social

4    contact with people.  And that's an abnormal situation to

5    place people in.

6           You can argue about whether or not it's justified

7    in some circumstances or not, but it's abnormal.  No one

8    would dispute it's abnormal for people to live without the

9    presence, the normal meaningful contact with others.

10          So how do we adjust to or adapt to living for a

11   long period of time in an abnormal situation?  We began to

12   make abnormal adaptations to that abnormal situation so that

13   the abnormal becomes normal.

14          People get used to not being around other people.

15   And after getting used to it it doesn't, it doesn't mean

16   they are not in pain about it, but they just assume that

17   there won't be other people in their life.

18          And then, after that happens, people begin

19   paradoxically, to become aversive.  They don't want to be

20   around people.  They, even though they are isolated from

21   people they isolate themselves even further.  And that's

22   what I've described a form of social pathology, that is, it

23   is a pathological human adaptation to an abnormal

24   pathological situation.

25   Q.   You said you had discussed the numbers in terms of the

1    prevalence.  And I think your slide that we have here does

2    that.

3    A.   Yes.  So this is a, this is a summary of some of the,

4    some of the data that's reported in the 2003 article that

5    we've talked about a couple times already.  These are data

6    that I collected in a study that I did some years ago in an

7    isolation unit in California.  I've done this kind of study

8    elsewhere in the United States.  And these numbers are

9    roughly comparable in each one of those institutions.

10          In fact, I had an opportunity to go back to that

11   particular facility and basically redo this study and came

12   up with many of the same exact results even though it was 20

13   or so years later.

14          And what you can see is that the symptoms of

15   stress related trauma are experienced by very high numbers

16   of people.  Now, this was a sample of people who were

17   randomly selected.  These were not prisoners who were

18   complaining or they were not prisoners whose lawyers brought

19   to me because they had issues.  This is a representative

20   sample of prisoners who were in that unit at that time.

21          And you can see over 50 percent of them were

22   experiencing one or another of these forms of trauma.  And

23   some of the stress related symptoms were being experienced

24   by nearly everybody, including anxiety, troubled sleep and

25   feelings of an impending breakdown.

1    Q.    And the next slide, please?

2    A.    And then there were, again, in the same study, same

3    group of people, a hundred randomly selected, so they were

4    representative of the general population of people in that

5    isolation unit.  And these are what I've characterized and

6    they are characterized in the literature as the

7    psychopathological effects of isolation.

8            These are a bit more extreme, but these are the

9    kinds of thing that happen to people, not just under stress,

10   but when they are under the kind of stress that people are

11   in when they are in isolation units.

12           And so you can see, again, very high prevalence

13   rates.  Most, in some instances nearly all of the prisoners

14   are experiencing these things, sometimes experiencing them

15   in very deep and profound ways.  You know, including things

16   like chronic depression, three out of four people talking

17   about just feeling hopeless and helpless.  More than three

18   out of four of them withdrawing that paradoxical effect of

19   being isolated, wanting to be around people, but then not

20   being comfortable around people and so pushing people even

21   further away withdrawing further into yourself.

22           The only, the only symptom of psychopathology

23   reported by less than half of the people in this study were

24   hallucinations and suicidality or thoughts of self harm.

25   But even those things were experienced in this study by a

1    relatively high number of people.  A quarter of the

2    prisoners I interviewed said that they had thought about,

3    thought seriously about taking their own lives.

4              THE COURT:  How do you correct for the

5    psychological impact of incarceration on all prisons?

6    Right, because the general population probably has some of

7    these troubles too.

8              THE WITNESS:  They do.  And so we have -- I didn't

9    show you -- we have data that show for the general

10   population much, much, as you would expect, much, much

11   lower.  And then for prisoners in general, again, higher

12   than the general population, but much lower than the

13   prevalence rates for people who are in solitary confinement.

