1  A.    Correct.

2  Q.    And is it fair to say that you've never been a

3  practicing attorney?  Is that accurate?

4  A.    That's fair to say.

5  Q.    So you have not done a trial yourself, correct?

6  A.    Correct.

7  Q.    Nor have you picked a jury yourself or been involved in

8  the trial phase, other than testifying, correct?

9  A.    That's correct.  I studied those things, but I haven't

10  actually -- I haven't actually appeared as the attorney of

11  record in any case, no.

12  Q.    And you said you are not a clinical psychologist, you

13  are a social psychologist, which means you don't do

14  diagnosis or treatment, correct?

15  A.    Correct.

16  Q.    You have, however, testified at criminal trials,

17  correct?

18  A.    I have.

19  Q.    In the penalty phase of death cases; is that correct?

20  A.    Yes.

21  Q.    And all of that testimony has been for the defense; is

22  that correct?

23  A.    Yes.  All of that -- all of the testimony about a

24  defendant's background or social history would have been on

25  behalf of the defense.

1  Q.    And in some instances, in that testimony, you also talk

2  about the nature of confinement or prison conditions,

3  correct?

4  A.    Yes.  If a person has lived part of their life in an

5  institutional setting I oftentimes try to analyze that

6  institutional setting and testify about their institutional

7  history as well as their social or family history.

8  Q.    You also testify in civil cases as well, correct?

9  A.    Yes.  I, I mentioned to His Honor that I had been

10 involved in some litigation around prison conditions type

11 issues.

12 Q.    And that's been on behalf of the plaintiffs or the

13 prisoners, correct?

14 A.    Um, some, you know, yeah, certainly mostly.  You know,

15 in the beginning when I was doing this I worked for the

16 Justice Department actually.  And I was a witness for the

17 United States in prison conditions cases.

18 Q.    Your more recent work has been on behalf of plaintiffs?

19 A.    It's generally the plaintiff's attorneys who retain me.

20 And I evaluate conditions at their, at their request.

21 Q.    So yes?

22 A.    Yeah.  I mean, it depends on what you mean by, on

23 behalf of the prisoners.  I mean, I do the evaluation the

24 way I do the evaluation.  And if it's helpful to them they

25 will put on the testimony and if it's not they don't.

1   Q.   Let's talk a little bit about the terminology that

2   you've used.   And you addressed this a little bit on direct

3   examination.   You have been using the term solitary

4   confinement, correct?

5   A.   Yes.

6   Q.   And you would agree with me that, not in the context of

7   experts in your field, but in the context of the lay person,

8   the lay person's vision, when they think of solitary

9   confinement, probably is that circumstance where somebody is

10  put into a cell, nobody contacts them except maybe some food

11  is shoved through the slot three times a day, and that's

12  about it, that's probably the lay person's impression of

13  solitary confinement, correct?

14  A.   I don't, I don't know.   I don't know what the lay

15  person's impression of that is.   I think there's been a lot

16  of public education about this issue in the last 10 or so

17  years.   And I think a lot of people, a lot of members of the

18  public understand that it constitutes pretty much what I

19  showed you today.

20  Q.   You referenced in one of your reports another

21  definition of solitary confinement which is Amnesty

22  International's definition that solitary confinement covers

23  all forms of incarceration that totally remove a prisoner

24  from inmate society, it often means that the prisoner is

25  visually and acoustically isolated from all other prisoners,

1    as well as having no personal contact with them.  You're

2    familiar with that definition, it's from your Regulating

3    Prisons Report, correct?

4    A.    Yes.  But that's not the definition that is typically

5    used.  That kind, that version of solitary confinement

6    doesn't exist.

7    Q.    But my question was, you're familiar with that

8    definition?

9    A.    Yes.

10    Q.    And you even talk about in your Regulating Prisons

11    Report, you talk about the fact that because of their, some

12    ambiguity in the use of the terminology surrounding this

13    type of housing, that it can sometimes be difficult to

14    ascertain the exact conditions that are applicable in each

15    study or each publication related to this issue?

16    A.    Well, I think I said in that, in that report, as I

17    recall, that that's why it's important to try to specify

18    what the conditions were.  That's why, for example, when I

19    was talking about the SCU I had pictures, I talked about how

20    it was different from other solitary confinement units I had

21    seen.  It's important to do that, yes.

22    Q.    And each facility, each jurisdiction has slightly

23    different policies in place as it relates to this type of

24    restrictive confinement?

25    A.    I think that's fair.  Within limits.  I mean, solitary

1    confinement is as I've described it.  And then, you know,

2    there are variations in terms of how much out of cell time,

3    whether you have a window that looks anywhere, whether you

4    have people housed along side of you and it's possible to

5    talk to through the wall.  You know, so there are, there are

6    variations on the theme and they vary in accordance.

7    Q.    So, yes, it does vary, correct?

8    A.    Within limits, yes.

9    Q.    You also -- in fact it's often discussed or called

10   administrative segregation or restrictive housing, as

11   opposed to solitary confinement, correct?

12   A.    Can you --

13   Q.    This type of housing is often referred to as either

14   administrative segregation or restrictive housing as opposed

15   to solitary confinement?

16   A.    Yes.  Different states have different terms; intensive

17   management unit, high security units, variations on the

18   terminology.

19   Q.    I want to clarify something.  In your report that you

20   provided for this case you used, at times, the terms

21   solitary confinement and you would say or supermax.  And you

22   used those almost interchangeably, but those are not

23   interchangeable terms are they?

24   A.    Um, it depends.  It depends on whether -- the term

25   solitary confinement is the broader term.  Supermax tends to

1  refer to a dedicated facility where there is typically

2  longer-term solitary confinement taking place.

3  Q.    For example, in the federal system, the only supermax

4  prison is the ADX Facility that you referred to, correct?

5  A.    Well, it depends.    Again, this is a definitional issue.

6  To a certain extent you could describe the SCU as a supermax

7  facility.

8             It's, it's a separate dedicated facility.    It's

9  dedicated to nothing else.    There's nothing else that

10  happens there except isolation and people are there for a

11  long time.

12  Q.    So you would describe the SCU as a supermax facility,

13  but the Bureau of Prisons does not describe it that way,

14  they only describe ADX as their only supermax facility,

15  correct?

16  A.    I don't know.    I don't know whether they, in fact, I

17  don't even know whether they describe it as a supermax.

18  They call it administrative maximum.

19  Q.    All right.    Well, we'll come back with that because

20  we're going to discuss ADX a little bit later on.

21             So I want to ask you some questions about some of

22  the studies that you've published.    You referenced, during

23  your direct examination, that one of the things that you had

24  done is in 1993 you conducted some interviews at Pelican

25  Bay's special housing unit, correct?

A.    Yes.

Q.    Now, at that time, my understanding is, that was a
group of 100 inmates that you ultimately spoke to; is that
correct?

