IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-292 |
| | ) | |
| ROBERT BOWERS | ) | |

## MOTION TO DISMISS COUNTS OF THE INDICTMENT CHARGING OFFENSES UNDER THE HATE CRIMES PREVENTION ACT AND THE CHURCH ARSON ACT

| | |
|---|---|
| 1001 Liberty Avenue | Judy Clarke |
| Suite 1500 | Clarke Johnston Thorp & Rice, PC |
| Pittsburgh, PA 15222 | |
| (412) 644-6565 | Michael J. Novara |
| | First Assistant Federal Public Defender |
| | |
| | Elisa A. Long |
| | Supervisory Assistant Federal Public Defender |
| | |
| | Attorneys for Defendant, |
| | Robert Bowers |

# Table of Contents

I.   Relevant procedural background of the Commonwealth's and the federal government's prosecutions of Mr. Bowers .................................................................. 2

II.   The federal government may exercise authority only as the Constitution delegates to it; police power is reposed in the states. ........................................................... 4

III.   The Thirteenth Amendment does not authorize Congress to enact a broad prohibition on crimes motivated by bias. ........................................................... 5

   A.   The Supreme Court has limited Congress' authority to pass "appropriate legislation" pursuant to Section 2 of the Thirteenth Amendment. ............................... 6

   B.   The Supreme Court has limited Congress' authority to enact legislation pursuant to the other Reconstruction Amendments with identical enabling clauses. ................. 11

IV.   Section 249(a)(1) is not "appropriate legislation" to achieve the goal of abolishing slavery and involuntary servitude. ................................................................. 14

   A.   Section 249(a)(1) is not necessary or justified by current needs. ..................... 14

   B.   Section 249(a)(1) is not a "proper" or "congruent and proportionate" response. 21

     1.   Section 249(a)(1) is exceedingly broad and untethered to the abolition of slavery. ................................................................................................. 22

     2.   The certification provision, to the extent it is a proper delegation of Congressional authority to the Attorney General, underscores the impropriety and incongruence of Section 249(a)(1). ................................................... 26

V.   Section 249(a)(1) is unconstitutional as applied here. ..................................... 29

VI.   Section 247 is unconstitutional because it criminalizes intrastate non-economic activity that does not have a substantial effect on interstate commerce. .......................... 30

   A.   The Supreme Court has recognized three areas that fall within the boundaries of Congress' commerce power. ..................................................................... 31

     1.   The Commerce Clause grants Congress authority to regulate the channels and instrumentalities of interstate commerce and activities that have a substantial effect on interstate commerce. .................................................................... 32

     2.   In *Lopez*, the Supreme Court struck down a federal statute regulating non-economic intrastate criminal conduct because there was no showing that the conduct substantially affected interstate commerce. ............................................... 34

     3.   In *United States v. Morrison,* the Supreme Court applied *Lopez* to strike down a federal civil cause of action for gender-motivated violence because such violence is not commercial and is properly subject to the police power that is vested in the states. ................................................................................................. 36

   B.   Under the principles set forth in *Lopez* and *Morrison*, § 247 is an unconstitutional exercise of Congress' commerce power where it regulates non-

economic, intrastate conduct that does not have a substantial effect on interstate commerce and is properly the subject of the states' police power. ............................... 40

    1.    Section 247's constitutionality must be analyzed in the third category of permitted regulation identified in *Lopez*–activities that substantially affect interstate commerce........................................................................................................... 41

    2.    The statute regulates criminal, non-economic activity, and the regulation is not essential to a larger, federal regulatory framework. ................................................... 41

    3.    Section 247's jurisdictional element does not establish that it is a proper exercise of Congress' regulation of interstate commerce. ........................................ 43

    4.    The legislative history of § 247 proves that it regulates intrastate activity that does not have a substantial effect on interstate commerce........................................ 45

    5.    Any effect that the noneconomic conduct that § 247 prohibits might have on interstate commerce is not substantial and is too attenuated to provide a basis for Congress to exercise its commerce power................................................................. 51

VII.   This Court should dismiss the religious obstruction charges in the superseding indictment because § 247 is invalid as applied to Mr. Bowers. ........................................ 55

  A.    The superseding indictment does not allege that Mr. Bowers' acts targeted the channels or instrumentalities of interstate commerce. .................................................. 55

  B.    The superseding indictment does not allege a use of the channels or instrumentalities of interstate commerce to commit the acts of obstruction by force that establishes jurisdiction for prosecution under § 247. .................................................... 56

    1.    The superseding indictment does not allege that Mr. Bowers used the channels of interstate commerce in any way that was essential or integral to the charged offenses. ................................................................................................................... 57

    2.    The superseding indictment does not allege that Mr. Bowers used instrumentalities of interstate commerce.................................................................. 58

    3.    The superseding indictment does not allege that Mr. Bowers' conduct substantially affected interstate commerce............................................................... 60

VIII.    The certifications under § 247(e) and § 249(b)(2) are procedurally and substantively flawed. ....................................................................................................... 62

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA        )
                                )
        v.                      )        Criminal No. 18-292
                                )
ROBERT BOWERS                   )

## MOTION TO DISMISS COUNTS OF THE INDICTMENT CHARGING OFFENSES UNDER THE HATE CRIMES PREVENTION ACT AND THE CHURCH ARSON ACT

Robert Bowers, through undersigned counsel, pursuant to Federal Rule of Criminal Procedure 12(b), files this motion to dismiss the counts of the superseding indictment charging offenses under the Hate Crimes Prevention Act and the Church Arson Act. At issue here is not whether the charged crimes are repugnant to society. Rather, the issue is whether the United States Constitution confers broad authority on the federal government to prosecute crimes traditionally considered to be the province of the states.

Counts 12 through 22 and 36 and 37 charge offenses under the Hate Crimes Prevention Act, in violation of 18 U.S.C. § 249(a)(1). As explained below, because it exceeds Congress' authority under the Thirteenth Amendment, Section 249(a)(1) is unconstitutional on its face and as applied to Mr. Bowers.

Count 1 through 11, 34 and 35, and 40-51 charge Mr. Bowers with offenses under the Church Arson Act, in violation of 18 U.S.C. § 247(a)(2). As also explained below,

1

because it exceeds Congress' authority under the Commerce Clause, Section 247(a)(2) is unconstitutional on its face and as applied to Mr. Bowers.

## I.    Relevant procedural background of the Commonwealth's and the federal government's prosecutions of Mr. Bowers

On October 27 2018, the Commonwealth of Pennsylvania filed a criminal complaint charging Mr. Bowers with 11 counts of criminal homicide, 6 counts of attempted homicide, 6 counts of aggravated assault, and 13 counts of ethnic intimidation. The ethnic intimidation counts allege that Mr. Bowers, "with malicious intention toward the actual or perceived race, color, religion, national origin of another individual or group of individuals . . . committed the offense of homicide with respect to such individuals . . . in violation of 18 Pa. C.S. § 2710(a)." *Commonwealth v. Bowers*, CR No. 9000-18, Magisterial District Court, Criminal Complaint (Oct. 27, 2018), attached as Exhibit A. The ethnic intimidation statute, which punishes criminal conduct motivated by hatred toward the race, color, religion or national origin of another, was enacted in 1982. 1982, June 18, P.L. 537, No. 154, § 1. The criminal homicide counts carry a maximum sentence of death, 18 Pa. C.S. § 1102; the ethnic intimidation counts carry a maximum sentence of life imprisonment without the possibility of parole. 18 Pa. C.S. § 2710.

Shortly after Mr. Bowers' arrest, the District Attorney of Allegheny County signaled his intention to seek the death penalty for Mr. Bowers. Matt Zapotosky et al., *Suspect in Pittsburgh Synagogue Shooting is Charged in 44-Count Hate-Crime Indictment,* The Washington Post (Oct. 31, 2018), attached as Exhibit B. The District

Attorney attempted to bring Mr. Bowers to state court to answer to the charges, obtaining an order directing the United States Marshals to "RETAIN [Mr. Bowers] at the Allegheny County Jail . . . AND PRODUCE him for Arraignment at the Pittsburgh Municipal Court . . . on October 30, 2018." *Bowers*, CR No. 9000-18, Petition for Writ of Habeas Corpus *ad Prosequendum* and Order (Oct. 29, 2018), attached as Exhibit C.

However, the District Attorney's efforts were thwarted by the federal government, which refused to honor the writ. Instead, the federal government moved Mr. Bowers out of the Allegheny County Jail, and out of the immediate reach of the District Attorney, transferring him to the Butler County Prison. *See* Excerpts of fax from Allegheny County Jail to Butler County Prison with release summary (Oct. 30, 2018), attached as Exhibit D.

Federal prosecutors filed a criminal complaint alleging the obstruction of the exercise of religious beliefs, in violation of 18 U.S.C. § 247, and the use of a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) and (j), on October 27, 2018. (ECF 1.) Several days later, on October 31, 2018, the federal government filed an indictment formally alleging offenses pursuant to the same federal statutes cited in the complaint. (ECF 10.)

More than three months later, on January 29, 2019, the federal government filed a superseding indictment alleging, for the first time, violations of the Hate Crimes Prevention Act. (ECF 44.) Counts 12 through 22 allege that Mr. Bowers "willfully caused bodily injury to each victim listed below because of that victim's actual and perceived religion. . . . The offenses resulted in the death of each victim listed . . . in violation of

3

Title 18, United States Code, Section 249(a)(1)(B)(i)." (ECF 44, at 4.) Counts 36 and 37 allege that Mr. Bowers "willfully caused bodily injury to each victim listed below because of that victim's actual and perceived religion . . . The offenses included an attempt to kill each victim . . . .in violation of Title 18, United States Code, Section 249(a)(1)(B)(ii)." (ECF 44, at 7.) These counts carry a maximum punishment of life imprisonment.

## II.     The federal government may exercise authority only as the Constitution delegates to it; police power is reposed in the states.

The federal government may exercise only such power as the Constitution delegates to it. U.S. Const., amend. X;[1] *see McCulloch v. Maryland*, 17 U.S. 316, 405 (1819). "All powers not granted to it by that instrument are reserved to the States or to the people." *United States v. Cruikshank*, 92 U.S. 542, 551 (1875). Congress' exercise of its legislative authority is appropriate only when it accommodates the sovereign interests of the states. *United States v. Comstock*, 560 U.S. 126 (2010). Preeminent among the sovereign interests of the states is the police power: "Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000); *see United States v.*

---

[1] The Tenth Amendment, ratified in 1791, states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

4

*Lopez*, 514 U.S. 549, 566 (1995) ("The Constitution . . . . withhold[s] from Congress a plenary police power that would authorize enactment of every type of legislation."). The Supreme Court has made clear that "States possess primary authority for defining and enforcing the criminal law." *Brecht v. Abrahamson*, 507 U.S. 619, 135 (1993) (quoting *Engle v. Isaac*, 456 U.S. 107, 128 (1982)); *see Medina v. California*, 505 U.S. 437, 445 (1992) ("[P]reventing and dealing with crime is much more the business of the States than it is of the Federal Government.")

Crime prevention as well as criminal prosecution are police powers; these are state powers not to be infringed by the federal government. As the Supreme Court observed: "When Congress criminalizes conduct already denounced as criminal by the States, it effects a change in the sensitive relation between federal and state criminal jurisdiction." *United States v. Lopez,* 514 U.S. 549, 561 n. 3 (1995) (quoting *United States v. Emmons*, 410 U.S. 396, 411–12 (1973)).

### III.    The Thirteenth Amendment does not authorize Congress to enact a broad prohibition on crimes motivated by bias.

The Thirteenth Amendment was enacted to prohibit slavery and involuntary servitude in the wake of the Civil War. It was not intended as a broad grant of power to the federal government to criminalize conduct motivated by bias with little or no relationship to slavery.

The Thirteenth Amendment, enacted in 1865, provides as follows:

> **Section 1**. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.
>
> **Section 2.** Congress shall have power to enforce this article by appropriate legislation.

The intent of the Thirteenth Amendment was as follows:

> To abolish slavery of whatever name and form and all its badges and incidents; to render impossible any state of bondage; to make labor free, by prohibiting that control by which the personal service of one man is disposed of or coerced for another's benefit, which is the essence of involuntary servitude.

*Bailey v. State of Alabama*, 219 U.S. 219, 241 (1911). Section 2 provides the constraint on the Congressional power conferred by the Thirteenth Amendment: "by appropriate legislation."

### A. The Supreme Court has limited Congress' authority to pass "appropriate legislation" pursuant to Section 2 of the Thirteenth Amendment.

In the first cases where the Supreme Court interpreted Congress' authority under the Thirteenth Amendment, it declined to read Section 2 broadly. In *United States v. Harris*, 106 U.S. 329 (1883), the Court addressed the constitutionality of the Ku Klux Klan Act of 1871which provided, in pertinent part:

> If two or more persons . . . conspire to go in disguise on the highway or on the        premises of another for the purpose of depriving . . . any person . . . of the equal protection of the laws . . . each of said persons shall be punished by a fine . . . or by imprisonment . . . .

*Id*. at 628 (quoting 17 Stat. 13 (1871)). The Court held that the Ku Klux Klan Act was overly broad because, for example, it covered any conspiracy between two or more free

6

white persons to deprive another free white person the equal protection of the law. *Id.* at 641. The Act "clearly cannot be authorized by the amendment which simply prohibits slavery and involuntary servitude." *Id.* at 641.

Shortly thereafter, in the *Civil Rights Cases*, 109 U.S 3 (1883), the Supreme Court considered provisions of the Civil Rights Act of 1877, 18 Stat. 335 (1875), criminalizing the denial of public accommodations to any citizen to be an improper exercise of Congress' Section 2 authority. The Court found that discrimination in public accommodations had "nothing to do with slavery or involuntary servitude," placing it outside the reach of the Thirteenth Amendment. *Id*. at 24. If a denial of public accommodations "is violative of any right of the party, his redress is to be sought under the laws of the State." *Id.* at 24.

In 1905, the Supreme Court addressed Congress' enactment of a criminal statute prohibiting peonage, the status or condition of compulsory service based upon the indebtedness of the peon to the master. *Clyatt v. United States*, 197 U.S. 207, 208 (1905). Finding that peonage is tantamount to "involuntary servitude," the Court in *Clyatt* held the statute was authorized under the Thirteenth Amendment. *Id.* ("Under the 13th Amendment, [Congress' power] has only to do with slavery and its incidents.")

The following year, in 1906, the Supreme Court again addressed the scope of

Congressional authority to enact a criminal statute under the Thirteenth Amendment in

*Hodges v. United States*, 203 U.S. 1 (1906).[2] The statute provided:

> If two or more persons conspire to **injure, oppress, threaten, or intimidate**
> any citizen **in the free exercise or enjoyment of any right or privilege**
> **secured to him by the Constitution or laws of the United States**, or
> because of his having so exercised the same; or if two or more persons go in
> disguise on the highway, or on the premises of another, with intent to prevent
> or hinder his free exercise or enjoyment of any right or privilege so secured
> -they shall be fined not more than five thousand dollars and imprisoned not
> more than ten years . . . .

*Hodges*, 203 U.S. at 13 (quoting Section 5508 (U. S. Comp. Stat. 1901, pp. 1259-1262,

3712, 3713)). In *Hodges*, the Court overturned the convictions of several white men for

removing black workers from a saw mill, through threatening and intimidating behavior,

so the black men could not perform their employment contract at the mill. The Court

explained:

> The things denounced are slavery and involuntary servitude, and Congress is
> given power to enforce that denunciation. All understand by these terms a
> condition of enforced compulsory service of one to another. While the
> inciting cause of the Amendment was the emancipation of the colored race,
> yet it is not an attempt to commit that race to the care of the nation. **It is the**
> **denunciation of a condition, and not a declaration in favor of a**
> **particular people.** It reaches every race and every individual, and if in any
> respect it commits one race to the nation, it commits every race and every
> individual thereof. Slavery or involuntary servitude of the Chinese, of the
> Italian, of the Anglo-Saxon, are as much within its compass as slavery or
> involuntary servitude of the African.

---

[2] As discussed below, *Hodges* was overruled in part by *Jones v. Alfred H. Mayer Co*, 392
U.S. 409 (1968).

*Hodges*, 16-17. Nonetheless, "it was not the intent of the [13th] Amendment to denounce every act done to an individual which was wrong if done to a free man, and yet justified in a condition of slavery, and to give authority to Congress to enforce such denunciation." *Id*. at 19. The Court reinforced the reservation of police power to the states: "Unless, therefore, the 13th Amendment vests in the nation the jurisdiction claimed, the remedy must be sought through state action and in state tribunals. Notwithstanding the adoption of these three amendments, [13th, 14th and 15th Amendments] the national government still remains one of enumerated powers." *Id.* at 14-16.

The Supreme Court has not since revisited Congress' authority to enact a criminal statute pursuant to the Thirteenth Amendment.[3] However, it has addressed Congress' authority to enact civil rights statutes pursuant to the Thirteenth Amendment on several occasions.

For example, in *Jones v. Alfred H. Mayer Co*, 392 U.S. 409 (1968), the Court addressed a civil anti-discrimination statute providing that all citizens "shall have the same right . . . as is enjoyed by white citizens . . . to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. Joseph Lee Jones sought damages and injunctive relief under the civil statute based upon the refusal of the Alfred

---

[3] *United States v. Kozminski*, 487 U.S. 931 (1988), addressed the meaning of "involuntary servitude" for purposes of criminal prosecution under 18 U.S.C. § 241 and 1584, but not the scope of Congress' authority to pass criminal legislation under the Thirteenth Amendment.

9

H. Mayer Co. to sell a home in a private subdivision to Mr. Jones and the other plaintiffs because they were Black. *Jones*, 392 U.S. at 409. *Jones* held that Congress intended the legislation to abolish the "badges and incidents of slavery," and the Thirteenth Amendment allowed Congress to rationally determine those "badges and incidents" of slavery. *Id*. at 440-444. The Court in *Jones* carefully examined the legislative record before concluding that Section 1982 was "necessary and proper" to end housing discrimination against African Americans—an evident badge of slavery. *Id*. at 439-443.

In his concurrence in *Jones*, Justice Douglas provided a number of examples of incidences and badges, including racial discrimination in education, housing, marriage, voting law, jury selection, transportation, public amenities, and real estate. *Id*. at 444-446. Justice Douglas concluded: "This recital is enough to show how prejudices, once part and parcel of slavery, still persist. The men who sat in Congress in 1866 were trying to remove some of the badges or 'customs' of slavery when they enacted section 1982." *Id.* at 448.

