IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-292 |
| | ) | |
| ROBERT BOWERS | ) | |

**DEFENDANT'S CHALLENGE TO THE NOTICE OF INTENT TO SEEK THE DEATH PENALTY (ECF 86)**

Defendant, Robert Bowers, through undersigned counsel, respectfully moves this Court pursuant to Article I and the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, 18 U.S.C 3592 *et seq.*, and the decisions of the United States Supreme Court to strike mental state eligibility and aggravating factors from the Notice of Intent To Seek The Death Penalty as set forth in the Memorandum in Support.

1

# MEMORANDUM IN SUPPORT OF DEFENDANT'S CHALLENGE TO THE NOTICE OF INTENT TO SEEK THE DEATH PENALTY

## TABLE OF CONTENTS

I.   The Court should strike all gateway mental state eligibility factors except the one alleging an intentional killing pursuant to 18 U.S.C. § 3591(a)(2)(A). .............................. 5

II.   The aggravating factors set forth in the NOI are governed by the Eighth Amendment's requirement that a jury's sentencing decision must be guided in order to narrow the application of the death penalty. .................................................................... 11

III.   The Court should strike non-statutory aggravators because they violate the Constitution. . . ............................................................................................ 14

    A.   The FDPA's incorporation of non-statutory aggravating factors creates a capital sentencing process that does not limit or guide the discretion of the jury and thus permits arbitrary and capricious death sentences. ......................................................... 14

    B.   Permitting the Department of Justice to define non-statutory aggravating factors after the crime but before trial violates the Constitutional prohibition of *ex post facto* laws............................................................................................... 16

    C.   The FDPA's grant of authority to the executive branch to create non-statutory aggravating factors that alter the elements necessary to be sentenced to death violates the non-delegation doctrine. .......................................................................... 19

IV.   Aggravating factors play a constitutional role in capital sentencing and must be written in a way that fulfills Constitutional requirements................................................. 22

    A.   The Constitution imposes standards for aggravating factors' specificity, intelligibility, relevance, and prejudicial effect. ........................................................ 22

    B.   Because non-statutory aggravators are the creation of prosecutorial whim and not a legislative process, they are subject to a heightened standard of reliability. .............. 24

    C.   The Constitution forbids aggravating factors that are too vague to provide a jury with clear guidance in the narrowing process of reaching its sentencing decision or so broad that they could apply to almost any killing and therefore do not have any narrowing effect. ..................................................................................... 26

    D.   Duplicative factors violate the Constitution because, where the jury weighs aggravating factors proved against mitigating factors found, duplicative aggravators place the government's thumb on death's side of the scale......................................... 28

V.   This Court should strike aggravating factors the government has listed in its NOI. ............................................................................................... 30

2

A.   This Court should strike the "grave risk of death to additional persons" statutory aggravator because it is inconsistent with the superseding indictment, vague, overbroad, and duplicative of the "multiple killings or attempted killings" aggravator where the two aggravators are established by the same evidence. ................................ 30

B.   This Court should strike the substantial planning and premeditation aggravating factor because it is unconstitutionally vague and overbroad. ........................................ 37

   1.   "Planning and premeditation" does not genuinely narrow the class of murders subject to the death penalty. ..................................................................................... 37

   2.   The word "substantial" also does not provide the clear, specific, and objective standard required to narrow the class of murderers subject to the death penalty and to channel the jury's discretion in doing so. ................................................................. 38

   3.   The opinions of courts which have upheld this factor show that it fails to narrow the class of murderers subject to the death penalty, is unconstitutionally vague, or both. ................................................................................................................ 40

   4.   Finally, this aggravating factor is duplicative and must be stricken. ............... 44

C.   This Court should strike the "vulnerable victims" aggravating factor because the government has applied it arbitrarily and made no showing that the victims' vulnerabilities were connected to their killings. ........................................................... 45

   1.   The government has arbitrarily imposed an age cut-off for application of the aggravator without any showing of why that age creates a vulnerability that makes those killings more worthy of punishment with death. ............................................... 45

   2.   The Government has not shown a nexus between the victims' vulnerabilities and the killings. ........................................................................................................ 46

D.   This Court should adhere to the rulings of the Supreme Court and the FDPA by limiting the "victim impact" aggravator to the family of those victims who were killed and strike that portion of the aggravator that is unconstitutionally vague. .................... 48

E.   This Court should strike the "injury to surviving victims" aggravator where it is unconstitutionally duplicative, overly broad, and vague. ............................................... 53

   1.   This alleged aggravator duplicates the victim impact aggravator by creating subsets of victims whose testimony will support each aggravating factor and thereby enable a jury to double-count evidence in favor of a death sentence against Mr. Bowers. ................................................................................................................... 53

   2.   The "surviving victims" aggravator is impermissibly vague and overbroad where its categories of harm and victims are not specific or limited and it applies across four categories of victims. ............................................................................... 54

3.    The substance and history of the FDPA does not authorize the jury to consider "injury to surviving victims" as an aggravating factor justifying a death sentence. . 56

F.    The Court should strike the government's non-statutory aggravating "lack of remorse" factor because it violates Mr. Bowers' Fifth Amendment right not to testify against himself. ......................................................................................................... 59

G.    This Court should strike the government's "selection of site" aggravating factors because it is overly broad and so syntactically incoherent that it is unconstitutionally vague and is also prohibited by the FDPA. ................................................................. 62

1.    The "selection of site" aggravating factor duplicates the "victim impact" and "injury to surviving victims" aggravators. ................................................................. 62

2.    The "selection of site" aggravating factor has multiple stacked elements each of which is unconstitutionally vague and indeterminate, which makes the entire aggravator exponentially so. ..................................................................................... 63

3.    The "selection of site" aggravating factor is too removed from the considerations Congress set forth as relevant to be permitted……………………65

4.    The aggravator is unsupported by the government's evidence. ....................... 67

H.    This Court should strike the "motivated by religious animus" aggravating factors because Congress rejected the death penalty for hate crimes motivated by religion. ................................................................................................................... 68

CONCLUSION ................................................................................................................. 69

## INTRODUCTION

The Notice of Intent To Seek The Death Penalty (NOI) alleges all four of the "statutory threshold factors" or mental state eligibility factors (ECF 86 at 1-2), only one of which is required to be found beyond a reasonable doubt before a jury can consider whether to sentence Mr. Bowers to life in prison without possibility of release or to be executed.  Because there is no allegation that Mr. Bowers aided or abetted anyone, or was aided and abetted by anyone, this charging strategy is legally flawed.  As a result, the

Court should strike all these allegations except for the one alleging an intentional killing under 18 U.S.C. § 3591(a)(2)(A).

The NOI also sets forth four aggravating factors that are taken from the statutory language of the Federal Death Penalty Act (FDPA).  (ECF 86 at 3); 18 U.S.C. § 3592(c). For a jury to sentence Mr. Bowers to death, it must unanimously find that the government has proved one of these factors beyond a reasonable doubt.  18 U.S.C. § 3593(c), (d), (e). The NOI also sets forth five "non-statutory" aggravating factors that the government intends to prove.  (ECF 86 at 3-4.)  Only one of these, victim impact, is expressly recognized in the FDPA.

The aggravating factors are addressed individually below.

## I.     The Court should strike all gateway mental state eligibility factors except the one alleging an intentional killing pursuant to 18 U.S.C. § 3591(a)(2)(A).

The superseding indictment is grounded in the theory that Mr. Bowers, acting alone, "opened fire, killing and injuring members of the Tree of Life, Dor Hadash, and New Light congregations" and "also fired at responding public safety officers." (ECF 44 at 2.) There is no allegation that he aided or abetted anyone, or that anyone aided and abetted him.  Despite this fact, the NOI alleges all four of the gateway mental state factors set forth in 18 U.S. C. § 3591(a)(2)(A)-(D). This charging strategy is legally flawed and should not be permitted.

The four mental states set forth in § 3591(a)(2)(A)-(D), like their almost identical predecessors in 21 U.S.C. § 848(e)(repealed),[1] "reflect four distinctly different levels of moral culpability, ranging downward from direct 'intentional killing,' (A), to intentionally engaging in conduct with known potential for causing death that did in fact cause it, (D)." *United States v. Tipton*, 90 F.3d 861, 898 (4th Cir.1996).  In *Tipton*, the Fourth Circuit concluded that the trial court's instructions "misconstrued the essential purpose of the specific (A)-(D) circumstances set out as discrete alternative bases for making the required (n)(1) finding." *Id*.

The corresponding gateway eligibility factor for the government's actual killer theory is set forth in 18 U.S.C. § 3591(a)(2)(A) (defendant "intentionally killed the victim"), which, in this case, subsumes the factor set forth in § 3591(a)(2)(B) (defendant "intentionally inflicted serious bodily injury that resulted in the death"), which should be stricken as duplicative. *See United States v. McCullah*, 76 F.3d 1087, 1111–12 (10th Cir.1996) (the use of duplicative mental state aggravating factors creates an unconstitutional skewing of the weighing process; "[w]hile the factors are not identical *per se*, the (n)(1)(C) factor necessarily subsumes the (n)(1)(D) factor."); *United States v. Beckford*, 968 F. Supp. 1080 (E.D.Va. 1997) (discussing overlapping interrelation of

---

[1] Enacted in 1988, the Anti-Drug Abuse Act (ADAA) allowed the death penalty for a small category of drug-related killings. 21 U.S.C. § 848(e). The ADAA also set out procedures for such cases. 21 U.S.C. § 848(g)-(r) (repealed). Those procedures are similar but not identical to the ones contained in the FDPA. In 2006, Congress repealed the Section 848 procedures, so the FDPA procedures now apply for all federal capital crimes.

(n)(1) factors); *see also United States v Bin Laden*, 126 F. Supp. 2d 290, 299 (S.D. N.Y.

2001) *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d

93 (2d Cir. 2008) ("[W]e hold that an aggravating factor that is necessarily and wholly

subsumed by a different aggravator within the same death penalty notice is invalid *per se*

and should not be submitted to the penalty jury for sentencing consideration.")

By contrast, the corresponding mental state threshold factors set forth in 18 U.S.C.

§ 3591(a)(2)(C) and (D) are premised on an aiding and abetting theory, under which the

defendant is not the actual killer but has performed some act in furtherance of the killing.

*See United States v. Williams*, 610 F.3d 271, 287 (5th Cir. 2010) ("The legislative history

to 18 U.S.C. § 3591(a)(2)(D) indicates the provision's purpose as authorizing death

sentences under the factors of *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v.

Arizona*, 481 U.S. 137 (1987)."); *United States v. Paul*, 217 F.3d 989, 997 (8th Cir. 2000)

("The jury found that Paul intentionally committed an act (aided and abetted), which he

knew would kill Sherman Williams. This finding clearly satisfies section 3591(a)(2)

because it closely tracks the language of subsection (C) of section 3591(a)(2) requiring

that Paul 'intentionally participated in an act, contemplating that the life of [Sherman

Williams] would be taken."); *United States v. Basciano*, 763 F. Supp. 2d 303, 344

(E.D.N.Y. 2011) ("As the legislative history of the FDPA makes clear, the purpose of

these Gateway Factors was to permit the death penalty when the mental state rises to the

level of culpability found in *Tison* . . . , where a defendant did not intentionally or even

knowingly participate in the actual killing of the victim, but substantially participated in a

felony that resulted in death and possessed the mental state of reckless indifference to

human life."); *United States v. Baskerville* 491 F. Supp. 2d 516, 520 (D.N.J. 2007)("It is clear from the legislative history of the FDPA that the two statutory intent factors relevant to this motion, § 3591(a)(2)(C) and (D), were based upon the Supreme Court's decisions in *Enmund* and *Tison. See* H.R. Rep. 103–466 (March 25, 1994) ("The intentional participation and 'reckless disregard for human life' standards stem from the Supreme Court's holdings in' *Enmund* and *Tison*).).")[2]

Since the factors asserted under 18 U.S.C. § 3591(a)(2)(C) and (D) in this case mirror an aiding and abetting theory which has not been advanced, the government should be estopped from asserting such a theory for purposes of the NOI, and the § 3591(a)(2)(C) and (D) allegations should be stricken. *See United States v. Stitt*, 760 F. Supp. 2d 570, 582 (E.D.Va. 2010); *United States v. Johnson*, 377 F. Supp. 2d 689 (N.D. Iowa 2005).

*Stitt* was an § 848(e) capital murder sentencing retrial in which the original jury found, and then the government re-alleged after a penalty phase reversal, three mental state threshold aggravating factors: (1) The defendant intentionally killed [the victim] pursuant to § 848(n)(1)(A); (2) The defendant intentionally inflicted serious bodily injury, which resulted in the death of [the victim] pursuant to § 848(n)(1)(B); and (3) The

---

[2] *See also United States v. Flores*, 63 F.3d 1342, 1370 (5th Cir. 1995) ("Garza and the government agree that these factors are taken from *Enmund*...and *Tison*. . . .  Taken together, *Enmund* and *Tison* stand for the rule that the state may not put to death a defendant who did not 'himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed,' *Enmund*, 458 U.S. at 797. . . , or significantly participate in a felony with reckless indifference to human life, *Tison*, 481 U.S. at 158 . . . .").

defendant intentionally engaged in conduct intending that [the victim] be killed and that lethal force be employed against the victim, which resulted in the death of [the victim] pursuant to § 848(n)(1)(C).  *Stitt*, 760 F. Supp. 2d at 582. The defendant asked the court to strike two of the mental state factors and submit only one to the jury "because they are inconsistent with the government's evidence" and because it was "implausible that he possessed all three distinct mental states simultaneously." *Id*. The Court granted the motion to strike, stating:

> [t]he Government requests that the Court provide limiting instructions in its penalty phase and in the special verdict form in order to prevent the jury from weighing more than one factor in Count Three.  However, § 848(n)(1)(A) as a mental state aggravator is simply inconsistent with the Government's evidence.  Regarding the murders, the Government's theory is that Defendant ordered the killing, not that he was the actual triggerman.  Moreover, although the Court did provide a limiting instruction, there is still the potential that the inclusion of more than one mental state factor could skew the weighing process. *See Tipton*, 90 F.3d at 899.

