IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      )
             )
      v.           )      Criminal No. 18-292
             )
ROBERT BOWERS         )

## MOTION REQUESTING COURT TO RECONSIDER ORDER DENYING FORENSIC DATA AND "CASE FILE" DISCOVERY

Defendant Robert Bowers, through counsel, asks this Court to reconsider its ruling (ECF No. 202) denying the defense request that the government produce copies of laboratory case files (ECF No. 154 at 13, § II(C)(viii)).[1] In addition, the defense moves the Court to order the government to produce Cell Site Location Information ("CSLI"). The requested information fits within the parameters of Rules 16(a)(1)(E)(i), (a)(1)(F), and (a)(1)(G) of the Federal Rules of Criminal Procedure.

## BACKGROUND

In compliance with the December 18, 2019, discovery motions deadline, the defense asked the Court to order the government to produce discovery, including "[c]opies of the laboratory case file for any scientific test or experiment, including, any bench notes made by each examiner in testing the items listed in the report referenced

---

[1]The discovery motion requested thirteen categories of forensic laboratory related discovery, of which case litigation packets were one category. (ECF 154 at 12–14) This request for reconsideration is limited to the request for the forensic case litigation packets.

above." (ECF 154 at 13, § II(C)(viii).) The request was among a larger list of forensic laboratory related items the defense sought. (*See* id. at 12–14.) On February 25, 2020, the Court granted the motion in part, but denied it with respect to most items, including the request for forensic laboratory related discovery. (ECF  202.)

On January 3, 2020, the government produced a large volume of discovery related to crime scene reconstruction and firearm toolmarks, and advised the defense that expert assistance would be necessary to make use of the data included in the discovery production. The government produced additional discovery on January 16, 2020, January 30, 2020, February 10, 2020, February 21, 2020, March 13, 2020, March 23, 2020, March 31, 2020, and April 10, 2020.

In early February 2020, the defense retained the services of expert/consultant J. Christopher McKee to assist with the evaluation of the forensic evidence provided by the government, including the significant volume of discovery produced on January 3, 2020. *See* Defense Exhibit A (attached Declaration of J. Christopher McKee).[2] Mr. McKee was retained to review the forensic evidence and, based on his expertise, advise and assist the defense in identifying appropriate experts to further analyze the forensic evidence. On March 31, 2020, the defense sent a letter to the government, explaining that the conclusory reports provided were insufficient to permit expert evaluation, noting that its response to a previous discovery request letter "referred us to conclusory reports that do

---

[2] Mr. McKee is a nationally recognized expert on forensic science evidence and its use in criminal courts. He has testified and been qualified as an expert in forensic science and related litigation issues.

not provide us with sufficient information to identify or retain an expert(s) in this area,"
and requesting that it provide the complete supporting/underlying case file
information/case litigation packets created by:

(1) Erich Smith in preparing Doc 361 (GOVT_5115-5139) (firearms/toolmarks);

(2) Brett Mills in preparing Docs 359 (GOVT_5070-5073) and 360 (GOVT_5074-5114) (firearms/toolmarks); and

(3) Marcy Plaza in preparing Doc 233 (GOVT_4106-4121) (DNA).

The government responded that, in its view, the defense was "not entitled to
production of these materials at this juncture of the proceedings." The government further
claimed, without elaboration, that "the reports that have been disclosed do provide
sufficient information for you to identify or retain any expert(s) in these areas."

On April 21, 2020, following further review of materials provided by the
government, the defense sent a letter to the government requesting Cell Site Location
Information data.[3] The government responded that disclosing the requested information
"would be premature."

---

[3] Specifically, the defense requested: (1) The device and software version of the
Gladiator Autonomous Receiver ("GAR") used to conduct the survey of the Sprint
network ("survey" or "drive testing") on or about December 12, 2018; (2) Any additional
drive testing conducted by CAST in relation to this case; (3) All raw/original data
generated from the GAR device on or about December 12, 2018; (4) All manuals,
training materials, and written/multimedia files relied upon/referenced by CAST for the
survey conducted on December 12, 2018; (5) All communications relating to preparing
and conducting December 12, 2018 survey; (6) A list of training courses attended by
Special Agent Hauger that are relevant to the survey conducted on December 12, 2018;
(7) All reports, published or unpublished, relied upon by CAST regarding the proper
methodology, validation, and verification of surveys on the T-Mobile and Sprint network
using a GAR device; (8) Any validation testing results for the GAR survey testing from

The information sought is material to identification and retention of appropriate experts and to potential *Daubert* and/or reliability challenges to evidence the government intends to rely upon as part of its guilt phase evidence. Rules 16(a)(1)(E)(i), (a)(1)(F), and (a)(1)(G) entitle the defense to the underlying bases for the government experts' conclusions. *See United States v. Con Ui*, No. 3:13-CR-123, 2016 WL 4140520, at *10 (M.D. Pa. Aug. 4, 2016) (in federal death penalty case, granting defense's discovery request under Rule 16 for the "'underlying documents and data used to compile'" studies and ruling, "Because the studies have already been provided and may be presented by the Government, the data forming the basis for the studies' results should be disclosed.").

## ARGUMENT

The defense moves the Court to reconsider its Order denying its request for the complete supporting/underlying case file information/case litigation packets in three areas of forensic analysis undertaken by the government: firearm toolmarks, crime scene reconstruction, and DNA analysis. In addition, the defense moves the Court to order the government to disclose Cell Site Location Information ("CSLI") data.

Reconsideration of a previous Court Order is appropriate "where the court has misunderstood a party or where there has been a significant change in law or facts since

---

the FBI; (9) Validation studies for the use of True Call or TDOA records supporting CAST's claim that the FBI has found these records to be "typically...accurate to +/- .1 mile in either direction"; (10) Validation studies for the version of the software from Hawk Analytics used by CAST to create the maps in this case; and (11). Verification results for all conclusions reached by CAST.

the court originally ruled on that issue." *United States v. Bogart*, No. 4:12–cv–347, 2014 WL 6908263, at \*2 (M.D. Pa. 2014); *see Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983) (noting "that there are circumstances when a motion to reconsider may perform a valuable function" and that "the motion is not uncommon in federal practice"). Here, there are significant changes in facts that warrant reconsideration of the part of the Order denying the defense access to the government's laboratory case files for forensic evidence.

