IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
|    -vs- | ) | Criminal No. 18-292 |
| | ) | |
| ROBERT BOWERS, | ) | |
| | ) | |
|    Defendant. | ) | |

AMBROSE, Senior District Judge

## OPINION AND ORDER

### Synopsis

On January 29, 2019, the Government filed a superseding indictment charging the Defendant, in part, with violations of the Hate Crimes Prevention Act ("HCPA"), 18 U.S.C. §249(a)(1) (Counts 12s-22s, 36s, 37s) and of the Church Arson Act, 18 U.S.C. § 247(a)(2) (Counts 1s-11s, 34s, 35s, 40s-51s). (ECF No. 44)  The Defendant has filed a Motion to Dismiss Counts of the Indictment Charging Offenses Under the Hate Crimes Prevention Act and the Church Arson Act. (ECF 239) Challenging the exercise of federal authority with respect to both Acts, the Defendant suggests that each Act infringes on a general police power reserved to the states by the Constitution. He also raises both facial and as-applied constitutional challenges to the HCPA and the Church Arson Act. Finally, he contends that the certifications submitted under both § 249(b)(2) and § 247(e) are procedurally and substantively flawed. The Government has responded (ECF 249) and the Defendant has replied. (ECF 251). For the reasons set forth below, the Motion is DENIED.

1

**Opinion**

**I. Federalism and Police Power**

The Defendant argues that the HCPA and the Church Arson Act unconstitutionally usurp traditional state police powers in violation of the Tenth Amendment, which reserves to the states those "powers not delegated to the United States by the Constitution, nor prohibited by it to the States." *U.S. Const., Amend. X*. I disagree. This argument ignores the dual-sovereign concept. Federal laws often criminalize conduct that falls within traditional areas of state law. *See United States v. Johnson*, 114 F.3d 476, 481 (4th Cir. 1997) Further, by its text, the Tenth Amendment explicitly permits Congress to exercise those powers delegated to it by the Constitution. "[W]hen the Constitution explicitly grants Congress authority to Act, the Tenth Amendment gives way… ." *United States v. Hatch*, 722, F.3d 1193, 1202 (10th Cir. 2013). See also, *United States v. Roof*, 225 F. Supp. 3d 438, 444 (D. S.C. 2016), *citing, United States v. Comstock*, 560 U.S. 126, 143-44 (2010)("[P]owers the Constitution grants to Congress necessarily are not powers the Constitution exclusively reserves to the states.") Congress derives its power to enact the HCPA and the Church Arson Act from the Thirteenth Amendment and the Commerce Clause.  Consequently, as have others, I reject the Defendant's challenges. See *United States v. Beebe*, 807 F. Supp. 2d 1045 (D. N.M. 2011) (finding that the HCPA does not impermissibly encroach on state authority to punish crimes in violation of the Tenth Amendment), *aff'd*. 722 F.3d 1193 (10th Cir. 2013); *United States v. Diggins*, 435 F. Supp. 3d 268 (D. Me. 2019) (rejecting argument that the HCPA violates the Tenth Amendment by transferring police power, which is reserved to the states, to the federal government); *United States v.*

*Metcalf*, Cr. No. 15-1032, 2016 WL 827763, at * 5 (D. Iowa 2016) ("because the Constitution granted Congress the power to enact §249(a)(1), the statute does not improperly intrude on the state police power and comports with the Tenth Amendment."); and *United States v. Henery*, 60 F. Supp. 3d 1126, 1131-32 (D. Idaho 2014) (rejecting federalism concerns about the enactment of the HCPA).[1]

**II. HCPA**[2]

    **A.** <u>Facial Challenge</u>:

The Defendant seeks the dismissal of the charges under § 249(a)(1) of the HCPA as an unconstitutional exercise of Congress' power under the Thirteenth Amendment of the United States Constitution. Section 249(a)(1) provides:

> Whoever, whether or not acting under color of law, willfully causes bodily injury to any person, or through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person [shall be subject to punishment].

18 U.S.C. § 249(a)(1). Section 249(a)(1) "rests solely on Congress's authority under §2 of the Thirteenth Amendment." *United States v. Cannon*, 750 F.3d 492, 498 (5th Cir. 2014).

Section 1 of the Thirteenth Amendment abolishes slavery and involuntary servitude.[3] Section 2 provides that "Congress shall have power to enforce this article by appropriate legislation." U.S. Const. Amend. XIII. Referencing § 2, the Supreme Court

---

[1] Although research did not disclose any cases rejecting Tenth Amendment challenges to the Church Arson Act, I find that the same analysis applies.

