IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.            ) | Criminal No. 18-292 |
| ) | |
| ROBERT BOWERS        ) | |

**REPLY TO GOVERNMENT'S RESPONSE TO
MOTION TO SUPPRESS NO. 9**

On October 1, 2020, the defendant, Robert Bowers, filed a motion to suppress evidence of statements. (ECF 296.) The government responded on November 4, 2020. (ECF 344.) Mr. Bowers now replies and requests an evidentiary hearing in connection with this motion.

**I.     The government fails to identify those "unsolicited, spontaneous, or 'volunteered statements'" that it asserts are not barred by the Fifth Amendment and not affected by *Miranda*.**

The government states that "certain of Bowers' statements during the course of his interaction with law enforcement were not in response to any questioning." (ECF 344 at 10.) Though the defense in its motion identified specific statements and also categorized statements by the location where Mr. Bowers made the statements, the government in its response fails to identify the purportedly "unsolicited, spontaneous, or 'volunteered statements'" it believes fall outside the protections of the Fifth Amendment and *Miranda*. The defense disputes that any statements made, other than those statements made while shots were being fired, were "unsolicited, spontaneous, or 'volunteered statements.'"

1

> II. **Mr. Bowers was "in custody" and subject to "interrogation" before ███████ on October 27, 2018. Because agents failed to comply with *Miranda*, all statements Mr. Bowers made before ███████ ███████ must be suppressed.**

The defense disputes the government's description of events and its assertion that "[p]rior to ███████████████████████████, ███████████████████████████" (ECF 344 at 12.) It is the government's burden to establish the admissibility of Mr. Bower's statements. An evidentiary hearing is necessary to resolve the disputed factual issues.

As the government concedes in its response, Mr. Bowers ███████ ███████████████ (ECF 344 at 7, 8.) At the time that Mr. Bowers ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████

The government claims ███████████████████████████ ███████████████████████████████████ However, ███ ███████████████████████████████████████ that he was "in custody" for purposes of *Miranda*. At that point in time, there was "such a restriction on [Mr. Bowers'] freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). The government's assertion that it was only when agents formally placed him under arrest by cuffing him that he was "in custody" is

2

simply wrong. ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████ Moreover, agents were questioning Mr. Bowers in a way that they knew or should have known would elicit an incriminating response.

The government erroneously suggests a likeness between Mr. Bowers' situation, ███████████████████████████████████████████████████████ and armed defendants who barricade themselves in a closed room out of sight of law enforcement. (*See* ECF 344 at 11–13 (citing, among other cases, *United States v. Mesa*, 638 F.2d 582 (3d Cir. 1980).) It argues, contrary to well-established law, that "the key aspect of the custodial setting, as described in *Miranda*, is the isolation of the suspect in a room that is dominated by law enforcement officials who will interrogate him." (*Id.* at 12.)

In determining whether a person is "in custody" for purposes of *Miranda*, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442 (1984). The question is whether there "has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). There is no requirement in the law that a person is in custody only if he is in a room dominated by law enforcement. Under the circumstances of this case, at the time Mr. Bowers was interrogated by law enforcement, he had no freedom of movement. In fact, ████████████████████ ██████████████████████████████████████ ███████████████████████ Without question, there was such "a restriction" on his

3

"freedom as to render him 'in custody.'" Law enforcement had complete control over him.

A person barricaded in a room with law enforcement outside is in a completely different situation. *See Mesa*, 638 F.2d at 589 (ruling that "where an armed suspect who possibly has hostages barricades himself away from the police, he is not in custody"); *see also id.* (concluding "merely that *Miranda* warnings are not a required prerequisite to the admission into evidence of statements made by an armed suspect who has barricaded himself away from the police and thus is not within their immediate control.").

The government's reliance on *Mesa* is inapt. Unlike in *Mesa*, Mr. Bowers, at the time of the officers' questioning, had not barricaded himself away from police and certainly did not have hostages. In contrast to the situation in *Mesa*, he was in the immediate control of police. If Mr. Bowers had made the statements at issue while still ▮ ▮, then *Mesa* would be on point. The facts here establish that Mr. Bowers was "in custody" for purposes of *Miranda* at the time of the officers' interrogation.

In a footnote, the government relies on *Mesa* to suggest that the agent's questioning of Mr. Bowers – ▮ – was not interrogation for purposes of *Miranda*. (ECF 344 at 13 n.2.) It selectively quotes from a concurring opinion in *Mesa*. But the full quote tells the whole story:

> Mesa indicated that he wished to talk to the agent, because he was in need of a sympathetic listener to whom he could vent his confused and tortured mind. Viater acted not as a questioner, but primarily as a listener. The conversation between Viater and Mesa was nonadversarial and

4

> noninquisitive in nature, and Viater's empathetic tone conveyed little of the subtle compulsion that characterizes police interrogation.

*Mesa*, 638 F.2d at 589–90 (Adams, J., concurring). Here, unlike in *Mesa*, Mr. Bowers  *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (noting "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response"). *Mesa* in fact supports the defense's argument that the circumstances and nature of agents' questioning of Mr. Bowers was "interrogation" for purposes of *Miranda*.

### III. Agents did not ask questions reasonably prompted by a concern for public safety and therefore the exception to *Miranda* outlined in *New York v. Quarles* does not apply.

The government string cites a number of cases and then asserts, without any analysis, that all of Mr. Bowers' statements at the Synagogue fall within the public safety exception to *Miranda* outlined in *New York v. Quarles*, 467 U.S. 649 (1984). The government is wrong: the public safety exception does not apply to law enforcement's interrogation of Mr. Bowers about why he did it and why he gave up.

