IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-292 |
| | ) | |
| ROBERT BOWERS | ) | |

## INTERIM REPORT

Defendant Robert Bowers, through undersigned counsel, files this interim report. *See* ECF 373 ("Defendant shall file an interim report by December 29, 2020, apprising the Court of its progress.").

### I.    Introduction

Nothing has improved with regard to the impact of the COVID-19 pandemic on the ability of the defense to make progress with in-person work in the field or expert mental health evaluations, both of which must happen before the defense can meaningfully discuss deadlines related to whether it intends to introduce mental health evidence.  Since the status conference of November 1, 2020, the pandemic has worsened across the United States, including in Western Pennsylvania. Indeed, given the surge of cases to the highest level ever since the start of the pandemic, the Chief Judge of the Western District of Pennsylvania halted all federal grand juries, suspended jury trials, and imposed greater restrictions on in-person contact within the courthouse.

The threat to personal and public health raised by the ongoing, uncontrolled spread of the COVID-19 virus, as well as travel-related quarantines and limits on in-person

1

contacts, leave the defense unable to move forward with mental health expert assessments or with necessary field work. In numerous pleadings, the defense has detailed its obligations to Mr. Bowers – as well as impediments to doing the necessary work. Notwithstanding the constraints of the pandemic, the defense has continued its review, analysis, research, drafting, and preparation to the extent possible without jeopardizing the health and safety of defense team members or others. For example, the defense has filed numerous substantive pleadings in the past few weeks addressing suppression issues, grand jury ministerial materials, and jury plan related matters. It has engaged experts and anticipates filing challenges to the some of the likely forensic evidence soon.

The government now insists that defense mental health assessments and examinations and collateral interviews are moving forward remotely in capital cases in other jurisdictions. Thus, according to the government, there is no reason not to press forward in this case.  However, as detailed and rebutted in the attached declarations, the government's assertions are misleading, and equally importantly, misrepresent the standard of care required for defending those facing the federal death penalty.

## II.    COVID-19 cases are at an all-time high.

Since the November 2, 2020 status conference, the country has experienced a surge in COVID-19 cases and deaths and public health officials are offering dire warnings about the escalation of cases, hospitalizations, and deaths throughout the country.[1]

In Allegheny County, the average number of new cases per day is approximately 587 – a 662% increase from November 1, 2020. Notably, the average number of new cases per day rose to 872 in the two weeks after Thanksgiving. It is reasonable to anticipate similar surges in the subsequent weeks after Christmas and New Year's.[2]

---

[1] We provide data for the surge in Pennsylvania and Allegheny County.  However, the COVID surge has also dramatically affected the rest of the country, including Southern California, where one of Mr. Bowers' attorneys lives (the 18 U.S.C. § 3005 "learned counsel"), *see e.g.,* 12/28/2020 Los Angeles Times "COVID-19 holiday surge may extend Southern California stay-at-home order into the new year", https://www.latimes.com/california/story/2020-12-28/la-countys-latest-coronavirus-numbers ("Stay-at-home orders will remain in effect until the region's projected ICU capacity is equal to or greater than 15%, according to state guidance. In the Southern California and San Joaquin Valley regions – which, combined, cover 23 of California's 58 counties – the current available ICU capacity stands at 0%.).  The nationwide surge in COVID affects the ability of all out-of-town defense team members to travel, and the defense team's ability to locate and interview potential witnesses.

[2] ACHD Staff, "COVID-19 Dashboard," Allegheny County Health Department (last visited Dec. 28, 2020).



*Figure 1 - New COVID-19 cases in Allegheny County - 9/1/2020 - 12/25/2020*

State-wide, as illustrated in the chart below, the numbers are no better. As of

December 28, 2020, the 7-day average of new cases per day topped 7,000.[3]



*Figure 2 – New Cases in Pennsylvania – 9/1/2020 – 12/26/2020*

---

[3] PA Department of Health Staff, "Open Data Pennsylvania: COVID-19 Aggregate Cases Current Daily County Health" (last visited Dec. 28, 2020), https://data.pa.gov/Health/COVID-19-Aggregate-Cases-Current-Daily-County-Heal/j72v-r42c.

