IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-292 |
| | ) | |
| ROBERT BOWERS | ) | |

**MOTION TO COMPEL THE PRODUCTION OF INFORMATION RELATED TO THE GOVERNMENT'S AWARENESS, MONITORING, AND DOCUMENTATION OF MR. BOWERS' ONLINE ACTIVITY PRIOR TO THE ALLEGED OFFENSES**

Defendant Robert Bowers, through undersigned counsel, hereby moves this Court to order the government to produce any information of its awareness, monitoring, or documentation of Mr. Bowers' activity on the Gab.com platform in 2018, and those with whom he communicated on that platform, prior to the shootings at issue in this case. This information is discoverable under the *Brady* doctrine because, though it does not impact Mr. Bowers' legal culpability for the acts charged, it is potentially mitigating or could lead to mitigating evidence that is relevant to deciding sentence.

## I.    Overview

The government has charged Mr. Bowers with multiple offenses punishable by death and served notice of its intent to seek a death sentence. ECF 44, 86. Among the aggravating factors in the government's notice of its intent are (i) that Mr. Bowers committed the offenses after substantial planning and premeditation; (ii) that Mr. Bowers was motivated by religious animus based on expressions of hatred and contempt toward members of the Jewish faith; and (iii) that Mr. Bowers selected the site of the offenses

with the intent to instill fear within the local, national, and international Jewish communities.

Mr. Bowers asked this Court to order the government to provide an informative outline of the statutory and non-statutory aggravating factors it intended to present to the jury in the event of a penalty phase in this case. ECF 157. The government objected, but in its opposition to the motion for an informative outline, it discussed Mr. Bowers' internet activity on Gab.com as a basis for those aggravating factors. Specifically, the government alleged (i) that Mr. Bowers researched the Hebrew Immigrant Aid Society and affiliated congregations, including Dor Hadash; (ii) that Mr. Bowers made communications evincing animosity toward people of the Jewish faith on Gab.com; and (iii) that Mr. Bowers' activity on Gab.com evinced a "desire to broadcast his actions to an intended audience" and an "awareness of how his actions would be perceived by the public." ECF 178 at 22, 40-42. In addition, in its opposition to Mr. Bowers' motion to compel discovery, the government asserted that Mr. Bowers made posts and engaged in chats on Gab.com wherein he "communicat[ed] with, and offer[ed] to assist, like-minded individuals." ECF 177 at 12.

It is plain from the government's filings that it has reviewed Mr. Bowers' online activity, at least on Gab.com. What is not plain, and what the government has declined to provide in response to Mr. Bowers' discovery requests, is whether the government was aware of his online activity prior to the shootings, as well as his exposure to the comments of others suggesting or promoting violence or expressing anti-Semitic

comments on Gab.com. The government has also declined to provide information about what, if any, action it took in response to that online activity before October 27, 2018.

Mr. Bowers asks this Court to order the government to produce any such information within the possession of any branch or agency of the federal government or joint state/federal task force as it is potentially mitigating or may lead to relevant mitigating evidence in a capital sentencing proceeding. Specifically, the government's awareness of the potential for a person to commit violent acts, and the government's capacity to deter such acts, are mitigating sentencing factors. Such government awareness or capacity to deter does **not** bear on guilt-phase culpability; it does not shift blame or excuse or justify conduct. Rather, it is relevant to a jury's determination of whether the death penalty is appropriate. Accordingly, this information is material to Mr. Bowers' preparation of his defense and discoverable under *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963), and the Eighth Amendment.

## II.    The government has been monitoring social media sites in an effort to anticipate White nationalist and anti-Semitic acts of violence for more than a decade.

Publicly available documents indicate that the federal government, including the Department of Homeland Security, the Department of Justice, and the Federal Bureau of Investigation, have been monitoring social media sites in an effort to anticipate White nationalist and anti-Semitic acts of violence. For example, in 2009, the Department of

Homeland Security ("DHS") reported on "rightwing extremist chatter on the Internet."[1] In that report, DHS noted the "rightwing extremist chatter on the Internet" by "Anti-Semitic extremists" who attributed job losses to "a cabal of Jewish 'financial elites.'"[2] DHS reported that "anti-immigration or strident pro-enforcement fervor has been directed against specific groups and has the potential to turn violent," and that "rightwing extremist groups' frustration over a perceived lack of government action on illegal immigration has the potential to incite individuals [] toward violence."[3]

At least since 2015, the Department of Justice ("DOJ") has contracted for social media mining software. In 2015, it awarded a contract to the Mitre Corporation to work on a "social media image fingerprinting project."[4] In 2016, the DOJ retained Pen-Link, Ltd., to develop software that "parses and analyzes media data."[5] And in 2019, the DOJ

---

[1] Department of Homeland Security, "Rightwing Extremism: Current Economic and Political Climate Fueling Resurgence in Radicalization and Recruitment," attached as Exhibit 1, at 3.

