IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-292 |
| | ) | **UNDER SEAL** |
| ROBERT BOWERS | ) | |

**MOTION TO DISMISS SUPERSEDING INDICTMENT PURSUANT TO
THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, THE JURY
SELECTION AND SERVICE ACT, 18 U.S.C. §243, AND THIS COURT'S
SUPERVISORY AUTHORITY OVER FEDERAL CRIMINAL
PROCEDURES, OR TO STAY THE PROCEEDINGS PENDING THE
SELECTION OF A NEW GRAND JURY AND A PETIT JURY IN
CONFORMITY WITH THE CONSTITUTION AND THE JURY
SELECTION AND SERVICE ACT, AND REQUEST FOR
EVIDENTIARY HEARING AND FURTHER DISCOVERY**

1001 Liberty Avenue
Suite 1500
Pittsburgh, PA 15222
(412) 644-6565

Judy Clarke
Clarke Johnston Thorp & Rice, PC

Michael Burt
Law Office of Michael Burt, PC

Michael J. Novara
First Assistant Federal Public
Defender

Elisa A. Long
Supervisory Assistant Federal
Public Defender

Attorneys for Defendant,
Robert Bowers

Table of Contents

**INTRODUCTION** ....................................................................................................**4**

   I.   This jury challenge is distinct from and significantly broader than that raised in *United States v. Savage.* ............................................................................................4

   II.   The Court has an independent obligation, particularly in this capital case, to ensure that Mr. Bowers' right to a fair and impartial grand and petit jury is protected. ...7

   III.   All of the jury pools and jury wheels in the process are subject to challenge. .........11

**STATEMENT OF FACTS** ......................................................................................**22**

   I.   Introduction and Summary of Expert Conclusions ......................................... 22

   II.   Summary of Findings ................................................................................. 26

      A.   The Defense Experts Found Significant Underrepresentation of Non-White Groups. ........................................................................................................... 26

      B.   The Voter Registration List is a Major Source of the Underrepresentation of Minority Groups. .......................................................................................... 34

      C.   Pennsylvania's Voter Registration Lists are Problematic in Many Ways ...........38

**ARGUMENT** .......................................................................................................**58**

   I.   SURE Voter Registration Lists Cannot Be Used as The Sole Source List in This Court's Jury Selection Plan Because the Lists Are Underinclusive, Insufficiently Representative, Productive of Non-random Selection Methods, Substantially Inaccurate, Unreliable, Not Up to Date, And Contain A Significant Number of Duplicates. ..............58

      A.   Implications of the *Savage* Decision and the Need for Additional Discovery ......58

      B.   Mr. Bowers Has Established A *Prima Facie* Case Of Violation Of His Rights Under The Fifth And Sixth Amendments, the JSSA and 18 U.S.C. § 243. ................... 72

         i.   Fifth Amendment Rights ........................................................................ 72

         ii.   The Sixth Amendment ........................................................................... 80

         iii.   The Jury Selection and Services Act ...................................................... 84

         iv.   18 U.S.C. § 243 ..................................................................................... 85

      C.   The JSSA And Its Legislative History ................................................... 86

      D.   The Effects of Past Discrimination and the Continued Need for Supplementation of the Voter Registration Lists ................................................................. 104

      E.   The Requirements of Accuracy, Inclusiveness, Randomness, and Reliability ...116

         i.   The Problems of Underinclusive, Inaccurate, and Stale Jury Registration Lists, Restrictive Registration Laws, and Jury List Purges In General ..............................124

         ii.   The Situation in Pennsylvania ............................................................ 137

   II.   The Superseding Indictment Must Be Dismissed And Any Jury Trial Must Be Stayed Because This Court's Jury Selection System Relies Upon Unconstitutional Qualification Criteria. ......................................................................................... 148

      A.   A federal jury selection process may not operate to discriminate against or act arbitrarily toward any group of our population .............................................................. 148

B.      The federal jury selection process is subject to strict scrutiny. ..........................152

C.      Two of the jury qualification criteria in the JSSA, the one-year residency requirement and the felon prohibition, do not meet constitutional muster.................158

    i.     The One-Year Residency Requirement, Which is Racially Discriminatory in Purpose and Impact, is Unconstitutional and Violative of 18 U.S.C. § 243. .............159

    ii.    The Disqualification Of All Charged And Convicted Felons and Misdemeanants Under 18 U.S. C. § 1865(b)(5), Which is Racially Discriminatory in Purpose and Impact, Is Unconstitutional and Violative of 18 U.S.C. § 243 ..................................195

        a.    The Felon Exclusion Provision is Overly Broad.................................................196

        b.    § 1865(b)(5) Is Violative of Mr. Bowers' Fair Cross- Section And Due Process Rights And Of The Constitutional Rights of Excluded Jurors Because It Is Not "Appropriately Tailored" To A Particular Case And Results In The Blanket Exclusion Of A Significant Portion Of The Minority Community.........................208

III.    There are Additional, Substantial Violations of the Jury Selection and Service Act of 1968, and the Cumulative Impact of All Violations Requires Dismissal of the Superseding Indictment and a Stay of the Case. ...........................................................216

IV.    Mr. Bowers Is Entitled To An Evidentiary Hearing ................................................225

**CONCLUSION**............................................................................................................**229**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     )
     )
     v.     ) Criminal No. 18-292
     )
ROBERT BOWERS     )

**MOTION TO DISMISS SUPERSEDING INDICTMENT PURSUANT TO
THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, THE JURY
SELECTION AND SERVICE ACT, 18 U.S.C. §243, AND THIS COURT'S
SUPERVISORY AUTHORITY OVER FEDERAL CRIMINAL
PROCEDURES, OR TO STAY THE PROCEEDINGS PENDING THE
SELECTION OF A NEW GRAND JURY AND A PETIT JURY IN
CONFORMITY WITH THE CONSTITUTION AND JURY SELECTION
AND SERVICE ACT, AND REQUEST FOR EVIDENTIARY HEARING
AND FURTHER DISCOVERY**

Robert Bowers, by and through counsel, respectfully moves this Court

for an Order dismissing the superseding indictment against him on five

grounds: (1) a violation of the Fifth Amendment's guarantees of a grand jury,

of due process, and of equal protection of the laws, (2) a violation of the Sixth

Amendment's guarantee of  trial by a petit jury that has been selected from a

fair cross-section of the community; (3) a violation of the Eighth Amendment

mandate that in a capital case the defendant is entitled to reliability and

enhanced procedural protections; (4) a violation of the Jury Selection and

Service Act of 1968 ("JSSA"); (5) a violation of  18 U.S,C. §243; and (6) as

necessary in the proper exercise of this Court's supervisory power over federal criminal procedure.

The Western District of Pennsylvania is in substantial violation of the JSSA and 18 U.S.C. §243, and of the Fifth, Sixth, and Eighth Amendments because: (1) it has failed to supplement its jury source list; (2) it has failed to take other reasonable measures designed to ensure a constitutionally adequate jury selection procedure, as outlined below and in Exhibit 1 (Report of Jury Selection Scholars) ("Scholars' Rpt.");[1] and (3) it is otherwise in violation of specific provisions of the JSSA designed to ensure inclusiveness, representativeness, randomness, accuracy,  reliability, proportionality, and fairness.

The Western District relies exclusively on registered voter lists in filling the master jury wheel. These registered voter lists significantly under-represent African-Americans, African-American men, Hispanics, and those who do not identify themselves as Non-Hispanic Whites to the Census Bureau.[2] They also over-represent Non-Hispanic Whites. As demonstrated in

---

[1] Because the materials provided by the Clerk of Court are covered by the protective order in this case, and because the materials provided by the Clerk and the Department of State implicate privacy concerns, Mr. Bowers files this motion and the exhibits under seal.

[2] Dr. John Weeks explains that the group of "those who do not identify themselves as Non-Hispanic White"

2

the attached affidavits of Jeffrey Martin (Exh. 2) ("Martin Aff."), and Dr. John Weeks (Exh. 3) ("Weeks Aff."), this statistically significant under-representation has persisted since at least 1995.[3] The Western District is also in substantial violation of the JSSA for its failure to follow up with prospective jurors who fail to return the qualification questionnaire or who omit race/ethnicity/religion information from their "Juror Qualification Questionnaires" as required by law, and its failure to compile jury

---

is a census-derived category that cross-tabulates the separate questions about race and ethnicity, as shown below in Figure 1, which provides a replica of the questions asked on the 2020 Census of Population. A person is first asked about their Hispanic origin, and then asked about their race. A person who responds "No" to the Hispanic (ethnic) question, and then checks that they are "White" will be tabulated as "Non-Hispanic White." All other race/ethnic groups are minority groups who are considered by the Court to be members of a Cognizable Group. In the Pittsburgh Division, they collectively account for 13.51% of the citizen population aged 18 or older (see Table 1). The 2020 Census data show that of these Cognizable Group members, 53% are Non-Hispanic Black, 21% are Non-Hispanic Persons of two or more races, 12% are Hispanic or Latino, 11% are Non-Hispanic Asian (including Native Hawaiian and Other Pacific Islander), 2% are Non-Hispanic "some other race," and 1% are Non-Hispanic American Indian or Alaska Native.

Exh. 3 at 5.

[3] In ECF 236, this Court ruled that "providing materials dating back to May 1, 2015, which comprises five (5) years and three (3) jury wheels, is sufficient to detect bias if any bias exists." Through the use of historical jury data subsequently made available by the Clerk of Court, the defense has been able to track demographic data back to 1995, although as later explained, that data is not perfect.

representativeness statistics in accordance with the procedures set forth by the JSSA, the Administrative Office of the United States Courts, and the Judicial Conference of the United States.

Mr. Bowers seeks dismissal of his superseding indictment on these bases. In the alternative, he seeks a stay of these proceedings and re-presentation of his case before a grand jury (and eventually trial by a petit jury) that is selected with procedures complying with the JSSA and 18 U.S.C. § 243, and the Fifth, Sixth, and Eighth Amendments.[4]

## INTRODUCTION

### I. This jury challenge is distinct from and significantly broader than that raised in *United States v. Savage*.

Last year, in the federal capital case of *United States v. Savage*, 970 F.3d. 217 (3d Cir. 2020), the Third Circuit summarized some of the key principles involved in typical jury composition challenges:

> Under the Sixth Amendment, a criminal defendant is entitled to a trial by an "impartial" jury. One important step in furthering impartiality is to draw jurors from diverse segments of the population. *See Holland v. Illinois*, 493 U.S. 474, 480, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990). The Supreme Court has declared this method a constitutional guarantee by concluding that "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment

---

[4] According to 28. U.S.C. § 1867(d), "[i]f the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the grand jury, the court shall stay the proceedings pending the selection of a grand jury in conformity with this title or dismiss the indictment, whichever is appropriate."

right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528, 95 S. Ct. 692, 42 L.Ed.2d 690 (1975).

A corresponding statutory framework facilitates the selection of a representative jury. The Jury Selection and Service Act of 1968 (JSSA) provides that federal juries are to be "selected at random from a fair cross section of the community." 28 U.S.C. § 1861. Federal district courts are tasked with creating jury-selection plans consistent with this fair-cross-section principle. § 1863(a). These plans generally must draw potential jurors from "voter registration lists" or "lists of actual voters," but they also must identify other sources "where necessary to foster the policy and protect the rights secured by" the JSSA's fair-cross-section principle. § 1863(b)(2).

*Savage,* 970 F. 3d. at 252-253.

The jury challenge at issue in *Savage* was a narrow one that was not factually well-developed.[5] It was focused solely on the Sixth Amendment fair

---

[5] Past challenges to the jury selection procedure in the Western District of Pennsylvania have also not been factually well-developed. *See, e.g.*, *United States v. Murphy*, 464 F. App'x 60, 63 (3d Cir. 2012) ("There is no evidence in this record that Murphy's counsel sought discovery or a hearing before the District Court regarding the Western District of Pennsylvania's jury selection plan. Before this Court, Murphy only presents the census data from the various counties within the district. This is plainly insufficient to satisfy the *Duren* test. Thus, the District Court properly overruled Murphy's objection."); *United States v. Weaver*, 267 F.3d 231, 245 (3d Cir. 2001) ("Due to Weaver's failure to present sufficient evidence to satisfy the requirements of the *prima facie* case set forth in *Duren,* we will affirm the District Court's denial of Weaver's fair cross section challenge to Erie's jury selection process."); *Smith v. United States*, 456 F.2d 121, 122 (3d Cir. 1972) ("Smith's petition for relief offers no allegations other than the unsubstantiated assertion that 'Blacks' were systematically excluded from service on the grand and petit juries upon which the district court could find, even after a hearing, that he was denied the effective assistance of counsel."); *United States v. Green*, No. CRIM. 10-186, 2011 WL 4737601, at *4 (W.D. Pa. Oct. 6, 2011), *aff'd in part*, 507 F.

cross-section requirement, it targeted only the qualified jury wheel, and

"Savage forfeited the opportunity to pursue a JSSA claim [ ] by failing to

raise it in the District Court." *Id.* at 254 n. 32.

---

App'x 239 (3d Cir. 2012) ("Defendant has not conducted any studies or presented any relevant statistical evidence to establish that the representation of African–Americans on grand juries in the Pittsburgh Division was unfair or unreasonable in relation to the number of such persons in the community…. Indeed, the information presented by defendant does not establish the percentage of African-Americans in the entire Pittsburgh Division, nor does it establish the percentage of African-Americans in the jury wheel, or include statistical evidence establishing the alleged disparity between African-Americans in the Pittsburgh Division versus the jury pool."); *Matthews v. United States*, No. CRIM. 03-072, 2013 WL 1674631, at *10 (W.D. Pa. Apr. 17, 2013) ("Here, like the defendant in *Green*, *Matthews* did not present factual allegations to support his argument that the representation of African-Americans in jury venires in the Western District of Pennsylvania was not 'fair and reasonable' in relation to the number of African-Americans in the community.")

   None of these cases allude to any affirmative evidence demonstrating that juries in the Western District have been and continue to be chosen from a fair cross-section of the community. Rather, the focus of these cases is on criticizing individual defendants for failure to present any, or insufficient, evidence to support constitutional or statutory challenges to the Western District's jury selection procedures. As such, these cases do not hold or imply that those procedures are immune from challenge. As the Attorney General correctly told Congress when it was considering the original version of the JSSA, "[a] finding that exclusion of a particular class was not established by the evidence in a given case is not necessarily the equivalent of a showing that discrimination does not exist in a particular jurisdiction." Statement of Attorney General Ramsey Clark, in *Civil Rights Act Of 1967: Hearings Before The Subcommittee On Constitutional Rights Of The Committee On The Judiciary United States Senate* 90 (1967), available athttps://babel.hathitrust.org/cgi/pt?id=uc1.$b643888&view=1up&seq=100&skin=2021.

Mr. Bowers has investigated a much broader challenge, one that now raises claims not only under the Sixth Amendment fair cross-section requirement, but also under the Fifth and Eighth Amendments, this Court's supervisory powers over federal criminal proceedings, 18 U.S. C. §243, and the numerous requirements of the JSSA described below. This multifaceted approach is called for both because the facts and law warrant it and because it is responsive to one of the points the Court has already made about Mr. Bowers' challenge.

## II.   The Court has an independent obligation, particularly in this capital case, to ensure that Mr. Bowers' right to a fair and impartial grand and petit jury is protected.

In ECF 442, this Court, citing *Savage*, stated: "I remind Defendant that the pertinent fair cross section issue is whether the challenged selection method fairly and reasonably represented a distinctive group among potential jurors compared with that group's representation in the community, not whether a 'superior' selection method exists or other methods might be more fair." *Id*. at 7 n.6. However, *Savage* itself recognizes that "courts have an independent obligation to ensure that the rights of criminal defendants are protected," and that under the Eighth Amendment "'[w]hen a defendant's life is at stake, the Court has been particularly sensitive to insure that every safeguard is observed.'" *United States v. Savage*, 970 F.3d at 247 (quoting *Gregg v. Georgia*, 428 U.S. 153, 187 (1976)). Being "particularly sensitive" to

7

ensure that "every" safeguard is observed cannot coexist with turning a blind eye toward routine practices utilized throughout the country to ensure a fair and impartial jury, particularly when the Supreme Court has expressly held that in a capital case one important factor in assessing whether a particular risk to an impartial jury is unacceptable is "the ease with which that risk could have been minimized." *Turner v. Murray*, 476 U.S. 28, 36 (1986). The Court in the same case emphasized that "the qualitative difference of death from all other punishments requires a correspondingly *greater degree of scrutiny* of" capital jury selection procedures. *Id.* (emphasis added). *See also Morgan v. Illinois*, 504 U.S. 719, 735–36 (1992) ("A defendant on trial for his life must be permitted on *voir dire* to ascertain whether his prospective jurors function under [a] misconception [about the death penalty]. The risk that such jurors may have been empaneled in this case and 'infected petitioner's capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized.'") (quoting *Turner*).

Under this Eighth Amendment standard, it is necessary and proper to consider whether the failure to use alternative, easily accessible, and effective jury selection procedures renders a system vulnerable to Eighth Amendment challenge.

Moreover, *Savage* also recognized that "'[u]pon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential

8

rights of the accused.'" *Savage*, 970 F.3d at 247 (quoting *Glasser v. United States*, 315 U.S. 60, 71 (1942)). *Glasser*, of course, went on to famously declare that

> the proper functioning of the jury system, and, indeed, our democracy itself, requires that the jury be a truly representative of the community, and not the organ of any special group or class. If that requirement is observed, the officials charged with choosing federal jurors may exercise some discretion to the end that competent jurors may be called. But they must not allow the desire for competent jurors to lead them into selections which do not comport with the concept of the jury as a cross-section of the community. Tendencies, no matter how slight, toward the selection of jurors by any method other than a process which will insure a trial by a representative group are undermining processes weakening the institution of jury trial, and should be sturdily resisted. That the motives influencing such tendencies may be of the best must not blind us to the dangers of allowing any encroachment whatsoever on this essential right. Steps innocently taken may one by one lead to the irretrievable impairment of substantial liberties.

*Id*. at 86.

Quoting this passage from *Glasser*, and noting that "instead of relying on the relevant constitutional provisions, the Supreme Court in prescribing the principles of jury selection for the federal system has chosen to utilize its supervisory power over the administration of justice in the federal courts *so as 'with greater freedom to reflect … (its) notions of good policy,'*" the Third Circuit long ago held that

> more must be required of jury officials than merely that they not 'intentionally and systematically exclude' any groups. It follows, therefore, that it must be the duty of jury officials, at least in the

federal system, not to exclude any cognizable groups from jury lists through neglect as well as through intentional conduct.

*Dow v. Carnegie-Illinois Steel Corp.*, 224 F.2d 414, 424 (3rd Cir.1955).

*Dow* expressly recognized that "[i]n cases involving the jury systems of the federal courts, … the applicable standards are not necessarily the same [as those decided under the Constitution], for those standards depend on a different source of power." Thus, at least in federal court,

> the present-day desideratum of jury selection is the obtaining of lists of individuals representative of a cross-section of the qualified community and it seems clear that it is the duty of the jury officials to use methods reasonably designed to attain that end. Undoubtedly, these officials have discretion in their choice of methods, but it must be exercised with this purpose in view. When in any court of this circuit there has been a failure to do this, either intentionally or through neglect, this court in the exercise of its supervisory power must require a new trial so that the error will be obliterated.

*Id.* at 423-424.

The Third Circuit's express adoption under its supervisory power of a negligence standard for the management of juries in federal court is important to the present motion because it means that "if a court's failure to manage its jury system in a reasonably effective manner contributes to legally insufficient minority representation in the jury pool, the court's negligent jury management is itself systematic exclusion." Paula Hannaford-Agor, *Systematic Negligence In Jury Operations: Why The Definition Of*

10

*Systematic Exclusion In Fair Cross Section Claims Must Be Expanded*, 59

Drake Law Review 761, 764 (2011) ("*Negligence In Jury Operations*").

The "pertinent fair cross section issue" under the Third Circuit's

negligence standard is not in fact "whether a '*superior*' selection method

exists or other methods *might* be more fair," but rather whether *routine*

methods exist that are not being utilized in this District that *demonstrably*

*would* cure or at least vastly improve the persistent underrepresentations

that are documented in the Martin and Weeks affidavits. On this factual

issue, the evidence is overwhelming:

> Over the past forty years, courts have implemented a number of
> effective practices to ensure an inclusive and representative
> master jury list and to minimize undeliverable, nonresponse and
> failure-to-appear, and excusal rates. All of these techniques
> demonstrably improve the demographic representation of the jury
> pool. The vast majority of courts employ these techniques on a
> routine basis.

*Negligence In Jury Operations* at 264. *See also* Exh. 1, Scholar's Report.

## III.  All of the jury pools and jury wheels in the process are subject to challenge.

One key component of the present challenge will be a focus not just on

the qualified wheel, but on all of the wheels and pools in the process,

including the voter registration lists provided to this Court by the

Pennsylvania Department of State that are used as the sole source list in this

Court's jury selection plan.[6] *Savage* notes that, under the Sixth Amendment, "[p]recedent reinforces that the qualified wheel is a valid option for assessing a fair-cross-section claim." *Id.* at 256. But it is not the only option. The seminal case of *Rabinowitz v. United States*, 366 F.2d 34 (5th Cir. 1966), cited repeatedly in the legislative history of the JSSA, found constitutionally and statutorily invalid a federal jury selection system grounded in a source list compiled through the use of a key man system.[7] The court found that "[t]hose responsible for compiling the jury lists violated the statutory scheme by applying the wrong standards and by using grossly inadequate sources." *Id.* at 60. The guiding principle of the decision is succinctly stated in the last

---

[6] In addition to source lists, "[t]he relevant jury pool may be defined by: (1) the master list; (2) the qualified wheel; (3) the venires; or (4) a combination of the three." *United States v. Rioux*, 97 F.3d 648, 657 (2d Cir. 1996). The Martin and Weeks Affidavits show persistent underrepresentation in source lists, master lists, qualified jury lists, and in grand jury venires.

[7] The Third Circuit embraced *Rabinowitz in United States v. Zirpolo*, 450 F.2d 424 (3d Cir. 1971). The Supreme Court followed suit in 1975, emphasizing in *Taylor v. Louisiana*, 419 U.S. 522, 529 n.8 (1975), that "[b]oth the Senate and House Reports made reference to the decision of the Court of Appeals in *Rabinowitz v. United States*, 366 F.2d 34, 57 (5th Cir. 1966), which in sustaining an attack on the composition of grand and petit jury venires in the Middle District of Georgia, had held that both the Constitution and 28 U.S.C. § 1861, prior to its amendment in 1968, required a system of jury selection 'that will probably result in a fair cross-section of the community being placed on the jury rolls.' *See* S. Rep. 90-891, at 11, 18 (1967); H. Rep. 90-1076, n.7 at 4, 5)."

paragraph of the court's opinion: "When the basic jury list [is] poisoned, the fruits of that list [are] also infected. To cure the infection, it is necessary to start the process anew." *Id.* at 60.[8] In other words, as one court put it, if the source list "is not representative of a cross-section of the community, the process is constitutionally defective *ab initio*." *People v. Wheeler*, 22 Cal. 3d 258, 272, 583 P.2d 748, 759 (1978).

The process is also statutorily defective because the legislative history of the JSSA is clear that "[t]he act guarantees ... that at ... the initial source list [stage] the selection process *shall* produce groups that accurately mirror community makeup." H. Rep. 90-1076 (1968) (emphasis added.); *see* S. Rep. 90-891 (1967) at 17. "Thus, the standard for adjudicating both statutory and

---

[8] How this tainting process works is well-articulated in Camille Fenton's, *A Jury of Someone Else's Peers: The Severe Underrepresentation of Native Americans from the Western Division of South Dakota's Jury-Selection Process*, 24 Texas Journal on Civil Liberties & Civil Rights 119, 136 (2018):

> By populating the master jury wheel exclusively with names from the voter-registration list, too few Native Americans are included in the master jury wheel. This results in too few Native Americans receiving the juror-qualification questionnaire, which then results in too few Native Americans making it onto the qualified jury wheel. The end product is a venire that underrepresents Native Americans.

This same pernicious result would also obviously occur for any other cognizable group underrepresented on voter registration lists. Indeed, as Exhibits 1-3 demonstrate, that is exactly what is happening in the Western District of Pennsylvania with regard to African-Americans, African-American men, Hispanics, and those who do not identify themselves as Non-Hispanic Whites.

constitutional challenges to jury selection plans requires at a minimum that 'petit juries must be drawn from a source fairly representative of the community.'" *United States v. Test*, 550 F.2d 577, 585 (10th Cir. 1976) (*en banc*) (quoting *Taylor v. Louisiana*, 419 U.S. at 528-30 & n. 11).

Source list challenges are not without precedent in the Third Circuit. One was mounted in the pre-JSSA case of *Dow v. Carnegie-Illinois Steel Corp.*, 224 F.2d 414 (3d Cir.1955), where a civil plaintiff raised many challenges to the key man system then used in the Western District of Pennsylvania to construct its source list. One argument was that the system was flawed because the court had available to it the better alternative of voter registration lists. The Third Circuit responded:

> The plaintiff … maintains that the only proper method for compiling jury lists is by taking names in some set system from the voting lists. But, as we have already said, the choice of the methods to be used lies with the jury officials. In arguing that the use of voting lists is the only reasonable method, the plaintiff has not even shown that the desideratum of a cross-section would be attained thereby. It may be that some cognizable groups generally fail to register to vote, so that such a method would be inherently faulty. Consequently – we cannot adhere to the plaintiff's contention.

*Dow*, 224 F.2d at 427.

This suggestion of disapproval of using voter registration lists as a sole source list for jury selection laid dormant for many years. However, in 1997, twenty-nine years after the JSSA was enacted, the Third Circuit Task Force

14

on Equal Treatment in the Courts issued its comprehensive Final Report to the Judicial Council. *See* Report of the Third Circuit Task Force on Equal Treatment in the Courts, 42 Vill. L. Rev. 1355 (1997). The Report contains two findings directly relevant to the present motion: (1) "[t]here is widespread perception and concern among attorneys and minority litigants in each district in the Third Circuit that racial and ethnic minorities are under-represented in the jury pools and on actual juries in federal court in Delaware, New Jersey and Pennsylvania;" and (2) "[i]n the District of Delaware, the Middle District of Pennsylvania and the Western District of Pennsylvania the jury pool is drawn from lists of registered voters. In these districts and generally in the jury divisions within the districts, racial and ethnic minorities, particularly African-Americans and Hispanics, are not represented in numbers as great as their percentage of the general population." *Id*. at 1802-1803.

The Report also contains two important recommendations relevant to the present motion: (1) "[t]he district courts within the Third Circuit should make efforts to supplement the lists from which the jury pool is selected so that the racial, ethnic and gender composition of the jury pool more closely comports with the racial, ethnic and gender composition of the district or jury division from which the jury pool is drawn;" and (2) "[e]ach district should identify potential source lists that would increase representativeness in the

15

jury pool. These lists may differ from district to district. Consideration should

be given to those sources which the experience of other districts, jurisdictions

and the scholarly literature suggest increase minority representation,

including state gross income tax returns, telephone directories and lists of

licensed motor vehicle drivers, filers of homestead rebate application forms or

similar filings, welfare recipients, unemployment compensation recipients,

Social Security benefits recipients and utility customers." *Id*. at 1805-1806.

    As far as the defense investigation has revealed, these

recommendations have never been implemented or even tested in the

Western District of Pennsylvania.[9] That fact is especially mystifying given

---

[9] In *Savage*, the Third Circuit commented that "[i]t is presumably the [District Court's] institutional role – not the role of Mr. Savage or the District Judge in this case – to conduct a study and make findings before deciding that voter registration lists must be supplemented with other sources." Savage, 970 F.3d at 261-62 n.46. This Court quotes this comment in ECF 442 at 7 n. 6. Respectfully, the Third Circuit itself has already conducted such a study and the Western District's sole use of voter lists was found wanting in 1997, nearly twenty-five years ago. This finding is hardly novel. *See* Exh. 1, Scholars' Report at 3-4 ("Federal circuit court committees [in the 1st and 9th Circuits] charged with identifying best practices for jury selection have also recommended adding source lists to improve diversity…. The use of additional source lists was also recommended for Pennsylvania state courts by the Pennsylvania Supreme Court Committee on Racial and Gender Bias in the Justice System and the Pennsylvania Committee for the Analysis and Reform of our Criminal Justice System. Indeed, at the state level, '[n]early all state courts now use more than one source list.'") (quoting Ninth Circuit Jury Trial Improvement Committee, First Report on Goals and Recommendations, at 3 (adopted by the Judicial Council of the Ninth Circuit, May 2004).)

the Third Circuit's decision in *Smith v. Yeager*, 465 F. 2d 272 (3d Cir. 1972).

There, a state court had historically been using voter lists as its sole jury

source list, but a judge found that "it did not produce enough negroes, women,

working class persons, or people from the City of Newark." *Id*. at 276. It was

therefore recommended to the jury commissioner that he switch to a key man

system. He did, it did not produce more representative juries, so he switched

back to using voter lists. In finding an equal protection violation, the Third

Circuit observed:

> [T]he general selection of the petit jury lists is potentially suspect
> because the Jury Commissioners persisted in using the voting lists after
> they were told by the Assignment Judge that the lists were not producing
> a cross-section of the community. While it is one thing to use a random
> selection procedure on the good faith assurance that it will produce a
> cross-section of the community, it is a far different problem if the facts
> reveal that the Jury Commissioners persisted in using that method when
> they knew it was not going to produce the requisite cross-section. Such a
> set of facts, if proved, might well raise a question of a denial of equal
> protection.

*Id*. at 278 n. 15.

The parallels between *Smith* and the situation this Court faced after

the Third Circuit recommended that voter lists be supplemented are obvious.

That case, along with the many factual circumstances and legal principles set

forth in this motion, lead the defense in this capital case to the conclusion

that good and strong grounds exist to challenge the jury selection system in

this district. More specifically, based on the investigation conducted to date,

and without yet having full access to all the jury records that the defense has requested from the Court, Mr. Bowers believes, for the reasons discussed below, that there are meritorious reasons to raise the type of broad source list fair cross-section challenge that was at issue in *United States v. Green*, 389 F. Supp. 2d 29, 58-59 (D. Mass. 2005), *overruled on other grounds by In re United States*, 426 F.3d 1 (1st Cir. 2005), where the court found a substantial violation of the fair cross-section requirement of the JSSA and noted:

> What is novel about defendants' fair cross-section challenge is their evidence of systematic defects in the way the source lists (resident lists) are prepared. Defendants present persuasive quantitative evidence that, as a result of these defects, the resident lists are not functioning as the Jury Plan assumed they would. In addition, the questionnaires that were sent to every city and town bolster the conclusion that the cities and towns vary in the way they update their annual lists—if they prepare annual lists at all. As a result, instead of capturing an accurate cross-section of the community, the resident lists are skewed because officials in some towns (white, affluent, and suburban) are doing a better job of continually updating and improving their lists than are officials in other towns (African-American, poor, and urban).

> Defendants document three phenomena that cause African-American underrepresentation: 1) overall, the resident lists undercount African-Americans from the outset; 2) many of the resident lists are not improved and updated annually, as required by state law, resulting in a disproportionately high rate of undeliverables (and nonresponses) in heavily African-American, poor, and urban communities, where geographic mobility is high; 3) the decision of some cities—notably Boston—to purge inactive voters from their resident lists, while other cities and towns

18

include inactive voters on their resident lists, aggravates undeliverable and nonresponse rates.[10]

---

[10] In *In re United States*, the First Circuit held that the remedy for the JSSA violation adopted by trial judge, which required the mailing of a second-round of summonses to specific geographic areas when juror questionnaires were not returned from those areas, violated the "equal odds" requirement of the local plan because the supplemental draw, constrained by the preferences for those in certain in certain zip codes, did not give equal odds of selection to every name in the master wheel. *In re United States*, 426 F.3d at 6. The court further held that the judge's adoption of such a remedy amounted to a *de facto* amendment of the plan, and that "the failure formally to amend the plan by vote of the whole court is not a defense of the present order but its vice .... The statute provides for the district court as a whole and then the review panel to consider plan changes in the first instance. 28 U.S.C. § 1863(a)." *Id.* at 7-9. The court issued a writ of mandamus directing the district court not to implement its remedial order but added: "Yet there is assuredly cause for concern ... where African-American defendants have been indicted for major crimes, and the proportion of blacks who return jury questionnaires is half the percentage to be expected from their presence in the division of the district concerned. The district court has always been free to revise its jury plan in compliance with the statute." *Id.* at 9. As pointed out *Systematic Negligence in Jury Operations* 778 n. 99, "[i]n 2006, the United States District Court for the District of Massachusetts amended its jury plan to respond to an undeliverable summons by sending an additional summons to the same zip code."

This same procedure was added to this Court's jury plan in March 2020. *See Plan of the United States District Court for the Western District of Pennsylvania for the Random Selection of Grand and Petit Jurors* (March 2020) (2020 Jury Plan) at 7. For the reasons stated in *In re United States,* Mr. Bowers contends that this amendment violated the "equal odds" requirement of the local plan because the supplemental draw, constrained by the preferences for those in certain in certain zip codes, did not give equal odds of selection to every name in the master wheel, and that this violation is a substantial failure to comply with the JSSA. The 2020 Jury Plan itself does not indicate why this change was made and the Court has so far denied without prejudice Mr. Bowers' motion for Rule 17 subpoenas to gain access to this information. ECF 533. By this motion, Mr. Bowers again seeks permission to issue Rule 17 subpoenas for the specific information sought in his prior Rule 17 motion because such information would shed light on why

Mr. Bowers believes that the attached exhibits establish the same type of "persuasive quantitative evidence" that was determinative in *Green*.[11] In addition, the exhibits and discussion below demonstrate that there are constitutional and statutory grounds for a challenge that go beyond the fair cross-section requirement of the Fifth and Sixth Amendment and the JSSA. These claims are based on the requirements of accuracy, inclusiveness, proportionality, randomness, and reliability. These challenges were also determinative in *Green,* and the legal basis for them is explained in more detail below.

The importance to the defense in this capital case of maintaining this challenge cannot be overemphasized. *Green*, too, was a capital case, and the implications of that fact were not lost on Judge Gertner:

---

the prior jury plan was amended to specifically include this change. If, for instance, the change was made because of long-standing problems of the type identified in *Green*, documentation of those problems would be highly relevant to the present motion to dismiss the Superseding Indictment.

[11] Moreover, unlike in *Green*, Mr. Bowers' motion is not focused solely on the source list, or solely on African-Americans. He believes that he has established significant and long-standing underrepresentation of African-Americans, African-American men, Hispanics, and those who do not identify themselves as non-Hispanic Whites, and that such underrepresentation exist in the source lists, the master lists, the qualified jury lists, and in grand jury venires. He also asserts constitutional challenges to the eligibility criteria of the JSSA and shows substantial failures to comply with the Act. As argued below, alll of the foregoing groups are "distinctive groups" for purposes of the Fifth and Sixth Amendments and the JSSA""S

20

> The stakes could not be higher. Undermining the right to a representative jury casts a pall over all jury trials in our District. The issue is particularly important for the capital jury, not only because of the stakes, but also because of that jury's unique role. It renders not simply a factual judgment—guilt or innocence—but "an ethical judgment expressing the conscience of the community." Jeffrey Abramson, *Death–Is–Different: Jurisprudence and the Role of the Capital Jury*, 2 Ohio St. J. Crim. L. 117, 119 (2004) (citing *Spaziano v. Florida*, 468 U.S. 447, 469, 104 S. Ct. 3154, 82 L.Ed.2d 340 (1984) (Stevens, J., concurring in part and dissenting in part)). And, as Justice Marshall eloquently noted, "[w]hen any large and identifiable segment of the community is excluded ... the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable." *Peters v. Kiff*, 407 U.S. 493, 503, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) (Marshall, J.). The result is not merely the appearance of bias; it may well be its reality. *Id.*

*Green*, 389 F. Supp. 2d at 36.

Underscoring this same point, and following *Green* in calling for the reform of the federal jury selection system in a district where African-Americans have been chronically underrepresented in jury pools, the court in *United States v. Bates*, 2009 WL 5033928 (E.D. Mich. Dec. 15, 2009), stated:

> The need for reform is particularly urgent: in several cases pending in this Court, the Government either intends to seek, or is considering asking for, the death penalty. The right to a representative jury is essential to any defendant, but it is particularly important in capital cases, because the capital jury "renders not simply a factual judgment—guilt or innocence—but 'an ethical judgment expressing the conscience of the community.' " *Green*, 389 F.Supp.2d at 36–37 (quoting Jeffrey Abramson, *Death–Is–Different: Jurisprudence and the Role of the Capital Jury*, 2 Ohio St. J.Crim. L. 117, 119 (2004)) (citation and footnote omitted). Minority defendants account for a disproportionate number of federal capital prosecutions and death sentences. At the same time, empirical research suggests that racial composition

21

affects the likelihood that a jury will impose the death penalty[12]
The high stakes and disproportionate impact of capital cases are
reason enough to continue the search for ways to elevate minority
representation in juries above the constitutional floor.

*Bates*, 2009 WL 5033928 at *21.

In what follows, Mr. Bowers will set forth the relevant facts supporting

this motion and explore the implications of *Savage* and other relevant

decisions; explain to the Court the many constitutional and statutory reasons

why voter registration lists cannot be used as the sole source list in this

Court's jury selection plan; establish that such lists are insufficiently

inclusive, unrepresentative, substantially inaccurate and unreliable, not up

to date, and contain a significant number of duplicates; explain why such

conditions exist and why they lead to diminishing representativeness as

prospective jurors are moved from the source lists through the subsequent

stages of the jury selection process; and explain why dismissal of the

Superseding Indictment and a stay of proceedings is necessary and proper.

## STATEMENT OF FACTS

## I.    Introduction and Summary of Expert Conclusions

---

[12] In a footnote, the court states: "According to one study, 'in the absence of
black male jurors, death sentences were imposed in 71.9% of the cases, as
compared to 42.9% when one black male was on the jury." Laura G. Dooley,
*The Dilution Effect: Federalization, Fair Cross–Sections, and the Concept of
Community*, 54 DePaul L.Rev. 79, 108 (2004) (quoted in *Green*, 389
F.Supp.2d at 41 n. 19).

Mr. Bowers moves to dismiss the Superseding Indictment filed against him on January 29, 2019, on the ground, among others, that the all-White grand jury that returned the indictment was selected pursuant to this Court's 2009 Jury Plan, which mandated that voter registration lists be used as the sole source list from which the master and qualified jury lists were derived. *See Plan of the United States District Court for the Western District of Pennsylvania for the Random Selection of Grand and Petit Jurors* (April 1, 2009) ("2009 Jury Plan"). A grand jury selected in this way was not selected at random from a source comprised of a fair cross-section of the community and, therefore, the selection process violated the Fifth, Sixth, and Eighth Amendments to the Constitution, and substantially failed to comply with the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 et seq. ("the Act"), and this Court's Jury Plan. Moreover, because in its March 2020 Jury Plan the Western District has not abandoned its total reliance on voter registration lists as the sole source for jury names, any petit jury drawn in reliance on these lists would also violate the Fifth, Sixth, and Eighth Amendments, and would similarly fail to comply with the Act, and the 2020 Jury Plan, requiring a stay of proceedings until a properly drawn petit jury panel can be assembled pursuant to 28 U.S.C. §§ 1863(a) and 1867(a). *See Plan of the United States District Court for the Western District of*

*Pennsylvania for the Random Selection of Grand and Petit Jurors* (March 2, 2020) ("2020 Jury Plan").[13]

This Court's 2009 and 2020 Jury Plans both provide that grand and petit jurors "shall be selected at random from the voter registration lists of all the counties within the relevant divisions." This means that the Jury Plans rely entirely on a single source – voter registration lists – to meet required constitutional and statutory standards.

---

[13] In *United States v. Savage*, 970 F. 3d at 261 n. 46, the Third Circuit stated:

> It is presumably the Eastern District's institutional role—not the role of Savage or the District Judge in this case—to conduct a study and make findings before deciding that voter registration lists must be supplemented with other sources. After all, the responsibility to create a jury-selection plan consistent with § 1861, and to modify it as needed, resides firmly with the respective district court under the supervision of a reviewing panel comprised of the circuit's judicial council and the district's chief judge or designee. 28 U.S.C. § 1863(a).

Thus, as in *In re United States*, 426 F.3d 1 (1st Cir. 2005), if this Court finds a violation of the Constitution or the JSSA affecting the grand or petit jury and is required to stay the proceedings, any stay would have to remain in effect until remedial changes in the Jury Plan were adopted and approved by the district court as a whole and then the review panel. That, anyway, was the position taken by the government in *In re United States*, where the First Circuit stated:

> Possibly a major departure from the existing plan by one judge might be justified if that plan were unconstitutional or in conflict with the JSSA. Such a situation would create a conflict between the substance of the plan and the procedure for altering it. The government says that in such a case the conflict-resolving solution would be to stay the trial and seek a formal amendment to the plan by the district court as a whole.

*Id*. at 7.

24

The original indictment in this case was returned on October 31, 2018, and the Superseding Indictment was returned on January 29, 2019. ECF 10, 44. According to an administrative order dated November 28, 2016, received from the Clerk of Court, a new Master Wheel used to summon grand jurors was filled on February 7, 2017 and was based on "the November 2016 Registration Rolls." Exhs. 11 & 12. According to the Clerk of Court's response to ECF 206, Nos. 5 & 6, on February 21, 2018, the 85 grand jurors who constituted the venire from which the grand jury that returned the Superseding Indictment in this case were summoned. Exh. 12.

According to the jury questionnaires and other documentation made available for inspection by the Clerk, there was only one African-American (a male) in this entire group of 85, and he was excused without any documented explanation. There were no Hispanics in the pool of 85. As indicated in the Martin Affidavit, "[t]he pool summoned to create the Grand Jury in this case is 1.19% Black or African-American persons, 1.19% Black or African-American males, and 0.00% Hispanic or Latino persons", and "[t]he 23 persons who comprise the Grand Jury in this case are 0.00% Black or African-American persons, 0.00% Black or African-American males, and 0.00% Hispanic or Latino." Exh. 2 at14, ¶¶ 75-76. The absolute disparity, comparative disparity, and statistical significance computations for the group of 85 and the group of 23 are set forth in charts at pages 15-17 of the Martin

25

Affidavit. Exh. 2 at 15-17.[14] Most notably, in the pool of 85, for African-Americans, there was an absolute disparity of -5.69%, a comparative disparity of 82.70%. *Id.* The percent of Black or African-American persons in this pool drawn from the Qualified Jury Wheel list differs from the percent of Black or African-American persons in the population by more than 2 (-2.06) standard deviations. *Id.*; *see Castaneda v. Partida*, 430 U.S. 482, 496 (1977). As a general rule for such large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist. Exh. 2 at 21-22.

But even more significantly, Mr. Martin was able to trace the root of pervasive, current, and historic disparities for African-Americans, African-American Men, and Hispanics back to the source list.

## II.     Summary of Findings

### A. The Defense Experts Found Significant Underrepresentation of Non-White Groups.

After conducting a detailed statistical analysis, Jeffrey Martin made the following findings:

> 5.     The source list of registered voters, the Master Jury Wheel, and the Qualified Jury Wheel used to select Grand Jurors in this case underrepresent Black or African-American persons, Black or African-

---

[14] These measures are described in detail in the Weeks Affidavit, Exh. 3, at 11-13.

American males, and Hispanic or Latino persons. The underrepresentation is statistically significant.

6. The underrepresentation of Black or African-American persons, Black or African-American males, and Hispanic or Latino persons continues and increases through the summoning of all grand jurors from the 2016 Wheel, the summoning of the pool of Grand Jurors in this case, and the Grand Jury in this case.

7. The largest single systematic factor in the underrepresentation of Black or African-American persons, Black or African-American males, and Hispanic or Latino persons is the selection of the voter registration list as the sole source of names.

8. Registered voters with an out-of-state alternate mailing address are excluded from receiving qualification questionnaires and from jury service. Because these registered voters are excluded from receiving qualification questionnaires, the effective proration of the counties is not proportional to the percentage of registered voters in the counties.

9. The underrepresentation of Black or African-American persons, Black or African-American males, and Hispanic or Latino persons in the voter registration lists, the Master Jury Wheel and the Qualified Jury Wheel has persisted historically.

Exh. 2 at 2-3.

Just how statistically significant the disparities were for these three groups at the source list level is indicated as follows:

126. The percent of Black or African-American persons in the source voter registration list differs from the percent of Black or African-American persons in the population by more than 111 standard deviations. In other words, the underrepresentation of Black or African-American persons in the source voter registration list is not the result of random factors, chance, or luck, but is the result of a systematic process that underrepresents Black or African-American persons.

Exh. 2 at 22-23.

27

130.   The percent of Black or African-American males in the source voter registration list differs from the percent of Black or African-American males in the population by more than 77 standard deviations. In other words, the underrepresentation of Black or African-American males in the source voter registration list is not the result of random factors, chance, or luck, but is the result of a systematic process that underrepresents Black or African-American males.

Exh. 2 at 23.

134.   The percent of Hispanic or Latino persons in the source voter registration list differs from the percent of Hispanic or Latino persons in the population by more than 46 standard deviations.  In other words, the underrepresentation of Hispanic or Latino persons in the source voter registration list is not the result of random factors, chance, or luck, but is the result of a systematic process that underrepresents Hispanic or Latino persons.

Exh. 2 at 24.

Extending this analysis, Dr. John Weeks looked at all of the grand jury pools for the period of 2015-2020. "This combined file [of 1,190 persons] provides us with enough jurors that we can draw statistically valid conclusions.'" Exh. 3 at 9. For the group of persons who did not identify themselves as Non-Hispanic White, he found an absolute disparity of -7.38, a comparative disparity of -54.60, and that the percent of this group in the combined pool differs from the percent of such persons in the population by more than 7 (-7.14) standard deviations. "In other words, there is less than one chance in 100,000 that this was a random finding. Put another way, this is highly statistically significant." Exh. 3 at 13.

For African-Americans, he found an absolute disparity of -4.18, a comparative disparity of -59.42, and that the percent of African-Americans in the combined pool differs from the percent of such persons in the population by more than 5 (-5.52) standard deviations. Exh. 3. at 16.

For African-American males, he found an absolute disparity of -2.05, a comparative disparity of -63.50, and that the percent of African-Americans in the combined pool differs from the percent of such persons in the population by more than 3 (-3.95) standard deviations. Exh. 3. at 16.

He found similar disparities when he analyzed the 2018 Master List. For the group of persons who did not identify themselves as Non-Hispanic White, he found an absolute disparity of -5.78, a comparative disparity of -42.76, and that the percent of this group in the 2018 Master List differs from the percent of such persons in the population by more than 27 (-27.11) standard deviations. Exh 3. at 29. For African-Americans, he found an absolute disparity of -2.96, a comparative disparity of -42.00, and that the percent of African-Americans in the 2018 Master List differs from the percent of such persons in the population by more than 18 (-18.85) standard deviations. Exh. 3. at 29. For African-American males, he found an absolute disparity of -1.63, a comparative disparity of -15.19, and that the percent of African-American males in the 2018 Master List differs from the percent of

such persons in the population by more than 18 (-18.85) standard deviations. Exh. 3. at 29.

He also analyzed a file containing the combined Qualified Jury Lists for the period 2015-2017. For the group of persons who did not identify themselves as Non-Hispanic White, he found an absolute disparity of -6.23, a comparative disparity of -46.09, and that the percent of this group in the combined Qualified Jury Lists differs from the percent of such persons in the population by more than 46 (-46.08) standard deviations. Exh. 3 at 33. For African-Americans, he found an absolute disparity of -2.97, a comparative disparity of -42.21, and that the percent of this group in the combined Qualified Jury Lists differs from the percent of such persons in the population by more than 29 (-29.95) standard deviations. Exh. 3 at 34. For African-American males, he found an absolute disparity of -1.79, a comparative disparity of -55.40, and that the percent of this group in the combined Qualified Jury Lists differs from the percent of such persons in the population by more than 26 (-26.24) standard deviations. Exh. 33 at 34.

From this data, Dr. Weeks concludes that "[i]t is very clear…that the Court's procedures are not generating representative jury pools." *Id.* at 16. Regarding the source lists, he concludes:

> Of considerable importance is that the CPS data show that in Allegheny County (which accounts for nearly half the population in the Pittsburgh Division), Non-Hispanic Blacks are much less likely to report that they

are registered voters (73%) than are Non-Hispanic Whites (83%). Thus, when the Clerk of the Court uses only the Voter Registration Lists, they are clearly less likely to include Non-Hispanic Blacks (and other Cognizable Groups) in the Master Jury Wheel to whom questionnaires are sent. This alone could account for the large disparities of Non-Hispanic Blacks and all Cognizable Groups in Allegheny County that I noted above in Tables 3, 4 and 5.

*Id*. at 18-19.

Regarding the Master and Qualified Lists, he concludes:

Of some interest is that the absolute disparity for all cognizable groups, based on responses to the JQQ from people on the Master Wheel (-5.78), is less than the absolute disparity calculated from the Qualified Wheel (-6.23), which itself is less than the absolute disparity calculated from the Grand Jury Pool (-7.38). Each step in the process leads to a lower proportion of prospective jurors who are members of a cognizable group, at least among those who respond. The pattern also holds for Non-Hispanic Blacks, where the absolute disparity does from -2.96 on the Master Wheel, to -2.97 on the Qualified Wheel to -4.18 on the Grand Jury Pool. And, not surprisingly, it also is present with respect to Non-Hispanic Black males, where the absolute disparity was -1.63 for the Master Wheel, -1.79 for the Qualified Wheel, and -2.05 for the Grand Jury Pool. This is, in fact, a pattern observed by researchers in the case of *United States v. Pritt* in the Middle District of Florida in 2010. As Rose and Abrahamson reported in 2011, the problem lies in "the bureaucratic indifference to the continual loss of prospective minority jurors as the district moves through the practical steps of mailing out forms summoning persons to jury duty, getting those summonses delivered to accurate addresses, and getting persons to respond to the summonses."

Exh. 3 at 34-35.

Dr. Weeks also concluded that the underrepresentations at the master wheel stags was explained at least in part by the facts that "the proportion of records from Allegheny County, which is home to 76 % of the Division's Non-Hispanic Black population, is smaller than it should be," and that "Zip codes

31

with larger numbers of Blacks are very disproportionately likely to have a smaller fraction of records on the master Wheel than on the …Voter List." Exh.3 at 22-23.

Both experts also found a long history of underrepresentation in jury pools in the Western District of Pennsylvania. Mr. Martin, referencing his earlier declaration in this case, points out that "[i]n that declaration I concluded that a historical analysis of the Qualified Jury Wheels in the Western District of Pennsylvania showed a persistent underrepresentation of African-American persons from 2009 through 2019 and in various other analyses from 1995, 1998, 2000, and 2002." Exh. 2 at 2 (citing ECF 33-2). Following the submission of that declaration, he was given access to the AO-12 forms dating back to 1995. Based on an analysis of those forms alone, Mr. Martin concludes that "[t]he underrepresentation of Black or African-American persons has persisted since 1995," the underrepresentation of Black or African-American males "has persisted since 2007," and the underrepresentation of Hispanics "has persisted since 2016." Exh. 2 at 30.

Dr. Weeks made similar findings:

76.    The disparities discussed above in this declaration do not represent a new phenomenon in the Pittsburgh Division of the Western District of Pennsylvania. I made this clear in my first declaration in this case back in October 2020, focusing especially on the underrepresentation of Blacks in the jury pools of the Pittsburgh Division (ECF 333-1) (Appendix B to this declaration).

77.    I have reformatted Table 4 from that earlier declaration to make it consistent with the tables in this document. As can be seen in Table 17, the disparity with respect to Blacks has existed since at the least the mid-1990s and it has increased over time, rather than becoming smaller.

Exh. 3 at 35-36.

He also points out that the Clerk of Court's tracking of jury demographics through AO-12 forms is seriously flawed:

[T]he AO 12 form does not cross-tabulate the Race and Ethnic questions in the way that these data are always cross-tabulated by the Census Bureau and other government agencies, since they are not mutually-exclusive categories. This cross-tabulation must be done in order to make proper use of the answers to those two separate questions….

The "Data Collection Instructions" on the AO 12 form include the suggestion that "[Y]ou may also provide a demographic breakdown of jury wheel data with unknown demographic data removed in order to provide a more accurate comparison of the known demographic breakdown of jury wheel data with citizen population data." There is no support in the statistical literature for this kind of assertion that such a calculation will be "more accurate." Rather, a high non-response rate to the race/ethnic questions should be a signal to the Clerk of the Court to exercise greater due diligence in collecting these data….

Calculating disparities from the AO 12 forms is also hampered by the fact that the Court does not use the most recent and appropriate demographic data from the Census Bureau. These numbers are supposed to be provided by the Administrative Office using Census Bureau information for every county of the district, but the AO 12 forms typically do not indicate the source or date of that information, nor do they have data by county….

An additional flaw with the AO 12 form is that it fails to collect any information about religion. The Third Circuit ruled long ago that recognized religious groups such as Catholics are a "classifiable category of our society which cannot be wrongfully excluded." [citing *Dow v. Carnegie-Illinois Steel Corp.*, 224 F. 2d. 414 (3rd Cir. 1955)]. A 2020 Pew Research Survey indicates that one in three (32%) adults in the

33

Pittsburgh Metropolitan Area is Catholic.  Because the AO 12 form does not ask about a person's religion in the same way that race and ethnic data are collected, there is no way short of an independent jury survey to ascertain whether Catholics or any other cognizable religious groups are being improperly excluded.

Exh. 3 at 36-38.

## B. The Voter Registration List is a Major Source of the Underrepresentation of Minority Groups.

Agreeing with Mr. Martin and Dr. Weeks, the Scholars' Report

highlights the source list as a major source of the underrepresentations

documented by the experts:

Recommended modification: Modify the Jury Plan to provide for the addition of other source lists.

Why this modification will help ensure jury diversity: The voter registration list is underinclusive of the population generally, and underrepresents people of color in particular; thus a jury pool sourced only from the voter list will likely be racially and ethnically underrepresentative.

Using the voter registration list as the exclusive source of juror names is inconsistent with best practices because it is underinclusive of the District's population. As recommended by the National Center for State Courts, the master jury list should "include 85% or more of the jury eligible population." Yet only 74.1% of Pennsylvania's population is registered to vote. In some counties in the Western District of Pennsylvania the voter registration rate is even lower. In Forest County, for example, where 25.9% of the population is African-American, the voter registration rate is only 53%. A number of counties in the Pittsburgh Division also have a voter registration rate that falls short of 85%: for example, the voter registration rate in Fayette County is 76%, in Greene County it is 75.9%, and in Indiana County only 71.4% of the population is registered to vote. Because the voter registration list used by the Western District of Pennsylvania fails to include 85% of the District's population – in fact more than 25% of the District's population

> is omitted - it is underinclusive. The voter registration list, moreover, fails to include even some people who have registered to vote. For example, 157,690 people who had registered to vote were removed from Pennsylvania's voter registration rolls in 2020 through the "Voter Removal Program" which removes voters when "[t]he voter did not respond to a list maintenance mailing and two federal general elections passed."
>
> Importantly, the voter registration lists underrepresents people of color. The most recent data from the United States Census shows that in Pennsylvania the voter registration rate varies by race and ethnicity. Specifically, the voter registration rate for the White non-Hispanic population is 77.3%, but the voter registration rate for the Black non-Hispanic population is 72%, the rate for the Hispanic population is 49.3%, and the rate for the Asian population is 38%.[8] A jury pool constituted from the voter registration list therefore likely underrepresents people of color.

Exh. 1 at 2-3.

According to the U.S. Census Bureau, since at least the November 1980 election and continuing through the November 2020 election, voter registration in the nation has *never* reached more than 80% of the adult population, and African-Americans, Hispanics, and Asians have *always* been substantially under-represented on the registered voter lists compared to non-Hispanic whites.  The diagram below from the Census Bureau illustrates

this point vividly: [15]



In addition, according to the U.S. Census Bureau, since at least the

November 1998 election and continuing through the November 2020 election,

African-Americans, Hispanics, and Asians have almost consistently been

underrepresented on the registered voter lists in Pennsylvania compared to

non-Hispanic whites, with no groups reaching 80 percent registration. The

---

[15] Available at:
https://www.census.gov/content/dam/Census/library/visualizations/time-series/demo/a6-presidential.jpg.)

chart below shows the percentage of age-eligible, citizens for each group that are registered to vote:

| Year [16] | % Eligible **White** (non-Hispanic) Registered to vote | % Eligible *Blacks* (non-Hispanic) Registered to vote | Disparity between African-American and non-Hispanic White registration rates | % Eligible **Hispanics**[17] Who are Registered to Vote | Disparity between Hispanic and non-Hispanic White registration rates | % Eligible **Asian**[18] (non-Hispanic) Registered to vote | Disparity between Asian and non-Hispanic White registration rates |
|---|---|---|---|---|---|---|---|
| November 1998 | 62.7 | 61.0 | **-1.7%** | 43.7 | **-19.0%** | 13.8 | **-48.9 %** |
| November 2000 | 66.2[19] | 70.2[20] | +4.0 % | 39.8 | **-26.4** | 30.7 | **-35.5 %** |
| November 2002 | 63.8 | 57.1 | **-6.7%** | 35.3 | **-28.5%** | 22.2 | **-41.6%** |
| November 2004 | 72.1 | 61.3 | **-10.8%** | 37.5 | **-34.6%** | 28.7 | **-43.4%** |
| November 2006 | 67.4 | 50.3 | **-17.1%** | 43.4 | **-24.0%** | 46.5 | **-20.9%** |
| November 2008 | 71.1 | 66.6 | **-4.5%** | 59.3 | **-11.8%** | 39.0 | **-32.1%** |

[16] All data is taken from U.S. Census Bureau, *Reported Voting and Registration, by Sex, Race, and Hispanic Origin, for States* (November 2000-November 2020) (Table 4b), available at https://www.census.gov/topics/public-sector/voting/data/tables.2016.List_1863097513.html.

[17] This figure includes Hispanics of any race.

[18] According to the Census, "Asian" refers to a person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent, including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

[19] The margin of error for this estimate is 1.6.

[20] The margin of error for this number is 5.9.

| November 2010 | 77.8 | 76.5 | **-1.3%** | 61.4 | **-16.4%** | 51.4 | **-26.4%** |
|---|---|---|---|---|---|---|---|
| November 2012 | 65.8 | 61.2 | **-4.6%** | 47.9 | **-17.9** | 53.5 | **-12.3%** |
| November 2014 | 73.1 | 71.8 | **-1.3** | 55.3 | **-17.8** | 61.7 | **-11.4%** |
| November 2016 | 72.5[21] | 74.5[22] | +2.0% | 62.9 | **-9.6%** | 61.8 | **-10.7%** |
| November 2018 | 71.2 | 63.5 | **-7.7%** | 41.2 | **-30.0%** | 46.0 | **-25.2%** |
| November 2020 | 77.8 | 76.5 | **-1.3** | 61.4 | **-16.4%** | 51.4 | **-26.4%** |

The Supreme Court aptly summarized the problem with using voter lists to select jurors: "[T]he fair-cross-section requirement involves a comparison of the makeup of jury venires or other sources from which jurors are drawn with the makeup of the community, not of voter registration lists." *Duren v. Missouri*, 439 U.S. 357, 365 n.23 (1979).

## C. Pennsylvania's Voter Registration Lists are Problematic in Many Ways.

Under this Court's 2009 and 2020 Jury Plans, "names of grand and petit jurors selected to serve on or after the effective date of this Plan shall be selected at random from the voter registration lists of all the counties within the relevant divisions," and "[v]oter registration lists are exclusively obtained

---

[21] The margin of error for this estimate is 1.7.

[22] The margin of error for this estimate is 5.5.

electronically from the Statewide Uniform Registry of Electors ("SURE")

through the Department of State for all the appropriate jurisdictional

counties." 2009 Jury Plan at 3; 2020 Jury Plan at 3. If those lists are

inaccurate or unreliable, then the whole jury system is tainted. *See*

*Rabinowitz v. United States*, 366 F.2d 34, 60 (1966) ("When the basic jury list

[is] poisoned, the fruits of that list [are] also infected. To cure the infection, it

is necessary to start the process anew."). *See also* National Research Council,

*Improving State Voter Registration Databases: Final Report* 63 (2010) ("NRC

Report") ("Voter registration lists are used for a number of purposes other

than establishing the eligibility of an individual to vote in an election. For

example, voter registration lists are used…., at least in part, to establish jury

pools. All of these uses require voter registration information to be as

accurate and complete as possible.")[23]

SURE is "a single, uniform integrated computer system" created by the

Pennsylvania legislature which "[c]ontain[s] a database of all registered

electors in this Commonwealth" and is designed to "[e]nsure the integrity and

accuracy of all registration records in the system by prohibiting unauthorized

entry, modification or deletion of registration records." 25 Pa.C.S. §§

---

[23] https://www.eac.gov/documents/2010/5/14/improving-state-voter-registration-databasesfinal-report.

1222(c)(1), (2). The numerous flaws in the administration of this system in the period January 1, 2016 to December 13, 2019 are well documented in the attached Exh. 4, a 192-page audit report authored by Pennsylvania's Auditor General entitled *Performance Audit Report: Pennsylvania Department of States: Statewide Uniform Registry of Electors* (Dec. 13, 2019) ("Audit Report"); *see Applewhite v. Com.*, No. 330 M.D. 2012, 2014 WL 184988, at *13 (Pa. Commw. Ct. Jan. 17, 2014) ("DOS' reliance upon the accuracy and completeness of the SURE Database is unreasonable given the inherent and acknowledged inaccuracies, missing and outdated information it contains.... That Respondents [Commonwealth and DOS] presented the flaws in the SURE Database as grounds to discredit Dr. Siskin is particularly telling..... If the SURE Database is as outdated, flawed, and riddled with inaccuracies or incomplete information, then it is not a proper ground for denying the free ID to which all registered electors are legislatively entitled as a means of ensuring qualified electors' right to vote.") The findings of the Pennsylvania audit are discussed below.

The Court's own experience with DOS has consistently put into jeopardy its ability to refill the Master Wheel every two years, as mandated by the Jury Plan. An administrative order provided by the Clerk of Court dated May 16, 2007, and signed by this Court, states that "the required Commonwealth of Pennsylvania Certification was delayed by the

40

Department of State causing unforeseen delays for the Clerk to begin creating a Master Jury Wheel." Exh. 13. Almost identically worded orders were entered by this Court on May 28, 2009, by Judge Lancaster on by May 25, 2011, and by Judge Hornack on May 30, 2019. Exh. 13.

Problems with the SURE system began to be documented as early as 2010. In 2010, the Election Assistance Commission reported to Congress that in the period 2005-2006 Pennsylvania had the highest by far in any state in the nation of rejecting voter registration applications (451, 222 rejected applications):

**2006 Election Administration and Voting Survey**
**Table 3. Applications Processed**    "*" = jurisdiction is exempt from NVRA.

| State | Election Juris. in Survey | Reported Registration 2006 | Applications Received 2004 to 2006 | Cases | Change of Address, Name, or Party Total | Cases | Pct. | Duplicate Applications Total | Cases | Pct. | Invalid or Rejected Applications Total | Cases | Pct. | New Registrants Added to Voter List 2004 to 2006 | Cases | % of App. Rec'd. | % of Report. Reg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | 67 | 2,469,807 | | 67 | 0 | 0 | 0.0 | 0 | 0 | ...... | 0 | 0 | ...... | | | 0.0 | 0.0 |
| Alaska | 1 | 466,258 | 235,249 | 1 | 159,170 | 1 | 67.7 | 19,143 | 1 | 8.1 | 6,449 | 1 | 2.7 | 50,487 | 1 | 21.5 | 10.8 |
| Arizona | 15 | 2,568,401 | 1,060,201 | 15 | 449,976 | 15 | 42.4 | 25,386 | 12 | 2.4 | 4,885 | 10 | 0.5 | 355,484 | 15 | 33.5 | 13.8 |
| Arkansas | 75 | 1,615,271 | 448,540 | 75 | 397,631 | 74 | 88.7 | 130 | 75 | 0.0 | 120 | 75 | 0.0 | 92,886 | 74 | 20.7 | 5.8 |
| California | 58 | 15,837,108 | 3,303,549 | 58 | 858,277 | 33 | 26.0 | 130,849 | 33 | 4.0 | 301,745 | 22 | 9.1 | 1,863,622 | 37 | 56.4 | 11.8 |
| Colorado | 64 | 3,000,836 | 1,256,354 | 64 | 784,772 | 64 | 62.5 | 88,315 | 64 | 7.0 | 0 | 57 | 0.0 | 383,271 | 64 | 30.5 | 12.8 |
| Connecticut | 1 | 1,941,467 | 186,536 | 8 | 0 | 0 | ...... | 0 | 0 | ...... | 0 | 0 | 0.0 | 186,536 | 8 | 100.0 | 9.6 |
| Delaware | 3 | 557,736 | 233,741 | 3 | 86,800 | 3 | 37.1 | 77,811 | 3 | 33.3 | 0 | 2 | 0.0 | 49,825 | 3 | 21.3 | 8.9 |
| District of Columbia | 1 | 395,926 | 0 | 1 | 0 | 0 | ...... | 0 | 0 | ...... | 0 | 0 | ...... | 31,203 | 1 | | 7.9 |
| Florida | 67 | 10,433,148 | 1,808,831 | 67 | 922,605 | 67 | 51.0 | 16,849 | 66 | 0.9 | 57,528 | 67 | 3.2 | 1,208,286 | 67 | 66.8 | 11.6 |
| Georgia | 159 | 4,408,840 | 1,583,643 | 159 | 494,555 | 159 | 31.2 | 339,416 | 159 | 21.4 | 5,733 | 155 | 0.4 | 906,634 | 159 | 57.2 | 20.6 |
| Hawaii | 4 | 662,728 | 193,158 | 4 | 91,368 | 4 | 47.3 | 35,588 | 4 | 18.4 | 6,553 | 3 | 3.4 | 42,252 | 3 | 21.9 | 6.4 |
| Idaho* | 44 | 764,880 | 207,062 | 44 | 0 | 0 | ...... | 0 | 0 | ...... | 0 | 0 | ...... | 207,062 | 44 | 100.0 | 27.1 |
| Illinois | 110 | 7,375,688 | 1,802,945 | 110 | 240,165 | 80 | 13.3 | 56,714 | 83 | 3.1 | 12,924 | 64 | 0.7 | 819,854 | 99 | 45.5 | 11.1 |
| Indiana | 92 | 4,295,687 | 472,888 | 92 | 165,062 | 92 | 34.9 | 13,340 | 92 | 2.8 | 3,132 | 92 | 0.7 | 205,512 | 92 | 43.5 | 4.8 |
| Iowa | 99 | 2,077,239 | 867,463 | 1 | 158,449 | 1 | 18.3 | 3,677 | 1 | 0.4 | 20,789 | 1 | 2.4 | 430,369 | 1 | 49.6 | 20.7 |
| Kansas | 105 | 1,663,017 | 512,244 | 105 | 9,016 | 62 | 1.8 | 9,738 | 72 | 1.9 | 0 | 1 | 0.0 | 232,705 | 105 | 45.4 | 14.0 |
| Kentucky | 120 | 2,766,288 | 1,211,758 | 120 | 1,002,459 | 1 | 82.7 | 0 | 0 | 0.0 | 77,182 | 1 | 6.4 | 209,299 | 1 | 17.3 | 7.6 |
| Louisiana | 64 | 2,890,891 | 583,353 | 64 | 117,092 | 64 | 20.1 | 48,142 | 64 | 8.3 | 38,974 | 64 | 6.7 | 269,980 | 64 | 46.3 | 9.3 |
| Maine | 16 | 993,748 | 154,674 | 16 | 0 | 0 | 0.0 | 6,709 | 16 | 4.3 | 0 | 0 | 0.0 | 121,997 | 16 | 78.9 | 12.3 |
| Maryland | 24 | 3,142,591 | 1,433,363 | 24 | 489,341 | 24 | 34.1 | 23,020 | 24 | 1.6 | 0 | 0 | 0.0 | 379,408 | 24 | 26.5 | 12.1 |
| Massachusetts | 14 | 3,990,505 | 408,798 | 14 | 0 | 0 | 0.0 | 4,505 | 6 | 1.1 | 0 | 0 | 0.0 | 0 | 0 | 0.0 | 0.0 |
| Michigan | 83 | 7,180,778 | 2,605,379 | 83 | 769,960 | 83 | 29.6 | 311,727 | 83 | 12.0 | 2,946 | 83 | 0.1 | 1,522,782 | 83 | 58.4 | 21.2 |
| Minnesota* | 87 | 3,118,398 | 0 | 87 | 0 | 0 | ...... | 0 | 0 | ...... | 0 | 0 | ...... | 186,667 | 87 | | 6.0 |
| Mississippi | 82 | 1,778,245 | 89,405 | 82 | 23,668 | 18 | 26.5 | 2,335 | 18 | 2.6 | 299 | 18 | 0.3 | 400,696 | 35 | 448.2 | 22.5 |
| Missouri | 116 | 4,007,174 | 727,300 | 116 | 276,400 | 113 | 38.0 | 30,464 | 100 | 4.2 | 8,010 | 113 | 1.1 | 521,216 | 115 | 71.7 | 13.0 |
| Montana | 56 | 649,436 | 84,138 | 56 | 1,022 | 56 | 1.2 | 2,011 | 56 | 2.4 | 1,077 | 56 | 1.3 | 72,181 | 56 | 85.8 | 11.1 |
| Nebraska | 93 | 1,138,422 | 334,983 | 93 | 282,460 | 93 | 84.3 | 7,072 | 72 | 2.1 | 2,615 | 69 | 0.8 | 106,315 | 93 | 31.7 | 9.3 |
| Nevada | 17 | 991,054 | 255,072 | 17 | 26,559 | 5 | 10.4 | 2,280 | 3 | 0.9 | 8,076 | 5 | 3.2 | 136,933 | 11 | 53.5 | 13.8 |
| New Hampshire* | 10 | 848,317 | 0 | 10 | 0 | 0 | ...... | 0 | 0 | ...... | 0 | 0 | ...... | 0 | 0 | | 0.0 |
| New Jersey | 21 | 4,848,956 | 808,794 | 21 | 264,656 | 11 | 32.7 | 26,315 | 11 | 3.3 | 8,224 | 11 | 1.0 | 409,835 | 17 | 50.7 | 8.5 |
| New Mexico | 33 | 1,088,977 | 127,428 | 33 | 20,459 | 9 | 16.0 | 0 | 0 | 0.0 | 0 | 4 | 0.0 | 53,028 | 16 | 41.6 | 4.9 |
| New York | 58 | 11,669,573 | 1,193,356 | 58 | 97,192 | 36 | 8.1 | 53,168 | 36 | 4.5 | 0 | 0 | 0.0 | 690,755 | 1 | 57.9 | 5.9 |
| North Carolina | 100 | 5,567,424 | 644,961 | 100 | 1,050 | 1 | 0.2 | 44,327 | 100 | 6.9 | 0 | 0 | 0.0 | 92,912 | 23 | 14.4 | 1.7 |
| North Dakota* | 53 | 491,000 | 0 | 53 | 0 | 0 | ...... | 0 | 0 | ...... | 0 | 0 | ...... | 0 | 0 | | 0.0 |
| Ohio | 88 | 7,860,052 | 1,886,819 | 88 | 682,403 | 88 | 36.2 | 129,267 | 87 | 6.9 | 12,528 | 85 | 0.7 | 841,226 | 87 | 44.6 | 10.7 |
| Oklahoma | 77 | 2,075,561 | 331,257 | 77 | 0 | 2 | 0.0 | 2,060 | 77 | 0.6 | 0 | 2 | 0.0 | 176,693 | 77 | 53.3 | 8.5 |
| Oregon | 36 | 1,976,669 | 551,587 | 36 | 218,546 | 35 | 39.6 | 47,201 | 35 | 8.6 | 0 | 0 | 0.0 | 188,179 | 36 | 34.1 | 9.5 |
| Pennsylvania | 67 | 8,182,876 | 3,117,883 | 67 | 889,709 | 67 | 28.5 | 279,616 | 67 | 9.0 | 451,222 | 67 | 14.5 | 794,910 | 67 | 25.5 | 9.7 |
| Rhode Island | 5 | 682,344 | 96,686 | 5 | 5,961 | 5 | 6.2 | 2,639 | 5 | 2.7 | 0 | 0 | 0.0 | 96,686 | 5 | 100.0 | 14.2 |
| South Carolina | 46 | 2,452,718 | 293,027 | 46 | 0 | 0 | 0.0 | 0 | 0 | 0.0 | 0 | 0 | 0.0 | 13,994 | 2 | 4.8 | 0.6 |
| South Dakota | 66 | 503,086 | 99,308 | 66 | 34,228 | 26 | 34.5 | 2,022 | 27 | 2.0 | 139 | 20 | 0.1 | 52,189 | 51 | 52.6 | 10.4 |
| Tennessee | 95 | 3,738,703 | 647,185 | 95 | 0 | 0 | 0.0 | 35,377 | 91 | 5.5 | 0 | 0 | 0.0 | 411,760 | 95 | 63.6 | 11.0 |
| Texas | 254 | 13,074,279 | 2,585,617 | 254 | 462,723 | 254 | 17.9 | 142,353 | 254 | 5.5 | 61,141 | 254 | 2.4 | 1,501,745 | 254 | 58.1 | 11.5 |
| Utah | 29 | 1,302,405 | 225,976 | 29 | 117,481 | 5 | 52.0 | 2,254 | 5 | 1.0 | 1,535 | 4 | 0.7 | 39,986 | 21 | 17.7 | 3.1 |
| Vermont | 14 | 433,572 | 0 | 14 | 0 | 0 | ...... | 0 | 0 | ...... | 0 | 0 | ...... | 0 | 0 | | 0.0 |
| Virginia | 134 | 4,555,940 | 1,046,818 | 134 | 262,866 | 1 | 25.1 | 73,104 | 1 | 7.0 | 43,034 | 1 | 4.1 | 702,672 | 1 | 67.1 | 15.4 |
| Washington | 39 | 3,264,511 | 443,798 | 39 | 74,324 | 16 | 16.7 | 101,684 | 17 | 22.9 | 2,081 | 14 | 0.5 | 192,195 | 29 | 43.3 | 5.9 |
| West Virginia | 55 | 1,137,371 | 93,283 | 55 | 0 | 0 | 0.0 | 0 | 0 | 0.0 | 0 | 0 | 0.0 | 0 | 0 | 0.0 | 0.0 |
| Wisconsin* | 72 | 3,543,725 | 0 | 72 | 0 | 0 | ...... | 0 | 0 | ...... | 0 | 0 | ...... | 0 | 0 | | 0.0 |
| Wyoming* | 23 | 263,083 | 15,733 | 23 | 0 | 1 | 0.0 | 0 | 1 | ...... | 0 | 1 | 0.0 | 20,678 | 23 | 131.4 | 7.9 |
| American Samoa* | 1 | 14,283 | 0 | 1 | 0 | 1 | ...... | 0 | 1 | ...... | 0 | 1 | ...... | 1,287 | 1 | | 9.0 |
| Guam* | 1 | | 0 | 1 | 0 | 1 | ...... | 0 | 1 | ...... | 0 | 1 | ...... | 0 | 0 | | |
| Puerto Rico* | 1 | | 0 | 1 | 0 | 0 | ...... | 0 | 0 | ...... | 0 | 0 | ...... | 0 | 0 | | |
| Virgin Islands* | 1 | 53,017 | 7,606 | 1 | 0 | 0 | 0.0 | 0 | 0 | 0.0 | 0 | 0 | 0.0 | 7,606 | 1 | 100.0 | 14.3 |
| **Sum of Above** | 3,123 | 172,810,009 | 36,277,749 | 3,025 | 10,938,385 | 1,669 | 30.2 | 2,196,606 | 1,933 | 6.1 | 1,138,955 | 1,422 | 3.1 | 17,281,234 | 2,165 | 47.6 | 10.0 |
| **States Included** | 53 | | 45 | | 35 | | | 37 | | | 27 | | | 46 | | | |
| **Maximum** | | 15,837,108 | 3,303,549 | | 1,002,459 | | 88.7 | 339,416 | | 33.3 | 451,222 | | 14.5 | 1,863,622 | | 131.4 | 27.1 |
| **Average** | | 3,260,566 | 806,172 | | 312,525 | | 33.2 | 59,368 | | 6.2 | 42,184 | | 2.5 | 375,679 | | 56.4 | 10.0 |
| **Minimum** | | 0 | 0 | | 0 | | 0.0 | 0 | | 0.0 | 0 | | 0.0 | 0 | | 0.0 | 0.0 |

U.S. Election Assistance Commission, *The Impact of The National Voter Registration Act On The Administration Of Elections For Federal Office, 2005-2006,* at 38 (May 25, 2010).[24]

As explained in the NRC Report, "[i]f the registrant is not already in the state's VRD [Voter Registration Database], the individual is considered to be a first-time applicant or someone whose previous voter registration was

---

[24] Available at https://www.eac.gov/documents/2010/05/25/impact-national-voter-registration-act-administration-elections-federal-4.

cancelled. HAVA requires certain procedures for verifying voter registration applications. With some exceptions specified in HAVA Section 303(b), applicants are required to provide a current and valid driver's license number (or a state-issued nondriver's identification) or, lacking one, the last four digits of their Social Security number (SSN)…. Currently, the state departments of motor vehicles and the Social Security Administration are using the first name, last name, month and year of birth, and last four digits of the SSN (SSN4) for the verification process. Under these agreements, the applicant's information can be verified against the information on file with the DMV or the SSA." NRC Report at 8.

The NRC Report further notes that:

Once it is known that an application is not a duplicate, and not just a change of address or party, the application needs to be checked against the relevant databases. Table 12, "Verification of Applications," on page 72 in the EAC report shows that each state has its own unique set of criteria for verifying the applications, ranging from states like Pennsylvania, which verifies only through the DMV and the SSA, to Montana, which verifies against the DMV, the SSA, Vital Records, "Match Against Voter Registration Databases," "Tracking Returned Voter ID Cards," "Tracking Returned Disposition Notices," and "Verify Through Other Agency." …

Consider two points. First, the state with the highest rate of "invalid or rejected" applications (Table 3, p. 38, in the EAC report)[Pennsylvania] also reported in this survey that it verifies application information only through the DMV and the SSA (Table 12). Second, the state reporting in this survey the highest percentage of applications rejected because they were duplicates [Georgia] also reports in this survey that it only date of birth and names provided by the applicant to identify duplications (Table 13 in the EAC report). These points do not prove a causal relationship

43

> between use of a small number of non-VRD databases or a small number
> of fields in verification and a high percentage of rejected applications, but
> presuming that the data reported are valid and accurately reported,
> these points raise the question of how a broader set of criteria would have
> changed the percentage of applications rejected.

*Id*. at 69-70.

The NRC Report also notes that "[c]urrently, the state departments of motor vehicles and the Social Security Administration are using the first name, last name, month and year of birth, and the last four digits of the SSN…for the verification process." *Id*. at 8. Under this methodology, a registration application cannot be verified unless all of these fields are an exact match. *Id*. at 70. The NRC Report notes that "to the best of the committee's knowledge, no testing of match criteria was conducted in advance of deployment, and the error rates that such a strategy would entail were unknown at the time of deployment." *Id*.

To illustrate the problems with such a methodology, the NRC Report posits the example of a single individual who submits a registration is listed on the SSA database as follows:

| **New Registration Card** | **SSA Record** |
| --- | --- |
| Tom T. Bowden | Taylor T. Bowden |
| 3121 Escondido Way | |
| 11/04/77 | 11/04/77 |
| SSN 000001087 | SSN 000001087 |

In this example, although the two persons are one and the same, "[i]n this case, the SSA would return a response of 'no match found.'" *Id.* at 71. The result would be that the application to register would be rejected, or, in the case of the same methodology being used for duplicate determination, the duplicate would not be found. For this reason, the NRC recommended to states that they "[u]pgrade the match algorithms and procedures used by election officials, the Social Security Administration, and departments of motor vehicles." *Id.* at 45. The NRC report explained:

> To the best of the committee's knowledge, many (if not most) of the matching procedures used by the states have been developed on the basis of intuitive reasoning without further systematic validation or mathematically rigorous analysis, do not reflect the state of the art in matching techniques, and have not been validated scientifically, in the market, or otherwise. The best computer matching procedures that have been developed and compared by both researchers and industry do not appear to be widely used by the states for voter registration purposes…. The enhanced methods should improve (1) the capability for locating of duplicates in a state's VRD, (2) the matching of voters against the state DMV file and the SSA files, and (3) the matching of registered voters against any secondary federal or state list (for example, of deaths, felons, and so on).

*Id.* at 45.

As of the Inspector General's Audit in 2019, this recommendation had not been implemented in Pennsylvania. *See* Audit Report at 48-49.

In July 2013, there was an extensive trial conducted concerning the constitutionality of Pennsylvania's Voter-ID law, with the trial court ultimately ruling that the law was unconstitutional, a ruling that the state

did not appeal. *Applewhite v. Com.*, No. 330 M.D. 2012, 2014 WL 184988 (Pa. Commw. Ct. Jan. 17, 2014). During the trial, one of the plaintiff's experts used the SURE database to make statistical comparisons. Remarkably, the Respondents (Commonwealth of Pennsylvania, Governor, and DOS) took the position, and called an expert to establish, that the statistical comparisons were invalid because the SURE database was unreliable and riddled with errors. At the conclusion of the trial, the trial court entered detailed findings of fact and conclusions of law. One of his conclusions of law was that

> DOS' reliance upon the accuracy and completeness of the SURE Database is unreasonable given the inherent and acknowledged inaccuracies, missing and outdated information it contains. See F.F. Nos. 92, 94, 95, 98, 99, 142. That Respondents presented the flaws in the SURE Database as grounds to discredit Dr. Siskin is particularly telling. F.F. No. 99. If the SURE Database is as outdated, flawed, and riddled with inaccuracies or incomplete information, then it is not a proper ground for denying the free ID to which all registered electors are legislatively entitled as a means of ensuring qualified electors' right to vote.

*Id.* at * 13. The referenced Findings of Fact are as follows:

> 91. Deceased voters are generally identified when reported to the Department of Health (DOH). DOH records of deceased voters are backlogged by several months which can total tens of thousands of records. The information comes in electronic batches. *"Id.* at * 38.)

> 94. There is a lag time for some County Boards of Elections, especially the larger counties, between the time an application for voter registration is received and the time that it is processed. Hr'g Tr., 7/17/13, at 568–569 (Marks). *"Id.* at * 38.)

> 95.    Registration backlogs, of two to three weeks, and more, are more pronounced in election years and in Pennsylvania's most populous

counties, Philadelphia and Allegheny. Hr'g Tr., 7/17/13, at 568–69
(Marks) *Id.* at * 39.)

98.    The SURE Database contains at least 130,189 invalid driver's
license numbers, likely due to data entry errors. Hr'g Tr., 7/30/12, at 907–
09 (Burgess). Also, SSNs are missing for approximately 748,000
registered voters. Hr'g Tr., 7/16/13, at 131 (Siskin); Pet'rs' Ex.2096a at 10
n.9. *Id.* at * 39.)

99.    Dr. Wecker [Respondents' expert] testified it is erroneous to rely
on the SURE Database because it does not actually correspond to real
Pennsylvania voters for the following reasons: (1) information obtained
from the DOH, Vital Statistics is backlogged so information regarding
deceased voters is outdated; (2) Database is not current as to out-of-state
migration; and,(3) many records are missing data. Hr'g Tr. 7/25/13, at
1454–63 (Wecker). *Id.* at * 39.)

142.    Respondents' evidence shows the information in theSURE
Database does not reflect the current registration status of qualified
electors: information is backlogged, as registrations are not recorded
timely; information is not accurate and/or consistent with regard to
elector status, addresses, and death records; and, the information is
incomplete as certain information is missing, see F.F. Nos. 92, 94–96, 98,
99 above (e.g., 130,189 invalid driver's license numbers).

*Id.* at *45.

According to the Auditor General's December 2019 Audit Report on the
SURE system, "SURE was designed to ensure the accuracy and integrity of
the Commonwealth's voter registration records maintained by the election
authorities in each of the 67 counties." Exh. 4 at 11. Following the *Applewhite*
trial, the integrity and accuracy of that system was further called into
question by a series of events beginning in 2017, as summarized in the audit:

In September 2017, the New York Times reported that earlier that
month, the United States Department of Homeland Security had

47

informed 21 states that their election systems had been ". . . targeted by hacking efforts possibly connected to Russia" during the 2016 Presidential election. The New York Times listed Pennsylvania as one of the states that informed the Associated Press that they had been targeted.

In May 2018, the United States Senate Intelligence Committee (Intelligence Committee) released an unclassified summary of its investigation into the matter, confirming that cyber actors affiliated with the Russian government scanned state systems extensively throughout the 2016 election cycle. These cyber actors made numerous attempts to access several state election systems and, in a small number of cases, actually accessed voter registration databases. The investigation also found that at least 21 states potentially had their election systems targeted in some fashion while other states reported suspicious or malicious behavior.

The targeting of state voter registration systems was confirmed by the Mueller Report, released in April 2019. This report found that officers of the Russian military intelligence agency used cyber hacking techniques during the 2016 presidential election to attack state boards of elections, secretaries of state, and county governments involved in the administration of elections, as well as individuals who worked for those entities.

Exh. 4 at 8-9.

More recently, "there has been concerning news of hacking the databases of all 50 states and federal officials have noted major concerns about Pennsylvania's system." *Id.* at 16. Additionally, "[v]arious members of [t]he state legislature voiced concerns regarding the security of Pennsylvania's voting systems," and, as early as November 2017, there was pending legislation that that would "require the Pennsylvania Department of the Auditor General (DAG) to audit the Pennsylvania Department of State's

(DOS) Statewide Uniform Registry of Electors (SURE)." *Id.* at 16. As a result of these developments, "DOS contacted DAG to discuss the pending legislation, and … it was agreed that DOS and DAG would enter into an Interagency Agreement (agreement) to conduct an audit which would accomplish the goals set forth in the proposed legislation." *Id.* at 16.

The audit covered the period January 1, 2016 through April 16, 2019, with updates through the report date, and focused on the audit objectives below, which were agreed upon and formalized in the agreement:

1. Assessment of whether records maintained within the SURE system are accurate and in accordance with the Help America Vote Act (HAVA) and Pennsylvania law.

2. Evaluation of the process for input and maintenance of voter registration records.

3. Review of the security protocols of the SURE system.

4. Review of the efficiency and accuracy of the SURE system.

5. Review of the internal controls, methodology for internal audits and internal audits review process.

6. Review of the external controls, methodology for external audits and external audits.

7. Review of the methodology for the issuance of directives and guidance to the counties by DOS regarding voter registration and list maintenance.

8. Any other relevant information or recommendations related to the accuracy, operability, and efficiency of the SURE system, as determined by the Auditor General.

Exh. 4, Introductory letter to Governor Wolf upon publication of the report,

Dec. 13, 2019.

After conducting an exhaustive investigation and analysis, the 184-

page audit report made seven key findings, three of which are most pertinent

here:

> Finding One: As a result of the Department of State's denial of access to critical documents and excessive redaction of documentation, the Department of the Auditor General was severely restricted from meeting its audit objectives in an audit which the Department of State itself had requested;

> Finding Two: Data analysis identified tens of thousands of potential duplicate and inaccurate voter records, as well as voter records for nearly three thousand potentially deceased voters that had not been removed from the SURE system;

> Finding Three: The Department of State must implement leading information technology security practices and information technology general controls to protect the SURE system and ensure the reliability of voter registration records.

> Finding Four: Voter record information is inaccurate due to weaknesses in the voter registration application process and the maintenance of voter records in the SURE system;

> Finding Five: Incorporating edit checks and other improvements into the design of the replacement system for SURE will reduce data errors and improve accuracy;

> Finding Six: A combination of a lack of cooperation by certain county election offices and PennDOT, as well as source documents not being available for seventy percent of our test sample, resulted in our inability to form any conclusions as to the accuracy of the entire population of voter records maintained in the SURE system. [25]

---

[25] The audit indicates that "four counties did not respond to our requests for

Finding Seven: The Department of State should update current job aids and develop additional job aids and guidance to address issues such as duplicate voter records, records of potentially deceased voters on the voter rolls, pending applications, and records retention.

Exh. 4 at i-ii.

Although all of these findings are important, Findings Two, Four, and Five warrant special emphasis because they bear directly on the accuracy and reliability of the SURE system. The Executive Summary in support of Finding Two states in part:

We requested SURE electronic files of all currently registered voters and the history of all of the changes made to voter records during the period January 1, 2016, to the present. We also requested copies of the Full Voter Export List for each county, which are available to the public through DOS' website. It took over three months for DOS to provide these electronic files. These files contained voter registration records for 8,567,700 registered voters as of October 9, 2018. Using these files, we performed data analysis to evaluate the information within SURE for reasonableness.

As a result of our data analysis, we identified potential inaccuracies, including:

● 24,408 cases where the same driver's license number was listed in more than one voter record.

● 13,913 potential duplicate cases.

● 6,876 potential date of birth (DOB) inaccuracies.

---

source documents" and that "[t]hese four counties were Allegheny, Bucks, Warren, and York." Exh. 1 at 72.

● 2,230 potential DOB and/or registration date inaccuracies.

● 2,991 records of potentially deceased voters.

Due to audit time constraints, we did not validate the thousands of cases/situations identified, and as a result, we use the term "potential" to be conservative. We believe, however, that in most of these instances, there are inaccuracies within the data maintained in SURE, and therefore, DOS will need to work with the counties to follow up and address all these situations in order to investigate and correct the voter records as appropriate.

Based on the results of our data analysis, along with reviewing DOS regulations and guidance, and on-site visits to seven counties where we observed staff processing new voter registration applications (applications) to check for duplicate records, we found the process ineffective for identifying duplicate records and removing voter records of deceased voters. We also identified other weaknesses increasing the risk of inaccurate records regarding the processing of applications and subsequent list maintenance, which are addressed separately in Findings 4 and 5.

Exh. 4 at 3.

The Executive Summary in support of Finding Four states in part:

*We found that the SURE system and supporting processes and controls are not effective to ensure that the voter registration information is accurate.* We identified several reasons why inaccuracies occur and grouped them into two areas: (1) weaknesses within the application process, and (2) weaknesses regarding the maintenance of voter registration records within the SURE system.

Regarding weaknesses within the application processes, we found that no review is required to ensure that data on the application form is being accurately entered into SURE either at the time of data entry or on a routine basis after data entry. Automated edit checks and other features to prevent or detect inaccuracies are also not sufficiently incorporated into the SURE system. *Additionally, we found that applications can remain in pending status for long time periods and in some cases*

*indefinitely. Based on data analysis, as of October 9, 2018, there were 91,495 applications in pending status, including 23,206 that had been placed in pending status prior to the beginning of our audit period on January 1, 2016.*

For weaknesses regarding the maintenance of voter registration records within the SURE system, we found that insufficient analysis by counties has resulted in inaccurate voter record data, despite the performance of list maintenance activities by the counties. Our analysis also identified 96,830 voters who potentially should be classified as inactive and an additional 65,533 records of inactive voters whose voter records potentially should have been canceled. *Additionally, DOS does not fully utilize the list maintenance feature it pays for as a member of the Electronic Registration Information Center (ERIC).*

*Id.* at 5 (emphasis added).

In further explication of this last finding, the audit states:

As previously described, it is critical that accurate voter records be maintained. Organizations such as ERIC have been established to help improve the accuracy of America's voter rolls and increase access to voter registration for all eligible citizens. From the launch of ERIC in 2012 through the end of 2017, ERIC helped its member states identify 8.4 million inaccurate voter records. ERIC provides its member states with reports on voters who have moved in-state or out-of-state, voters who have died, voters with duplicate registrations in the same state, and individuals who are potentially eligible to vote but are not registered. According to DOS management, however, it only uses ERIC to obtain information for list maintenance purposes regarding change of address and is not utilizing available information such as death notices and cross-state matches. We inquired of DOS management as to why they are not fully utilizing all of the features available through ERIC. DOS management responded that they "have plans to incorporate them into production prior to the November 2019 election." This is despite the fact that DOS has paid for but not utilized some of the information available to ERIC members since it first joined in 2015.

Exh. 4 at 57.

The Executive Summary in support of Finding Five states in part:

In addition to the inadequate or nonexistent automated checks in the SURE system for allowing duplicate voter records, preventing adding a voter with a driver's license already associated with a voter record, and recording of obviously inaccurate birthdates and/or voter registration dates (addressed in Finding 2), we found features that were missing or inadequate which could further reduce or prevent errors. Specifically, we found that the SURE system does not prevent applications with a non-Pennsylvania residential address from being approved. The SURE system also lacks geographical mapping assistance which would reduce inefficiencies and potential inaccuracies by preventing applications from being sent to the wrong county for processing. Additionally, the SURE system lacks a "Read Only" feature to prevent key fields with permanent data such as a date of birth, Social Security number, or driver's license number from being changed. Finally, the SURE system does not have controls in place to ensure that voter registrations are not improperly cancelled within 90 days of an election.

We were also informed of two additional areas needing improvement related to the PennDOT Motor Voter process and the reporting capabilities within the SURE system. We found that some individuals confuse the change of address prompt at PennDOT's photo license centers with registering to vote. Through discussions with DOS management and input from county officials, we also found that the ability to create reports in the SURE system is too limited and it lacks editable report capabilities.

*Id.* at 5-6.

These are just *some* of the highlights of this audit. The defense urges the Court to read the audit in full because it strongly supports the defense concern about the SURE system and the need for the defense to obtain additional information about the system's multiple failings.

54

Three other points about the audit need to be made. First, it is significant that DOS management admitted to the DAG that "they are starting the process to obtain and implement a new SURE system. DOS is currently working with the Office of Administration, Office for Information Technology to develop a request for proposal to replace the SURE system." *Id.* at 15. In other words, the fountainhead of this Court's jury selection system may be on the verge of replacement.

Second, Findings One and Six quoted above would strongly support a finding by this Court that it is reasonably probable that the substantial amount of relevant material withheld from the DAG by the DOS and the four listed counties would be helpful in establishing that the SURE system as it is currently being administered is inaccurate and unreliable. The circumstances surrounding the withholding of the records and the records the withheld records themselves are described in the audit as follows:

> During the audit, DOS management denied us access to significant key documents/information related to the security and operation of the SURE system and, for some documents that were provided, redacted information to the extent that the documentation was not usable as evidence.

> The following list identifies the key documents/information that were not provided (items 1, 2, and 5) or were heavily redacted (items 3 and 4):

> 1. Contents of external security assessment reports issued by the United States Department of Homeland Security

55

(Homeland Security) as well as reports issued by private firms contracted to assess security.

>    2. Systems and Organization Control reports detailing the security practices in place at outside vendors key to the security and operation of the SURE system.

>    3. Detailed information on system configuration and implementation of cybersecurity policies.

>    4. The formal results and corrective action plans from the 2018 test of the emergency recovery system.

>    5. Documentation of significant IT controls and system interfaces.

Exh. 4 at 19-20. For this reason, the withheld information is evidence favorable to the defense and should be disclosed, either outright or after *in camera* review by the Court. [26]

Third, with regard to the audit's finding that at the time of the audit DOS was underutilizing ERIC, the defense has learned that prior to the utilization of any of the services of ERIC, the Commonwealth used the Crosscheck program to assist in its voter purging process. The Crosscheck

---

[26] *Cf. Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 96 (3d Cir. 1983) ("The unexplained failure or refusal of a party to judicial proceedings to produce evidence that would tend to throw light on the issues authorizes, under certain circumstances, an inference or presumption unfavorable to such party…. For the rule to apply, it is essential that the evidence in question be within the party's possession or control…. Further, it must appear that there has been an actual suppression or withholding of the evidence….")

program is discussed in more detail below. Pennsylvania first announced that it was joining the Crosscheck program on April 20, 2013, at which time Secretary of the Commonwealth Carol Aichele announced that "Pennsylvania will provide data for the crosscheck program, starting in January 2014 and should have a list of potential duplicate registrations early next year." Patrick Murphy, *Pennsylvania joins multi-state initiative to prevent voter fraud*.[27] It was not until July 27, 2017 that a State Representative revealed that "the state had removed itself from Crosscheck back in April." *Pennsylvania Removes Itself from the Interstate Crosscheck System*, July 27, 2017.[28] By this time, Crosscheck "was responsible for the purging of over 1 million voters from registration rolls across the country just before the 2016 election. The majority of voters purged were Black, Latino and otherwise eligible to vote." *Id.*

Significantly, on June 30, 2017, five months after the November 2016 voter list had already been used to create the master wheel from which the grand jury in this case was selected, Governor Wolf wrote a letter to the creator of Crosscheck, Kris Kobach, stating that "my predecessor sought to

---

[27] Available at https://www.pennlive.com/midstate/2013/08/
/pennsylvania_joins_multi-state.html.

[28] Available at https://medium.com/@SIIPCampaigns/breaking-news-
pennsylvania-removes-itself-from-the-interstate-crosscheck-system-
c3a78d126d77.

participate in your failed Inter-State Crosscheck Program, only to have local election officials explain that the program was useless, and even hurtful to improving the integrity of our election systems. The Crosscheck data was riddled with errors and inaccurate. Even so, the program discovered absolutely no double voting within the Commonwealth." Exh. 5. Although no double voting was discovered, the Governor's letter does not address how many minority citizens were permanently and erroneously removed from Pennsylvania's voting rolls as a result of the use of a purging program that was "useless" and "riddled with errors and inaccurate."

In sum, whatever may be said for the accuracy and reliability of voter registration lists generally, there can be no doubt that the SURE database system has a long and well-documented history as a system that cannot be relied upon to perform the critical task of selecting juries that represent a ccoss-section of the community.

## ARGUMENT

I. **SURE Voter Registration Lists Cannot Be Used as The Sole Source List in This Court's Jury Selection Plan Because the Lists Are Underinclusive, Insufficiently Representative, Productive of Non-random Selection Methods, Substantially Inaccurate, Unreliable, Not Up to Date, And Contain A Significant Number of Duplicates.**

A. **The Implications of The *Savage* Decision and the Need for Additional Discovery**

In *Savage*, the Third Circuit recently considered the constitutionality of the Eastern District of Pennsylvania's reliance on voter registration lists as

58

its sole source list for jurors and reaffirmed that for purposes of a Sixth Amendment fair cross-section claim, "a defendant may establish an exclusionary process by identifying 'a large discrepancy over time such that the system must be said to bring about the underrepresentation.'" *United States v. Savage*, 970 F. 3d at 259 (quoting *Howell v. Superintendent Rockview SCI*, 939 F.3d 260, 269 (3d Cir. 2019) (3d Cir. 2020) and *United States v. Weaver*, 267 F.3d 231, 244 (3d Cir. 2001)). The court also reaffirmed, citing the same cases, that "facial neutrality alone of a selection system is not dispositive." "Even if a process is facially neutral, it might consistently produce disproportionately low representation of a particular group," thus satisfying the requirement of *Duren v. Missouri*, 439 U.S. 357 (1979), that there be "systematic" exclusion of the group in the jury selection process. *Id.* at 260. Accordingly, "the use of a voter registration list alone might still run afoul of the third prong if it produced underrepresentation over time—enough time to deem the under- representation persistent." *Id.* (internal quotation omitted).

In *Savage*, the defense had produced in support of its challenge statistics derived from a single qualified jury list. *Id.* at 255 n. 33. As a result, "[a]t oral argument, Savage conceded that he had not provided the District Court with any record of underrepresentation over time," thus dooming his challenge. *Id.* at 260.

For Mr. Bowers, the message of *Savage* is clear: an attack on the use of voter registration lists as the sole source list in this Court's Jury Plans is subject to a viable constitutional and statutory fair cross-section claim, but such a claim cannot be sustained by presenting statistical information from one qualified jury wheel. As indicated in Exhibits 1, 2, and 3, the defense has gone way beyond what was presented in *Savage*, while also presenting other jury composition claims, such as Fifth Amendment, Eighth Amendment, and supervisory power claims, claims based on the requirements of accuracy, inclusiveness, randomness, reliability, and proportionality, claims of the unconstitutionality of certain eligibility criteria, and claims based on the JSSA that were plainly not raised in the *Savage* case.

One other issue the defense has explored that was not presented in *Savage* is whether the use of voter registration lists as a sole source list. While this may have had some limited acceptance in 1968 when the JSSA was adopted, it has now become, with the passage of fifty-two years and the increasing availability and use of great improvements in the technology of jury system management, an anachronistic system that can no longer be justified as necessary in light of the availability of more efficient and reliable ways to achieve the goal of fair cross-section representation.[29] *See* Exh. 2

---

[29] The extent of the use of voter registration lists as a *sole* source list at the

(Scholars' Letter) at 2-10 (documenting the extent to which the use of
multiple source lists has been recommended to and adopted by numerous
federal courts); *id*. at 10 ("The addition of other source lists not only increases
diversity – it can also help to correct inaccuracies on the voter registration
list. For example, the voter registration list may contain an outdated address
for a voter, but a list that is updated more frequently, such as the taxpayer
list, is more likely to have the correct address. When the voter list and the
taxpayer lists are merged, the jury system can use the more recently updated

---

time the JSSA was adopted was limited. S. Rpt. No 90-891 vaguely states
that "a number of districts do use voter lists as the source of potential jurors.
Included among these are: the eastern and southern districts of Illinois, the
northern and middle districts of Georgia the western district of Missouri,
Montana, New Jersey, the eastern and southern districts of New York, and
the southern district of Ohio." It is not clear from this statement how many of
these courts used voter registration lists as their *sole* source list. When Judge
Kaufman was asked about this topic at the hearing, he stated:

> Senator Tydings: Did anyone other than Judge Becker on your
> Committee have any experience with the use of the voter list as a
> basis?

> Judge Kaufman: Well I did, in the southern district of New York,
> where I was a judge for 12 years. I did not go around the table and
> ask each judge whether or not he had such experience. But
> remember we had a cross section of judges on this Committee, too.
> Each one had a different point of view. We talked it over. Some
> thought their system-the keyman system was better. But it was
> after a common discussion and much deliberation that we came to
> this conclusion.

Federal Jury Selection, Hearings before the Subcommittee on Improvement
of Judicial Machinery of the Senate Committee on the Judiciary, 90th Cong.,
first sess. (1967) at 267 ("Federal Jury Selection").

address. In addition, the voter list may contain duplications, where the same person is listed more than once. These duplicate names would be removed if more than one source list is used, because the merger of two or more lists requires the removal of duplicate names.").

As argued above, this showing is certainly relevant to Mr. Bowers' Eighth Amendment and supervisory powers claims. It is also relevant under the mandate of *Savage* and other cases which conclude that in ruling on a fair cross-section claim, a court should "evaluate evidence of the nature of the system, length of time studied, *and efforts at reform to increase the representativeness of jury lists*." *Id.* at *25 (emphasis added); *see Howell*, 939 F.3d at 270 ("Where the government is engaged in on-going efforts to improve the representativeness of jury lists, it is less likely that the data reflects that under-representation is due to a systematic exclusion in the jury process."); *Ramseur v. Beyer*, 983 F.2d 1215, 1235 (3d Cir. 1992) (*en banc*) ("Such efforts at reform to increase the representativeness of jury lists have some relevance to the question of whether a group's representation on those lists is 'fair and reasonable.'"). Finally, it is relevant to a claim not asserted in *Savage*, but asserted here, namely, that the due process and equal protection components of the Fifth Amendment are being violated in this District because the continued use of a system that is known to produce underrepresentation establishes that jury selection officials are intentionally and arbitrarily

discriminating again people of color. *See Smith v. Yeager*, 465 F. 2d 272

(*prima facie* violation of the equal protection clause was established because

selection officials continued to use a selection procedure after gaining

knowledge that the procedure was not producing representative juries.)

It would probably not be "fair and reasonable" to require the

government to engage in "reform efforts" that were ineffectual, impractical,

not being used by other courts, and not recommended by any professional

groups qualified to study and suggest practical and effective reforms. On the

other hand, the existence of effective and cost-effective reform measures,

utilized in other courts, and recommended by those qualified to study the

topic, but not yet adopted in the Western District of Pennsylvania, would

certainly strongly suggest that the district may be in violation of what the

Third Circuit has long held to be "the duty of jury officials, at least in the

federal system, not to exclude any cognizable groups from jury lists through

neglect as well as through intentional conduct." *Dow*, 224 F.2d at 424. "Thus,

the present-day desideratum of jury selection is the obtaining of lists of

individuals representative of a cross-section of the qualified community and it

seems clear that it is the duty of the jury officials to use methods reasonably

designed to attain that end." *Id*.; *see Smith v. Yeager*, 465 F. 2d at 282

("Although a jury commissioner has a thankless, underpaid job, often done

out of a sense of civic responsibility, he cannot perform his duties wholly oblivious to his responsibilities. He is charged with producing a cross-section of the community the state deems appropriate for jury service.").

In the trial court in *Savage*, the defense attempted to address the reform issue by merely "identif[ying] two pieces of point-in-time evidence to suggest that exclusion was systematic: Pennsylvania state legislation and a Pennsylvania state commission report." *Savage*, 970 F. 3d at 260 n. 43. The Third Circuit ruled that "[t]his 'snapshot' evidence fails to demonstrate systematic exclusion in 2007, much less in 2012 when Savage moved to strike the venires. Neither the state legislation nor the state report specifically addresses underrepresentation of Blacks on jury wheels or venires in federal court in the Eastern District of Pennsylvania." *Id*. at n. 43.

Also, in *Savage*, for the first time on appeal, the defense attempted to rely on: (1) a new argument that "the federal district courts in Pennsylvania have failed to implement a jury-selection lesson learned by their sister courts within the Third Circuit" in that "[f]ederal district courts in New Jersey, Delaware and the Virgin Islands supplement voter lists with at least one other source;" (2) a statement by counsel in a "one-sentence footnote – devoid of authority or record citation" that insisted that "black people in Pennsylvania have faced significant challenges in participating in the voting process;" and (3) two law review articles, one of which claimed that "a

64

Pennsylvania state law enacted in 2012 reportedly disenfranchised voters in mostly black districts at a much higher rate." *Id*. at 261 n. 44 & 45. The Third Circuit held that all these claims had been waived, that in any event "the use of supplementary sources in other jurisdictions does not by itself demonstrate systematic exclusion of Blacks in the Eastern District of Pennsylvania," and that the two law review articles were "unspecific to the Eastern District, and they fail to demonstrate underrepresentation over time." *Id*.

*Savage* is a good roadmap on how *not* to litigate a jury challenge, and it underscores the point that in order to win such a challenge, the defense needs to obtain and then present to the trial court the type of compelling evidence that was found lacking in *Savage*.

For example, Savage's point-in-time evidence "identifying" Pennsylvania state legislation consisted entirely of five sentences in the jury challenge of a co-defendant that Savage had joined:

> (1)     "[i]n 2007, the Pennsylvania legislature passed Act 37 of 2007 instructing the Administrative Office of Pennsylvania Courts (AOPC) to expand the list of eligible voters in the Commonwealth";
>
> (2)     "[a]ccordingly, the AOPC has compiled a list of prospective jurors from not only the voter registration rolls, but from records of the Department of Public Welfare, Pennsylvania Department of Transportation (driver's license lists) and Department of Revenue property tax records";
>
> (3)     "[a] remedy exists to correct … under-representation, *i.e.* strike these two jury panels and utilize the expanded lists of prospective jurors

already in the possession of the AOPC for the Eastern District of Pennsylvania";

(4)      "[t]he failure of the Eastern District of Pennsylvania to contact the AOPC to obtain the expanded jury lists is inexcusable since such lists were created precisely to remedy the under-representation of minorities in Pennsylvania jury pools", and

(5)      "[t]he failure of the Eastern District of Pennsylvania to use the expanded jury lists deprives these Defendants of the opportunity to participate in the selection of a jury of their peers."

*United States v. Northington*, E.D. Pa., No. 2:07-cr-00550-RBS, ECF 701.

As noted in *Savage*, "[i]n 2007, state legislation expanded the sources of potential jurors available to state courts, Act of July 17, 2007, P.L. 123, No. 37, § 3 (codified as amended at 42 Pa. Cons. Stat. § 4521.1), and soon made information available to federal district courts in Pennsylvania as well "[u]pon request," § 4521.1(d)(2) (2008 amendment)." *Savage*, 970 F. 3d at 217.

Section 4521.1(d)(2) provides that

Upon request from the Clerk of Court for a United States District Court, the Court Administrator shall make available to the requesting Clerk of Court the list of names for the counties comprising the district within the jurisdiction of the requesting court from the Statewide jury information system. In providing the information, the Court Administrator shall only provide the name, address and date of birth of each individual on the list being provided. All other identifying information shall be removed from any list made available pursuant to the request. Under no circumstances may the Court Administrator include any other identifying information.

The "showing" made in *Savage* at the trial level failed to address two critical issues. First, and most importantly, as in *Dow*, "[i]n arguing that the

use of [the AOPC list] is the only reasonable method, the [challenger] has not even shown that the desideratum of a cross-section would be attained thereby." *Dow*, 224 F.2d at 427. By motion (ECF 280), Mr. Bowers sought access to the AOPC list so that he could make such a showing. As indicated in the motion, he intended to conduct a demographic analysis of the AOPC list and then compare it to a demographic analysis of voter lists from the counties that make up the Pittsburgh Division. The purpose is to demonstrate that the source list derived from voter registration lists alone is underinclusive and does not represent a fair-cross-section of the community, whereas the AOPC list is inclusive and does represent a cross-section of the community. ECF 280 at 23-27. The failure to make such a showing in *Savage* allowed the Third Circuit to relegate the discussion of the issue to a brief footnote which stated that the passing reference to the 2007 legislation did not "specifically addre[ss] underrepresentation of Blacks on jury wheels or venires in federal court in the Eastern District of Pennsylvania." *Savage*, 2020 WL 4691500 at * 26 n. 43. Mr. Bowers' proposed demographic study *would* have addressed this issue because it would entail a demographic comparison between the very county jury voter registration lists used to select jurors in the Western District of Pennsylvania, which he has obtained from the Court and the Department of State, with the comparable portions of the AOPC list from those same counties.

The fact that the AOPC list may not contain demographic information beyond name, address, and date of birth is not an impediment to a demographic study. Using geocoding and surname analysis techniques, an expert can discern the demographic characteristics of the AOPC list, if given access to juror names, addresses, and dates of birth. These techniques are typically seen as a better way to discern the actual demographic characteristic of a source list than trying to infer such characteristics by utilizing JS-12 records, which, although certainly relevant, typically rely on small self-reported samples taken not from the source list itself but from a much smaller master or qualified juror list, where the presence of non-respondents often cast doubt on any statistical calculation. *See, e.g., United States v. Weaver*, 267 F. 3d at 244 ("In order to support Weaver's allegation of underrepresentation on the master wheel, Beveridge would have had to either analyze the races of all 5,877 jurors on the master wheel (as he claimed to have done), perform sampling of the master wheel and then calculate the standard deviation,  or, alternatively, account for the statistical impact of the unreturned questionnaires."); *United States v. Reyes*, 934 F. Supp. 553, 562 (S.D.N.Y. 1996) ("Although both experts have examined the self-reporting of race and ethnicity in the JS-12 study, both experts acknowledged that the 1,000 names in the JS-12 study constitute a small sample. … Further, the Government expert stated that when geocoding is

used for an entire sample, the larger sample is better. … This expert

testimony suggests that the larger sample better represents the actual

composition of the population being studied. Consequently, the Court will not

rely on the JS-12 study in deciding this motion. Only the geocoded data from

the Jury Wheel study will be considered.");[30] *United States v. Berks Cty.,*

*Pennsylvania*, 277 F. Supp. 2d 570, 575 (E.D. Pa. 2003) (stipulation by

defendants to Spanish surname methodology and to United States' geocoding

--------

[30] In 1971, Judge Kaufman's Committee reported to Congress that

> [W]e have received statistical information from the Eastern
> District of Tennessee; the District of New Jersey; the District of
> Maryland; and the Western District of Pennsylvania. All reports
> reveal one common fact – a substantial number of prospective
> Jurors exercise the option not to disclose race. The Fourth and
> Fifth Circuits aside, the percentage of nondisclosure of race are as
> follows: Eastern District of Tennessee from 6 percent to 13 percent;
> District of New Jersey-17 percent; District of Maryland-27.7
> percent; and Western District of Pennsylvania-10 percent….

> This unknown factor renders it impossible to reach a positive or
> negative conclusion as to whether the names placed in the master
> wheel from the voter registration lists represent a fair cross
> section, racially, of the communities involved. As concluded by a
> study conducted by statisticians at American University, if the
> unknown or unclassified responses to juror questionnaires exceed
> 5 percent of the sample, it is practically impossible to determine,
> statistically, whether the various classes are in fact being
> proportionately represented.

*Federal Jury Service,* Hearings Before Subcommittee No. 5 of the Committee
on The Judiciary, House Of Representatives, Ninety-Second Congress, First
Session, On Legislation Relating To Federal Jury Service 34-35 (1971).

analysis of 2003 voter registration list); *United States v. Ortiz,* 1995 WL 381595, at \*1 (E.D. Pa. June 23, 1995) ("The defendants' expert, Prof. Eugene P. Ericksen, requested additional information during the week of May 8, 1995. Professor Ericksen sought a list of the names of persons who failed to respond to the juror questionnaires so that he could compare the surnames of these persons to a list of Spanish surnames published by the United States Bureau of the Census. This comparison would permit him to estimate the percentage of Hispanics who did not respond to the juror questionnaire. The court convened a telephone conference on May 17, 1995, and, without opposition from the government, authorized attorney Bosch to get the additional information from the jury clerk."); *United States v. Hunt*, 265 F. Supp. 178, 188 (W.D. Tex. 1967) ("The exhibits show that the Census Bureau and others engaged in the field of population composition made use of various tests for determining who might be classified as belonging to the group which is termed by the defendant as Mexican-Americans. The test that was and is thought to be the best test for determining who is to be classified as being included in that group is the Spanish surname test.").

The second flaw in the "showing" made in *Savage* at the trial level was the failure to address how many counties in Pennsylvania use the AOPC list. From research and investigation in this case, it appears that only two of the twenty-five counties in the WDPA (Beaver and Clearfield) rely solely on voter

70

registration lists as the source of potential jurors. Nineteen of the WDPA counties take advantage of the AOPC list as the source of potential jurors. Again, "efforts at reform to increase the representativeness of jury lists have some relevance to the question of whether a group's representation on those lists is 'fair and reasonable.'" *Ramseur v. Beyer*, 983 at 1235; *accord Savage*, 970 F. 3d at 259.

In ECF 442, the Court denied without prejudice the defendant's request to either grant discovery of the AOPC list or treat his discovery motion as a request for issuance of a subpoena for the list. *Id*. at 8-13. By this motion, Mr. Bowers again seeks access to the AOPC list for the thirteen counties in the Pittsburgh Division so that he can demonstrate that this list is representative and inclusive of the eligible population of these counties, whereas, as demonstrated in Exhibits 2 and 3, the voter lists are not. This showing, in turn, will demonstrate, as required by *Dow*, that there is an existing supplemental list that is available to the district court as a reform measure that would cure underrepresentation and other errors in the voter registration lists. The AOPC list is thus relevant, it is not otherwise procurable in advance of the hearing on the present challenge (*see* ECF 231), the defense cannot properly prepare for the hearing of this motion without the list, the failure to obtain the list in advance of the hearing may tend unreasonably to delay the trial, and the requested list has been described

with great specificity, so there can be no contention that the defense is acting in bad faith or that he is engaged in a "fishing expedition." Given all these factors, Mr. Bowers is entitled to production of the list by way of Rule 17 subpoena. Any other result would deny him his constitutional right to a full and fair opportunity to litigate his jury challenge. *See Coleman v. Alabama*, 377 U.S. 129, 133 (1964) (the federal constitutional right against systematic exclusion of classes of citizens from the grand jury implies an ancillary right to fair opportunities to discover and prove systematic exclusion claims).

## B. Mr. Bowers Has Established A *Prima Facie* Case Of Violation Of His Rights Under The Fifth And Sixth Amendments, the JSSA and 18 U.S.C. § 243.

### i.    Fifth Amendment Rights

First, "[t]he Fifth Amendment guarantees an accused the right to an indictment returned by a grand jury. U.S. Const. amend. V. This Fifth Amendment protection includes the right to be indicted by a grand jury that constitutes a fair cross section of the community from which it is drawn." *United States v. Green*, No. CRIM. 10-186, 2011 WL 4737601, at *2 (W.D. Pa. Oct. 6, 2011), *aff'd in part*, 507 F. App'x 239 (3d Cir. 2012).

In the appeal of the *Green* case, the Third Circuit stated in a unpublished opinion that "[w]e have applied the right to state grand juries as well. *Ramseur v. Beyer*, 983 F.2d 1215, 1229–31 (3d Cir. 1992) (*en banc*). Whether it extends to federal grand juries is unclear." *United States v. Green*,

72

507 F. App'x 239, 241 (3d Cir. 2012). However, the Supreme Court has clearly

held that "[t]he principles that apply to the systematic exclusion of potential

jurors on the ground of race are essentially the same for grand juries and for

petit juries." *Alexander v. Louisiana*, 405 U.S. 625, 626 n. 3 (1972). *See also*

*Murphy v. Johnson*, 205 F.3d 809, 818 (5th Cir. 2000 ("We note…that by

October 1994, the Supreme Court had consistently held that racial

discrimination in the selection of grand juries was violative of the fair cross-

section requirement. Thus, at the time Murphy's conviction became final, our

precedent dictated that the fair cross-section requirement of the Sixth

Amendment applied to the selection process for grand juries.") (citing *Peters*

*v. Kiff*, 407 U.S. 493 (1972) and *Smith v. Texas*, 311 U.S. 128 (1940)); *United*

*States v. Burdett*, No. CR 20-139, 2021 WL 2581356, at *8 (E.D. La. June 23,

2021) ("The fair-cross-section guarantee applies to both grand and petit

juries.");*United States v. Scrushy*, No. CR.2:05CR119-MEF, 2007 WL

1296000, at *4 (M.D. Ala. May 1, 2007) ("The right to a 'representative' grand

jury is a federal right that derives not from the requirement of equal

protection but from the Fifth Amendment's explicit requirement of a grand

jury. That right is similar to the right applicable to state proceedings to a

representative petit jury under the Sixth Amendment."); *United States v.*

*Frumento*, 409 F.Supp. 136, 141 (E.D.Pa.1976), aff'd, 563 F.2d 1083 (3d

Cir.1977) (the Fifth Amendment "has been held to require that no group in

73

the community be excluded unjustly from grand jury service and that a grand jury panel shall constitute a fair cross-section of the judicial district from which it is chosen.").

The Third Circuit itself stressed as early as 1972 that "[t]he need of a cross-section of the community on a grand jury is particularly important because of its unique functions in the judicial process." *Smith v. Yeager*, 465 F. 2d at 275. It is hard to discern any principled reason why, as was concluded in *Ramseur*, the right to a fair cross section applies in a state case where no federal constitutional right to a grand jury exists, but does not apply in a federal case, where the Fifth Amendment expressly guarantees the right to indictment by grand jury. The fair cross-section principles discussed below in relation to the Sixth Amendment should therefore be applied to Mr. Bowers' Fifth Amendment fair cross-section claim.

The Fifth Amendment also guarantees federal defendants the right to due process and right to the equal protection of the laws. In *Peters v. Kiff*, 407 U.S. 493, 502–03 (1972), the Court held that

> [A] State cannot, consistent with due process, subject a defendant to indictment or trial by a jury that has been selected in an arbitrary and discriminatory manner, in violation of the Constitution and laws of the United States. Illegal and unconstitutional jury selection procedures cast doubt on the integrity of the whole judicial process. They create the appearance of bias in the decision of individual cases, and they increase the risk of actual bias as well.

"A violation of equal protection by the federal government offends the Due Process Clause of the Fifth Amendment." *United States v. Green*, 507 F. App'x 239, 241 (3d Cir. 2012) (citing *Bolling v. Sharpe*, 347 U.S. 497, 500, 74 S.Ct. 693, 98 L.Ed. 884 (1954)).

First, to prove an equal protection violation, a defendant must first "identify a constitutionally cognizable group, that is, a group capable of being singled out for discriminatory treatment." *Ramseur v. Beyer*, 983 F. 2d at 1230. Mr. Bowers has clearly met this prong of the equal protection test. *See United States v. Savage*, 970 F.3d at 255 ("We routinely recognize that Blacks qualify as a distinctive group."); *United States v. Weaver*, 267 F.3d 231, 240 (3d Cir. 2001) ("African–Americans and Hispanics are 'distinctive' groups for the purposes of a fair cross-section analysis."); *Green v. Travis*, 414 F.3d 288, 296–98 (2d Cir.2005) ("[A] defendant raising a *Batson* claim of purposeful racial discrimination does not have to demonstrate that all venirepersons who were peremptorily excused belong to the same 'cognizable racial group.'…It is indisputable that one venireperson cannot be excluded from a jury on account of race. *A fortiori*, several venirepersons of different races cannot be excluded from a jury on account of race.") (Sotomayor, J.); *United States v. Rinaldi*, No. 3:18-CR-279, 2020 WL 4589037, at *5 (M.D. Pa. Aug. 10, 2020) ("Rinaldi has met the first prong of the test by asserting a 'distinctive group' consisting of 'Hispanics, Latinos, [and] Blacks' "); *People v.*

*Armstrong*, 6 Cal. 5th 735, 768–69, No. 319CR00038MMDCLB, 2021 WL

951885, at *2 (D. Nev. Mar. 11, 2021) ("To start, there is no dispute that as a

Black male, Knight is a member of a distinct group under an equal protection

analysis."); *Quadra v. Superior Court,* 378 F.Supp. 605, 617 (N.D. Cal. 1974)

(the combined group of non-white ethnic minorities is a distinctive group); *id.*

("Since each of these sub-groups [Blacks, Asians, and Latinos] is probably an

identifiable group, the combination of the three into one group is permissible

for the purposes of statistical allegations."). *See also People v. Armstrong*, 6

Cal. 5th 735, 768–769 ("The People contend that African-American men

should not be considered a cognizable group, pointing to federal cases and to

a concurring opinion disagreeing with the approach this court has taken. …

Settled law dictates otherwise.") (collecting cases); *Com. v. Jordan,* 439 Mass.

47, 62, 785 N.E.2d 368, 380 (2003) ("[I]t would seem anomalous and

inconsistent with the primary end of ensuring an impartial jury and a fair

trial to conclude that the protection we afford to groups defined by race or

gender against impermissible exclusion from jury panels ought not extend to

groups defined by race and gender. We decline to do so….").

Second, to prove an equal protection violation, "the defendant must

show that the cognizable group was subject to 'substantial

underrepresentation' over a significant period of time." *Ramseur v. Beyer*, 983

F. 2d at 1230 (quoting *Castaneda v. Partida*, 430 U.S. 482, 494 (1977)). In

*Castaneda*, the United States Supreme Court employed a statistical significance test, not the absolute or comparative disparity tests typically used in Sixth Amendment cases, in resolving an equal protection challenge, with two standard deviations as the suggested guideline for establishing a violation. *See id*. at 497 n. 17. *See also Alston v. Manson,* 791 F.2d 255, 257–58 (2d Cir. 1986) ("The reliable tool referred to as Statistical Decision Theory is an appropriate instrument for analyzing whether minority underrepresentation in the jury array is substantial [under the equal protection clause]. The goal of such an inquiry is to determine if chance alone could account for a meager representation of minorities.") (citing *Castaneda*).

A different mode of analysis is called for because of the difference in the nature of the violations under each Amendment. Under the Sixth Amendment, a disparity creates a *per se* violation. *See Ramseur*, 983 F. 2d at 1231 ("To succeed in a Sixth Amendment challenge, the defendant need show only that the underrepresentation was the result of systemic exclusion of the group in the jury selection process."); *Alston*, 791 F.2d at 258.

Under the Fourteenth Amendment, however, a disparity supports not only a finding of discriminatory effect, but also discriminatory purpose—an essential element of a Fourteenth Amendment challenge, but not required for a Sixth Amendment claim. *Duren v. Missouri* (1979) 439 U.S. 357, 368 n.26. Because statistical decisional theory "reveals the possible role of chance" in

the jury selection process, it is "ideally suited for shedding light on this issue." *Alston*, 791 F.2d at 258; *see Ford v. Seabold*, 841 F.2d 677, 684 n. 5 (6th Cir.1988) (acknowledging the use of statistical decision theory in the context of equal protection claims, but rejecting its use in the context of a fair-cross-section claim); *United States v. Scott*,__F. Fed. Supp. 3d ___, 2021 WL 2643819, at *12 (S.D.N.Y. June 28, 2021) (concluding that defendant's statistics failed to establish a Sixth Amendment violation, but that under the Fourteenth Amendment he carried his burden to demonstrate that Black and Latinx individuals were substantially underrepresented on the Qualified Wheel); *id.* (defendant's expert determined that the underrepresentation of either Black or Latinx individuals on the Qualified Wheel is more than three standard deviations from the White Plains Division population, which would occur by random chance less than 0.5 percent of the time, with the probability that this underrepresentation would come about by chance at approximately five in one thousand).

In ruling on an equal protection claim, the court in *Ramseur* cited absolute and comparative computations, but then stated that "[p]erhaps more importantly, however, the standard deviation analysis revealed 28.9 standard deviations… We, like the New Jersey Supreme Court, find that this standard deviation analysis reveals that the underrepresentation of blacks in the Essex County jury pools is not the result of random selection." *Ramseur*, 983

78

F. 2d at 1232. The court went on to hold, however, that the claim failed because the defendant's study only covered a period of two years and one qualified list. *Id.* at 1233. Here, in contrast, Mr. Bowers demonstrates statistically significant disparities that extend back to 1995 and involve the analysis of hundreds of thousands of jurors. For this reason, the second prong is met.

Finally, to prove an equal protection violation, the defendant "must show that the procedure being used to select the jurors is "'susceptible of abuse or is not racially neutral.'" *Ramseur*, 983 F. 2d at 1231, *Castaneda*, 430 U.S. at 494. As indicated above, the Third Circuit held in *Yeager* that this requirement was satisfied when a jury official continued to use a selection system after being informed that it was not producing a fair cross-section. The *en banc* court in *Ramseur* cited the *Yeager* case approvingly and also observed:

> It is possible, however, that were Mr. Ramseur's data more comprehensive a presumption of discrimination would exist.

> The New Jersey Supreme Court explained:

>> We may assume, although defendant did not attempt to prove, that a major reason for the apparent underrepresentation of blacks in Essex County jury pools is the likelihood that proportionally more blacks than whites do not register to vote and do not have driver's licenses. Knowing this, jury officials may not sit by idly in the belief that no constitutional complaint may be lodged against a random selection mechanism that relies upon facially "neutral" voter and DMV lists. That belief would be

mistaken, for such inaction in the face of knowledge of the system's underrepresentativeness would indicate that the underrepresentation has a systematic and partly subjective cause, has continued over a significant period of time, and is not being counteracted by efforts at reform. Thus, even though the numbers shown here are arguably within acceptable limits, if they were to continue over a significant period of time, the continued exclusive reliance by jury officials on the voter and DMV lists could become constitutionally suspect.

*Ramseur*, 106 N.J. at 227, 524 A.2d at 239.

*Ramseur*, 983 F. 2d at 1234 n. 20.

Under this reasoning, and certainly under the holding in *Yeager*, Mr. Bowers has established the third and final prong of an equal protection violation.

### ii.    The Sixth Amendment

"The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314 (2010). "[J]ury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Duren v. Missouri*, 439 U.S. 357,363–64 (1979) (quoting *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)).

Mr. Bowers "has the burden to establish a violation of his fair-cross-section rights by identifying (1) 'a 'distinctive' group in the community' (2) that was 'not fair[ly] and reasonab[ly]' represented among potential jurors

compared with its representation in the community (3) because of 'systematic exclusion of the group in the jury-selection process.'" *United States v. Savage*, 970 F.3d at 254 (quoting *Duren*, 439 U.S. at 364).

Mr. Bowers meets the first prong of this test for the same reason he meets the first prong of the equal protection test. *See Ramseur*, 983 F. 2d at 1230 (concluding that the first prong for both equal protection and fair cross section analysis is the same).

In considering the second prong, Mr. Bowers emphasizes, as he did in his Reply to the Government's Opposition to his discovery motion (ECF 333), that *Savage* did not establish any type of mechanical bright-line rule which requires the Court to compare the absolute and comparative disparities derived from the single qualified jury list sample in *Savage* with the disparities found in this case over a significant period of time in the source lists, the master lists, the qualified jury lists, and the grand jury venires. Such an approach would be inconsistent with *Savage* itself.

*Savage* clearly favors a nuanced approach in which all applicable statistical tests and historical data are considered in determining whether a group is "sizeably" underrepresented. *See Savage,* 970 F.3d at 257 ("Savage argues that the District Court inappropriately took 'bright-line' approaches dismissive of an absolute disparity under 10% and a comparative disparity for a small population. These characterizations fail to appreciate the District

Court's nuanced treatment of the absolute and comparative disparities together."); *id*. at 256 ("[I]n *Berghuis v. Smith*, the Court observed that 'neither *Duren* nor any other decision of this Court specifies the method or test courts must use to measure the representation of distinctive groups in jury pools.'"); *id*. at 256 n. 36 ("We have also used a third metric, standard deviation, to assess the reliability of sample data."); *id*. at 260 ("We have … left open the possibility that drawing on voter registration lists alone might be actionable 'under some circumstances' when use of those lists 'over time did have the effect of sizeably underrepresenting a particular class or group on the jury venire.'"); *id*. at 261 n.45 (rejecting reliance on two studies offered by the defendant, in part because "they fail to demonstrate underrepresentation over time.").

As explained in detail in Dr. Weeks's October 20, 2020 declaration, from a statistical standpoint,

> [t]he government is wrong in arguing that in light of the absolute and comparative disparities for a single qualified jury wheel, defendant can never satisfy the second or third prongs of the *Duren* test. The data presented here show that over a very long period of time, Blacks have been substantially underrepresented on jury wheels in the Pittsburgh Division, and every single one of these data points is highly statistically significant. These are not chance results--they are real results.

ECF 333-1 (Weeks Declaration) at 18.

The subsequent statistical analyses reflected in Exhibits 2 and 3 document beyond any doubt persistent and highly statistically disparities stretching back to 1995, and stand in sharp contrast to the single data point at issue in *Savage*. If the statistical showing made here is insufficient to satisfy the second prong of the fair cross section test, than it is hard to imagine what showing would suffice, short of proof of total exclusion.

Moreover, in *Savage,* Blacks represented 16.82% of the Eastern District population. *Savage*, 970 F. 3d at 256. By contrast, in this case, from 1995 to 2019, Blacks in the Pittsburgh Division have never exceeded 7.04% of the population, and Black males (3.21%) and Hispanics (1.22%) are even less of a percentage of the population. Exh. 2 at 15-16; Exh. 3 at 36. This is significant because, according to *Savage*, the absolute and comparative disparity tests "'can be misleading" when a group's population percentage is small:

> The two methods have countervailing weaknesses when it comes to evaluating the underrepresentation of a relatively small minority: Absolute disparity tends to *understate* any discrepancy, while comparative disparity tends to *overstate* it. *Weaver*, 267 F.3d at 242–43 (collecting cases). So relying on these methods 'can be misleading' when a group's population percentage is small. *Berghuis*, 559 U.S. at 329, 130 S.Ct. 1382; *see, e.g.*, *United States v. Ashley*, 54 F.3d 311, 313–14 (7th Cir. 1995) (denying fair-cross-section claim when group comprised 3% of relevant population but 0% of venire, due to absolute disparity of merely 3%).

*Savage,* 970 F.3d at 256.

For this reason, as explained by Dr. Weeks, the statistical significance test must loom large in any case like the present one in which the relevant population falls below 10%. Exh. 2 at 9-15. Given the length of time that the defense statistics cover, the size of the groups at issue, and the consistent findings of two experts that there are statistically significant disparities at all stages of the selection process, the Court should conclude that prong three has been satisfied.

As with prongs one and two of the *Duren* test, Mr. Bowers meets prong three. *Savage* confirms that "a defendant may establish an exclusionary process by identifying a large discrepancy over time such that the system must be said to bring about the underrepresentation." *United States v. Savage*, 970 F.3d at 259 (internal quotation omitted). This is exactly what Exhibits 2 and 3 demonstrate.

### iii.    The Jury Selection and Services Act

A defendant can challenge the jury selection process through the JSSA. The JSSA further solidifies the cross-section requirement of the Sixth Amendment. The JSSA only remedies "substantial failure[s] to comply" with the Act's requirements. 28 U.S.C. § 1867(d); *United States v. Calabrese*, 942 F. 2d 218, 227 (3rd Cir. 1991); *United States v. Carmichael*, 560 F.3d 1270, 1277 (11th Cir. 2009). The JSSA sets forth three primary principles, which, if violated, causes a substantial violation. *Calabrese*, 942 F. 2d at 227;

*Carmichael*, 560 F.3d at 1277. These three principles are "(1) random selection of juror names; (2) from a fair cross-section of the community; and (3) use of objective criteria for determination of disqualifications, excuses, exemptions and exclusions." *Id*. Fair cross section claims under the Act "are analyzed using the same standard as a Sixth Amendment fair cross section claim." *Weaver*, 267 F. 3d at 231. Because Mr. Bowers has established a constitutional fair cross section claim he has necessarily established a violation of the fair cross section requirement of the JSSA. Other violations of the JSSA are discussed below.

### iv.   18 U.S.C. § 243

In *Peters v. Kiff*, 407 U.S. 493 (1972), three members of the Court concluded that a jury that has been selected in an arbitrary and discriminatory manner violates 18 U.S.C.A. § 243, which provides:

> No citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State on account of race, color, or previous condition of servitude; and whoever, being an officer or other person charged with any duty in the selection or summoning of jurors, excludes or fails to summon any citizen for such cause, shall be fined not more than $5,000.

*Id*. at 497-498.

The Court in *Ramseur* noted this statute and observed that "the Supreme Court has frequently discussed this statute in cases in which defendants challenged their convictions based on discrimination in the jury

selection process." *Ramseur*, 983 F.2d at 1225 n. 6 (citing *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614 (1991); *Powers v. Ohio*, 499 U.S. 400 (1991); *Neal v. Delaware*, 103 U.S. 370, 394 (1881)). However, the Court concluded that "[s]ince Ramseur has not invoked 18 U.S.C. § 243, we are …not required to decide whether he could assert rights under this statute." *Id*.

Although this issue remains undecided in the Third Circuit, the statute unambiguously prohibits race discrimination in jury selection. Accordingly, Mr. Bowers invokes it as an additional basis for granting his motion.

Having established both constitutional and statutory violations, Mr. Bowers turns to the issue of what standard the Court should apply under the JSSA in determining whether a supplemental source list is required.

### C. The JSSA And Its Legislative History

The Jury Selection and Service Act of 1968 ("Act") provides in 28 U.S.C. § 1863 (a) that "[e]ach United States district court shall devise and place into operation a written plan for random selection of grand and petit jurors that shall be designed to achieve the objectives of sections 1861 and 1862 of this title, and that shall otherwise comply with the provisions of this title."

Section 1861 provides:

It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and

petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose.

Section 1862 provides:

No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States on account of race, color, religion, sex, national origin, or economic status.

At the time of its enactment in 1968, Section 1863(b)(2) provided in part that a district court's written plan for random selection of grand and petit jurors shall, among other things,

specify whether the names of prospective jurors shall be selected from the voter registration lists or the lists of actual voters of the political subdivisions within the district or division. The plan shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title. The plan for the District of Columbia may require the names of prospective jurors to be selected from the city directory rather than from voter lists. The plans for the districts of Puerto Rico and the Canal Zone may prescribe some other source or sources of names of prospective jurors in lieu of voter lists, the use of which shall be consistent with the policies declared and rights secured by sections 1861 and 1862 of this title.[31]

---

[31] In 1992, an additional sentence was added to this provision: "The plan for the district of Massachusetts may require the names of prospective jurors to be selected from the resident list provided for in chapter 234A, Massachusetts General Laws, or comparable authority, rather than from voter lists."  Pub.L. 102-572, Title IV, § 401, Oct. 29, 1992, 106 Stat. 4511.

The meaning and intent of this provision is spelled out in the legislative history of the Act. The House Report accompanying S. 989 states:

> The bill specifies that voter lists be used as the <u>basic</u> source of juror names. These lists provide the widest community cross section of any list readily available. Census data quickly become out of date and are not suitable. The bill requires that the voter lists be supplemented by other sources whenever they do not adequately reflect a cross section of the community. The bill, as amended, provides that sources of names other than voter lists may be used to *supplement*, but not *supplant*, voter lists.
>
> The voting list requirement, together with the provision for supplementation, is therefore the primary technique for implementing the cross sectional goal of this legislation.

H. Rep. 90-1076 (1968) at 4-5 (italics in original; underlining added).

The Senate Report in support of the bill also contains the statement that "[t]he bill requires that the voter lists be supplemented whenever they do not adequately reflect a cross section of the community" and it quotes the testimony of jury system experts Professors Harry Kalven and Hans Zeisel who informed the Senate Judiciary subcommittee conducting hearings on the bill that:

> When all is said and done, we believe that the voter registration list is by far the most desirable list *as the foundation* of the juror selection process. *We don't mean necessarily that the voter list should be the only one. if it is found seriously deficient, as it might be in some areas, then by all means it should be supplemented by other lists*, but I think from the point of view of the statistician who wants to obtain a representative cross section of the population, the voter list is by far the most desirable source.

S. Rep. 90-891 (1967) at 16-17 (quoting *Federal Jury Selection,* Hearings before the Subcommittee on Improvement of Judicial Machinery of the Senate Committee on the Judiciary, 90th Cong., first sess. (1967) at 131) ("Federal Jury Selection") (emphasis added).

Consistent with this and other testimony at the hearings, both Reports declare that:

> The voting list need not perfectly mirror the percentage structure of the community. But any substantial percentage deviations must be corrected by the use of supplemental sources.

S. Rep. 90-891 at 17; H. Rep. 90-1076 at 5.

The erroneous concept embraced by some courts, but rejected in the Third Circuit in cases such as *Weaver*, *Howell*, and now *Savage,* that under the Act or under the Sixth Amendment, supplementation of the voter registration lists is mandated only where it can be shown that underrepresentation of cognizable groups is due to some systemic factor other than an individual choice not to register to vote was squarely rejected by the very Department of Justice that proposed the predecessor bill (H.R. 14765) that served as the model for S. 989.[32] In his remarks introducing H.R. 14765, the Civil Rights Act of 1966, Attorney General Katzenbach told Congress:

---

[32] *See* H. Rep. 90-1076 at 3 ("In the 89th Congress, H.R. 14765 was considered and favorably reported by this committee (see Civil Rights 1966, Hearings before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., second sess., serial No. 16, and H. Rept. 1678). The House approved

89

These voter rolls currently reflect a fair cross section of the community in most areas, and the Voting Rights Act of 1965 provides the means to end in the near future such racial discrimination in the voter registration process which has not yet been eliminated. We have, however, also made provision for the current period of transition during which some areas are moving from large-scale exclusion of Negroes from the electorate to full participation by Negroes in elections.

The key provision is section 1864(a). It provides that in areas in which Negroes and/or other groups are still not fairly represented on the voter rolls – whether because of the lingering effects of past discrimination, intimidation, the mores of a segregated society, or other factors-the judicial council of the circuit would be required to designate other sources of names to supplement the voting lists so that the pool of potential jurors will fairly reflect the population of the district. The sitting appellate court judges comprise the judicial council.

Civil Rights 1966, Hearings before Subcommittee No. 5 of the House

Committee on the Judiciary, 89th Cong., second sess., serial No. 16, and H.

Rept. 1678 (1966) at 1064 ("Civil Rights 1966").[33]

---

the measure on August 9, 1966. Title I of H.R. 14765 contained proposed amendments to the Federal jury selection system which were identical in terms of objectives and fundamental principles to S. 989, as amended."); S. Rep. 90-891 at 15 ("In February 1967, the President sent to Congress the civil rights bill of 1967. In its major principles, title I of that bill did not differ from the Kaufman Committee's proposal [S. 989] or from the administration's 1966 proposal [H.R. 14765].")

[33] The proposed § 1864, almost identical to what was enacted in the 90th Congress as § 1863(b)(2), provided:

(a) Each jury commission shall maintain a master jury wheel and shall place in the master wheel names selected at random from the voter registration lists of persons residing in the judicial district or

One of the criticisms of proposed § 1864(a) in H.R. 14765 was that it was too broad. In the Senate debate on H.R. 14765, Senator Eastman objected that:

> It is clear, therefore, that the proviso in subsection (a) of the proposed new section 1864 of title 28, on page 4 of this bill, authorizes the judicial council of the circuit, whenever it may decide that a particular race, or color, or religion, or sex, or national origin, or economic status is not represented by enough names in the jury wheel, to provide for placing in the wheel additional names of persons of that particular race, or color, or religion, or sex, or national origin, or economic status. This is to be done by prescribing some source or sources of names other than the voter registration lists. There is no further restriction in this subsection, or anywhere else in the bill, or where the additional names are to come from. The judicial council is left free to name any conceivable source or sources of names.

112 Congressional Record, 89th Congress, 2nd Sess., part 17 (1966) at 22736.

Another criticism was aimed at the use of voter registration lists themselves. Senator Ervin objected that

> [t]he title does allow the use of additional sources of names. However, it requires that the registration lists be kept as the principal source. In some areas, such as the District of Columbia and my own State of North Carolina, there are alternative sources of names far superior to registration lists. The District uses a city directory containing the names

---

division it serves: Provided, That the judicial council of the circuit, with such advice as the chief judge of the district may offer, shall prescribe some other source or sources of names for the master wheel in addition to the voter registration lists where necessary, in the judgement of the council, to protect the rights secured by section 1862 of this title.

of every resident in the city. In other districts it may well be that one or a combination of sources will give a comprehensive list of nearly every potential juror. In these cases the requirement of the registration list is superfluous and merely creates additional burdens on the already overworked court staff.

An additional defect in using voter registration lists is the fact that in many areas registration is permanent. These lists contain names of persons no longer residents and no longer voters. In some places, these lists are cleared by election officials only occasionally, and I have no doubt that in many areas, the lists are years out of date. The lists also contain the names of people who have died and, while some may consider them nonetheless qualified for voting, this just adds to the burden of the jury commissioners who must send them qualification forms or call them in for interviews, send the marshal out to find them when they do not respond, and keep records on these efforts for 6 years afterward. Reliance on registration lists ignores a major recommendation of President Kennedy's Commission on Registration and Voting Participation, which specifically disapproved of using such lists as sources of prospective jurors.

*Id.* at 22645.[34]

---

[34] In 1963, President Kennedy's *Commission on Registration and Voting Participation,* available at https://books.google.com/books?id=8V015we_ODUC&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false, recommended that voter registration lists be used only for electoral purposes for these reasons:

> It has been indicated to the Commission that some persons do not register to vote because the voter registers in their counties are used for tax assessment, jury selection, and other nonvoting purposes. While the Commission is fully aware of the importance of these other civic responsibilities, we believe that registration lists should not be used for these purposes.

_____

In 1970, the Conference of Commissioners on Uniform State Laws adopted the Uniform Jury Selection and Service Act. The Uniform Act differs from the Federal Act in one critical respect. Although both designate either voter registration lists or lists of actual voters as the initial source of names, section 5 the Uniform Act provides that supplementation of the initial source of names is mandatory. The comment to section 5 of the Uniform Act states that exclusive use of voter registration lists might have a chilling effect on the exercise of the voting franchise itself.

In 1975, Senator Edward Kennedy released to the Senate a nationwide study that "confirms the serious nature of the problem" and "demonstrates that use of registration lists for jury duty actively discourages potential voters from registering, and that relatively large numbers of voters are affected, with the actual numbers running into the millions nationwide."121 Cong. Rec. part 8, 94 Cong., 1st. Sess. 10238 (1975). *See also* Stephen Knack, *Deterring Voter Registration through Juror Selection Practices: Evidence from Survey Data*, 43 Public Choice 49 (2000) ("Presenting evidence from additional data sources, this study confirms that the use of voter registration lists for jury selection purposes significantly reduces registration rates. Further, evidence is provided for the first time that a large percentage of Americans are aware that voter registration lists are the primary source lists for selection of jurors.")

As argued below, the right to vote is a fundamental constitutional right, and so is the right to a jury chosen from a fair cross-section of the community. Based on the demonstrated impact that using voter lists as juror source lists has on the right to vote, such use violates the due process and equal protection components of the Fifth Amendment, as well as the Twenty Fourth Amendment, because it unconstitutionally burdens and chills the right to vote. *See* Alexander E. Preller, *Jury Duty is a Poll Tax: The Case for Severing the Link Between Voter Registration and Jury Service*, 46 Columbia Journal of Law and Social Problems 1 (2012) ("[J]ury duty is sufficiently burdensome, and …this burden sufficiently impacts voting, so as to constitute a poll tax in violation of the Twenty-Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment. There is a simple, effective solution to this problem: prohibiting the use of voter registration lists to create jury lists, and instead using any number of available alternative sources to create a representative jury pool.")

As Senate Report 90-891 points out, H.R. 14765 did not pass in the Senate because "the Judicial Conference did not have an opportunity to consider the measure, and that factor, together with serious problems of administrative feasibility, was widely cited as a major reason for the failure to enact the proposal." *Id*. at 14. "The Conference responded quickly, however, to the controversy aroused by the attempt to legislate extensive jury selection reform. In August 1966, Chief Justice Earl Warren reactivated the Conference's Committee on the Operation of the Jury System, appointed Judge Irving R. Kaufman, of the Court of Appeals for the Second Circuit, as Chairman, and named eleven other members, one from each judicial circuit. ... [T]he the Kaufman Committee chose to go forward with its own measure since it contained important differences in detail that were responsive in the main to changes suggested by district judges throughout the country. On February 16, 1967, Senator Tydings introduced the Kaufman Committee's proposal as S. 989." *Id*. at 14-15.

The Kaufman Committee's proposed bill essentially ignored Senator Eastman's criticism, but it sought to address the criticisms of Senator Ervin by adding actual voter lists as an alternative to voter registration lists, while leaving intact the broad supplemental provision of the 1966 Civil Rights bill. The Kaufman Committee's report to the Judicial Conference states:

The 1966 and 1967 Civil Rights bills permit only voter registration lists to be used as the source of names. But because voter registration is not required in some political subdivisions, and in other registration lists are so far outdated as to be unreliable, the committee has provided that actual voter lists, or registered voter lists, may be used as the source of juror names.

By requiring random selection from voter lists, the draft bill would eliminate the "key man" or "suggester" system in the Federal courts. The committee believes this is a desirable and necessary reform because the key man system allows opportunities for discrimination – unintentional as well as intentional. Even if the jury commissioners or the key men do not deliberately intend to discriminate, they often are not acquainted with citizens of some minority or low income groups, and so these individuals are never afforded an opportunity to serve. Perhaps more important, the haphazard nature of the process does not insure that each qualified citizen will have an opportunity equal to that of every other qualified citizen to be considered for jury service.

Report of the Committee on the Operation of the Jury System of the Judicial Conference of the United States, 42 F.R.D. 353, 360-361 (1967)) ("Kaufman Report"); see Federal Jury Selection at 254 ("The difficulty with allowing only registration lists to be used is that many persons whose names appear on such lists do not have to register periodically and often will have moved or died before election. Thus, the clerks would be put to a good deal of useless work in mailing qualification forms to these individuals.") (Statement of Judge Kaufman).

Prohibiting the use of "outdated" and "unreliable" methods that produce "haphazard" results which create a "good deal of useless work" and defeat the goals of allowing "each qualified citizen [to] have an opportunity

95

equal to that of every other qualified citizen to be considered for jury service"
and encouraging participation by "minority [and] low income groups," became
central purposes of the JSSA. At the same time, and despite Senator
Eastman's criticism, the supplemental list proviso of the 1966 bill was left
fully intact to ensure flexibility in the face of current or future conditions:

> In a few jurisdictions voter lists do not represent a fair cross-section of the community, but we have been advised by the Department of Justice that this situation is being corrected since the passage of the Voting Rights Act of 1965, 42 U.S.C. § 1973 et seq. Where this condition still exists, however, the committee's draft bill requires the use of other lists in addition to the voter lists to obtain the representative cross-section.

Kaufman Report at 361-362.

In a footnote, the Report added that "[p]rovision is also made for the
use of sources in lieu of voter lists *where such lists are unsatisfactory or
unavailable*, *e.g.*, in the District of Columbia or the Canal Zone." *Id*. at 362 n.
3 (emphasis added).

Significantly, one jurisdiction where the use of voter lists was deemed
"unsatisfactory" was the Western District of Pennsylvania. Judge Edward
Dumbauld, who served on this Court from 1961-1997, wrote to the Senate
Judiciary Committee that was considering the several versions of the federal
jury reform measure:

> Another specific objection occurs to me with respect to the provision of s. 386 calling for use of voter registration lists as the basic source of names. In this connection the broader provisions of

> S. 385 would be preferable. Since voting is a privilege rather than a legal obligation, there may be many well qualified citizens who are not voters. Telephone directories and tax lists might well be consulted as a source.

*See* Exh. 6, *Federal Jury Selection* at 698-702 (letters of Judge Dumbauld to Senate Judiciary Committee); *id*. at 1134-1138 (Western District of Pennsylvania, Questionnaire on Current Jury Selection Methods).[35]

In a subsequent letter, Judge Dumbauld wrote to the Committee about his views of S. 989:

> I am glad to see that this bill contemplates the use of other sources than voters lists. In my judgment there are several strong objections to a procedure limited to voters lists. In the first place, this would exclude, contrary to the policy of providing a cross-section of the community, a number of qualified jurors, simply

---

[35] The Questionnaire, filled out by the Clerk of Court, indicates that the key man system was currently being used by the Court, but that "[p]resently the Court is considering using the Voters' List since we are encountering difficulty securing a sufficient number of jurors, especially men, on the recommendation basis.") This is a puzzling statement in light of the Third Circuit's suggestion in *Dow* that the use of such lists may be inappropriate because "[i]t may be that some cognizable groups generally fail to register to vote, so that such a method would be inherently faulty." *Dow*, 224 F.2d at 427; *see United States v. Zirpolo*, 450 F.2d 424, 431 (3d Cir.1971) (citing with approval *United States v. Hoff*a, 196 F. Supp. 25, 31 (S.D.Fla.1961)) ("Could it be said in the present case that a jury panel from which all registered voters had been intentionally excluded was truly representative of the community? This Court does not think so. It is evident that a jury panel from which all were deliberately and systematically excluded who did not register to vote, in a community where many citizens qualified for Federal jury service do not so register, and to likewise exclude all women from jury service except the very few who registered for jury service in the State Courts, is not a fair representation of the community.")

because they failed to register to vote. Having been a Common Pleas judge in Pennsylvania before becoming a federal judge, I have had occasion to campaign among the voters, and know from personal experience that many citizens do not register as voters because of their erroneous belief that they will be more likely to be taxed if they register as voters. I have endeavored to explain that this is an erroneous belief, and that the assessors can and probably will assess them for taxation regardless of whether they register as voters, but the belief is a very persistent one among the populace.

Furthermore, there are many fine people who because of their religious beliefs (such as Mennonites and similar sects, numerous in Pennsylvania and also in Maryland) believe that it is wrong for them to participate in government.

In the third place there are practical inconveniences, such as the retention on voters lists of dead wood composed of people who have changed their address without notification. More reliably up-to-date lists such as telephone directories should be used, in addition to voting lists.

Exh. 6 at 701.

The broad supplemental list proviso of § 1863(b)(2) was intended to allow the flexibility necessary to accommodate these kinds of local concerns.

As persuasively summarized by Judge Gertner in *Green*:

The legislative history is extraordinary, reflecting several important themes, which have perhaps been forgotten in the administration of the JSSA:

First, Congress decried the underrepresentation of minorities in the "key-man" system, *whatever* the cause, whether intentional discrimination, or the natural, even well-intentioned, tendency of the key men to draw upon their limited circle of acquaintances. H.R. Rep. at 4; S. Rep. at 10. The statute's goal was broad and remedial: "The defect that calls for congressional action is that the representational goal of jury selection is impaired when the

98

methods used are *haphazard or less than adequate* to ensure fair selection from a fair sample." S. Rep. at 10 (emphasis in original).

Second, even though Congress chose to use voter registration lists as the default source list, it recognized their inadequacies. It left it to the courts to define when a particular voter list is so underrepresentative that it requires supplementation, as in communities in which a substantial percentage of the population has not registered to vote. S. Rep. at 16–17, 25.

Third, and relatedly, Congress recognized that the fact that a citizen chose not to register to vote did not necessarily mean it was appropriate to disqualify him or her from jury service. The issue was not that potential juror's individual choice. Rather, it was the right of the *defendant* to a jury drawn from a fair cross-section of the community; a goal that would be undermined if juries consisted exclusively of those "who have manifested their civic interest by registering to vote." Handman, *Underrepresentation of Economic Groups on Federal Juries*, [57 B.U.L.Rev. 205 (1977)] at 207, 208.

Fourth, the standard for triggering supplementation was intentionally broad. Both the House and Senate Reports state that the affirmative obligation to supplement is triggered whenever there exists "any substantial percentage deviation" between the source lists and an ideal fair cross-section of the community, no matter how that deviation came to pass. S. Rep. at 17 (emphasis added); see also Handman, *Underrepresentation of Economic Groups on Federal Juries*, at 205 ("Apparently, the only inquiry relevant to supplementation is whether the prohibited deviation actually exists"). The definition of "substantial deviation" was left to the courts. S. Rep. at 17;73 H.R. Rep. at 3.

Finally, neither the language of the Act nor its legislative history indicates that Congress intended for the finding of a Sixth Amendment violation to be a prerequisite to supplementation pursuant to § 1863(b)(2). After all, as described above, at the time the JSSA was passed, Sixth Amendment law was very narrowly drawn, focusing on intentional discrimination. It was not until *Taylor* in 1975 that Sixth Amendment law diverged from that approach and focused on concerns for a cross-sectional jury.

*Green*, 389 F. Supp. 2d at 70 (emphasis in original).

In the 90th Congress, during the House debate on S. 989, Congressman Cellar, the Chairman of the House Judiciary Committee, and the bill's principle sponsor in the House, noted that

> Section 1863 of S. 989 requires that voter lists be used as the primary source of names for prospective jurors, supplemented only by other lists *when voter lists are determined to be insufficiently representative.*

114 Congressional Record, 90th Congress, 2nd Session (1968) at 3990 (emphasis added).

He also made clear in the below exchange the flexible nature of the supplementation provision:

> Mr. WAGGONNER. Could I ask the chairman another question? This sets forth a random plan of jury selection allowing each Federal district judge, with the approval of some council, a judicial council, to devise a plan which might be utilized in that district and in that district alone: In effect, this random selection jury plan will allow as many different plans as we have Federal judicial districts in the country, will it not?
>
> Mr. CELLER. Let me put it this way: This bill lays down certain criteria or outlines to be followed throughout the length and breadth of the land in all the Federal courts. It is not absolute. For example, if a district court finds voting lists inadequate, the district court plan could supplement the voting lists with additional lists. If in some communities the lists of actual voters together with the registration lists, would still prove inadequate, the court in its discretion could get other lists like census lists, or the city directory. In that sense there is variation or flexibility, but fundamentally there is uniformity.

*Id*. at 3996.

Thus, under the Act, the key issue in determining whether voter lists must be supplemented is whether such lists "are determined to be insufficiently representative," not whether the under-representativeness is caused by an unfettered choice not to vote. As was stated in *Broadway v. Culpepper*, 439 F.2d 1253, 1257 (5th Cir. 1971), under the Act, "[t]he use of voter list[s] is not the end sought. Rather, that is the principal source. If the source is deficient or infected its use alone will not suffice."). *See United States v. Armsbury*, 408 F. Supp. 1130, 1140 (D. Or. 1976) ("The voting list is not the end sought but only the means used to ensure that all cognizable groups within the populace are represented on juries. The voting list cannot be adequate if some groups are significantly underrepresented, regardless of the cause."). As was held in *Green*:

> The JSSA requires that district court jury plans supplement district source lists "where necessary to foster the policy and protect the rights" of litigants to a jury that reflects a fair cross-section of their community. 28 U.S.C. § 1863(b)(2). The language is that of an affirmative obligation to ensure selection from a fair cross-section of the community. There is no requirement to prove causation or to identify the mechanism by which the underrepresentation occurs. There is no inquiry as to whether the underrepresentation was created by discrimination or by the choice of the potential jurors (in not registering to vote, for example, in a jurisdiction where voting lists are used). Rather, the obligation to supplement is triggered by any set of facts which undermines the "policy" of the JSSA and the "rights secured by sections § 1861 and § 1862." 28 U.S.C. § 1863(b)(2). Those rights include freedom from discrimination (§ 1862), as well as cross-sectional jury selection (§ 1861).

101

*Green*, 389 F. Supp. 2d at 69.

That *Green's* reading of the statute is correct is clearly indicated in the legislative history of the Act. Both Senate and House Reports on the Act contain this identical language:

> Subsection (b)(2) contains the fundamental requirement that voter lists be used as the *basic* source of juror names. In accord with the theme of flexibility, each district plan may choose whether to use voter registration lists or lists of actual voters. These alternatives are offered because the preferred source, the registration lists, may not be up-to-date in some areas. Moreover, the bill recognizes that in some areas voter lists of all kinds may be insufficient to implement the policies of the act, *by reason of local voting practices*. Where that is true, the plan must prescribe other sources to supplement the voter lists.

H. Rep. 90-1076 at 9-10; Sen. Rep. 90-891 at 27 (emphasis added.)

It is true that one passage of the legislative history of the JSSA, if read out of context, could be and has been misconstrued by some courts outside the Third Circuit to support the historically inaccurate view that, because voter registration is simply a matter of free choice unencumbered by a history of racism or other impediments, the sole reliance on voter registration lists is perfectly appropriate. *See, e.g., United States v. Cecil*, 836 F.2d 1431, 1448 (4th Cir. 1988) ("[T]he use of the voter registration lists been uniformly approved by the Court of Appeals as the basic source for the jury selection process and will not be invalidated because a group chooses not to avail itself

of the right to register without any discrimination of any kind."). Reference is

made in *Cecil* to the fact that both Reports accompanying the JSSA state that

> In a sense the use of voter lists *as the basic source of juror names*
> discriminates against those who have the requisite qualifications
> for jury service but who do not register or vote. This is not unfair,
> however, because anyone with minimal qualifications-
> qualifications that are relevant to jury service-can cause his name
> to be placed on the lists simply by registering or voting. No
> economic or social characteristics prevent one who wants to be
> considered for jury service from having his name placed in the
> pool from which jurors are selected.

H. Rep. 90-1076 at 5; Sen. Rep. 90-891 at 17 (emphasis added).

What this passage says is that it is not unfair to use voter lists "as the

basic source of juror names" (not as the sole source) because any

discrimination against those who chose not to vote is alleviated by the fact a

person can be included on the list "simply" by registering or voting. The

statement also presupposes that there are no historical or other impediments

to registering or voting, and no economic or social characteristics that would

prevent one who wants to be considered for jury service from having his name

placed in the pool from which jurors are selected. Elsewhere, however, as

quoted and discussed above, the legislative history makes it clear that where

such impediments or economic or social characteristics do exist, or even

where voluntary voting practices have produced a pattern of

underrepresentation, supplemental lists "must" be employed. *See Armsbury*,

408 F. Supp. at 1140 ("From this [passage] was inferred that as long as

people are not prevented from registering to vote, voting lists are *ipso facto* deemed adequate. This interpretation is erroneous. I believe that [this passage] merely indicates that non-voters do not form a cognizable group. It does not mean that voting lists are always adequate when free from discrimination in voter registration. The voting list is not the end sought but only the means used to ensure that all cognizable groups within the populace are represented on juries. The voting list cannot be adequate if some groups are significantly underrepresented, regardless of the cause.").

The plain meaning of this passage was not lost on Congressman Kastenmeier who, in arguing in support of the bill, expressed his understanding that

> [s]ources in addition to voter lists are to be used only where there is pronounced underrepresentation of a particular group. In the past, in some parts of the country, Negroes were largely excluded from the electoral process. The Voting Rights Act of 1965 has altered this situation significantly. *Still, there are some areas where the percentages of Negroes registered to vote is much lower than that for whites. In such areas, the juror-selection plan must prescribe sources in addition to voter lists.* However, we can expect that, in time, with the continuing implementation of the Voting Rights Act, the need to employ supplemental sources will end.

114 Congressional Record, 90th Congress, 2nd Session (1968) at 3998 (emphasis added).

### D. The Effects of Past Discrimination and the Continued Need for Supplementation of the Voter Registration Lists

Unfortunately, although Congressman Kastenmeier's reading of the statute was generally right, his optimistic prediction of the future has proven to be wildly incorrect, as demonstrated below. Far from ending, the need to employ supplemental source lists has *increased* rather than decreased with the passage of time. This is largely due to the facts that racist voter and juror suppression efforts have deep historical roots in this country that have not been eradicated with the passage of time or legislation, and that those in favor of such efforts have increasingly come up with new and aggressive ways to suppress minority voting and jury rights. The history and present state of race discrimination in jury selection is well known and is vividly summarized in Judge Higginbotham's concurring opinion in *United States v. Clemmons*, 892 F.2d 1153 (3d Cir. 1989):

> Racial discrimination in jury selection has tainted the American legal system since the colonial period.
>
> Before the Civil War, nearly all states, through statute or custom, prohibited blacks from serving on juries. L. Litwack, *North of Slavery: The Negro in the Free States 1790-1860* 94 (1961). Although the statutory exclusion of blacks from jury duty was struck down by the Supreme Court in *Strauder v. West Virginia*, 100 U.S. (10 Otto) 303, 25 L.Ed. 664 (1880), legislatures, prosecutors, and jury commissioners have since developed an imaginative array of devices to bar blacks and other minorities from the jury box. *See, e.g., Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) (blacks excluded through peremptory challenges); *Avery v. Georgia*, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953) (jurors selected by means of racially coded tickets); *Hill v. Texas*, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942) (jury commissioners selected jurors from among their

personal acquaintances); *Neal v. Delaware*, 103 U.S. (13 Otto) 370, 26 L.Ed. 567 (1881) (selection of jurors from list of "sober and judicious" citizens); *Labat v. Bennett*, 365 F.2d 698 (5th Cir.1966) (exclusion of hourly wage earners), *cert. denied*, 386 U.S. 991 (1967); *Rabinowitz v. United States*, 366 F.2d 34 (5th Cir.1966) (blacks excluded through "key man" system of panel selection, in which "respectable" citizens were asked to recommend other "good citizens" for jury duty); *U.S. ex rel. Goldsby v. Harpole*, 263 F.2d 71 (5th Cir.) (jury lists drawn from voter registration lists, from which blacks were excluded), *cert. denied*, 361 U.S. 838, 80 S.Ct. 58, 4 L.Ed.2d 78 (1959); L. Rice, *The Negro in Texas: 1874-1900* 255-57 (1971) (blacks excluded through subjective eligibility criteria for jury duty, jury commissioner discretion, literacy qualifications). *See generally* J. Bass, *Unlikely Heroes* 278-285 (1981) (race discrimination in jury selection in the Fifth Circuit during the 1950s and 1960s); D. Bell, *Race, Racism and American Law* 235-77 (2d ed. 1980).

Today, over one hundred years after *Strauder*, the integrity of the jury system is still threatened by sometimes blatant race discrimination on the part of government attorneys. As Justice Marshall noted in his *Batson* concurrence, an instruction handbook used by the Dallas, Texas prosecutor's office in the 1970s "explicitly advised prosecutors that they conduct jury selection so as to eliminate 'any member of a minority group.'" An earlier jury-selection guide used by those same prosecutors phrased this advice more bluntly: "Do not take Jews, Negroes, Dagos, Mexicans or a member of any minority race on a jury, no matter how rich or well educated." 476 U.S. at 104 & n. 3, 106 S.Ct. at 1727 & n. 3 (citations omitted). The government attorney in a recent § 1983 case, *Clark v. City of Bridgeport*, 645 F. Supp. 890 (D.Conn.1986), candidly admitted that he struck eight out of eight black venirepersons on purely racial grounds. When asked to justify his peremptory challenges, he stated: '[I]f I had a choice between a white juror and a black juror under the facts of these cases, I'm going to take a white juror. That's what I'm saying.... [W]hy should I put my city and my defendants at the mercy of the people in my opinion who make the most civil rights claims, at least in my experience[?] ...' *Id*. at 894.

Clearly, we are still some distance from our constitutional objective of colorblind jury selection.

*Id.* at 1160.; *see Flowers v. Mississippi*, 139 S. Ct. 2228, 2239 (2019) (conviction reversed because overwhelming evidence indicated that in the course of six trials of the defendant for the same crimes "[t]he State's relentless, determined effort to rid the jury of black individuals strongly suggests that the State wanted to try Flowers before a jury with as few black jurors as possible, and ideally before an all-white jury."); *id.* ("In the decades after *Strauder*, the Court reiterated that States may not discriminate on the basis of race in jury selection. ... But critical problems persisted. Even though laws barring blacks from serving on juries were unconstitutional after *Strauder*, many jurisdictions employed various discriminatory tools to prevent black persons from being called for jury service. And when those tactics failed, or were invalidated, prosecutors could still exercise peremptory strikes in individual cases to remove most or all black prospective jurors."); *Ind. State Conf. of NAACP v. Lawson*, 326 F. Supp. 3d 646, 650 (S.D. Ind. 2018) ("Historically . . . throughout the country, voter registration and election practices have interfered with the ability of minority, low-income, and other traditionally disenfranchised communities to participate in democracy.").

107

This history of racism is important because it is not easily forgotten by those who are the victims of it, thus discouraging minority participation in both voting and jury service. The concept of lingering effects of past discrimination was developed in *Bradas v. Rapides Parish Police Jury*, 508 F.2d 1109, 1112 (5th Cir. 1975):

> [T]he issue here of course is not whether Rapides Parish discriminated against blacks in the past, but rather whether any debilitating effects of that discrimination still persist…. In previous cases such debilitating effects have usually been shown by a relatively large discrepancy between the size of the black population and the number of registered black voters.

Failure to acknowledge this concept can lead to faulty reasoning, as was the case in *Kirksey v. Bd. of Sup'rs of Hinds Cty.,* 554 F.2d 139, 145 (5th Cir. 1977) (*en banc*):

> [T]he district court considered specific indicia which it felt demonstrated that the 'lack of access' of the past had become 'equal access' in the present. These indicia will not bear the weight which the court put on them. The court referred to post-1966 registration of black voters and concluded that any black not currently registered has failed to register because of lack of interest or apathy. This conclusion is not supported by sufficient evidence. It is not a matter for judicial notice.

The conclusion was not supported by sufficient evidence and could not be judicially noticed because

> [f]ailure to register may be, for example, a residual effect of past non-access, or of disproportionate education, employment, income level or living conditions. Or it may be in whole or in part attributable to bloc voting by the white majority, *i. e.*, a black may think it futile to register.

*Id.* n.13.

Although these two cases involve access to the right to vote, the same concept of lingering effects of past discrimination has been applied in a criminal case where the issue was whether a criminal defendant had been denied the constitutional right to a trial drawn from a fair cross-section of the community because the jury commissioner used voter registration lists as his sole source list. In *King v. Cook*, 298 F. Supp. 584 (N.D. Miss. 1969) the court overturned the defendant's conviction:

> [W]e must conclude that the master jury list of April 1966, drawn exclusively from the voter registration rolls, did not constitute a reasonable cross-section of the population of Quitman County, as a direct result of past official discrimination against Negro voter registration.
>
> The proof at the hearing showed that, although all legal and administrative impediments to Negro registration had been removed prior to April 1966, the fear of reprisal at the hands of the white community, albeit unfounded, was still present in the minds of a substantial segment of the Quitman County Negro population. This being so, the indictment and conviction of petitioner may not stand.

*Id.* at 588.

All three of these cases are from the Deep South, but nobody aware of the pervasive racial inequality that exists today can legitimately claim that racism and its pernicious impacts are a regional phenomenon or that certain states are immune from its effects. One needs only to skim though the long

and ever-increasing number of Congressional hearings on, and other government publications about, voter registration suppression efforts to see how pervasive racism is even in Northern states like Pennsylvania, including:

(1) *Voter Registration*: *Hearing Held Before The Task Force On Elections Of The Committee On House Administration, House Of Representatives*, Ninety-Eighth Congress, Second Session 123 (1983) ("What I am pointing out is that barriers to registration do exist. I have cited examples in Connecticut and Pennsylvania and Arizona and Alabama and Mississippi, Virginia, and Georgia. So for black people, it is not just a southern problem; in fact, there are procedures or obstacles in place in Northern States, as well. I am suggesting the barriers to registration do not exist just in the minds of paranoid minorities but in restrictive and manipulative procedures administered by insensitive election officials. These barriers discourage voter participation."); *id*. at 128 ("In Pennsylvania, where postcard registration is permitted, organizations wishing to hand out postcards and encourage registration are not allowed to do so in public welfare offices.");

(2) V*oting Rights Act: Runoff Primaries And Registration Barriers: Oversight Hearings Before The Subcommittee On Civil And Constitutional Rights Of The Committee On The Judiciary*, House Of Representatives Ninety-Eighth Congress Second Session (1984) at 119 ("Statistics from states with large minority populations suggest the continuing negative impact of registration restrictions on voting by all citizens, but especially Blacks and Hispanics: the average black-white registration discrepancy in the South is about 10 percentage points; the number of unregistered blacks in the North ranges from several hundred thousand in Pennsylvania, Michigan and New Jersey to just under one million in New York; more than 60 percent of Hispanics over 18 didn't vote in 1980 because they were unregistered...");

(3) *Voter Registration: Hearings Held Before the Subcommittee on Elections of the Committee on House Administration*, House of Representatives, One Hundredth Congress, Second Session (1988)

at 71 ("States had residency requirements of varying lengths. Delaware, Kentucky and Pennsylvania required two years of residence before suffrage was allowed while Georgia required only 6 months."); *id*. at 204 ("States requiring registration 30 days or more before an election include:.. Pennsylvania."); *id*. at 245 ("Even in states with mail or postcard registration problems exist. In Pennsylvania and Utah election officials give out forms in very small quantities and require completed forms to be turned in before handing out additional ones. This makes registration of large numbers of people at food stamp offices and surplus food distribution sites very difficult or impossible. And in 1986, volunteers were routinely thrown out of Pennsylvania public agencies even though a lawsuit in 1984 had ruled public agencies open to volunteers conducting registration. The case was litigated again in 1986."); *id*. at 751 ("In Pennsylvania, we wanted to register citizens at unemployment offices. Rather than applaud our efforts, the incumbent governor of the time, attempted to block our access to the sites. After a court battle, we won access and registered over 4,000 voters.");

(4) *Voter Registration: Hearing Held Before The Subcommittee On Elections Of The Committee On House Administration*, U.S. House Of Representatives, One Hundred Third Congress, First Session (1993) at 160 ("It is imperative that all barriers which limit access to a citizen's right to vote be removed. In Pennsylvania, as well as other states in the nation, voter participation in the electoral process is discouragingly low. To the degree possible, all requirements pertaining to voter registration should not of themselves serve as barriers to voting.") (Letter of Commonwealth of Pennsylvania Secretary of State);

(5) Congressional Research Services, *The National Voter Registration Act of 1993: History, Implementation, and Effects* (2011) at 18 ("On January 22, 1995, the Justice Department filed suit against California, Illinois, and Pennsylvania for failure to implement the NVRA by January 1, 1995.");

(6) *The American Voting Experience: Report and Recommendations of the Presidential Commission on Election Administration* (2014) at 17 (PCEA Report) ("DMVs, which are supposed to play the most important registration role in the statute, are the weakest link in

the system. Some DMVs appear to disregard the law. Others erect impediments to the seamless transfer of registration data to election offices managing statewide registration lists. This noncompliance leads to preventable inaccuracies in the voter registration lists. Voters who think they registered or updated their address at the DMV show up at polling locations only to find out they are not registered or are in the wrong polling location. The DMVs do not shoulder all of the blame; the other public assistance agencies required by the NVRA to register voters also often fail to comply with the law.");

(7) *Voting Rights And Election Administration In America: Hearing Before The Subcommittee On Elections Committee On House Administration*, House Of Representatives , One Hundred Sixteenth Congress, First Session (2019) at 138 ("In 1965, the Voting Rights Act outlawed racial discrimination in voting and established procedures to protect equal access to the vote for everyone. Despite a long history of support from legislators of all political parties, in 2013 the Supreme Court overturned key provisions of the VRA in the case of *Shelby County v. Holder*. Since that decision, politicians across the country have passed unnecessarily restrictive legislation and adopted practices that discriminate against and disenfranchise voters of color and minorities whose first language is not English, making it harder for them to register and much more difficult to vote. These restrictive legislative initiatives included efforts to implement photo ID requirements in States like Texas, Wisconsin, Missouri, and Pennsylvania.") (Statement of Chief Executive Officer at the League of Women Voters of the United States).

At the same time, in June 2017, the Trump Administration, through its now defunct Presidential Advisory Commission on Election Integrity, made headlines by serving a written demand on the State of Pennsylvania to turn over, so the Commission could disclose to the public, "the publicly available voter roll data for Pennsylvania, including, if publicly available under the laws of your state, the full first and last names of all registrants, middle

112

names or initials if available, addresses, dates of birth, political party (if

recorded in your state), last four digits of social security number if available,

voter history (elections voted in) from 2006 onward, active/inactive

status, cancelled status, information regarding any felony convictions,

information regarding voter registration in another state, information

regarding military status, and overseas citizen information." Exh. 5, June 27,

2017 Letter of Kris W. Kobach, Vice Chair, Presidential Advisory

Commission on Election Integrity, to Pennsylvania. The stated purpose of

such a request was to allow the Commission to discharge its duty "to fully

analyze vulnerabilities and issues related to voter registration and voting."

*Id.*

Governor Wolf responded to this request with a letter in which he

stated that he had "serious reservations about the true intentions of this

effort in light of the false statements this administration has made regarding

voting integrity, the historical suppression of voting rights, and the way that

such data has been used in the past." He also expressed "grave concerns" the

request was "a mere pretense for pursuing restrictions on the fundamental

right of citizens to vote," and explained that "[h]ere in Pennsylvania, our

Courts have already struck down a voter identification program, holding that

such program placed unconstitutional and undue burden on this fundamental

right. I have no interest in contributing to any effort to suppress the right to

vote or create unnecessary or unfair burdens on voters." He conceded,

however, that "like any citizen, you are welcome to purchase the publicly

available voter file from the Pennsylvania Department of State."[36] *See* Exh. 5,

June 30, 2017 response by Governor Thomas Wolf.

Even more recently, in late June 2020, the Trump campaign filed in

this Court a lawsuit against the DOS and all 67 counties in Pennsylvania,

claiming that the voting system in Pennsylvania is illegal and

---

[36] The Commission served this same demand on all fifty states. In a federal lawsuit seeking to prevent compliance with such disclosures, the Trump Administration has taken the position that

> the Commission has only requested information that is "publicly available," Second Am. Compl., Ex. 3, much, if not all, of it pursuant to the National Voter Registration Act, 52 U.S.C. § 20507(i)(1), or through public access laws of individual states. *See* Nat'l Conference of State Legislatures, The Canvass: States and Election Reform, It's a Presidential Election Year: Do You Know Where Your Voter Records Are? (Feb. 2016), http://www.ncsl.org/Documents/Elections/The_Canvass_February _2016_66.pdf (discussing availability of voter information under state laws); *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 336 (4th Cir. 2012) (holding that 52 U.S.C. § 20507(i)(1) "unmistakably encompasses completed voter registration applications"). Whatever the bounds of a supposed constitutional right to informational privacy, it does not extend to matters already in the public record. Indeed, courts have repeatedly held that "there is no question that an individual cannot expect to have a constitutionally protected privacy interest in matters of public record." *Doe v. City of N.Y.*, 15 F.3d 264, 268 (2d Cir. 1994) (citing *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 493-96 (1975)).

*Electronic Privacy Information Center v. Presidential Advisory Commission On Election Integrity*, et al, D.D.C., No. Civil Action No. 1:17-cv-1320 (CKK), ECF 49-1 at 50.

unconstitutional. *See Donald J. Trump For President, Inc., et al. v. Kathy Boockvar, in her capacity as Secretary of the Commonwealth of Pennsylvania, et al.*, W.D. Pa., No. 2:20-cv-966. In their complaint, "[p]laintiffs point to the 2020 primary election, where 'no excuse' mail-in voting was first implemented in Pennsylvania, and describe an election plagued by chaos. They say the primary was a 'hazardous, hurried, and illegal implementation of unmonitored mail-in voting which provides fraudsters an easy opportunity to engage in ballot harvesting, manipulate or destroy ballots, manufacture duplicitous votes, and sow chaos.' [ECF 234, ¶ 1]. They fear the same will occur in the November general election, where much more, of course, is at stake." *Id.* at ECF 409 at 1-2.

Whether these specific allegations are factually supportable or not is beside the point. Widespread publicity about them and other similar developments can only lead citizens, especially minority citizens, to either question the integrity of Pennsylvania's voting system or to believe, as Governor Wolf apparently does, that there is a plot afloat to investigate would-be voter registrants and to expose them as "fraudsters." Either way, the effect will no doubt be further suppression of already low minority voter registration rates. As explained in Bridgett A. King, ed., *Voting Rights in America: Primary Documents in Context* at 286 (2019):

Although the environment surrounding elections, voting, and democracy in the United States has always featured political undercurrents, recent elections and the political environment in which they have occurred have dramatically increased the scrutiny under which elections are being conducted across America. As political parties and candidates strive to win elections, the rules that govern voting, registration, and representation continue to be tools utilized by political elites to determine who is eligible to participate and the rules that will facilitate or constrain that participation. While this approach may result in temporary wins and losses for political parties, for the public the manipulation of the election system from internal and external actors has profoundly negative consequences. Many observers fear that voting rules and regulations that are clearly being advanced for partisan advantage are eroding public faith in the integrity of American elections.

For this reason, supplementation of voter registration lists is necessary to eradicate the effects of past discrimination and to achieve the fundamental goal of guaranteeing Mr. Bowers a fair trial by an impartial jury drawn from a fair cross-section of the entire community.

### E. The Requirements of Accuracy, Inclusiveness, Randomness, and Reliability

The legislative history discussed above indicates that in passing the JSSA, Congress sought to condemn juror source lists that were: (1) "insufficiently representative;" (2) unreliable and inaccurate; (3) so riddled with duplicates that the requirements of randomness and proportionality cannot be met; (4) less complete and up to date than other readily available representative lists; and/or (5) creating a good deal of useless mailing of qualification forms to nonexistent addressees.  In this case, all of these goals

will be frustrated if the Court upholds reliance on the SURE database as the sole source list for jury selection. Because use of this database frustrates these legislative purposes, the use of it is a substantial violation of the JSSA.

With regard to the requirement of randomness, the Act and this Court's 2009 and 2020 Jury Plans require random selection at every stage of the process. *See* 28 U.S. Code §§ 1861, 1863, 1864, 1866.[37] A fundamental premise of the Judicial Conference's proposal of S. 989 was that "[r]andom selection from a single source of names, such as voter lists, ... has the important advantage of affording every qualified citizen an opportunity equal to that of any other qualified citizen to be selected for jury service." Federal Jury Selection at 253) (Statement of Judge Kaufman).

Violation of the random selection requirement of the Act or of a local plan can constitute a substantial failure to comply with the Act within the meaning of § 1867(a), which would require a dismissal of the indictment and

---

[37] *See also* 2009 Jury Plan at 3 ("This Plan's reference to random selection shall mean a purely random selection of all names, or a selection where only the first selected name shall be chosen by a purely random method, with each subsequent name for that drawing chosen systematically at regular intervals through the remainder of the source list. Either selection process used must insure: a) that names chosen will represent all segments of the source file from which drawn, b) that the mathematical odds of any single name being picked are substantially equalized, and c) that the possibility of human discretion or choice affecting the selection of any individual's name is eliminated."); 2020 Jury Plan at 3.

a stay of trial, even absent any showing of prejudice caused by the violation. *See United States v. Calabrese*, 942 F.2d 218, 227 (3d Cir. 1991) ("In determining whether a violation is substantial, the alleged violations must be weighed against the underlying principles of the Act. These principles are (1) random selection of jurors and (2) determination of disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only."); *see id*. (holding that the exclusion of jurors for cause on basis of mere knowledge of defendant violated JSSA, the violation was material, and the proper relief was a new trial). *See also United States v. Carmichael*, 560 F.3d 1270, 1277 (11th Cir. 2009) ("A JSSA violation is considered 'substantial' when it frustrates one of the three principles underlying the Act: (1) random selection of juror names; (2) from a fair cross-section of the community; and (3) use of objective criteria for determination of disqualifications, excuses, exemptions, and exclusions."); *In re United States*, 426 F.3d 1 (1st Cir. 2005) (holding that jury selection remedy adopted by trial judge in capital murder trial involving African-American defendants, requiring mailing of second-round of summonses to specific geographic areas when juror questionnaires were not returned from those areas, did not comply with JSSA or the local plan, even though the process created by the district court was developed to address low juror questionnaire return rates in particular zip codes, which resulted in under representation of African-American jurors in jury pool; supplemental

draw process created by district court did not give equal odds of selection to every name in master wheel; writ of mandamus was granted); *United States v. Branscome*, 682 F.2d 484, 485 (4th Cir. 1982) (affirming dismissal of indictment, in part because "the selection of volunteers results in a non-random selection process in violation of the Congressional intent that random selection be preserved throughout the entire selection process"); *United States v. Kennedy* (5th Cir. 1977) 548 F.2d 608, 613-614 ("[A] properly preserved claim of substantial noncompliance with the [statutory requirement of randomness] would of course require reversal if meritorious…"); *United States v. Okiyama*, 521 F.2d 601, 604 (9th Cir. 1975) ("The legislative history of 28 U.S.C. s 1867(d) reveals that Congress deliberately excised a prejudice component that had existed in a prior version of the bill which was ultimately enacted as the Jury Selection and Service Act of 1968.").

As Congressman Cellar explained during debates on the Act:

> Mr. Chairman, the vast majority of the bench and the bar subscribe to the principle of random selection of Federal juries. Of course, by random selection we do not mean the use of strict mathematical or statistical system, nor do we mean the jurors will be chosen haphazardly without regard to their competence. As used in the proposed statute, random selection is intended only to insure that the names of potential jurors are chosen *without the possibility of discrimination or arbitrariness*."

114 Cong. Rec. at 3991 (emphasis added [38]

Here, as the First Circuit held in *In re United States*, 426 F.3d 1 (1st Cir. 2005), this Court's March 2020 Amendment to the Jury Plan, which requires in Section 9 that "for each juror qualification mailing returned by the Post Office as undeliverable and/or for each person who fails to complete and/or respond to the juror qualification questionnaire within 21 days of the date of mailing, the Clerk shall draw at random, the name of a resident whose address is in the same zip code to which this original juror qualification mailing had been sent", does not comply with the randomness requirement of the JSSA or the local plan, even though the process created by the Court may have been developed to address low juror questionnaire return rates in particular zip codes. As the First Circuit also concluded, this provision also violates local plan mandates, such as the one in Section 5 of the 2020 Plan that state that "[e]ither selection process used must insure: (a) that names chosen will represent all segments of the source file from which drawn, (b) that the mathematical odds of any single name being picked are substantially equalized."

---

[38] Perhaps going beyond the Act, this Court's Jury Plans *do* require that "the mathematical odds of any single name being picked are substantially equalized." 2009 Jury Plan at 3; 2020 Jury Plan 3 at 3.

In addition to the requirement of random selection, the Act also requires that the source list itself be accurate and reliable. *See* H. Rep. 90-1076 at 5 ("The act guarantees ... that at ... the initial source list [stage] the selection process shall produce groups that *accurately* mirror community makeup."); S. Rep. 90-891 at 17 (same); Kaufman Report at 360 (Act was designed to eradicate source lists that were "so far out-dated as to be unreliable.").

Finally, the JSSA also requires that every district's jury plan "ensures that each county, parish, or similar political subdivision within the district or division is substantially proportionally represented in the master jury wheel for that judicial district [or] division." 28 U.S.C. § 1863(b)(3). The Act further specifies that proportional representation can be measured by using "either the number of actual voters at the last general election in each county, parish, or similar political subdivision, or the number of registered voters if registration of voters is uniformly required throughout the district or division." *Id*. This Court's 2009 and 2020 Plans use the voter registration lists to determine proportionality. 2009 Jury Plan at 4; 2020 Jury Plan at 4. Clearly,

> [i]n adopting the proportionality requirement, it was Congress'
> intent that the "initial source lists ... accurately mirror community
> makeup." House Report, 1968 U.S.C.C.A.N. 1792, at 1794. If the
> initial source lists are missing large portions of the population and
> consequently fail to "mirror community makeup" at the outset, ...

121

they cannot be used to measure proportionality in a meaningful way. Unless proportionality is measured with respect to the percentage that each county *actually* represents of the ... Division's entire adult population, the policy of the Act is defeated.

*Green*, 389 F. Supp. 2d at 64.

The impact of inaccurate or out-of-date lists on the requirements of representativeness and randomness can be devastating, as was the case in *Green*:

> Plainly, the "mathematical odds" that any given name will be picked are not "substantially equal" across the region, as the Plan requires. A citizen's chances of getting on a federal jury are far better in Needham and Sudbury, which update their lists through multiple mailings, telephone calls, and even door-to-door visits, than they are in Lynn and Brockton, where there is no follow-up, or in New Bedford, where there has not been an annual count since 1999. Nor has the random selection of names from resident lists, rather than voting lists, been sufficient to guarantee a fair cross-section of the community. If the Lynn, New Bedford and Brockton resident lists are inaccurate, it does not matter how perfectly random the procedures used by the Court are to cull names from resident lists; the names on the list are chimerical. Finally, these deficiencies are hardly insubstantial; they result in high rates of undeliverables and nonresponses to jury summonses, particularly in communities with large African–American populations.

*Green*, 389 F. Supp. 2d at 66.

In this case, as in *Green*, there is plainly, in the words of Congressman Cellar, a "possibility" of discrimination and arbitrariness and non-randomness if jurors are chosen from inaccurate, out-of-date voter registration lists that contains thousands of duplicate names. As explained in

the National Center for State Court's, *Jury Managers' Toolbox: Best Practices for Duplicate Removal* (2009) ("Duplicate Removal"): [39]

> When [analyzing duplicate removal] techniques, courts should recognize the possibility that two errors are possible. First, failing to identify duplicate records (a missed match) undermines the principle of random selection insofar that individuals who have more than one record on the master jury list ... have a greater probability of being selected than individuals with only one record. Second, incorrectly removing a record (a mismatch) on the mistaken belief that it duplicates an existing record disenfranchises a potentially eligible individual and decreases the inclusiveness of the master jury list.

Use of inaccurate voter lists also undermines a separate purpose of the Act, namely, to ensure that only competent jurors be chosen to serve. According to Congressman Cellar, "the initial line of defense against incompetence is a requirement in the bill that voter lists be used as a primary source of potential jurors. The bill proceeds on the premise that those persons who are sufficiently interested in government to vote and who can satisfy other specific statutory qualifications are capable of serving as jurors in the Federal courts." 114 Cong. Rec. at 3991; *see id.* at 3993 ("Voter lists contain an important built-in screening element in that they eliminate those individuals who are either unqualified to vote or insufficiently interested in

---

[39] http://www.ncsc-jurystudies.org/data/assets/pdf_file/0021/7851/duplicate-removal-techniques-report-mjl.pdf

the world about them to do so.") (Statement of Congressman Rogers). This Congressional premise is undermined, however, when: (1) voter registration lists contain thousands of deceased people or people who are otherwise ineligible to vote; (2) election officials unreasonably delay registration of those who are eligible to vote; and (3) election officials improperly purge from the lists those who are qualified to vote. Based on the Statement of Facts and Exhibits outlined above and in the discussion which follows, Mr. Bowers has established a *prima facie* case that these three conditions exist both with respect to Pennsylvania's Statewide Uniform Registry of Electors (SURE) and with respect to the Counties that make up the Pittsburgh Division, as defined in the Court's Jury Plans. He therefore contends that this Court's use of inaccurate voter lists violates the letter and spirit of both the Act and this Court's own jury selection plan, as well as the Fifth and Sixth Amendments.

### i. The Problems of Underinclusive, Inaccurate, and Stale Jury Registration Lists, Restrictive Registration Laws, and Jury List Purges In General

"It has been estimated that 24 million voter registrations in the United States—about one in eight—are either invalid or significantly inaccurate. Pew Center on the States, Election Initiatives Issue Brief (Feb. 2012). And about 2.75 million people are said to be registered to vote in more than one State. *Ibid.*" *Husted v. A. Philip Randolph Institute*, 138 S.Ct. 1833, 1838 (2018). The cited study also found that (1) at least 51 million eligible U.S.

citizens are unregistered, or more than 24 percent of the eligible population;[40]

(2) more than 1.8 million deceased individuals are listed as voters; (3)

_____

[40] The American Bar Association does not specify a numerical standard, but recommends that "[j]uror source pools should be assembled so as to assure representativeness and inclusiveness" that "[t]he names of potential jurors should be drawn from a jury source list compiled from two or more regularly maintained source lists of persons residing in the jurisdiction", that "[t]he jury source list and the assembled jury pool should be representative and inclusive of the eligible population in the jurisdiction", and that "[t]hese source lists should be updated at least annually." American Bar Association, *Principles for Juries and Jury Trials* 10-11 (2016), available at https://www.americanbar.org/content/dam/aba/administrative/american_jury/principles.authcheckdam.pdf. The National Center for State Courts (NCSC) recommends that the source list include 85% or more of the total adult population. *See* NCSC, *Jury Managers' Toolbox: Characteristics of an Effective Master Jury List* (2009), available at https://www.jurytoolbox.org/more/Characteristics%20of%20Effective%20MJL.pdf. The Director of the Center for Jury Studies of NCSC wrote in 2011 that "[t]oday, the vast majority of state courts and a sizeable number of federal courts have adopted the use of multiple lists as the starting point for a defensible jury system," and that

> [a]s recently as 2008, only 71% of the voting-aged citizens in the United States were registered to vote. Had the courts in this country continued to rely exclusively on voter registration lists for the sole source of juror names, they would have fallen far short of the 85% inclusiveness suggested by the NCSC. They would have also fallen far short of the goal of representativeness, as racial and ethnic minorities are still significantly less likely to register to vote than whites, in spite of several decades of voter registration efforts.

Paula Hannaford-Agor, Systematic Negligence in Jury Operations: *Why the Definition of Systematic Exclusion in Fair Cross Section Claims must Be Expanded*, 59 Drake Law Review 761, 779-780 (2011) (citing Sarah Crissey & Thom File, U.S. Census Bureau, *Voting and Registration in the Election of November 2008* 1 (2010)), available at http://www.census.gov/prod/2010pubs/p20-562.pdf (reporting that 73.5% of non-Hispanic white citizens are registered to vote compared to 69.7% of

approximately 12.7 million records nationwide appear to be out of date and

no longer reflect the voter's current information; (4) about 12 million records

had incorrect addresses, indicating that either the voters have moved, or that

errors in the information on file make it unlikely the Postal Service can reach

them; (5) more than 70,000 people could be registered in three or more states;

(6) nearly 25 percent of those who attempted to register at a Motor Vehicle

Administration office in 2007-2011 did not make it onto the

state's voter rolls; (7) election officials administer a system that is

fundamentally inefficient in a number of ways: (i) They generally do not have

access to modern data-matching techniques used by private industry and

other government agencies to compare records to readily available databases

and minimize inaccuracies caused by Americans' mobility; (ii) they are

relegated to reacting to incoming information from voters and third-party

organizations, if it comes to them at all; additionally, much of it is presented

---

blacks, 55.3% of Asians, and 59.4% of Hispanics.). *See also* U.S. Census Bureau, *Voting and Registration in the Election of November 2018* (2019), available at https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-583.html (reporting that 71.0 % of non-Hispanic white citizens were registered to vote in 2018 compared to 63.9 % of blacks, 53.0% of Asians, and 53.7% of Hispanics.); U.S. Census Bureau, Voting and Registration in the Election of November 2016 (2017), available at https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-580.html (reporting that 73.9 % of non-Hispanic white citizens are registered to vote compared to 69.4 % of blacks, 56.3% of Asians, and 57.3% of Hispanics.).

with inaccuracies and in a concentrated period right before an election, when they are responsible for all other aspects of election administration; and (iii) they typically receive information on paper that must be entered manually into the voter systems, greatly increasing the potential to introduce errors and producing the public perception that the voter registration lists "lack integrity or could be susceptible to fraud." *See* Pew Center on the States, *Inaccurate, Costly, and Inefficient Evidence That America's Voter Registration System Needs an Upgrade* (Feb. 2012).[41]

Another recent article by the same organization reports on developments in the highly volatile issue of election official voter purges. *See* Pew Center on the States, *The Messy Politics of Voter Purges* (Dec. 2019).[42] The article points out that "dropping voters from the rolls inspires forceful political pushback, as many voting rights activists fear it is a form of voter suppression. They liken it to other largely Republican efforts to limit access, such as enacting voter ID laws, cutting early voting and reducing the number of polling places." *Id.* The article also summarizes recent research in this area, including a Brennan Center for Justice study, which called the voter

---

[41] https://www.pewtrusts.org/-/media/legacy/uploadedfiles/pcs_assets/2012/pewupgradingvoterregistrationpdf.pdf.

[42] https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2019/10/25/the-messy-politics-of-voter-purges

purging process "often-flawed," and found that between 2014 and 2016, states removed nearly 16 million people from their rolls. It also discusses a recent Ohio study in which the Ohio Secretary of State allowed an organization to have access to a list of 235,000 names that election officials had identified as needing to be purged, and the organization found that "[m]ore than 40,000 of those names had been wrongly added to the purge list by county election officials or by election software error."

The cited Brennan Center for Justice study, *Purges: A Growing Threat to the Right to Vote* (2018)(hereafter referred to as "*Growing Threat*"),[43] is based on an examination of data for more than 6,600 jurisdictions that report purge rates to the Election Assistance Commission and a calculation of the purge rates for all of the 49 states that require voter registration. Overall, the study found that in the two-year election cycle ending in 2008, the median jurisdiction purged 6.2 percent of voters, whereas for the two years ending in 2016, the purge rate of the median jurisdiction had increased to 7.8 percent. *Id*. at 1 n. 1. The study also found that "between 2014 and 2016, states removed almost 16 million voters from the rolls," and that "[a]lmost 4 million more names were purged from the rolls between 2014 and 2016 than between

---

[43] https://www.brennancenter.org/sites/default/files/2019-08/Report_Purges_Growing_Threat.pdf

2006 and 2008. This growth in the number of removed voters represented an increase of 33 percent — far outstripping growth in both total registered voters (18 percent) and total population (6 percent)." *Id.*

The study "suggests great cause for concern that the Supreme Court's 2013 decision in *Shelby County v. Holder* (which ended federal 'preclearance,' a Voting Rights Act provision that was enacted to apply extra scrutiny to jurisdictions with a history of racial discrimination) has had a profound and negative impact: For the two election cycles between 2012 and 2016, jurisdictions no longer subject to federal preclearance had purge rates significantly higher than jurisdictions that did not have it in 2013." *Id* at 1. Also, "the Justice Department has abdicated its assigned role in preventing overly aggressive purges. In fact, the Justice Department has sent letters to election officials inquiring about their purging practices — a move seen by many as laying the groundwork for claims that some jurisdictions are not sufficiently aggressive in clearing names off the rolls." *Id.* The 2018 Brennan Center for Justice study "follows an extensive analysis of this issue in a 2008 Brennan Center report entitled *Voter Purges.*[44] In that report, we uncovered

---

[44] Myrna Pérez, *Voter Purges* (New York: Brennan Center for Justice, September 2008), https://www.brennancenter.org/sites/default/files/legacy/publications/Voter.Purges.f.pdf

evidence that election administrators were purging people based on error-ridden practices, that voters were purged secretly and without notice, and that there were limited protections against purges. In this year's report, we discovered that little about purge practices has improved and that a number of things have, in fact, gotten worse." Id.

The 2018 study identified three reasons why things had "gotten worse." First, there had been increased usage of "interstate databases that purport to identify voters who have moved to a new state and are registered in both their current and former state. The two databases primarily used are the Interstate Voter Registration Crosscheck program (Crosscheck) and Electronic Registration Information Center (ERIC)." *Id.* at 6. The Center's research "shows these new interstate databases have serious weaknesses that can lead to widespread and inaccurate purges." *Id.* at 7.

Crosscheck, launched in 2005 by Kris W. Kobach, a former Kansas election official who was later named by President Trump to lead the now defunct Presidential Advisory Commission on Election Integrity and who wrote the June 30, 2017 letter to DOS Secretary Pedro Cortés discussed above,[45] "compares the voter registration list of each participating state against the voter registration lists of the other participating states and flags

---

[45] *See* Exh. 5.

all records that have the same first name, last name, and date of birth."
*Growing Threat* at 8. Because of the loose matching criteria used by the
program, "Crosscheck's flaws put approximately 100 million voters in its
database at potential risk, but some individuals are more vulnerable than
others." *Id.* at 7. "Voters with common names are … more likely to match
with different individuals for obvious reasons, but a less-obvious concern is
the disproportionate effect this has on minority voters. African-American,
Asian-American, and Latino voters are much more likely than Caucasians to
have one of the most common 100 last names in the United States." *Id.* "Non-
white people are more likely to have common shared names. For instance,
16.3 percent of Hispanic people and 13 percent of black people have one of the
10 most common surnames, compared to 4.5 percent of white people."
*Growing Threat* at 7 n. 1 ( citing Joshua Comenetz, "Frequently Occurring
Surnames in the 2010 Census," U.S. Census Bureau, October 2016.)[46] "A
2017 study led by Stanford professor Sharad Goel found that if applied
nationwide, Crosscheck would 'impede 300 legal votes for every double vote
prevented.'" *Growing Threat* at. at 8 (quoting Sharad Goel *et al.*, *One Person,*

---

[46] https://www2.census.gov/topics/genealogy/2010surnames/surnames.pdf

*One Vote: Estimating the Prevalence of Double Voting in U.S. Presidential Elections* (working paper, Stanford University *et al.*, 2017).[47]

> The other database service, ERIC, also had identified flaws:
>
> Although most of the election administrators that we interviewed reported positive experiences with ERIC, the new data source has its limits. Administrators from Maryland and Illinois, for example, reported that it could be difficult to determine a voter's most recent address, which is a problem for frequent movers. This absence of precise information means that, even though ERIC is generally processed at the state level, it is local officials who must identify errors and determine which registration is more current — the one in the relevant jurisdiction or a registration in another state. Wisconsin, meanwhile, reported that although ERIC was helpful in updating more than 25,000 registration addresses in 2017 and 2018, it also resulted in more than 1,300 voters signing "supplemental poll lists" at a spring 2018 election, indicating that they had not in fact moved and were wrongly flagged.

*Id.* at 8-9.[48]

A recent study of those Wisconsin supplemental poll lists estimated that "about 9 % of those who voted in Wisconsin in 2018 cast a ballot at the address flagged as as out of date", and that "minority registrants in the movers poll books were more than twice as likely as white registrants in the

---

[47] https://scholar.harvard.edu/files/morse /files/1p1v.pdf

[48] One positive aspect of ERIC is that it is capable of generating, and does generate for its member states, lists of non-registrants who are eligible to vote. According to the New York Times, "[s]ince its founding in 2012, the nonprofit center has identified 26 million people who are eligible but unregistered to vote." Steve Lohr, *Another Use for A.I.: Finding Millions of Unregistered Voters*, N.Y. Times, November 5, 2018, available at https://www.nytimes.com/2018/11/05/technology/unregistered-voter-rolls.html

movers poll books to vote at the address flagged by ERIC as out of date."
Gregory Huber, et.al, *The racial burden of voter registration maintenance*
*errors: Evidence from Wisconsin's supplemental movers poll books*, 7 Science
Advances 1, 2 (Feb, 2021). [49] "[O]ur best estimate is that minorities in the
movers poll books were 3.8 percentage points more likely to vote at the
address flagged by ERIC than whites in the movers poll books, meaning that
about 6.5 % of minorities in the movers poll books cast a ballot at the address
of registration flagged by ERIC. Notably, this means that the lowest bound
on the false mover error rate is more than 100% larger for minorities than for
whites." *Id.* at 5.)

These authors point out that "[a]n evaluation of ERIC's list
maintenance practices was never publicly released despite a suggestion that
such an evaluation was forthcoming. Moreover, independent external
evaluations have not occurred because ERIC prevents member states from
disclosing the data it provides to third parties." *Id.* at 2.) As the Court is
aware, the Court denied without prejudice Mr. Bowers' motion to compel
ERIC and/or the Department of State to release ERIC data that the state
uses in its voter list maintenance efforts. Mr. Bowers renews that motion

---

[49] Available at https://www.science.org/doi/10.1126/sciadv.abe4498.

here because he strongly believes that this new study indicates that Pennsylvania may be using flawed data from ERIC that is having a discriminatory effect on the composition of the voter registration list used as the source list in this District.

"The second risky development is the increasing number of states scouring their rolls to identify alleged noncitizens registered to vote."

(*Growing Threat* 6. As the 2018 study explained:

> As is true with other purges, the information relied upon to purge alleged noncitizens can be inaccurate. For example, at least 14 states have sought access to the federal Systematic Alien Verification for Entitlements (SAVE) program, which checks several databases to ascertain the residence or citizenship status of people who have contacted benefit-granting agencies… Some states use driver's license data to purge noncitizens…. The problem, however, is that a person can lawfully not update their driver's license information for many years, in which time they may have become a citizen…. States may also scour their voter lists for those who did not check the box indicating that they were a citizen on their driver's license application or renewal…. Not surprisingly, election officials told us that sometimes citizens fail to check the citizenship box.

*Id.* at 9.

"Finally, several conservative activist groups have sued state and local jurisdictions in recent years seeking to force them to purge their rolls more aggressively." *Id.* at 7.  The 2018 Study focuses on two groups in particular, Judicial Watch and the Pacific Interest Legal Foundation that have been particularly aggressive in Pennsylvania, as explained below. For

134

instance, the 2018 Study explains that last September the Public Interest

Legal Foundation noted that it had brought nine suits in six states in the

past two years alleging lax vigilance of voter rolls. That tally was included in

a press release announcing that the group had put 248 counties in 24 states

'on notice' that they were risking litigation if they could not demonstrate

'effective voter roll maintenance.'" *Id.* at 7 (quoting Public Interest Legal

Foundation, "248 Counties Have More Registered Voters Than Live Adults,"

news release, September 25, 2017).[50] This marked a change in the use of

litigation:

> In the past, litigation was often used by groups seeking to protect
> voters against *bad* voter purges…From 1998 through 2007, most
> of the litigation seeking purges was brought by the Justice
> Department — which made voter purges a priority in the midst of
> a failed nationwide voter fraud hunt — whereas private plaintiffs
> typically brought suits because they were worried eligible people
> would be improperly purged. From 2008 to the present however,
> more than half of the 32 federal purge-related lawsuits brought by
> private parties have been filed by plaintiffs who believed that
> jurisdictions are not purging enough names from the rolls.

*Id.* at 9. The 2018 Study notes that "[u]nfortunately, this litigation has

consequences…. Judicial Watch's 2012 suit against Indiana arguably led to

the state undertaking more aggressive list maintenance. Before the suit was

dismissed, Indiana announced that it had sent an 'address confirmation

---

[50] https://publicinterestlegal.org/blog/248-counties-registered-voters-live-adults/

mailing to all voters' and undertook other purging initiatives that led to more than 480,000 canceled registrations after the 2016 election. Judicial Watch boasted that their lawsuit 'forced' Indiana to undertake additional purge practices." *Id.* at 19-20.

On August 1, 2019, the Brennan Center published an update of their 2018 report. *See Voter Purge Rates Remain High, Analysis Finds* (August 1, 2019).[51] The update was based on data released by the federal Election Assistance Commission in June 2019. The update found that "[a]t least 17 million voters were purged nationwide between 2016 and 2018, similar to the number we saw between 2014 and 2016, but considerably higher than we saw between 2006 and 2008." Like the 2016 report, the update highlights some of the main concerns about voter registration purges:

> Problems arise when states remove voters who are still eligible to vote. States rely on faulty data that purport to show that a voter has moved to another state. Oftentimes, these data get people mixed up. In big states like California and Texas, multiple individuals can have the same name and date of birth, making it hard to be sure that the right voter is being purged when perfect data are unavailable. Troublingly, minority voters are more likely to share names than white voters, potentially exposing them to a greater risk of being purged. Voters often do not realize they have been purged until they try to cast a ballot on Election Day — after it's already too late. If those voters live in a state without election day registration, they are often prevented from participating in that election.

---

[51] https://www.brennancenter.org/our-work/analysis-opinion/voter-purge-rates-remain-high-analysis-finds

*Id.*

### ii.     The Situation in Pennsylvania

Many of the facts relevant to the situation in Pennsylvania have already been reviewed in the Statement of Facts. Mr. Bowers adds here details about recent voter litigation.

An important issue applicable to Pennsylvania in general and to the counties in this District in particular is the threat to voter registration posed by agenda-driven litigation aimed at increasing registration purges and challenging any innovation that might lead to greater registration and voting. The Trump Campaign's lawsuit against all 67 of Pennsylvania's counties is discussed above. In addition, on December 11, 2019, the conservative watchdog group Judicial Watch sent identical letters to the Board of Elections in the counties of Allegheny, Bucks, Chester, and Delaware. *See* Letters to the Board of Elections, attached as Exh. 7. These letters claimed that all four counties were in violation of the requirements of Section 8 of the National Voter Registration Act (NVRA) because of their failure to purge and otherwise properly maintain their voter registration lists. The letters threatened that "Judicial Watch will bring a lawsuit against you … if these violations are not corrected within 90 days." *Id.* The letter directed to Allegheny County states:

Judicial Watch examines a number of metrics in order to assess whether a jurisdiction is conducting a general program that makes a reasonable effort to remove ineligible registrants from its voter rolls. To begin with, Judicial Watch determines each jurisdiction's registration rate. States must report detailed registration data every other year to the U.S. Election Assistance Commission (EAC). Judicial Watch hires experts to compare this data to the citizen voting-age population in each state and county where data is available. An unusually high registration rate suggests that a jurisdiction is not removing voters who have died or who have moved elsewhere, as required by 52 U.S.C. § 20507(a)(4). Federal courts adjudicating NVRA claims have acknowledged the significance of high registration rates. See *Am. Civ. Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 793 (W.D. Tex. 2015); *Voter Integrity Project NC, Inc. v. Wake Cnty. Bd. of Elections*, 301 F. Supp. 3d 612, 618 (E.D.N.C. 2017).

Judicial Watch also considers how many registrations were ultimately removed from the voter rolls because a registrant failed to respond to an address confirmation notice and then failed to vote during the NVRA's statutory waiting period. If few or no voters were removed by means of this process, the jurisdiction is obviously failing to comply with Section 8(d) of the NVRA. 52 U.S.C. § 20507(d)(1). States must report the number of such removals to the EAC.

Our analysis of the data regarding Allegheny County showed the following:

● The County reported removing only 72 voter registrations in the last two-year reporting period on the grounds that the registrants failed to respond to an address confirmation notice and failed to vote in two consecutive federal elections. This is an absurdly low figure for a county of this size. If this figure is accurate, it establishes beyond any dispute that the County is not complying with the NVRA.

● The County has an implausibly high registration rate of about 98%.

These facts establish clear violations of Section 8(a)(4) of the NVRA.

Exh. 7.

Allegheny County almost immediately responded to this threat by purging approximately 69,000 names from its voter registration list. *See Under Threat of Lawsuit, Allegheny Co. Purging 69,000 Inactive Voters From Rolls*, CBSN Pittsburgh, January 20, 2020.[52] Elections Manager Dave Voye is quoted as saying "I would concede that we are behind in culling our rolls. We are in the process of doing so." *Id.*

The other counties adopted a different approach. Speaking through the Secretary of the Commonwealth in a letter attached as Exhibit 8, they emphasized that, far from lagging behind in voter purging, the four counties were some of the biggest voter registration purgers in the state:

> In 2018 alone, Allegheny, Bucks, Chester and Delaware counties together cancelled 52,317 active voter records and 13,178 inactive voter records via annual voter list maintenance activities, accounting for nearly 18% of the 372,694 voter list maintenance cancellations in Pennsylvania during that year. In 2017, these four counties accounted for 106,338 (22%) of the 487,768 voter list maintenance cancellations statewide, and in 2016, these four counties accounted for 74,416 (18%) of the 405,163 voter list maintenance cancellations statewide. In January of this year, Allegheny County cancelled 69,695 voter records that were inactive for two (2) federal elections after back to back quiet

---

[52] https://pittsburgh.cbslocal.com/2020/01/14/allegheny-county-board-of-elections-voter-rolls/

periods due to special elections in 2019 that prevented them from
finalizing last year's voter list maintenance before the end of 2019.

Exh. 8 [53]

_____

[53] The Secretary also denied Judicial Watch's record request on the ground
that "you can find information about the Commonwealth's voter list
maintenance activities as reported in the Department of State's annual
reports. Detailed breakdowns of the data summarized in the following
paragraphs can be found in Appendix D of each annual report published on
the department's website." While it is true that "you can find information
about the Commonwealth's voter list maintenance activities" on the
department's website, you cannot find the specific records or information
requested in Judicial Watch's letter or in this motion. For instance, from the
most recent report released in June 2020, one can determine that in the year
2019, the counties in the Pittsburgh Division cancelled, under a variety of
cancellation categories listed in the report, 45,577 active voters and 21,076
inactive voters, with the vast majority of cancellations coming from Allegheny
County (23,874) followed next in numbers by Westmoreland County (19,019)
and Butler County (4194). *See* Pennsylvania Department of State, *The
Administration of Voter Registration In Pennsylvania: 2019 Report to the
General Assembly* 34-35, available at
https://www.dos.pa.gov/VotingElections/OtherServices
Events/VotingElectionStatistics/Pages/Annual-Reports-on-Voter-
Registration.aspx. *See also* 2018 Report at 38-39 (counties in the Pittsburgh
Division cancelled 50,641 active voters and 23,436 inactive voters); 2017
Report at 35-36 (counties in the Pittsburgh Division cancelled 47, 414 active
voters and 16,045 inactive voters); 2016 Report at 36-37 (counties in the
Pittsburgh Division cancelled 59,823, 414 active voters and 34,417 inactive
voters); 2015 Report at 36-37 (counties in the Pittsburgh Division cancelled
45, 121 active voters and 61,121 inactive voters); 2014 Report at 34-35
(counties in the Pittsburgh Division cancelled 45,750 active voters and 20,761
inactive voters).

What these reports do not address is how officials determined whether
each voter fit into each cancellation category and whether that method
produced accurate and reliable results for the 471,187 voters in the Division
or whose registrations was cancelled during this period of time.

It is noteworthy and suspicious that during the period of time from
2014-2019, the highest number of cancellations in the Division was in the
years 2015 and 2016 when the state was using the unreliable Crosscheck

Not satisfied with this response, Judicial Watch promptly sued the state and Bucks, Chester and Delaware counties in federal court. *Judicial Watch, Inc v. Commonwealth of Pennsylvania*; *Kathy Boockvar, et. al*, M.D. Pa., No. 1:20-cv-00708-CCC. The case is still active. On August 3, 2020, the court ordered that "in light of the approaching election on November 3, 2020, as well as the current COVID-19 pandemic . . . [d]iscovery in this case is STAYED until after the November 3, 2020 election," but "[f]ull discovery shall commence following the election and resolution of the pending motions to intervene and to dismiss." *Id.* at ECF 43.

The public's perception of these developments was no doubt informed by the publicity surrounding them. The CBSN Pittsburgh story quotes Judicial Watch President Tom Fitton as saying "Dirty voting rolls can mean dirty elections and Judicial Watch will insist, in court if necessary, that states follow federal law to clean up their voting rolls." The story clearly

---

purge program. The total number of yearly Division cancellations were: 2014 (66,511); 2015 (106, 242), 2016 (94,245), 2017 (63,458), 2018 (74,077), and 2019 (66,653). It is also noteworthy and suspicious that Allegheny County's *one month* massive purge of 69,695 voters in January 2020 far exceeded the County's *yearly* number of purges for every year from 2014-2019. The total number of yearly County cancellations were: 2014 (21,372); 2015 (55,549); 2016 (27,060); 2017 (23,320); 2018 (21,918); 2019 (23, 874).

implied, contrary to federal law, that the mere fact that a person had not

voted in past elections made the person no longer eligible to vote: "No one's

alleging that dead people are voting in Allegheny County, but at the Board of

Elections, there are tens of thousands of registrations for voters who are

deceased, moved away *or haven't voted in several years* that *need to be culled*

*from the rolls.*" *Id.*[54] According to the story, "[t]here are 957,000 registered

voters in Allegheny County but the elections concedes that about 140,000 —

more than 15 percent — are inactive. This mountain of *faulty registrations*

has now courted the attention of the conservative watchdog group Judicial

Watch." The story quotes Elections Manager Dave Voye's response to the

question "Does this raise the possibility of voter fraud?" as: "If any of these

inactive voters show up on election day there is paperwork they need to fill

out, swearing that they didn't move and committing themselves to perjury."

*Id*.

Another story in the online publication *The Intercept*, under the banner

headline "Right Wing Group Sees to Purge Up To 800,000 Voters in

Pennsylvania, a Key Battleground State,"[55] emphasized that Judicial Watch's

---

[54] Under both the NVRA and Pennsylvania law, voters whose registrations
are inactive may still vote on election day. 52 U.S.C. § 20507(d)(2)(A); 25 PA.
C.S. § 1902.

[55] https://theintercept.com/2020/05/28/pennsylvania-voter-rolls-purge-judicial-watch/

lawsuits "raise the specter of voter fraud," and that Judicial Watch had both

the power and the will to get its way with county authorities:

> Judicial Watch, which focuses on the courts and is funded
> primarily by large grants from conservative foundations, is suing
> Pennsylvania's chief election official, along with county legislators
> and election officials in three of the state's six counties with the
> most registered voters…. Earlier this year, under threat of a
> Judicial Watch lawsuit, Pennsylvania's Allegheny County
> removed 69,000 names from its voter rolls.

*Id.*

These lawsuits, and the threat of them, therefore, seem to be doing

double duty for groups like Judicial Watch. They induce counties like

Allegheny County to take hasty action to conduct massive purges of their

registration lists, while at the same time sending the message to the populace

that if they dare to register or vote in a fraudulent and "dirty" election,

Judicial Watch will be there with a federal lawsuit or a perjury prosecution to

make them pay the price.

Not to be outdone, on January 15, 2020, the conservative watchdog

group Public Interest Legal Foundation (PILF) served on Allegheny County a

similar letter to the threatening one sent by Judicial Watch. However, PILF's

letter contained far more factually detailed allegations against Allegheny

County's administration of its registration system than the Judicial Watch

letter, and it included an express reference to the Auditor General's

December 2019 audit report. *See* Public Interest Legal Foundation Letter,

143

attached as Exh. 9. PILF's evidence of the County's inadequate list maintenance was set forth under the following categories:

*(1) Allegheny's implausible registration rate.*

"According to the official list of eligible voters published by the Pennsylvania Department of State in October 2019, Allegheny County has 952,815 persons registered to vote, as of October 2019. Based on this data, Allegheny County has a registration rate over 96%. However, Allegheny County's true registration rate is certainly even higher because the total voting-age population used to calculate this registration rate includes individuals, such as non-citizens, who are ineligible to register and vote in Pennsylvania."

*(2) Deceased registrants and implausible dates of birth*

"Using the County's official voter roll extract from October 2019, we identified more than 1,500 registrants aged older than 100 years (i.e. with years of birth listed as 1919 or earlier). Within this set, 49 registrants are listed with dates of birth **in the 19th Century**. The oldest of these registrants is listed as being born in January 18, 1800, which would make him almost 220 years old."

"The County roll currently contains at least 1,580 registrants who are matched against the SSDI or published obituaries with corresponding dates of death on file at various credit reporting bureaus."

*(3) In-county duplicate registrations*

"[T]he Foundation identified more than **3,700** sets of matched voter registrations in Allegheny County. Among these, we identified matches deriving from married/maiden name confusion, middle name errors, date of birth errors, clerical mistakes, and even cases of triplication, quadruplication, and … septuplication."

*(4) interstate duplicate registrations*

"Allegheny County registration records were cross-referenced with registration records in Palm Beach County, Florida. This analysis returned 438 likely matches between the two jurisdictions."

*(5) placeholder or missing registration data*

"Our research further identified nearly 1,400 registrations that omit or use placeholders for important data, including dates of birth and dates of registration. Registration files with incomplete data can make it difficult to remove ineligible registrants, such as when matching key registration data to data contained in a death record."

*(6) corrupted residence data*

"Some registrations appear to provide Allegheny County street addresses for the residence, but list a state other than Pennsylvania. Others copy out of

state or country mailing addresses into the intended Pennsylvania address fields."

(7) *implausibly low number of inactive voters removed*

"Allegheny County must remove registrants who fail to respond to address confirmation mailings and thereafter fail to vote in two consecutive general elections. 52 U.S.C. § 20507(a)(4)(B); Pa.C.S. § 1901(b)-(d). On the 2018 Election Administration and Voting Survey published by the U.S. Election Assistance Commission, Allegheny County reported that it removed only 72 such registrants. Such an implausibly low removal rate indicates Allegheny County is not complying with the aforementioned removal procedures as required by law."

As in the Judicial Watch letter, PILF demanded that pursuant to Section 20507(i) of the NVRA the County turn over records very similar to the records requested in Mr. Bowers' case. Exh. 9.

On February 24, 2020, PILF filed a lawsuit against Allegheny County and its officials in this Court. *See Public Interest Legal Foundation v. David Voye, Manager of Elections for Allegheny County, et. al.*, W.D. Pa., No. 2:20-cv-00279-CB-CRE. The complaint sets forth and elaborates upon the factual allegations contained in PILF's letter. *See id.* at ECF 1, attached as Exh. 10. The complaint also alleges that "The parties were not able to agree on a remedial plan to address the failures in the list maintenance program

discovered by the Foundation" and that "[n]one of the NVRA violations about which the Foundation notified the Defendants had been cured as of February 4, 2020, nor had any procedures been systematically implemented to cure the list maintenance problems discovered by the Foundation." Exh. 10 at 16. On April 14, 2020, the parties filed a joint motion to stay the case in which it informed the Court that "[t]he parties are actively engaging in settlement negotiations and will use the additional time to work towards a final resolution." *Public Interest Legal Foundation,* No. 2:20-cv-00279-CB-CRE, ECF 38 at 1. On May 18, 2020, based on a stipulation filed by PILF, the Court dismissed the case with prejudice. *Id*. at ECF 41, 42.

Because no issues of fact were decided in either the Judicial Watch or PILF lawsuits, no court has resolved the many factual issues that existed between the parties in these lawsuits. However, the complaints in these cases raise serious allegations which call into question the accuracy and reliability of the voter registration list compiled by Allegheny County, the largest contributor of jurors in the Pittsburgh Division. Moreover, the Auditor General's December 2019 audit, summarized above demonstrates beyond any doubt that the flaws identified in these lawsuits extend beyond Allegheny County.

## II. The Superseding Indictment Must Be Dismissed And Any Jury Trial Must Be Stayed Because This Court's Jury Selection System Relies Upon Unconstitutional Qualification Criteria.

### A. A federal jury selection process may not operate to discriminate against or act arbitrarily toward any group of our population.

As indicated above, "[t]he Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010). Thus, the primary goal for any jury selection system is the assurance of this Sixth Amendment right of the accused.

There is a second objective—maximum citizen participation in government. As the Supreme Court said in *Glasser v. United States*, 315 U.S. 60, 85 (1942), "Our notions of what a proper jury is have developed in harmony with our base concepts of a democratic society and a representative government." "For …discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government." *Smith v. State of Texas*, 311 U.S. 128, 130 (1940). "Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system." *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975). Thus, "the

148

broad representative character of the jury should be maintained, partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility." *Thiel v. S. Pac. Co.*, 328 U.S. 217, 227 (1946).

Of course, in constructing a jury selection system to meet these objectives, Congress was free to prescribe relevant qualifications for jurors, but this is true only so long as the source from which juries are empaneled reasonably reflects a cross-section of the population suitable for that civic duty and the selection criteria do not violate other constitutional or statutory proscriptions. *Peters v. Kiff*, 407 U.S. 493, 497-498 (1972); *Carter v. Jury Commission*, 396 U.S. 320, 332-333 (1970). In other words, the prescribed qualifications must reasonably relate to the efficiency and competence of the jurors, must be equally administered, and must not intrude on fundamental constitutional or statutory rights. *Brown v. Allen*, 344 U.S. 443, 473 (1953). *See also Powers v. Ohio*, 499 U.S. 400, 407 (1991) ("While States may prescribe relevant qualifications for their jurors, [citing *Carter*], a member of the community may not be excluded from jury service on account of his or her race.")

When a federal jury selection process operates so that it discriminates against or acts arbitrarily toward any group of our population, there are at least four rights that are violated: first, the Sixth Amendment and due

149

process right of the individual to be indicted and tried by a jury selected from a representative cross-section of the community;[56] second, the right of the individual to be indicted and tried by a jury that has been selected in a non-arbitrary manner that does not violate federal law;[57] third, the right of the

---

[56] "The principles that apply to the systematic exclusion of potential jurors on the ground of race are essentially the same for grand juries and for petit juries." *Alexander v. Louisiana*, 405 U.S. 625, 626 n. 3. *See also Ramseur v. Beyer*, 983 F.2d 1215, 1229–31 (3d Cir.1992) (*en banc*) (applying the fair cross section requirement to a state grand jury); *Murphy v. Johnson*, 205 F.3d 809, 818 (5th Cir. 2000) ("We note…that by October 1994, the Supreme Court had consistently held that racial discrimination in the selection of grand juries was violative of the fair cross-section requirement. Thus, at the time Murphy's conviction became final, our precedent dictated that the fair cross-section requirement of the Sixth Amendment applied to the selection process for grand juries."); *United States v. Burdett*, No. CR 20-139, 2021 WL 2581356, at *8 (E.D. La. June 23, 2021) ("The fair-cross-section guarantee applies to both grand and petit juries."); *United States v. Scrushy*, No. CR.2:05CR119-MEF, 2007 WL 1296000, at *4 (M.D. Ala. May 1, 2007) ("The right to a 'representative' grand jury is a federal right that derives not from the requirement of equal protection but from the Fifth Amendment's explicit requirement of a grand jury. That right is similar to the right applicable to state proceedings to a representative petit jury under the Sixth Amendment."); *United States v. Frumento*, 409 F.Supp. 136, 141 (E.D.Pa.1976), *aff'd*, 563 F.2d 1083 (3d Cir.1977) (the Fifth Amendment "has been held to require that no group in the community be excluded unjustly from grand jury service and that a grand jury panel shall constitute a fair cross-section of the judicial district from which it is chosen.").

[57] In *Peters v. Kiff*, 407 U.S. 493, 502–03 (1972), the Court held that

> a State cannot, consistent with due process, subject a defendant to indictment or trial by a jury that has been selected in an arbitrary and discriminatory manner, in violation of the Constitution and laws of the United States. Illegal and unconstitutional jury selection procedures cast doubt on the integrity of the whole

group that is discriminated against to participate in a governmental activity,

responsibility, and fundamental right open to others; and fourth, the right of

the excluded group not be discriminated against and to enjoy the equal

protection of the laws.[58]

---

judicial process. They create the appearance of bias in the decision of individual cases, and they increase the risk of actual bias as well.

The Court further concluded that a jury that has been selected in an arbitrary and discriminatory manner violates 18 U.S.C.A. § 243, which provides that

[n]o citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State on account of race, color, or previous condition of servitude; and whoever, being an officer or other person charged with any duty in the selection or summoning of jurors, excludes or fails to summon any citizen for such cause, shall be fined not more than $5,000.

*Id*. at 497-498.

[58] As indicated below, a fifth right at issue in this case is the excluded group's fundamental right to travel. Mr. Bowers has standing to assert both his own fair cross-section and due process rights, as well as the rights of the excluded group. *See Peters v. Kiff*, 407 U.S. at 498 ("The crime, and the unconstitutional state action, occur whether the defendant is white or Negro, whether he is acquitted or convicted. In short, when a grand or petit jury has been selected on an impermissible basis, the existence of a constitutional violation does not depend on the circumstances of the person making the claim."); *id*. at 505 ("we hold that, whatever his race, a criminal defendant has standing to challenge the system used to select his grand or petit jury, on the ground that it arbitrarily excludes from service the members of any race, and thereby denies him due process of law."). *See also Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019) ("A defendant of any race may raise a [equal protection] *Batson* claim, and a defendant may raise a *Batson* claim even if the defendant and the excluded juror are of different races."); *Campbell v.*

## B. The federal jury selection process is subject to strict scrutiny.

As the Court is aware, the Supreme Court created the idea of "fundamental rights" in order to protect certain very special rights from any discrimination that is not absolutely essential. Those rights declared to be "fundamental" are those that are preservative of other rights, such as the right to vote, or are so basic to freedom that they must be protected against all statutory incursions. The Supreme Court specifically declared in the context of equal protection litigation (and due process decisions using equal protection concepts) that our fundamental rights include (1) the right of a criminal defendant to due process and a fair trial, (2) first amendment rights to freedom of speech, (3) the right to vote, (4) the right to travel, and (5) the right to privacy. A classification scheme that affects any of these rights must fall, unless the government can show under the "strict scrutiny" test a compelling state interest to justify the discrimination. *See generally* Jon M.

_____

*Louisiana*, 523 U.S. 392 (1998) (a white criminal defendant has standing to object to discrimination against black defendants in the selection of grand jurors); *Taylor v. Louisiana*, 419 U.S. at 526 ("Taylor was not a member of the excluded class; but there is no rule that [fair cross section] claims such as Taylor presents may be made only by those defendants who are members of the group excluded from jury service.")

Van Dyke, *Jury Service is a Fundamental Right*, 2 Hastings Const. L.Q. 27,

28 (1975) (collecting cases.)

The first reason discrimination in the selection of juror qualification

criteria is subject to "strict scrutiny" by this Court is that Mr. Bowers has a

"fundamental" right to trial by an impartial and representative jury. In *Reid*

*v. Covert*, 354 U.S. 1 (1957), a case rejecting the government's assertion that

the wife of an American serviceman accused of killing her husband overseas

could be tried by a military court-martial, Justice Hugo Black said for a

plurality of the Court:

> Moreover, in view of our heritage and the history of the adoption
> of the Constitution and the Bill of Rights, it seems peculiarly
> anomalous to say that trial before a civilian judge and by *an*
> *independent jury picked from the common citizenry is not a*
> *fundamental right.*

*Id.* at 9 (emphasis added).

In *Duncan v. Louisiana*, 391 U.S. 145 (1968), the case in which the

Supreme Court ruled that the Sixth Amendment required that the

states grant jury trials to all persons facing a possible non-petty penalty,

Justice Byron R. White wrote for the Court that the right to trial

by jury is among those "*fundamental* principles of liberty and justice

which lie at the base of all our civil and political institutions." *Id.* at 148

(emphasis added). Later in the opinion, Justice White wrote that "[b]ecause

we believe that trial by jury in criminal cases is fundamental to the American

153

scheme of justice, we hold that the Fourteenth Amendment guarantees a right to jury trial in all criminal cases which-were they to be tried in federal court-would come within the Sixth Amendment's guarantee." *Id*. at 149 (emphasis added).

These governing standards were articulated in an even more explicit fashion in *Taylor v. Louisiana*, 419 U.S. 522 (1975), the case in which the Supreme Court declared unconstitutional Louisiana's statute limiting jury service among women to those who volunteered for jury duty. Writing for an 8-1 majority, Justice White stated that "[w]e accept the fair-cross-section requirement as *fundamental* to the jury trial guaranteed by the Sixth Amendment." He then rejected Louisiana's argument that jury service would interfere with the "distinctive role in society" of women by stating that "[t]he right to a proper jury cannot be overcome on merely rational grounds." *Id*. at 529, 534. A higher standard of review must be imposed because a "fundamental right" is at stake.

In its opinion in *White v. Crook*, 251 F. Supp. 401, 408 (M.D. Ala. 1966), a case cited favorably in *Peters v. Kiff*, a special three-judge federal court declared that "jury service on the part of citizens of the United States is considered under our law in this country as one of the basic rights and obligations of citizenship" and "a form of participation in the processes of government, a responsibility and a right that should be shared by all citizens

154

. . . ." This same principle was endorsed many years later by the Supreme

Court in *Lockhart v. McCree*, 476 U.S. 162 (1986). There the Court

acknowledged that exclusion from jury service of distinctive groups for

reasons completely unrelated to the ability of members of the group to serve

as jurors in a particular case

> raised at least the possibility that the composition of juries would
> be arbitrarily skewed in such a way as to deny criminal defendants
> the benefit of the common-sense judgment of the community. In
> addition, the exclusion from jury service of large groups of
> individuals not on the basis of their inability to serve as jurors, but
> on the basis of some immutable characteristic such as race, gender,
> or ethnic background, undeniably gave rise to an "appearance of
> unfairness." Finally, such exclusion improperly deprived members
> of these often historically disadvantaged groups of *their right as
> citizens to serve on juries in criminal cases.*

*Id*. at 175 (emphasis added). *See also United States v. Haymond*, 139 S. Ct.

2369, 2378-2379 (2019) (plurality opinion) (Restrictions on the Sixth

Amendment right to a jury trial infringe not only "the rights of the accused; it

also divest[s] the 'people at large'—the men and women who make up a jury

of a defendant's peers—of their constitutional authority to set the metes and

bounds of judicially administered criminal punishments."); *Tennessee v. Lane*,

541 U.S. 509, 524 ("Congress enacted Title II against a backdrop of pervasive

unequal treatment in the administration of state services and programs,

including systematic deprivations of *fundamental rights*. For example[,]… a

number of States have prohibited and continue to prohibit persons with

disabilities from engaging in activities such as marrying and *serving as jurors*."); *Toll v. Moreno*, 458 U.S. 1, 40 (1982) (the right to vote, to run for elective office, and jury service "lie the heart of our political institutions.")

In *Powell v. Ohio*, the Court, through Justice Kennedy did not reference the clear statement in *Lockhart* that disadvantaged groups had a "*right as citizens to serve on juries in criminal cases,*" but instead stressed that "with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process." Justice Kennedy explained that "'[w]hether jury service be deemed a right, a privilege, or a duty, the State may no more extend it to some of its citizens and deny it to others on racial grounds than it may invidiously discriminate in the offering and withholding of the elective franchise.'" *Powell*, 499 U.S. at 407-408 (quoting *Carter*, 396 U.S. at 330).[59] *See also Powell*, 499 U.S. at 409

---

[59] Justice Kennedy again compared jury service to voting in *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 626 (1991) ("The principle that the selection of state officials, other than through election by all qualified voters, may constitute state action applies with even greater force in the context of jury selection through the use of peremptory challenges. Though the motive of a peremptory challenge may be to protect a private interest, the objective of jury selection proceedings is to determine representation on a governmental body.") *See also United States v. Haymond*, 139 S. Ct. 2369, 2375 (2019) ("Together with the right to vote, those who wrote our Constitution considered the right to trial by jury the heart and lungs, the mainspring and the center wheel of our liberties, without which the body must die; the watch must run down; the government must become arbitrary.") (internal quotation omitted).

("An individual juror does not have a right to sit on any particular petit jury, but he or she does possess the right not to be excluded from one on account of race.")

But regardless of whether one characterizes the right at issue as the *"right as citizens to serve on juries in criminal cases" (Lockhart)*, or the "right not to be excluded from one on account of race" (*Powell*), the result should be the same in terms of the high level of scrutiny that is required for equal protection or due process analysis of jury eligibility criteria. *Carter*, *Powell*, *Edmonson,* and *Haymond* all conclude that serving on a jury is closely comparable to voting:

> The analogy of jury service to the vote is important because the right to vote has been explicitly viewed as 'fundamental' in a number of recent cases, and hence all allegations of discrimination regarding the vote are governed by the "strict scrutiny, compelling state interest" test. Both jury service and the vote are essential democratic links between the government and the people that must be protected against any legislative or bureaucratic action.
>
> The reasons that we rely so heavily on the jury are "to prevent oppression by the Government," and "to maintain a link between contemporary community values and the penal system." These functions can be performed by the jury only if the jurors are selected without discrimination of any sort, so that the jurors are in fact representatives of "contemporary community values" capable of preventing "oppression by the government." Thus the

> selection of jurors must be protected by a standard as strict as that
> protecting the exercise of the vote.

Jon M. Van Dyke, *Jury Service is a Fundamental Right*, 2 Hastings Const.

L.Q. 27, 29 (1975) (quoting *Duncan v. Louisiana*, 391 U.S. at 155, and

*Witherspoon v. Illinois*, 391 U.S. 510, 519 n.15 (1968)). *See also* Vikram David

Amar, *Jury Service as Political Participation Akin to Voting*, 80 Cornell L.

Rev. 203, 206 (1995) ("[T]he link between jury service and other rights of

political participation such as voting is an important part of our overall

constitutional structure, spanning three centuries and eight amendments:

the Fifth, Sixth, Seventh, Fourteenth, Fifteenth, Nineteenth, Twenty-Fourth,

and Twenty-Sixth.")

### C. Two of the jury qualification criteria in the JSSA, the one-year residency requirement and the felon prohibition, do not meet constitutional muster.

Judged by the strict scrutiny standard, or even by some lesser

standard, two of the jury qualification criteria established by Congress in the

JSSA do not meet current constitutional standards: the one-year residency

requirement set forth in 28 U.S.C § 1865(b)(1), and the broad disqualification

set forth in § 1865(b)(5) of any individual who has "a charge pending against

him for the commission of, or has been convicted in a State or Federal court of

record of, a crime punishable by imprisonment for more than one year and

his civil rights have not been restored." The use of these irrelevant, arbitrary,

and discriminatory jury eligibility criteria in a death penalty case mocks the tradition of the representative jury of one's peers, transgresses the democratic ideal, and violates the Fifth Amendment's due process and equal protection guarantees, the Sixth Amendment's jury trial guarantee, the Eighth Amendment's guarantee of enhanced procedural protections in a death penalty case, and the prohibition of discrimination in 18 U.S. C. § 243.

The use of these criteria in this case has already deprived, and will continue to deprive, Mr. Bowers of constitutional and statutory rights that he is entitled to enforce. Their application here renders void the Superseding Indictment and any jury trial composed using such criteria.

### i.     The One-Year Residency Requirement, Which is Racially Discriminatory in Purpose and Impact, is Unconstitutional and Violative of 18 U.S.C. § 243.

Prior to the passage of the Jury Selection and Service Act of 1968, qualifications for service on federal juries were set out in 28 U.S.C. § 1861 (not § 1865 as it is now). As originally enacted in 1948, 28 U.S.C. § 1861 stated:

> Any citizen of the United States who has attained the age of 21 years and resides within the judicial district, is competent to serve as a grand or petit juror unless: (1) He has been convicted in a state or federal court of record of a crime punishable by imprisonment for more than one year and his civil rights have not been restored by pardon or amnesty. (2) He is unable to read, write, speak and understand the English language. (3) He is incapable, by reason of mental or physical infirmities to render efficient jury service. (4)

He is incompetent to serve as a grand or petit juror by the law of
the State in which the district court is held.

28 U.S.C. § 1861 (1948).[60]

In 1957, as part of last-ditch attempt to mollify Southern Senators who
were outraged at the prospect of passing even a watered-down version of the
Civil Right Act of 1957 and were interested in preserving the right to have
Southern juries decide contempt cases involving violations of the Act, Senator
Church proposed and Congress eventually adopted an amendment to the Act
that modified § 1861. It read:

[a]ny citizen of the United States who has attained the age of
twenty-one years and *who has resided for a period of one year
within the judicial district*, is competent to serve as a grand or petit
juror unless - (1) He has been convicted in a State or Federal court
of record of a crime punishable by imprisonment for more than one
year and his civil rights have not been restored by pardon or
amnesty. (2) He is unable to read, write, speak, and understand
the English language. (3) He is incapable, by reason of mental or
physical infirmities to render efficient jury service.

28 U.S.C. 1861 (1957), amended by Jury Selection and Service Act of 1968, 28
U.S.C. §§ 1861-1869 (emphasis added).

---

[60] For a detailed history of the federal juror qualification statutes dating to
1789, including an explanation of Subsection 4, its origin and effect of
excluding women and minorities from federal juries, see the Report of the
Judicial Conference Committee on the Operation of the Jury System, 26
F.R.D. 409, 443-45 (1960). There is no mention in this history of a durational
residency requirement.

The Church amendment was in fact an amendment to an earlier amendment by Senator O'Mahoney. As explained in *Rabinowitz v. United. States*, 366 F.2d 34, 48 (5th Cir. 1966):

> The Eighty-fifth Congress in 1957 found itself debating what was to become the first broad Civil Rights Act since the reconstruction era. Injected into this charged arena of public affairs was the issue of whether persons accused of judicial contempt should be given a jury trial— the O'Mahoney amendment. One argument most strongly advanced by opponents of the amendment was that State law disqualified large numbers of Negroes from jury service in many parts of our country, especially in the South. While supporting the Civil Rights Act, of 1957, these opponents of the O'Mahoney jury trial amendment feared that predominantly white southern juries would prevent the enforcement of the Civil Rights Act by crippling the courts' power to enforce its injunctions through contempt proceedings. *In an effort to make the O'Mahoney amendment more palatable* and to vitiate many of the objections to contempt jury trials, Senator Church introduced a modification which was then incorporated into the O'Mahoney amendment.

*Id*. at 48 (emphasis added). In introducing the bill, Senator Church explained:

> Mr. CHURCH. Mr. President, the amendment is designed to eliminate whatever basis there may be for the charge that the efficacy of trial by jury in the Federal courts is weakened by the fact that, in some areas, colored citizens, because of the operation of State laws, are prevented from serving as jurors. Thus, the argument has been made that no jury trial should be permitted in civil rights cases, even in a proceeding for criminal contempt, because such cases concern relationships between the races, and in the South they would be tried by an all-white jury.
>
> Mr. President, the cases which will be brought under any civil-rights bill will be prosecuted in Federal courts. There is no reason why Congress should not modify Federal law so as to safeguard against discrimination on the basis of race, color, or creed, in the selection of jurors who are to serve in Federal courts.

161

We believe the amendment we have now incorporated in the RECORD will accomplish at least three important and long overdue objectives:

First. It will establish reasonable and uniform qualifications for jurors serving in Federal courts, eliminating the 48 different sets of qualifications which now obtain. This is in complete accord with the generally accepted principle that Federal rules should govern Federal practice.

Second. It will place the selection of jurors entirely in the hands of the Federal courts, thus avoiding practices under State law that, in effect, may systematically exclude citizens from jury duty in Federal courts on account of race or color.

Third. Through the accomplishment of the above two objectives, it will confer another civil right—the right to serve as a juror—on a large segment of colored citizens, who now, in practice, may be prevented from doing so.

Mr. President, we believe the amendment constitutes a great step forward in the field of civil rights. We believe also that it can contribute significantly in forwarding the cause to which most of us are dedicated—the cause of enacting a civil-rights bill in this session of the Congress.

103 Cong. Rec. S 11933 (July 31, 1957.)

Neither Senator Church nor any other legislator attempted at any point in the legislative history to explain either the specific purpose of the one-year residency requirement or how such an exclusionary provision, although "uniform," could possibly accomplish the twin goals of avoiding practices that "in effect, may systematically exclude citizens from jury duty in Federal courts on account of race or color" and of granting the right to serve

162

as a juror "on a large segment of colored citizens, who now, in practice, may be prevented from doing so." *Id.*

The true purpose of the jury amendment was better identified on August 2, 1957, when then-Senator Lyndon Johnson introduced into the record an article in that morning's *Washington Post* which he said "places the situation in its true perspective." 103 Cong. Rec. S 11933 (July 31, 1957). The article states in part that "[t]he amendment agreed to last night amounts to a very substantial concession to the sensibilities of the South. There is no excuse now for any further delaying tactics in final adoption of the civil-rights bill." *Id.* That the amendment was in fact intended as such a concession was admitted by Senator O'Mahoney, who proclaimed that

> [t]he inclusion of a jury-trial amendment in this bill *will greatly mollify the opposition* to the bill, for it will indicate to those who have regarded it in its original form as a force bill, that the proponents, following the temperate caution of the Supreme Court in the desegregation decision, wish to encourage the extension of the right to vote in the areas where it had not been granted "with all deliberate speed."

103 Cong. Rec. S 11935 (July 31, 1957) (statement of Wyoming Senator O'Mahoney) (emphasis added).

The bargain being struck was that proponents of the Act, who were originally opposed to granting a right to jury trial in criminal contempt proceedings involving the Act for fear that Southern juries would always acquit, would agree to guarantee a right to trial jury in such cases, but only if

state control of federal jury qualifications were abolished. Southern Senators and their allies were obviously not in favor of abolishing state control over the qualifications of federal juries. *See, e.g.*, 103 Cong.Rec. 13249, 13312 ("When the O'Mahoney amendment strikes out the provision, now in Federal statutes, that no person not eligible under State law can serve on a Federal jury, the amendment constitutes one more encroachment on State responsibility.") (Statement of Senator Saltonstall). To "mollify" this concern, the one-year residency requirement was highlighted as an exclusionary measure, to take the sting out of the fact that Southerners would be losing their ability to shape Southern juries through state jury qualification criteria:

> Mr. Case of South Dakota: So the effect of the amendment which the Senator has now incorporated in his amendment would be to make it impossible for a state to disqualify a person for service on a grand or petit jury. Is that correct? ....

> Mr. O'Mahoney: The Senator from South Dakota is quite correct. There is another modification, however, to which I ought to call his attention. There is a provision, in the first paragraph of the new language, with respect to a citizen of the United States who has attained the age of 21 years and who has resided in the vicinage for a period of 1 year. That is new language. The present language of the Federal statue is "and resides." The new language is "who has resided for a period of 1 year."

> Mr. Case of South Dakota: I think that would be an important change, and a desirable one, so far as I can see, but the principle change would be in the other respect.

103 Cong. Rec. S 11935 (July 31, 1957).

The "sensibilities of the South" that the jury amendment was designed to "mollify" had been expressed repeatedly throughout the debate on the Act by various Southern legislators. Illustrative, but by no means atypical of the ugliness of the debate and of the times, was the copy of a recent address by Georgia Representative Watts that was introduced into the record by Virginia Representative Tuck. 103 Cong. Rec. H 11933 (August 22, 1957). In the address, Watts railed against the Supreme Court's recent school desegregation ruling, claiming:

> Two cases of attempted assault by Negro boys on white girls were reported in one day at one junior high school. These cases involved language and action so vile and sordid that it staggers the imagination.
>
> We cannot afford to subject our children to such a malignant experiment. The same integrationists and mongrelizers have stated that they only want equal rights and opportunities for the Negro. Yet the radical NAACP has repeatedly declared that their ultimate goal is intermarriage and complete mongrelization of the American people. The fact that this is also the identical aim of the Communist Party of the United States is more than just coincidental. If they are successful in cramming this school decision down our throats, they will follow it with a decision invalidating our marriage laws, and that will be the end.
>
> The time to end this judicial usurpation is now. The time to restore the Constitution to the people is now.
>
> I have given you tonight, in brief, a picture of the deplorable situation in Washington. I have seen there the tragic results which come from the breakdown of segregation and substitution of an integrated public-school system.

> This same thing can happen here and will happen to you if the people meekly accept wrongful usurpation of power, and a Supreme Court dictatorship, as they did in Washington.

103 Cong. Rec. H 15719 (August 22, 1957); *see* 103 Cong. Rec H. 15042 (August 29, 1957) ("As taken up initially by the Senate, it was a force bill of the rankest order. It would have conferred upon the Attorney General of the United States unlimited power to harass, intimidate, and control the thoughts and actions of all Americans in all areas of human conduct. It would have empowered the President of the United States—or the Attorney General acting for him—to use the full armed might of the Nation to force, integration of the races in every facet of life, public and private, in the South.") (Statement of Senator Talmadge); 103 Cong. Rec S. 14961 (August 29, 1957) ("Behind this force bill lies a game of power politics. Both national parties are struggling to control the votes of herded Negroes in big northern cities and their liberal allies. These bloc voters are believed to hold the balance of political power In the United States. Buried beneath the nauseating political greed that has produced this force bill are principles once dear to Americans. The bill has many of the earmarks of totalitarian government that the Constitution was built to prevent.") (Statement of Senator Thurmond); 103 Cong. Rec H. 7636 (June 7, 1957) ("It was surprising to me to find that the questions most on the minds of those Negro ministers was their belief that undue leniency was being shown to members of their race by the judges in

166

the criminal courts of North Carolina. There was not one word of complaint

that the members of the Negro race had been unfairly treated…My friends, I

could continue for many hours with examples and facts of the harmonious

race relations which are now enjoyed in that section of this Nation toward

which this vicious legislation is directed—the South.") (Statement of

Representative Whitener)

As the history above demonstrates, there can be no rational basis,

much less a compelling one, for adopting a one-year residency requirement

for jury service for the purpose of effecting a concession to such reprehensible

"sensibilities." Legislation enacted to mollify such "sensibilities" is racist in

purpose and for that reason alone is unconstitutional. As the Supreme Court

has held::

> [*Washington v. Davis*, 426 U.S. 229(1976)] does not require a
> plaintiff to prove that the challenged action rested solely on
> racially discriminatory purposes. Rarely can it be said that a
> legislature or administrative body operating under a broad
> mandate made a decision motivated solely by a single concern, or
> even that a particular purpose was the "dominant" or "primary"
> one. In fact, it is because legislators and administrators are
> properly concerned with balancing numerous competing
> considerations that courts refrain from reviewing the merits of
> their decisions, absent a showing of arbitrariness or irrationality.
> *But racial discrimination is not just another competing
> consideration. When there is a proof that a discriminatory purpose
> has been a motivating factor in the decision, this judicial deference
> is no longer justified.*

167

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 264-265

(1997) (emphasis added). *Cf. United States v. Carrillo-Lopez,* No.

320CR00026MMDWGC, 2021 WL 3667330, at *1 (D. Nev. Aug. 18, 2021)

(8 U.S.C. § 1326 was unconstitutional under *Arlington Heights* "[b]ecause

Carrillo-Lopez has established that Section 1326 was enacted with a

discriminatory purpose and that the law has a disparate impact on Latinx

persons, and the government fails to show that Section 1326 would have been

enacted absent racial animus.")[61]

In 1968, when Congress passed the Jury Selection and Service Act, the

one-year residency requirement was adopted unchanged from the 1957

amendment. The new requirement was—and is—that any person is qualified

to serve on grand and petit juries in the district court unless he or she "(1) is

not a citizen of the United States eighteen years old who has resided for a

period of one year within the judicial district." 28 U.S.C. § 1865(b)(1); *see* H.R.

Rep. No. 1076, at 13 n.1 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1792 ("With

one exception, these criteria mirror the requirements for service enumerated

in the present statute. The one exception is the disqualification of those

against whom a charge is pending for a crime punishable by imprisonment

for more than 1 year.") The racist purpose of the 1957 legislation was thus

---

[61] The issue of discriminatory impact is discussed below.

carried forward in the JSSA. *See United States v. Carrillo-Lopez*, 2021 WL 3667330, at *17 ("Contrary to the government's argument that re-enactment of an existing law 'cleanses' it from any discriminatory aspects of its history … the [cases] expressly war[n] against the possibility that a legislative body might seek to insulate from challenge a law known to have been originally enacted with a discriminatory purpose by (quietly) reenacting it without significant change.") (internal quotation omitted).

In the legislative history of the JSSA, like the legislative history of the 1957 amendment, there is very little discussion of the specific purpose of the one-year residency requirement. Both the House and Senate Reports on the bill contain a single sentence devoted to the topic, both of which state that "the 1-year residence requirement assures some substantial nexus between a juror and the community whose sense of justice the jury as a whole is expected to reflect." H.R. Rep. No. 1076, at 6 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1792; S.Rep. No. 891 at 22 (1968) (same). The "substantial nexus" language of the reports is mentioned only once in the entire Congressional debate on the JSSA, when on February 26, 1968, Representative MacGregor read into the record verbatim the language of the Senate Report quoted above. 114 Cong. Rec. H 1343 (February 26, 1968).

While there was no debate on the one-year residency exclusion, Congress was warned that there were constitutional issues with the proposal.

In an August 1, 1966, letter to a Senate subcommittee that was conducting hearings on pending jury proposals, the Chief Judge of the Southern District of Indiana wrote:

> The provision in Title I of S. 3290 that the Jury Commission, among other things, shall deem any person qualified to serve on grand and petit juries in the district court unless he has not resided for a period of one year within the judicial district is, in my opinion, constitutionally suspect. A person is no less a citizen of a Judicial district by reason of not having resided in the district for one year than the person who has resided there for a year or more.

*Civil Rights: Hearings Before The Subcommittee On Constitutional Rights Of The Committee On The Judiciary of the United States Senate* 1843 (July-August 1966). This letter was introduced into the record by Senator Ervin on August 3, 1966. 112 Cong. Rec. S 17246-17247.

At a June 6, 1967, legislative hearing on the various jury proposals then pending before Congress, during a discussion of the inadequacy of using voter registration lists as the sole source of juror names, the Director of the ACLU in Washington, DC told a committee:

> [Mr. Speiser]: On the source of names, we have rejected the 1ist of key men for jury service, and are apprehensive of using voter registration lists, as primary or, exclusive source of names as suggested in several bills. First of all, as you suggested, Mr. Chairman, in many areas of the country the millennium has not yet arrived; voter registration lists are not representative of the community. There is a great disparity between various groups in particular areas and those that are on voter registration lists. Also

there is a problem which the President has just recognized on the residency requirements that exist.[62]

We were unsuccessful in a case involving your State of Maryland as a matter of fact, 2 years ago. It was about the time we had the poll tax case. We challenged the voter residence requirements for

---

[62] The reference is to President Johnson's speech to Congress on May 25, 1967 in which he introduced the Residency Voting Act of 1967, which provided that a citizen, otherwise qualified to vote under the laws of a state, may not be denied his vote in a presidential election if he becomes a resident of the state by the first day of September preceding the election. The President explained the need for the bill:

> This Nation has already assured that no man can legally be denied the right to vote because of the color of his skin or his economic condition. But we find that millions of Americans are still disenfranchised--because they have moved their residence from one locality to another.

> Mobility is one of the attributes of a free society, and increasingly a chief characteristic of our Nation in the 20th Century. More American citizens than ever before move in search of new jobs and better opportunities.

> *For a mobile society, election laws which impose unduly long residence requirements are obsolete. They serve only to create a new class of disenfranchised Americans.*

> An analysis of the 1960 election, the last election for which studies are available, shows that between 5 and 8 million otherwise eligible voters were deprived of the right to vote because of unnecessarily long residency requirements in many of the states. Almost half the states, for example, through laws a century old, require a citizen to be a resident a full 12 months before he can vote even in a Presidential election.

> These requirements diminish democracy. The people's rights to travel freely from State to State is constitutionally protected. The exercise of that right should not imperil the loss of another constitutionally protected right--the right to vote.

113 Cong. Rec. H 6344-48 (May 25, 1967) (*The Political Process in America*, a speech by President Lyndon Johnson) (emphasis added).

171

registering in the State of Maryland, and were unsuccessful in the case, but perhaps somewhat successful in losing the battle but winning the war. Thereafter the voter registration was changed from a year down to 45 days by legislative action, as a result of the attention the case attracted. In many States there are tremendous voter registration residence requirements.

We are a transient population and a lot of people are cut off front participation in jury service because of that.

Federal Jury Selection at 339-340 (Testimony of ACLU Director Lawrence Speiser); *see also id*. at 336. ("The [voter registration] lists …exclude many residents who are sufficiently mobile that they are ineligible to vote, yet are permanent enough to have ties to the community.") (Statement of Lawrence Speiser.)

More significantly, while the Congressional debates on the JSSA were still underway, four separate three-judge district court panels concluded that one-year residency requirements imposed by the states for all persons coming into the states who applied for public welfare assistance violated the Equal Protection Clause, the Privileges and Immunities Clause, and the right to travel with its concomitant right to establish residence. *See Harrell v. Tobriner,* 279 F.Supp. 22 (D.D.C. 1967); *Smith v. Reynolds*, 277 F.Supp. 65 (E.D.Pa. 1967); *Thompson v. Shapiro*, 270 F.Supp. 331 (D.Conn. 1967); *Green v. Department of Public Welfare*, 270 F.Supp. 173 (D.Del. 1967).

Congress was well aware of the holding in these cases prior to the JSSA's enactment. *See* 113 Cong. Rec. S 17944 (December 5, 1967) ("The

most striking example of decisions by the courts involving conditions
attached to the granting of a privilege by the Congress of the United States
and the legislatures of the several States is a series of recent decisions by
three-judge U.S. district courts voiding the 1-year residence requirements for
the payment of welfare benefits in the District of Columbia, Delaware,
Connecticut, and Pennsylvania.") (Statement of Senator Eastland, citing and
discussing above-cited cases in debate on another bill). *See also Social
Security Amendments of 1967: Hearings Before The Committee On Finance,
United States Senate* 1282-1383 (August 28-September 19, 1967) (discussion
of the cited cases to demonstrate that "[t]he residence requirements condoned
by the Social Security Act are not only cruel and anachronistic; they violate
several provisions of the United States Constitution, including, perhaps, the
prohibition of Article IV, § 2, of discrimination against citizens of other
states; the privileges and immunities clause of the Fourteenth Amendment;
the due process clause, the equal protection clause ; and the implied ban on
restriction of interstate travel.") (Testimony of NAACP Legal Defense Fund
Attorney Leroy D. Clark); *Examination of the War On Poverty: Hearings
Before The Subcommittee On Employment, Manpower, And Poverty Of The
Committee On Labor And Public Welfare, United States Senate* 2912 (June
22-28, 1967) (describing these two cases and noting that they "held that the
one- year waiting period violated the Equal Protection Clause, the Privileges

and Immunities Clause and the right to travel with its concomitant right to establish residence.")

While these cases concerned deprivation of welfare "benefits," and not deprivation of "rights," their implication for the JSSA's one-year residency requirement would and should have been obvious to Congress. According to H.R. Rep. No. 1076, "[t]he new section 1861 …guarantees the *right* of qualified citizens to an opportunity to be considered for service under the procedures set forth." *Id*. at 8. (emphasis added). If the deprivation of gratuitously providing welfare benefits could give rise to constitutional violations, then certainly deprivation of the *right* to be considered for service on a jury would and should be subject to the same, and perhaps even a greater, standard. Moreover, as Senator Eastman reminded his fellow Senators in December 1967, in the *Harrell* case, the court specifically concluded that "[i]t is said that Congress in gratuitously providing for assistance may not be held to constitutional standards", but "[t]he decisions are to the contrary." 113 Cong. Rec. S 17944 (citing *Harrell v. Tobriner*, 279 F. Supp. at 28).

Despite all these warning signs, on March 27, 1968, Congress enacted the JSSA with the one-year residency requirement. *See* 82 Stat. 53. If it was not obvious when this requirement was enacted that it was unconstitutional, subsequent events very quickly removed any doubt about the matter.

174

On April 21, 1969, the Supreme Court upheld the decisions in the *Harrell*, *Smith*, and *Thomson* cases, concluding that "the statutory prohibition of benefits to residents of less than a year creates a classification which constitutes an invidious discrimination denying [plaintiffs] equal protection of the laws." *Shapiro v. Thompson*, 394 U.S. 618, 627 (1969). "The interests which appellants assert are promoted by the classification either may not constitutionally be promoted by government or are not compelling governmental interests." *Id.*. The Court also declared that "in moving from State to State or to the District of Columbia appellees were exercising a constitutional right, and any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a compelling governmental interest, is unconstitutional." *Id*.

The Court in *Shapiro* also rejected the argument that a one-year residency requirement provides an objective test of residency:

> The argument that the waiting period serves as an administratively efficient rule of thumb for determining residency similarly will not withstand scrutiny. The residence requirement and the one-year waiting-period requirement are distinct and independent prerequisites for assistance under these three statutes, and the facts relevant to the determination of each are directly examined by the welfare authorities. Before granting an application, the welfare authorities investigate the applicant's employment, housing, and family situation and in the course of the inquiry necessarily learn the facts upon which to determine whether the applicant is a resident.

*Id*. at 636.

On June 22, 1970, Congress enacted Public Law 91-285, which

extended the Voting Rights Act of 1965 and added a new Section 202 aimed

at a durational residency requirement. That section states in part:

> Sec 202. (a) The Congress hereby finds that the imposition and application of the durational residency requirement as a precondition to voting for the offices of President and Vice President, and the lack of sufficient opportunities for absentee registration and absentee balloting in presidential elections—
>
> > (1) denies or abridges the inherent constitutional right of citizens to vote for their President and Vice President;
> >
> > (2) denies or abridges the inherent constitutional right of citizens to enjoy their free movement across State lines;
>
> (3) denies or abridges the privileges and immunities guaranteed to the citizens of each State under article IV, section 2, clause I of the Constitution;
>
> > (4) In some instances has the impermissible purpose or effect of denying citizens the right to vote for such officers because of the way they may vote;
> >
> > (5) has the effect of denying to citizens the equality of civil rights, and due process and equal protection of the laws that are guaranteed to them under the fourteenth amendment; and
> >
> > (6) *does not bear a reasonable relationship to any compelling State interest in the conduct of presidential elections.*
>
> (b) Upon the basis of these findings, Congress declares that in order to secure and protect the above-stated right of citizens under the Constitution, to enable citizens to better obtain the enjoyment of such rights, and to enforce the guarantees of the fourteenth amendment, it is necessary (1) to completely abolish the durational residency requirement as a precondition to voting for President and Vice President, and (2) to establish nationwide, uniform

standards relative to absentee registration and absentee balloting in presidential elections.

(c) No citizen of the United States who is otherwise qualified to vote in any election for President and Vice President shall be denied the right to vote for electors for President and Vice President, or for President and Vice President, in such election because of the failure of such citizen to comply with any durational residency requirement of such State or political subdivision…

*Id.*

On March 21, 1972, in *Dunn v. Blumstein*, 405 U.S. 330 (1972), the Supreme Court applied the "compelling state interest" test to durational residency voting requirements that restricted the right to vote to persons who had lived in the state for more than one year and had lived in the county for more than three months. The Court declared that the residency requirements were unconstitutional (1) because they impermissibly interfered with the fundamental right to vote; and (2) because they created a "suspect" classification penalizing some residents because of recent interstate movement. The state argued that the law was justified to ensure purity of the ballot box and to guarantee knowledgeable voters. *Id.* at 343-360. The Court rejected both justifications. *Id.*

As argued above, the link between the right to an opportunity for jury service and other rights of political participation such as voting is an important part of our overall constitutional structure and therefore these two rights must be treated the same for purposes of constitutional analysis. The

177

one-year residency requirement in the JSSA is unconstitutional in part because, as in *Dunn*, "[d]urational residence requirements completely bar from [the opportunity to serve on a jury] all residents not meeting the fixed durational standards. By denying some citizens [such] right …, such laws deprive them of 'a fundamental political right, … preservative of all rights.'" *Dunn*, 405 U.S. at 336. The durational residency requirement of the JSSA also impinges on Mr. Bowers' right to grand and petit juries selected from a cross-section of the community, which, like the right to vote, is considered a fundamental right.

Also, as in *Dunn*, the JSSA's "durational residence laws classify *bona fide* residents on the basis of recent travel, penalizing those persons, and only those persons, who have gone from one jurisdiction to another during the qualifying period. Thus, the durational residence requirement directly impinges on the exercise of a second fundamental personal right, the right to travel." *Id.* at 338.

Finally, the "knowledgeable voter" rationale rejected in *Dunn* is indistinguishable from the one-line "substantial nexus to the community" rationale offered in the legislative history of the JSSA to support the one-year residency requirement in § 1865(b)(1):

> The argument that durational residence requirements further the goal of having "knowledgeable voters" appears to involve three separate claims. The first is that such requirements "afford some

178

surety that the voter has, in fact, become a member of the community." But here the State appears to confuse a *bona fide* residence requirement with a durational residence requirement. As already noted, a State does have an interest in limiting the franchise to bona fide members of the community. But this does not justify or explain the exclusion from the franchise of persons, not because their *bona fide* residence is questioned, but because they are recent rather than longtime residents.

The second branch of the "knowledgeable voters" justification is that durational residence requirements assure that the voter "has a common interest in all matters pertaining to (the community's) government … ." By this, presumably, the State means that it may require a period of residence sufficiently lengthy to impress upon its voters the local viewpoint. This is precisely the sort of argument this Court has repeatedly rejected. In *Carrington v. Rash*, [380 U.S. 89 (1965)], for example, the State argued that military men newly moved into Texas might not have local interests sufficiently in mind, and therefore could be excluded from voting in state elections. This Court replied: "But if they are in fact residents, … they, as all other qualified residents, have a right to an equal opportunity for political representation …'Fencing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." 380 U.S., at 94, 85 S.Ct., at 779….

Similarly here, Tennessee's hopes for voters with a "common interest in all matters pertaining to (the community's) government" is impermissible. To paraphrase what we said elsewhere, "All too often, lack of a ('common interest') might mean no more than a different interest." *Evans v. Cornman*, 398 U.S., at 423, 90 S.Ct., at 1755. "[D]ifferences of opinion" may not be the basis for excluding any group or person from the franchise. *Cipriano v. City of Houma*, 395 U.S., at 705—706, 89 S.Ct., at 1900—1901. "[T]he fact that newly arrived (Tennesseans) may have a more national outlook than longtime residents, or even may retain a viewpoint characteristic of the region from which they have come, is a constitutionally impermissible reason for depriving them of their chance to influence the electoral vote of their new home State." *Hall v. Beals*, 396 U.S. 45, 53-54, 90 S.Ct. 200, 204, 24 L.Ed. 24 (1969) (dissenting opinion).

179

> Finally, the State urges that a longtime resident is "more likely to exercise his right (to vote) more intelligently." To the extent that this is different from the previous argument, the State is apparently asserting an interest in limiting the franchise to voters who are knowledgeable about the issues. In this case, Tennessee argues that people who have been in the State less than a year and the county less than three months are likely to be unaware of the issues involved in the congressional, state, and local elections, and therefore can be barred from the franchise. We note that the criterion of "intelligent" voting is an elusive one, and susceptible of abuse. But without deciding as a general matter the extent to which a State can bar less knowledgeable or intelligent citizens from the franchise, … we conclude that durational residence requirements cannot be justified on this basis.

*Id*. at 354-357; *see Adams v. Superior Ct*., 12 Cal. 3d 55, 67-68, 524 P.2d 375, 383 (1974) (Mosk, Tobriner, and Sullivan, JJ., dissenting) ("Mere duration of residence seems no more relevant to the ability to comprehend and judge the issues of a typical trial than to the ability to analyze and judge the issues of a typical election. Although residence in the community is a critical consideration in determining compliance with the vicinage requirement of the Sixth Amendment (citation omitted), the duration of residence does not appear rationally related to the only legitimate interest of the state in establishing juror qualifications, *i.e.*, the assurance of obtaining capable jurors."); *id*. ("Under our trial system the jury is to determine the case exclusively on the basis of evidence adduced in court. The asserted interest of the state—assurance of a jury's significant connection with the community and identification with local

customs and norms—is based on the erroneous assumption that such extrajudicial knowledge is somehow involved in the jury's analysis of the evidence. Consideration of elements or factors inculcated by sources extraneous to the particular trial is highly improper. But in any event there is no supportive basis for holding that jurors with 13 months' residence in a community are for that reason alone better able to analyze evidence and reach a just verdict than those with 11 months' residence.")

For all these reasons, *Dunn* controls this case and mandates a holding that the one-year residency requirement is unconstitutional for the reasons stated in *Dunn* and the other residency requirement cases cited above. *See also Memorial Hosp. v. Maricopa County*, 415 U.S. 250 (1974) (denial of access to nonemergency medical care based on a durational residency requirement was an unconstitutional penalty); *Warrick v. Snider*, 2 F.Supp.2d 720 (W.D. Pa.1997) (Ambrose, J.) (60 days  durational residency requirement as a precondition to receiving welfare benefits was unconstitutional because: (1) it was an unconstitutional penalty on right of interstate migration; and (2) it was not rationally related to legitimate governmental purpose of encouraging employment).

The leading post-*Dunn* case on the constitutionality of § 1865(b)(1) is *United States v. Ross*, 468 F.2d 1213, 1215–16 (9th Cir. 1972). The Ninth Circuit's entire discussion of the issues is as follows:

181

Ross argues that the one-year residency requirement of section 1865(b)(1) violated his Fifth and Sixth Amendment rights. Again, a similar challenge was rejected by this court in *Duncan*, *supra*, 456 F.2d at 1406.

Ross contends that in *Duncan* we applied the wrong constitutional standard to the residency requirement and urges us to re-examine its holding in the light of *Dunn v. Blumstein*, 1972, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274.

In *Dunn*, the Supreme Court held invalid a Tennessee statute which prohibited new residents from voting in state elections for certain periods of time. It found that this residency requirement could not withstand the close scrutiny required by the strict equal protection test of the Fourteenth Amendment. 405 U.S. at 342, 360, 92 S.Ct. 995. Ross would have us apply the same test here. However, while the equal protection clause and the due process clause of the Fifth Amendment are not mutually exclusive, *see Schneider v. Rusk*, 1963, 377 U.S. 163, 168, 84 S.Ct. 1187, 12 L.Ed. 2d 218; *Bolling v. Sharpe*, 1954, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884, decisions applying the one are not automatically transferable to the other. Rather, classifications in federal statutes will be invalidated only if they are arbitrary or otherwise "so unjustifiable as to be violative of due process." *Bolling v. Sharpe*, supra, 347 U.S. at 499, 500, 74 S.Ct. at 694. It was that test under which we sustained the residency requirement in *Duncan*; *Dunn v. Blumstein* is not in point. We adhere to our decision in *Duncan*.

Most federal courts considering the issue after *Ross* have simply cited and followed the case uncritically. *See, e.g.*, *United States v. Fell*, No. 5:01-CR-12-01, 2018 WL 7254852, at *5 (D. Vt. Aug. 6, 2018) ("*Dunn* is inapposite for the reasons stated in *Ross*."); *United States v. Armsbury*, 408 F. Supp. 1130, 1134 (D. Or. 1976) ("It is well settled that the one-year residency requirement is constitutional.") (citing *Ross*); *United States v. Gurney*, 393 F. Supp. 688, 697 (M.D. Fla. 1974) ("Although the Fifth Circuit Court of Appeals

has approved the plans of several districts which contain this requirement it does not appear to have passed directly on this contention. It was carefully considered by the Ninth Circuit, which in a post *Dunn* decision, [*Ross*] rejected the contention. For the reasons given there this Court likewise finds it to be without merit.")

However, *Ross* is based on the glaringly false premise that equal protection principles do not apply with full force to the federal government. *Ross* purports to rely on *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954), for this proposition, but *Bolling* actually stands for the exact opposite proposition. There, the Supreme Court clearly held:

> In view of our decision that the Constitution prohibits the states from maintaining racially segregated public schools, *it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government*. We hold that racial segregation in the public schools of the District of Columbia is a denial of the due process of law guaranteed by the Fifth Amendment to the Constitution.

*Bolling*, 347 U.S. at 500 (emphasis added).

As the Supreme Court later affirmed in *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 215–16 (1995):

> In *Bolling v. Sharpe*, ..., the Court for the first time explicitly questioned the existence of any difference between the obligations of the Federal Government and the States to avoid racial classifications. *Bolling* did note that "[t]he 'equal protection of the laws' is a more explicit safeguard of prohibited unfairness than 'due process of law,' " *id*., at 499... But *Bolling* then concluded that, "[i]n view of [the] decision that the Constitution prohibits the

states from maintaining racially segregated public schools, it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government." *Id.*, at 500...*Bolling's* facts concerned school desegregation, but its reasoning was not so limited. The Court's observations that "[d]istinctions between citizens solely because of their ancestry are by their very nature odious," [*Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)], and that "all legal restrictions which curtail the civil rights of a single racial group are immediately suspect,"[*Korematsu v. United States*, 323 U.S. 214, 216], carry no less force in the context of federal action than in the context of action by the States—indeed, they first appeared in cases concerning action by the Federal Government. *Bolling* relied on those observations, 347 U.S., at 499, n. 3, ..., and reiterated " 'that the Constitution of the United States, in its present form, forbids, so far as civil and political rights are concerned, discrimination *by the General Government, or by the States,* against any citizen because of his race,' " *id.*, at 499, 74 S.Ct., at 694 (quoting *Gibson v. Mississippi*, 162 U.S. 565, 591...(1896)) (emphasis in original). The Court's application of that general principle to the case before it, and the resulting imposition on the Federal Government of an obligation equivalent to that of the States, followed as a matter of course.

Later cases in contexts other than school desegregation did not distinguish between the duties of the States and the Federal Government to avoid racial classifications.

If there was any doubt about the issue, it was definitively resolved by *Adarand Constructors,* which concluded: "[W]e hold today that all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Adarand Constructors,* 515 U.S. at 227.

The Ninth Circuit's gross misreading of *Bolling* in the *Ross* case has spawned a group of decisions that have all erroneously refused to apply *Dunn v. Blumstein* to the one-year residency requirement set forth in the JSSA on the mistaken assumption that constitutional principles do not apply with full force to the federal government. *Adarand Constructors* teaches that *Ross* and its progeny are wrong. This Court should therefore not follow this line of cases and should hold instead that, in accordance with *Dunn v. Blumstein,* the one-year residency requirement in the JSSA is unconstitutional.

The truth is that, as President Johnson declared long ago in 1967, "[f]or a mobile society, election laws [or jury selection laws] which impose unduly long residence requirements are obsolete. They serve only to create a new class of disenfranchised Americans." 113 Cong. Rec. H 6344-48 (May 25, 1967). The American Bar Association, writing almost fifty years later, agrees:

> In accordance with the statutes of most states, this subsection recommends no minimum period of residence. Courts have ruled lengthy periods of residency unconstitutional as prerequisites for voting and receiving public assistance. *Memorial Hosp. v. Maricopa County* 415 U.S. 250 (1974); *Dunn v. Blumstein*, 405 U.S. 330 (1972); *Shapiro v. Thompson*, 394 U.S. 618 (1969). Therefore, the term "resident" refers to all persons living in the jurisdiction and includes students attending local universities, and military personnel and their dependents who live in the community.

American Bar Association, *Principles for Juries And Jury Trials* (Revised 2016 8.10 (recommending that "[a]ll persons should be eligible for jury service except those who: [a]re not residents of the jurisdiction in which they have

185

been summoned to serve.").[63] *See also* Uniform Jury Selection and Service Act, Section 8(b), 13 Unif.Laws Annot. 509 (1980) ("A prospective juror is disqualified to serve on a jury if he:(1) is not a citizen of the United States, (21) years old, and a resident of the (district) (county).")

Finally, Mr. Bowers considers the likely characteristics of the population excluded by the one-year residency requirement and the likely impact of the exclusion in this case. In *Dunn*, the Court noted that "[w]hile it would be difficult to determine precisely how many would-be voters throughout the country cannot vote because of durational residence requirements, . . . it is worth noting that during the period 1947-1970 an average of approximately 3.3% of the total national population moved interstate each year. (An additional 3.2% of the population moved from one county to another intrastate each year.) U.S. Dept. of Commerce, Bureau of the Census, Current Population Reports, Population Characteristics Series P—20, No. 210, Jan. 15, 1971, Table 1, pp. 7—8." *Dunn*, 405 U.S. at 335 n. 5. Based solely on these general statistics and other considerations, the Court found an equal protection violation.

---

[63] Available at:
https://www.americanbar.org/content/dam/aba/administrative/american_jury/2016-jury-principal-comments.pdf.

The Court in *Dunn* also commented that although it would not "rely on this alleged original purpose of durational residence requirements in striking them down today," it has "been noted elsewhere, … that '(t)he historical purpose of (durational) residency requirements seems to have been to deny the vote to undesirables, immigrants and outsiders with different ideas.' Cocanower & Rich, 12 Ariz.L.Rev., at 484 and nn. 44, 45, and 46." *Id.* at 356 n. 27.

> Another article has also noted that, as a matter of historical fact,
>
> [o]ut of fear that the polls would be open to a large number of vagrants and migratory individuals, the states increasingly began to turn to durational residency rules to define and control their electorates. To be sure, some states welcomed newly eligible voters, and many passed legislation making it easier for those from the poorer classes who did not own land, and who were previously disenfranchised, to vote. Yet in many states, durational residency requirements were designed to prevent migrants from voting or from influencing the composition and functioning of the government in a place where they were temporarily located and did not intend to stay.

Eugene D. Mazo, *Residency and Democracy: Durational Residency Requirements From the Framers to the Present*, 43 Fla. St. U. L. Rev. 611, 626 (2017). Indeed, "in many of the states located along the eastern seaboard, where immigrants were plentiful and where they increasingly settled in urban areas with large populations, longer durational residency requirements became much more commonplace." *Id.* at 626-627. Pennsylvania, for example, enacted a one-year durational residency

187

requirement for voting as early as 1823. *Id*. at 629. "In the 1890s, durational residency requirements were also used in the Southern states—along with poll taxes and literacy tests—to disenfranchise African-Americans, whom many southern whites unfairly considered to be 'nomadic.' African-Americans often had a harder time proving their residency and the length of their stay in a certain area, and durational residency requirements were used to discriminate against them. Wherever they existed, state durational residency qualifications penalized mobility and reinforced parochial perspectives." *Id*. at 631. As argued above, the historical lineage of durational residency requirements is reason alone to make them constitutionally suspect under *Vill. of Arlington Heights*. In many cases, the discriminatory goal of the duration residency requirements has been attained:

> Over time, the results of such restrictions have been predictable. The constantly increasing mobility of our nation in the twentieth century, in conjunction with residence requirements for voting, has created a new class of disenfranchised Americans. This "new class" includes a highly disproportionate number of young and black voters, who, while representing only thirty per cent of the voting age population, constitute approximately fifty-five per cent of those precluded from voting by these requirements.

Geoffrey R. Stone, *Residence Requirements for Voting in Presidential Elections,* 37 University of Chicago Law Review 359, 360 (1970) (relying on 1968 Census data.)

Numerous scholars writing about jury selection issues have also documented this effect:

> The residency criterion …imposes a restriction that affects the minority/majority composition of juries. People with jobs in unstable, secondary labor markets are characterized by a high incidence of residential and geographic mobility and a low incidence of residential ownership. Their high degree of residential mobility makes it less likely that they will register to vote, particularly if there is a stringent residency requirement.

Hiroshi Fukurai and Edgar W. Butler, *Sources Of Racial Disenfranchisement In The Jury And Jury Selection System,* 13 National Black Law Journal 238, 244-245 (1995). *See also* Samuel R. Sommers, *Determinants and Consequences of Jury Racial Diversity: Empirical Findings, Implications, and Directions for Future Research,* 2 Social Issues and Policy Review 65, 70 (2008) ("Factors contributing to [underrepresentation in jury pools] include… the disproportionately high rate of disqualifying characteristics found among low-SES and racial minority individuals.")

More recent data from the Census Bureau indicates that for one year alone (2019), the total number of people in the United States who had moved within the year from another state and would thus be subject to a one-year residency requirement was 7,475,038. *See* United States Census Bureau, *Geographical Mobility In The Past Year For Current Residence--State, County And Place Level In The United States* (2019: ACS 5-Year Estimates Detailed

189

Tables).[64] In the period from 2015-2019, that figure was 36,745,136. *Id*. This group is both large and readily identifiable by the fact that every member of the group had exercised their constitutional right to travel between the states and is being penalized for doing so. The group is therefore "distinctive" for purposes of both Sixth Amendment and equal protection analysis. *See Peters v. Kiff*, 407 U.S. at 503–04 ("When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented.")

A report from the Census Bureau also indicates that

[t]hirty-nine million people, or 14 percent of the population, moved between March 2003 and March 2004. The duration-in-residence data…show that in 2004 about 16 percent of the population had lived in their current homes fewer than 12 months, while 37 percent of the population had lived in their current residences for 120 months or more (10 years or longer)."

---

[64] Available at: https://data.census.gov/cedsci/table?q=Mobility&tid=ACSDT5Y2019.B07204.

United States Census Bureau, *Seasonality of Moves and the Duration and Tenure of Residence: 2004* 6 (2010).[65]

The report also indicates that the rates of those living in their homes for less than 12 months vary by race: White alone (15.4 %); Non-Hispanic White (14.5 %); Black alone (19.5 %); Hispanic alone (21.9 %); Asian alone (20.1 %); and all other race alone or in combination (22.2 %). *Id*. at 7.

Other recent data from the Census Bureau indicates that

it is clear that a number of personal characteristics were associated with desiring to move. These included race/ethnicity, the presence of children, socioeconomic status and employment status during 2009 to 2010, and disability status. In general, racial and ethnic minorities were more likely to report desiring to move than non-Hispanic Whites. Black householders (16.6 percent) and Hispanic householders (13.2 percent) reported desiring to move more frequently than Whites (7.6 percent). Of respondents who identified as a race/ethnicity group other than White, Black, Asian, and Hispanic, 16.4 percent reported desiring to move.

United States Census Bureau, *Household Economic Studies: Desire to Move and Residential Mobility: 2010–2011* 8-9 (2015).[66]

This report also indicates that

[f]or both owners and renters, householders who desired to move lived in neighborhoods with higher poverty rates. For example, the average homeowner who desired to move lived in a census tract

---

[65] Available at: https://www2.census.gov/library/publications/2010/demo/p70-122.pdf.

[66] Available at: https://www.census.gov/content/dam/Census/library/publications/2015/demo/p70-140.pdf

with a poverty rate of 13.7 percent while the average homeowner overall lived in a census tract with a poverty rate of about 10.3 percent. The differences were not limited to poverty; householders who desired to move lived in neighborhoods with lower median incomes, older housing, more foreign-born individuals, and fewer non-Hispanic Whites than householders who did not desire to move.

*Id*. at 10. The report further notes that "the likelihood of moving is higher for households who desire to move, and most of the factors associated with desiring to move are also associated with moving." *Id*. at 17.

The Census Bureau currently does not offer mobility data broken down by race or ethnicity at the county level. However, it does provide county data of the five-year total number of persons who have moved from another state in the last twelve months.[67] For the Western District of Pennsylvania, those numbers are as follows based on the 2015-2019 ACS:

| COUNTY | MOVED FROM DIFFERENT STATE IN LAST YEAR |
|---|---|
| Alleghany County | 27,102 |
| Armstrong County | 391 |
| Beaver County | 2515 |
| Butler County | 2803 |
| Clarion County | 403 |

---

[67] Available at:

https://www.census.gov/data/tables/2019/demo/geographic-mobility/county-to-county-migration-2015-2019.html.

| | |
|---|---|
| Fayette County | 1269 |
| Green County | 562 |
| Indiana County | 1127 |
| Jefferson County | 467 |
| Lawrence County | 1396 |
| Mercer County | 2112 |
| Washington County | 3116 |
| Westmoreland County | 3382 |
| **Total** | **46646** |

In addition to this information, the Clerk of Court has also provided the defense with a combined spreadsheet for the period of 2014-2018, which indicates that the Clerk disqualified 4,005 prospective jurors in the Pittsburgh Division for failure to meet the one-year residency requirement during that time frame. Of this group, a total of 2,712 persons (67.7 %) failed to provide race or ethnicity information, making it impossible to determine the race/ethnicity pattern of the group that were disqualified for failure to satisfy the one-year residency requirement.[68] The defense can ascertain that

---

[68] This issue is addressed below as a substantial failure to comply with the requirements of the JSSA.

of the 1293 persons who did provide race or ethnicity data, 1,167 identified themselves as white, 43 as black, 25 as Hispanic, 57 as Asian, 4 as Pacific Islanders, and 16 as multiracial. As indicated above, each of the minority groups is a distinctive group for Fifth and Sixth Amendment purposes, and Mr. Bowers has suffered an injury in fact through the elimination of these prospective jurors from his jury pool.

Dr. Weeks was able to perform some statistical analysis of this issue. He is emphatic that "[g]iven the higher fraction of Non-Hispanic Blacks, especially males, who were disqualified on the basis of prior or pending criminal issues or on too short a length of residence (11.26% of JQQ Non-Hispanic Black male respondents) than was true for Non-Hispanic White males (3.63% of JQQ Non-Hispanic White respondents), **a change in policy regarding those as disqualifiers for jury service would certainly serve to diminish the disparities that we have consistently observed.**" Exh. 3 at 31.

In *Dunn*, the Court found an equal protection violation without any individualized statistical showing, based in part on the theory that the group defined as "those persons…who have gone from one jurisdiction to another during the qualifying period" was an identifiable group that had totally been excluded from voting and thus had been penalized for exercising their constitutional right to interstate travel. *Dunn*, 405 U.S. at 338.

194

The same can be said for the group excluded in this case, who are being deprived of their right to be considered for jury service at the same time that Mr. Bowers is being deprived of his right to a jury chosen non-arbitrarily from a fair cross section of the community. Moreover, as was emphasized in *Flowers v. Mississippi*, 139 S. Ct. at 2241, it is "a basic equal protection point [that] [i]n the eyes of the Constitution, one racially discriminatory peremptory strike is one too many." Here, thousands of prospective jurors are being struck for no other reason than that they have exercised their constitutional right to travel. As indicated above, this is an arbitrary and discriminatory action that violates both Mr. Bowers' rights and the rights of the prospective jurors being excluded. For this reason, the Superseding Indictment must be dismissed, and any trial must be stayed until a constitutional selection system is put in place.

### ii. The Disqualification Of All Charged And Convicted Felons and Misdemeanants Under 18 U.S. C. § 1865(b)(5), Which is Racially Discriminatory in Purpose and Impact, Is Unconstitutional and Violative of 18 U.S.C. § 243

Under 18 U.S.C. § 1865(b)(5), "any" person is qualified to serve on grand and petit juries in the district court unless he or she "has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored." This overly broad

provision was controversial when the JSSA was first enacted, and it is even more controversial today in an age of mass incarceration. *See generally* James M. Binnall, *Twenty Million Angry Men: The Case for Including Convicted Felons in Our Jury System* (2021).

The most important constitutional problem with this provision is that it is racist in historical purpose and discriminatory in its present impact:

> Early in their history in the United States, felon-juror exclusion statutes were used to prevent racial minorities from serving on juries. Today, while intent may be less obvious, such statutes undeniably have a disparate racial impact….Race-neutral on their face, such statues hade a disparate impact on communities of color. Today, that impact has been exacerbated exponentially in the wake of mass incarceration.

*Id*. at 18. *Cf. Hunter v. Underwood*, 471 U.S. 222 (Alabama constitutional provision disenfranchising persons convicted of crimes of moral turpitude violates the equal protection clause because it was intended to disenfranchise blacks and foster white supremacy).

### a. The Felon Exclusion Provision is Overly Broad.

While this is the main constitutional problem with the provision, it is not the only one. In considering the constitutionality of this provision, it is important at the outset to stress the breadth and uniqueness of 18 U.S.C. § 1865(b)(5). First, in excluding all those who are merely charged with certain crimes, the federal government stands almost alone, with the exception of

196

Alabama (*Dobyne v. State*, 672 So. 2d 1319, 1331 (Ala. Crim. App. 1994)),

Delaware (10 Del.C. § 4506(b)(5)), and Maryland (CJP § 8–103(b)) """.

In the American Bar Association's *Principles for Juries and Jury Trials*

(Revised 2016), *supra,* at 6, it proposes a narrowly tailored restriction: "All

persons should be eligible for jury service except those who:… Have been

convicted of a felony *and are in actual confinement or on probation, parole or*

*other court supervision*." (emphasis added). The ABA has explained the

rationale for keeping such a restriction narrowly focused:

> Felons are disqualified in 31 states and in federal courts from ever
> serving on a jury. This subsection adds the proviso that in addition
> to a felony conviction, the disqualified individual must also be
> under court or penal supervision. It has been argued that the
> presence of felons on juries may undermine the public's respect for
> the process or inject bias into jury deliberations. However, the
> desire for a jury representative of the population may be thwarted
> if large groups of citizens are automatically debarred from service.
> *See* Brian C. Kalt, *The Exclusion of Felons from Jury Service*, 53
> AM. U.L. REV. 65 (2003).

*Id*. at 11.

The reason why it is a violation of due process to exclude from jury

service all those who are merely charged with certain crimes was forcefully

stated by Senator Eastland during debate on the predecessor bill to the

JSSA:

> Since any person may be falsely charged with crime, it has always
> been an axiom in our lexicon of freedom that a mere charge of
> crime should never be the basis for the infliction of any
> punishment or the application of any sanction. Not even an

administrative sanction may be applied without granting a fair hearing to the person charged; yet here before us is a bill which proposes to authorize disqualification for service on Federal juries because of a mere charge of crime, without any provision for any form of hearing whatsoever, and without any requirement for any conviction, or even for a finding of reasonable grounds to believe the defendant guilty, a finding such as would be a prerequisite to the actual trial in a criminal case.

This provision is not in coincidence with American theories of freedom, liberty, and justice. It is foreign to our system of jurisprudence, and it should be eliminated from this bill.

112 Cong. Rec. S 21873 (September 16, 1966); *see Federal Jury Selection Hearings* at 248 ("I have difficulty with it because it either rests on a notion that impinges on the assumption that a person is innocent until he is proven guilty, and it is difficult to remove that element from the situation, or it rests on the notion that everyone who is charged is biased against the agencies of Justice…. The fact of the matter is that there are more people undercharges, as you know, who come from poor backgrounds and poor circumstances. A great many of those charges are dropped or *nolle prossed*.") (Statement of William Taylor, Director of the U.S. Commission of Civil Rights).

House Report No. 1076 states that the JSSA "contains some guarantee of 'probity'-- at least to the extent that persons are disqualified who have charges pending against them for, or have been convicted of, a crime punishable by imprisonment for more than 1 year." H.R. Rep. No. 1076, at 6 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1792. Yet in conclusively presuming

that a person merely accused of a crime lacks "probity," the Act suffers the

same constitutional infirmity that was found determinative in *Dunn v,*

*Burnstein*:

> *There is simply nothing in the record to support the conclusive presumption* that residents who have lived in the State for less than a year and their county for less than three months are uninformed about elections. *Cf. Shapiro v. Thompson*, 394 U.S., at 631, 89 S.Ct., at 1329. These durational residence requirements crudely exclude large numbers of fully qualified people….
>
> It may well be true that new residents as a group know less about state and local issues than older residents; and it is surely true that durational residence requirements will exclude some people from voting who are totally uninformed about election matters. *But as devices to limit the franchise to knowledgeable residents, the conclusive presumptions of durational residence requirements are much too crude. They exclude too many people who should not, and need not, be excluded.* They represent a requirement of knowledge unfairly imposed on only some citizens. We are aware that classifications are always imprecise. By requiring classifications to be *tailored to their purpose*, we do not secretly require the impossible. Here, there is simply too attenuated a relationship between the state interest in an informed electorate and the fixed requirement that voters must have been residents in the State for a year and the county for three months. Given the exacting standard of precision we require of statutes affecting constitutional rights, we cannot say that durational residence requirements are necessary to further a compelling state interest.

*Dunn*, 405 U.S. at 358-359 (emphasis added).

Similarly, with respect to the exclusion from jury service of *all* persons

charged with certain crimes, an exclusion which impacts both Mr. Bowers'

fundamental right to a jury chosen from a fair cross section of the community

and the excluded accused person's fundamental right to an opportunity to

serve on a jury, "[t]here is simply nothing in the record to support the

conclusive presumption" that such persons lack "probity." Indeed, it has been

held that the mere presence of a *convicted* felon on a jury is not prejudicial

given that the statutory disqualification does not make felons "necessarily …

fundamentally unfit to serve." *United States v. Humphrey*, 982 F.2d 254, 261

(8th Cir. 1992); *see United States v. Boney*, 977 F.2d 624, 633 (D.C. Cir. 1992)

("The Sixth Amendment right to an impartial jury similarly does not require

an absolute bar on felon-jurors … A *per se* rule would be appropriate…only if

one could reasonably conclude that felons are always biased against one

party or another. But felon status, alone, does not necessarily imply bias."). If

a felony *conviction* does not make felons "necessarily … fundamentally unfit

to serve," and if "felon status, alone, does not necessarily imply bias," then

certainly there is no rational basis, much less a compelling one, for ignoring

the presumption of innocence and conclusively presuming that all persons

*accused* of certain crimes lack "probity."[69]

---

[69] *See* James Binnall, *Twenty Million Angry Men*, *supra* at 29 ("For many,
convicted felons' supposed lack of character, criminal loyalties, and presumed
collective hatred for the state make felon-juror exclusion appear logical, and
perhaps even inevitable. Nonetheless, evidence does not support these
contentions. Research not only shows that the alleged character flaws and
biases of convicted felons are dramatically overstated, but that felon-jurors do
not diminish the integrity or functioning of the jury process. Rather, research
tends to demonstrate that felon-juror inclusion may in fact add to
deliberation quality, and can help facilitate the successful reintegration and

Second, although the defenders of § 1865(b)(5) and some writers refer to the provision as a "felony" exclusion provision, it is not by its terms restricted to felonies and applies to any federal *or state* "crime punishable by imprisonment for more than one year [unless] civil rights have … been restored." In interjecting state charges and convictions into this provision Congress irrationally returned to the pre-1957 crazy-quilt jury selection system that the 1957 Civil Rights Act was designed to abolish and that ostensibly the JSSA carried forward in its insistence on allegedly objective, uniform, and non-arbitrary qualification and excusal criteria. *Compare The Jury System in the Federal Courts*, 26 F.R.D. 409, 443 (1960) ("Pointing out that with the enactment of the Civil Rights Act in 1957 "the qualifications and exemptions of jurors in the federal courts are now governed entirely by Act of Congress and are, therefore, uniform throughout the federal judicial system. They are in no respect dependent on or connected with state law") *with* House Report No. 1076 at 3 (JSSA was intended in part to "impose a measure of uniformity on Federal jury selection.")

That Congress was aware that adoption of § 1865(b)(5) would destroy the uniformity of the system and would return the law to the irrationality of the past is demonstrated in the following passage from the legislative history:

[Senator Whitener]: First, on page 13, lines 14 through 18,

_____

criminal desistance of those citizens with a felony criminal history.")

Qualifications for jury service, this would say that a person is not qualified for federal jury service if he has a charge pending against him for the commission of a crime or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than 1 year and his civil rights have not been restored by pardon or amnesty.

In my State a general misdemeanor for which no specific penalty is prescribed by statute is punishable by up to 2 years in prison. On another occasion I outlined a great many of those, which I do not remember now, but I can tell you that one of them is hazing by a college student. Another is willfully breaking a soft-drink bottle which belongs to a bottling company. It is a general misdemeanor for which no punishment is provided. I know that the committee intends that those who are charged with, or who have been convicted of committing a felony should be disqualified from Federal jury service. But I wonder what happens in North Carolina if an individual would like to relieve himself of the burden of Federal jury service and would walk down to the street corner and publicly break a bottle and have a police officer friend take him to the city court, let him plead guilty, and pay $12 costs, getting out of it, and thereby he could relieve himself permanently of jury service in the Federal court without much stigma. Is it the chairman's intention that those convicted of petty misdemeanors would not be qualified to serve on juries?

Mr. CELLER. In the case that you mentioned just now about the broken bottle, in your own State, since punishment is more than a year, the man breaking the bottle would not be able to qualify for Federal jury service.

Mr. WHITENER. That is correct.

Mr. CELLER. That is the law today.

Mr. WHITENER. Suppose that the offense of reckless driving is punishable by up to 2 years
.
Mr. CELLER. That is rather improbable.

Mr. WHITENER. I can tell the gentleman it is not so improbable.

Mr. CELLER. If, in the judgment of the State, a drastic penalty like that is to be applied, that is the judgment of the State, and therefore he could not serve on a Federal jury.

Mr. WHITENER. But this is exactly my point. The bill does not say that a judge must take that serious view. It says that if under the law of this State it may be punishable by that. It may be punishable by 2 years, and yet a judge may charge only a $5 fine or no fine.

Mr. CELLER. This statement the gentlemen made is the law in the States, not in the Federal courts
.
Mr. WHITENER. Apparently I am not asking myself clear. I am not talking about the law in the States except as it affects the eligibility to serve on the Federal jury and the opportunity for one who does not desire to be burdened by jury service to escape it by committing some little act that does not involve any stigma and thereby happily getting himself disqualified. Is there anything to keep a North Carolinian from hazing a college student, or something or that sort, and thereby disqualifying himself permanently from jury service?

Mr. CELLER. Apparently; yes

114 Cong. Rec. H 1344 (February 26, 1968).

In Pennsylvania, as in North Carolina, there is no bright line rule defining a misdemeanor such as the federal rule limiting misdemeanors to terms of imprisonment of one year or less. *See* 18 U.S.C. Sections 3559 and 3581. Under Pennsylvania's general sentencing law: (1) "a crime is a misdemeanor of the first degree if it is so designated in this title or if a person convicted thereof may be sentenced to a term of imprisonment, the maximum of which is not more than five years"; (2) "[a] crime is a misdemeanor of the

203

second degree if it is so designated in this title or if a person convicted thereof may be sentenced to a term of imprisonment, the maximum of which is not more than two years"; and (3) "[a] crime is a misdemeanor of the third degree if it is so designated in this title or if a person convicted thereof may be sentenced to a term of imprisonment, the maximum of which is not more than one year." 18 Pa. Stat. and Cons. Stat. Ann. § 106.

In Pennsylvania, resisting arrest, theft of property worth $50 or more but less than $200, a second shoplifting offense less than $150.00, simple assault, and failure of disorderly persons to disperse upon official order are all misdemeanors of the second degree, as are many other minor offenses. *See* 18 Pa.C.S.A. §§ 2701, 3903, 3929, 5502, 5104. Thus, in Pennsylvania, because of the operation of state law, an ancient or current conviction on any of these offenses, or a current charge of them, renders someone ineligible to be juror in federal court, potentially for life. To complicate matters further, there are specific laws, such as the Game and Wildlife Code, which provide that certain violations of that Code are misdemeanors of the first degree and that such offenses are punishable by "not more than $10,000 and may be sentenced to imprisonment up to 18 months." 34 Pa. Stat. and Cons. Stat. Ann. § 925. There is no rational basis, much less a compelling one, for categorically excluding from federal jury service on "probity" grounds all individuals who have been charged with, or convicted of, a misdemeanor of the first or second

204

degree under Pennsylvania law, including Game and Wildlife Code violations. *See* Federal Rules of Evidence, Rule 404, 609; Binnall, *Twenty Million Angry Men*, at 36-38 ("Perhaps the most persuasive contextual argument against the probity rationale comes from the legal profession itself … Forty-five states and the federal court system do not permanently disqualify a convicted felon from practicing law. Instead, in these jurisdictions a felony conviction merely amounts to a presumptive disqualification rebuttable by a felonious bar applicant at a moral character and fitness determination.")[70]

At the same time, there is no rational basis, much less a compelling one to conclude that someone who has been convicted of two dozen recent misdemeanors of the third degree involving moral turpitude has enough "probity" to be included in the jury pool, but someone who has been convicted of shoplifting twenty years ago must be categorically barred from having the opportunity to serve.

Third, that part of the provision that purports to remove the disability if "civil rights have … been restored" is wholly illusory, especially in states

---

[70] James Binnall himself went through this process and was admitted to the bar.

like Pennsylvania, which has a juror qualification statute that provides in

part that

> [e]very citizen of this Commonwealth who is of the required
> minimum age for voting for State or local officials and who resides
> in the county shall be qualified to serve as a juror therein unless
> such citizen: … has been convicted of a crime punishable by
> imprisonment for more than one year *and has not been granted a*
> *pardon or amnesty therefor.*

42 Pa. Cons. Stat. Ann. § 4502 (emphasis added.).

This provision has been construed to mean that a Pennsylvania court

has no power to restore the right to sit on a jury and thus no power to restore

a person's civil rights. *See Commonwealth v. Stiver*, 2012 Pa. Super. 113, 50

A.3d 702, 705 (2012) ("[T]he trial court declared that Stiver's civil rights had

been restored. However, simply declaring that rights are restored does not

mean that the rights were actually restored or that the court had the

authority to restore them. As the trial court notes, Article II, § 7 of the

Pennsylvania Constitution prohibits any person who had been convicted of a

felony from holding public office. Pa. Const. Art. II, § 7 (prohibiting persons

convicted of "infamous crime" from holding public office) … Further, section

4502 of the Judiciary Code prohibits persons convicted of crimes punishable

by more than one year of imprisonment from sitting on a jury … Thus, the

trial court did not have the authority to restore Stiver's right to hold public

office or serve on a jury.")

206

If a person could overcome this Catch-22 obstacle, he or she would still face another roadblock. In *United States v. Hefner*, 842 F.2d 731, 732 (4th Cir. 1988), the court held that "some affirmative act recognized in law must first take place to restore one's civil rights to meet the eligibility requirements of section 1865(b)(5)." In Pennsylvania, because of *Stiver* and § 4502, the only affirmative act a person could take to restore his civil rights is by seeking a pardon or amnesty. Yet, as *Hefner* points out,

> [a]s originally drafted, this provision stated that a convicted felon was ineligible to serve on a grand jury unless his civil rights had been restored 'by pardon or amnesty.' This phrase was subsequently deleted by amendment in the Jury System Improvements Act of 1978. The legislative history of this amendment indicates congressional concern that the 'pardon or amnesty' requirement unduly limited the potential means by which an individual's civil rights could be restored.

*Id*.

At every level, therefore, at least in Pennsylvania, § 1865(b)(5) operates in an illogical and irrational fashion that frustrates legitimate Congressional concerns at every turn. It does not ensure "probity" of jurors above and beyond what could already be ensured through the *voir dire* process, it sweeps too broadly and too narrowly, it violates the presumption of innocence, it reinstates a crazy-quilt pattern of jury qualification features that Congress expressly condemned in the Civil Rights Act of 1957, and it relegates Pennsylvania citizens who have been convicted of misdemeanors or

207

felonies to a restoration procedure that Congress itself found was unduly limiting.

> **b.   § 1865(b)(5) Is Violative of Mr. Bowers' Fair Cross-Section And Due Process Rights And Of The Constitutional Rights of Excluded Jurors Because It Is Not "Appropriately Tailored" To A Particular Case And Results In The Blanket Exclusion Of A Significant Portion Of The Minority Community.**

As indicated above, the worst feature of § 1865(b)(5) is its impact on Mr. Bowers' right to grand and petit juries selected from a cross-section of the community. The Pennsylvania Department of Corrections currently reports that "[i]n Pennsylvania, people of color are overrepresented in prison, on probation, and on parole. Black Pennsylvanians are 6.5 times as likely to be under DOC control as their white counterparts and Latino Pennsylvanians are 2.3 times as likely." Pennsylvania Department of Corrections, *Racial Disparities*, https://dashboard.cor.pa.gov/us-pa/narratives/racial-disparities/1. "People who are Black make up 12% of Pennsylvania's population; they represent 43% of the population sentenced to time under DOC control." *Id*. "People who are Hispanic make up 8% of Pennsylvania's population; they represent 10% of the population sentenced to time under DOC control." *Id*.

Especially significant in assessing the impact of a jury eligibility criterion that depends upon *charges* as well as convictions, the DOC acknowledges that

> [d]isparities emerge long before a person is incarcerated. By the
> time someone comes under the DOC's care, they have been
> arrested, charged, convicted, and sentenced. Even before contact
> with the criminal justice system, disparities in community
> investment (education, housing, healthcare) may play an
> important role in creating the disparities that we see in sentencing
> data.

*Id.*

This undeniable fact is nowhere more true than in Allegheny County,
which provides the largest percentage and number of jurors to the Pittsburgh
Division. The attached declaration of Dr. John Weeks indicates that 12.02
percent of the jury-eligible population in Allegheny County is Non-Hispanic
Blacks. (Weeks Declaration at 14.) By contrast, according to the Allegheny
County Department of Human Resources, the current demographics of the
Allegheny County jail are as follows:[71]

---

[71] DHS, Allegheny County Jail Population Management: Interactive
Dashboards,
https://www.alleghenycountyanalytics.us/index.php/2021/03/04/allegheny-
county-jail-population-management-dashboards-2/.

# Race

On average (1/1/19 - 11/26/21), **65%** of the individuals in jail are **Black**.



Further, an analysis of DHS data for the period May-June 2020 reveals that, "[d]espite being less than 7% of the county population, Black men between May 11 and June 8 made up 32% of misdemeanor arrests and 44% of misdemeanor defendants."[72]

These statistics, coupled with the attached Affidavits of Jeffrey Martin and Dr. John Weeks, establish beyond any doubt that distinctive groups, including African-Americans, and African-American men, have been excluded over a substantial period of time in the Pittsburgh Division, and that one cause of such disparity is undoubtably the disparate impact which § 1865(b)(5) inevitably has on people of color. This inference is compelled by the fact that the underrepresentation get worse as the prospective jurors pass through the qualification/excusal stage, and by the fact that large number of African-Americans, especially African-American men, are impacted by this total ban in comparison to the number of White persons exposed to this criterion.

In *Duren,* the United States Supreme Court held that once underrepresentation of a distinctive group attributable to systematic

---

[72] ALC Court Watch, *Cash Bail, Arbitrary Detention And Apartheid In Allegheny County* (Summer 2020), https://abolitionistlawcenter.org/wp-content/uploads/2020/11/ALC-COURT-WATCH-REPORT-SUMMER-2020-FINAL-6.pdf.

exclusion had been shown, the Constitution "requires that a significant state interest be manifestly and primarily advanced" by that aspect of the jury selection process disproportionately excluding members of the distinctive group. In *Duren,* 439 U.S. at 364, reaffirming its holding in *Taylor v. Louisiana*, the Court was quite explicit in describing the test for measuring the constitutionality of that aspect of the jury selection process causing disproportionate exclusion of the distinctive group: "The right to a proper jury cannot be overcome on merely rational grounds." *Id.*

In *Duren*, the State of Missouri granted women an automatic exemption from jury service upon request and provided women additional opportunities to decline service by returning the summons or simply failing to report for jury duty. It was not an absolute bar— unlike of § 1865(b)(5) —but it reduced representation of women on juries from 50% to, on average, 15%. The State justified doing so on the grounds of women's family responsibilities for the care of children.

The Court rejected the State's argument. It explained that the Constitution's guarantee of a fair cross-section of the community "requires that States exercise proper caution in exempting broad categories of persons from jury service" because inevitably they involved some degree either of over-inclusiveness or under-inclusiveness. Any exemption, any aspect of the jury selection process causing disproportionate exclusion, must be

212

"appropriately tailored" to the State's claimed interest. *Id*. at 370. Some women have childcare responsibilities, but others no longer have them, never had them, or have other means of fulfilling them. A broad, across-the-board exemption could not be justified when it resulted in defendants not having a jury pool and jury panel representing a fair cross-section of the community. Individualized assessments would have to be made before exemption or excusal could be ordered. *Id*.[73]

Likewise, § 1865(b)(5)'s absolute exclusion of accused and convicted felons and misdemeanants is not "appropriately tailored" to the government's asserted interest in protecting the "probity" of juries, as it is both overinclusive (including many crimes and charges that have nothing to do with probity) and underinclusive (because it excludes some serial misdemeanants who do in fact lack probity). *Duren v. Missouri* made clear that individualized juror assessment was required rather than across-the-board exemptions or exclusions.

Later cases of the Supreme Court confirmed that approach. Writing for the Court in *Lockhart v. McCree*, 476 U. S. 162 (1986), and subsequently as the Chief Justice in *Holland v. Illinois*, 493 U.S. 474 (1990), Justice

---

[73] The equal protection analysis in *Dunn*, quoted above, is essentially the same.

Rehnquist focused on key details of the Arkansas challenge for cause process in a death penalty case that it upheld against a fair cross-section claim. Pointing out the individualized determination of each person struck for cause as decisive, *Lockhart* emphasized that those who opposed the death penalty in Arkansas can still serve "in other criminal cases" and even can serve in death penalty cases "so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Id.* at 176. In *Holland*, Chief Justice Rehnquist reemphasized *Lockhart's* "fundamental principle" that "[i]t does not violate [the fair cross-section] requirement … to disqualify a group for a reason that is related 'to the ability of members of the group to serve as jurors *in a particular case.*'" (*Holland*, 493 U. S. at 483.)

The normal challenge for cause process involves individualized questioning as to a prospective juror's impartiality in that particular case, such as was done in *Lockhart*. The individualized juror inquiries into a prospective juror's impartiality made in *Lockhart* stand in stark contrast to the process that occurs under § 1865(b)(5), where a prospective juror is asked outside the courthouse to check a box on a form indicating whether the prospective juror has previously been convicted of or is charged with certain crimes. Once that fact is established, the prospective juror is disqualified without any inquiry into his or her ability to be impartial in that particular

case. Neither the Clerk nor the Court takes into consideration how long it has been since the person was released from supervision, the seriousness of the person's offense, its relevance to the charges in the instant case, evidence of the person's rehabilitation and reintegration into the community, acceptance and discharge of responsibilities, or even whether the person's civil rights have been restored. The disqualification of prospective jurors who answer yes to the § 1865(b)(5) question has nothing to do with whether each juror could be impartial and fair in a particular case. Furthermore, unlike the Arkansas procedure upheld in *Lockhart*, § 1865(b)(5) constitutes an across-the-board bar of every person with a qualifying charge or conviction from participation as a juror forever. Unlike the procedure in *Lockhart*, in which disqualification was only for a particular case, § 1865(b)(5) is a life-time bar from jury service except in the very unlikely event of a pardon or amnesty.

This is wholesale, indiscriminate, systematic exclusion. A ruling that § 1865(b)(5) constitutes systematic exclusion under *Duren* prong 3—that its automatic disqualification of every person who has a qualifying charge or conviction without any examination of their ability to serve impartially in a particular case violates the fair cross-section requirement of the Sixth Amendment's impartial jury guarantee—is consistent with each of the three purposes served by the fair cross-section recognized in *Taylor* and *Lockhart*. That does not mean that a prospective juror previously convicted of or

currently charged with a qualifying offense cannot be challenged for cause. Such a juror might bear ill will or be prejudiced against the prosecution or law enforcement, or even against the defense. But it does mean that there must be individualized inquiry into the question of partiality through traditional *voir dire* questioning, as would be the case with any prospective juror.

Because such individualized inquiry did not take place at the grand jury stage of this case, because § 1865(b)(5) is arbitrary, irrational, and unconstitutional under the reasoning of both *Duren* and *Dunn*, and because it is flawed in other respects identified above, the Superseding Indictment must be dismissed, or this action must be stayed.

### III.   There are Additional, Substantial Violations of the Jury Selection and Service Act of 1968, and the Cumulative Impact of All Violations Requires Dismissal of the Superseding Indictment and a Stay of the Case.

Mr. Bowers argues above that the Western District's jury selection policies and practices substantially violate the specific provisions and legislative intent of the JSSA and of the Court's own Jury Plan in a number of ways, including violating the statutory fair cross-section right, violating the requirement of randomness, violating the mathematical odds provision of the Plan, and frustrating the underlying policy of the Act to ensure selection from source lists that are inclusive, representative, accurate, reliable, up-to-

date and non-duplicative. Here, he discusses several other violations, each of which is substantial, and he asks the Court to consider the cumulative impact of all JSSA errors as an independent reason to dismiss the Superseding Indictment and stay the case.

The JSSA provides that, "[i]f the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the grand jury, the court shall stay the proceedings pending the selection of a grand jury in conformity with this title or dismiss the indictment, whichever is appropriate." 28 U.S.C. § 1867(d). The JSSA does not require a showing of prejudice to trigger the remedies of a stay or dismissal. Congress expressly considered -- and rejected -- a prejudice requirement within the JSSA's text. H.R. Rep. No. 1076, at 14 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1792, 1806 ("A committee amendment to S. 989 eliminates the need to prove prejudice as a condition of judicial intervention when substantial noncompliance is established. The committee believes that the 'prejudice' requirement would unduly burden the procedure established by the bill for challenging noncompliance."). Accordingly, Mr. Bowers requests that this Court dismiss the Superseding Indictment pending against him because the violations of the JSSA in this case individually -- and collectively -- constitute substantial violations of the Act.

According to the JSSA, the Western District is required to "submit a report on the jury selection process within its jurisdiction to the Administrative office of the United States Courts in such form and at such times as the Judicial Conference of the United States may specify." 28 U.S.C. §1863(a). The Form AO-12: Jury Representativeness Statistics, is the "report" used by Administrative Office of the United States Courts to monitor the district courts' success in complying with the JSSA. In 1982, the Judicial Conference of the United States modified the reporting requirements of Section 1863(a) such that district courts are no longer required to submit the AO-1's to the Administrative Office but "[the AO-12's are] required to be prepared for retention by the court as one of the jury wheel records." Exh. 2-B at 3-4 (Form AO-12: JURY REPRESENTATIVENESS STATISTICS, Data Collection Instructions).

The collection and retention of jury representativeness data is critical to the process of self-evaluation that district courts are supposed to undertake as part of the JSSA. *See* Exh. 1 (Scholars' Letter) at 27-33. If the District repeatedly fails to conduct this self-evaluation of the representativeness of its jury wheels in an accurate and complete way, it is not complying with the direction of the Administrative Office and the Judicial Conference and is in substantial violation of 28 U.S.C. §1863(a). *See* Exh. 2-B at 3-4. More importantly, without the biennial creation of accurate and

218

complete AO-12's documenting jury wheel representativeness, the Court has no way of knowing if it is actually netting a fair cross section of the community. This information is essential to public confidence in the fairness of Western District indictments and trials. *See Taylor v. Louisiana*, 419 U.S. 522, 530 (1975) ("Community participation in the administration of the criminal law . . . is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system."). Indeed, this function is so important that it is a constitutionally mandated duty of selection officials. *See Smith v. Yeager*, 465 F.2d 272, 277 (1972) ("At least one of the jury commissioners testified he did not know the size of the component parts of the county's population, and that he had no idea what type of grand jury list his work was producing. … Such conduct was in dereliction of the responsibilities that courts have required jury commissioners to take under the equal protection clause in order to provide a reasonable cross-section.")

When Congress first passed the JSSA in 1968, potential jurors were not required to state their racial, ethnic, or religious background, even though § 1862 broadly prohibited discrimination in all forms: "No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States on account of race, color, religion, sex, national origin, or

economic status." S. Rep. No. 1144, at 1(1972), *reprinted in* 1972

U.S.C.C.A.N. 3402.

U.S. Representatives Robert McClory and Charles E. Wiggins had both

urged Congress to require prospective jurors provide such data. H.R. Rep. No.

1076, at 17 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1792, 1808-09. They posed

the following question and proposed a response:

> When a litigant claims that discrimination has been practiced, what is his remedy? Unless the discriminators openly admit their wrong, the litigant must compare the characteristics of the jury pool with the characteristics of the community. . . . At this critical stage when the challenger needs proof of just who is in the jury pool, this legislation refuses to insure its availability. . . . Thus the challenger may be denied the very information he needs to make the bill work. If a significant number of people fail to supply the necessary data in completing the juror qualification form so that the character of the jury pool cannot be gleaned from the forms, the challenger will then be compelled to undertake his own survey. We fear that the burden of that task will retard the enforcement of this legislation.

*Id.*

Congress eventually came around to the perspective of Reps. McClory

and Wiggins, at least on the question of race and ethnicity. In 1972, Congress

amended Section 1869 of the JSSA to require that potential jurors provide

data on their race/ethnicity. 28 U.S.C. §1869(h); S. Rep. No. 1144, at 1(1972),

*reprinted in* 1972 U.S.C.C.A.N. 3402. This change was based on the

experience of courts in the intervening period that as many as 30% of people

failed to state their race/ethnicity. S. Rep. No. 1144, at 1(1972), *reprinted in*

1972 U.S.C.C.A.N. 3402 ("Although this information is requested, studies

220

show that it is omitted by up to 30 percent of the respondents. The result is that there is little reliable information that can be used to determine if discrimination exists."). With the widespread failure of persons to provide this data, Congress found that, "[o]ne cannot accurately determine whether litigants in the Federal courts are having their matters considered by jurors who represent 'a fair cross section of the community' as required by the Jury Selection Act." *Id*. at 2. Congress also found that without that data, it would be "impossible effectively to monitor and enforce nondiscrimination in the selection of Federal jurors." *Id*. at 2. Thus, 28 U.S.C. § 1869(h) states that the juror qualification questionnaire "shall elicit the . . . race" of the potential juror. To ensure that such information is eventually received even if not originally provided, 28 U.S.C. § 1864(a) states that, "[i]n any case in which it appears that there is an omission, ambiguity, or error in a form, the clerk or jury commission shall return the form with instructions to the person to make such additions or corrections as may be necessary and to return the form to the clerk or jury commission within ten days." There is not one word in the legislative history about why demographic data should not be collected for the other groups protected by § 1862.

Dr. Weeks aptly summarizes the many flaws in this District's AO 12 process:

[F]or reasons not explained by the court, the AO 12 form does not cross-tabulate the Race and Ethnic questions in the way that these data are always cross-tabulated by the Census Bureau and other government agencies, since they are not mutually-exclusive categories. This cross-tabulation must be done in order to make proper use of the answers to those two separate questions. In particular, a person may identify ethnically as "Hispanic" (a Cognizable Group), but may also identify racially as "White." Without cross tabulating the results, we don't know whether this person should, for example, be deleted from the "White" category because, in fact, they identify with a Cognizable Group. The "Data Collection Instructions" on the AO 12 form include the suggestion that "[Y]ou may also provide a demographic breakdown of jury wheel data with unknown demographic data removed in order to provide a more accurate comparison of the known demographic breakdown of jury wheel data with citizen population data." There is no support in the statistical literature for this kind of assertion that such a calculation will be "more accurate." Rather, a high non-response rate to the race/ethnic questions should be a signal to the Clerk of the Court to exercise greater due diligence in collecting these data.

Calculating disparities from the AO 12 forms is also hampered by the fact that the Court does not use the most recent and appropriate demographic data from the Census Bureau. These numbers are supposed to be provided by the Administrative Office using Census Bureau information for every county of the district, but the AO 12 forms typically do not indicate the source or date of that information, nor do they have data by county.

An additional flaw with the AO 12 form is that it fails to collect any information about religion. The Third Circuit ruled long ago that recognized religious groups such as Catholics are a "classifiable category of our society which cannot be wrongfully excluded." A 2020 Pew Research Survey indicates that one in three (32%) adults in the Pittsburgh Metropolitan Area is Catholic. Because the AO 12 form does not ask about a person's religion in the same way that race and ethnic data are collected, there is no way short of an independent jury survey to ascertain whether Catholics or any other cognizable religious groups are being improperly excluded.

Exh. 3 at 36-37.

Additional violations are identified in the Martin Affidavit. He notes the following:

> "Registered voters with an out-of-state alternate mailing address are excluded from receiving qualification questionnaires and from jury service. Because these registered voters are excluded from receiving qualification questionnaires, the effective proration of the counties is not proportional to the percentage of registered voters in the counties." Exh. 2 at 3;

> "The Master Jury Wheel data supplied has been redacted as to the street address.   However, it is apparent that the only address used in the Master Jury Wheel is the alternate mailing address for those persons who have supplied one. As described below, persons with an out of state alternate mailing address have been excluded from receiving a qualification questionnaire even though their permament address is within the Pittsburgh Division." *Id.* at 5;

> "In the Pittsburgh Division, 39,215 persons were selected to receive a qualification questionnaire [3/7/17]. Of the 39,215 persons selected to receive a qualification questionnaire: i. *2,406 or 6.14% were returned by the United States Postal Service as undeliverable;* ii. *no response was received for 9,224 or 23.52% of the qualification…*" *Id.* at 5-6;

> "The elimination of persons with out of state alternate mailing addresses increased the underrepresentation of Black or African-American persons by 0.05% in Absolute Disparity and 0.76% in Comparative Disparity." *Id.* at 26;

> "The return of qualification questionnaires by the United States Postal Service increased the underrepresentation of Black or African-American persons by 0.17% in Absolute Disparity and 1.64% in Comparative Disparity." *Id.* at 26;

> "The qualification questionnaires for which no response was received by the Clerk increased the underrepresentation of Black or African-American persons by 0.82% in Absolute Disparity and 12.77% in Comparative Disparity." *Id.* at 26;

"The elimination of persons with out of state alternate mailing addresses increased the underrepresentation of Black or African-American males by 0.02% in Absolute Disparity and 0.77% in Comparative Disparity." *Id.* at 27;

"The return of qualification questionnaires by the United States Postal Service increased the underrepresentation of Black or African-American males by 0.07% in Absolute Disparity and 2.26% in Comparative Disparity." *Id.* at 28;

"The qualification questionnaires for which no response was received by the Clerk increased the underrepresentation of Black or African-American males by 0.86% in Absolute Disparity and 26.80% in Comparative Disparity." *Id.* at 28;

"The elimination of persons with out-of-state alternate mailing addresses increased the underrepresentation of Hispanic or Latino persons by 0.09% in Absolute Disparity and 7.48% in Comparative Disparity." *Id.* at 29;

"The qualification questionnaires for which no response was received by the Clerk increased the underrepresentation of Hispanic or Latino persons by 0.23% in Absolute Disparity and 18.75% in Comparative Disparity." *Id.* at 29;

"The difference in the percentages between the census data and the data from the Clerk is affected by the fact that most persons disqualified did not answer the question about their race and that the Clerk's information does not include persons for whom no response to the qualification form was received (undeliverable by the United States Postal Service or no response was received) which are estimated to be disproportionately Black or African-American persons. If the self-reported racial information was collected by the Clerk, the numbers from actual disqualified persons would be more reliable." *Id.* at 33.

These errors are substantial under 28 U.S.C. § 1867(d) for three reasons: (1) they result in the creation of master and qualified jury wheels that are not fair cross sections of the "jury-eligible" communities in the

224

Pittsburgh Division; (2) they violate the proportionality requirement of the Act and the Plans; and (3) they result in an absence of accurate data on representativeness rendering it impossible to meaningfully evaluate the performance of the Western District's Jury Selection Plan. Consequently, this Court should dismiss the Superseding Indictment against Mr. Bowers or stay further proceedings until a lawful and constitutional jury selection system is in place.

## IV.   Mr. Bowers Is Entitled To An Evidentiary Hearing

For jury challenge claims arising under the Constitution, the law has long been settled that upon the proper raising of such a challenge, a defendant is entitled to an evidentiary hearing to prove the merits of his challenge. *See Coleman v. Alabama*, 377 U.S. 129, 133 (1964) (the federal constitutional right against systematic exclusion of classes of citizens from the grand jury implies an ancillary right to fair opportunities to discover and prove systematic exclusion claims); *Dow v. U.S. Steel Corp.*, 195 F.2d 478, 480 (3d Cir. 1952) ("We think that the [constitutional jury selection] issues raised by the plaintiff's counsel are such that he should be entitled to present evidence on the point."). *See also Willis v. Zant*, 720 F.2d 1212, 1216- 1217 (11th Cir. 1983) (vacating the denial of habeas relief on a fair cross-section claim and remanding the claim to the district court for an evidentiary hearing; petitioner "claims that young adults constituted a distinct group"

and he is "entitled to a chance to prove his claim" because "[w]hether or not a class of persons is a sufficiently distinct and cognizable for sixth amendment fair cross-section analysis is a question of fact") (citing *Hernandez v. Texas*, 347 U.S. 475, 478 (1954) ("[W]hether such a group exists within the community is a question of fact."); *Mobley v. United States*, 379 F.2d 768, 773–74 (5th Cir. 1967) ("A further supplemental hearing should be held by the court on the question of systematic exclusion, and in order that the record may be complete, we direct that all evidence heretofore taken on the subject be considered together with such additional evidence as both parties may present and as may be found relevant by the trial court under standards articulated and announced in our recent *en banc* decisions on the subject. In view of the constitutional importance of this matter, the hearing to be held ought to be as broad as that permitted in a post-conviction Section 2255 proceeding.").

For claims arising under the JSSA, 28 U.S.C. § 1867(d) provides that

> Upon motion filed under subsection (a), (b), or (c) of this section, containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title, the moving party shall be entitled to present in support of such motion the testimony of the jury commission or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, and any other relevant evidence.

"The legislative history makes clear that this requirement was considered independently important as a means for discouraging spurious challenges

226

filed for dilatory purposes." *United States v. Kennedy*, 548 F.2d 608, 613 (5th Cir. 1977). In the Third Circuit, the requirement is subject to exception. *See United States v. Calabrese*, 942 F.2d 218, 222 (3d Cir. 1991) (section is subject to "an exception for undisputed facts, sufficient to provide a basis for the district court's decision.").

Here, Mr. Bowers' motion is not spurious. It is supported by sworn statements of facts of two qualified experts, which, if true, would constitute a substantial failure to comply with the JSSA; it is based in part on facts which should be undisputed; and it is not being filed for dilatory purposes. Both the letter and spirit of this section have been complied with, and Mr. Bowers is entitled to an evidentiary hearing to prove his JSSA claims.

In any event, § 1867(d) has no effect on Mr. Bowers' right to an evidentiary hearing to prove his constitutional claims. *See* 28 U. S. C. § 1867(e) ("The procedures prescribed by this section shall be the exclusive means by which a person accused of a Federal crime, the Attorney General of the United States or a party in a civil case may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title. Nothing in this section shall preclude any person or the United States from pursuing any other remedy, civil or criminal, which may be available for the vindication or enforcement of any law prohibiting discrimination on account of race, color, religion, sex, national origin or

economic status in the selection of persons for service on grand or petit juries."); Memorandum Order of September 27, 2021 at 3 n. 2 ("Defendant spends much of his Reply Brief [558] arguing that Section 1867 of the JSSA is neither the exclusive means by which to bring a jury challenge nor the exclusive means by which to gather evidence in support of a jury challenge. I do not disagree, and Defendant is free to raise a Sixth Amendment or other challenge in addition to a challenge under the JSSA. *See* 28 U.S.C. § 1867(e).")

The House Committee which conducted hearings on the Act pointed out that section 1867 was not intended to "preclude any person or the United States from asserting rights created by other statutes *or for enforcing constitutional rights*." H.Rept. 1076, 90th Cong., 2d Sess., at 16, U.S.Code Cong. & Admin. News 1968, at 1806 (emphasis added). Thus, by its express terms and its legislative history 28 U.S.C. § 1867 applies only to challenges under the Act, not to challenges under the constitution. *See United States v. Jones*, 687 F.2d 1265, 1269 (8th Cir.1982) (holding the failure to comply with the Act does not bar defendant from raising a constitutional challenge to jury selection procedures); *United States v. Grose*, 525 F.2d 1115, 1118–19 (7th Cir.1975), *cert. denied*, 424 U.S. 973 (1976) (although a statutory challenge to the jury array was precluded because of defendant's failure to make such a challenge before *voir dire*, his constitutional challenge was not foreclosed);

*United States v. De Alba-Conrado*, 481 F.2d 1266, 1270 (5th Cir. 1973) ("By its terms 28 U.S.C. § 1867 applies only to challenges under the Act. Since it appears that the challenge of appellant presents an alleged constitutional issue, section 1867 does not bar his presentation of the jury question.")[74]

## CONCLUSION

"The importance of non-discriminatory jury composition is magnified in capital cases, where juries are required to consider 'as a mitigating factor,

---

[74] *See Morris v. United States of Am.*, No. 1:11-CR-149-01, 2018 WL 11306071, at *2 (W.D. Mich. Nov. 15, 2018) ("The JSSA provides the 'exclusive means' for Morris to assert a challenge based on the failure to comply with the statute.... The JSSA does not preclude a defendant from pursuing other remedies.") (citing § 1867(e)); *United States v. Rodella*, No. CR 14-2783 JB, 2014 WL 4792598, at *10 (D.N.M. Sept. 15, 2014) ("Section 1867 provides the exclusive procedures to challenge a jury that was not selected in conformity with the Act, but not the exclusive procedure for challenging the selection of a jury on constitutional grounds."); *United States v. Rodriguez*, 924 F. Supp. 2d 1108, 1118–19 (C.D. Cal. 2013) ("Although the Court finds that Rodriguez's JSSA grand jury challenge is untimely, Rodriguez may bring his motion separately on constitutional grounds, a position the Government does not dispute."); *United States v. Greene*, 971 F. Supp. 1117, 1126 (E.D. Mich. 1997) (H.Rep. 1076, Grouse, and De Alba-Conrado "make clear that Defendant's Sixth Amendment challenge is not barred by …28 U.S.C. § 1867"); *Mitchell v. Morgan*, 844 F. Supp. 398, 402 (M.D. Tenn.) ("Although Mitchell is barred from making a statutory challenge, he is not precluded from asserting a constitutional claim to the jury selection process."); *United States v. Arnett*, 342 F. Supp. 1255, 1258 (D.Mass. 1970) (same). *See also Gov't of Virgin Islands v. Navarro*, 513 F.2d 11, 18 (3d Cir. 1975) (citing Arnett for the proposition that "[c]ompliance with the procedural provisions of the Act is the exclusive means of challenging the jury on the basis of a violation of the statute", but concluding that "[w]e need not reach…the difficult question of whether failure to comply with 28 U.S.C. s 1867(a) bars assertion of even a constitutional challenge in the same action…")

any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *Gibson v. Zant*, 705 F.2d 1543, 1546 (11th Cir. 1983) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)).

As indicated at the outset of this motion, in 1997, twenty-nine years after the JSSA was enacted, the Third Circuit Task Force on Equal Treatment in the Courts issued its comprehensive Final Report to the Judicial Council in which it recommended that "[t]he district courts within the Third Circuit should make efforts to supplement the lists from which the jury pool is selected so that the racial, ethnic and gender composition of the jury pool more closely comports with the racial, ethnic and gender composition of the district or jury division from which the jury pool is drawn." *Report of the Third Circuit Task Force on Equal Treatment in the Courts*, 42 Vill. L. Rev. 1355, 1805-1806.) (1997).

That recommendation has never been implemented in this district. That fact, along with the many factual circumstances and legal principles set forth in this motion, compel the conclusion that the present motion to dismiss the Superseding Indictment and stay the proceedings should be granted.

Respectfully submitted,

***/s/ Judy Clarke***
Judy Clarke
Clarke Johnston Thorp & Rice, PC

***/s/ Michael Burt***
Michael Burt
Law Office of Michael Burt, PC

***/s/ Michael J. Novara***
Michael J. Novara
First Assistant Federal Public Defender

***/s/ Elisa A. Long***
Elisa A. Long
Supervisory Assistant Federal Public Defender

231