IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

ROBERT BOWERS

Criminal No. 18-292
**UNDER SEAL**

**UNITED STATES' RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTION
TO DISMISS SUPERSEDING INDICTMENT PURSUANT TO THE FIFTH, SIXTH,
AND EIGHTH AMENDMENTS, THE JURY SELECTION AND SERVICE ACT,
18 U.S.C. § 243, AND THIS COURT'S SUPERVISORY AUTHORITY**

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 3

II.     THE DISTRICT'S JURY PLAN AND RELEVANT PROCEDURAL HISTORY ......... 4

  A.  The Jury Plan .................................................................................................... 4

  B.  Relevant Procedural History And Productions Made By The Clerk Of Court ................. 5

III.    ARGUMENT ..................................................................................................... 7

  A.  The Defendant Cannot Establish A Sixth Amendment Violation ....................................... 7

     1.   Step One:  The Defendant Has Identified Only Two Cognizable Groups ...................... 8

     2.   Step Two:  African Americans And Hispanics Were Represented Fairly And Reasonably On The 2016 Qualified Jury Wheel .............................................. 14

     3.   Step Three:  The Defendant Has Failed To Show Systematic Exclusion ..................... 27

  B.  The Defendant Has Failed To Establish An Equal Protection Violation .......................... 38

     1.   Step One:  The Defendant Has Identified Only Two Cognizable Groups .................... 40

     2.   Step Two:  The Defendant Has Failed To Demonstrate Underrepresentation Over A Significant Period Of Time ........................................................... 40

     3.   Step Three:  The Jury Plan Is Racially Neutral And Not Susceptible To Abuse .......... 43

  C.  The Defendant Has Failed To Establish A Substantial Failure To Comply With The JSSA .............................................................................................. 48

  D.  The JSSA Is Not Unconstitutional ...................................................................... 55

     1.   Restrictions on Jury-Service Eligibility Are Subject to Rational Basis Review ........... 55

     2.   The JSSA's Durational Residency Requirement Is Not Unconstitutional ................... 58

     3.   The JSSA's Felon Prohibition Is Not Unconstitutional .................................... 62

  E.  The Defendant Is Not Entitled To Relief Pursuant To 18 U.S.C. § 243, The Eighth Amendment, Or The Court's Supervisory Authority .......................................... 64

  F.  The Defendant Is Not Entitled To An Evidentiary Hearing ............................................. 67

IV.    CONCLUSION ................................................................................................. 70

AND NOW comes the United States of America, by its attorneys, Cindy K. Chung, United States Attorney for the Western District of Pennsylvania, Troy Rivetti, Soo C. Song, and Eric G. Olshan, Assistant United States Attorneys for said district, and Julia Gegenheimer, Special Litigation Counsel, Civil Rights Division, and hereby files its response in opposition to defendant Robert Bowers's Motion to Dismiss Superseding Indictment Pursuant to the Fifth, Sixth, and Eighth Amendments, the Jury Selection and Service Act, 18 U.S.C. § 243, and This Court's Supervisory Authority.  Doc. No. 650.

I.    **<u>INTRODUCTION</u>**

In the present motion, defendant Robert Bowers—who is charged with killing 11 Jewish worshippers at the Tree of Life Synagogue on account of their religious faith—demands that the Court dismiss the Superseding Indictment returned against him because, in his view, implementation of the jury-service plan in the Western District of Pennsylvania has led to the impermissible underrepresentation of certain minority groups on juries in this district—principally African Americans and Hispanics.  After two years of litigation and the production of substantial discovery by the Clerk of Court concerning the district's jury-selection protocols, the defendant cannot meet his burden.  He advances arguments that rely, in part, on invalid statistical estimates and fail both factually and as a matter of law in any event.  Specifically, under the Sixth Amendment's fair-cross-section analysis, the defendant cannot show sufficient underrepresentation of either African Americans or Hispanics on the relevant jury wheel in the Pittsburgh Division—let alone systematic exclusion over a significant period of time.  The same is true for his Fifth Amendment equal protection claim, which requires proof of purposeful discrimination.  To that end, the defendant fails to demonstrate systemic underrepresentation or that the district's racially neutral jury-service protocols are susceptible to abuse.

Having failed to establish a constitutional violation, the defendant similarly comes up short under the Jury Service and Selection Act (JSSA) of 1968 because he cannot show "substantial failures" to comply with the statute.  Indeed, almost all of his disparate statutory arguments do not implicate the limited areas of relief that the Third Circuit has recognized under the statute. Similarly, to the extent the defendant challenges the constitutionality of the JSSA's durational residency requirement and felon prohibition, uniform precedent has upheld each provision against constitutional attack.  The defendant also cannot invoke 18 U.S.C. § 243, the Eighth Amendment, or this Court's supervisory authority to remedy non-existent constitutional or statutory violations. Finally, because there are no material factual disputes presented here that the Court is required to resolve, the Court can and should dispose of the defendant's motion without an evidentiary hearing.

## II.     THE DISTRICT'S JURY PLAN AND RELEVANT PROCEDURAL HISTORY

### A.     The Jury Plan

Pursuant to the JSSA, 28 U.S.C. § 1863, and like every other district, the Western District of Pennsylvania has implemented a plan to ensure the random selection of grand and petit jurors appearing for jury service in this district ("the Jury Plan").  The most recent version took effect in March 2020.  See Plan of the U.S. Dist. Ct. for the W.D. of Pa. for the Random Selection of Grand and Petit Jurors (eff. Mar. 2, 2020) ("2020 Jury Plan"); Exh. 1 (Selected Jury Plans) at 281-300. When the Indictment and Superseding Indictment were returned in this case in October 2018 and January 2019, respectively, the Court was operating under an earlier Jury Plan that became effective in April 2009 ("the 2009 Jury Plan").  Aside from one change, discussed below, the 2009 and 2020 Jury Plans are identical.

Pursuant to the Jury Plan,[1] the district forms the jury pools in each of its three divisions (Pittsburgh, Erie, and Johnstown) from voter registration lists provided by the Pennsylvania Department of State every two years. 2009 Jury Plan § 5. Initially, a set number of names is randomly selected from this source list for each division. Id. This process is completed by a third-party vendor and results in the creation of the master jury wheel. Id. § 17. The district then implements a "two-step" qualification process. First, the master wheel is culled by randomly choosing individuals, mailing each of them a juror qualification questionnaire, id. § 9, and evaluating their responses to identify who is disqualified, exempt, or excused from service. Id. §§ 10-12. The result is the qualified jury wheel. Id. § 13. Second, individuals randomly selected from the qualified jury wheel are summonsed to serve as either grand jurors or petit jurors. Id.

In 2020, the district amended the Jury Plan and added a provision that requires the mailing of a supplemental juror qualification each time a previously mailed questionnaire is not returned after 21 days or is otherwise undeliverable. 2020 Jury Plan § 9. The new provision calls for the supplemental questionnaire to be sent to an individual randomly selected from the master wheel who resides in the same zip code as the intended recipient of the original questionnaire that was not returned or was undeliverable. Id.

B.      **Relevant Procedural History And Productions Made By The Clerk Of Court**

On December 18, 2019, the defendant filed a motion pursuant to the JSSA seeking the disclosure of certain jury records in anticipation of the instant substantive motion. Doc. No. 158. The Court granted the defendant's motion in part on February 25, 2020, ordering the Clerk of Court to produce, among other materials, the AO-12 statistical form for the qualified jury wheel in place when the defendant was indicted (i.e., the 2016 qualified jury wheel), certain redacted

---

[1]        Throughout this pleading, the government refers generally to the "Jury Plan," unless it is necessary to distinguish between the 2009 and 2020 versions.

data for master jury wheels and qualified jury wheels dating back to 2014 (i.e., without names and street addresses of prospective jurors), and data for the relevant grand jury venire and 23-person grand jury that returned the Indictment and Superseding Indictment.  Doc. No. 206.  The Court also made available for in-person inspection the voter registration source list from which the 2016 wheels were created.  Id.  When the Clerk produced responsive records on September 13, 2020, the production included certain additional disclosures, such as master jury wheel data for 2008, 2010, and 2012.[2]

In subsequent litigation, the Court permitted duplication and off-site review of the 2016 voter registration source list, Doc. No. 483, and also allowed the parties to submit substantive questions to the Clerk's Office regarding the initial productions and the manner in which jury officials implemented the Jury Plan.  Doc. No. 443.  On August 25, 2021, the Clerk of Court provided responses to the parties' initial questions along with spreadsheets containing juror information, including demographic information for all grand jury pools summonsed since May 2015.[3]

On September 9, 2021, the defendant filed yet another motion, this time seeking access to historical data in the Clerk's possession pursuant to 28 U.S.C. § 1868.  Doc. No. 561.  The Court granted the motion on October 5, 2021.  Doc. No. 604.  On October 21, 2021, the Court authorized the parties to duplicate all such historical materials for off-site review, including: AO-12 and JS-12 statistical forms dating back to the 1990s; the 2010, 2012, and 2014 voter registration source lists; and unredacted master jury wheels for 2010, 2012, and 2014.  See Doc. No. 627.  As a result,

---

[2]    In addition to seeking records in the custody of the Clerk of Court, on August 28, 2020, the defendant also sought leave to compel the production of records from certain third-party entities—the Administrative Office of Pennsylvania Courts (AOPC), Pennsylvania Department of State, and Electronic Registration Information Center (ERIC), Doc. No. 280, which the Court denied on April 2, 2021.  Doc. No. 442.  The Court, however, did permit on-site review of records in the Clerk's possession related to the rationale for the 2020 Jury Plan Amendment.  Id. at 4 n.1.

[3]    The Clerk of Court also provided written answers to defense questions on multiple other occasions.

the defendant possesses data for millions of prospective jurors covering jury operations in the Western District of Pennsylvania.

The defendant filed the instant motion on December 6, 2021.

## III.   ARGUMENT

### A.   The Defendant Cannot Establish A Sixth Amendment Violation

The defendant asserts a violation of his Sixth Amendment right to a grand jury drawn from a fair cross-section of the community.  Doc. No. 650 at 80-84.  "[T]he American concept of the jury trial contemplates a jury drawn from a fair cross section of the community. . . . [I]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community."  Taylor v. Louisiana, 419 U.S. 522, 527 (1975) (internal quotation marks omitted).  "This requirement of a fair cross section is not without substantial limits—it does not guarantee that juries be 'of any particular composition.'"  United States v. Weaver, 267 F.3d 231, 236 (3d Cir. 2001) (quoting Taylor, 419 U.S. at 538).

To establish a fair-cross-section violation, the defendant bears the "the burden to establish a violation of his fair-cross-section rights by identifying (1) 'a "distinctive" group in the community' (2) that was 'not fair[ly] and reasonab[ly]' represented among potential jurors compared with its representation in the community (3) because of 'systematic exclusion of the group in the jury-selection process.'"  United States v. Savage, 970 F.3d 217, 254 (3d Cir. 2020) (quoting Duren v. Missouri, 439 U.S. 357, 364 (1979)).  If the defendant makes this prima facie showing, the government would "bear[ ] the burden of justifying this infringement by showing attainment of a fair cross section to be incompatible with a significant state interest."  Weaver, 267 F.3d at 237 (internal quotation marks omitted).

Because the defendant cannot meet his burden under steps two and three of the <u>Duren</u> test, his Sixth Amendment challenge fails, and the Court "need not reach the [g]overnment's rebuttal burden." <u>Savage</u>, 970 F.3d at 254 n.31.

### 1.    Step One:  The Defendant Has Identified Only Two Cognizable Groups

The defendant identifies a total of four groups that he claims are cognizable groups for purposes of his constitutional challenges: African Americans, African-American Males, Hispanics, and all Non-Whites.[4]  Doc. No. 650 at 2, 75-76.  Just two of these groups, however—African Americans and Hispanics—are sufficiently "cognizable" or "distinctive" under existing constitutional precedent.  <u>See</u> <u>Weaver</u>, 267 F.3d at 240 ("African-Americans and Hispanics are 'distinctive' groups for the purposes of a fair cross-section analysis."); <u>Ramseur v. Beyer</u>, 983 F.2d 1215, 1230 (3d Cir. 1992) (en banc) ("African-Americans are unquestionably a constitutionally cognizable group.");[5] <u>Castaneda</u>, 430 U.S. 482, 495 (1977) ("[I]t is no longer open to dispute that Mexican-Americans are a clearly identifiable class.").

In contrast, no federal court has ever held that the combined race-gender category of African-American Males qualifies as a cognizable group for constitutional purposes.  <u>See</u> <u>United States v. Barlow</u>, 732 F. Supp. 2d 1, 28 (E.D.N.Y. 2010) (noting that "defendant has not cited—and the Court's independent research has not revealed—any cases affirmatively deciding that African-American males are a distinctive group"); <u>cf.</u> <u>Turner v. Mitchell</u>, 63 F.3d 807, 812 (9th Cir. 1995) ("[N]either the Supreme Court nor the Ninth Circuit has recognized that the combination of race and gender, such as 'black males,' may establish a cognizable group for

---

[4]    One of the defendant's experts, Dr. John Weeks, refers to this group as "persons who do NOT identify themselves racially/ethnically as Non-Hispanic Whites."  Doc. No. 650-3 ("Weeks Aff.") ¶ 11.  For brevity, the government refers to this group simply as "Non-Whites" or "all Non-Whites."

[5]    The analysis as to whether a particular group is "cognizable" is the same for fair-cross-section and equal protection claims.  <u>See</u> <u>Ramseur</u>, 983 F.2d at 1230.

<u>Batson</u> purposes."), <u>overruled on other grounds by</u> <u>Tolbert v. Page</u>, 182 F.3d 677 (9th Cir. 1999);

<u>Sweeper v. Graham</u>, 2017 WL 4516645, at *10 (S.D.N.Y. Sept. 26, 2017) ("[F]ederal law has <u>not</u>

extended the <u>Batson</u> protection to <u>combinations</u> of race and sex.") (emphasis in original).

Indeed, multiple courts have outright rejected arguments that combined gender-race

categories are cognizable for constitutional purposes.  <u>See, e.g.</u>, <u>United States v. Dennis</u>, 804 F.2d

1208, 1210 (11th Cir. 1986) (recognizing that the test is whether a specified group is "'one that is

a recognizable, distinct class, singled out for different treatment under the laws, as written or as

applied,'" and holding that while "[t]he group of blacks generally clearly qualifies under this

definition[,] <u>appellants have failed to show . . . that black males constitute a distinct, recognizable</u>

<u>subclass of individuals who have been singled out for different treatment under the laws not simply</u>

<u>as blacks, but as black males</u>") (quoting <u>Castaneda</u>, 430 U.S. at 494) (emphasis added); <u>United</u>

<u>States v. Greer</u>, 900 F. Supp. 952, 957-58 (N.D. Ill. 1995) (concluding that "recognizing the

subgroup of African-American males as a <u>Duren</u> distinctive group would amount to pursuing a

level and type of representativeness that is simply not demanded by the Sixth Amendment, which

requires only a cross-section that is fair, not one perfectly attuned to multiple variables"); <u>United</u>

<u>States v. Underwood</u>, 617 F. Supp. 713, 718-19 (N.D. Ala. 1985) (finding "white males" were not

a distinctive group and generally "reject[ing] the concept of adding together 'cognizable groups'

so as to make a separate 'cognizable group'"); <u>cf.</u> <u>United States v. Blair</u>, 493 F. Supp. 398, 407

(D. Md. 1980) ("It is doubtful that black males constitute a distinct group within the community.");

<u>Cooperwood v. Cambra</u>, 245 F.3d 1042, 1046 (9th Cir. 2001) (declining to find cognizable group

based on combination of race and gender and concluding, "[t]hat [defendant] and the challenged

juror are both African-American is enough to form the basis of a <u>Batson</u> claim").  As one court

noted:

the main concerns underlying these cases is that, if mixed race-gender groups can qualify as distinctive, th[e]n numerous other characteristics—such as ethnicity, religion, and age could be melded together so that fair cross-section violations could be found based on the exclusion of groups that make up a minuscule part of the population.

Barlow, 732 F. Supp. 2d at 27-28 (citing Underwood, 617 F. Supp. at 718-19 (expressing concern that "[a] social scientist might, with complete honesty, argue for a merger of the black, female, poor, elderly Catholics and find that the percentage of the group thus combined is terribly underrepresented or terribly over-represented in the jury pool")).

Likewise, courts from across the country, including at least one in the Third Circuit, have repeatedly rejected arguments that the aggregation of all individual cognizable groups into a single omnibus category of Non-Whites is permissible for constitutional purposes.  See, e.g., United States v. Suttiswad, 696 F.2d 645, 649 (9th Cir. 1982) (holding that absolute disparities of "2.8% for Blacks, 7.7% for [Hispanics], and 4.7% for Asians" collectively do not constitute underrepresentation since "nonwhites" are not a cognizable group); id. ("Defendant suggests that this Court should 'add up' all of the separate figures of minority underrepresentation in order to arrive at one figure for underrepresentation of 'non-whites,' who defendant asserts, comprise over 36% of the population in the Northern District of California.  No authority is presented for the argument that 'non-whites' should be recognized as a separate 'ethnic group' for this purpose."); United States v. Tyler, 2017 WL 11490103, at *3 (M.D. Pa. June 26, 2017) ("While it is well-established that individuals of a particular race or gender are a distinctive, cognizable group for purposes of a fair cross section analysis, we have scoured the case law and have not found a single reported case where a federal court utilized "non-whites" as the relevant distinctive group.") (emphasis added); United States v. Luong, 255 F. Supp. 2d 1123, 1127 (E.D. Cal. 2003) ("[T]he Ninth Circuit has rejected the theory that all non-white groups can be combined to form a single

'distinctive' group for the purpose of a jury selection challenge."); <u>Ahmed v. Houk</u>, 2014 WL 2709765, at *103 (S.D. Ohio June 16, 2014) ("'Non-whites' has never been recognized as a 'distinctive group' in the community."); <u>United States v. Marcano</u>, 508 F. Supp. 462, 469-70 (D.P.R. 1980) (same).

