IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-292 |
| | ) | |
| ROBERT BOWERS | ) | |

**MOTION TO TRANSFER VENUE PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 21 AND THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

Robert Bowers, through undersigned counsel, moves this Court, pursuant to the Fifth, Sixth, and Eighth Amendments to the United States Constitution and Fed. R. Crim. P. 21, to transfer venue out of the Western District of Pennsylvania. Due to a combination of factors, "so great a prejudice against the defendant exists in the [Western] district that [Mr. Bowers] cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). Mr. Bowers further requests an evidentiary hearing on this motion.

## I.   Introduction

According to the government, Mr. Bowers specifically selected as his target a synagogue in the Squirrel Hill neighborhood of Pittsburgh, which is home to one of the largest and oldest urban Jewish populations in the United States. He chose this site "in order to maximize the devastation, amplify the harm of his crimes, and instill fear within the local, national, and international Jewish communities." ECF 178 at 41. The Western District of Pennsylvania has been saturated with pretrial publicity surrounding the "deadliest attack on the Jewish Community in the history of the United States." As the

1

attached media analysis and community survey establishes, the media coverage has created a "presumption of guilt" and a "presumption of death." That is, the burden of proof at trial and penalty phase has been shifted to Mr. Bowers, with a majority of potential jurors holding a fixed opinion that Mr. Bowers is guilty and should be sentenced to death. These fixed opinions as to guilt and a death sentence are significantly related to how much jurors know about the case from the media.

## II.   Relevant factual and procedural background
### A.  Relevant factual allegations

According to the government, on October 27, 2018, Mr. Bowers drove to the Tree of Life Synagogue in Pittsburgh, Pennsylvania, and entered the building carrying multiple firearms, including a high-powered AR-15 rifle. Mr. Bowers opened fire, killing 11 congregants and attempting to kill or injure 26 others, 12 of whom were law enforcement officers. He injured members of the Tree of Life, Dor Hadash, and New Light congregations. When law enforcement responded to the scene, Mr. Bowers opened fire on them, injuring four public safety officers. While inside the Tree of Life Synagogue, the defendant made statements indicating his desire to "kill Jews." Law enforcement responded to the scene and Mr. Bowers also opened fire upon them, injuring four public safety officers, before he surrendered. ECF 178 at 2.

Prior to October 27, 2018, Mr. Bowers, using his account on the Alt-Right website Gab.com, "posted his belief that 'jews are the children of satan' and authored several other posts that referred to Jewish people using anti-Semitic slurs, demonstrated deep

animosity toward those of the Jewish faith, and applauded violence and death." ECF 178 at 2-3. About two weeks prior, Mr. Bowers posted on Gab.com a criticism of the Hebrew Immigrant Aid Society (HIAS) and a link to a HIAS webpage listing Jewish congregations that were hosting refugee-related events. That list of congregations included the Dor Hadash Jewish congregation of Pittsburgh. In the posting, Mr. Bowers wrote, "Why hello there HIAS! You like to bring in hostile invaders to dwell among us? We appreciate the list of friends you have provided[.]" *Id*. at 3. On the morning of October 27, 2018, just prior to entering the building, Bowers again posted on Gab.com: "HIAS likes to bring invaders in that kill our people. I can't sit by and watch my people get slaughtered.  Screw your optics, I'm going in." *Id.*

### B.  Relevant procedural background

State and federal prosecutors immediately filed death-eligible charges against Mr. Bowers, with federal prosecutors ultimately prevailing in their efforts to try the federal case first. *See* ECF 239 at 5-6. A federal grand jury returned an indictment alleging the obstruction of the exercise of religious beliefs, in violation of 18 U.S.C. § 247, and the use of a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) and (j). ECF 10. The indictment alleges that Mr. Bowers killed or attempted to kill a total of 37 people. It alleges that he killed 11 victims and attempted to kill 26 others, some of whom were injured.

Three months later, on January 29, 2019, a federal grand jury returned a superseding indictment adding violations of the Hate Crimes Prevention Act. ECF 44.

On August 26, 2019, the government filed a Notice of Intent to Seek the Death Penalty ECF 86. The government alleged four statutory threshold factors under 18 U.S.C. § 3591(a)(2)(A)-(D), as well as four statutory aggravating factors, including:

- **Creating a grave risk of death to additional persons in the commission of the offense and in escaping apprehension, to include public safety officers**. ECF 86 at 3.

