## DECLARATION OF BRYAN EDELMAN, Ph.D.

I, Bryan Edelman, solemnly, sincerely, and truly declare and affirm as follows:

## I.    INTRODUCTION

I am the co-founder of Trial Innovations, Inc., a national full-service jury research firm. I have worked as a trial consultant for 20 years and have conducted pretrial and post-trial research on both criminal and civil cases across the country. In addition, I have been retained as an expert in over 50 high-profile cases to assess the impact of pretrial publicity on the fairness of the trial proceedings. Counsel for the defendant in *United States v. Robert Bowers* retained me to make a recommendation to the Court on whether or not any remedial measures, including a change of venue, may be appropriate to protect the defendant's due process rights. As part of my analysis, I evaluated relevant newspaper publicity and conducted a community attitude survey in the Western District of Pennsylvania (Pittsburgh Division), Eastern District of Pennsylvania (Philadelphia Division), Middle District of Pennsylvania (Harrisburg Division), and the District of Columbia.

It is my opinion that the jury pool in the Pittsburgh Division has been saturated with extensive prejudicial pretrial publicity surrounding the "deadliest attack on the Jewish Community in the history of the United States." This shooting generated massive media coverage—which incorporated potentially inadmissible content around the rise of the Alt-Right and conspiracy theories in America—and sparked an outpouring of support for the Jewish Community and Tree of Life Synagogue.

The history of Squirrel Hill in Pittsburgh is another important and unique factor to consider. The mass shooting at the Tree of Life Synagogue was an attack on one of the oldest minority communities in the city. Jews have lived in Squirrel Hill since the 1840s. After the shooting at the Tree of Life there was an outpouring of support throughout Pittsburgh for the neighborhood and its residents which continues to this day. More than $10 million was raised in the aftermath of the shooting. Pittsburgh started the "Stronger than Hate" campaign and tributes appeared throughout the city (e.g., 11 trees planted for the victims, Pittsburgh Steelers honor the victims). Funds were raised to renovate the synagogue and the city hosted several anti-hate conferences. The attack on "one of our historical communities" created a unique bond between prospective jurors and the victims that does not exist in other venues.

A community attitude survey was conducted to assess whether or not the media coverage has had an impact on the jury pool during the leadup to trial. Despite the passage of time and size of the Pittsburgh Division, this mass shooting remains seared in the public's consciousness.

**EXHIBIT A**

Eighty-nine percent (**89%**) of the jury pool was familiar with the case, which increased to **96%** for those who regularly watch the news and read the newspaper. In addition, prospective jurors have more than just a passing familiarity with these events. Approximately **71%** of survey respondents recognized at least three of seven media items tested in the survey. Fifty-three percent (**53%**) of those familiar with the case knew that Bowers has been charged with a hate crime. Another **85%** were aware that several of the victims were elderly, and **64%** were recalled hearing that the shooting occurred as religious services were getting started.

The media coverage has also shifted the burden of proof to the defendant on both questions of guilt and sentence. Most community members hold a "presumption of guilt" in this case. Ninety-two percent (**92%**) of prospective jurors in the Pittsburgh Division who recognized the case reported that Bowers was guilty of murder, and **82%** indicated that he would have a difficult time convincing them that he is <u>not</u> guilty. These fixed opinions were significantly related to case knowledge. Prospective jurors who recognized multiple media items were more likely to maintain a "presumption of guilt" that was resistant to change.

Residents in the Pittsburgh division have also developed strong opinions toward sentence. Fifty-four percent (**54%**) of survey respondents who recognized the case reported that Bowers should be sentenced to death compared to just **28%** who believed he should receive a life sentence. Only ten percent (**10%**) of survey respondents remained undecided on how Bowers should be sentenced. Once again, prospective jurors demonstrated strong fixed opinions. Eighty-six percent (**86%**) of those who believed the defendant should receive the death penalty reported that he would have a difficult time convincing them that he should receive a life sentence.

In conclusion, given the extent and nature of the pretrial publicity and its negative impact on the jury pool, it is my opinion that the burden of proof has shifted toward the defendant. Prospective jurors enter the courtroom with a "presumption of guilt" and "presumption of death" which appear to be intransient. Given that the defendant faces the ultimate punishment in this case, remedial measures—including a change of venue—are necessary to protect his Constitutional right to a fair and impartial trial.

## II.     QUALIFICATIONS

**Education and Experience**: A copy of my curriculum vitae can be found in **Appendix 1** to this declaration. Upon completion of my undergraduate education, I received an MA and Ph.D. in Social Psychology from the University of Nevada, Reno, and an LL.M. from the University of Kent in the United Kingdom. My graduate studies have provided me with a broad foundation in

both qualitative and quantitative research methodologies as well as statistics

The Social Psychology Program at the University of Nevada is unique in that it is one of the few in the country that has an emphasis on the application of social psychological theory to the legal arena. During my studies I specialized in jury related issues and examined how attitudes, race, stereotypes, pretrial publicity, and other factors influence juror and jury decision-making. In this regard, I took coursework addressing topics associated with change of venue motions, the impact of pretrial publicity on jurors' ability to be fair and impartial, and the steps necessary to conduct a change of venue analysis. The University's association with the National Judicial College and other government agencies also afforded me the opportunity to conduct research with the Public Defender, District Attorney, Court Services, the judiciary, and other institutions in Washoe County, Nevada.

**Research Experience**: While at the University of Nevada, Reno I worked as a Research Assistant and Project Manager at the Grant Sawyer Center for Justice Studies where I assisted with several national surveys, including one that examined the judiciary's understanding and application of the Daubert standard. I also explored how jurors "minimize" what they have read, seen, or heard about high profile cases during voir dire. In addition, I oversaw a study of the Washoe County's pretrial release program and assisted with the development of training programs for foreign justices, court administrators, prosecutors, and defense attorneys who were brought to the United States by the Department of State.

Further, I have conducted and published research on the impact of illegitimate factors on juror decision-making. This research included developing and testing a model that attempted to explain how factors such as race and empathy influence juror and jury sentencing decisions in capital cases. My research on juror decision-making in capital cases was later published as a book. Since completing my studies I have also published on the impact of graphic images on jurors, and on methodological issues associated with online survey research.

**Jury Research Experience**: I began working as a trial consultant in 1998 and cofounded Trial Innovations in 2010. Over the years I have worked on hundreds of criminal and civil cases across the country. As a trial consultant I have conducted mock trials, focus groups, surveys, post-trial interviews, and other research exercises. I have consulted in the courtroom and assisted with jury selection on more than 100 cases. I have also served as a presenter at local bar associations, law firms, national meetings, and conferences.  In addition, I have been invited to conduct MCLE courses related to jury selection by the Public Defender, Alternate Defender, and District Attorney

in California, Nevada, and New Mexico. I have also served as a guest lecturer at the University of Santa Cruz, Saint Mary's College, and Stanford Law School.

**Venue Experience**: As a graduate student, I was trained by Dr. Ronald Dillehay and Dr. Edward Bronson, two of the leading experts in the country on venue and pretrial publicity.  Over the years I have had the opportunity to work with Dr. Bronson on a number of change of venue studies.

I have worked on change of venue issues in several different capacities. As a researcher I have coded trial transcripts in high profile cases to evaluate how jurors "minimize" their bias and exposure to pretrial publicity during voir dire, and the challenges this phenomenon poses for judges and attorneys. In addition, I have examined the quality of juror recall of case knowledge when asked open-ended questions, and the impact of social desirability on professions of impartiality after exposure to highly prejudicial media coverage. I have presented as a panelist on change of venue issues at the American Society of Trial Consultants' annual conference and been a co-author on the chapter in the "California Criminal Law Procedure and Practice" on change of venue since 2011.

I have conducted content analyses of media coverage on a host of topics and have designed more than 50 community attitude surveys over the years. I have been retained as an expert to conduct and evaluate change of venue studies and make recommendations to address the negative impact of pretrial publicity on prospective jurors.

**Expert Witness Experience**: I have been retained as an expert witness on matters including freedom of religion in China (political asylum hearing), eyewitness identification, and change of venue. I have testified as an expert witness in person or by declaration in California, Idaho, Colorado, Texas, Michigan, Florida, Massachusetts, Nevada, Pennsylvania, Tennessee and Washington in state and federal court. I have been retained by both the prosecution and defense and have recommended against a change of venue in the majority of cases I have been involved in.[1]

## III.    THE INFLUENCE OF ATTITUDES ON COGNITION[2]

There is a substantial body of literature documenting the impact of attitudes on information processing. Attitudes have been shown to have an impact on selective attention, the evaluation of

---

[1] These exclude instances where I have been hired to review a change of venue survey, assist with addressing media coverage during voir dire, or review trial transcripts and pretrial publicity as part of a post-conviction appeal.

[2] Cognition is a term referring to the mental processes involved in gaining knowledge and comprehension, including thinking, knowing, remembering, judging and problem solving.

new information, memory recall, and behavior. This research provides insight into how media coverage may lead to juror bias.

Pretrial publicity can have a prejudicial effect on jurors through its impact on the formation of attitudes and beliefs that they bring into the courtroom. Attitudes are not isolated entities but are often linked to other memories, experiences, attitudes, and beliefs. These links can create large networks of attitudes, which are resistant to change. The links between attitudes strengthen with repeated activation. As these links strengthen, the probability increases that the attitudes and underlying beliefs will be consistent with one another and brought to awareness simultaneously. Attitudes that are strongly linked to one another are more easily accessible in memory and more likely to be automatically activated with exposure to the attitude object. Attitudes can be activated automatically without any conscious, intentional processing. This is more likely to occur when an attitude has been repeatedly activated in the past.[3]

When media coverage surrounding a case is broad, extensive, and redundant, strong links between relevant attitudes and beliefs begin to form. If the pretrial publicity creates links between case details, attitudes, and beliefs over the course of a trial, these attitudes are likely to be automatically activated at a subconscious level. As described below, this network of linked attitudes can have an impact on a juror's attention to and evaluation of the evidence and arguments presented in court.

As the network of linked attitudes grows and strengthens, specific attitudes become resistant to change because change requires revisions to other attitudes and beliefs within the network. Resistance to revising well-established attitudes has been shown to lead to biased information processing. When attitudes are strong, there is a tendency to favor arguments and information in support of those attitudes over arguments that may disprove them. The acceptance of a counterargument can create cognitive dissonance.[4] In an effort to avoid cognitive dissonance, information that supports attitudes may be selectively attended to and counterarguments may be distorted or dismissed.[5]

Attitudes can also have an impact on attention and recall. Research has shown that information that supports a preexisting attitude is easier to learn, more accurately retained and

---

[3] Eagley, A.H., & Chaiken, S. (1993). *The psychology of attitudes.* Florida: Harcourt Brace College Publishers.
[4] Cognitive dissonance is an uncomfortable feeling caused by holding two contradictory ideas simultaneously. People have a motivational drive to reduce dissonance by changing their attitudes, beliefs and behaviors or by justifying or rationalizing them.
[5] For example, people list more counterarguments for information that refutes preexisting attitudes than information that supports them.

DECLARATION OF BRYAN EDELMAN

easier to recall. The links formed between attitudinally supporting information and preexisting attitudes are stronger than those formed between counterarguments and preexisting attitudes. As a result, the latter is more difficult to retrieve from memory. Further, there is a tendency to produce new beliefs, which support preexisting attitudes and suppress those that run counter to such attitudes.

In sum, when a venue is exposed to prejudicial media coverage surrounding a crime, there is a risk that potential jurors will develop a large network of linked attitudes and beliefs relating to the victim, the defendant, and the crime. These linked attitudes include opinions about the guilt of the defendant, appropriate sentence and evaluations of the evidence presented through the media. When the links between attitudes are strong, they can be activated at a subconscious level and have an impact on jurors' evaluation of the evidence and arguments presented at trial.

Attitudinally supporting arguments will be more closely attended to, evaluated as persuasive, integrated into the existing network of attitudes and beliefs and made easily accessible during deliberations. In contrast, counterarguments and evidence conflicting with well-established attitudes may create cognitive dissonance. As a result, jurors will either ignore this evidence or make cognitive efforts to refute it. This evidence will not establish strong links to preexisting attitudes and will not be easily accessible during deliberations. When a venue has been saturated with pretrial publicity, these psychological processes can put the defendant at a significant disadvantage, undermine the presumption of innocence, create punishment bias in favor of death as the appropriate sentence, and diminish the prosecution's burden of proof.

The prejudicial impact of preexisting attitudes is accentuated by the fact that the media coverage underlying them is often biased in favor of the prosecution. Furthermore, news content is encoded under very different circumstances from those found in the courtroom, because the rules of evidence that are strictly enforced at trial and during the sentencing phase do not apply. As such, the persuasive impact of information presented through the news media becomes more significant and engrained in the juror's mind than the evidence presented at trial.

## IV.    THE PREJUDICIAL IMPACT OF PRETRIAL PUBLICITY

There is a body of research within the social sciences that attempts to address the impact of pretrial publicity on decision-making in the courtroom. This literature suggests that pretrial publicity influences evaluations of the defendant, perceptions of criminality, sympathy toward the

defendant, pretrial judgments regarding guilt, and final verdicts.[6]

Daftary-Kapur, Penrod, O'Connor, and Wallace (2014) conducted a field study that incorporated real time evidence into the methodology.[7] Participants included jury-eligible community members who were naturally exposed to pretrial publicity over a 14-month period leading up to the trial. Trial summaries were presented online during six sessions over the course of ten weeks.

