IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **2:18-CR-00292-DWA** |
| | ) | |
| vs. | ) | |
| | ) | |
| ROBERT BOWERS, | ) | |
| | ) | |
| Defendant. | ) | |

AMBROSE, United States Senior District Judge


**<u>OPINION</u>**

On October 27, 2018, over the course of approximately two and a half hours,
tragedy struck in the Squirrel Hill neighborhood of Pittsburgh, Pennsylvania. The
incident that unfolded that day involved a heartbreaking loss of life. Those who
responded to the scene did so with a remarkable amount of selflessness and bravery.
That those individuals were able to maintain their composure and act with such
professionalism in the face of what they encountered is a testament to their training and
character. The City of Pittsburgh and surrounding region are fortunate to have had them
on site that day.

The matter before me involves statements that the Defendant is alleged to have
made on that day while at the Tree of Life synagogue, during transport to the hospital,
and while at the hospital. Specifically, Defendant Robert Bowers ("Bowers") filed a
Motion to Suppress Statements (ECF No. 296 redacted / 319 unredacted) pursuant to
Federal Rule of Criminal Procedure 12(b)(3)(C). His Motion is based, inter alia, upon the

Fifth and Sixth Amendments to the United States Constitution, the rule announced in *Miranda v. Arizona*, 384 U.S. 436 (1966), and the understanding that statements made during the course of medical treatment should not be admissible. The Government has filed a Response in Opposition (ECF No. 344 redacted / 361 unredacted), urging that the statements are properly admissible at trial as either an exception to the rule announced in *Miranda*, that the statements were made prior to being "in custody," and thus are outside the purview of *Miranda*, or because the statements were volunteered and therefore not barred by the Fifth Amendment. The Government also challenges any assertion of "privacy" with respect to comments Bowers made in the context of medical treatment. Bowers filed a Reply (ECF No. 385 redacted / 392 unredacted) and the Government filed a Surreply. (ECF No. 401). This Court held an evidentiary hearing on October 12-13, 2021. The parties thereafter filed proposed Findings of Fact and Conclusions of Law. (ECF Nos. 648, 649) and Replies thereto (ECF Nos. 653, 654). The Motion is now ripe for resolution.

For the reasons set forth below, the Motion is DENIED.

## Findings of Fact

A. Dispatch to Tree of Life:

At 9:55 a.m. on October 27, 2018, the Pittsburgh Bureau of Police ("BOP") dispatcher reported multiple calls of an active shooter at the Tree of Life Synagogue.

(ECF No. 630, p. 20-21). Within moments, City of Pittsburgh Police Officers, SWAT[1]

team members and TEMS Medics[2] began responding. (ECF No. 630, p. 11).

Numerous factors coalesced to present an imminent threat both to the safety of

the responding officers and to the public at large. First, law enforcement officers

believed that shotguns had been reported being used. (Government Ex. 3, 009-

9:55:18). Second, the officers believed that there were multiple active shooters based

upon the dispatcher's reports. (Government Ex. 3, 009-09:55:18; ECF No. 630, p. 20,

30,145, 148, 154, 218) ("they have shotguns."). Third, the officers knew that people

were sheltering in place in the same building as the shooters. (Government Ex. 3, 019-

09:57:01; ECF No. 630, p. 20-21). Fourth, the first responding officers were immediately

fired upon with an automatic weapon and at least one officer, Dan Mead, was injured

and required medical attention. (Government Ex. 3, 029-09:59:46; ECF No. 630, p. 147-

148). The threat posed was so great that calls for "every available unit in the city" were

made and surrounding roads were closed. (Government Ex. 3, 031-10:00:11). Dispatch

was directed to call a rehabilitation facility located next door and instruct them to go "on

lockdown." (Government Ex. 3, 108-10:15:09).Given the scope and size of the incident,

the Allegheny County Police, the State Police, the South Hills Area Government Council

("SHACOG") SWAT team, and the North Hills SWAT team were called in to assist.

(ECF No. 630, p. 13-14).

B. Entering Tree of Life:

[1] The City of Pittsburgh Bureau of Police employs a group of individual police officers who are assigned to a Special Deployment Division known as the "SWAT team." "SWAT" stands for Special Weapons and Tactics. (ECF No. 630, p. 7-8). They undergo extensive and continuous training and are assigned to handle critical incidents and high risk operations. (ECF No. 630, p. 8-9).
[2] TEMS medics are tactical emergency medics that are attached to the SWAT team. They are highly trained paramedics that are also tactically trained to operate with the SWAT team. (ECF No. 630 p. 31).

The danger and threat only increased once the officers entered the Tree of Life. At approximately 10:29 a.m., various officers made entry. (Government Ex. 3, 164-10:29:22). Among them, Officers Mescan,[3] Saldutte, and Garris entered through the main entrance on the Wilkins Avenue side. (ECF No. 630, p. 24-26; Government Ex. 20H ("Lobby")). At the same time, Officers Miller, Thimons,[4]  and Craig entered the synagogue via a different entrance. (ECF No. 630, p. 27).They confronted a "very complicated" floorplan. (ECF No. 630, p. 41-43). The building appeared to have expanded over time, with older and newer portions of the building offset. (ECF No. 630, p. 42, 259) (describing the challenge the flow of the building presented in that "floors that went to, for example, the basement but didn't go up to the second floor, and ones that went from the first floor to the third floor but didn't go to the basement."). The nature of the floorplan compounded the difficulties the officers faced in that they were not able to reference "east or west or second floor, third floor" in terms of signaling to each other their presence or intended direction. (ECF No. 630, p. 37-38).

As officers fanned out to search and clear the building, they encountered deceased victims, injured and uninjured congregants, a spent magazine, and rifle casings covered in blood. (Government Ex. 3, 165-10:29:38 and 166-10:29:56; ECF No. 630, p. 28, 32-34, 38). While moving through the building they also came upon locked doors and called for breaching equipment. (ECF No. 630, p. 221-222). Each locked

---

[3] Stephan Mescan is a tactical commander and is responsible for the leadership, training, research, and development of the Pittsburgh SWAT team. (ECF No. 630, p. 6-7). He has served as a police officer for 28 years and has been with the SWAT team for 22 years. (ECF No. 630, p. 7). He is a member of the National Tactical Officers Association and serves as a board member. (ECF No. 630 p. 7). The Association develops best practices for tactical teams across the country. (ECF No. 630 p. 10). At some point during the incident, Mescan assumed leadership inside the synagogue. (ECF No. 630 p. 28).
[4] Clint Thimons has been employed with the City of Pittsburgh, Bureau of Police for 21 years. (ECF No. 630, p. 137). He joined the SWAT team in 2005 and became a K-9 officer. Thimons also received advanced hostage negotiation training with SWAT. (ECF No. 630 p. 141).

door presented an unknown threat consisting of active shooters, congregants requiring help, or even explosive devices.

