IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,           )
                                    )
                                    )        2:18-CR-00292-RJC
                                    )
        vs.                         )
                                    )
ROBERT BOWERS,                      )
                                    )
        Defendant.                  )

COLVILLE, United States District Judge

## OPINION

Pending is Defendant's Motion to Dismiss Superseding Indictment Pursuant to the Fifth, Sixth, and Eighth Amendments, the Jury Selection and Service Act, 18 U.S.C. § 243, and this Court's Supervisory Authority over Federal Criminal Procedures, or to Stay the Proceedings Pending the Selection of a New Grand Jury and a Petit Jury in Conformity with the Constitution and Jury Selection and Service Act, and Request for Evidentiary Hearing and Further Discovery. (ECF No. 650). The Government filed a Response to Defendant's Motion on January 10, 2022 (ECF No. 659), Defendant filed a Reply on January 18, 2022 (ECF Nos. 681, 683),  the Government filed a Sur-Reply on February 22, 2022 (ECF No. 700), and Defendant filed a Sur-Sur-Reply on March 4, 2022 (ECF No. 709). The Motion is now ripe for review.

### I. SYNOPSIS

On January 29, 2019, a grand jury returned a Superseding Indictment charging Defendant with multiple capital-eligible and non-capital offenses. (ECF No. 44). In the instant Motion, Defendant seeks an order dismissing the Superseding Indictment against him on the following grounds: (1) a violation of the Fifth Amendment's guarantees of a grand jury, due process, and

equal protection of the laws; (2) a violation of the Sixth Amendment's guarantee of trial by a petit jury selected from a fair cross-section of the community; (3) a violation of the Eighth Amendment mandate that, in a capital case, the defendant is entitled to reliability and enhanced procedural protections; (4) a violation of the Jury Selection and Service Act of 1968 ("JSSA"); (5) a violation of 18 U.S.C. § 243; and (6) as necessary in the proper exercise of this Court's supervisory power over federal criminal procedure. (ECF No. 650). Defendant asserts that the Western District of Pennsylvania is in substantial violation of the JSSA, 18 U.S.C. § 243, and the Constitution because: (1) it has failed to supplement its jury source list; (2) it has failed to take other reasonable measures designed to ensure a constitutionally adequate jury selection procedure; and (3) it is otherwise in violation of specific provisions of the JSSA designed to ensure inclusiveness, representativeness, randomness, accuracy, reliability, proportionality, and fairness. Id. If dismissal is not deemed appropriate, Defendant alternatively seeks a stay of these proceedings and re-presentation of his case before a grand jury selected with procedures in compliance with these statutory provisions and the Constitution. Id. Defendant seeks an evidentiary hearing in support of the same. In response, the Government disputes the merits of Defendant's claims. (ECF No. 659). The Government also states that Defendant fails to raise any issues of material fact and, therefore, that an evidentiary hearing is not necessary. Id.

The Court addresses each of Defendant's claims in turn.

**II. ANALYSIS**

A. Western District of Pennsylvania's Jury Plan

Pursuant to the JSSA, the United States District Court for the Western District of Pennsylvania has in place a written plan for the random selection of grand and petit jurors. See 28 U.S.C. §1863; Plan of the United States District Court for the Western District of Pennsylvania for

2

the Random Selection of Grand and Petit Jurors ("Jury Plan"). In the instant Motion, Defendant challenges the Jury Plan as it currently exists (effective March 2, 2020) and as it existed at the time of Defendant's indictment and superseding indictment (effective April 1, 2009).[1] Aside from a single amendment to Section 9, discussed more fully below, the two plans are identical. Accordingly, the Court refers to the plans generically as the "Jury Plan" except where necessary to distinguish the two versions.

The Jury Plan applies to all three divisions of the District Court for the Western District of Pennsylvania (Erie, Johnstown, and Pittsburgh). Jury Plan § 3. The Pittsburgh Division is at issue in this case and consists of Allegheny, Armstrong, Beaver, Butler, Clarion, Fayette, Greene, Indiana, Jefferson, Lawrence, Mercer, Washington, and Westmoreland counties. Id. The Jury Plan sets forth essentially a two-step process for juror selection. First, the district creates a master jury wheel for each of its three divisions by selecting names at random from voter registration lists for the applicable division. Id. § 5 (stating that "names of grand and petit jurors selected to serve . . . shall be selected at random from the voter registration lists of all the counties within the relevant divisions"). "Voter registration lists" as used in the Jury Plan mean "the voter registration lists for a statewide primary or general election as maintained by the counties." Id. The voter registration lists are obtained electronically and exclusively from the Statewide Uniform Registry of Electors ("SURE") through the Pennsylvania Department of State. Id. The Jury Plan asserts that "(v)oter registration lists represent a fair cross section of the community in each division of the Western District of Pennsylvania." Id.

---

[1] The 2020 Plan is filed at ECF No. 659, Ex. 1 at 281-300. and also is accessible on the Court's website. See https://www.pawd.uscourts.gov/sites/pawd/files/Jury_Plan_Final_2020.pdf. (last accessed April 5, 2022).

After the master jury wheel is filled, names are randomly drawn from the master wheel to receive a juror qualification questionnaire. Id. § 9. The answers to this questionnaire determine whether the person responding is deemed qualified to serve as a juror. Id. §§ 9-12. The names of all persons drawn from the master jury wheel in each division, who are not disqualified, exempt, or excused pursuant to the Jury Plan, are then put into a second wheel, called the qualified jury wheel. Id. § 11. Individuals from the qualified jury wheel are then randomly selected as necessary to be summoned for service on grand or petit juries. Id. § 13.

The Jury Plan provides that "[t]he master jury wheel shall be emptied and refilled every two years and refilled within four months after a November general election." Id. § 8. Similarly, "[t]he qualified wheel for each division shall be emptied and refilled every two (2) years and within seven (7) months after a November general election." Id. § 13. The master jury wheel pertinent to the grand jury in this case was filled on February 7, 2017. See ECF No. 650-11. On February 21, 2018, 85 grand jurors were summoned from the qualified jury wheel to be considered as grand jurors in this case. See id. A trial date for this case has not yet been set, and, thus, it is not certain from which jury wheel the petit jury will be selected.[2]

As set forth above, the Jury Plan in place at the time of the grand jury selection in this case was amended effective March 2, 2020. The sole difference between the 2009 Jury Plan and the

---

[2] There appears to be some confusion between the parties about the scope of Defendant's current Motion. Defendant purports to challenge both the grand and petit juries, while the Government frames the motion as solely a grand jury challenge due to the fact that the petit jury has yet to be chosen. Compare ECF No. 682, at 3 n.2 (defense motion seeking post-2020 jury records stating, inter alia, that "because the defense *has now filed* both a grand *and a petit jury* challenge, ECF 650, the request for records is no longer premature" (emphasis added)), with ECF No. 693, at 1 (Government response agreeing to production because Defendant "also states that the records should be disclosed in connection with *his anticipated challenge* to the implementation of the Jury Plan as it relates to the *eventual petit jury* in this case" (emphasis added)). To the extent that the arguments Defendant raises in his current motion pertain generally to the 2020 Jury Plan and/or petit jury selection, the Court will address them here. To the extent, however, Defendant makes arguments that depend on as yet unknown statistics or other facts specific to the eventual petit jury selection in this case, his motion remains premature and is denied as such.

