IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-292 |
| | ) | |
| ROBERT BOWERS | ) | |

**MOTION TO PROHIBIT THE DEATH QUALIFICATION OF THE JURY**

1001 Liberty Avenue
Suite 1500
Pittsburgh, PA 15222
(412) 644-6565

Judy Clarke
Clarke Johnston Thorp & Rice, PC

Michael Burt
Law Office of Michael Burt, PC

Michael J. Novara
First Assistant Federal Public Defender

Elisa A. Long
Supervisory Assistant Federal Public
Defender

Attorneys for Defendant,
Robert Bowers

Table of Contents

I.   Introduction ................................................................................................ 2

II.  Death qualifying the jury, in combination with the Western District's jury selection
     system, will disproportionally exclude minorities, women, and other cognizable
     groups based upon their opposition to capital punishment ........................................ 3

     A.   The Constitution guarantees the right to a trial by an impartial jury drawn
          from sources reflecting a fair cross section of the community ........................... 3

     B.   The underrepresentation problem caused by the Western District's jury
          selection system will be exacerbated by the death qualification process .......... 6

     C.   Decades of research by dozens of social scientists show that Blacks have
          significantly different views than Whites about the criminal justice system . . 16

     D.   Because racial bias—including unconscious bias—is a comparatively strong
          predicator of White support for capital punishment, death qualification
          increases the risk that racial bias will play a role in the trial. ........................ 20

     E.   Women are also disproportionately excluded through death qualification
          because of their opposition to the death penalty. ........................................... 24

     F.   Hispanics are disproportionately excluded through death qualification because
          of their opposition to the death penalty. ......................................................... 26

     G.   Cognizable groups are also disproportionately excluded because of their
          opposition to the death penalty ....................................................................... 28

III. Death qualifying Mr. Bowers' jury will result in a jury biased in favor of conviction
     and death. ............................................................................................................... 32

     A.   In *Witherspoon*, the Supreme Court left open the question of whether the
          Constitution precludes death qualification of the guilt phase jury ................. 32

     B.   In *McCree*, the Supreme Court heard overwhelming empirical evidence that
          death qualification produces a conviction-prone jury, and that evidence has
          been validated. ................................................................................................ 35

          1.   The empirical evidence presented in *McCree* demonstrates that death
               qualification produces conviction-prone juries ....................................... 35

2.   Subsequent social science research confirmed the evidence on conviction proneness presented in *McCree*. ............................................................... 39

C.   Empirical research published since *McCree* uniformly shows that death qualified jurors are also biased in favor of a death verdict. ............................ 44

IV.   Death qualification violates Mr. Bowers' right to a jury selected from a fair cross-section of the community. ......................................................................................... 47

A.   Hispanics, African-Americans, women, and religious groups who are disproportionately excluded by death qualification are cognizable groups. ... 49

B.   "Guilt phase includables" are a distinctive group for fair cross-section purposes. ............................................................................................................. 49

V.   Death qualification violates Mr. Bowers' right to a fair trial by an impartial jury. 52

A.   This court should find that *Witherspoon*'s reasoning applies to the selection of the guilt phase jury. ...................................................................................... 53

B.   Death qualification will prevent Mr. Bowers' jury from functioning impartially in the guilt phase as constitutionally required. ............................ 55

C.   Based upon a historic and textual interpretation of Sixth Amendment, death qualification violates the right to an impartial jury. ........................................ 57

1.   There is no basis in federal law permitting or requiring removal of jurors who oppose the death penalty. ................................................................. 57

2.   There is an emerging claim that the death qualification of juries violates the Sixth Amendment right to an impartial jury. .................................... 61

VI.   This Court should find that death qualification violates the Eighth and Fourteenth Amendments. ................................................................................................................. 66

A.   This Court should find that death qualification undermines the Eighth Amendment's requirements of heightened reliability and individualized capital sentencing. ............................................................................................... 66

B.   Death qualification prevents courts from evaluating society's evolving standards of decency through the objective indicator of jury determinations. 69

1.   Death qualification precludes juries from serving as an objective indicator of the evolving standards of decency under the Eighth Amendment because the process results in the exclusion of a significant percentage of otherwise qualified jurors. ................................................ 70

2.   Death qualification precludes juries from serving as an objective indicator of the evolving standards of decency under the Eighth Amendment because the process disproportionately excludes African-Americans and women. ......................................................................... 74

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-292 |
| | ) | |
| ROBERT BOWERS | ) | |

**MOTION TO PROHIBIT THE DEATH QUALIFICATION OF THE JURY**

Robert Bowers, through his counsel, moves this Court for an order prohibiting the death qualification of his jury on the grounds that it contravenes the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. This motion is based on the Court's judicial authority to decline to death qualify the jury because (1) the process will almost certainly result in the selection of a jury that has been stripped of Hispanics, African-Americans, women, and members of religious groups that oppose the death penalty; (2) the disproportionate exclusion of these cognizable groups will result in a jury that is biased in favor of conviction and death; and (3) the exclusion of all individuals who are opposed to the death penalty or have scruples about its imposition, but can be fair and impartial in the guilt phase of the trial, will produce a jury that is biased in favor of conviction and death.[1]

---

[1] Given capital defense counsel's obligation to ensure "'any and all conceivable errors'" be preserved for review, counsel are filing this motion concurrently with the briefing in support of the defense version of the proposed juror questionnaire. *American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913 (rev. ed. 2003), 10.8 commentary (quoting Steven

## I.   Introduction

Death qualification[2] of Mr. Bowers' jury will produce a jury that is statistically less likely to include legally cognizable groups opposed to capital punishment, is skewed toward conviction, and is more likely to sentence him to death. This result is fundamentally unfair and violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Although the United States Supreme Court has upheld death qualification of capital trial juries against discrete fact-based constitutional challenges, the Court has not ruled that this method of jury selection is required. *See, e.g., Lockhart v. McCree*, 476 U.S. 162 (1986) (holding that groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors, such as the "*Witherspoon*-excludables" at issue here,[3] are not "distinctive groups" for fair-cross-section purposes):

-------------------

B. Bright, *Preserving Error at Capital Trials*, The Champion, Apr. 1997, at 42-43. Defense counsel are not aware that any Federal District Court has granted such a motion.

[2] "Death qualification" is the process by which the government is permitted to *voir dire* prospective jurors to learn if their opposition to the death penalty would "prevent or substantially impair the performance of their duties as jurors" to give consideration to imposing a death sentence in the case. *United States v. Johnson*, 366 F. Supp. 2d 822 (N.D. Iowa 2005).

[3] In *Witherspoon v. Illinois*, the Court held that prosecution cause-challenges based on a prospective juror's reservations or scruples regarding capital punishment should be granted under circumstances where the juror "would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them…." 391 U.S. 510, 522 n.21 (1968).

2

> While the Supreme Court has held that death-qualifying a unitary jury is not unconstitutional, neither has it held that the Constitution requires it. Put simply; just because death-qualifying the liability jury that may also hear the penalty phase does not offend a defendant's rights, does not mean its opposite: That the failure to death-qualify the liability jury (while death-qualifying the punishment jury) somehow undermines the government's rights.

*United States v. Green*, 343 F. Supp. 2d 23, 26 (D. Mass. 2004), 348 F. Supp. 2d 1 (D. Mass. 2004), *vacated on other grounds*, 407 F.3d 434 (1st Cir. 2005). Accordingly, this Court therefore has the authority to forgo death qualification.

The empirical studies discussed below provide stark statistical evidence that death qualifying a venire that is already under representative of Hispanics and other minorities[4] will exclude all, or nearly all, of the potential Hispanic jurors from Mr. Bowers' jury, as well as other cognizable groups. Prohibiting death qualification will decrease the risk of excluding Hispanics, African Americans, women, and other cognizable groups in the venire.

## II. Death qualifying the jury, in combination with the Western District's jury selection system, will disproportionally exclude minorities, women, and other cognizable groups based upon their opposition to capital punishment.

### A. The Constitution guarantees the right to a trial by an impartial jury drawn from sources reflecting a fair cross section of the community.

"Together with the right to vote, those who wrote our Constitution considered the right to trial by jury the heart and lungs, the mainspring and the center wheel of our

---

[4] *See* Motion to Dismiss Superseding Indictment Pursuant to the Fifth, Sixth, and Eighth Amendments, the Jury Selection and Service Act, and the Court's Supervisory Authority, ECF 650, at 22-57.

liberties, without which the body must die; the watch must run down; the government must become arbitrary." *United States v. Haymond*, 139 S. Ct. 2369, 2375 (2019) (plurality opinion) (internal quotation marks omitted.) Restrictions on the Sixth Amendment right to a jury trial infringe not only "the rights the rights of the accused; it also divest[s] the 'people at large' —the men and women who make up a jury of a defendant's peers—of their constitutional authority to set the metes and bounds of judicially administered criminal punishments." *Id.* at 2378-2379.

      "The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314, 329 (2010) (citing *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)). To satisfy the Sixth Amendment, jury wheels, pools of names, panels, and venires must represent "a fair cross section of the community." *Duren v. Missouri*, 439 U.S. 357, 666 (1979); *Taylor*, 419 U.S. at 538 (stating that "jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.").

      The jury itself need not represent a fair cross-section of the community, so long as the method by which a potential jury is drawn does not systematically exclude distinctive groups. *Holland v. Illinois*, 493 U.S. 474, 477-84 (1990); *Taylor*, 419 U.S. at 538. The objectives of the fair cross-section requirement include avoiding "the possibility that the composition of juries would be arbitrarily skewed in such a way as to deny criminal

defendants the benefit of the common sense judgment of the community" and avoiding the "appearance of unfairness" that would result from excluding "large groups of individuals, not on the basis of their ability to serve as jurors, but on the basis of some immutable characteristic such as race, gender or ethnic background." *Lockhart*, 476 U.S. at 174-75; *see Taylor*, 419 U.S. at 530-31.

Extra precautions must be taken to protect the defendant's right to an impartial and representative jury in a capital case because of "the broad discretion given the jury at the death-penalty hearing" and "the special seriousness of the risk of improper sentencing." *Turner v. Murray*, 476 U.S. 28, 37 (1986). "It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury. *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988). *See also Sampson v. United States*, 724 F.3d 150, 163 (1st Cir. 2013) ("The right to an impartial jury is nowhere as precious as when a defendant is on trial for his life."); *Gibson v. Zant*, 705 F. 2d 1543,1546 (11th Cir. 1983) ("The importance of non-discriminatory jury composition is magnified in capital cases, where juries are required to consider ' as a mitigating factor , any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis of a sentence less than death.'"). In a death penalty case, "a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." *Uttecht v. Brown*, 551 U.S. 1, 9 (2007).

5

A criminal defendant has standing to object to the systematic exclusion of a group even where the defendant is not a member of that group. *See Peters v. Kiff*, 407 U.S. 493, 500 (1972) (finding that a White defendant had standing to challenge the systematic exclusion of Blacks from jury service since "the exclusion of a discernible class from jury service injures not only those defendants who belong to the excluded class, but other defendants as well, in that it destroys the possibility that the jury will reflect a representative cross section of the community"); *Taylor*, 419 U.S. at 526 (finding that a male defendant had standing to challenge the exclusion of women from the jury pool).

A defendant's right to be tried by a representative cross-section of the community is guaranteed as well by the Fourteenth Amendment to the United States Constitution. *See, e.g., Peters,* 407 U.S. at 504. Under the United States Constitution, trial must be selected in a manner which does not systematically exclude, or substantially underrepresent, the members of an identifiable group in the community. *Id*.

### B. The underrepresentation problem caused by the Western District's jury selection system will be exacerbated by the death qualification process.

The underrepresentation problem caused by the Western District's jury selection system[5] will be greatly exacerbated by the death penalty qualification process, as the statistics discussed below demonstrate. It is well understood that, as a result of death-

---

[5] *See* Motion to Dismiss Superseding Indictment Pursuant to the Fifth, Sixth, and Eighth Amendments, the Jury Selection and Service Act, and the Court's Supervisory Authority, ECF 650, at 22-57.

qualification, "capital juries are more likely to be white, older, predominantly male,

Protestant, and less educated than other criminal juries, than the society from which they

were picked." Richard Salgado, *Tribunals Organized to Convict: Searching for a Lesser*

*Evil in the Capital Juror Death-Qualification Process in United States v. Green*, 2005

B.Y.U. L. Rev. 519, 520, 529-530 (2005) (discussing studies). In addition, numerous

studies have indicated that death-qualified guilt-phase juries are less favorable to

defendants than more broadly constituted juries. *See, e.g.*, Erik Lillquist, *Absolute*

*Certainty and the Death Penalty*, 42 Am. Crim. L. Rev. 45, 88 (2005) (describing a

"robust scholarly consensus that death-qualification of jurors lowers the effective

standard of proof in criminal cases."). In particular, Professor Lillquist notes that death-

qualified jurors are more likely to believe government witnesses, find the facts presented

by the government to be credible, and draw inferences favoring the prosecution. *Id.* at 86.

Equally disturbing, "[e]vidence suggests that white, male, death-qualified jurors were

more likely to convict in sample cases than were African Americans or Hispanics and one

and a half times more likely to sentence a defendant to death." Salgado, *Tribunals*

*Organized To Convict* at 531 n. 82. Justice Stevens put the matter bluntly in his

concurring opinion in *Baze v. Rees*, 533 U.S. 35, 84 (2008):

> Of special concern to me are rules that deprive the defendant of a trial by
> jurors representing a fair cross section of the community. Litigation
> involving both challenges for cause and peremptory challenges has
> persuaded me that the process of obtaining a "death qualified jury" is really
> a procedure that has the purpose and effect of obtaining a jury that is biased
> in favor of conviction.

In *McCree*, the Court concluded that death-qualification did not violate the fair cross-section requirement for a jury because the process of excluding a group defined exclusively by their death penalty attitudes did not involve the systematic exclusion of a distinctive group in the community. In the Court's opinion, "groups defined solely [by] shared attitudes that would prevent" them from performing their duties as jurors are not "distinctive groups." *Id.* at 174.

One year after *McCree*, in *State v. Ramseur*, 524 A.2d 188, 252 n.54 (N.J. 1987), the New Jersey Supreme Court found "no reason in state tradition or doctrine to depart from *Lockhart.*" Nevertheless, the Court added an important qualification:

> We place one reservation on this decision. The reservation concerns the defendant's argument that, as one federal district court put it, all of the "evidence establishes that one consistent and inevitable result of the death qualification process is the disproportionate exclusion of blacks and women." *Grigsby v. Mabry*, 569 F.Supp. 1273, 1283 (E.D.Ark.1983), aff'd as mod., 758 F.2d 226 (8th Cir.1985), rev'd sub nom. *Lockhart v. McCree*, 476 U.S. ——, 106 S.Ct. 59, 90 L.Ed.2d 137 (1986). We have before us no evidence that in New Jersey there has been a resultant systematic exclusion of blacks and women in disproportionate numbers. In *State v. Gilmore*, *supra*, 103 N.J. 508, 511 A.2d 1150, we recently expressed our disdain for the systematic exclusion of distinctive groups because of our special commitment to the fair cross-section requirement. Therefore, if data relevant to the New Jersey practice are presented to us indicating such a result, we would be prepared to address this constitutional concern.

