IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                          ) | Criminal No. 18-292 |
| ) | |
| ROBERT BOWERS          ) | |

**MOTION TO STAY THE PROCEEDINGS PENDING THE SELECTION OF A PETIT JURY IN CONFORMITY WITH THE CONSTITUTION AND THE JURY SELECTION AND SERVICE ACT, AND REQUEST FOR AN EVIDENTIARY HEARING**

Defendant Robert Bowers, through counsel, moves the Court for an Order staying the proceedings in this case on the following grounds: (1) the Clerk of Court exceeded her authority in *de facto* amending the March 2, 2020, Plan of the United States District Court for the Western District of Pennsylvania for the Random Selection of Grand and Petit Jurors ("Jury Plan"), violating the procedural requirements of the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 et seq. ("JSSA"); (2) the Clerk of Court's implementation of section 9 of the Jury Plan, in failing to draw at random the name of another resident to replace undeliverables, non-completions, and non-responses, violates Mr. Bowers' rights under the Sixth Amendment and JSSA to a trial by a petit jury that has been selected from a fair cross section of the community; and (3) the Jury Plan's reliance on voter registration lists as the sole source list violates Mr. Bowers' rights under the Sixth Amendment and JSSA to a trial by a petit jury that has been selected from a fair cross section of the community.

1

Previously, on December 6, 2021, the defense sought dismissal of the superseding indictment or a stay of the proceedings based on challenges to the jury selection process. On April 5, 2022, this Court denied the motion but ruled that "[t]o the extent . . . Defendant makes arguments that depend on as yet unknown statistics or other facts specific to the eventual petit jury selection in this case, his motion remains premature and is denied as such." ECF 714 at 4 n.2. The defense moved for production of additional records, which this Court granted, relevant to the Clerk's implementation of the Jury Plan. *See* ECF 708, 837 (Court Orders directing Clerk of Court to produce additional records and information).[1]

Below, the defense makes arguments based on data and information concerning the Clerk's implementation of the Jury Plan, data and information unknown to the defense at the time it filed its original motion. Based on the violations of the JSSA and Sixth Amendment, the defense moves to stay the proceedings until the implementation of the Jury Plan is in compliance with the statute and the Constitution. The defense requests an evidentiary hearing in connection with this motion. In support of this motion, the defense submits the declarations of Jeffrey Martin (Exh. A) ("Martin Dec.") and Dr. John Weeks (Exh. B) ("Weeks Dec.").

**I.     The Clerk of Court exceeded her authority in *de facto* amending the Jury Plan, violating the procedural requirements of the JSSA.**

---

[1] This Court granted defense requests and joint requests for additional jury records from the Clerk of Court. *See* ECF 708, 808, 832. The Clerk provided notice on December 1, 2022, that it had produced records responsive to the Court's Order, *see* ECF 837, concerning the latest defense request for records.

In at least one way, the Clerk of Court did not comply with the District's Jury Plan, in effect amending the Jury Plan.

First, for each person who failed to complete or respond to the juror qualification questionnaire within 21 days of the date of mailing, the Clerk failed to "draw at random, the name of a resident whose address is in the same zip code to which this original juror qualification mailing had been sent." Jury Plan at § 9.

On December 8, 2022, the defense sent the Clerk the following request for information about data for those mailings for which the Clerk did not receive any response:

> With respect to section v of the Court's order, "Provide the Participant Number for persons on the Master Jury Wheel who were replaced and the Participant Number for the person who replaced the original juror qualification mailing," ECF 837, the Clerk's Office stated that "Information responsive to this paragraph is reflected in the attached Excel spreadsheets." The information in Excel spreadsheet pertains to the juror qualification mailings that were returned as "undeliverable," however, the spreadsheet does not contain information about the mailings that were not responded to. Would you please provide this information to the parties?

Exhibit C (Email to Clerk of Court, dated December 8, 2022). On December 15, 2022, the Clerk responded, asserting that the Jury Plan gave her the authority to choose the category—undeliverables, non-completions, or non-responses—from which to draw at random the name of another resident:

> All information responsive to Paragraph (v) of Court Order #837 was provided to counsel on December 1, 2022. I have reattached the applicable Excel file (named "Substituted Undeliverables Reports"). As you correctly note, this Excel file does not contain information about "mailings that were not responded to." Information about such mailings, identified with the status "Questionnaire Issued," see Clerk of Court's August 21, 2021 Answers document, attached, at p. 3, can be found in the Excel files, attached,

3

that were produced on March 16, 2022 and October 21, 2022 (named "Combined [Item] 5, 6, 7 Spreadsheet").  The Court's Jury Plan does not mandate that "mailings that were not responded to" be replaced. Jury Plan, Sec. 9, at p. 8 ("…for each juror qualification mailing returned by the Post Office as undeliverable and/or for each person who fails to complete and/or respond to the juror qualification questionnaire within 21 days of the date of mailing, the Clerk shall draw at random, the name of a resident whose address is in the same zip code to which this original juror qualification mailing had been sent.")