14             So other people, I've done some of that research

15   myself, but there are other people who have studied what

16   happens to people in mainline prison populations.  And those

17   prevalences are nowhere near as high.

18   Q.   Now, doctor, you talked about your experience with

19   people who have been in these isolation conditions for long

20   periods of time.  And I want to focus just for a couple

21   minutes on definitions of longer term isolation.

22             So if we could have the next slide and then the

23   next slide as well?

24   A.   So longer-term isolation, when I use this term, you

25   said what do you mean by longer-term isolation.  So I

1    thought I would try to define it in, with reference to how

2    other people, other organizations have defined it.

3              Obviously longer-term or long-term is a relative

4    comparative term.  So what do people who have opined about

5    solitary confinement think is long-term.

6              So I've given you several examples here of people

7    who have issued opinions and standards or mandates about the

8    use of long-term solitary confinement.

9              The first one comes from the American Psychiatric

10   Association and separately the Society of Correctional

11   Physicians.  So the American Psychiatric Association, I'm

12   sure you know, is the professional organization for the

13   nation's psychiatrists.  The Society of Correctional

14   Physicians is a group of physicians who work in prison

15   settings.  So these are people who are not only physicians,

16   but whose primary occupation is to work in correctional

17   settings, oftentimes working for correctional institutions.

18   They define solitary confinement that lasts for longer than

19   four weeks as prolonged solitary confinement.

20             The second citation I've given you here is just

21   from something that was issued last year by the United

22   Nations.  The United Nations, as you may know, devises and

23   then promulgates what they call standard minimum rules for

24   the treatment of prisoners.  These have come to be known as

25   the Mandela Rules, after Nelson Mandela.

1          But just last year they issued the latest version

2     of these.  And they prohibit the use of solitary confinement

3     that is indefinite.  So any solitary confinement that has no

4     ending point to it is prohibited under the Mandela Rules.

5     And it will also, what they call prolonged solitary

6     confinement lasting more than 15 days, they, the Mandela

7     Rules also prohibit.

8          The American Bar Association has standards on the

9     treatment of prisoners.  They mandate, not an absolute

10    ending point, but they do identify as 90 days the interval

11    at which, each 90 days there needs to be a full

12    classification review.  But not only that, an individualized

13    treatment plan each 90 days devised in segregation with, as

14    they say quote, a presumption in favor of removing the

15    prisoner from segregated housing.  So a treatment plan each

16    90 days, with the expectation that that prisoner will be

17    moved from solitary confinement.

18          And, finally, just a few months ago, the National

19    Commission on Correctional Healthcare issued a position

20    statement concluding that what they called, prolonged

21    solitary confinement, i.e., greater than 15 consecutive

22    days, constituted cruel, inhumane and degrading treatment

23    and is harmful to an individual's health.

24          So these obviously are examples of what certain

25    bodies or organizations that have considered this issue have

1    considered either long-term or prolonged.

2              In the United States we deal typically with longer

3    periods than that.  But just so you can get a framework for

4    what some of the evolving standards look like in terms of

5    the length of time people regard as problematic, harmful or

6    in the case of the NCCHC cruel, inhuman and degrading.

7    Q.   Who is on this National Commission on Correctional

8    Healthcare and what role do they play in the correctional

9    system?

10   A.   It's actually a prestigious body of correctional

11   healthcare administrators and physicians, and including

12   mental health professionals, who actually certify

13   correctional healthcare in systems all around the country.

14             So you may know that the American Correctional

15   Association does this as well.  And, but the NCCHC also is a

16   body that evaluates the quality of correctional healthcare

17   and mental healthcare around the country.

18             And correctional institutions apply for

19   certification either from the American Correctional

20   Association or from this organization or both.

21   Q.   Before we turn to your analysis of the federal death

22   row, could you just elaborate a little on this idea of

23   social pathologies of long-term isolation, which I think on

24   the next slide you have summarized?

25   A.   Sure.  Again, this is based on the notion that somebody