A.    I actually spoke to more than that.  There were a
hundred of them who were randomly selected.  So they were
selected from the inmate roster of all of the -- taken from
all of the prisoners who were in that facility.  At the time
there were about a thousand prisoners who were housed there.
I randomly selected a hundred names off of that list.  But I
interviewed a number of other people in addition to those
folks.

Q.    And what was the purpose of conducting those
interviews?  Was it for litigation or was it related to your
own study that you wished to conduct?

A.    It was both.  At that time nobody really knew, at least
in the United States, or at least not that I knew of, what
the effects of that kind of complete isolation were.
Pelican Bay was a recently opened facility in California.
And it imposed isolation to a degree that very few of us who
studied prisons had ever seen before.  It was a supermax
facility.  It was one of the first supermaxes in the United
States.  I didn't know what effects of it would be.  I was
relatively new to studying those kind of facilities.

          There was also a federal lawsuit which was pending

1  over those conditions.  So that was how I was able to get

2  access to prisoners and able to conduct the interviews.  But

3  it was for the joint purpose of genuinely finding out what

4  the effects were.

5          THE COURT:  You must have said that's a state,

6  California state facility?

7          THE WITNESS:  Yes, sir.  It was.

8  Q.   And ultimately the publication that discusses those

9  interviews is the Mental Health Issues in Long-term Solitary

10 and Supermax Publication in Crime and Delinquency from 2003;

11 is that correct?

12 A.   Yes.

13 Q.   And that's, there wasn't anything published in 1993 or

14 close in time to when you conducted those studies, it was

15 the 2003 publication where it's discussed; is that correct?

16 A.   Yes.

17 Q.   Okay.  When you conducted those interviews, did you do

18 them yourself or did you have somebody working with you who

19 conducted them?

20 A.   I had a team of people for that study.

21 Q.   And so you didn't speak to every single one of those

22 100 people, correct?

23 A.   No.  I, I probably interviewed a third to close, you

24 know, maybe a little more than that, but there were three

25 other researchers who were with me.

1   Q.   And did everybody who was involved in interviewing the

2   inmates have a set of questions that they were supposed to

3   ask the inmates?

4   A.   Yes.

5   Q.   And do you have those with you?

6   A.   No.

7   Q.   Do you -- what were the questions?  What did they

8   involve?  How many questions were there?

9   A.   There were a series of questions.  We did the

10  interviews the way I've done them many times since then.

11  That was the first such study that we did.

12          We did an institutional history.  We asked the

13  prisoners to tell us a little bit about their background,

14  their experience in the prison system, how old they were

15  when they came into the prison system, what other

16  institutions they had been to.

17          We asked them some demographic information; their

18  age, their marital status.  We made a notation of their race

19  or ethnicity, where they lived.  They were California

20  prisoners.  Where they lived in California.  Asked them a

21  little bit about how many visits they had had in the last

22  year.

23          And then we asked them a series of questions about

24  things that we told them prisoners who were in isolation

25  sometimes experience and sometimes don't.  And we were

1    interested in finding out from them whether or not they had

2    experienced these things.  And if they said that they had

3    experienced these things we asked them how often they

4    experienced them.

5           And then there were a list of 27 items, 25 of

6    which were items that were taken from literature about

7    stress and trauma and some of the literature that addressed

8    issues of psychopathology or psychopathological consequences

9    of isolation, things like ruminations, depression and so on.

10   Q.   So when they were asked about these series of symptoms

11   or psychological effects, they essentially were providing a

12   yes or no answer followed up by, if they said yes, how often

13   that occurred; is that understanding correct?

14   A.   It was a little bit more elaborate than that.  We asked

15   them yes or no.  And then we asked them how often.  And then

16   we asked them to describe a little more, tell us a little

17   bit more.  How long has this been going on, how has it

18   affected you, elaborate.  And we took notes on what they

19   said.

20   Q.   And so the percentages that you published in that 2003

21   paper, that we were discussing, are those percentages based

22   on their yes or no answers to whether or not they had

23   experienced that particular symptom?

24   A.   Yes.  We asked them have you experienced these, been

25   bothered by these things in the last three months.

1  Q.   And that would reflect the percentage -- if they said

2  yes they were included in having experienced that symptom?

3  A.   Yes.

4  Q.   These were not symptoms that were intended to diagnose

5  them with any particular mental illness, correct?

6  A.   No.   These were signs and symptoms of trauma and stress

7  or the psychopathology of isolation, but not diagnostic and

8  statistical manual symptoms that would lead to a diagnosis

9  of a mental disorder.

10 Q.   And that's not what you do, that's not the type of work

11 you do, correct?

12 A.   Correct.

13 Q.   And when these inmates were asked these questions they

14 were already housed in the special housing unit at Pelican

15 Bay, correct?

16 A.   Yes.

17 Q.   And this is some now over 20 years ago when this

18 happened.   The conditions at Pelican Bay are different or

19 were different at that time than the conditions you

20 described at the special confinement unit at USP Terre

21 Haute?

22 A.   In some respects they were different, yes.   They are

23 different facilities.

24 Q.   And then ultimately your publication that you, that you

25 published about this study, you ultimately compared the

1  results how often these inmates or what percentage of these

2  inmates indicated they had experienced one of these trauma

3  symptoms, and you compared them to some surveys that had

4  been done of the general population, meaning the general

5  population outside of prison, correct?

6  A.   We compared them to a couple different populations.  So

7  there were, there were some studies that had been done of

8  people in general.  There were some studies -- in which some

9  of the same kind of items were used.  There were some

10  studies that had been done on people in prison.  There were

11  studies that had been done of people who were in prison and

12  in isolation units, but protective custody units, where they

13  essentially asked to be placed for their own protection in

14  these units.

15        And then we also had some -- I did some

16  comparisons with -- I looked to find a group of comparably

17  traumatized people in, in the psychiatric or mental health

18  literature.  And we were able to find one group of people

19  who approximated the Pelican Bay prisoners.  They were a

20  group of people who were former political prisoners in East

21  Germany who had come to West Germany for psychiatric care.

22  Q.   And the different surveys that you were comparing your

23  group to, those surveys were done in different years.  For

24  example, the Dupuy Engel, that sample was done in 1970,

25  correct?

A.    Yes.  General, general survey of the U.S. population.

Q.    And the survey done by Broadski and Scoggins, that was done in 1988, correct?

A.    Yes.

Q.    And your questioning was done in 1993, correct?

A.    Correct.

Q.    You did not use a control group in this study; is that correct?

A.    No, we didn't have a control group.

Q.    You also, you mentioned that you had a chance to go back and interview inmates at Pelican Bay.  That happened in 2003, correct?