The Court also criticized *Hodges'* narrow view of Congressional power under the Thirteenth Amendment, stating, "Insofar as *Hodges* is inconsistent with our holding today, it is hereby overruled." *Jones,* 392 U.S. at 441, n.78. Importantly, the Court relied upon the dissenters in *Hodges*, who believed that the common purpose of the **Thirteenth, Fourteenth, and Fifteenth Amendments** "was to secure to a people theretofore in servitude, the free enjoyment, without discrimination merely on account of their race, of the essential rights that appertain to American citizenship and to freedom." *Jones*, 392

10

U.S. at 441 n.78 (quoting *Hodges*, 203 U.S. at 37 (Harlan, J., dissenting)). Even if the footnote in *Jones* rendered the statute at issue in *Hodges* a proper exercise of Congress' authority under the Thirteenth Amendment, that statute did not penalize assaultive conduct toward African Americans generally; rather, it penalized assaultive conduct that was closely tied to "one of the disabilities of slavery, one of the indicia of its existence . . . a lack of power to make or perform contracts.'" *Id*. (quoting *Hodges*, 203 U.S. at 17).

Several years later, in *Griffin v. Breckenridge*, 403 U.S. 88 (1971), the Court held that Congress was within its authority under the Thirteenth Amendment to enact 42 U.S.C. § 1985(3), which created a civil remedy for African Americans who had been victims of racially discriminatory private action.

Unlike the civil anti-discrimination statutes at issue in *Jones* and *Griffin*, that provided a cause of action by one private party against another, criminal statutes authorizing federal prosecution and punishment represent the federal government's greatest application of power against its own citizens. This power includes the federal government's ability to impose on its citizens "slavery or involuntary servitude"—the very conditions prohibited by the Thirteenth Amendment—as "punishment for crime." U.S. Const., amend. XIII.

### B. The Supreme Court has limited Congress' authority to enact legislation pursuant to the other Reconstruction Amendments with identical enabling clauses.

The Thirteenth, Fourteenth, and Fifteenth Amendments—all ratified in the wake of the Civil War between 1865 and 1870—are collectively referred to as the

11

Reconstruction Amendments. All three Amendments were ratified between 1865 and 1870 in the wake of the Civil War. "Although each Amendment provides unique powers, they  share 'a unity of purpose, when taken in connection with the history of the times, which cannot fail to have an important bearing on any question of doubt concerning their true meaning.'" *United States v. Cannon*, 750 F.3d 492, 509 (5th Cir. 2014) (Elrod, J., concurring) (quoting *United States v. Hatch,* 722 F.3d 1193, 1202 (10th Cir. 2013)). That "unity of purpose" was to "confront slavery and the atrocious practices associated with it." *Id*.

The plain language of the Thirteenth Amendment authorizes Congress to enact "appropriate legislation." *Jones* explained that Congress had the authority "rationally" to determine "badge and incidents of slavery" and to enact "effective legislation." *Jones*, 392 U.S. at 440. Congress is thus limited, when exercising its authority under the Thirteenth Amendment, to enact legislation that is both "necessary and proper" to abolish the badges and incidents of slavery.  *Jones*, 392 U.S. at 439.

Given that the Thirteenth, Fourteenth, and Fifteenth Amendments were adopted at almost the same time for the same purposes, and that their enforcement standards are nearly identical, it is logical that the Supreme Court's interpretation of the Fourteenth and Fifteenth Amendment's enforcement provisions have relevance when assessing the constitutionality of legislation enacted to enforce the Thirteenth Amendment.

In *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997), the Court interpreted Congress's powers under the Fourteenth Amendment's nearly identical enforcement

12

provision,[4] holding legislation is "appropriate" only if there is "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne* struck down the Religious Freedom Restoration Act of 1993 as unconstitutional because it was "so out of proportion to [its] supposed remedial or preventive object" it could not "be understood as responsive to, or designed to prevent unconstitutional behavior." *Id*. at 532. The Court noted that the legislative history "centered upon anecdotal evidence" that failed to indicate a "widespread pattern of religious discrimination." *Id*. at 530-31. It also observed the Act's "sweeping coverage." *Id.* at 532.

Under the standard articulated in *City of Boerne*, the Supreme Court has held that Congress exceeded its authority in passing several civil rights laws. *See Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001) (Title I of the Americans with Disabilities Act); *United States v. Morrison*, 529 U.S. 598 (2000) (Violence Against Women Act); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000) (Age Discrimination in Employment Act).

In *Shelby County v. Holder*, 570 U.S. 529 (2013), the Court considered the Fifteenth Amendment's nearly identical enforcement clause.[5] *Shelby County* held an anti-

---

[4] "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const., amend. XIV(5).
[5] "The Congress shall have power to enforce this article by appropriate legislation." U.S. Const., amend. XV(2).

13

discrimination provision in the Voting Rights Act was not "appropriate legislation" because the law was not "justified by current needs" imposed by "current burdens." *Id.* at 550 (citation omitted). Congress' reliance on "decades-old data and eradicated practices" could not justify the provision, given recent developments that made it no longer "appropriate." *Id.* at 551, 553 (citation omitted).

City of Boerne and *Shelby County,* read together, establish that legislation is not "appropriate" under the Reconstruction Amendments unless concrete evidence proves there is a "current need" and the legislation is a "congruent and proportional" response to that need.

## IV.   Section 249(a)(1) is not "appropriate legislation" to achieve the goal of abolishing slavery and involuntary servitude.

At issue here is not whether hate crimes are repugnant to society or whether they are deserving of more severe punishment. Rather, the issue is whether the Constitution confers broad authority to the federal government to prosecute assaultive crimes if certain types of bias motivate the offense. Section 249(a)(1) is not "appropriate legislation" within the meaning of Section 2 of the Thirteenth Amendment because it is neither "necessary and proper," nor is it a "congruent and proportional" response to a "current need." In addition, Section 249(b)'s certification requirement, if it is a proper delegation of Congressional authority to the Attorney General, underscores the impropriety and incongruence of Section 249(a)(1).

### A.  Section 249(a)(1) is not necessary or justified by current needs.

14

Section 249(a)(1) prohibits both bodily injury and attempted bodily injury motivated by any one of four "actual or perceived" characteristics of the victim: (i) race, (ii) color, (iii) religion, or (iv) national origin. Section 249(a)(1) covers a broad range of conduct with no connection whatsoever to a federally protected activity, much less an activity with any discernable nexus to slavery or involuntary servitude.

The justification offered for the legislation appears to be that, because slavery and involuntary servitude were enforced through violence, the federal government's criminalizing racially motivated violence is a means of eliminating the badges and incidents of slavery. *See* 34 U.S.C. 30501(7). The justification for the federal criminalization of violence motivated by religion or national origin seems to be that such violence is also a means of eliminating the badges and incidents of slavery, but only "to the extent such religions or national origins were regarded as races at the time of the adoption of the 13th, 14th, and 15th amendments to the Constitution of the United States." 34 U.S.C. § 30501(8).

As an initial matter, Section 249(a)(1) does not prohibit any conduct—the willful causation of bodily injury or attempted causation of bodily injury—that is not already illegal under the laws of every state. *See Local Law Enforcement Hate Crimes Prevention Act of 2007*, H.R.Rep. 110—113 (April 30, 2007) at 45. Indeed, during the Senate Judiciary Committee Hearings on the legislation, the Department of Justice endorsed the "tireless" work by state and local law enforcement agencies "to hold all individuals who commit violent crimes accountable for their actions." *The Matthew Shepard Hate Crimes*

15

*Prevention Act of 2009: Hearing before the Senate Committee on the Judiciary*, 111th

Cong. (June 25, 2009) ("Sen. Hrg.") at 63 (statement of Attorney General Eric Holder).

As Attorney General Holder explained, "The Department's strong support of this

legislation is not premised on a belief that other levels of law enforcement are not taking

appropriate action to combat these serious crimes." Sen. Hrg. at 69.

Not only is the underlying violent conduct, or attempted conduct, punishable as a

crime in every state, 45 of 50 states and the District of Columbia had adopted criminal

offenses that increased the penalties for violent crimes deemed to be "hate crimes" at the

time the legislation was passed in 2009. *See* Sen. Hrg. at 14, 62, 171; House Report No.

111-86 (Apr. 27, 2009), 2009 WL 1137121 at *44.

Despite being provided repeated opportunities, the proponents of the legislation

could point to no data showing that the states had failed to prosecute hate crimes:

> Senator Hatch:  Now, do you have any evidence . . . that there is a trend that,
> specifically with regard to bias-motivated crimes, justice is not being served
> in this country?

> Attorney General Holder: I'm not sure that I would say that I see a trend. I
> think that State and local prosecutors are partners and do a good job.

Sen. Hrg. at 7. Other portions of the legislative record are consistent:

- Attorney General Holder was unaware of any statistics that showed that, of the
  hate crimes identified in the FBI database, a certain number represent those where
  the states' response was inadequate.  Sen. Hrg. at 14.

- Attorney General Holder could not identify any state that was failing to enforce its
  laws punishing crimes of violence. Sen. Hrg. at 14.

- Attorney General Holder wrote: "The Department is unable to provide an exact number of cases in which state, local, or tribal jurisdictions have failed to prosecute hate crimes . . . ." Sen. Hrg. at 73.

- Attorney General Holder acknowledged, "I don't think I can say that there is a trend, that there is a trend among the States or local jurisdictions in failing to go after these kinds of crimes." Sen. Hrg. at 14.

- Proponent Dr. Mark Actemeir, University of Dubuque Theological Seminary, admitted, "No, we don't have statistical reports, but there's an awful lot in the headlines. Ordinary Iowans and relatives from around the country have a distinct sense that certain groups in our society are in more jeopardy than others and require particular protections." Sen. Hrg. at 35.

- Attorney General Holder wrote: "The Department believes that our partners at all levels of law enforcement share our commitment to effective hate crimes enforcement. The Department does not have access to precise statistics of hate crimes that have gone unprosecuted at the state and local level, and we are unaware of any source for such comprehensive information of unprosecuted offenses generally." Sen. Hrg. at 62.

As one witness explained, "[I]f it was shown that there was a widespread, systematic disregard of a State's own laws on hate crimes or a State's own law on violence, if they weren't being enforced against when the acts were committed against gays or committed against any individual, anything that shows that there's a de jure, tacit approval, then this would be a different law altogether and I think that that would make a lot more sense . . . ." Sen. Hrg. at 38-39 (testimony of Brian Walsh, The Heritage Foundation). Simply put, "headlines" and "distinct senses" are inadequate.

Proposals to obtain the needed data were repeatedly rejected. Sen. Hrg. at 20. "Unfortunately, in their haste to rush this bill through the Committee, the majority has not done any fact finding whatsoever. . . . [T]he Majority failed to hold adequate hearings

concerning the scope of hate crimes in this country, their numbers, and their impact on the economy." House Report 111-86 (April 27, 2009), 2009 WL 1137121 at *42. Without the data, statistics or meaningful fact finding demonstrating that states were unable to prosecute, or had declined to prosecute hate crimes, the federal assertion of jurisdiction over such prosecutions is not "necessary," nor is it justified by "current needs."

The legislative history mentions only a handful of isolated incidents where states purportedly failed to adequately prosecute bias crimes. Sen. Hrg. at 19-20, 171, 173-174. In one, the perpetrators were prosecuted by California authorities for assault and battery and hate crimes charges, and the judge presiding over the case convicted them of the assault and battery counts and sentenced them to terms of imprisonment. However, the California judge found the facts insufficient to support a hate crimes conviction. The federal government then brought a second prosecution, under 18 U.S.C. § 245(b), and obtained a conviction and additional terms of imprisonment. *See* https://www.tahoedailytribune.com/news/couple-convicted-twice-for-tahoe-beach-beating/. It is difficult to see how this successful conviction under an already existing federal statute justifies the enactment of an additional, broader legislation.

In a second incident, the federal government charged the three perpetrators under 18 U.S.C. § 245. Sen. Hrg. at 172. One entered a guilty plea, testified at trial against the other two, and was sentenced to a term of imprisonment. The prosecution found the cooperator's testimony to be truthful and candid; nonetheless, the jury returned a not

18

guilty verdict.[6] *United States v. Joseph Grohs et al.*, No. 2:04-cr-57, ECF 61-63, 70 (EDNY Oct. 1, 2004). Like the first anecdotal incident, this incident provides no support for additional, more sweeping federal legislation.

Similarly, the state prosecutions of the victims for whom the HCPA is named, James Byrd, Jr. and Matthew Shepard, do not provide justification for federal intervention. In the case of the perpetrators of the violent acts against Matthew Shepard, the state of Wyoming quickly arrested and charged the two perpetrators with first degree murder. They sought the death penalty against one and subsequently agreed, with the consent of the victim's family, to the imposition of two life sentences. Michael Janofsky, *Parents of Gay Obtain Mercy For His Killer*, N.Y. Times (Nov. 5, 1999), available at https://www.nytimes.com/1999/11/05/us/parents-of-gay-obtain-mercy-for-his-killer.html. The second perpetrator received a life sentence. Tom Kenworthy, *2nd Man Is Convicted Of Killing Gay Student*, Wash. Post (Nov. 4, 1999), available at https://www.washingtonpost.com/archive/politics/1999/11/04/2nd-man-is-convicted-of-killing-gay-student/1d3d6cc2-61b3-4c18-918e-a73bd735de8f/.

In the case of two of the perpetrators of the crime against James Byrd, Jr., the second person for whom the HCPA is named, the state of Texas sought and obtained

---

[6] A review of the court records reveals only "not guilty" verdicts. However, Attorney General Holder claimed that the reason for the acquittals was that the jury found the evidence insufficient to prove that the offense happened "because the victims were trying to use the restaurant (a public accommodation)." Sen. Hrg. at 172. The source of this information is unclear from the record.

death sentences, and both have been executed. *White supremacist Lawrence Russell Brewer executed for dragging death,* Associated Press (Sept. 22, 2011), available at https://www.masslive.com/news/2011/09/white_supremacist_lawrence_rus.html; Campbell Robertson, *Texas Executes White Supremacist for 1998 Dragging Death of James Byrd Jr.,* New York Times (Apr. 24, 2019), available at https://www.nytimes.com/2019/04/24/us/james-byrd-jr-john-william-king.html. The third perpetrator received a life sentence. Liz Tietz, *Byrd's family: Don't forget him,* Beaumont Enterprise (June 4, 2018), available at https://www.beaumontenterprise.com/news/article/Byrd-s-family-Don-t-forget-him-12965531.php.

When Section 249(a)(1) was enacted in 2009, Pennsylvania had been prosecuting hate crimes pursuant to its own statute for more than a quarter century. 18 Pa. C.S. § 2710. In allowing the federal government virtually unchecked discretion to prosecute crime already being adequately punished by the states, Section 249(a)(1) impermissibly usurps the police power reserved for the states. Where there was no evidence that states were routinely or systematically failing to enforce their laws against the intentional infliction of bodily harm, and no evidence that states were routinely or systematically failing to enforce their own hate crimes laws, the few, isolated cases where federal law enforcement or Senators would have handled the prosecution differently do not and cannot make Section 249(a)(1) constitutional. It is not "necessary" nor is it justified by "current needs."

That separate provisions of the legislation provide federal funding and

prosecutorial resources (at the sole discretion of the Attorney General) to state and local

jurisdictions[7] does not render Section 249(a)(1) "necessary." *United States v. Roof*, 225 F.

Supp. 3d 438, 443–44 (D.S.C. 2016) (citing to funding and assistance provisions as

justification). Indeed, Section 249(a)(1) provides the federal government unchecked

power to prosecute conduct on its own, without regard to any state or local interest in

conducting the prosecution and without any obligation whatsoever to fund or assist state

or local efforts.

### B.   Section 249(a)(1) is not a "proper" or "congruent and proportionate" response.

Even if Congress had established that Section 249(a)(1) was "necessary" or

justified by "current needs," it is not a "proper" or "congruent and proportionate"

response. This is because Section 249(a)(1) criminalizes "vast swaths" of private

violence, untethered to any federally protected interest, if the/such violence is motivated

by the actual or perceived color, national origin, religion, or race of another. *Cannon*, 750

F.3d at 512 (Elrod, J., concurring).

---

[7] 34 U.S.C. § 3051(3)(a) (providing that the Attorney General "may provide technical, forensic, prosecutorial, or any other form of assistance" to states or local jurisdictions in the investigation and prosecution of crimes motivated by bias); 34 U.S.C. § 3051(3)(b) (providing that the Attorney General "may award grants" to state and local law enforcement agencies in their investigation and prosecution of hate crimes).

21

### 1. Section 249(a)(1) is exceedingly broad and untethered to the abolition of slavery.

Section 249(a)(1) represents an unprecedented and exceedingly broad expansion of federal prosecutorial authority. Prior to 2009, federal authorities could prosecute a violent act motivated by the victim's "race, color, religion, national origin," but only to protect the victim's right to engage in a wide range of "federally protected activities" pursuant to 18 U.S.C. § 245(b)(2).[8] Congress' purported authority to enact Section 245(b)(2) was derived from the Commerce Clause and all of the Reconstruction Amendments.[9] In contrast, Section 249(a)(1) must rest exclusively on Congress' authority under the Thirteenth Amendment. Notably, Section 245(b)(2) was enacted in

---

[8] The activities protected under 18 U.S.C. § 245(b)(2) include: (A) enrolling in or attending any public school or public college; (B) participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State . . . ; (C) applying for or enjoying employment . . . by any private employer or any agency of any State or subdivision thereof, or joining or using the services or advantages of any labor organization . . . ; (D) serving, or attending upon any court of any State in connection with possible service, as a grand or petit juror; (E) traveling in or using any facility of interstate commerce, or using any vehicle, terminal, or facility of any common carrier by motor, rail, water, or air; (F) enjoying the goods, services, facilities, privileges, advantages, or accommodations of any inn, hotel, motel, or other establishment which provides lodging to transient guests, or of any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility which serves the public and which is principally engaged in selling food or beverages for consumption on the premises, or of any gasoline station, or of any motion picture house, theater, concert hall, sports arena, stadium, or any other place of exhibition or entertainment which serves the public.

[9] Courts have liberally construed the scope of these publicly protected activities, which include walking on a city street and drinking a beer in a public park. *United States v. Nelson*, 277 F.3d 164 (2d Cir. 2002); *United States v. Allen,* 341 F.3d 870 (9th Cir. 2003).

1969 during the Civil Rights Era when there was a demonstrated Congressional record of state authorities failing to enact or enforce laws protecting the rights of African Americans to engage in these publicly protected activities. And, as evidenced by the sparse anecdotal evidence offered by the Attorney General in the Congressional record, Section 245(b)(2) has been, and continues to be, an adequate and effective tool for federal prosecutors. *See supra* Section III.C.1.

In contrast to Section 245(b)(2), Section 249(a)(1) criminalizes private violence without any relationship to a federally protected interest, if it is motivated by the actual or perceived color, national origin, religion, or race of another. Critically, although the plain language of the statute says "religion" and "national origin" without qualification, it only means "real or perceived religions or national origins, at least to the extent such religions or national origins were regarded as races at the time of the adoption of the 13th, 14th, and 15th amendments to the Constitution of the United States." 18 U.S.C. § 30501.