*Id*.

Similarly, prior to the trial in *Johnson*,  the government struck allegations charging Ms. Johnson as a "principal" in the ten capital charges against her, opting instead to proceed to trial only on an "aiding and abetting" theory as to each count.  *Johnson*, 377 F. Supp. 2d at 689-690.  Johnson sought an order barring any evidence or argument that "suggests" she was a "principal" in the intentional killings of the individuals listed in the second superseding indictment.  Relying on *Smith v. Groose*, 205 F.3d 1045, 1049 (8th Cir. 2000), which found the due process clause prohibits the prosecutor from presenting factually inconsistent theories relating to the same crime, Chief Judge Bennett concluded that, because evidence of Ms. Johnson being a principal was relevant to whether she was

an aider and abettor, such evidence would be permitted. *Id*. at 694.  However, the court also  found the government was "estopped from arguing that Johnson is guilty of any offense as a 'principal' rather than an 'aider and abettor' by its election to go to trial only on an 'aiding and abetting' theory." *Id*.

Here, the government has elected to forego the theory that defendant was an "aider and abettor" and claims instead that he is the actual killer.  As in *Stitt* and *Johnson*, the government should be held to its election and estopped from advancing alternate theories based on § 3591(a)(2)(C) or (D).

Finally, allowing the allegations in the NOI to stand,  providing a basis for evidence, argument, and instructions concerning § 3591(a)(2)(C) or (D) would violate § 3593(c) and the Fifth, Sixth, and Eighth Amendments, because it would inject into this case information the probative value of which is "outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *Bin Laden*, 126 F. Supp. 2d at 298 (citing 18 U.S.C. § 3593(c)). Allowing these multiple gateway factors would confuse the jury because they relate to a theory of the crimes that has been explicitly abandoned by the government in the superseding indictment.  It would be unfairly prejudicial because it would allow the government to artificially inflate the mental state gateway factors by interjecting legal theories that the government itself is not relying upon.  *See United States v. Basciano*, 763 F. Supp. 2d 303, 344 (E.D.N.Y. 2011) (striking the gateway factor under § 3591(a)(2)(D) to avoid the risk of confusing the jury where the Government argued that it was not advancing a "reckless-disregard theory"); *United States v. Sampson*, 275 F. Supp. 2d 49, 106 (D. Mass. 2003) ("Another concern

implicated by [allowing the charging of multiple aggravating factors] is the risk that jurors will improperly assign extra weight to aggravating factors because of sheer numerosity.").[3]

## II.   The aggravating factors set forth in the NOI are governed by the Eighth Amendment's requirement that a jury's sentencing decision must be guided in order to narrow the application of the death penalty.

Where the government believes that "the circumstances of [an] offense are such that a sentence of death is justified," it must file with the court and serve on a defendant "a notice . . . setting forth the aggravating factor or factors that the government [] proposes to prove as justifying a sentence of death."  18 U.S.C. § 3593(a)(2).  This provision of the FDPA is not merely procedural.  It is a constitutional safeguard in the administration of the federal death penalty.

---

[3] Technically, under the FDPA, unlike under § 848(n)(repealed), "the gateway findings of intent . . . are not part of the final weighing process under 18 U.S.C. § 3593(c)." *United States v. Sampson*, 335 F. Supp. 2d 166, 180 n.3 (D. Mass. 2004). *See also United States v. Webster*, 162 F.3d 308, 355 (5th Cir. 1998) ("As the government points out, § 3591(a) does not set forth a list of aggravating factors, but, on the contrary, serves a gatekeeping function.").  However, it would be counterintuitive in the extreme for a jury to follow an instruction that it must first determine whether Mr. Bowers possessed any of four extremely aggravating mental states in order to determine that he is  eligible for the death penalty, but that in deciding whether the death penalty should be imposed the jury must give no weight whatsoever to their unanimous finding beyond a reasonable doubt that the defendant "intentionally killed the victim" or had any of other  mental states set forth in § 3591(a)(2)(B) - (D). As in *Stitt*, "although the Court [can] provide a limiting instruction, there is still the potential that the inclusion of more than one mental state factor could skew the weighing process." *Stitt*, 760 F. Supp. 2d at 582; *see also Tipton*, 90 F.3d at 899 ("To allow cumulative findings of these intended alternative circumstances, all of which do involve different forms of criminal intent, runs a clear risk of skewing the weighing process in favor of the death penalty and thereby causing it to be imposed arbitrarily, hence unconstitutionally.").

Governments administering capital punishment have "a constitutional responsibility to tailor and apply [the] law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (plurality opinion). In order for a capital sentencing scheme to comport with the Constitution, it must both "genuinely narrow the class of persons eligible for the death penalty," and at the same time "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). *See also Lowenfeld v. Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant*). When a sentencing authority is invested with discretion "on a matter so grave as the determination of whether a human life should be taken or spared," its discretion must be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976).[4] *See also Lewis v. Jeffers*, 497 U.S. 764, 774 (1990) (quoting *Godfrey*, 446 U.S. at 428 (state's capital sentencing scheme must "'channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death.'")). When a statutory aggravating circumstance is put forth by the prosecution in order to enable jurors to distinguish those who deserve capital punishment from those who do not, "the

---

[4] Mr. Bowers does not concede the FDPA's provision of aggravating factors to guide juries' sentencing decisions results in an application of the death penalty that is not arbitrary or capricious. He preserves his claims and arguments set forth in ECF 162-165, 198-199, and 213.

circumstance must provide a principled basis for doing so." *Arave v. Creech*, 507 U.S. 463, 474 (1993) (citing *Jeffers*, 497 U.S. at 776; *Godfrey*, 446 U.S. at 433).

The Supreme Court has held that aggravating factors must meet two requirements. First, an aggravating factor "may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (citing *Creech*, 507 U.S. at 474) ("If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm"). *See also Maynard v. Cartwright*, 486 U.S. 356, 364 (1988) (invalidating aggravating circumstance that "an ordinary person could honestly believe" described every murder); *Godfrey,* 446 U.S. at 428-429.

Second, the aggravating factor "may not be unconstitutionally vague." *Tuilaepa*, 512 U.S. at 972 (citing *Godfrey,* 446 U.S at 428); *Creech*, 507 U.S. at 471.  The Court observed in *Gregg* that a death penalty system "could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries," which could re-create the pattern of arbitrary and capricious sentencing that the Court found unconstitutional in *Furman*. *Gregg,* 428 U.S. at 195 n.46.

The aggravating factors the government has included in the NOI must comport with these Eighth Amendment protections.  They must narrow the class of persons who can be sentenced to death for the offenses charged in the superseding indictment, and they cannot be vague.  Where any of the aggravators the government proposes to prove do not satisfy these requirements, this Court must strike them.

III.   **The Court should strike non-statutory aggravators because they violate the Constitution.**

   A.   **The FDPA's incorporation of non-statutory aggravating factors creates a capital sentencing process that does not limit or guide the discretion of the jury and thus permits arbitrary and capricious death sentences.**

As noted, in *Gregg v. Georgia*, the Supreme Court held that where a sentencing body is granted discretion on "a matter so grave as the determination of whether a human life should be taken or spared," the Eighth Amendment requires that such discretion be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189. Ten years after *Gregg*, the Court adhered to this tenet in *McCleskey v. Kemp*, 481 U.S. 279 (1987). In *McCleskey*, the Court explained that, while a capital jury may not be prevented from considering any relevant information offered as a reason for sparing a defendant's life, *see Lockett v. Ohio*, 438 U.S. 586 (1978), a jury's decision of whether to sentence a defendant to death must be guided by "carefully defined standards that must narrow a sentencer's discretion." *McCleskey*, 481 U.S. at 304.

Section 3592(c) obliterates the second half of this dyad. It grants the government unilateral, open-ended authority to expand on a case-by-case basis the list of reasons to impose death. By creating additional reasons to impose a death sentence that a jury will factor into its decision, the government puts its thumb on the scale in favor of a vote for death. The FDPA requires capital jurors to weigh all aggravating factors the jury has unanimously found the government proved beyond a reasonable doubt against the mitigating factors that each juror has found has been established by a preponderance of

14

the evidence.  18 U.S.C. § 3593(c).  While jurors can attribute as much or as little weight to any aggravating factor as they choose, "the mere finding of an aggravating factor cannot but imply a qualitative value to that factor."  *McCullah*, 76 F.3d at 1112.

Moreover, beyond empowering the government to create reasons to impose a death sentence in addition to those which are the product of Congress' legislative process, the FDPA does not provide any guidance to prosecutors for the selection and definition of non-statutory aggravating factors in particular cases.  *See* 18 U.S.C. § 3592(b), (d), §3593(a).  The result is a system operated on caprice that does not limit the factors that can be used to persuade jurors to impose death in a given case with "clear and objective" criteria that the Court found in *Gregg* satisfies the Constitution.  *Gregg*, 428 U.S. at 197. Instead, it makes the selection of sentence a matter of the prosecutor's creativity.  The government can vastly expand the evidence it introduces by creating additional aggravating factors that require evidentiary support.  The net effect is an impermissible risk that a federal jury will impose a death sentence arbitrarily or capriciously in violation of the Eighth Amendment.

The FDPA's authorization of non-statutory aggravating factors, i.e., reasons to impose a death sentence made up by the government from case to case, plainly grants the government permission to put its thumb on death's side of the scale and injects into the federal capital sentencing process the very same unconstitutional arbitrariness *Furman* forbade when it invalidated then-existing death penalty schemes.  *Cf. Stringer v. Black*, 503 U.S. 222, 232 (1992).  For this reason, this Court should strike the non-statutory aggravating factors the government included in the NOI.

15

**B.**     **Permitting the Department of Justice to define non-statutory aggravating factors after the crime but before trial violates the Constitutional prohibition of *ex post facto* laws.**

Article I, Section 9, clause 3 of the United States Constitution requires that "No . . . *ex post facto* law shall be passed."  A defendant's right to notice and to fair warning of the conduct that impacts his liberty or his life is a fundamental principle that the Supreme Court has long recognized. *See, e.g., Bouie v. City of Columbia*, 378 U.S. 347, 350-51 (1964); *In re Oliver*, 333 U.S. 257, 273 (1948).  Section 3592's grant of authority to the government to create aggravating factors out of thin air **after** a crime has been committed, and apply such factors retroactively in order to achieve a more severe sentence, is inherently antithetical to the Constitution's protection.  This provision of the FDPA "makes more burdensome the punishment for a crime, after its commission . . . ." *Beazell v. Ohio*, 269 U.S. 167 (1925).  *See Lindsey v. Washington*, 301 U.S. 397 (1937) (statutory change from discretionary to mandatory death penalty barred by *ex post facto* clause when retroactively applied).

In *Apprendi v. New Jersey*, 540 U.S. 466 (2000), the Supreme Court held that  any fact that "expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict" is an element of a greater offense that must be submitted to a jury. *Id.* at 494 n.19 (2000).  Two years later, in *Ring v. Arizona*, 536 U.S. 584 (2002), the Court recognized the import of *Apprendi* in the context of capital-sentencing proceedings. There, the Court held that aggravating factors which make a defendant eligible for the death penalty "operate as 'the functional equivalent of an element of a **greater offense**.'" *Ring*, 536 U.S. at 609 (emphasis added) (quoting *Apprendi*, 530 U.S. at 494, n.19).

16

"That is to say, for purposes of the Sixth Amendment's jury-trial guarantee, the underlying offense of "murder" is a distinct, lesser included offense of 'murder plus one or more aggravating circumstances': Whereas the former exposes a defendant to a maximum penalty of life imprisonment, the latter increases the maximum permissible sentence to death." *Sattazahn v. Pennsylvania,* 537 U.S. 101, 111 (2003).

The FDPA requires the sentencer to make three distinct fact-findings in order to impose a death sentence, i.e., a punishment greater than that authorized by a guilty verdict.  First, the jury must unanimously find beyond a reasonable doubt that the defendant possessed one of the mental state factors enumerated in § 3591(a).  Second, if the jury so finds, it must then unanimously find that the government proved at least one of the statutory aggravating factors enumerated in § 3592 beyond a reasonable doubt.[5] Third, each juror must then find beyond a reasonable doubt that the weight of all of the aggravating factors that the government proved beyond a reasonable doubt is greater than the weight of any mitigating factors that the juror found by a preponderance of the evidence, or that the weight of the aggravating factors unanimously found is sufficient to justify a sentence of death.  18 U.S.C. § 3593(e).  Thus, the required elements for the greater federal punishment of a sentence of death sentence (which is beyond the punishment permitted by conviction for the charged offense) are an **intent to kill**, the **existence** of at least one enumerated aggravating factor, and a determination that the **weight** of the aggravating factors justifies a death sentence.