First, on January 3, 2020, after the deadline for the defense to file discovery motions, the government produced a large volume of forensic evidence related discovery. In its discovery production letter, the government expressly advised the defense that it would need to hire an expert to "make use of this data." The government's January 3 discovery production is a significant new fact that was unavailable to the defense at the time that the defense was required to file its discovery motion.

Second, in early February 2020, partly in response to the government's January 3, 2020 discovery production, the defense retained expert/consultant J. Christopher McKee to assist with understanding the totality of the forensic evidence and its reliability, as well as assisting with a review of the discovery produced on January 3. *See* Defense Exhibit A (attached Declaration of J. Christopher McKee). Mr. McKee advised the defense that case file/case litigation packets are routinely produced in federal criminal cases and are necessary to understanding the reliability of the laboratory work and conclusions of the government's proposed forensic evidence, as well as a determination of whether it is the "science" that is at issue, or whether the results are simply unreliable. *Id*. As noted in

5

McKee's declaration, the documents contained in laboratory case litigation packets "are directly pertinent to the meaningful understanding of, or foundation for, the test results and opinions contained in the reports already disclosed." *Id*. at ¶ 12. And that "[w]ithout a review of the testing results and their supporting documents, as well as the bases of opinions drawn from the testing, . . . it is not possible to properly analyze the accuracy and admissibility of various expert opinions nor identify the correct independent scientific experts who may assist in Mr. Bowers' case." *Id*. at ¶ 13. Mr. McKee's expert assistance and assessment is also a new fact that warrants this Court's reconsideration of its previous Order.

In *Above the Belt, Inc.*, the district court noted the late Justice Cardozo's comments "on the importance of the motion to reconsider":

> He hypothesized a motion, clearly ripe, correctly decided by the trial court on the facts before it. What, Judge Cardozo asked, of the defeated party who acquires favorable evidence after the ruling:
>
> > Can it be that he is remediless? An appeal will not aid him, for that must be heard upon the papers on which the motion was decided.... A grievous wrong may be committed by some misapprehension or inadvertence by the judge for which there would be no redress, if this power did not exist.
>
> [Citation omitted.]
>
> It is clear, then, that there are circumstances when a motion to reconsider may perform a valuable function.

*Above the Belt, Inc.*, 99 F.R.D. at 101. Here, the issue is not whether this Court misapprehended any fact or law; rather, the issue is that the defense acquired additional information after this Court's ruling and acquired that information at least partly due to

the government's later production of discovery. Under these circumstances, the law

permits this Court to reconsider the narrow issue of whether to order the government to

produce the underlying information contained in case litigation packets for forensic

evidence.

Section I below outlines the law regarding materiality under Rule 16, and explains

in detail why each item of requested information is material to preparing the defense.[4]

Section II dissects the government's response to the initial discovery motion and

demonstrates how the cases relied upon by the government do not support its refusal to

produce—or delay the production of—the requested information. Finally, Section III

directs the Court to the 1993 Advisory Committee Notes that accompany Fed.R.Crim.P.

Rule 16 and discuss the importance of early and complete disclosure of expert data and

underlying bases for opinions.

## I.      The information requested is material to addressing the reliability of forensic evidence the government intends to introduce in evidence at trial.

Rules 16(a)(1)(E)(i) and (a)(1)(F) require the government to disclose information

if, among other factors, it is "material to preparing the defense." Fed.R.Crim.P.

16(a)(1)(E)(i) and (a)(1)(F)(iii).. The "[m]ateriality standard is not a heavy burden,"

*United States v. Davidson*, No. 4-CR-17-393, 2018 WL 2230624, at *2 (M.D. Pa. May

16, 2018) (internal quotation marks and citation omitted), and requires only that the

---

[4] The government does not appear to dispute that the requested information is in its possession, *see* Fed. R. Crim. P. 16(a)(1)(E) and (a)(1)(F)(i), or that the attorney for the government knows that the item exists, *see* Fed. R. Crim. P. 16(a)(1)(F)(ii). (ECF 177 at 21, section II(C)(viii).)

defense make a *prima facie* showing of "some indication" that disclosure of the item

would enable the defendant "significantly to alter the quantum of proof in his favor."

*United States v. Con Ui*, No. 3:13-CR-123, 2016 WL 4140520, at *3 (M.D. Pa. Aug. 4,

2016); *see United States v. RMI Co.*, 599 F.2d 1183, 1189 (3d Cir. 1979) (recognizing

"the lower 'materiality' threshold of discovery under Rule 16 (as opposed to the

'particularized need' standard which has been held applicable to Rule 6(e))"; *United*

*States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993) (noting the materiality standard "'is

not a heavy burden,' . . . rather, evidence is material as long as there is a strong indication

that it will play an important role in uncovering admissible evidence, aiding witness

preparation, corroborating testimony, or assisting impeachment or rebuttal"); *United*

*States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010) ("Federal Rule of Criminal Procedure

16 grants criminal defendants a broad right to discovery.").

   The government charged Mr. Bowers with sixty-three criminal offenses. (ECF

44.) Whether an item of evidence is "material" to preparing a defense against these

charges is context-dependent. *See United States v. Enigwe*, No. 92–00257, 1993 WL

276966, at *8 (E.D. Pa. July 13, 1993) ("Materiality must be assessed against the

backdrop of all the evidence presented at trial."); *United States v. Bloom*, 78 F.R.D. 591,

616 (E.D. Pa. 1977) (noting "the Supreme Court tailored its definition of materiality to

vary, depending on the facts").