[2] The Defendant asserts both facial and as-applied constitutional challenges. For the distinctions between these types of challenges, and the Defendant's burden in establishing the validity of his arguments, see footnote 8 and the discussion under the Church Arson Act.

[3] Section 1 provides: "Neither slavery nor involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. Amend. XVIII.

observed that "the power vested in Congress to enforce the article by appropriate legislation, clothes Congress with power to pass all laws necessary and proper for abolishing *all badges and incidents of slavery* in the United States…." *The Civil Rights Cases*, 109 U.S. 3, 20, 3 S. Ct. 18 (1883) (emphasis added). It is Congress's role to "rationally … determine what are the badges and the incidents of slavery, and … to translate that determination into effective legislation." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 440, 88 S. Ct. 2186 (1968).[4] Thus, "if Congress rationally determines that something is a badge or incident of slavery, it may broadly legislate against it through §2 of the Thirteenth Amendment." *Hatch*, 722 F.3d at 1201. Thirteenth Amendment caselaw "afford[s] Congress ample deference in defining what private actions qualify as 'badges' and 'incidents' of slavery." *Cannon*, 750 F.3d at 501. *See also, United States v.*

---

[4] The Defendant urges that the Supreme Court's decisions in *Shelby County v. Holder*, 570 U.S. 529, 133 S. Ct. 2612 (2013) and *City of Boerne v. Flores*, 521 U.S. 507, 117 S. Ct. 2157 (1997) undermine and limit the application of *Jones, supra*. That is, the Defendant contends that the "rational basis" test does not apply. In *Shelby County*, the Court declared the Voting Rights Act, passed under Congress's Fifteenth Amendment power, unconstitutional because it failed to address contemporary rather than historical discrimination. The Court explained that the legislation was not justified by "current needs" imposed by "current burdens." *Shelby County*, 570 U.S. at 550, 133 S. Ct. 2612. In *City of Boerne*, the Court declared the Religious Freedom and Restoration Act of 1993 an unconstitutional overreach of congressional power under the Fourteenth Amendment because it lacked a "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne*, 521 U.S. at 532, 117 S. Ct. 2157. The Defendant reasons that *City of Boerne* and *Shelby County*, show that § 249(a)(1) is not "appropriate" under the 13th Amendment "unless concrete evidence proves there is a 'current need' and the legislation is a 'congruent and proportional' response to that need." (ECF 239, p. 14) I disagree and find that *Jones, supra,* remains controlling law here.

First, the 14th and 15th Amendments impact state sovereignty. In contrast, the 13th Amendment reaches purely private conduct. Further, the 13th Amendment is limited in nature and permits Congress to legislate against "the badges and incidents of slavery." U.S. Const. Amend. XIII. Conversely, the 14th Amendment, which grants substantive protection against state action violating due process, equal protection and privileges and immunities, is far broader in scope. Additionally, it defies logic to argue that congressional authority under the 13th Amendment would turn on a current need. The 13th Amendment stems from the historical facts of slavery in the United States. The salient issue is whether the prohibited conduct can rationally be described as "a badge or incident of slavery." Additionally, the *Jones* decision is directly on point. "If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson / Am. Express, Inc.*, 490 U.S. 477, 484, 109 S. Ct. 1917 (1989). Moreover, neither the *City of Boerne* or *Shelby County* cases addressed congressional power under the 13th Amendment or in fact even mentioned the *Jones* decision. Nothing in the language of *City of Boerne* indicates that the Court intended to "do something as sweeping" as overruling *Jones*. *Beebe*, 807 F. Supp. 2d at 1049. In light of this silence, I am unwilling to say that either, or both, of those decisions overruled *Jones*. I find that *Jones* remains controlling here.

*Metcalf*, 881 F.3d 641, 645 (8th Cir. 2018) ("Congress *rationally determined* that racially motivated violence constitutes a badge and incident of slavery") (emphasis added); *United States v. Cannon*, 750 F.3d 492, 505 (5th Cir. 2014) (finding *Jones* controlling and applying rational basis test); *Hatch*, 722 F.3d at 1204-05 (following *Jones* and employing rational basis scrutiny); *Diggins*, 435 F. Supp. 3d at 273 (D. Me. 2019); *Henery*, 60 F. Supp. 3d at 1131 ("*Jones* is controlling"); *Beebe*, 807 F. Supp. 2d at 1049 ("*Jones* remains the controlling relevant precedent in interpreting § Two of the Thirteenth Amendment."); and *United States v. Nelson*, 277 F.3d 164, 185 n. 20 (2d Cir. 2002).