The "dispositive question" under *Quarles* is "whether, considering all the circumstances, it was objectively reasonable for [the government agent] to have thought

5

that asking [the defendant the question at issue] was necessary to protect himself, his partner, or the public from immediate danger." *United States v. Duncan*, No. 07-1086, 2009 WL 215353, at *605 (3d Cir. 2009). In *Duncan,* officers asked the defendant, who was sitting in a parked car nearby where a shooting had occurred, if the object in his pocket was a gun. The Third Circuit described it as "a close case given the narrowness of the exception" but ruled the public safety exception applied, considering the defendant's "movement of his arms and reaching toward his pocket, and the perceived and obvious danger if the object was in fact a gun and were to go off." *Id*. at *606. The public safety exception requires an immediate threat of danger, as in *Duncan*. *See Quarles*, 467 U.S. at 657 ("[I]n the very act of apprehending a suspect, [police] were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.").

      The Supreme Court in *Quarles* noted that the public safety "exception will not be difficult for police officers to apply because in each case it will be circumscribed by the exigency which justifies it." *Id.* at 658. It said: "We think police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." *Id.* at 658–59. Asking Mr. Bowers ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ served no

purpose other than to elicit incriminating statements. The questions certainly did not serve the purpose of calming Mr. Bowers and thereby ensuring officer safety, and no reasonable officer would have thought they would do so. If anything, asking a suspect ▇▇▇ will inflame a volatile situation, ▇▇▇ ▇▇▇ (ECF 344 at 7.) Asking a suspect ▇▇▇ ▇▇▇ does nothing to ensure the safety of officers.

The cases the government cites involve police questioning that directly related to the circumstances of the offense and directly implicated officer safety. (*See, e.g.*, ECF 344 at 14 (citing *Fleming v. Collins*, 954 F.2d 1109 (5th Cir. 1992) (noting police questioning without *Miranda* warning about the gun and shooting incident appropriate for public and officer safety where officer "confronted a still-volatile situation as she questioned [the individual]" and "did not know whether he, or the man who had drawn a gun on him, was the victim or perpetrator of an offense").) The other cases the government cites similarly involve situations and questioning categorically different than in Mr. Bowers' case. Here, unlike in *Fleming* and the other cases the government cites, ▇▇▇ ▇▇▇ with entirely unrelated questions that did not serve to advance public or officer safety and, in fact, did the opposite, ▇▇▇. The *Quarles* public safety exception is plainly inapplicable to the agents' questioning ▇▇▇ ▇▇▇.

As set forth above, an evidentiary hearing is necessary to resolve these disputed facts.

### IV. The government cannot meet its burden of establishing the voluntariness of Mr. Bowers' statements.

The defense challenges the voluntariness of all of Mr. Bowers' statements. The government responds that Mr. Bowers' statements were voluntary because he "remained conscious, oriented, and responsive" and that "[t]here is no evidence that his will was overborne by law enforcement." (ECF 344 at 15.) However, the government also concedes that Mr. Bowers was ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (*Id*. at 6.) In other words, Mr. Bowers' very life was dependent on his complying with their instructions, including answering their questions.

The defense requests an evidentiary hearing on the issue of voluntariness. The evidence, considered in the totality of the circumstances, supports the involuntariness of Mr. Bowers' statements. *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994).

In sum, the Court cannot accept the government's assertion that the statements were voluntary without requiring it to meet its factual burden at an evidentiary hearing and without giving the defense an opportunity to counter the government's claims.

### V. The government mischaracterizes the defense's multiple arguments for why the Court should bar the government from using Mr. Bowers' statements made in the course of medical treatment.

The defense argued that Mr. Bowers' statements made in the course of medical treatment must be suppressed. (ECF 296 at 9–14.) The defense argued that he had a constitutional privacy interest in those statements and that the Fourth and Fifth Amendments barred the government from using those statements against him. The

government appears to misunderstand the defense arguments concerning statements made in the course of medical treatment and incorrectly characterizes them as "based on the Health Insurance Portability and Accountability Act (HIPAA) and [Mr. Bowers'] own notions of 'private medical information.'" (ECF 344 at 16.)

The defense presented three arguments concerning such statements. First, that despite Mr. Bowers' having invoked his rights to silence and an attorney, while in the course of medical treatment, officers initiated interrogation and elicited incriminating statements. The Fifth and Sixth Amendments bar the use of those statements. (ECF 296 at 10.) Given the disputed facts, the Court must hold an evidentiary hearing.

Second, the defense argued that the Fourth Amendment prohibited the use of his statements made in the course of medical treatment. (ECF 296 at 10–13.) It argued Mr. Bowers had a reasonable expectation of privacy in those statements. Contrary to the government's response, the defense does not claim that HIPAA created a constitutional privacy interest. Rather, the defense argues only that HIPAA supports the fact that Mr. Bowers had a reasonable expectation of privacy in statements made in the course of medical treatment. Given the disputed facts, an evidentiary hearing is necessary. The court will need to consider the circumstances of the statements, the individuals present, the physical environment, including the positioning of the agents, and Mr. Bowers' physical condition.

Finally, the defense argued that Mr. Bowers' private medical information, which includes his statements made in the course of medical treatment, is within the zone of privacy entitled to constitutional protection. (ECF 296 at 13–14.) In deciding whether an

9

intrusion into a person's privacy is justified, courts look to multiple factors, including "the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access." *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir. 1980).

Respectfully submitted,

*/s/ Judy Clarke*
Judy Clarke
Clarke Johnston Thorp & Rice, PC

*/s/ Michael J. Novara*
Michael J. Novara
First Assistant Federal Public Defender

*s/ Elisa A. Long*
Elisa A. Long
Supervisory Assistant Federal Public Defender