To address the surge, Allegheny County issued a stay-at-home advisory on November 18, 2020; a few days later, on November 23, 2020, Pennsylvania Governor Tom Wolf issued a stay-at-home advisory. These advisories urge residents to remain at home except as required for work, school, or essential needs. They ask residents to avoid unnecessary travel both within and outside of the Commonwealth.[4]

The Pennsylvania Department of Health has also issued an order requiring individuals traveling into and returning to Pennsylvania from any location outside the Commonwealth to either (i) produce proof of a negative COVID-19 test, (ii) self-quarantine for 10 days, or (iii) provide proof of a negative COVID-19 test upon arrival.[5]

On November 27, 2020, Governor Wolf mandated that all businesses conduct their operations remotely if telework is possible. If telework is impossible, businesses are

---

[4] Debra Bogen, "Official Advisory from the Health Director of Allegheny County COVID-19 Related Stay-at-Home Advisory," Allegheny County Department of Public Health (Nov. 18, 2020), available at https://www.alleghenycounty.us/uploadedFiles/Allegheny_Home/Health_Department/Resources/COVID-19/Docs/COVID-19%20Related%20Stay-at-Home%20to%20Stop%20Social%20Gatherings%20Advisory.pdf; Tom Wolf, "Limited-time Stay At Home Advisory of the Governor of the Commonwealth of Pennsylvania" (Nov. 23, 2020), available at https://www.governor.pa.gov/wp-content/uploads/2020/11/20201123-TWW-stay-at-home-advisory.pdf.

[5] Rachel Levine, "Second Amendment to the Order of the Secretary of the Pennsylvania Department of Health for Mitigation Relating to Travel," Pennsylvania Department of Health (Dec. 9, 2020), available at https://www.health.pa.gov/topics/Documents/Diseases%20and%20Conditions/Travel%20Order%20Amendment.pdf.

required to implement cleaning and mitigation protocols, as detailed in the order, including temperature screening, providing access to sanitation materials, and staggering employee work start and stop times to prevent groups from entering and leaving the premises at the same time.[6]

On December 10, 2020, finding that "the Commonwealth is now recording daily COVID-19 cases and hospitalizations **in greater numbers than at any other time during this pandemic**," Pennsylvania Governor Tom Wolf and Secretary of Health Dr. Rachel Levine announced new mitigation measures.[7] These included shutting down all indoor dining, prohibiting indoor gatherings of more than 10 people, closing of fitness facilities, and reducing business capacity to 50%. The goal of these measures is threefold: to stop the spread of the virus in Pennsylvania; to prevent hospitals and health care workers from becoming overwhelmed; and to help Pennsylvania get through the upcoming holiday season.

---

[6] Tom Wolf, "Order of the Governor of the Commonwealth of Pennsylvania for Mitigation, Enforcement, and Immunity Protection" (Nov. 23, 2020), available at https://www.governor.pa.gov/wp-content/uploads/2020/11/20201123-TWW-mitigation-enforcement-immunity-order.pdf.

[7] Tom Wolf, "Order of the Governor of the Commonwealth of Pennsylvania Directing Limited-Time Mitigation," Office of the Governor of the Commonwealth of Pennsylvania (Dec. 10, 2020) (emphasis added), available at https://www.governor.pa.gov/wp-content/uploads/2020/12/20201210-TWW-Limited-Time-Mitigation-Order.pdf

Although the terrible trends in case numbers, hospitalizations, and deaths are predicted to persist throughout the winter months, there is hope that vaccines will shift the curves and offer protection to the population as a whole by the summer of 2021. On December 11, 2020, the FDA issued an emergency use authorization (EUA) to permit the use of the Pfizer COVID-19 vaccine in persons age 16 years or older. A second EUA was issued on December 18 to permit the use of the Moderna COVID-19 vaccine in persons age 18 years and older.[8]  Both vaccines require two injections, with the second following between three and four weeks after the first. According to the Centers for Disease Control (CDC),[9] there are currently 2,071,875 doses of the Pfizer vaccine and 5,990,000 doses of the Modern vaccine to be allocated for distribution.  Of those, Pennsylvania will receive 166,725 Pfizer vaccines and 198,800 Moderna vaccines.[10]

---

[8] HHS Assistant Secretary for Public Affairs, "COVID-19 Vaccine Distribution", U.S. Department of Health and Human Services (Dec. 18, 2020), https://www.hhs.gov/coronavirus/covid-19-vaccines/distribution/index.html.

[9] HHS Assistant Secretary for Public Affairs, "COVID-19 Vaccine Distribution Allocations by Jurisdiction – Pfizer", Centers for Disease Control (Dec. 19, 2020), https://data.cdc.gov/Vaccinations/COVID-19-Vaccine-Distribution-Allocations-by-Juris/saz5-9hgg; HHS Assistant Secretary for Public Affairs, "COVID-19 Vaccine Distribution Allocations by Jurisdiction – Pfizer", Centers for Disease Control (Dec. 19, 2020), https://data.cdc.gov/Vaccinations/COVID-19-Vaccine-Distribution-Allocations-by-Juris/b7pe-5nws.

[10] Philadelphia will receive its own separate allotment of vaccines – 23,400 Pfizer vaccines and 27,600 Modern vaccines.