[2] Exhibit 1 at 3-4.

[3] Exhibit 1 at 3-4.

[4] https://www.usaspending.gov/award/CONT_AWD_DJF151200P0009650_1549_DJFJF BI12128_1549 (last visited Mar. 26, 2021).

[5] https://www.usaspending.gov/award/CONT_AWD_DJF161200P0005668_1549_-NONE-_-NONE- (last visited Mar. 26, 2021).

contracted with Magnet Forensics for software that "extract[s] social media footprint and related activities from digital evidence."[6]

In April 2015, the FBI issued a "Counterterrorism Policy Guide."[7] This guide provided instruction for "online investigations" that encompass "a subject's online activities and participation with extremist forums, chat rooms, bulletin boards, blogs, servers, or Web sites."[8] The document states that an investigation may be considered an "online investigation" if it focuses on a "suspected extremist['s]" use of "Internet forums, chat rooms, bulletin boards, blogs, server Web sites" or when it is based on "the subject's online activities and participation with extremist forums, chat rooms, bulletin boards, blogs, servers, or Web sites."[9]

---

[6] https://www.usaspending.gov/award/CONT_AWD_15F06719P0002719_1549_-NONE-_-NONE- (last visited Mar. 26, 2021); *see American Civil Liberties Union Foundation v. United States Department of Justice*, 19-cv-00290-EMC (N.D. CA.), ECF 33 (Plaintiffs' Opposition to Defendant's Motion for Partial Summary Judgment).

[7] Attached as Exhibit 2 (hereinafter "Counterterrorism Policy Guide"). Portions of the Counterterrorism Policy Guide have been posted online, and that is what Mr. Bowers relies on here. *See https://www.documentcloud.org/documents/3423189-CT-Excerpt.html#document/p16/a336266* (last visited Mar. 23, 2021). This document was reportedly leaked to the public. *See* Brennan Center for Justice, *Written Testimony of Michael German, Fellow, Before the House Committee on Oversight and Reform*, Sept. 29, 2020, at 2 (available at https://docs.house.gov/meetings/GO/GO02/20200929/111003/HHRG-116-GO02-Wstate-GermanM-20200929.pdf, last visited Mar. 23, 2021). For the sake of clarity, citations to the Counterterrorism Policy Guide are to its original page numbers.

[8] Exhibit 2 at 53.

[9] Exhibit 2 at 74-75.

In May 2017, the FBI and DHS issued a Joint Intelligence Bulletin entitled "White Supremacist Extremism Poses Persistent Threat of Lethal Violence."[10] Both agencies determined that "lone actors … within the white supremacist extremist (WSE) movement [would] likely continue to pose a threat of lethal violence over the next year."[11] The Joint Intelligence Bulletin noted that "the internet, including the emergence of social media, has enabled individuals to engage in the WSE movement without joining organized groups."[12] It further reported that individuals who participated in White supremacist extremism through the internet posed a threat of lethal violence in the coming year.[13]

On August 9, 2017, three months after the issuance of the Joint Intelligence Bulletin, DHS prepared a report entitled "Domestic Terrorist Violence at Lawfully Permitted White Supremacist Rallies Likely to Continue."[14] This document addressed clashes between White supremacists and counter-protestors and was intended to alert law enforcement to the potential for violence at the Unite the Right demonstration that would take place in Charlottesville, Virginia, on August 11 and 12, 2017. The report noted that

---

[10] Attached as Exhibit 3.

[11] Exhibit 3 at 2. The report defined "white supremacist extremists" as "individuals who seek, wholly or in part, through unlawful acts of force or violence, to support their belief in the intellectual and moral superiority of the white race over other races." *Id.* at n. 7.

[12] Exhibit 3 at n. "†."

[13] Exhibit 3 at 5.