Simply put, Non-Whites are not a distinctive group because such a group "would have no internal cohesion, nor would it be viewed as an identifiable class by the general population." <u>Suttiswad</u>, 696 F. 2d at 649. "Certainly, the members of such group would have diverse attitudes and characteristics which would defy classification." <u>Id.</u> (internal quotations omitted). Recently, a judge in the Middle District of Pennsylvania rejected a defendant's reliance on Non-Whites as a cognizable group and "agree[d] wholeheartedly with the reasoning of our sister courts, [having] been presented with no availing reason to part company with such sound logic." <u>Tyler</u>, 2017 WL 11490103, at *3.

For his part, the defendant cites a handful of cases in support of his position that African-American Males and Non-Whites are cognizable groups. But each case does not say what the defendant asserts it does, is bad law, or is otherwise inapposite. For example, the defendant seizes on the phrase "Black male" in a quote from the constitutional analysis in <u>United States v. Knight</u>: "[T]here is no dispute that as a Black male, Knight is a member of a distinct group under an equal protection analysis." 2021 WL 951885, at *2 (D. Nev. Mar. 11, 2021); <u>see</u> Doc. No. 650 at 76. The district court in <u>Knight</u> said nothing, however, indicating that it recognized a <u>combined</u> race-gender category, as opposed to two cognizable but distinct categories in which the defendant could claim membership: African American or male. Indeed, the passage quoted by the defendant concluded with citations to two decisions that make clear the court was identifying two distinct categories—not a combined one. <u>See Knight</u>, 2021 WL 951885, at *2 (citing <u>United States v.</u>

Cannady, 54 F.3d 544, 547 (9th Cir. 1995) (noting that African Americans were a cognizable category), Craig v. Boren, 429 U.S. 190, 197 (1976) (same for males)).  Knight's own statistical analysis also reflected that his claims were based on an evaluation of these groups individually, not in combination.  Id. at *2 n.2 ("Specifically, under Mr. Martin's comparative disparity analysis, Black individuals are 53.34% underrepresented in the jury pool, and males are underrepresented by 4.27%.").  Moreover, the defendant's reading would put Knight in conflict with the Ninth Circuit's recognition that "neither the Supreme Court nor th[is] [] Circuit has recognized that the combination of race and gender, such as 'black males,' may establish a cognizable group" for constitutional purposes.  Turner, 63 F.3d at 812.[6]

The defendant also cites two decisions in which state courts recognized combined race-gender categories in the context of examining the exercise of peremptory challenges under state law.  See People v. Armstrong, 433 P.3d 987, 1015 (Cal. 2019); Com v. Jordan, 785 N.E.2d 368, 380 (Mass. 2003).  But the fact that some state courts have permitted such challenges under their respective laws does not control whether race-gender combinations are cognizable under federal law.  See United States v. Walker, 490 F.3d 1282, 1291 n.10 (11th Cir. 2007) (noting that the Supreme Court has not determined whether race-gender combinations are cognizable for equal protection purposes while "[s]tate courts examining this question under their own constitutions and precedents are divided on the issue") (emphasis added) (collecting state cases).  Moreover, both state decisions cited by the defendant expressly recognized that state court rulings actually conflicted with federal precedent on this point.  See Armstrong, 433 P.3d at 1015; Jordan, 785 N.E.2d at 378 (noting that "lower Federal courts addressing the issue have generally declined to

---

[6]     This reasoning is bolstered by the Knight court's re-articulation of the defendant's argument elsewhere in the same opinion: "There is again no dispute as to the first prong—that Knight's allegedly excluded groups of Black, male, American Indian, Native Alaskan, and Hispanic or Latino are 'distinctive' in the community."  2021 WL 951885, at *3 (emphasis added).

recognize such groups as being protected from discrimination in the jury selection process by the United States Constitution").  Because these state court cases are inapposite, and the defendant cites no other support for his claim that gender-race combinations are cognizable groups under federal law, the Court should reject his efforts to sidestep prevailing precedent establishing that African-American Males are not a cognizable group for constitutional analysis.

The same is true as to the defendant's flawed argument that Non-Whites are a cognizable group.  Although the district court in United States v. Rinaldi, 2020 WL 4589037, at *5 (M.D. Pa. Aug. 10, 2020), identified a "'distinctive group' consisting of 'Hispanics, Latinos, [and] Blacks,'" it did so only after quoting Third Circuit precedent that referred to "whether African-Americans and Hispanics are cognizable groups." Id. (quoting Weaver, 267 F.3d at 239).  In other words, the district court simply used shorthand for the well-established principle that each of the specified groups was—individually—a cognizable group.  The court did not specifically address the question of whether a combination of cognizable groups was permissible.  Nor did that defendant in his handwritten, pro se motion—which included no statistical analysis whatsoever—even ask the court to combine categories when he made a blanket assertion of improper underrepresentation. See United States v. Rinaldi, 2:18-cr-279, Doc. No. 310 at 6 (M.D. Pa. July 9, 2020) ("It is widely known that Hispanics, Latinos, Blacks[,] [a]nd other minorities register to vote in far lower numbers than whites.")[7]  Moreover, the Rinaldi decision did not address the specific collective group the defendant advances here—all Non-Whites—which, as noted, courts uniformly have refused to recognize for constitutional challenges.

Finally, the defendant cites a 1974 district court case permitting the combination of "blacks, Asians, and 'Latinos.'" Quadra v. Superior Court of San Francisco, 378 F. Supp. 605, 617 (N.D.

---

[7]     Indeed, the Rinaldi reference to "Hispanics, Latinos, [and] Blacks" was simply a paraphrase of this sentence from the defendant's motion.  2020 WL 4589037, at *5 (citing defendant's motion).

Cal. 1974).  Notwithstanding that <u>Quadra</u> did not address the specific group at issue in this case—all Non-Whites—it is also now bad law as to this issue in its own circuit.  <u>See</u> <u>Suttiswad</u>, 696 F.2d at 649 (holding that absolute disparities of "2.8% for Blacks, 7.7% for [Hispanics], and 4.7% for Asians" collectively do not constitute underrepresentation since "nonwhites" are not a cognizable group).

For the foregoing reasons, the defendant has only identified two cognizable groups for purposes of his constitutional challenges—African Americans and Hispanics—and the Court should reject his efforts to shoehorn two additional categories into his analysis—African-American Males and Non-Whites—that have never been recognized under federal law.

### 2.    Step Two:  African Americans And Hispanics Were Represented Fairly And Reasonably On The 2016 Qualified Jury Wheel

At step two of the <u>Duren</u> analysis, the defendant must show that the representation of African Americans and Hispanics "among potential jurors was not 'fair and reasonable' when compared to the proportion of th[e] group[s] within the [We]stern District population."  <u>Savage</u>, 970 F.3d at 255.  The analysis requires that the Court "look to statistics to assess the degree, if any, to which [both groups] were underrepresented."  <u>Id.</u> (citing <u>Weaver</u>, 267 F.3d at 240 (noting the inquiry is "at least in part, a mathematical exercise, and must be supported by statistical evidence")).  It then proceeds as follows: (1) the Court first must determine the "share of the [] population" of African Americans and Hispanics in the population of the Pittsburgh Division;[8] (2) the Court next must evaluate the share of each group in the relevant jury pool; and (3) the Court

---

[8]    In <u>Savage</u>, the Third Circuit analyzed the entire Eastern District of Pennsylvania, 970 F.3d at 255, which is not broken into divisions.  <u>See</u> U.S. Dist. Ct. for E.D. of Pa., Plan for the Random Selection of Grand and Petit Jurors § 3 (adopted 2017), <u>available at</u> https://www.paed.uscourts.gov/documents/jury/Jury%20Plan.pdf (last visited Dec. 28, 2021) (mandating random mailing of questionnaires to prospective jurors in all of district's nine counties).  Here, the parties agree that the appropriate focus is the Pittsburgh Division of the Western District of Pennsylvania, where the Indictment and Superseding Indictment were returned.  <u>See</u> Doc. No. 650 at 26-32 (summarizing expert findings focusing on Pittsburgh Division); <u>Weaver</u>, 267 F.2d at 237 (analyzing Erie Division of Western District).

must use "statistical methods to evaluate any disparity between the two shares" as to each group. See id.

### a. The African American and Hispanic share of the population

The defendant's expert, Jeffrey Martin, used the 2018 American Community Survey (ACS) 5-Year Average to identify the race and ethnic demographics for the jury-eligible population in the Pittsburgh Division.  Per this source, Mr. Martin calculated that the Pittsburgh Division was 6.88% African American and 1.22% Hispanic.  Doc. No. 650-2 ("Martin Aff.") ¶ 42.  The government does not contest that the 2018 ACS 5-Year Average is a sufficient source for jury-eligible population statistics and that Mr. Martin's specified populations for African Americans and Hispanics can be used in evaluating the defendant's constitutional challenges.  Cf. Savage, 970 F.3d at 255 (noting that the "District Court should have distilled the jury-service-eligible population" as opposed to the entire population) (citing Berghuis v. Smith, 559 U.S. 314, 319 (2010); Howell v. Superintendent Rockview SCI, 939 F.3d 260, 263, 266 (3d Cir. 2019); Ramseur, 983 F.2d at 1231.

### b. The 2016 qualified jury wheel is an appropriate option for evaluating the defendant's fair-cross-section challenge

#### i. Binding precedent supports using the qualified jury wheel

Next, the Court must determine the relevant jury pool to examine.  Recently, in Savage, the Third Circuit approved focusing on the qualified jury wheel, particularly where, as here, the master wheel—and by extension the source list—contains limited demographic information.  970 F.3d at 255 ("[A]s between the two wheels, the master wheel contained limited racial data, so the District Court determined the qualified wheel reflecting juror questionnaire responses was preferable for fair-cross-section purposes."); id. at 256 ("Precedent reinforces that the qualified

wheel is a valid option for assessing a fair-cross-section claim.") (citing <u>Duren</u>, 439 U.S. at 363-64).

Indeed, the defendant's expert, Mr. Martin, agrees that although there is "self-reported racial and Hispanic ethnicity information for the Qualified Jury Wheel," the same is not true for "the source list of registered voters in Pennsylvania," which "does not include self-reported racial or Hispanic ethnicity information."  Martin Aff. ¶ 43.  Based on self-reported data, Mr. Martin found that the 2016 qualified jury wheel was <u>3.89%</u> African American and <u>.82%</u> Hispanic.  <u>Id.</u> ¶ 71.  Again, the government does not dispute the use of these percentages as to the 2016 qualified jury wheel, which are appropriate for conducting the Court's analysis at step two of the <u>Duren</u> test.

   ii. <u>The defendant's expert failed to use all available information and standard statistical methods to estimate the racial and ethnic demographics of the 2016 source list</u>

Yet the defendant devotes the bulk of his motion to challenging the composition of the 2016 source list (i.e., the Pennsylvania voter registration list), notwithstanding that the source list (and the 2016 master jury wheel) do not contain race and ethnicity information.  <u>See, e.g.</u>, Doc. No. 650 at 34-62.  To that end, the defendant describes what he claims is voluminous evidence that the voter list is rife with errors, the result of which is the substantial underrepresentation of African Americans and Hispanics, among other non-cognizable groups.  <u>Id.</u> at 124-48.  This argument rests entirely on the premise that the voter list, in fact, underrepresents these groups.  But if the source list does <u>not</u> underrepresent those cognizable groups, then any alleged structural flaws in the source list are legally irrelevant to the defendant's constitutional challenges.  As explained below, a valid statistical estimate of the 2016 source list's race and ethnic demographics reveals exactly that: <u>no</u> evidence that African Americans and Hispanics were underrepresented.

16

In connection with this litigation, the government retained Dr. Maxwell Palmer, a tenured professor at Boston University who obtained his Ph.D. in political science from Harvard University and whose peer-reviewed, published research "uses a variety of analytical approaches, including statistics, geographic analysis, and simulations, and data sources including academic surveys, precinct-level election results, voter registration and vote history files, and census data." See Exh. 2 ("Palmer Aff.") ¶ 2.  Dr. Palmer employed a standard statistical methodology to estimate the percentage of African Americans and Hispanics on the 2016 source list.  Specifically, he used a form of geocoding known as Bayesian Improved Surname Geocoding (BISG), which is "a method that combines information about the location of each voter with information about their surnames and other demographic information."  Id. ¶ 18.  As Dr. Palmer notes, "[t]his process is more accurate than estimating race using geography or surnames alone," and "BISG has been used in both academic work and court testimony."  Id.  Indeed, geocoding methodologies have been accepted in multiple fair-cross-section cases within the last year alone.  See, e.g, United States v. Todd, 2021 WL 5712153, at *5 (E.D.N.Y. Dec. 1, 2021) ("[T]he court finds it appropriate to use geocoding to determine the demographic makeup of the master wheel."); United States v. Lucas, 2021 WL 4925715, at *3 (S.D.N.Y. Oct. 21, 2021) (permitting BISG analysis to estimate racial and ethnic demographics of master wheel); United States v. Allen, 2021 WL 431458, at *3 n.5 (S.D.N.Y. Feb. 8, 2021) ("[T]he Government's expert utilized geocoding, which estimates the racial and ethnic composition based on residential address.").

In his motion, the defendant concedes that geocoding is a valid methodology for demographic estimation: "[u]sing geocoding and surname analysis techniques, an expert can discern [] demographic characteristics . . . if given access to juror names, addresses, and dates of birth.  These techniques are typically seen as a better way to discern the actual demographics of a

source list . . . ."  Doc. No. 650 at 68 (citing <u>United States v. Reyes</u>, 934 F. Supp. 553, 562 (S.D.N.Y. 1996) ("Only the geocoded data from the Jury Wheel study will be considered."); <u>United States v. Berks County</u>, 277 F. Supp. 2d 570, 575 (E.D. Pa. 2003) (noting that parties stipulated to Spanish surname methodology and to United States' geocoding analysis of 2003 voter registration list); <u>United States v. Ortiz</u>, 1995 WL 381595, at *1 (E.D. Pa. June 23, 1995) (permitting surname analysis to determine Hispanic demographics)).

The defendant's own expert, Mr. Martin, has also repeatedly relied on geocoding when conducting demographic analysis in criminal cases charged within the last five years.  <u>See, e.g.</u>, <u>United States v. Balde</u>, Crim. No. 20-CR-281 (KPF) (S.D.N.Y.), Doc. No. 61-1, ¶ 28 ("the standard statistical method of geocoding by Zip Code can be used to estimate the demographic characteristics of voters"); <u>United States v. Gilmore</u>, Crim. No. 19-CR-724 (JGK) (S.D.N.Y.), Doc. No. 81-1, ¶ 66 (same); <u>United States v. Allen</u>, Crim. No. 20-CR-366 (NSR) (S.D.N.Y.), Doc. No. 25-1, ¶ 28 (same); <u>United States v. Schulte</u>, Crim. No. No. 17-CR-548 (PAC) (S.D.N.Y.), Doc. No. 435-1, ¶ 28 (same).

Here, using all available information from the 2016 voter list—a voter's street address, gender, surname, and age—Dr. Palmer's application of the accepted BISG methodology resulted in an estimate that the source list contained <u>7.8%</u> African Americans and <u>1.9%</u> Hispanics.  Palmer Aff. ¶ 20.  These raw numbers actually <u>exceed</u> the agreed-upon jury-eligible populations of 6.88% African American and 1.22% Hispanic in the Pittsburgh Division.  Dr. Palmer thus found "no evidence to suggest that the 2016 voter registration list underrepresents Black or Hispanic people." <u>Id.</u> ¶ 21.