- **Committing the offenses against victims who were particularly vulnerable due to old age and infirmity**. ECF 86 at 3. According to the government, the deceased victims had undergone "surgeries" or had "other physical conditions which may have impaired [their] ability of the victims of flee or escape in the course of defendant's assault." ECF 178 at 25-26. Six of the victims ranged from ages 71 to 97, and two of the victims "suffered from genetic disorder and attendant cognitive deficiencies." ECF 178 at 26.

The government also alleged five non-statutory aggravating factors, including the following:

- **Selection of site.** Mr. Bowers targeted men and women participating in Jewish religious worship at the Tree of Life synagogue, located in the Squirrel Hill neighborhood of Pittsburgh, which is home to one of the largest and oldest urban Jewish populations in the United States, in order to maximize the devastation, amplify the harm of his crimes, and instill fear

4

within the local, national, and international Jewish communities. ECF 86 at 4.

- **Victim impact**. Mr. Bowers caused injury, harm, and loss to the eleven decedents, as well as to their family, friends, and co-workers. ECF 86 at 3-4. The victim impact witnesses will "discuss[] the victim's life history," including "the witness's last contacts with the victim, how the witness learned of the victim's fate, their reactions to the victim's death, the impacts the victim's death had on his or her community and workplace, and their efforts to cope with the loss." ECF 178 at 31.

- **Killings motivated by religious animus**. Mr. Bowers expressed hatred and contempt toward members of the Jewish faith, and his animus toward members of the Jewish faith played a role in the killing of eleven people. ECF 86 at 4. Mr. Bowers used force to obstruct the victims from freely worshipping and engaging in religious activities, entering the synagogue armed with a rifle and three additional firearms, intending to, in his words, "kill Jews." *Id*. at 40-41.

- **Lack of remorse**. Mr. Bowers demonstrated a lack of remorse, as evidenced by his statements and actions during the course of and following the commission of the offenses. ECF 86 at 4.

- **Injury to surviving victims**. Mr. Bowers caused serious physical and emotional injury, including maiming, disfigurement, permanent disability,

5

severe psychological impacts, and grievous economic hardship to 26

individuals who survived the attack. ECF 86 at 4.

### III.   Governing law

The Fifth Amendment guarantees that no person shall be "deprived of life, liberty,

or property without due process of law."  U.S. Const. amend. V. Due process requires a

trial by an impartial jury. *In re Murchison*, 349 U.S. 133, 136 (1955). The Sixth

Amendment specifically guarantees a trial "by an impartial jury of the State and district

wherein the crime shall have been committed." U.S. Const. amend. VI. *See also* Art. III,

§ 2, cl. 3. "The Constitution's place-of-trial prescriptions, however, do not impede

transfer of the proceeding to a different district at the defendant's request if extraordinary

local prejudice will prevent a fair trial—a 'basic requirement of due process.'" *Skilling v.*

*United States*, 561 U.S. 358, 378 (2010) (quoting *Murchison*, 349 U.S. at 136). Where

prejudice may impede a fair trial, Fed. R. Crim. P. 21(a) provides that "[u]pon the

defendant's motion, the court must transfer the proceeding against that defendant to

another district if the court is satisfied that so great a prejudice against the defendant

exists in the transferring district that the defendant cannot obtain a fair and impartial trial

there."

The Supreme Court has long held that, when the community from which jurors are

drawn is sufficiently affected by adverse publicity or by the effects of the events at issue,

or both, there arises a presumption of prejudice such that *voir dire* cannot perform the

usual function of securing a fair and impartial jury. *See Sheppard v. Maxwell*, 384 U.S.

6

333, 362-63 (1966); *Estes v. Texas*, 381 U.S. 532, 55051 (1965); *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963); *Irvin v. Dowd*, 366 U.S. 717, 725-28 (1961). "Presumed prejudice" arises when "media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process." *Rock v. Zimmerman*, 959 F.2d 1237, 1252 (3d Cir. 1992), *overruled on other grounds* by *Brecht v. Abrahamson,* 507 U.S. 619 (1993)). Courts use a "totality of the circumstances" analysis to determine if presumed prejudice has been established. *Murphy v. Florida,* 421 U.S. 794, 799 (1975). Where the potential of prejudice is great, the *voir dire* process cannot assure an impartial jury. *See Patton v. Yount*, 467 U.S. 1025, 1031 (1984) ("There are times when adverse pre-trial publicity can create such a potential of prejudice in the community that jurors should not be believed if they claim they can be impartial.").