The researchers reported a pretrial publicity effect that persisted throughout the actual trial. Despite the admonitions to set-aside prejudicial pretrial publicity, participants were biased by the content of the pretrial publicity. Specifically, those exposed to prosecution-oriented articles were more punitive in their guilty ratings across all six sessions compared to those exposed to pro-defense pretrial publicity. The amount of the pretrial publicity participants were exposed to also had a significant effect. In addition, the biasing effect of pretrial publicity did not disappear over time. Thus, neither delay nor trial evidence eliminated the pretrial publicity effect on judgments of guilt.

Steblay, et al. (1999) conducted a meta-analysis[8] encompassing 44 research studies on pretrial publicity. The authors reported a statistically significant relationship between pretrial publicity and verdicts.[9] Media coverage addressing the defendant's prior record, the existence of confessions, the heinousness of the crime, and negative character of the defendant have all been shown to have an effect on perceptions of guilt and final verdicts. Furthermore, deliberations may not reduce the biasing impact of pretrial publicity.[10] In fact, Kramer, Kerr, and Carroll (1990),

---

[6] *See* Constantini, E., & King, J. (1980-1981). The partial juror: Correlates and causes of prejudgment. *Law and Society review, 15,* 9-40; DeLuca, A.J. (1979). *Tipping the scales of justice. The effects of pretrial publicity.* Unpublished master's thesis, Iowa State University, Ames; Hvistendahl, J.K. (1979). The effect of placement of biasing information. *Journalism Quarterly, 56,* 863-865; Kline, F.G., & Jess, P.H. (1966). Prejudicial publicity: Its effects on law school mock juries. *Journalism Quarterly, 43,* 113-116; Moran, G. & Cutler, B.L. (1991). The prejudicial impact of pretrial publicity. *Journal of Applied Social Psychology, 21,* 345-367; Otto, A.L., Penrod, S., & Dexter, H. (1994). The biasing impact of pretrial publicity on juror judgments. *Law and Human Behavior, 18,* 453-470; Padawer-Singer, A. & Barton A.H. (1975). The impact of pretrial publicity on jurors' verdicts. In R.J. Simon (Ed.) *The jury system in America: A critical overview* (pp. 123-139). Beverly Hills, CA: Sage; Simon, R.J., Eimermann, T. (1971). The jury finds not guilty: Another look at media influence on the jury. *Journalism Quarterly, 48,* 343-344; Sue, S., Smith, R.E., & Gilbert, R. (1974). Biasing effect of pretrial publicity on judicial decisions. *Journal of Criminal Justice, 2,* 163-171;Tans, M., & Chaffee, S. (1966). Pretrial publicity and juror prejudice. *Journalism Quarterly, 43,* 647-654.
[7] Daftary-Kapur, T., Penrod, S.D., O'Connor, M. & Wallace, B. (2014). Examining pretrial publicity in a shadow jury paradigm: Issues of slant, quantity, persistence and generalizability. *Law and Human Behavior,* 38(5), 462-477.
[8] A meta-analysis is a statistical analysis of several separate but similar experiments or studies in order to test the pooled data for statistical significance.
[9] Steblay, Jasmina Besirevic, Solomon M. Fulero, Belia Jimenez-Lorente. "The Effects of Pretrial Publicity on Juror Verdicts: A Meta-Analytic Review", Law and Human Behavior, vol.23, no.2, pp. 219-235, 1999.
[10] Otto, A.L., Penrod, S. & Dexter, H.R. (1994). The biasing impact of pretrial publicity on juror judgments. *Law and Human Behavior*, 18(4), 452-469.

DECLARATION OF BRYAN EDELMAN

found that deliberations actually accentuated the effects of pretrial publicity on final verdicts.[11]

Dexter, Cutler, and Moran (1992) also reported a significant relationship between pretrial publicity and views toward guilt. Participants were given pretrial publicity a week before the study began. Negative pretrial publicity increased conviction rates, even for subjects who underwent extensive voir dire addressing pretrial publicity.[12]

As demonstrated by Ruva and McEvoy (2007) exposure to pretrial publicity can influence verdicts by affecting perceptions of defendant credibility, ratings of the prosecuting and defense attorneys, and source attribution errors (i.e., misattributing information learned from the media as evidence presented as trial evidence).[13]

Consistent with the experimental literature on attitudes described above, Hope, Memon, and McGeorge (2004) found that jurors exposed to negative pretrial publicity evaluate pro-prosecution evidence more favorably than its actual probative value, a phenomenon coined "pre-decisional distortion."[14] Thus, attitudes developed from exposure to pretrial publicity serve as a filter through which later trial evidence is evaluated.

## V.      THE SQUIRREL HILL NEIGHBORHOOD

Although all mass shootings generate an outpouring of support for the victims, the attack on the oldest Jewish community in the United States was unique. The attack on "one of our historical communities" created a unique bond between prospective jurors and the victims that does not exist in other venues.

Squirrel Hill has been an important neighborhood in Pittsburgh since the 1840s. Home to 26,500 people, it is the largest and most populous neighborhood in the city. The shooting at the Tree of Life Synagogue was an assault on the center of Jewish life and culture in Pittsburgh. Squirrel Hill is known as a model of inclusivity.[15] Pittsburgh residents viewed the shooting as an attack on the city's multicultural makeup and what it represents.

The Pittsburgh community responded to this shooting with an outpouring of support for Squirrel Hill and its residents which continues to this day. More than $10 million has been raised

---

[11] Kramer, G.P., Kerr, N.L., & Carroll, J.S. (1990). Pretrial publicity, judicial remedies, and jury bias. *Law and Human Behavior,* 14(5), 409-438.

[12] Dexter, H., Cutler, B.L., & Moran, G. (1992). A test of voir dire as a remedy for the prejudicial effects of pretrial publicity. *Journal of Applied Social Psychology*, 22, 819-832.

[13] Ruva, C.L., & McEvoy, C. (2008). Negative and positive pretrial publicity affect juror memory and decision-making. *Journal of Experimental Psychology: Applied,* 14(3), 226-235.

[14] Hope, L., Memon, A. & McGeorge, P. (2004). Understanding pretrial publicity: Predecisional distortion of evidence by mock jurors. *Journal of Experimental Psychology: Applied,* 10, 111-119.

[15] Lebovits, H. (October 20, 2018). Squirrel Hill is a special place—and it's not by accident. *BELT Magazine.*

DECLARATION OF BRYAN EDELMAN

since the shooting occurred. Pittsburgh started the "Stronger than Hate" campaign and tributes appeared throughout the city (e.g., 11 trees planted for the victims, Pittsburgh Stealers honor the victims). Local museums collected artifacts and stories from the shooting to create exhibits. Funds were dedicated to renovating the Tree of Life synagogue as a memorial and museum. Several non-profits were established (e.g., 10-27 Healing Project) and the city hosted anti-hate conferences. Reminders of the attack can be found throughout Pittsburgh more than three-years later.

## VI.      MEDIA ANALYSIS

An effort was made to collect the articles published in newspapers with circulation in the Western District of Pennsylvania (Pittsburgh Division) to assess the extent of pretrial publicity surrounding the shooting at the Tree of Life Synagogue. Despite the size of the venue, the division was saturated with massive media coverage. A search of the *Pittsburgh Post-Gazette, Tribune-Review, Pittsburgh Business Times, Pittsburgh City Paper,* and the *New Pittsburgh Courier* uncovered over **1200** articles published between October 27, 2018 and October 23, 2021.

The nature of the coverage is an important factor to consider when weighing the need for a change of venue. This shooting was described as the "worst anti-Semitic killing in U.S. history." There were more than **670** mentions of "anti-Semitism" and **229** references to the shooting as a "hate crime." The focus on these aspects of the shooting were some of the key elements which helped keep this case in the public's eye despite the passage of time:

- What happened in Pittsburgh was the **deadliest anti-Semitic attack in this country's history**.

- This is likely the **deadliest attack on the Jewish community in the history of the United States**.

- The **deadliest anti-Semitic attack in the United States since 2014** - occurs at time when ADL has reported a **historic increase in both anti-Semitic incidents** and anti-Semitic online harassment.

- Was **"likely the deadliest attack on the Jewish community"** in the country's history, according to the Anti-Defamation League.

- The shooting is believed to be the w**orst anti-Semitic attack in the history of the United States.**

- **Anti-Semitism and bigotry in general have been on the rise** in the past couple of years in the U.S.

- There's a **lot of anti-Semitism out there and there's a lot of hate out there**. And it's

sobering that it's touched our community.

- Because of the number of shots fired, "I suspected it was a **hate crime from the start**," said Mr. Hardin.

- One of her neighbors was Melvin Wax, an 87-year-old retired accountant, who was killed inside Tree of Life. Bastacky said the massacre is a symptom of **growing anti-Semitism** in the United States.

- When the **neo-Nazis were screaming hateful things against Jews in Charlottesville**, that disturbed me to no end.

- The charges would include those **for hate crimes act of anti-Semitic** violence is devastating.

- The **voices of evil** seek to divide us along the lines of politics, **race, religion, income, gender and sexual orientation**.

- Their **bigoted** and **partisan rhetoric** has made our nation less safe.

- Jewish doctors and nurses helping a man **shouting anti-Semitic slurs** while being **unloaded from an ambulance**.

The coverage attempts to put this act of violence into the national debate around identity politics and the rise of the Alt-Right. There were more than **170** references in the pretrial publicity to **"Nazi"**, "Neo-Nazi", and the "modern American movement." Within this context, former President Donald Trump was mentioned more than **650** times. The media around the Alt-Right movement is particularly concerning as it incorporates prejudicial content which may be inadmissible at trial including conspiracy theories spreading via social media:

- Make no mistake, the shooting at the Tree of Life synagogue is, in part, a result of that very **national politics of hate, intolerance and unconstrained gun ownership**.

- In this context, it's clear that the **hate crime in Pittsburgh is not new**, **but part of a long legacy of nationalistic, anti-immigrant sentiments embraced by groups in the United States**. Unfortunately, **our president is fanning these flames**.

- These acts are part of **a horrifying three-year trend** that has coincided with a **spike in course and heated racial rhetoric in political discourse**.

- **These events are part of an anti-immigrant wave** that has **been brewing** in our country for generations.

- Three months before the shooting at the Tree of Life synagogue, **several people associated with a Pennsylvania white supremacist group** attacked a black man in a bar in Avalon.

- In December, **anti-Semitic pamphlets were distributed** in Squirrel Hill.
- The affidavit also cites indications that they were part of **"Vanguard America," a group that seeks a whites-only United States**.
- The disturbing reality is that there are **hate groups all across the country**. And they've been particularly **successful at recruitment and radicalization** in the last few years
- "Most weekends you can spot **someone wearing a white power T-shirt in Pittsburgh**," he said, adding later, "They're not wearing swastikas. That tends to be too risky to wear around town. But if you're wearing an SS symbol and someone recognizes the symbol, then you can fly your flag without announcing it too much."
- **Robert Bowers espoused many of the popular white nationalist conspirac**y theories **online**.
- But social media also has a darker side, **allowing the socially alienated to seek out others of their ilk and post conspiracy theories, ethnic and racial slurs, and extremist political positions**.
- "**The anti-Semitism of white supremacy sees the Jews as a critical handmaid** of the people they see as **subhuman -- blacks, Muslims, immigrants**," she said.
- "According to that theory, **there is a plan to replace white Christians in this country with Jews and people of color, immigrants**. They think there is some kind of conspiracy to **undermine the white Christian domination** of the United States. They think Jews are behind it," Paharik said.
- **Gab.com** hosts "leaders of this movement who identify as such, and their followers know to find them there," Mr. Hankes said. "**This is one of the only places these people can go, and say whatever they want, no matter how despicable**."

Much of the pretrial publicity connects the defendant to Alt-Right beliefs and anti-Semitic conspiracy theories. This type of media has the potential to generate strong negative impressions of Bowers during the lead-up to trial, which is particularly concerning in a capital trial where jurors are required to weigh aggravating and mitigating factors. According to the coverage, Bowers was angry because he believed Jews were trying to help illegal immigrants enter the United States and change the demographics of the county. There were more than **100** mentions to the motive behind the attack and another **90** references to conspiracy theories, Jews committing genocide against the white majority, the HIA Hebrew Immigration Aid society, and comments by Bowers posted on social media:

- Prosecutors have said Mr. **Bowers was motivated in the attack by hatred of Jews**.

- In repeated online posts, Robert D. Bowers **shared hateful anti-Semitic writings** and **called Jews "the children of Satan."**

- A profile by the name of Robert Bowers wrote that "**Jews are the children of Satan.**" That profile was unavailable Saturday.

- The **searing hate behind it** that the alleged gunman Robert Bowers expressed online.

- The **Jews** are **committing genocide on whites**.

- The **Jews control President Donald Trump**.

- To Robert Bowers, **Jews were an "other," an object of hate**.

- The gunman **targeted Dor Hadash** because the **congregation** had **participated in National Refugee Shabbat**, a program promoted by HIAS.

- In **online postings**, the **gunman accused HIAS of bringing "hostile invaders to dwell among us."** He sought to **intimidate** Jewish people who advocated on behalf of refugees and put a stop to their efforts.

- Robert Bowers on Gab.com posted this morning that "H**IAS likes to bring invaders in that kill our people. I can't sit by and watch my people get slaughtered. Screw your optics, I'm going in**."

- "**He'd spent the morning posting furious anti-Semitic conspiracy theories** on his social media accounts, **conspiracies long popular among white nationalists and neo-Nazis**. The **Jews are committing genocide on whites**.