Given the threat to safety, Mescan sought to employ technological assistance to minimize risk. For instance, he called for a tactical K-9. Mescan also sought to deploy robotics equipment located in the weapons truck. (Government Ex. 3, 263-10:50:09, 265-10:50:23, 269-10:51:02, 288-10:53:24). Due to the rapid deployment of the SWAT team, the weapons truck arrived after they had made entry into the Tree of Life. (ECF No. 630, p. 39). Certain of the robotics equipment would have assisted them in locating people or suspects. (ECF No. 630 p. 39-40). However, given the lack of any available assistive technology, and because of the priority of life, the SWAT team members continued to push through the structure with the equipment, manpower and tools then available to them. (ECF No. 630 p. 41).

C. Engagement with Bowers:

At 10:53 a.m. several officers pushed into Room TT (Classroom 11). (ECF No. 630, Government Ex. 20E). Unbeknownst to them, Bowers was hiding in the room. (ECF No. 630, p. 91). Bowers and the officers exchanged gunfire and Bowers shot both Officers Burke and Matson.

Officers Burke, Saldutte, and Miller retreated from Room TT up the stairs to Classroom UU. Saldutte and Miller applied a tourniquet to Burke's arm in an effort to control the bleeding. (ECF No. 630 p. 52; Government Ex. 3, 309-10:58:17). At the same time, other SWAT officers dragged Matson out of the hallway and down the stairs to the medics. (ECF No. 630 p. 50). Matson sustained multiple gunshot wounds to his left arm, left leg and his head and was losing copious amounts of blood. Medics

Shawn Eigenbrode and Eric Barazotta provided immediate medical care then moved him to one of the Mobile Field Forces. (ECF No. 630 p. 255-256, 261-263).

The situation was extremely chaotic and dangerous. (ECF No. 630 p. 51-52). The building remained unsecured. At this point three officers had been shot and at least eight victims had been discovered. (Government Ex. 3, 210-10:38:33). Bowers remained barricaded in Room TT and had a tactical advantage with respect to positioning. (ECF No. 630 p. 91). SWAT officers believed that the possibility of "additional suspects and additional problems was extremely high…." (ECF No. 630 p. 52). Mescan credibly testified:

> So we're dealing with one problem, in this case this particular gunman, but multiple gunmen inside the location, and we're sure that our backs aren't safe, meaning it's – in other situations other than active shooter, you usually know where the person is located, and it's kind of like in front of me. In this particular case, because we hadn't secured the entire structure, the possibility of us having additional suspects and additional problems was extremely high, which stressed our manpower.

(ECF No. 630 p. 52).

At 11:00 a.m. the SWAT team and Bowers exchanged a second volley of gunfire. (ECF No. 630 p. 52-53; Government Ex. 3, 313-11:00:11). Given the elevated threat of additional injury or death, Mescan called for the use of explosives to assist in Bowers' seizure. (ECF No. 630 p. 55) ("I'm requesting an IV bag, which is basically saline water, wrapped in det cord, and we're going to use that water and packing material along with the explosives to seize the suspect.") (Government Ex. 3, 328-11:02:41).

D. Communications with Bowers:

Moments later, Thimons heard a man's voice coming from Room TT. (Government Exhibit 3, 332-11:03:14). Although multiple people initially spoke to

6

Bowers, SWAT is trained as a unit to have only one person speaking. (ECF No. 630 p. 173). Thimons became that person. Bowers indicated that he was injured, required help, and wanted SWAT to provide aid. (ECF No. 630 p. 55-57, 172-173; ECF No. 631 p. 82-84, 126). Thimons responded "crawl out or you will die." (ECF No. 630 p. 56, 173, 203; Government Ex. 3, 332-11:03:14). Bowers again repeated that he was injured and could not. Thimons instructed that "he had to crawl out if he wanted to survive his injuries, if he wanted to live." (ECF No. 630 p. 173-174; ECF No. 631 p. 84).

While Thimons spoke with Bowers, officers continued training their weapons at the doorway to Room TT. (ECF No. 630 p. 176). Bowers' indication that he was giving up and that he was injured did not diminish the danger posed to either the officers or to the public in general. Bowers' injuries were unverified. He could have been attempting to lure them into Room TT and ambush them. The number of active shooters remained unknown. The SWAT team's continued efforts to identify what the shooter(s) was wearing confirms my finding that they remained uncertain as to the number of shooters. (ECF No. 630 p. 59).[5] Entering Room TT under these dangerous circumstances ran counter to SWAT training. (ECF No. 630 p. 174).

Despite the dangerous and volatile situation, Thimons used his training as a hostage negotiator to build a rapport with Bowers in order to effectuate a surrender. He

---

[5] "As he was coming out, I wanted to make sure that we had at least one of the actors that were described. So we're trying to deconflict information. We have information, but we wanted to make it actionable, in a sense make it some type of intelligence so we can verify it to say that this is actually one of the guys who was involved in the initial incident and to start to determine if there's one, two, three, four shooters, we don't know but we're trying to determine in this particular case if we have at least one." (ECF No. 630 p. 59); Government Ex. 3, 339-11:04:51 ("The initial description from the responding officer was a green jacket. And then later there was a nine one one call from inside the structure that said a blue shirt and blue jeans."); Government Ex. 3, 352-11:07:22 ("The description given is green jacket, dark pants, long rifle, leather strap."); Government Ex. 3, 357-11:08:54 ("Okay, be advised that we got [inaudible] red shirt at this time. We don't know if he changed his clothes.")

testified credibly that a rapport helps to "build a little bit of trust" and "calm[s] the situation." (ECF No. 630 p. 141-142). His voice "came down" as did Bowers' and the exchange became more conversational. (ECF No. 630 p. 177). Thimons continued to encourage Bowers to crawl out of the room. At times Bowers was unresponsive and Thimons was unsure whether Bowers was passing out or simply feigning passing out. At one point Bowers voiced his fear that the officers wanted to kill him. Thimons assured him that he would not be hurt if he cooperated and continued to crawl out. (ECF No. 630 p. 176-177).

At 11:04 a.m., Thimons could see Bowers' hands emerge from the doorway to Room TT / Classroom 11. (ECF No. 630 p. 178; ECF No. 631 p. 127-128; Government Ex. 3, 337-11:04:30). He army-crawled out on his arms, elbows, and stomach, pausing several times "acting as though he was too injured to continue." (ECF No. 630 p. 178-179). Thimons encouraged him, indicating that Bowers had to control his access to medical care by continuing to crawl towards them. (ECF No. 630 p. 179). The danger the situation still posed precluded the SWAT team from ascending the stairs and seizing Bowers. (ECF No. 630 p. 179). SWAT did not know whether Bowers was armed, what his intentions were, or whether he had accomplices. Thimons asked Bowers his name and age and Bowers responded. (ECF No. 630 p. 17, 181-182; Government Ex. 3, 346-11:06:18). Thimons credibly testified that he asked these questions in order to keep Bowers alert and awake and focused on him so as to prevent Bowers from planning additional hostile moves, as well as to begin to assess the scope of the incident. (ECF

No. 630 p. 144, 179-180).[6] Mescan put the information on the air so that others could

begin to gather intelligence on Bowers.[7]

Thimons also asked Bowers about weapons. (ECF No. 630 p. 182). Again,

Thimons did so in order to gauge the threat Bowers posed. Bowers responded that he

had a Glock handgun on his waist and on his ankle. He also stated that he had an AR-

15 but left that weapon in Room TT. (ECF No. 630 p. 182-183). Another SWAT officer

asked Bowers why he gave up. Bowers responded that he had run out of ammunition.