2020 Jury Plan is the addition of the following paragraph to the end of Section 9 in the 2020 version:

> Additionally, for each juror qualification mailing returned by the Post Office as undeliverable and/or for each person who fails to complete and/or respond to the juror qualification questionnaire within 21 days of the date of mailing, the Clerk shall draw at random, the name of a resident whose address is in the same zip code to which this original juror qualification mailing had been sent. The Clerk shall then mail a paper version of the juror qualification questionnaire to that resident and, thereafter, follow the procedures set forth in this section of the Plan with respect to that new prospective juror.

(ECF No. 659-1, at 289).

      B.     <u>Fair Cross Section Claim</u>[3]

          1.     General Principles

The Sixth Amendment entitles a criminal defendant to a trial by an impartial jury.  U.S. Const., amend. VI. An "important step in furthering impartiality is to draw jurors from diverse segments of the population." <u>United States v. Savage</u>, 970 F.3d 217, 252 (3d Cir. 2020), <u>cert. denied</u>, 142 S. Ct. 481 (U.S. 2021) . "The Supreme Court has declared this method a constitutional guarantee by concluding that 'the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial.'" <u>Id.</u> (quoting <u>Taylor v. Louisiana</u>, 419 U.S. 522, 528 (1975)). The fair-cross-section requirement does not guarantee that the jury itself be "of any particular composition," but only "that 'the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude

---

[3] Defendant asserts a violation of his constitutional and statutory rights to a jury drawn from a fair cross-section of the community. As set forth above, the petit jury has not yet been drawn in this case, nor has a trial date been set. Thus, it is impossible to know which jury wheel will be relevant to a petit jury challenge. Accordingly, the Court considers Defendant's fair cross-section claim as it pertains to the grand jury selection in this case. See <u>supra</u> n.2.

distinctive groups in the community and thereby fail to be reasonably representative thereof.'" United States v. Weaver, 267 F.3d 231, 236 (3d Cir. 2001) (quoting Taylor, 419 U.S. at 538).[4]

The JSSA provides a corresponding statutory framework to facilitate the selection of a representative jury. See 28 U.S.C. § 1861 (stating that "all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes"). The Act tasks federal district courts "with creating jury-selection plans consistent with this fair cross-section principle." Savage, 970 F.3d at 252. Such plans generally must draw potential jurors from "voter registration lists" or "lists of actual voters," but also must identify other sources "where necessary to foster the policy and protect the rights secured by" the JSSA's fair-cross-section principle. Id. at 252-53 (quoting 28 U.S.C. § 1863(b)(2)).

To succeed on a constitutional or statutory "fair-cross-section" challenge, a defendant has the burden to show each of the following three elements:

> (1) "a 'distinctive' group in the community" (2) that was "not fair[ly] and reasonab[ly]" represented among potential jurors compared with its representation in the community (3) because of "systematic exclusion of the group in the jury-selection process."

---

[4] Although the Sixth Amendment pertains specifically to the petit jury, courts have recognized the Fifth Amendment right to an indictment returned by a grand jury to include "the right to be indicted by a grand jury that constitutes a fair cross section of the community from which it is drawn." United States v. Green, Criminal No. 10-186, 2011 WL 4737601, at *2 (W.D. Pa. Oct. 6, 2011) (citing United States v. Frumento, 409 F. Supp. 136, 141 (E.D. Pa. 1976), aff'd, 563 F.2d 1083 (3d Cir. 1977)), aff'd in part, 507 F. App'x 239 (3d Cir. 2012). On appeal in Green, the Court of Appeals noted that, although it has applied the right to state grand juries, it is unclear whether the right to have a jury drawn from a fair-cross-section of the community applies to federal grand juries as well. See United States v. Green, 507 F. App'x 239, 241 (3d Cir. 2012). Defendant argues that precedent dictates that the same constitutional fair-cross-section standards apply to both grand and petit federal juries, and the Government does not contest this point. See ECF No. 650, at 72-75 (citing cases). Moreover, the statutory fair-cross-section requirement set forth in the JSSA expressly extends to both grand and petit juries. 28 U.S.C. § 1861. Accordingly, the Court addresses Defendant's fair-cross-section claim on its merits as it relates to the grand jury in this case.

Id. at 254 (quoting Duren v. Missouri, 439 U.S. 357, 364 (1979)).[5] If a defendant makes this *prima facie* showing, then the burden shifts to the government to justify "this infringement by showing attainment of a fair cross section to be incompatible with a significant state interest." Id. at 254 n.31 (citations omitted). The Court addresses each of the Duren factors in turn.

a. Distinctive Group in the Community

The parties agree that the test for determining whether a group is constitutionally "cognizable" is whether the group is "a recognizable, distinct class, singled out for different treatment under the laws, as written or applied." See ECF No. 681 at 3; ECF No. 659 at 9 (quoting Castaneda v. Partida, 430 U.S. 482, 494 (1977)). Defendant identifies four groups he contends constitute "distinctive" community groups within the meaning of the Fifth and Sixth Amendments and the Duren analysis: African-Americans, African-American males, Hispanics, and all Non-Whites.[6] See ECF No. 650 at 26-34; ECF No. 681 at 2-28.[7]

Two of these groups, African-Americans and Hispanics, unquestionably satisfy the first Duren prong. See Weaver, 267 F.3d at 240 ("African–Americans and Hispanics are 'distinctive' groups for the purposes of a fair cross-section analysis."). The same cannot be said, however, for the remaining two groups: "African-American males" and "all Non-Whites."

---

[5] This test, commonly referred to as the Duren test, applies to both JSSA and constitutional fair-cross-section claims. See Savage, 970 F.2d at 254 n.32.

[6] Defendant's expert, John Weeks, Ph.D., defines the category "all non-Whites" as a census-derived category that encompasses all persons in the Pittsburgh division "who do NOT identify themselves racially/ethnically as Non-Hispanic Whites." See ECF No. 650-3 ("Weeks Aff.") at 5. The specific sub-groups in this census-derived category include African-American, American Indian or Alaska Native, Chinese, Filipino, Asian Indian, Vietnamese, Korean, Japanese, Native Hawaiian, Samoan, Chamorro, Other Pacific Islander, and "Some Other Race." See ECF No. 681 at 16 (citing Weeks Aff at 5, Fig. 1).

[7] The Court recognizes that Defendant, a white male, is not a member of any of the groups he asserts are cognizable; however, this fact does not preclude his fair-cross-section claims. See Taylor v. Louisiana, 419 U.S. 522, 526 (1975) ("[T]here is no rule that claims such as [the defendant] presents may be made only by those defendants who are members of the group excluded from jury service.").