*Id*.

This issue was taken up on the federal level by District Judge Nancy Gertner in the federal capital case of *Green*, 343 F. Supp. 2d at 23, *rev'd on other grounds*, 407 F.3d 434 (1st Cir. 2005), where the question arose of whether attitudes about the death penalty were so polarized according to race and gender that excluding jurors because of their

8

opposition to the death penalty also constituted the virtual exclusion of African Americans and women.

One important factor in favor of disallowing any death qualification until a guilty verdict was reached was that "[t]he government concedes the fact that death-qualification of the punishment jury would add substantially to the time it takes for the …trial" and that "[i]t is premature to conclude that there will be a need for a punishment phase at all." *Id.* at 32.

Another important factor in favor of disallowing any death qualification until a guilty verdict was reached was that

> studies suggest that death-qualification leads to the exclusion of a disproportionate number of black and female jurors, especially in this Commonwealth. Defendant's preliminary data suggests that African–Americans are under-represented in the jury venire in the Eastern Division of Massachusetts, by as much as half their representation in the community— particularly that 7.8%—9.1% of residents in the Eastern Division of Massachusetts are in whole or in part African–American, that a significantly smaller percentage are included in the jury venire, that in the United States population 48% of black people (but only 22% of whites) oppose the death penalty, and that 45% of Massachusetts voters overall oppose the death penalty….. Death-qualifying a jury could significantly deplete the already paltry number of minority jurors in the Eastern District.

*Id.* at 33.

> Importantly, the Court noted that

> *Lockhart* and [*Buchanan v. Kentucky* 483 U.S. 402 (1987)] only addressed the exclusion of a given viewpoint—feelings about the death penalty, not explicitly the exclusion of a disproportionate number of African Americans and women. While the exclusion of a viewpoint is not constitutionally significant, the exclusion of women and African Americans may well be. Both are plainly cognizable groups under the Fourteenth Amendment. If the net effect of death-qualification—in this Commonwealth, at this point in

history—substantially undermines the participation of women and African Americans in the petit jury (and in the case of African–Americans, entirely eliminated them from the petit jury), constitutional concerns may well be raised.

*Id.* at 32.

The Court identified still another factor in favor of disallowing any death

qualification until a guilty verdict was reached:

> Moreover, similar studies raise the serious concern that death-qualified juries are more conviction prone. In both of the cases where it considered the issue—*Witherspoon* and *Lockhart*—the Supreme Court has rejected this argument citing "tentative and fragmentary" data. *Lockhart* at 170, 106 S.Ct. 1758 (citing *Witherspoon* at 517–18, 88 S.Ct. 1770). Notably, the Court did not wholly foreclose any constitutional infirmities stemming from conviction-prone death-qualified juries. See *Witherspoon* at 517–518, 88 S.Ct. 1770 ("We simply cannot conclude... on the basis of the record now before us... In light of the presently available information... " that excluding jurors opposed to capital punishment increases the risk of conviction to the level of constitutional infirmity) (emphasis added). In the years since *Witherspoon* and *Lockhart* were decided, significant social science research has been devoted to studying the effect of death-qualification on jurors.
>
> Updated data presented by defendants in this case overwhelmingly shows that death-qualified jurors are significantly more conviction prone than jurors who are not death qualified. For example, nearly one half (49.2%) of all death-qualified capital jurors make their sentencing decision before the penalty phase of the trial even begins. Darryl Green and Branden Morris's Supplemental Memorandum On the Issue of Impaneling Separate Juries, filed September 10, 2004, at p. 6 (citing William Bowers and Wanda Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 30 Crim. Law Bulletin 51, 56 (2003)). Several qualitative studies found that jurors who were exposed to the potential punishment during jury selection have a propensity to believe that the subtext of the voir dire is that the trial is not about whether the defendant committed the underlying crime but about what punishment the defendant should receive. *Id.* at 9–10 (citing *Craig Haney, On the Selection of Capital Juries: The Biasing Effects of the Death–Qualification Process*, 8 Law & Human Behavior 121 (1984); *Examining Death Qualification: Further Analysis of the Process Effect*, 8 Law & Human Behavior 133 (1984); Haney, Hurado &

> Vega, *"Modern" Death Qualification: New Data on Its Biasing Effects*, 18
> Law & Human Behavior 619 (1994)). These findings represent just a sliver
> of the recent data indicating that death-qualified jurors are skewed to be
> conviction-prone.

*Id.* at 34-35. *See also United States v. Green*, 324 F. Supp. 2d 311, 330 (D. Mass. 2004)

(citing additional studies on this issue and noting that "[i]n a state without a death

penalty, where forty-five percent of voters are reportedly opposed to it, the phenomenon

may be even starker.")

Facing the concerns of potential unconstitutionality, fairness, and judicial economy,

Judge Gertner initially proposed two possible solutions to the death-qualification

dilemma: (1) selecting a single jury (including the maximum number of alternates), but

deferring death-qualification until after the guilt phase had concluded; if a capital

conviction ensued, the court would then attempt to death-qualify the jury before the

penalty phase began and, if the number of remaining jurors and alternates fell below the

requisite twelve, would discharge that jury and empanel a new, death-qualified jury

exclusively for the penalty phase; or (2) selecting two distinct juries at the outset, one

(non-death-qualified) to hear the guilt phase and the other (death-qualified) to hear the

penalty phase. *Green*, 324 F. Supp. 2d at 331. In the briefing that followed, the

government denigrated both options, and the defendants lobbied for the second. The

district court ultimately ordered two juries empaneled (one to adjudicate guilt and the

second, if needed, to fix the nature of the penalty). *Green*, 343 F.Supp. 2d at 25. The

court reasoned that

> [w]hile this decision does not rest on the conviction-prone juror problem, and its constitutional implications, it surely affects my obligations as a trial judge. Death penalty qualification hinders my responsibility to facilitate, to the best of my ability, a fair trial on guilt. It provides an additional 'good cause' justifying bifurcating the juries in the trials of the capital defendants before me.

*Id.* at 35.

The First Circuit held that under the particular wording of 18 U.S.C. § 3593(b)(2)(c), Judge Gertner did not have the authority in advance of the trial to decide that she would discharge the guilt phase jury. Significantly, however, the court did not disagree with Judge Gerner's assessment that a problem of constitutional dimension existed that needs some form of remedy. *See United States v. Green*, 407 F.3d at 444 ("The government invites us to pass upon the validity of the district court's suggestion that it might defer death-qualification altogether until after it takes a verdict on the issue of guilt or innocence.... We decline the invitation.")

The impact of death qualification on the fairness of a capital trial was also recently explored in *United States v. Fell*, 224 F. Supp. 3d 327 (D. Vt. 2016), where the Judge Geoffrey W. Crawford held an extensive evidentiary hearing regarding the overall constitutionality of the Federal Death Penalty Act. The court heard the testimony of several of the authors of the death qualification studies cited in the *Green* opinion. Summarizing some of that testimony, the district court concluded as follows:

> The social science studies presented at the hearing in this case considered whether the process of determining whether jurors suffer from "substantial impairment" in their ability to reach a verdict in favor of death is itself a cause of bias in favor of conviction at the guilt phase as well as subsequent imposition of the death penalty. The principal witness on this issue was Craig

Haney who is a social psychologist at the University of California at Santa Cruz.

Dr. Haney testified that the process of death qualification results in capital juries which are biased in favor of the prosecution. There are five reasons for this opinion. (1) Death qualification tends to exclude women and minorities who are more likely to oppose the death penalty than white men. (2) The jurors who emerge from the death qualification process tend to be more conservative than average on issues related to criminal justice. (3) Due to these inherent biases, a death penalty qualified jury is more likely to convict on the issue of guilt than juries that sit on other criminal cases. (4) Jurors who are "death qualified" are more likely to impose the death penalty than other jurors. (5) The process of death qualification itself tends to promote death penalty verdicts because of the psychological effect of the questions asked and the answers provided by prospective jurors. Haney Ex. 2 (Rule 16 disclosure, pp. 42–43).

Dr. Haney's testimony supported all of these conclusions as did the exhibits admitted in connection with his testimony. The first claim is that identifying and excluding jurors who hold views against the death penalty stacks the deck in the words of Justice Stewart in *Witherspoon*. This was precisely the issue which also concerned the Court in *Wainwright* and *Lockhart*. A substantial portion of the American population opposes the death penalty. In recent years, the percentage has ranged from 47 percent (1967) to a low of 16 percent (1995) to a more recent figure of 33 percent (2015). See Haney Ex. 2 (Gallup poll results 1937–2015). If these jurors are excluded as "substantially impaired" in their willingness to impose the death penalty, then the remainder of the population no longer represents the views of the general population.

The *Witherspoon* decision expressed a concern that social science data was "too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in favor of guilt." 391 U.S. at 517, 88 S.Ct. 1770. In 1986, in the *Lockhart* decision, Justice Rehnquist offered a similar criticism. He observed that the petitioner had offered only six studies which "purported to deal with the central issue in this case, namely, the potential effects on the determination of guilt or innocence of excluding '*Witherspoon*-excludables' from the jury." 476 U.S. at 170, 106 S.Ct. 1758. Of these, three were previously before the Court in *Witherspoon*. The new studies were of randomly selected subjects, not actual jurors who had served in death penalty cases. None considered the problem of "nullifiers" who harbored "deep-seated opposition to the death penalty." 476 U.S. at 171, 106 S.Ct. 1758. The majority found the social science to be unpersuasive. The

13

question for this court is whether new research since *McCree* supports reexamination of the issue.

Since at least 1980, Dr. Haney has worked to fill in the gap in the scientific record. With respect to the compositional bias of the death-qualified jury, it can no longer be seriously questioned that panels who have announced their openness to a death penalty verdict and have been selected on that basis are more likely to convict than jurors who more closely mirror the full range of moral values in our society.

*Id.* at 332–33.

Following an exhaustive review of the relevant studies and the testimony of the other social scientists who testified at the hearing, the court concluded:

In considering testimony about the level of inherent bias generated by the process of jury selection, the court finds that the social science studies conducted since 1980 have converged on a common conclusion that the process by which jurors are selected does not measure up to the standards of detached objectivity required by *Gregg*. The exclusion of many people opposed to the death penalty on religious or moral grounds and the implicit process of persuasion at voir dire that death is the likely outcome create jury populations which stack the deck against defendants. This suspicion originally expressed by Justice Stewart has been shown to be true. The most telling evidence is the absence of contrary research results. The studies brought to the court's attention supported the position of the defense that jury selection since *Gregg* is not the solution to inherent jury bias but rather a substantial part of the problem.

*Id.* at 337.

The court's ultimate conclusion on this aspect of the case was that:

In summary, the court finds that the evidence introduced at the hearing supports a finding that the procedures for conducting jury trials mandated by the *Gregg* decision have not cured systemic shortcomings in jury selection and jury deliberations. The death qualification process continues to weight jury panels in favor of conviction and in favor of the death penalty through the exclusion of a large portion of the community which holds views opposed to the death penalty. When surveyed, jurors who actually served in capital cases had great difficulty in following the trial courts' instructions. It is an inadequate response to presume that juries follow our instructions when the

14

> evidence is to the contrary. The evidence introduced at the hearing demonstrates that despite efforts to create a more just death penalty regime, the FDPA—like the very similar state death penalty statutes enacted after *Furman*—remains inherently unreliable as it seeks to identify those cases in which death is the just outcome.

*Id.* at 339-340.

The problems identified by Judge Gertner in *Green* and Judge Crawford in *Fell* also exist in this case. As in *Green*, "death-qualification of the punishment jury would add substantially to the time it takes for the …trial," and "[i]t is premature to conclude that there will be a need for a punishment phase at all." *Green*, 343 F. Supp. 2d at 32. Also as in *Green,* the defense has established that both African Americans and Hispanics are historically underrepresented in jury venires.[6] As will be demonstrated below, African Americans and Hispanics tend to oppose the death penalty at a much higher rate than Whites. Thus, as in *Green*, in combination with the Western District's jury selection procedures, "[d]eath-qualifying a jury could significantly deplete the already paltry number of minority jurors in the district." *Green*, 343 F. Supp. 2d at 33.

For these and other reasons discussed below, this Court should decline to death qualify the venire in this case because, as summarized in the *Fell* case:

> (1) Death qualification tends to exclude women and minorities who are more likely to oppose the death penalty than white men. (2) The jurors who emerge from the death qualification process tend to be more conservative than average on issues related to criminal justice. (3) Due to these inherent biases, a death penalty qualified jury is more likely to convict on the issue of guilt

---

[6] *See* Motion to Dismiss Superseding Indictment Pursuant to the Fifth, Sixth, and Eighth Amendments, the Jury Selection and Service Act, and the Court's Supervisory Authority, ECF 650, at 22-57.

than juries that sit on other criminal cases. (4) Jurors who are 'death qualified' are more likely to impose the death penalty than other jurors. (5) The process of death qualification itself tends to promote death penalty verdicts because of the psychological effect of the questions asked and the answers provided by prospective jurors.

*Fell*, 224 F. Supp. 3d at 332-333.

### C. Decades of research by dozens of social scientists show that Blacks have significantly different views than Whites about the criminal justice system.

More than a half-century of social science research confirms that (1) Blacks and Whites differ in their views about the criminal justice system, with Blacks consistently holding less punitive views than Whites; (2) Blacks are significantly more likely to oppose capital punishment than Whites; (3) Blacks and Whites differ in their views about mitigating and aggravating evidence, with Blacks significantly more receptive to mitigating evidence than Whites; (4) Blacks are disproportionately excluded from jury service for their opposition to the death penalty through death qualification; and (5) racial diversity on capital juries mitigates the risk of racial bias infecting the decision-making process.[7] Below, Mr. Bowers provides a brief summary of the findings on each of the five

_____

[7] A substantial portion of the research was conducted by the Capital Jury Project ("CJP"), which was established in 1991 with funding from the Law and Social Sciences Program of the National Science Foundation.  *See* William J. Bowers, Wanda Foglia, Jean E. Giles & Michael E. Antonio, *The Decision Maker Matters: An Empirical Examination of the Way the Role of the Judge and the Jury Influence Death Penalty Decision-Making*, 63 Wash. & Lee L. Rev. 931, 951, 951 n.109 (2006). The CJP has studied the decision-making of jurors in 353 capital trials in fourteen states. *Id.* at 951-52; *see also What Is the Capital Jury Project*?, http://www.albany.edu/scj/13189.php. The court in the *Fell* case relied heavily on the CJP studies in its assessment of the effects of death qualification. The court's summary of the CJP studies and testimony was as follows:

points. Exhibit A, attached hereto and incorporated herein by reference, lists some of the key social science research that supports the observations regarding each point. Exhibit B, Logan A. Yelderman, Monica K. Miller and Clayton D. Peoples, *Capitalizing Jurors: How Death Qualification Relates to Jury Composition, Jurors' Perceptions, and Trial Outcomes*, in Bornstein and Miller, eds., 2 Advances in Psychology and Law 27 (2016), is a recent and comprehensive overview of the scientific literature on all the death qualification issues raised in this motion.