Exhibit D (Email from Clerk of Court, dated December 15, 2022). The data indicates, and the Clerk confirms, that the Clerk chose to draw a name only for each undeliverable.[2] To support her interpretation of the Jury Plan, the Clerk relies on the following sentence in the Plan:

> Additionally, for each juror qualification mailing returned by the Post Office as undeliverable and/or for each person who fails to complete and/or respond to the juror qualification questionnaire within 21 days of the date of mailing, the Clerk shall draw at random, the name of a resident whose address is in the same zip code to which this original juror qualification mailing had been sent.

Jury Plan at § 9.

The Clerk appears to interpret "and/or" to mean she can choose to draw the name of another resident for either undeliverables or non-completions[3] or non-responses, at her discretion. The Clerk ignores, however, the directive that "the Clerk **shall** draw at random . . . ." Taken together, rather than vest in the Clerk the authority to choose, the Jury Plan

---

[2] But even with respect to undeliverables, the Clerk failed to account for more than 8% of undeliverables, further exacerbating the underrepresentation of Black persons, as shown below and in section II: "The data reflects that there were 2,997 persons marked as 'Undeliverable as Addressed' in the Pittsburgh Division.  2,751 of the 2,997 or 91.79% were replaced with another qualification form to a person in the same zip code as the original qualification form." Martin Dec. at ¶ 32.

[3] From the data, it is not clear how the Clerk categorized non-completions ("each person who fails to complete," *see* Jury Plan at § 9).

directs that whether the juror qualification form is returned as undeliverable or is not completed or is not responded to, the Clerk **shall** draw at random the name of another resident. This interpretation is supported by the plain meaning of the language of the Jury Plan, as well as the intent of the amendment to the Jury Plan.

> In discussing the development of the 2020 Jury Plan, Chief Judge Hornak noted:
>
> The only substantive changes are found in Section 9 and reflect the way additional jurors are selected when a prospective juror fails to respond to [the WDPA's] jury qualification questionnaire. Notably, the drawing of additional names in the same zip code is a process that we understand has been successfully employed by the [USDCT EDPA].[4]

Chief Judge Hornak contemplated that the Plan directed the Clerk to draw additional names for non-completions and non-responses rather than vesting in the Clerk the authority to choose to ignore these categories and elect to comply with the Plan as to only the undeliverables.  Chief Judge Hornak additionally noted the modest changes in the 2020 Jury Plan "as 'incremental' in the sense that mechanisms for jury pool selection will remain under review by our Court over time, **with a focus on incorporating 'best practices' in assuring that our Plan allows for broad participation in federal jury service**."[5]  The plain meaning and the intent of the amendment establish that the 2020 Jury Plan directed the Clerk's Office to draw additional names whether it received non-responses, non-completions, or undeliverables, a process that "allows for broad

---

[4] On April 2, 2021, the Court ordered the Clerk to "produce for inspection by counsel all records, papers, or other documents, if any, explaining the reasoning behind the amendment of Section 9 of the [Jury Plan] . . . ." ECF 442. The quotations from these materials are from undersigned counsel's notes taken during the inspection.
[5] *See* n. 5 (emphasis added).

participation in federal jury service." By restricting, for no apparent reason, the drawing of additional names only for undeliverables, the Clerk is subverting this Court's intent to incorporating "best practices" and "assuring . . . broad participation in federal jury service."