A.    No.  That, that happened, that happened just two years ago.

Q.    Well, I'm referring to when you went back and you, this was part of the Ashaer litigation?

A.    Yes.

Q.    And you discussed that in your 2003 publication, correct?

A.    No.  The Ashaer litigation was not even filed until 2013.

Q.    You, in that you were working for the plaintiff's attorney, correct?

A.    Yes.

Q.    And you went back and you again interviewed some

1  individuals in the SHU at Pelican Bay?

2  A.    I did.

3  Q.    Twenty-five of the people -- it's my understanding that

4  25 of the people, I could have that number wrong, but a

5  portion of the people were specifically selected by the

6  plaintiff's attorney, correct?  It wasn't random, they said

7  I want you to go talk to these people?

8  A.    No, that's not correct.  They were randomly selected.

9  If you are talking about the -- so there were several groups

10  of people I interviewed.  If you're talking about the

11  comparisons that I made at Pelican Bay, I made a point of

12  randomly selecting people.

13        And there, there there was a comparison group

14  because I also randomly selected people who were in the

15  mainline housing unit also at Pelican Bay, but not in

16  isolation.  And they were also randomly selected.

17  Q.    I'm talking about as part of your Ashaer litigation,

18  correct?

19  A.    Umhum.

20  Q.    And you did a report related to that, correct?

21  A.    Yes.

22  Q.    Okay.  It was a declaration.  And you referenced in

23  that report that some of the inmates that were interviewed

24  were selected by plaintiff's counsel?

25  A.    But that was not -- as I said, there were several

1    groups of inmates.  The group of 25 inmates, that you're

2    referring to, were randomly selected.

3    Q.    I apologize.  I may have mis-spoke with the number of

4    25.  I don't want to mislead you with that number.

5          My question is, in general, in the course of the

6    work that you did related to this litigation, some of the

7    inmates that you spoke to were identified to you by

8    plaintiff's counsel?

9    A.    Yes.  The named plaintiffs in the litigation were among

10   the people who I interviewed.  Not as part of the study of

11   Pelican Bay, but, rather, as part of just talking to them

12   and understanding what the issues were that they, that they

13   were concerned with.  But the study that I did at Pelican

14   Bay was of 25 randomly selected prisoners from the

15   population of isolated prisoners.  And then I compared that

16   to a group of people who had been in the mainline housing

17   unit.  Both groups that had been at least 10 years or more.

18   Q.    You handled that similarly to how you handled it back

19   in 1993, correct?  It was a series of questions through an

20   interview process?

21   A.    Correct.

22   Q.    Identifying symptoms that they had?

23   A.    Yes.  It's the only way anybody can identify symptoms

24   whether you are a clinical psychologist or a social

25   psychologist is by asking people whether they are

1  experiencing certain things.

2  Q.   You referenced, during your direct testimony as well, a

3  study done by Grassian, and that was Psychiatric Effects of

4  Solitary Confinement.   You mentioned that study in your

5  direct examination?

6  A.   It's actually a literature review.   He does a long

7  literature review.   If you'll remember, that is the slide

8  where I said there are some extensive literature reviews

9  that have been done of the literature on solitary

10  confinement.

11          That was a literature review in which Stuart

12  Grassian wrote about, not only his own research, but the

13  research that a number of other people had done as well.

14  Q.   He didn't do any original study for that publication,

15  correct?

16  A.   I don't know, I don't think he did for that

17  publication.   He has done original research on this issue.

18  He did one of the early studies done in the recent history

19  of this in the United States done in Massachusetts, but I

20  don't, I don't remember whether, how much he references his

21  own work in that literature review and how much he

22  concentrates on the work of others.

23  Q.   Well, would it sound familiar if I said he does discuss

24  some basically anecdotal reports of prisoners that he's

25  spoken with, but doesn't do any original work specifically

1   for that publication, would that sound accurate to you?

2   A.   It could very well be.

3   Q.   He also, when he goes through this literature review he

4   includes things outside of the prison context that he

5   discusses, correct?

6   A.   Yes.

7   Q.   He talks about prisoner of war experiences, correct?

8   A.   Yes.

9   Q.   He talks about experimental research on sensory

10  deprivation?

11  A.   Yes.

12  Q.   He talks about soundproof rooms, cardboard tubes

13  surrounding the arms, things like that, that are done, that

14  were done by other people in specific testing circumstances,

15  correct?

16  A.   Yes.  Long tradition of sensory deprivation research, a

17  lot of it done in Canada in the '60's or so.  And he

18  references some of that.

19  Q.   And the conditions that inmates housed at, whether it's

20  the SCU or a special housing unit in prison, they are not

21  subjected to the sensory deprivation that is discussed in

22  part of in his study, correct?

23  A.   Not in the same way.  I mean, I think what Stuart is

24  saying, and what I've said when I write about these things,

25  is not that these are exactly the same kinds of experiences,

1  but that we know from those studies that a lack of sensory

2  stimulation causes psychological and even psychiatric

3  problems.  That's what that research shows.

4          And there is some limitation of stimulation in

5  these environments, even in an environment like the SCU.

6  Not like the sensory deprivation studies certainly, but it,

7  certainly in a way that also suggests that people can

8  deteriorate and your mental faculties can atrophy from a

9  lack of activity or what might be described as sensory

10 stimulation.

11 Q.   Would it be accurate if I stated that my understanding

12 is the only publication that you've published that

13 specifically discusses your own work or a study that you've

14 done in a scientific journal or legal journal has been not

15 mental health issues in long-term solitary?  And I'm not

16 talking about literature reviews.  I'm talking about

17 something where you discuss your own work or your results

18 from interviews or surveys or what have you.

19 A.   No.  I think I've -- I think I discuss my work

20 periodically from time to time.  I'm involved in writing a

21 book about solitary confinement now, in which the more

22 recent Pelican Bay study is, is featured in that.

23          You know, I've been doing this for a lot of years

24 and have done a lot of interviews as I've described.  And I

25 refer to them from time to time in written work.

1    Q.    And I'm talking about not just referring to them, but a

2    process where you're publishing information about a

3    particular study you did, describing the methodology and

4    describing the results of that study?

5    A.    No.  I think -- no, I don't -- I wouldn't --

6    Q.    As contrasted to anecdotal references, maybe in some of

7    your other publications, where you're talking about your

8    experience?

9    A.    No.  I think I often, I often refer to that work in

10   various, in various publications.  I often refer to the work

11   that I do not -- in more than an anecdotal basis.

12   Q.    And what -- so then what other publications have you

13   discussed the exact methodology that you've gone through,

14   what your results were?  What other publications?

15   A.    Well, I'm not sure I've discussed exactly what the

16   methodology was, but I've certainly made reference to those

17   results in a variety of different publications talking about

18   the impact, the prevalence of solitary -- the prevalence of

19   these symptoms in solitary confinement units in a variety --

20   I think I may have even referred to it in my book on

21   prisons, Reforming Punishment.