This is problematic for at least two reasons: (1) it raises serious equal protection concerns as any religion not deemed a "race" in the 19th century is simply not protected; and (2) what was considered a "race" in the 19th century is, in many circumstances, completely unrelated to the abolition of slavery and involuntary servitude.

23

In interpreting the scope of 42 U.S.C. § 1981[10] (not whether Congress had the authority to enact it) to determine whether a professor born in Iraq who became an American citizen could bring a civil cause of action against his employer, the Court in *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 610 (1987), discussed the definition of "race." It began by noting that, although Section 1981 does not use the word "race," it had been construed by the Court "to forbid all 'racial' discrimination in the making of private as well as public contracts.'" *Id*. at 609 (quoting *Runyon v. McCrary*, 427 U.S. 160, 168 (1976)). Thus, the issue before the Court was whether the professor "alleged **racial** discrimination within the meaning of § 1981." *Id*. at 609 (emphasis in original). The Court looked to dictionaries and encyclopedias from the 19th Century, when the statute was enacted, to ascertain the meaning of "race." It concluded: "Plainly, all those who might be deemed Caucasian today were not thought to be the same race at the time § 1981 became law." *Saint Francis College*, 481 U.S. at 610. For example, the Court observed that Italians, Blacks, Greeks, Gypsies, Arabs, Russians, Mongolians, Hebrews, Basques, Finns, Jews, and other groups were considered to be distinct "races" at that time. *Id*. The Court ultimately ruled that, although Arabs are considered part of the white

---

[10] 42 U.S.C. § 1981 provides: All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

or Caucasian race today, the Iraqi-born professor had alleged racial discrimination within the meaning of § 1981. *Id.* at 613.

In a case decided on the same day, the Court held that Jews, although considered to be part of the Caucasian race today, are entitled to state a claim under § 1982[11] against other members of the Caucasian race. *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 616-617 (1987). As in *St. Francis College,* the Court's analysis began with the observation that the Court previously had held that § 1982 forbids official and private **racially** discriminatory interference with property rights. *Id*. at 616 (citing *Jones,* 392 U.S. 409).

Significantly, neither *St. Francis College* nor *Shaare Tefila Congregation* mention the Thirteenth Amendment, slavery or involuntary servitude whatsoever, much less make a connection between the "races" identified by the dictionaries and encyclopedias of the 19th century and the institution of slavery. In other words, even if the Thirteenth Amendment's prohibition on slavery itself is race neutral, it does not follow that its prohibition on the legacies of slavery are also race neutral. Accordingly, the language of 249(a)(1) prohibiting assaultive crimes motivated by not only "race," but also religion, color and national origin, is untethered to the Thirteenth Amendment and is therefore an improper exercise of Congressional authority.

---

[11] 42 U.S.C. § 1982 guarantees all citizens of the United States, "the same right ... as is enjoyed by white citizens ... to inherit, purchase, lease, sell, hold, and convey real and personal property."

25

**2.  The certification provision, to the extent it is a proper delegation of Congressional authority to the Attorney General, underscores the impropriety and incongruence of Section 249(a)(1).**

Section 249(b)(1) requires the Attorney General, before undertaking prosecution, to certify the prosecution:

> No prosecution of any offense described in this subsection may be undertaken by the United States, except under the certification in writing of the Attorney General, or a designee, that
>
> (A) the State does not have jurisdiction;
> (B) the State has requested that the Federal Government assume jurisdiction;
> (C) the verdict or sentence obtained pursuant to State charges left demonstratively unvindicated the Federal interest in eradicating bias-motivated violence; or
> (D) a prosecution by the United States is in the public interest and necessary to secure substantial justice.

Section 249(b)(1)(D), which is at issue here, allows the Attorney General to decide whether a federal prosecution is "in the public interest and necessary to secure substantial justice." The provision permits the Attorney General to police himself or herself and is vague to the point of being almost meaningless. As such it constitutes an unconstitutional delegation of Congressional authority to the Executive. *See Gundy v. United States*, 588 U.S. __, 139 S. Ct. 2116, 2123 (2019) (citing *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825)). *See also id.* at 2130-31 (Alito, J., concurring); *id.* at 2131 (Gorsuch, J., dissenting).

In addition, the certification requirement in Section 249(b) underscores the impropriety and incongruence of Section 249(a)(1). Notably, Attorney General Holder, in promoting the legislation, continually referred to the legislation as a "backstop" to the

26

states, suggesting that the federal government would only step in where a state was unable or unwilling to prosecute. *See, e.g.,* Sen. Hrg. at 9 ("The backstop of the law is that the Federal Attorney General, if the State refuses to prosecute, can also look into the case and make a decision, well, this case, in fact, does deserve prosecution."); *id*. at 9 "[I]f there is a State that refuses to prosecute, that ignores the element of hate in the commission of a felony, the Federal Government can stand up and say, we're going to prosecute."); *id*. at 14 ("What we're looking for is an ability in those instances-those rare instances—where there is an inability or an unwillingness by State or local jurisdiction to proceed, that the Federal Government would be able to stop, would be able to fill that gap."); *id*. at 20, 69, 73 (describing the legislation as a "backstop" to the states' efforts); *id*. at 67 ("The certification provision in proposed 18 U.S.C. 249(b) will not provide the Attorney General with unlimited authority and it will not interfere with the prosecution of crimes that can be handled effectively at the local level."); *id*. at 68 ("Consistent with our current practice under existing federal hate crimes laws, we would continue to consult closely with our state, local, and tribal colleagues in all cases."); *id*. at 68 (referring to the "Petite Policy" as placing "strict limits on an dual or subsequent federal prosecutions.")

Indeed, some of members of Congress, including Senators Cardin and Klobuchar, appeared to misunderstand the certification requirement: "First, as Senator Klobuchar has said, it is a backstop, so there's opportunity for the State to act. If the State acts and there's no need for Federal involvement, my expectation is there would be no Federal involvement. If the States had the capacity to deal with this issue, that's the preferred

27

route." Sen. Hrg. at 18 (Senator Cardin). Tellingly, Congress ultimately rejected the

House of Representatives' version of the bill that contained a certification provision

requiring that a state consent to the assumption of federal jurisdiction. Sen. Hrg. at 6.

While the legislation could potentially be used as a "backstop," the plain language

of the statute allows the Attorney General to press forward with federal prosecutions in

defiance of and without regard to the interests and needs of the states. In fact, the federal

government has done so repeatedly, including its prosecutions of the cases of Dylann

Roof, John Earnest, and James Fields.[12] And it has done so in Mr. Bowers' case.

Indeed, the Attorney General's practice of certifying prosecutions without regard

to the interests of the states reveals that the concerns over the double jeopardy

implications of Section 249(a)(1), voiced by the Civil Rights Commission of the United

States during the pendency of the legislation, were warranted. Sen. Hrg. at 20. Those

concerns were based upon the "dual sovereignty rule," the legitimacy of which depends

on the federal courts' enforcement of the Constitution's framework of limited,

enumerated Congressional powers. *See United States v. Lanza,* 260 U.S. 377 (1922).

Reliance upon the unenforceable and unreviewable "policies" and "practices" of

the Attorney General—leaving the prosecutor as the sole arbiter of the prosecutor—

---

[12] *United States v. Dylann Storm Roof*, No. 15-472-RMG (D.S.C.); *United States v. John Timothy Earnest*, No. 19-cr-1850-AJB (S.D.Cal); *United States v. James Alex Fields, Jr.*, No.18-CR-00011-MFU (W.D. Va).

highlights the impropriety and disproportionality of the legislation. As then Senator Jeff Sessions, who later became the Attorney General, observed: "Well, it just gives the Attorney General the right to pick and choose his favorite groups of the day, maybe the group that supported the Attorney General or the President that appointed him." Sen. Hrg. at 34; *see* Sen. Hrg. at 28 (testimony of Gail Heriot) ("Selective enforcement of an exceedingly broad law is generally impossible to distinguish from a politically motivated prosecution.")

In sum, Section 249(a)(1) is not appropriate legislation under Section 2 of the Thirteenth Amendment. It is not necessary or justified by current needs; and it is not a proper or congruent response to any need.

### V.   Section 249(a)(1) is unconstitutional as applied here.

Even if this Court were to determine that Section 249(a)(1) is facially constitutional, it is unconstitutional as applied in this case. The superseding indictment makes clear that the Section 249(a)(1) counts allege that Mr. Bowers caused bodily injury because of each victim's actual and perceived religion—namely Judaism. (*See* ECF 44.) Although the Supreme Court has determined, primarily by examining dictionaries and encyclopedias from the 19th century, that Jews were considered a "race" at that time, *St. Francis College*, 481 U.S. 604; *Shaare Tefila Congregation*, 481 U.S. 615, it has never found that Jews were subjected to slavery or involuntary servitude in the United States nor that bias toward Jews was a badge or incident of slavery pursuant to the Thirteenth Amendment.

29

In *United States v. Beebe*, 807 F.Supp.2d 1045, 1053-1054 (DNM 2011), the Court addressed an as applied challenge to Section 249(a)(1) where the defendant was Caucasian and the victim was Navajo. The court carefully reviewed the history of relations between white settlers and the Navajo in New Mexico and concluded that that the history "made plain that Navajos were enslaved by the Europeans throughout the 1800s." *Id*. at 1053. Because the Navajo victim was "a member of a class that suffered slavery before the passage of the Thirteenth Amendment," the court held that the statute was constitutional as applied to the defendant. *Id*. at 1055.

Although Jews have been subjected to involuntary servitude and slavery in other parts of the world throughout history, that has not been their legacy in the United States. Although anti-Semitism in the United States has been and remains problematic, Jews were not enslaved in the United States like African Americans and the Navajo. Accordingly, Section 249(a)(1) is not constitutional as applied in this case.

## VI.     Section 247 is unconstitutional because it criminalizes intrastate non-economic activity that does not have a substantial effect on interstate commerce.

Section 247 of Title 18 is referred to as the "Church Arson Prevention Act." PL 104–155, July 3, 1996, 110 Stat 1392. The statute's first section criminalizes the intentional "defac[ing], damag[ing], or [destruction]" of religious real property because of that property's "religious character." 18 U.S.C. § 247(a)(1). The second part of § 247(a) makes it a crime to "intentionally obstruct by force or threat of force, any person in the enjoyment of that person's free exercise of religious beliefs, or attempt[] to do so."

18 U.S.C. § 247(a)(2). The damage or assault must be "in or affect[] interstate commerce." 18 U.S.C. § 247(b). Counts 1-11, 34-35, and 40-51 of the superseding indictment charge Mr. Bowers with multiple counts of violating § 247(a)(2). (ECF 44.)

Section 247 is an unconstitutional exercise of Congressional power. As Supreme Court jurisprudence and the statute's legislative history make clear, § 247 regulates instrastate, non-economic criminal activity that does not substantially affect interstate commerce; it therefore exceeds the limits of Congress' authority to legislate under the Commerce Clause. The conduct that § 247 presumes to proscribe is reserved for the states. Moreover, even if constitutional principles and statutory analysis are twisted and perverted to find § 247 represents a lawful exercise of Congressional authority, the statute is unconstitutional as applied to Mr. Bowers, where the alleged criminal acts did not occur in or affect interstate commerce.

For these reasons, this Court should dismiss the § 247 charges in the superseding indictment.

## A. The Supreme Court has recognized three areas that fall within the boundaries of Congress' commerce power.

It is a cornerstone of our nation's legal structure that "every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution." *United States v. Morrison*, 529 U.S. 598, 606 (2000). This includes laws that Congress enacts criminalizing intrastate conduct by private individuals. Indeed, the Constitution does not confer a plenary police power on Congress. *See* Const. Art. 1, § 8; *United States v. Lopez*,

31

514 U.S. 549, 566 (1995). A pair of decisions, wherein the Supreme Court struck down federal laws that exceeded Congress' power to legislate under the Commerce Clause, articulate and clarify the boundaries of that power. The limits the Court placed on Congress' commerce clause power demonstrate that § 247 goes beyond Congress' constitutional authority.

1. **The Commerce Clause grants Congress authority to regulate the channels and instrumentalities of interstate commerce and activities that have a substantial effect on interstate commerce.**

Among those powers delegated to Congress is the power "[t]o regulate Commerce [] among the several States []." U.S. Const. Art. I, § 8. That power invests Congress with the authority to "prescribe the rule by which **commerce** is to be governed" and "may be exercised to its utmost extent." *United States v. Lopez*, 514 U.S. at 553 (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 196, 6 L.Ed. 23 (1824) (emphasis added)). Though broad, it is not unlimited. Congressional commerce clause authority is limited "to that commerce which concerns more States than one." *Lopez*, 514 U.S. at 553 (citing *Gibbons*, 9 Wheat. at 194-95).

Throughout most of the 20th century, as both interstate commerce and Congressional regulations thereof grew in the United States, the Supreme Court recognized an increasingly expansive commerce power for Congress. *See Lopez,* 514 U.S. at 554-558. In that body of law, the Court identified "three broad categories of activity that Congress may regulate" under its commerce power. *Lopez*, 514 U.S. at 558.

32

The first category is "the use of the channels of interstate commerce." *Id*. (citing *United States v. Darby*, 312 U.S. 100 (1941); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964)). Congress' authority to regulate the channels of interstate commerce includes keeping them "free from immoral and injurious use." *Heart of Atlanta Motel*, 379 U.S. at 256 (internal quotations omitted). The second category of interstate commerce to which Congress' commerce power extends is the "instrumentalities of interstate commerce"–"regulat[ing] and protect[ing] persons or things in interstate commerce, even though the threat may come only from intrastate activities." *Lopez*, 514 U.S. at 58 (citing *Shreveport Rate Cases*, 234 U.S. 342 (1914); *Southern R. Co. v. United States*, 222 U.S. 20 (1911)).[13]

The final category of regulation within Congress' commerce power is "activities having a substantial relation to interstate commerce, *i.e.* those activities that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558-59 (citing *NLRB v. Jones & Laughlin Steel*, 301 U.S. 1 (1937); *Maryland v. Wirtz*, 392 U.S. 163 (1968)). The Court acknowledged in *Lopez* that its prior decisions had not been clear as to whether activity in this third category has to "affect" or "substantially affect" interstate commerce to be within Congress' power to regulate. It then held that, consistent with "the great weight" of Supreme Court case law, the proper test is "whether the regulated activity

_____

[13] The *Lopez* Court gave the destruction of aircraft or thefts from interstate shipments as examples of this category. *Lopez*, 514 U.S. at 559.

33

'substantially affects' interstate commerce." *Lopez*, 514 U.S. at 559. Where Congress enacts legislation that regulates "economic activity [that] substantially affects interstate commerce," including intrastate **economic** activity, that legislation will be sustained. *See id*. at 559-60 (citing *Hodel v. Virginia Surface Mining & reclamation Assn., Inc.*, 452 U.S. 264 (1981) (regulation of intrastate coal mining); *Perez v. United States*, 402 U.S. 146 (1971) (intrastate extortionate credit transactions); *Katzenbach v. McClung*, 379 U.S. 294 (1964) (regulation of restaurants using substantial interstate supplies); *Heart of Atlanta Motel*, 379 U.S. 241 (hotels catering to interstate guests); *Wickard v. Filburn*, 317 U.S. 111 (1942) (production and consumption of homegrown wheat)).

> 2. **In *Lopez*, the Supreme Court struck down a federal statute regulating non-economic intrastate criminal conduct because there was no showing that the conduct substantially affected interstate commerce.**

*Lopez* involved a challenge to a conviction under 18 U.S.C. § 922(q)(1)(A), which made it a federal offense to "knowingly possess a firearm" in a school zone. 18 U.S.C. 922(q)(1)(a) (1988 ed., Supp. V). Lopez claimed that the statute, which did not require an interstate nexus, exceeded Congress' commerce power. The Court agreed.

Its analysis examined three factors. After noting that the statute plainly did not regulate either channels or instrumentalities of interstate commerce, the Court first found the statute regulated activity that was not "'commerce' or any sort of economic enterprise." *Lopez*, 514 U.S. at 561. Neither, the Court observed, was the prohibition on gun possession "an essential part of a larger regulation of economic activity . . . that

could be undercut unless the intrastate activity were regulated." *Id*. As a result, the statute could not be sustained under any of the Supreme Court's cases upholding "regulations of activities that arise out of or are connected with a commercial transaction." *Id*.

The second factor in the Court's analysis was that the statute did not contain a jurisdictional element that "might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." *Id*. at 562. Third, the Court observed that there were no Congressional findings in the statute or its legislative history that would enable a reviewing court to "evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such effect was visible to the naked eye." *Id*. at 563. In light of these factors, the Court held that "the possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Id*. at 567.

The Court also considered and rejected the government's arguments that a connection could be drawn between possession of a gun in a school zone and interstate commerce. The government posited that possession of guns leads to violence, the costs of which spread throughout the population and reduces the willingness of people to travel. The government also argued that guns in school zones could interfere with educational environments, which could in turn affect learning and thereby reduce national productivity. The Court rejected these arguments because they drew too attenuated a link between the activity and interstate commerce, and could be rolled out to give Congress

35

power to legislate in exclusive domains of state regulation, such as family law or elementary school curricula. *Lopez*, 514 U.S. at 565. To accept the government's contentions, the Court explained, would require it to "pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id*. at 567.

For all of these reasons, the Court found the statute in *Lopez,* which did not regulate channels or instrumentalities of interstate commerce, but rather a non-economic activity that did not substantially affect interstate commerce, constituted an unconstitutional exercise of Congress' commerce power.

> **3. In *United States v. Morrison,* the Supreme Court applied *Lopez* to strike down a federal civil cause of action for gender-motivated violence because such violence is not commercial and is properly subject to the police power that is vested in the states.**

Five years after *Lopez*, the Court had opportunity to apply the commerce clause analysis it developed there in *United States v. Morrison*, 529 U.S. 598 (2000). In *Morrison,* the Court considered a challenge to the section of the Violence Against Women Act ("VAWA") that created a civil cause of action for victims of gender-motivated violence. 42 U.S.C. § 13981. Congress enacted the statute, including the provision under review, pursuant to the Commerce Clause and § 5 of the Fourteenth Amendment. *Morrison*, 529 U.S. at 607.

The Court found that Congress overreached its Commerce Clause authority because "gender-motivated crimes of violence are not, in any sense of the phrase,

economic activity," and Commerce Clause regulation of intrastate activity had only been upheld where the activity was economic in nature. *Morrison*, 529 U.S. at 613 ("[The] principles underlying our Commerce Clause jurisprudence [make it clear that this is] the proper resolution."). Furthermore, the Court rejected the idea that Congress can regulate non-economic violent criminal conduct based solely on the conduct's aggregate effect on interstate commerce. *Id*. at 617. "The Constitution," the Court wrote, "requires a distinction between what is truly national and what is truly local." *Id*. at 617-18. Regulating and punishing "intrastate violence that is not directed at the instrumentalities of, channels, or goods involved in interstate commerce has always been the province of the States," and there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *Id*. at 618.