---

[5] The aggravating factors enumerated in subsection (c) are at issue here.

17

As explained, non-statutory aggravating factors operate within the FDPA's sentencing scheme by allowing the government to add weight to death's side of the scale in a juror's sentencing decision by creating additional, non-enumerated, case-specific aggravating factors. Any non-statutory aggravating factors that a jury finds at the prosecutor's urging play the exact same role in the decision whether to sentence a defendant to death as do the statutory aggravating factors. *United States v. Concepcion Sablan*, 555 F. Supp. 2d 1205, 1221 (D. Colo. 2007) (Under the FDPA, "the existence of all the aggravating factors are constitutionally significant facts that should be found by the jury."); *United States v. Mills*, 446 F. Supp. 2d 1115, 1130-31 (C.D. Cal. 2006) (same); *United States v. Green*, 372 F. Supp. 2d 168, 175 (D. Mass. 2005) (same). Each such factor that is found by a jury necessarily tips the sentencing calculus in favor of death. *McCullah*, 76 F.3d at 1112. Indeed,

> [A]ny aggravating factor is "legally essential to punishment" because, while not linearly triggering a higher sentence within the statutory maximum, as Federal Sentencing Guidelines factors do, it may effectively tip the scale from life to death in combination with the other factors at play . . . . Because we will never know exactly how each factor influences the jurors' ultimate punishment determination, logic dictates that all aggravating factors – together – be considered legally essential to the punishment. Indeed . . . if the government does not require additional evidence to convince the jury to vote for death, why is it invoking non-statutory factors at all?

*Green*, 372 F. Supp. 2d at 177-178. Thus, by creating non-statutory aggravating factors and including them in the NOI, the government not only expands the bases for a death sentence, it effectively alters the third element required for a death sentence (the weight of the aggravating factors justify a sentence of death).

The Supreme Court affirmed the principle that the weight of aggravating factors in the capital sentencing is fact-finding the Sixth Amendment requires be done by the jury in the capital sentencing context in *Hurst v. Florida*, 577 U.S. __, 136 S. Ct. 616 (2016). In *Hurst*, he Court considered Florida's capital sentencing scheme, which required the jury to render an advisory verdict without specifying the basis of its recommendation and then the judge to weigh aggravating and mitigating factors and impose a sentence. *Hurst*, 136 S.Ct. at 620. Hurst's jury recommended death by 7 to 5, and the trial court sentenced Hurst to death based, in part, on the "great weight" that it accorded to the aggravating factors that it found. *Id*. The Supreme Court held that Florida's capital sentencing statute was constitutionally flawed in light of *Ring* because it did "not require the jury to make the critical findings necessary to impose the death penalty," including "'the existence *and weight* of aggravating circumstances.'" *Hurst*, 136 S. Ct. at 622 (quoting *State v. Steele*, 921 So.2d 538, 546 (Fla. 2005)) (emphasis added).

Because the non-statutory factors that the government alleges in the NOI violate the Constitution's *ex post facto* clause by creating an element essential to the increased punishment of death, after commission of the charged offenses, this Court should strike all of the non-statutory aggravating factors.[6]

C.     **The FDPA's grant of authority to the executive branch to create non-statutory aggravating factors that alter the elements necessary to be sentenced to death violates the non-delegation doctrine.**

---

[6] This claim was denied by the Court in *United States v. Solomon*, 513 F. Supp. 2d 520, 532 (W.D.Pa. 2007), but that case was decided before *Hurst*'s ruling that the weight of aggravation is a fact finding that must be made by a jury and therefore does not bind this Court.

The first section of the first article of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. Art. I, § 1.  Corollary to that assignment of power to Congress is a "bar on its further delegation," including "to another branch," such as the executive.  *Gundy v. United States*, 588 U.S. __, 139 S. Ct. 2116, 2123 (2019) (Opinion of Kagan, J.) (citing *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825)).  *See also id.* at 2130-31 (Alito, J., concurring); *id.* at 2131 (Gorsuch, J., dissenting).  However, the Supreme Court has held that the Constitution does permit Congress to delegate power "under broad general directives" that set forth an "intelligible principle" to which the authority to whom the power is delegated "is directed to conform."  *Gundy*, 139 S. Ct. at 2123.  *See also id.* at 2129 (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946) ("delegation is permissible if Congress has made clear to the delegee 'the general policy' he must pursue and the 'boundaries of his authority.'").

Subsections (b), (c), and (d) of § 3592 each empower the executive branch, specifically the offices of the United States attorneys, to create additional aggravating factors to present to juries in capital prosecutions in support of a death sentence.  This constitutes a delegation of Congress' power to establish the elements of offenses.  Because the statute fails to provide any intelligible principle to guide the creation of additional elements of federal capital offenses the delegation does not fit within the parameters identified by the Supreme Court, and therefore represents an unconstitutional delegation of congressional authority to the executive.

20

In *Gundy*, the "intelligible principle" paradigm was called into question by three of the justices. Justice Gorsuch, writing in dissent for himself, Chief Justice Roberts and Justice Thomas, rejected the "intelligible principle" test as having "no basis in the original meaning of the Constitution, in history, or even in the decision from which it was plucked." *Gundy,* 139 S. Ct. at 2140. The dissenters would substitute a much stricter test that would invalidate any delegation of Congressional authority that does not merely authorize another branch to "fill up the details," engage in fact-finding to determine application of a rule, or carry out responsibilities that are inherent in that branch's (executive or judicial) power. *See id.* at 2137-38. Establishing additional elements of capital crimes beyond those enacted by Congress does not fit into any of these categories.

Justice Gorsuch's dissent in *Gundy,* calling for a re-examination of the "intelligible principle" test, was also joined by Justice Alito, who wrote separately and concurred only in the judgment. Justice Alito indicated that he too would be inclined to reconsider the "intelligible principle" test when a majority of the Court was willing to do so. *Gundy,* at 2130-31 (Alito, J., concurring). At that time, the Court was evenly divided because Justice Kavanaugh had not taken the bench. Since he has been confirmed, Justice Kavanaugh has now also indicated that he believes that Justice Gorsuch's opinion in *Gundy* raised important points that "may warrant further consideration []." *Paul v. United States*, 140 S.Ct. 342 (2019) (Kavanaugh, J., respecting denial of certiorari).

The FDPA's delegation to the executive of the power to establish additional elements of a greater offense in the form of non-statutory aggravating factors and without any guiding principal violates the anti-delegation doctrine. For this reason, this Court

21

should strike the non-statutory aggravating factors other than victim impact evidence from the NOI.[7]

## IV. Aggravating factors play a constitutional role in capital sentencing and must be written in a way that fulfills Constitutional requirements.

### A. The Constitution imposes standards for aggravating factors' specificity, intelligibility, relevance, and prejudicial effect.

In the federal capital prosecution of those persons accused of conducting the bombings at U.S. embassies in Kenya and Tanzania, the district court identified four limiting principles for aggravating factors based on the decisions of the Supreme Court. *Bin Laden*, 126 F. Supp. 2d 290. First, the Constitution forbids that an aggravator that be "so vague as to lack 'some common-sense core meaning ... that criminal juries [are] capable of understanding.'" *Bin Laden*, 126 F. Supp. 2d at 298 (quoting *Tuilaepa,* 512 U.S. at 972). Aggravating factors must have some "common-sense core meaning . . . that criminal juries should be capable of understanding." *Tuilaepa*, 512 U.S. at 973; *see also Johnson v. United States*, 135 S. Ct. 2551, 2556-57 (2015) (striking down a portion of the Armed Career Criminal Act because application of the statute to a felony that "involves conduct that presents a serious potential risk of physical injury to another" was void for

---

[7] A non-delegation challenge to the non-statutory aggravating factors was denied in *United States v. Solomon*, 513 F. Supp. 2d 520, 532 (W.D.Pa. 2007), based on the "intelligible principle" exception to the anti-delegation doctrine. However, the decision in *Solomon* was 10 years ago, and before five justices called for re-examining the "guiding principle" exception. This Court obviously is not bound by *Solomon*, and should consider the issue anew.

vagueness in that "it fails to give ordinary people fair notice of the conduct it punishes, [and is] so standard less that it involves arbitrary enforcement").

Second, an aggravating factor alleged as a ground for execution cannot be "overbroad such that a sentencing juror 'fairly could conclude that [the] aggravating circumstance applies to every defendant eligible for the death penalty.'" *Bin Laden*, 126 F. Supp. 2d at 298 (quoting *Creech*, 507 U.S. at 474); *see also Tuilaepa*, 512 U.S. at 972. The factor must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of capital murder." *Zant*, 462 U.S. at 877. The failure to narrow the class of those eligible for a death sentence is the reason that, in *Godfrey v. Georgia*, the Supreme Court struck down an aggravating factor that asked the jury to find that the killing was "outrageously or wantonly vile, horrible or inhuman." The Court concluded that the language failed to provide "inherent restraint on the arbitrary and capricious infliction of the death sentence," because virtually every murder could be said to fit that criteria. *Godfrey* at 428-29; *id*. at 433 ("There is no principled way to distinguish this case, in which the death penalty was imposed, from the many in which it was not.").

Third, as the *Bin Laden* court determined, an aggravating factor "must be 'sufficiently relevant to the question of who should live and who should die.'" *Bin Laden*, 126 F. Supp. 2d at 298 (quoting *United States v. Davis*, 912 F. Supp. 938, 943 (E.D.La. 1996) and citing *Creech,* 507 U.S. at 474); *United States v. Cuff*, 38 F. Supp. 2d 282, 288–289 (S.D.N.Y.1999) ("A predicate to fulfilling the constitutional conditions for

23

an aggravating factor is that the disputed factor be an aggravating factor in the first

place."); *United States v. Friend*, 92 F. Supp. 2d 534, 541 (E.D.Va. 2000).  The

requirement of particular relevance means that an aggravating factor must help the jury to

distinguish "those who deserve capital punishment from those who do not."  *Creech*, 507

U.S. at 474; *see also United States v. Fell*, 372 F. Supp. 2d 753, 763 (D. Vt. 2005)

(quoting *Gregg*, 428 U.S. at 192) ("Aggravating factors in death penalty cases must be

'particularly relevant to the sentencing decision, not merely relevant, in some generalized

sense, to whether the defendant might be considered a bad person.").  Thus, aggravating

factors should be "of sufficient seriousness in the scale of societal values to be weighed

in selecting who is to live or die."  *Friend*, 92 F. Supp. 2d at 544; *see also United States*

*v. Gilbert*, 120 F. Supp. 2d 147, 153-54 (D. Mass. 2000).  When an aggravating factor is

not relevant to a determination of life or death, it should be stricken from the death

notice.

Fourth, "even if relevant" to a sentencing decision, an aggravating factor "may be

excluded 'if its probative value is outweighed by the danger of creating unfair prejudice,

confusing the issues, or misleading the jury.'" *Bin Laden,* 126 F. Supp. 2d at 298 (citing

18 U.S.C. § 3593(c)); *Friend*, 92 F. Supp. 2d at 541 (deeming it "essential that an

aggravating factor be measured in perspective of the fundamental requirement of

heightened reliability").

> **B.    Because non-statutory aggravators are the creation of prosecutorial whim and not a legislative process, they are subject to a heightened standard of reliability.**

Like all procedural aspects of capital prosecutions, aggravating factors must meet a heightened standard of reliability. *Ford v. Wainwright*, 477 U.S. 399, 411 (1986). For this reason, federal courts presiding over capital prosecutions have held that "an aggravating factor is invalid if it cannot be established by reliable evidence." *Fell*, 372 F. Supp. 2d at 762-766; *see also United States v. Gilbert*, 120 F. Supp. 2d at 153 (striking uncharged misconduct that occurred eight years prior to alleged murder because "any testimony about the incident thirteen years after the fact is not reliable enough to be used at a capital sentencing hearing"); *Friend*, 92 F. Supp. 2d at 541 (striking obstruction of justice factor based on an inmate overhearing a conversation between the defendants).

This requirement for heightened reliability is especially acute for non-statutory aggravating factors. These factors, arbitrarily created by the executive branch "by definition, lack [] the stamp of approval that Congress has bestowed upon the statutory aggravating factors" which makes the concept of heightened reliability "play an independently significant role." *Friend*, 92 F. Supp. 2d at 542. For this reason, a court may require the government to identify the nature of its proofs in support of aggravating factors in order to exercise its gatekeeping responsibility to limit penalty evidence to that which meets the standard of heightened reliability. *See United States v. Llera Plaza*, 179 F. Supp. 2d 464, 469 (E.D.Pa. 2001) ("[T]his court has the authority to conduct a hearing to examine the reliability of evidence the government intends to introduce at the sentencing phase.") (collecting cases).

**C.    The Constitution forbids aggravating factors that are too vague to provide a jury with clear guidance in the narrowing process of reaching its sentencing decision or so broad that they could apply to almost any killing and therefore do not have any narrowing effect.**

An unconstitutionally vague aggravating factor "undermines the reliability of the sentencing decision because it creates an unacceptable risk that the decision is random, arbitrary, and capricious, in violation of the Eighth Amendment." *United States v. Minerd*, 176 F. Supp. 2d 424, 437 (W.D.Pa. 2001) (citing *Tuilaepa*, 512 U.S. at 974–75; *Stringer*, 503 U.S. at 230–32).   Aggravating factors must have a "common sense core of meaning . . . that criminal juries should be capable of understanding." *Tuilaepa*, 512 U.S. at 975 (quoting *Jurek v. Texas*, 428 U.S. 262, 279 (1976)) (White, J., concurring in judgment).  In deciding whether to strike an aggravating factor for vagueness, the court "must first determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer." *Creech*, 507 U.S. at 471 (quoting *Walton v. Arizona*, 497 U.S. 639, 654 (1990)).  Factors that fail to provide such guidance should be stricken or modified, or the government should be required to make a detailed offer of proof to eliminate vagueness concerns.