   The relevant facts in assessing materiality include the fact that this is a capital

case. *See* ABA Standards for Criminal Justice 4–1.2(c) (3d ed. 1993) ("Since the death

penalty differs from other criminal penalties in its finality, defense counsel in a capital

case should respond to this difference by making extraordinary efforts on behalf of the accused."). Under the ABA Guidelines, in a death penalty case, "[a]t every stage of the proceedings, counsel has a duty to investigate the case thoroughly." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.7, Commentary, p. 77 (2003). "With respect to the guilt/innocence phase, defense counsel must independently investigate the circumstances of the crime, and all evidence – whether testimonial, forensic, or otherwise – purporting to inculpate the client." *Id*. at 6. The Guidelines instruct that "[t]o assume the accuracy of whatever information the client may initially offer or the prosecutor may choose or be compelled to disclose is to render ineffective assistance of counsel." *Id*. Therefore, "[t]he defense lawyer's obligation includes not only finding, interviewing, and scrutinizing the backgrounds of potential prosecution witnesses, but also searching for any other potential witnesses who might challenge the prosecution's version of events, and subjecting all forensic evidence to rigorous independent scrutiny." *Id*.

Investigating all aspects of government expert reports, as mandated of counsel in a capital case, requires access to the underlying bases of the experts' conclusions. The forensic evidence at issue in this motion—firearm toolmarks, crime scene reconstruction, DNA, and CSLI—implicates guilt phase investigation. Intrinsic to evidentiary proof of Mr. Bowers' guilt for the alleged offenses is the reliability of the government's forensic evidence. The defense seeks the underlying bases, testing processes, and results for the government experts' conclusions solely to discharge its duty under the Sixth Amendment to investigate the case and test the experts' conclusions.

9

Also relevant to the "materiality" analysis is the fact that requiring the government to disclose the requested information now will permit the defense to continue diligently investigating this case and allocate scarce resources efficiently ultimately potentially saving thousands of dollars in expenses. The government's stance that it will wait until a trial date is set in this matter or possibly later to produce this information in conjunction with expert witness summaries will only cause unnecessary delay, as the defense will require significant time before trial to review and permit experts to analyze and test the underlying bases. In turn, that delay will also cause potentially avoidable significant defense expenditures, as the defense will be forced to hire experts now without a proper sense of the scope of the work required. The government already has produced its experts' conclusions, so it makes no sense why it cannot now produce the underlying data and testing results, as well as bases for those conclusions. These additional considerations further support the materiality of the requested information.

Generally, the underlying bases for expert opinions are discoverable under Rule 16 where the defense explains in detail why the information is necessary to preparing the defense. *United States v. Liquid Sugars, Inc.*, 158 F.R.D. 466, 473 (E.D. Cal. 1994) (ruling on defense discovery motion supported by "specific exhibits," including declaration from defense expert, that underlying bases contained in "documents" are "directly pertinent to the meaningful understanding of, or foundation for, the test results" and are therefore discoverable under Rule 16(a)(1)(E) (then Rule 16(a)(1)(C))); *United States v. Giardina*, No. 04-29J, 2005 WL 3088441, at *7 (W.D. Pa. Nov. 17, 2005) (citing *Liquid Sugars* approvingly, stating, "Although *Liquid Sugars* concerned a

question of whether the defendant had met the materiality prong for the production of documents and tangible objects under Rule 16, its observation of the need for production of foundational evidence for reports to be produced at trial is helpful in our analysis of the case-in-chief prong of Rule 16"); *United States v. Con Ui*, No. 3:13-CR-123, 2016 WL 4140520, at *10 (M.D. Pa. Aug. 4, 2016) (in federal death penalty case, ruling that "the data forming the basis for the studies' results should be disclosed.").

The failure to disclose underlying information, such as bench notes, for expert conclusions has in fact led to wrongful convictions. *See, e.g.*, Susan Rutberg, *Anatomy of a Miscarriage of Justice: The Wrongful Conviction of Peter J. Rose*, 37 GGULR 7, 15 (2006) ("Because it could certainly have been characterized as potentially exculpatory under Brady v. Maryland, the fact that Rose and Alicia have different blood types and that Rose's blood type was not found in the semen on her underwear is evidence that should have been provided to the defense in discovery. Although this crucial fact appears in the criminalist's 'bench' notes regarding the blood tests, it does not appear in her report. Only the report, with its conclusion of 'inconclusive' results, was turned over to defense counsel.").

As discussed below, each item of requested information is material to the defense and required for it to satisfy its the Sixth Amendment obligations.

A.     **The underlying bases for conclusions concerning firearm toolmarks and shooting reconstruction contained in FBI Laboratory Reports authored by Brett A. Mills and Erich Smith are material to preparing the defense.**

The government alleges that Mr. Bowers used multiple firearms to kill and injure multiple victims. During the alleged offense conduct, law enforcement agents arrived on scene and fired multiple weapons in response. Critical to the government's guilt phase evidence are conclusions made by FBI Laboratory experts concerning the connection between certain cartridges and/or casings and/or bullet fragments and either Mr. Bowers' weapons or law enforcement weapons. *See* Defense Exhibit A at ¶ 9 (attached Declaration of J. Christopher McKee).

The firearm toolmarks evidence, and the conclusions drawn by government experts, constitute direct evidence of whether Mr. Bowers committed each of the sixty-three charged offenses against each named victim. (*See* ECF  44.)

To date, the only information produced in response to the numerous requests are two conclusory firearm related reports that allege an ability to link specific shell casings and bullets to a particular firearm and an ability to reconstruct the shooting through an analysis of holes, impacts and trajectories at the crime scene.  Missing from these reports are the facts and data considered by the forensic expert(s), underlying documentation of the examination or analyses performed and material necessary for another analyst to understand the expert's actual work or conclusions. *See* Defense Exhibit A at ¶ 9. The supporting case file, which documents the analyses performed, is critical to understanding the government's forensic experts' opinions. *Id*.

12

> **B.    The underlying bases for conclusions concerning DNA contained in FBI Laboratory Reports authored by Marcy Plaza are material to preparing the defense.**

The government also alleges that DNA evidence found on a Colt rifle (Item 1) and a Glock pistol (Item 3) may link Mr. Bowers and victims from the crime scene to these firearms. There are also additional DNA testing results that allegedly link Mr. Bowers to several other recovered firearms and non-firearm items of evidence.