Each federal court to have considered the constitutionality of § 249(a)(1) has found it to be a valid exercise of Congressional power under the Thirteenth Amendment. *See Metcalf*, *supra*; *Cannon*, supra; *Hatch*, *supra*; *United States v. Maybee*, 687 F.3d 1026 (8th Cir. 2012); *Diggins*, *supra*; *Roof*, *supra*; *Henery*, *supra*; and *Beebe*, *supra*, *aff'd sub. nom Hatch*, *supra*. In adopting § 249(a)(1), Congress noted that:

> …
> (7) For generations, the institutions of slavery and involuntary servitude were defined by the race, color, and ancestry of those held in bondage. Slavery and involuntary servitude were enforced, both prior to and after the adoption of the 13th amendment to the Constitution of the United States, through widespread public and private violence directed at persons because of their race, color, or ancestry, or perceived race, color, or ancestry. Accordingly, eliminating racially motivated violence is an important means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude.
>
> (8) Both at the time when the 13th, 14th, and 15th amendments to the Constitution of the United States were adopted, and continuing to date, members of certain religious and national origin groups were and are perceived to be distinct "races." Thus, in order to eliminate, to the extent possible, the badges, incidents, and relics of slavery, it is necessary to prohibit assaults on the basis of real or perceived religions or national origins, at least to the extent such religions or national origins were regarded as races at the time of the adoption of the 13th, 14th, and 15th amendments to the Constitution of the United States.

5

*Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act*, Pub. L. No. 111-84, 123 Stat. 2836 (2009), § 4702.

The Tenth Circuit found that Congress satisfied the rationality test by narrowly focusing § 249(a)(1) on three considerations: "(1) the salient characteristics of the victim, (2) the state of mind of the person subjecting the victim to some prohibited conduct, and (3) the prohibited conduct itself." *Hatch*, 722 F.3d at 1205. As to the first consideration, the Tenth Circuit understood "the salient characteristics of the victim" to include race, color, religion, or national origin as those concepts were understood by Congress in the 1860s "and therefore sought to protect these categories 'at least to the extent such religions or national origins were regarded as races' in the 1860s." *Id.* As for the second consideration, the court noted that Congress sought to punish only those who acted "because of" the victim's actual or perceived race. *Id.* at 1206. As to the third consideration, the court observed that "[j]ust as master-on-slave violence was intended to enforce the social and racial superiority of the attacker and the relative powerlessness of the victim, Congress could conceive that modern racially motivated violence communicates to the victim that he or she must remain in a subservient position, unworthy of the decency afforded to other races." *Id.* Consequently, the Tenth Circuit found that "Congress could rationally conclude that physically attacking a person of a particular race because of animus toward or a desire to assert superiority over that race is a badge or incident of slavery." *Id.*

I find the *Hatch* decision, as well as the many others upholding the constitutionality of § 249(a)(1), to be persuasive. "Under the expansive view of 'badges and incidents' articulated in *Jones* and *Griffin*, Congress's identification of racially

6

motivated violence as a badge and incident of slavery is 'not merely rational, but inescapable.'" *Diggins*, 435 F. Supp. at 272, *quoting*, *Beebe*, 807 F. Supp. 2d at 1052-53. Thus, I reject the Defendant's facial challenge to the § 249(a)(1) of the HCPA.[5]

    B. <u>As-Applied Challenge</u>:

The Defendant urges, in the alternative, that § 249(a)(1) is unconstitutional as-applied because the Supreme Court has never found "that Jews were subjected to slavery or involuntary servitude in the United States nor that bias toward Jews was a badge or incident of slavery pursuant to the Thirteenth Amendment." (ECF 239, p. 29) The Defendant reasons that, for § 249(a)(1) to be constitutionally applied, a person must have been a member of a class that has suffered slavery before the passage of the Thirteenth Amendment. The Thirteenth Amendment is not so narrow as the Defendant represents. I look to Supreme Court cases interpreting the nineteenth century conceptions of "race" in the context of the Thirteenth Amendment for guidance in determining which people are protected under the Thirteenth Amendment. The Supreme Court recognized that "[w]hile the immediate concern [of the Thirteenth Amendment] was with African slavery, the Amendment was not limited to that. It was a charter of universal freedom for all persons, whatever the race, color or estate, under the flag." *Bailey v. Alabama*, 219 U.S. 219, 240-41, 31 S. Ct. 145 (1911).