The interim guidance offered by the Advisory Committee on Immunization Practices (ACIP) provides that health care personnel and residents of long-term care facilities receive COVID-19 vaccines during the first phases of any vaccination program (Phase 1A).[11] Phase 1B includes persons 75 years of age and older and frontline essential workers; Phase 1C consists of persons aged 65 to 74 years of age, persons of all ages with comorbid and underlying conditions that put them at significant risk should they contract COVID-19; and other essential workers.[12] Although prisoners in county, state, and federal facilities have infection rates significantly higher than the general population, it is unclear when they will be eligible to receive the vaccine.[13] It is also unclear when members of the defense team, experts and potential witnesses will be eligible to be vaccinated.

---

[11] Kathleen Dooling, Nancy McClung, Mary Cumberland, et al., "MMWR Morbidity and Mortality Weekly Report, The Advisory Committee on Immunization Practices' Interim Recommendation for Allocating Initial Supplies of COVID-19 Vaccine—United States, 2020" (December 11, 2020), available at https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6949e1-H.pdf

[12] Kathleen Dooling, "ACIP Meeting, Phased Allocation of COVID-19 Vaccines" (Dec. 20, 2020), available at https://www.cdc.gov/vaccines/acip/meetings/downloads/slides-2020-12/slides-12-20/02-COVID-Dooling.pdf.

[13] Beth Schwartzapfel, Katie Park, and Andrew Demillo, "One in Five Prisoners in the U.S. Has Had COVID-19", *The Marshall Project* (Dec. 18, 2020), https://www.themarshallproject.org/2020/12/18/1-in-5-prisoners-in-the-u-s-has-had-covid-19.

### III.    Chief Judge Hornak has suspended all jury trials and all grand jury sessions.

On October 30, 2020, in recognition of "material, persistent and significant increased numerical occurrences and positivity rates of COVID-19 infections and accompanying hospitalizations in the counties which make up this judicial District," as well as "evidence of a recurring COVID-19 infection surge nationally and regionally in the prevalence of positive COVID-19 cases, testing positivity and hospitalizations," the Chief Judge of the United States District Court for the Western District of Pennsylvania suspended all jury trials until February 8, 2021.[14]  In his order, the Chief Judge also acknowledged that governmental public health orders have "**materially and substantially impaired or wholly curtailed**, and continue to impair, **the ability of defense counsel to engage in necessary case and field investigations and client consultations** . . . ."[15]

A few weeks later, on December 7, 2020, the Chief Judge suspended all grand jury sessions until January 4, 2020.[16]  In issuing his order, the Chief Judge took into account

---

[14] *In Re*: Administrative Order Concerning Jury Trials and Certain Other Proceedings Relative to COVID-19 Matter, Misc. No. 2:20-mc-394, at 5-6 (Oct. 30, 2020).

[15] *Id*. at 3 (emphasis added).

[16] *In Re*: Administrative Order Regarding Computation of Time for Filing of Informations or Indictments due to COVID-19 Matters, Misc. No. 2:20-mc-401 (Dec. 7, 2020)

the public health data for each of the divisions of the Western District of Pennsylvania, which "demonstrated a dramatic upward incidence in positive COVID-19 cases, testing positivity, transmission factors, and the limitation on the availability of necessary hospital beds, all consistent with high levels of community spread of the COVID-19 virus . . . ."[17]

The Chief Judge has recently issued more stringent mask or face covering requirements within the courthouses in the district in response to the Pennsylvania Department of Health's "urgent guidance."[18] As it has since the pandemic began, the federal courthouse in Pittsburgh remains in Phase 1 of a 5-phase reopening process.

## IV.   The Newman and Murrie Declarations are Misleading and Misrepresent the Standard of Care in Capital Cases.

Despite the lack of meaningful change regarding the work the defense must do once team members and experts may again travel and, in the words of the Chief Judge, "engage in necessary case and field investigations and client consultations," the government misleadingly insists that the defense may proceed with its expert mental health work remotely.  Oddly, the government uses its response to the defense request to file an *ex parte* pleading advising the Court of the status of its expert mental health investigation to provide the Court with two declarations purporting to support the use of non-contact visiting spaces, distancing and/or videoconferencing for mental health

---

[17] *Id*. at 1-2.

[18] *In re*. Administrative Order Concerning the Use of Face Masks/Coverings in Public Areas of the District's Courthouses, Misc. No. 2:20-mc-593 (Dec. 7, 2020).