[14] Attached as Exhibit 4.

the Virginia Fusion Center was monitoring social media and other online sources in anticipation of the demonstration.[15]

A federal court in the Northern District of California found that there was a "wide array of evidence" indicating that federal agencies engage in social media monitoring and that those agencies "cooperate, coordinate, and share information with the FBI." *American Civil Liberties Union v. Department of Justice et al.,* 19-cv-00290-EMC (N.D. CA.), ECF 39 (Order Denying Defendant's Motion for Partial Summary Judgment) at 10. The Court made this observation based in part on the declaration of the FBI's Assistant Section Chief of the Record/Information Dissemination Section of the Information Management Division that "the FBI has acknowledged generally it monitors social media as a law enforcement technique." *Id.*, ECF 31-1 (Declaration of Michael G. Seidel), at 1, 7. The plaintiffs in the case filed as exhibits emails and a report from DHS reflecting that agency's social media monitoring programs. *See id*., ECF 34-7 ("Email Regarding Social Media Working Group"); ECF 34-8 ("Email Regarding Social Media Vetting Task Force"); ECF 34-9 ("HS' Pilots for Social Media Screening Need Increased Rigor to Ensure Scalability and Long-term Success").

---

[15] Exhibit 4 at 2. Fusion Centers are "state-owned and operated centers that serve as focal points in states and major urban areas for the receipt, analysis, gathering and sharing of threat-related information between State, Local, Tribal and Territorial (SLTT), federal and private sector partners." *See* https://www.dhs.gov/fusion-centers (last visited Mar. 26, 2021). There is a Fusion Center in Pittsburgh. *Id.*

In fact, federal law enforcement has averted potential acts of domestic terrorism based on its monitoring of social media and internet activity. For example, between August 2017 and March 2018, the FBI identified and investigated the online activity of Daniel McMahon, which included extensive activity on the Gab.com platform. *United States v. McMahon*, 3:19-cr-00014-NKM-JCH, ECF No. 58 (Sentencing Memorandum) at 2 (W.D. VA. Aug. 23, 2020). On January 8, 2019, the FBI "discovered" violent, racist posts that McMahon made on Gab threatening a Black man's candidacy for local office less than 24 hours after McMahon made them. *Id*. at 3-5. Public reporting indicates that McMahon interacted with Mr. Bowers on Gab.com.[16]

In November 2019, Richard Holzer was arrested and charged with attempting to obstruct religious exercise by force using explosives (specifically, planning to blow up the Temple Emanuel in Pueblo, Colorado). The FBI identified the defendant in or about September 2019 based on his use of Facebook accounts to promote White supremacy ideology and acts of violence, including racially motivated acts of violence in messages and chats. *See United States v. Holzer*, 19-cr-00488 (D. CO.), ECF 1 (Criminal Complaint).

---

[16] Journalist Molly Conger was tracking McMahon's online activity and observed him interacting with Mr. Bowers in April 2018.  *See* "Meet the Undercover Fascists," in Rolling Stone, Feb. 14, 2021, *available at* *https://www.rollingstone.com/politics/politics-features/antifa-proud-boys-militia-trump-insurrection-1121933/* (last visited Mar. 26, 2021).

In October 2020, six men were indicted in the Western District of Michigan in connection with a conspiracy to kidnap that state's governor. According to the criminal complaint sworn by an FBI agent, federal law enforcement "became aware through social media that a group of individuals" were discussing the idea. *United States v. Fox*, 1:20-mj-00416-SJ (W.D. MI.), ECF No. 1 (Criminal Complaint, Oct. 6, 2020), at 2.

As demonstrated by the government-sponsored reports discussed above, for many years before the shootings at the Tree of Life synagogue on October 27, 2018, the government was aware of the threat of online White nationalist mobilization and the efforts to recruit individual actors to the cause online. For years, the government has sponsored the development of software and other tools to track the online activity. In public reports, the government made clear that this threat was significant and should be a focus of law enforcement monitoring and intervention. The government was aware that White nationalists had specifically identified immigration and anti-Semitism as a recruiting focus. Indeed, the government had recognized the role of online radicalization and had developed tools to monitor and track it long before Mr. Bowers opened an account on Gab.com.[17]