In addition, by applying the same BISG methodology to the 2014 Master Wheel,[9] Dr. Palmer was able to identify significant disparities between Whites, African Americans, and Hispanics with respect to unreturned and undeliverable juror qualification questionnaires. In particular, he concluded that African Americans and Hispanics were much less likely to return questionnaires compared to Whites and that both groups also were much more likely than Whites to be sent undeliverable questionnaires. Id. ¶¶ 26-29. As a result, Dr. Palmer concluded that these two phenomena—unreturned and undeliverable questionnaires—contributed most to the disparity of African Americans and Hispanics on the 2016 qualified jury wheel when compared to the jury eligible population in the Pittsburgh Division. Id. ¶ 29.[10]

The defendant arrives at a different result, arguing that the 2016 source list in fact underrepresents both of these groups. This argument relies on faulty analysis, and it hinges on Mr. Martin's estimate that the 2016 source list contains only 4.85% African Americans .86% Hispanics. Martin Aff. ¶ 50.[11] These estimates, however, are the product of an invalid methodology that rejects the use of geocoding. The methodology thus conflicts with the defendant's own stated position in this case that geocoding and surname analysis are appropriate, as well as Mr. Martin's prior reliance on geocoding as a valid methodology. As Dr. Palmer makes clear, Mr. Martin arrives at his estimates by improperly claiming that geocoding the 2016 qualified jury wheel overestimates the presence of African Americans and Hispanics when compared to

---

[9]     Dr. Palmer applied BISG to the 2014 master jury wheel data, which contained names, addresses, ages, and genders for prospective jurors. The 2016 Master Wheel was produced in redacted form without names and street addresses. Because neither the Jury Plan nor the baseline population demographics changed between 2014 and 2016, Dr. Palmer's conclusions with respect to unreturned and undelivered questionnaires on the 2014 master wheel are applicable to the 2016 master wheel from which the grand juries were selected in this case. See Palmer Aff. ¶¶ 24, 28.
[10]    As discussed below, the law is clear that disparities caused by undeliverable or unreturned questionnaires reflect external forces that do not justify invalidating a jury plan. See infra pp. 31-32.
[11]    Mr. Martin's affidavit contains two ¶ 50s—these statistics appear in the second.

self-reported data for the wheel, and then attempting to correct this overestimation by applying a

manufactured 50% "adjustment" to estimate the demographics of the source list.  Dr. Palmer notes:

> There are two significant flaws in Mr. Martin's analysis of the demographics of the voter registration list.  First, Mr. Martin's "geocoding estimation adjusted for overestimation" (Martin, ¶46–51) is an unjustified and inappropriate approach to analyzing the voter file.  Second, Mr. Martin estimates race using each registrant's zip code, and not any other available information.  Other race estimation procedures utilize not only geographic information, but individual-level information available on the voter registration list as well, including surnames, gender, and age. . . . Mr. Martin provides no explanation for why he chooses to estimate race using zip code demographics alone, rather than more precise geocoding and valuable demographic information, especially surnames, from the voter registration list.  Mr. Martin's choice to estimate race with such limited information may explain why he has no confidence in his own geocoding analysis of the 2016 voter registration list.
>
> Mr. Martin first estimates the percentage of Black and Hispanic voters on the 2016 voter registration list using census data on each voter's zip code.  Then, he repeats this analysis with the Qualified Jury Wheel, and compares his race estimates of the Qualified Jury Wheel, based on demographic data at the zip code level alone, to the self-reported races on the qualified jurors.  Mr. Martin concludes that because he estimates larger percentages of Black and Hispanic people on Qualified Jury Wheel than the self-reported percentage of these groups, his race estimation process must overestimate the percentages of Black and Hispanic people on the voter file as well.  As a result, he then "adjusts" the percentages of each group on the voter registration list based on his calculated overestimation.  Mr. Martin justifies this choice because he claims that "geocoding estimation can be inaccurate" and "the largest group of persons with self-reported racial information in this analysis is the Pittsburgh Qualified Jury Wheel."  While Mr. Martin is correct that race estimation is not perfect, he provides no evidence of any systematic error or bias in his estimates to justify his adjustments.  Mr. Martin also does not provide any evidence that his overestimates of the Qualified Jury Wheel should apply to the voter registration list.
>
> Additionally, Mr. Martin's analysis assumes that the demographics of the 2016 Qualified Jury Wheel will perfectly match the demographics of the voter registration list. . . . [T]his is not correct due to differing juror qualification questionnaire response rates and undeliverable rates.  Mr. Martin presents no evidence suggesting that his adjustment is necessary or correct, nor does he cite any research supporting his methodology.
>
> By adjusting the demographics of Black and Hispanic voters in this way, Mr. Martin is ensuring that disparities between the 2016 voter registration list and jury eligible population are similar to disparities in the 2016 Qualified Jury Wheel.  Any conclusions Mr. Martin draws on this estimation (and related estimates of the 2016

Master Jury Wheel and population selected to receive a juror qualification questionnaire) are directly the results of this adjustment, rather than based on a careful estimation of the race of each voter on the voter registration list. <u>Due to Mr. Martin's flawed methodology, all of Mr. Martin's conclusions regarding the demographics of the 2016 voter registration list are also flawed.</u>

<u>Id.</u> ¶¶ 12-15 (footnotes omitted) (emphasis added).

In other words, upon examining Mr. Martin's methodology, Dr. Palmer found that Mr. Martin failed to use all of the data available to him and unjustifiably assumed that the demographics of the qualified jury wheel would match those of the source list. Mr. Martin cites no support—peer reviewed or otherwise—for his "adjustment" methodology, which, again, conflicts with his own approach in numerous other cases. Although it appears that he has attempted the same flawed approach recently, it was rejected in favor of the government's use of standard geocoding. <u>See</u> <u>Todd</u>, 2021 WL 5712153, at *5 ("In particular, the defendant contends that when applied to the qualified wheel, geocoding overestimates the Black population by 1.71% and the Latino population by 1.37% in absolute terms, and that the method can be expected to do the same in the master wheel. The government asserts, however—and the defendant does not meaningfully dispute—that the process of mailing and returning qualification forms introduces larger disparities in the representation of Black and Latino persons.") (internal citations and quotation marks omitted). As in <u>Todd</u>, Mr. Martin now fails to account for the effect of unreturned and undeliverable questionnaires on the demographics of the qualified jury wheel, as compared to the source list.

There is further reason to question the validity of Mr. Martin's adjusted race and ethnicity estimates for the 2016 voter registration list. When Dr. Palmer removed Mr. Martin's "adjustment" to determine his original geocoding estimate of the voter list—which Mr. Martin does not report—Dr. Palmer found that Mr. Martin's own geocoding analysis estimated 7.3%

African American and 1.3% Hispanic representation on the source list—figures that closely match Dr. Palmer's results utilizing legitimate BISG methodology (7.8% and 1.9%, respectively). Palmer Aff. ¶ 16.

The defendant's additional expert, Dr. John Weeks, also used data that corroborates Dr. Palmer's estimates. Dr. Weeks conducted part of his analysis using a data set known as the 2020 Current Population Survey (CPS) Voting and Registration Supplement—data gathered from a survey of residents to determine voter registration rates. See, e.g., Weeks Aff. ¶¶ 32, 38-39. Dr. Palmer examined the same data set and found that "[t]he CPS data estimates that 7.6% of registered voters in the Pittsburgh Division are Black and 1.3% are Hispanic." Palmer Aff. ¶ 31. "Dr. Weeks does not report these estimates in his report," presumably because "[t]he CPS data used by Dr. Weeks provides clear corroboration of [Dr. Palmer's] estimates and an additional independent data source for the demographics of the voter file." Id. ¶ 32.[12]

In sum, the Court can only rely on demographic estimates that are the result of accepted statistical methodologies. Dr. Palmer used one such methodology to estimate the proportion of African Americans and Hispanics on the 2016 voter registration list. Mr. Martin did not. As a result, it would be inappropriate to conduct further analysis under Duren based on the defendant's flawed race and ethnicity estimates. Importantly, the Court need not resolve the parties' disputed methodologies in order to rule on the defendant's constitutional challenges because the parties

---

[12]    It is notable that despite litigating discovery on this issue for the better part of two years and focusing his entire argument on challenging the validity of Pennsylvania's voter registration list, the defendant has offered no analysis whatsoever of substantial volumes of data produced by the Clerk's Office that might bear on this question, including unredacted source lists and master wheels for 2010, 2012, and 2014. Instead of analyzing this in-hand data, the defendant once again resorts to asking the Court to permit third-party discovery of the AOPC source list used in the state court system. Doc. No. 650 at 71-72. The Court has already denied this request once, Doc. No. 442, and the defendant offers no new reason for the Court to reconsider that decision. His request is particularly dubious to the extent it is predicated on his claimed desire to conduct geocoding and surname analysis of the AOPC list—an estimation methodology his own expert refused to apply to 2016 source list data already in the defendant's possession. More generally, he cites no case where a court determined that a defendant was entitled to third-party discovery concerning a possible alternative source list, and the Court should reject his repeat request to subpoena the AOPC.

agree on the demographics of the 2016 qualified wheel, the use of which the Third Circuit has approved for purposes of such challenges.

c.     **The absolute and comparative disparities of African Americans and Hispanics on the 2016 qualified jury wheel are permissible**

The final component of the analysis under step two of <u>Duren</u> is to calculate the disparities between African Americans and Hispanics on the 2016 qualified jury wheel and the jury eligible population of each group in the Pittsburgh Division at the relevant time.   The Third Circuit "evaluate[s] the significance of this shortfall by calculating two metrics: absolute and comparative disparities."   <u>Savage</u>, 970 F.3d at 256.   Despite the relative strengths and weaknesses of the approaches, the "Court continues to use both absolute and comparative disparity methods, because, when applied together, one method can be reasonably expected to offset the shortcomings of the other."  <u>Id.</u> at 256-57 (citations omitted).   Still, as the <u>Savage</u> court recognized, the Third Circuit has "shown some solicitude for absolute disparity."  <u>Id.</u> at 257.

"Absolute disparity is simply the difference between [the] two statistical inputs."  <u>Id.</u> at 256.  Here, using agreed-upon figures, the absolute disparity for African Americans is 6.88% (the jury eligible population) minus 3.89% (the population on the 2016 qualified jury wheel), or <u>2.99%</u>. <u>See</u> Martin Aff. ¶ 87.   Likewise, the absolute disparity for Hispanics is 1.22% minus .82%, or <u>.40%</u>.  <u>Id.</u> ¶ 99.  Both absolute disparities—2.99% for African Americans or .40% for Hispanics— fall well below other disparities the Third Circuit has found to be insufficient to establish a violation under <u>Duren</u>.  <u>See, e.g.</u>, <u>Savage</u>, 970 F.3d at 257 (holding that 8.45% absolute disparity was insufficient) (citing <u>Howell</u>, 939 F.3d at 268 (absolute disparity of 5.83% insufficient); <u>United States v. Davis</u>, 854 F.3d 1276, 1295 (11th Cir. 2017) (same as to 6.7% absolute disparity); <u>United States v. Grisham</u>, 63 F.3d 1074, 1078–79, 1081 (11th Cir. 1995) (same as to absolute disparity of 4.72%); <u>United States v. Clifford</u>, 640 F.2d 150, 154–55 (8th Cir. 1981) (same as to absolute

23

disparity of 7.2%); Ramseur, 983 F.2d at 1230–32 (concluding that absolute disparity of 14.1% was "of borderline significance" in equal protection analysis overlapping with fair-cross-section analysis)).

The defendant's challenge does no better as to comparative disparity, which "is the quotient of the absolute disparity and the population percentage." Id. at 256 (citing Weaver, 267 F.3d at 238). The resulting comparative disparity for African Americans is 2.99% (the absolute disparity) divided by 6.88% (the jury eligible population), or 43.46%. The comparative disparity for Hispanics is .40% divided by 1.22%, or 32.79%.[13] Once again, these values fall below comparative disparities the Third Circuit has found to be insufficient to establish a constitutional violation under Duren. See, e.g., id. at 258 (holding that 50.24% comparative disparity was insufficient) (citing Howell, 939 F.3d at 268 (comparative disparity of 54.49% insufficient); United States v. Orange, 447 F.3d 792, 796, 798–99 (10th Cir. 2006) (comparative disparities "rang[ing] from 38.17% to 51.22%" insufficient where population percentages ranged from 1.64% to 8.63%); United States v. Chanthadara, 230 F.3d 1237, 1256–57 (10th Cir. 2000) (comparative disparities of 40.89% and 58.39% insufficient; population percentages of 7.9% and 2.74%, respectively); Weaver, 267 F.3d at 240, 243 (considering comparative disparities of 40.01% and even 72.98% to be "of questionable probative value" due to particularly small population percentages of 3.07% and 0.97%, respectively)).[14]

---

[13] Using the same input values, Mr. Martin arrives at slightly different comparative disparities of 43.43% (African Americans) and 32.68% (Hispanics) for reasons that are unclear. Martin Aff. ¶¶ 108, 120. These differences, however, are immaterial to the disparity analysis, as none of the figures demonstrates an impermissible disparity.

[14] Even if the Court were to accept Mr. Martin's flawed estimate of the African American and Hispanic populations in the 2016 voter registration list, the resulting absolute and comparative disparities for the voter list also would not run afoul of Third Circuit precedent. See Martin Aff. ¶ 81 (Step One) (2.03% absolute disparity and 29.55% comparative disparity for African Americans), ¶ 83 (Step One) (.37% absolute disparity and 29.89% comparative disparity for Hispanics). Likewise, even if African-American Males were considered a cognizable group—which, again, they are not—Mr. Martin's disparity calculations for this group, id. ¶ 82 (Step 10) (1.95% absolute disparity and 60.68% comparative disparity), do not run afoul of Savage and the cases it cites, particularly those addressing small populations. 970 F.3d at 258 (collecting cases).

Rather than acknowledge that the absolute and comparative analyses doom his argument at step two of the <u>Duren</u> test, the defendant asks the Court to rely <u>exclusively</u> on a third statistical method—standard deviation or SDT analysis, which calculates the likelihood that an outcome is the result of random chance.  Doc. No. 650 at 78-81.  According to Mr. Martin, the fact that the African-American and Hispanic populations on the voter list and the qualified jury wheel, for example, differ from the groups' jury eligible populations by more than two or three standard deviations is statistically significant.  Martin Aff. ¶¶ 124, 128, 136.  But "no court in the country has accepted [standard deviation analysis] alone as determinative in Sixth Amendment challenges to jury selection systems."  <u>United States v. Rioux</u>, 97 F.3d 648, 655 (2d Cir. 1996).  Moreover, as the Second Circuit recognized in <u>Rioux</u>:

> <u>It is illogical to apply a theory based on random selection when assessing the</u> <u>constitutionality of a qualified wheel.</u>  By definition, the qualified wheel is not the product of random selection; it entails reasoned disqualifications based on numerous factors.  It is irrational to gauge the qualified wheel—an inherently non-random sample—by its potential for randomness.

<u>Id.</u> (emphasis added); <u>see also</u> <u>United States v. Williams</u>, 2021 WL 2581265, at *15 (E.D. La. June 23, 2021) ("It is statistical fancy for Defendants to expect that the racial composition of the master jury wheel would be replicated in the 136 jury pools selected at random from the qualified jury wheel given the intervening and determinative external forces involving individual choice.  Thus, Defendants' application of . . . standard deviation theory to analyze the jury pools or the qualified jury wheel simply does not work.").

Although the defendant urges the court to use standard deviation analysis, he does so only by misquoting a footnote in <u>Savage</u> and in particular omitting the following underlined language: "We have also used a third metric, standard deviation, to assess the reliability of sample data. <u>See</u> <u>Howell</u>, 939 F.3d at 266–68.  <u>But no sampling occurred here.  Instead we rely on a statistic</u>

representing the entire qualified wheel." Doc. No. 650 at 82 (citing Savage, 970 F.3d at 256 n.35). As in Savage, the defendant's analysis of the 2016 qualified jury wheel—and indeed his analysis of the 2016 voter list—involved no sampling. Instead, he relies on a "statistic representing the entire" wheel and source list. See also Howell, 939 F.3d at 266 n.4 ("As called for in Weaver, reliable data requires a standard deviation calculation if the entire population is not accounted for, which "indicates how accurately the mean represents sample data.") (emphasis added) (citing Dong Kyu Lee et al., Standard Deviation and Standard Error of the Mean, 68 Korean J. Anesthesiology 220 (2015); Weaver, 267 F.3d at 238 n.6 (requiring calculation of the standard deviation "because it establishes the probability that a sample taken from the jury wheel accurately reflects the composition of the entire wheel")); cf. Ramseur, 983 F.2d at 1233 (noting that defendant's statistical analysis included "two telephone surveys covering a two year period and . . . a total of 739 persons on the juror source list."). Even if the defendant had employed sampling, the fact remains that nothing in Savage somehow requires this Court to rely on a statistical method that no court inside or outside the Third Circuit has ever found to be determinative in the fair-cross-section context.

Finally, it is worth noting that the standard deviation values Mr. Martin calculated for the 2016 qualified jury wheel—15.90 (African Americans) and 4.99 (Hispanics), Martin Aff. ¶¶ 81 (Step 10), 83 (Step 10)—still do not approach the values that the Third Circuit and Supreme Court have found impermissible under this methodology. See Castaneda, 430 U.S. at 496 n.17 (29 standard deviations); Ramseur, 983 F.2d at 1232 (28.9 standard deviations). And while it is true that these figures exceed two to three standard deviations, "the challenging party must establish not only statistical significance, but also legal significance." United States v. Hernandez-Estrada, 749 F.3d 1154, 1165 (9th Cir. 2014) (emphasis in original). To that end, in another recent capital

case in which Mr. Martin served as a defense expert, the district court concluded that differences of 13 and 16 standard deviations for African Americans and American Indians/Alaska Natives, respectively, failed to demonstrate disparities "of legal significance." United States v. Smith, 457 F. Supp. 3d 734, 743 (D. Alaska 2020).  In reaching this conclusion, the court noted that that "disparities calculated under both the absolute disparity method and comparative disparity method f[e]ll within the ranges" that were permissible under circuit precedent. Id. (citing United States v. Maskeny, 609 F.2d 183, 190 (5th Cir. 1980) (declining to focus on standard deviation disparity when the absolute disparities demonstrated by the defendant did not make out a constitutional violation); Orange, 447 F.3d at 799 (declining to consider "other statistical measures . . . when the existing measures, absolute and comparative disparity, fail to establish a prima facie case under existing law")).

Here, too, the defendant's standard deviation analysis results in disparities on the 2016 qualified jury wheel that are in line with those found to be permissible in Smith.  In any event, neither the absolute nor comparative disparities that Mr. Martin calculates for either African Americans or Hispanics are impermissible, as explained above.  Because the defendant has failed to establish impermissible absolute disparities and comparative disparities for either cognizable group, and because the Court is not obliged to conduct a standard deviation analysis, the defendant's fair-cross-section challenge fails at step two of the Duren test.  The defendant cannot show that the representation of African Americans and Hispanics on the 2016 qualified jury wheel was anything other than "fair and reasonable."