Where jurors will determine not only the guilt or innocence of a defendant but may also determine whether a defendant should be sentenced to death, there are additional constitutional implications. Given the absolute finality of the death penalty, there is a "heightened need for reliability" in capital cases. *See, e.g., Caldwell v. Mississippi*, 472 U.S. 320, 323 (1985) (internal quotation marks omitted); *Beck*, 447 U.S. at 637–38 & n.13. Procedures which undercut this heightened need for reliability violate the Eighth Amendment. *See, e.g., Lankford v. Idaho*, 500 U.S. 110, 125–26 & n.20 (1991); *Eddings v. Oklahoma*, 455 U.S. 104, 118–19 (1982) (O'Connor, J., concurring); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). This is so even when those same procedures do not violate due process. *See, e.g., Maynard v. Cartwright*, 486 U.S. 356, 361(1988)

7

(statute unconstitutionally vague under Eighth Amendment even where it is not vague under Due Process Clause); *Beck*, 447 U.S. at 636–38 (in capital case, Eighth Amendment need for reliability requires instructions on lesser included offenses even though Due Process Clause may not).

The Eighth Amendment requires that capital juries must be able to consider and give effect to mitigation evidence. *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("sentencer must . . . be able to consider and give effect to [mitigation] evidence in imposing sentence"). Each individual juror must be able to consider and give effect to mitigation information that the defendant has shown to be true by a preponderance of the evidence. *McCoy v. North Carolina*, 494 U.S. 433, 441 (1990) (quoted in *Tennard v. Dretke*, 542 U.S. 274, 285 (2004)); 18 U.S.C. § 3593(c). "It is of vital importance . . . that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358 (1977).

The decision to grant or deny a motion to change venue is committed to the sound discretion of the district court. *Martin v. Warden, Huntingdon State Corr. Inst.*, 653 F.2d 799, 804 (3d Cir. 1981).

## IV.   Grounds for transferring venue

### A.  The effects of the attack on the community

The attack on the Tree of Life Synagogue was perceived an attack on the center of Jewish life in Pittsburgh and a neighborhood known as a model of inclusivity.[1] Squirrel Hill is described as "the spiritual center of Pittsburgh Judaism"[2] or its "historic heart."[3] It is the largest of Pittsburgh's 90 neighborhoods and one of its most prosperous.[4] People who work or live in Pittsburgh and the surrounding areas often have some sort of tie to either Squirrel Hill or to Tree of Life Synagogue.

Eastern European Jews who previously lived in Pittsburgh's Hill District neighborhood moved to what is now known as Squirrel Hill in the 1920s. From there, the Jewish community began developing businesses, synagogues, and social centers.[5] According to recent studies by the Jewish Community Foundation of Greater Pittsburgh, Squirrel Hill is home to 26% of Pittsburgh's Jewish population; an additional 31% live in nearby neighborhoods.[6] Squirrel Hill is a neighborhood with more than eleven

---

[1] *See* Mark Oppenheimer, *Squirrel Hill: The Tree of Life Synagogue and the Soul of a Neighborhood*, Chapter 11 (2021).

[2] Stephen Huba. "Shock, Sadness and Dread Come as a Stranger to a Place of Peace*"*, *Pittsburgh Post-Gazette* (Oct. 28, 2018).

[3] Andrew Goldstein, Paula Reed Ward, Liz Navratil, Kris Mamula, and Shelly Bradbury. "Eleven Dead, Six Wounded in Mass Shooting at Squirrel Hill Synagogue; Authorities Investigating Shooting Incident as Hate Crime," *Pittsburgh Post-Gazette* (Oct. 28, 2018).

[4] *See* Squirrel Hill Historical Society, *Squirrel Hill: A Neighborhood History*, Introduction (2017).

[5] *See* Oppenheimer, Chapter 11.

[6] Brandeis University, *The 2017 Greater Pittsburgh Jewish Community Study* (2018), available at https://www.brandeis.edu/cmjs/community-studies/pittsburgh-report.html

synagogues and three Jewish schools,[7] in addition to organizations such as the Jewish

Family and Community Services and the Jewish Community Center of Greater

Pittsburgh.

The Pittsburgh community responded to the attack with an outpouring of support

for Squirrel Hill, its institutions, and its residents. That support is ongoing and highly

visible. The community rallied behind the slogan "Stronger than Hate," which became an

unofficial motto for the Pittsburgh community. The community has raised millions of

dollars for the victims, their families, and their religious institutions.[8] Tributes and

memorials for the victims appear throughout the city. The local history museum has

collected thousands of artifacts and stories,[9] and the Tree of Life building is being

renovated by the son of Holocaust survivors to serve as a space commemorating the 2018

attack.[10] Local non-profits and advocacy groups that sprung up in the wake of the

shootings continue their work to this day.