- **He had espoused anti-Semitic views** and is **charged in the worst anti-Semitic killing in U.S. history.**

- Someone posting under the name Robert Bowers **on the social media site Gab.com**, wrote on or around Oct. 10: "**Why hello there HIAS! You like to bring in hostile invaders to dwell among us? We appreciate the list of friends you have provided,**" and included a link to the website for HIAS National Refugee Shabbat, formerly the Hebrew Immigration Aid Society

- **Robert Bowers on Gab.com** indicated a week ago that he "**noticed a change in people saying 'illegals' that now say 'invaders' I like this.**" He also called one other poster on Gab.com a "deceptive little oven dodger" in response to a post debunking a rumor that **trucks marked with the Star of David were bringing Central American migrants to the U.S.**

- In recent days, Robert Bowers **vigorously shared anti-Jewish posts** and wrote several of his own.
- **That morning's post followed other anti-Semitic messages** that Mr. Bowers apparently made public on the platform under the handle @onedingo.
- He said "**he wanted all Jews to die and also that they [Jews] were committing genocide to his people,**" investigators said.
- Among the posts: "Daily Reminder: **Diversity means chasing down the last white person**."
- Another: "welp, it's 8 bells and **time to raid the kike group**."
- Yet another: "**The Mass Migration Agenda [link to a YouTube video] diversity for you but not for jew**."
- "Bowers **commented to one law enforcement officer**, in substance, **'They're committing genocide to my people. I just want to kill Jews.'**"

The pretrial publicity also covers the events leading up to the Government's decision to charge Bowers with a capital crime and pursue the death penalty. This decision created considerable debate in the Pittsburgh community as pro-death and pro-life factions expressed their opinions in the media. There were more than **280** mentions of the death penalty in the coverage:

- In a court filing Monday, **prosecutors said Mr. Bowers qualifies for the death penalty** because he **allegedly targeted vulnerable people out of religious hatred, killed multiple victims and tried to kill others, chose the site to make an impact and showed no remorse, among other factors**.
- **Bowers is the fourth defendant** in the **history** of this **district**, which comprises 25 counties, to face the death penalty.
- Earlier this year, **the defense attorneys proposed a plea deal that would spare Mr. Bowers the death penalty if he pleaded guilty**.
- Tuesday's court filing confirmed that the **defense sought a life sentence without the possibility of releas**e.
- Federal prosecutors rejected an offer from accused Tree of Life synagogue gunman Robert Bowers to **plead guilty in exchange for life in prison**.

- **Robert Bowers** could become the o**nly person from Western Pennsylvania on federal death row if he is convicted** and sentenced to death for the mass shooting inside a Squirrel Hill synagogue last year.

- "It's probably **as bad as it gets.** If there was **ever a case for the death penalty** proponents to use, and **use him as their poster child**, that would be it.

- "(Donald Trump) -- **having already publicly called for our client's execution** -- may be **expected to politicize this case again**" and pollute the potential jury pool, Bowers' attorneys wrote.

- "I think they should **very much bring the death penalty into vogue**," Trump said last year after 11 people were gunned down at the Tree of Life synagogue in Pittsburgh.

- "**I'm only guilty if the death penalty is off the table**, otherwise **I make the victims relive their trauma by testifying**," is baloney from all perspectives.

- So, on the anniversary of its rampage, **hell still sits in custody** awaiting its day in court. **It is willing to plead guilty right now** and spare the survivors the trauma of a trial if the state passes on seeking the death penalty, **but hell isn't in a position to negotiate**.

- For now, **only death provides such finality**. This **shooter's fate should be worse than death. Take away his name**.

- Thus, earlier this month, **leaders and members from two of the Jewish congregations that were brutally attacked** in last year's massacre at the Tree of Life synagogue **called upon Attorney General William Barr a**nd his team of federal prosecutors **to refrain from seeking the death penalty** for the suspect in the shooting, which claimed 11 lives.

- Even though **some family members of the victims have asked that hell not be executed** because they would prefer to see it spend its life in prison**, the state wants to show hell the same "mercy" it showed its victims**.

- They stated that a "**a drawn out and difficult death penalty trial would be a disaster with witnesses and attorneys d**redging up horrifying drama and giving this killer the media attention he does not deserve.**"

In the wake of this tragedy, residents rallied behind the slogan "Stronger than Hate." This message appeared more than **200** times in the coverage. There was also a massive outpouring of support that culminated in memorials, candlelight vigils, and fundraising efforts which raised millions of dollars for the congregation and synagogue. This coverage—which includes more than

**415** comments about community memorials—chronicles how the greater Pittsburgh area took on the feeling of a small community trying to process a devastating tragedy:

- Mr. Hindes, 40, designed the "**Stronger Than Hate**" image that has been, seemingly, everywhere.

- "This **fundraiser** is meant to **help the congregation with the physical damages** to the building, as well as the survivors and the victims' families. **Respond to this hateful act with your act of love today**."

- This is what we mean when we say **Love over Hate**.

- "**What makes us one family** is that we are all decent people that in here demonstrate our **position toward hatred**," he said.

- In the wake of Saturday's tragedy, **we need to embrace our Jewish friends** and **neighbors** and assure them they are not an "other."

- "**We're not going to allow the Jewish community to respond alone**," said Imam Hamza Perez of Light of the Age Mosque on the North Side. "**We're going to respond as one people**. And that's the beauty of it, that t**he city can set an example nationwide how we can come together against terrorism**."

- Everybody in the **entire Jewish community** has been affected by this, and **the whole Pittsburgh community**.

- "**I'm just sick for the community**," said Mr. Hardin, who is not a member of the synagogue.

- A **vigil** will be held Monday at the Westmoreland County Courthouse **to honor the victims** of the Tree of Life Congregation shooting in Pittsburgh.

- Next we drove to Soldiers and Sailors Memorial Hall for a **community vigil and rally**.

- I was one of **4,000 people** - 2,500 seated inside and 1,500 standing outside in the rain.

- Among the hundreds of people who **placed flowers, candles, cards and other tributes** at several memorials near the synagogue.

- Shay Khatiri closely tracked the GoFundMe account he set up to help in the wake of the Tree of Life tragedy **as it surpassed $1 million** Wednesday evening and kept climbing.

- The GoFundMe account **he created reached $1.05 million** by 6 p.m., with contributions from some **16,800 donors**.

- **Muslim charitable organizations have surpassed $225,000** in fundraising through the LaunchGood crowdfunding site.
- The Jan. 31 article **"Tree of Life fundraisers collect more than $10M"** was a testament to the **generous** and **caring spirit of people** in the Pittsburgh area.
- **"Our Victims of Terror" fund** to help those impacted by the shooting.
- **Auditoriums overflowed with thousands** during **vigils** and interfaith services.
- **People cried and sang**, held each other and prayed, **shuddered at the attack and remembered those killed for how they lived, not how they died**.
- Rabbi Perlman, who pushed Mr. Werber and Ms. Black into the storage closet, made an **emotional plea during a vigil attended by more than 2,000 people**
- The performance titled **"A Concert for Peace and Unity"** will **honor the Tree of Life synagogue victims** and be an evening of remembrance and reverence.
- **Eight-hundred Americans**, most of whom weren't Jewish, **stood in silence and lowered their heads.**
- Within days of the shooting, **the Muslim community raised over a quarter of a million dollars** for victims and their families.
- An **Iranian-American launched a GoFundMe** campaign that, to date, has raised **over $1 million.**
- **The small crafted hearts that have been turning up in unlikely spots around Pittsburgh** were created as a compassionate response to the senseless attack on worshippers at the Tree of Life synagogue in Squirrel Hill.
- **People have come by the thousands to pay their respects** and add to the ever-growing **spontaneous memorial** at the busy intersection of Shady and Wilkins avenues.
- Each night, they have been **offering music, stories and a listening ear**. They call themselves TOLAH, for Tree of Life Arts Healing.
- In this case, many of the signs and notes left at Tree of Life are marked by **appeals to overcome bigotry and hatred across religious, ethnic and racial lines**

The survey data indicate that the media coverage has negatively impacted the jury pool. This coverage often describes hate speech posted by Bowers on social media and his efforts to reach a plea deal to avoid the ultimate punishment for his crimes. The pretrial publicity incorporates emotional language, prejudicial details, victim impact statements, and stories about

law enforcement officers who were injured at the scene.

Fifty-nine percent (**59%**) of Pittsburgh Division survey respondents who recognized the case knew that Bowers had posted anti-Jewish comments on social media before the attack. The survey data also suggest that the coverage has shifted the burden of proof onto the defendant on both questions of guilt and sentence. Eighty-two percent (**82%**) of those who recognized the case reported that Bowers would have a difficult time convincing them that he is not guilty of murder. In addition, **86%** of prospective jurors who believe Bowers should be sentenced to death indicated that Bowers would have a difficult time changing their opinion.

## VII.    TELEPHONE SURVEY

A community attitude survey was conducted to help evaluate the effect, if any, of the pretrial publicity on the jury pool. The telephone survey was administered in the Western District of Pennsylvania (Pittsburgh Division), Eastern District of Pennsylvania (Philadelphia Division), Middle District of Pennsylvania (Harrisburg), and within the District of Columbia. *Research Strategies Inc*. which is based in Mobile, Alabama, was hired to field the telephone survey. Standard methodological practices related to the development of the instrument, interviewer training, sampling, and callbacks were closely followed. All recognition questions were designed in an effort to describe the case using the language found in the media coverage. The survey was in the field between November 7 and December 20, 2021.[16] Ultimately, 1150 jury-eligible residents completed one of the four surveys.[17]

It is my opinion that the results of the telephone survey indicate that there is bias in the Pittsburgh Division jury pool against Robert Bowers stemming from exposure to pretrial publicity. Despite the size of the venue and passage of time, **89%** of jury eligible respondents were familiar with the case. Consistent with the social science literature, the recognition rate was significantly related to media habits. Ninety-six percent (**96%**) of those who regularly read and watch local were familiar with the case. Unlike most crimes in large venues, this mass shooting captured the public's attention. Sixty-nine percent (**69%**) of survey respondents who recognized the case have talked about—or heard others talking about—the shooting in person or online. This behavior mirrors what often happens in smaller communities where informal communication networks develop which spread information and rumors. Prospective jurors from the Pittsburgh Division also reported connections to the shooting or synagogue. Twenty-eight percent (**28%**) of survey

---

[16] The survey instrument can be found in **Appendix 2**.
[17] 400 respondents completed the Western District of Pennsylvania (Pittsburgh Division) survey and 250 completed each of the three comparison surveys.

respondents knew someone directly or indirectly affected by the shooting and **39%** were familiar with the Tree of Life Synagogue.

In addition, **92%** of prospective jurors in the Pittsburgh Division who were familiar with the case believe the defendant is guilty of murder, with **66%** reporting that he is "definitely" guilty. The media coverage has also undermined the presumption of innocence. Eighty-two percent (**82%**) of residents who have been exposed to media coverage believe Bowers would have a difficult time convincing them that he is <u>not</u> guilty of murder.

Prospective jurors in the Pittsburgh Division have also developed strong opinions toward the proper punishment. Eighty-two percent (**82%**) would start the trial with an opinion regarding sentence, with **54%** favoring the death penalty and just **28%** a life sentence. Those who support the death penalty also maintained strong fixed opinions, as **86%** indicated that Mr. Bowers would have a difficult time convincing them that he should receive a life sentence.

In contrast, the comparison surveys conducted in the Philadelphia and Harrisburg Divisions found recognition rates of just **60%** and **56%**, respectively. The recognition rate in the District of Columbia was only **64%**. As for prejudgment, **83%** of Philadelphia, **77%** of Harrisburg, and **80%** of survey respondents from the District of Columbia believed that Bowers was guilty. However, these attitudes were not as strong as those found in the Pittsburgh Division. Fifty-one percent (**51%**) of survey respondents in Philadelphia, **53%** in Harrisburg, and **39%** in the District of Columbia maintained that the defendant was "definitely guilty." Although the burden of proof has shifted toward the defendant in the comparison venues, not to the extent found in Pittsburgh. Whereas 82% of prospective jurors in the Pittsburgh Division reported that Bowers would have a difficult time changing their opinion, those numbers stood at **67%** in Philadelphia, **69%** in Harrisburg and **71%** the District of Columbia.

Survey respondents in the comparison venues who recognized the case were also less likely to start the trial favoring the death penalty. Forty-five percent (**45%**) of prospective jurors in Philadelphia, **54%** in Harrisburg, and **14%** from the District of Columbia believed Bowers should be sentenced to death. In addition, these prospective jurors were significantly less likely to hold strong fixed opinion compared to their counterparts in the Pittsburgh Division. Whereas **86%** of prospective jurors in Pittsburgh maintained that the defendant would have a difficult time convincing them that he should receive a life sentence, those numbers stood at **68%** (Philadelphia), **77%** (Harrisburg), and **59%** (District of Columbia) in the comparison venues.

Members of the Pittsburgh Division jury pool recognized prejudicial details widely

reported in the pretrial publicity. Approximately **71%** of respondents were familiar with at least three of the seven media items incorporated into the survey compared to just **46%** in Harrisburg, **47%** from Philadelphia, and **50%** of District of Columbia residents. Fifty-three percent (**53%**) of prospective jurors from the Pittsburgh Division knew that Bowers has been charged with a hate crime. In addition, **64%** were aware that the shooting occurred as religious services were getting started. Another **85%** were aware that several of the victims were elderly, and **34%** knew Bowers had posted anti-Jewish comments on social media before the attack.