(ECF No. 630 p. 163-164).

Officers Saldutte and Mescan both expressed concerns about the possibility that

Bowers was wearing an improvised explosive device. Their communications about the

threat concerning improvised explosive devices reinforce my finding that the situation

remained dangerous and volatile despite the fact that numerous SWAT officers had

guns trained on Bowers.  Mescan credibly testified that it is not uncommon in active

shooter situations that individuals also have improvised explosive devices. (ECF No.

630 p. 61).  Consequently, SWAT operators instructed Bowers to pull his jacket up, pull

up his shirt, and expose both his stomach and his back in order to demonstrate either

the presence or absence of explosives. (ECF No. 630 p. 185). During the silence while

Bowers was exposing his back and stomach as directed, Thimons asked Bowers "why

he did it." (ECF No. 630 p. 186). Bowers responded that "he's had enough, that Jews

---

[6] Thimons expressed that he wanted to start to focus on whether Bowers presented the only threat or whether the threat was larger, whether he had accomplices, whether the incident was resolving or part of something larger. (ECF No. 630 p. 179-180).
[7] Mescan explained that "the reason we're getting it out on the air is we know we were having detectives on the ground. Maybe somebody can identify him as a former worker of the synagogue, some relation to the synagogue, to gather whether or not the reason that this guy is particularly here. Is he associated with anyone or any other people associated with the synagogue? It can potentially give us some actionable intelligence on what the next course of action is going to be." (ECF No. 630 p. 60).

are killing our children, and he couldn't take it anymore, that all Jews had to die." (ECF No. 630 p. 66-67, 186, 229-230; ECF No. 631 p. 90, 128-129, 135 ("He said, 'I had to do it. Jews are the children of Satan, and they're murdering our children."), 147-148, 152-153, 163); (Government Ex. 3, 354-11:08:18). Bowers also referenced "hiss / HIAS." (ECF No. 630 p. 189; ECF No. 631 p. 147-148).[8]

I find credible testimony that SWAT's focus was not on obtaining a statement or conducting an interrogation. (ECF No. 630 p. 64-65). Rather, Thimons was trying to keep Bowers' attention focused on him and simply asked the first question that popped into his mind. (ECF No. 630 p. 207). Thimons admitted that he was at least, in part, curious about why Bowers had taken such action, but he also stated that there was a public safety purpose in asking the question. (ECF No. 630 p. 213). Specifically, Thimons sought to identify Bowers' motive in order to determine the scope of the threat.[9] Bowers' references to Jews, his attack on a synagogue, and the use of a rifle suggested to Thimons that it was a terroristic attack. (ECF No. 630, p. 187). Given Bowers' response, Thimons asked if he had any bombs or explosives. Bowers responded that he did not. (ECF No. 630 p. 189).

That safety remained the SWAT team's paramount concern and that the threat of danger persisted is underscored by Mescan's refusal to take a picture of Bowers and forward it to incident command. (ECF No. 630 p. 67-68; Government Ex. 3, 362-11:09:34). Mescan explained that incident command wanted to positively identify

---

[8] "HIAS" is an acronym for the Hebrew Immigrant Aid Society which is a non-profit organization that provides assistance to refugees. See https://www.hias.org/

[9] "[T]here's a big difference between something of this incident where it was anti-Semitic, his comments, or if it was, say, workplace violence or a domestic violence situation. Those situations in my experience are usually isolated, whereas something more of a terrorist incident can be very well planned and large in scope." (ECF NO. 630 p. 186).

Bowers through the photo. He declined to do so because it was too dangerous. (ECF No. 630 p. 67-68).

Similarly, the scene was too volatile and dangerous to advise Bowers of his *Miranda* rights at this time. (ECF No. 630 p. 64-65). Mescan testified:

> The situation is continuing. It's live. The individual is not in custody. We still have potentially another shooter. We don't have everybody in the synagogue accounted for as far as we know. The critical incident or the active scene is still ongoing.
>
> Though we're dealing with this problem, we have multiple operators now showing up that we're redirecting other places to recheck locations in the synagogue.
>
> We know that we have an IED that's been discovered, or what we've learned is an IED discovered in the main or the old prayer area that our EOD[10] techs are handling. So there's a lot going on that's all safety priority and priority of life. It has nothing to do with investigative means whatsoever.

(ECF No. 630 p. 64-65).

E. Bowers is Handcuffed:

Thimons encouraged Bowers to continue crawling down the steps in his direction. (ECF No. 630 p. 190). At 11:13 a.m., Bowers made it to the door threshold where SWAT officers were positioned. No longer in direct view of Room TT, Thimons and other agents pulled Bowers into a safe room ("Room QQ"), away from the threat of harm, disarmed him and handcuffed him with flexible plastic handcuffs. (ECF No. 630 p. 190-191).

Officer David Blahut[11] assisted Officer Miller in placing Bowers in handcuffs. During a pat down, they discovered two loaded magazines and a gun at Bowers'

---

[10] "EOD" refers to explosive ordinance disposal, or what is commonly referred to as bomb technicians. (ECF No. 630 p. 67).

[11] Blahut is a police officer with the City of Pittsburgh. He has been a member of the SWAT team since 2005 and also serves as a sniper. In addition to his duties with SWAT, he works with the River Rescue unit and the Pittsburgh medic unit. (ECF No. 630 p. 215).

waistband and another in an ankle holster. (ECF No. 630 p. 232-233; ECF No. 630 p. 135-137).  At 11:14 a.m., Blahut reported that "Actor's in custody" and requested TAC medics to the third floor. (Government Exhibit 3, 385-11:14:13). Blahut time stamped this action on the radio because, having cuffed Bowers, Blahut understood that they now had a duty of care and he wanted to ensure that it was noted that they were obtaining medical care for him. (ECF No. 630 p. 235).