With respect to "African-American males," numerous federal courts have rejected the notion of such mixed race/gender groups or expressed disapproval of this approach without needing to decide the issue. See, e.g., United States v. Greer, 900 F. Supp. 952, 956-67 (N.D. Ill. 1995) ("Greer identifies no authority that African–American males, or any other group defined along race *and* gender lines, is a Duren distinctive group."); United States v. Darden, 346 F. Supp. 3d 1096, 1107-08 (M.D. Tenn. 2018) ("True, the systematic exclusions of African-Americans, Hispanics, and women is unlawful, but it does not automatically follow that a 'mixed race-gender group – such as African-American [fe]males can constitute a distinctive group under Duren.'" (internal citations omitted) (quoting United States v. Barlow, 732 F. Supp.2d 1, 27 (E.D.N.Y. 2010), aff'd 479 F. App'x 372 (2d Cir. 2012)); United States v. Underwood, 617 F. Supp. 713, 718-19 (N.D. Ala. 1985) (noting that "white males" do not constitute a cognizable group in the context of jury selection discrimination cases and rejecting "the concept of adding together 'cognizable groups' so as to make a separate 'cognizable group'"). As the district court in Greer aptly explained:

> recognizing the subgroup of African–American males as a Duren distinctive group would amount to pursuing a level and type of representativeness that is simply not demanded by the Sixth Amendment, which requires only a cross-section that is fair, not one perfectly attuned to multiple variables.

900 F. Supp. at 956-57.

Groups comprised of "all Non-Whites" demonstrate an even more pronounced lack of cohesion and have been similarly rejected as distinctive for purposes of Duren. See, e.g., United States v. Tyler, Crim. No. 1:96-cr-106, 2017 WL 11490103, at *3 (M.D. Pa. June 26, 2017) ("While it is well-established that individuals of a particular race or gender are a distinctive, cognizable group for purposes of a fair cross section analysis, we have scoured the case law and have not found a single reported case where a federal court utilized 'non-whites' as the relevant

8

distinctive group. . . . Rather, and notably, we have found that federal courts have rejected non-whites as a distinctive group for fair cross section claims." (citations omitted)); United States v. Luong, 255 F. Supp. 2d 1123, 1127 (E.D. Cal. 2003) ("The Ninth Circuit has rejected the theory that all non-white groups can be combined to form a single 'distinctive' group for the purpose of a jury selection challenge." (citing United States v. Suttiswad, 696 F.2d 645, 648 (9th Cir. 1982))). As the court of appeals in Suttiswad explained:

> Any group which might casually be referred to as 'non-whites' would have no internal cohesion, nor would it be viewed as an identifiable class by the general population. Certainly the members of such group would have diverse attitudes and characteristics which would defy classification.

696 F.2d at 649 (internal citations omitted).[8]

Based on the above, the Court agrees that neither "African-American Males" nor "All Non-Whites" constitute a "distinctive group" within the meaning of Duren in this case. Even if, as Defendant asserts, this question is an issue that is fact-specific to each individual case, he has not identified any facts which, if true, differ materially from those in the cases above such that a different conclusion follows. Moreover, and in any event, even if Defendant could make such a showing, he cannot establish systematic exclusion of these groups as set forth more fully below. See ECF No. 650-2, 650-3 and statistics cited therein.

b. Unfair or unreasonable representation

---

[8] Courts also have been mindful of the risk of statistical manipulation that a broad interpretation of the distinctive group requirement would invite in the fair-cross-section context. See, e.g., United States v. Biaggi, 673 F. Supp. 96, 100 (E.D.N.Y. 1987) ("Because discrimination in the venire under the Sixth Amendment may be statistical, the definition of a 'cognizable group' must be narrowly drawn lest any group imaginable by defense counsel be found numerically underrepresented."), aff'd, 853 F.2d 89 (2d Cir. 1988); Underwood, 617 F. Supp. at 719 ("If one had a truly suspicious nature one might suspect that the hopeful creation of a new class of 'white males' is occasioned by the failure, upon a close demographic examination of the records, to find any cognizable group previously recognized by judicial decisions reflecting the degree of disparity which would come even close to rendering the jury pool constitutionally deficient.").

To evaluate whether a cognizable group was unfairly or unreasonably represented among prospective jurors compared to the group's representation in the community, courts within this district look to statistics. See Savage, 970 F.3d at 255. This analysis involves: (1) identifying the share of the Pittsburgh division population who are part of the cognizable group; (2) determining the share of the relevant jury wheel, pool of names, panel, or venire that consisted of that cognizable group; and (3) employing statistical methods to evaluate any disparity between the two shares. See id.

With respect to statistical methods, courts within this circuit look at two metrics: absolute and comparative disparity. See id. at 256-59. Absolute disparity is simply the difference between the two statistical inputs (e.g., population percentage – percentage representation on the wheel), and comparative disparity is the quotient of the absolute disparity and the population percentage. See id. at 256. Consideration of both types of disparities together is especially important when considering small population percentages because "[t]he two methods have countervailing weaknesses when it comes to evaluating the underrepresentation of a relatively small minority." Id. Specifically, "absolute disparity tends to *understate* any discrepancy, while comparative disparity tends to *overstate* it." Id. (citing Weaver, 267 F.3d at 242-43). When applied together, however, "one method can be reasonably expected to offset the shortcomings of the other." Id. at 257.[9]

---

[9] Although the Savage court reiterated the importance of considering both metrics, it noted that it nevertheless has "shown some solicitude for absolute disparity" and that absolute disparity seems to be the preferred analytical method in most cases. Savage, 970 F.3d at 257-58 (quoting Weaver, 267 F.3d at 242). The court of appeals also noted that, while absolute disparities under 10% generally do not reflect unfair representation, it has not adopted a bright-line 10% threshold. Rather, courts within this circuit must continue to consider both absolute and comparative disparities together. Id.

By way of illustration, in <u>Savage</u>,[10] the Court of Appeals compared the percentage of Blacks[11] in the Eastern District population (16.82%) to the percentage of Blacks represented on the qualified jury wheel (8.37%). These numbers reflected an absolute disparity of 8.45% (16.82% -8.37%) and a comparative disparity of 50.24% (8.45%/16.82%). <u>See id.</u> Considering these two disparities together in conjunction with the population percentage and relevant authority, the <u>Savage</u> court concluded that the numbers failed to prove unfair and unreasonable representation of Blacks on the Eastern District's qualified wheel. <u>See id.</u> at 259.

In this case, Defendant's expert, Jeffrey Martin, using the 2018 American Community Survey ("ACS") 5-Year Average, calculated that the relevant jury-eligible population in the Pittsburgh Division was 6.88% African-American and 1.22% Hispanic. <u>See</u> ECF No. 650-2 ("Martin Aff.") ¶ 42. The government does not contest these figures, and the Court accepts them for purposes of its analysis.

The Court next must view these general population figures against the representation of African-Americans and Hispanics on the relevant jury wheel, pool of names, panel, or venire that consisted of those cognizable groups. Citing <u>Savage</u>, the government asserts that the qualified jury

---

[10] Shortly after the grand jury returned the Superseding Indictment in this case, the Court of Appeals for the Third Circuit issued the <u>Savage</u> opinion affirming the denial of a capital defendant's fair-cross-section challenge to the Eastern District of Pennsylvania's jury selection plan. <u>See</u> <u>Savage</u>, 970 F.3d 217. Like this District, the Eastern District had "long drawn its potential jurors exclusively from voter registration lists" and its jury plan prescribed a similar process to form the jury pool. <u>Id.</u> at 253. Asserting his Sixth Amendment rights, the defendant in <u>Savage</u> sought to strike two panels of prospective jurors and requested that the court instead draw jurors from lists maintained by the Administrative Office of Pennsylvania Courts ("AOPC"), which supplements voter registration lists with information from other sources. <u>Id.</u> at 253-54. Savage's argument was denied.