---

In addition to Dr. Haney's testimony, Dr. Wanda Foglia testified concerning the work of the Capital Jury Project ("CJP"). Dr. Foglia is a law professor at Rowan University who conducts social science research in the area of criminology. Over the course of some 15 years, members of the CJP interviewed 1,198 jurors who had served in 353 capital trials. This work was funded by the National Science Foundation and occurred in fourteen states. The empirical research was exhaustive and painstaking. It was performed through detailed questionnaires and interviews with actual jurors. The research provides very strong evidence of three primary findings derived from seven specific problems. First, the process of death qualification at voir dire produces juries which are biased in favor of imposing the death penalty. This occurs both because jurors who are opposed to the death penalty are excluded and because the voir dire discussion itself creates an expectation in the minds of many jurors that the outcome of the case is likely to be the death penalty. Second, in the course of trial, a majority of jurors make up their minds about the death penalty before completing the conviction phase. In many cases, the later balancing of aggravating and mitigating factors which *Gregg* relied upon to distinguish defendants who truly deserve death from those who do not does not actually take place. Finally, jurors demonstrated a consistent inability to understand and apply the courts' instructions concerning the two phases of the trial, the different burdens of proof for aggravating and mitigating factors, and the other protections intended to guide the jury's discretion.

*Fell*, 224 F. Supp. 3d at 335–36.

17

**1.   Empirical evidence that Blacks and Whites differ in their views of the criminal justice system**. This evidence shows that significantly more Whites than Blacks believe that the police in their communities treat racial and ethnic minorities equally; almost two-thirds of Blacks do not agree that the justice system treats people fairly and equally, but less than half of Whites share this view; and 68% of African-Americans believe that the justice system is biased against African-Americans, while only 26% of Whites share that opinion.

**2.   Studies and surveys demonstrating that more Whites than Blacks consistently support capital punishment**. This research demonstrates that the substantial difference between African-Americans' and Whites' support for the death penalty is enduring and was found in almost every public opinion poll and social scientific survey conducted in the United States in the last fifty years.

**3.   Studies showing that Whites, especially White men, are less receptive to mitigating evidence than Blacks**. This data demonstrates that, "as a function of the defendant's race," there were "striking differences in how White male jurors evaluated "all of the mitigating evidence and some of the aggravating evidence";[8] overall, White jurors "are much less receptive to mitigation" than Blacks;[9] and African-American jurors

---

[8] Mona Lynch & Craig Haney, Capital Jury Deliberation: Effects on Death Sentencing, Comprehension, and Discrimination, 33 Law & Hum. Behav. 481, 494 (2009).

[9] William J. Bowers, Thomas W. Brewer & Marla Sandys, *Crossing Racial Boundaries: A Closer Look at the Roots of Racial Bias in Capital Sentencing When the Defendant is Black and the Victim in White*, 53 DePaul L. Rev. 1497, 1515, 1532 (2004).

are more likely than White jurors to "keep the sin separate from the sinner" no matter what the race of the defendant or the victim; that is, they are more likely to be able to see the defendant as a human being.[10]

**4. Social science evidence supporting the conclusion that, based upon their opposition to capital punishment, Blacks are significantly more likely than Whites to be excluded from capital juries through death qualification**. This research demonstrates that there is a consistent difference in the exclusion rates over several decades of study; the percentage of African-Americans who are excluded was consistently between 25% and 35%, as compared to the percentage of Whites who were removed, which, more typically, ranged from less than 10% to 20%.

**5. Studies demonstrating that racially diverse juries reduce discriminatory decision-making and the likelihood of a death verdict, especially in cases involving Black defendants and White victims**. This evidence shows that juries with a high number of White men were significantly more biased in favor of a death sentence for Black defendants than were juries with a low number of White men or in cases with a White defendant; the proportion of White jurors was a significant predictor of death verdicts in cases involving Black defendants; and when there were no Black male jurors,

---

[10] Stephen P. Garvey, *The Emotional Economy of Capital Sentencing*, 75 N.Y.U. L. Rev. 26, 46- 47 (2000).

death sentences were imposed in about 72% of the cases, as compared to almost 43% of the cases when there was one Black man on the jury.

**D. Because racial bias—including unconscious bias—is a comparatively strong predicator of White support for capital punishment, death qualification increases the risk that racial bias will play a role in the trial.**

Over the past several decades, social scientists have examined the relationship between racial bias and support for capital punishment, and more broadly, support for punitive criminal justice policies. The results of the research are relevant to understanding the significance of the risk that if Mr. Bowers' jury is death qualified, racial discrimination will improperly influence the outcome of the trial. Some of these studies are summarized below:

A study published in 2003 examined "the roots of white support for capital punishment in the United States" by conducting "a quantitative case study of white death penalty support in the U.S., as it stood in 1992." Joe Soss, Laura Langbein & Alan R. Metelko, *Why Do White Americans Support the Death Penalty*, 65 J. of Pol. 397, 399 (2003). Soss and his co-authors employed survey data from the 1992 American National Election Study and contextual data from the 1990 U.S. Census. *Id.* at 406. They found that racial prejudice is a "comparatively strong predictor of white support for the death penalty." *Id.* at 397.

Lawrence D. Bobo and Devon Johnson conducted "a series of survey-based experiments and large, nationally representative samples of White and African-American respondents" to examine opinions about aspects of the criminal justice system, to better

20

understand the reasons for divergent views between the two groups, and "to pinpoint just how substantial a role anti-black racial prejudice plays in the contemporary 'taste for punishment.'" Lawrence D. Bobo & Devon Johnson, *A Taste for Punishment: Black and White Americans' Views on the Death Penalty and the War on Drugs,* 1 Du Bois Rev. Soc. Sci. Res. on Race 151, 153 (2004). Their research was conducted following two decades of "aggressive and deeply punitive" criminal justice policies that had particularly harsh consequences for communities of color, especially for African-Americans.[11] *Id.* at 151-52. The data showed significant attitudinal differences between Blacks and Whites with regard to criminal justice policies, with "Blacks consistently less punitive than

---

[11] *See* Bobo & Johnson, *supra*, at 152 (summarizing research documenting the "near-tripling of the rate of Black incarceration" during the years 1980 to 2000 to the point that "[a]lthough African-Americans constitute only 12% of the U.S. population, they currently make-up about half of those in jail or in prison"); *id.* (describing the scholarship that explains "the turn toward harsh criminal justice policies [as] necessary to maintain the class and racial hierarchies in the wake of Black political mobilization"); *id.* (discussing the characterization of "current rates of Black incarceration and changes in policing practices as tantamount to a new 'peculiar institution' or fourth state of American racial oppression aptly termed the 'carceral state'") (internal citation omitted); *see also* Ashley Nellis, *The Color of Justice: Racial and Ethnic Disparity in State Prisons*, The Sentencing Project, 10 (June 14, 2016), http://www.sentencingproject.org/publications/color-of-justice-racial-and-ethnic-disparity-in- state-prisons/#II.%20Overall%20Findings ("The rise in incarceration that has become known as mass imprisonment began in 1973 and can be attributed to three major eras of policy making, all of which had a disparate impact of people of color, especially African-Americans."); Nazgol Ghandnoosh, *Race and Punishment: Racial Perceptions of Crime and Support for Punitive Policies*, The Sentencing Project, 5,8 (Sept. 3, 2014), http://www.sentencingproject.org/ publications/race-and-punishment-racial-perceptions-of-crime-and-support-for-punitive-policies/ (demonstrating that the "[s]trong support for punitive polices" that emerged in the late 1960s and grew dramatically over the next four decades was racially patterned") .

Whites." *Id.* at 151. And, "the most consistent predictor of criminal justice policy attitudes is, in fact, a form of racial prejudice." *Id.* at 171. With more than 80% of Whites supporting the death penalty as compared to just over 50% of Blacks, the study found that the impact of racial bias on support for capital punishment "is about twice as large for whites as it is for blacks." *Id.* at 159, 170.

A 2008 study further investigated the racial divide in views about the death penalty. James Unnever, Francis Cullen & Cheryl Lero Johnson, *Race, Racism, and Support for Capital Punishment*, 37 Crime & Just. 45, 54 (2008). The authors analyzed survey data over a four-decade period that measured support for and opposition to the death penalty among Whites and African-Americans. In addition to finding a "longstanding, durable racial divide" in support for the death penalty, the research showed that "a substantively important percentage of the difference" in views "arises from racial resentments among whites." *Id.* at 81. Importantly, the research revealed that support for capital punishment is not confined to Whites whom one would describe as overtly or traditionally racist, but particularly includes Whites whose negative or mixed views about African-Americans are more subtle. *Id.* at 64-65, 69.

In *The Social Sources of American's Punitiveness*, the researchers tested the "explanatory power" of difference with regard to "the public's harshness toward crime." James Unnever & Francis T. Cullen, *The Social Sources of American's Punitiveness: A Test of Three Competing Models*, 48 Criminology 99 (2010). The authors developed their theories from the existing social science literature and empirically tested them on "a

22

national sample of respondents surveyed in the 2000 National Election Study,"
specifically, 1,620 interviews of the voting-age population residing in housing units in
forty-eight states. *Id.* at 99, 108. The study included "two dependent variables to measure
the degree to which Americans endorse punitive attitudes: (1) "whether respondents
supported a harsher or more punitive approach to crime" and (2) "the degree to which the
respondents supported capital punishment." *Id.* at 108-09. The results showed that the
measure employed to assess racial resentment "is one of the most substantive and
consistent predictors" for endorsement of both punitive crime policies and capital
punishment. *Id.* at 117.

A discussion of the relationship between racial bias and support for capital
punishment would not be complete without mention of the role of implicit bias, that is,
"the automatic attitudes and stereotypes that appear in individuals." Justin D. Levinson,
Robert J. Smith & Danielle M. Young, *Devaluing Death: An Empirical Study of Implicit
Racial Bias on Jury- Eligible Citizens in Six Death Penalty States*, 89 N.Y.U. L. Rev.
513, 518 (2014). While implicit bias has surely played a role in the racial disparities that
characterize the administration of capital punishment, empirical research did not, until
relatively recently, attempt to identify the extent to which implicit bias figures in capital
case outcomes. *Id.* at 518-19, 518 n.9.

Levinson and his colleagues conducted a study of 445 jury-eligible citizens in six
states with high death-sentencing rates. *Id.* at 553. The pool of participants was diverse
by measures such as gender, race, ethnicity, education, and religion. *Id.* at 553-54. Some

23

of their key findings include the following: (1) "White jurors displayed higher levels of implicit racial bias than non-White jurors," *id.* at 557; (2) "[d]eath qualified jurors displayed moderate to strong implicit biases . . . such that they implicitly associate White with positive stereotypes and Black with negative stereotypes and implicitly associate White with worth and Black with worthlessness," *id.* at 559; and (3) the exclusion of jurors of color through death qualification contributes to higher levels of racial bias on the seated jury because jurors who harbor less implicit and explicit bias have been removed. *Id.* at 559-60.

### E.  Women are also disproportionately excluded through death qualification because of their opposition to the death penalty.

Several studies illustrate the disproportionate exclusion of women through death qualification:

- In 1984, Robert Fitzgerald and Phoebe Ellsworth published one of the first studies to examine the effects of death qualification. Robert Fitzgerald & Phoebe C. Ellsworth, *Due Process v. Crime Control: Death Qualification and Jury Attitudes*, 8 Law & Hum. Behav. 31, (1984). The research, using a 1979 survey of Alameda County, California, jury-eligible individuals, found that 21% of women were likely to be removed using the *Witherspoon* standard, as compared to 13% of men. *Id.* at 46.

- A survey of California adults published in 1994 found that women, who comprised 48.4% of the sample, were disproportionately likely to be excluded relative to men. Craig Haney, Aida Hurtado & Luis Vega, *"Modern" Death*

*Qualification: New Data on Its Biasing Effects*, 18 Law & Hum. Behav. 619, 629 (1994) (hereinafter Haney, et al., *"Modern" Death Qualification*). Women made up 58.6% of those excluded under the *Witherspoon* standard and 64.1% of those excluded under the *Witt* standard. *Id.* at 629.

- A study published in 2010, applying the *Witt* standard to mock jurors, found that women were 58% more likely than men to be excluded. Alicia Summers, R. David Hayward & Monica K. Miller, *Death Qualification as Systematic Exclusion of Jurors with Certain Religious and Other Characteristics*, 40 J. App. Soc. Psych. 3218, 3224-25, 3228 (2010).

- A recent study of jury-eligible citizens in "six leading death penalty states," in which 57.7% of the participants were women, found that "[f]emale jurors were significantly more likely to be excluded for failing to be death-qualified, with 24% of female jurors indicating that they would be unwilling to sentence a defendant to death, compared to 14.3% of male jurors." Levinson, et al. *supra*, at 553, 558.

- A study of thirty-five capital trials in South Carolina that resulted in death verdicts found that, of female prospective jurors removed for their death penalty views, 79% were excluded for their opposition, whereas 21% were removed "for favoring the death penalty too strongly." Ann Eisenberg, *Removal of Women and African-Americans in Jury Selection in South Carolina Capital Cases, 1997-2012,*

25

9 Ne. U. L.J. 299, 24, 333-34. Of the men who were removed based upon their

death penalty views, 46% were excluded for their pro-death opinions. *Id.* at 30.

As the data described above demonstrates, the pernicious effects of death

qualification are not simply found in the removal of a disproportionate number of

African-Americans and women from the capital jury. They also stem from the increased

representation of White men on the seated jury. Mona Lynch & Craig Haney, *Death*

*Qualification in Black and White: Radicalized Decision Making and Death-Qualified*

*Juries,* 40 Law and Policy 2, 167 (2018). The result is "a group that is not only

attitudinally skewed in favor of the death penalty overall but that also, in any given case,

may be significantly less receptive to the defense's case in mitigation and more highly

attuned to the prosecution's case for death." *Id.*

### F.  Hispanics are disproportionately excluded through death qualification because of their opposition to the death penalty.