In addition to amending the Jury Plan by failing to draw replacements for non-responses and non-completions, it is unclear from the data provided whether the Clerk also amended the Plan by failing to send paper copies of the juror qualification questionnaire to those who did not respond to the initial postcard mailing. In a change from the procedures applicable to the previous Master Jury Wheel, the Jury Plan requires that the Clerk "prepare and have mailed to every person whose name is so drawn, a postcard directing that person to complete a juror qualification questionnaire form . . . through the Court's internet website within ten days." Jury Plan at § 9. For any person who fails to respond to this initial postcard by completing the form through the Court's internet website, the Jury Plan requires the clerk to mail a "paper version of the juror qualification questionnaire form" to that person. *Id.* The data the Clerk produced does not indicate whether the Clerk complied with this provision by mailing a paper version of the form to those individuals who failed to respond to the initial postcard directing them to complete the form through the Court's internet website.[6]

Section 1863 outlines the process for a district court to develop, obtain approval for, and implement a written plan for random selection of grand and petit jurors. *See* 28

---

[6] Counsel will follow up with the Clerk of Court to confirm whether data exists to confirm compliance with this provision.

U.S.C. § 1863(a)–(d). After the "reviewing panel" approves the plan, the plan "shall be placed into operation . . . ." 28 U.S.C. § 1863(a). The Jury Plan for this District directs that the "Clerk of the Court shall manage the jury selection process . . . ." Jury Plan at § 4.

The Plan allows the Clerk to manage the jury selection process, not to amend it. Here, the Clerk in effect amended the Jury Plan by ignoring the changes that had been approved in accord with the procedural mechanisms outlined in the JSSA. The Clerk's failure to comply with the Plan was **not** a "minor adjustment of administration on a matter left unaddressed by the existing plan." *In re United States*, 426 F.3d 1, 7 (1st Cir. 2005). Rather, in failing to draw, at random, the name of another resident for each person who did not complete or respond to the juror qualification questionnaire, the Clerk effectively struck the language from the Plan requiring her to do so.[7] As a result, in at least one way, the Clerk diminished, with "consequential" effect, "the bases for a new draw," and the Clerk's action therefore "amounts to a *de facto* amendment*"* of the Jury Plan. *Id.* Regardless of the rationale, any amendment with "consequential" effect, cannot "escape the statute's procedural requirements." *Id.*

The Clerk's *de facto* amendment(s) to the Jury Plan consequentially diminished the representation of Black residents on the qualified jury wheel. As presently structured, the Qualified Jury Wheel is 4.18% African-American. Martin Dec. at ¶ 22; Weeks Dec. at

---

[7] If the Clerk also failed to mail a paper version of the form to those individuals who did not respond to the initial postcard, the Clerk similarly amended the Plan without authority, effectively striking language from the Plan.

¶¶ 7, 14. Even this is a statistically significant underrepresentation of African-Americans who are eligible for jury service. Martin Dec. at ¶ 27; Weeks Dec at ¶¶ 7, 14. Compared to the previous jury plan for the District, the Jury Plan as implemented by the Clerk provided for replacement forms to be mailed to another resident drawn at random to replace the forms for those persons for whom the mailing was returned as undeliverable. According to Mr. Martin, due to this change, the replacement of undeliverables, the "replacements resulted in an additional 942 qualified persons and a reduction in the under-representation of Black or African-American persons." Martin Dec. at ¶ 34. The replacement of undeliverables increased the percentage of African-Americans in the qualified jury pool from 4.07% to 4.18%.[8]

    Mr. Martin notes that there were "6,994 juror qualification forms for which no response was received or more than twice the number" of the undeliverable forms. Martin Dec. at ¶ 35. Extrapolating from the data for the undeliverables, "[a]ssuming the same response rate and qualification rate as the replacement of undeliverable juror qualification forms (32.25%)[,] there would have been an additional 2,256 qualified persons if there was replacement of juror qualification forms for which no response was received." Martin Dec. at ¶ 36. The replacement of non-responses would reduce the

---

[8] As noted above, the Clerk chose to draw at random replacements only for those forms returned as undeliverable but even then did not do so for all forms returned as undeliverable. The Clerk replaced "2,751 of the 2,997 or 91.79%" of the undeliverable forms. Had the Clerk replaced all undeliverable forms, the percentage African-American in the qualified jury pool would be even more improved.

underrepresentation of African-American persons in the Qualified Jury Pool. Martin Dec. at ¶ 37.

Dr. Weeks reaches the same conclusion as Mr. Martin. Looking at data by county, Mr. Weeks determined that "there was a very high correlation of 0.66 (in which 0.00 is no correlation and 1.00 is a perfect correlation) between the percent Black in a county and the percent of non-responses." Weeks Dec. at ¶ 17. Dr. Weeks observes that the "very clear and obvious conclusion to be drawn from this analysis of the 2020 Qualified Wheel data" is that replacing the non-responses "will almost certainly increase the percentage of Blacks in the jury pools of the Pittsburgh Division." Weeks Dec. at ¶ 20.