22        I mean, it's not something that I don't talk about

23   or don't make reference to in articles.  The findings, not

24   necessarily the methodology, but the findings.

25   Q.    Let's talk about the Colorado study.  You're familiar

1    with the Colorado study, correct?

2    A.    I am.

3    Q.    That's a study that was done in 2010, correct?

4    A.    Yes.

5    Q.    At the Colorado Department of Corrections?

6    A.    Yes.

7    Q.    And it was done about what they referred to as their, I

8    believe they use administrative segregation to describe that

9    population, correct?

10   A.    Correct.

11   Q.    And you referenced that in your Pre-Sentence Report as

12   something you're very familiar with?

13   A.    I am very familiar with.

14   Q.    And you are aware that one of the goals of that study

15   was to address criticisms that there wasn't enough empirical

16   research in the area of restrictive housing, correct?

17   A.    Well, that was, that was the perception -- that's the

18   stated goal of the people who did the study, yes.

19   Q.    Yes.  That's my question.  I'm talking about what their

20   stated goal was.  And there was, they wanted to respond to

21   that by putting together this study on administrative

22   segregation in Colorado, correct?

23   A.    They wanted to get to the bottom of what the effects of

24   administrative segregation were in the Colorado system.

25   Q.    They followed in that study inmates who had been housed

1   in administrative segregation for a period of a year,

2   correct?

3   A.    A period of as much as a year, yes.

4   Q.    And they also started out prior to these inmates being

5   assigned to administrative segregation, correct?

6   A.    I'm not sure what you mean by that.

7   Q.    Well, in your study in Pelican Bay, when you went to

8   interview the inmates, they had already been, for some

9   period of time, in the special housing unit there, correct?

10  A.    Yes.

11  Q.    In the Colorado study, they attempted to identify

12  individuals who were just at the point where they were being

13  assigned to either administrative segregation or not

14  administrative segregation, correct?

15  A.    Yes.  That's correct.  But it's, it's an important

16  issue because it's one of the fatal flaws in the study.  All

17  of those people were already in a form of solitary

18  confinement.  That's how they were identified.

19          So they were originally being considered for, they

20  were originally being considered for placement in one year

21  of administrative segregation and housed in a special form

22  of solitary confinement in the Colorado system, all of them.

23  Q.    Well, one of the ways, and we're going to talk about in

24  a little while why people get placed into restrictive

25  housing, but one of the ways that people end up in

1 administrative segregation, at least in Colorado, is that

2 there's some investigation into some conduct in prison, or

3 perhaps they are new coming into the prison, so they are

4 housed there temporarily until a decision is made, either

5 yes, we're going to send you to administrative segregation

6 or no, your punishment, or what have you, is not going to be

7 administrative segregation, you're going back to general

8 population?

9 A.    Right.  And that, and that temporary housing is, was a

10 very severe form of solitary confinement.

11 Q.    And in the Colorado study they did several different, I

12 guess I'll use the word interview, although we're going to

13 talk about what they did, but they talked to these inmates

14 and gathered data at several different points in time,

15 correct?

16 A.    They did no interviews.  Another flaw in the study.

17 They administered questionnaires.  So they had a graduate

18 student who came and handed out questionnaires to the

19 prisoners.  The prisoners filled out the questionnaires.

20         She looked at the questionnaires.  If there were

21 answers on the questionnaires that she didn't -- that

22 concerned her she gave them the questionnaires back to

23 correct.  So it was a terrible methodology.

24 Q.    I understand that you have criticisms of the study, and

25 we're going to talk about those criticisms, but right now my

1   question was, whether or not they spoke or performed these

2   questionnaires at various different points of time with the

3   inmates.  That's how they did it, correct?

4   A.   Yes.  I thought you asked me whether or not she did

5   interviews with them or they interviewed the prisoners.

6   They did not ever interview the prisoners.

7   Q.   Well, my question was about the timing of it, that they

8   did it at several different points in time, correct?

9   A.   Yes.  They did it over, for most of them, over a year

10  period.  Not all of them, but for most of them.

11  Q.   And, in fact, I believe there was four different time

12  periods where they would go back and administer these

13  questionaries?

14  A.   Yes.  Assuming the prisoners were still there.

15  Q.   And, correct.  And obviously some of them left before

16  the end.

17          At some point, the initial questionnaire that was

18  administered though, was generally administered as soon as

19  they could after they were identified as going into this

20  special area where the decision was going to be made about

21  administrative segregation, correct?

22  A.   Yes.  They would be in another form of administrative

23  segregation.  And that was when the initial contact was

24  made.

25  Q.   They also used actual assessment tools with these

1  questionnaires, correct?

2  A.   They used a variety of questionnaires.

3  Q.   And these were assessments that were looking at --

4  well, I'm just going to go through I guess what the

5  instruments were.

6         There's one called the Beck Hopelessness Scale,

7  correct?

8  A.   They used items from that.  They didn't use the actual

9  entire scale.

10  Q.   Well, they indicated the 12 self-report instruments

11  used in the study were the Beck Hopelessness Scale, the

12  Brief Symptom Inventory, correct?

13  A.   Um, hum.  Yes.

14  Q.   The Coolidge Correctional Inventory, correct?

15  A.   Correct.

16  Q.   The Deliberate Self-Armed Inventory, correct?

17  A.   It's been a while since I looked at this study, but if

18  you're reading it I assume it's correct.  They used a

19  variety of scales, not necessarily the whole form of all of

20  the scales, but they used a variety of scales.

21  Q.   Would it be helpful if I gave you a copy of the study

22  to look at as we're discussing it?

23  A.   No.  And I understand it well enough to talk to you

24  about it.

25  Q.   Okay.  They used the Prison Symptom Inventory, correct?

1    A.    It sounds correct.

2    Q.    Profiled Mood States?

3    A.    Fair enough.

4    Q.    Sounds correct?  St. Louis University Mental Status,

5    State Trait Anxiety Inventory, Structured Inventory of

6    Malingered, Symptomatology, Trail Making Test and Trauma

7    Symptom Inventory, if all of those are listed, and I'm

8    reading directly from the report, you are not disputing that

9    those were the tools that were used?

10   A.    If you're reading them I'm sure they are there.

11   Q.    All right.  And so they conducted this study.  And

12   they, it had this questionnaire administered at four

13   different times where that was possible, correct?

14   A.    Yes.

15   Q.    And they approached this study with the hypothesis that

16   administrative segregation is extremely detrimental to

17   inmates both with and without mental illness, correct?

18   A.    I'm, I'm not sure, when you say they, I'm not sure that

19   um, I can verify what everybody working on this study had as

20   their hypothesis.

21          I know, for example, that one of the consultants

22   on the study, Jeff Metzner, has had ambivalent feelings

23   about whether or not solitary confinement had a negative

24   effect on people.  So I'm not sure what everybody's

25   hypothesis was.