The Court's review of the statute at issue tracked the *Lopez* decision, which "provides the proper framework for conducting the required analysis." *Morrison*, 529 U.S. at 609.[14] As in *Lopez*, the statute in *Morrison* addressed non-economic, intrastate criminal conduct–a fact that was "central to [the] decision" in *Lopez*, where the review of Commerce Clause case law demonstrated that in cases where the Court had sustained

_____

[14] Then-Chief Justice Rehnquist, who wrote the majority opinion in *Lopez*, also wrote for the majority in *Morrison*.

federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, "the activity in question has been **some sort of economic endeavor**." *Id*. at 610-11 (emphasis added).

The Court also considered the second and third factors from *Lopez*–whether the statute included an interstate commerce jurisdictional element and any Congressional findings regarding the interstate commerce effects of the activity regulated. *Id*. at 611-12. As in *Lopez*, the provision involved in *Morrison* did not have an interstate commerce jurisdictional element. *Morrison*, 529 U.S. at 613. However, the VAWA provision at issue was distinct from the school zone gun regulation at issue in *Lopez* because it was "supported by numerous findings regarding the serious impact that gender-motivated violence has []." *Morrison*, 529 U.S. at 614.[15] However, the Court held that it was inappropriate to defer to such findings without question: "Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so. Rather, whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is

---

[15] Congress found that gender-motivated violence affects interstate commerce by "'deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce; . . . by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products.'" *Morrison*, 529 U.S. at 615 (quoting H.R. Conf. Rep. No 103-711, at 385, U.S.Code Cong. & Admin. News 1994, pp. 1803, 1853) (ellipsis in original).

38

ultimately a judicial rather than a legislative question, and can be settled finally only by

this Court." *Id*. (internal quotations omitted). Congress' findings on the effects of gender-

motivated violence on interstate commerce, the Court ruled, relied on the same stacked,

attenuated connections *Lopez* rejected, making the concern expressed in *Lopez,* that

Congress might use its commerce power "to completely obliterate the Constitution's

distinction between national and local authority[,]" well-founded.[16] Congress' findings,

the Court held,

> followed the but-for causal chain from the initial occurrence of violent crime
> (**the suppression of which has always been the prime object of the States'
> police power**) to every attenuated effect upon interstate commerce. If
> accepted [such] reasoning would allow Congress to regulate any crime as
> long as the nationwide, aggregated impact of that crime has substantial
> effects on employment, production, transit, or consumptions. Indeed, if
> Congress may regulate gender-motivated violence, it would be able to
> regulate [] any other type of violence since gender-motivated violence, as a
> subset of all violent crime, is certain to have lesser economic impact than the
> larger class of which it is a part.

*Morrison*, 529 U.S. at 615 (emphasis supplied).

    *Morrison* establishes four principles for federal courts reviewing legislation

enacted pursuant to Congress' commerce power. First, where Congress regulates

intrastate activity, it must be of an **economic** nature. Second, crimes of violence are **not**

---

[16] The Court explained that its decision in *Lopez* "rested in part" on the fact that the link
between the regulated activity and interstate commerce was "attenuated." *Morrison*, 529
U.S. at 612-13 (citing *Lopez*, 513 U.S. at 563-67 ("We rejected these 'costs of crime' and
'national productivity arguments because they would permit Congress to regulate not
only all violent crimes, but all activities that might lead to violent crime, regardless of
how tenuously they related to interstate commerce.") (internal quotations omitted)).

economic activity. Third, Congressional findings that a particular activity substantially affects interstate commerce are subject to judicial review, and such findings may not aggregate effects to substantiate a tenuous connection. Finally, the regulation of violent crime is a matter of the police power the Constitution vests in the States which Congress cannot usurp through the Commerce Clause.

> **B. Under the principles set forth in *Lopez* and *Morrison*, § 247 is an unconstitutional exercise of Congress' commerce power where it regulates non-economic, intrastate conduct that does not have a substantial effect on interstate commerce and is properly the subject of the states' police power.**

As explained, § 247 regulates damaging religious real property and religiously motivated violence. It does not regulate the use of channels or instrumentalities of interstate commerce; it criminalizes vandalism and interpersonal violence. These crimes are distinctly **non**-economic activities that are within the exclusive jurisdiction of the states. *Morrison*, 529 U.S. at 611. Moreover, the legislative history of § 247 does not contain any findings that the proscribed conduct has an effect on interstate commerce– much less a substantial one. Any link that would be drawn between the conduct § 247 criminalizes and interstate commerce is an attenuated one that requires stacking inferences atop assumptions, which the Supreme Court has held cannot be done. *Morrison*, 529 U.S. at 615; *Lopez*, 514 U.S. at 564.

For these reasons, § 247 represents an unconstitutional overreach by Congress, and this Court should dismiss Counts 1-11, 34-35 and 40-51 of the superseding indictment.

1. **Section 247's constitutionality must be analyzed in the third category of permitted regulation identified in *Lopez*–activities that substantially affect interstate commerce.**

Section 247 proscribes specific conduct, *viz.,* damaging real property and religiously motivated violence. As such, it regulates an activity. It does not regulate the use of the channels of interstate commerce–roadways or railways or water routes–or the instrumentalities of interstate commerce–planes or trucks or things or people moving in interstate commerce. *Lopez*, 514 U.S. at 558. Therefore, the constitutionality of the statute must be evaluated as an exercise of Congress' commerce power under the third category of permissible regulation identified in *Lopez,* activities that substantially affect interstate commerce. *Lopez*, 514 U.S. at 558-59. For regulation of this non-economic conduct to be within Congress' commerce power, the conduct must substantially affect interstate commerce. It does not.

2. **The statute regulates criminal, non-economic activity, and the regulation is not essential to a larger, federal regulatory framework.**

Section 247 regulates property damage and religiously motivated violence. These are distinctly criminal activities that have "nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez*, 514 U.S. at 560-61. The statute also is not an essential part of a larger regulation of economic activity that would be undercut absent regulation of this intrastate criminal conduct. *Id*. at 561. The non-economic nature of the conduct § 247 regulates must be central to this Court's analysis, just as it was in *Lopez* and *Morrison*. *Morrison*, 529 U.S. at 610.

41

As the Court observed in *Morrison*, "[t]he regulation of and punishment of intrastate violence that is not **directed at** the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." *Morrison*, 529 U.S. at 618. Indeed, every aspect of the conduct charged under § 247(a)(2) constitutes a criminal offense under Pennsylvania law:

- Murder in the first degree (18 Pa.C.S. § 2502) (may be punished by death);

- Aggravated assault–intentionally or knowingly attempting to or causing serious bodily injury under circumstances manifesting extreme indifference to the value of human life (18 Pa.C.S. § 2702(a)(1));

- Aggravated assault against an officer (18 Pa.C.S. § 2702(a)(2));

- Assault of a law enforcement officer–attempting to or knowingly or intentionally causing bodily injury to a law enforcement officer (18 Pa.C.S. § 2702.1);

- Discharge of a firearm into an occupied structure (18 Pa.C.S.§ 2707.1);

- Disrupting meetings and processions–disrupting or interrupting a lawful meeting or gathering with intent to prevent or disrupt it (18 Pa.C.S. § 5508);

- Ethnic intimidation–committing any of the above offenses with malicious intent toward the religion of an individual or group of individuals (18 Pa.C.S. § 2710) (ranging from felony of the 3rd to 1st degree).[17]

These crimes are not, "in any sense of the phrase, economic activity," and the Supreme Court has upheld regulation of intrastate criminal conduct under the Commerce Clause "only where [it] is economic in nature." *Morrison*, 529 U.S. at 613. *See also*

---

[17] *See also* Pa Crime Victims Act, 18 P.S. § 11.101 *et seq.*; 71 P.S. § 180-9.1.

42

*Lopez*, 514 U.S. at 559-60 (reviewing case law sustaining federal regulation of intrastate activity).

Section 247 regulates non-economic criminal conduct that does not target channels or instrumentalities of interstate commerce. Nor is it an essential part of a larger framework regulating economic activity. For these reasons, it fails the third measure of Congressional authority identified in *Lopez*.

### 3. Section 247's jurisdictional element does not establish that it is a proper exercise of Congress' regulation of interstate commerce.

In *Lopez* and *Morrison*, the Supreme Court found the absence of jurisdictional elements in the challenged statutes weighed against finding that Congress properly exercised its commerce power. The fact that a statute contains a jurisdictional element, however, is not dispositive of its constitutionality. The inclusion of such a jurisdictional hook must be weighed against the other factors identified in *Lopez* and evaluated for its nexus to interstate commerce.

In *Morrison*, the Supreme Court noted that a jurisdictional element "**may** establish that the enactment is in pursuance of Congress' regulation interstate commerce." *Morrison*, 529 U.S. at 612 (emphasis added). Though a jurisdictional element could conceivably sustain a statute that regulates non-economic, criminal intrastate activity, it does not necessarily do so. *See United States v. Wilson*, 73 F.3d 675, 685 (7th Cir. 1995) ("[I]n *Lopez* the Court simply did not state or imply that all criminal statues must have such an element, or that all statutes with such an element would be constitutional.").

43

The Third Circuit has recognized that the sufficiency of a jurisdictional element in a statute that regulates non-economic intrastate activity is a matter for courts to decide, and it has reviewed such elements in challenges to statutes under the Commerce Clause. In *United States v. Bishop*, 66 F.3d 569 (3d Cir. 1995), the Court considered a challenge to the federal carjacking statute. Following the analysis outlined in *Lopez*, the Court observed that "[t]he mere presence of a jurisdictional element [] does not in and of itself insulate a statute from judicial scrutiny under the Commerce Clause, or render it *per se* constitutional. To the contrary, **courts must inquire further to determine whether the jurisdictional element has the requisite nexus with interstate commerce**." *Bishop*, 66 F.3d at 585 (emphasis supplied). In *United States v. Rodia*, 194 F.3d 465 (3d Cir. 1999), the Court applied *Lopez* when addressing a constitutional challenge to a federal child pornography statute. Following the instruction in *Bishop* to determine the jurisdictional element's nexus to interstate commerce, the *Rodia* Court explained that a "hard and fast rule that the presence of a jurisdictional element automatically ensures the constitutionality of a statute ignores the fact that the connection between the activity regulated and the jurisdictional hook may be so attenuated as to fail to guarantee that the activity regulated has a substantial effect on interstate commerce." *Rodia*, 194 F.3d 465, 472.

*Bishop*'s instruction must be followed here. The jurisdictional element of § 247 cannot resolve the question of whether the regulated activity **actually and substantially** affects interstate commerce. This Court must examine the subject of § 247—damage to

44

property and religiously motivated violence—and determine whether those intrastate activities have a substantial effect of interstate commerce that would permit Congress to regulate it. In this way, the jurisdictional element operates as a limitation, as opposed to a facilitator of the federal power. These activities must have a substantial effect on interstate commerce, **and only then** may Congress regulate it in those instances where it occurs in or affects interstate commerce.

This Court's inquiry must be whether the connection between criminal conduct § 247 proscribes and the statute's jurisdictional element is so attenuated that it fails "to guarantee that the [conduct] has a substantial effect on interstate commerce." *Rodia*, 194 F.3d 465, 472.

### 4. The legislative history of § 247 proves that it regulates intrastate activity that does not have a substantial effect on interstate commerce.

The current wording of § 247 reflects an amendment to the statute as it was originally enacted. The history of the first version and the reasoning for the amendment confirm that the conduct that § 247 prohibits is intrastate, non-economic activity that does not have a substantial effect on interstate commerce and is properly subject only to States' police power. Thus, the statute exceeds Congress' commerce power.

Section 247 was enacted in 1988. Pub. L. No. 100-346, § 1, 102 Stat. 644 (1988). It was Congress' response to the destruction of houses of worship, particularly African-American congregations in the southeast as a vestige of the violent suppression of the

45

civil-rights movement, and of vandalism at synagogues across the country.[18]  The

legislative history of the original statute demonstrates that the reason for its passage was

Congress' concern that houses of worship and religious practice were sacrosanct in the

United States and therefore Congress ought to protect them. *See* Hearings before the

Subcommittee on Criminal Justice of the House Judiciary Committee, 99th Cong. 1st

Session, on HR 665, 613, 775 (May 16 and June 19, 1985). There was no discussion of

the effect on interstate commerce of damage to houses of worship or religiously

motivated violence.[19] When enacted in 1988, the statute required that the offender have

---

[18]  A bill was first put forward in 1979.  *See* H.R. 5917, 96th Cong., 1st Sess. (Nov. 15, 1979).

[19] *See, e.g.,* 134 Cong. Rec. S6136-37 (daily ed. May 18, 1988) (Sen. Simon stating upon passage of S.B. 794, "Unfortunately we are seeing an increasing amount of violence directed at persons because they belong to a particular religious group. . . .  In passing this legislation Congress is sending a clear signal that the desecrations, the injuries, the deaths, are intolerable in a free society such as ours."); H.Rep.No. 100-337, 100th Cong., 1st Sess. (Oct. 2, 1987) (report on companion House bill, H.R. 3258, stating that "In view of the increase in violence motivated by religious bias, it is important that Congress help combat this threat to the free exercise of religious beliefs by making it possible for Federal authorities to investigate and prosecute persons who commit such crimes."); 133 Cong. Rec. S3536-37 (daily ed. March 19, 1987) (Sen. Metzenbaum introducing bill and stating "Our Nation has historically been committed to assuring the free exercise of religion, conduct protected by the Constitution. In cases where these fundamental liberties are threatened by others, it is appropriate that there be a specific remedy based on Federal law."); 133 Cong. Rec. S4015 (daily ed. March 26, 1987) (Sen. Roth stating "Unlike totalitarian Communist regimes, this right is not merely stated in theory in our fundamental law; it is honored in practice.  Thus, I think it most appropriate that the Federal executive be given effective means to protect the right to religious freedom when groups or individuals attempt to interfere with that right through force or violence.").

"travel[ed] in interstate or foreign commerce, or use[d] a facility or instrumentality of

interstate or foreign commerce in interstate or foreign commerce." Pub. L. No. 100-346,

§ 1, 102 Stat. 644 (1988).[20]

     In 1996, Congress amended the statute because the Department of Justice was

only able to prosecute a very small number of cases under the statute's original

jurisdictional element, which required travel in interstate commerce or use of an

instrumentality of interstate commerce in interstate commerce. In a hearing before the

House Judiciary Committee, the Chief of the Corruption/Civil Rights Section of the

Criminal Investigative Division of the Federal Bureau of Investigation stated that "the

statutory requirements of **having to prove an interstate nexus** and a monetary loss []

limited the number of investigations that the FBI could open." *See* Prepared Statement of

Tron W. Brekke, Hearing before the Committee on the Judiciary, House of

Representatives, 104th Congress, 2nd Session, May 21, 1996 ("Church Fires in the

Southeast"), at 53.[21]

---

[20] The statute also required that the property damage be worth more than $10,000.

[21] *See also id*. at 23-24 (prepared statement of Assistant Attorney General, Civil Rights Division, Department of Justice) (explaining that two intrastate arsons were prosecuted in federal court because they occurred in separate counties so "trial in state court would have required separate state indictments and resulted in the juries in each case seeing only part of the overall crime.").

  The assistant attorney general also testified that 18 U.S.C. § 844(i), which criminalizes damage to a building "used in interstate [] commerce or in an activity affecting interstate [] commerce" was an effective tool to combat church arson. Church Fires in the Southeast, at 21. This is significant for two reasons. The first is that § 844 is drawn much more narrowly to require a direct effect on interstate commerce by its requirement

Throughout the remainder of the hearing, not a single moment of testimony or evidence addressed the effects on interstate commerce from damage to houses of worship or assault that obstructs religious practice. *See id.*, at 2-3 (Rep. Conyers); 4-15 (testimony & prepared statement of Rep. Payne addressing numbers of burnings and growth of bigotry); 27-46 (testimony and prepared statement of Director, Bureau of Alcohol, Tobacco, Firearms) (discussing number of church arson incidents and investigations and characterizing burning of churches as heinous because it strikes at fundamental liberties and sources of support without mentioning any effects on commerce);[22] 47-65 (testimony and prepared statement of Chief of the Criminal Investigative Division of the Corruption/Civil Rights Division, Federal Bureau of Investigation) (discussing FBI priorities, methods, and accomplishments in investigating church arsons without mentioning any effects on interstate commerce); 66-69 (testimony and prepared statement of Assistant Secretary for Enforcement, Department of the Treasury addressing commitment of ATF to investigating church arson and its effect on a congregation's spirit

---

focused on the use of the building. *See Russell v. United States*, 541 U.S. 848 (1985) (ruling that arson of a building used as rental property fit statute's interstate commerce element); *compare Jones v. United States*, 529 U.S. 848 (2000) (finding that an owner occupied building was not used in interstate commerce or in an activity affecting interstate commerce). The second reason that the statement is significant is that the assistant attorney general's comments indicate that the focus of enforcement under § 247 was the destruction of buildings, not religiously motivated violence, the conduct at issue here.

[22] *See also id.* at 33 (denying that there was any evidence of an interstate conspiracy to damage churches).

without any discussion of interstate commerce). *See also id.* at 90 (assistant attorney general testifying that in the cases investigated under the act up to that point, the defendants had been people from within the general community where the arson occurred).

Congress made **no** finding that the non-economic conduct proscribed by § 247 substantially affects (or even affects) interstate commerce. Moreover, the government's admission that the jurisdictional element requiring travel in interstate commerce or use of an instrumentality of interstate commerce limited federal prosecutions is clear evidence that the amended statute at issue here regulates intrastate criminal activity that is properly the subject of the states' police power. *See Morrison,* 529 U.S. at 618. Furthermore, the evidence presented to Congress did **not** suggest a national interstate phenomenon. In the five and a half years between enactment and the hearing on the amendment, the Department of Justice investigated 57 incidents that resulted in 8 federal prosecutions. "Church Fires in the Southeast" at 20.

The statements of the sponsors of the amendment reflect a desire to give the statute a broader reach without there being any "express finding" of a substantial effect on interstate commerce that would support such measure. *Morrison*, 529 at 612. *See* 142 Cong. Rec. H6980-05, 1996 WL 362321.[23] *See also* "Statement of Chairman Henry J.