In addition, aggravating factors must not be alleged vaguely so that they do not provide the defendant with adequate notice.  Reasonable notice is a requirement of due process, especially in a capital case. *See Gardner v. Florida*, 430 U.S. 349, 358 (1977) (Stevens, J.) (plurality opinion) (recognizing that "the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause" and that due process is violated "when the death sentence was imposed, at least in part, on the basis of

information which [a defendant] had no opportunity to deny or explain"); *Russell v. United States*, 369 U.S. 749, 766-68 (1962) (finding the Sixth Amendment violated where an indictment left the "chief issue undefined," thereby allowing "the prosecution free to roam at large" and present the defendant "with a different theory, or . . . no theory at all" at every stage of the criminal proceedings).   Open ended and non-exclusive language like "among," "including," and "but not limited to" are too vague to meet these notice requirements.  *See United States v. Johnson*, 915 F. Supp. 2d 958, 1023 (N.D. Iowa 2013), *order vacated in part*, 764 F.3d 937 (8th Cir. 2014) (striking "including but not limited to" language from aggravating factor and permitting the government to rely only on incidents identified in notice); *United States v. Lujan*, 530 F. Supp. 2d 1224, 1271 (D.N.M. 2008) (requiring the government to "specify if it intends to rely on other acts of violence . . . than the crimes alleged in the indictment").

Similarly, an aggravating factor that is overly broad fails to provide the constitutionally required narrowing in the sentencing process because it does not "genuinely narrow the class of persons eligible for the death penalty." *Creech*, 507 U.S. at 474 (quoting *Zant*, 462 U.S. at 877).  An overbroad aggravating factor is one that that "the sentencer fairly could conclude [] applies to every defendant eligible for the death penalty." *Id.* at 474 (citing *Cartwright,* 486 U.S. at 364) (invalidating aggravating factor that "an ordinary person could honestly believe" described every murder); *Godfrey,* 446 U.S. at 428-429 ("A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.'").

**D.    Duplicative factors violate the Constitution because, where the jury weighs aggravating factors proved against mitigating factors found, duplicative aggravators place the government's thumb on death's side of the scale.**

Duplicative aggravating factors undermine the integrity of jurors' weighing process because they allow the same evidence to be weighed more than once.  In *United States v. McCullah*, the Tenth Circuit observed that when the same aggravating factor is counted twice, "the defendant is essentially condemned twice for the same culpable act which is inherently unfair." *McCullah*, 76 F.3d at 1111 (reversing a federal sentence of death) (internal quotations omitted).   Though jurors in federal capital prosecutions independently determine what weight to give aggravating factors, where the same evidence substantiates different but duplicative aggravators, the mere finding of the factor unavoidably gives it at least some minimal weight that effectively places a "thumb [on] death's side of the scale." *Stringer*, 503 U.S. at 232.  Thus, the Tenth Circuit ruled that duplicative aggravating factors creates an unconstitutional "skewing of the weighing process" because they create "the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally." *McCullah*, 76 F.3d at 1111 (citing *Stringer)*.

In *Bin Laden*, the court found  an aggravating factor that is "necessarily and wholly subsumed by a different aggravator within the same death penalty notice is invalid *per se* and should not be submitted to the penalty jury for sentencing consideration." *Bin Laden*, 126 F. Supp. 2d at 299.  Specifically, the court found that one of the non-statutory aggravating factors proposed by the government, "serious injury to surviving victims," was "entirely and wholly subsumed by the 'victim impact evidence'

28

non-statutory aggravator, and thus impermissibly duplicative." *Id.*at 300.  The function

of both factors, the court found, was to provide the jury with "details concerning the

widespread human trauma allegedly caused by the accused's criminal conduct," even

though the government had limited the former aggravator to surviving victims and the

latter to deceased victims.  *Id*.  In reaching this conclusion, the court noted explicitly that

although it was appropriate for a jury to consider the harmful effects of a capital

defendant's actions:

> the Government's attempt to spin off multiple freestanding aggravators
> from what should really only be one represents a strategy that should not be
> permitted. What is most problematic is the fact that, because such parsing
> of categories serves no evidentiary purpose (since such evidence would still
> be admitted under the aegis of the umbrella aggravator), the sole motivation
> for doing so is to ratchet up the number of aggravating factors and "give the
> government free reign to trump whatever mitigating factors are raised by
> the defendant." *U.S. v. Bradley*, 880 F. Supp. 271, 285 (M.D.Pa.1994)

*Id.* at 300 (internal quotations and citations omitted).

Like the court in *Bin Laden*, federal courts presiding over capital prosecutions

have consistently followed the Tenth Circuit's ruling in *McCullah* to review challenges to

notices of intent to seek the death penalty on the ground that they included duplicative

aggravating factors.[8]  *See United States  v. Glover*, 43 F. Supp. 2d 1217, 1221-23 (1999)

(ordering removal of numerous duplicative aggravating factors);  *United States v.*

*Johnson*, 136 F. Supp. 2d 553, 561-62 (W.D.Va. 2001) (non-statutory aggravating factor

---

[8] In *Jones v. United States*, 527 U.S. 373, 398 (1999) (plurality opinion), the Supreme
Court noted that it had not considered the validity of *McCullah*'s "double-counting"
theory, nor held that aggravating factors' being duplicative could render them
unconstitutional.  However, the Court has not overruled *McCullah*.

of "death of a fetus" improperly duplicative of factor that defendant "terminated the victim's pregnancy"); *United States v. Umana*, 707 F. Supp. 2d 621, 639 (W.D.N.C. 2010) (striking non-statutory aggravating factor of "callous disregard for the severity of the offense" as potentially duplicative of lack-of-remorse component of future-dangerousness aggravating factor); *United States v. Watson*, 2007 WL 4591860, \*1-2 (E.D.Mich. 2007) (requiring government to elect between two non-statutory aggravating factors).

**V.      This Court should strike aggravating factors the government has listed in its NOI.**

Based on the foregoing arguments, supported by decisions of the Supreme Court and lower federal courts presiding over capital prosecutions, this Court should strike aggravating factors from the government's NOI to seek death or consolidate certain of those factors where they are duplicative of one another.

> **A.      This Court should strike the "grave risk of death to additional persons" statutory aggravator because it is inconsistent with the superseding indictment, vague, overbroad, and duplicative of the "multiple killings or attempted killings" aggravator where the two aggravators are established by the same evidence.**

There are a number of constitutional flaws in the "grave risk of death to additional persons" statutory aggravator alleged in the NOI.

First, whereas the special findings in the superseding indictment alleges that Mr. Bowers "committed the offenses . . .  knowingly creating a grave risk of death to one or more persons in addition to the victims of the offenses . . .[,]" the NOI attempts to expand

this finding by alleging that Mr. Bowers "in the commission of the offense, **and in escaping apprehension for the violation of the offense,** knowingly created a grave risk of death to one or more persons in addition to the victim of the offense . . . ." The emphasized phrase is not in the superseding indictment and must be stricken pursuant to well established constitutional principles.

As noted by the district court in *United States v. Sampson*, 245 F. Supp. 2d 327 (D. Mass. 2003):

> [b]ecause the intent and aggravating factors requirements of the Federal Death Penalty Act must now be treated procedurally as elements of an offense for which the death penalty is authorized, a grand jury must agree with the Department of Justice that it is permissible and appropriate that a defendant be exposed to the death penalty and give him notice in the indictment of the alleged grounds for imposing it.

*Sampson*, 245 F. Supp. 2d at 333. It is also a "settled proposition of law" that "'an indictment may not be amended except by resubmission to the grand jury unless the change is merely a matter of form.'" *United States v. Cotton*, 535 U.S. 625, 631 (2002) (quoting *Russell v. United States*, 369 U.S. 749, 770 (1962)). Here, the government seeks to expand the findings of the grand jury by adding an allegation that Mr. Bowers created a grave risk of death to others "in escaping apprehension for a violation of the offense." This expansion is more than "merely a matter of form" and cannot be done without violating Mr. Bowers' Sixth Amendment right to indictment by a grand jury and his due process right to reasonable notice.

Accordingly, this portion of the first statutory aggravating factor should be stricken. *See United States v. Diaz*, No. CR 05-00167 WHA, 2007 WL 2349286 (N.D.

Cal., Aug. 14, 2007) ("Here, the inconsistency is more than just a matter of form. The language in the notice broadens the number of scenarios that would fall under the factor's description by incorporating risks created while the defendant is escaping apprehension. The same problem exists with respect to defendant Fort's notice.  Because the indictment and the notices do not correspond, the inconsistent material included in the death notices - "or in escaping apprehension for the violation of the offense"- shall be struck from the notices.").

Second, the statutory phrase "a grave risk of death to one or more persons in addition to the victim of the offense" is both vague and overbroad.  Past challenges to the vagueness and overbreadth of this factor have been dismissed rather perfunctorily with the observation that "the construction of an aggravating factor is reflected largely by the jury instructions relating to that factor[,]" and with the prediction that "the parties and the court can craft jury instructions that will adequately define 'grave risk' for the sentencer." *United States v. Cheever*, 423 F. Supp. 2d 1181, 1202–03 (D. Kan. 2006) (collecting cases).[9]  However, as of 2020, the Third Circuit's Model Criminal Jury Instructions do

---

[9] Neither *Cheever* nor any of the other cases it cites are controlling or persuasive here because they predate the Supreme Court's important void-for-vagueness decisions in *Johnson v. United States*, 135 S. Ct. 2551 (2015) and *United States v. Davis*, 139 S. Ct. 2319 (2019). Those cases upheld vagueness challenges to statutory language that, if anything, is less vague and speculative than the statutory aggravating factor challenged here. *Johnson*, 135 S.Ct. at 2555; *Davis*, 1389 S.Ct. at 2323. In *Johnson*, the Court invalidated the residual clause of the Armed Career Criminal Act, which provides a non-capital sentencing enhancement for any crime that "is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another*." § 924(e)(2)(B) (emphasis added). In *Davis*, the Court invalidated the residual clause of 18 U.S.C. § 924(c), which provides an enhancement for felonies "that by [their] nature, involv[e] a substantial risk that physical

not include capital sentencing instructions, and the pattern instructions from other Circuits are themselves too vague and sweep far too broadly to satisfy Eighth Amendment and due process standards.

The Eighth Circuit's Model Jury Instruction 12.07E states that "'Grave risk of death' means a significant and considerable **possibility** that another person **might** be killed." (emphasis added.)[10] The Tenth Circuit's Pattern Jury Instruction 3.08.5 is even more open-ended, leaving it entirely to the government to define the term "grave risk of death":

GRAVE RISK OF DEATH TO ADDITIONAL PERSONS

You must unanimously find that the government has proved beyond a reasonable doubt that the defendant, in committing the offense, or in escaping apprehension for committing the offense, knowingly created a grave risk of death to one or more persons, in addition to the victim(s) of the offense. In this case [insert government specification of grave risk].[11]

Defining the term "grave risk of death" in terms of "possibil[ities]" or in terms of what "might" happen, or leaving it to the government to define this term as it sees fit makes a mockery of the constitutional requirement that it is the legislative body (not the prosecutor) that must "channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the

---

force against the person or property of another may be used in the course of committing the offense."

[10] http://www.juryinstructions.ca8.uscourts.gov/Criminal-Jury-Instructions-2017.pdf.

[11] https://www.ca10.uscourts.gov/sites/default/files/clerk/Jury Instructions Update 2018.pdf

process for imposing a sentence of death." *Jeffers*, 497 U.S. at 774. As the Court recently

stressed in *Davis*:

> In our constitutional order, a vague law is no law at all. Only the people's elected
> representatives in Congress have the power to write new federal criminal laws. And
> when Congress exercises that power, it has to write statutes that give ordinary
> people fair warning about what the law demands of them. Vague laws transgress
> both of those constitutional requirements. They hand off the legislature's
> responsibility for defining criminal behavior to unelected prosecutors and judges,
> and they leave people with no sure way to know what consequences will attach to
> their conduct. When Congress passes a vague law, the role of courts under our
> Constitution is not to fashion a new, clearer law to take its place, but to treat the law
> as a nullity and invite Congress to try again.")

*Davis*, 139 S.Ct. at 2323.

Third, as pled by the government in the NOI, this statutory aggravating factor is

also vague and open-ended in the sense that it includes the language that the grave risk of

death extends "to one or more persons in addition to the victim of the offense, **to include**

[12 named] responding public safety officers." The phrase "to include" impermissibly

allows the government to expand its theory at trial to include as yet unnamed persons.

Use of open-ended qualifiers such as "will include evidence" or "as demonstrated

by, but not limited to" have been specifically condemned in several cases.  For instance,

in *United States v. Davis*, No. CRIM.A. 94-381, 1996 WL 6997, *1 (E.D.La. Jan. 5,

1996), the court ruled that "[t]he use of 'among others' in lieu of listing specific acts does

not meet the notice requirements of the death penalty statute."). *See also Lujan*, 530 F.