The report authored by Marcy Plaza merely summarizes her conclusions about any alleged links and provides Likelihood Ratio statistics assigning a weight to the evidence. Missing from the report are any facts or data considered by the forensic expert that would have been generated through the DNA testing process. Regarding the screening for possible blood on items of evidence, it is not clear from the conclusory report what actual serological tests were performed. There is no information in the report regarding the quantity of biological material found on these items of evidence—which is a critical factor when analyzing the validity of the conclusions drawn from DNA testing. Nor are there any data, charts, or graphs, generated during DNA testing that would show the results of the tests performed and that would allow the testing process and results to be analyzed by another expert. Finally, there are no supporting reports or data that would have been generated by the STRmix software program that produced the Likelihood Ratio statistics. These reports are critical to understanding how that program assessed the DNA mixtures, assigned possible mixture ratios and weighed alternative hypotheses central to the function of that software. *See* Defense Exhibit A at ¶ 10.

**C.      The underlying bases for conclusions concerning Cell Site Location Information contained in FBI Laboratory Reports authored by FBI Agent Hauger and/or the CAST team are material to preparing the defense.**

The defense requests information relating to the conclusions provided in discovery regarding the location of mobile devices. This request is based, in part, upon the draft reports provided by Special Agent John Hauger from the FBI's Cellular Analysis Survey Team ("CAST"). According to the draft reports, Special Agent Hauger reached conclusions about the location of mobile devices based on records provided by mobile carriers and data he generated while conducting a survey. As for the records from mobile carriers, Special Agent Hauger relied upon Call Detail Records ("CDRs"), True Call data, and/or TDOA or Timing Advance Information to conduct his analysis. Although Special Agent Hauger acknowledges True Call data "is provided by T-Mobile with the disclaimer that the measurements are 'best estimates,' rather than 'precise data,'" he nonetheless utilized this data in reaching his conclusions because, based on "the experience of the FBI CAST team, True Call measurements have been typically found to be accurate to +/- .1 mile in either direction." Government's Discovery at GOVT_18292_004934. Moreover, Special Agent Hauger based his opinion on the location of mobile devices based on a survey of the cellular network that occurred on or about December 12, 2018. Finally, it appears that Special Agent Hauger used a version of a program created by Hawk Analytics to place this data into a map. In order to review the scientific accuracy of these conclusions, the defense requires the following information in the possession of the government:

14

1. The device and software version of the Gladiator Autonomous Receiver ("GAR") used to conduct the survey of the Sprint network ("survey" or "drive testing") on or about December 12, 2018;

2. Any additional drive testing conducted by CAST in relation to this case;

3. All raw/original data generated from the GAR device on or about December 12, 2018;

4. All manuals, training materials, and written/multimedia files relied upon/referenced by CAST for the survey conducted on December 12, 2018;

5. All communications relating to preparing and conducting December 12, 2018 survey;

6. A list of training courses attended by Special Agent Hauger that are relevant to the survey conducted on December 12, 2018;

7. All reports, published or unpublished, relied upon by CAST regarding the proper methodology, validation, and verification of surveys on the T-Mobile and Sprint network using a GAR device;

8. Any validation testing results for the GAR survey testing from the FBI;

9. Validation studies for the use of True Call or TDOA records supporting CAST's claim that the FBI has found these records to be "typically...accurate to +/- .1 mile in either direction";

10. Validation studies for the version of the software from Hawk Analytics used by CAST to create the maps in this case; and

11. Verification results for all conclusions reached by CAST.

**II.     The case law the government cited in its response to the  initial discovery motion does not preclude this Court—in the context of this capital case, where the defense details why the requested information is material to preparing the defense—from ordering disclosure of underlying forensic case file information.**

In its response to the initial request for the case litigation packets for forensic

laboratory evidence, the government wrote: "This request is overbroad under Rule

16(a)(1)(F) and should be denied at this juncture. Information responsive to this request will likely be contained in the government's expert summaries and qualifications pursuant to Rule 16(a)(1)(G)." (ECF 177 at 21.) As noted, with respect to forensic laboratory related discovery, the defense originally requested thirteen categories of discovery, of which case litigation packets were one category. (ECF 154 at 12–14.) This motion to reconsider is limited to case litigation packets for forensic evidence.

The government cited multiple cases in response to all the forensic laboratory related discovery requests. Regarding case litigation packets for forensic evidence, the government ignored the crux of argument and supporting case law, which is that a district court's decision to order disclosure of underlying information that forms the bases of an expert's conclusion is context-dependent, and there is no one-size-fits-all rule.

After asserting that the "language of Rule 16(a)(1)(F) is clear, unambiguous, and limited to reports of examinations and tests," the government cited to *United States v. Price*, 75 F.3d 1440, 1444–45 (10th Cir. 1996). (ECF 177 at 17.) In *Price*, the court noted that the defendant's references to Rule 16 in his motion "were entirely without detail, and the argument before the district court provided no further basis for a ruling." *Price*, 75 F.3d at 1445. Further, the government neglected to point out that in *Price*, "it had already made its **entire file** available to Price's counsel," and on the record the prosecutor stated that defense counsel "has everything that we have in our possession except for prosecution summaries." *Price*, 75 F.3d at 1444, 1445. In that context, the court said, "The government therefore complied with [Rule 16]." *Id*. at 1445. The defense here would welcome the government adopting the protocol it followed in *Price* to make its

entire case file available to Mr. Bowers' counsel. Until it does, reliance on *Price* to support its argument that it has fully complied with Rule 16, is inapt.

The government also relied on *United States v. Dennison*, 937 F.2d 559, 565–66 (10th Cir. 1991), for the proposition that Rule 16 pretrial disclosure is "limited to reports of examinations and tests." (ECF 177 at 17.) *Dennison*, however, is far from on point. In *Dennison*, the Tenth Circuit held it unwarranted for the district court to order the **defense** to produce its mental health expert's notes to the government. The court said it "view[ed] such notes as non-discoverable statements made by the defendant to his agent in connection with his defense." *Id*. at 566. When the government "contend[ed] that disclosure was necessary to enable meaningful cross-examination," the court noted "the government did not use the notes to challenge Dr. Siegal's opinion of defendant's mental condition [but] [i]nstead, the prosecutor merely quoted defendant's statements to the jury through his questioning of Dr. Siegal." *Id*. The court concluded: "Under **these circumstances**, we fail to see why disclosure was necessary." *Id*. (emphasis added).