---

[5] The Defendant briefly "references" an Equal Protection Challenge to § 249(a)(1) but does elaborate or adequately brief this issue. He urges only that § 249(a)(1) "raises serious equal protection concerns as any religion not deemed a 'race' in the 19th century is simply not protected…." (ECF No. 239, p. 23) The role of the Court is not to develop arguments for the Defendant. Therefore, I decline to rule on or entertain the issue as it has not been squarely placed before me. I note only that the protection offered under § 249(a)(1) appears to rest, not upon a religious basis *per se*, but upon an "ethnic" or "racial" basis. That Jews may have been, or may be, considered an "ethnoreligious" group does not mean that the protection offered under § 249(a)(1) stems from their religious affiliation. Further, I note that the portion of the HCPA enacted under the Commerce Clause (§ 249(a)(2)) incorporates religions not considered a "race" under 19th century law.

In *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 107 S. Ct. 2022 (1987) a college professor brought suit pursuant to 42 U.S.C. § 1981 against his employer, contending that he was denied tenure because of his Arabian ancestry or race. The College urged that the professor was a Caucasian and thus could not allege the kind of discrimination that § 1981 forbids. The Court observed:

> [The College's] submission rests on the assumption that all those who might be Caucasians today were thought to be of the same race when §1981 became law in the 19th century; and it may be that a variety of ethnic groups, including Arabs, are now considered to be within the Caucasian race. The understanding of "race" in the 19th century, however, was different. Plainly, all those who might be deemed Caucasian today were not thought to be of the same race at the time §1981 became law.

*Saint Francis College*, 481 U.S. at 610 (footnote omitted). Examining dictionaries and encyclopedias, the Court observed that Finns, Gypsies, Basques, Swedes, Norwegians, Germans, Greeks, Italians, Mongolians, Jews, Hungarians, and Hebrews were all identified as distinct races. *Id.*, at 611-612. The Court also noted that the legislative history of § 1981 referred to the Scandinavian, Chinese, Latin, Spanish, Anglo-Saxon, Jews, Mexicans, blacks, Mongolians, Gypsies, and Germans as distinct "races." *Id.* at 612. The Court found that discrimination based on ancestry or ethnic characteristics "is racial discrimination that Congress intended §1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory." *Id.* at 613. As a result, because Arabs were considered a part of a distinct "race" in the nineteenth century, they were among the classes of people protected under § 1981 based on their ancestry or ethnic characteristics and the professor had a right to proceed on his claim. *Id.*

The Court expanded this concept of race announced in *Saint Francis* in *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 107 S. Ct. 2019 (1987). In *Shaare Tefila*, a

8

congregation sued under 42 U.S.C. § 1982 for racially discriminatory interference with property rights based on the desecration of its synagogue. The district court dismissed the claims, holding that discrimination against Jews does not constitute racial discrimination under §1982 and the appellate court affirmed. The Supreme Court reversed. Referencing the *Saint Francis* decision, the Court stated that "the question before us is not whether Jews are considered to be a separate race by today's standards, but whether, at the time § 1982 was adopted, Jews constituted a group of people that Congress intended to protect." *Shaare Tefila*, 481 U.S. at 617, 107 S. Ct. 2019. "It is evident from the legislative history of the section reviewed in *Saint Francis College*," the Court continued, "a review that we need not repeat here, that Jews and Arabs were among the peoples then considered to be distinct races and hence within the protection of the statute." *Id.*, at 617-618. The Court therefore found that the congregation was not foreclosed from asserting a claim under § 1982 "against other members of what today is considered to be part of the Caucasian race." *Id.*[6]

In *United States v. Nelson*, 277 F.3d 164 (2d Cir. 2002), the Second Circuit looked to the *Saint Francis College* and *Shaare Tefila* decisions in considering constitutional challenges to convictions under 18 U.S.C. § 245(b)(2)(B) for willfully intimidating and interfering with a victim because of his Jewish religion. In finding that the Thirteenth Amendment protects Jews as a "race" from discrimination, and thus

---

[6] Although as the Defendant points out, neither *Saint Francis* nor *Shaare Tefila* explicitly mention the 13th Amendment, it is clear from other Supreme Court cases that §§ 1981 and 1982 rest on the 13th Amendment. *See Runyon v. McCrary*, 427 U.S. 160, 170, 96 S. Ct. 2586, 2594 (1976) *quoting, Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 440, 88 S. Ct. 2186, 2203-04 (1968) ("Relying on the legislative history of s 1, from which both s 1981 and s 1982 derive, the Court concluded that Congress intended to prohibit 'all racial discrimination, private and public, in the sale … of property,' … and that this prohibition was within Congress' power under s 2 of the Thirteenth Amendment 'rationally to determine what are the badges and the incidents of slavery, and … to translate that determination into effective legislation.'").