10

assessments and examinations and collateral interviews.  (ECF 372-1 (Declaration of

Alan W. Newman, M.D.); ECF 372-2 (Affidavit of Daniel Murrie, PhD)). Notably,

neither declaration acknowledges that the defense has advised the Court that its current

work requires **in-person, unobstructed physical contact** with Mr. Bowers and in-

person, unobstructed contact in the field. (*See* Tr. 8/24/2020, at 3) (emphasis added).[19]

The Newman and Murrie declarations are misleading and affirmatively

misrepresent the standard of care and obligations of the defense to competently

investigate, and then make decisions about litigating, a defendant's mental condition in a

capital case.  The defense investigation, including field work, consultation, and

assessment by potential experts, is an iterative, evolving process, and is required **before**

---

[19] The defense can only address further specific detail about the expert work that has been accomplished in the *ex parte* pleading it has repeatedly sought to file with the Court. To advise the government of the details of a defense investigation would be irresponsible and damaging to the work of the defense, and the government's argument to the contrary is not supported by *United States v. Lujan*, 2011 WL 13210250 (D. N.M. 2011). In that case, the mitigation specialist provided a list of reasons she believed it important to conduct a mitigation investigation in Juarez, Mexico. The reasons given in support of the need to travel gave no information about the actual work product of the defense beyond information that would have been known to the government regardless (*e.g.*, the defendant's family lived in Juarez, important vital records were in Juarez, the defendant and siblings spent time in Juarez). The defense moved to dismiss the death notice because of the dangers presented by travel to Juarez at that time. In its opinion, which the government cites in support of its position on work product protections, the Court found that it was highly unlikely the defense would gain meaningful information in Juarez and thus travel there was not necessary to an effective case in mitigation sufficient to warrant dismissal of the death notice. Here, core, essential, work of the defense has been interrupted by a worldwide pandemic.

the defense can make a reasoned, evidence-based decision to raise a constitutional or statutory bar to a capital prosecution or, consistent with Fed. R. Crim. P. 12.2, form the intent to introduce expert evidence relating to a mental condition during the guilt phase or on the issue of punishment in a capital case.[20]

By his own description, Dr. Newman's primary COVID-19-based experience with telepsychiatry is in monitoring telepsychiatry evaluations conducted by psychiatric residents in emergency rooms, and assessing patients with acute psychiatric symptoms, who often require hospitalization. (ECF 372-1, Newman Declaration (hereafter "Newman"), ¶12). Dr. Newman also cites to the value of telepsychiatry for diagnostic evaluations and patient care. (Newman, ¶14). Finally, Dr. Newman cites to a single

---

[20] Fed. R. Crim. P. 12.2 sets forth notice requirements for a defendant who **intends** to assert a defense of insanity (12.2(a)), or who **intends to introduce** expert evidence relating to a mental condition of the defendant bearing on guilt (12.2(b)(1)) or punishment in a capital case (12.2(b)(2)). The Rule then sets forth provisions for examination "on the government's motion" – **requiring** a court appointed expert to examine under 18 U.S.C. § 4242 in the event the defendant has given notice of the intent to assert a defense of insanity – and **permitting** an examination on motion of the government "under procedures to be ordered by the court" where the defendant has given notice of an intent to introduce expert evidence relating to a mental condition bearing on the issue of guilt or on the issue of punishment in a capital case. Thus, a defendant's expression of **intent** to introduce expert evidence of a mental condition may well open the door to evaluation by a government mental health expert – a serious step with potentially grave implications. *See Estelle v. Smith*, 451 U.S. 454, 467 (1981) (analogizing a government expert's mental health evaluation to an in-custody interrogation by law enforcement). The Court's determination of whether to permit a government rebuttal examination and the procedures of such an examination must be consistent with the purposes of the Rule – to facilitate the government's preparation of its rebuttal case – while preserving the defendant's Fifth and Sixth Amendment rights.

12

pandemic era forensic assessment he conducted – one performed as part of an insanity defense evaluation for a murder case in Arkansas. (Newman, ¶16).[21] Significantly, the research cited by Dr. Newman does not conclude that telepsychiatry and in-person outcomes are the same, but instead points to the limits of telepsychiatry on several key issues. And none of the available research even considers telepsychiatry in the context of capital cases. (*See* Dudley Declaration, Exh. 3, ¶¶ 36, 39).

Dr. Murrie's affidavit advises that "reduced human contact" evaluations are now the norm, including his clinic's remodeling of a room to permit socially distant seating, and installing technology to conduct video-conferenced evaluations. (ECF 372-2, Murrie Affidavit (hereafter "Murrie"), ¶4). As proof of the applicability of remote evaluations in capital cases, Dr. Murrie cites to three examples of his own remote work in three capital cases in Virginia. (Murrie, ¶7).  However, Dr. Murrie's affidavit fails to advise the Court that his three examples are from cases that **are no longer capital cases**, and thus his pandemic era remote work has not been in in cases where the defendants face the death penalty. (*See* Engle Declaration, Exh. 2, at ¶22 ("The particular cases discussed in

---

[21] It is unclear how much work was completed in this single example before Dr. Newman conducted his part of this insanity evaluation. It appears that this is a state case in Arkansas involving an individual who had undergone multiple forensic evaluations, including in-person evaluations for fitness to stand trial and insanity at the Arkansas State Hospital before Dr. Newman's remote evaluation. *See Benton County v. Andrea Wilson*, CR-18-1023 (Benton County Circuit Court, 19th West Circuit Division 1, Bentonville, Arkansas).