---

[17] More recently, in the days before the January 6, 2021, attack on the United States Capitol, the FBI circulated a memo to local law enforcement agencies that warned of violence at the Capitol based on "online threads" and "comments" on "a thread on a message board." "FBI report warned of 'war' at Capitol, contradicting claims there was no indication of looming violence," Washington Post, Jan. 12, 2021, *available at* https://www.washingtonpost.com/national-security/capitol-riot-fbi-intelligence/2021/01/12/30d12748-546b-11eb-a817-e5e7f8a406d6_story.html (last visited Mar. 26, 2021); *see* "FBI memo warns law enforcement across U.S. of possible armed protests at 50 state capitols," *available at*

Based upon the documented monitoring by federal agencies over an extended period of time – both prior to and after October 27, 2018 – there is good cause to believe that the federal government was aware of Mr. Bowers' online activity, and the activity of others with whom he interacted on Gab.com, during the months before the shootings at the Tree of Life Synagogue.

### III.    The government has refused to provide the requested information.

Mr. Bowers previously filed a motion to compel production of discovery seeking information about individuals who advocated domestic terrorism and domestic terrorist organizations known or suspected to be connected to or to have communicated with Mr. Bowers.[18] ECF 154 at 14-15. The government opposed the request, arguing in part that the defense had failed to specify materiality and that the government was not responsible

---

https://www.nbcnews.com/politics/donald-trump/fbi-memo-warns-law-enforcement-across-u-s-possible-armed-n1253750 (last visited Mar. 26, 2021) (warnings based in part on information gathered from social media).

[18] Specifically, the motion sought "data collected by law enforcement" that related to:

(1) any group or organization that expressed white supremacist, white nationalist, or anti-Semitic beliefs, or any individual known or suspected to be associated with or connected to such an organization, with which Mr. Bowers had had contact; or

(2) individuals to whom Mr. Bowers was known or suspected to be connected who promoted violence encouraged others to act violently, indicated material support for violence, or promoted ideas that the government assessed to be related to the promotion of violence.

In correspondence with the defense, the government indicated that there is an ongoing criminal investigation into "like-minded individuals" with whom Mr. Bowers communicated on Gab.com.

for knowing the existence of *Brady* material in a file unrelated to the case being prosecuted. ECF 177 at 24-25).[19] This Court denied Mr. Bowers' motion. ECF 202.

In this motion, Mr. Bowers narrows his request to a specified time period – January 2018 through October 27, 2018 – seeking information focused on the government's knowledge and awareness of his activity on Gab.com and those with whom he communicated on that platform. The motion further addresses the mitigating value of the information.[20]

---

[19] The government disclaimed any obligation under *Brady* to produce the material, arguing the defense had not made a *prima facie* showing that it was "material to his guilt or innocence." ECF 177 at 24. This ignores two facts. First, the government's *Brady* obligations extend beyond the guilt phase to the penalty phase. *See Brady*, 373 U.S. 83, 87; *United States v. Bagley,* 473 U.S. 667, 675 (1985); *see also United States v. Tsarnaev*, 968 F.3d 24 (1st Cir. 2020), *cert. granted* (Mar. 22, 2021) (reversing death sentence in part for government's withholding of law enforcement records that supported argument that defendant's brother coerced people into participating in criminal acts). Second, the defense discovery motion stated clearly that the information sought may have influenced or contributed to Mr. Bowers' actions, which is plainly material to his culpability for punishment purposes.

[20] In a letter dated September 11, 2020, Mr. Bowers asked the government to confirm the following:

- whether he or any user on Gab.com was monitored or identified in 2018 as a subject who posed a threat of mobilizing to violence;
- whether any covert law enforcement or national security contact was initiated with him or any other Gab.com user in 2018;
- whether any of the federal programs or law enforcement agencies addressing the threat of white supremacists and/or online radicalization identified him before October 27, 2018, as a threat to Jewish synagogues or other entities owned or publicly supported by Jewish persons in the Pittsburgh area; and
- if he was identified as a threat to synagogues or other entities owned or publicly supported by Jewish individuals in the Pittsburgh area, the names of those synagogues or other entities, whether those synagogues or other entities were advised of the potential threats, and what steps, if any, were taken as a result.