      **3.**    **Step Three:  The Defendant Has Failed To Show Systematic Exclusion**

Even if the defendant could meet his burden at step two of the Duren test (which he cannot) he would still need to demonstrate that underrepresentation of African Americans and Hispanics

was "due to systematic exclusion in the jury selection process." Weaver, 267 F.3d at 244 (citing Duren, 439 U.S. at 366). "In Duren, the Supreme Court found systematic exclusion where a state law permitted women to exclude themselves from jury selection simply because of their gender." Howell, 939 F.3d at 269 (citing Duren, 439 U.S. at 367). "Unlike in Duren, where the system that caused the underrepresentation—a state statute—was readily apparent, there is no identifiable cause for the underrepresentation" of African Americans and Hispanics on the jury wheels in the Pittsburgh Division. Id. As a result, to satisfy his burden at step three, the defendant must show "a large discrepancy over time such that the system must be said to bring about the underrepresentation." Weaver, 267 F.3d at 244. To evaluate this showing, the Third Circuit "consider[s] the nature of the system, length of time studied, and 'efforts at reform to increase the representativeness of jury lists' in determining whether the jury selection system caused the under-representation." Howell, 939 F.3d at 269 (quoting Ramseur, 983 F.2d at 1234-35). Again, the defendant cannot meet his burden.

### a.        The Jury Plan is facially neutral

As an initial matter, "[a] selection process that is facially neutral is unlikely to demonstrate systematic exclusion." Savage, 970 F.3d at 259 (quoting Howell, 939 F.3d at 269). As in Savage, the defendant "has not identified anything on the face of the [Western] District's jury selection process that draws racial distinctions." Id. Indeed, "[t]he process relies exclusively on voter registration lists, consistent with other facially neutral processes this Circuit has upheld." Id. at 259-60 (citing Howell, 939 F.3d at 269 (voter registration lists and driving records); Weaver, 267 F.3d at 237, 244–45 (voter registration lists); Ramseur, 983 F.2d at 1229, 1235 (voter registration and licensed driver lists); Savage, 547 F.2d at 215 (voter registration list)).

> **b.      The defendant cannot show systemic underrepresentation over time**

To be sure, the Third Circuit has recognized that facial neutrality does not necessarily end the step-three inquiry where the defendant can establish systemic underrepresentation "over time." Id. at 260.  Here, the Clerk of Court has produced jury data for jury wheels dating back to the mid-1990s, and the defendant's experts have relied on this information in the analyses they conducted.[15] As such, the government does not dispute the duration of the defendant's showing as to this step but rather the substance of his argument.  To that end, as part of his analysis, Mr. Martin compiled statistical data from the Clerk's Office for the period 1995 to 2017, reflecting the percentage of African Americans and Hispanics in the qualified jury wheel at various points in time.  Martin Aff. ¶¶ 178-80, 183-84.[16]

---

[15]      The defendant's two experts have presented a hodgepodge of disparate statistical analyses.  For example, Mr. Martin analyzed the representation of Hispanics on the 2016 source list and wheels, as well as their historical representation over time, see, e.g., Martin Aff. ¶¶ 83, 184, 198, but Dr. Weeks did not analyze this group's representation at all.  Meanwhile, Dr. Weeks conducted various analyses related to the non-cognizable group of all Non-Whites, see, e.g., Weeks Aff. ¶ 60; Mr. Martin had nothing to say about this group.  Mr. Martin also combined non-Hispanic African Americans and Hispanic African Americans into the single group of African Americans, see Palmer Aff. ¶ 16 n.5, but Dr. Weeks primarily focused on non-Hispanic African Americans.  See, e.g., Weeks Aff. ¶ 62.  In addition, Mr. Martin relied on data contained in standard AO-12 and JS-12 forms, see Martin Aff. ¶ 178, while Dr. Weeks refused to do the same.  See Weeks Aff. ¶ 78.  Mr. Martin used a (flawed) geocoding/adjustment methodology, see Martin Aff. ¶¶ 46-51, while Dr. Weeks made no effort whatsoever to estimate race and ethnicity for any data source (i.e., he focused only on self-reported data from returned qualification questionnaires).  The defendant makes no effort to reconcile these differing and, in some ways, conflicting approaches, and his argument section is devoid of specific discussion about any particular approach or set of data.  He relies instead on the simplistic argument that everything his experts have dumped into their affidavits establishes violations under the prevailing legal tests.  See Doc. No. 650 at 72-84.  This Court, however, is under no obligation to parse the defendant's affidavits to discern a cohesive analytical framework and instead can rely on data from qualified wheels, as Savage permits.  See 970 F.3d at 255.

[16]      Mr. Martin attached to his affidavit the source documents for his compiled historical statistics, although several of the figures he reports in his affidavit do not align with what the data in the supporting documents shows.  For example, Mr. Martin states that an AO-12 dated May 11, 1998, reflects 5.38% African Americans on the qualified wheel at the time.  Martin Aff. ¶ 178.  Review of the AO-12 attached to his affidavit, however, shows that African Americans comprised 27 of the 505 people sampled from the qualified wheel, which the form calculates as 5.3%, or 5.35% if rounded to one more decimal place.  See Martin Aff. Exh. D at 2.  There are similar minor differences—i.e., hundredths of a percent—in Mr. Martin's historical summary.  None of these discrepancies, however, affects the historical analysis, and the government does not object to the Court's use of what Mr. Martin reports in paragraph 178 of his affidavit.

As to African Americans, Mr. Martin's analysis shows that the absolute disparities for this group over the twenty-two-year period fell in the range of .83% to 3.49%. These figures exclude the AO-12 for September 23, 1999, which, as Mr. Martin acknowledges, actually reflects an overrepresentation of African Americans. Id. ¶ 180. Each of these historical absolute disparity values falls within the range of permissible disparities under controlling precedent. See, e.g., Savage, 970 F.3d at 255 (collecting absolute disparity cases). The same is true for the comparative disparities of the defendant's historical figures for African Americans, which range between 13.35% and 50.72%. See, e.g., id. (collecting comparative disparity cases).

The defendant's historical analysis as to Hispanics is even weaker. According to Mr. Martin, with the exception of one data point in 1998 (reflecting a modest .12% absolute disparity and 23.80% comparative disparity), Hispanics were consistently overrepresented on the qualified jury wheel from 1995 to 2013. Martin Aff. ¶ 184. And for the two data points he cites after 2013, both reflect entirely permissible absolute and comparative disparities: .46% and 41.26%, respectively, in 2015; and 0.38% and 32.22%, respectively, in 2017.[17]

Put differently, at any point going back to 1995, the data available to the Clerk's Office as it related to the qualified jury wheels reflected entirely permissible disparities for both cognizable groups. At no time, then, would the Clerk's Office have examined this data and had reason to believe that systemic underrepresentation was occurring in a manner that violated federal law.[18] These statistics stand in stark contrast to cases where courts have found systemic

---

[17]     Dr. Weeks presents a superficially similar historical analysis, but unlike Mr. Martin, he is inconsistent in the data types he reports going back to 1994. He cites, without an articulated rationale, some data from returned questionnaires, some data from qualified wheels, and even one data point from the single grand jury venire in this case. Weeks Aff. Table 17. The defendant does not articulate how this inconsistent representation is legally permissible. Regardless, the disparity figures Dr. Weeks reports are generally in line with those reported by Mr. Martin and likewise fail to show legally cognizable systemic underrepresentation over time a significant period of time.

[18]     The same historical takeaway applies to African-American Males, though they do not constitute a legally cognizable group for this analysis. See Martin Aff. ¶ 182.

underrepresentation over time.  See, e.g., Duren, 439 U.S. at 362-63 (39% absolute disparity between female population and female percentage of weekly venires over an eight-month period). As to African Americans and Hispanics, Mr. Martin's historical analysis reflects no single data point outside the range of what the Third Circuit has found to be impermissible.  Yet the defendant asks this Court to invalidate the entire Jury Plan and dismiss the Superseding Indictment.  That is simply not the law, and the defendant points to no case supporting such an unjustified request.[19]

Moreover, as Dr. Palmer found, the likely greatest contributor to the disparities in African American and Hispanic representation on the 2016 qualified jury wheel is the combination of low response rates amongst each group to juror qualification questionnaires and the higher incidence of undeliverable questionnaires compared to White prospective voters.  Palmer Aff. ¶¶ 26-27.  But courts have repeatedly held that systematic exclusion under Duren "does not occur simply because a facially neutral disqualification criterion disproportionately impacts a particular group."  United States v. Charles, 2021 WL 2457139, at *4 (S.D.N.Y. June 16, 2021) (quoting United States v. Barlow, 732 F. Supp. 2d 1, 40 (E.D.N.Y. 2010)); see also United States v. Neilly, 2021 WL 3913559, at *4 (S.D.N.Y. Sept. 1, 2021) ("[F]ailing to follow up with potential jurors who do not respond to the juror qualification questionnaire [is a] facially neutral practice[].").

---

[19]    Dr. Weeks also conducted other analyses spanning much shorter periods of time—a review of a compilation of grand jury venires between 2015 and 2020 and a compilation of qualified jury wheels between 2015 and 2017. See, e.g., Weeks Aff. Table 4, Table 15. Again, the defendant fails to specify how these statistics, which reflect absolute and comparative disparities in line with those approved in Savage, 970 F.3d at 258, are relevant to his systematic argument.  He also does not establish the legal propriety of Dr. Weeks's adding data together that spans multiple master wheels to calculate a single disparity for the entire set, particularly where each individual data set is already the result of non-random qualification processes (which Dr. Weeks also makes no effort to address).  See Rioux, 97 F.3d at 655.  Moreover, the 2015-2020 compilation of grand jury venire data includes fewer than 1,200 people—a particularly small sample—thus limiting its utility.  See Moultrie v. Martin, 690 F.2d 1078, 1083 (4th Cir. 1982) ("[I]t is axiomatic in statistical analysis that the precision and dependability of statistics is directly related to the size of the sample being evaluated.").  Regardless, because the defendant cannot show systematic underrepresentation based on the qualified wheels between 1995 and 2017, smaller data sets, covering shorter periods of time cannot alter that conclusion.

More specifically, a defendant cannot establish a "Sixth Amendment violation based on people's choice not to return the questionnaire or the undeliverability of their mail." Charles, 2021 WL 2457139, at *4 n.6; see also United States v. Ortiz, 897 F. Supp. 199, 204 (E.D. Pa. 1985) ("Hispanics were found to be less likely to return census questionnaires and thus presumably less likely to send back jury questionnaires.  This . . . supports the finding that unlike Duren it was not the court's use of voter registration lists or the jury selection system itself which may have resulted in underrepresentation of Hispanics."); United States v. Burgess, 2015 WL 13674173, at *4 (E.D. Wash. Feb. 19, 2015) (holding that underrepresentation due to lower response rate was not due to jury-selection system itself); United States v. Murphy, 1996 WL 341444, at *5 (N.D. Ill. June 18, 1996) ("The jury selection system . . . is not excluding African-Americans as a group, but many African-American individuals are excluding themselves by not responding to jury questionnaires."); cf. Rioux, 97 F.3d at 658 ("The inability to serve juror questionnaires because they were returned as undeliverable is not due to the system itself, but to outside forces, such as demographic changes.").  Thus, when the cause of exclusion "is an external force, not an inherent flaw within the Jury Plan," any underrepresentation is not "systematic." United States v. Tagliaferro, 2021 WL 1172502, at *4 (S.D.N.Y. Mar. 29, 2021).

This principle applies equally with respect to any disparities that potentially arise as a result of a district's decision to use voter lists as the sole source for its jury-selection process.  See Howell, 939 F.3d at 271-72 (Porter, J., concurring) ("Congress specifically approved the use of such lists even though it was recognized that persons who chose not to register would be excluded from the jury selection process.") (quoting United States v. Cecil, 836 F.2d 1431, 1448 (4th Cir. 1988)).  The defendant has not attempted to identify any "inherent flaws" in the 2009 Jury Plan— as opposed to "external factors" like disproportionate voter registration or failure to return

questionnaires.  As such, the defendant cannot show sufficient underrepresentation over a period of time.

**c.      Reform efforts codified in the 2020 Jury Plan further undermine the defendant's fair-cross-section challenge**

Finally, when analyzing <u>Duren</u>'s third step, courts look to "efforts at reform to increase the representativeness of jury lists."  <u>Howell</u>, 939 F.3d at 269 (quoting <u>Ramseur</u>, 983 F.2d at 1234-35).  The Third Circuit "presume[s] that the process is legitimate where the government's efforts seem likely to create a representative jury."[20]  <u>Id.</u> at 270.  In 2020, the Western District of Pennsylvania amended its Jury Plan and added one substantive provision related to unreturned and undeliverable questionnaires:

> Additionally, for each juror qualification mailing returned by the Post Office as undeliverable and/or for each person who fails to complete and/or respond to the juror qualification questionnaire within 21 days of the date of mailing, the Clerk shall draw at random, the name of a resident whose address is in the same zip code to which this original juror qualification mailing had been sent. The Clerk shall then mail a paper version of the juror qualification questionnaire to that resident and, thereafter, follow the procedures set forth in this section of the Plan with respect to that new prospective juror.

2020 Jury Plan § 9.  The district's revised Jury Plan was approved by the Third Circuit on February 6, 2020, and it became effective on March 2, 2020.

This change to the earlier 2009 Jury Plan is notable because, as Dr. Palmer found, African Americans and Hispanics are much less likely to return juror qualification questionnaires than are Whites.  These groups are also much more likely to be sent questionnaires that are returned as undeliverable.  Palmer ¶¶ 26-27.  Moreover, as the defendant's expert Dr. Weeks notes, the African-American population in particular is often highly concentrated within zip codes—

---

[20]      The fact that a court engages in reform efforts that have the effect of increasing representativeness does not mean, however, that its earlier practices were constitutionally deficient.  <u>See</u> <u>Howell</u>, 939 F.3d at 272 (Porter, J., concurring) (citing <u>Ramseur</u>, 983 F.2d at 1235).

particularly in Allegheny County, the county with the largest percentage of African Americans in the Pittsburgh Division.  Weeks Aff. ¶ 39 ("In fact, 70% of the adult Black population in Pittsburgh lives in just 10 of the city's zip codes.").  Even the group of law professors who submitted a letter in support of the defendant's motion agree that undeliverable questionnaires disproportionately affect minority representation in jury pools: "Importantly, the rate of undeliverable summons [sic] is usually higher in communities of color.  The power of undeliverables to reduce jury diversity has been recognized by courts, jury scholars, and federal circuit court commissions charged with addressing racial equity in their court systems."  Doc. No. 650-1 ("Prof. Report") at 12-13 (footnotes omitted).[21]

As such, uniform authority, which includes the defendant's own experts, underscores that the effect of the revised 2020 Jury Plan likely is to increase the representation of these cognizable groups—particularly African Americans—by sending new questionnaires to individuals residing in the same zip code as the original intended recipient.  Indeed, one district expressly recognized the salutary effect of such zip-code based mailings in its current jury plan:

> In an effort to increase the likelihood that the qualified wheel represents a fair cross section of the community, the Clerk will conduct a supplemental draw for all questionnaires returned as undeliverable by the United States Postal Service (USPS) and those to which no response has been received after the Clerk has sent a follow-up questionnaire to the person who has not responded.
>
> For each juror qualification questionnaire returned as undeliverable or to which no response has been received after the mailing of a follow-up questionnaire, the Clerk, as soon as practicable, shall mail a new juror qualification form or letter with instructions to complete the juror qualification form electronically to another address within the same zip code as the questionnaire returned undeliverable or to which no response has been received after the mailing of a follow-up questionnaire. The Clerk shall randomly draw these names for additional juror qualification forms from the master jury wheel . . . .

---

[21]     To help address the issue of undeliverable mailings, the professors recommend that courts cross-reference the names on the master jury wheel and qualified jury wheel with the National Change of Address database.  Prof. Report at 22.  Mr. Martin acknowledges that this district already employs that practice as to the master wheel.  Martin Aff. ¶¶ 24-25.

D.R.I. Jury Selection Plan § II(B)(3) (eff. July 10, 2019), available at https://www.rid.uscourts.gov/sites/rid/files/documents/Jury%20Selection%20Plan%20Revised% 202019.pdf (last visited December 28, 2021) (emphasis added); Exh. 1 at 308.

In addition, when the district court in United States v. Green—a case the defendant cites repeatedly, Doc. No. 650 at 18-21, 98-100—concluded that the District of Massachusetts's then-applicable jury plan resulted in the underrepresentation of African Americans in violation of the JSSA, it ordered the Clerk of Court to employ the exact same zip-code based process that the court now uses in this district, the Western District of Pennsylvania. 389 F. Supp. 2d 29, 79 (D. Mass. 2005) (noting that the Clerk "will send out additional summonses and questionnaires to individuals on that supplemental list to replace undeliverable or unresponded to summonses from the same zip code"). Not surprisingly, the defense experts in Green had identified a correlation that is consistent with Dr. Palmer's findings (and the defendant's experts) in the present case. Id. at 49 ("[D]efendants used zip code data to focus on precisely which cities and towns are suffering from the highest rates of undeliverables and nonresponses. They found these to be the cities and towns in the Eastern Division with the most African-American (and poor) residents."); see also Ortiz, 897 F. Supp. at 204 ("[M]any Hispanics are poor. Like other poor people, they are apt to move more frequently than the more affluent, with their mail not being forwarded to their new address. Secondly, poor people in general have less reliable mail service."); Israel v. United States, 109 A.3d 594, 604 (D.C. 2014) ("The expert reports that were before the court indicated that African Americans were overrepresented among those whose summonses were returned to the Juror Office as undeliverable . . . ."); United States v. Barnes, 1996 WL 684388, at *5 (D. Conn. June 26, 1996) ("[U]nderrepresentation . . . results from the high rate of questionnaires mailed to Hispanic communities which are returned as undeliverable.").