---

[7] *See* Squirrel Hill Historical Society, *Squirrel Hill: A Neighborhood History,* Chapter 1 (2017).
[8] Sean D. Hamill, "Tree of Life Fundraisers Collect More Than $10M," *Pittsburgh Post-Gazette* (Jan. 31, 2019).
[9] Marylynne Pitz, "Heinz History Center to Collect Artifacts, Documents from Tree of Life Tragedy," *Pittsburgh Post-Gazette* (Nov. 3, 2018).
[10] Peter Smith, "Tree of Life moves toward a fresh start, taps world-renowned architect to oversee synagogue redesign," *Pittsburgh Post-Gazette* (May 4, 2021).

Although all mass shootings generate an outpouring of community support for the victims, the historical nature of the attack is unique, creating a unique bond between prospective jurors and victims in the Western District of Pennsylvania.

### B.  The pretrial publicity

Dr. Bryan Edelman, a jury expert who has conducted pretrial and post-trial jury research in criminal and civil cases for 20 years, undertook a search of local media, including the *Pittsburgh Post-Gazette, Tribune-Review, Pittsburgh Business Times, Pittsburgh City Paper*, and the *New Pittsburgh Courier*, from October 27, 2018, to October 23, 2021.[11] His search revealed over 1200 articles published about the mass shooting.[12] The coverage portrays Mr. Bowers as the government is expected to portray him at trial: as a hate-filled, violent person who promoted anti-Semitic and anti-immigrant extremist views shared by others on the far right of political spectrum. The coverage reports on Mr. Bowers' alleged inflammatory, offensive, and inculpatory statements on his social medial posts and at the crime scene, as well as his subsequent offers to enter a plea of guilty.

The historical nature of the shooting, purportedly the deadliest attack on Jews in United States history, is repeatedly mentioned. The coverage extensively details the life stories of the deceased and surviving victims, as well as their long-standing and deep

---

[11] Dr. Edelman's declaration is attached as Exhibit A. His *curriculum vitae* is attached as Exhibit A, Appendix 1.
[12] The collection of articles is attached as Exhibits C-E.

connections to the Pittsburgh community. The pretrial publicity "incorporates emotional language, prejudicial details, victim impact statements—some of whom had survived the Holocaust—and stories about law enforcement officers who were injured at the scene." Exhibit A at 16-17. The officers who responded to the scene and negotiated Mr. Bowers' surrender are lauded as local heroes time and time again.

Dr. Edelman found more than 670 mentions of "anti-Semitism" and 229 references to the shooting as a hate crime. "The focus on these aspects of the shooting were some of the key elements which helped keep this case in the public's eye despite the passage of time." Exhibit A at 9-10.

The coverage places the shooting into the larger debate in the United States around identity politics and the rise of the Alt-Right, with more than 170 references to "Nazi," "Neo-Nazi," and the "modern American movement." Within this context, former President Donald Trump—a polarizing figure particularly with respect to these issues— was mentioned more than 650 times. Dr. Edelman notes that the media around the Alt-Right movement is concerning as it ties Mr. Bowers to Alt-Right and anti-Semitic conspiracy theories and incorporates prejudicial content which may be inadmissible at trial. Exhibit A at 10.

According to the coverage, Mr. Bowers was angry because he believed Jews were trying to help illegal immigrants enter the United States and change the demographics of the county (*i.e.*, make it less white). To that end, there were more than 100 mentions of the motive behind the attack and another 90 references to conspiracy theories, Jews

12

committing genocide against the white majority, the Hebrew Immigration Aid Society (HIAS), and comments by Mr. Bowers posted on social media. This type of publicity has the potential to generate – and given the firm beliefs regarding penalty, apparently has generated – strong negative impressions of Mr. Bowers, which is particularly concerning in a capital trial where the jury will be called upon to consider and give full effect to mitigating circumstances regarding Mr. Bowers' life history. Exhibit A at 11.

In the wake of the shooting, the community rallied behind the slogan "Stronger than Hate," which became an unofficial motto for the Pittsburgh community. Businesses began displaying the motto on their storefronts and marquees. Modified versions of the Pittsburgh Penguins and Pittsburgh Steelers logos circulated across the internet, with the phrase "Stronger than Hate" and a Star of David. All the city's professional sports teams pinned posts declaring "Pittsburgh is #StrongerThanHate" to the top of their official Twitter accounts. Businesses and student groups sold "Stronger than Hate" apparel to benefit the victims and their families. The "Stronger than Hate" message appeared more than 200 times in the local coverage. Exhibit A at 14-15.