Consistent with the social science literature, case knowledge was significantly related to prejudgment. For example, **97%** of Pittsburgh Division respondents who were familiar with five or more of the media items believed Bowers was guilty of murder, and **90%** reported that Bowers would have a difficult time convincing them that he was not guilty. Case knowledge also had an impact on fixed opinions toward the appropriate sentence. Approximately **76%** of those who favored the death penalty and recognized five or more items reported that Bowers would have a difficult time convincing them that he should receive a life sentence.

Overall, the survey data show strong bias among prospective jurors who have been exposed to media coverage surrounding this case. However, attitudes are significantly stronger in the Pittsburgh Division where recognition rates are higher than those found in the comparison venues. Based on the survey data, the following trends would appear on venires of 100 prospective jurors across the four venues:

| | Pittsburgh | Philadelphia | Harrisburg | District of Columbia |
|---|---|---|---|---|
| Recognize the case | **89** | 60 | 56 | 64 |
| Believe Bowers is guilty | **82** | 48 | 40 | 52 |
| Believe Bowers should be sentenced to death | **48** | 26 | 30 | 9 |
| Believe Bowers should be sentenced to life | **25** | 25 | 16 | 39 |
| Recognize three or more media items | **63** | 28 | 26 | 32 |

As these data show, there are a greater number of prospective jurors with preconceived notions about the defendant's guilt and the appropriate sentence in the Pittsburgh Division compared to the alternate venues. The survey data also offer qualitative insight into how residents in the Pittsburgh Division have developed strong attitudes about this this mass shooting. When asked for their opinions about the defendant, the victims, and the crime, many respondents expressed anger and a desire to see Bowers receive the death penalty:

- He is a **coward** and it's **terrible** for someone to kill someone because of that.
- Personally, I feel that he should be **tortured and hung by his toenails**.

- I think that he is a **disgusting human being for having so much hate** for people he didn't even know. **The families deserve putting the shot in him.**
- He is a **monster**, and I'm **sorry he isn't already dead.**
- I feel that he **needs to be hanged** for this and **definitely get the death penalty.**
- I am all in **favor of the death penalty**. It is definitely true that this is a strange case.
- I think Robert Bowers is a **coward** and he **doesn't deserve to live**.  The people that he killed had no choice.  I don't care if they are Jews, White, Black or whatever they didn't deserve to die and the **Bible says an eye for an eye**.  He thought those people should die so **I think he should die.**
- **He is the worst type of criminal**.  **I would not show him any mercy.**  The victims. It's heartbreaking.  The victims that died have left a **huge void in the community** and he is the worst ever.  **The shooting is the worst crime and it's incomprehensible.**
- Feel **bad** for the **victims** and **could care less about the guy that killed them**.
- I mean it just seems like he had **pretty clear motives about what he was doing**, it was clearly a **hate crime**, but he should have a trial. Based on what he said, specific hateful comments about specific people.
- Robert Bowers **should be executed**. The **victims and shooting was senseless** and was ethnically motivated.
- Robert Bowers **can die tomorrow and I wouldn't care**. It's needless. **How people's mind can be that screwed up is mind boggling.**
- I personally think he should **get the death penalty.**
- I think they should **execute him** if he did it. And the victims should get reimbursed somehow since it happened in the church.
- I think Robert Bowers **should be executed.**
- I think that Bowers, although he may have felt justified, **that he is a coward**. The victims, **my heart goes out to the families**. Shooting **senseless** and **unwarranted**. Nobody should have to fear going to worship.
- I believe **that he should get capitol punishment** because this was a **hate crime** and nothing else.  **He devastated these people**.  These people will always be **traumatized** by these deaths.  I have to figure this out the rest of my life and they will need therapy.  I feel very sorry for the people that this happened to and it never should have occurred.

- It was a tragic situation by a disturbed individual and if he is found guilty, **he should get the death penalty.**

- I think he should get the **death penalty**. There should be **no mercy** for mental problems.

- He is guilty and this **should be a death penalty** case. I think what happened was abhorrent.

- I'm sad for the victims. **I don't understand the murders**. If Bowers is found guilty, I **hope he gets the death penalty.**

- My **thought about the victims my prayers go toward the families** and the Tree of Life Synagogue. My thoughts about him honestly I think, **I'm not a supporter of the death penalty, but in his case I'd pull the lever myself for something so heinous as this.** They live out their lives on death row, the money, but let the punishment fit the crime.

- I don't feel that he should be allowed to be put into prison while we pay for his life, since he took so many lives**.  I prefer that he be put to death.  My heart aches for the victims**, I can't even put it into words, plus, my daughter-in-law works for Achieva school for children and people that need extra mental help and I remember her telling me that the two guys that were also slaughtered were two people that my daughter-in-law used to assist.

- He should be charged. **Death by injection may be too good for him.**

- I feel that if he is found guilty, he **should definitely get the death penalty.**  And he destroyed the lives of the victims.

- If he is found guilty **he should get the death penalty.**

- I feel bad for the victims, **I think the shooter should hang**, be sentenced to death for what he did and have no leniency for him.

- I feel bad for the victims, and I feel that he **should get the death penalty.**

- I feel that he should **definitely get the death penalty**.  I feel empathy for the victims.

- I would rather not use the man's name because you are giving them power and he **should be put to death as quick as they can**. They saw him doing it and they should put him to death.  I'm **scared to death with my grandchildren.**  The Jewish people I am so sorry for them, no one should be hurt or killed and some people who claim to be Christian and Republican because they are empowering these people.

- **He should fry**. What he did is an **embarrassment** to **everybody**.
- I believe that there is **an eye for an eye and he should be hung by the highest tree in the land.** I feel that Robert Bowers did a horrific crime towards these innocent victims.
- He is a **real bastard** and he should have been brought to trial years ago and may justice be done. The victims were in the house of worship and that is the **last place you would expect to be killed and it is very sad**. From what I have seen since then he was very sane and did the killing deliberately.
- **I was totally disturbed.** I believe he had some ulterior motive. I believe it was **a hate crime and he deserves death by lethal injection**.
- Regardless of religion no one deserves that. Bowers should have died**. My tax dollars are going to pay his way.**
- Unfortunate for victims. **Robert Bowers should be sentenced to death.**
- This guy is **not one to get mercy**. It **is a hate crime, clear cut.**
- He is a **terrible man.**
- I mean you feel terrible for anyone in those circumstances and Mr. Bowers, if **he's truly guilty they should hang him.** I don't care if they're Chinese, Jewish, they're people. You can't hurt people, I don't care where they're from. Any humane person would say if you go to church and get killed there's something wrong.

## VIII.   ABILITY TO SELECT A FAIR AND IMPARTIAL JURY IN VENUES SATURATED WITH MEDIA COVERAGE

When a jury pool has been inundated to media coverage, the trial court and parties are faced with unique challenges which are not present in most cases. In high-profile cases, many prospective jurors enter the courtroom with extensive knowledge and attitudes about the case, defendant, and victim. However, it is often difficult for prospective jurors to predict how case-specific knowledge and opinions may affect them over the course of a trial. Prospective jurors may also unintentionally omit exposure to specific media items during voir dire when asked what they recall hearing about the case. These items, however, may become salient and recalled from memory once witness testimony begins. The research also shows that information learned from

media exposure can be misattributed as evidence presented at trial.[18]

Given these factors, it is important to ferret out during voir dire the full extent of exposure to pretrial publicity, case-specific attitudes, impressions of the defendant, and potential motivations to serve. However, the prejudicial effects of preexisting attitudes can occur at both a conscious and subconscious level, meaning jurors who profess impartiality may not be fully aware of their bias or how it may affect them as the trial unfolds. This can make it difficult to identify potential prejudice during the jury selection process. The Supreme Court has recognized the limitations of the voir dire process as a remedy where potentially prejudicial pretrial publicity is an issue. In *Irvin v. Dowd*, the Court concluded:

> No doubt, each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight. As one of the jurors put it, "You can't forget what you hear and see." With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt.[19]

Research on voir dire shows that these concerns are justified. Jurors are often reluctant to disclose relevant experiences, relationships or opinions that may lead to bias, even when pretrial publicity is not an issue. One study found that while 71% of jurors had a fixed opinion regarding guilt, only 15% admitted so during the voir dire.[20] Marshall obtained questionnaires from 277 former jurors in two counties and found that 18% of those jurors admitted to withholding information during voir dire.[21] Seltzer reported that approximately 39% of jurors who were interviewed after trial should have come forward in response to questions regarding crime victimization or knowledge of police officers during jury selection, but failed to do so.[22]

Many aspects of the large group voir dire format deter juror candor. Federal Court Judge Gregory Mize published his findings after experimenting with an expanded voir dire procedure in

---

[18] Ruva, C.L., & McEvoy, C. (2008). Negative and positive pretrial publicity affect juror memory and decision-making. *Journal of Experimental Psychology: Applied,* 14(3), 226-35.

[19] *Irvin v. Dowd,* 366 U.S. 717, 727-28 (1960).

[20] Fahringer, H.P. (1980). In the valley of the blind: A primer on jury selection in a criminal case. *Law and Contemporary Problems,* 43, 116-36.

[21] Marshall, L.L. (1983). Juror, judge and counsel perceptions of voir dire. Ph.D. dissertation, Boston University.

[22] Seltzer, R. (1991). Juror honesty during the voir dire. *Journal of Criminal justice,* 19, 451.462.

DECLARATION OF BRYAN EDELMAN

30 federal criminal trials over a nine-month period, which included individual interviews with every venire member who failed to respond to his general opening questions. Judge Mize reported that approximately 28% of members of each panel failed to respond to the dozens of questions posed in open court, an average of about 16 people per trial. However, when questioned in private, one in five of these silent jurors disclosed personal information that was relevant to the case. In 90% of the trials, between one and four of these silent jurors expressed bias that led to their removal for cause.[23]

A search of appellate opinions shows that juror disclosure has led to several mistrials by undermining a defendant's fair trial rights. For example, in *U.S. v. Colombo*, 869 F.2d 149 (2d Cir. 1989), a juror failed to disclose when asked during voir dire that her brother-in-law was a lawyer for the government. She did not mention this fact because she wanted to sit on the jury for the case. In *Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998), a juror answered "no" when the panel was asked if anyone had ever been the victim of a crime. After the guilt phase, the defense learned that her brother had been shot and killed six years earlier. When questioned, she told the judge that she answered "no" because she, "thought the shooting was an accident, not a crime." Her brother had been pistol-whipped four times and shot in the back of the head.

Problems such as these have also been reported in high-profile cases. For example, in the 2012 murder trial of Matthew Stebbins, who had been charged in a shooting death at a homeless shelter, a mistrial was declared after a juror announced during deliberations that she had a previous issue with violent crime. One of her children had been shot in the head. She failed to raise her hand during jury selection when asked if anyone had been a victim of a violent crime. According to her, "she did not think it was going to be an issue."[24]

A $6.5M judgment was overturned in the high-profile police corruption lawsuit against the Public Defender surrounding the Rampart Division in Los Angeles County.  It was uncovered after the verdict that one of the jurors—Jennifer Salinas—had concealed knowledge of the scandal during jury selection.  She did not raise her hand when asked if anyone had some knowledge of events surrounding the Rampart Division. Later it was discovered that Salinas had played a prominent role in a movie titled "Gang Warz" that was based on the Rampart Division. Other

---

[23] Mize, G.E. (1999). On better jury selection: Spotting UFO jurors before they enter the jury room, *Connecticut Review Spring,* 33.
[24] Villarreal, M. (2012, March 12). Judge declares mistrial in Corpus Christi murder case. *Corpus Christi Caller Times.* Retrieved February 10, 2015, from http://www.caller.com/news/local-news/crime/judge-declares-mistrial-in-corpus-christi-murder.

jurors on the panel corroborated that she was very familiar with the scandal and discussed aspects that were not in the evidence.[25]

Prospective jurors in cases with extensive media coverage enter the courtroom with case-specific knowledge gleaned from the media, social media, and discussions with friends, family members, and co-workers. Uncovering the full extent of jurors' case-specific knowledge and opinions in high-profile cases can be extremely difficult. Jury selection as a judicial remedy to address such bias relies on two factors: 1) that jurors can access their source of bias and 2) are willing to report it. In one study where researchers tested the effectiveness of extended voir dire, participants in the experimental condition were exposed to pretrial publicity a week before the experiment.[26] Prior to viewing a trial, they were subjected to minimal or extended voir dire. The attorney in the extended voir dire condition explained how pretrial publicity may inappropriately impact decision-making, asked jurors to hold each other accountable for not discussing pretrial publicity, obtained public commitments to base their verdict solely on the evidence presented in court, and to ensure that fellow jurors did the same. The researchers ultimately found that educating jurors on the potential impact of pretrial publicity did not eliminate the effects of pretrial publicity.