This did not, however, render the scene safe. Concerned that other actors were still in the building, at Mescan's directive, Thimons conducted a "ruse." He told Bowers that they had seen him and his partner enter the synagogue on the surveillance cameras and asked Bowers where his partner was. (ECF No. p. 85, 117, 132-33, 194, 210-211). Bowers responded with a puzzled look and stated that he acted alone. (ECF No. p. 85) ("That must have been some fucking Jew. I came in here all by myself."). Additionally, seeking to further address any pending safety issues, officers inquired as to Bowers' mode of arrival at the Tree of Life. Mescan explained that it is not uncommon for active shooters to arrive in a vehicle containing explosive devices and / or a cache of weapons. (ECF No. p. 83-84). Bowers responded that he drove a green Hyundai Sonata. Mescan directed the Explosive Ordinance Disposal ("EOD") Team to establish a perimeter around the car. (Government Ex. 3, 430-11:22:33).

F. Medical Attention:

Once Bowers was removed to Room QQ, the SWAT team turned its attention to Officer Burke, who was bleeding profusely and required medical attention. Bowers' presence in the hallway had prevented either Burke from being evacuated or medics from getting to his location. Because the scene remained dangerous given the potential

presence of explosives and / or additional actors, SWAT used a diversionary device in order to safely move Burke past Room TT. They deployed a noise flash diversionary device into the threshold of Room TT intended to disorientate someone for a few seconds as Burke, Saldutte, and Persin moved down the stairs and out of the building. (ECF No. 631 p. 96-98).

Bowers also needed medical attention but the danger the situation posed with evacuating Burke momentarily delayed the arrival of medics. Laying on the floor, Bowers complained that his handcuffs were too tight. (ECF No. 630 p. 234). Blahut responded that Bowers would be treated humanely and that medics were responding. At this point, Bowers volunteered, "Good. These people are committing genocide to my people, and I just want to kill Jews." (ECF No. 630 p. 234-235). I find credible Blahut's testimony that he had not been asking Bowers any questions because "[h]e was in custody, and he wasn't *Mirandized*." (ECF No. 630 p. 236). Bowers was very calm, not screaming, and seemed very alert and polite. (ECF No. 630 p. 236).

Medics Shawn Eigenbrode and Leone Barone responded to the request for aid to Bowers. (ECF No. 630 p. 265-266). Bowers had a wound to his left upper leg and a wound to the left elbow. Both were bleeding but not profusely. (ECF No. 630 p. 267). The flex cuffs were moved to the front at the medics' request so that they could better render aid. They applied a tourniquet to Bowers' left arm. (ECF No. 630 p. 268). He was alert, eyes open, paying attention, responding to questions, and answering appropriately. (ECF No. 630 p. 267-268).

Bowers had to be evacuated on a canvas stretcher down the fire escape because the synagogue remained an active site and potentially dangerous. (ECF No.

630 p. 269; Government Ex. 19). While descending, Eigenbrode asked Bowers about a "clock" that was found in one of the rooms based upon credible concerns that it was a bomb. (ECF No. 630 p. 270-271). When asked, Bowers responded that it was a distraction device not a bomb. He added that he did not want to hurt any police officers. (ECF No. 630 p. 271). I find credible Eigenbrode's testimony that his only purpose in asking Bowers about the device was to ensure "that any other threats or hazards would be mitigated or identified." (ECF No. 630 p. 271-272). It was not to interrogate.

G. Transport to the Hospital:

At the bottom of the fire escape, Bowers was handed off to others for transport to Allegheny General Hospital ("AGH"). (ECF No. 630 p. 275). City of Pittsburgh paramedics Anthony DeSantis and Gregory Guckert, aided by a TAC medic, provided care and transport for Bowers. (ECF No. 631 p. 9-12). Several other individuals rode in the ambulance as well. A City of Pittsburgh Police Officer's body camera captured most of the ambulance ride. (Government Ex. 22).

DeSantis, who has 28 years of experience as a paramedic, assessed Bowers' condition and documented his treatment. (ECF No. 631 p. 7-9; Government Ex. 23). He determined that Bowers was conscious and breathing on his own and administered an IV due to Bowers' blood loss and corresponding low blood pressure. (ECF No. 631 p. 19-21). All other vitals were in the normal range. Bowers was oriented to "person, place and time" and received the highest possible score on the "Glasgow Coma Scale." (ECF No. 631 p. 23-24).

At 11:35 a.m., Pittsburgh Homicide Detective Robert Shaw read Bowers his Miranda warnings. (ECF No. 631 p. 45). Bowers, whose eyes were open, and who

appeared alert and oriented, indicated that he believed he should speak to a lawyer before responding to questions. Shaw asked Bowers routine biographical questions such as his name, date of birth, and address. Bowers responded with appropriate answers, although initially he stated that he did not know his address. (ECF No. 631 p. 45-46).

I find credible Shaw's testimony that he did not interrogate Bowers once Bowers invoked his *Miranda* rights. (ECF No. 631 p. 46-47). He did, however, ask Bowers questions about how he was feeling. Knowing that Bowers had sustained multiple gunshot wounds, and, knowing that the ride to the hospital would be approximately twenty minutes, Shaw asked Bowers if he was okay and told him to hang in there. (ECF No. 631 p. 47). These questions / comments did not amount to custodial interrogation.

The ambulance departed for the hospital at approximately 11:49 a.m. (ECF No. 631 p. 108). During the ride, Bowers appeared calm, lucid, aware, cooperative, and polite. (ECF No. 631 p. 48). He did complain of pain on a few occasions but did not appear to be in agony. (ECF No. 631 p. 48).

At 12:25 p.m., after the Tree of Life had been thoroughly checked and cleared, and any potential threats regarding accomplices and explosive devices had been resolved, Mescan declared the scene secure and safe. (ECF No. 631 p. 91-92; Government Ex. 3, 322-12:25:42). I find credible Shaw's and Patcher's testimony that they were unaware that Mescan had declared the site safe at any time before they left the hospital at the end of the day. When Shaw initially got in the ambulance with Bowers, all he knew was that there had been multiple fatalities and that law enforcement personnel had been injured. He understood that this was a "higher profile

thing." (ECF No. 631 p. 44). As the ambulance pulled away from the synagogue, it was a "very active crime scene" and Shaw had concerns about continuing danger, including more casualties, accomplices, and bombs. (ECF No. 631 p. 52-53). Similarly, Agent Patcher of the FBI, who also rode in the ambulance, stated that, as they left the scene, he knew about "reports of explosives," and saw "EOD with the robots," there was a report of a device making noise, and understood that officers were still engaged. (ECF No. 631 p. 116, 122). Neither Shaw nor Agent Patcher of the FBI knew at the time that Mescan had declared a "Code 4." (ECF No. 631 p. 68-69; p. 115-116). In fact, Patcher did not receive any communications with anyone at the scene. (ECF No. 631 p. 121).