[11] The Court of Appeals in <u>Savage</u> identified Blacks as the cognizable group at issue in that case. 970 F.3d at 255. In this case, Defendant primarily uses the term African-Americans. <u>See</u> ECF No. 681 at 2 (describing his claimed cognizable groups as "African-Americans, African-American Males, Hispanics, and all Non-Whites"). For purposes of consistency and clarity, the Court adopts Defendant's terminology in this Opinion. In so doing, the Court in no way implies a material distinction between the groups for purposes of its analysis.

wheel is the most appropriate option for evaluating this prong. See ECF No. 659 at 15-16. Indeed, in Savage, the district court determined that it was more appropriate to assess the representation of African-Americans on the qualified jury wheel than either the master wheel or the venires assembled for the defendant's trial. See Savage, 970 F.3d at 255; United States v. Savage, Criminal Action Nos. 07–550–03, 07–550–04, 07–550–05, 07–550–06, 2013 WL 315688, at *4 (E.D. Pa. Jan. 28, 2013), aff'd, 970 F.3d 217 (3d Cir. 2020). Although the defendant had presented statistics from the venires, the district court found that "it is the master and qualified wheels from which individual jury panels are drawn that would be most demonstrative of any systemic exclusionary processes inherent in sourcing names from voter registration lists." Savage, 2013 WL 315688, at *4. The Court ultimately utilized the statistics from the qualified jury wheel because, between the two wheels, the master wheel contained more limited racial data. See id. On appeal, the Court of Appeals did not revisit this issue because Savage did not contest the lower court's reliance on the qualified wheel. See Savage, 970 F.3d at 255-56. The Court noted, however, that "[p]recedent reinforces that the qualified wheel is a valid option for assessing a fair-cross section claim." Id. at 256.

As in Savage, Defendant's expert in this case, Dr. Martin, was able to use self-reported data to determine the composition of the 2016 qualified jury wheel. See ECF No. 650-2 ¶¶ 65-66.[12] Using this self-reported racial and Hispanic ethnicity information, Dr. Martin calculated that

---

[12] The 2016 qualified jury wheel was the wheel in use at the time the grand jury in this case was empaneled. See ECF No. 650-2, Section C. In his statistical analysis of underrepresentation, Dr. Martin also analyzed, inter alia, the composition of the voter registration source list, the master jury wheel, and the jurors summoned for grand jury duty in this case. See id. Section E. Of these analyses, Dr. Martin stated that "[t]he most relevant statistical analysis is of the Qualified Jury Wheel (Step 10). The Qualified Wheel is the list from which jurors are summoned. It is the largest list with self-reported racial and Hispanic ethnicity, so no estimation procedures are required." Id. ¶ 79. Due to the lack of self-reported data, Dr. Martin utilized an adjusted geocoding analysis to estimate the composition of the master jury wheel and the source list of registered voters. Id. ¶¶ 46-64. Dr. Martin stressed that "these estimations are only estimations and can be inaccurate." Id. ¶ 45.

the qualified jury wheel consisted of 3.89% African-Americans and 0.82% Hispanics. See ECF No. 650-2 ¶ 71. The government does not dispute the use of these percentages. See ECF No. 659 at 16. Comparison of these percentages to the agreed-upon population percentages of 6.88% African-American and 1.22% Hispanic results in an absolute disparity of 2.99% and a comparative disparity of 43.44% for African-Americans, and an absolute disparity of 0.40% and a comparative disparity of 32.68% for Hispanics. See ECF No. 650-2 ¶¶ 81, 83.[13] Each of these statistics falls well within the ranges found acceptable by Savage and other precedents as well as numerous additional similar cases cited favorably by the Court of Appeals. See, e.g., Savage, 970 F.3d at 256 (8.45% absolute disparity and 50.24% comparative disparity for African-Americans; population percentage 16.82%); Weaver, 267 F.3d at 241 (absolute disparities of 1.23% for African-Americans and 0.71% for Hispanics; comparative disparities of 40.01% for African-Americans and 72.98% for Hispanics; population percentage 3.07% and 0.97%, respectively); Howell v. Superintendent Rockview SCI, 939 F.3d 260, 268 (3d Cir. 2019) (absolute disparity of 5.83% for African-Americans; comparative disparity of 54.49%; population percentage 10.7%); United States v. Chanthadara, 230 F.3d 1237, 1256 (10th Cir. 2000) (absolute disparities of 3.23% for African-Americans and 1.60% for Hispanics; comparative disparities of 40.89% for African-Americans and 58.39% for Hispanics; population percentage 7.9% and 2.74%, respectively).[14]

---

[13] The absolute disparity numbers mean that if the Court drew a venire of 100 people from the qualified wheel, it would expect about 3 fewer African-Americans and <1 fewer Hispanics than if the Court drew one hundred people from the voting-eligible population of the Pittsburgh Division at large. The comparative disparity figures indicate that African-Americans were about forty percent less likely, and Hispanics about one-third less likely, to appear in the qualified wheel as the Court would expect based on their share of the population. See Savage, 970 F.3d at 256; Weaver, 267 F.3d at 238 n.5; Howell, 939 F.3d at 268 n.7, n.8.

[14] To the extent Defendant contends that a third statistical calculation – standard deviation – is nevertheless indicative of unfair representation, see ECF No. 650 at 82-85; ECF No. 650-2, Section H, this Court disagrees for the same reasons set forth in Savage. See Savage, 970 F.3d at 256 n.35 ("We have also used a third metric, standard deviation, to assess the reliability of sample data . . . . But no sampling occurred here. Instead, we rely on a statistic representing the entire qualified wheel."); see also Weaver, 267 F.3d at

The fact that relatively small population percentages are at issue in this case does not alter the Court's analysis. As set forth in Savage, the consideration of both absolute and comparative disparities together allows for a nuanced analysis in which each method helps offset the shortcomings of the other, especially when dealing with small population sizes. Savage, 970 F.3d at 256-58. Indeed, the percentages in this case are very similar to those upheld in Weaver, in which the court of appeals affirmed the denial of a fair cross section challenge to the Western District's Jury Plan as applied in the Erie Division. See Weaver, 267 F.3d at 242-43 (examining and considering both absolute and comparative disparities relating to African-American and Hispanic representation on the master jury wheel "in order to obtain the most accurate picture possible").

Recognizing the obstacles Savage presents to his fair cross section claim, Defendant attempts both to distinguish Savage and to raise additional arguments not addressed by the Savage court. See ECF No. 650 at 65 ("Savage is a good roadmap on how *not* to litigate a jury challenge."). Although Defendant's efforts in this regard are admirably comprehensive and thorough, they do not persuade the Court that a fair cross section violation has been established or further evidence is necessary on this issue.