"Latin death penalty support is generally lower than that of Whites, but greater

than that of Black Americans." Alexander H. Updegrove, *Acculturation and Capital*

*Punishment: The Effect of Mexico Versus United States Cultural Orientations on Public*

*Support for the Death Penalty*, 63 International Journal of Offender Therapy and

Comparative Criminology 1220 (2019). For instance, according to a 2013 Pew Research

Center survey, "Twice as many white Americans favor the death penalty as oppose it

(63% vs. 30%). Among Black adults, the balance of opinion is reversed: 55% oppose

capital punishment, while 36% support it. The margin is narrower among Hispanics, but

more oppose the death penalty (50%) than support it (40%)."[12] Among Hispanic Catholics, 54% oppose the death penalty while only 37% support it. *Id.* A Pew Research Survey conducted in 2015 reported that "wide racial differences persist. About six-in-ten whites (63%) favor the death penalty, compared with 34% of Blacks and 45% of Hispanics."[13]

A study published in 2010, applying the *Witt* standard to mock jurors, found that "racial minority members [including Hispanics] were more than twice as likely as were White mock jurors to be excluded by the death-qualification item." Summers et. al, *supra,* at 3218, 3228.

As with African American defendants, the pernicious effects of death qualification are not simply found in the removal of a disproportionate number of Hispanics from the capital jury. They also stem from the increased representation of White men on the seated jury.

Like African Americans, as compared to White jurors, Hispanics have negative attitudes about the criminal justice system. *See* Padilla, J. B., Miller, M. K., & Broadus,

---

[12] Shrinking Majority of Americans Support Death Penalty, Pew Research Center, March 28, 2014, https://www.pewforum.org/2014/03/28/shrinking-majority-of-americans-support-death-penalty/

[13] Less Support for Death Penalty, Especially Among Democrats, Pew Research Center, April 15, 2015, https://www.people-press.org/2015/04/16/less-support-for-death-penalty-especially-among-democrats/

A. D., *Analysis of Hispanic Representation and Conceptualization in Psychology and Law Research*, 26 Behavioral Sciences & the Law 655 (2008). "The majority of studies examining Hispanic attitudes toward the police have compared them to the attitudes of Caucasians. These studies consistently found that Hispanic perception of the police were less positive than those of Caucasians." *Id.* at 658. "Hispanics are more likely than Caucasians to report having had negative experiences with police." *Id.* "Hispanics also are significantly more likely than Caucasians to believe that they have experienced racial profiling by police and that racial profiling is unjustified." *Id.* at 659. "[S]tudies have found that Hispanic majority juries gave defendants shorter recommended sentences and earlier parole than Caucasian majority juries," and "juries comprised of a majority of Hispanic jurors render less severe verdicts than predominately 'non-Hispanic juries.'" *Id.* at 661. "[T]the results are consistent with other research, that juries composed primarily of Hispanic jurors were more lenient than were juries with a majority of Caucasian jurors. Such studies indicate that the attitudes of Hispanics differ from the attitudes of Caucasians when it comes to making decisions as jurors." *Id.*

> **G. Cognizable groups are also disproportionately excluded because of their opposition to the death penalty.**

"Research supports the notion that religion relates to death penalty support; Protestants are more in favor of the death penalty than Catholics or Jews. Thus, it is not surprising that Catholics [are] being eliminated." Exhibit B, Logan A. Yelderman, Monica K. Miller and Clayton D. Peoples, *Capitalizing Jurors: How Death Qualification Relates to Jury Composition, Jurors' Perceptions, and Trial Outcomes*, in Bornstein and

Miller, eds., 2 Advances In Psychology and Law 27 (2016) (citing Bornstein, B. H., & Miller, M. K., *God in the courtroom: Religion's role at trial* (2009) ("Capitalizing Jurors")); *see, e.g.,* Summers et. al, *supra,* at 3218; Union for Reform Judaism, *Resolution Opposing Capital Punishment* (45th Council, Nov. 1959) ("We believe that in the light of modern scientific knowledge and concepts of humanity, the resort to our continuation of capital punishment either by a state or by the national government is no longer morally justifiable.");[14] Central Conference on American Rabbis*, Resolution on Capital Punishment* (90th Annual Convention, March 26-29, 1979) ("Both in concept and in practice, Jewish tradition found capital punishment repugnant, despite Biblical sanctions for it.").[15]

Some research more specifically addresses the question of whether death qualification systematically excludes jurors who hold certain religious beliefs. In a study assessing relationships between death qualification status and individual differences, Catholics were more likely to be excluded than non-Catholics. Summers, et al., *supra*, at 3218. Further, religious fundamentalists and individuals who interpreted the Bible literally were less likely to be excluded, compared to their counterparts, and both fundamentalism and literal interpretation were related to attitudes in favor of the death

---

[14]https://www.deathpenaltyaction.org/files/jewish/Proceedings%20of%20The%20Rabbinical%20Assembly%20.pdf
[15]https://www.deathpenaltyaction.org/files/jewish/Proceedings%20of%20The%20Rabbinical%20Assembly%20.pdf

penalty. *Id.*; Miller, M. K., & Hayward, R. D., *Religious Characteristics and the Death Penalty*, 32 Law and Human Behavior 113 (2008). "Research suggests Protestants, specifically fundamentalists and Evangelicals, tend to be more supportive of the death penalty than Catholics." *Capitalizing Jurors* at 36. As several researchers have suggested:

> [F]undamentalists are more punitive because they believe in an 'eye for an eye' doctrine constituting the death penalty as a just and appropriate punishment for murder… In line with this framework, results of the current studies suggest that fundamentalism is positively associated with rendering a death sentence because fundamentalists are less supportive of, and give less weight to, mitigating circumstances that formally make a defendant less deserving of a death sentence.

Yelderman, L.,West, M., Miller, M., *Death penalty decision-making: Fundamentalist beliefs and the evaluation of aggravating and mitigating circumstances*, 24 Legal and Criminological Psychology 103, 116 (2019). The researchers further explained:

> The legally appropriate way of determining a death sentence would be to weigh aggravating circumstances over mitigating circumstances. If mitigating circumstances were sufficient to outweigh aggravating circumstances, then fundamentalists would be legally bound to abandon their moral identities. To avoid identity abandonment and to compensate, fundamentalists instead devalue mitigating circumstances to skew the overall weighing of evidence in favour of the death penalty, and this occurs through motivated reasoning and confirmation bias. Aggravators are accepted as legally defined, but mitigators are rejected through devaluation or outright refutation.

*Id.* at 117.

In August, 2018, Pope Francis announced a revision to Number 2267 of the Catechism of the Catholic Church, which will now read in part: "[T]he Church teaches, in the light of the Gospel, that 'the death penalty is inadmissible because it is an attack on

the inviolability and dignity of the person,' and she works with determination for its abolition worldwide."[16] Roughly one-fifth of Americans identify as Catholics.[17]

> It is hard to know how many of them rigidly adhere to the strictures of church doctrine, or how many of them will do so in this case. But if even a fraction of them do, the declaration may have the effect of making our society, as a whole, less accepting of capital punishment and thus may shift our society's collective 'evolving standards of decency.' Yet, counterintuitively, the Pope's announcement may in fact make death sentences easier to come by, at least in the short term. The reason for this peculiarity is the 'death qualification' of capital jurors.

Cover, A., *The Pope and the Capital Juror,* The Yale Law Journal Forum 599, Dec. 3, 2018. "Already, large segments of the population may be excluded for cause on the basis of their opposition to capital punishment," and "there is evidence that Catholics are already removed at a disproportionate rate." *Id.* at 602. The Pope's announcement has made matters worse:

> [P]rior to the Pope's announcement, even many devout Catholics had the moral wiggle room to remain on a capital jury, because the Catechism of the

---

[16] Edward Pentin, *Pope Francis Changes Catechism to Say Death Penalty "Inadmissible,"* Nat'l Catholic Reg. (Aug. 2, 2018), http://www.ncregister.com/blog/edward-pentin/pope-francis-changes-catechism-to-declare-death-penalty-inadmissible; *see* Letter from Luis F. Card. Ladaria, Cardinal of the Roman Catholic Church, *Letter to the Bishops Regarding the New Revision of Number 2267 of the Catechism of the Catholic Church on the Death Penalty* (Aug. 1, 2018), http://press.vatican.va/content/salastampa/it/bollettino/pubblico/2018/08/02/0556/01210. html (explaining the revision).

[17] *America's Changing Religious Landscape*, Pew Res Forum (May 12, 2015), http://www.pewforum.org/wp-content/uploads/sites/7/2015/05/RLS-08-26-full-report.pdf

Catholic Church made the punishment practice permissible under certain circumstances….

Today, more Catholic adherents, following Pope Francis's directive, may be unwilling to even consider imposing death because doing so would run directly contrary to Catholic teachings. They will be readily struck from capital jury service. These now-excludable Catholic jurors may have long held reservations about capital punishment, in keeping with Pope John Paul II's encyclical narrowing of the permissible circumstances for the death penalty in the 1990s. Before Pope Francis's unequivocal prohibition, however, such Catholics may have been death-averse—but still qualified—jurors.

*Id.* at 602.

Because death qualification will systemically remove or diminish cognizable religious groups who are opposed to the death penalty, it violates the fair cross section requirement of the Sixth and Fourteenth Amendments.

### III. Death qualifying Mr. Bowers' jury will result in a jury biased in favor of conviction and death.

#### A. In *Witherspoon*, the Supreme Court left open the question of whether the Constitution precludes death qualification of the guilt phase jury.

In *Witherspoon*, the Supreme Court, for the first time, addressed the constitutionality of death qualification. The petitioner challenged an Illinois statute that allowed jurors to be excluded for cause when they expressed "conscientious scruples" against capital punishment. *Witherspoon,* 391 U.S. at 512.

Witherspoon argued that the process of permitting only "death-qualified" jurors to serve, unlike the process of selecting a jury at random from a "cross-section of the

community," produces a jury skewed in favor of conviction.[18] *Witherspoon*, 391 U.S. at

516-17.  He supported his claim with social science studies demonstrating that "death-

qualified jurors are partial to the prosecution on the issue of guilt or innocence." *Id.* at

517. Among them was a study based on interviews of 1,248 individuals who had served

on felony juries in New York and Chicago.[19] *Id.* at n.10. The data from the study showed

that "'a jury consisting only of jurors who have no scruples against the death penalty is

likely to be more prosecution prone than a jury on which objectors to the death penalty

sit,' and that 'the defendant's chances of acquittal are somewhat reduced if the objectors

are excluded from the jury.'"[20] *Id.* at 517, 517 n.10 (quoting Hans Ziesel, *Some Insights

into the Operation of Criminal Juries* 42, (confidential first draft, U. of Chi. Nov. 1957)).

---

[18] The Illinois statute allowed the exclusion for cause of "'any juror who shall, on being examined, state that he has conscientious scruples against capital punishment, or that he is opposed to the same.'" *Witherspoon*, 391 U.S. at 512 (quoting Ill. Rev. Stat., c. 38, § 743 (1959)).

[19] Witherspoon presented two other studies to support this proposition: Faye Goldberg, *Attitudes Toward Capital Punishment and Behavior as a Juror in Simulated Capital Cases,* unpublished manuscript (Morehouse Coll., undated); Cody Wilson, *Belief in Capital Punishment and Jury Performance* (1964) (unpublished manuscript, U. of Tex.). *Witherspoon*, 391 U.S. at 517 n.10. The first survey involved 187 college students and the second involved 200 students. *Id*. The first survey was later published. Faye Goldberg, *Toward Expansion of* Witherspoon: *Capital Scruples, Jury Bias, and Use of Psychological Data to Raise Presumptions in the Law*, 5 Harv. C.R-C.L L. Rev. 53 (1970).

[20] The research was later published. Hans Zeisel, *Some Data on Juror Attitudes towards Capital Punishment* (Ctr. for Studies in Crim. Justice U. Chi. 1968).

Witherspoon's lawyers "explicitly noted the disproportionate exclusion of Blacks in the operation of Illinois's death qualification process." Carol S. Steiker & Jordan M. Steiker, *Courting Death: The Supreme Court and Capital Punishment*, at 85, 85 n.18 (2016) (citing brief). The NAACP Legal Defense Fund's amicus brief focused on this risk, as did the ACLU's amicus brief, "citing evidence that 78 percent of Blacks opposed the death penalty." *Id.* at 85, 85 nn.19-20. "The various briefs together suggested the possibility of a troubling dynamic in which Blacks experienced the death penalty as racially discriminatory, thereby enabling their disproportionate exclusion from capital juries based on their 'scruples,' which in turn would contribute to discriminatory results." *Id.* at 85-86.

The Supreme Court in *Witherspoon* was not persuaded by the "presently available" data, which the Court described as "too tentative and fragmentary" to support a finding that the removal of jurors opposed to the death penalty "results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction." *Witherspoon*, 391 U.S. at 517-18. Although the Court was not "prepared to announce a *per se* constitutional rule" precluding death qualification of the guilt phase jury, the Court did not close the door on revisiting the issue should more reliable empirical evidence be developed. *Id.*

The Court held that prospective jurors could be excluded from service only if those jurors "made unmistakably clear" that they would "**automatically** vote against the imposition of capital punishment without regard to any evidence that might be developed

34

at the trial of the case before them," or because "their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's **guilt**." *Witherspoon*, 391 U.S. at 523 n.21 (emphasis added). The Court disapproved the exclusion of a prospective juror simply because he or she "voiced general objections to the death penalty" or "conscientious or religious scruples against its infliction." *Id.* at 522. While the Court held that death qualification, as circumscribed in *Witherspoon*, is constitutionally permissible, the opinion did not rule that this method of jury selection is required in capital trials.

### B. In *McCree*, the Supreme Court heard overwhelming empirical evidence that death qualification produces a conviction-prone jury, and that evidence has been validated.

#### 1. The empirical evidence presented in *McCree* demonstrates that death qualification produces conviction-prone juries.

The United States Supreme Court in *McCree* considered whether, under the Sixth and Fourteenth Amendments, death qualification produces conviction-prone juries in violation of the fair cross-section requirement and the right to trial by a fair and impartial jury. *McCree*, 476 U.S. at 165-68. McCree was not sentenced to death. *Id.* at 166. Thus, the only issue before the Court was the impact of death qualification on the jury's guilt phase determination. *Id.* at 183. Social scientists had responded to the question left open in *Witherspoon* with a number of studies concluding that death qualification produces a guilt-prone jury. McCree presented those studies in federal district court in support of his habeas corpus petition. *Id.* at 169-70 nn. 4-6. The Eighth Circuit granted McCree relief on his fair cross- section claim based on the "'substantial evidentiary support' . . . that the

removal for cause of '*Witherspoon*-excludables' resulted in 'conviction-prone' juries." *Id.* at 168.[21] The Supreme Court granted the state's petition for *certiorari*.