Mr. Martin also notes that with the change to a postcard for the initial mailing, the rate of undeliverable qualification forms has increased as has the percentage of non-responses. Martin Dec. at ¶¶ 40- 43. Extrapolating from the data, Mr. Martin concludes that the change to a postcard for the initial mailing disproportionately affects African-American persons. Martin Dec. at ¶¶ 44, 45. That is, more of the postcards are undeliverable or not responded to overall, and the undeliverables and non-responses are disproportionately African-American. Martin Dec. at ¶¶ 44, 45.

There are many reasons why the District's change to a postcard for the initial mailing increases the percentages of undeliverables and non-responses. The postcard is small and thin, and while the postal delivery person might endeavor to place each postcard in each mailbox, due to the small size of the postcard, it is likely that at least some of the postcards are not delivered. *See* Exhibit E (sample postcard taken from District's website). Additionally, the postcard offers only one option: complete the

questionnaire online. It is well established that economically disadvantaged communities, which are often communities with a higher percentage of Black residents, have less access to the internet. *See, e.g.*, Report on Digital Equity, *Neighborhood Allies*, available https://reports.mysidewalk.com/8f04ba646b (citing U.S. Census Bureau data from 2017–2021 regarding internet access amongst households in Allegheny County, Pennsylvania and noting that 10.4% of households do not have internet access); Julia Felton, "Pittsburgh, Allegheny County Officials Push to Close Digital Divide," The Tribune-Review (Sept. 28, 2022), available at https://www.govtech.com/network/pittsburgh-allegheny-county-officials-vow-to-close-digital-divide (noting that "[a]bout 30% of the region's senior citizens do not have broadband access, and about 30% of households making under $20,000 a year also lack Internet access in their homes"). Finally, the postcard does not provide a phone number to call for those who do not have internet access or for those who may have technical or other questions regarding the questionnaire. Regardless of the reasons why, the facts are that the data indicates that the change to a postcard for the initial mailing has had a net negative effect on the percentage of African-Americans in the qualified jury pool.

Taken together, the data establishes that, in failing to draw, at random, the name of another resident for each person who did not complete or respond to the juror qualification questionnaire, the Clerk consequentially diminished the percentage of African-Americans in the qualified jury pool.[9] Without authority, the Clerk amended the

---

[9] To the extent that the Clerk also failed to mail a paper version of the juror qualification questionnaire form to any person who did not respond to the initial postcard, the data similarly

Jury Plan in at least one way with "consequential effect," causing a statistically significant reduction in the percentage of African-Americans in the Qualified Jury Wheel. *In re United States*, 426 F.3d at 7. Because the Clerk's amendment of the Jury Plan violates the JSSA, the Court should stay the proceedings until the Qualified Jury Wheel is selected in compliance with the Jury Plan.

> II. **As a consequence of the Clerk of Court's implementation of the Jury Plan, the qualified jury pool was not selected at random from a fair cross-section of the community and, therefore, the selection process violated the Sixth Amendment to the U.S. Constitution and substantially failed to comply with the JSSA.**

"The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314 (2010). "[J]ury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Duren v. Missouri*, 439 U.S. 357, 363–64 (1979) (quoting *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)). Mr. Bowers "has the burden to establish a violation of his fair-cross section rights by identifying (1) 'a 'distinctive' group in the community' (2) that was 'not fair[ly] and reasonab[ly]' represented among potential jurors compared with its representation in the community (3) because of 'systematic exclusion of the group in the jury-selection process.'" *United States v. Savage*, 970 F.3d 217, 254 (3d Cir. 2020) (quoting *Duren*, 439 U.S. at 364).

---

suggests that any failure to send the paper form, at a minimum, would have exacerbated the negative effects of the Jury Plan's change to a postcard for the initial mailing.

Mr. Bowers meets the first prong of this test. *See Savage*, 970 F.3d at 255 ("We routinely recognize that Blacks qualify as a distinctive group."); *United States v. Weaver*, 267 F.3d 231, 240 (3d Cir. 2001) ("African–Americans and Hispanics are 'distinctive' groups for the purposes of a fair cross-section analysis.").