1    Q.   Well, I'm talking about the actual published study in

2    which the section labeled findings are quoted as saying, the

3    results of this study were largely inconsistent with our

4    hypothesis and the bulk of literature that indicates AS,

5    standing for administrative segregation, is extremely

6    detrimental to inmates with and without mental illness.

7         So regardless of what you're saying you think the

8    personal opinions of the individuals are, this publication,

9    that's what they state as their findings, correct?

10   A.   That's what they state, yes.

11        THE COURT:  Did you say consistent or

12   inconsistent?  I just couldn't hear.

13        MS. JIMENEZ:  Inconsistent.

14   Q.   So, and I guess let me back up a little bit, because in

15   addition to following and administering these questions to

16   both inmates who were placed in administrative segregation

17   and sent back to general population, they also divided those

18   groups into inmates who had been previously diagnosed as

19   either mentally ill or not mentally ill, correct?

20   A.   Yes.

21   Q.   And they also followed a separate group that were sent

22   into special housing at a special psychiatric unit?

23   A.   Correct.

24   Q.   And so they were following all of these different

25   groups to compare them?

1   A.    Yes.

2   Q.    And, in fact, they went into this with the hypothesis

3   or the opinion that the results were going to be that

4   administrative segregation caused harm to these inmates?

5   A.    No.  That's, it may be as a minor disagreement between

6   us, but I don't think that's entirely accurate.  I know, in

7   fact, that Jeffrey Metzner, who is colleague of mine, did

8   not hold that hypothesis.

9         So I can't speak for the others who I don't know

10  terribly well.  But I do know him.  And I know he had

11  expressed, even in print, skepticism about whether or not

12  solitary confinement was harmful.  He has since changed his

13  opinion, but his opinion at the time of this study was done

14  was quite different.

15  Q.    You are not actually listed as an author on this study?

16  A.    Correct.

17  Q.    And the study that's published, and I'm quoting again,

18  states, we hypothesized that inmates in segregation would

19  experience greater psychological deterioration over time

20  than comparison inmates who were comprised of similar

21  offenders confined in non-segregation prison.  So they state

22  what their hypothesis is right there, correct?

23  A.    Well, that's a hypothesis, but not necessarily an

24  expectation.  That's different.  I mean, you say it's your

25  expectation, that suggests that you are implying that you

1 expect that to happen. Hypothesis is something you're

2 testing.

3 Q. And their hypothesis was that there wouldn't be any

4 harm, correct?

5 A. There -- no, I think their hypothesis was --

6 Q. Or, I'm sorry, that there would be harm? I apologize.

7 A. Yes.

8 Q. That was my fault. And the results of the study were

9 actually contrary to their hypothesis, correct?

10 A. The results of the study, as I pointed out in my

11 report, are uninterpretable.

12        THE COURT: Are what?

13        THE WITNESS: Uninterpretable, Your Honor.

14 Q. You've given your opinion, right now I'm asking what

15 the results in the published study are. We're going to talk

16 about your opinion.

17        The findings, as reported in the study, were that

18 more inmates in segregation improved than declined with

19 their mental health, correct?

20 A. Yes. That segregation was good for people.

21 Q. The findings in the -- well, that's not what they say

22 actually. We're just talking about percentages now. So

23 they found that percentage-wise more inmates in segregation

24 improved than declined, correct?

25 A. More improved than declined.

1    Q.   They also found that adverse psychological symptoms in

2    segregation could not be attributed to the segregation,

3    correct?

4    A.   Correct.

5    Q.   They also reported that the greatest degree of

6    psychological disturbances and the greatest degree of

7    negative change were actually found in the group of

8    offenders in the psychiatric care facility, correct?

9    A.   If you're reading the results I'm sure that's right.

10   Q.   You don't have a specific memory of that as you sit

11   here?

12   A.   I remember them concluding a whole lot of things on the

13   basis of data that was, as I said a moment ago,

14   uninterpretable.

15           THE COURT:  Why don't we take an hour for lunch,

16   okay?  We'll get back together a few minutes after 1.

17           (The Court recessed at 12:02 p.m. and resumed at

18   1:03 p.m.)

19           THE CLERK:  Your Honor, we are back on the record

20   in criminal number 01-12, United States of America versus

21   Donald Fell.  And we have Craig Haney still on the stand.

22           THE COURT:  All yours.

23           MS. JIMENEZ:  Thank you, Your Honor.

24           EXAMINATION CONTINUED BY MS. JIMENEZ:

25   Q.   And Dr. Haney, I went ahead and asked Madame Clerk if

1  she would mark for identification the Colorado study.  It's

2  been marked as Government's Exhibit 10.  I'm directly

3  quoting from it.  I'd be more comfortable if you had it in

4  front of you.

5          MS. JIMENEZ:  And may I have the Court's

6  permission to approach and provide that to the witness?

7          THE COURT:  Of course.

8          MS. JIMENEZ:  Thank you.

9          May I have the Court's indulgence for a moment?  I

10  thought ahead and printed two.  I didn't think I had to

11  print three for defense counsel.  And I think I can give it

12  to him digitally and he can put it on his computer?

13          THE COURT:  Yeah, sure.

14          MS. JIMENEZ:  My apologies.  Thank you, Your

15  Honor.

16          THE COURT:  Sure.

17  Q.    So, Dr. Haney, what I would like to do is talk about,

18  just briefly, we ended, and I believe I was asking you about

19  the conclusions or the findings of the study.  And if you'll

20  refer to the study, starting at Page 31, you agree with me

21  that's the section that starts with the results, correct?

22  A.    Yes, correct.

23  Q.    And I'm going to ask you to just sort of briefly flip

24  through to page 77.  And you can maybe flip over and look at

25  78.  And just ask you if you would agree with me that

1  generally speaking the results are quite lengthy and are

2  described in detail on pages 31 through 77 of the report,

3  correct?

4  A.    Yes.

5  Q.    The good news is, I'm not going to go through every

6  single page in detail of that, but I wanted to have some

7  sense that there's quite a bit of analysis, there's charts,

8  graphs, statistical analysis present in those pages, would

9  you agree with that?

10 A.    I would.

11 Q.    And if you'll go specifically to page 78, to the bottom

12 paragraph, I'm going to ask you to go ahead and take a look

13 at that paragraph and ask if you would agree that that

14 appears to be basically a summary of one of their main

15 findings in the study?

16 A.    Yes.

17 Q.    And part of their conclusion was that, and I'm going to

18 about four lines from the bottom, this study cannot

19 attribute the presence of SHU symptoms to confinement in AS

20 or administrative segregation, correct?