---

[23] Congress made the following "findings":
> (1) The incidence of arson or other destruction or vandalism of places of religious worship, and the incidence of violent interference with an

49

Hyde, Committee on the Judiciary at Full Committee Markup of H.R. 3525, June 11, 1996", 1996 WL 333028.[24] However, as the Third Circuit observed, "[t]he mere presence of a jurisdictional element [] does not in and of itself insulate a statute from judicial scrutiny under the Commerce Clause, or render it *per se* constitutional." *Bishop*, 66 F.3d at 585. There is simply no indication, much less a finding, in the legislative history of § 247 that the non-economic activity of religiously motivated violence has a substantial

---

individual's lawful exercise or attempted exercise of the right of religious freedom at a place of religious worship pose a serious national problem.

(2) The incidence of arson of places of religious worship has recently increased, especially in the context of places of religious worship that serve predominantly African-American congregations.

(3) Changes in Federal law are necessary to deal properly with this problem.

(4) Although local jurisdictions have attempted to respond to the challenges posed by such acts of destruction or damage to religious property, the problem is sufficiently serious, widespread, and interstate in scope to warrant Federal intervention to assist State and local jurisdictions.

(5) Congress has authority, pursuant to the Commerce Clause of the Constitution, to make acts of destruction or damage to religious property a violation of Federal law."

142 Cong. Rec. H6980-05, 1996 WL 362321.

[24] "The arson of a place of worship is repulsive to us as a society.  When a fire is motivated by racial hatred it is even more reprehensible. In my view there is no crime that should be more vigilantly investigated and the perpetrators more vigorously prosecuted than crimes of this type. We are dealing with depraved actions resulting from twisted and bigoted minds. It is important that this Committee move forward on this legislation to ensure that Federal law enforcement has the necessary tools to punish and deter these shameful, vile acts." 1996 WL 333028.

effect on interstate commerce that could empower Congress under the Commerce Clause to enact the statute.

Religiously motivated violence is not an economic activity, and the legislative history of § 247 demonstrates that Congress never even considered whether such conduct has a substantial effect in interstate commerce. Indeed, the legislative history reveals that hinging federal jurisdiction on use of channels and instrumentalities of interstate commerce resulted in the federal government's almost never having jurisdiction over those acts. Not only is there no Congressional finding of a sufficient effect on interstate commerce, the legislative record makes clear that the impact on interstate commerce was not the reason or justification for the amended statute.

Section 247 therefore fails to satisfy the third *Lopez* factor for determining the constitutionality of Congressional legislation under the authority of the Commerce Clause.

> **5.  Any effect that the noneconomic conduct that § 247 prohibits might have on interstate commerce is not substantial and is too attenuated to provide a basis for Congress to exercise its commerce power.**

After consideration of each of the statutory factors determining the constitutionality of Congress' exercise of its commerce power—the nature of the activity regulated, the inclusion of a jurisdictional element, and Congressional findings of a substantial effect on interstate commerce—in the final instance, the determination whether § 247's regulation substantially affects interstate commerce belongs to the

federal courts. *Lopez*, 514 U.S. at 557 n.2. For this reason, in *Morrison* and *Lopez*, the Supreme Court considered arguments by the government in support of the statutes under review. In each case, the Court found that the link between the conduct regulated and interstate commerce was too attenuated and required the Court to pile inference upon inference in search of a substantial effect on interstate commerce. The Court held this would violate the Constitution's requirement of a distinction between what is truly national and truly local. *Lopez*, 514 U.S. at 567. The same conclusion here is unavoidable.

To countenance the constitutional adequacy of § 247 based on the jurisdictional element would directly enable what *Lopez* and *Morrison* say the Constitution prohibits—following the "but-for causal chain from the initial occurrence of violent crime [] to every attenuated effect upon interstate commerce." *Morrison*, 529 U.S. at 615. The reach of the national government in the "complex society" of 1937 wherein the Supreme Court warned that embracing effects upon interstate commerce "so indirect and remote [] would effectually obliterate the distinction between what is national and what is local and create a completely centralized government," *Lopez*, 514 U.S. at 557 (quoting *Jones & Laughlin Steel*, 301 U.S. at 37), is exponentially greater in the complex society of 2020. Cell phones, foreign produced goods that are shipped interstate to retail outlets or shipped on to homes through e-commerce, vehicles manufactured abroad or domestically that are then sold and bought in the interstate used-car market, and industrial agriculture that takes produce and livestock from raising to processing and then again to retail or e-

commerce deliveries make up an all-encompassing national economic framework that can touch almost any intrastate act, thereby subjecting it to federal regulation. This would erase the distinction between States and the federal government that the Constitution requires.

> As the Third Circuit explained:

> "[I]n view of our complex society," there is virtually nothing that does not affect interstate commerce in some manner. *Lopez*, 514 U.S. at 555, 115 S.Ct. 1624. Though certain conduct may appear to be the quintessence of local activity, if we "follow the money" the trail we will always disclose some effect on interstate and/or foreign commerce. For example, though the effect is highly attenuated, driving a few blocks to pick up one's children (consumption of gasoline refined from foreign oil, and wear and tear on vehicle manufactured in another state or country) or eating dinner in front of one's own television set (consuming food and beverages from outside of state or country, as well as decisions on how to spend hundreds of millions of advertising dollars), have an indirect effect on interstate, and often foreign commerce. Even such a seemingly parochial action as borrowing a cup of sugar from a neighbor can be viewed as part of the stream of commerce that extends to refineries overseas.

*United States v. McGuire*, 178 F.3d 203, 209–10 (3d Cir. 1999).[25] In other words, there is **no** distinction between these activities with attenuated connections to

---

[25] There are other examples: Robbing a person of a cellphone is a taking by force of an instrumentality of interstate commerce that may inhibit people from buying phones or using them in public to choose a restaurant, which in turn diminishes commercial activity. Using a credit card to buy drinks for a person to get them intoxicated in order to sexually assault them touches both the channels and instrumentalities of interstate commerce – electronic financial networks and alcohol – that could have similar effect on social commercial activity; people may stop drinking alcohol or going to restaurants or bars may stop taking credit cards. Driving home across town from an extra-marital rendezvous employs an instrumentality (and perhaps a channel) of interstate commerce to engage in a ground for divorce, *see* 23 Pa.C.S.A. §3301(a)(2), which disrupts family

53

interstate commerce and that required to show the conduct criminalized under § 247 affects interstate commerce.[26] *See Morrison*, 529 U.S. at 615 (such reasoning "would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption.").

Thus, § 247 fails each of *Lopez'*s determinative measures. It regulates intrastate, non-economic criminal activity that is traditionally the subject of states' police power. It is not supported by any Congressional findings that religiously motivated violence substantially affects interstate commerce; nor is any such effect apparent to the naked eye. *Lopez,* 514 U.S. at 563. To uphold the statute simply because it contains a jurisdictional element, where that element requires the same stacked attenuated connection to interstate commerce as the Supreme Court rejected in *Lopez* and *Morrison*, would grant Congress the unlimited power that the Constitution forbids.

---

structures and diverts financial resources, thereby reducing the nation's aggregate productivity. *Compare Lopez* at 564 (rejecting "national productivity" theory to justify statute because it would empower Congress to regulate "any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody) for example."). Paying for parking with a credit card at a municipal parking meter and overstaying the time paid for uses a channel and instrumentality of interstate commerce to violate Pittsburgh Code § 541.02(C)(3), constraining space for other people to park and engage in commerce, thereby reducing aggregate productivity.

[26] Indeed, buying drinks or paying for parking is at least economic activity and therefore closer to the Congress' commerce power than the activity regulated by § 247.

For all of these reasons, §247 is unconstitutional on its face, and this Court should dismiss Counts 1-11, 34-35, and 40-51 of the superseding indictment.

### VII.   This Court should dismiss the religious obstruction charges in the superseding indictment because § 247 is invalid as applied to Mr. Bowers.

For the reasons set forth in the preceding section, this Court should find that 18 U.S.C. § 247 is unconstitutional on its face because it exceeds Congress' commerce power. If the Court were to conclude that § 247 is constitutional, it should nevertheless dismiss the § 247 counts in the superseding indictment because the statute is unconstitutional as applied to Mr. Bowers.

As the government has acknowledged, the essence of the charges against Mr. Bowers involves acts of violence at the Tree of Life Synagogue in Pittsburgh, Pennsylvania. (ECF 178 at 17 ("Distilled to their essence, the charges in this case involve the defendant's lethal, criminal acts on one day, at one location, which lasted for less than two hours.").) However, those acts did not substantially affect interstate commerce as required by § 247. Therefore, this Court should dismiss Counts 1-11, 34-35, and 40-51 of the superseding indictment.

### A.  The superseding indictment does not allege that Mr. Bowers' acts targeted the channels or instrumentalities of interstate commerce.

In *Lopez*, the Supreme Court recognized the regulation of the channels and the instrumentalities of interstate commerce as two categories of legislation that are within Congress' commerce power. *Lopez*, 514 U.S. at 558. This power to regulate the channels encompasses regulating their use and the power to keep them "free from immoral and

55

injurious uses." *Id.(*quoting *Heart of Atlanta Motel,* 379 U.S. at 256*)*. Similarly, the

power to regulate the instrumentalities of interstate commerce also encompasses the

power to protect them, as well as "persons or things **in** interstate commerce." *Id.*

(emphasis supplied). The Court cited cases upholding regulation of safety mechanisms on

vehicles used in interstate commerce, destruction of an aircraft, or theft from interstate

shipments. *Id. (*citing *Southern R. Co. v. United States*, 222 U.S. 20 (1911), and *Perez v.*

*United States*, 402 U.S. 146, 150 (1914)).

Here, the government does not allege that Mr. Bowers' acts targeted a channel or

any instrumentality of interstate commerce to satisfy § 247(b). The victims are not

alleged to have been travelling in interstate commerce, as the Court contemplated in

*Lopez*. Neither is Mr. Bowers alleged to have traveled in interstate commerce. For this

reason, the superseding indictment does not allege facts to that constitute an offense

against the channels or instrumentalities of interstate commerce that would support the

government's charges.

> **B. The superseding indictment does not allege a use of the channels or instrumentalities of interstate commerce to commit the acts of obstruction by force that establishes jurisdiction for prosecution under § 247.**

The superseding indictment does not allege that Mr. Bowers made use of either a

channel or instrumentality of interstate commerce in committing the acts that are the

"essence" of the charged conduct, though necessary to satisfy the jurisdictional element

of § 247.

1. **The superseding indictment does not allege that Mr. Bowers used the channels of interstate commerce in any way that was essential or integral to the charged offenses.**

The government does not allege that Mr. Bowers' traveled in a channel of interstate commerce in way that was essential to acts that violated § 247. The superseding indictment does not indicate that Mr. Bowers crossed state lines or even traveled on an interstate highway to get to the Tree of Life Synagogue. Though the superseding indictment references Mr. Bowers' use of the internet at home and through a cell phone, neither was essential nor integral to the charged acts of religious obstruction by force so as to make the criminal conduct "in interstate commerce" for purposes of § 247(b).

Although the superseding indictment alleges that Mr. Bowers used a cell phone to post a message on the internet before he entered the Tree of Life Synagogue (ECF 44 at 2), that act is not an element of the criminal conduct that violates § 247(a)(2). It is a defendant's **criminal** conduct that must be in or affecting interstate commerce. Posting a message is not prohibited conduct under § 247, and if Mr. Bowers had not posted the message, his acts of force that obstructed the religious practice of the victims at the synagogue would still constitute a criminal offense. Therefore, the allegation that he used the cell phone **before** he committed those acts does not make his offense "in a channel of" interstate commerce.

Similarly, the allegation in the superseding indictment that Mr. Bowers posted a comment on the internet on October 10, 2018, is not integral or essential to his alleged acts of obstruction to make those acts in a channel of interstate commerce. The alleged

57

posting occurred more than two weeks before the shooting at the Tree of Life Synagogue, far outside the two hours on October 27, 2018 wherein the government admits the criminal acts, "distilled to their essence," occurred. (ECF 178 at 17.) Therefore, use of the internet does not make the offense charged "in a channel of" interstate commerce for purposes of § 247(b).

### 2. The superseding indictment does not allege that Mr. Bowers used instrumentalities of interstate commerce.

The allegations that Mr. Bowers posted a comment on the internet from his home computer more than two weeks before committing the criminal act and from a cell phone before entering the Tree of Life Synagogue are insufficient to make his acts of religious obstruction "in the channels of" interstate commerce for purposes of prosecution under § 247. Similarly, these allegations do not constitute the use of an instrumentality of interstate commerce in the commission of the criminal acts. Mr. Bowers' alleged use of his computer and cell phone were not integral or essential to the alleged violent acts that constituted the obstruction of religious practice; nor does either use in and of itself constitute an act of obstruction. For this reason, Mr. Bowers' use of his computer and cell phone were insufficient to make his acts of obstruction "in interstate commerce" for purposes of § 247(b). *Compare United States v. Corum*, 362 F.3d 489 (8th Cir. 2004) (finding evidence that defendant obstructed religious practice at synagogues by making phone calls threatening burn them down or blow them up sufficient for conviction under

§ 247(a)(2) where the obstruction occurred by means of an instrumentality of interstate commerce).[27]

Mr. Bowers' use of firearms is likewise insufficient for purposes of the statute's jurisdictional element. The superseding indictment does not allege a connection between the guns and interstate commerce that would create a nexus to Mr. Bowers' criminal acts. The government's citation to *United States v. Singletary*, 268 F.3d 196 (3d Cir. 2001), for the proposition that proof that a gun traveled in interstate commerce is sufficient to satisfy the "in or affecting interstate commerce" element (ECF at 6 n.3), invites the Court to accept two legal fallacies. First, the argument substitutes the jurisdictional element of one statute's regulation of an **instrumentality** of interstate commerce for another statute's regulation of an intrastate non-economic **activity**. In *Singletary,* the Third Circuit denied a challenge under *Lopez* and *Morrison* to the felon-in-possession provision of 18 U.S.C. § 922(g) based on its determination that § 922(g) was quintessentially different from the statutes that the Supreme Court invalidated. The Court observed that, "while *Lopez* and *Morrison* were questions concerning the power of Congress to regulate **activities** substantially affecting interstate commerce, § 922(g)(1) regulates the possession of **goods moved in interstate commerce**." *Singletary*, 268 F.3d 196, 204

--------

[27] The shooter at the mosques in Christ Church, New Zealand, who broadcast live video of the killings, is fairly said to have acted in a channel of interstate commerce through some mechanism that was an instrumentality of interstate commerce. *See United States v. MacEwan*, 445 F.3d 237, 245 (3d Cir. 2006) ("[T]he internet is an instrumentality and channel of interstate commerce."). This is not what occurred here.

59

(emphasis supplied). Thus, the government's reliance on *Singletary* asks this Court to interpose federal jurisdiction over instrumentalities in interstate commerce for federal jurisdiction over intrastate non-economic activity. To do so would ignore the very distinction the *Singletary* Court found dispositive—that is, the difference between challenges to Congressional action under *Lopez*'s second category versus the third.[28]

The government's filing acknowledges that the essence of Mr. Bowers' criminal conduct was his lethal acts. Those acts do not include his use of technology to access and use the internet, and therefore that use does not make his acts "in" interstate commerce for purposes of § 247(b). In addition, the constitutionality of a statute that regulates an instrumentality of interstate commerce cannot establish that Mr. Bowers' criminal activity was "in" interstate commerce.

### 3. The superseding indictment does not allege that Mr. Bowers' conduct substantially affected interstate commerce.

The government does not allege that Mr. Bowers' criminal conduct had a substantial effect on interstate commerce. Such a showing cannot be made because houses of

---

[28] *Singletary* rejected any doubt that Congress' power to regulate the movement of firearms in interstate commerce includes the power to regulate their possession. *See* 18 U.S.C. § 921 "Congressional Findings and Declaration (reciting finding of widespread traffic in firearms that is beyond states' power to regulate, and the public safety risks that flow from it). That power may encompass the power to regulate the use of firearms that travel in interstate commerce to obstruct the free exercise of religion. *Compare* 18 U.S.C. 924(b) (prohibiting receipt of a firearm or any ammunition with the intent to commit an offense punishable by imprisonment for a term exceeding one year). But that is not what § 247 does.

worship and religious congregations are generally not considered business enterprises that operate in interstate commerce. *See United States v. Davies*, 394 F.3d 182 (3d Cir. 2005); *United States v. Lamont*, 330 F.3d 1249, 1255 (9th Cir. 2003); *United States v. Odom*, 252 F.3d 1289 (11th Cir. 2001).

Though houses of worship engage in commerce through the solicitation and receipt of donations, that is usually geared to providing charitable spiritual, social, and community services. *Odom*, 252 F.3d at 1294-95 (citing *United States v. Grassie*, 237 F.3d 1199, 1204 (10th Cir. 2001)). Payments for insurance, physical maintenance, utilities, and employees that are integral to carrying out that charitable purpose do not make a house of worship a commercial enterprise or the building used in interstate commerce. *United States v. Doggart*, 947 F.3d 879, 884-85 (6th Cir. 2020); *United States v. Rea*, 300 F.3d 952, 962 (8th Cir. 2002); *Odom*, 252 at 1295 (citing *United States v. Jones*, 529 U.S. 848, 858 (2000)). The same is true for the purchase of books of worship and routine office supplies. *Odom* at 1296-97. Even where houses of worship rent space within their buildings, that alone does not transform them into instrumentalities of, or create a substantial effect on, interstate commerce. *Doggart*, 947 F.3d at 886-87.

Moreover, to show **any** effect on interstate commerce from the obstruction of religious practices would require the same attenuated chain of events that *Lopez* and *Morrison* rejected as a basis for Congress' use of its commerce power. In *Odom*, the Eleventh Circuit examined aggregation of churches' connections with interstate commerce in light of *Lopez* and *Morrison*. *Odom,* 252 F.3d at 1297. The court observed

61

*Lopez*'s instruction that the purpose of aggregation is "to allow regulation of purely intrastate activity where the absence of such regulation would undercut a larger economic regulatory scheme affecting interstate commerce." *Id*. (citing *Lopez*, 514 U.S. at 561). The Court went on to observe that, in regards to non-economic criminal activity, "the *Morrison* court clearly rejected Congress' ability to 'regulate [such] conduct based solely on that conduct's aggregate effect on interstate commerce.'" As in *Odom,* there is no Congressional regulatory scheme here. Likewise, if the government cannot meet the jurisdictional requirement in a criminal statute regulating non-economic activity, it may not rely on the aggregate effect of that conduct.

The government has not and cannot allege that Mr. Bowers' criminal conduct had a substantial effect on interstate commerce. Nor can it show that Mr. Bowers' criminal conduct occurred in or affected a channel or instrumentality of interstate commerce. This stands to reason, as Mr. Bowers' activity was intrinsically non-economic and purely intrastate. For these reasons, § 247 is invalid as applied to his acts and therefore this Court should dismiss Counts 1-11, 34-35, and 40-51 of the indictment.