Supp. 2d at 1271  ("The open-ended phrase 'including, at least' creates ambiguity as to

whether the Government will present evidence of additional acts of violence outside the

crimes charged in the indictment and the double homicide.  In fairness to Mr. Lujan and

out of concerns for due process, Mr. Lujan should be given notice of other crimes about which the Government intends to introduce evidence."); *United States v. Diaz*, 2007 WL 196752, *5 (N.D. Cal. 2007) ("The government must omit any language – such as the word 'including' – that leaves open the possibility that other unidentified homicides may be introduced.") Thus, the words "to include" must be stricken from the NOI or, at the very least, the government should be required to identify all persons who are the subject of this aggravator. *See Llera Plaza*, 179 F. Supp. 2d at 464 (ordering the government to supplement its notice of intent as to this factor with an outline of the identity of the additional persons put at risk.")

Fourth, as the court found in *United States v. Glover*, 43 F. Supp. 2d 1217, 1221–22 (D. Kan. 1999), the "grave risk" factor set forth in § 3592(c)(5) and the factor enumerated in § 3592(c)(16), that "the defendant attempted to kill more than one person," were impermissibly duplicative, and that the government would have to strike one of the aggravators in advance of trial. The same problem exists here and the same result should follow.

In its first statutory aggravator, the government charges that Mr. Bowers "knowingly created a grave risk of death to one or more persons in addition to the victims of the offense" including public safety officers.  (ECF 86 at 3.)  *See* 18 U.S.C. §3592(c)(5).  In its fourth aggravator, the government charges that Mr. Bowers intentionally killed and attempted to kill more than one person.  (ECF 86 at 3.)  *See* 18 U.S.C. §3592(c)(16).

In these two aggravators, the government seeks to prove essentially the same thing – that Mr. Bowers attempted to kill multiple people and that he thereby created a great risk of death to one or more persons, including public safety officers.   In this way, these aggravators create the same prejudice that the court found in *Bin Laden*.  It is an attempt by the government "to spin off multiple freestanding aggravators from what should really only be one." *Bin Laden*, 126 F. Supp. 2d at 300. For this reason, this Court should strike one of the two duplicative aggravators from the NOI.

Finally, at least one court has considered whether this "grave risk of death" aggravating factor was improperly duplicative when the government also relies on 18 U.S.C. § 3591(a)(2)(D) (intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person other than one of the participants in the offense) for one of the requisite mental states.  In *United States v. O'Reilly*, No. 05-80025, 2007 WL 2420830, *5 (E.D.Mich. Aug. 23, 2007), the court rejected a claim that impermissible skewing of the verdict in favor of death resulted from such a combination, reasoning that the mental states finding is part of the requisite gateway finding prior to consideration of aggravators and mitigators. Because such gateway intent findings are not weighed during the penalty phase, the court found no improper duplication of aggravating factors. *Id*.  For reasons discussed above in footnote 8, this reasoning is unsound because it is simply unrealistic to expect that the jury will ignore its mental state gateway findings in reaching the decision of whether to impose the death penalty. Consequently, either the 18 U.S.C. § 3591(a)(2)(D) gateway factor or the first statutory aggravating factor should be stricken.

**B.      This Court should strike the substantial planning and premeditation aggravating factor because it is unconstitutionally vague and overbroad.**

The NOI alleges that Mr. Bowers "committed the offense after substantial planning and premeditation to cause the death of a person."  (ECF 86 at 3); 18 U.S.C. § 3592(c)(9).  This aggravating factor is so vague and overbroad that it can apply to any premeditated killing.

First, evidence of "planning and premeditation" by itself is inadequate to narrow the class of murders eligible for the death penalty, since "almost every murder" involves some planning and premeditation.  *See Godfrey*, 420 U.S. at 428-29 (1980).  Second, the modifying phrase "substantial" does not cure this problem, because, even as it has been construed by the courts, the addition of the word substantial "fails adequately to inform juries what they must find to impose the death penalty." *Maynard*, 486 U.S. at 361-62.  And third, courts have been unable to fashion a construction of "substantial" for this factor that would be both narrowing and specific.

**1.      "Planning and premeditation" does not genuinely narrow the class of murders subject to the death penalty.**

A statutory aggravating factor must genuinely narrow the class of murders which may be subject to the death penalty.  *Zant*, 462 U.S. at 877; *Godfrey*, 446 U.S. at 428-29.  That is, the factor must be something that is not present in "almost every murder." *Godfrey*, 446 U.S. at 428-29.  The concepts of "planning and premeditation" are part of every intentional murder; they do not genuinely narrow the class of murders subject to the death penalty.  "Planning" means only "carrying out plans," and a plan can be just a

"method of achieving something." *Webster's Third New International Dictionary* 1729 ("plan"), 1731 ("planning"). Accordingly, any murder that has a "method," which is to say virtually every one, is planned.

"Premeditation" provides no greater limitation. Premeditation, of course, was a part of first-degree murder at common law and remains so under federal law. *See* 18 U.S.C. § 1111. In its capacity as a common-law element, it required little, if anything, more than the decision to kill. *See* 2 W. LaFave & A. Scott, *Substantive Criminal Law*, § 7.7 at 237 (1986) (it is "often said that premeditation and deliberation require only a 'brief moment of thought' or a 'matter of seconds'"). Even in common usage, "premeditate" means simply "to think on and revolve in the mind beforehand," *Webster's Third New International Dictionary* 1789, and virtually every murderer "thinks on" his crime before committing it; otherwise, it would not be murder. *See United States v. Spivey*, 958 F. Supp. 1523, 1531 (D.N.M. 1997) ("virtually all murders require some planning and premeditation"). Thus, the terms "planning" nor "premeditation" do not perform the constitutionally required function of narrowing the class of murderers subject to the death penalty.

> **2.    The word "substantial" also does not provide the clear, specific, and objective standard required to narrow the class of murderers subject to the death penalty and to channel the jury's discretion in doing so.**

Because the terms "planning and premeditation" by themselves do nothing to narrow the class of all murders, this aggravating factor must be stricken unless the word "substantial" narrows their meaning in a way that actually "channel[s] the sentencer's

discretion by **clear** and **objective** standards that provide **specific** and detailed guidance,

and that make rationally reviewable the process for imposing a sentence of death."

*Creech*, 507 U.S. at 471 (quoting *Jeffers*, 497 U.S. at 774; *Godfrey*, 446 U.S. at 428)

(emphasis added).  The word "substantial" cannot carry this burden because it provides

no guidance to a court or a jury as to "how much" or "what kind of" planning and

premeditation are necessary to rise to the level "substantial."  The word gives a

questioning juror no clue as to how complicated a plan the defendant must have

formulated before committing the offense or how long he must have thought about the

crime before committing it.  Accordingly, some jurors will require a defendant to have

employed some complicated mechanism to produce death and others will find

"substantial" planning and premeditation in taking the gun out of the desk drawer.

Indeed, it is telling that not even highly trained federal appellate court judges can agree

on what the word "substantial" means in the context of the statute. *See, e.g., McCullah*,

76 F.3d at 1110–11 ("'Substantial' planning does not require 'considerably more

planning than is typical' but rather it means 'considerable' or 'ample for commission of

the crime.'"); *Tipton*, 90 F.3d at 896  ("substantial" means "more than the minimum

amount sufficient to commit the offense" or "'more than merely adequate.'"); *Flores*, 63

F.3d at 1374  ("substantial" denotes "a thing of high magnitude").  The Eighth Circuit's

circular definition of the word "substantial" does not cure this defect.  *See* Eighth Circuit

Manual of Model Criminal Jury Instructions (2014), Instruction 12.07 I ("'Substantial'

planning and premeditation means a considerable or significant amount of planning and

premeditation.").  *See also Levinson v. Spector Motor Service*, 330 U.S. 649, 670 (1947)

("...[T]the indefiniteness of the terms 'large' or 'substantial' is obvious..."); *Cf. United States v. Parcel of Land and Residence Located thereon at 5 Bell Rock Road, Freetown, Mass.*, 896 F.2d 605, 711 (1st Cir. 1990) (finding the words "large quantities" suffers from "vagueness") (Breyer, J.).  The lack of any "clear," "objective," and "specific" guidance to jurors permits the imposition of the death penalty in an arbitrary way.

For this reason, the Supreme Court of Georgia has held the word "substantial" unconstitutionally vague in circumstances similar to these.  *Arnold v. State*, 224 S.E.2d 386, 392 (Ga. 1976).  Georgia had an aggravating factor making anyone with a "substantial criminal history" eligible for the death penalty. *Id*.  The Georgia Supreme Court held that the word "substantial," which it read to mean "of real ... importance," was unconstitutionally vague because its application was "highly subjective." *Id*.  *See also Creech*, 507 U.S. at 471 (standard must be "objective").  The Court noted that the word "substantial" might be sufficiently clear in other contexts, but that "the fact that we are here concerned with the imposition of a death sentence compels a different result." *Arnold v. State*, 224 S.E.2d at 392.  This, too, is a death penalty case, and the word "substantial" is no less "subjective" in application here than it was in *Arnold*.

> **3.    The opinions of courts which have upheld this factor show that it fails to narrow the class of murderers subject to the death penalty, is unconstitutionally vague, or both.**

The circuits that have upheld the constitutionality of the substantial planning and premeditation factor have construed "substantial" in a way that does not narrow the term as required by the Eighth Amendment.  Moreover, even as construed by these courts, the

word "substantial" remains unconstitutionally vague and violates the Fifth and Eighth Amendments.

The initial problem with the judicial construction of this aggravator is that it does not perform the required narrowing function.  In *McCullah*, for example, the Tenth Circuit upheld this aggravating factor on the ground that "substantial" means simply "ample for commission of the crime."  "Ample," of course, means anything "more than adequate."  *Webster's Third New International Dictionary* 74.  The Fourth Circuit, in *Tipton*, agreed, holding that "substantial" means only "more than the minimum amount sufficient to commit the offense."  *Tipton*, 90 F.3d at 896.[12]  Under these interpretations of "substantial," any murder, other than one undertaken with the "minimum" possible planning and premeditation, would be subject to the death penalty. Such a result cannot be constitutional, as it would permit jurors to impose the death penalty for a degree of planning and premeditation that barely exceeds what is essential to commit a homicide at all, indeed for a degree present in "almost every murder."[13] *Godfrey*, 446 U.S. at 428-29.

---

[12] *Tipton* and *McCullah* also used the word "considerable," which *Tipton* explained means "more than merely adequate," as a synonym for "substantial." *Tipton*, 90 F.3d at 896; *McCullah*, 76 F.3d at 1111.

[13] As noted above, the minimum amount of planning and premeditation necessary to commit a murder is extremely small. It is well-settled that premeditation can occur in a matter of seconds*, see e.g., State v. Flores*, 418 N.W.2d 150, 155 (Minn. 1988) (premeditation may occur the "moment or instant before killing"), and a "plan" may be as little as picking up a nearby weapon. Almost every murder has more premeditation and planning than this. For example, the murderer who goes to the next room to get a gun has done "more than the minimum amount sufficient" to commit the murder, but still less than is present than in almost every murder. A construction that permits jurors to find this aggravating factor on the ground of "ample" premeditation, or "more than adequate" premeditation, or "more than the minimum" premeditation, solves neither the narrowing

Moreover, the limits of the word "substantial" are so undefined that it is likely to be applied with great inconsistency, even arbitrariness. The federal cases discussed above do not explain why the concept "substantial," even as they construe it, is not subject to arbitrary application. Their construction of the word leaves it entirely to the jurors to decide what the "minimum" amount of planning and premeditation is required for a murder.[14]  It also leaves entirely to the jurors the determination of how much more than the minimum is necessary to rise to a "substantial" level.  The Eighth Circuit's open-ended definition leaves it to each individual juror to decide whether a murder involved a "considerable or significant amount of planning and premeditation."  *See* Instruction 12.07 I.  Some juries will doubtless conclude, as the Fourth Circuit did, that anything more than the absolute minimum will permit a verdict of death; others may require truly careful and complex planning and lengthy forethought before death will be imposed. Nothing provided to the jury even suggests which of these interpretations would be correct.  The Eighth Amendment requires that an aggravating factor "channel" jurors' discretion more consistently than this.

The vagueness of this factor is further demonstrated by the fact that the courts' interpretation deviates widely from other common usages of the word "substantial."  The

---

nor the vagueness problems. It leaves jurors free to decide what an "adequate" or "minimum" amount is, and to decide in their sole discretion, that some greater amount exceeds that minimum, even though the greater amount is found in almost every murder.

[14] Such a determination is more properly a legislative function and not one for a jury. It is the job of Congress, not of individual jurors, to define the "minimum" amount of premeditation and planning typical of almost every murder.