Here, the defense seeks data from the government to challenge the reliability and substance of the government experts' conclusions reached based on that data, a situation far different from that in *Dennison* where the government sought privileged communications between the defendant and the defense's mental health examiner, not to challenge the expert's conclusion about the defendant's mental health status, but rather solely to reveal to the jury the defendant's otherwise inadmissible statements. *Dennison* does not support the government's position here; rather, it supports the defense

contention that a district court has authority to order disclosure under certain circumstances.

The government cited and cursorily discussed three additional cases. (*See* ECF 177 at 17–18) (citing *United States v. Alex*, 791 F. Supp. 723, 729 (N.D. Ill. 1992), *United States v. Orzechowski*, 547 F.2d 978, 983–85 (7th Cir.1976), and *United States v. Bear*, No. CR 08–50067–01, 2009 WL 917593, at *2 (D.S.D. Mar. 31, 2009)). In *Alex*, the defendant perfunctorily requested disclosure of facts and data underlying expert opinions when the government had not conducted any scientific tests or generated any expert reports. *Alex*, 791 F. Supp. at 729. In that context, the court declined to order disclosure. Here, as outlined below, the defense describes in detail why the requested items are material and essential to effectively challenge the already-disclosed government experts' conclusions.

In *Orzechowski*, the defendant sought disclosure of certain Drug Enforcement Administration internal memoranda "which related, among other things, to the tests necessary for determining whether a substance represented to be cocaine was an unlawful isomer of cocaine." *Orzechowski*, 547 F.2d at 983. The Seventh Circuit noted that the items sought were "general memoranda from various attorneys in the Drug Enforcement Administration and the Justice Department for the purpose of generally warning personnel within the Drug Enforcement Administration that the l-d isomer issue might arise in cocaine prosecutions." *Id*. at 984. The court noted: "None of these . . . memoranda were concerned specifically with the appellant's prosecution; none were used by attorneys for the Government preparing for or trying the case; and none contained the

statements of any witness who testified." *Id*. The court rejected the defendant's argument

that the items were discoverable under Rule 16 and concluded that "[c]onsidering the

contents of the memoranda and report, the purpose for which the memoranda and report

were sought, the full knowledge of the subject matter possessed by defendant, and the

extensive cross-examination of the government chemist at trial, we cannot say that these

items were material within the meaning of Rule 16." *Id*. In contrast to the general

memoranda described in *Orzechowski*, here, the defense requests case-specific items that

bear directly on the government experts' conclusions about Mr. Bowers' alleged conduct.

The third case cited by the government similarly does not address the argument

that case-specific data and results underlying the government experts' conclusions are

material to preparing the defense. In *Bear*, the defense requested that the government

produce "polygraph materials, including audio or visual recordings, charts, questions,

score sheets, control sheets, and computerized files and disks" in order "to determine the

true results of his polygraph examination and whether the federal agents misled him

about those results to elicit inculpatory statements." *Bear*, 2009 WL 917593, at *2. There

is no indication that the request established that any of the underlying polygraph items

were material to preparing a defense. The district court characterized the items sought as

"devices used to assist the polygraphist in administering the polygraph test and in

reaching a conclusion based upon the polygraph test" and concluded that "courts

interpreting Fed.R.Crim.P. 16 have generally found that results and reports do not include

the materials that provide the underlying basis for the results and reports." *Id*. While a

court may generally dismiss the defendant's cursory request for underlying data, as the

district court in *Bear* did, where, as here, the defense outlines in detail why the underlying case file information is material to enabling the defense to challenge the reliability and substance of the government experts' conclusions, production should be ordered.

The case relied on most extensively by the government is *United States v. Iglesias*, 881 F.2d 1519 (9th Cir. 1989). (ECF 177 at 17–18.) While the court in *Iglesias* concluded that Rule 16(a)(1)(F) (then Rule 16(a)(1)(D)) does not compel the government to disclose a government lab expert's drug testing log notes, it did so based on its conclusion that the defense had not justified ordering disclosure. *Iglesias*, 881 F.2d at 1524. The court noted the justifications for disclosure outlined in the 1974 Advisory Committee Notes to Rule 16:

> [M]andatory disclosure of reports of scientific tests is justified because:
>
> > (1) it is difficult to test expert testimony at trial without advance notice and preparation;
> >
> > (2) it is not likely that such evidence will be distorted or misused if disclosed prior to trial; and
> >
> > (3) to the extent that a test may be favorable to the defense, its disclosure is mandated under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

*Id.* The court wrote that "[t]hese justifications are not applicable to internal documents like the log notes requested by [defendant] in part because "the actual reports received by [defendant] are sufficient to enable her to adequately cross-examine the government chemist" and "unlike the final reports, the preliminary log notes are much more likely to

be distorted and misused." *Id*. The defense in *Iglesias*, according to the court, had not

justified disclosure of the underlying log notes and had not addressed how disclosing the

log notes would not lead to distortion and misuse. Here, the defense has explained in

detail (and in the attached declaration of defense expert McKee) why the underlying case

file information is necessary to enable the defense to challenge effectively the

government experts' conclusions and how disclosing the information would not lead to

misuse but rather would help the factfinder evaluate the evidence.

      *Iglesias* also involved a vigorous and detailed dissent, which examined the history

of the term "any results or reports" in Rule 16(a)(1)(F), noting the Rule's advisory

committee notes and the commentary to the American Bar Association's Criminal Justice

Standards. The dissent concluded:

> I would hold that Iglesias was entitled to inspect and copy "all
> documents of whatever sort generated in connection with" the
> tests, including the notes of the examiner. They are "results" of
> the testing. . . . The rule . . . is intended to provide the minimum
> amount of discovery to which the parties are entitled. *See*
> Fed.R.Crim.P. 16 advisory committee's note, 1974
> amendment.