9

upholding the constitutionality of §245(b)(2)(B), the court referenced the Supreme Court's interpretations of § 1981 and §1982 set forth in *Saint Francis* and *Shaare Tefila* noting:

> these arguments apply, *a fortiori*, to the Thirteenth Amendment itself. For it is on the authority of the Thirteenth Amendment that the application of these civil rights statutes developed. … Accordingly, we find that Jews were among the "races" intended to be protected from slavery and involuntary servitude by the Thirteenth Amendment, and that Congress may today protect Jews pursuant to that Amendment.

*Nelson*, 277 F.3d at 178 (footnote omitted). *See also, Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1260-1261 (7th Cir. 1990) (observing that "[n]owadays the use of the term 'race' is pretty much limited to the three major racial divisions – Caucasoid, Negroid, and Mongoloid – but historically the term was used much more broadly, to denote groups having common ancestry or even a common culture (or, as often, both). And in this sense Jews are members of a distinct race. The civil rights statutes enacted in the period of Reconstruction, in guaranteeing all persons the rights of white citizens, have been held to protect all groups that are 'races' in the traditional loose sense, such as Jews and Arabs.").

The *Saint Francis*, *Shaare Tefila*, and *Nelson* decisions inform which classes of citizens the Thirteenth Amendment protects. Sections 1981 and 1982 were passed in the wake of the Thirteenth Amendment. *See Nelson*, 277 F.3d at 177 ("because the Fourteenth Amendment was not ratified until 1868, both §1981 and §1982 must, in their initial 1866 instantiations, have been enacted pursuant to the Thirteenth Amendment, which was adopted in 1865. And, because both sections reach purely *private* action, it remains the Thirteenth Amendment that must continue to play a dominant role in supporting their constitutionality today. … It follows that the scope of the 'races'

10

protected by the Thirteenth Amendment cannot be narrower than the scope of 'races' these statutes themselves protect.") As stated above, the congressional intent behind §249(a)(1) makes clear that Congress intended to prohibit violence on the basis of real or perceived religions that "were regarded as races at the time of the adoption of the [Reconstruction] amendments." *Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act*, Pub. L. No. 111-84, 123 Stat. 2836 (2009), § 4702. I therefore find that § 249(a)(1) includes protection for Jewish people in that they were considered a distinct race when the Thirteenth Amendment was-applied. As a result, I reject the Defendant's as-applied constitutional challenge.[7]

## III. Church Arson Act

As discussed above, the Defendant is charged with multiple counts of violations of 18 U.S.C. 247. Section 247 provides, in relevant part:

(a) Whoever, in any of the circumstances referred to in subsection (b) of this section –
…
    (2) intentionally obstructs, by force or threat of force, including by threat of force against religious real property, any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so;
shall be punished as provided in subsection (d).

(b) The circumstances referred to in subsection (a) are that the offense is in or affects interstate or foreign commerce.

---

[7] The Defendant cites *United States v. Beebe*, 807 F. Supp. 2d 1045 (D. N.M. 2011) for the proposition that a victim must be a member of a class that suffered enslavement prior to the passage of the 13th Amendment for § 249(a)(1) to be constitutionally applied. (ECF 239, p. 30). I disagree. Certainly, the *Beebe* court discussed Navajo-Caucasian relations throughout the 1800s and the history of Navajo enslavement by Europeans, but the court did not hold that enslavement was required to survive an as-applied challenge. In fact, the court noted that "the Thirteenth Amendment bans 'slavery' as an institution in its entirety, whatever its form and whomever its victims might be. … It nowhere limits that ban to enslavement of Africans and African Americans, or more broadly to enslavement of any class of persons that was enslaved in America before the passage of the Thirteenth Amendment." *Beebe*, 807 F. Supp. 2d at 1055. The court found that the "Defendants are plainly wrong that the statute is overbroad in that racially motivated hate crimes against white victims could not be characterized as a badge of slavery…." *Id*. In referencing the historical enslavement of the Navajo, the court simply found that "these facts fall well within the scope of conduct that Section Two of the Thirteenth Amendment empowered Congress to ban." *Id*. at 1054.