Paragraph 7 of Dr. Murrie's Affidavit are not examples of capital sentencing evaluations being conducted remotely and should not be read to condone a practice that fails to include repeated in-person interviews of mitigation witnesses in potential death penalty cases."). Moreover, Dr. Murrie describes cases in which rapport was established prior to the pandemic and in which the in-person field work conducted by others also occurred prior to the pandemic. Thus, his examples and opinions based on those experiences are irrelevant to this capital case and the work which must be done in the midst of a worsening pandemic. Finally, neither Dr. Murrie nor Dr. Newman acknowledge or discuss the standard of care in a capital case. They opine without reference to the established standards in capital cases that defense counsel must adhere to, and under which counsel must retain and guide experts in performing their assessments.

To correct the misinformation, and address more completely the defense work required – pandemic or not – the defense provides the Court with the three attached declarations, which in combination address why telepsychiatry and remote forms of mitigation investigation are inappropriate tools for the defense in investigating potential expert evidence regarding a defendant's mental condition. These declarations also address the broader question of the defense obligations in investigating a defendant's background (biopsychosocial history). These clarifying declarations from individuals with vast capital case experience – and accurately setting forth the standard of care required of defense counsel in capital cases – are attached as Exhibits 1, 2 and 3:

(1)     Dr. Richard Dudley, M.D., addressing the use of telepsychiatry in capital case psychiatric assessment (attached as Exhibit 1, hereafter "Dudley");

(2)     Matthew Engle, an experienced capital defense attorney and a Visiting Professor of Law at Washington & Lee University in Virginia, specifically addressing the typical "capital mitigation evaluation" conducted by Dr. Murrie in Virginia, and alerting the court to the inapplicability of the "mitigation" examples cited by Dr. Murrie (attached as Exhibit 2, hereafter "Engle"); and,

(3)     Russell Stetler, the recently retired National Mitigation Coordinator, a position funded by the Administrative Office of the U.S. Courts, and the most experienced capital case investigator in the United States, addressing the standard of care to which the defense must be held (attached as Exhibit 3, hereafter "Stetler").

## V.     The Defense Mitigation Investigation and Mental Health Assessments Cannot be Competently Conducted by Video or Telephone.

The Declaration by Russell Stetler, the country's most experienced capital case investigator, highlights the breadth of a social history investigation in capital cases:

> Social history investigation generally involves a multigenerational inquiry into the biological, psychological, and social influences on the development and adult functioning of the accused. Because this biographical investigation situates the client in the ecological context of the environment that shaped him, it is also referred to as a social history investigation; and of course, it is by definition a life-history investigation… This investigation involves parallel tracks of collecting and analyzing life-history records, and conducting multiple, in-person, face-to-face interviews. The purpose of this thorough investigation is to develop evidence that will humanize the defendant, help jurors and other decision-makers to understand why he may have committed the capital offense, and to evoke compassion and empathy by identifying the client's individual frailties that at once establish human kinship and expose vulnerabilities and disadvantage. The fruits of a thorough

social history investigation not only provide capital defendants with the
effective representation to which they are entitled under the Sixth
Amendment but assure jurors of the opportunity to consider all the evidence
relevant to the reasoned moral judgment they are asked to render, thereby
also assuring the courts of an outcome that is reliable and just.

(Stetler, ¶2). Mr. Stetler further describes the unique nature of social history evidence and

the need for multiple, in-person, face-to-face interviews:

Family members and others whom the client may identify as potentially
helpful witnesses mistakenly assume that they are wanted as traditional
character witnesses, rather than as factual witnesses with intimate knowledge
of all the painful experiences that may have shaped the client's development.
Social history investigation is invasive, touching issues and experiences
which families and communities often go to great lengths to hide. It is quite
typical, in the first interview with clients or their family members, to obtain
incomplete, superficial, and defensive responses if we ask questions about
family dynamics, socioeconomic status, religious and cultural practices, the
existence of intra-familial abuse, trauma, and mentally ill family members.
Properly trained investigators know how to open the hidden away secrets and
to allow for disclosure of the most hidden and shameful secrets of the client's
family; but such inquiries expose raw nerves, and scratch at the scars nearest
the client's heart, thereby also requiring skill in keeping the client or family
member able to communicate with the defense team and eventually defense
experts. Because this type investigation requires the capital defense team to
overcome barriers to disclosure of this sensitive information, the process
requires patience, consistency and in-person, face to face contact to develop
and maintain trust and rapport. It simply cannot be done by telephone and
videoconferencing. **The Covid-19 pandemic has brought in-person
interviews to a stop, made it impossible to initiate new contacts and
paused any pre-existing rapport-building process that was begun pre-
Covid-19. At best, defense teams can check in with family members to
let them know what is happening with the case and to express concern
for their health and safety, especially for older family members.
However, the iterative process of eliciting sensitive information cannot
proceed**.