IV.     **The government is required to disclose its knowledge of Mr. Bowers'
        activities on Gab.com prior to the Tree of Life shootings under *Brady v.
        Maryland* and the Eighth Amendment.**

The defense has briefed the government's *Brady* obligations in a capital case:

> Due process requires the government to disclose not only evidence that
> would be favorable to the defense at trial, but also evidence that would be
> favorable at sentencing, *i.e.*, that would help establish mitigating factors or
> weaken or counter aggravating ones. *See, e.g., Brady v. Maryland*, 373 U.S.
> 83, 87-88 (1963) (requiring disclosure of material that "would . . . tend to
> reduce the penalty" from death to life imprisonment). Under *Brady* and its
> progeny "the government must always produce any potentially exculpatory
> or otherwise favorable evidence without regard to how the withholding of
> such evidence might be viewed – with the benefit of hindsight – as affecting
> the outcome of the trial." *United States v. Safavian*, 233 F.R.D. 12, 16
> (D.D.C. 2005); *see United States v. Carter*, 313 F. Supp. 2d 921, 925 (E.D.
> Wis. 2004) ("[I]n the pretrial context, the court should require disclosure of
> favorable evidence under *Brady* and *Giglio* without attempting to analyze its
> 'materiality' at trial. The judge cannot know what possible effect certain
> evidence will have on a trial not yet held.").

> The meaning of "favorable" includes any information in the possession of
> the government that relates to guilt or punishment and tends to *help* the
> defense by either bolstering the defense case or impeaching potential
> prosecution witnesses. *Safavian*, 233 F.R.D. at 16.  It covers both exculpatory
> and impeaching evidence. *United States v. Bagley*, 473 U.S. 667, 676-677
> (1985). '"The government is obligated to disclose all evidence relating to
> guilt or punishment which might be reasonably considered favorable to the
> defendant's case,' that is, all favorable evidence that is itself admissible or
> 'that is likely to lead to favorable evidence that would be admissible'. . .."
> *Safavian*, 233 F.R.D. at 17 (quoting *United S1tates. v. Sudikoff*, 36 F. Supp.
> 2d 1196, 1199-1200 (C.D. Cal. 999)). "Where doubt exists as to the
> usefulness of the evidence to the defendant, the government must resolve all
> such doubts in favor of full disclosure." *Safavian*, 33 F.R.D. at 17 (citing

---

In its response, the government expressed its unwillingness to address Mr. Bowers'
discovery requests.  However, the government acknowledged in a footnote that "many of
the materials" that Mr. Bowers sought "(to the extent they exist) reside with law
enforcement entities that were not involved in the instant investigation and prosecution
[]." The government's obligations under *Brady* are not so limited.

> *United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988)); *see Dennis v. Sec., Pennsylvania Dept. of Corrections*, 834 F.3d 263, 293 (3d Cir. 2016) ("All favorable material ought to be disclosed by the prosecution."); *United States v. Olsen*, 704 F.3d 1172, 1183 n. 3 (9th Cir. 2013) ("A trial prosecutor's speculative prediction about the likely materiality of favorable evidence, however, should not limit the disclosure of such evidence, because it is just too difficult to analyze before trial whether particular evidence ultimately will prove to be 'material' after trial.").

ECF 154, at 3-4. In reply to the government's opposition, Mr. Bowers again addressed the pretrial *Brady* standard and the government's ongoing failure to appreciate the breadth of the doctrine as it applies to capital sentencing proceedings. *See* ECF 191 at 1-4.[21]

The information Mr. Bowers seeks – government awareness of his activity and persons with whom he "communicated" or "offered to assist" on Gab.com – is "favorable" within the meaning of *Brady* because it is mitigating or may lead to information that tends to mitigate a sentence of death. Federal courts have consistently recognized, and capital juries have consistently found, that the government's awareness of the potential for a person to commit violence, and the government's capacity to avert

---

[21] The defense has repeatedly expressed concern that the government fails to understand *Brady* in the context of a capital prosecution. A Pennsylvania federal court vacated a guilty plea and death sentence on post-conviction review in a federal capital case finding a *Brady* violation at the sentencing phase. *See United States v. Hammer*, 404 F. Supp. 2d 676, 786 (M.D. Pa. 2005) (reversing based on prosecution's withholding of witness statements: "the question is whether the withheld evidence would have had an effect on even a single juror because the vote for life of one single juror in the sentencing phase of a capital trial results in the imposition of a life sentence."). In another federal capital case (a BOP homicide prosecution in Texas), the government failed to disclose mental health evidence from the BOP file that was "relevant to multiple issues in the sentencing phase" – and as a result agreed that the death sentence should be vacated. *See United States v. Jackson*, 09-cv-1039 (E.D. Tex. 2013), ECF 171, at 4.