35

Perhaps recognizing that the district's 2020 Jury Plan reform further undercuts his argument at step three of <u>Duren</u>, the defendant misapprehends that the First Circuit somehow rejected this zip-code-based mailing protocol when it granted mandamus in <u>Green</u>.  Doc. No. 650 at 120.  According to the defendant, the court of appeals found that the district court's chosen remedy for a JSSA violation was itself a violation of the JSSA.  <u>Id.</u>  He is wrong: the First Circuit simply concluded that the district judge in <u>Green</u> did not have the unilateral authority to dictate changes to the district's jury plan because, pursuant to the JSSA, that authority rested with the District of Massachusetts as a whole.  <u>In re United States</u>, 426 F.3d 1, 5-9 (1st Cir. 2005).  Having reached this conclusion, the court of appeals expressly <u>declined</u> to address the propriety of the zip-code-based remedy on substantive grounds.  <u>Id.</u> at 9 (noting that "the government has questioned whether the district court's remedy would comport with the statute even if embodied in a properly adopted plan" but refusing to pre-judge the question before the district as a whole had an opportunity to decide whether and how to amend the jury plan).

Any doubt as to the legitimacy of the zip-code-based supplemental mailing protocol was laid to rest only one year after the decisions in <u>Green</u> and <u>In re United States</u>, when, in 2006, the District of Massachusetts formally amended its jury plan pursuant to the JSSA and added the zip-code-based protocol for undeliverable questionnaires—a change the defendant acknowledges only in passing.  Doc. No. 650 at 19 n.10.  This protocol remains in effect in the district 15 years later. D. Mass. Jury Plan § 8(a) (eff. Nov. 1, 2015), <u>available at</u> https://www.mad.uscourts.gov/ general/pdf/a2015/11%2001%202015%20D-MA%20General%20Order%2015-3%20Jury% 20Plan%20-%20signed.pdf (last visited Dec. 28, 2021); Exh. 1 at 236.  Notably, pursuant to the JSSA, the First Circuit was required to (and did) approve this change to the district's plan.  <u>Id.</u> at 231; <u>see</u> 28 U.S.C. § 1863(a).  It would be illogical, then, for the First Circuit to have rejected this

approach to achieve greater representation in <u>In re United States</u>, as the defendant argues, only to turn around and immediately approve the allegedly problematic practice the next year.

The District of Massachusetts is not the only other district that has implemented this protocol to achieve greater representation on its jury wheels.  Indeed, a total of seventeen courts, including the District of Massachusetts and the Western District of Pennsylvania, have codified a zip-code-based protocol for sending supplemental questionnaires when original questionnaires are undeliverable, unreturned, or both.  <u>See</u> N.D. Cal. Jury Plan § 8 (eff. Aug. 7, 2017) (undeliverable and unreturned questionnaires); S.D. Cal. Jury Plan § 3.02 (eff. June 21, 2021) (undeliverable and unreturned questionnaires); D. Conn. Jury Plan § 8 (eff. July 27, 2009) (undeliverable questionnaires); N.D. Ill. Jury Plan § 7(b) (eff. Jan. 8, 2020) (undeliverable questionnaires); S.D. Ind. Jury Plan § 11(c)-(d) (eff. Apr. 11, 2014) (undeliverable and unreturned questionnaires); N.D. Iowa Jury Plan § 6(e) (eff. Feb. 21, 2017) (undeliverable questionnaires); D. Kan. L.R. 38.1(g)(2) (eff. Mar. 17, 2018) (undeliverable and unreturned questionnaires); M.D. La. Jury Plan § 8 (eff. May 19, 2021) (undeliverable and unreturned questionnaires); D. Me. Jury Plan § V(D) (eff. July 12, 2021) (undeliverable and unreturned questionnaires); E.D. Mich. Jury Plan § k(1) (eff. Mar. 18, 2013) (undeliverable questionnaires); W.D. Mo. Jury Plan at 4 (eff. Apr. 8, 2019) (undeliverable questionnaires); E.D. Okla. Jury Plan at 3 (eff. Mar. 3, 2020) (undeliverable questionnaires); D.R.I. Jury Plan § II(B)(3) (eff. July 10, 2019) (undeliverable and unreturned questionnaires); W.D. Va. Jury Plan (undated) (unreturned questionnaires); E.D. Wash. Jury Plan § 3.02(b) (eff. Jan. 1, 2017) (undeliverable and unreturned questionnaires).[22]  Pursuant to 28 U.S.C. § 1863(a), the plans containing these provisions were approved by a total of ten courts of appeals: the First Circuit (D. Mass., D.R.I., D. Me.), Second Circuit (D. Conn.), Third Circuit (W.D. Pa.),

---

[22]    These jury plans are compiled alphabetically in Exhibit 1.

Fourth Circuit (W.D. Va.), Fifth Circuit (M.D. La.), Sixth Circuit (E.D. Mich.), Seventh Circuit
(N.D. Ill., S.D. Ind.), Eighth Circuit (N.D. Iowa, W.D. Mo.), Ninth Circuit (N.D. Cal., S.D. Cal.,
E.D. Wash.), and Tenth Circuit (D. Kan., E.D. Okla.).[23]

As the foregoing makes clear, when the Western District of Pennsylvania revised its Jury
Plan in 2020, it joined a growing list of districts across the country that allow for the zip-code-
based mailing of supplemental questionnaires.  Such a reform will likely help ensure greater
representation of certain demographic groups—principally African Americans—who tend to live
in more concentrated areas and who are both less likely to return juror qualification questionnaires
and more likely to be sent questionnaires that are undeliverable.[24]  As such, the district's "effort[]
at reform" further undermines the defendant's already hobbled fair-cross-section claim.

In sum, consideration of the nature of the system, length of time studied, and efforts at
reform each support a finding that the defendant has failed to meet his burden at step three of the
Duren test.  The Court should therefore reject the defendant's Sixth Amendment challenge.

B.    **The Defendant Has Failed To Establish An Equal Protection Violation**

In addition to his fair-cross-section argument under the Sixth Amendment, the defendant
raises a corresponding equal protection claim.  Although "[t]he Fifth Amendment . . . does not

---

[23]    Indeed, at least two circuits have specifically commented on the undeliverable rate's effect on representation.
See First Circuit Jury Plan Committee Recommended Best Practices, at 4 (adopted Apr. 11, 2019) ("[T]he high
undeliverable rate is likely to have a negative impact on representativeness."); Ninth Circuit Jury Trial Improvement
Committee, First Report on Goals and Recommendations at 5 (adopted May 2004) (recognizing that "transitory
populations" and "the high number of undeliverable questionnaires" "have a negative impact on the extent to which
the juror source lists accurately represent populations in the districts").
[24]    Despite the uniform authority as to the propriety and purpose of zip-code-based supplemental mailings, the
defendant still believes he is entitled to yet additional discovery—specifically, records from members of the district
court and a legal representative of the Administrative Office of the United States Courts related to the reasoning behind
the amendment.  Doc. No. 650 at 19 n.10.  The Court has already denied this request, see Doc. No. 679, and the
defendant fails entirely to address the shortcomings in his original request, including an utter lack of specificity and
the privilege implications of the third-party discovery he demands.  Id.  Moreover, given that his own experts agree
that the purpose of such amendments is to increase representation, his request to issue yet more process pursuant to
Rule 17(c) is baseless—particularly where the 2020 amendment is only one of multiple reasons why the defendant's
Sixth Amendment challenges fails.  This Court should reject it.

contain an equal protection clause as does the Fourteenth Amendment which applies only to the states," the Supreme Court has applied the equal protection guarantee against the United States with equivalent force under the Due Process Clause of the Fifth Amendment. Bolling v. Sharpe, 347 U.S. 497, 499 (1954).[25]  The Constitution "requires the eradication of 'racial discrimination in the procedures used to select the venire from which individual jurors are drawn.'" Ramseur v. Beyer, 983 F.2d 1215, 1230 (3d Cir. 1992) (quoting Batson v. Kentucky, 476 U.S. 79, 86 (1986)). In contrast to Sixth Amendment claims, the Supreme Court has held that for equal protection purposes, "substantial underrepresentation of [a cognizable] group constitutes a constitutional violation . . . if it results from purposeful discrimination." Castaneda, 430 U.S. at 493 (emphasis added); see also Howell, 939 F.3d at 265 (noting that to succeed on an equal protection claim "a showing of discriminatory purpose is essential") (citing Duren, 439 U.S. at 368 n.26).  Indeed, "an official act is not unconstitutional solely because it has a racially disproportionate impact." Castaneda, 430 U.S. at 493.

Notwithstanding that equal protection challenges require additional proof of discriminatory intent, the test applied under the Fifth Amendment is similar to the one used in the fair-cross-section context. See, e.g., United States v. Tuttle, 729 F.2d 1325, 1327 n.2 (11th Cir. 1984) ("The prima facie case under the equal protection clause is 'virtually identical' to that under the [S]ixth [A]mendment.") (quoting Machetti v. Linahan, 679 F.2d 236, 241 n.6 (11th Cir. 1982)).

To establish a presumption that there has been an equal protection violation, a defendant must establish three things.  First, the defendant must point to a "group . . . that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied." Castaneda, 430 U.S. at 494 (citing Hernandez v. Texas, 347 U.S. 475, 478-79 (1954)).  Second,

---

[25]     Thus, although the defendant invokes the Fourteenth Amendment in his equal protection argument, Doc. No. 650 at 77, the analysis is no different when properly construed as a challenge arising under the Fifth Amendment.

"the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time."  Id.  And third, "a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing."  Id.  If a defendant establishes a presumption of purposeful discrimination, the burden shifts to the government to rebut the presumption.  Id. at 495.  As with his Sixth Amendment argument, the defendant's equal protection claim fails at step two and step three, and as a result the burden never shifts to the government.

### 1.   Step One:  The Defendant Has Identified Only Two Cognizable Groups

The analysis as to whether a particular group is "cognizable" is the same for equal protection and fair-cross-section claims.  See Ramseur, 983 F.2d at 1230.  For the reasons outlined above, see supra pp. 8-14, the defendant has only identified two cognizable groups for purposes of his equal protection challenge:  African Americans and Hispanics.  See Ramseur, 983 F.2d at 1230 ("African-Americans are unquestionably a constitutionally cognizable group."); Weaver, 267 F.3d at 240 ("African-Americans and Hispanics are 'distinctive' groups for the purposes of a fair cross-section analysis.").

### 2.   Step Two:    The Defendant Has Failed To Demonstrate Underrepresentation Over A Significant Period Of Time

At step two of the equal protection analysis, the defendant must show underrepresentation over a significant period of time.  This step essentially combines step two of the Duren test—i.e., whether a cognizable group's representation is fair and reasonable—with a component of step three of the same test—i.e., the duration of time covered by the analysis.  See, e.g., Tuttle, 729 F.2d at 1327.  The government thus incorporates by reference the corresponding portions of its Sixth Amendment argument.  See supra pp. 14-32.  As before, the Court should focus its analysis

on the 2016 qualified jury wheel, for which there is self-reported race and ethnicity information. The government does not contest the Court's use of the defendant's estimates of the baseline jury-eligible population of African Americans and Hispanics in the Pittsburgh Division from the 2018 ACS 5-Year Average—6.88% and 1.22%, respectively. Martin Aff. ¶ 42.

Again, the defendant cannot show legally significant underrepresentation of either cognizable group on the 2016 qualified jury wheel. The absolute and comparative disparities for African Americans (2.99 and 43.46%, respectively) and Hispanics (.40% and 32.79%, respectively) are just as legally permissible in the equal protection context as they are under the Sixth Amendment. See Savage, 970 F.3d at 258 (summarizing cases and examples of permissible disparities under both methodologies).

Moreover, although the Third Circuit relied on a third disparity methodology—standard deviation analysis—when it evaluated an equal protection claim in Ramseur, the present case is distinguishable. The court's use of a methodology a single time does not equate to a mandate that courts must use it every time, and Ramseur simply does not require courts in this circuit to use standard deviation analysis when evaluating all equal protection arguments.[26] In addition, the Ramseur court turned to this methodology only after concluding that both the absolute and comparative disparity analyses resulted in "borderline" disparities. 983 F.2d at 1232.[27] Here, neither standard methodology results in similarly "borderline" disparities under current precedent—let alone both—rendering sole reliance on standard deviation misplaced. See Orange,

---

[26]    Indeed, in Castaneda—the Supreme Court's seminal equal protection case in this area of law—the only discussion of the standard deviation methodology appears in dicta in a footnote. 430 U.S. at 496 n.17.

[27]    The "borderline" absolute disparity in Ramseur was 14.1% for African Americans—more than 10% greater than the 2.99% absolute disparity here. Likewise, although the Ramseur court deemed a comparative disparity of about 40% as "borderline," the Third Circuit more recently clarified in Savage that such figure is no longer near the permissible margin. 970 F.3d at 258 ("But even if Ramseur lent some support when Savage filed his briefs, it is less helpful in the wake of Howell. There we determined that a comparative disparity of 54.49%—higher than both Ramseur's 40% and Savage's 50.24%—was not enough to tip the scales.").

447 F.3d at 799 (declining to consider "other statistical measures . . . when the existing measures, absolute and comparative disparity, fail to establish a prima facie case under existing law"). Finally, even employing the standard deviation disparities that Mr. Martin found—15.90 (African Americans) and 4.99 (Hispanics), Martin Aff. ¶¶ 81 (Step 10), 83 (Step 10)—produces results below the problematic values in <u>Ramseur</u> (28.9 standard deviations) and <u>Castaneda</u> (29 standard deviations) and in the same range as those permitted by the district court in <u>Smith</u> (13 to 16 standard deviations).[28]

Lastly, the defendant cannot show sufficient underrepresentation over a significant period of time.  As with the fair-cross-section analysis, Mr. Martin's own long-term historical figures reflect legally permissible absolute disparities, comparative disparities, and standard deviation disparities for African Americans dating back to 1995, including one year in which they were overrepresented.  Martin Aff. ¶ 180.  Likewise, Hispanics appear to have been historically <u>overrepresented</u> between 1995 and 2013, with more recent figures falling readily into permissible ranges.  <u>Id.</u> ¶ 184.  Thus, as with the Sixth Amendment analysis, the defendant cannot show legally impermissible underrepresentation of either cognizable group over a significant period of time, and his claim fails at step two of the equal protection analysis.[29]

---

[28]    The defendant cites <u>Alston v. Manson</u>, 791 F.2d 255, 248 (2d Cir. 1986), for the permissibility of employing standard deviation analysis in the equal protection context.  Doc. No. 650 at 78.  <u>Alston</u>, which involved Connecticut's use of racially biased population quotas for jury-service purposes, did not hold that this methodology was required, and it predates the Second Circuit's repudiation of standard deviation analysis as applied to qualified wheels—which, as noted, are the product of external, non-random factors.  <u>Rioux</u>, 97 F.3d at 655.  As a result, to the extent the district court in <u>United States v. Scott</u>, 2021 WL 2643819, at *12 (S.D.N.Y. June 28, 2021)—another case cited by the defendant, Doc. No. 650 at 78—relied on this methodology to evaluate an equal protection claim focused on the qualified wheel, the court's opinion on this point runs afoul of binding Second Circuit precedent in <u>Rioux</u>.

[29]    The same is true for the non-cognizable group of African-American Males.  <u>See</u> Martin Aff. ¶¶ 82 (Step 10) (14.62 standard deviations for 2016 qualified wheel), 182 (historical standard deviations between 12.07 and 14.25).

### 3. Step Three: The Jury Plan Is Racially Neutral And Not Susceptible To Abuse

Because the defendant has not made a sufficient showing at the second step of the equal protection analysis—namely, that there has been sufficient underrepresentation of African Americans and Hispanics over a substantial period of time in the Pittsburgh Division—the Court need not address the third and final step. Even considering this final prong, however, the defendant cannot show that "the procedure which is being used to select the jurors is 'susceptible of abuse or is not racially neutral.'" Ramseur, 983 F.2d at 1231 (quoting Castaneda, 430 U.S. at 494).

Without question, the district's use of the voter registration list is a racially neutral mechanism for filling the master and qualified jury wheels. See id. at 1233 ("[A]n examination of the source lists reveals that the mechanism used to create the source lists was facially neutral with respect to race. Essex County, New Jersey utilized voter registration and Department of Motor Vehicle lists to create its jury venire."). The defendant points to no aspect of the Jury Plan that is "susceptible to abuse" by unscrupulous actors within the Clerk's Office. Indeed, as in Ramseur, the Jury Plan's routinized process utilizes "facially neutral criteria and allow[s] no opportunity for subjective or racially motivated judgments." Id. As such, the district's Jury Plan stands in stark contrast to the subjective selection mechanisms that have been invalidated in past cases. See, e.g., Castaneda, 430 U.S. at 497 (concluding that "highly subjective" key-man system was "susceptible to abuse as applied"); Alexander v. Louisiana, 405 U.S. 625, 630 (1972) (noting that jury commissioners had "a clear and easy opportunity for racial discrimination"); United States v. Yeager, 465 F.2d 272, 280 (3d Cir. 1972) (invalidating jury system that permitted "tainted subjective decision[s]"). No such subjectivity exists here, and in fact the Supreme Court has noted that "random selection methods similar to the federal system would probably avoid most of the potential for abuse found in the key-man system." Castaneda, 430 U.S. at 497 n.18.