There was also a massive outpouring of community support that culminated in memorials, candlelight vigils, and fundraising efforts that raised millions of dollars for the congregations and the victims. The local history museum began actively working with the three impacted congregations, with community partners, and with impacted individuals to collect and preserve documentation from the shootings. The collection includes thousands of items and is continuing. The media coverage—which includes

more than 415 comments about community memorials—chronicles how the greater Pittsburgh area took on the feeling of a small community trying to process a devastating tragedy. Exhibit A at 14-15.

The pretrial publicity also covers the events leading up to the government's decision to seek the death penalty. This decision created considerable debate in the Pittsburgh community as pro-death and pro-life factions expressed their opinions in the media. There were more than 280 mentions of the death penalty in the coverage. Exhibit A at 13.

Overall, the local coverage of the shootings portrays Mr. Bowers in a prejudicial light, linking him to Alt-Right, Neo-Nazi, and conspiracy-minded groups. In contrast, the sympathetic stories of the deceased and surviving victims, as well as their long-standing and deep connections to the Pittsburgh community, are prominent in the publicity. While publicity may surround the case wherever it is tried, the impact on potential jurors in the Western District of Pennsylvania will be significantly greater, as demonstrated by the community's reaction to the shootings, including the commemorations and memorials.

### C.  Survey data

Dr. Edelman also conducted a community attitude survey to evaluate the effect, if any, of the pretrial publicity on the jury pool. The telephone survey was administered by Research Strategies, Inc., in the Western District of Pennsylvania (Pittsburgh Division), Eastern District of Pennsylvania (Philadelphia Division), Middle District of Pennsylvania (Harrisburg Division), and within the District of Columbia. Standard methodological

14

practices related to the development of the instrument, interviewer training, sampling, and callbacks were closely followed. Research Strategies conducted the survey from November 10, 2022, to December 9, 2022.[13] Ultimately, 1150 jury-eligible residents completed one of the four surveys, 400 in the Western District of Pennsylvania (Pittsburgh Division), and 250 in each of the comparison venues.[14]

As Dr. Edelman concludes, "despite the passage of time and size of the Pittsburgh Division, this mass shooting remains seared in the public's consciousness." Exhibit A at 1-2. This is in part due to the extensive media coverage, as well as the community's outpouring of support that continues to this day and remains highly visible. Pittsburgh ranked as the most prejudiced on all of the critical measures:  case awareness, case knowledge, pre-judgment of guilt, and pre-judgment of death as the appropriate punishment. Exhibit A at 1-2.

In the Pittsburgh Division, 89% of the jury pool was familiar with the case, which increased to 96% for those who regularly watch the news and read the newspaper. In addition, community members have more than just a passing familiarity with these events. Approximately 71% of survey respondents recognized at least three of seven media items tested in the survey. For example, 85% were aware that several of the victims were elderly, 64% recalled hearing that the shooting occurred as religious

_____

[13] A copy of the survey instrument is attached as Exhibit A, Appendix 2.
[14] A copy of the survey report is attached as Exhibit B.

services were getting started, and 53% knew that Mr. Bowers has been charged with a hate crime. Exhibit A at 1-2.

Prospective jurors have also formed strong opinions regarding Mr. Bowers' guilt. Ninety-two percent (92%) of prospective jurors in the Pittsburgh Division who were familiar with the case believe the defendant is guilty of murder, with 66% reporting that he is "definitely" guilty. Dr. Edelman has concluded that the pervasive media coverage of the shootings, as well as the community reaction and outpouring of support for the victims, has undermined the presumption of innocence. Notably, 82% of residents who were familiar with the case reported that Mr. Bowers would have a difficult time convincing them that he is **not** guilty of murder. Exhibit A at 1-2, 18.

Prospective jurors in the Pittsburgh Division who recognized the case have also developed strong opinions about the proper punishment. Eighty-two percent (82%) of prospective jurors would start the trial with an opinion regarding sentence, with 54% favoring the death penalty and only 28% a life sentence. Those who support the death penalty also maintained strong fixed opinions: 86% indicated that Mr. Bowers would have a difficult time convincing them that he should **not** be sentenced to death. Exhibit A at 18.