High-profile cases also create a unique challenge during jury selection known as the "minimization effect."[27] This concept refers to prospective jurors' attempts to minimize the full extent of their exposure to pretrial publicity. During voir dire, prospective jurors try to downplay their knowledge of the case using qualifiers such as, "just," "nothing other than," "only," "a little bit," and "that's all." In an archival study that analyzed the jury selection transcripts from five high-profile cases, 69% of prospective jurors used minimization language when questioned by the judge or attorneys.[28]

Another challenge in cases with significant media coverage surrounds the difficulty jurors have during voir dire to recall every detail they have read, seen, or heard about a case. These types of open-ended "recall" questions require significant cognitive effort and often result in incomplete recollection. This phenomenon is an inherent limitation in how memory works. For example, if someone is asked to recall everything they know about the movie *Star Wars,* their description

[25] Ellis, S.M. (2008, January 22). Appeals court orders new trial in suit against public defender. *Metropolitan News-Enterprise*. Retrieved February 12, 2015, from http://www.metnews.com/articles/2008/ovan012208.htm.
[26] Dexter, H. R., Cutler, B. L., & Moran, G. (1992). A test of voir dire as a remedy for the prejudicial effects of pretrial publicity. *Journal of Applied Social Psychology*, 22, 819-32.
[27] Bronson, E. (1989). The effectiveness of *voir dire* in Discovering Prejudice in High Publicity Cases: An archival Study of The Minimization Effect.
[28] Edelman, B., Dahir, V.B., & Dillehay, R. (2011). Paper presented at the meeting of the American Society of Trial Consultants.

would likely miss important details they are familiar with. Memory is much more accurate when answering "recognition" questions: *Have you read, seen, or heard if Darth Vader was Luke Skywalker's father?*

This concern is not mere speculation. In a 2017 change of venue hearing in Texas, community residents exposed to detailed pretrial publicity over a number of years were called as witnesses.[29] During the hearing they were asked to recall everything they knew about the case. Following the "recall" question, they were asked a number of "recognition" questions about specific prejudicial and potentially inadmissible media items they failed to mention. The hearing demonstrated the limitations in memory and voir dire as a corrective remedy:

Q. Can you tell the Court the facts that you know about the State of Texas versus John Feit as it relates to Irene Garza?

A. [Description of basic facts]

Q. Is that it?

A. **Let's see. I believe so.**

Q. Now, Ms. Perez, have you read, seen, or heard about John Feit **giving a confession to a priest**?

A. **Yes.**

Q. **And you didn't mention that a few minutes ago?**

A. I'm sorry. **There were two that I remember. They mentioned that there were two confessions that he made to two priests.**

Q. Okay. Have you read, seen, or heard about whether or not Ms. Irene Garza **was alleged to have been raped?**

A. **I read, yes.**

Q. Now having refreshed your memory a few minutes ago, **are there any other facts that you have read, seen, or heard that you haven't told the Court about**?

A. **I don't believe so.**

Q. Okay. Have your read, seen, or heard that **John Feit was transferred to a monastery after this**?

A. **I did read that, yes.**

This limitation in memory recall has been demonstrated in several high-profile cases around the country. For example, in a change of venue survey in Sonora, California, 95% of survey

---

[29] *State of Texas v. John Feit*, CR-0464-16-A (2017).

DECLARATION OF BRYAN EDELMAN

respondents recognized at least one additional detail reported in the media from the closed-ended recognition questions that they failed to mention in the open-ended recall question. A near identical trend (96%) was found in another high-profile case in Nashville, Tennessee.[30] For example, when asked, "What have you read, seen, or heard about the case," one respondent answered, "Bits and pieces on the news. They were just talking about the case." However, he later recognized several media items including that: 1) the shooting was captured on video by surveillance cameras in the area and played on the television news and internet; and 2) the public approved a ballot measure in the last election to create a community oversight board to monitor the Metro Nashville Police Department. Both were prejudicial items widely reported in the media.

A similar pattern was found in the Bowers case. Many prospective jurors from the Pittsburgh Division used minimization language or incomplete answers when asked what they knew about the case. Ultimately, **93%** of survey respondents later recognized at least one additional media item they failed to mention in their open-ended answer and averaged **3.3** additional media items.

| What have you read, seen, or heard about this case and the shooting [recognized the case]? | Number of media items recognized but not mentioned in the open-ended response |
|---|---|
| I remember it on the news, not a lot of details. | 7 of 7 |
| I know that this guy went into this place and shot all these innocent people, but that's about all I remember right off. | 7 of 7 |
| He shot people at the synagogue. Eleven dead and six injured. | 7 of 7 |
| That this man went into the synagogue and started shooting people. | 7 of 7 |
| They caught him in the act and he is pleading not guilty. | 7 of 7 |
| He shot everybody. | 6 of 7 |
| He is going back to court. | 6 of 7 |
| He shot a lot of people for no reason. | 6 of 7 |
| Saw the reports, police interviews and watched the news. | 6 of 7 |
| I've seen something recently about the families saying they wanted him to have the death penalty. | 6 of 7 |
| On the TV I saw that it was horrific and they told about how he hated the Jews. | 6 of 7 |
| It was all over the news. | 6 of 7 |
| It has been going on for years and they had several events during the anniversary. | 6 of 7 |
| He went into a church and shot people. | 6 of 7 |
| Just the general articles that you would find on TV, or a radio station. Not too much about it for me to have more appropriate attention for special details. | 5 of 7 |
| Not a whole lot. I don't follow the news all the time. I heard about the case a while ago, but I don't concentrate on it too much. It brings me down. | 5 of 7 |

---

[30] *State of Tennessee v. Andrew Delke*, Case No. 2019-A-26 and *People of the State of California v. Diane Anderson*, Case No.: CRF53011.

| | |
|---|---|
| I saw some of the footage. | 5 of 7 |
| They caught him at the scene. | 5 of 7 |
| I heard he went into the synagogue and started shooting. | 5 of 7 |
| The guy entered and started firing his gun. | 5 of 7 |
| I really do not remember. | 5 of 7 |
| All the TV stuff. | 5 of 7 |
| I heard what happened. | 5 of 7 |
| That a man walked into a synagogue and opened fire. | 5 of 7 |
| I just saw it on the news, but don't really remember what was being said. | 4 of 7 |
| That was a while ago, but just that he went in while they were having service and opened fire killing a lot of people. | 4 of 7 |
| I just remember seeing it on the news when it happened. | 4 of 7 |
| Just what was posted in the news media. | 4 of 7 |
| I just heard about it, but don't know all the facts. It's been a while and I'm old and forgetful. | 4 of 7 |
| I just know the little bit I saw back then. I always turn it when it comes on so I just know he went in and shot it up. | 4 of 7 |
| The details of the case. | 4 of 7 |
| He went and opened fire in the church. | 4 of 7 |
| The people died and it was at a temple. | 4 of 7 |
| That this guy opened fired on these people and they caught him. | 4 of 7 |
| Saw the coverage. | 4 of 7 |
| I know he walked into this church and started shooting people. | 4 of 7 |
| He killed all of the people. | 4 of 7 |
| He went into the synagogue and started shooting. | 4 of 7 |
| He went in shot some people. | 4 of 7 |
| A man went in and started shooting and he killed people. | 4 of 7 |
| He went in and shot a bunch a people. | 4 of 7 |
| Not too much. | 3 of 7 |
| I'm just trying to remember that he shot up a synagogue. | 3 of 7 |
| Just what they put on the news and I have a hard time believing the news these days. | 3 of 7 |
| I don't remember the details. | 3 of 7 |
| It was so long ago and so much has happened since then. | 3 of 7 |
| I think it was a few years ago and he just went inside the synagogue and started shooting. | 3 of 7 |
| I just remember seeing the whole thing transpire on the news. | 3 of 7 |
| Just regular media information, I have not researched it further. | 3 of 7 |
| It's been awhile, but he went in and killed and shot people. | 3 of 7 |
| I only heard over the news. | 3 of 7 |
| I believe this person went into a Jewish synagogue and opened fire on innocent people. | 3 of 7 |
| I don't have all the details, but he went in there and shot people. | 3 of 7 |
| I'm just trying to remember that he shot up a synagogue. | 3 of 7 |

The inability to provide a full account of everything a juror knows about a case puts the defendant in an untenable position. Counsel must choose to either rely on an open-ended question—known to generate incomplete recall—or ask media specific recognition questions, which are more diagnostic but risk exposing prospective jurors to extrajudicial information they

may not be familiar with.

Prospective jurors' inability to recall the full extent of their exposure to pretrial publicity can undermine the value of voir dire as a corrective measure for identifying and ferreting out bias. If jurors are unable to fully recall from memory their detailed knowledge about a case when asked an open-ended question, it makes it difficult for counsel to effectively exercise challenges. Incomplete recall also poses a problem for the trial court when exercising its discretion to weigh prospective jurors' self-reports about their ability to be fair and impartial and rule on cause challenges.

This predicament is illustrated by research, which suggests that professions of impartiality should not always be taken at face value. Part of the challenge media coverage presents surrounds jurors' efforts to guess how exposure to pretrial publicity may affect their evaluations of the evidence. Given the difficulties that such a guess poses, it is not surprising that claims of impartiality in high profile cases have been shown to be unreliable. A study on the prejudicial impact of pretrial publicity found that 62% of jury-eligible residents said they could be fair and impartial and decide the case solely on the basis of the evidence presented. However, only 39% said they could put knowledge of the media out of his or her mind.[31]

Another obstacle is the well-documented tendency for individuals to respond in a manner that will be viewed favorably by others, which has been coined the "social desirability" effect. This phenomenon has been researched and found in a multitude of disciplinary settings, including the courtroom. Socially desirable responses are more likely to occur when individuals become focused on the public aspects of themselves. Public awareness of oneself can become particularly salient in a courtroom setting where prospective jurors are asked questions by an authority figure in front of a public audience. Jones, for example, reported that participants appeared to alter their answers to reflect what they thought a judge wanted to hear rather than what they actually thought.[32] When potential jurors learn through the jury selection process that the law requires them to be fair and impartial, there is a risk that they will overstate their ability to set aside their knowledge and beliefs in order to create a favorable public impression.

Also referred to as response bias and demand characteristics, the effect causes the juror (interviewee) to pick up the subtle and overt clues as to what a lawyer or judge (interviewer) wants

---

[31] Moran, C., & Cutler, B.L. (1991). The prejudicial impact of pretrial publicity. *Journal of Applied Social Psychology*, 21(5), 345-67.

[32] Jones, S. (1987). Judge versus attorney conducted voir dire: An empirical investigation of juror candor. *Law and Human Behavior,* 11(2), 131-46. Responses were inconsistent with what had been reported earlier in a questionnaire.

DECLARATION OF BRYAN EDELMAN

to hear. During voir dire a clear, strong message is often sent to prospective jurors: good jurors are not supposed to have prejudicial information or biases about the case. If they do, then they should set them aside and decide the case solely on the law and the evidence presented in court.[33] When this is established, many prospective jurors will adjust their public statements to meet to these courtroom norms.

The social desirability effect is found even in instances when the jury pool has been exposed to extreme forms of prejudicial media coverage. In *Rideau*, the jury pool was exposed to a taped 20-minute interview in the jail between the defendant and Sheriff.[34] In the interrogation, the defendant confessed to the murder of three people during a bank robbery. A soundtrack was added to the recording and the interview aired three times on television within a few months leading up to trial. Three of the 12 seated jurors had seen the televised interrogation. Despite the highly prejudicial nature of such a sensational televised confession, all three jurors told the court during voir dire that they could "lay aside any opinion, give the defendant the presumption of innocence as provided by law, base their decision solely upon the evidence, and apply the law as given by the court."[35]

Accordingly, a juror's professed ability to be fair and impartial should not be taken at face value in cases where there is substantial prejudicial pretrial publicity. This is less of an issue when dealing with the tangential experiences, limited case knowledge, and general attitudes jurors typically bring with them into the courtroom. There is little evidence, however, to suggest that individuals can forget or dissociate themselves from specific attitudes, emotions, and beliefs about the defendant and case developed from exposure to media coverage.

## IX.    CONCLUSION

The Pittsburgh Division jury pool has been saturated with media coverage surrounding the mass shooting at the Tree of Life Synagogue in Squirrel Hill. This pretrial publicity contains prejudicial content that often describes the defendant's anti-Semitic posts on Gab.com and other

---

[33] The same "good citizen" impulse leads a number of respondents in telephone surveys to claim that they are registered
to vote when in fact they are not. Silver, B., et al., "Who Overreports Voting?" 80 American Political Science Review
613 (1986). Book publishers have long said that if survey respondents had actually read all the books they reported
having read recently when they are surveyed, the book publishing business would be the most profitable business in the
country. These effects, in response to an anonymous telephone pollster, are amplified in the presence of real authority
figures in the courtroom and makes it difficult to assess problematic attitudes in prospective jurors.
[34] *Rideau v. Louisiana*, 373 U.S. 723 (1963).
[35] *Id*. at 732.

social media sites. The coverage supports aggravating evidence that this was a hate crime. The media frequently mentions that Bower was driven by anti-Semitism and Alt-Right conspiracies around immigration. The nature of the coverage has the capacity to undermine the presumption of innocence and generate a presumption of death as the appropriate sentence by generating strong opinions about the defendant, his motivations, and perceived dangerousness.

The survey data show that the pretrial publicity has had an impact on the jury pool. Eighty-nine percent (**89%**) of prospective jurors in the Pittsburgh Division were familiar with the case. Case recognition increased to **96%** for those who regularly watch the news and read the newspaper. Prospective jurors who have been exposed to pretrial publicity exhibited bias which undermines the presumption of innocence. Eighty-two percent (**82%**) reported that the defendant would have a difficult time convincing them that he is <u>not</u> guilty. Fifty-four percent (**54%**) believed Bowers should receive the death penalty, with just **28%** favoring life. Those who supported death also exhibited fixed opinions as **86%** reported that Bowers would have a difficult time changing their minds.