H. At the Hospital:

Upon arrival at the hospital, Shaw and Patcher stayed with Bowers at the request of medical personnel. (ECF No. 631 p. 51-52). During their stay with Bowers at the hospital, both Shawn and Patcher asked Bowers several questions motivated by a concern regarding danger to the public and officers. (ECF No. 631 p. 53) (Shaw said "you know, Rob, this is a public safety statement. I just want to know just so nobody else gets hurt, is there anything that we should be concerned about that's remaining at the synagogue?") and (ECF No. 631 p. 123) (Patcher explained that they prefaced questions to Bowers with comments about wanting to make sure that nobody else would get hurt "[o]ne, to elicit a truthful response and two, to show that this was not us trying to investigate the crime. It was simply to ensure that nobody else was injured."). Bowers responded by identifying the AR-15 rifle and three handguns that he had used but denied any other threats. (ECF No. 631, p. 53, 56). Shaw also inquired about dangers present at Bowers' home. Bowers denied anything other than "black powder."

(ECF No. 631 p. 55-56). Shaw and Patcher also verified certain biographical information about Bowers. (ECF No. 631 p. 71-72).

At approximately 4:15 p.m., Shaw attempted to re-*Mirandize* Bowers. Bowers expressed an interest in speaking but stated that he wanted his counsel present. (ECF No. 631 p. 56).

### Conclusions of Law

Bowers contends that officers interrogated him at the scene, in the ambulance, and at the hospital, in violation of this Fifth and Sixth Amendment rights and *Miranda v. Arizona*, 384 U.S. 436 (1966). He also urges that the Court should suppress any statements made in the course of medical treatment under the Fifth Amendment and *Miranda* because the statements were made under circumstances induced by officers either prior to being *Mirandized* or after he invoked his *Miranda* rights; because he maintained a reasonable expectation of privacy in all communications with medical personnel during the course of medical treatment under the Fourth Amendment and HIPPA; and because he maintains a federal constitutional privacy interest in his medical information. The Government counters that all statements are admissible because Bowers was not subject to custodial interrogation under *Miranda* or because an exception to *Miranda* applies and that any communications with medical providers are not protected.

(A) Custodial Interrogation

The Fifth Amendment provides that "No person … shall be compelled in any criminal case to be a witness against himself." *U.S. Const. amend. V*. In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), the Supreme Court recognized a

prophylactic rule which excluded the use of voluntary statements unless the defendant was provided certain warnings and voluntarily, knowingly, and intelligently waived his or her right to have an attorney present during the interrogation.  "This protection only applies to statements made when the defendant is both in custody and subject to interrogation." *U.S. v. Martinez*, 460 Fed. Appx. 190, 193 (3d Cir. 2012) (*citations omitted*). The Third Circuit Court applies a two-pronged test to aid in determining whether there has been a custodial interrogation. First, the court must determine whether the suspect was in custody. If so, the court must then determine whether the police interrogated the suspect. *United States v. Mesa*, 638 F.2d 582, 585 (3d Cir. 1980) (*citations omitted*).

"For a person to be in custody when he has not been arrested, 'something must be said or done by the authorities, either in their manner or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.'" *United States v. Taylor*, 22 F. Supp.3d 387, 390 (M.D. Pa. 2014), *citing, United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006) (*internal quotation marks and citations omitted*). In other words, there must be "circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012).  The Third Circuit Court explained that, in determining whether someone is in custody, it is guided by the following factors:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*United States v. Ingino*, 845 Fed Appx. 135, 137 (3d Cir. 2021), *quoting, United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010) and *Willaman*, 437 F.3d at 359.  "[T]he ultimate inquiry is whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Reinert v. Larkins*, 379 F.3d 76, 86 (3d Cir. 2004) (*internal citations and quotation marks omitted*). "When the individual has not been openly arrested when the statements are made, something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so." *Reinert*, 379 F.3d at 86 (*internal quotation marks and citations omitted*). The court should be guided by objectively considering "how a reasonable man in the suspect's position would have understood his situation." *Stansbury v. California*, 511 U.S. 318, 324, 114 S. Ct. 1526 (1994) (*citations omitted*).

The other component for *Miranda* purposes is "interrogation." The term "interrogation" refers "to express questioning as well as its functional equivalent, i.e., 'any words or actions on the part of the police … that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Martinez*, 460 Fed. Appx. at 193, *quoting, Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682 (1980).  Our Court of Appeals instructs courts to "consider whether officers 'intentionally created circumstances likely to elicit a statement' from a defendant…, whether the defendant appeared emotionally distressed or overwrought, … and whether he 'would have felt compelled to respond to the arresting officer's statement…'" *United States v. Rodriguez-Colon*, 827 Fed Appx. 188, 191 (3d Cir. 2020) (*citations omitted*). "If the individual indicates his wish to remain silent, he is invoking his right to exercise his Fifth

Amendment privilege and the interrogation must cease. … But '[a]ny statement given freely and voluntarily without any compelling influences is … admissible in evidence.'" *Martinez, 2012 WL 1375832 at * 2, quoting, Miranda*, 384 U.S. at 473-74, 86 S. Ct. 1602.

Applying these considerations to the facts at hand, I find that the Defendant was in custody at 11:04 a.m., when he began crawling into the hallway outside of Room TT with his arms outstretched and visible to the SWAT officers.[12] In so holding, I do not mean to suggest that all potential threats had been removed. In fact, the situation posed significant ongoing threats to both the responding officers and members of the public. Nevertheless, the determination of custody is an objective inquiry and focuses upon what a reasonable person would believe. When Bowers emerged into the hallway, numerous SWAT team members were both above and below him on the stairwell. Weapons were displayed, hostile tones of voice had been used, and Bowers' movement was being dictated by the SWAT team. He had been warned that a failure to follow the

---

[12] I reject the Government's suggestion that the decision in *United States v. Mesa*, 638 F.2d 582, 584 (3d Cir. 1980) is instructive in this respect. In *Mesa*, our Court of Appeals held that a tape-recorded conversation between the defendant and an FBI hostage negotiator was not subject to suppression on *Miranda* grounds. The defendant had barricaded himself in a motel room and between 25 and 30 officers surrounded the motel. Significantly, the conversation "primarily involved long narrative monologues" over telephone by the defendant with the hostage negotiator listening. *Mesa*, 638 F.2d at 583. In finding that the defendant was not subject to a custodial setting, the Court emphasized: law enforcement officials had no immediate control over his actions; they could not compel him to even listen to any questions they wanted to ask; that they had no power "to handcuff him or use other reasonable means to confine him in such a manner that he had no choice but to listen to questioning"; the conversation did not take place where the defendant was alone in a room or other enclosed area such that all possible distractions had been eliminated; and the defendant remained free to terminate the phone conversation at any time. *Id.*, at 586. Here, in contrast, Bowers was not speaking with the SWAT officers over the phone. Rather, they were separated by mere feet and had guns directed at him. Bowers could not ignore questioning or directives by hanging up a phone. Further, they were, in effect, in an enclosed room. For the same reasons, I find the Government's reliance on the decisions in *Manzella v. Senkowski*, No. 97-cv-921A(F), 2004 WL 1498195, at * 24-25 (W.D. N.Y. July 2, 2004); *State of New Mexico v. Cooper*, 949 P.2d 660, 667 (N.M. 1997); and *State of Wisconsin v. Stearns*, 178 Wis.2d 845, 852, 506 N.W.2d 165, 168 (Wis. Ct. App. 1993), to be unpersuasive. Nor do I find the citation to cases involving *Terry* stops to be analogous. The "temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop" is factually inapposite.