Primarily, Defendant attempts to shift focus from the qualified wheel to the master wheel and the source list (i.e., the voter registration list) at large. See ECF No. 681 at 28-32, 57-59 ("The

---

238 ("Known as 'standard deviation' analysis, this calculation is only utilized where the expert has performed an analysis based on a random sample from the voter wheel."); Howell, 939 F.3d at 266 n.4 ("As called for in Weaver, reliable data requires a standard deviation calculation if the entire population is not accounted for, which 'indicates how accurately the mean represents sample data.'"). Even considering Defendant's standard deviation calculations in this case in conjunction with the plainly acceptable absolute and comparative disparity statistics, those figures are not indicative of unfair or unreasonable representation. See United States v. Hernandez-Estrada, 749 F.3d 1154, 1165 (9th Cir. 2014) (noting that "statistical significance" is not equivalent to "legal significance"); Chanthadara, 230 F.3d at 1257 ("Standard deviations are not helpful in this case. Here, such calculations merely represent a manipulation of the same numbers that we have held were not sufficient to establish a prima facie violation of the Sixth Amendment.").

issue . . . is what jury wheels, pools of names, panels, *or* venires the *defendant's* challenge is targeting, not what parts of the challenge the government would like to focus on."). Defendant urges this course of action even though self-reported racial and Hispanic ethnicity information exists only beginning with the qualified jury wheel, and, thus, the experts must turn to less reliable procedures such as geocoding to estimate the racial and Hispanic ethnicity demographics of the source list and the master wheel. See ECF No. 650-2 (Martin Aff.) ¶¶ 43-79. Even if the Court accepts Defendant's premise, his experts' findings, even if accurate, do not demonstrate unfair or unreasonable representation of African-Americans or Hispanics across any of these additional categories. To the contrary, the calculated disparities again fall within well-accepted parameters. See id. ¶¶ 81, 83.[15]

For all of these reasons, the Court finds that Defendant has failed to establish unfair or unreasonable representation under the second Duren prong. Accordingly, Defendant cannot establish a violation of his constitutional or statutory fair-cross-section rights, and  consideration of prong three of the Duren test – systematic exclusion, is not warranted.[16]

---

[15] With respect to the voter registration source list, Dr. Martin calculated absolute disparities of 2.03% for African-Americans and 0.37% for Hispanics; and comparative disparities of 29.55% for African-Americans and 29.89% for Hispanics. See ECF No. 650-2 ¶¶ 81, 83 (Step 1). As to the master wheel, Dr. Martin calculated absolute disparities of 1.99% for African-Americans and 0.18% for Hispanics; and comparative disparities of 28.96% for African-Americans and 14.95% for Hispanics. See id. (Step 2).

[16] To the extent Defendant contends that the issue of underrepresentation over time should be considered under prong two of Duren, see ECF No. 650 at 58-72, 80-84, the Court disagrees. As the Court of Appeals explained in Weaver:

In our brief discussion of Ramseur's Sixth Amendment claim, we appear to have combined the second and the third prongs of Duren, and stated, generally, that our inquiry involved an examination of "the nature of the process by which jury lists are composed, the length of time of underrepresentation, and the strength of the evidence that purports to establish an 'unfair and unreasonable' representation under Duren." Id. at 1235. We determined that, looking at these factors, Ramseur had not made out a prima facie case under the Sixth Amendment. Id. Ramseur presented two years of inconclusive statistical data and the county process was shown to be facially neutral and part of an ongoing process in New Jersey to increase the representative nature of jury lists. Id. Though we considered these

C.      Equal Protection Claim

Defendant further asserts that underrepresentation of African Americans and Hispanics in the Pittsburgh Division violates his Equal Protection rights under the Fifth Amendment. "The Equal Protection Clause . . .  requires the eradication of 'racial discrimination in the procedures used to select the venire from which individual jurors are drawn.'" Ramseur v. Beyer, 983 F.2d 1215, 1230 (3d Cir. 1992) (quoting Batson v. Kentucky, 476 U.S. 79, 86 (1986)).[17] The requirements a defendant must meet when challenging the grand jury selection process as discriminatory based on race are comparable, although not identical, to the Sixth Amendment fair cross section analysis. See Green, 2011 WL 4737601, at *3. Specifically, to establish an equal protection violation relating to grand jury selection procedures, a defendant must: (1) identify a constitutionally cognizable group, that is, a group capable of being singled out for discriminatory treatment; (2) prove the degree of underrepresentation by showing that the cognizable group was subject to "substantial underrepresentation" over a significant period of time; and (3) show that the procedure being used to select the jurors is "susceptible of abuse or is not racially neutral."

---

two prongs in tandem in Ramseur, here we will evaluate them separately. Following Duren's approach, the strength of the evidence should be considered under the second prong, while the nature of the process and the length of time of underrepresentation should be considered under the third.

Weaver, 267 F.3d at 241 & n.10 (citing its prior fair-cross-section decision in Ramseur v. Beyer, 983 F.2d 1215 (3d Cir. 1992)). If a defendant cannot establish the second Duren prong, his claim fails regardless of whether the third prong is met. See Savage, 970 F.3d at 259 (characterizing the prong three analysis as an "alternative" argument); Weaver, 267 F.3d at 244 ("While we need not reach the third prong, it merits our attention because the District Court placed some degree of reliance on this aspect."). To the extent Defendant asserts various grounds for relief outside the scope of the fair-cross-section analysis, the Court addresses these additional arguments later in this opinion.

[17] In Ramseur, the Court of Appeals rejected both a fair-cross-section and equal-protection challenge to the use in Essex County, New Jersey of a source list composed of DMV drivers license records and voter registration lists. 983 F.2d at 1229-35.

Ramseur, 983 F.2d at 1230-31; see also Castaneda, 430 U.S. at 494; Green, 2011 WL 4737601, at *5.[18]

The first prong of this analysis is plainly met. For the same reasons set forth above, Defendant has successfully identified two cognizable groups for purposes of his equal protection claim – African-Americans and Hispanics. See Ramseur, 983 F.3d at 1230. For these same reasons, African-American males and "all Non-Whites" do not qualify as cognizable groups.

Defendant, however, has not satisfied prongs two and three of the equal protection analysis. Prong two of the analysis is similar to prong two of the fair-cross-section test with the additional requirement that the substantial underrepresentation occur over a significant period of time. See id. at 1230-31. As set forth above, the statistics in this case do not show unfair or unreasonable representation of any cognizable group with respect to the 2016 wheels, venires, or related source lists. Although Defendant's experts have carefully compiled statistics extending back to 1995 – far longer than the two years found to be insufficient in Ramseur – the calculated disparities still do not reach levels demonstrating substantial underrepresentation, let alone substantial underrepresentation over time. See ECF No. 650-2, Section J; ECF No. 650-3, at 35-37.[19]

---

[18] A key difference between a fair-cross-section challenge and an equal protection claim is that, in the equal protection context, purposeful discrimination must have occurred. See Ramseur, 983 F.2d at 1230; Weaver, 267 F.3d at 237 (noting that, unlike Equal Protection cases, a defendant need not show discriminatory intent when mounting a Sixth Amendment fair-cross-section challenge); Howell, 939 F.3d at 265 (explaining that the Supreme Court in Duren distinguished the Sixth Amendment claim before it from cases brought under the Equal Protection Clause by noting that, in the latter, a showing of discriminatory purpose is essential, but that, in the former, "systematic disproportion itself demonstrates an infringement." (quoting Duren, 439 U.S. at 368 n.26)).

[19] Even if, as Defendant suggests, statistical measures such as standard deviation, play a greater role in the equal protection analysis than with a fair-cross-section claim, his statistics still do not meet the required standard. See ECF No. 650-2 (Martin Aff.) Section J (calculating standard deviations well below the 28.9 standard deviation found significant in Ramseur). Compare Ramseur, 983 F.2d at 1232-33 (noting borderline absolute and comparative disparities of 14.1% and 40%, respectively, with a standard deviation of 28.9).