The Court in *McCree* held that death qualification of the guilt phase jury was not constitutionally prohibited. *McCree,* 476 U.S. at 173. The majority, while critical of McCree's empirical evidence, *id.* at 170-73, assumed for purposes of its legal analysis that "the studies [presented] are both methodologically valid and adequate to establish that 'death qualification' produces juries more 'conviction-prone' than 'non-death-qualified' juries." *Id.* at 173.

The Supreme Court concluded that only six of the studies introduced by McCree dealt with the "central issue" of measuring the "effects on the determination of guilt or innocence of excluding '*Witherspoon*–excludables' from the jury."[22] *McCree*, 476 U.S. at 170. Three of the six studies had been before the Court when it decided *Witherspoon*, and the Court dismissed them as "still insufficient." *Id.* at 171. The Court was not persuaded by the three new studies because they did not include the views of "actual jurors sworn under oath to apply the law to the facts of an actual case involving the fate of an actual capital defendant." *Id.* The Court held that only one of the six studies attempted to

---

[21] For that reason, the Court of Appeals did not reach the impartial-jury question. *McCree*, 476 U.S. at 168.

[22] The Court used the term "*Witherspoon* excludables" because six of the fifteen studies in *McCree* dealt with the effects of excluding prospective jurors under the *Witherspoon* standard. *McCree*, 476 U.S. at 168-70.

"identify and account for the presence of so-called 'nullifiers'" and that studies that "fail to take into account the presence of such 'nullifiers' thus are fatally flawed." *Id.* at 172.

Justice Marshall began by observing that while the *Witherspoon* majority was unpersuaded by the petitioner's "'tentative and fragmentary'" data, the Court unequivocally acknowledged that future research might well establish that a death-qualified jury "'was less than neutral with respect to guilt.'" *McCree*, 476 U.S. at 186, 190 (Marshall, J., dissenting) (quoting *Witherspoon*, 391 U.S. 520 n.18). In Justice Marshall's view, McCree had a far stronger claim than Witherspoon. Whereas the Court in *Witherspoon* assumed that the "exclusion of scrupled jurors would unacceptably increase the likelihood that the defendant would be condemned to death," McCree introduced solid empirical evidence, "subjected to the traditional testing mechanisms of the adversary process," to support his claim that death-qualified juries are "substantially more likely to convict." *Id.* at 190-91, 197. Justice Marshall characterized the unanimity of the results as one obtained by researchers employing "diverse subjects and varied methodologies," emphasizing that the federal district court had "exhaustively analyzed" the findings.[23] *Id.* at 187, 189. Justice Marshall's dissent also surfaced the majority's

_____

[23] Justice Marshall also disagreed with the majority's view that the empirical evidence based on simulation studies should be discounted, observing that it is "the courts who have often stood in the way of surveys involving real jurors." *McCree*, 476 U.S. at 189 (Marshall, J., dissenting) (internal quotation marks and citation omitted). Justice Marshall responded to the majority's claim that only one study took into account "nullifiers." *Id.* at 189. He explained that although "some studies" may have "fail[ed] to distinguish . . . between nullifiers (whom [McCree] concedes may be excluded from the guilt phase) and

37

failure to address the racially discriminatory impact of death qualification, writing that

"[b]ecause opposition to capital punishment is significantly more prevalent among Blacks

than among whites, the evidence suggests that death qualification will disproportionately

affect the representation of Blacks on capital juries." *Id.* at 201.

Justice Marshall summarized the persuasiveness of McCree's evidence as follows:

> 1.      "The data strongly suggest" death qualification would exclude at least eleven to seventeen percent of "jurors who could be impartial during the guilt phase of trial" and that among the jurors who would be removed "are a disproportionate number of blacks and women." *McCree*, 476 U.S. at 187 (Marshall, J., dissenting).

> 2.      Death-qualified jurors' conviction proneness is the product of "perspectives on the criminal justice system" that are antagonistic to the defendant; *e.g.*, these jurors are more likely to believe that a defendant's failure to testify is evidence of guilt, to be "hostile to the insanity defense," distrustful of defense counsel, and "less concerned" about the risk of wrongful convictions. *McCree*, 476 U.S. at 188 (Marshall, J., dissenting).

> 3.      "[T]he very process of death qualification-which focuses the attention on the death penalty before trial has even begun-has been found to predispose the jurors that survive it to believe the defendant is guilty." *McCree*, 476 U.S. at 188 (Marshall, J., dissenting).

For several reasons, "[t]he true impact of death qualification on the fairness of a

trial is likely even more devastating than the studies show." *McCree*, 476 U.S. at 190

(Marshall, J., dissenting). First, prosecutors use their peremptory challenges to

"systematically" remove jurors with reservations about capital punishment who survive

_____

those who could assess guilt impartially," the results were "entirely consistent with those [results] obtained after nullifiers had indeed been excluded [from a study]." *Id.*

death qualification, thus "expanding" the excluded group beyond the limitations imposed by *Witherspoon*. *Id.* at 191.[24] Second, studies show that trial and appellate courts have not been lax in their application of *Witherspoon* and have sanctioned the removal of jurors whose opposition to capital punishment was not "absolute." *Id.* Third, the Court's decision in *Witt* enlarged the number of excludable jurors. *Id.* at 192.

###### 2.   Subsequent social science research confirmed the evidence on conviction proneness presented in *McCree.*

At least three social science articles engaged in a comprehensive evaluation of the *McCree* majority's reading of the empirical evidence and found it deeply flawed.

Based on their review of case law and the empirical evidence on death qualification, Rick Seltzer and his colleagues concluded that the *McCree* majority opinion "demonstrates the inability of the highest court in the land to accurately interpret and apply social science data." Seltzer et al., *supra*, at 573. The authors reviewed twelve of the death qualification studies that were presented in *McCree*. *Id.* at 577-81 (summarizing the studies). They found that "there are no competent empirical studies

---

[24] Aliza Plener Cover, *The Eighth Amendment's Lost Jurors: Death Qualification and Evolving Standards of Decency*, 92 Ind. L.J. 113, 134 (2016) (reporting, based on study of capital *voir dire* proceedings in Louisiana, that "in one trial, the state ultimately peremptorily struck three of the five jurors who were unsuccessfully challenged under Witherspoon; in another trial, two of three; and in another trial, two of three."); Bruce J. Winick, *Prosecutorial Peremptory Challenge Practices in Capital Cases: An Empirical Study and a Constitutional Analysis*, 81 Mich. L. Rev.1, 28-29 (1982) (reporting that in one judicial district in Florida, "the prosecution used peremptory challenges against . . . 77% of the scrupled jurors.").

which reach contrary conclusions [on the conviction-proneness question]." Seltzer et al., *supra*, *at* 581. From the perspective of social scientists, "the empirical question raised in *Witherspoon* has been conclusively answered." *Id.*

Seltzer and his colleagues criticized the *McCree* majority for ignoring significant indicators of conviction proneness in the studies. Seltzer et al., *supra*, at 586. The Court dismissed the studies that "dealt solely with generalized attitudes . . . about the death penalty and . . . criminal justice system" because the Court believed them to be "only marginally relevant to the constitutionality of McCree's conviction." *McCree*, 476 U.S. at 169. Consistent with Justice Marshall's observations in *McCree*, Seltzer and his co-authors explained that attitudes toward the criminal justice system are "significant indicators of whether a prospective juror is conviction prone." Seltzer et al., *supra*, at 586; *see also McCree*, 476 U.S. at 188 (Marshall, J., dissenting). For example, the studies found that death qualified jurors are (1) "more likely to distrust insanity defenses and defense attorneys, more likely to believe that defendants who do not testify are probably guilty, and more likely to convict innocent people than to let guilty people go free"; (2) "less accepting of the concerns of mercy and the presumption of innocence"; and (3) "more likely to believe the testimony of a police officer than a black defendant, and have less regret about convicting innocent defendants than jurors who cannot be death qualified." Seltzer et al., *supra*, at 586. In sum, these findings are "highly probative of whether or not a death qualified jury has a propensity toward conviction that triggers a constitutional violation." *Id.*

The authors also criticized the *McCree* majority's dismissal of the three studies presented in *Witherspoon*. Seltzer et al., *supra*, at 587. The Court in *McCree* rejected the studies, finding that because they remained "unchanged," the studies were insufficient to support McCree's claim. *McCree*, 476 U.S. at 171. Seltzer and his co-authors agreed that when they were presented in *Witherspoon* some of the studies were unfinished, none of the studies had been published, and the authors had not been cross-examined in court. Seltzer et al., *supra*, at 587. However, when the studies were submitted in *McCree*, two (Goldberg and Zeisel) had been published by "well-recognized academic peer-reviewed publications," and the authors had since testified at "a number of evidentiary hearings in state and federal courts." *Id.*

The researchers criticized as "disingenuous" the *McCree* majority's rejection of three studies because they were based on simulation research, rather than on surveys of individuals who had served as jurors. Seltzer et al., *supra*, at 587.[25] They agreed with Justice Marshall's dissent because (1) courts restricted surveys of actual jurors and (2) the Supreme Court sanctioned guilt and penalty verdicts rendered by the same jury, defendants should not be "'denied recourse to the only available means of proving [his or her] case, recreations of the voir dire and trial process.'" *Id.* (quoting *McCree,* 476 U.S. at 189 (Marshall, J., dissenting)).

---

[25] The three studies were: Cowan, et al., *supra*; George Jurow, *New Data on the Effect of a "Death Qualified" Jury on the Guilt Determination Process*, 84 Harv. L. Rev. 567 (1971); Louis Harris & Associates, Inc., *Study No. 2016* (1971) (unpublished study).

Finally, the researchers addressed the *McCree* majority's criticism that only one of the "post-*Witherspoon* studies" excluded from its analysis "jurors who could not be fair and impartial during the guilt-innocence stage." Seltzer et al., *supra*, at 593. They pointed out that in fact the nullifier jurors were excluded in **three** of the studies the Court discounted because "those studies did not encompass guilt/innocence determinations."[26] *Id.*

In addition to dissecting the *McCree* majority's interpretation of the empirical research, Seltzer and his co-authors published their own study.[27] *See* Seltzer et al., *supra*, at 599-607. "This study combined with the body of empirical data on death qualification, conclusively shows that the removal for cause of *Witherspoon* excludables results in a

_____

[26] The three studies that excluded the nullifiers were: Phoebe C. Ellsworth, Raymond M. Bukaty, Claudia L. Cowan & William C. Thompson, *The Death-Qualified Jury and the Defense of Insanity*, 8 Law & Hum. Behav. 81 (1984); Fitzgerald & Ellsworth, *supra*; William C. Thompson, Claudia L. Cowan, Phoebe C. Ellsworth & Joan C., *Harrington, Death Penalty Attitudes and Conviction Proneness: The Translation of Attitudes into Verdicts*, 8 Law & Hum. Behav. 95 (1984).

[27] The research consisted of a survey of death penalty attitudes in Maryland in 1983. Seltzer et al., *supra*, at 599-607. The study was designed to answer three questions: First, could the finding that death-qualified juries are more conviction prone be verified and duplicated in Maryland? Second, what proportion of the venire would automatically vote for the death penalty? Third, was there consistency between respondents' answers to abstract death penalty questions and answers to questions that asked them to specify penalties for hypothetical crimes? *Id.* at 600. The study found that "death penalty opponents"—those who could be fair in the guilt-innocence determination but would automatically vote for life as a penalty—"were less conviction prone than death qualified jurors." *Id.* at 603. "[S]imilar to previous studies," the Maryland survey "found that death qualification results in juries which underrepresent blacks." *Id.* at 604.

petit jury that is prone to convict and underrepresentative of the community from which it is drawn." *Id.* at 607.

Thomas Moar also reviewed the data presented in *McCree* and called the majority's analysis of the three *Witherspoon* studies "superficial." Thomas Moar, *Death Qualified Juries in Capital Cases: The Supreme Court's Decision in Lockhart v. McCree,* 19 Colum. Hum. Rts. L. Rev. 369, 376 (1988). Like Seltzer and his colleagues, Moar criticized the Court for mistakenly dismissing the three studies presented in *Witherspoon* because they had not changed in the eighteen years since they were originally presented to the Court. *Id.* He observed that "[a]lthough there are valid criticisms of some of the *Witherspoon* studies and the potential effects studies, none of their independent weaknesses appear to justify the Court's rejection of the studies' significance for McCree's claim that the death qualification procedure tends to produce guilt-prone juries."[28] *Id.* at 382. Moar explained that the majority had failed to understand that initial studies in any new area of research are always "'too tentative and fragmentary'" and that when subsequent studies validate them, the initial studies are then regarded as a part of an "established and coherent body of scientific knowledge." *Id.* (quoting *McCree*, 476 U.S. at 171).

---

[28] The "potential effects studies" are those by Jurow; Harris Associates, Inc.; and Cowan, et al. Moar, *supra*, at 378 n.60.

43

Moar concluded that the *McCree* majority "erred in its rejection of the empirical evidence." *Id.* at 396.Moar found that "every study [presented by McCree], either directly or indirectly, suggests that the death qualification procedure tends to produce conviction-prone juries." *Id.* at 395.

William Thompson observed that the *McCree* opinion is "poorly reasoned and unconvincing both in its analysis of the social science evidence and its analysis of the legal issue of jury impartiality." William C. Thompson, *Death Qualification after Wainwright v. Witt and Lockhart v. McCree,* 13 Law & Hum. Behav. 185, 202 (1989). Thompson explained that when the Court found a "'flaw' in a study, or a group of studies, [the Court] dismissed it from further consideration, never considering that alternative hypotheses left open by shortcomings in studies of one type might be ruled out by studies of another type"; any study deemed less than definitive was rejected as completely uninformative. *Id.* at 195.  Thompson reasoned that, given the district court's thorough assessment of the empirical evidence and the persuasiveness of the results, the *McCree* decision raised "serious doubts about the ability of these Justices to understand and deal with social science." *See id.* at 196, 202.

In sum, the *McCree* majority's analysis of the studies has been thoroughly discredited. In light of the post- *McCree* research presented below, this Court should exercise its authority to decline to death qualify the trial jury.