With respect to the second prong, the statistical analyses by Mr. Martin and Dr. Weeks demonstrate that, as a consequence of the Clerk's implementation of the Jury Plan, African-Americans are not fairly and reasonably represented among potential jurors as compared with their representation in the community. African-Americans comprised 6.86% of the jury eligible population in the Pittsburgh Division in 2021. Martin Dec. at ¶ 27; Weeks Dec. at ¶ 7. Though the Clerk's replacement of undeliverables arguably made a minor improvement, still, there is a statistically significant disparity in the representation of African-Americans in the Qualified Jury Wheel as compared to the percentage of African-Americans in the jury eligible population. Martin Dec. at ¶ 34; Weeks Dec. at ¶ 7. While the absolute and comparative disparities noted are within the range this Court, and other courts, have found acceptable, the focus ought to be on whether the disparity is statistically significant. Under the rubric this Court applied in its previous Order denying the first defense motion challenging the jury selection process, *see* ECF 714, for relatively small populations such as is applicable here, where the percentage of jury eligible African-Americans is only 6.86%, the absolute disparity will never rise to a level sufficient to raise a fair cross section claim. However, the fact that the disparity is statistically significant is what matters. The statistically significant disparity documented by Mr. Martin and Dr. Weeks—over 14 standard deviations from

12

the percentage of African-Americans in the jury eligible population—is sufficient to meet the second prong of the *Duren* test. *See Segar v. Smith*, 738 F.2d 1249, 1262 (D.C. Cir. 1984) ("[A] standard deviation level higher than three indicates that the odds are less than one in a thousand that an observed result could have occurred by chance . . . . A study is generally considered to be statistically significant when the odds that the result occurred by chance are at best one in 20."); *Boyle v. City of Philadelphia*, 476 F. Supp. 3d 101, 109 (E.D. Pa. 2020) (citing *Stagi v. National R.R. Passenger Corp.*, 391 Fed. Appx. 133, 140 (3d Cir. 2010) ("With regard to the first approach, the Third Circuit has affirmed that 'a finding of statistical significance with a probability level at or below 0.05, or at 2 to 3 standard deviations or greater, will typically be sufficient' to establish statistical significance").

As to prong three of the *Duren* test—systematic exclusion of the group in the jury-selection process—"a defendant may establish an exclusionary process by identifying a large discrepancy over time such that the system must be said to bring about the underrepresentation." *United States v. Savage*, 970 F.3d at 259 (internal quotation omitted). Here, the defense incorporates the previously-filed declarations of Mr. Martin and Dr. Weeks. ECF 650-2 and 650-3. In those declarations, Mr. Martin and Dr. Weeks demonstrate that statistically significant disparities persist over time with respect to the number of African-Americans in the Qualified Jury Wheel of the Pittsburgh Division. And that statistically significant disparity continues with the updated October 2022 data. The Clerk was required to reduce, but has not reduced, the disparity by taking the relatively simple steps of (i) drawing replacement names for **all** undeliverables, instead of

failing to replace more than 8% of undeliverables, *see supra* n.4, and (ii) drawing replacement names for non-responses and non-completions.[1] The Clerk's use of a postcard for the initial mailing (or what may be the only mailing) has increased the percentage of undeliverables and non-responses, which disproportionately affect African-Americans and ultimately reduced the percentage of African-Americans in the Qualified Jury Wheel. The use of the postcard, and the failure to replace all of the undeliverables and none of the non-responses and non-completions, are further evidence that the exclusion of African-Americans from the Qualified Jury Wheel is systematic.

The defense has thus established systematic exclusion, meeting all three prongs of the *Duren* test. The Court, therefore, should stay the proceedings until the selection process conforms to the fair cross section requirements of the Sixth Amendment.

For the same reasons outlined above, Mr. Bowers asserts a fair cross section claim under the JSSA and requests a stay of the proceedings. Fair cross section claims under the JSSA "are analyzed using the same standard as a Sixth Amendment fair cross section claim." *Weaver*, 267 F. 3d at 231. Because Mr. Bowers has established a constitutional fair cross section claim he has necessarily established a violation of the fair cross section requirement of the JSSA.

> **III.** **The Jury Plan's reliance on voter registration lists as the sole source list violates Mr. Bowers' rights under the Sixth Amendment and JSSA to a trial by a petit jury that has been selected from a fair cross section of the community**

Previously, Mr. Bowers raised statutory and constitutional fair cross section claims based on the use of voter registration lists as the sole source list in this Court's Jury Plans.