21 A.    Yes.

22 Q.    And they even showed that there was a -- that the last

23 line states that, in fact, the group of offenders who were

24 placed in a psychiatric care facility had the greatest

25 degree of psychological disturbances and the greatest amount

1  of negative change, correct?

2  A.   Yes.  That's correct.

3  Q.   And you mentioned in some of the your answers that

4  there were some concerns to the study.  And, in fact, if you

5  look at Page 79 there's a section where they discuss some of

6  the limitations of the study, correct?

7  A.   Yes.

8  Q.   And they discuss, starting at the bottom of that page,

9  they indicate that this study can only be generalized to

10  other prison systems to the extent that their conditions of

11  administrative segregation confinement are similar to

12  Colorado, correct?

13  A.   Yes.

14  Q.   And so they take a section, and I've just read one

15  statement, but there's several paragraphs long where they go

16  through and they talk about the limitations of the study and

17  they're forthright in discussing those in that section, is

18  that correct?

19  A.   No, that's not correct.

20  Q.   You disagree with that statement.  As you indicated,

21  you believe that there were serious flaws in the study,

22  correct?

23  A.   I believe the flaws were fatal.

24  Q.   Now, in this study, they did do statistical analysis by

25  having control groups and by dividing the groups into

1  mentally ill and non-mentally ill individuals, correct?

2  A.    They did, yes.

3  Q.    And they used those psychological assessments we

4  discussed in making determinations about the mental health

5  of the inmates, correct?

6  A.    Yes.  The questionaries we talked about.

7  Q.    And they also did, in their statistical analysis, they

8  did various checks or robustness checks on their data as

9  well, correct?

10  A.    They elaborately statistically analyzed the data in a

11  number of ways.

12  Q.    Now, you've mentioned that your opinion is that the

13  data is fatally flawed.  And, in fact, there have been

14  several articles that have been published criticizing the

15  Colorado study, correct?

16  A.    Numerous articles, yes.

17  Q.    And several of them were published in an issue of the

18  Corrections and Mental Health, an Update of the National

19  Institute of Corrections.  Are you familiar with that?

20  A.    Yes.

21  Q.    And I have, I did have that marked as Government's

22  Exhibit 12.  And I don't know what I did with it.  Did I not

23  take them all yet?  May I approach the clerk, Your Honor?

24  A.    Counsel, I think you may have handed that to me by

25  mistake.

1　Q.　Oh, do you have that in front of you?

2　A.　I'm not sure I have -- something at the bottom of this

3　that you handed to me.

4　Q.　That's correct.　So I'll leave that up there with you.

5　That was going to be my next question.

6　　　　And I wanted to ask you, are you familiar with

7　what's been marked for identification as Government's

8　Exhibit 11?

9　A.　Yes.

10　Q.　And that is a reply by the authors of the Colorado

11　study to some of the criticisms that were published in that

12　same publication, the Corrections and Mental Health, an

13　Update of the National Institute of Corrections, correct?

14　A.　Yes.

15　Q.　And we're going, I'm not going to go through all of

16　their arguments or their rebuttals, but I do want to talk

17　about a few that you mentioned in answering questions during

18　cross examination.

19　　　　You mentioned, for example, the fact that these

20　inmates had already spent some time in administrative

21　segregation, correct?

22　A.　Yes.

23　Q.　And I would ask you to turn to, to turn to Page 7 of

24　that, of Government's Exhibit 11 marked for identification.

25　And there's a section that is entitled, in the middle of

1  that page, Study Groups, correct?

2  A.   Yes.

3  Q.   And they make the comment that it would, about three

4  lines down, that it would be ideal, from a research

5  standpoint, to randomly assign first-time inmates to

6  administrative segregation or general prison confinement and

7  then observe change in psychological well-being over time.

8        And that's essentially your criticism, correct,

9  that they have inmates who have already spent time in

10  administrative segregation?

11  A.   Well, you just -- those are two separate things.  They

12  don't address that issue.  What you just -- what you just

13  described is a lack of random assignment.  And, of course,

14  that would be impossible.  And that's what they talk about.

15        What I addressed was the fact that they were

16  supposed to have a control group, the design of the study

17  was to have a control group where people experience solitary

18  confinement and then they would be compared to people who

19  did not.

20        You can't begin a study like that by having

21  everybody having started out in solitary confinement.  By

22  definition then that's not a non-solitary confinement

23  control group.

24        As I do a random assignment it has to do with

25  whether or not the people who are supposedly in your control

1  group have experienced, recently experienced precisely what

2  it is you are studying.

3  Q.   And then if you'll turn to Page 8, the second

4  paragraph, or the first full paragraph, they also

5  acknowledge your point that some of these individuals may

6  have been in administrative segregation prior to this study,

7  correct?  At the beginning, first few lines?

8  A.   Well, that's different.  I mean, that's -- I'm not

9  sure -- I'm not sure, give me the lines.  They're talking

10  about a couple things here.  Which lines are you referring

11  to?

12  Q.   Okay.  I'll quote.  I'm starting at the beginning.  As

13  may be expected from a behaviorally disruptive group, our

14  participants had a history of AS and likely punitive

15  segregation with a group being placed in AS during the study

16  period having a higher incidence of past AS experiences than

17  comparison subjects.

18  A.   Yes.

19  Q.   Then they make the statement, we do not know if these

20  earlier segregation experiences contributed to elevated

21  measures of psychological distress at the start of the

22  study.  However, they do not explain the lack of change or

23  improvement over time?

24  A.   Yes, they say that.

25  Q.   And as you mentioned, there are limitations, and not

1  only are they mentioned in this rebuttal from the Colorado
2  study authors, but you've commented on them in papers that
3  there are some ethical limitations to how you can conduct a
4  study of people in prison, correct?
5  A.    Yes, there are.
6  Q.    I mean, you can't take people who are entering the
7  prison system and randomly assign some to general population
8  and some to administrative segregation because that wouldn't
9  be fair to the inmates?
10  A.    No question about that.
11  Q.    And that's something that applies not just to their
12  study, but to any study that you could come up with?
13  A.    That you could not randomly assign people to
14  administrative segregation or not?
15  Q.    In the prison system, correct?
16  A.    Yes, of course.
17  Q.    However, your opinion is that completely discredits the
18  work as opposed to being an issue of concern or an issue to
19  take into account when analyzing the results of the study,
20  correct?
21  A.    Well, there are so many criticisms in this study that I
22  would try the Court's patience by going through all of them.
23  This is just one of them.  There are multiple criticisms.
24  The authors of the study don't deal with even half of them.
25  And I think the consensus in the field is that this study is

1    not something that anybody can make any sense of.

2    Q.    Okay.  We're going to come back to the consensus in the

3    field.  So I'm glad you said that.  But let me ask you this,

4    one of the, and like you said, we're not going to go through

5    all of them, but one of the other criticisms you mentioned

6    is you had an objection to them using a written

7    questionnaire instead of an interview process, correct?