## VIII.   The certifications under § 247(e) and § 249(b)(2) are procedurally and substantively flawed.

Before the government can undertake a prosecution under either § 247 or § 249, it must comply with the statutes' certification requirements. *See* 18 U.S.C. §§ 247(e) & 249(b)(2). Section 247's certification requirement was added to "ensure appropriate deference to state or local prosecution in most cases, while allowing Federal prosecution

where state or local officials will not assume jurisdiction or for any reason are unable to secure a conviction." S. Rep. No. 324, 1988 U.S.C.C.A.N. 721, available at 1988 WL 170000 S. REP. 100-324, 1988 U.S.C.C.A.N. 721 (quoting letter from John Bolton, Assistant Attorney General, to Senator Joseph R. Biden, Jr., Nov. 3, 1987).

Section 249's certification requirement is intended to "ensure the federal government will assert its new hate crimes jurisdiction only in a principled and properly limited fashion." H.R. Rep. No. 111–86, at 14 (2009). The intended means of achieving that is "a full and careful evaluation of any proposed prosecution by both career prosecutors and by officials at the highest level in the Department ... before Federal charges are brought." Sen. Hrg. at 63 (statement of Attorney General Eric H. Holder).

A prosecution under § 247 cannot be undertaken until the Attorney General or his designee certifies, in writing, "that in his judgment a prosecution by the United States is in the public interest and necessary to secure substantial justice." § 247(e). Section 249 includes several bases upon which the Attorney General can rely: "(A) the State does not have jurisdiction; (B) the State has requested that the Federal Government assume jurisdiction; (C) the verdict or sentence obtained pursuant to State charges left demonstratively unvindicated the Federal interest in eradicating bias-motivated violence; or (D) a prosecution by the United States is in the public interest and necessary to secure substantial justice." § 249(b)(2)(A)-(D).

Because, as explained above in Part I, Pennsylvania has jurisdiction to prosecute Mr. Bowers and, in fact initiated a prosecution against him, the only available basis for

certification of the federal prosecution against him under § 249 was that "a prosecution by the United States is in the public interest and necessary to secure substantial justice." § 249(b)(2)(D).

On October 27, 2018, the government filed a criminal complaint alleging the obstruction of the exercise of religious beliefs, in violation of 18 U.S.C. § 247, and the use of a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) and (j). (ECF 1.) Although no certification was publicly filed, upon request, the government later provided a copy of a written certification, signed by then-Acting Assistant Attorney General of the Civil Rights Division, John M. Gore, and dated October 27, 2018.[29] The certification reads, "I, John M. Gore, hereby certify that in my judgment, prosecution by the United States of Robert Bowers for violations of Title 18, United States Code, § 247, is in the public interest and is necessary to secure substantial justice. This certification is made pursuant to Title 18, United States Code, § 247." Several days later, the federal government filed an indictment alleging offenses under the same federal statutes cited in the complaint. (ECF 10.)

---

[29] "The Assistant Attorney General for the Civil Rights Division has been delegated this certification authority. *See* 28 C.F.R. § 0.50 (delegating authority for §§ 245 and 249); Attorney General Order No. 2048-96, Delegation of Authority to Authorize the Initiation of Prosecutions under 18 U.S.C § 247 (delegating authority for § 247). No indictment, information, or criminal complaint under these statutes may issue without such certification." 8-3.141 - Certification Provisions, 2018 WL 2087446, at *1.

Several months later, on January 29, 2019, the government filed a superseding indictment alleging, for the first time, violations of the Hate Crimes Prevention Act. (ECF 44.) Again, no certification was publicly filed. Upon request, the government provided a copy of a written certification, signed by Assistant Attorney General of the Civil Rights Division, Eric S. Dreiband, dated January 28, 2019. The certification reads, "I, Eric S. Dreiband, hereby certify that in my judgment, prosecution by the United States of Robert Bowers for violations of Title 18, United States Code, § 249, is in the public interest and is necessary to secure substantial justice. This certification is made pursuant to Title 18, United States Code, § 249."

Even though the superseding indictment included charges under both Sections 247 and 249, the contemporaneous certification only certified a prosecution under § 249. Insofar as purpose of the certification requirement is to ensure that, before charges under §§ 247 and 249 are brought, the exercise of federal jurisdiction is warranted, the failure of the government to obtain certifications under both § 247(e) and § 249(b)(2) at the time of the superseding indictment was in error. A decision about whether an indictment charging only § 247 offenses is "in the public interest and necessary to secure substantial justice" is quite different from the question whether an indictment alleging violations of both § 247 and § 249 is "in the public interest and necessary to secure substantial justice." For example, one could reasonably conclude that charges under § 247 were no longer necessary in light of the decision to include violations of § 249. It would be

65

likewise reasonable to conclude that charges under § 249 were not necessary in light of the decision to include alleged violations of § 247.[30]

Given the express purposes of the statutes' certification requirements – to ensure the federal government will only assert its jurisdiction in a principled and properly limited fashion – both the decision to certify, and the required written memorialization of that decision, should address the public interest in, and the need for, charges under both statutes. The government's procedural failure to obtain a separate certification of the § 247 charges at the time it filed a superseding indictment requires dismissal of the charges under both §§ 247 and 249, as neither the Court nor the public can be assured that "a full and careful evaluation of [the] proposed prosecution by both career prosecutors and by officials at the highest level in the Department" was undertaken pursuant to both statutes before the superseding indictment was filed.[31] Sen. Hrg. (statement of Attorney General Eric H. Holder).

---

[30] It is worth noting that in *Roof*, where the government also sought to prosecution under both §§ 247 and 249, the Attorney General (not her designee) signed two certifications, on the same date prior to the date the indictment was filed, that were publicly filed along with the indictment. *United States v. Roof*, 2:15-cr-472, ECF 2 (July 22, 2015), attached as Exhibit E.

[31] Where, as here, the two certifications were not only done at different times, with different considerations, they were done by different actors – one an Acting Assistant Attorney General – the need for an assessment of the decision to proceed with prosecutions under both statutes is heightened.

Even if the certification process had been faithfully followed with its intended purpose in mind, the decision to certify the public interest in, and the necessity of, a federal prosecution here is nevertheless unwarranted. As the government asserts, "[a]t all times relevant to the Superseding Indictment," Mr. Bowers was a resident of Allegheny County, Pennsylvania. (ECF 44 at 1.) In addition, each count of the indictment alleges conduct that occurred in Western District of Pennsylvania, and nowhere else. (Doc. 44.) Indeed, Allegheny County has initiated prosecution under Pennsylvania's own hate crimes statute and homicide statute, statutes that carry a maximum of death or life imprisonment without the possibility of parole. However, its efforts have been thwarted by the federal government's refusal to honor the writ of habeas corpus *ad prosequendum* issued by an Allegheny County judge and its movement of Mr. Bowers into a different county and out of the reach of the Allegheny County prosecution team.

Given these circumstances, where the federal government has usurped Pennsylvania's efforts to assert its own jurisdiction police its own citizens, the Attorney General's certification that its conduct is "in the public interest and necessary to secure substantial justice" is unwarranted. Mr. Bowers requests that this Court conduct a substantive review of the certification.[32]

For all of the reasons stated, this Court should find that the certification process

---

[32] Although the Third Circuit has yet to address whether a certification under either § 247 or § 249 is subject to substantive review or for procedural defects, courts appear to be split on the issue.

was procedurally flawed and that the decision to assert federal jurisdiction here was unwarranted, and dismiss the §§ 247 and 249 charges in the superseding indictment.

**Conclusion**

For the reasons set forth above, Mr. Bowers moves this Court to dismiss Counts 1-11, 23-35, and 38-63 of the superseding indictment.

Respectfully submitted,

*/s/ Judy Clarke*
Judy Clarke
Clarke Johnston Thorp & Rice, PC

*/s/ Michael J. Novara*
Michael J. Novara
First Assistant Federal Public Defender

*/s/ Elisa A. Long*
Elisa A. Long
Supervisory Assistant Federal Public Defender

| COMMONWEALTH OF PENNSYLVANIA | POLICE CRIMINAL COMPLAINT |
|---|---|
| COUNTY OF: ALLEGHENY | COMMONWEALTH OF PENNSYLVANIA VS. |

MDJ· PITTSBURGH MUNICIPAL COURT
Magisterial District Number· 05-0-03
Address. 660 FIRST AVENUE
PITTSBURGH, PA 15219

Phone: 412.350.6715

**POLICE CRIMINAL COMPLAINT**
**COMMONWEALTH OF PENNSYLVANIA**
**VS.**

DEFENDANT: *(NAME and ADDRESS):*
ROBERT GREGORY BOWERS
First Name   Middle Name   Last Name   Gen.
5323 MCANULTY ROAD PITTSBURGH, PA 15227

NCIC Extradition Code Type

Felony - Full Extradition
Distance: ___

**DEFENDANT IDENTIFICATION INFORMATION**

Docket Number: CR.9000-1K   Date Filed: 10/37/18   OTN/LiveScan Number: G 822246-5   Complaint/Incident Number: 18213087   Request Lab Services? ☐ Yes

| GENDER MALE | DOB 09/04/1972 | POB | Add'l DOB | Co-Defendant(s) ☐ |
| RACE WHITE | First Name | Middle Name | Last Name | Gen. |
| ETHNICITY | AKA | | | |

HAIR COLOR BRO (BROWN)   EYE COLOR BLU (BLUE)   WEIGHT (lbs.) 225

| DNA | | DNA Location | | |
| FBI Number | | MNU Number | Ft. 6 HEIGHT in. 00 |
| Defendant Fingerprinted | | | |
| Fingerprint Classification | | | |

**DEFENDANT VEHICLE INFORMATION**

| Plate # | State | Hazmat | Registration Sticker (MM/YY) | Comm'l Veh. Ind. | School Veh. | Oth. NCIC Veh. Code | Reg. Same as Def. |
|---|---|---|---|---|---|---|---|
| VIN | | Year | Make | Model | Style | Color | |

Office of the attorney for the Commonwealth ☒ Approved ☐ Disapproved because: _____

(The attorney for the Commonwealth may require that the complaint, arrest warrant affidavit, or both be approved by the attorney for the Commonwealth prior to filing. See Pa.R.Crim.P. 507).

name of the attorney for the Commonwealth)   (Signature of the attorney for the Commonwealth)   (Date)

I, EDWARD FALLERT   19132
(Name of the Affiant)   (PSP/MPOETC -Assigned Affiant ID Number & Badge #)
of CITY OF PITTSBURGH   PAPPD0000
(Identify Department or Agency Represented and Political Subdivision)   (Police Agency ORI Number)

do hereby state: (check appropriate box)
1. x   I accuse the above named defendant who lives at the address set forth above
I accuse the defendant whose name is unknown to me but who is described as _____

I accuse the defendant whose name and popular designation or nickname are unknown to me and whom I have, therefore, designated as John Doe or Jane Doe

with violating the penal laws of the Commonwealth of Pennsylvania at   301   PITTSBURGH CITY
(Subdivision Code)   (Place-Political Subdivision)

In Allegheny County   02 (County Code)   on or about   10/27/2018   9:54

AOPC 412A - Rev. 07/18   Page 1 of 7

**EXHIBIT A**

POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: | OTN/LiveScan Number | | Complaint/Incident Number |
|---|---|---|---|---|
| | | G 822246-5 | | 18213087 |
| Defendant Name | First: ROBERT | Middle: GREGORY | | Last: BOWERS |

The acts committed by the accused are described below with each Act of Assembly or statute allegedly violated, if appropriate. When there is more than one offense, each offense should be numbered chronologically.
(Set forth a *brief* summary of the facts sufficient to advise the defendant of the nature of the offense(s) charged. A citation to the statute(s) allegedly violated, without more, is not sufficient. In a summary case, you must cite the specific section(s) and subsection(s) of the statute(s) or ordinance(s) allegedly violated. In addition, social security numbers and financial information (e.g. PINS) should not be listed. If the identity of an account must be established, list only the last four digits. 204 PA.Code §§213.1 – 213.7.)

| Inchoate Offense | ☐ Attempt 18 901 A | | ☐Solicitation 18 902 A | | ☐Conspiracy 18 903 | | | |
|---|---|---|---|---|---|---|---|---|

| X | 1 | 2501 | A | of the | 18 | 11 | H1 | | |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data (if applicable) | Accident Number | | | ☐ Safety Zone | | ☐ Work Zone |
|---|---|---|---|---|---|---|

Statute Description/Acts of the accused associated with this Offense:

18 2501A CRIMINAL HOMICIDE H1    11 COUNTS
   The actor intentionally, knowingly, recklessly or negligently caused the death of Victim 1 another human being, in violation of 18 Pa. C.S. §2501(a).
   The actor intentionally, knowingly, recklessly or negligently caused the death of Victim 2 another human being, in violation of 18 Pa. C.S. §2501(a).
   The actor intentionally, knowingly, recklessly or negligently caused the death of Victim 3 another human being, in violation of 18 Pa. C.S. §2501(a).
   The actor intentionally, knowingly, recklessly or negligently caused the death of Victim 4 another human being, in violation of 18 Pa. C.S. §2501(a).
   The actor intentionally, knowingly, recklessly or negligently caused the death of Victim 5 another human being, in violation of 18 Pa. C.S. §2501(a).
   The actor intentionally, knowingly, recklessly or negligently caused the death of Victim 6 another human being, in violation of 18 Pa. C.S. §2501(a).
   The actor intentionally, knowingly, recklessly or negligently caused the death of Victim 7 another human being, in violation of 18 Pa. C.S. §2501(a).
   The actor intentionally, knowingly, recklessly or negligently caused the death of Victim 8 another human being, in violation of 18 Pa. C.S. §2501(a).
   The actor intentionally, knowingly, recklessly or negligently caused the death of Victim 9 another human being, in violation of 18 Pa. C.S. §2501(a).
   The actor intentionally, knowingly, recklessly or negligently caused the death of Victim 10 another human being, in violation of 18 Pa. C.S. §2501(a).
   The actor intentionally, knowingly, recklessly or negligently caused the death of Victim 11 another human being, in violation of 18 Pa. C.S. §2501(a).

AOPC 412A – Rev. 09/08

# EXHIBIT A

🏛 **POLICE CRIMINAL COMPLAINT**

| Docket Number: | Date Filed: | OTN/LiveScan Number | Complaint/Incident Number |
|---|---|---|---|
| | | G 822246-5 | 18213087 |
| Defendant Name | First: ROBERT | Middle: GREGORY | Last: BOWERS |

| Inchoate Offense | [x] Attempt 18 901 A | | | | [ ] Solicitation 18 902 A | | | [ ] Conspiracy 18 903 | |
|---|---|---|---|---|---|---|---|---|---|

| 2 | 2501 | A | of the | 18 | 6 | H1 | | |
|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data (if applicable) | Accident Number | | [ ] Safety Zone | [ ] Work Zone |
|---|---|---|---|---|

Statute Description/Acts of the accused associated with this Offense:

18 901A CRIMINAL ATTEMPT H1    6 COUNTS
   The actor committed an attempt when, with intent to commit the crime of 18:2501:A, the said actor did the act or acts of Homicide, which constituted a substantial step toward the commission of the aforesaid crime, in violation of 18 Pa. C.S. §901(a).
   The actor committed an attempt when, with intent to commit the crime of 18:2501:A, the said actor did the act or acts of Homicide, which constituted a substantial step toward the commission of the aforesaid crime, in violation of 18 Pa. C.S. §901(a).
   The actor committed an attempt when, with intent to commit the crime of 18:2501:A, the said actor did the act or acts of Homicide, which constituted a substantial step toward the commission of the aforesaid crime, in violation of 18 Pa. C.S. §901(a).
   The actor committed an attempt when, with intent to commit the crime of 18:2501:A, the said actor did the act or acts of Homicide, which constituted a substantial step toward the commission of the aforesaid crime, in violation of 18 Pa. C.S. §901(a).
   The actor committed an attempt when, with intent to commit the crime of 18:2501:A, the said actor did the act or acts of Homicide, which constituted a substantial step toward the commission of the aforesaid crime, in violation of 18 Pa. C.S. §901(a).
   The actor committed an attempt when, with intent to commit the crime of 18:2501:A, the said actor did the act or acts of Homicide, which constituted a substantial step toward the commission of the aforesaid crime, in violation of 18 Pa. C.S. §901(a).

| Inchoate Offense | [ ] Attempt 18 901 A | | | | [ ] Solicitation 18 902 A | | | [ ] Conspiracy 18 903 | |
|---|---|---|---|---|---|---|---|---|---|

| 3 | 2702 | A1 | of the | 18 | 2 | F1 | | |
|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data (if applicable) | Accident Number | | [ ] Safety Zone | [ ] Work Zone |
|---|---|---|---|---|

Statute Description/Acts of the accused associated with this Offense:

18 2702A1 AGGRAVATED ASSAULT F1    2 COUNTS
   The actor attempted to cause serious bodily injury to Victim 12 or caused such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life, in violation of 18 Pa.C.S. §2702(a)(1).
   The actor attempted to cause serious bodily injury to Victim 13 or caused such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life, in violation of 18 Pa.C.S. §2702(a)(1).

AOPC 412A – Rev. 09/08

# EXHIBIT A

🏛 **POLICE CRIMINAL COMPLAINT**

| Docket Number: | Date Filed: | OTN/LiveScan Number<br>G 822246-5 | | Complaint/Incident Number<br>18213087 |
|---|---|---|---|---|
| Defendant Name | First:<br>ROBERT | Middle:<br>GREGORY | | Last:<br>BOWERS |

| Inchoate<br>Offense | ☐ Attempt<br>18 901 A | | ☐Solicitation<br>18 902 A | | ☐Conspiracy<br>18 903 | | | |
|---|---|---|---|---|---|---|---|---|

| Lead? | Offense# | Section | Subsection | of the | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |
|---|---|---|---|---|---|---|---|---|---|
| | 4 | 2702 | A2 | | 18 | 4 | F1 | | |

| PennDOT Data<br>(if applicable) | Accident<br>Number | | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|

Statute Description/Acts of the accused associated with this Offense:

18 2702A2 AGGRAVATED ASSAULT F1   4 COUNTS
   The actor attempted to cause or intentionally, knowingly or recklessly caused serious bodily injury to Police Officer #1 while in the performance of duty, as defined in section 2702(c) or engaged in public transportation, in violation of 18 Pa. C.S. §2702(a)(2).
   The actor attempted to cause or intentionally, knowingly or recklessly caused serious bodily injury to Police Officer #2 while in the performance of duty, as defined in section 2702(c) or engaged in public transportation, in violation of 18 Pa. C.S. §2702(a)(2).
   The actor attempted to cause or intentionally, knowingly or recklessly caused serious bodily injury to Police Officer #3 while in the performance of duty, as defined in section 2702(c) or engaged in public transportation, in violation of 18 Pa. C.S. §2702(a)(2).
   The actor attempted to cause or intentionally, knowingly or recklessly caused serious bodily injury to Police Officer #4 while in the performance of duty, as defined in section 2702(c) or engaged in public transportation, in violation of 18 Pa. C.S. §2702(a)(2).