Supreme Court itself has noted that the meaning of a "substantial" amount of something

is "a large degree" of that thing.  *Victor v. Nebraska*, 511 U.S. 1, 19 (1994).[15]  But it is

not ordinary or natural usage to call any amount of something, even an amount barely

above the minimum, a "large degree" of that thing.  Indeed, amounts close to the

minimum would most plausibly be called a "small degree."  The standard adopted by

cases such as *Tipton* is thus quite similar to "more than minimal planning" under the

Sentencing Guidelines.  *See* U.S.S.G. § 1B1.1(f) ("[m]ore than minimal planning" is

"more planning than is typical for commission of the offense in a simple form").  It

seems clear that the word "substantial" must fall well above "more than the minimum

amount sufficient," "ample," "minimal," or "more than minimal," on any scale of

magnitude, but how far above has not, and cannot, be described in clear terms.  The very

inability of the courts to fashion a specific constitutional definition of this factor shows

that its meaning remains a "highly subjective" matter for each juror, *Arnold*, 224 S.E.2d

at 392, and that it is unconstitutionally vague.[16]

---

[15] The word "substantial" also has an inherent ambiguity, since it can mean simply "something that exists."  *Victor*, 511 U.S. at 19.  Courts that have considered the vagueness of the factor have concluded this definition does not apply to the aggravating factor here, *see*, *e.g.*, *Tipton*, 90 F.3d at 895, although a juror might assume that it did.

[16] One case has, without much discussion, held this factor constitutional because there is a "common sense core" of meaning to "substantial."  *United States v. McVeigh*, 944 F. Supp. 1478, 1490 (D. Colo. 1996).  This conclusion is belied in the first place by the inability of courts to say what that core is. Moreover, it overlooks the fact that, if there is a "common sense core" to the term, that core itself is apparently unconstitutional.  As that "core" was construed by two Courts of Appeal, the term applies to conduct that is present in almost every murder, leaving the factor at odds with the Eighth Amendment.

Some states with similar aggravating factors have construed them in a way that attempts to eliminate vagueness. In Florida, for example, the state supreme court, when faced with an aggravating factor requiring "cold, calculated, and premeditated" actions by a defendant, held the factor unconstitutionally vague on its face. *Jackson v. State*, 648 So. 2d 85, 87 (Fla. 1994). The court required that in the future, juries be told that they must determine that "the killing was the product of cool and calm reflection" and "that the defendant had a careful plan or prearranged design to commit murder before the fatal incident." *Id*. at 89. But Congress has not limited the word "substantial" in this aggravator in any way, or indicated how it would do so. Accordingly, this Court may not provide a limiting construction for it. The Eighth Amendment requires both that the concept of "planning and premeditation" be limited to narrow the class of death-eligible murders, and that it be limited in a clear, specific, objective way. Simply tacking the word "substantial" on to the phrase does neither, and this aggravating factor accordingly violates the Fifth and Eighth Amendments.

### 4. Finally, this aggravating factor is duplicative and must be stricken.

As noted above, Section 4.D., it is error to submit duplicative aggravating factors to the jury. As in *McCullah*, the crimes charged in the superseding indictment, the substantial planning and premeditation aggravating factor, and the mental state eligibility gateway factors, while "not identical *per se*," do so "substantially overlap," that they must be held to "subsume" one another. And, as in *McCullah*, these aggravating factors substantially overlap "because they [are] predicated upon the same acts" by Mr. Bowers.

44

For all these reasons, this aggravating factor fails to "genuinely narrow the class of persons eligible for the death penalty," *Zant*, 462 U.S. at 877, and does not perform the constitutionally required function.  Thus, the Court should strike it.

**C.    This Court should strike the "vulnerable victims" aggravating factor because the government has applied it arbitrarily and made no showing that the victims' vulnerabilities were connected to their killings.**

The NOI includes as an aggravating factor that Mr. Bowers "committed the offense against a victim who was particularly vulnerable due to old age [] and infirmity." (ECF 86 at 3.)  *See* 18 U.S.C. 3592(c)(9).  The government's inclusion of this factor is arbitrary and unsupported by the evidence.  For these reasons, the Court should strike this aggravating factor.

**1.    The government has arbitrarily imposed an age cut-off for application of the aggravator without any showing of why that age creates a vulnerability that makes those killings more worthy of punishment with death.**

The government has arbitrarily selected victims of the shooting who were particularly vulnerable due to old age.  The NOI applies this aggravator only to those victims who were over 70 years old.  (*See* ECF 86 at 3, listing counts one, three, and seven through ten.)[17] There is no rationale given for making 70 the cutoff age.  Indeed, the arbitrariness is highlighted by the fact that there is less than two years' difference

---

[17] These counts correspond to victims' initials listed in the superseding indictment. (ECF 44 at 3.)  The NOI also lists the corresponding counts from the Hate Crimes Act charges. (*See* ECF 86 at 3.)  The victims' ages were provided by the government in discovery. With the intent of respect and discretion, they are not included here.

between certain victims' ages; one is over 70 and therefore qualifies as a "vulnerable" victim" for purposes of aggravation, but the other is not and does not qualify as vulnerable.

The government asserts that the Ninth Circuit's decision in *United States v. Mitchell*, 502 F.3d 931, 978 (9th Cir. 2007), is "analogous" to this case because it affirms the application of the "vulnerable victim" aggravator to a 63-year-old victim. (ECF 178 at 27, Govt Opp. to Motion for Informative Outline.) *Mitchell* demonstrates that the government's imposition of an age cutoff for the aggravator is arbitrary, as the same aggravating factor has been applied to encompass those who are under 70. Similarly, the model federal capital jury instructions characterize "old age" as "having lived beyond the middle period of life." 1 Leonard Sands, Modern Federal Jury Instructions, ¶ 9A.14. That period is so subjective that the starting point of any period "beyond" it cannot be conclusively identified for purposes of capital sentencing. The government's attempt to do so creates an arbitrariness to the proceedings that violates the Constitution.

Where the government has not shown any basis in fact or law for drawing an age cut-off for the application of the vulnerable victim aggravator, that application is arbitrary. For that reason, this Court should strike that factor from the NOI.

> **2.      The Government has not shown a nexus between the victims' vulnerabilities and the killings.**

The government alleges that those victims to whose killing this aggravator applies were "particularly vulnerable" because of "old age [] and infirmity []." (ECF 86 at 3.) The government has failed to allege any nexus between these unique conditions and the

killings that support the application of this aggravator, and therefore this Court should strike it from the NOI.

In its filings, the government argues that "the facts are self-evident and not complex – persons of advanced age or suffering from impaired cognitive ability are obviously and reasonably more vulnerable to a surprise attack from an active shooter." (ECF 178 at 28, Govt Opp. to Motion for Informative Outline.)  The government also characterizes the weapon that Mr. Bowers allegedly used for the shooting variously as a "high-powered AR-15 rifle" and an "AR-15 assault-style rifle."  (ECF 178 at 2, 19, 26, Govt Opp. to Motion for Informative Outline.) The AR-15 is a semiautomatic rifle that was designed for speedy reloading in combat situations, can fire dozens of rounds in seconds, has a low recoil that makes it easier to shoot, and is as accurate as the military grade M-16.[18]

The reality is that neither infirmity made any victim more vulnerable than those who the government excludes from this aggravating factor.  Where the government's application of this aggravator to select victims is predicated on the unspoken argument that a person under 70 or who is unimpaired would be less vulnerable to a surprise attack with a weapon, the aggravator cannot stand.[19]  *See United States v. Mikos*, 539 F.3d 706,

---

[18] *See* Vitkovskaya, Julie and Patrick Martin, "4 basic questions about the AR-15," *The Washington Post*, Feb. 16, 2018, available at https://www.washingtonpost.com/news/checkpoint/wp/2018/02/15/4-basic-questions-about-the-ar-15/ (last visited June 5, 2020).

[19] Furthermore, the government uses the conjunctive "and" between the two vulnerabilities, which syntactically requires that the identified victims have **both** disabilities – old age and impairments.  From the government's filings, it does not appear

721 (7th Cir. 2008) (Posner, J., dissenting) (finding "vulnerable victim" aggravator

unsupported the evidence in killing of morbidly obese woman because "the average

person would not have escaped in this case with his life" and the victim "could not have

outrun his bullets even if she had been an Olympic sprinter").

Because this aggravating factor is predicated upon an arbitrary age cut-off and is

unsupported by the evidence, this Court should strike it from the NOI.

> **D.      This Court should adhere to the rulings of the Supreme Court and the
> FDPA by limiting the "victim impact" aggravator to the family of those
> victims who were killed and strike that portion of the aggravator that
> is unconstitutionally vague.**

The NOI also relied on "victim impact" as an aggravating factor.  (ECF 86 at 3.)

To prove this aggravating factor, the government intends to show "injury, harm, and loss"

to those victims who were killed, "as well as to the family, friends, and co-workers of

those individuals" with evidence of "the impact of [each] victim's death upon his or her

family, friends, associates, and co-workers."  *Id.* at 3-4.  The inclusion of "friends,

associates, and co-workers" exceeds the language of the sentencing provisions of the

FDPA as well as the Eighth Amendment parameters the Supreme Court has recognized.

This aggravating factor also is overbroad in that it relies on testimony from so many

categories of people that "a sentencing juror fairly could conclude that [the] aggravating

circumstance applies to every defendant eligible for the death penalty." *Bin Laden*, 126 F.

Supp. 2d at 298 (internal quotations omitted).  Finally, this aggravating factor is

---

that any of the victims identified in this aggravating circumstance have both disabilities.
(ECF 178 at 25-28, Govt Opp. to Motion for Informative Outline.)

unconstitutionally vague in that it is premised upon "injury, harm, and loss," which terms are too vague "to provide any guidance to the sentencer." *Creech*, 507 U.S. at 471

In *Payne v. Tennessee*, 501 U.S. 808 (1991), the Supreme Court held that the Eighth Amendment does not erect a *per se* bar to the admission of victim impact evidence, and therefore death penalty sentencing procedures may provide for "evidence about the victim and about the impact of the murder on the victim's family" to be presented to the jury. *Payne*, 501 U.S. at 827. The Court's decision was based on a challenge to the admission in a capital sentencing of testimony from the mother of the victim about the effect of the killing on the victim's child. *Id*. at 814-15. In reaching its decision, the Court overruled its decision in *Booth v. Maryland*, 482 U.S. 496 (1987), where the Court had found that the Eighth Amendment prohibited the admission in a capital sentencing of a statement from the victims' family.[20] In reviewing *Booth* and deciding to overrule it, the majority in *Payne* made clear that both rulings turned on two premises: the relevance of evidence relating to a particular victim or to the harm that a capital defendant causes a victim's **family** to the defendant's "blameworthiness," and the Eighth Amendment's limit in capital sentencing decisions to evidence relating to "blameworthiness." *Payne*, 501 U.S. at 818-819 (emphasis added).[21]  *Payne* held that

---

[20] The statement came from the victims' son, daughter, son-in-law, and granddaughter. *See Payne* at 817.

[21] In *Booth*, the Court determined that factors other than a defendant"s character and the immediate characteristics of the crime are irrelevant to the capital sentencing decision unless they have "some bearing on the defendant's 'personal responsibility and moral guilt'" and to the extent that victim impact evidence presents factors about which the

evidence of the harm a defendant causes to a victim's family is relevant to blameworthiness and therefore within that which the Eighth Amendment permits.

When Congress enacted the FDPA, five years after *Payne*, it adhered to the Court's ruling there and included among the factors that the government may prove as justifying a sentence of death "the effect of the offense on the victim and the victim's **family**." 18 U.S.C. § 3593(a) (emphasis added). The statute permits the government to prove this effect with "oral testimony, a victim-impact statement that identifies [] the extent and scope of injury and loss suffered by [] the victim's family, and any other relevant information." *Id*. Thus, neither the federal capital sentencing statute nor the Supreme Court decision from which it derives authority extends to friends and co-workers.

The combined effect of *Payne's* Eighth Amendment ruling and the FDPA is to place specific restrictions upon the type of victim impact evidence the government may present. Such evidence must be limited to "evidence relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family." *Payne*, 501 U.S. at 817. The Constitution allows only such evidence as is necessary to provide "a **glimpse** of the life" of the victim. *Id*. at 822 (emphasis added). Furthermore, the Eighth Amendment prohibits victim impact testimony of "victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence." *Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (*per curiam*). Victim

---

defendant was unaware, and that were irrelevant to the decision to kill, it has nothing to do with the blameworthiness of a particular defendant. *Booth*, 482 U.S. at 502-04.

impact evidence also must be relevant and not consist of "a 'mere emotional plea,'" unrelated to the impact of the crime on the victims or their families. *Sampson*, 335 F. Supp. 2d 166, 187 (D. Mass. 2004) (citing *Hain v. Gibson*, 287 F.3d 1224, 1237-38 (10th Cir. 2002)). Finally, a defendant's due process rights are violated where victim- impact evidence is "so unduly prejudicial that it renders the trial fundamentally unfair." *Payne*, 501 U.S. at 825; *see also id*. at 836 (Souter, J., concurring) (noting that "[e]vidence about the victim and survivors, and of course any jury argument predicated on it, can of course be so inflammatory as to risk a verdict impermissibly based on passion, not deliberation," in violation of due process); 18 U.S.C. § 3593(c) (evidence may be excluded from penalty phase proceeding "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury").

For these reasons, this Court should strike that portion of the government's victim impact aggravating factor that exceeds the boundaries of *Payne* and § 2593(a) and limit the victim impact to family of the homicide victims. *See Solomon*, 05-385 (W.D.Pa.), ECF 193 (Notice of Intent to Seek the Death Penalty) (limiting victim impact aggravator to "effects on the lives of [victim's] children and family") *U.S. v. Hanner*, 05-385 (W.D.Pa.), ECF 194 (Notice of Intent to Seek the Death Penalty) (same); *United States v. Minerd*, 99-215 (W.D.Pa.), ECF 38 (Notice of Intent To Seek The Death Penalty) (same).