*Iglesias*, 881 F.2d at 1527 (Boochever, J., dissenting). The dissent noted the "admittedly

scant authority construing Rule 16's use of the phrase 'any results or reports.'" *Id*. at

1526. The authority that did exist – the advisory committee notes and ABA standards—

made it "clear, however, that each amendment of the rule was for the purpose of

expanding discovery rights." *Id*. The dissent concluded: "The goal of the amended rule is

to enable counsel, prior to trial, to become familiar with the relevant tests and test

procedures and to determine whether the tests performed were appropriate." *Id*. Here, the

defense requests disclosure of the underlying case information for precisely the reasons outlined in the *Iglesias* dissent.

Notably, the Ninth Circuit in *Iglesias* denied the defense's motion only under Rule 16(a)(1)(F) (then Rule 16(a)(1)(D)); the court did not address whether the requested information was discoverable as "books, papers, documents, data, [or] photographs" under Rule 16(a)(1)(E) (then Rule 16(a)(1)(C). The dissent in *Iglesias* explicitly noted that the items would also be discoverable under Rule 16(a)(1)(E) (then Rule 16(a)(1)(C)) and the majority did not dispute that point. *Iglesias*, 881 F.2d at 1527 (Boochever, J., dissenting) ("Although Iglesias appears to have waived the argument, the manuals, guidelines, and instructions may be discoverable under 16(a)(1)(C). . . . Requiring production of testing manuals and instructions appears to further the purpose of the rule and to come within its scope.").

Under both Rules 16(a)(1)(E)(i) and (a)(1)(F), the requested information is discoverable and is material to preparing the defense. The Court should order immediate disclosure of all supporting laboratory "case file" documentation for the reports already disclosed, as well as the Cell Site Location Information (CSLI).

### III.    Federal Rule of Criminal Procedure Rule 16 and recent reforms articulated by the Department of Justice encourage broad and early discovery regarding expert testing data and bases for opinions.

In 1993, new subsections (a)(1)(E) and (b)(1)(C) together with (a)(1)(D)—reflected in today's (a)(1)(E), (F), and (G)—expanded federal criminal discovery by requiring disclosure of the intent to rely on expert opinion testimony, what the testimony will consist of, and the bases of the testimony. As the Committee Notes reflect, the

purpose of the amendments to Rule 16 in 1993 were to "minimize the surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed.R.Crim.P. 16 Advisory Committeenotes (1993).

Regarding the issue of the timing of disclosures, no specific timing requirements are included in Rule 16. The 1993 Committee Notes, however, clearly reflect that requests and disclosures should be made in a timely fashion. Read as a whole, the 1993 amendments to Rule 16 sought to encourage detailed and prompt disclosure of expert results and opinions. That is what Mr. Bowers seeks here.

Since 2010, it has also been Department of Justice's written policy to encourage detailed and prompt disclosure of discovery. On January 4, 2010, Deputy Attorney General David Ogden authored a Memorandum on Guidance for Prosecutors Regarding Criminal Discovery that stated that Department of Justice attorneys should generally provide broad and early discovery, which he notes "promotes the truth-seeking mission of the Department." *See* Ogden Memorandum, at https://www.justice.gov/archives/dag/memorandum-department-prosecutors (last visited May 15, 2020). This direction from the Department of Justice became even more clear as it relates to forensic science evidence in a subsequent Memorandum authored by Deputy Attorney General Sally Yates on January 5, 2017, titled Supplemental Guidance for Prosecutors Regarding Criminal Discovery Involving Forensic Evidence and Experts.

Deputy Attorney General Yates reaffirmed the goals of the Ogden Memorandum. *See* Yates Memoranda at

https://www.justice.gov/archives/ncfs/page/file/930411/download (last visited May 15, 2020). Citing Federal Rules of Criminal Procedure Rule 16 (a)(1)(E), (F), and (G), the Yates Memorandum made it clear  that if requested by the defense the following should be disclosed as soon as reasonably possible:

> A copy of, or access to, the laboratory or forensic expert's "case file," either in electronic or hard copy form.  This information, which may be kept in an actual file or may be compiled by the forensic expert, normally will describe the facts or data considered by the forensic expert, include the underlying documentation of the examination or analysis performed, and contain material necessary for another examiner to understand the expert's report.  The exact material contained in a case file varies depending on the type of forensic analysis performed.  It may include such items as a chain-of-custody log; photographs of physical evidence; analysts' worksheets or bench notes; a scope of work; an examination plan; and data, charts and graphs that illustrate the results of the tests conducted.

*Id*.

This "case file" information, or "case litigation packet" material, is exactly what Mr. Bowers seeks here in order to understand the forensic evidence the government intends to use and to be able to consult with the proper independent experts as needed. *See* Exhibit A (Declaration of J. Christopher McKee). Delay in producing the requested information will only cause further delay down the line. Ordering the government to disclose the requested information to the defense now, as Rule 16 permits, will allow for the continued diligent defense investigation of this case.

Dated: June 23, 2020                    Respectfully submitted,

*/s/ Judy Clarke*
Judy Clarke
Clarke Johnston Thorp & Rice, PC

*/s/ Michael J. Novara*
Michael J. Novara
First Assistant Federal Public Defender

*/s/ Elisa A. Long*
Elisa A. Long
Supervisory Assistant Federal Public Defender

## DECLARATION OF J. CHRISTOPHER MCKEE

I, J. Christopher McKee, do swear and affirm the following:

1.      I am an expert in the law of evidence, forensic science evidence and criminal litigation with over 20 years of experience.  I hold a Juris Doctorate degree and have worked in the area of criminal law for my entire career.  An accurate copy of my CV is attached.

2.      I have taught at the University of Colorado School of Law since 2009.  My scholarly interest is in the intersection of the law of evidence and forensic science.

3.      I have previously testified and been qualified in courts as an expert in forensic science, forensic science evidence and criminal litigation in pre-trial, trial and post-conviction proceedings.

4.      I have consulted on criminal cases, specifically those involving forensic science issues, since 2009 throughout the United States in both Federal and State courts.  My consulting work is centered around reviewing, analyzing and advising on forensic science evidence.