>…
>(d) The punishment for a violation of subsection (a) or (c) of this section shall be –
>>(1) if death results from acts committed in violation of this section or if acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, a fine in accordance with this title and imprisonment for any term of years or for life, or both, or may be sentenced to death;…

18 U.S.C. § 247. The Defendant asserts facial and as-applied constitutional challenges to § 247(a).[8]

A. <u>Facial Challenge</u>:

According to the Defendant, § 247 is facially invalid because Congress exceeded its authority under the Commerce Clause in passing and then amending the legislation. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that *no set of circumstances* exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095 (1987) (emphasis added) "Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *Morrison*, 529 U.S. at 607. Consequently, the Defendant's facial challenge to § 247(e) requires him to prove that under no circumstances could an attack on a religious property be in or substantially affect interstate commerce.

He has not discharged this burden. Every court to consider the issue has found § 247(a) to be a valid exercise of Congressional power under the Commerce Clause. *See*

---

[8] "The distinction between facial and as-applied challenges … goes to the breadth of the remedy employed by the Court. *Citizens United v. Fed. Election Comm'n*., 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). That is, an as-applied challenge is a claim that the operation of a statute is unconstitutional in a particular case while a facial challenge indicates that the statute may rarely or never be constitutionally applied.'" *Constitution Party of Pennsylvania v. Cortes*, 824 F.3d 386, 394 (3d Cir. 2016) (internal quotation marks and citations omitted).

*United States v. Ballinger*, 395 F.3d 1218 (11th Cir. 2005); *United States v. Grassie*, 237 F.3d 1199 (10th Cir. 2001); *Roof*, 225 F. Supp. 3d at 452; *United States v. Hari*, Cr. No. 18-150, 2019 WL 7838282 (D. Minn. Sept. 17, 2019), *adopted*, 2019 WL 6975425, at * 1 (D. Minn. Dec. 20, 2019). The Defendant has not identified a single case in *any* jurisdiction upholding a facial challenge.

Further, the *Hari* and *Roof* cases, together with the *Ballinger* and *Grassie* cases, have rejected each of the particular arguments that the Defendant now raises. I find these cases to be persuasive and adopt their reasoning. That is, I agree that Congress signaled its intent to exercise its full authority under the Commerce Clause when it added the jurisdictional element to § 247. *See Ballinger*, 395 F.3d at 1231 and *Grassie*, 237 F.3d at 1208 (citations omitted). Thus, contrary to the Defendant's contentions, Congress intended § 247 to apply to all three broad categories of activity under its Commerce Clause power: (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) activities that substantially affect interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558-59 (1995); *Hari*, 2019 WL 7839282, at * 3 ("The phrase 'in commerce' is a linguistic tool often used by Congress to invoke its Commerce Clause authority under *Lopez's* first two categories, whereas the phrase 'affects commerce' invokes the third *Lopez* category.") *citing, Ballinger*, 395 F.3d at 1231, *Roof*, 225 F. Supp. 3d at 453 and *United States v. Mosby*, 60 F.3d 454, 456 (8th Cir. 1995).

Here, the Defendant does not argue that there is no set of circumstances under which an attack under § 247 could be in interstate commerce. Any such argument would be futile. I agree with the *Hari* and *Roof* courts that § 247 is a valid exercise of

13

Congress's authority under the first two *Lopez* categories and that "acts such as mailing a bomb to a church, using a cellular phone to detonate a bomb, intentionally driving a car across state lines to transport a bomb, and using a cellular phone to instruct someone in another state to detonate a bomb would implicate the channels and instrumentalities used in interstate commerce." *Hari*, 2019 WL 7838282, at * 3. *See also Roof*, 225 F. Supp. 3d at 453 ("One could of course use the channels or instrumentalities of interstate commerce to attack a house of worship, for example, by mailing a bomb to a church.")

Similarly, I find that § 247 is a valid exercise of Congress's authority under the third *Lopez* category. The effect a prohibited activity has on interstate commerce is evaluated based on four elements: (1) whether the prohibited activity is economic in nature; (2) whether the statute at issue contains an express jurisdictional element; (3) whether there are any congressional findings on the effects upon interstate commerce; and (4) whether the link between the prohibited conduct and interstate commerce is too attenuated. *Morrison*, 529 U.S. at 607. Congress need have only had a rational basis to conclude that the regulated activity substantially affected interstate commerce. *Hari*, 2019 WL 7838282, at * 4 (citations omitted).