(Stetler, ¶3 (emphasis added)). Mr. Stetler further identifies the importance of the social

history investigation to the selection of, and work with, mental health experts:

16

The social history investigation also guides the team in selecting the mental health experts who are appropriate to the needs of the case. Decades of experience with death penalty cases have demonstrated that mental health experts are not fungible, and the investigation will enable teams to choose experts wisely based on the clues that are discovered through records, interviews, and lengthy in-person observation of the capital client himself. When the American Bar Association revised its Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases in 2003, published in 31 HOFSTRA L. REV. 913 (2003), *available at* www.ambar.org/2003guidelines, it not only required full teams of attorneys, fact investigators, and mitigation specialists, but specified that at least one member of the team should be qualified by training and experience to screen for mental and psychological disorders and impairments. That is, the core team should have at least one member with sufficient training and experience to have some insight into the kinds of experts that may be appropriate in the individual case.

Relatedly, the social history investigation is the foundation of a reliable mental health assessment, providing the experts with the objective, multigenerational genetic and social data convergence that forms the basis of a reliable and accurate expert opinion, and will make the expert's opinion credible in the adversarial setting. The social history data allows for differential diagnosis, and additionally, it elucidates the periods throughout a defendant's life where the social conditions and mental illnesses altered the pathway the defendant might have been on and narrowed the available alternatives. Perhaps most importantly, in capital cases, mental health experts are called upon to opine on myriad issues outside the narrowly defined categories most common in the ordinary criminal context (competency and sanity). The social history investigation enables the capital defense team to frame its referral questions with care so that the experts are addressing clearly defined areas germane to the unified defense theory arcing over both phases of a potential capital trial. Finally, once the defense has determined what kinds of experts are needed and what referral questions they should address, it must decide on the roles the experts will play – including, for example, whether one or more will be "teaching experts" who will assist the court and the jury in understanding the mental health evidence, without actually examining the defendant and making an assessment.

(Stetler, ¶5-6).

He explains how a deficient social history investigation prevents the defense from

making informed decisions about mental health:

> Without the thorough social history investigation, … that a skilled
> mitigation specialist can develop, it is impossible to ascertain the existence
> of previous head injuries, childhood trauma, and a host of other life
> experiences that may provide a compelling reason for the jury to vote for a
> life sentence. Moreover, without a social history, counsel cannot make an
> informed and thoughtful decision, based on the nature and extent of a
> client's possible mental disorders and impairments, about which types of
> experts to retain, what evaluation or assessment to request of an expert, or
> even how to most effectively work with a client whose everyday life may
> be shaped by mental disorders and impairments. Mental health experts, in
> turn, require social history information to conduct a complete and reliable
> evaluation.

(Stetler, ¶65 (emphasis added)).

Finally, Mr. Stetler answers the question of whether a capital defense team can

complete a competent social history investigation under the emergency conditions

currently imposed by the COVID-19 pandemic, providing in summary that:

> Covid-19 has temporarily prevented capital defense teams across the country
> from completing the thorough social history investigation that is required by
> both prevailing professional norms and an unbroken line of Supreme Court
> cases from 2000 to 2020. The lawyers, mitigation specialists, and mental
> health experts retained in capital cases cannot fulfill the requirements of the
> mitigation function until they have the ability to spend substantial amounts
> of time, over multiple in-person visits, with clients and mitigation witnesses,
> and to have access to all the relevant documentary evidence necessary not
> only for reliable mental health assessments but for constitutionally effective
> representation at trial. Reliable evidence that is the fruit of a thorough and
> complete mitigation investigation not only will assure Mr. Bowers of the
> effective representation that he is guaranteed by the Sixth Amendment. It will
> also assure jurors of the evidence they will need to render the reasoned moral
> decision that is their responsibility when a capital case proceeds to trial. The
> restrictions imposed by Covid-19 have been longer than we all hoped, but
> they are not permanent. It is my considered professional opinion that counsel

18

for Mr. Bowers cannot make critical decisions about mental health experts and their roles and referral questions until their diligent social history investigation can substantially resume.

(Stetler, ¶73).

Experienced capital defense attorney, and Visiting Professor of Law, Matthew Engle of Virginia, concurs with Mr. Stetler's assessment of the standard of care in capital cases:

Mr. Stetler's Declaration accurately describes the standard of practice when conducting a mitigation investigation. Mitigation interviews must be conducted in person in order to establish the rapport and trust necessary for a client or a client's family member to reveal the sensitive and often embarrassing information that is necessary for an accurate assessment. And those family members with the most important information to share will always require multiple in-person interviews.