violence, are mitigating circumstances of a capital offense. *See United States v. Christensen*, 2:17-cr-20037-JES-JEH (C.D. IL.), ECF 481 (Sentencing Verdict Form), at 14 (enumerating as mitigating factor that state university's counseling center did not treat or follow up with defendant, who sought mental health intervention for homicidal thoughts); *United States v. Candelario-Santana*, No. 09-427 (D.P.R.), ECF 1051 (Sentencing Verdict Form), at 11 (jurors wrote in that system "failed" defendant by not managing his incarceration or following up with him during probation); *United States v. McCluskey*, Cr. No. 10-2734 (D.N.M.), ECF 1481-1 (Sentencing Verdict Sheet), at 5-6 (failure of department of corrections to properly supervise private contractor contributed to the occurrence of the offenses; failure of contractor to follow proper security policy contributed to the occurrence of the offenses; offenses would not have occurred had department of corrections properly supervised private contractor; offenses would not have occurred had contractor followed proper security policy); *United States v. Richardson*, 1:08-CR-139 (N.D. GA.), ECF 948 (Sentencing Verdict Sheet), at 11 (crime "never would have happened if BOP had paid proper attention to the cell assignments" of defendant and his cellmate or if defendant "had been properly medicated prior to the offense"); *United States v. Duong*, 5:01-cr-20154-JF-1 (N.D. CA.), ECF 1492 (Sentencing Verdict Sheet), at 9 (jurors wrote in "Early intervention by law enforcement could have prevented later crimes."); *United States v. Sablan*, 00-CR-00531 (D. CO.), ECF 2959-8 at 16 (BOP placed defendant in Special Housing Unit cell along with the co-defendant and victim despite the fact that the cell was designed to house only two people; circumstances that led to victim's death "existed, at least in part, because of failure(s) by

BOP officials to properly do their job(s), by allowing alcohol and weapons in the cell;" jurors wrote in that "BOP didn't do their job by faulty logic of putting [co-defendants] in the same cell" and victim died "because the guards failed to do 30-minute rounds."). Furthermore, in addition to finding that the government's awareness of the defendants' conduct before the homicides was a mitigating factor, the juries in each of these cases imposed life sentences.[22]

Where the information that Mr. Bowers seeks would be admissible as mitigating evidence or could lead to admissible mitigating evidence under the reasoning of these federal capital cases, "the heightened reliability demanded by the Eighth Amendment in the determination whether the death penalty is appropriate in a particular case" requires that the government produce the information requested. *Sumner v. Shuman*, 483 U.S. 66, 72 (1987). "The fundamental respect for humanity" that underlies the Eighth Amendment requires consideration of "the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). As federal courts have recognized, and capital juries have found, the type of information Mr. Bowers seeks is a relevant circumstance of the offenses with which he is charged for purposes of deciding whether he should be executed. Thus, pursuant to *Brady* and the Eighth Amendment, the government must provide the requested information.

---

[22] Candelario-Santana was convicted of nine murders, including a pregnant woman.

Based on the government-sponsored reports and federal cases discussing the government's social media monitoring set forth in Section II above, there is reason to believe that the government was monitoring activity and statements on Gab.com and was thereby aware of Mr. Bowers' online activity – and interaction with and exposure to others promoting anti-Semitic beliefs and potential violence – prior to October 27, 2018. Indeed, the government has alleged that Mr. Bowers "made communications evincing animosity toward people of the Jewish faith on Gab.com" and his activity on Gab.com "evinced a 'desire to broadcast his actions to an intended audience.'" ECF 178 at 22, 40-42. These fall squarely within the scope of the government's investigation and reporting of "rightwing extremist chatter on the Internet" by "Anti-Semitic extremists" who attributed job losses to "a cabal of Jewish 'financial elites.'" Exhibit 1 at 3-4. The alleged communications are encompassed by the investigation and reporting on "anti-immigration or strident pro-enforcement fervor [that] has been directed against specific groups and has the potential to turn violent," and "rightwing extremist groups' frustration over a perceived lack of government action on illegal immigration [that] has the potential to incite individuals [] toward violence." Exhibit 1 at 3-4. More than a year before the shootings, the government also reported that individuals who participated in White supremacist extremism though the internet posed a threat of lethal violence in the coming year. Exhibit 3 at 5.