The defendant does not claim that the Jury Plan is "susceptible of abuse or not racially neutral."  Instead, he rests his argument on the following dicta from a footnote in Ramseur, in which the Third Circuit quoted yet more dicta from the New Jersey Supreme Court's earlier decision in the same case:

> We may assume, although defendant did not attempt to prove, that a major reason for the apparent underrepresentation of blacks in Essex County jury pools is the likelihood that proportionally more blacks than whites do not register to vote and do not have driver's licenses.  Knowing this, jury officials may not sit by idly in the belief that no constitutional complaint may be lodged against a random selection mechanism that relies upon facially "neutral" voter and DMV lists.  That belief would be mistaken, for such inaction in the face of knowledge of the system's underrepresentativeness would indicate that the underrepresentation has a systematic and partly subjective cause, has continued over a significant period of time, and is not being counteracted by efforts at reform.  Thus, even though the numbers shown here are arguably within acceptable limits, if they were to continue over a significant period of time, the continued exclusive reliance by jury officials on the voter and DMV lists could become constitutionally suspect.

983 F.2d 1234 n.20 (quoting State v. Ramseur, 524 A.2d 188, 239 (N.J. 1987)).  According to the defendant, because the Clerk's Office (and by extension the district court) were aware of underrepresentation of certain cognizable groups, over a lengthy period of time, its inaction amounts to purposeful discrimination for equal protection purposes and satisfies step three of the test.  Doc. No. 650 at 79-80.

Aside from the obvious fact that the Third Circuit has never revisited its footnoted reference to this language, the defendant's reliance on it is flawed for several reasons.  First, Ramseur involved a challenge to a state jury-selection system—not a federal system implemented pursuant to the JSSA.  The JSSA codifies an affirmative preference for the use of voter lists, 28 U.S.C. § 1863(b)(2), and "courts have consistently held that using voter-registration lists alone is sufficient."  Howell, 939 F.3d at 271-72 (Porter, J., concurring) (citing United States v. Guzman, 468 F.2d 1245, 1247-49 (2d Cir. 1972) (approving the use of voter-registration lists as the sole

source of names for jury selection); <u>United States v. Odeneal</u>, 517 F.3d 406, 412 (6th Cir. 2008) (approving jury administrator's use of voter-registration lists, noting these "are the presumptive statutory source for potential jurors"); <u>United States v. Greatwalker</u>, 356 F.3d 908, 911 (8th Cir. 2004) (finding no systematic exclusion from jury selection plan that draws its pools of prospective jurors randomly from lists of persons who voted in the last presidential election)).   Indeed, "Congress specifically approved the use of such lists <u>even though it was recognized that persons who chose not to register would be excluded from the jury selection process.</u>" <u>Id.</u> (quoting <u>United States v. Cecil</u>, 836 F.2d 1431, 1448 (4th Cir. 1988)) (emphasis added).  To the extent Congress understood that people "who chose not to register" to vote would not be included in the pool of potential jurors when voter lists were used, it nevertheless enacted the JSSA.  <u>Cf.</u> <u>Schanbarger v. Macy</u>, 77 F.3d 1424 (2d Cir. 1996) (per curiam) ("[A] jury venire drawn from voter registration lists violates neither the Sixth Amendment's fair cross-section requirement nor the Fifth Amendment's guarantee of Equal Protection."); <u>United States v. Biaggi</u>, 909 F.2d 662, 677 (2d Cir. 1990) (affirming district court's finding that "use of the voter registration list as the sole source of prospective jurors had not been shown to deprive the Jury Plan of racial neutrality or render it susceptible to abuse").[30]  As a result, the New Jersey Supreme Court's rationale as it related to the challenged <u>state</u> jury-selection system in <u>Ramseur</u> is inapposite as applied to JSSA challenges.

Second, as noted in the step two analysis, the defendant cannot show that the Clerk's Office "knew" about legally meaningful underrepresentation when no such underrepresentation existed over time.  Again, even according to the defendant's expert, Mr. Martin, all of the calculated disparities as to African Americans and Hispanics, dating back to 1995, reflected either a legally

---

[30]     According to the defendant's own experts, more than half of all districts currently rely on voter registration lists as the sole source for their jury plans.  <u>See</u> Prof. Report at 6 ("[F]orty-three (43) federal district courts reject exclusive reliance on voter registration lists.").

permissible disparity or, particularly as to Hispanics, an overrepresentation.  See Martin Aff. ¶¶ 180, 184.

Finally, to bolster his argument under Ramseur's dicta that jury officials were aware of problems of underrepresentation, the defendant points to a variety of additional point-in-time sources beyond the statistics put forward by his experts.  For example, the defendant highlights recommendations made by a Third Circuit task force in a 1997 report, including that districts within the circuit should supplement their source lists to achieve greater representation of minority groups.  Doc. No. 650 at 14-16 (citing Report of the Third Circuit Task Force on Equal Treatment in the Courts, 42 Vill. L. Rev. 1355 (1997) ("Task Force Report").  The defendant omits, however, the results of a survey conducted by the task force, which found that for juries convened in September and October 1996, "[i]n New Jersey and the Western District of Pennsylvania, the percentage of minority jurors was essentially the same as the percentage of minorities in the population of the district, jury division or vicinage."  Task Force Report at 1804.

Moreover, as one Third Circuit judge recently concluded, penalizing courts for examining issues related to jury representation—as the defendant would have the Court do here—even when they show "constitutionally sufficient" representation, is "weak tea."  Howell, 939 F.3d at 272 (Porter, J., concurring) ("In support of systematic exclusion, Howell argues that the County's problems with 'non-representative jury venires were widely known well before' Howell's trial, largely because the County and some academics studied it.  This is weak tea.  The fact that the County studied this issue does not show that the County knew its selection system was constitutionally unsound; rather, it may simply show that the County was responsibly trying to determine the system's soundness or seeking to improve (already constitutionally sufficient) representation.").  Mr. Martin attaches to his affidavit a 2012 memorandum from the Clerk of

Court, in which a jury official, Terri Morder, calculated the absolute and comparative disparities for African Americans on the qualified jury wheel (2.27% and 34%, respectively), concluding that "the percentages computed for each division under either method do not demonstrate the type of 'marked' or 'gross' disparities that have been found necessary to establish that the representation of a group is not fair and reasonable" under the then-prevailing decision in Weaver.  Martin Aff. Exh. C.  This type of periodic review demonstrates the Clerk's conscientious efforts to adhere to prevailing law—and not, as the defendant argues, evidence of impermissible knowledge of underrepresentation.

This case, then, is much different than what the Third Circuit confronted in Yeager, where state jury officials reverted to using voting lists after a judge on the same court affirmatively told them that the system was generating improper underrepresentation.  465 F.2d at 278 n.15 ("[T]he general selection of the petit jury lists is potentially suspect because the Jury Commissioners persisted in using the voting lists after they were told by the Assignment Judge that the lists were not producing a cross-section of the community.").

The defendant also cites to a December 2019 audit of the state's voter registration system by the Pennsylvania Department of State, as well as various legal challenges and criticisms, made in 2020, of Pennsylvania's use of voter registration lists.  Doc. No. 650 at 40, 45-50, 138-47.  This tactic is a red herring.  Even if he could establish that jury personnel in the district "kn[e]w[] this" information in the audit, challenges, and criticisms, Ramseur, 983 F.2d 1234 n.20, the defendant fails to account for how such knowledge is relevant to the execution of the Jury Plan when he was indicted in October 2018 and January 2019.  In other words, the defendant cannot credibly criticize the actions of jury officials based on events that occurred after the defendant was indicted.

For the foregoing reasons, the defendant's equal protection claim fails at step three, as he has not shown that the Jury Plan was "susceptible of abuse or . . . not racially neutral," and nothing in <u>Ramseur</u>'s dicta changes this analysis and conclusion.[31]  <u>Cf. Knight</u>, 2021 WL 951885, at *2 ("And without any affirmative evidence of discriminatory intent on this district's part when it adopted the operative Jury Selection Plan, the Court finds Knight's argument that the deviation here is "so severe that . . . the court must presume racial or other class-related factors entered into the selection process even more unpersuasive.") (internal quotation marks omitted).

### C.   The Defendant Has Failed To Establish A Substantial Failure To Comply With The JSSA

In addition to his constitutional challenges, the defendant also claims various statutory violations of the JSSA.  Doc. No. 650 at 84-85, 216-24.  He neglects to articulate, however, how his scattershot statutory arguments implicate the narrow categories of relief recognized under existing JSSA precedent.  As with the defendant's constitutional claims, the Court should reject his efforts to mount a statutory challenge.

The JSSA provides as follows:

> [A]ll litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes.  It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose.

28 U.S.C. § 1861.  The Third Circuit has recognized that the JSSA "seeks to ensure that potential grand and petit jurors are selected at random from a representative cross section of the community and that all qualified citizens have the opportunity to be considered for service."  <u>United States v. Calabrese</u>, 942 F.2d 218, 220 (3d Cir.1991) (internal quotation marks omitted).

---

[31]     Because the defendant cannot make a prima facie showing of an equal protection violation, the burden does not shift to the government.  <u>Castaneda</u>, 430 U.S. at 494.

"By its terms, the [JSSA] only provides a remedy for <u>substantial</u> failures to comply with its provisions," <u>id.</u> at 227 (citing 28 U.S.C. § 1867(d)) (emphasis in original), and any alleged violations must "be weighed against the underlying principles of the [JSSA]." <u>Id.</u> (quoting <u>United States v. Gregory</u>, 730 F.2d 692, 699 (11th Cir. 1984)). The Third Circuit has recognized that "[t]hese principles are (1) random selection of jurors and (2) determination of disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only." <u>Id.</u>

The Court has separately recognized that fair-cross-section claims, which are intertwined with the randomness principle, are also cognizable under the statute. <u>See</u> <u>Weaver</u>, 267 F.3d at 236-37; <u>see also</u> <u>United States v. Carmichael</u>, 560 F.3d 1270, 1277 (11th Cir. 2009) ("A JSSA violation is considered 'substantial' when it frustrates one of the three principles underlying the Act: (1) random selection of juror names; (2) from a fair cross-section of the community; and (3) use of objective criteria for determination of disqualifications, excuses, exemptions, and exclusions.") (citing <u>Gregory</u>, 730 F.2d at 699). The <u>Weaver</u> court clarified, however, that "[c]laims under the [JSSA] are analyzed using the same standard as a Sixth Amendment fair cross section claim." 267 F.3d at 236; <u>see also</u> <u>Savage</u>, 970 F.3d at 254 n.32 ("[T]he fair-cross-section standard is equivalent for claims under the Sixth Amendment and the JSSA.").

In addition, not every violation of the JSSA amounts to a "substantial" failure to comply with the statute. "[M]ere technical deviations from the [JSSA] that do not implicate this goal, <u>even a number of them</u>, are insufficient to warrant relief." <u>Carmichael</u>, 560 F.3d at 1277 (internal quotation marks omitted) (emphasis added); <u>see also</u> <u>United States v. Bearden</u>, 659 F.2d 590, 609 (5th Cir. Unit B 1981) (finding no substantial failure to comply with statute despite multiple "procedural errors made by those in charge of selecting juries").[32]

---

[32]     To the extent the defendant argues that jury officials in this district violate the JSSA by failing to follow up on unreturned or undeliverable questionnaires, Doc. No. 650 at 3, his position is once again out of step with the law.

Because the fair-cross-section analysis under the JSSA is equivalent to the Sixth Amendment test outlined in <u>Duren</u>, any separate statutory claim the defendant raises that implicates this principle necessarily fails for the reasons outlined above.  Because the proportions of African Americans and Hispanics on the 2016 qualified jury wheel were "fair and reasonable" and neither cognizable group was subject to systematic discrimination—step two and step three under <u>Duren</u>—the defendant fares no better under the statute than he does under the Sixth Amendment.

Moreover, although the defendant devotes significant portions of his brief to discussing the JSSA—and various alleged infirmities of the source list and implementation of the 2009 Jury Plan, <u>see</u> Doc. No. 650 at 58-72, 86-147—he fails entirely to articulate how almost all of these shortcomings implicate the three recognized categories of statutory relief—i.e., random selection, the fair-cross-section guarantee, and the use of objective criteria for disqualifications, excuses, exemptions, and exclusions.  For example, the defendant repeatedly references the terms "accuracy," "inclusiveness," and "reliability," claiming that the Jury Plan's use of voter registration lists violates these "requirements" of the JSSA.  <u>See, e.g.</u>, <u>id.</u> at 2, 20, 58, 60, 116, 123. But these undefined concepts are not viable avenues for relief under the JSSA in the Third Circuit, and the defendant cites no authority for his argument that his mere invocation of them entitles him to relief under the statute.

The same is true for the defendant's overriding argument that the JSSA requires the district to supplement voter registration lists with other sources of potential jurors to remedy the defendant's laundry list of complaints with the Pennsylvania voter lists.  <u>See, e.g.</u>, <u>id.</u> at 101-02,

---

See <u>Carmichael</u>, 560 F.3d at 1279 (declining to find a JSSA violation where the Jury Administrator did not have a routine practice for following up on questionnaires that were returned as undeliverable); <u>cf.</u> <u>Berghuis</u>, 559 U.S. at 332 (finding no constitutional violation based on jury officials' "reliance on mail notices[] [and] [] failure to follow up on nonresponses," among other alleged failings).

115-16.  This argument, however, is built on the faulty premise that use of the voter registration

list actually leads to the underrepresentation of cognizable groups.  Of course, as Dr. Palmer found

using legitimate statistical methodologies, there is no evidence that the 2016 voter registration list

underrepresented either African Americans or Hispanics in the Pittsburgh Division.  See Palmer

Aff. ¶¶ 20-21.

  More importantly, the Third Circuit has never recognized a "duty to supplement" the

source list as an independent basis for statutory relief in addition to the three recognized bases.

Nor has any other circuit.  The defendant cites a single case in which a district court granted relief

under the JSSA based on a district's failure to supplement.  See Doc. No. 650 at 101-02 (citing

Green, 389 F. Supp. 2d at 69).  Aside from being a single district court opinion from outside this

circuit, Green is inapposite because the remedy the district court ordered there was different than

the remedy the defendant seeks here.  Specifically, the district court in Green ordered the Clerk of

Court in the District of Massachusetts to supplement the list of potential qualified jurors by sending

supplemental questionnaires to individuals randomly selected from the master jury wheel who

resided in the same zip code as anyone previously sent an undeliverable questionnaire or who did

not return their questionnaire.  389 F. Supp. 2d at 79.

  Despite recognizing numerous flaws in the district's reliance on a single source—resident

lists compiled by individual municipalities—the Green court did not order the Clerk to replace the

source list or even supplement it with another source of names (e.g., voter lists, driver's license

records, tax records).  And despite the district judge's cataloguing of problems with the resident

lists, the District of Massachusetts still uses them as the district's sole source under the JSSA more

than 15 years later.  See Exh. 1 at 234 (D. Mass. Jury Plan § 6(a)(iii) ("The Master Jury Wheel

shall consist of the names and addresses of all persons randomly selected from the municipal resident lists . . . .")).

Here, the defendant argues a similar duty to supplement exists under the JSSA but seeks a different remedy: supplementation of the voter registration list with other sources of potential jurors. But a "duty to supplement" is not recognized under the JSSA in the Third Circuit. Moreover, as noted above, by amending the Jury Plan in 2020 to permit the mailing of supplemental questionnaires whenever one is not returned or is undeliverable, the Western District of Pennsylvania has already implemented a process similar to the actual remedy called for in Green (and later adopted by the District of Massachusetts). Thus, even if the Third Circuit imposed a duty to supplement, this district has already promulgated a remedial supplementation effort similar to the one in Green.

The defendant also takes issue, as noted above, with the 2020 Jury Plan's inclusion of the zip-code-based supplemental mailing protocol, claiming that it violates the JSSA's randomness requirement. Doc. No. 650 at 120.[33] Although he manages to identify a viable avenue for relief under the JSSA—randomness—he still cannot show a "substantial" failure under the statute. Contrary to his argument, the First Circuit did not hold in In re United States that this type of provision violates the JSSA—only that the district court lacked the authority to amend the district's plan sua sponte. 426 F.3d at 5-9. As outlined above, similar provisions have now been enacted by district courts across ten judicial circuits. See supra pp. 37-38.

To the extent the defendant claims that randomly drawing a name from a single zip code results in a selection that is not purely random, that is also not problematic. "The randomness

---

[33]     The defendant does not explain how a provision added to the 2020 Jury Plan has any relevance to whether the implementation of the 2009 Jury Plan—which was in place when he was indicted in 2018 and 2019—violates the JSSA. Nevertheless, because his argument about the new provision in the 2020 Jury Plan is readily refuted, the government addresses it here.

principle does not require statistical randomness but rather requires a system of selection that affords no room for impermissible discrimination against individuals or groups."[34] <u>Carmichael</u>, 560 F.3d at 1277 (citing S. Rep. No. 891, at 16 n.9, 90th Cong., 1st Sess. (1967)) (internal quotation marks omitted).  "Therefore, in considering challenges to jury plans under the JSSA because of violations of random selection, courts revert to the <u>Duren</u> test to determine if the lack of randomness resulted in impermissible discrimination." <u>Scott</u>, 2021 WL 2643819, at *15 (citing <u>Bearden</u>, 659 F.2d at 602).  The defendant does not—and cannot credibly—claim that the added zip-code-based mailing provision leads to "impermissible discrimination" under <u>Duren</u>.  Quite the opposite: this facially neutral provision is likely to <u>increase</u> the participation of at least African Americans in the jury system in the district, as the defendant's own experts acknowledge.