Attitudes are significantly stronger and recognition rates are significantly higher in the Pittsburgh Division than in the comparison venues. With respect to opinions regarding guilt, 83% or prospective jurors from Philadelphia, 77% from Harrisburg, and 80% from the District of Columbia believe that Mr. Bowers is guilty. However, these

attitudes were not as strong as those found in the Pittsburgh Division. Fifty-one percent (51%) of survey respondents in Philadelphia, 53% in Harrisburg, and 39% in the District of Columbia reported that the defendant was "definitely guilty," as compared to 66% in Pittsburgh. Exhibit A at 18.

Although the burden of proof at trial has shifted toward Mr. Bowers in each venue surveyed, this shift was more pronounced in the Pittsburgh Division. While 82% of prospective jurors in Pittsburgh reported that Mr. Bowers would have a difficult time changing their opinion that he is guilty, those numbers stood at 67% in Philadelphia, 69% in Harrisburg, and 71% the District of Columbia. Exhibit A at 18.

Survey respondents in the comparison venues who recognized the case were also less likely to start the trial favoring the death penalty, with the exception of Harrisburg, which was also 54%. Forty-five percent (45%) of prospective jurors in Philadelphia, and 14% in the District of Columbia favored death. In addition, these prospective jurors were less likely to hold strong fixed opinion compared to their counterparts in the Pittsburgh Division. As compared to 86% of prospective jurors in Pittsburgh, 68% in Philadelphia, 77% in Harrisburg, and 59% in the District of Columbia reported that Mr. Bowers would have a difficult time convincing them that he should **not** be sentenced to death. Exhibit A at 18.

Finally, while 71% of survey respondents were familiar with at least three of the seven media items incorporated into the survey, that number was just 46% in Harrisburg, 47% in Philadelphia, and 50% in the District of Columbia. Exhibit A at 18-19.

Consistent with the social science literature cited in Dr. Edelman's declaration, knowledge of this case was significantly related to prejudgment. For example, 97% of Pittsburgh Division respondents who were familiar with five or more of the media items believed Mr. Bowers was guilty of murder, and 90% reported that Mr. Bowers would have a difficult time convincing them that he was not guilty. Knowledge of the case also had an impact on fixed opinions about the appropriate sentence. For those who favored the death penalty and recognized five or more of the media items, 76% reported that Mr. Bowers would have a difficult time convincing them that he should not be sentenced to death. Exhibit A at 19.

Overall, the survey data show strong bias among prospective jurors who have been exposed to publicity surrounding this case. However, attitudes are significantly stronger in the Pittsburgh Division where recognition rates are higher than those found in the other districts. Exhibit A at 19. This is evident in the portions of the survey where Pittsburgh respondents expressed significant hostility toward Mr. Bowers and a deep sense sympathy for the victims:

- My thought about the victims my prayers go toward the families and the Tree of Life Synagogue. My thoughts about him honestly I think, I'm not a supporter of the death penalty, but in his case I'd pull the lever myself for something so heinous as this.

- He is the worst type of criminal. I would not show him any mercy.  The victims. It's heartbreaking. The victims that died have left a huge void in

the community and he is the worst ever. The shooting is the worst crime
and it's incomprehensible.

- Personally, I feel that he should be tortured and hung by his toenails.

- I prefer that he be put to death. My heart aches for the victims, I can't even
  put it into words, plus, my daughter-in-law works for Achieva school for
  children and people that need extra mental help and I remember her telling
  me that the two guys that were also slaughtered were two people that my
  daughter-in-law used to assist.

- Feel bad for the victims and could care less about the guy that killed them.

Exhibit A at 19-22.

### D. Prejudice in the jury pool prevents a fair and impartial trial and penalty phase in the Western District of Pennsylvania.

Considering the "totality of the circumstances," *Murphy,* 421 U.S. at 799, a
change of venue is required in this case. These circumstances include (i) the extensive,
sustained publicity, (ii) the massive and ongoing outpouring of support for the victim
community, and (iii) the fixed views of prospective jurors as to guilt and a punishment of
death. The Supreme Court has long held that, when the community from which jurors are
drawn is sufficiently affected by the effects of the events at issue or the adverse publicity,
or both, there arises a presumption of prejudice such that *voir dire* cannot perform the
usual function of securing a fair and impartial jury. *See Sheppard v. Maxwell*, 384 U.S.
333, 362-63 (1966); *Estes v. Texas*, 381 U.S. 532, 55051 (1965); *Rideau v. Louisiana*,
373 U.S. 723, 726-27 (1963); *Irvin v. Dowd*, 366 U.S. 717, 725-28 (1961).