Despite the passage of time, prospective jurors also retained extensive case knowledge from exposure to pretrial publicity. Seventy-one percent (**71%**) of survey respondents were familiar with at least three of seven media items tested in the survey. These numbers are particularly concerning given the limitations in extracting the extent of prospective jurors' case knowledge during voir dire. Consistent with research literature, survey respondents offered incomplete recall when asked open-ended questions about their case knowledge.

Squirrel Hill is one of the oldest neighborhoods in Pittsburgh and has a rich history of diversity. The survey data demonstrate a strong connection between residents in the Pittsburgh Division and the Jewish community in Squirrel Hill and these events. Twenty-eight percent (**28%**) of survey respondents knew someone who was directly or indirectly impacted by the shooting. Another **39%** were personally familiar with the Tree of Life Synagogue.

In conclusion, based on the nature of the pretrial publicity—and its apparent impact on the jury pool—I believe the presumption of innocence has been threatened and a presumption of death has been established. These findings are particularly concerning given the severity of the crime and the possible sentence the defendant faces if convicted. As such, remedial measures are necessary to protect the defendant's Constitutional rights to a fair and impartial trial. Although this mass shooting received media attention throughout the country, the survey data show significantly lower recognition rates in comparison venues. As such, it is my opinion that a change of venue

would be an appropriate prophylactic measure to protect the defendant's fair trial rights.


     I declare under penalty of perjury under the laws of the State of California that the foregoing facts are true and correct, except as to facts stated upon information and belief, which facts I believe to be true.

Executed on January 17, 2022

 

 

_____

                   Bryan Edelman

# APPENDIX 1: CURRICULUM VITA

## BRYAN EDELMAN, PH.D.

6257 Westover Dr. • Oakland, California  94611
(415) 944-9989 • bryan@trialinnovations.com

### PROFESSIONAL EXPERIENCE

**Trial Innovations,** Oakland and Los Angeles, California      **2011-Current**
Co-founder
- Design and implement jury research
- Conduct community survey research on jury issues
- Serve as expert witness on venue, survey jury issues, and eyewitness identification
- Assist with jury selection, juror questionnaire design, etc.
- Provide trial consulting services
- Provide in-house legal education
- Conduct post-trial juror interviews
- Conduct consumer insight research for fortune 500 companies (e.g., Facebook, Google)

**The Jury Research Institute,** Alamo, California      **2005-2010**
Senior Trial Consultant
- Conducted multi-stage qualitative and quantitative research (e.g., focus groups, mock trials, shadow juries)
- Served as expert witness (e.g., change of venue motions)
- Designed and conducted telephone and online survey research
- Conducted post-trial juror interviews
- Provided trial consulting services
- Analyzed qualitative and quantitative data
- Served as speaker and visiting lecturer at conferences, universities, law firms, and Bar Associations

**The National Jury Project,** Oakland, California      **2005**
Associate Trial Consultant
- Conducted qualitative and quantitative research
- Analyzed quantitative and qualitative data from prospective juror questionnaires
- Interpreted research results and developed strategy recommendations
- Assisted with crafting opening statements and closing arguments

**Trial Science, Inc.,** Reno, Nevada      **1999-2003**
Associate Trial Consultant
- Conducted focus groups and mock trials
- Analyzed quantitative and qualitative data
- Presented findings and recommendations to trial team
- Developed jury selection profiles

**Grant Sawyer Center for Justice Studies,** Reno, Nevada      **2000-2003**
Project Manager, "Predicting Failure in Pre-trial Release Programs in Washoe County"
- Designed and implemented an evaluation of the Washoe County pre-trial release program
- Oversaw data collection (over 40,000 cases) and analyzed data
- Served as an ombudsman between trial courts, police departments, Court Services, and the judicial sub-committee

- Presented findings to the Court Services Sub-Committee and at international conferences

Research Associate, "Minimization of Pre-Trial Publicity Knowledge during Voir Dire"
- Co-developed research methodology
- Performed content analysis of trial transcripts from high profile cases
- Analyzed data

Research Associate, "Science in the Courtroom"
- Co-developed survey codebook
- Completed content analysis of judges' responses regarding the Daubert standard

Research Associate, "Judicial Workload Pilot Project"
- Completed telephone interviews with judges
- Conducted content analysis of qualitative data from interviews

## EXPERT WITNESS & VENUE EXPERIENCE[36]

*State of Minnesota v. Alex Kueng (2021)*.  Conducted community attitude survey.  Pending.

*United States v. Robert Bowers* (2021).  Conducted community attitude survey.  Pending.

*People v. Nikolas Cruz* (2021).  Conducted community attitude survey.  Testified in closure hearing.

*Timaero Ireland Limited v. The Boeing Company* (2020).  Conducted community attitude survey.  Pending.

*State of Tennessee v. Andrew Delke* (2019).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*People v. Diane Anderson* (2019).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*State of Tennessee v. Nikolaus Johnson* (2019).  Conducted content analysis of media coverage and reviewed jury selection transcripts.  Testified at post-conviction hearing.

*People v. Jason Van Dyke* (2018).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*People v. Brian Cooks* (2017).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended remedial measures during jury selection [Case settled].

*People v. Johnathan Feit* (2017).  Conducted community attitude survey.  Conducted community attitude survey.  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*People v. Jonathan Renfro* (2017).  Conducted community attitude survey.  Did not make recommendations regarding remedial measures.

*People v. Kenneth Rossy* (2017).   Conducted preliminary media analysis.  Recommended moving forward with community attitude survey.

*Angelo Harmon et al. v. The Salvation Army, et al* (2017).  Conducted community attitude survey.  Did not make any recommendations.

---

[36] This is not an exhaustive list and does not include some current cases which are still pending.

DECLARATION OF BRYAN EDELMAN

*United States v. Charles Banks* (2016). Conducted community attitude survey.  Recommended change of venue.

*United States v. Jessie Con-ui* (2016).  Conducted community attitude survey.  Recommended remedial measures during jury selection.

*People v. Lubrin, et al.* (2016).  Conducted community attitude survey.  Recommended remedial measures during jury selection.

*Melissa Mays, et al., v. Rick Snyder, et al.* (2016).  Conducted community attitude survey.  Recommended change of venue.

People v. Balser and Robinson (2016).  Conducted preliminary media analysis.  Recommended against moving forward with venue study.

United States v. Dredd (2016).  Conducted community attitude survey.  Recommended remedial measures during jury selection.

People v. Romero (2016): Conducted preliminary media analysis.  Recommended against moving forward with venue study.

People v. Morales (2016). Conducted community attitude survey and content analysis of media coverage. Testified at change of venue hearing.  Recommended remedial measures during jury selection [Granted].

People v Williams (2015). Conducted community attitude survey.  Recommended against a change of venue.

Commonwealth v. Chism (2015). Approved by Court to assist with crafting juror questionnaire to address pretrial publicity.

U.S. v. Blankenship (2015). Conducted community attitude survey for the DOJ.

U.S. v. Sablan (2014). Conducted community attitude story and submitted a declaration.  Recommended a change of venue [Granted].

People v. Bealer (2014). Conducted community attitude survey and content analysis of media coverage. Testified at change of venue hearing and transfer hearing.  Recommended a change of venue [Granted].

People v. Ware, et al. (2014). Conducted content analysis of media coverage and grand jury transcript. Submitted a declaration recommending that the grand jury transcript remain sealed [Granted].

People v. Castillo (2014).  Conducted community attitude survey [Venue hearing denied].

People v. Shirakawa (2014). Conducted community attitude survey Recommended against a change of venue.

People v. Holmes (2014): Conducted content analysis of media coverage.  Recommended a change of venue [Denied].

People v. Tree (2014): Conducted preliminary media analysis.  Recommended against moving forward with venue study.

People v. Hoyt (2014): Reviewed pretrial publicity, juror questionnaires, and voir dire transcript. Recommended that trial counsel should have pursued change of venue.

People v. Duran (2014). Conducted preliminary media analysis.  Recommended against moving forward with venue study.

People v. White (2013): Conducted preliminary media analysis.  Recommended against moving forward with venue study.

People v. Vega (2013): Conducted preliminary media analysis.  Recommended against moving forward with venue study.

People v. Ayers (2013): Conducted community attitude survey.  Recommended against a change of venue.

People v. Lucero (2013): Conducted community attitude survey.  Recommended against a change of venue.

People v. Bennett (2013): Conducted media analysis.  Recommended against a change of venue.

People v. Deloney (2012): Testified as expert witness regarding literature on the accuracy of eyewitness identification, memory, cognition, and suggestive questioning.

People v. Ortega, et al. (2012):  Conducted community attitude survey and content analysis of pretrial publicity. Testified as expert witness about results, the impact of pretrial publicity on attitudes, memory, jury selection, and jury-decision making.

People v. Bey (2011): Conducted community attitude survey and content analysis of pretrial publicity. Testified as expert witness about results, the impact of pretrial publicity on attitudes, memory, jury selection, and jury-decision making.

Johnson, et al. v. BART, et al. (2011).  Conducted community attitude survey.  Recommended against filing a change of venue motion.

People v. Fowler (2011): Conducted community attitude survey. Recommended certain communities be excluded from the venue [Granted]

People v. Sanchez, et al (2011): Conducted preliminary media analysis.  Recommended against moving forward with venue study.

People v. Loughner (2011): Conducted media analysis.

Huang Xiu Mei, New York (2007): Expert witness in political asylum hearing.

Weather Shield v. Bostik (2005): Evaluated plaintiff's change of venue motion.

Olympic Pipeline Company v. Washington (2002).  Assisted with content analysis of media coverage.

## PUBLICATIONS AND PRESENTATIONS

Gordan, N. & Edelman, B. (2020). Self-Assessments About Fairness in the Robert Durst Case.  Presented at the American Psychology Law Society Annual Conference, New Orleans, LA.

Edelman, B. (2018). *Psychology of the Jury.* Presented at the American Board of Trial Advocates MIT Program, Sacramento, CA.

Edelman, B. (2018). *Preventing Runaway Juries.* Presented at the Michigan Defense Trial Counsel's Annual Meeting, MT Pleasant, MI.

Edelman, B. (2018). *Trial Consulting 101*. Presented at the American Psychological Association, Division 41, Memphis, TN.

Edelman, B. (2018). *Trial Consulting 101*. Presented at American Society of Trial Consultants Conference, Ft Worth, TX.

Bronson, E. Edelman, B., & Philipsborn, J.T. (2020). Change of Venue.  In N. Yuenger (Ed.), *California criminal law procedure and practice*. Oakland: Continuing Education of the Bar.

Edelman, B. (2016). *Conducting an Effective Jury Selection*. Presented at Santa Barbara Bar Association Bench and Bar Conference, Santa Barbara, CA.

Edelman, B. (2015). *Trial Consulting 101*. Presented at American Society of Trial Consultants Conference, Nashville, TN.

Edelman, B. (2015). *Effective Jury Selection Lunch and Learn*. Sponsored by Thomas Reuters (Oakland).

Edelman, B. (2015). *The Social Psychology of Jurors and Juries*. Presented at Washoe County Alternate Defender, Reno, NV.

Edelman, B. (2013). *The Social Psychology of Jurors and Juries*. Presented at Washoe County Alternate Defender, Reno, NV.

Edelman, B. (2013).   *Police Liability.* Presented at the Lorman Education Services Seminar in Santa Rosa.

Edelman, B., & Canon, D. (2012). *The Social Psychology of Jurors and Juries*. Presented at Office of the Public Defender, Albuquerque, NM.

Edelman, B. (2013).   *Police Liability.* Presented at the Lorman Education Services Seminar in Sacramento.

Edelman, B., & Canon, D. (2012). *The Social Psychology of Jurors and Juries*. Presented at Office of the Public Defender, Albuquerque, NM.

Edelman, B. (2011). Using online surveys to conduct jury research. *The Jury Expert,* 23(6), 51-54.

Edelman, B. (2011). Juror race and capital sentencing. *The Jury Expert,* 23(4), 47-49.

Bronson, E., Dillehay, R. Edelman, B., & Rountree, W. (2011). *Analyzing Pretrial Publicity in the New-Media Universe.* Presented at the American Society of Trial Consultants Conference.

Edelman, B. (2010). *CLE: Selecting your Jury.*  Presented at White and Williams, LLP, Philadelphia, PA.
Edelman, B. (2010). *Trial Consulting 101.* Presented at the University of Nevada, Reno.

Edelman, B. (2009). The impact of graphic injury photographs on liability verdicts and non-economic damage awards. *The Jury Expert,* 21(5), 1-4.

Edelman, B. (2009) *Online Research Tools to Evaluate Cases.* Presented at the Santa Clara County Bar Association.

Edelman, B. (2009).   *Psychology in the Courtroom: Selecting Your Jury.* Presented at the Monterey County Bar Association.

Edelman, B. (2008).   *Striking the Jury.* Visiting lecturer at Stanford Law School.

Edelman (2008).  *Communicating with the Jury.* Presented at the International Symposium on Life Care Planning, Phoenix.

Edelman (2007).  *Race, Empathy, and Capital Punishment.*  Visiting lecturer at the University of California, Santa Cruz.

Edelman, B. *Racial Prejudice, Juror Empathy, and Sentencing in Death Penalty Cases.* (New York: LFB Scholarly Publishing LLC, 2006)*.*

Edelman, B. & J.T. Richardson, (2005). Imposed limitations on freedom of religion in China and the margin of appreciation doctrine: A legal analysis of the crackdown on the Falun Gong and other "evil cults." *The Journal of Church and State,* 47(2), 243-267.