instructions would result in his being left in the room to "bleed out" and possibly die from his injuries. Bowers was surrounded and had no means of egress other than past armed officers. As such, I think it clear, under these circumstances, that, although he was not formally under arrest at this point, a "reasonable man" in Bowers' situation would not have believed he was free to leave. Consequently, I find that he was in custody prior to the time handcuffs were placed upon him.  Additionally, I find that Bowers was interrogated. Asking Bowers why he "did it" or why he "gave up" are questions that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Martinez*, 460 Fed. Appx. at 193. Given the totality of the circumstances then, I find that the objective circumstances indicate that Bowers was subjected to custodial interrogation after 11:04 a.m.

Statements made by a defendant during a custodial interrogation are generally inadmissible at trial and are presumed to have been compelled if the defendant had not been advised of his *Miranda* rights. *United States v. Duncan*, 308 Fed. Appx. 601, 605 (3d Cir. 2009). As set forth above, Bowers has satisfied his burden to show that evidence should be suppressed because he was subjected to custodial questioning without the benefit of *Miranda* warnings. The burden thus shifts to the Government to prove by a preponderance of the evidence that there was some exception to the *Miranda* rule, or that he otherwise waived his rights. *See United States v. Valenta*, Crim. No. 15-161, 2017 WL 2131375, at * 4 (W.D. Pa. May 17, 2017) (*citations omitted*). As the Government contends, questions reasonably prompted by a concern for public safety constitute an exception to *Miranda* requirements as do routine booking questions. Finally, "volunteered" statements are not subject to *Miranda*.

21

(B) Public Safety Exception

At times, "'the need for answers to questions in a situation posing a threat to public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination,' and 'spontaneity rather than adherence to a police manual is necessarily the order of the day.'" *United States v. Greaves*, 831 Fed. Appx. 52, 53 (3d Cir. 2020) (*quoting, New York v. Quarles*, 467 U.S. 656-57, 104 S. Ct. 2626 (1984)[13]). In such instances, "'pressing public safety concerns' *Oregon v. Elstad*, 470 U.S. 298, 317, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), allow 'questions necessary to secure [the officers'] own safety or the safety of the public,' *Quarles*, 467 U.S. at 659, 104 S.Ct. 2626." *Greaves*, 831 Fed. Appx. at 53. The public safety exception applies "when it would have been objectively reasonable for the officer to believe that asking the question was necessary to protect the public or police from immediate danger." *United States v. Duncan*, 308 Fed. Appx. 601, 605 (3d Cir. 2009) (*citing and quoting Quarles*, 467 U.S. at 656, 659 n. 8). Application of the public safety

---

[13] The Supreme Court recognized the public safety exception to *Miranda* in *New York v. Quarles*, 467 U.S. 649 (1984). In *Quarles*, a woman reported a rape to police officers who were on road patrol. She indicated that the assailant was carrying a gun and had just entered a nearby supermarket. One of the officers entered the store and spotted the defendant who matched the woman's description. After initially losing sight of him, the officer then located and handcuffed the defendant. Before giving *Miranda* warnings the officer inquired as to the gun's location. The defendant indicated where it was and the officer retrieved the gun. The trial court excluded the defendant's initial statement regarding the gun's location because the defendant had not been *Mirandized. Quarles*, 467 U.S. at 651. The Supreme Court reversed, finding that such an exception "does not depend upon the motivation of the individual officers involved." *Id.*, at 656. The Court explained that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 657. In so holding, the Court sought to avoid placing the officer in the "untenable position" of having to consider, "often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the Miranda warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them." *Id.* at 657-58.

exception requires an "examination of the totality of the circumstances." *Duncan*, 308
Fed. Appx. at 606 (*internal quotations omitted*).

Here, law enforcement officers faced an imminent threat to public safety
beginning the moment the dispatcher announced the first 911 calls at 9:55 a.m. through
the time Detective Shaw and Agent Patcher left Bowers at the hospital. They responded
to an unprecedented large scale attack on the Tree of Life synagogue. Law
enforcement officers confronted open fire, high powered weapons, numerous victims, a
confusing floorplan, a barricaded gunman, conflicting reports regarding the number of
assailants, the potential use of explosives, and a chaotic and volatile scene. The
responding officers were at significant risk as were those congregants still hiding in the
synagogue. Indeed, at least three officers were wounded during their response to Tree
of Life. To ensure the safety of the officers at the scene and the surrounding community,
they needed information about the quantity and location of firearms, whether any
explosive devices had been placed at the synagogue or elsewhere, and whether
Bowers acted alone or with collaborators or accomplices as part of a larger attack.

The questions officers posed, including those relating to why Bowers
surrendered and why he engaged in the attack, served those purposes. As Officer
Thimons credibly testified, understanding why Bowers attacked the Tree of Life would
shed light on the scale of the attack (domestic violence, workplace, or terrorist) and
permit officers to respond accordingly. Similarly, Bowers' answer to questions regarding
the decision to surrender could reveal whether he was planning an ambush. At that
point in time Bowers remained armed and officers were unsure as to the presence of
accomplices or any explosive devices. The questions posed were not investigatory in

nature or sought for the purpose of eliciting testimonial evidence. Rather, each question furthered the goal of ensuring safety.

I recognize that the questions posed while Bowers was at the hospital happened when he personally no longer posed a threat, but his apprehension did not remove the potential threat existing elsewhere. Officers needed to know whether his car or home presented any danger. Additionally, to the extent that Detective Shaw or Agent Patcher inquired about threats still existing at the Tree of Life, I find credible their uncontradicted testimony that they were unaware at the time that the synagogue had been "cleared" and declared secure and safe ("Code 4") at 12:25 p.m. *Allen v. Roe*, 305 F.3d 1046, 1051 (9th Cir. 2002) ("the 'objectively reasonable need' for protection is based on what the officers knew at the time of the questioning.").

The public safety exception is applicable in situations, like that in *Quarles*, where officers were attempting to locate a gun. *See United States v. Powell*, 444 Fed. Appx. 517 (3d Cir. 2011); *United States v. Duncan*, 308 Fed. Appx. 601 (3d Cir. 2009); and *United States v. Johnson*, 95 Fed. Appx. 448 (3d Cir. 2004). The officers' need to locate Bowers' weapons, alone, would justify application of the exception in this case.