Moreover, even assuming Defendant could establish substantial underrepresentation of African-Americans and Hispanics over time, he has not satisfied prong three of the analysis – i.e., that the procedure being used to select the jurors is "susceptible of abuse or is not racially neutral." As in Ramseur, the mechanism used to create the source lists here was facially neutral with respect to race and ethnicity. See Ramseur, 983 F.2d at 1233 (process of using voter registration and DMV lists to create jury venire was facially neutral); see also 28 U.S.C. § 1863(b)(2) (codifying use of voter registration lists as source list for prospective jurors). Specifically, the routine, mechanized processes set forth in the Jury Plan, use "facially neutral criteria and allow no opportunity for subjective or racially motivated judgments." Id.  Additionally, Defendant has not cited any aspect of the Jury Plan that would be "susceptible to abuse" by jury officers, the Clerk of Court, or any other individual. Indeed, the jury system at issue here is a far cry from the highly-subjective key-man systems such as the one that the Supreme Court invalidated in Castaneda. See Castaneda, 430 U.S. at 497 n.18 ("It has been said that random selection methods similar to the federal system would probably avoid most of the potential for abuse found in the key-man system.").

To the extent Defendant asserts that this third prong is met because jury officials in the Pittsburgh Division have continued to use the current selection system after being informed it was not producing a fair-cross-section, such suggestion is without merit. See ECF No. 650 at 79-80 (citing Ramseur, 983 F.2d at 1234 n.20). As set forth above, the evidence does not demonstrate substantial underrepresentation in the Pittsburgh Division. This case is also unlike cases such as Smith v. Yeager where jury commissioners persisted in using supplemental voter lists after being told by the assignment judge that the lists were not producing a cross-section of the community. See 465 F.2d at 278 n.15. Rather, the evidence here shows that the jury office periodically reviewed

jury representativeness statistics to ensure compliance with the randomness and nondiscrimination provisions of the JSSA. See ECF No. 650-2, Ex. C.

For all of these reasons, the Court finds that Defendant has failed to establish an Equal Protection violation related to the grand jury selection process in this case.

D. Additional Alleged JSSA Violations

Defendant asserts that the Clerk's Office has violated several substantive provisions of the JSSA itself. ECF No. 650 at 84-85, 120-24, 216-24. By its terms, the JSSA provides a remedy only for "substantial failures to comply" with its provisions. See 28 U.S.C. § 1867(d); United States v. Calabrese, 942 F.2d 218, 227 (3d Cir. 1991). In addition, any alleged violations must "be weighed against the underlying principles of the Act," which include (1) random selection of jurors, and (2) determination of disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only. Id. at 227; see also United States v. Carmichael, 560 F.3d 1270, 1277 (11th Cir. 2009) (noting that mere technical violations of the JSSA, even a number of them, do not implicate these principles).

To the extent Defendant asserts a statutory fair-cross-section claim under the JSSA, this claim is identical to his Sixth Amendment challenge, and has already been denied as set forth more fully above. See Savage, 970 F.2d at 254 n.32 (noting that the Duren test applies to both JSSA and Sixth Amendment fair-cross-section claims). Defendant's JSSA claim likewise is denied to the extent it faults the Clerk of Court for failing to supplement the voter registration list with additional sources of potential jurors. As set forth above, Defendant cannot establish that use of the voter lists at issue resulted in the unfair underrepresentation of a cognizable group.

Defendant's remaining alleged statutory violations include a laundry-list of vaguely-defined complaints involving matters such as: flaws in the AO-12 Forms that the Clerk is required

to complete and mistakes in the way in which the Clerk completes them; the exclusion of registered

voters with an out-of-state mailing address from jury service; and the inclusion in the 2020 Jury

Plan of zip-code based supplemental mailing protocols for summonses returned as undeliverable.

See ECF No. 650 at 120-124, 216-225. Defendant does not clearly articulate the bases for these

objections, but rather generically asserts that these policies and practices violate the JSSA's

requirement of randomness, violate the Jury Plan's mathematical odds provision, and frustrate the

underlying policy of the Act. See id. As the Court of Appeals for the Fifth Circuit in Bearden

explained:

> In sorting out the details of statutory procedures, there is perhaps a tendency to lose
> sight of the fundamental purpose of the law. The purpose of the Act is to prevent
> discrimination, whether it be on account of "race, color, religion, sex, national
> origin, or economic status." 28 U.S.C.A. [§] 1862. Where the procedural errors
> made by those in charge of selecting juries do not raise the possibility of frustrating
> this goal, a court should be hesitant to order the drastic remedy of the dismissal of
> indictments.

United States v. Bearden, 659 F.2d 590, 609 (5th Cir. Unit B 1981).

After careful review of Defendant's claims, it is clear that none of the alleged violations,

alone or together, rise to the level of a "substantial" failure within the meaning of the JSSA. See,

e.g., ECF No. 650-3 (Weeks Aff.) (Defendant's own expert report showing that the claimed impact

of the removal of jurors with out-of-state mailing addresses on the population of individuals

receiving qualification questionnaires was minimal); United States v. Smith, 457 F. Supp 3d 734,

737 (D. Alaska 2020) (inadequate information on the AO-12 Forms does not establish a

constitutional or statutory violation); Bearden, 659 F.2d at 609 (multiple "procedural errors made

by those in charge of selecting juries" do not constitute a substantial failure to comply); United

States v. Hernandez-Estrada, 749 F.3d 1154, 1166–68 (9th Cir. 2014) (disqualification of potential

Hispanic jurors due to responses to outdated question regarding language proficiency not

substantial error because exclusion was based on objective criteria and number of exclusions was not significant).[20] For all of the reasons set forth above, the Court denies Defendant's statutory claims.

    E. <u>Constitutionality of the JSSA</u>

    In addition to his fair-cross-section and Equal Protection claims, Defendant raises several constitutional challenges to the JSSA itself. Specifically, Defendant challenges the Act's durational residency requirement and its provision disqualifying felons. The Court addresses each of these arguments in turn.

    1. Durational Residency Requirement

    Section 1865(b)(1) of the JSSA disqualifies from jury service anyone who has not "resided for a period of one year within the judicial district." 28 U.S.C. § 1865(b)(1). In a lengthy argument, Defendant asserts that this provision is an unconstitutional attempt by Congress to discriminate against African-American voters. He also contends that the provision violates the constitutional right to travel. <u>See</u> ECF No. 650 at 159-95. Although the Court commends Defendant's thorough and thoughtful consideration of this issue, he has failed to cite any authority supporting his

---

[20] With respect to Defendant's statutory challenge to the 2020 Jury Plan Amendment adding a zip-code-based supplemental mailing protocol, the Court finds that this argument is largely premature. Defendant contends that the 2020 Plan Amendment violates the JSSA's randomness requirement. <u>See</u> ECF No. 650 at 120. In considering challenges to jury plans based on violations of random selection, however, courts look to "the <u>Duren</u> test to determine if the lack of randomness resulted in impermissible discrimination." <u>United States v. Scott</u>, 545 F.Supp.3d 152, 174 (S.D.N.Y. 2021) (citing <u>Bearden</u>, 659 F.2d at 602). Because the 2020 Plan Amendment post-dated the 2016 jury wheels at issue in this case, the Court is unable to undertake a randomness analysis based on the statistics before it. Moreover, the Plan Amendment is, at best, relevant only as to the eventual petit jury selection in this case. As a general matter, however, the Court disagrees with Defendant to the extent he argues that the Amendment violates the JSSA simply because it may create a conflict within the Jury Plan itself. <u>See</u> ECF No. 650 at 19 n.10 (suggesting that the Amendment is in conflict with the Jury Plan's equal odds requirement). Even assuming there is tension between these provisions, the Jury Plan provides that, in the case of any conflict between the Plan and the Act, the statutory provisions shall govern. Jury Plan, preamble. Moreover, the randomness principle does not "require statistical randomness but rather requires a system of selection that affords no room for impermissible discrimination against individuals or groups." <u>Carmichael</u>, 560 F.3d at 1277.