**C. Empirical research published since *McCree* uniformly shows that death qualified jurors are also biased in favor of a death verdict.**

44

In the three decades since the *McCree* decision, extensive social science data has been published, which lends further support to the conclusion that death qualified juries are also biased in favor of a death sentence. A disturbingly significant percentage of these jurors do not understand penalty phase instructions, do not follow the law, and are motivated to vote for death based on erroneous beliefs about the death penalty and/or life without the possibility of release. Below are some examples of the findings:

- In a mock jury study of 539 California residents who "were required to be both jury- eligible and death qualified," researchers reported that some mitigating evidence was most as to be treated as aggravating as the converse among jurors who voted for death. Mona Lynch & Craig Haney, *Capital Jury Deliberation: Effects on Death Sentencing, Comprehension, and Discrimination*, 33 Law & Hum. Behav.*,* 481, 483, 486 (2009). Depending upon the particular mitigating factor, between 14% and 30% of jurors who voted for death "actually weighed mitigating evidence as favoring a death sentence." *Id.* at 486. Commenting on the "troubling," two-fold consequence of the conversion of mitigating into aggravating evidence, the authors observed that "it would speciously inflate the rate of death sentencing." *Id.* at 492.

- In a study involving data from the CJP of 916 capital jurors in eleven states, "[v]irtually half of the capital jurors (48.3%) . . . indicated that they thought they knew what the punishment should be during the guilt phase…….[S]izable proportions of jurors in nearly all of the states took a stand on punishment before the penalty stage of the trial." William J. Bowers, Marla Sandys & Benjamin D. Steiner, *Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Guilt-Trial Experience, and*

45

*Premature Decision-Making,* 83 Cornell L. Rev. 1476, 1488 (1998). "Nearly four out of five jurors" who expressed a pro-death stand at the guilt stage held fast to that position until the final penalty vote. *Id*. at 1492. And, "[m]any early pro-death jurors appear to have operated under a presumption that unequivocal proof of guilt justified the death penalty." *Id.* at 1497.

- In a study of data from capital juror interviews collected by the CJP, the researchers determined that only half of those who stated that "life" is the alternative punishment understood that "life" means there is no parole. William J. Bowers & Benjamin D. Steiner, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 Tex. L. Rev. 605, 650 (1995); *see* Wanda D. Foglia, *They Know Not What They Do: Unguided and Misguided Decision-Making in Pennsylvania Capital Cases*, 20 Just. Q. 187, 194, 196 (2003) (a CJP study of capital jurors in Pennsylvania—a state in which life without parole is the alternative to the death penalty—finding that "most of the jurors . . . did not think that a life sentence truly meant life in prison[;] [o]ver a fifth thought that the defendant would be out of prison in 9 or fewer years, and the median estimate was 15-19 years").

- In a study of data gathered by the CJP of 153 jurors who sat in South Carolina capital trials, one-third of the jurors "were under the mistaken impression that the law required a death sentence if they found heinousness or dangerousness, a result replicated in a multi- state study of the interview data." Theodore Eisenberg, Stephen P. Garvey & Martin T. Wells, *Jury Responsibility in Capital Sentencing: An Empirical Study*, 44 Buff. L. Rev. 339-40, 360 (1996).

- In a study of jurors who sat in thirty-one South Carolina murder cases, the

CJP found that "about twenty percent of the jurors on death juries believe that an aggravating factor can be established by a preponderance of the evidence or only to a juror's personal satisfaction," though state law requires proof beyond a reasonable doubt. Theodore Eisenberg & Martin T. Wells, *Deadly Confusion: Juror Instructions in Capital Cases*, 79 Cornell L. Rev. 1, 10. (1993). Forty-nine percent of those jurors believed that a mitigating factor has to be proved beyond a reasonable doubt, and 66% believed that all jurors have to agree on that factor when neither is mandated by South Carolina law. *Id.* at 11; *see* John Blume, Theodore Eisenberg & Stephen Garvey, *Lessons from the Capital Jury Project in Beyond Repair?: American's Death Penalty* 144-77, 158 (2003) (a CJP study of North and South Carolina capital jurors finding that 41% of the former and 51% of the latter erroneously believed that the defendant was required to prove the existence of a mitigating factor beyond a reasonable doubt).

In sum, more than forty years of empirical evidence demonstrates conclusively that death qualification disproportionately removes African-Americans and women from capital juries and produces juries that are predisposed to convict and render a death verdict.

## IV. Death qualification violates Mr. Bowers' right to a jury selected from a fair cross-section of the community.

Death qualification violates Mr. Bowers' right to a jury selected from a fair cross-section of the community under the Sixth and Fourteenth Amendments. As the Supreme Court has held, juries play a critical "historic role as a bulwark between the State and the accused." *Oregon v. Ice,* 555 U.S. 160, 168 (2009). A jury's purpose is "to guard against

the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge." *Taylor,* 419 U.S. at 530. In the death penalty context, the jury's function as a shield between the government and the defendant is enhanced and unique.

Nowhere is a representative jury more critical than in a capital case. In such cases the jury not only resolves the question of guilt or innocence but also serves as the conscience of the community in its most compelling role: it decides whether a person shall live or die. In this life-or-death determination, the interplay of diverse values and views is imperative if a fair and impartial judgment is to be rendered.

As argued below, death qualification violates Mr. Bowers' federal constitutional right to a jury selected from a fair cross-section of the community for two primary reasons:

(1) death qualification disproportionately excludes cognizable groups, namely, Hispanics, African-Americans, women, and religious groups that oppose the death penalty; and

(2) "guilt phase includables"[29] are a distinctive group for fair cross-section purposes.

---

[29] This term refers to jurors who are otherwise qualified and competent to render a verdict at a trial but are excluded from jury service because of their views on capital punishment.

### A. Hispanics, African-Americans, women, and religious groups who are disproportionately excluded by death qualification are cognizable groups.

As indicated above, there is no question that Hispanics, African-Americans, women, and religious are cognizable groups for purposes of Sixth and Fourteenth Amendment analysis. In *McCree*, the Court distinguished *Witherspoon*-excludables from groups the Court had previously recognized as "distinctive," whose removal on "the basis of some immutable characteristic such as race, gender, or ethnic background, undeniably gave rise to an 'appearance of unfairness.'" 476 U.S. at 175. The Court stated that "[t]he wholesale exclusion of these large [historically excluded] groups from jury service clearly contravened all three . . . purposes of the fair-cross-section requirement." *Id.* As Justice Marshall pointed out, McCree's data indeed showed that "a disproportionate number of blacks and women" would be excluded through death qualification. *McCree*, 476 U.S. at 168- 173; *id.* at 187 (Marshall, J., dissenting). Social science research conducted in the years following *McCree* confirmed these statistics and extended them to other cognizable groups. *See* Section III.C above.

When a court sanctions the removal of a disproportionate numbers of legally cognizable groups, the court undermines the purpose of the fair cross-section requirement. *See McCree*, 476 U.S. at 174-75.

### B. "Guilt phase includables" are a distinctive group for fair cross-section purposes.

A jury from which a significant segment of the community has been removed undermines the three purposes of the federal fair cross-section requirement identified by the Court in *McCree* and discussed above. *See McCree*, 476 U.S. at 174-75.

First, a jury from which the prosecutor excludes all prospective jurors who harbor doubts about the wisdom of capital punishment cannot ensure that the "'commonsense judgment of the community'" will guard against the prosecutor's "'exercise of arbitrary power.'" *See id.* at 174 (quoting *Taylor*, 419 U.S. at 530). Second, the exclusion of prospective jurors who comprise a significant portion of the population does not "preserve public confidence in the fairness of the criminal justice system" because it creates the appearance of unfairness. *See id.* at 174-75. Third, death qualification prevents all citizens from "sharing in the administration of justice" as a part of our collective "civic responsibility." *See id.* at 175. Death qualification violates a defendant's Sixth and Fourteenth Amendment rights because the failure to recognize "guilt phase includables" as a distinctive group prohibits capital juries from fulfilling the purposes of the fair cross-section requirement.

In *Witherspoon*, the Court explained the importance of having opposing viewpoints represented in capital juries:

> [A] jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death. Yet, in a nation less than half of whose people believe in the death penalty, a jury composed exclusively of such people cannot speak for the community. Culled of all who harbor doubts about the wisdom of capital punishment—of all who would be

50

reluctant to pronounce the extreme penalty—such a jury can speak only for a distinct and dwindling minority.

*Witherspoon*, 391 U.S. at 519-20.

In his concurring opinion in *Witherspoon*, Justice Douglas urged that "the wholesale exclusion of a class that makes up a substantial portion of the population produces an unrepresentative jury." 391 U.S. at 530 (Douglas, J., concurring). Justice Douglas wrote that "[t]he conscience of the community is subject to many variables, one of which is the attitude toward the death sentence." *Id.* at 528. He explained that "[i]f a particular community were overwhelmingly opposed to capital punishment," then "an accused [should] have the benefit of that controlling principle of mercy in the community." *Id.* at 528.[30] In 2008, Justice Stevens expressed his "special concern" about "rules that deprive the defendant of a trial by jurors representing a fair cross section of the community." *Baze v. Rees*, 553 U.S. 35, 84 (2008) (Stevens, J., concurring).

In Mr. Bowers' trial, the exclusion from the penalty phase of scrupled jurors, which tips the balance in favor of death and away from life without possibility of parole, will deprive Mr. Bowers of a jury drawn from a cross-section of the community, one capable of representing the Western District of Pennsylvania's demographic and attitudinal diversity at both phases of the trial. In fact, it means that a guilt phase jury will

---

[30] Justice Marshall observed that "[t]he right to have a particular group represented on venires is of absolutely no value if every member of that group will automatically be excluded from service as soon as he is found to be a member of that group." *McCree*, 476 U.S. at 193 n.6 (Marshall, J., dissenting).

be distinctly different from a jury in any other criminal case. In every other criminal trial, the court creates a firewall between the jurors and any consideration of the matter of sentencing; jurors are not informed of the sentence and instructed not to consider the sentencing consequences of their verdicts.

Death qualification not only deprives the defendant of a fair cross-section, it also deprives jurors of their right to serve and to render verdicts that reflect the normative values of the community. *See Batson v. Kentucky*, 476 U.S. 79 (1986) (observing that "[a]s long ago as *Strauder* [*v. West Virginia*, 100 U.S. 303, 308 (1880)] . . . , the Court recognized that by denying a person participation in jury service on account of his race, the State unconstitutionally discriminated against the excluded juror"). The process not only impacts who decides sentencing at the penalty phase, but who decides guilt. And death qualification renders certain jurors incompetent to make guilt phase decisions, when there is no evidence that their guilt phase verdict would be compromised.

Accordingly, this Court should prohibit death qualification because it denies Mr. Bowers his rights under the Sixth and Fourteenth Amendments to a jury selected from a fair cross-section of the community.

### V.  Death qualification violates Mr. Bowers' right to a fair trial by an impartial jury.

Death qualification also violates Mr. Bowers' right to a fair trial by an impartial jury. *See* U.S. Const. amend. VI; *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (holding that the right to jury trial guarantees the criminally accused a fair trial by a panel of impartial, indifferent jurors). In *Thiel v. Southern Pac. Co.*, 328 U.S. 217, 227 (1946), the Supreme

Court held that a "[t]rial by jury presupposes a jury . . . representative of the community **as well as** impartial in a specific case" (emphasis added). The right to trial by an impartial jury is among the constitutional guarantees that United States Supreme Court has acknowledged are "fundamental." *Duncan v. Louisiana*, 391 U.S. 145, 157-58 (1968) (holding that "in the American States, as in the federal judicial system, a general grant of jury trial for serious offenses is a fundamental right . . . for assuring that fair trials are provided").

Below, Mr. Bowers argues that (1) *Witherspoon*'s logic applies to the selection of the guilt phase jury; (2) death qualification will prevent his guilt phase jury from functioning as an impartial tribunal; and (3) in light of the original conception of a jury, death qualification violates the right to an impartial jury.

### A. This court should find that *Witherspoon*'s reasoning applies to the selection of the guilt phase jury.

This Court should find that Supreme Court's analysis in *Witherspoon* with respect to the penalty phase jury also applies to the selection of the guilt phase jury. In *Witherspoon*, the Supreme Court found no flaw in the petitioner's legal argument that jurors "partial to the prosecution on the issue of guilt or innocence" should be excluded from service. 391 U.S. at 517-18. Rather, the Court was not persuaded by Witherspoon's empirical evidence that death-qualified juries are conviction prone.[31] Instead of revisiting

---

[31] As discussed above, researchers responded to the concerns expressed by the Court in *Witherspoon* and *McCree* by conducting further empirical studies on the effects of death

53

*Witherspoon*'s unanswered question, Justice Rehnquist, writing for the *McCree* majority, held that even if the result of death qualification is that individuals biased in favor of the prosecution are allowed to decide the guilt-innocence question, legitimate government interests warrant infringing the defendant's right to an impartial jury. *See McCree,* 476 U.S. at 180-81.

In contrast to the penalty phase in which the state had "no valid interest in such a broad- based rule" of excluding jurors with conscientious scruples against capital punishment, the majority in *McCree* concluded that the removal of *Witherspoon*-excludables from the guilt phase serves the "[s]tate's entirely proper interest in obtaining a single jury that could impartially decide all of the issues." *McCree,* 476 U.S. at 180. The Court also surmised that a capital defendant may "benefit at the sentencing phase of the trial from the jury's 'residual doubts' about the evidence presented at the guilt phase." *Id.* at 181. Finally, the *McCree* majority concluded that "a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury." *Id.* at 184.

Justice Marshall observed, however, that *McCree's* logic mirrored the Court's reasoning in *Witherspoon*. *McCree,* 476 U.S. at 193-95 (Marshall, J., dissenting). "Witherspoon had been denied a fair sentencing determination, . . . not because any

---

qualification, which confirmed the research presented in both cases and added further support to the conclusion that death-qualified juries are conviction and death prone.

member of his jury lacked the requisite constitutional impartiality, but because the manner in which the jury had been selected 'stacked the deck' against him." *Id.* at 194 (quoting *Witherspoon*, 391 U.S. at 523). Justice Marshall explained that *Adams v. Texas*, 448 U.S. 38 (1980), further demonstrates that *Witherspoon*'s analysis applies to the guilt phase of a capital trial. *McCree*, 476 U.S. at 196-97 (Marshall, J., dissenting).

In *Adams*, the Court applied *Witherspoon* to the Texas death penalty scheme, which, at the time, required the jury to answer three factual questions. *Adams*, 448 U.S. at 40-41. Thus, "even where the role of the jury at the penalty stage of a capital trial is limited to . . . a fact-finding role, the right to an impartial jury established in *Witherspoon*" still applies. *McCree*, 476 U.S. at 196-97 (Marshall, J., dissenting). As Justice Marshall pointed out, Chief Justice Rehnquist's analysis in *McCree* could not be reconciled with his position in *Adams* in which the Chief Justice stated that "he could 'see no plausible distinction between the role of the jury in the guilt/innocence phase of the trial and its role, as defined by the State of Texas, in the sentencing phase.'" *Id.* at 197 (quoting *Adams*, 448 U.S. at 54 (Rehnquist, C.J., dissenting)).

### B. Death qualification will prevent Mr. Bowers' jury from functioning impartially in the guilt phase as constitutionally required.