ECF 650 at 58–147. He noted then that "such a claim cannot be sustained by presenting statistical information from one qualified jury wheel." *Id.* at 60. The defense renews and incorporates here the arguments previously made and the exhibits previously submitted. *See* ECF 650 at 58–147 and ECF 650-1–650-14. The defense supplements the argument with the updated October 2022 data provided by the Clerk of Court and the analysis of that data by Mr. Martin. The analysis of the updated data establishes that the choice of the voter registration list as the source of jurors decreased the percentage of African-American eligible jurors by 2.16%, resulting in a statistically significant 119 standard deviations from the population value in a normal distribution. Martin Dec. at ¶¶ 27, 29. Mr. Martin concludes that "the largest single systematic factor in the underrepresentation of Black or African-American persons is the selection of the voter registration list as the sole source of names." Martin Dec. at ¶ 7. Combined with the data previously presented, *see* ECF 650 at 58–147 and ECF 650-1–650-14, the new, updated October 2022 data only strengthens Mr. Bowers' argument that the use of voter registration lists as the sole source list in this Court's Jury Plans violates the fair cross section requirements of the Sixth Amendment and the JSSA. For these reasons, the Court should stay the proceedings until the Jury Plan is in conformity with constitutional and statutory fair cross sections requirements.

### IV.   Mr. Bowers is entitled to an evidentiary hearing.

For jury challenge claims arising under the Constitution, the law has long been settled that upon the proper raising of such a challenge, a defendant is entitled to an evidentiary hearing to prove the merits of his challenge. *See Coleman v. Alabama*, 377

U.S. 129, 133 (1964) (the federal constitutional right against the systematic exclusion of classes of citizens from the grand jury implies an ancillary right to fair opportunities to discover and prove systematic exclusion claims); *Dow v. U.S. Steel Corp.*, 195 F.2d 478, 480 (3d Cir. 1952) ("We think that the [constitutional jury selection] issues raised by the plaintiff's counsel are such that he should be entitled to present evidence on the point."). *See also Willis v. Zant*, 720 F.2d 1212, 1216–17 (11th Cir. 1983) (vacating the denial of habeas relief on a fair cross-section claim and remanding the claim to the district court for an evidentiary hearing; petitioner "claims that young adults constituted a distinct group" and he is "entitled to a chance to prove his claim" because "[w]hether or not a class of persons is a sufficiently distinct and cognizable for sixth amendment fair cross-section analysis is a question of fact") (citing *Hernandez v. Texas*, 347 U.S. 475, 478 (1954) ("[W]hether such a group exists within the community is a question of fact."); *Mobley v. United States*, 379 F.2d 768, 773–74 (5th Cir. 1967) ("A further supplemental hearing should be held by the court on the question of systematic exclusion, and in order that the record may be complete, we direct that all evidence heretofore taken on the subject be considered together with such additional evidence as both parties may present and as may be found relevant by the trial court under standards articulated and announced in our recent *en banc* decisions on the subject. In view of the constitutional importance of this matter, the hearing to be held ought to be as broad as that permitted in a post-conviction Section 2255 proceeding.").

For claims arising under the JSSA, 28 U.S.C. § 1867(d) provides:

> Upon motion filed under subsection (a), (b), or (c) of this section, containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title, the moving party shall be entitled to present in support of such motion the testimony of the jury commission or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, and any other relevant evidence.

"The legislative history makes clear that this requirement was considered independently important as a means for discouraging spurious challenges filed for dilatory purposes." *United States v. Kennedy*, 548 F.2d 608, 613 (5th Cir. 1977). In the Third Circuit, the requirement is subject to exception. *See United States v. Calabrese*, 942 F.2d 218, 222 (3d Cir. 1991) (section is subject to "an exception for undisputed facts, sufficient to provide a basis for the district court's decision").

Here, Mr. Bowers' motion is not spurious. It is supported by sworn statements of facts of two qualified experts, which, if true, would constitute a substantial failure to comply with the JSSA; it is based in part on facts which should be undisputed; and it is not being filed for dilatory purposes. Both the letter and spirit of this section have been complied with, and Mr. Bowers is entitled to an evidentiary hearing to prove his JSSA claims independent of his right to a hearing to prove his constitutional claims.

Respectfully submitted,

*/s/ Judy Clarke*
Judy Clarke
Clarke Johnston Thorp & Rice, PC

*/s/ Michael N. Burt*
Michael N. Burt
Law Office of Michael Burt, PC

*/s/ Michael J. Novara*
Michael J. Novara
First Assistant Federal Public Defender

*/s/ Elisa A. Long*
Elisa A. Long
Supervisory Assistant Federal Public Defender