8    A.    Well, it was a little more complicated than that.  It

9    was that there were a lot of questionnaires and the

10   questionnaires were administered without there being any

11   relationship of trust between the person administering the

12   questionaries and the inmate who was being asked to fill

13   them out.

14   Q.    The researcher who issued the questionnaire, she was a

15   professional research assistant, correct?

16   A.    She was a graduate student.

17   Q.    She had a Bachelor's Degree in Psychology and previous

18   corrections research experience, correct?

19   A.    I'm not sure about the correctional research

20   experience, but she was a graduate student with a Bachelor's

21   Degree in Psychology.

22   Q.    My question was, she was a professional research

23   assistant who, according to this report, had a degree in

24   psychology and previous corrections research experience.

25   You don't have reason to dispute that she had previous

1  corrections research experience?

2  A.    I don't know, but I don't know what that was.

3  Q.    She also was criticized for her ability to determine if

4  test scores were accurate and truthful.  That was one of the

5  criticisms of her, correct?

6  A.    Yes.

7  Q.    And the response, and I'm looking at the very bottom of

8  Page 6, if you'd like to follow along.  And I'm starting,

9  it's about five lines up, the line starts, her assessment of

10  responses.  Do you see that?

11  A.    Yes.

12  Q.    And the authors of the Colorado study indicated her

13  assessment of responses were related to response style.  For

14  example, did the participant circle the same response for

15  all questions, not respond substance.  This was not a

16  judgment about psychological response, but rather, a check

17  of how the participant filled out the scoresheet.

18  Assessments were marked questionable so we could consider

19  those responses overall when analyzing an individual's

20  consistency across measures or to check that there was at

21  least feasibility of taking the task seriously, correct?

22  A.    Yes, that's what it says.

23  Q.    And so that's how they explained, the accusation was,

24  well, she's making them redo the test.  The explanation was

25  they were testing the -- they were examining the

1  questionnaires to make sure that the inmate was

2  appropriately responding taking the test seriously or the

3  questionnaire seriously?  I shouldn't call it a test.

4  A.   Well, she was making a judgment about the responses and

5  whether, in her opinion, the responses were accurate or

6  correct.

7       It wasn't a judgment about them psychologically,

8  it was a judgment about what she deemed to be the accuracy

9  of the responses.  And when she felt the responses were

10 problematic she returned the questionnaire to have them

11 refilled out.

12 Q.   Okay.  And you don't think there's any, I mean, you're

13 aware that sometimes, whether it's an innate, whether it's

14 maybe a student who doesn't care about a test result, there

15 are times that if somebody doesn't want to participate they

16 may not answer the questions being asked truthfully,

17 correct?

18 A.   Yes.

19 Q.   And that's something that you would want a researcher

20 to be aware of, correct?

21 A.   Well, we want them to be aware of it, but this concern

22 in the larger context of how these questionnaires were

23 administered.

24      I said earlier that there wasn't an interview.

25 There was not a relationship between the person who was

1  administering the questionnaires.  And that was complicated

2  by the fact that she would review the answers to the

3  questionnaires and when she decided that there was some

4  reason why the questionnaire answers were problematic would

5  return them to the inmate.  That's a problematic practice.

6  Q.    One of the other criticisms that you mentioned was the

7  fact that these inmates were in punitive segregation before

8  being assigned to administrative segregation, correct?

9  A.    Yes.

10  Q.    And the response to that from the authors of the study

11  was that that was why they obtained the measures as quickly

12  as possible once the person was placed in punitive

13  segregation, correct?

14  A.    Yes.  I'm sure they did it as quickly as possible, but

15  in a number of instances it was weeks in punitive

16  segregation.

17  Q.    On Page 7, the last full paragraph, they indicated that

18  the participants were confined in segregation for an average

19  of 30 days prior to the first assessment?

20  A.    Yes.

21  Q.    And so when you say weeks, you believe it was a time

22  period longer than 30 days?

23  A.    An average of 30 days means that some are shorter and

24  some are longer.

25  Q.    When you conducted your survey or your interviews in

1  Pelican Bay, some of those individuals had been in the

2  special housing unit for upwards of 10 years I believe you

3  testified, or perhaps it's in your paper, correct?

4  A.    Yes.   Absolutely.   But a different kind of study.   I

5  never represented them as members of a control group.   The

6  issue here is not whether people going into administrative

7  segregation have been in punitive segregation first.   It is

8  whether or not you say that people who have been in punitive

9  segregation, and then leave it, have not been exposed to

10  solitary confinement.   That's not a control group.

11  Q.    There's a difference between the control group they

12  went to general population, the group being studied went to

13  administrative segregation, correct?

14  A.    Both groups, both groups were studied.

15  Q.    Both groups were studied.   They started in punitive

16  segregation.   One group went to general population, one

17  group went to administrative segregation, correct?

18  A.    Except that if you read the study carefully you learn

19  that both groups were cross-contaminated.   So some of the

20  people who went to general population ended up in

21  administrative segregation and some of the people who were

22  in administrative segregation ended up back in general

23  population.   And that's the end of the study.   Then it's no

24  longer a study of people who are in general population

25  versus people who are in administrative segregation.

1    And I will say, you know, commendably to them,

2  they acknowledged the fact that it was cross-contamination

3  between the groups, but acknowledging the problem is not

4  solving it.

5  Q.   Let me go back, just for a second, to follow up on the

6  paper and pencil, the questionnaires, instead of the

7  interview format.

8    The authors of the study indicated that they did

9  the paper and pencil questionnaire because part of the goal

10 of their study was to address the criticism that most

11 studies had not used standardized data with known

12 psychometric properties.

13 A.   Yes.

14 Q.   Would you agree that that's true, that the prior

15 literature did not address or use standardized data with

16 known psychometric properties?

17 A.   Yes.  But, again, if you read further in the study you

18 will find that they didn't really do that either.  They

19 combined those scales in ways that don't have psychometric

20 properties.

21 Q.   There was also a criticism about the paper and pencil

22 assessments about whether or not the results, the

23 self-reported results from the inmates were accurate; is

24 that correct?

25 A.   I, I'm not sure.  I'm not, I don't, I don't recall

1    exactly whether that was one of the criticisms that was

2    levied.  There's a concern about just handing inmates

3    questionnaires to fill out, especially when there's no

4    relationship between the person whose asking and the person

5    whose filling out the questionnaire.  That was my point

6    about the lack of an interview.

7            I don't, I don't know whether or not there were

8    specific criticisms or reasons for concern about whether or

9    not the questionnaires were being answered honestly.

10           Also, if you hand out a questionnaire you are

11   excluding people from the study who are not literate.

12   Q.   Well, and they addressed that.  Well, you've made sort

13   of two points in your answer that went beyond what we were

14   talking about.  But let me address, I guess, both of those.