# EXHIBIT A

POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: | OTN/LiveScan Number<br>G 822246-5 | | Complaint/Incident Number<br>18213087 |
|---|---|---|---|---|
| Defendant Name | First:<br>ROBERT | | Middle:<br>GREGORY | Last:<br>BOWERS |

| Inchoate<br>Offense | ☐ Attempt<br>18 901 A | | | ☐Solicitation<br>18 902 A | | ☐Conspiracy<br>18 903 | | |
|---|---|---|---|---|---|---|---|---|

| | 5 | 2710 | A | of the | 18 | 13 | F1 | | |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data<br>(if applicable) | Accident<br>Number | | | ☐ Safety Zone | ☐Work Zone |
|---|---|---|---|---|---|

Statute Description/Acts of the accused associated with this Offense:

18 2710A ETHNIC INTIMIDATION F1   13 COUNTS
   The actor with malicious intention toward the actual or perceived race, color, religion, national origin of another individual or group of individuals, namely, Victim 1 committed the offense of Homicide with respect to such individual(s) or his or her property or with respect to one or more members of such group or their property, in violation of 18 Pa. C.S. §2710 (a).
   The actor with malicious intention toward the actual or perceived race, color, religion, national origin of another individual or group of individuals, namely, Victim 2 committed the offense of Homicide with respect to such individual(s) or his or her property or with respect to one or more members of such group or their property, in violation of 18 Pa. C.S. §2710 (a).
   The actor with malicious intention toward the actual or perceived race, color, religion, national origin of another individual or group of individuals, namely, Victim 3 committed the offense of Homicide with respect to such individual(s) or his or her property or with respect to one or more members of such group or their property, in violation of 18 Pa. C.S. §2710 (a).
   The actor with malicious intention toward the actual or perceived race, color, religion, national origin of another individual or group of individuals, namely, Victim 4 committed the offense of Homicide with respect to such individual(s) or his or her property or with respect to one or more members of such group or their property, in violation of 18 Pa. C.S. §2710 (a).
   The actor with malicious intention toward the actual or perceived race, color, religion, national origin of another individual or group of individuals, namely, Victim 5 committed the offense of Ho with respect to such individual(s) or his or her property or with respect to one or more members of such group or their property, in violation of 18 Pa. C.S. §2710 (a).
   The actor with malicious intention toward the actual or perceived race, color, religion, national origin of another individual or group of individuals, namely, Victim 6 committed the offense of Homicide with respect to such individual(s) or his or her property or with respect to one or more members of such group or their property, in violation of 18 Pa. C.S. §2710 (a).
   The actor with malicious intention toward the actual or perceived race, color, religion, national origin of another individual or group of individuals, namely, Victim 7 committed the offense of Homicide with respect to such individual(s) or his or her property or with respect to one or more members of such group or their property, in violation of 18 Pa. C.S. §2710 (a).
   The actor with malicious intention toward the actual or perceived race, color, religion, national origin of another individual or group of individuals, namely, Victim 8 committed the offense of Homicide with respect to such individual(s) or his or her property or with respect to one or more members of such group or their property, in violation of 18 Pa. C.S. §2710 (a).
   The actor with malicious intention toward the actual or perceived race, color, religion, national origin of another individual or group of individuals, namely, Victim 9 committed the offense of Homicide with respect to such individual(s) or his or her property or with respect to one or more members of such group or their

# EXHIBIT A

🦅 **POLICE CRIMINAL COMPLAINT**

| Docket Number: | Date Filed: | OTN/LiveScan Number | Complaint/Incident Number |
|---|---|---|---|
| | | G 822246-5 | 18213087 |
| Defendant Name | First:<br>ROBERT | Middle:<br>GREGORY | Last:<br>BOWERS |

property, in violation of 18 Pa. C.S. §2710 (a).

The actor with malicious intention toward the actual or perceived race, color, religion, national origin of another individual or group of individuals, namely, Victim 10 committed the offense of Homicide with respect to such individual(s) or his or her property or with respect to one or more members of such group or their property, in violation of 18 Pa. C.S. §2710 (a).

The actor with malicious intention toward the actual or perceived race, color, religion, national origin of another individual or group of individuals, namely, Victim 11 committed the offense of Homicide with respect to such individual(s) or his or her property or with respect to one or more members of such group or their property, in violation of 18 Pa. C.S. §2710 (a).

The actor with malicious intention toward the actual or perceived race, color, religion, national origin of another individual or group of individuals, namely, Victim 12 committed the offense of Aggravated asault/ criminal attempt homicide with respect to such individual(s) or his or her property or with respect to one or more members of such group or their property, in violation of 18 Pa. C.S. §2710 (a).

The actor with malicious intention toward the actual or perceived race, color, religion, national origin of another individual or group of individuals, namely, Victim 13 committed the offense of Aggravated asault/ criminal attempt homicide with respect to such individual(s) or his or her property or with respect to one or more members of such group or their property, in violation of 18 Pa. C.S. §2710 (a).

# EXHIBIT A

🦅 **POLICE CRIMINAL COMPLAINT**

| Docket Number: | Date Filed: | OTN/LiveScan Number<br>G 822246-5 | | Complaint/Incident Number<br>18213087 |
|---|---|---|---|---|
| Defendant Name | First:<br>ROBERT | | Middle:<br>GREGORY | Last:<br>BOWERS |

2. I ask that a warrant of arrest or a summons be issued and that the defendant be required to answer the charges I have made.

3. I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 PA.C.S.§4904) relating to unsworn falsification to authorities.

4. This complaint is comprised of the preceding page(s) numbered        through

5. I certify that this filing complies with the provisions of the Case Records Public Access Policy of the Unified Judicial System of Pennsylvania that require filing confidential information and documents differently than non-confidential information and documents.

The acts committed by the accused, as listed and hereafter, were against the peace and dignity of the Commonwealth of Pennsylvania and were contrary to the Act(s) of the Assembly, or in violation of the statutes cited.
**(Before a warrant of arrest can be issued, an affidavit of probable cause must be completed, sworn to before the issuing authority, and attached.)**

_____    _____    _____
                                                      (Signature of Affiant)

(Date)

AND NOW, on this date _____10-27-18_____ I certify that the complaint has been properly completed and verified.

An affidavit of probable cause must be completed before a warrant can be issued.

_____    _____
(Magisterial District Court Number)    (Issuing Authority)

AOPC 412A - Rev. 09/08

# EXHIBIT A

🏛 **POLICE CRIMINAL COMPLAINT**

| Docket Number: | Date Filed: | OTN/LiveScan Number<br>G 822246-5 | | Complaint/Incident Number<br>18213087 |
|---|---|---|---|---|
| Defendant Name | First:<br>ROBERT | Middle:<br>GREGORY | | Last:<br>BOWERS |

## AFFIDAVIT of PROBABLE CAUSE

1. **WHEN:**

   a) Date when Affiant received information:

      10/27/2018

   b) Date when the source of information (Police Officers, Informant, Victim, Co-Defendant, Defendant, etc.) received information:

      10/27/2018

2. **HOW:**

   a) How Affiant knows this particular person committed crime: (personal observation, defendant's admissions, etc.):

      Personal observations of Police Officers on scene and information received

   b) How the source of information knows this particular person committed the crime:

      Personal observations of Police Officers on scene

   c) How both Affiant and/or source of information knows that a particular crime has been committed:

      Personal observations of Police Officers on scene

3. **WHAT CRIMES:**

# EXHIBIT A

🏛️ **POLICE CRIMINAL COMPLAINT**

| Docket Number: | Date Filed: | OTN/LiveScan Number<br>G 822246-5 | | Complaint/Incident Number<br>18213087 |
|---|---|---|---|---|
| Defendant Name | First:<br>ROBERT | | Middle:<br>GREGORY | Last:<br>BOWERS |

18 2501 A CRIMINAL HOMICIDE
18 2501 A CRIMINAL HOMICIDE
18 2501 A CRIMINAL HOMICIDE
18 2501 A CRIMINAL HOMICIDE
18 2501 A CRIMINAL HOMICIDE
18 2501 A CRIMINAL HOMICIDE
18 2702 A2 AGGRAVATED ASSAULT
18 901 A CRIMINAL ATTEMPT
18 901 A CRIMINAL ATTEMPT
18 901 A CRIMINAL ATTEMPT
18 901 A CRIMINAL ATTEMPT
18 901 A CRIMINAL ATTEMPT
18 2710 A ETHNIC INTIMIDATION
18 2710 A ETHNIC INTIMIDATION
18 2702 A2 AGGRAVATED ASSAULT
18 2702 A2 AGGRAVATED ASSAULT
18 2710 A ETHNIC INTIMIDATION
18 2710 A ETHNIC INTIMIDATION
18 2710 A ETHNIC INTIMIDATION
18 2501 A CRIMINAL HOMICIDE
18 2501 A CRIMINAL HOMICIDE
18 2501 A CRIMINAL HOMICIDE
18 2501 A CRIMINAL HOMICIDE
18 2501 A CRIMINAL HOMICIDE
18 2702 A2 AGGRAVATED ASSAULT
18 2702 A1 AGGRAVATED ASSAULT
18 2702 A1 AGGRAVATED ASSAULT
18 901 A CRIMINAL ATTEMPT
18 2710 A ETHNIC INTIMIDATION
18 2710 A ETHNIC INTIMIDATION
18 2710 A ETHNIC INTIMIDATION
18 2710 A ETHNIC INTIMIDATION
18 2710 A ETHNIC INTIMIDATION
18 2710 A ETHNIC INTIMIDATION
18 2710 A ETHNIC INTIMIDATION
18 2710 A ETHNIC INTIMIDATION

4.   **WHERE CRIME(S) COMMITTED:**

TREE OF LIFE SYNAGOGUE

# EXHIBIT A

🜂 **POLICE CRIMINAL COMPLAINT**

| Docket Number: | Date Filed: | OTN/LiveScan Number | Complaint/Incident Number |
|---|---|---|---|
| | | G 822246-5 | 18213087 |

| Defendant Name | First: ROBERT | Middle: GREGORY | Last: BOWERS |
|---|---|---|---|

5. **WHY AFFIANT BELIEVES THE SOURCE OF INFORMATION:**

   X   Source is presumed reliable, i.e. other Police Officer, Eyewitness, Victim of Crime, etc.

   Source has given information in the past which has led to arrest and/or conviction

   Defendant's reputation for criminal activity

   X   This source made declaration against his/her penal interest to the above offense

   X   Affiant and/or other Police Officers corroborated details of the information

# EXHIBIT A

🏛️ **POLICE CRIMINAL COMPLAINT**

| Docket Number: | Date Filed: | OTN/LiveScan Number | | Complaint/Incident Number |
|---|---|---|---|---|
| | | G 822246-5 | | 18213087 - |
| Defendant Name | First:<br>ROBERT | Middle:<br>GREGORY | | Last:<br>BOWERS |

Your affiants, Edward A. Fallert and James D. McGee, are Pittsburgh Police Detectives and are currently assigned to the Violent Crime Division. Together we have a combined 55 years of law enforcement experience and have been detectives for the past 42 years. During our tenure we have conducted thousands of investigations involving violent crimes to include murder, aggravated assault and robberies involving firearms or other deadly weapons.

The information contained in this affidavit was learned directly by your affiants or by other law enforcement officers who assisted in this investigation.

On Saturday, October 27, 2018 at approximately 0954 hours 911 dispatch received multiple calls to the Tree of Life Jewish Synagogue, located at 5898 Wilkins Avenue, Pittsburgh, 15217 for gunshots being fired. At that time multiple people were in attendance at the Tree Of Life Synagogue and engaged in religious services and worship. Callers inside the Synagogue reported an active shooter inside the location firing gunshots and relayed that they were being attacked.

Zone 4 Officers responded to the scene. Officers 1 and 2 arrived on scene and observed a male who was armed with an assault-style rifle. This male, who was later identified as Robert BOWERS, opened fire on Officers 1 and 2, who then returned fire. During the exchange Officer 1 was shot in the hand. Officer 2 received several cuts to his face from shrapnel and broken glass. Bowers then retreated further into the building.

Pittsburgh SWAT formed a small team and entered the structure. Inside the Synagogue, they observed that BOWERS had shot and killed multiple victims (11 in total which consisted of 3 women and 8 male victims). Two victims (1 female and 1 male) received gunshot wounds and were carried by SWAT Medics and Officers to the exterior of the building. They were then transported by Pittsburgh Paramedics to UPMC Presbyterian Hospital for treatment and are now listed as being in stable condition.

In the course of the deadly assaults, BOWERS proceeded to the third floor of the building.
SWAT operators entered the third floor of the building. While searching for any remaining victims, Swat Operators encountered Bowers, who opened fire on the officers. During the gunfire, Officer 3 was shot multiple times and critically wounded. Officer 4 was also shot multiple times by the actor. The remaining SWAT Operators engaged the suspect in a gun battle in which multiple rounds were exchanged. Swat Operators carried the injured officers to the exterior of the building and both Officers were transported by Pittsburgh Paramedics for treatment.

During the exchange of gunfire Bowers was wounded. While in custody and receiving medical treatment BOWERS made statements to SWAT Operator David Blahut that he wanted all Jews to die and also that they (Jews) were committing genocide to his people.

Based on the forgoing your affiants aver that there is probable cause to charge Robert Bowers with 11 counts of Criminal Homicide for the victims located inside the Synagogue, also 6 counts of Attempted Homicide and 6 counts of Aggravated Assault for the 2 victims who were shot inside the Synagogue by Bowers and the 4 Officers who were shot by Bowers during his rampage. Your affiants also believe that probable cause exists to charge Bowers with 13 court of Ethnic Intimidation for the Homicides and Assaults that he committed based on what Bowers himself described as his hatred for "Jews".



# EXHIBIT A

## 🏛 POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: | OTN/LiveScan Number G 822246-5 | | Complaint/Incident Number 18213087 |
|---|---|---|---|---|
| Defendant Name | First: ROBERT | | Middle: GREGORY | Last: BOWERS |

I,  EDWARD FALLERT  , BEING DULY SWORN ACCORDING TO THE LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

I CERTIFY THAT THIS FILING COMPLIES WITH THE PROVISIONS OF THE CASE RECORDS PUBLIC ACCESS POLICY OF THE UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA THAT REQUIRE FILING CONFIDENTIAL INFORMATION AND DOCUMENTS DIFFERENTLY THAN NON-CONFIDENTIAL INFORMATION AND DOCUMENTS.

(Signature of Affiant)

Sworn to me and subscribed before me this 27 day of OCTOBER 2018

10-27-18 Date

, Magisterial District Judge

My commission expires  first Monday of January,

# EXHIBIT A

# The Washington Post

*Democracy Dies in Darkness*

+

# Suspect in Pittsburgh synagogue shooting is charged in 44-count hate-crime indictment

By **Matt Zapotosky**, **Devlin Barrett** and **Mark Berman**

Oct. 31, 2018 at 2:51 p.m. EDT

The suspect in a grisly shooting that left 11 people dead at a Pittsburgh synagogue was charged Wednesday in a 44-count indictment accusing him of federal hate crimes.

Officials say Robert Bowers, 46, of Baldwin, Pa., drove to Tree of Life synagogue armed with Glock .357 handguns and a Colt AR-15 rifle. The indictment charges that while inside the synagogue, Bowers made statements indicating his desire to "kill Jews."

In a statement announcing the indictment, Attorney General Jeff Sessions said the alleged crimes "are incomprehensibly evil and utterly repugnant to the values of this nation. Therefore this case is not only important to the victims and their loved ones, but to the city of Pittsburgh and the entire nation."

AD

**EXHIBIT B**

The indictment charges Bowers, a truck driver, with killing 11 people, and for each of those victims he faces separate counts of obstruction of free exercise of religion resulting in death and of using a firearm to commit murder during a crime of violence.

He also faces charges of attempting to kill people exercising their religious beliefs and civil rights charges related to injuring several police officers who responded to the attack.

The charges carry a possible death sentence, and the Justice Department has said previously that federal prosecutors in Pittsburgh had initiated the process to seek such a punishment. The case, though, must still be reviewed by Justice Department lawyers specializing in capital cases, and the final decision will ultimately be left to the attorney general.

AD

**EXHIBIT B**

The attack was the deadliest on Jews in U.S. history — killing worshipers who ranged in age from 54 to 97. Among those slain were two brothers who had attended services each week since boyhood, a doctor who led Torah studies and a research assistant who took turns as a front-door greeter. The indictment listed each victim only by initials.

Little is known about Bowers — aside from an allegedly deep capacity to hate. Neighbors said he seldom had visitors at his apartment in Baldwin, though he exchanged greetings with passersby. Online, though, he posted anti-Semitic and racist rants, comparing Jews to Satan and using slurs to refer to women who had relationships with black men.

Bowers also faces number of state charges filed over the weekend, including 11 counts of criminal homicide. Allegheny County District Attorney Stephen A. Zappala Jr. said Tuesday his office sought to have Bowers arraigned on the state charges but was denied by federal authorities. Zappala said that he would prefer that local residents "sit in judgment" of Bowers in a trial but would let the federal case proceed and put the state charges on hold for the time being. The district attorney has signaled he is likely to also pursue a death sentence for Bowers.

AD

While the Bureau of Alcohol, Tobacco, Firearms and Explosives said Tuesday that

**EXHIBIT B**

Bowers legally acquired and possessed the guns found in the synagogue and his home, the agency said Wednesday that this announcement was "premature" and that "no determination" had been made yet.

Authorities have not said whether Bowers — who was wounded during the gun battle with police responding at the synagogue — is cooperating with investigators or detailed what he may have told them. But according to the hospital that treated him for two days after the attack, he continued making comments there about wanting to kill Jews, even as some of the nurses and doctors who treated him were Jewish.

The federal public defender's office did not immediately respond to a message seeking comment about the case.

AD

**EXHIBIT B**

# EXHIBIT B

# EXHIBIT B

IN THE COURT OF COMMON PLEAS, ALLEGHENY COUNTY, PENNSYLVANIA

CRIMINAL DIVISION

| COMMONWEALTH OF PENNSYLVANIA | CRIMINAL DIVISION |
|---|---|
| V. | |
| **ROBERT BOWERS** | **MD#** |
| DOC #189380 | OTN# G 822246-5 |

<u>PETITION FOR WRIT OF HABEAS CORPUS AD PROSEQUENDUM</u>

TO THE HONORABLE, THE JUDGES OF SAID COURT:

The petition of STEPHEN A. ZAPPALA JR., District Attorney of Allegheny County, Pennsylvania, by Stephie-Anna Ramaley, Deputy District Attorney, respectfully represents:

1. That the above captioned prisoner is a Federal Prisoner in the custody of the United States Marshal presently confined in the Allegheny County Jail at Pittsburgh, Pennsylvania.