In addition to exceeding the victim impact testimony that the Supreme Court has found to be permitted by the Eighth Amendment, the government's victim impact aggravator is also unconstitutionally over broad where it includes the impact of the killings on "friends, associates, and co-workers." To introduce testimony from so many

categories of people connected to the victims would run roughshod over the "glimpse into the life" of the victims contemplated by *Payne*.   Someone is affected by every killing, but to allow anyone who has been affected to testify to the killings impact fails to narrow in any meaningful way the class of murders deserving of death or to channel the jury's discretion by clear and objective criteria that provide specific and detailed guidance and thus is unconstitutional. *Godfrey*, 446 U.S. at 428; *Jeffers* 497 U.S. at 774.

Lastly, this aggravating factor as written is impermissibly vague.  Within the range of the human experience, the words "injury, harm, and loss" do not give adequate notice to the defendant.  Indeed, where Mr. Bowers faces 22 capital charges for killing 11 people, "that the range of human suffering – whether physical, emotional, or economic – is vast goes without saying," and an "oblique reference to victims' 'injury, harm, and loss,' without more, does nothing to guide [the] vital task of preparing for the penalty phase of trial."  *Bin Laden*, 126 F. Supp. 2d at 304 (ordering government to provide bill of particulars specifying the particularized categories of "injury, harm, and loss" that will be proffered at sentencing, citing *Glover*, 43 F. Supp. 2d at 1224 ("The court finds that the defendant is entitled to greater specificity as to the 'serious physical and emotional injury the government claims the defendant caused [the victim].").

For these reasons, this Court should strike the aggravator as written and order the government to re-write it in terms that are permitted by *Payne* and the FDPA and are constitutionally narrow. At an appropriate time, the defense will ask the Court to hold a hearing on the proposed victim impact testimony, to obtain specificity regarding the witnesses the government intends to call and to identify the particularized categories or

subjects of testimony the government intends to introduce.  A hearing on this potential testimony will be necessary so that this Court can ensure compliance with *Payne* and the FDPA.[22]

### E. This Court should strike the "injury to surviving victims" aggravator where it is unconstitutionally duplicative, overly broad, and vague.

The NOI alleges "injury to surviving victims" as an aggravating factor that makes a death sentence the appropriate punishment for Mr. Bowers.  (ECF 86 at 4-5.)  This aggravating factor alleges no less than three categories of injury, with at least four subcategories, to at least four categories of people.  It is duplicative, overbroad, and vague, and therefore this Court should strike it from the NOI.

### 1. This alleged aggravator duplicates the victim impact aggravator by creating subsets of victims whose testimony will support each aggravating factor and thereby enable a jury to double-count evidence in favor of a death sentence against Mr. Bowers.

The government bases this aggravating factor on the victimization of persons at the Tree of Life synagogue – civilian and public safety officers – who were not killed in the shooting.  By so doing, the government is factionalizing victim impact testimony in

---

[22] By its nature, victim impact testimony risks overwhelming a jury. The Supreme Court has recognized that such evidence, and accompanying argument, "can of course be so inflammatory as to risk a verdict impermissibly based on passion, not deliberation" citing *Payne*, 501 U.S. at 836 (Souter and Kennedy, JJ., concurring).  The Supreme Court cautions lower courts to be careful not to "cross[]" the "line" into "inflammatory" evidence that would render a capital sentencing hearing "fundamentally unfair." *Payne,* 501 U.S. at 831 (majority opinion). *Accord id*. at 836 (noting "trial judge's authority and responsibility" to "guard against the inflammatory risk") (Souter and Kennedy, JJ., concurring). *See also Fell*, 531 F.3d at 239 (noting that "victim-impact evidence . . . can sometimes be unduly prejudicial" and "inflammatory").

order to create multiple aggravators out of a single group of witnesses.  Where this aggravating factor is "necessarily and wholly subsumed" by the victim impact aggravator, it is "invalid *per se* and should not be submitted to the penalty jury for sentencing consideration." *Bin Laden,* 126 F. Supp. 2d at 299.

As the court found in *Bin Laden*,  the government's "injury to surviving victims" aggravator and "victim impact" aggravator both serve to lay before the jury the breadth of deleterious consequences allegedly caused by the shootings at the Tree of Life synagogue. *Id*.  The Government has merely divided that evidence, limiting the former aggravator to surviving victims and the latter to deceased victims only in order to "ratchet up the number of aggravating factors and 'give the government free reign to trump whatever mitigating factors are raised by the defendant.'" *Bin Laden*, 126 F. Supp. 2d at 300 (quoting *U.S. v. Bradley*, 880 F. Supp. 271, 285 (M.D.Pa.1994)).

This Court should not permit this strategy that attempts to "spin off multiple freestanding aggravators from what should really only be one." *Bin Laden,* 126 F. Supp. 2d at 300.  The government's "parsing of categories" serves no evidentiary purpose, tends to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally.

> **2. The "surviving victims" aggravator is impermissibly vague and overbroad where its categories of harm and victims are not specific or limited and it applies across four categories of victims.**

In addition to having created this aggravator for a subset of victims that is subsumed by the "victim impact" aggravator, the government also attempts to create a

"catchall" aggravating factor through which it may introduce evidence of no less than 20 categories of harm and with the effect that the jury only needs to find one. It is a sentencing blunderbuss, which by its essence cannot narrow the application of the death penalty.

The government's "surviving victim" aggravator identifies but does not limit itself to four categories of victims: "physically injured civilian survivors," "otherwise injured civilian survivors," "physically injured law enforcement survivors," and "otherwise injured law enforcement officers." (ECF 86 at 5.) The aggravating factor does not identify what characterizes an "otherwise" injury, thus leaving it literally unlimited. In fact, the injuries that this aggravating factor, physical and "otherwise" might include are maiming, disfigurement, permanent disability, severe psychological impacts, and grievous economic hardship, but are not limited to these. *Id*. The net result is a minimum of 20 different categories of harm that the government may prove (4 classes of victims x 5 classes of harm).[23] (ECF 178 at 43-44, Govt Opp. to Def. Mot. for Informative Outline) (acknowledging five categories of harm across four categories of victims).

Moreover, the terms of the aggravator are themselves vague and undefined. "Grievous economic hardship" is a subjective measure based on an individual's *a priori* factor; what is "grievous" for one person may not be for another. Likewise, the endless

---

[23] However, the government has enumerated the categories of injury with "and," suggesting that each of the categories of victim experienced all the categories of harm. This is evidence of the confusing structure of the aggravating factor.

individualized variations among the respective victims' states of mind and well-being before the shootings make it impossible to define whose response was a "severe" psychological impact.  Furthermore, the definitions of "maiming" and "disfiguring" both include the other word.  *See Webster's Ninth New Collegiate Dictionary* (Miriam Webster, 1985).

This factor intends to cast a wide enough net to address every aspect of harm that the shootings at the synagogue may be alleged to have caused, which by definition is not a "carefully defined standard" that will narrow a sentencer's discretion.  *McCleskey*, 481 U.S. at 304.  Where every shooting causes some harm, by comprising every instance of harm in this case, any juror could easily conclude the government's "injury to surviving victims" factor "applies to every defendant eligible for the death penalty." *Creech*, 507 U.S. at 474.

The "injury to surviving victims" aggravating factor fails the standards recognized by the Supreme Court in *Creech*, *Tuilaepa*, *McCleskey*, and *Godfrey*.  For this reason, it should be stricken.  *Cf. Johnson*, 915 F. Supp. 2d at 1023, *order vacated in part*, 764 F.3d 937 (8th Cir. 2014); *Lujan*, 530 F. Supp. 2d at 1271.

### 3. The substance and history of the FDPA does not authorize the jury to consider "injury to surviving victims" as an aggravating factor justifying a death sentence.

The NOI improperly alleges Mr. Bowers "caused serious physical and emotional injury, including maiming, disfigurement, permanent disability, and grievous economic hardship" to the surviving victims.  (ECF 86 at 4.)  Capital jurors do not make sentencing

determinations on non-capital counts; rather, district courts do, in separate proceedings. Because the FDPA does not permit penalty-phase testimony on the impact of injuries suffered by survivors, this factor should be stricken.

When Congress passed the FDPA in 1994, it provided for victim impact evidence according to the Supreme Court's decision in *Payne*. Section 3593(a) provides that the government may allege as a non-statutory aggravating factor "the effect of the offense on the victim and the victim's family." Evidence in support of this factor "may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information." This language codified *Payne* and authorized consideration of the precise type of family victim impact evidence involved in *Payne*: impact of the capital offenses on homicide victims' families. But Congress did not go further and permit penalty-phase jurors to consider victim impact testimony from surviving victims about their own lives and the difficulties they themselves have endured following the crimes, but not about the deceased.

Context confirms this. In numerous other provisions of the FDPA that use the term "victim," it is unambiguous that the statute means "homicide victim." *See, e.g.*, §§ 3591(a)(2)(A) ("killed the victim"); 3591(a)(2)(B) ("death of the victim"); 3591(a)(2)(C) ("the victim died"); 3591(a)(2)(D) ("the victim died"); 3592(a)(7) ("the victim's death"); 3592(c)(5) ("a grave risk of death to 1 or more persons in addition to the victim"). And it is a "normal rule of statutory construction that identical words used in different parts of

the same act are intended to have the same meaning." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995).

Legislative history points the same way.  Prior to Congress' adoption of the FDPA, President George H.W. Bush submitted legislation to Congress that included the precise victim impact language which would become § 3593(a).  *See* Comprehensive Violent Crime Control Act of 1991, H.R. Doc. No. 102-58, at 19 (1991).  When the President submitted this legislation to Congress, he attached a section-by-section analysis explaining that the victim impact evidence referenced in § 3593(a) was limited to capital homicide victims:

> The subsection specifies that aggravating factors for which notice is provided may include factors concerning the effect of the offense on the victim and the victim's family.  **The effect on the victim may include the suffering of the victim in the course of the killing or during a period of time between the infliction of injury and resulting death**, and the victim's loss of the opportunity to continue his characteristic activities and enjoyments and to realize his plans and aspirations **because of the extinction of his life by the defendant.**

*Id*. at 166 (emphasis added).  Congress then enacted the proposed language in § 3593(a)(2) without change from the version submitted by the President.  *Compare* § 3593(a)(2), *with* H.R. Doc. No. 102-58, at 19.

Surviving victims – like any other witnesses – certainly may testify at the penalty phase in support of any properly alleged aggravating factor relating to the capital charges. Congress also has specifically provided that such witnesses have a right to be heard when a district court imposes sentence on both the capital and non-capital charges, following the jury's life or death determination.  *See* 18 U.S.C. § 3771(a)(4).  However, in view of

the clear language of the FDPA and recognized principles of statutory construction, Congress did not intend to permit jury consideration of victim impact evidence from surviving victims at the death-penalty phase.

For these reasons, this Court should strike the government's "injury to surviving victims" aggravating factor.

F.     The Court should strike the government's non-statutory aggravating "lack of remorse" factor because it violates Mr. Bowers' Fifth Amendment right not to testify against himself.

In *United States v. Johnson*, 915 F. Supp. 2d 958 (N.D. Iowa 2013), the court properly observed that there are "undoubtedly constitutional concerns, **including concerns with the reliability of evidence**, surrounding consideration of evidence of 'lack of remorse' as an aggravating factor in a capital case." *Johnson*, 915 F. Supp. 2d at 996 (citing *United States v. Caro*, 597 F.3d 608, 627–31 (4th Cir.2010)), *order vacated in part*, 764 F.3d 937 (8th Cir. 2014)). This is the case here, where the government alleges as a non-statutory aggravating factor that Mr. Bowers has demonstrated a lack of remorse for the offenses charged.

The government's filings indicate it intends to prove this aggravator by Mr. Bowers' "statement and actions during the course of and following the commission of" the acts alleged in the superseding indictment. (ECF 86, at 4.) The government has also "affirmatively represent[ed]" that it does not intend "to rely on [Mr. Bowers'] right to remain silent" to establish its "lack of remorse" aggravator. (ECF 178 at 42.)

59

Nevertheless, the problems identified by the court in *Johnson* are present and overriding here.

First, the government intends to prove its allegation that Mr. Bowers lacks remorse based on statements he made "in the course of [] the commission of the offense." This is quintessentially illogical and, more problematically, "applies to every defendant eligible for the death penalty." *Creech*, 507 U.S. at 474.

Remorse is an inherently **retrospective** emotion. *Miriam Webster* defines it as "a gnawing distress arising from a sense of guilt **past** wrongs." *Miriam Webster's Ninth Collegiate Dictionary*, *supra* (emphasis added). Thus, remorse is an after-arising state of mind. It is internally inconsistent to allege that Mr. Bowers intended to commit the alleged offenses, and then characterize any alleged statements made in that moment as an absence of remorse. Doing so conflates intent with lack of remorse. Furthermore, relying on statements Mr. Bowers allegedly made during the commission of the offense is effectively a duplication by inversion of another of the government's non-statutory aggravating factors, that the killings were motivated by religious animus (see below). (ECF 86 at 4.) That aggravating factor alleges that Mr. Bowers' expressions of animus toward Jewish people are a reason to sentence him to death. The government's "lack of remorse" aggravator takes those same expressions and makes them into an absence of remorse that it alleges is also a reason to sentence him to death. This essentially condemns Mr. Bowers twice for the same culpable act, "which is inherently unfair." *McCullah*, 76 F.3d at 1111.