5.      Prior to teaching and consulting, my last position at the Public Defender Service for the District of Columbia (PDS DC) was as Special Counsel to the Director and all divisions in the agency on forensic science matters.  As Special Counsel, part of my duties was to remain informed about the developments in forensic science arenas in both the courts and related scientific fields.  I received instruction through conferences and trainings in various scientific disciplines such as DNA, serology, firearm toolmarks, shooting reconstruction, fingerprints and digital forensics.  Another part of my duties was

1

EXHIBIT A

to identify the proper experts to retain after a careful review of expert notice, bases of opinions and supporting forensic science discovery in PDS DC cases.  At the time that I was at the PDS DC, the primary forensic testing agencies were divisions within the Federal Bureau of Investigation (FBI) laboratories in Quantico, VA.

6.      I have been retained by the Federal Public Defender in

*United States v. Robert Bowers*, Case No. 18-292, to assist with the review of forensic science discovery and to advise trial counsel on legal and factual issues presented by this evidence.

7.      In my review of the discovery provided to date related to the DNA, firearm toolmark, shooting reconstruction and cellular data evidence in the case, it is my opinion that the discovery is incomplete and prevents a meaningful review or investigation into hiring possible independent defense experts.

8.      I have reviewed reports authored by agents of the Federal Government, specifically reports authored by Erich Smith, Brett Mills and Marcy Plaza.  These reports offer conclusory opinions and provide very little information regarding the bases of the opinions or the actual testing procedures and results alluded to within these reports.

9.      In the firearm reports authored by Erich Smith and Brett Mills, conclusions are drawn about links between a particular firearm and bullets or shell casings recovered from the scene.  The authors claim to either identify a specific firearm to a bullet, casing or cartridge either through (unspecified) toolmarks or an analysis of the shooting scene through reconstruction.  What is lacking in these reports are any details regarding what kind of toolmarks were observed or their importance to making an identification.  There

2

EXHIBIT A

are no actual facts or data discussed that were considered by the forensic expert, no underlying documentation of the examination or analysis performed nor any material necessary for another analyst to understand the expert's actual work or conclusions. What is critical to understanding the expert opinions is the supporting case file that documents the analysis performed in this case. The shooting reconstruction report similarly lacks detail about what actual testing was performed or details of the equipment that was used in the analysis of the scene.

10.     In the DNA report authored by Marcy Plaza, conclusions are drawn about the alleged likelihood of Mr. Bowers DNA, as well as a number of decedent's DNA, being on an item of recovered evidence. What remains unknown without the supporting testing documentation are the actual genetic markers analyzed, methodologies employed and specific equipment/instruments/chemistries utilized. These leave unanswered such threshold questions such as the type of biological material on an item and the type of test used to determine the biological substance through serological testing; the quantity of DNA tested in each sample; any anomalies observed in the data which are always subject to human interpretation; as well as, the underlying data and results in support of the computer software analysis using the STRmix Probabilistic Genotyping Program which was used to generate the likelihood ratio statistics contained within the report.

11.     It is my experience that the FBI laboratory (and its various divisions), the primary laboratory involved in the testing in this case, maintains and routinely discloses the bases of opinions and testing results contained within case related documents. These documents are commonly called "case files" or "case litigation packets." These case files

EXHIBIT A

contain such critical information such as the chain of custody of items that are tested, laboratory bench sheets, testing procedures utilized, calibration standards utilized, laboratory preparation logs, identifying information for instruments and equipment utilized, and other methodologies employed in the testing.  In addition, the raw electronic data of DNA testing files are also routinely provided for independent review.

12.     These documents are directly pertinent to the meaningful understanding of, or foundation for, the test results and opinions contained in the reports already disclosed.

13.     Without a review of the testing results and their supporting documents, as well as the bases of opinions drawn from the testing, it is my conclusion that it is not possible to properly analyze the accuracy and admissibility of various expert opinions nor identify the correct independent scientific experts who may assist in Mr. Bowers' case.  For instance, in the context of the DNA evidence alone, it may be that multiple experts are needed to assist in the case depending on whether the opinions are supported, or lack support, in any number of sciences/disciplines involved in the DNA process or interpretation.  A testing molecular geneticist may be needed.  A population geneticist may be needed.  A statistician may be needed.  An individual credentialed in computer expert systems may be needed.  A similar lack of discovery regarding other forensic evidence prevents the proper analysis of the evidence or an ability to consult with the proper experts.

14.     It can no longer be assumed that only forensic science practitioners have something valuable to say about the validity of forensic evidence.  The recognition in the broader legal and scientific community of problems with some of the foundational claims

4

EXHIBIT A

of forensic science disciplines is now indisputable.  In 2009, the National Academy of Sciences (NAS) issued a report entitled, *Strengthening Forensic Science in the United States: A Path Forward*, where a committee of eminent scientists and legal experts raised serious concerns about foundations of firearm toolmark, fingerprint and a variety of other long-recognized and accepted forensic disciplines.  In 2016, the President's Council of Advisors on Science and Technology (PCAST) added their voice to concerns about the lack of foundational validity of fields such as firearm toolmark and complex DNA mixture analysis – two types of testing and analysis performed in this case.

15.    The FBI Laboratory, in particular, over the past few decades have had to abandon and disavow forensic evidence claims that they have made in prior criminal proceedings regarding Comparative Bullet-Lead Analysis (CBLA) and Microscopic Hair Comparison Analysis when those fields became tested using superior scientific testing methods like Mitochondrial-DNA or received outside scientific scrutiny by non-forensic science practitioners.

16.    Not surprisingly, in the light of the NAS and PCAST reports, as well as the FBI scandals surrounding exaggerated forensic evidence claims, the issue of full and transparent discovery in regards to forensic science expert testing and opinions has been recognized as one of the most important reforms to combat errors and miscarriages of justice.   Since 2010, the Department of Justice (DOJ) has adopted and published several policies that direct laboratories to preserve reports, testing results and supporting documentation.  DOJ has also directed their prosecutors to provide "<u>broad and early discovery</u>" specifically regarding forensic science results.  These directives can be found

EXHIBIT A

in Memoranda authored by Deputy Attorney General David Ogden in January 2010 and

Deputy Attorney General Sally Yates in January 2017.

17.     Therefore, it is my experience that full and early discovery regarding testing

procedures and results are routinely provided as a part of the pre-trial discovery process

under Federal Rule of Criminal Procedure Rule 16 without delay.  It is my opinion, that

given the Constitutional obligation of defense counsel to investigate and hire the proper

experts, it is necessary to review the full forensic science evidence discovery at the

earliest possible stages of a case.