Here, although the activity regulated by § 247 may not be inherently economic in nature, the statute does contain an express jurisdictional element[9] and Congress discussed such findings on the floor regarding the effects of the proscribed activity. *See Grassie*, 237 F.3d at 1209; *Hari*, 2019 WL 7838282, at * 5; *Roof*, 225 F. Supp. 3d at

---

[9] "[T]he inclusion of a jurisdictional element in a criminal statute is a sufficient basis on which to uphold the statute's validity under the Commerce Clause." *Hari*, 2019 WL 7838282, at * 4, *citing*, *United States v. House*, 825 F.3d 381, 386 (8th Cir. 2016); *United States v. Baker*, 82 F.3d 273, 275 (8th Cir. 1996) and *United States v. Crenshaw*, 359 F.3d 977, 985 (8th Cir. 2004).

14

454. In terms of a link between the regulated activity and interstate commerce, "[i]t is well established that religious organizations can and do engage in and affect interstate commerce." *United States v. Corum*, Cr. No. 1-236, 2002 WL 1285078, at * 3, *aff'd*, 362 F.3d 489 (8th Cir. 2004); *Hari*, 2019 WL 7838282, at * 6. Thus I find, as the *Hari* court did, that "on balance, the four factors weigh strongly in favor of finding that § 247 is a valid exercise of Congress's authority under the Commerce Clause" and that Congress had a rational basis to conclude that the conduct regulated by § 247 substantially affects interstate commerce. *Hari*, 2019 WL 7838282, at * 6. For that reason, I reject the Defendant's facial constitutional attack.

    B. <u>As-Applied Challenge</u>:

    The Defendant's as-applied attack is also fatally flawed. He contends that the superseding indictment does not allege that he used the channels or instrumentalities of interstate commerce in any way that was essential or integral to the charged offenses or that his conduct substantially affected interstate commerce. Yet the Superseding Indictment alleges that, for each of the § 247(a)(2) counts, "the offense was in and affected interstate commerce." See ECF No. 44, pp. 3, 6, 9, and 10. The language is sufficient and this Court must accept the Government's allegations as true at this stage of the proceedings. *See United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990) ("In considering a defense motion to dismiss an indictment, the district court accepts as true the factual allegations set forth in the indictment.") An indictment is sufficient on its face if it "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a

15

former acquittal or conviction in the event of a subsequent prosecution." *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012), *quoting, United States v. Vitillo*, 490 F.3d 314, 320 (3d Cir. 2007). No greater specificity is required. *United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007).[10]

The Defendant's as-applied challenge requires consideration of a developed factual record and the application of the statute to those facts. Thus, it is premature to determine the as-applied issue at this time. *See, United States v. Hill*, 700 Fed. Appx. 235 (4th Cir. 2017)(rejecting a motion to dismiss based on an as-applied constitutional challenge to an HPCA case). The Government "is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29." *Huet*, 665 F.3d 588, 595-96 (3d Cir. 2012)(internal quotation omitted). As a result, I also reject the Defendant's as-applied constitutional attack.

**IV. Certifications**

The Defendant mounts a procedural challenge to the certifications under each statute. Both the Church Arson Act and the HCPA include certification requirements. Section 247(e) of the Church Arson Act provides that:

> No prosecution of any offense described in this section shall be undertaken by the United States except upon the certification in writing of the Attorney General or his designee that in his judgment a prosecution by the United States is in the public interest and necessary to secure substantial justice.

18 U.S.C. § 247(e). The HCPA contains a similar certification requirement:

---

[10] I note that the superseding indictment goes beyond simply tracking the statutory language. It includes, for instance, references to the Defendant's posting of materials to a website and the use of a vehicle in driving to the Tree of Life Synagogue. The internet is an instrumentality and channel of interstate commerce and motor vehicles are instrumentalities of interstate commerce. See, *United States v. MacEwan*, 445 F.3d 237, 245 (3d Cir. 2006); *United States v. Bishop,* 66 F.3d 569, 590 (3d Cir. 1995).

16

> No prosecution of any offense … may be undertaken by the United States, except in certification in writing of the Attorney General, or a designee, that –
>
> …
>
> (D) a prosecution by the United States is in the public interest and necessary to secure substantial justice.