(Engle, ¶20). Professor Engle also refutes the suggestions made by Dr. Murrie that a virtual mitigation investigation or evaluation can be competently accomplished:

[B]ased upon my experience representing capital murder defendants and in training other capital defense attorneys, the standard of practice in death penalty cases in the Commonwealth and elsewhere would never permit a capital defense team to conduct a virtual mitigation investigation.  In my opinion, attempting to do so would be malpractice.  Furthermore, nothing in Dr. Murrie's Affidavit should be read to suggest that a virtual mitigation evaluation in a death penalty case would be consistent with Virginia – or federal capital – practice.  Any mitigation evaluation that is not based upon thorough, repeated in-person interviews of the defendant and collateral witnesses would be inconsistent with the professional obligations that capital defense attorneys owe to their clients.

19

(Engle, ¶23).[22]

Finally, Dr. Richard Dudley, M.D., an experienced psychiatrist whom the United States Supreme Court once referred to as a "well-credentialed expert," *Sears v. Upton*, 561 U.S. 945, 951 (2010) (*per curiam*), confirms the critical importance of the social history investigation, and the process involved in developing reliable and valid mental health evidence:

> [T]he process of developing reliable and valid mental health evidence is an iterative one in which the defense team uses the multigenerational social history to determine the types of mental health experts that might be needed for the case, then pursues further investigation once the expert is able to assimilate and interpret the data and suggest further records, witnesses and areas of mitigation to pursue based on the expert's specialized knowledge. The standard of care for investigating and developing the underpinnings of a mental health evaluation, the comprehensive social history, is extensive, time consuming and necessary.

(Dudley, ¶20). The process is crucial to assuring reliability:

> Once the expert has had the opportunity to review records and conduct interviews, it is common for an expert to uncover information which leads to additional records and additional, relevant witnesses. This is the iterative process of developing expert opinions in a capital case. As follow-up interviews and record collection proceed, further questions may arise for the defendant and witnesses. This part of the formulation of an expert opinion

---

[22] As noted above, Mr. Engle also provides the background of the cases Dr. Murrie cites, explaining that these Murrie pandemic era assessments have been done after the cases were no longer capital cases. (*See* Engle, at ¶22 "The particular cases discussed in Paragraph 7 of Dr. Murrie's Affidavit are not examples of capital sentencing evaluations being conducted remotely and should not be read to condone a practice that fails to include repeated in-person interviews of mitigation witnesses in potential death penalty cases.")

> helps to assure the reliability of the information as it is gathered, cross-validated with other sources and tested by further questioning.
>
> Having engaged in this iterative process, an expert will formulate opinions and share those with counsel.  There may be continued discussion of the themes and meaning of the experiences that shaped the defendant and how the defendant perceives and understands the world.

(Dudley, ¶¶31- 32). Only after the social history investigation, and this evolving process with potentially multiple experts, will counsel have enough information to engage in the strategic consideration of giving notice of intent to introduce expert mental health evidence at any of the various stages of a capital case. (*See* Dudley, ¶33).  As Dr. Dudley spells out:

> The strategic consideration of how to make use of the mental health evidence and expert opinions requires the defense team to consider the entire case.  The defense team has to make strategic decisions about the use of mental health evidence in the context of the entire case, not in a haphazard or piecemeal fashion.  This includes consideration of both the mental health aspects and the legal aspects.

(Dudley, ¶34).

Dr. Dudley also addresses the use of telepsychiatry tools, having utilized them to provide services for inmates in remote prisons in New York state. He notes the value of such tools in non-capital cases, and the value **after** the establishment of rapport and engagement (Dudley, ¶¶27-28).  Dr. Dudley agrees that telepsychiatry and telepsychology have a place and can be useful in the right circumstance, but **not in the circumstance of a capital case**:

> Telepsychiatry and telepsychology are not appropriate tools for the demands of a capital case. Too much information is missed and, as of now, there is too

little evidence of the reliability and validity of those methods compared to in-person, face-to-face assessments. … It is my opinion that such approaches should not be used in capital cases as they fail to meet the high standards necessary for completing forensic assessments in such high stakes cases.

(Dudley, ¶45).

Dr. Dudley further addresses concerns about the process at the end of in-person interviews for a jailed individual after making sensitive disclosures, issues that cannot be dealt with by phone or video in a clinically responsible manner. (Dudley, ¶29). And he clarifies what the literature actually says about telepsychiatry as a means of providing services – it does not assert that the outcomes of telepsychiatry and in-person practice are the same, but rather points to the limits of telepsychiatry, and there is a complete absence of available research on the effectiveness of its use in the context of capital cases. (Dudley, ¶¶36-39).  Finally, Dr. Dudley provides context for the conducting of an insanity evaluation (Dr. Newman's lone example of a pandemic-era capital case evaluation), noting the narrow and limited instruments used to assess sanity as compared to the evaluations required to develop capital case mental health evidence. (Dudley, ¶¶ 40-41).