Where the government has charged religious animus as an aggravating factor in support of death (ECF 86 at 4), and alleged that Mr. Bowers "communicat[ed] with, and offer[ed] to assist, like-minded individuals" (ECF 177 at 12), it cannot be beyond the

government's discovery obligation to produce information related to federal law
enforcement's knowledge of interactions between Mr. Bowers and individuals or groups
promoting anti-Semitic violence. For the government to resist production of this
information for a lack of showing that it is material to guilt or innocence (ECF 177)
overlooks the rule that its *Brady* obligation extends to information that is mitigating as to
punishment.

Importantly, other federal courts have granted similar defense discovery motions
that sought production of information – including documents, reports, and records – in
the government's possession pertaining to government awareness of the defendant or
interaction with him before the charged violence occurred, as well as its opportunity to
intervene. *See United States v. Christensen*, 2:17-cr-20037-JES-JEH (C.D. IL.), ECF
465-1 (subpoenas served by defense), at 3-4 (seeking records pertaining to defendant's
seeking mental health treatment from state university prior to date of offense); *United
States v. Con-ui*, No. 3:13-CR-123, 2015 WL 13501329, at *2 (M.D. Pa. May 8, 2015)
(ordering production of all records related to allegations of BOP staff misconduct at USP
for five years preceding homicide; documentation related to incidents at specific USP for
preceding 5 years and nationwide for 20 years; labor relations and training materials for
preceding 5 years); *United States v. Stone*, No. 12-CR-0072 JCC-GSA, 2013 WL
4541513, at *5 (E.D. Cal. Aug. 27, 2013) (ordering production of records relating to any
investigation, disciplinary hearing concerning any BOP employee that was in any way
connected to the victim's death); *Perez*, 222 F. Supp. 2d 164, 170 (granting defendant
discovery over government's objection in potentially capital case of, *inter alia*, "all

17

information tending to undermine the application of any aggravating factors" and "all *Brady* information which may be favorable [] in the [] penalty phase" where it was material to potential punishment under *Brady*).

Mr. Bowers has plainly met the threshold to compel government production. He seeks evidence of the government's awareness, monitoring, documentation of, or reporting on his online activity in 2018, or those with whom he "communicated" or "offered to assist," prior to the shootings. Any such awareness is potentially a mitigating circumstance of the offense, and any information in the government's possession related to such awareness is therefore relevant to Mr. Bowers' preparation of his defense and discoverable under *Brady*.

## V.    Conclusion

The government's awareness of Mr. Bowers' online activity and opportunity to intervene prior to the shootings at the Tree of Life synagogue are potentially mitigating factors. Any information of such awareness in the government's possession falls within the government's *Brady* obligations. Multiple federal courts have reached similar conclusions and ordered analogous discovery. For these reasons, Mr. Bowers asks this Court to order the government to produce the following information:

a)   all documentation, reporting, communication, and records of any federal agency (*e.g.*, Homeland Security, DOJ, or federal law enforcement agency, including any national security agency) concerning, discussing, making reference to, or related to any awareness, monitoring, review, or surveilling of Mr. Bowers' activity on Gab.com between January 1, 2018 and October 27, 2018;

18

b) all documentation, reporting, communication, and records of any federal agency (*e.g*., Homeland Security, DOJ, or federal law enforcement agency, including any national security agency) concerning, discussing, making reference to, or related to any monitoring, reviewing, investigating, or surveilling of any user on Gab.com with whom Mr. Bowers interacted or communicated between January 1, 2018 and October 27, 2018; and

c) all documentation, reporting, communication, and records of any federal agency (*e.g*., Homeland Security, DOJ, or federal law enforcement agency, including any national security agency) concerning, discussing, making reference to, or related to any identification, monitoring, or surveilling of Mr. Bowers as a subject who posed a potential threat of mobilizing to violence, and any law enforcement or national security contact initiated with Mr. Bowers between January 1, 2018 and October 27, 2018.

Respectfully submitted,

*/s/ Judy Clarke*
Judy Clarke
Clarke Johnston Thorp & Rice, PC

*/s/ Michael J. Novara*
Michael J. Novara
First Assistant Federal Public Defender

*/s/ Elisa A. Long*
Elisa A. Long
Supervisory Assistant Federal Public Defender