Finally, at the end of the defendant's motion, he alleges a hodgepodge of other purported JSSA violations—without articulating any valid legal argument as to why they amount to substantial failures to comply with the JSSA.  Doc. No. 650 at 216-25.[35]  To that end, several of

---

[34]     Aside from his claim that the new provision violates the JSSA, he appears to argue that it creates an internal conflict within the 2020 Jury Plan itself, <u>see</u> Doc. No. 650 at 19 n.10, which elsewhere requires that "the mathematical odds of any single name being picked are substantially equalized." 2020 Jury Plan § 5.  The defendant suggests that this random selection language is at odds with the added provision's focus on random selection from within particular zip codes (as opposed to the whole master wheel).  Even if these provisions were in tension, however, the defendant cites no case where an internal conflict of this nature created a remedy under the JSSA, particularly where, as here, the plan affirmatively resolves conflicts in favor of the statute, which, as noted, does not "require statistical randomness." <u>Carmichael</u>, 560 F.3d at 1277; Jury Plan pmbl. ("In case of any conflict between this Plan and any statute, the statutory provisions shall govern.").

[35]     The defendant devotes a portion of this section to discussing the role jury officials play in collecting and reporting demographic information on AO-12 forms, although he does not allege that the Clerk's Office has failed adequately to carry out this function in the Western District of Pennsylvania.  Doc. No. 650 at 218-22.  Notwithstanding Dr. Weeks's complaints that AO-12 forms do not cross-tabulate race and ethnicity, do not use the most current census data, and exclude data on religion (specifically Catholics), Weeks Aff. ¶¶ 78-80, the defendant cannot allege a legitimate JSSA violation related to the district's use of a standard document completed by every other district in the country, as required by the Judicial Conference of the United States pursuant to the JSSA. <u>See</u> 28 U.S.C. § 1863(a) ("Each district court shall submit a report on the jury selection process within its jurisdiction to the Administrative Office of the United States Courts in such form and at such times as the Judicial Conference of the United States may specify."); <u>see also</u> <u>Smith</u>, 457 F. Supp. 3d at 737 ("Even assuming that there is inadequate information on the AO-12 forms about the demographics of the registered voters in each division, this would not establish a constitutional or statutory violation, particularly as it is undisputed that the district has submitted the AO-12 report on the form and in the manner required by the Judicial Conference.").  Indeed, Mr. Martin actually relied on

his claims arise from the apparent removal from the 2016 master jury wheel of prospective jurors with out-of-state alternate mailing addresses.  Id. at 30, 226-27.  But even by his own expert's calculations, the claimed impact on the population of individuals receiving qualification questionnaires was 0.05% (absolute disparity) and .76% (comparative disparity) for African American and 0.09% (absolute disparity) and 7.48% (comparative disparity) for Hispanics.  Id. at 226-27.  These disparities are entirely permissible under Duren, and as such do not violate the JSSA.  See, e.g., Savage, 970 F.3d at 257-58.

Likewise, to the extent that the defendant claims the removal of these prospective jurors skews the county-based proration (by some unspecified amount) on the master jury wheel, he once again fails to state a valid statutory claim.  Doc. No. 650 at 223.  Indeed, "[c]ourts have found that geographically disproportionate representation, without evidence that it violates the fair cross-section requirement, does not constitute a substantial violation of the JSSA."  Scott, 2021 WL 2643819, at *16 (citing Orange, 447 F.3d at 801 ("Mere geographical imbalance as measured by a division's over[-]representation in a master jury wheel, absent evidence that an identifiable and cognizable segment of the community has been systematically excluded or underrepresented by reason of such imbalance, does not violate the statutory and constitutional requirement that the jury panel represent a fair cross section of the community.") (internal quotation marks and alterations omitted); United States v. Matthews, 350 F. Supp. 1103, 1111 (D. Del. 1972)).[36]  As a

---

the AO-12s when conducting his historical analysis.  See, e.g., Martin Aff. ¶ 178.  The Court therefore should reject the defendant's challenge under the JSSA based on the district's use of AO-12 forms.

[36]     Courts have also held that "residents of a geographic area are not a distinct, cognizable group based on their place of residence alone."  United States v. Traficant, 209 F. Supp. 2d 764, 780 (N.D. Ohio 2002); see also United States v. Butera, 420 F.2d 564, 572 (1st Cir. 1970) (holding that residents of a particular county do not qualify as a "distinctive group" for purposes of a fair-cross-section analysis), overruled on other grounds by Barber v. Ponte, 772 F.2d 982, 998 (1st Cir. 1985).

result, the defendant cannot establish a viable claim under the JSSA, and his assorted statutory challenges fail.[37]

### D.   **The JSSA Is Not Unconstitutional**

Having failed to establish a substantive violation of the JSSA, the defendant next attempts to challenge the constitutionality of the statute itself—specifically, the automatic disqualification of individuals who have not resided in the district for at least a year ("the durational residency requirement") and those who have been charged with, or convicted of, offenses punishable by a year or more in prison ("the felon probation").   Doc. No. 650 at 159-215; see 28 U.S.C. § 1865(b)(1), (b)(5).   Once again, the defendant runs headlong into a uniform body of case law rejecting his position, and the Court likewise should deny his attempt to invalidate the challenged statutory provisions.

### 1.   **Restrictions on Jury-Service Eligibility Are Subject to Rational Basis Review**

As an initial matter, the defendant argues that service on a jury is a fundamental right and that statutes infringing such purported constitutional right should be subject to strict scrutiny.   He cites no case, however, in which the Supreme Court has held that jury service amounts to a fundamental right akin to the constitutional rights ensuring, for example, free speech, due process, fair trials, and the right to vote.   There are none.

The defendant points instead to a handful of cases that simply discuss in dicta the importance of jury service but that are silent on this specific question.   Doc. No. 650 at 155-58. For example, in Lockhart v. McCree, 476 U.S. 162 (1986), the Supreme Court was tasked with

---

[37]      Contrary to his claim, Doc. No. 650 at 217, even if the defendant could show a handful of technical violations, their cumulative effect would not amount to a "substantial" lack of compliance with the statute.   See Bearden, 659 F.2d at 609 (finding no substantial failure to comply with statute despite multiple "procedural errors made by those in charge of selecting juries").

determining whether exclusion of all jurors in capital cases who could not put aside their opposition to the death penalty violated the Sixth Amendment's fair-cross-section principle. The Court held that that it did not. Id. at 176-77. Although it noted that exclusion of certain cognizable groups for improper reasons could deprive such individuals of "their right as citizens to serve on juries in criminal cases," the Court did so only in passing and did not address whether such "right" was a fundamental one.

Importantly, just five years later, the Court clarified in Powers v. Ohio, 499 U.S. 400 (1991), that jury service was an "honor and privilege" not on par with the right to vote, noting that "with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process." Id. at 407 (emphasis added).[38] None of the other cases cited by the defendant describe jury service as a right, let alone a fundamental one. See, e g., United States v. Haymond, 139 S. Ct. 2369, 2378-79 (2019) (plurality) (holding that judicial enhancement of a criminal penalty improperly "divested" jurors of their "constitutional authority to set the metes and bounds judicially administered criminal punishments" in violation of defendant's Fifth and Sixth Amendment rights) (internal quotation marks omitted); Edmonson v. Leesville Concrete Co., 500 U.S. 614, 619 (1991) (classifying the denial of the right to serve as a juror as the denial of an "honor and privilege," without describing the right as fundamental); Toll v. Moreno, 458 U.S. 1, 40 (1982) (Rehnquist, C.J., dissenting) ("[I]t is clear that a State may deny aliens the right to vote, or to run for elective office, for these lie at

---

[38]   The defendant inexplicably cites this quote from Powers as supporting his position, Doc. No. 650 at 156, despite that it affirmatively undermines his argument that jury service is somehow a fundamental right parallel to the right to vote.

the heart of our political institutions.  Similar considerations support a legislative determination to exclude aliens from jury service.") (internal citations and quotations omitted).[39]

It is not surprising, then, that the defendant's argument relies on a law review article from almost 50 years ago to claim that jury service is on par with the fundamental right to vote.  Doc. No. 650 at 157-58 (citing Jon M. Van Dyke, Jury Service Is a Fundamental Right, 2 Hastings Const. L.Q. 27, 29 (1975)).  But a law review article is not persuasive authority, let alone the equivalent of judicial precedent, and the defendant wholly ignores recent case law concluding that "the Supreme Court has [n]ever implicated equal protection to hold that the right to serve on a jury is a fundamental right."  United States v. Allen, 2018 WL 453725, at *12 (D. Kan. Jan. 17, 2018). "No court that has considered the question of whether being eligible for jury service is a constitutional right has answered in the affirmative."  United States v. Conant, 116 F. Supp. 2d 1015, 1020 (E.D. Wis. 2020) (citing Eckstein v. Kirby, 452 F. Supp. 1235, 1241 (E.D. Ark. 1978) ("This court . . . holds that the plaintiff's interest in serving as a juror . . . is not a 'fundamental right' explicitly or implicitly protected by the United States Constitution."); Adams v. Superior Court of San Diego, 524 P.2d 375, 380 (Cal. 1974) ("[A]n individual's interest in serving on a jury cannot be held a fundamental right.")).

As in this case, the defendants in Conant asked "the court [to] find an historical basis for the right to serve on a jury from analogy to the right to vote."  Id. at 1022.  The court rejected this false analogy, however, noting that "[t]he Supreme Court [has] specifically warned against finding constitutional rights by implication from other rights."  Id. (citing San Antonio Indep. Sch. Dist.

---

[39]     The defendant omits that his citation to Toll was from Chief Justice Rehnquist's dissent, and he likewise misquotes the text to suggest that jury service—like the right to vote—lies at "the heart of our political institution." Doc. No. 650 at 156.

v. Rodriguez, 411 U.S. 1, 33 (1973)).  The court ultimately found that no such fundamental right

existed in the context of jury service:

> While the court agrees with defendants that jury service is a "badge of citizenship"
> worn proudly by all those who have the opportunity to do so and that it would,
> indeed, be desirable for all citizens to have that opportunity, the court is unwilling
> to go the next step and to proclaim the opportunity to serve on a jury to be a
> fundamental right.

Id. at 1022 (citing Washington v. Glucksberg, 521 U.S. 702, 720 (1997) ("[W]e have always been

reluctant to expand the concept of [fundamental rights] because guideposts for responsible

decisionmaking in this unchartered area are scarce and open-ended.")).

Because the weight of authority supports the conclusion that jury service is not a

fundamental right, "the test to be applied by the court in analyzing any procedure that affects that

'right' is mere rational basis scrutiny"—i.e., "if there exists a rational relationship between the

disparity of treatment and some legitimate government purpose, the accused procedure does not

violate the equal protection guarantees of the constitution.  Id. (citing Rodriguez, 411 U.S. at 17).

That is the case here.

## 2.   The JSSA's Durational Residency Requirement Is Not Unconstitutional

The JSSA's first statutory basis for disqualification from jury service applies to anyone

who "is not a citizen of the United States eighteen years old who has resided for a period of one

year within the judicial district."  28 U.S.C. § 1865(b)(1) (emphasis added).  The defendant takes

issue with this durational residency requirement, arguing that it amounts to congressional

discrimination against African-American prospective jurors.  Doc. No. 650 at 159-95.  Once again,

he is wrong.

Every court that has addressed the constitutionality of the durational residency

requirements has upheld it, including courts spanning at least seven circuits.  See, e.g., United

States v. Maskeny, 609 F.2d 183, 192 (5th Cir. 1980) (reiterating its conclusion in United States v. Perry, 480 F.2d 147, 148 (5th Cir. 1973), that one-year residency requirement did not violate the constitution under Duren); Test, 550 F.2d at 594; United States v. Ross, 468 F.2d 1213, 1215 (9th Cir. 1972); United States v. Gast, 457 F.2d 141, 142-43 (7th Cir. 1972); United States v. Fell, 2018 WL 7254852, at *5 (D. Vt. Aug. 6, 2018); United States v. Sampson, 2016 WL 2851313, at *5 (D. Mass. May 13, 2016) ("In light of the Act and the weight of authority, the Court rejects Sampson's challenge to the residency requirement."); United States v. Johnson, 2013 WL 1149763, at *1 & n.1 (N.D. Iowa Mar. 19, 2013).  As one court recently noted when rejecting an identical challenge in another capital case, "[t]he defense"—like the defendant here—"cites no cases striking down the one-year residency requirement as unconstitutional."  Fell, 2018 WL 7254852, at *5.

In the face of this uniform precedent, the defendant cites to the Supreme Court's decision in Dunn v. Blumstein, 405 U.S. 330 (1972), in which the Court applied strict scrutiny and invalidated Tennessee's durational residency requirement for voting.  Id. at 360.  Although the defendant argues that this Court should invalidate the JSSA's durational residency requirement in similar fashion, he concedes (as he must) that multiple courts have rejected a similar reliance on Dunn in challenges to the § 1865(b)(1).  Doc. No. 650 at 181-82; see, e.g., Ross, 468 F.2d at 1215-16, United States v. Armsbury, 408 F. Supp. 1130, 1134 (D. Or. 1976) (citing Ross); United States v. Gurney, 393 F. Supp. 688, 697 (M.D. Fla. 1974) (same); Fell, 2018 WL 7254852, at *5 ("The defense asserts that the residency requirement should be held invalid under Dunn[].  The court rejects that argument; Dunn is inapposite for the reasons stated in Ross.").

Dunn is also readily distinguishable because it involved a durational residency requirement that impaired the fundamental right to vote and, as noted, no such fundamental right is at issue

with respect to the "privilege" of jury service under the JSSA.  Conant, 116 F. Supp. 2d at 1022.
The Supreme Court's earlier decision in Shapiro v. Thompson, 394 U.S. 618 (1969), is also
distinguishable.  In Shapiro, the Court struck down state laws that imposed a durational residency
requirement on individuals seeking certain public benefits, holding that the challenged provisions
impermissibly deprived certain newer residents of the "very means to subsist—food, shelter, and
other necessities of life."  Id. at 627.  In contrast, the JSSA's durational requirement has no similar
draconian impact on poor residents' ability to meet their most basic needs.

While it is true that Tennessee's durational residency restriction also implicated the
constitutional right to travel in Dunn, the Supreme Court has clarified that a law implicating the
right to travel is subject to strict scrutiny analysis in only three circumscribed situations: "when it
actually deters such travel, when impeding travel is its primary objective, or when it uses any
classification which serves to penalize the exercise of that right." Att'y Gen. of New York v. Soto-
Lopez, 476 U.S. 898, 903 (1986) (citations and internal quotation marks omitted).  None of these
situations is present as to the JSSA's durational residency argument.  The defendant does not argue
that the JSSA's residency requirement has actually deterred travel, and the government is aware
of no such evidence.  Likewise, the defendant concedes that "[i]n the legislative history of the
JSSA . . . there is very little discussion of the specific purpose of the one-year residency
requirement." Doc. No. 650 at 169 (emphasis added).[40]  And what the JSSA's legislative history

---

[40]     The defendant expends significant energy arguing that the JSSA's residency requirement is somehow the product of an implicitly racist congressional motivation. Doc. No. 650 at 159-74.  But because the JSSA's legislative history provides a race-neutral (and travel-neutral) justification for the requirement, he is forced to cobble together his argument challenging the residency requirement not from the JSSA's legislative history, but from the legislative history of the 1957 amendment to the JSSA's predecessor statute, 28 U.S.C. § 1861.  In doing so, he claims that the residency restriction was the result of an improper effort to appease the "sensibilities of the South." Doc. No. 650 at 165, 167.  Notwithstanding that the defendant invokes this phrase multiple times to support his argument, no legislator ever uttered it during debate over the amendment, the phrase only appears in the legislative record because it is found in a Washington Post newspaper article that was entered into the record, and the story did not even mention (let alone focus on) the addition of the durational residency requirement. Id. at 163.

does say about the provision is facially neutral, articulating a legitimate, rational basis for the requirement: "[T]he 1-year residence requirement assures some substantial nexus between a juror and the community whose sense of justice the jury as a whole is expected to reflect." H.R. Rep. No. 1076, at 6 (1968).[41] This stated purpose has nothing to do with deterring travel between states, and it stands in stark contrast to the law the Supreme Court invalidated in <u>Shapiro</u> where the legislature's desire to deter interstate travel was stated expressly in the legislative history. <u>See</u> 394 U.S. at 628 ("The sponsor of the Connecticut requirement said in its support: I doubt that Connecticut can and should continue to allow unlimited migration into the state on the basis of offering instant money and permanent income to all who can make their way to the state regardless of their ability to contribute to the economy.") (internal quotation marks omitted).

Nor does the JSSA's residency requirement improperly penalize non-residents who exercise the right to travel in a manner that would justify strict scrutiny analysis. This Court's decision in <u>Warrick v. Snider</u>, 2 F. Supp. 2d 720 (W.D. Pa. 1997), is instructive on this point. In <u>Warrick</u>, the Court considered a Pennsylvania law that imposed a 60-day residency requirement before residents were eligible for certain public benefits. <u>Id.</u> at 722. As the Court noted, laws that

---

The defendant also quotes an exchange between the 1957 bill's sponsor, Senator Joseph O'Mahoney, and Senator Frank Case, in which O'Mahoney did nothing more than describe the addition of the requirement as a change to the then-existing law. <u>Id.</u> at 164. The defendant fails to show how this superficial reference to the provision in an exchange between legislators from Wyoming and South Dakota supports an inference that the "primary purpose" of the requirement was to benefit southern states by deterring travel or otherwise penalizing African Americans.