This mass shooting has been perceived as a direct attack on Pittsburgh, its religious community, its institutions, and its residents.[15] Indeed, the government has alleged, as reason for the jury to find that a death sentence is warranted, that Mr. Bowers specifically selected as his target a synagogue in the Squirrel Hill neighborhood of Pittsburgh, "home to one of the largest and oldest urban Jewish populations in the United States." ECF 86 at 4. The government's theory, echoed in the media, is that he chose this site "in order to maximize the devastation, amplify the harm of his crimes, and instill fear in the local, national, and international Jewish community." ECF 86 at 4.

As noted, prospective jurors in the Western District have a strong connection to the Jewish community in Squirrel Hill. The attack has salience in Pittsburgh that does not exist in any other jurisdiction. It triggered widespread participation and support of local civic and religious activities both in person and online, including numerous ceremonies, commemorations, and conferences. The community adopted the motto "Stronger than Hate," prominently displayed on local professional sports teams' uniforms and social media, in windows of local businesses, and on attire sold for the benefit of the victims and their families. Several local non-profits and advocacy groups sprung up in the wake of the shootings. In reacting to the shooting, Pittsburgh took on the character of a small town coming together to support and honor the 37 victims and to denounce Mr. Bowers

---

[15] Allegheny County, where Pittsburgh is located, has the largest number of eligible jurors in the Western District of Pennsylvania and accounts for approximately half of the eligible jury pool.

and his extremist views. Although all mass shootings generate an outpouring of community support for the victims, the historical nature of the attack here is unique, creating "a unique bond between prospective jurors and the victims that does not exist in other venues." Exhibit A at 1.

With respect to the nature of the coverage, as noted above, the media portrays Mr. Bowers as the government is expected to portray him at trial: as a hate-filled, violent extremist who promoted anti-Semitic and anti-immigrant views shared by white supremacists and others on the far right. The coverage reports on Mr. Bowers' inflammatory, offensive, and inculpatory statements on his social medial posts and at the crime scene, as well as his subsequent offers to enter a plea of guilty. It links Mr. Bowers to Neo-Nazis, the Alt-Right, and groups espousing far-fetched conspiracy theories.

The coverage extensively details the life stories of the deceased and surviving victims, as well as their long-standing and deep connections to the Pittsburgh community. The pretrial publicity "incorporates emotional language, prejudicial details, victim impact statements and stories about law enforcement officers who were injured at the scene." Exhibit A at 16-17. The local law enforcement officers who responded to the scene (some of whom were injured) and negotiated Mr. Bowers' surrender are repeatedly lauded as heroes.

Of all of the venues studied, Pittsburgh ranked as the most prejudiced on all of the critical measures: case knowledge, pre-judgment of guilt, and pre-judgment of death as the appropriate punishment. Importantly, the pre-judgment of guilt and pre-judgment of

death are particularly fixed, shifting legal burdens that properly belong to the prosecution

to Mr. Bowers. Given these widespread, strong dispositions in favor of the prosecution, it

will be virtually impossible for prospective jurors to give meaningful consideration to any

trial defense and mitigating factors presented by the defense, implicating heightened

Eighth Amendment concerns. As Justice Marshall has explained:

> [W]e must recognize and rule on the difference between the guilt
> and penalty phases of a capital trial for the purpose of presuming prejudice
> when jury impartiality is called into question. This distinction is required not
> because death is a qualitatively different penalty from any other (although it
> is), but because the jury's function is profoundly altered when it sits as
> sentencer.

*Brecheen v. Oklahoma*, 485 U.S. 909, 912–13 (1988) (Marshall, J., dissenting from

denial of *certiorari*).

 Although the publicity has naturally subsided since the shooting itself, it

continues to this day. Indeed, the community survey conducted more than three

years after the attack indicates that a large percentage of the Western District of

Pennsylvania jury pool has retained considerable knowledge about the case. Exhibit

A at 27-28.

As Dr. Edelman explains:

> [W]hen a venue is exposed to prejudicial media coverage surrounding a
> crime, there is a risk that potential jurors will develop a large network of
> linked attitudes and beliefs relating to the victim, the defendant, and the
> crime. These linked attitudes include opinions about the guilt of the
> defendant, appropriate sentence and evaluations of the evidence presented
> through the media. When the links between attitudes are strong, they can be
> activated at a subconscious level and have an impact on jurors' evaluation of
> the evidence and arguments presented at trial.