Richardson, J.T., & Edelman, B., Cult controversies and legal developments concerning new religions in Japan and China. In D.H. Davis & G. Besier (Eds.), *International Perspectives on Freedom and Equality of Religious Belief*, Waco: (Dawson Institute of Church-State Studies, Baylor University, 2002), reprinted in J.T. Richardson (Ed), *Regulating Religion Case Studies from Around the World*. (United States: Kluwer Academic/Plenum Publishers, 2004), pp. 359-380.

Edelman, B. & Richardson, J.T. (2003).  Falun Gong and the law: Development of legal social control in China. *Nova Religio*, 6(2), pp. 312-331.

Edelman, B., Dillehay, R.C., Bennett, D., & Hinxman, C. (2002). *The difficulties of collecting data in a local justice system*. Presented at the annual meeting of the Pacific Sociological Association, Vancouver, Canada.

Edelman, B. & Richardson, J.T. (2002). *Falun Gong and the law*.  Presented at the annual meeting of the Society for the Study of Religion, Houston, TX.

Edelman, B. & Richardson, J.T. (2002). *The crackdown on the Falun Gong: Western influence and the development of the anti-cult movement in China*.  Presented at the Society for the Scientific Study of Religion annual conference, Salt Lake City, Utah.

Richardson, J.T. & Edelman, B. (2001). *Cult controversies and legal developments in Japan and China*. Presented at the annual conference on "New Religions," Heidelberg, Germany.

## EDUCATION

**LL.M.,** International Law, with Distinction, University of Kent, Canterbury, United Kingdom    **2004**

**Ph.D.,** Interdisciplinary Social Psychology, University of Nevada, Reno, Nevada    **2003**

**B.S.,** Magna Cum Laude, Psychology, Florida State University, Tallahassee, Florida    **1997**

DECLARATION OF BRYAN EDELMAN

# APPENDIX 2: SURVEY INSTRUMENT

## Main Questionnaire

Before I begin asking you questions, I'd like you to know that there are no right or wrong answers and that you are free to respond with a "<u>don't know</u>" or "<u>no opinion</u>" answer to any question.  All of your answers will remain confidential!

Q1. Now I'd like to read you a few statements about the criminal justice system. Please tell me whether you <u>strongly  agree;</u> <u>somewhat agree;</u> <u>somewhat  disagree;</u> or <u>strongly disagree</u> with the following statement:

Q1a.  If the government brings someone to trial, that person is probably guilty.

| | |
|---|---|
| Strongly agree............... | 1 |
| Somewhat agree.......... | 2 |
| Somewhat disagree...... | 3 |
| Strongly disagree.......... | 4 |
| No opinion............... | 5 |
| Don't know................... | 8 |
| Refused/NA................. | 9 |

Q1b.  Next.  Even the worst criminal should be considered for mercy.

| | |
|---|---|
| Strongly agree............... | 1 |
| Somewhat agree.......... | 2 |
| Somewhat disagree...... | 3 |
| Strongly disagree.......... | 4 |
| No opinion............... | 5 |
| Don't know................... | 8 |
| Refused/NA................. | 9 |

Q1c. Hate crimes against Jews have risen in recent years.

| | |
|---|---|
| Strongly agree............... | 1 |
| Somewhat agree.......... | 2 |
| Somewhat disagree...... | 3 |
| Strongly disagree.......... | 4 |
| No opinion............... | 5 |
| Don't know................... | 8 |
| Refused/NA................. | 9 |

Q2a.   Now I'd like to ask you about a specific case in the Pittsburgh area.  Back in 2018, a gunman opened fire in the Tree of Life Synagogue in Pittsburgh, killing 11 people and injuring six more. The Federal Government has charged Robert Bowers with multiple counts of first-degree murder. Have you read, seen, or heard anything about this case?

Yes…………................    1 GO TO Q3a
No…………................    2 GO TO Q2b
Don't know.................    8 GO TO Q2b

Q2b.  Robert Bowers shot several police officers during the attack. Have you read, seen, or heard anything about this case?

Yes…………................    1 GO TO Q3a
No…………................    2 GO TO Q12
Don't know.................    8 GO TO Q12
Refused/NA...............    9 GO TO Q12

---

Q3a.   Based on what you have read, seen, or heard, do you believe Robert Bowers is <u>definitely guilty</u>; <u>probably guilty</u>; <u>probably not guilty</u>; or <u>definitely not guilty</u> of first-degree murder?

Definitely guilty..................    1
Probably guilty..................    2
Probably not guilty............    3
Definitely not guilty............    4
No opinion...............    5
*Other……………………...    7
Don't know........................    8
Refused/NA........................    9

**THE RESPONSE OPTIONS SHOULD BE ROTATED FOR HALF THE SAMPLE**

*Record responses

---

Q3b. Given what you have read, seen, or heard about these events, would Robert Bowers have a difficult time convincing you that he **is not—repeat is not—** guilty of murder?

Yes............................................. 1
No............................................. 2
No opinion………………….... 5
Don't know............................... 8
Refused/NA.............................. 9

Q4a.  What have you read, seen, or heard about this case and the shooting?
Q4b.  What are your thoughts and feelings about Robert Bowers, the victims, and the shooting?
**PROBE ONCE: What other opinions do you have about Robert Bowers?**

Q5.  The prosecution is seeking the death penalty for Robert Bowers.  If the jury finds him guilty of first-degree murder it must then decide on whether to sentence him to the death penalty or to life without the possibility of parole.  Which sentence do you believe the jury should select, the death penalty or life without the possibility of parole?

                    Death penalty……….............                    1
                    Life without the possibility of parole ………….    2 GO TO Q6
                    Other .......................................    3 [RECORD RESPONSE]
                    No opinion...........................            5
                    Don't know............................           8
                    Refused/NA........................               9

**NOTE- ENTER VERBATIM RESPONSE FOR "OTHER."**

Q5a. Given what you know and how you feel about these events, would Robert Bowers have a difficult time convincing you that he should receive life without the possibility of parole instead of the death penalty?

                    Yes............................................    1
                    No.............................................    2
                    No opinion..............................         5
                    Don't know..............................         8
                    Refused/NA...........................           9

Q6.  How, if at all, has the Tree of Life shooting impacted or changed your views of mass shootings and gun control?

Q7.  As you may know, the media have reported a number of things about this case.  Some people may remember some things, while others may remember other things.  We're interested in what you may remember, even if you already told me in one of the previous questions.

[**ONLY** THOSE WHO ANSWERED "YES" ON Q2a SHOULD BE ASKED QUESTION Q7a]

Q7a.  Have you read, seen, or heard if Robert Bowers shot several police officers during the attack?

                    Yes............................................ 1
                    No............................................. 2
                    Don't know.............................. 8
                    Refused/NA............................. 9
[EVERYONE WHO ANSWERED "YES" ON Q2A OR Q2B SHOULD BE ASKED Q7B-Q7G]

Q7b.   Have you read, seen, or heard if Robert Bowers has been charged with a hate crime?

                    Yes............................................ 1
                    No............................................. 2
                    Don't know.............................. 8
                    Refused/NA............................. 9

DECLARATION OF BRYAN EDELMAN

Q7c.    Have you read, seen, or heard if several of the victims who were killed were elderly?

            Yes............................................ 1
            No............................................. 2
            Don't know............................... 8
            Refused/NA............................. 9

Q7d.   Have you read, seen, or heard if Robert Bowers posted anti-Jewish comments on social media before the attack?

            Yes............................................ 1
            No............................................. 2
            Don't know............................... 8
            Refused/NA............................. 9

Q7e.    Have you read, seen, or heard if the shooting occurred as religious services were getting started?

            Yes............................................ 1
            No............................................. 2
            Don't know............................... 8
            Refused/NA............................. 9

Q7f.   Have you read, seen, or heard if this shooting was the deadliest attack against Jews in the history of the United States?

            Yes............................................ 1
            No............................................. 2
            Don't know............................... 8
            Refused/NA............................. 9

Q7g.    Have you read, seen, or heard if Robert Bowers made several anti-Jewish comments to police after the shooting?

            Yes............................................ 1
            No............................................. 2
            Don't know............................... 8
            Refused/NA............................. 9

Q8a.    Have you ever talked about this shooting with your family, friends, or co-workers, or discussed it online, for example, on Facebook or other social media sites?

            Yes............................................ 1
            No............................................. 2
            Don't know............................... 8

Refused/NA.............................. 9

Q8b.   Have you ever heard others talking about the shooting in person or online?

Yes.............................................. 1
No............................................... 2
Don't know.................................. 8
Refused/NA.............................. 9

Q9.   Do you know anyone who was directly or indirectly affected by the shooting at the Tree of Life Synagogue?

Yes............................................1
No.............................................2
No opinion...........................  97
Don't know..........................  98
Refused/NA........................  99

Q10.   Are you personally familiar with the Tree of Life Synagogue in Squirrel Hill?

Yes............................................1
No.............................................2
No opinion...........................  97
Don't know..........................  98
Refused/NA........................  99

Q11a.   How did the community respond to the Tree of Life Synagogue shooting?

Q11b.   How, if at all, did the shooting impact the community and local politics?

Q12.   Finally, I have a couple of more questions to be sure we have included all groups in this survey.
All of your answers will remain confidential.

[ASK EVERYONE]

Q12a.   First, how often do you read a hard copy or online version of a newspaper?  Would you say you read it <u>every day</u>, <u>several times a week</u>, <u>once or twice a week</u>, <u>less often than once a week</u>, or <u>never</u>?

Every day.................................................  1 (GO TO Q12b)
Several times a week...........................  2 (GO TO Q12b)
Once or twice a week..........................  3 (GO TO Q12b)
Less often than once a week...............  4 (GO TO Q12b)
Never…………………………….  5 (GO TO Q13)
Don't know...........................................  8 (GO TO Q12b)

DECLARATION OF BRYAN EDELMAN

Refused/NA........................................... 9 (GO TO Q12b)

Q12b.  What newspapers do you read?  I am interested in both local and out-of-town papers.

(PROBE) Do you read any other papers?

[RECORD UP TO 4 NEWSPAPERS]

INSTRUCTION: DO NOT READ THE LIST OF NEWSPAPERS TO RESPONDENTS.

| Local Publications | 1 |
|---|---|
| Pennsylvania Newspaper Association   [Harrisburg] | 2 |
| Allentown Times   [Allentown] | 3 |
| Beaver County Times   [Beaver] | 4 |
| The Bradford Era   [Bradford] | 5 |
| Bridgeville Star   [Bridgeville] | 6 |
| Bucks County Courier Times   [Levittown] | 7 |
| Butler Eagle   [Butler] | 8 |
| Centre Daily Times   [State College] | 9 |
| Chester County Press   [Oxford] | 10 |
| Citizen Standard   [Valley View] | 11 |
| The Citizens Voice   [Wilkes Barre] | 12 |
| City Paper   [Philadelphia] | 13 |
| Clarion News   [Clarion] | 14 |
| Coraopolis Record   [Coropolis] | 15 |
| The Courier-Express   [Du Bois] | 16 |
| The Daily American   [Somerset] | 17 |
| Daily Courier   [Connellsville] | 18 |
| The Daily Item   [Sunbury] | 19 |
| Daily Local News   [West Chester] | 20 |
| Daily News   [McKeesport] | 21 |
| Daily Review   [Towanda] | 22 |
| The Danville News   [Danville] | 23 |
| Delaware County Daily Times   [Primos] | 24 |
| The Derrick   [Oil City] | 25 |
| Ellwood City Ledger   [Ellwood City] | 26 |
| Erie Daily Times/Morning News   [Erie] | 27 |
| The Evening Sun   [Hanover] | 28 |
| The Evening Times   [Sayre] | 29 |
| The Express   [Lock Haven] | 30 |
| The Express-Times   [Easton] | 31 |
| Forest City News   [Forest City] | 32 |
| The Fulton County News   [McConnellsburg] | 33 |
| The Gettysburg Times   [Gettysburg] | 34 |
| Greene County Messenger   [Waynesburg] | 35 |