However, "[t]his was no single gun in a grocery store." *United States v. Rogers*, 13-cr-130, 2013 WL 6388459, at * 9 (D. Minn. Aug. 29, 2013), *objections sustained in part and overruled in part by United States v. Rogers*, 2013 WL 6388457 (D. Minn. Dec. 6, 2013). In the face of a terrorist attack,[14] the public safety exception must be broadly

---

[14] This case is factually more analogous to those cases involving potential terrorist attacks than those involving the simple location of a missing gun. *See Rogers*, 2013 WL 6388457; *United States v. Abdulmutallab*, 2011 WL 445243 (E.D. Mich. Sept. 16, 2011); and *United States v. Peace*, 14-cr-011, 2014 WL 6908412 (N.D. Ga. Dec. 8, 2014) (FBI agents knew that defendants were "actively promoting a multifaceted terror operation … intended to trigger the institution of martial law").

construed as the threat to the public and responding officers is commensurately greater. Questions may go beyond those pertaining to the location of weapons. See *United States v. Abdulmutallab*, No. 10-20005, 2011 WL 4345243 (E.D. Mich. Sept. 16, 2011) (public safety exception applies to questions such as where defendant had traveled, when, how and with whom, the details of the explosive device, details regarding the bomb maker, where the defendant had received the bomb, his intentions in attacking the flight, who else might be planning an attack, whether he associated with or lived with others who had a similar mind-set, *et cetera*, because the questions were designed to discover whether the defendant had information about others who would make similar attacks); *United States v. Khalil*, 214 F.3d 111 (2nd Cir. 2000) (public safety exception encompassed questions of whether a defendant intended to kill himself while detonating bombs because answer would have had the potential for shedding light on the bomb's stability); *United States v. Ciancia*, Crim. No. 13-902, 2015 WL 13798663, at * 2-4 (C.D. Cal. Oct. 26, 2015) (public safety exception applied to questions posed following an exchange of gunfire with officers at LAX, including whether the defendant had a carry-on bag, what color the bag was, whether he lived alone, whether he worked at the airport, how he arrived at the airport, how long he had been at the airport, *et cetera*); *Wilcox v. Warren*, Crim. No. 13-3524, 2015 WL 8780331, at * 7 (D.N.J. Dec. 15, 2015) (public safety exception applied to questions concerning location of victim of stabbing because there was an objectively reasonable basis for officer to conclude that the victim may need emergency medical care); and *United States v. Carillo*, 16 F.3d 1046, 1049 (9th Cir. 1994) (public safety exception applied to officer's question of whether defendant used drugs based on officer's objectively reasonable need to protect himself from

contact with syringes and toxic substances). I find the situation at hand analogous to the fact patterns in these cases. The questions posed by the SWAT officers were designed to ensure the safety of the officers and the public rather than to elicit incriminating answers. To find otherwise would:

> place officers … in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.

*Quarles*, 467 U.S. at 657-658. Consequently, all statements at issue are admissible under the public safety exception to *Miranda*.

(C) Routine Booking Questions

The Government offers another exception to the suppression of statements under *Miranda*. Certain statements responsive to "routine booking" questions are admissible as an exception to *Miranda*. According to the Supreme Court, statements regarding "biographical data necessary to complete booking or pretrial services" fall outside the protection offered by *Miranda*. *Pennsylvania v. Muniz*, 496 U.S. 582, 601-02, 110 S.Ct. 2638 (1990).  Thus, "[q]uestions regarding a suspect's name, address, height, weight, eye color, date of birth, current age, or matters reasonably related to the police's administrative concerns that are not designed to elicit incriminatory admissions" are exempt from *Miranda* protections. *U.S. v. Algarraobo*, Crim. No. 00-318, 2000 WL 1886595 at * 2 (E.D. Pa. Dec. 14, 2000), *citing, Muniz*, 496 U.S. at 601-602.  *See also*, *United States v. Paxton*, 848 F.3d 803, 813 (7th Cir. 2017) (no Fifth Amendment violations occurred when defendants were asked the sorts of biographical questions

26

that would be posed in booking any arrested individual); *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996) ("it is well-settled that routine biographical data is exempted from *Miranda's* coverage"); *United States v. Ozuna*, 170 F.3d 654, 657 n. 1 (6th Cir. 1999) ("[N]ot all questioning of in-custody suspects constitutes interrogation triggering *Miranda* protections. In the context of routine booking following an arrest, this Court has held that 'routine biographical questions are not ordinarily considered interrogation.'") (*citations omitted*); and *United States v. Mata-Abundiz*, 717 F.2d 1277, 1280 (9th Cir. 1983) (discussing "routine booking procedures" exception to *Miranda*).

Based upon this well-established exception to *Miranda*, I find that any statements made in response to routine booking questions are admissible under *Muniz*. In so holding, I note that Bowers did not respond to the Government's argument in this regard nor has he otherwise suggested that any "biographical" questions were otherwise designed to elicit incriminatory answers.

(D) Voluntary Statements

The Government also contends that "certain of Bower's statements during the course of his interaction with law enforcement were not in response to any questioning." (ECF 361, p. 10) As such, the Government argues, these statements were unsolicited, spontaneous, and otherwise "volunteered" and are not subject to the dictates of *Miranda*. In establishing the *Miranda* rule, the Supreme Court explained that "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda*, 384 U.S. at 478. Additionally, "'unforeseeable' responses to police questions or actions do not invoke *Miranda*." *Gomez v. Pitkins*,

27

2010 WL 7765836, at * 4 (E.D. Pa. Oct. 20, 2010) (*citing, Rhode Island v. Innis*, 446

U.S. 291, 302, 100 S.Ct. 1682 (1980)).

Given that I have already determined that any statements made in response to

questions by law enforcement officials fall within the public safety exception, and some

also qualify under the routine booking questions exception, I need not parse out

whether some also qualify as voluntary statements. However, out of an abundance of

caution, I find, in addition, that Bowers "volunteered" several statements and that such

statements do not fall within the purview of *Miranda*. Those consist of: statements made

prior to being in custody that he had been shot, that he could not crawl and needed

SWAT officers to come to him, and that he feared that law enforcement wanted to kill

him (ECF No. 630 p. 55-57, 172-173, 177; ECF No. 631 p. 82-84); statements, in

response to a comment that he would be treated humanely, that "[t]hese people are

committing genocide on my people, and I just want to kill Jews" (ECF No. 630 p. 235);

complaints of pain (or lack thereof) at the synagogue, during the ambulance ride, and

while at the hospital (ECF No. 630 p. 234, 268-269, ECF No. 631 p. 23-24); and the

identification of Detective Shaw at the hospital (ECF No. 631 p. 56-57). Consequently,

those statements are also admissible under the "voluntary statement" exception to

*Miranda*.