contention that the one-year residency requirement violates the Constitution. To the contrary, every case deciding this issue has upheld the residency requirement as constitutional. See ECF No. 659 at 58-59 (collecting cases); see also United States v. Fell, Case No. 5:01-cr-12-01, 2018 WL 7254852, at *5 (D. Vt. Aug. 6, 2018) (same). To the extent Defendant cites the Supreme Court's opinion in Dunn v. Blumstein, 405 U.S. 330 (1972), in support of his claim, the comparison is inapposite. See, e.g., United States v. Ross, 468 F.2d 1213, 1215 (9th Cir. 1972) (explaining why Dunn, which applied strict scrutiny to a state durational residency requirement for voting, does not apply to challenges to federal statutory residency requirements relating to jury service); Fell, 2018 WL 7254852, at *5 (same). After careful review, the Court agrees with this long line of caselaw, and rejects Defendant's constitutional challenge to the JSSA's durational residency requirement.

2. "Felon" Prohibition

The JSSA also disqualifies from jury service anyone who "has a charge pending against him for the commission of, or has been convicted in a State or Federal Court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored." 28 U.S.C. § 1865(b)(5). Defendant challenges the constitutionality of this provision as overly broad and not appropriately tailored to a particular case, resulting in the blanket exclusion of a significant portion of the minority community. See ECF No. 650, at 196-216. As with the durational residency requirement, every court that has decided this issue has upheld Section 1865(b)(5) as constitutional. See, e.g., Fell, 2018 WL 7254582, at *6 (collecting cases). Applying a rational-basis standard of review, these courts generally have held that the provision is a rationally based mechanism for assuring juror probity. See, e.g., United States v. Foxworth, 599 F.2d 1, 4 (1st Cir. 1979); United States v. Barry, 71 F.3d 1269, 1274 (7th Cir. 1995); United States

v. Arce, 997 F.2d 1123, 1127 (5th Cir. 1993) ("We have no trouble concluding that § 1865(b)(5) is constitutional. The constitutionality of § 1865(b) is subject to rational basis review.").

Defendant's attempt to nevertheless fashion a fair-cross-section-type challenge to Section 1865(b)(5) is unavailing. As an initial matter, felons and those charged with felonies are not a distinctive group within the meaning of Duren. See Barry, 71 F.3d at 1274 ("We are not convinced that alleged felons compromise a distinctive group."). Moreover, to the extent that Defendant alleges Section 1865(b)(5) has a disparate impact on minority groups such as African-Americans, causing them to be excluded from the jury pool in greater numbers than other groups, the Court already has determined that Defendant's fair-cross-section claim is without merit. Finally, to the extent Defendant argues that Section 1865(b)(5) is overly broad in this case because Pennsylvania law does not limit all misdemeanors to terms of one year or less, this is a distinction without a difference. Nothing in the JSSA specifically limits Section 1865(b)(5) to felons. Rather, it is the amount of time associated with the crime, not its label, that is significant. The Court finds the statute is not ambiguous as to whom it applies, and is not unconstitutionally overbroad. Even if the Court were sympathetic to many of Defendant's policy points, "the question presented here is not whether § 1865(b)(5) is good policy; the question is whether it is unconstitutional." Fell, 2018 WL 7254582, at *6. Based on the authority cited above, the Court finds that it is not.

F.    Eighth Amendment Claim

Defendant argues that the Western District's jury selection process violates an Eighth Amendment "mandate that in a capital case the defendant is entitled to reliability and enhanced procedural protections." See ECF No. 650 at 1. Citing Savage, Defendant contends that "courts have an independent obligation to ensure that the rights of criminal defendants are protected," and that, "under the Eighth Amendment, '[w]hen a defendant's life is at stake, the Court has been

particularly sensitive to insure that every safeguard is observed.'" Id. at 7 (quoting Savage, 970 F.3d at 247).[21] Defendant then cites the Supreme Court's decisions in Turner v. Murray, 476 U.S. 28 (1986) and Morgan v. Illinois, 504 U.S. 719 (1992), for the proposition that, in a capital case, an "important factor in assessing whether a particular risk to an impartial jury is unacceptable is 'the ease with which that risk could have been minimized.'" ECF No. 650 at 8 (quoting Turner, 476 U.S. at 36, and Morgan, 504 U.S. at 735-36). Subsequently, without citation, Defendant broadly asserts that "[u]nder this Eighth Amendment standard, it is necessary and proper to consider whether the failure to use alternative, easily accessible, and effective jury selection procedures renders a system vulnerable to Eighth Amendment challenge." Id. at 8.

Defendant has failed to articulate a cognizable Eighth Amendment claim related to jury selection. Although Defendant cites Savage as set forth above, he quotes from a section of the opinion entirely unrelated to either the jury-plan challenge or the Eighth Amendment. See Savage, 970 F.3d at 244-49 (discussing defendant's Sixth Amendment constructive denial of counsel claim). Likewise, neither Turner nor Morgan involved a fair-cross-section claim or other jury-plan challenge. See Turner, 476 U.S. at 36-37 (addressing whether, in a case involving interracial violence, the trial judge violated capital defendant's constitutional right to a fair and impartial jury

---

[21] Defendant suggests that he raises his Eighth Amendment argument, at least in part, to respond to a point the Court previously made about his jury challenge. See ECF No. 650 at 7. In this regard, Defendant states that "[i]n ECF 442, this Court, citing Savage," reminded Defendant that "the pertinent fair cross section issue is whether the challenged selection method fairly and reasonably represented a distinctive group among potential jurors compared with that group's representation in the community, not whether a 'superior' selection method exists or other methods might be more fair." ECF No. 650 at 7 (citing ECF No. 442 at 7 n.6). Defendant further states that, "[h]owever, Savage itself recognizes that 'courts have an independent obligation to ensure that the rights of criminal defendants are protected . . . .". Id. To clarify, the pertinent case to which the Court cited in footnote 6 of its Opinion at ECF No. 442 was a 1976 Court of Appeals opinion involving an unrelated defendant also surnamed Savage. See ECF No. 442, at 7 n.6 (quoting Savage v. United States, 547 F.2d 212, 214–16 (3d Cir.1976)). Moreover, as set forth more fully above, nothing in the 2020 Savage opinion supports Defendant's suggestion that the Court could or should exercise independent supervisory authority to order an alternative jury selection procedure to correct underrepresentation not deemed unfair under the Sixth Amendment simply because this is a capital case. Indeed, Savage itself was a capital case.

by refusing to question prospective petit jurors on racial prejudice during *voir dire*); Morgan, 504 U.S. at 735-36 (holding that, during *voir dire* for a capital offense, a state court may not, consistent with the Due Process Clause of the Fourteenth Amendment, refuse inquiry into whether a potential petit juror would automatically impose the death penalty upon conviction of the defendant). Indeed, Defendant has not cited a single case in which a court has applied the Eighth Amendment to a fair-cross-section claim or other jury-plan challenge let alone articulated how the amendment would apply to such a claim or what the applicable standard would be. (ECF No. 659 at 66).[22]

Because Defendant has failed to articulate or develop a cognizable Eighth Amendment claim related to this District's jury-selection procedures, his Motion to Dismiss on these grounds is denied.