The majority in *McCree* focused on the impracticality of "balancing" juries but ignored the impact of death qualification on the group that remains, that is, the seated jurors. *See McCree*, 476 U.S. at 177-78. The Court, however, mischaracterized McCree's claim. He did not, nor does Mr. Bowers, argue that jury impartiality is the function of a mathematical formula. Rather, McCree objected, as does Mr. Bowers, that the wholesale

55

removal of "a class of potential jurors less prone than the population at large to vote for conviction," gives the prosecution "an unconstitutional advantage at his trial." *Id.* at 193 (Marshall, J., dissenting).

In *Ballew*, decided almost a decade before *McCree*, the Court held that a criminal conviction rendered by a five-person—as opposed to a six-person—jury violated the right to an impartial jury trial under the Sixth and Fourteenth Amendments. *Ballew*, 435 U.S. at 245. There, the Court relied on empirical evidence showing that a five-member jury "[is] less likely to foster effective group deliberation," resulting in "inaccurate fact-finding and incorrect application of the common sense of the community to the facts." *Id.* at 232. The Court found further that as juries decrease in size "they are less likely to have members who remember each of the important pieces of evidence or argument," and that "the smaller the group, the less likely it is to overcome the biases of its members to obtain an accurate result." *Id.* at 233.

In *McCree*, Justice Marshall observed that each of the "concerns" that led the Court in *Ballew* to find that "a misdemeanor defendant had been deprived of his constitutional right to a fair trial by jury is implicated by the process of death qualification." *McCree*, 476 U.S. at 199 (Marshall, J., dissenting). First, the empirical data on the effects of death qualification showed that the process reduces the number of impartial jurors on the petit jury, disrupting the "counterbalancing of various biases," critical to the "effective functioning of juries." *Id.*

Second, when compared to juries that sit in all other criminal trials, death qualified juries in capital cases are more likely to be "deficient in the quality of their deliberations, the accuracy of their results, the degree to which they are prone to favor the prosecution, and the extent to which they adequately represent minority groups in the community." *Id.* Justice Marshall concluded that, with even more clarity than the data considered in *Ballew*, the "studies adduced by [McCree] showed a broad pattern of 'biased decision-making.'" *Id.* at 200 (quoting *Ballew*, 435 U.S. at 239). By reducing the jury to those who survive death qualification, the jurors are not only "more likely to accept the word of the prosecution and be satisfied with a lower standard of proof than those who are excluded," but also, "death-qualified jurors are actually more likely to convict than their peers." *Id.* at 200-01.

The empirical evidence that death qualification is a significant obstacle to the "effective functioning of [capital] juries" is overwhelming. *See McCree*, 476 U.S. at 199 (Marshall, J., dissenting). Therefore, this Court should find that death qualification will deprive Mr. Bowers of his right to trial by a fair and impartial jury.

### C. Based upon a historic and textual interpretation of Sixth Amendment, death qualification violates the right to an impartial jury.

#### 1. There is no basis in federal law permitting or requiring removal of jurors who oppose the death penalty.

The United States Supreme Court has long recognized that the regulation of cause and peremptory challenges is left to "the common law or to the enactments of Congress." *United States v. Wood*, 299 U.S. 123, 145 (1936).  Death qualification did not exist at

57

common law or in Blackstone's England. In Blackstone's England, as at common law, there were only four challenges for cause:

> 1. If a Lord was empaneled, he could be challenged *propter honoris respectum* (on account of respect for nobility). 2. If a person previously convicted of a felony or misdemeanor was empaneled, he could be challenged *propter delictum* (on account of crime). 3. If an alien or slave was empaneled, he could be challenged *propter defectum* (on account of defect). 4. If a venireman was related to either party, was the defendant's master or servant, or had previously served as a juror or arbitrator in the same cause, then he could be challenged *propter affectum* (on account of favor or bias).

*4 William Blackstone, Commentaries* *337, *346

As Blackstone made clear, the "bias" that formed the basis of a challenge "*propter affectum*" was limited to relational bias. *Id.,* at *346-47. Cause challenges based on a juror's conscientious objection to a particular law or punishment did not seep into the American criminal trial scheme until the nineteenth century, as the nation struggled with the issues of religious freedom and slavery. No case prior to 1829, a half-century after the Constitution was adopted, describes instances where prospective jurors are excused for cause based upon their opposition to the death penalty. *See Commonwealth v. Lesher*, 17 Serg. & Rawle 155, 159, 1828 Pa. LEXIS 9 (Pa. 1828).  In that case, Justice Gibson accused his colleagues of legislating from the bench: "[F]eeling, as I do, a horror of judicial legislation, I would suffer any extremity of inconvenience, rather than step beyond the legitimate province of the court to touch even the hair of any privilege of a prisoner on trial for his life." *Id.*, 17 Serg. & Rawle, at 164-65 (Gibson, J., dissenting).

Moreover, it appears that from the outset there existed an inexorable connection between race and the death-qualification of juries. *See, e.g.*, Robert M. De Witt, John Edwin Cooke, *The Life, Trial and Execution of Capt. John Brown, Being a Full Account of the Attempted Insurrection at Harper's Ferry* 63 (1859) (noting death-qualification of jury in an indictment against "white men" and "free negroes" for conspiring insurrection against the Commonwealth to free slaves:[32]  "[T]he following were the questions put to the jury...have you any conscientious scruples against convicting a party of an offense to which the law assigns the punishment of death, merely because that is the penalty assigned.")[33] From the varying accounts of John Brown's trial, it remains unclear whether the jurors who were opposed to the death penalty were removed for cause or after resolving the cause challenges on the prosecutor's peremptory strike.

Although the authority for "death qualification" is often presumed to flow from *Witherspoon*, 391 U.S. 510, and *Witt*, 469 U.S. 412, in those two cases, the Supreme Court made clear that it was not establishing a basis for removing jurors because of their views on the death penalty, but rather identifying a limitation on the government's ability to exclude jurors should the state chose to do so.

---

[32] The indictment appears at
http://www.law.umkc.edu/faculty/projects/FTrials/johnbrown/browntrial.html.
[33] *Id*., October 26, 1859, afternoon session.

59

In *Witherspoon*, what was at stake was the constitutionality of an Illinois statute which provided that, "In trials for murder it shall be a cause for challenge of any juror who shall, on being examined, state that he has conscientious scruples against capital punishment, or that he is opposed to the same." *Witherspoon*, 391 U.S. at 512. The Court found that the operation of that statute was impermissible under the Sixth Amendment. As the Supreme Court later explained:

> As an initial matter, it is clear beyond peradventure that *Witherspoon* is not a ground for challenging any prospective juror. It is rather a limitation on the State's power to exclude: if prospective jurors are barred from jury service because of their views about capital punishment on "any broader basis" than inability to follow the law or abide by their oaths, the death sentence cannot be carried out.

*Adams v. Texas*, 448 U.S. 38, 47-48 (1980).

The Supreme Court affirmed this limited holding of *Witherspoon* in *Witt,* a State of Florida death sentence reviewed in a federal habeas corpus proceeding. In *Witt*, the Court explained: "We begin by reiterating *Adams'* [*Adams v. Texas*, 448 U.S. at 47-48] acknowledgment that "*Witherspoon* is not a ground for challenging any prospective juror. It is rather a limitation on the state's power to exclude....." *Witt*, 469 U.S. at 423-24. Thus, these cases do not establish an independent basis for a challenge for cause based on death penalty attitudes in capital cases. The Supreme Court rulings do recognize that a state may, under its traditional powers to regulate challenges for cause, enact such a challenge. Rather than create such a challenge, these cases establish the constitutional frame within which such a challenge must fit if it is enacted.

60

And this is where there is a critical difference between the Federal Death Penalty Act and state death penalty schemes reviewed by the United States Supreme Court. Unlike the legislatures in Illinois (*Witherspoon*), Texas (*Adams*), and Florida (*Wainwright*), Congress has not seen fit to provide for the removal from federal death penalty processes those prospective jurors who oppose the death penalty. Because such a challenge was not recognized at common law, and because Congress did not create such a challenge by statute, a prospective juror in a federal death penalty case may not be removed for cause because of his or her views on capital punishment.

### 2. There is an emerging claim that the death qualification of juries violates the Sixth Amendment right to an impartial jury.

There is an emerging claim that the death-qualification of juries violates the Sixth Amendment right to an impartial jury, and a capital defendant must preserve that argument. A number of historians and legal scholars have suggested that it is now time to reconsider *Wainwright* and *Adams* in light of the original conception of a jury. *See Campbell v. Louisiana*, No. 08-399, Amici Curiae Brief of Academics, 2008 WL 4753021 (U.S. Oct. 27, 2008).

While the Supreme Court's jurisprudence currently permits limited death qualification of jurors when authorized by statute, *see Adams,* the Court has not hesitated to reexamine other precedents concerning the Sixth Amendment for fidelity to the Framers' intent and understanding. *See, e.g., Ring v. Arizona*, 536 U.S. 584 (2002)

(reversing *Walton v. Arizona*, 497 U.S. 639 (1990), based upon historic and textual interpretation of Sixth Amendment "right to a jury trial"); *Crawford v. Washington*, 541 U.S. 36 (2004) (reversing *Ohio v. Roberts*, 448 U.S. 56 (1980), based upon historic and textual interpretation of Sixth Amendment right to confrontation). *See also Melendez Diaz v. Massachusetts*, 557 U.S. 305 (2009).

The Supreme Court's decisions in *Jones v. United States*, 526 U.S. 227 (1999), *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Blakely v. Washington*, 542 U.S. 296 (2004), and *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), have been predicated upon the view that the Sixth Amendment guarantees a jury trial right as understood at the time of the founding, rather than based on processes for assessing guilt and punishment that evolved later.

In *Jones*, the Court expressed concern with any effort that prevented juries from expressing the will of the community by nullifying an egregious law. Removing from a jury all otherwise eligible jurors who would not do the state's bidding in a capital case constitutes a similar erosion of the jury trial right. It is akin to the "attempts to confine jury determinations in libel cases to findings of fact, leaving it to the judges to apply the law and, thus, to limit the opportunities for juror nullification." *Jones,* 526 U.S. at 246 (discussing T. Green, *Verdict According to Conscience*, 318-355 (1985), and J. Rakove, *Original Meanings,* 300-302 (1996)).

The Framers believed the jury to be finders of both fact and law.[34] The breadth of this responsibility and influence is at odds with some contemporary views of the jury function. Yet, the Framers' support for a strong and independent jury was clearly stated: they viewed the jury as a bicameral branch of the judiciary. *See* Akhil Reed Amar, *The Bill Of Rights: Creation and Reconstruction* 100 (1998) ("[J]uries can be seen as part of the judicial department, the lower (and if anything, presumptively more legitimate, because more popular) branch.").

John Adams, writing in 1771, observed that juries served the central purpose of being the "voice of the people." 2 *Works of John Adams* 253 (1771) (explaining that "[j]uries are taken, by lot or by suffrage, from the mass of the people, and no man can be

---

[34] *See, e.g.*, Jeffrey Abramson, *We the Jury: The Jury System and the Ideal of Democracy* 30- 31, 63-64, 67-77 (1994); *The Complete JuryMan: Or, A Compendium of the Laws Relating to Jurors* 194-202, 246-47 (1752); Clay S. Conrad, *Jury Nullification: The Evolution of a Doctrine* 13-63 (1998); William L. Dwyer, *In the Hands of the People: The Trial Jury's Origins, Triumphs, Troubles, and Future in American Democracy* 62-72 (1st ed. 2002); *The English-Man's Right: A Dialogue Between a Barrister at Law and a Jury-Man 10-35 (1680);* Norman J. Finkel*, Commonsense Justice: Jurors' Notions of the Law* 24-31 (1995); Thomas Andrew Green, *Verdict According to Conscience: Perspectives on the English Criminal Trial Jury* 1200-1800, at 153-99 (1985); John Hostettler, *The Criminal Jury Old and New: Jury Power From Early Times to the Present Day* 30-32, 48, 70-72, 92-103, 112- 14, 121, 133-34 (2004); Larry D. Kramer, *The People Themselves: Popular Constitutionalism and Judicial Review* 28-29 (2004); Leonard W. Levy, *The Palladium of Justice: Origins of Trial by Jury* 69-105 (1st ed. 1999). All these authorities appeared in *United States v. Polizzi,* 2008 U.S. Dist. LEXIS 26900 (E.D.N.Y April 1, 2008) (Weinstein, J.) (opinion later withdrawn).

63

condemned of life, or limb, or property, or reputation, without the concurrence of the voice of the people"). Adams noted that one of the objections informing those who sought independence from England was that some juries were being instructed to render verdicts which "would render juries a mere ostentation and pageantry, and the court absolute judges of law and fact." *Id.* at 253-54.

Alexander Hamilton's views on the great protection of the jury trial right were reflected in his defense of Harry Croswell, who the prosecution argued had libeled Thomas Jefferson by claiming that Jefferson had paid "James Thompson Callender for calling George Washington 'a traitor, a robber, and a perjurer' and for calling John Adams 'a hoary-headed incendiary.'" *People v. Croswell*, 3 Johns. Case. 337, 341, 342, 1804 N.Y. LEXIS 175 (N.Y. 1804). Hamilton had defended Croswell by observing that juries have the power to determine the law, and that jurors have the duty to follow their convictions. *Id.*

Early jurists further confirmed the view of the jury as finder of both fact and law: The "history of English criminal jurisprudence furnishes abundant evidence . . . that the power of juries to determine the law as well as the facts in criminal trials was essential to the protection of innocence and the preservation of liberty." *State v. Croteau*, 23 VT. 14, 21-23, 1849 VT. LEXIS 106 (1849) (overruled on other grounds by *State v. Burpee*, 65 VT. 1, 25 A. 964 (1892) (jury instruction issue).

Whereas the Framers' jury had the power to rule on the constitutionality of the death penalty (though the force of any ruling applied only to the particular case on which they sat), a prospective juror today cannot even sit on a capital jury unless the juror promises that he or she would be able and willing to impose a sentence of death. The practical effect of death qualification is to expose the capitally accused to increased odds of receiving the death penalty. Death qualification also eliminates the voices of citizens who would opt to "check" the government's decision to inflict the ultimate penalty. Death qualification eliminates from juries those citizens who would find a death sentence to be cruel and unusual either generally or in a particular context. As a result, when appellate courts review the frequency with which juries impose a death sentence for a certain class of capital crimes, that measure is necessarily an inaccurate thermometer for determining how much a society has chilled to the idea of executing a certain class of offenders.