15           One of their responses to the criticism of the

16   paper and pencil test is that, they make the comment that,

17   look, if you take the results of the paper and pencil test,

18   those results do indicate that there is high elevations on

19   measures of psychological distress and that that would be

20   the same result that they, that you would have had if you

21   had just done an interview technique which is the same

22   strategy that you and Grassian used.  And they even

23   reference you specifically.  I'm on Page 7, the first

24   paragraph.

25           And so they say the difference -- they ended that

1 paragraph by saying, within the context of measuring early

2 and multiple times, as well as including comparison groups,

3 our study just differs in how we attribute the cause of the

4 elevated scores.

5      So they make the point that the results from the

6 paper and pencil test, in terms of just the answers and

7 showing that there was some psychological stress, were the

8 same as if you had done your interview.

9 A.   Not so.

10 Q.   You disagree with that statement?

11 A.   Of course.  An interview is a relationship.  It's a

12 conversation.  You have an opportunity to ask people what

13 they mean, explain further.  You develop a level of trust

14 with them.  It's one of the reasons you begin an interview

15 by asking background questions, social history questions.

16 You can't, really not just with prisoners, but especially

17 with prisoners, show up and hand out questionnaires and

18 necessarily expect a level of engagement and a level of

19 honesty that you would get when you were talking to someone

20 face to face.

21      THE COURT:  So is the problem a little like when I

22 go to one of these conferences and they ask that every

23 single speaker be evaluated.  And the first day you do your

24 best and by the third day you are just done with it?

25      THE WITNESS:  Exactly.

THE COURT:  Like that?  Okay.

THE WITNESS:  That's exactly my, one of the criticisms of the study is exactly that.

Q.   And isn't it also possible that when you develop this rapport with the inmates, that they either learn more about what you are doing and perhaps have a motivation to exaggerate their symptoms or perhaps they develop a relationship with you and want to please you by giving you the answers they think you're looking for?

A.   Well, there's always the possibility of that.  So you have to be careful that that's not what's taking place. When I do my interviews I build in a control question.  I ask them a question about something that's not a sign or a symptom of being in isolation.  So it allows me to compare whether or not I'm getting everybody simply answering yes to these things.

And when you actually see the column of responses you see prisoners telling you, no, that happens to me, but that doesn't.  And you get a very complicated pattern of responses from people.

Prisoners don't answer yes to every question. They don't say yes, that's a terrible problem for me.  And it turns out, and I've done this now well over a thousand times, that the control question ends up being answered affirmatively the least of all the questions that I ask.

1    Q.   In your interviewing questions, you said you ask a
2    control question, but do you do any kind of scientific
3    testing for malingering in the inmates?
4    A.   I don't do malingering testing, no.
5    Q.   They did do malingering testing in the Colorado study,
6    correct?
7    A.   They did just about every test known to mankind in the
8    Colorado study.
9    Q.   Because that was their whole goal was to do a
10   scientific, empirical examination, to the extent possible,
11   under the circumstances?
12   A.   Except that was the goal.  And it was a noble goal.
13   And sadly it fell apart almost at the very beginning of the
14   study.  And that's ashame.
15   Q.   You indicated that the consensus in the community was
16   that the study was flawed, correct?
17   A.   Yes.
18   Q.   I would like to have you take a look at what I've
19   marked for identification as Government Exhibit 12 and ask
20   if you recognize that article or publication by Robert
21   Berger, MD, Paul Chaplin PhD. and Robert Trestman PhD.  Have
22   you read that before?
23   A.   I've seen this, yes.
24   Q.   So you are familiar with it or have read it at least,
25   in the past?

A.    Yes.

Q.    And would you agree with me that they had favorable things to say about the methodology of the Colorado study?

A.    Yes.  Yes, they do.  But these are not experts on these, on these issues.  These are, these are folks who are entitled to their opinion, but they are not experts on the psychological or psychiatric effects of solitary confinement.

Q.    Well, they are individuals who have, who are medical doctors and in one case a PhD., correct?

A.    Yes, fair enough.  But that's, that's different than being an expert either on research methodology or on solitary confinement.

Q.    Well, I didn't suggest that it was.  My question was simply if they had an MD or PhD., correct?

A.    Yes.

Q.    And people with an MD or PhD. are generally considered to be scientists, correct?

A.    Well, I don't know what their, the kind of MD work that they do or the kind of PhD. that they have.  Not always. Some of them are clinical practitioners who don't necessarily have any training in research methodology whatsoever.

Q.    The footnote, I guess you could call it in this article, is that Dr. Berger is Director of Mental Health and

1    Psychiatric Facilities.  Dr. Chapman is director of

2    Psychological Services and Dr. Trestman is Executive

3    Director of the Correctional Managed Healthcare, it looks

4    like at the University, and a Professor of Medicine at the

5    University of Connecticut?

6    A.    Yes, my point exactly.  They appear to be clinicians,

7    not researchers.

8    Q.    They comment on page, what's page 261 of their study,

9    that given the intrinsic limitations of the study

10   environment, the study design nonetheless created a

11   reasonable real world test of the hypothesis.

12          You believe that opinion is invalid because they

13   aren't -- you don't believe them to be research experts,

14   correct?

15   A.    Well, I don't know whether they are or not.  They are

16   obviously from your occupational descriptions they are

17   clinicians.  I don't know how you much research training

18   they have.

19          That's an incorrect conclusion.  This is not a

20   study, as we've been saying for a while now, I'm disagreeing

21   about.  This is not a study that tells you anything about

22   the effects of even one year of administrative segregation.

23   Q.    And they disagree with your opinion and they state that

24   the full year of assessments more realistically reflects the

25   timeframe of greatest concern regarding potential

1  psychological impact?

2  A.    And that seems to me, on its face, to be a kind of a

3  non-sequitur.  Why would one year be of greatest concern,

4  especially, when in this case, we're talking about people

5  who, the bulk of whom have been in for 10 years.

6  Q.    Well, prior to this study the only arguably empirical

7  work that had been done had been done for much shorter

8  periods of time.  And I may get the name wrong, I think it's

9  Springer maybe who had done that study, and it followed

10  individuals for maybe a period of 30 days in Canada,

11  correct?

12  A.    Zinger.

13  Q.    Zinger.  Thank you.  I apologize.  I didn't have it in

14  front of me.

15          And so to the extent that they followed people for

16  a year that was an improvement over the 30 day prior study,

17  correct?

18  A.    Well, yes.  It was an improvement.  Zinger actually

19  didn't follow people for 60 days either.  So, I mean, here

20  you have to be, you have to look at them carefully, not just

21  what the title says, but what actually happened.

22          So in the Zinger study there were only a very

23  small number of people even stayed for 60 days in solitary

24  confinement.  But many other studies have looked at longer

25  term solitary confinement.