2. That the said defendant has been charged in this Court at the above number(s) charged with the crime(s) of Criminal Homicide, et al, and his presence in Court will be necessary.

# EXHIBIT C

WHEREFORE, your petitioner prays your Honorable Court for a WRIT OF HABEAS CORPUS AD PROSEQUENDUM, directing the United States Marshal's at Pittsburgh, Pennsylvania, and to the Warden of the Allegheny County Jail at Pittsburgh, Pennsylvania, to RETAIN the SAID DEFENDANT at the Allegheny County Jail at Pittsburgh, Pennsylvania, AND PRODUCE him for Arraignment at the Pittsburgh Municipal Court, 660 First Avenue, Pittsburgh, Pennsylvania, on October 30, 2018. CUSTODY of the said **ROBERT BOWERS** shall be FORTHWITH RETURNED to the United States Marshal Service at Pittsburgh, Pennsylvania, at the Allegheny County Jail, Pittsburgh, Pennsylvania in the custody of the Allegheny County Sheriffs.

All costs to be paid by Allegheny County.

RESPECTFULLY SUBMITTED,
STEPHEN A. ZAPPALA JR.
DISTRICT ATTORNEY

BY: _Stephie-Anna Ramaley_
STEPHIE-ANNA RAMALEY
DEPUTY DISTRICT ATTORNEY

# EXHIBIT C

IN THE COURT OF COMMON PLEAS, ALLEGHENY COUNTY, PENNSYLVANIA

CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA                    CRIMINAL DIVISION

V.

**ROBERT BOWERS**                               MD#  5449 - 18
**DOC# 189380**                                 OTN# G 822246-5

**ORDER OF COURT**

**Transportation of a Federal Prisoner**

AND NOW, this 29TH day of October, 2018, the within petition having been presented in open Court, upon consideration thereof and upon motion of the Allegheny County District Attorney, it is hereby ORDERED that a WRIT OF HABEAS CORPUS AD PROSEQUENDUM issue, directed to the United States Marshal's at Pittsburgh, Pennsylvania and to the Warden of the Allegheny County Jail at Pittsburgh, Pennsylvania directing them to RETAIN the ABOVE CAPTIONED DEFENDANT, at the Allegheny County Jail at Pittsburgh, PA, and PRODUCE him to the Pittsburgh Municipal Court, 660 First Avenue, Pittsburgh, Pennsylvania on October 30, 2018 for the purpose of Arraignment, that said shall be securely lodged at the Allegheny County Jail at Pittsburgh, Pennsylvania WITHOUT BAIL until the end of proceedings, at which time CUSTODY shall be FORTHWITH RETURNED to the United States Marshal's Service, Pittsburgh, Pennsylvania and the Allegheny County Jail at Pittsburgh, PA.

All Costs are to be paid by Allegheny County

BY THE COURT,

ALLEGHENY COUNTY, PA
CRIMINAL DIVISION
DEPT OF COURT RECORDS

2018 OCT 29 PM 4: 21

FILED

# EXHIBIT C

# 1

## COUNTY OF ALLEGHENY

RICH FITZGERALD
COUNTY EXECUTIVE

# FAX SHEET

Date: 10-30·18

To: _____

Fax: 724·431·0443

From: AllEGHEny County

No. of Sheets: Jail

Regarding: _____

☑ Urgent    ☐ For Review    ☐ Please Reply    ☐ Please Comment

Notes:

\*\*This correspondence includes information protected by Federal and State confidentiality laws. If you are not the person to whom this correspondence is addressed you are not permitted to view its contents.

ORLANDO L. HARPER, WARDEN
**ALLEGHENY COUNTY JAIL**
950 SECOND AVENUE • PITTSBURGH, PA 15219
PHONE (412) 350-2000 • (412) 350-2032
WWW.ALLEGHENYCOUNTY.US

# EXHIBIT D



Allegheny County Jail
950 2nd Ave
Pittsburgh, PA 15219

10/30/2018 12:09:33 PM Eastern Daylight Time

## RELEASE SUMMARY - Created on 10/30/2018 12:09:33 PM Eastern Daylight Time

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | BOWERS, ROBERT | **#:** | | **Lang:** | |
| **DOB:** | | **Sex:** | M | **Race:** | W |
| **Housing:** | CO-COURT ORDER RELEASE | **SSN:** | **HIDDEN** | **Type:** | |
| **Status:** | ACTIVE | | | | |

☐ Patient Refused

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) | Height (in) | Weight | BMI |
|---|---|---|---|---|---|---|---|---|---|---|
| / | | | | | | | 0 | 0 | MAP | |

**Reason for Visit:**

**History of Medical Problems**

| Name | Date Identified | | Resolved |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| UNITED STATES OF AMERICA | CR. NO.: *2:15cr 472* |
|---|---|
| | 18 U.S.C. § 249(a)(1) |
| v. | 18 U.S.C. § 247(a)(2) |
| | 18 U.S.C. § 247(d)(1) |
| | 18 U.S.C. § 247(d)(3) |
| DYLANN STORM ROOF | 18 U.S.C. § 924(c)(1)(A) |
| | 18 U.S.C. § 924(c)(1)(C) |
| | 18 U.S.C. § 924(j) |
| | 18 U.S.C. § 3591 |
| | 18 U.S.C. § 3592 |

## INDICTMENT

THE GRAND JURY CHARGES:

1.    Defendant DYLANN STORM ROOF is a white male who, on June 17, 2015, was twenty-one years old.

2.    In April 2015, Defendant DYLANN STORM ROOF purchased a Glock, model 41, .45 caliber pistol.

3.    In the months before June 17, 2015, Defendant DYLANN STORM ROOF decided to attack African-Americans because of their race. He further decided to attack African-American worshipers in an African-American church in order to make his attack more notorious.

4.    Prior to June 17, 2015, Defendant DYLANN STORM ROOF obtained and used the website lastrhodesian.com. He

# EXHIBIT E

placed on that website a manuscript and photographs expressing his racist beliefs. In the manuscript, DYLANN STORM ROOF uses racial slurs to describe African-Americans, expresses his belief that white people are superior to African-Americans, and decries integration. The photographs on lastrhodesian.com include DYLANN STORM ROOF wearing a jacket with flags of two former apartheid African nations, displaying his Glock .45 caliber pistol, and holding a confederate flag.

5.    On the evening of June 17, 2015, Defendant DYLANN STORM ROOF drove to the Emanuel African Methodist Episcopal (AME) Church in Charleston, South Carolina, commonly referred to as "Mother Emanuel," to attack African-American parishioners engaged in religious activities. He selected Emanuel AME Church because it had a predominately African-American membership, and because it was significant to the people of Charleston, of South Carolina, and of the Nation.

6.    By attacking African-American parishioners, Defendant DYLANN STORM ROOF wanted to increase racial tensions across the Nation, and sought retribution for perceived wrongs he believed African-Americans had committed against white people.

# EXHIBIT E

7.   On the evening of June 17, 2015, African-American parishioners at Emanuel AME Church were participating in a religious worship and Bible study group led by Reverend Clementa Pinckney (a forty-one-year-old African-American man) and attended by Reverend Sharonda Coleman-Singleton (a forty-five-year-old African-American woman), Cynthia Hurd (a fifty-four-year-old African-American woman), Susie Jackson (an eighty-seven-year-old African-American woman), Ethel Lee Lance (a seventy-year-old African-American woman), K.M. (an eleven-year-old African-American girl), Reverend DePayne Middleton-Doctor (a forty-nine-year-old African-American woman), Felicia Sanders (a fifty-eight-year-old African-American woman), Tywanza Sanders (a twenty-six-year-old African-American man), Reverend Daniel Simmons, Sr. (a seventy-four-year-old African-American man), Polly Sheppard (a seventy-year-old African-American woman), and Myra Thompson (a fifty-nine-year-old African-American woman).

8.   On the evening of June 17, 2015, Defendant DYLANN STORM ROOF entered Emanuel AME Church with his Glock, model 41, .45 caliber pistol and eight magazines loaded with hollow-point bullets, with the intent of killing African-

3

**EXHIBIT E**

Americans engaged in the exercise of their religious beliefs.

9.   The parishioners welcomed Defendant DYLANN STORM ROOF into their Bible study group, and ROOF sat next to Reverend Clementa Pinckney.

10.   While the parishioners were engaged in religious worship and Bible study, Defendant DYLANN STORM ROOF drew his pistol and opened fire on the parishioners, killing Reverend Sharonda Coleman-Singleton, Cynthia Hurd, Susie Jackson, Ethel Lee Lance, Reverend DePayne Middleton-Doctor, Reverend Clementa Pinckney, Tywanza Sanders, Reverend Daniel Simmons, Sr., and Myra Thompson; and attempting to kill K.M., Felicia Sanders, and Polly Sheppard.

### COUNTS 1-9
### (Hate Crime Act Resulting in Death)

THE GRAND JURY FURTHER CHARGES:

11.   The allegations set forth in paragraphs 1 through 10 are repeated and realleged as if set forth fully herein.

12.   On or about June 17, 2015, in the District of South Carolina, Defendant DYLANN STORM ROOF willfully caused bodily injury to the below-listed victims because of their actual and perceived race and color:

4

# EXHIBIT E

| COUNT | VICTIM |
|-------|--------|
| 1 | Reverend Sharonda Coleman-Singleton |
| 2 | Cynthia Hurd |
| 3 | Susie Jackson |
| 4 | Ethel Lee Lance |
| 5 | Reverend DePayne Middleton-Doctor |
| 6 | Reverend Clementa Pinckney |
| 7 | Tywanza Sanders |
| 8 | Reverend Daniel Simmons, Sr. |
| 9 | Myra Thompson |

The offenses resulted in the death of each of the victims in Counts 1 to 9.

All in violation of Title 18, United States Code, Section 249(a)(1).

## COUNTS 10-12
### (Hate Crime Act Involving An Attempt to Kill)

THE GRAND JURY FURTHER CHARGES:

13. The allegations set forth in paragraphs 1 through 10 are repeated and realleged as if set forth fully herein.

14. On or about June 17, 2015, in the District of South Carolina, Defendant DYLANN STORM ROOF, through the

# EXHIBIT E

use of a firearm (a Glock, model 41, .45 caliber pistol),
attempted to cause bodily injury to the below-listed
victims because of their actual and perceived race and
color:

| COUNT | VICTIM |
|-------|-----------------|
| 10    | K.M.            |
| 11    | Felicia Sanders |
| 12    | Polly Sheppard  |

The offenses included an attempt to kill each of the
victims in Counts 10 to 12.

All in violation of Title 18, United States Code,
Section 249(a)(1).

## COUNTS 13-21
### (Obstruction of Exercise of Religion Resulting in Death)

THE GRAND JURY FURTHER CHARGES:

15. The allegations set forth in paragraphs 1 through
10 are repeated and realleged as if set forth fully herein.

16. On or about June 17, 2015, in the District of
South Carolina, Defendant DYLANN STORM ROOF intentionally
obstructed by force each victim listed below in the

6

# EXHIBIT E

enjoyment of that victim's free exercise of religious beliefs:

| COUNT | VICTIM |
|-------|--------|
| 13 | Reverend Sharonda Coleman-Singleton |
| 14 | Cynthia Hurd |
| 15 | Susie Jackson |
| 16 | Ethel Lee Lance |
| 17 | Reverend DePayne Middleton-Doctor |
| 18 | Reverend Clementa Pinckney |
| 19 | Tywanza Sanders |
| 20 | Reverend Daniel Simmons, Sr. |
| 21 | Myra Thompson |

The acts of Defendant DYLANN STORM ROOF resulted in the death of each victim listed in Counts 13 to 21 and were in and affected interstate commerce.

All in violation of Title 18, United States Code, Sections 247(a)(2) and 247(d)(1).

7

# EXHIBIT E

COUNTS 22-24
**(Obstruction of Exercise of Religion Involving An Attempt
to Kill and Use of a Dangerous Weapon)**

THE GRAND JURY FURTHER CHARGES:

17. The allegations set forth in paragraphs 1 through 10 are repeated and realleged as if set forth fully herein.

18. On or about June 17, 2015, in the District of South Carolina, Defendant DYLANN STORM ROOF intentionally obstructed by force and threat of force each victim listed below in the enjoyment of that victim's free exercise of religious beliefs, and attempted to do so:

| COUNT | VICTIM |
|-------|--------|
| 22 | K.M. |
| 23 | Felicia Sanders |
| 24 | Polly Sheppard |

The acts of Defendant DYLANN STORM ROOF included an attempt to kill each of the victims in Counts 22 to 24; involved the use of a dangerous weapon (a Glock, model 41, .45 caliber pistol); and were in and affected interstate commerce.

All in violation of Title 18, United States Code, Sections 247(a)(2), 247(d)(1), and 247(d)(3).

8

# EXHIBIT E

## COUNTS 25-33
### (Use of a Firearm to Commit Murder During and In Relation to a Crime of Violence)

THE GRAND JURY FURTHER CHARGES:

19.  The allegations set forth in paragraphs 1 through 10 are repeated and realleged as if set forth fully herein.

20. On or about June 17, 2015, in the District of South Carolina, Defendant DYLANN STORM ROOF knowingly used and discharged a firearm (Glock, model 41, .45 caliber pistol) during and in relation to a crime of violence for which he may be prosecuted in a court of the United States – violations of 18 U.S.C. § 249 as charged in Counts 1 to 9, and violations of 18 U.S.C. § 247 as charged in Counts 13 to 21 – and caused the death of each victim listed below through the use of the firearm in such a manner as to constitute murder as defined in 18 U.S.C. § 1111, in that the Defendant, with malice aforethought, did unlawfully kill each victim with the firearm.

| COUNT | VICTIM |
|-------|--------|
| 25 | Reverend Sharonda Coleman-Singleton |
| 26 | Cynthia Hurd |
| 27 | Susie Jackson |

# EXHIBIT E

| 28 | Ethel Lee Lance |
|----|------------------|
| 29 | Reverend DePayne Middleton-Doctor |
| 30 | Reverend Clementa Pinckney |
| 31 | Tywanza Sanders |
| 32 | Reverend Daniel Simmons, Sr. |
| 33 | Myra Thompson |

All in violation of Title 18, United States Code, Sections 924(c)(1)(A), 924(c)(1)(C), and 924(j)(1).

**NOTICE OF SPECIAL FINDINGS PURSUANT TO TITLE 18, UNITED STATES CODE, SECTIONS 3591 AND 3592**

THE GRAND JURY FURTHER FINDS:

21.  The allegations set forth in paragraphs 1 through 20 are repeated and realleged as if set forth fully herein.

22.  As to Counts 13-21 and 25-33, the Defendant DYLANN STORM ROOF:

(a)  was 18 years of age or older at the time of the offense;

(b)  intentionally killed Reverend Sharonda Coleman-Singleton, Cynthia Hurd, Susie Jackson, Ethel Lee Lance, Reverend DePayne Middleton-Doctor, Reverend Clementa Pinckney, Tywanza

10

**EXHIBIT E**

Sanders, Reverend Daniel Simmons, Sr., and Myra Thompson (18 U.S.C. § 3591(a)(2)(A));

(c) intentionally inflicted serious bodily injury that resulted in the deaths of Reverend Sharonda Coleman-Singleton, Cynthia Hurd, Susie Jackson, Ethel Lee Lance, Reverend DePayne Middleton-Doctor, Reverend Clementa Pinckney, Tywanza Sanders, Reverend Daniel Simmons, Sr., and Myra Thompson (18 U.S.C. § 3591(a)(2)(B));

(d) intentionally participated in an act, contemplating that the life of a person would be taken and intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and Reverend Sharonda Coleman-Singleton, Cynthia Hurd, Susie Jackson, Ethel Lee Lance, Reverend DePayne Middleton-Doctor, Reverend Clementa Pinckney, Tywanza Sanders, Reverend Daniel Simmons, Sr., and Myra Thompson died as a direct result of such act (18 U.S.C. § 3591(a)(2)(C));

(e) intentionally and specifically engaged in an act of violence, knowing that the act created a

# EXHIBIT E

grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Reverend Sharonda Coleman-Singleton, Cynthia Hurd, Susie Jackson, Ethel Lee Lance, Reverend DePayne Middleton-Doctor, Reverend Clementa Pinckney, Tywanza Sanders, Reverend Daniel Simmons, Sr., and Myra Thompson died as a direct result of the act (18 U.S.C. § 3591(a)(2)(D));

(f) committed the offenses charged in Counts 13-21 and 25-33 after substantial planning and premeditation to cause the death of a person (18 U.S.C. § 3592(c)(9));

(g) committed the offenses in Counts 15 and 27 (for killing Susie Jackson who was eighty-seven years old), Counts 16 and 28 (for killing Ethel Lee Lance, who was seventy years old), and Counts 20 and 32 (for killing Reverend Daniel Simmons, Sr., who was seventy-four years old) on victims who were particularly vulnerable due to old age (18 U.S.C. § 3592(c)(11)); and

12

# EXHIBIT E

(h) in committing the offenses in Counts 13-21 and 25-33, intentionally killed and attempted to kill more than one person in a single criminal episode (18 U.S.C. § 3592(c)(16)).

A *TRUE* _____ Bill

Redacted

FOREPERSON

WILLIAM N. NETTLES (jnr)
UNITED STATES ATTORNEY

VANITA GUPTA
PRINCIPAL DEPUTY ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION

13

# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CRIMINAL NO.   2:15-cr-472 |
| | § | |
| DYLANN ROOF | § | |
| | § | |

## CERTIFICATE OF THE ATTORNEY GENERAL

I, Loretta E. Lynch, hereby certify that in my judgment, prosecution by the United States of Dylann Roof for violating Title 18, United States Code, § 249(a)(1), is in the public interest and is necessary to secure substantial justice and the state lacks jurisdiction to bring a hate crime prosecution.  This certification is made pursuant to Title 18, United States Code, § 249.

Signed this 20ᵗʰ day of July , 2015.

Loretta E. Lynch
Attorney General

# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

UNITED STATES OF AMERICA          §
                                  §
V.                                §          CRIMINAL NO.    2:15-cr-472
                                  §
DYLANN ROOF                       §
                                  §
                                  §

<u>CERTIFICATE OF THE ATTORNEY GENERAL</u>

I, Loretta E. Lynch, hereby certify that in my judgment, prosecution by the United States

of Dylann Roof for violating Title 18, United States Code, § 247(a)(2), is in the public interest

and is necessary to secure substantial justice.  This certification is made pursuant to Title 18,

United States Code, § 247 (e).

Signed this _20th_ day of July, 2015.

Loretta E. Lynch
Attorney General

# EXHIBIT E