Moreover, reliance on statements made during the commission of an act, expressing the intent to commit that act, as a basis for a sentence of death could apply to almost every person convicted of intentional homicide.  It does nothing to narrow the application of the death penalty, and therefore does not meet the heightened standard of reliability that is required for non-statutory aggravating factors.

In *United States v. Davis*, 912 F. Supp. 938 (E.D.La. 1996), the trial court struck the "lack of remorse" aggravating factor and observed that "[l]ack of remorse is a subjective state of mind, difficult to gage objectively since behavior and words don't necessarily correlate with internal feelings."  *Davis*, 912 F. Supp. at 946.  There, the court found that the aggravator was "inappropriate" because the only evidence the government offered to sustain the lack-of-remorse factor was the defendant's alleged jubilation in learning that the victim had been killed. The government here does not propose to introduce "evidence of continuing glee, or boastfulness, or other affirmative words or conduct that would indicate a pervading and continuing lack of remorse."  *Id*. *See also* *Stitt*, 760 F. Supp. 2d at  587  (striking "lack of remorse aggravator where evidence was "highly subjective and should not be singled out based solely on this comment"); *United States v. Roman*, 371 F. Supp. 2d 36, 50 (D.P.R. 2005) (striking lack of remorse aggravator because "there must be a showing of continuing glee, boastfulness, or other affirmative conduct which indicates a pervading and continuing lack of remorse following the criminal conduct" and the government's evidence was "too speculative, and too intertwined with [the defendant's] conduct during the crime such that it cannot indicate continued remorselessness.").

This Court should reach the same conclusion.  The government's allegation does not contain any indication that Mr. Bowers has shown continuous glee or boasted of his alleged acts or any other conduct indicating a pervading and continuing lack of remorse. Indeed, what the evidence the government intends to show is conduct during the offense, which is inherently unrelated to a backward-looking sense of remorse, and that is impermissibly duplicative where it is the basis for a different non-statutory aggravator.

For all these reasons, this Court should strike the "lack of remorse" aggravating factor from its NOI.

> **G.  This Court should strike the government's "selection of site" aggravating factors because it is overly broad and so syntactically incoherent that it is unconstitutionally vague and is also prohibited by the FDPA.**

> **1.  The "selection of site" aggravating factor duplicates the "victim impact" and "injury to surviving victims" aggravators.**

This aggravating factor alleges that Mr. Bowers committed the charged acts at the Tree of Life Synagogue in the Squirrel Hill neighborhood of Pittsburgh in order to instill fear within the "local, national, and international Jewish communities."  (ECF 86 at 4.) This asks the jury to measure the victim impact effect around the world.  Making the global Jewish community the victim subsumes the families of those victims who were killed (non-statutory factor #1) and the surviving victims (non-statutory factor #5).  For this reason, the aggravator is impermissibly duplicative and overbroad.

Although this factor duplicates and subsumes the other two non-statutory aggravating factors, the error is not cured by striking those two and permitting this one to

stand.  As explained below, this factor is irremediably flawed because it is impermissibly vague and overbroad and not relevant to the sentencing considerations established by Congress in the statutory aggravating factors enumerated in § 3593(c).  Therefore, this Court should strike this aggravating factor.

> **2.      The "selection of site" aggravating factor has multiple stacked elements each of which is unconstitutionally vague and indeterminate, which makes the entire aggravator exponentially so.**

In this aggravating factor, the government stacks a multiplicity of alternative facts that build on one another to create a matrix aggravator that is impermissibly vague and overbroad. Specifically, in this aggravating factor, the government alleges that Squirrel Hill is "home to one of the largest and oldest urban Jewish populations in the United States."  (ECF 86 at 4.)  This requires the government to prove and the jury to find that this is a true and accurate description of Squirrel Hill.[24]  The aggravator goes on to allege that Mr. Bowers committed the charged acts at the Tree of Life Synagogue in Squirrel Hill to "maximize devastation, amplify the harm of his crimes, and instill fear within the

---

[24] Such proof and inquiry might address the date of establishment of the Jewish community in Squirrel Hill, i.e., when there became a critical mass that could be called a "population"; what is "urban" for purposes of comparison to other Jewish "populations" in the United States; and that the population is both one of the oldest **and** one of the largest.  It is unclear if to be "one of" those superlatives, the Squirrel Hill community must be in the top three, the top five, the top ten, or the top quartile.  Some measures from Jewish resources indicate that Pittsburgh itself is not in the top 20 in the United States.  *See* "Largest Jewish Populated Areas in the United States (2018)," *available at* https://www.jewishvirtuallibrary.org/largest-jewish-populated-metropolitan-areas-united-states (last visited June 7, 2020).

local, national, and international Jewish communities." *Id*. Where these effects are joined with the conjunctive "and," the government must prove and the jury must find that Mr. Bowers committed the acts charged at the Tree of Life synagogue to achieve **each** of the three – maximizing devastation, amplifying harm, and instilling fear.[25] Finally, the aggravator alleges that Mr. Bowers committed acts to achieve those three effects on three different scales, *viz*., the "local, national, and international Jewish communities." *Id.* Because the government also used the conjunctive "and" for these three prongs, it will have to prove and the jury will have to find that Mr. Bowers intended all of the alleged effects.

The aggravator thus requires 10 distinct findings – that Squirrel Hill satisfies the government's characterization and that Mr. Bowers selected that site to achieve each of nine different outcomes – devastation, harm, and fear on each of local, national, and international scales. With so much complexity, this aggravating factor is inherently incapable of channeling the jury's discretion "by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." *Godfrey*, 446 U.S. at 428 (internal quotations omitted). "Devastation," "harm," and "fear" are each vague terms that do not have "common-sense core of meaning . . . that criminal juries should be capable of

---

[25] To "maximize" these effects is a comparative inquiry that would require proof that Mr. Bowers considered other locations where he might have committed the alleged acts and what the difference in harm would be. The government has not made any allegation that Mr. Bowers preferred the Tree of Life to other potential locations outside of Squirrel Hill. Indeed, as detailed below in Point V.G.4., the evidence indicates that he did not.

understanding." *Jurek,* 428 U.S. at 279.  This is doubly so where the inquiry is not

objective, but instead involves a subjective assessment of what Mr. Bowers intended and

foresaw.  In this way, the aggravating factor commits the error that the Supreme Court

held out as the lingering constitutional weakness in capital punishment – *"*standards so

vague that they [] fail adequately to channel the sentencing decision patterns of juries

with the result that a pattern of arbitrary and capricious sentencing like that found

unconstitutional in *Furman* could occur." *Gregg*, 428 U.S. at 195, n.46.

Where each component of the government's "selection of site" aggravator is

unconstitutionally vague, and the stacked and conjunctive structure of the aggravator

make it exponentially vaguer, this Court should strike this aggravating factor.

> 3.    **The "selection of site" aggravating factor is too removed from the considerations Congress set forth as relevant to be permitted.**

The government's "selection of site" aggravating factor alleges that Mr. Bowers

committed the acts charged in the superseding indictment with the intent to have effect on

the national and global Jewish communities.  Though Congress did not articulate a

guiding principle for its delegation to the executive of the authority to create capital

aggravating factors, the FDPA reflects what was Congress' focus was in determining

whether a federal capital defendant should be sentenced to death.  Section 3593(c)

requires that any information presented in a capital sentencing hearing be "relevant."   As

well, the enumerated statutory aggravating factors "all focus uniquely and narrowly on

the crime's lethal effects – i.e., on the extent of human trauma involved." *Bin Laden*, 126

F. Supp. 2d at 302 (citing 18 U.S.C. §§ 3592(c)(1), (11) & (14)).  As other courts have

done, this Court should presume that "Congress would not craft a statute which would defeat the fundamental objectives reflected in the Supreme Court's death penalty jurisprudence by relaxing the standards of reliability and relevance of non-statutory aggravating factors when it so carefully defined the statutory aggravating factors and, in so doing, confined them to a strikingly high level of relevance and reliability." *Friend*, 92 F. Supp. 2d at 544. *See also Davis*, 912 F. Supp. at 943 ("To carefully define the statutory aggravating factors, but then allow wholesale introduction of non-statutory aggravating information, would defeat the goal of guided and measurable jury discretion, and return us to an unconstitutional system where the death penalty is "wantonly" and "freakishly" imposed. It cannot be presumed that Congress intended to create a statute that is so self-defeating, much less one that would be unconstitutional."); *Bin Laden,* 126 F. Supp. 2d at 302 (quoting *Friend*).

On this principle, where the government's "selection of site" aggravating factor diverts so far from the lethal effects and human trauma involved in the shootings at the Tree of Life Synagogue to a scale of impact Mr. Bowers allegedly intended, the aggravator does not address a relevant issue. *See Bin Laden,* 126 F. Supp. 2d at 302-03 (striking government's non-statutory aggravating circumstance that the defendants intended to and did disrupt the government's embassy-centered functions not sufficiently indicative of a defendant's disdain for human life as to warrant submission as an aggravating factor for the jury's consideration); *Id.* ("not every consequence of a defendant's actions will support the imposition of capital punishment" and "[the rationale

in favor of execution wanes] as the continuing effects of a crime ripple outwards from its core locus of human suffering.").

The heightened reliability requirement makes this especially critical where the government has not shown any evidence to support its allegation that Mr. Bowers intended this broad, far-reaching effect. *Cf. United States v. Ciancia*, No. CR 13-902 2015 WL 13798677, *5-6 (C.D.Ca. Sept. 8, 2015) (allowing the non-statutory aggravator that alleged that defendant who shot TSA agent intended to terrorize TSA employees where government had note from defendant stating he wished to "instill fear in [TSA agents'] traitorous minds[,]" but striking portion of aggravator alleging that defendant intended to "strike fear in their hearts" as impermissibly inflammatory.).

The government's non-statutory "selection of site" aggravating factor is too far removed from the considerations that Congress set forth as relevant to a jury's decision of whether to sentence a defendant to death. Therefore, this Court should strike this aggravating factor from the government's NOI.

### 4. The aggravator is unsupported by the government's evidence.

The government's "selection of site" aggravating factors alleges that Mr. Bowers committed the charged acts at the Tree of Life Synagogue in Squirrel Hill to "maximize devastation, amplify the harm of his crimes, and instill fear within the local, national, and international Jewish communities." *Id*. This is not supported by the evidence.

The government alleges that Mr. Bowers posted a link on an internet site to a Hebrew Immigrant Aid Society (HIAS") webpage that listed Jewish congregations that were hosting refugee-related events. (ECF 178 at 40.) This list included the Dor Hadash

congregation.  The list also included two other congregations in Pittsburgh, both of which were within one mile of the Tree of Life Synagogue and within the Squirrel Hill neighborhood.  Thus, where the government alleges that Mr. Bowers was targeting HIAS support, and all of the Pittsburgh congregations listed by HIAS as supporting its work were located in Squirrel Hill, the evidence does **not** show that Mr. Bowers identified the Dor Hadash congregation because of its location in Squirrel Hill.  Therefore, the government's evidence contradicts its allegation that Mr. Bowers selected a congregation in the Squirrel Hill neighborhood to achieve the multiple effects enumerated in its "selection of site" aggravating factor.

For the reasons set forth above, this Court should strike the government's non-statutory "selection of site" aggravating factor from the NOI.

### H. This Court should strike the "motivated by religious animus" aggravating factors because Congress rejected the death penalty for hate crimes motivated by religion.

The NOI alleges as an aggravating factor that Mr. Bowers "expressed hatred and contempt toward members of the Jewish faith and his animus toward members of the Jewish faith played a role in the killings." (ECF 86 at 4.)  This aggravating factor must be stricken because Congress elected not to provide for the death penalty for crimes motivated by religious animus.  *See* 18 U.S.C. § 249 ("Whoever … willfully causes bodily injury … because of the actual or perceived race, color, religion, or national origin of any person …shall be imprisoned for any term of years or for life…if death results from the offense…").

Case 2:18-cr-00292-DWA   Document 241   Filed 06/16/20   Page 69 of 70

As the Tenth Circuit found in *McCullah*:

[t]o the extent that Congress wants a particular aggravating factor to receive enhanced weight in the sentencing process, it can provide for such enhancement in the statute itself.  However, Congress elected not to do so, and the prosecutor cannot attempt to circumvent Congress's inaction by introducing the same factor in a different guise a second time.

*McCullah,* 76 F. 3d at 1112. *See also Davis*, 912 F. Supp. at 943 ("To carefully define the statutory aggravating factors, but then allow wholesale introduction of non-statutory aggravating information would defeat the goal of guided and measurable jury discretion and return us to an unconstitutional system where the death penalty is 'wantonly' and 'freakishly' imposed.).

Thus, where Congress has provided for a penalty of life in prison – not death – for a crime motivated by religious animus, the government cannot be permitted to make the same factor the basis for a sentence of death.

## CONCLUSION

WHEREFORE, for the reasons set forth, Mr. Bowers respectfully requests this Court to strike all or portions of the statutory threshold intent factors, and aggravating factors in the Notice of Intent To Seek Penalty of Death as set forth above.

Respectfully submitted,

**_/s/ Judy Clarke_**
Judy Clarke
Clarke Johnston Thorp & Rice, PC

**_/s/ Michael J. Novara_**
Michael J. Novara
First Assistant Federal Public Defender

**_/s/ Elisa A. Long_**
Elisa A. Long
Supervisory Assistant Federal Public Defender