I declare under the penalty of perjury under the laws of the United States of

America that the foregoing is true and correct.  Executed on June 23, 2020.


_/s/J. Christopher McKee_
J. Christopher McKee

EXHIBIT A

**J. Christopher McKee**
Boulder, Colorado 80304

## PROFESSIONAL

**University of Colorado School of Law**, Boulder, CO                    *August 2009 - Present*
*Adjunct Faculty and Former Schaden Director of Experiential Learning*
Since 2009, have taught and directed academic and administrative components at Colorado School of Law.  Scholarly focus on forensic science evidence issues.

**Forensic Defense Strategies, LLP**, Boulder, CO                    *August 2009 - Present*
*Co-Founding Partner and Consulting Expert*
Provide independent expert consultation on forensic science evidence; primarily in the areas of DNA, Serology, Pattern Analysis (Friction Ridge, Firearm Toolmark, Handwriting, Footwear) and Arson Investigation for privately retained and court-appointed defense counsel in criminal cases across the United States.  Previously qualified as an expert on forensic science evidence regarding the reliability and validity of several forensic science disciplines/evidence, including friction ridge and firearm tool mark patterns, canine scent detection and DNA technology/analysis.

**Public Defender Service,** Washington, DC                    *October 2000 - August 2010*
*Special Counsel to the Director (Last position held)*
Led office efforts focused specifically on forensic science evidence issues; directed Forensic Practice Group made up of fifteen trial division lawyers working to advance forensic challenges; managed staff of forensic fellows and served as sole reviewer of requests for expert services expenditures.  Developed and directed use and understanding of forensic evidence, including, but not limited to, DNA, fingerprint, ballistics, pathology, crime scene reconstruction, eyewitness identification, false confession and mental health evidence.  Oversaw all aspects of Annual Forensic Science Conferences open to more than 120 attorneys both inside and outside of the agency.  Maintained an active caseload of primarily homicide cases.  Directly supervised several individual trial attorneys in all aspects of their practice, as well as law student clerks and interns.  During tenure with office, served as *Deputy Trial Chief*, *Trial Division Supervisor* and as a *Staff Attorney* handling numerous felony and misdemeanor cases/trials/appeals.

**Office of the Public Defender for DeKalb County,** Decatur, GA          *May 1997 - February 2000*
*Assistant Public Defender, Trial and Appellate Divisions*
Served as trial counsel in felony and misdemeanor cases.  Defended numerous clients at jury and non-jury trials, hearings and pleas.  Responsible for felony capital and non-capital appeals of convictions to the Georgia Supreme Court and Court of Appeals while managing trial caseload.

## EDUCATION

**Emory University,** Atlanta, GA
Law and Religion Joint Degree Graduate
Juris Doctor and Masters of Theological Studies, *May 1997*

**University of North Carolina**, Greensboro, NC
Bachelor of Arts, *cum laude, May 1992*
*Studies*:  History and Religious Studies majors; minor in Political Science

EXHIBIT A

## MEMBERSHIPS AND ACTIVITIES

Member of the State Bars of Colorado, Georgia (Inactive) and the District of Columbia

Administrative Office of the United States Courts *January 2010 - Present*
*Faculty Member, Training Division*

Harvard Law School, Cambridge, MA *January 2012 - Present*
*Faculty Member, Trial Advocacy Workshop*

National DNA Bootcamp, Oakland, CA *November 2016- Present*
*Faculty Member*

## TRAININGS AND PRESENTATIONS *August 2009 - Present*

Presented lectures and trainings for the American Bar Association; Administrative
Office of the U.S. Courts; National Association of Criminal Defense Lawyers; National Association
of Legal Aid and Defender's Association; National Juvenile Defender Center; National Defender
Investigator Association; National Forensic Science College; Committee for Public Counsel for
Massachusetts; Louisiana Defender Training Institute; Gideon's Promise; Habeas Corpus Resource
Center of California; Colorado State Public Defender; State of Colorado Office of the Alternate
Defense Counsel; Criminal Defense Bar Associations of Texas, Nebraska, Alabama, Florida and the
District of Columbia.

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-292 |
| | ) | |
| ROBERT BOWERS | ) | |

## ORDER OF COURT

Upon consideration of the Defendant's Motion Requesting Court to Reconsider

Order Denying Forensic Data and "Case File" Discovery, it is ordered that the motion for

reconsideration is GRANTED. The government is ORDERED to provide the complete

supporting/underlying case file information/case litigation packets in three areas of

forensic analysis undertaken by the government: firearm toolmarks, crime scene

reconstruction, and DNA analysis.

In addition, it is ordered that the Defendant's motion to produce Cell Site Location

Information ("CSLI") is GRANTED. The government is ORDERED to provide the

following information in its possession:

1. The device and software version of the Gladiator Autonomous Receiver
   ("GAR") used to conduct the survey of the Sprint network ("survey" or
   "drive testing") on or about December 12, 2018;

2. Any additional drive testing conducted by CAST in relation to this case;

3. All raw/original data generated from the GAR device on or about
   December 12, 2018;

4. All manuals, training materials, and written/multimedia files relied
   upon/referenced by CAST for the survey conducted on December 12,
   2018;

5.  All communications relating to preparing and conducting December 12, 2018 survey;

6.  A list of training courses attended by Special Agent Hauger that are relevant to the survey conducted on December 12, 2018;

7.  All reports, published or unpublished, relied upon by CAST regarding the proper methodology, validation, and verification of surveys on the T-Mobile and Sprint network using a GAR device;

8.  Any validation testing results for the GAR survey testing from the FBI;

9.  Validation studies for the use of True Call or TDOA records supporting CAST's claim that the FBI has found these records to be "typically...accurate to +/- .1 mile in either direction";

10. Validation studies for the version of the software from Hawk Analytics used by CAST to create the maps in this case; and

11. Verification results for all conclusions reached by CAST.


_____                          _____
Date                                Donetta W. Ambrose
                                    United States Senior District Judge