18 U.S.C. § 249(b)(1)(D).

In October 2018, just before filing the indictment charging the Defendant with violations of § 247 of the Church Arson Act, the Attorney General's designee certified, in writing, that in his judgment, a prosecution by the United States is in the public interest and necessary to secure substantial justice. Thereafter, a certification under the HCPA was issued in January 2019 before the filing of the superseding indictment charging the Defendant with violations of § 249 of the HCPA. The Defendant urges that the Government's "procedural failure to obtain a separate certification of the § 247 charges at the time it filed a superseding indictment requires a dismissal of the charges under both §§247 and 249, as neither the Court nor the public can be assured that 'a full and careful evaluation of [the] proposed prosecution by both career prosecutors and by officials at the highest level in the Department' was undertaken pursuant to both statutes before the superseding indictment was filed." (ECF 239, p. 66) (citations omitted). I disagree.

The certifications mirror the language of the statutes. The Defendant does not challenge that Gore and Dreiband were authorized to issue the certifications. The certifications were issued before the filing of charges in accordance with the statutes. The Defendant has identified no authority showing that a certification must be reissued before a superseding indictment or that a certification is somehow nullified once a superseding indictment is issued. I do not believe it a fair inference that, having certified

17

in October that prosecution under § 249 of the Church Arson Act is in the public interest, the Government failed to engage in a full and careful evaluation before deciding that, in addition to the § 249 charges, pursuing the § 247 charges would also be in the public interest. In the absence of contrary authority, I think it more reasonable that, once the claims are certified as "in the public interest and necessary to secure substantial justice," they remain so until the Government informs the Court otherwise.

Neither am I persuaded by the Defendant's substantive challenge. The Defendant urges that, in certifying the claims under §§ 247 and 249, the Government has thwarted local interest in pursuing claims and "has usurped Pennsylvania's efforts to assert its own jurisdiction [to] police its own citizens…." (ECF 239, p. 70). Thus, the Defendant invites this Court to "conduct a substantive review of certification." I decline.

While the Third Circuit has yet to address the reviewability of § 247's or § 249's certification requirement, it has considered the reviewability of an analogous certification requirement, 18 U.S.C. § 5032,[11] and found that § 5032 lacks any language endorsing substantive judicial reviewability of the Attorney General's certification. *See, Impounded (Juvenile R.G.),* 117 F.3d 730, 736 (3d Cir. 1997)(assessing certification requirement in a case involving the transfer of a juvenile from state to federal authorities for prosecution in federal court and holding it lacked the jurisdiction to perform a substantive review of the Attorney General's certification.)[12]  Like § 5032, § 249(b) lacks any language endorsing substantive judicial reviewability of the Attorney General's

---

[11] The Attorney General must certify that "there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction." 18 U.S.C. § 5032.

[12] The Defendant makes no effort to distinguish the text or legislative history between § 5032 and §§ 249 and 247. Nor does he otherwise try to distinguish this case from that in *Impounded (Juvenile R. G.)*.

18

certification. Guided by *Impounded (Juvenile R.G.),* I find I lack the ability to engage in a substantive review of the Government's certification. *See Hari,* 2019 WL 7838282, at * 7, *adopting Magistrate Judge's Report and Recommendation*, 2019 WL 6975425 (D. Minn. Dec. 20, 2019) (certification requirement of § 247(e) has no standard for judicial reviewability and thus is not subject to substantial judicial review.); *see also United States v. Maybee,* Cr. No. 11-30006-002, 2013 WL 3930562, at * 3 (W.D. Ark. July 30, 2013)(judicial review of certification under 18 U.S.C. §249(b)(1) is "inappropriate" where the statute has no provision or standard of review); *United States v. Jenkins*, 909 F.Supp2d 758, 774 (E.D. Ky. 2012) (finding same).

Consequently, I am not persuaded by either of the Defendant's challenges to the certification requirements.

An appropriate order shall follow.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
|    -vs-                             ) | Criminal No. 18-292 |
|                                   ) | |
| ROBERT BOWERS,             ) | |
|                                   ) | |
|    Defendant.               ) | |

AMBROSE, Senior District Judge

### **Order**

And now, this 15th day of October, 2020, upon consideration of Defendant's Motion to Dismiss Counts of the Indictment Charging Offenses Under the Hate Crimes Prevention Act and the Church Arson Act (ECF 239), it is ordered that said Motion is DENIED.

BY THE COURT:

*/s/ Donetta W. Ambrose*
Donetta W. Ambrose
United States Senior District Judge