In sum, the points raised by the government in response to the defense request to provide the Court with an *ex parte* update on the status of the expert mental health investigation, and the declarations attached to that response, are misleading, inaccurate, and irrelevant to the conduct of a mental health investigation a capital case.

**VI.    The defense has continued its review, analysis, research, drafting, and preparation without jeopardizing the health and safety of themselves or others.**

Since the last status conference on November 1, 2020, the defense has researched, drafted, and filed a number of substantial pleadings. These include the Motion to Vacate the Court's Notice of Compliance and Request to Reset the Deadline to File a Jury Composition Challenge (ECF 347); a Supplemental Brief to the Motion to Compel Production of Further Records in Support of Anticipated Jury Composition Motion (ECF 375); replies to the government's opposition to the Motion to Suppress Evidence Seized During Searches of Target Residence, Target P.O. Box, and Target Vehicle (Motion to Suppress No. 1) (ECF 351), Motion to Suppress Evidence Seized During the Second and Third Searches of the Target Residence (Motion to Suppress No. 2) (ECF 351), Motion to Suppress Evidence Seized During Search Of Target Device (Motion to Suppress No. 4) (ECF 378), Motion to Suppress Evidence Seized From Social Media Account (Motion to Suppress No. 5) (ECF 379), Motion to Suppress Evidence of Cell Site Location Records (Motion to Suppress No. 6) (ECF 386), Motion to Suppress Evidence Seized During Search and Seizure From Internet Service Provider Information Associated With Target Accounts and Target IMEI (Motion to Suppress No. 7) (ECF 380), Motion to Suppress Statements (Motion to Suppress No. 9) (ECF 385), Motion to Suppress Evidence Seized During Search and Seizure of Records and Information Associated With Domain Name From Internet Service Provider (Motion to Suppress No. 12) (ECF 381), Motion to Suppress Evidence Seized During Search of Records Associated With Geolocation Data

and Email Address (Motion to Suppress No. 13) (ECF 382), Motion to Suppress

Evidence Seized During Search of Records From Medical Records Facilities Identified

As Target Location 1 And Target Location 2 (Motion to Suppress No. 14) (ECF 383);

and Motion to Suppress Evidence Of Vehicle Location Data (Motion to Suppress No. 15)

(ECF 384); a Reply to Government's Opposition to Motion to Compel Production of

Grand Jury Ministerial Matters (ECF 402); and a Reply to Government's Opposition to

Motion to Vacation Clerk of Court's Notice of Compliance (ECF 403).

Once the Court resolves the pending grand jury-related motions (ECF 280, 333,

375, 337, 403, 336, 402), counsel anticipate addressing a challenge to the jury plan. In the

meantime, defense counsel are continuing their review of and consultation with experts

regarding the voluminous discovery provided in this case. And, as noted above, defense

counsel also anticipate filing motions challenging some of the anticipated forensic

evidence as well as a motion seeking additional discovery.[23]

## VII.    Conclusion

Nothing has changed that would enable the defense to competently discuss

deadlines related to mental health issues since the COVID-19 pandemic hit the United

States shortly after briefing of this issue in February 2020. *See* ECF 196. At that time, the

---

[23] Though *Daubert* challenges are often considered shortly before trial, there are complex issues to be addressed with the DNA, firearm toolmark and cell site location evidence, and an opportunity during COVID to address these issues well in advance of a trial date.   In addition to these challenges, there may be additional *Daubert* challenges down the road, but it is unclear at this point whether the government will seek to introduce other "forensic" evidence.

Court declined to schedule deadlines, permitting four additional months for the defense to "make productive use" of time toward being able to schedule notice deadlines. Indeed, as recognized by the U.S. District Court in Pittsburgh, as well as other federal courts across the country, the COVID-19 situation is currently more dangerous than it has ever been.

It is critically important to remember that the decision of the prosecution to seek the death penalty is an entirely discretionary one. No amount of aggravating evidence compels the government to seek the death penalty, and no amount of such evidence requires a jury to impose a sentence of death. At the same time, the obligations of the defense are not discretionary, and essential corners should not be cut simply to accommodate the impediments and limitations imposed by the COVID-19 pandemic. Conducting a sub-standard mental health investigation **in this capital prosecution** only increases the likelihood this case will be returned for a new trial after years of post-conviction litigation. The understandable desire to bring this case to a close should not be at the cost of the defense attempts to provide effective, competent representation to the accused.

Respectfully submitted,

*/s/ Judy Clarke*
Judy Clarke
Clarke Johnston Thorp & Rice, PC

*/s/ Michael J. Novara*
Michael J. Novara
First Assistant Federal Public Defender

*/s/ Elisa A. Long*
Elisa A. Long
Supervisory Assistant Federal Public Defender

25