The irony in the defendant's attack on the 1957 law is that far from being the product of legislative racism, it was enacted principally as a means to end discrimination against African Americans by eliminating the federal courts' reliance on state laws—including bigoted state laws—when determining eligibility for federal jury service. <u>See</u> 103 Cong. Rec. S 11933 (July 31, 1957) (Statement of Senator Frank Church) ("[The 1957 amendment] will place the selection of jurors entirely in the hands of the Federal courts, thus avoiding practices under State law that, in effect, may systematically exclude citizens from jury duty in Federal courts on account of race or color."). To that end, in the same exchange between Senators O'Mahoney and Case, the latter referred to the fact that the new law would "make it impossible for a state to disqualify a person for service on a grand or petit jury" as the "principal change"— rather than the addition of the durational residency requirement. Doc. No. 650 at 164. The Court should therefore reject the defendant's attempt to distort the purpose of the JSSA's durational residency requirement through a selective and misleading interpretation of the legislative history of a predecessor statute.

[41]   Contrary to the defendant's position, Doc. No. 650 at 178, the fact that the Supreme Court found a similar nexus-based rationale insufficient under strict scrutiny analysis in <u>Dunn</u> says nothing about its propriety in the context of the JSSA, which is only subject to rational basis review.

affect citizens' right to interstate travel may be subject to strict scrutiny analysis if they impose a "penalty" on those who have exercised this constitutional right.  Id. at 725 (citing Memorial Hospital v. Maricopa County, 415 U.S. 250, 258 (1974)).  The Court then highlighted examples of such recognized penalties:

> For example, in Dunn, the Court determined that the denial of the right to vote, a "fundamental political right," constitutes a penalty.  In Shapiro, the Court found deprivation of the "basic necessities" of life, such as food and shelter, to be a penalty.  Finally, denial of access to nonemergency medical care has also been declared an unconstitutional penalty.  Maricopa, [415 U.S. at 269].

Id. (citations omitted).  Ultimately, the Court concluded that the challenged state law was subject to strict scrutiny analysis because the state durational residency requirement "may deprive new residents of such basic necessities as shelter, food, medical assistance, and employment training." Id. at 726.  The Court's penalty analysis in Warrick underscores the weakness of the defendant's argument here: the JSSA's durational residency requirement simply does not impose a penalty on par with those where the Supreme Court has applied strict scrutiny to strike down laws that infringe fundamental rights (e.g., the right to vote), the "basic necessities of life," or even access to medical care.  Because the rationale in Dunn is inapplicable here, the Court should join an unbroken line of cases and reject the defendant's challenge to the residency requirement found in 28 U.S.C. § 1865(b)(1), which amounts to a rational exercise of Congress's legislative authority.

### 3.    The JSSA's Felon Prohibition Is Not Unconstitutional

The defendant also challenges the JSSA's disqualification of anyone who "has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record, of a crime punishable by imprisonment for more than one year."  28 U.S.C. 1865(b)(5); Doc. No. 650 at 195-215.  The defendant claims that the statute sweeps too broadly and that it has

a disproportionate impact on minorities.  His challenge to this provision, however, fares no better than his challenge to the durational residency requirement.

Once again, every court that has confronted constitutional challenges to § 1865(b)(5) has rejected arguments that the exclusion of felons or those charged with a felony violates the constitution.  See, e.g., United States v. Barry, 71 F.3d 1269, 1274 (7th Cir. 1995) ("Even were the prima facie case made, we would find . . . that the governmental interest in juror probity outweighs a defendant's interest in having a jury which could include someone accused of a felony."); United States v. Arce, 997 F.2d 1123, 1127 (5th Cir. 1993) ("We have no trouble concluding that § 1865(b)(5) is constitutional.  The constitutionality of § 1865(b) is subject to rational basis review."); United States v. Greene, 995 F.2d 793, 798 (8th Cir. 1993) (holding that, even if defendant established prima facie fair-cross-section violation based on the exclusion of persons charged with—but not convicted of—felonies, exclusion was permissible based on "the significant governmental interest in having jurors who can be relied upon to perform their duties conscientiously, and in accordance with the law"); United States v. Foxworth, 599 F.2d 1, 4 (1st Cir. 1979) (upholding § 1865(b)(5) because it is a "rationally based" mechanism for "assur[ing] the 'probity' of the jury" (quoting H.R. No. 1076, reprinted in 1968 U.S.C.C.A.N. 1792, 1796)); Fell, 2018 WL 7254852, at *6 (collecting cases).

The defendant acknowledges none of these cases rejecting challenges identical to his own. Nor does he cite any authority upholding a constitutional challenge to § 1865(b)(5), as there are no such cases in his favor.  Instead, the defendant argues that the statutory provision violates the fair-cross-section component of the Sixth Amendment,[42] highlighting the disproportionate impact

---

[42]    The defendant also claims a violation of his Due Process rights based on the exclusion of felons but advances no argument beyond a single reference to Due Process in the section heading.  Doc. No. 650 at 208.  As this Court has noted, it is not the Court's job to "comb through . . . [the] Defendant's briefing on this Motion and make . . . arguments for him in the first instance."  Doc. No. 442 at 10.

the felon-exclusion provision has on minorities.  Felons and those charged with felonies, however, are not a cognizable group for Sixth Amendment purposes, and the defendant's attempted misdirection necessarily fails.  See Barry 71 F.3d at 1274 ("We are not convinced that alleged felons comprise a distinctive group.  They have in common that they may have run afoul of the criminal justice system.  However, there are many and varied ways to do that: dealing drugs, murder, extortion, rape, kidnapping, or tax evasion, embezzlement, and sometimes driving offenses.  It is possible that an alleged tax evader may have something in common with a charged kidnapper, but the remote chance that he might, does not support a finding that the group is distinct.").  The defendant has offered no cogent reason to depart from the uniform line of cases upholding § 1865(b)(5).  Accordingly, the Court should reject his challenge to this statutory basis for disqualification under the JSSA.

### E.       The Defendant Is Not Entitled To Relief Pursuant To 18 U.S.C. § 243, The Eighth Amendment, Or The Court's Supervisory Authority

Finally, the defendant pursues unsupported and superficial claims for relief under 18 U.S.C. § 243, the Eighth Amendment, and the Court's supervisory authority.  See Doc. No. 650 at 7-11, 85.  Because each of these bases for relief is either imagined or not available here, the Court should reject his arguments.

Section 243 is a criminal statute that prohibits jury officials from "disqualif[ying] for service as grand or petit juror in any court" otherwise qualified prospective jurors "on account of race, color, or previous condition of servitude."  18 U.S.C. § 243.  The statute imposes a fine of up to $5,000, which the defendant presumably would have the Court levy against the Clerk of

Court.  No court has ever invoked the statute in remedying fair-cross-section or equal protection violations in the jury-selection context.[43]

In general, criminal statutes typically do not create private rights that can be enforced by individual defendants.  See, e.g., Chrysler Corp. v. Brown, 441 U.S. 281, 316 (1979)).  Indeed, one judge in this district dismissed various claims in a civil action alleging violations of the series of related civil rights statutes codified at 18 U.S.C. §§ 241, 242, 243, 244, and 245, finding that the plaintiff "ha[d] no private cause of action under these criminal statutes."  U.S ex rel. Vampire Nation v. Citifinancial Mortg. Co., 2007 WL 2142404, at *5 (W.D. Pa. July 9, 2007) (Hay, M.J.) (citing Newcomb v. Ingle, 827 F.2d 675, 676 n.1 (10th Cir. 1987) ("Section 241 is a criminal statute prohibiting acts of conspiracy against the rights of citizens, and it does not provide for a private cause of action."); Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 511 (2d Cir. 1994) (no private cause of action under 18 U.S.C. § 242); Quadra, 378 F. Supp. at 609 ("That section [i.e., 18 U.S.C. § 243], however, is a criminal provision prohibiting the exclusion of persons from service on federal or state grand or petit juries 'on account of race, color, or previous condition of servitude' and does not provide the basis for a civil suit."); Lovoi v. Alitalia Airlines, 2001 WL 1287113, *2 (E.D. La. Oct. 23, 2001) ("However, Plaintiff has brought a civil action against Defendants, and these criminal code provisions [including § 244] do not provide for a private cause of action."); Quarles v. Texas, 312 F. Supp. 835, 837 (S.D. Tex. 1970) (holding that "18 U.S.C. §§ 242-244 do not give this Court jurisdiction because they create only criminal jurisdiction" and dismissing the claims); Dugar v. Coughlin, 613 F. Supp. 849, 852 n.1 (S.D.N.Y. 1985) ("Sections 241, 242, and 245 relate to deprivation of civil rights, however there is no private

---

[43]      The fact that three concurring Justices in Peters v. Kiff, 407 U.S. 493, 505-5-6 (White, J., concurring), would have found that the statute conferred a private right of action does not affect this conclusion, as the majority did not reach the issue.

right of action under any of these statutes."); <u>People ex rel. Snead v. Kirkland</u>, 462 F. Supp. 914, 920 (E.D. Pa. 1978) (concluding that 18 U.S.C. § 245 does not confer substantive rights nor private action for damages)).

The weight of authority thus disfavors creation of a private right of action under 18 U.S.C § 243.  As in <u>Ramseur</u>, however, the Court need not resolve this question, because the defendant has failed to substantiate any constitutional or JSSA violations that would implicate § 243's criminal prohibition.  983 F.2d at 1244 & n.6.

The defendant's Eighth Amendment argument is even weaker.  He cites no case where any court has even referenced this amendment in the context of a fair-cross-section or jury-plan challenge, let alone articulated how this constitutional provision would apply or what an appropriate test would be.  Instead, the defendant invents an "Eighth Amendment standard" that would somehow require the district to reform its jury plan.  Doc. No. 650 at 11.  According to the defendant, "<u>Savage</u> itself recognizes that 'courts have an independent obligation to ensure that the rights of criminal defendants' are protected,' and that under the Eighth Amendment '[w]hen a defendant's life is at stake, the Court has been particularly sensitive to insure that every safeguard is observed.'"  <u>Id.</u> at 10 (quoting <u>Savage</u>, 970 F.3d at 247) (internal quotation marks omitted).  But the quoted language in <u>Savage</u> is from a discussion of an entirely unrelated topic—whether the defendant was denied his right to counsel—and had nothing to do with the Eighth Amendment. 970 F.3d at 247.  The defendant also cites <u>Turner v. Murray</u>, 476 U.S. 28, 36 (1986), and <u>Morgan v. Illinois</u>, 504 U.S. 719, 735-36 (1992), Doc. No. 650 at 11, but these cases dealt with the selection of petit juries in capital cases—not the development and implementation of a district's jury plan. The defendant has concocted an illusory Eighth Amendment argument by selectively citing and misquoting inapposite authority.  The Court should reject his invocation of this amendment.

There is also no basis for the Court to explore the bounds of its supervisory authority in this matter.  Id. at 10.  The defendant claims that the Third Circuit has created, pursuant to its supervisory power, a so-called "negligence standard for the management of juries in federal court." Id. (citing Dow v. Carnegie-Illinois Steel Corp., 224 F.2d 414, 424 (3rd Cir. 1955) ("When in any court of this circuit there has been a failure to [obtain a list representing a fair cross-section of the community], either intentionally or through neglect, this court in the exercise of its supervisory power must require a new trial so that the error will be obliterated.")).  Dow was decided in 1955— before the passage of the JSSA in 1968 and before the Supreme Court's decisions in Duren and Castaneda, which establish the modern tests for evaluating fair-cross-section and equal protection claims.

Tellingly, no court has ever cited the language the defendant highlights, let alone for the proposition that jury challenges are subject to a "negligence" standard under the court's supervisory power.  This language is also dicta, as the court in Dow ultimately rejected a civil litigant's claim that various groups had been improperly inhibited in their jury service.  224 F.2d at 428 ("We find the methods employed not to have been unreasonable.").  Accordingly, the Court should deny the defendant's request to conjure a new form of relief pursuant to its supervisory authority—one that no court has ever employed and that would conflict with the well-settled and more rigorous tests applicable under prevailing fair-cross-section and equal protection doctrine.

### F.    The Defendant Is Not Entitled To An Evidentiary Hearing

The defendant is also not entitled to an evidentiary hearing, particularly having failed to carry his burden under the fair-cross-section and equal protection analyses, as well as the JSSA. Courts routinely decide these challenges without holding a hearing, based on the parties' pleadings and the submission of sworn affidavits.  See, e.g., Knight, 2021 WL 951885, at *1-2 (denying fair-

cross-section and equal protection claims; affidavit submitted by Mr. Martin); Todd, 2021 WL 5712153, at *10 (fair-cross-section and JSSA claims; affidavits submitted by Mr. Martin and on behalf of government); Lucas, 2021 WL 4925715, at *6 (same); Allen, 2021 WL 431458, at *4-10 (fair-cross-section, JSSA, and equal protection claims; affidavits submitted by Mr. Martin and on behalf of government).  The situation is no different here, as there are no disputes of material fact that the Court must resolve before ruling on the defendant's motion.

Specifically, the undisputed demographic analysis of the 2016 qualified jury wheel dooms the defendant's fair-cross-section argument at step two of the Duren test.  Savage makes clear as a matter of law that the qualified wheel is a sufficient pool for constitutional purposes, and the disparities as to this wheel simply do not run afoul of prevailing Third Circuit precedent.[44]  The same is true for step three of Duren, where there is no material dispute as to the historical demographics of the qualified wheel or the reform codified in the 2020 Jury Plan.

The outcome is the same for the equal protection argument.  Even if the defendant could establish underrepresentation over a significant period of time at step two, he cannot meet his burden as a matter of law to show that the Jury Plan is susceptible to abuse and not racially neutral at step three.  And as to his scattershot JSSA claims, he has failed to articulate a "substantial failure" to comply with the statute that falls within the three narrow categories of claims recognized in the Third Circuit: randomness, the fair-cross-section guarantee, and objective criteria for disqualification, excusals, exceptions, and exemptions.  Accordingly, he is not entitled to a hearing under the statute.  See 28 U.S.C. § 1867(d); Calabrese, 942 F.2d at 222 (noting that JSSA does not require hearing on "undisputed facts, sufficient to provide a basis for the district court's decision").

---

[44]    As such, the Court need not address the validity of Mr. Martin's flawed methodology for estimating the demographics of the source list or master wheel.

The cases cited by the defendant do not require a different outcome.  Doc. No. 650 at 225-229.  In Coleman v. Alabama, 377 U.S. 129 (1964), for example, the Supreme Court granted a state defendant a hearing on his jury challenge, but not because he was entitled to a hearing as a matter of right.  Rather, the Court held that the state court had erred as a procedural matter when it granted him a post-trial hearing and then did not permit him to question the witnesses that the court previously permitted him to call.  Id. at 133-34.  Dow v. U.S. Steel Corp., 195 F.2d 478, 480 (3d Cir. 1952), is similarly inapposite: the disputed facts in that case focused primarily on whether potential jurors were intimidated when they were contacted before trial by an investigator, leaving several unanswered, dispositive factual questions.  Id.

Moreover, to the extent that the Supreme Court has held that the distinctiveness of a particular group is a question of fact, Hernandez v. Texas, 347 U.S. 475, 478 (1954), "a court can [nevertheless] determine as a matter of law that a group is not cognizable or distinct."  Willis v. Zant, 720 F.2d 1212, 1217 (11th Cir. 1983).  Simply put, this Court is not writing on a blank slate, and faced with the uniform authority establishing that African-American Males and all Non-Whites are not cognizable groups under federal law, the defendant cannot conjure a basis for an evidentiary hearing simply by claiming the opposite.[45]

The Court can resolve the defendant's motion based on the parties' submissions and without having to resolve disputes of material fact; it should do so without a hearing.

---

[45]	The Fifth Circuit's decision in Mobley v. United States, 379 F.2d 768, 773-74 (5th Cir. 1967), is similarly unavailing.  In Mobley the court of appeals did not hold that the defendant was entitled to an evidentiary hearing in the first instance; rather, the court simply determined that the record from the hearing the trial court had permitted was incomplete and remanded so the parties could complete it. Id.

IV.     **CONCLUSION**

"[A] defendant has no right to a grand or petit jury of any given demographic composition, but only to jury panels selected from a source 'reasonably representative' of the community." Test, 550 F.2d at 590 (quoting Taylor, 419 U.S. at 538).  As the foregoing makes clear, that is exactly what happened in this case.  The Court should deny the defendant's motion to dismiss the Superseding Indictment without an evidentiary hearing.[46]

                                         Respectfully submitted,


                                         CINDY K. CHUNG
                                         United States Attorney

                         By:     s/Troy Rivetti
                                 TROY RIVETTI
                                 Assistant U.S. Attorney
                                 PA ID No. 56816


                                 s/Soo C. Song
                                 SOO C. SONG
                                 Assistant U.S. Attorney
                                 DC ID No. 457268


                                 s/Julia Gegenheimer
                                 JULIA GEGENHEIMER
                                 Special Litigation Counsel
                                 Civil Rights Division
                                 NY ID No. 4949475


                                 s/Eric G. Olshan
                                 ERIC G. OLSHAN
                                 Assistant U.S. Attorney
                                 IL ID No. 6290382

---

[46]     The defendant filed his motion under seal, and the United States is following suit pending a separate motion to unseal.  Neither pleading contains any personal or otherwise sensitive information, and jury-plan challenges are routinely litigated and adjudicated on the public docket, as the cases cited by the parties make clear.  That should be the case here, too.  The government will seek to unseal the defendant's motion and the government's response, as well as all exhibits, with the exception of Exhibit 14 to the defendant's motion.  This exhibit, which the defendant never references in his motion, is a compilation of all materials produced by the Clerk of Court in connection with this litigation, including unredacted jury lists and master jury wheels.  All other documents should be unsealed.