22

Exhibit A at 6. This is precisely what has happened in the Western District of Pennsylvania, where, as detailed above, 92% of prospective jurors who are familiar with the case believe Mr. Bowers is guilty, with 66% reporting that he is "definitely" guilty. Notably, 82% of residents who are familiar with the case reported that Mr. Bowers would have a difficult time convincing them that he is **not** guilty of murder. Similarly, 82% of prospective jurors would start the trial with an opinion regarding sentence, with 54% favoring the death penalty and only 28% a life sentence. Those who support the death penalty also maintained strong fixed opinions: 86% indicated that Mr. Bowers would have a difficult time convincing them that he should **not** be sentenced to death.

The consequences of these strong, fixed opinions can be severe during any trial and penalty phase:

> Attitudinally supporting arguments will be more closely attended to, evaluated as persuasive, integrated into the existing network of attitudes and beliefs and made easily accessible during deliberations. In contrast, counterarguments and evidence conflicting with well-established attitudes may create cognitive dissonance. As a result, jurors will either ignore this evidence or make cognitive efforts to refute it. This evidence will not establish strong links to preexisting attitudes and will not be easily accessible during deliberations. When a venue has been saturated with pretrial publicity, these psychological processes can put the defendant at a significant disadvantage, undermine the presumption of innocence, create punishment bias in favor of death as the appropriate sentence, and diminish the prosecution's burden of proof.

Exhibit A at 6.

Where, as here, a venue has been saturated with media coverage, many prospective jurors enter the courtroom with extensive knowledge and attitudes about the case, defendant, and the victims. "However, it is often difficult for prospective jurors to predict how case-specific knowledge and opinions may affect them over the course of a trial. Prospective jurors may also unintentionally omit exposure to specific media items during voir dire when asked what they recall hearing about the case. These items, however, may become salient and recalled from memory once witness testimony begins." Exhibit A at 22. Although the purpose of *voir dire* is to surface the full extent of any predisposition, including exposure to pretrial publicity, case-specific attitudes, impressions of the defendant, and potential motivations to serve, it is an imperfect process. As Dr. Edelman explains, "the prejudicial effects of preexisting attitudes can occur at both a conscious and subconscious level, meaning jurors who profess impartiality may not be fully aware of their bias or how it may affect them as the trial unfolds. This can make it difficult to identify potential prejudice during the jury selection process." Exhibit A at 23.

Of particular concern here the "minimization effect," which refers to prospective jurors' minimization of the full extent of their exposure to pretrial publicity. Exhibit A at 25. As Dr. Edelman explains, where a venue is saturated with media coverage, prospective jurors have difficultly during *voir dire* recalling every detail they have read, seen, or heard about a case. *Id*. Indeed, Dr. Edelman's survey data in this case bear this

24

out: "Many prospective jurors from the Pittsburgh Division used minimization language or incomplete answers when asked what they knew about the case." Exhibit A at 27.

As the Supreme Court has recognized, the word of a prospective juror on his ability to "lay aside his impression or opinion and render a verdict based on the evidence presented in court" is not decisive. *Irvin* at 725. This is especially true when "the build-up of prejudice [in the community] is clear and convincing." *Irvin* at 725. The Court did not "doubt [that] each juror was sincere when he said that he would be fair and impartial to [Irvin], but ... [w]here so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight." *Id*. at 728; *see Patton v. Yount*, 467 U.S. 1025, 1031 (1984) ("There are times when adverse pre-trial publicity can create such a potential of prejudice in the community that jurors should not be believed.")

Given the impact of the attack on the community in the Pittsburgh Division of the Western District of Pennsylvania, the extensive, prejudicial pretrial publicity, and the firm, fixed opinions of prospective jurors establishing a presumption of guilt and presumption of death, Mr. Bowers cannot obtain a fair trial by an impartial jury in the Western District of Pennsylvania. In light of these conditions, any penalty phase would not comport with due process and the Eighth Amendment.

## V.    Conclusion

For the reasons stated above, and in the attached declaration from Dr. Edelman,

Mr. Bowers asks the Court to transfer venue from the Western District of Pennsylvania.


Respectfully submitted,

*/s/ Judy Clarke*
Judy Clarke
Clarke Johnston Thorp & Rice, PC

*/s/ Michael N. Burt*
Michael N. Burt
Law Offices of Michael Burt, PC

*/s/ Michael J. Novara*
Michael J. Novara
First Assistant Federal Public Defender

*/s/ Elisa A. Long*
Elisa A. Long
Supervisory Assistant Federal Public Defender

26