DECLARATION OF BRYAN EDELMAN

| | |
|---|---|
| The Herald   [Sharon] | 36 |
| Herald-Standard   [Uniontown] | 37 |
| The Indiana Gazette   [Indiana] | 38 |
| Intelligencer/The Record   [Doylestown] | 39 |
| Leader Times   [Kittanning] | 40 |
| The Main Line Times   [Ardmore] | 41 |
| The Mercury   [Pottstown] | 42 |
| Moon Record   [Moon Township] | 43 |
| The Morning Call   [Allentown] | 44 |
| Mountaintop Eagle   [Mountaintop] | 45 |
| Murrysville Star   [Murrysville] | 46 |
| New Castle News   [New Castle] | 47 |
| News-Item   [Shamokin] | 48 |
| North Hills News Record   [Warrendale] | 49 |
| North Journal   [Wexford] | 50 |
| Northeast News Gleaner   [Philadelphia] | 51 |
| Norwin Star   [Irwin] | 52 |
| Observer-Reporter   [Washington] | 53 |
| Patriot News   [Harrisburg] | 54 |
| Penn Hills Progress   [Penn Hills] | 55 |
| Perry County Times   [New Bloomfield] | 56 |
| Philadelphia Inquirer   [Philadelphia] | 57 |
| Philadelphia Daily News   [Philadelphia] | 58 |
| Philadelphia Weekly   [Philadelphia] | 59 |
| Pittsburgh City Paper   [Pittsburgh] | 60 |
| The Phoenix   [Phoenixville] | 61 |
| Pittsburgh Post-Gazette   [Pittsburgh] | 62 |
| Pittsburgh Tribune-Review   [Pittsburgh] | 63 |
| Plum Advance Leader   [Plum] | 64 |
| Pocono Record   [Stroudsburg] | 65 |
| Pottsville Republican   [Pottsville] | 66 |
| Press-Enterprise   [Bloomsburg] | 67 |
| Reading Times/Reading Eagle   [Reading] | 68 |
| The Record Herald   [Waynesboro] | 69 |
| Rocket-Courier   [Wyalusing] | 70 |
| Scranton Times/The Tribune   [Scranton] | 71 |
| The Sentinel   [Carlisle] | 72 |
| The Sentinel   [Lewistown] | 73 |
| Sewickly Herald   [Sewickly] | 74 |
| South Hills Record   [Monroeville] | 75 |
| Standard Observer   [Irwin] | 76 |
| Standard-Speaker   [Hazleton] | 77 |
| Times Express   [Monroeville] | 78 |
| The Times Herald   [Norristown] | 79 |
| The Times Leader   [Wilkes-Barre] | 80 |
| The Times News   [Lehighton] | 81 |

| | |
|---|---|
| Titusville Herald   [Titusville] | 82 |
| The Tribune-Democrat   [Johnstown] | 83 |
| Tribune-Review   [Greensburg] | 84 |
| Upper Dauphin Sentinel   [Millersburg] | 85 |
| The Valley Herald   [Aspinwall] | 86 |
| Valley Independent   [Monessen] | 87 |
| Valley News Dispatch   [Tarentum] | 88 |
| Voices of Central PA   [State College] | 89 |
| The Wayne Independent   [Honesdale] | 90 |
| Wayne Suburban   [Wayne] | 91 |
| The Weekender   [Wilkes-Barre] | 92 |
| The Weekly Journal   [Moscow] | 93 |
| Williamsport Sun-Gazette   [Williamsport] | 94 |
| Woodland Progress   [Forest Hills] | 95 |
| New York Times | 100 |
| USA Today | 101 |
| Wall Street Journal | 102 |
| Washington Post | 103 |
| Other: Specify | 997 |
| Don't know | 998 |
| Refused/NA | 999 |

Q13.  How often do you listen to local news on the radio or watch it on television?  Do you listen to or watch local news:  every day, several times a week, once or twice a week, less often than once a week, or never?

<div style="margin-left: 2em;">

Every day.................................................... 1
Several times a week............................. 2
Once or twice a week............................. 3
Less often than once a week............... 4
Never……………………………………….. 5
Don't know............................................ 8
Refused/NA........................................... 9

</div>

Q14.  How often do you see local news or news related updates on social media sites such as Facebook or Twitter?  Do you see local news or news related updates on social media sites every day, several times a week, once or twice a week, less often than once a week, or never?

<div style="margin-left: 2em;">

Every day.................................................... 1
Several times a week............................. 2
Once or twice a week............................. 3
Less often than once a week............... 4
Never……………………………………….. 5
Don't know............................................ 8
Refused/NA........................................... 9

</div>

Q15. What city or town do you live in or nearest? (DO NOT READ RESPONSES)

| **Allegheny County** | |
|---|---|
| Aspinwall | 1 |
| Baldwin | 2 |
| Bethel Park | 3 |
| Braddock | 4 |
| Brentwood | 5 |
| Bridgeville | 6 |
| Carnegie | 7 |
| Castle Shannon | 8 |
| Cheswick | 9 |
| Clairton | 10 |
| Coraopolis | 11 |
| Crafton | 12 |
| Dormont | 13 |
| Duquesne | 14 |
| East Pittsburgh | 15 |
| Elizabeth | 16 |
| Etna | 17 |
| Forest Hills | 18 |
| Fox Chapel | 19 |
| Franklin Park | 20 |
| Gibsonia | 21 |
| Glassport | 22 |
| Homestead | 23 |
| Jefferson Hills | 24 |
| McCandless | 25 |
| McKees Rocks | 26 |
| McKeesport | 27 |
| Millvale | 28 |
| Monroeville | 29 |
| Moon | 30 |
| Mount Lebanon | 31 |
| Munhall | 32 |
| North Braddock | 33 |
| North Versailles | 34 |
| Oakdale | 35 |
| Oakmont | 36 |
| Penn Hills | 37 |
| Pittsburgh | 38 |
| Plum | 39 |
| Ross Township | 40 |
| Sewickley | 41 |
| Sharpsburg | 42 |
| South Park Township | 43 |

DECLARATION OF BRYAN EDELMAN

| | |
|---|---|
| Springdale | 44 |
| Swissvale | 45 |
| Tarentum | 46 |
| Turtle Creek | 47 |
| Upper Saint Clair | 48 |
| West Mifflin | 49 |
| White Oak | 50 |
| Wilkinsburg | 51 |
| Other:(Specify) | 97 |
| Don't know | 98 |
| Refused | 99 |
| **Beaver County** | |
| Aliquippa | 101 |
| Ambridge | 102 |
| Baden | 103 |
| Beaver | 104 |
| Beaver Falls | 105 |
| Big Beaver | 106 |
| Bridgewater | 107 |
| Conway | 108 |
| Darlington | 109 |
| East Rochester | 110 |
| Eastvale | 111 |
| Economy | 112 |
| Fallston | 113 |
| Frankfort Springs | 114 |
| Freedom | 115 |
| Georgetown | 116 |
| Glasgow | 117 |
| Harmony Township | 118 |
| Homewood | 119 |
| Hookstown | 120 |
| Industry | 121 |
| Koppel | 122 |
| Midland | 123 |
| Monaca | 124 |
| New Brighton | 125 |
| New Galilee | 126 |
| Ohioville | 127 |
| Patterson Heights | 128 |
| Patterson Township | 129 |
| Rochester | 130 |
| Shippingport | 131 |
| South Heights | 132 |
| West Mayfield | 133 |
| Other:(Specify) | 197 |

DECLARATION OF BRYAN EDELMAN

| | |
|---|---|
| Don't know | 198 |
| Refused | 199 |
| **Butler County** | |
| Bruin | 201 |
| Butler | 202 |
| Callery | 203 |
| Cherry Valley | 204 |
| Chicora | 205 |
| Connoquenessing | 206 |
| Cranberry Township | 207 |
| East Butler | 208 |
| Eau Claire | 209 |
| Evans City | 210 |
| Fairview | 211 |
| Harmony | 212 |
| Harrisville | 213 |
| Homeacre-Lyndora | 214 |
| Karns City | 215 |
| Lake Arthur Estates | 216 |
| Mars | 217 |
| Meridian | 218 |
| Nixon | 219 |
| Oak Hills | 220 |
| Petrolia | 221 |
| Portersville | 222 |
| Prospect | 223 |
| Saxonburg | 224 |
| Seven Fields | 225 |
| Shanor-Northvue | 226 |
| Slippery Rock | 227 |
| Valencia | 228 |
| West Liberty | 229 |
| West Sunbury | 230 |
| Zelienople | 231 |
| Other:(Specify) | 297 |
| Don't know | 298 |
| Refused | 299 |
| **Fayette County** | |
| Allison | 301 |
| Belle Vernon | 302 |
| Brownsville | 303 |
| Buffington | 304 |
| Chalkhill | 305 |
| Connellsville | 306 |
| Dawson | 307 |
| Dunbar | 308 |

DECLARATION OF BRYAN EDELMAN

| | |
|---|---|
| East Uniontown | 309 |
| Everson | 310 |
| Fairchance | 311 |
| Farmington | 312 |
| Fayette City | 313 |
| Grindstone | 314 |
| Hiller | 315 |
| Hopwood | 316 |
| Leith-Hatfield | 317 |
| Lemont Furnace | 318 |
| Markleysburg | 319 |
| Masontown | 320 |
| New Salem | 321 |
| Newell | 322 |
| Ohiopyle | 323 |
| Oliver | 324 |
| Perryopolis | 325 |
| Point Marion | 326 |
| Republic | 327 |
| Ronco | 328 |
| Smithfield | 329 |
| Smock | 330 |
| South Connellsville | 331 |
| Springfield Township | 332 |
| Uniontown | 333 |
| Vanderbilt | 334 |
| Other:(Specify) | 397 |
| Don't know | 398 |
| Refused | 399 |
| **Washington County** | |
| Allenport | 401 |
| Atlasburg | 402 |
| Avella | 403 |
| Beallsville | 404 |
| Bentleyville | 405 |
| Bulger | 406 |
| Burgettstown | 407 |
| California | 408 |
| Canonsburg | 409 |
| Centerville | 410 |
| Charleroi | 411 |
| Claysville | 412 |
| Coal Center | 413 |
| Cokeburg | 414 |
| Cross Creek | 415 |
| Deemston | 416 |

DECLARATION OF BRYAN EDELMAN

| | |
|---|---|
| Donora | 417 |
| Dunlevy | 418 |
| East Washington | 419 |
| Eighty Four | 420 |
| Elco | 421 |
| Ellsworth | 422 |
| Elrama | 423 |
| Finleyville | 424 |
| Fredericktown | 425 |
| Gastonville | 426 |
| Green Hills | 427 |
| Hickory | 428 |
| Houston | 429 |
| Langeloth | 430 |
| Lawrence | 431 |
| Long Branch | 432 |
| Marianna | 433 |
| McMurray | 434 |
| Meadowlands | 435 |
| Midway | 436 |
| Millsboro | 437 |
| Monongahela | 438 |
| New Eagle | 439 |
| North Charleroi | 440 |
| Roscoe | 441 |
| Slovan | 442 |
| Speers | 443 |
| Stockdale | 444 |
| Taylorstown | 445 |
| Venetia | 446 |
| Washington | 447 |
| West Alexander | 448 |
| West Brownsville | 449 |
| West Middletown | 450 |
| Wolfdale | 451 |
| Other:(Specify) | 497 |
| Don't know | 498 |
| Refused | 499 |
| **Westmoreland County** | |
| Adamsburg | 501 |
| Arnold | 502 |
| Arona | 503 |
| Avonmore | 504 |
| Bolivar | 505 |
| Bradenville | 506 |
| Crabtree | 507 |

DECLARATION OF BRYAN EDELMAN

| | |
|---|---|
| Delmont | 508 |
| Derry | 509 |
| Donegal | 510 |
| East Vandergrift | 511 |
| Export | 512 |
| Greensburg | 513 |
| Hunker | 514 |
| Hyde Park | 515 |
| Irwin | 516 |
| Jeannette | 517 |
| Latrobe | 518 |
| Laurel Mountain | 519 |
| Ligonier | 520 |
| Lower Burrell | 521 |
| Madison | 522 |
| Mammoth | 523 |
| Manor | 524 |
| McChesneytown-Loyalhanna | 525 |
| Monessen | 526 |
| Mount Pleasant | 527 |
| Murrysville | 528 |
| New Alexandria | 529 |
| New Florence | 530 |
| New Kensington | 531 |
| New Stanton | 532 |
| North Belle Vernon | 533 |
| North Huntingdon | 534 |
| North Irwin | 535 |
| Oklahoma | 536 |
| Penn | 537 |
| Scottdale | 538 |
| Seward | 539 |
| Slickville | 540 |
| Smithton | 541 |
| South Greensburg | 542 |
| Southwest Greensburg | 543 |
| Sutersville | 544 |
| Vandergrift | 545 |
| West Leechburg | 546 |
| West Newton | 547 |
| Wyano | 548 |
| Youngstown | 549 |
| Youngwood | 550 |
| Yukon | 551 |
| Other:(Specify) | 597 |

| Don't know | 598 |
| Refused | 599 |

Q16.  Could you please tell us how old you are?

(DO NOT READ RESPONSES.  IF RESPONDENT ANSWERS, E.G., "OVER 30," PROBE)

18-24...................................... 1
25-34...................................... 2
35-44...................................... 3
45-54...................................... 4
55-64...................................... 5
65 or over ............................ 6
Refused/NA  ..................... 9

Q17.  Regardless of race, are you of Hispanic, Latino, or Spanish origin?

Yes ..................................... 1
No ....................................... 2
Don't know ........................... 8
Refused/NA .......................... 9

Q18.  Could Regardless of your Hispanic, Latino, or Spanish origin, what is your race?  Are you white, African American, Asian, Pacific Islander, American Indian, a member of some other race, or of mixed race?

White………….…………… 1
African American ………… 2
Asian……………………….. 3
Pacific Islander…………… 4
American Indian …………. 5
Mixed……………………….. 6
Other: Specify_____ 97
Don't know……………….... 98
Refused/NA……………… 99

Q19.  Finally, for statistical purposes only, we need to know if you have ever been convicted of a felony.

Yes ..................................... 1 **[TERMINATE]**
No ....................................... 2
Don't know ........................... 8
Refused/NA .......................... 9

Q20.  (NOTE GENDER OF RESPONDENT)

Female …………....................        1
Male …………………………        2

Well, those are all the questions that I have.  Lastly, let me verify that I dialed ____-_____.
Again, my name is (*Your First Name*), and on occasion a small percentage of people like you are
called back just to verify that this interview actually took place.  May I please have your first
name, and first name <u>only</u>, so my supervisor will know whom to ask for in case this interview is
verified? Thank you for your time and have a good (evening/day)!

Respondent Name:_____ Phone (    )_____-_____
Interview Date:_____        End Time:_____

DECLARATION OF BRYAN EDELMAN