(E) Statements Made During the Course of Medical Treatment

Bowers also seeks the suppression of statements made during the course of

medical treatment. He offers several arguments in support of suppression. First, he

contends that certain statements were made before being *Mirandized* and that, upon

being *Mirandized*, he invoked his right to silence and the aid of an attorney. As such, he

reasons, the Fifth and Sixth Amendments bar the admission of any statements. Second, he argues that the Fourth Amendment prohibits the admission of any statements made during the course of medical treatment because he had a reasonable expectation of privacy in any such statements. Contrary to the Government's characterization, the Defendant does not urge that the Health Insurance Portability and Accountability Act ("HIPPA") created a constitutional privacy interest, rather he simply urges that HIPPA supports the recognition of such an interest. Finally, Bowers urges that his medical information falls within the "zone of privacy" entitled to constitutional protection.[15]

As to his first argument, as set forth above, I agree that Bowers was in custody for purposes of *Miranda* at the time he was transported to the hospital and while at the hospital. It is also clear that he had invoked his right to remain silent and his right to counsel. The question, then, is whether the statements are otherwise admissible. As stated above, I find that the public safety exception applies in this case. This finding extends to those questions posed during transportation to the hospital and while receiving medical care asking about the presence of explosives at the synagogue and about the presence of explosives or "anything that could hurt people" at his residence. Similarly, as stated above, responses to questions seeking biographical information such as his place of birth and family members are admissible. Finally, as detailed

---

[15] Bowers identifies certain "acts" that medics and officers reported that he contends disclosed information and, as such, must be suppressed. These "acts" include descriptions of Bowers "being in a daze," as not reacting while having his wounds packed, as "opening and closing his eyes," as appearing to be "willing himself to forget the pain," and as being unresponsive when asked about shortness of breath and chest pain. (ECF No. 649, p. 19). I reject his contention that these "acts" constitute statements that fall within the scope of *Miranda*. In this context, these non-verbal reactions were non-assertive and "real or physical" in nature rather than "testimonial." *See Pennsylvania v. Muniz*, 496 U.S. 582, 591, 110 S.Ct. 2638, 2645 (1990) (finding that any slurring of speech and other evidence of lack of muscular coordination revealed by a defendant's response to direct questions constitutes nontestimonial components of those responses, as compared to the content of the answer which might give rise to the inference of an impairment).

above, certain of Bowers' comments also fall within the "volunteered" statements exception to Miranda and are admissible in that sense as well.

As to his second argument, Bowers concedes that officers had the authority to stay by his side during the course of medical treatment but insists that they did not have lawful authority to listen to and / or record his communications with medical providers. Specifically, he urges that he had a "reasonable expectation of privacy" under the Fourth Amendment in any protected health information, both oral and behavioral statements. He argues that the police officers represented an "uninvited ear." I disagree. Certainly, "[t]he Fourth Amendment protects against unreasonable searches and seizures, including the monitoring of oral statements." *Katz v. United States*, 389 U.S. 347, 353, 88 S. Ct. 507 (1967). An individual in a phone booth may have a reasonable expectation of privacy because he has sought to exclude listeners from what he intends to be a private conversation. *Katz*, 389 U.S. at 511-12. ("One who occupies it, shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world."). Yet Bowers has not identified any case law suggesting that an individual has a reasonable expectation of privacy when communicating with medical providers while in the presence of police officers. Although he may have had an actual or subjective expectation of privacy, I am not prepared to find that such an expectation is one that society recognizes as "reasonable." *Katz*, 389 U.S. at 361, 88 S. Ct. 507 (Harlan, J., concurring). As Justice Harlan contemplated, "conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable." *Id*. The fact that Congress passed HIPPA does

not otherwise make reasonable an expectation of privacy regarding statements made to medical personnel in the presence of others.

Finally, Bowers argues that all communications, oral and behavioral, made in the course of receiving medical treatment should be suppressed because private medical information falls within the "zone of privacy" and is entitled to constitutional protection. "It is indeed clear beyond peradventure that 'the Constitution embodies a promise that a certain private sphere of individual liberty will be kept largely beyond the reach of government'" and that this right to privacy includes medical records. *In re Search Warrant (Sealed),* 810 F.2d 67, 71 (3d Cir. 1987), *quoting, Thornburgh v. American College of Obstetricians*, 476 U.S. 747, 106 S. Ct. 2169 (1986) and *Whalen v. Roe*, 429 U.S. 589, 599, 97 S. Ct. 869, 876 (1977). In *Whalen v. Roe*, 429 U.S. 589, 97 S. Ct. 869 (1977), the Supreme Court found that a statute requiring the maintenance of records for the identity of people for whom doctors prescribed dangerous medications was lawful and did not invade any constitutional right to privacy. Nevertheless, the Court implied that the disclosure of a person's medical records by or under the compulsion of government, "might" invade a constitutional right to privacy. *Whalen*, 429 U.S. at 598-600, 605-06. In *United States v. Westinghouse Electric Corp.*, 638 F.2d 570, 577 (3d Cir. 1980) the Third Circuit Court observed that "[t]here can be no question that an employee's medical records, which may contain intimate facts of a personal nature, are well within the ambit of materials entitled to privacy protection." The right to privacy is not absolute, however, and must be balanced against societal interest in disclosure. *Westinghouse*, 638 F.2d at 577.[16] *See also, In re Search Warrant*, 810 F.2d 67, 71-72

---

[16] In considering the competing claims of the government's asserted need for information and the employees' right to privacy concerning medical records, the Court evaluated the following factors: (1) the

(3d Cir. 1987) ("[a]nd as courts have held, medical records are clearly within this constitutionally protected sphere).  While the Court is prepared to find that medical records are entitled to some degree of protection, Bowers has not identified any case law suggesting that statements (be they oral or behavioral communications or acts) made to medical personnel while in the presence of police officers are subject to the same protection. Nor has he suggested how the factors identified in *Westinghouse* favor the protection of the information sought to be protected here. In the absence of such, I decline to find constitutional protection applicable in this instance.

 Accordingly, the Motion is denied. An Order will follow.

---

type of record requested [and] the information it does or might contain, (2) the potential for harm in any subsequent nonconsensual disclosure, (3) the injury from disclosure to the relationship in which the record was generated, (4) the adequacy of safeguards to prevent unauthorized disclosure, (5) the degree of need for access, and (6) whether there is an express statutory mandate, articulated public policy, or other recognizable public interest [in favor of access]." *Id.*, at 578.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **2:18-CR-00292-DWA** |
| | ) | |
| vs. | ) | |
| | ) | |
| ROBERT BOWERS, | ) | |
| | ) | |
| Defendant. | ) | |

AMBROSE, United States Senior District Judge

**ORDER OF COURT**
**RE: MOTIONS TO SUPPRESS NO. 9**

AND now, this 20th day of January, 2022, upon consideration of the Defendant's

Motion to Suppress (Motion to Suppress No. 9 at ECF No. 296/319) and the related

submissions, said Motion to Suppress is denied.

BY THE COURT:

_Donetta F. Ambrose_

_____
Donetta W. Ambrose
United States Senior District Judge