G. The Court's Supervisory Authority

Although not clearly articulated, Defendant appears to contend that the United States Court of Appeals for the Third Circuit has adopted "under its supervisory power" a "negligence standard for the management of juries in federal court." See ECF No. 650 at 10 (citing Dow v. Carnegie-Illinois Steel Corp., 224 F.2d 414, 424 (3d Cir. 1955)). To the extent Defendant requests the Court to apply a standard of relief in addition to, or in conflict with, the standards set forth elsewhere in this opinion, the Court declines his invitation.

The portion of the Dow case to which Defendant refers states that "[w]hen in any court of this circuit there has been a failure to [obtain a list of individuals representing a cross-section of

---

[22] If anything, courts have appeared loath to use the Eighth Amendment as a vehicle to broaden the scope of jury-selection challenges in capital cases. See, e.g., United States v. Martinez-Hernandez, Criminal No. 3:15-00075 (JAF), 2016 WL 1275039, at *1 (D.P.R. Apr. 1, 2016) (describing Eighth-Amendment challenge to the English-language requirement for federal jurors as "a Sixth Amendment fair cross-section claim repackaged under the Eighth Amendment" and stating that "[i]f an English-proficient jury in Puerto Rico is 'impartial' under the Sixth Amendment, there is no reason why an otherwise legal capital sentence meted out by such a jury would suddenly become 'cruel and unusual' under the Eighth Amendment").

the qualified community], either intentionally or through neglect, this court in the exercise of its supervisory power must require a new trial so that the error will be obliterated." 224 F.2d at 424. Nowhere in this passage, however, does the court state that it is establishing a new standard for fair-cross-section claims and Defendant has not pointed to any case law adopting such a standard. Moreover, as the Government notes, the <u>Dow</u> decision is over fifty years old and predates both the JSSA and <u>Duren</u>. Thus, to the extent there is any conflict between <u>Dow</u> and these later authorities, the JSSA and <u>Duren</u> standards must govern.

H. <u>18 U.S.C. § 243</u>

Defendant also cursorily cites 18 U.S.C. § 243 - a criminal statute that prohibits jury officials from "disqualify[ing] for service as grand or petit juror in any court" otherwise qualified prospective jurors "on account of race, color, or previous condition of servitude" – as a basis for relief in this case. Again, Defendant does not cite to any case law invoking this statutory provision to remedy fair-cross-section or equal protection violations or any other violations related to jury selection. Generally, criminal statutes do not create private rights that can be enforced by individual defendants, and the Court finds no occasion to create one here. <u>See</u> <u>Hall v. Valeska</u>, 849 F. Supp. 2d 1332, 1340-41 (M.D. Ala. 2012) (noting that "the criminal penalty in § 243 is a legal deterrent to the proscribed conduct" and concluding that "§ 243 is only a criminal statute, and does not provide a private right of action"); <u>United States <em>ex rel.</em> Vampire Nation v. Citifinancial Mortgage Co.</u>, Civil Action No. 06-936, 2007 WL 2142404, at *5 (W.D. Pa. July 9, 2007) (same), <u>report and recommendation adopted as modified</u>, 2007 WL 2142410 (W.D. Pa. July 24, 2001).[23]

---

[23] In <u>Ramseur</u>, then-Circuit Judge Alito referenced Section 243 in a concurring opinion, noting that "[s]ince Ramseur has not invoked 18 U.S.C. § 243, we are likewise not required to decide whether he could assert rights under this statute, which Congress enacted pursuant to Section Five of the Fourteenth Amendment and which criminalizes racial discrimination in the selection of state and federal grand and petit juries." <u>Ramseur</u>, 983 F.2d at 1244 n.6 (Alito, J., concurring). Judge Alito further noted that, in a 1972 Supreme Court case, three concurring Justices felt that a criminal defendant could assert rights under Section 243.

I. <u>Evidentiary Hearing and Further Discovery</u>

Defendant spends a large portion of his Brief, Reply Brief, and Sur-Sur Reply arguing that an evidentiary hearing is necessary in this case. The Court disagrees. The parties have provided the Court with over 1,000 pages of briefing on this Motion, including over 700 pages of exhibits and expert reports. <u>See</u> ECF Nos. 650, 659, 681, 683, 700, and 709. In addition, the Court has permitted Defendant to obtain voluminous discovery from the Clerk of Court. Although the Court has not granted all of Defendant's requests, it has gone well beyond the minimum requirements of Sections 1867(f) and 1868. <u>See</u> ECF Nos. 206, 431, 432, 442, 443, 483, 509, 604, 605, 627, 706, 708. While the Court recognizes that Defendant has renewed some of his discovery requests in the instant Motion, none of the documents or testimony he seeks are relevant given the Court's rulings on the merits of the principal motion addressed above.

Defendant's citation to Section 1867(d) does not require a different result. Section 1867(d) provides that:

> Upon motion filed under subsection (a), (b), or (c) of this section, containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title, the moving party shall be entitled to present in support of such motion the testimony of the jury commission or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, and any other relevant evidence.

28 U.S.C. § 1867(d). Here, even accepting Defendant's factual representations as true, including the statistical data provided by his experts, those facts do not constitute a substantial failure to comply with the JSSA. Nor has Defendant established that a hearing is necessary on any of his non-statutory claims.

---

<u>Ramseur</u>, 983 F.2d at 1244 n.6 (citing <u>Peters v. Kiff</u>, 407 U.S. 493, 505–07 (1972) (White, J., concurring)). Judge Alito further acknowledged, however, that "[c]riminal statutes rarely convey private rights" and that a Supreme Court majority has never clearly held that Section 243 is an exception. <u>Id.</u> The <u>Ramseur</u> majority did not address Section 243. Given the weight of authority finding that Section 243 does not convey a private enforcement right, the Court declines to find one here as set forth more fully above.

In short, the Court has provided Defendant a fair opportunity to discover and prove his systematic exclusion claims. His request for an evidentiary hearing and further discovery on this issue is denied.

## III. CONCLUSION

For all of these reasons, Defendant's Motion to Dismiss Superseding Indictment Pursuant to the Fifth, Sixth, and Eighth Amendments, the Jury Selection and Service Act, 18 U.S.C. § 243, and this Court's Supervisory Authority over Federal Criminal Procedures, or to Stay the Proceedings Pending the Selection of a New Grand Jury and a Petit Jury in Conformity with the Constitution and Jury Selection and Service Act, and Request for Evidentiary Hearing and Further Discovery (ECF No. 650) is denied.


Dated:  April 5, 2022


> /s/ *Robert J. Colville*
> Robert J. Colville
> United States District Judge


Cc:  Counsel of Record *via CM-ECF Electronic Notic*e