That the Sixth Amendment might interfere with the government's effort to impose a death sentence may be inconvenient; but the historical basis for the Amendment was to interpose citizens between the government and the accused for that very purpose. We cannot have strayed that far from the original intent. Indeed, when the Supreme Court relatively recently decided cases *Jones*, *Apprendi*, *Blakely*, *Crawford*, *Melendez Diaz*, and *Ramos*, the Court emphasized the importance of the original intent.

65

Because there is no legislative enactment providing for the removal of jurors based upon their views on the death penalty in a federal death penalty case, allowing the removal of such a juror by a challenge for cause violates the Sixth Amendment right to trial by an impartial jury.

## VI.    This Court should find that death qualification violates the Eighth and Fourteenth Amendments.

In addition to violating the fair cross section and impartial jury requirements, death qualification also violates the constitutional prohibition against "cruel and unusual punishment" because the procedure undermines the Eighth Amendment's dual requirements of heightened reliability and individualized sentencing. Death qualification prevents the United States Supreme Court from relying on capital jury verdicts to evaluate society's evolving standards of decency, which is an essential function of the constitutional guarantee, for two reasons: (1) the process excludes a significant percentage of otherwise qualified jurors, and (2) the process disproportionately excludes African-Americans and women based upon their opposition to the death penalty.

### A.  This Court should find that death qualification undermines the Eighth Amendment's requirements of heightened reliability and individualized capital sentencing.

The Eighth Amendment necessitates heightened reliability in both the guilt and penalty determinations of a capital trial. *See, e.g.*, *Beck v. Alabama*, 447 U.S. 625, 638 (1980); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). *Woodson* announced that this requirement applies to the penalty phase of a capital trial and "rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of

imprisonment however long. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Id.* In *Beck*, the Court held that the same reasoning, which precludes "procedural rules that tended to diminish the reliability of the sentencing determination . . . must apply to rules that diminish the reliability of the guilt determination" because the failure to do so "enhances the risk of an unwarranted conviction." *Beck*, 447 U.S. at 638.

In *Woodson*, the Supreme Court held that Louisiana's mandatory death penalty law violated the Eighth Amendment because the mandatory sentencing determination did not permit consideration "of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." 428 U.S. at 304. In *Lockett v. Ohio*, Chief Justice Burger explained that Ohio's death penalty statute violated the Eighth and Fourteenth Amendments because a jury cannot "be precluded from considering **as a mitigating factor**, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. 586, 604 (1978) (plur. op. of Burger, C.J.). Although *Lockett* was a plurality opinion, "the rule it announced was endorsed and broadened in . . . subsequent decisions" because of "the severity of imposing a death sentence." *Abdul-Kabir v. Quarterman,* 550 U.S. 233, 248 (2007). The requirement of individualized penalty consideration has been applied to overturn statutes that preclude a defendant from

67

presenting mitigating evidence and those that have the effect of preventing the sentencer

from giving mitigating effect to the evidence. *Compare Eddings v. Oklahoma*, 455 U.S.

104, 109, 112-14 (1982) (reversing the death judgment where Oklahoma's statute neither

defined nor limited mitigating circumstances, but where the trial judge believed that he

was not permitted, as a matter of law, to consider evidence of the defendant's childhood

and upbringing) *with Lockett,* 438 U.S. at 607-08 (holding unconstitutional Ohio's

statute, which restricted the presentation of mitigating evidence to three statutory

enumerated circumstances).

In deciding the question of punishment, each juror **must consider** the evidence in

mitigation that Mr. Bowers presents. *See Eddings*, 455 U.S. at 112-14. However, as

demonstrated above, death qualification produces juries that are both conviction-prone

and guilt-prone, some of whose members will not consider each mitigating circumstance

and/or will improperly consider mitigating evidence as aggravation. Extensive empirical

research has shown that these biases are both more nuanced and more powerful than the

label suggests because death qualified jurors are also predisposed to reject mitigating

evidence and embrace aggravating evidence. These findings are consistent whether the

research employs the *Witherspoon* or the *Witt* standard.[35]

---

[35] *See, e.g.*, Brooke Butler, *The Role of Death Qualification in Venirepersons'
Susceptibility to Victim Impact Statements*, 14 Psych., Crime & L. 133, 139-40 (2008)
(employing the *Witt* standard in a study of Florida jurors and finding that, overall, death-
qualified jurors were more likely than excluded jurors to sentence the defendant to death,
but "when victim impact statements were present," they were "even more likely" to do

Because death-qualified juries are disinclined to follow the law, these jurors cannot ensure that the verdict will satisfy the Eighth Amendment's dual requirements of heightened reliability at both phases of the trial and of individualized consideration at the penalty phase.

### B.   Death qualification prevents courts from evaluating society's evolving standards of decency through the objective indicator of jury determinations.

The meaning of "cruel and unusual" under the Eighth Amendment is defined by "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plur. op. of Warren, C.J.). The Eighth Amendment's protection is "determined not by the standards that prevailed when the Eighth Amendment was adopted in 1791 but by the norms that 'currently prevail.'" *Kennedy v.*

---

so); Brooke M. Butler & Gary Moran, *The Role of Death Qualification in Venirepersons' Evaluations of Aggravating and Mitigating Circumstances in Capital Trials*, 26 Law & Hum. Behav. 175, 181 (2002) (using the *Witt* standard in a study of Florida jurors and showing that "death-qualified venirepersons, as opposed to excludables, exhibited higher endorsements of all 14 aggravators [in the study]" and "excludables, as opposed to death-qualified venirepersons, were more likely to endorse all five nonstatutory mitigators [in the study]"); Haney, et al.,*"Modern" Death Qualification*, *supra*, at 626 Table 2, 627 (a California survey employing the *Witherspoon* and *Witt* standards finding that "both *Witherspoon*- and *Witt*-excludable respondents were differentially receptive to virtually every potentially mitigating and aggravating feature of a capital case . . . (i.e., they were significantly *more* receptive to numerous potential mitigating factors and *less* receptive to aggravating ones")); *id*. at 628, 629 Table 3 (also finding that "the remaining Death-qualified group was still a significantly different—and significantly more punitive—group than it would have been if the Excludables had not been removed").

*Louisiana*, 554 U.S. 407, 419 (2008) (quoting *Atkins v. Virginia*, 536 U.S. 304, 311 (2002)). By definition, "evolving standards of decency" are constantly changing. *Compare Penry v. Lynaugh*, 492 U.S. 302, 340 (1989) (holding the objective indicia of society's moral judgment supports the imposition of the death penalty on individuals with intellectual disability) with *Atkins*, 536 U.S. at 321 (holding that a consensus exists that such individuals should not be eligible for capital punishment).

Death qualification prevents juries from serving as an objective indicator of the evolving standards of decency because the process (1) results in the removal of a significant percentage of otherwise qualified jurors and (2) disproportionately excludes African-American and women prospective jurors.

**1. Death qualification precludes juries from serving as an objective indicator of the evolving standards of decency under the Eighth Amendment because the process results in the exclusion of a significant percentage of otherwise qualified jurors.**

In *Witherspoon*, the Supreme Court observed that "one of the most important functions any jury can perform in making [the penalty] selection is to maintain a link between contemporary community values and the penal system – a link without which the determination of punishment could hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.'" 391 U.S. at 519 n.15 (plur. op. of Warren, C.J.) (quoting *Trop*, 356 U.S. at 101). The Court and individual Justices have underscored the pivotal role jury verdicts play in the Eighth Amendment inquiry. For example, in *Furman*, Justice Brennan concluded that the death penalty had "proved

progressively more troublesome to the national conscience" as evinced by "[j]uries, 'express(ing) the conscience of the community on the ultimate question of life or death.'" 408 U.S. 238, 299 (1972) (Brennan, J., concurring) (quoting *Witherspoon*, 391 U.S. at 519). Justice Brennan observed that juries "vote[d] for death in a mere 100 or so cases among the thousands tried each year where the punishment [was] available." *Id.* Justice Powell, joined by three other Justices in his dissenting opinion, agreed that "[a]ny attempt to discern . . . where the prevailing standards of decency lie must take careful account of the jury's response to the question of capital punishment." *Id.* at 440-41.

In *Woodson*, three Justices emphasized the importance of jury verdicts as evidence that North Carolina's mandatory capital punishment statute did not comport with "contemporary values." 428 U.S. at 295 (plur. op. of Stewart, J.). In *Coker v. Georgia*, Justice White observed that "'[t]he jury . . . is a significant and reliable objective index of contemporary values because it is so directly involved.'" 433 U.S. 584, 596 (1977) (plur. op. of White, J.) (quoting *Gregg,* 428 at 181); *see Enmund v. Florida*, 458 U.S. 782, 788 (1982) (explaining that the Court must look to historical developments, legislative judgments, international opinion, and juries' sentencing decisions). More recently in *Kennedy*, the Court held that the death penalty for the rape of a child violated the Eighth Amendment because it was "not a proportional punishment" for that crime. 554 U.S. at 446. *Kennedy*, informed by the Court's past decisions in *Coker* and *Enmund*, held that the Court should be guided by jury determinations as "'objective indicia of society's standards.'" 554 U.S. at 421 (quoting *Roper v. Simmons*, 543 U.S. 551, 563 (2005)).

71

If the function of juries is to "maintain a link between contemporary community values and the penal system," then death-qualified juries break this essential link. *See Witherspoon*, 391 U.S. at 519 n.15. The Court explained in *Witherspoon* that a jury "cannot speak for the community" when it is "[c]ulled of all who harbor doubts about the wisdom of capital punishment." *Id.* at 520. However, the process of death qualification precludes men and women from serving on death penalty juries based on their beliefs about capital punishment. When prospective jurors ''reluctant to pronounce the extreme penalty" are prevented from serving, the full range of community values is not represented in jury deliberations. *Id.*

A quantitative study of eleven trials in Louisiana that resulted in death verdicts between 2009 and 2013 found that an average of 22.2% of the venire "was struck for cause on the basis of *Witherspoon* due to an inability to meaningfully consider the death penalty." Aliza Plenar Cover, *The Eighth Amendment's Lost Jurors*, 92 Ind. L.J. 113, 134 (2016).[36] Based upon her empirical research, Cover argues that "[t]he use of death-qualified jury verdicts as 'objective indicia' of contemporary values produces an obviously warped data set from which to gauge 'evolving standards of decency.'" *Id.* at 128. Stated differently, the Supreme Court's view that "juries serve as a link between

---

[36] Cover identified twenty-seven capital trials and fourteen death verdicts in Louisiana during this period. Cover, *supra*, at 131. Of the fourteen cases in which there were death verdicts, transcripts were available in eleven. Cover "conducted an in-depth review" of these eleven cases. *Id.* at 131-32.

punishments and the conscience of the community" fails "to account for the impact of

death qualification upon the representativeness of the capital jury." *Id.* at 124, 126. Cover

explains that "[d]eath qualification eliminates from jury service a sizable portion of the

population that disagrees with the morality of the death penalty and therefore prevents

jury verdicts from accurately reflecting the stance of the community on whether the death

penalty is 'cruel and unusual.'" *Id.* at 126.

      Cover also describes why the "measure of reciprocity" ostensibly achieved by the

adoption of the *Morgan* standard "does not overcome the impact of *Witherspoon* and

*Witt*." Cover, *supra*, at 122. For example, judges more readily dismiss "automatic-life"

jurors than they do "automatic-death" jurors. *Id.; see* John Holdridge, *Selecting Capital

Jurors Uncommonly Willing to Condemn a Man to Die: Lower Courts' Contradictory

Readings of Wainwright v. Witt and Morgan v. Illinois*, 19 Miss. C. L. Rev. 283, 290

(1999) (explaining that lower courts apply inconsistent standards to challenges for cause

and "have been extraordinarily resistant to allowing the defense to challenge for cause

prospective jurors whose ability to fairly consider a life sentence is substantially

impaired").

      Finally, there is also "strong empirical evidence" that a large number of *Morgan*-

excludable jurors are not removed through death qualification. Cover*, supra*, at 122.

Cover states, "There is widespread agreement that the cumulative impact of *Witherspoon*

proceedings—even as moderated by *Morgan*—is to yield juries more death-prone than

the communities from which their members are drawn." *Id.* at 122-23; *see also* Marla

Sandys & Adam Trahan, *Life Qualification, Automatic Death Penalty Voter Status, and Juror Decision Making in Capital Cases*, 29 Just. Sys. J. 385, 387-89 (2008) (a study using CJP data, finding that "a general *Morgan*-type life qualification question" misidentified as non-ADPs jurors who were in fact ADPs, and estimating that, at minimum, 19.2% of the Kentucky capital jurors they interviewed should have been excluded); William J. Bowers & Wanda D. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 Crim. L. Bull. 51, 62 (2003) (hereinafter Bowers & Foglia, *Still Singularly Agonizing*) (finding that "many of the jurors who survived death qualification and decided capital cases should have been excluded as [automatic death penalty] jurors"); Ronald C. Dillehay & Marla R. Sandys, *Life under* Wainwright v. Witt*: Juror Dispositions and Death Qualification*, 20 Law & Hum. Beh. 147, 153, 159 (1996) (a study of individuals who had prior felony jury experience in Kentucky, finding that 28.2% of those who would be seated when *Witt* is the standard would in fact automatically impose the death penalty).

### 2. Death qualification precludes juries from serving as an objective indicator of the evolving standards of decency under the Eighth Amendment because the process disproportionately excludes African-Americans and women.

As demonstrated above, death qualification further precludes jury verdicts from reflecting community values because the procedure disproportionately excludes African-Americans and women based upon their opposition to capital punishment. Mr. Bowers notes here that while disqualification of jurors under the *Morgan* standard removes more

Whites than Blacks, it does not alleviate the disproportionate exclusion of African-American prospective jurors. *See, e.g.*, Cover, *supra*, at 140 (finding that the removal of jurors under *Morgan* only "slightly reduced the racially disparate impact" of death qualification).

To represent the "conscience of the community," a jury must be representative of all societal values. *Witherspoon*, 391 U.S. at 519. The Court assesses whether the death penalty is "regarded as unacceptable in our society" by using jury determinations as a measure of "social consensus." *Kennedy*, 554 U.S. at 433. However, death qualification disproportionately excludes African-Americans and women. The process is unconstitutional because it precludes a significant portion of the population from taking part in the "constitutional conversation." *See* Cover, *supra*, at 149.

## CONCLUSION

For the reasons set forth above, Mr. Bowers moves this Court for an order prohibiting the death qualification of his jury on the grounds that it contravenes the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Respectfully submitted,

*/s/ Judy Clarke*
Judy Clarke
Clarke Johnston Thorp & Rice, PC

*/s/ Michael N. Burt*
Michael N. Burt
Law Offices of Michael Burt, PC

75

*/s/ Michael J. Novara*
Michael J. Novara
First Assistant Federal Public Defender

*/s/ Elisa A. Long*
Elisa A. Long
Supervisory Assistant Federal Public Defender