**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-292 |
| | ) | |
| ROBERT BOWERS | ) | |

## OPINION

Robert J. Colville, United States District Judge

### I.   Background

Before the Court is the Motion to Stay the Proceedings Pending the Selection of a Petit Jury in Conformity with the Constitution and the Jury Selection and Service Act, and Request for an Evidentiary Hearing ("Motion to Stay") (ECF No. 916) filed by Defendant Robert Bowers. Defendant asserts that the Clerk of Court for the Western District of Pennsylvania has violated certain procedural requirements of the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 et seq., ("JSSA") by purportedly de facto amending the March 2, 2020 Plan of the United States District Court for the Western District of Pennsylvania for the Random Selection of Grand and Petit Jurors ("Jury Plan").   Defendant further asserts that the Clerk of Court's implementation of the Jury Plan, as well as the Jury Plan's reliance on voter registration lists as the sole source list, violates Defendant's rights under the Sixth Amendment and the JSSA to a trial by a petit jury that has been selected from a fair cross section of the community.  Mot. 1, ECF No. 916.  Defendant requests that this Court stay the proceedings in this matter in light of these purported violations. The Government filed its Response in Opposition (ECF No. 946) to the Motion to Stay on February 1, 2023, and Defendant filed a Reply (ECF No. 954) on February 8, 2023.  The Motion to Stay has been fully briefed and is ripe for consideration.  For the reasons that follow, the Court will deny the Motion to Stay.

1

Initially, the Court notes that it previously rejected constitutional and statutory challenges raised by the Defendant to the Western District's implementation of its Jury Plan with respect to the 2016 source list, the 2016 master jury wheel, and the 2016 qualified jury wheel in denying Defendant's "Motion to Dismiss Superseding Indictment Pursuant to the Fifth, Sixth, and Eighth Amendments, the Jury Selection and Service Act, 18 U.S.C. § 243, and this Court's Supervisory Authority over Federal Criminal Procedures, or to Stay the Proceedings Pending the Selection of a New Grand Jury and a Petit Jury in Conformity with the Constitution and Jury Selection and Service Act, and Request for Evidentiary Hearing and Further Discovery" (ECF No. 650). Following that denial, the Court granted Defendant's subsequent requests for additional jury records from the Clerk of Court. *See* ECF Nos. 708, 808, 837. On December 1, 2022, the Clerk provided notice to the parties that the Clerk's Office had produced records responsive to the Court's most recent Order (ECF No. 837) requiring production of records. ECF No. 916 at 2 n.1.

Many of the arguments set forth in the Motion to Stay, which takes issue with the Western District's implementation of the Jury Plan with respect to the 2020 source list and the 2020 master and qualified jury wheels, advance materially similar or identical positions to those previously addressed by the Court in its Opinion at ECF No. 714. Accordingly, the Court's analysis and conclusions with respect to the Motion to Stay will borrow heavily from, and will, in some regards, be guided by, its Opinion at ECF No. 714, as the Court finds that Defendant fails to provide the Court with any basis to reconsider either the analysis or conclusions set forth in that Opinion.

## II.   Analysis

### A.  Western District of Pennsylvania's Jury Plan

Pursuant to the JSSA, the United States District Court for the Western District of Pennsylvania has in place a written plan for the random selection of grand and petit jurors. *See* 28

U.S.C. §1863; Jury Plan.  In the Motion to Stay, Defendant challenges the Jury Plan as it currently exists (effective March 2, 2020).  The Jury Plan applies to all three divisions of the United States District Court for the Western District of Pennsylvania (Erie, Johnstown, and Pittsburgh).  Jury Plan § 3.  The Pittsburgh Division is at issue in this case and consists of Allegheny, Armstrong, Beaver, Butler, Clarion, Fayette, Greene, Indiana, Jefferson, Lawrence, Mercer, Washington, and Westmoreland counties.  *Id.*  The Jury Plan sets forth essentially a two-step process for juror selection.  First, the district creates a master jury wheel for each of its three divisions by selecting names at random from voter registration lists for the applicable division.  *Id.* § 5 (stating that "names of grand and petit jurors selected to serve . . . shall be selected at random from the voter registration lists of all the counties within the relevant divisions").  "Voter registration lists" as used in the Jury Plan mean "the voter registration lists for a statewide primary or general election as maintained by the counties."  *Id.*  The voter registration lists are obtained electronically and exclusively from the Statewide Uniform Registry of Electors ("SURE") through the Pennsylvania Department of State.  *Id.*  The Jury Plan asserts that "(v)oter registration lists represent a fair cross section of the community in each division of the Western District of Pennsylvania."  *Id.*

After the master jury wheel is filled, names are randomly drawn from the master wheel to receive a juror qualification questionnaire.  *Id.* § 9.  The answers to this questionnaire determine whether the person responding is deemed qualified to serve as a juror.  *Id.* §§ 9-12.  The names of all persons drawn from the master jury wheel in each division, who are not disqualified, exempt, or excused pursuant to the Jury Plan, are then put into a second wheel, called the qualified jury wheel.  *Id.* § 11.  Individuals from the qualified jury wheel are then randomly selected as necessary to be summoned for service on grand or petit juries.  *Id.* § 13.  The Jury Plan provides that "[t]he master jury wheel shall be emptied and refilled every two years and refilled within four months

after a November general election." *Id.* § 8.  Similarly, "[t]he qualified wheel for each division

shall be emptied and refilled every two (2) years and within seven (7) months after a November

general election." *Id.* § 13.  Unless this Court grants Defendant's requested relief, the petit jury

will be selected from the 2020 qualified wheel in this case.[1]

The Western District's Jury Plan was amended effective March 2, 2020.  The sole

difference between the 2009 Jury Plan and the 2020 Jury Plan is the addition of the following

paragraph to the end of Section 9 in the 2020 version:

> Additionally, for each juror qualification mailing returned by the Post Office as
> undeliverable and/or for each person who fails to complete and/or respond to the
> juror qualification questionnaire within 21 days of the date of mailing, the Clerk
> shall draw at random, the name of a resident whose address is in the same zip code
> to which this original juror qualification mailing had been sent.  The Clerk shall
> then mail a paper version of the juror qualification questionnaire to that resident
> and, thereafter, follow the procedures set forth in this section of the Plan with
> respect to that new prospective juror.

ECF No. 659-1 at 289.[2]  The Motion to Stay takes issue with the Clerk's interpretation of the 2020

Jury Plan Amendment.

### B.  Fair Cross Section Claim

The Sixth Amendment entitles a criminal defendant to a trial by an impartial jury.  U.S.

Const., amend. VI.  An "important step in furthering impartiality is to draw jurors from diverse

segments of the population."  *United States v. Savage*, 970 F.3d 217, 252 (3d Cir. 2020), *cert.*

---

[1] In its Opinion at ECF No. 714, the Court noted that there was confusion as to the scope of the motion at issue in that
Opinion, and specifically whether Defendant sought to challenge both the grand and petit juries by way of that motion
and whether the same was premature.  Mot. 4 n. 2, ECF No. 714.  This Court explained:

> To the extent that the arguments Defendant raises in his current motion pertain generally to the 2020
> Jury Plan and/or petit jury selection, the Court will address them here.  To the extent, however,
> Defendant makes arguments that depend on as yet unknown statistics or other facts specific to the
> eventual petit jury selection in this case, his motion remains premature and is denied as such.

*Id*.  Defendant has obtained statistics and information related to the 2020 qualified wheel, from which the petit jury
will be chosen, and now asserts, inter alia, a challenge to that wheel.

[2] The Court shall refer to this amendment as the "2020 Jury Plan Amendment."

*denied*, 142 S. Ct. 481 (U.S. 2021).  "The Supreme Court has declared this method a constitutional guarantee by concluding that 'the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial.'"  *Id.* (quoting *Taylor v. Louisiana,* 419 U.S. 522, 528 (1975)).  The fair-cross-section requirement does not guarantee that the jury itself be "of any particular composition," but only "that 'the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.'" *United States v. Weaver*, 267 F.3d 231, 236 (3d Cir. 2001) (quoting *Taylor*, 419 U.S. at 538).

The JSSA provides a corresponding statutory framework to facilitate the selection of a representative jury.  *See* 28 U.S.C. § 1861 (stating that "all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes").  The Act tasks federal district courts "with creating jury-selection plans consistent with this fair cross-section principle." *Savage*, 970 F.3d at 252.  Such plans generally must draw potential jurors from "voter registration lists" or "lists of actual voters," but also must identify other sources "where necessary to foster the policy and protect the rights secured by" the JSSA's fair-cross-section principle.  *Id.* at 252-53 (quoting 28 U.S.C. § 1863(b)(2)).

To succeed on a constitutional or statutory "fair-cross-section" challenge, a defendant has the burden to show each of the following three elements:

> (1) "a 'distinctive' group in the community" (2) that was "not fair[ly] and reasonab[ly]" represented among potential jurors compared with its representation in the community (3) because of "systematic exclusion of the group in the jury-selection process."

*Id.* at 254 (quoting *Duren v. Missouri,* 439 U.S. 357, 364 (1979)).[3]  If a defendant makes this prima

facie showing, then the burden shifts to the government to justify "this infringement by showing

attainment of a fair cross section to be incompatible with a significant state interest." *Id.* at 254

n.31 (citations omitted).  The Court addresses each of the *Duren* factors in turn.

### 1. Distinctive Group in the Community

Defendant has identified a distinctive group in the community, specifically African-

Americans.[4]  *See Weaver*, 267 F.3d at 240 ("African–Americans and Hispanics are 'distinctive'

groups for the purposes of a fair cross-section analysis.").  Accordingly, Defendant has satisfied

the first *Duren* prong.

### 2. Unfair or Unreasonable Representation

Defendant has not established unfair or unreasonable representation of African-Americans

in the 2020 qualified wheel.  To evaluate whether a cognizable group was unfairly or unreasonably

represented among prospective jurors compared to the group's representation in the community,

courts within this district look to statistics.  *See Savage*, 970 F.3d at 255.  This analysis involves:

(1) identifying the share of the Pittsburgh division population who are part of the cognizable group;

(2) determining the share of the relevant jury wheel, pool of names, panel, or venire that consisted

of that cognizable group; and (3) employing statistical methods to evaluate any disparity between

the two shares.  *See id.*

With respect to statistical methods, courts within this circuit look at two metrics: absolute

and comparative disparity.  *See id.* at 256-59.  Absolute disparity is simply the difference between

---

[3] This test, commonly referred to as the *Duren* test, applies to both JSSA and constitutional fair-cross-section claims. *See Savage*, 970 F.2d at 254 n.32.

[4] The Court recognizes that Defendant, a white male, is not a member of the group he asserts is cognizable; however, this fact does not preclude his fair-cross-section claims.  *See Taylor v. Louisiana*, 419 U.S. 522, 526 (1975) ("[T]here is no rule that claims such as [the defendant] presents may be made only by those defendants who are members of the group excluded from jury service.").

the two statistical inputs (e.g., population percentage – percentage representation on the wheel), and comparative disparity is the quotient of the absolute disparity and the population percentage. *See id.* at 256.  Consideration of both types of disparities together is especially important when considering small population percentages because "[t]he two methods have countervailing weaknesses when it comes to evaluating the underrepresentation of a relatively small minority." *Id*.  Specifically, "absolute disparity tends to *understate* any discrepancy, while comparative disparity tends to *overstate* it." *Id.* (citing *Weaver*, 267 F.3d at 242-43).  When applied together, however, "one method can be reasonably expected to offset the shortcomings of the other." *Id.* at 257.[5]

By way of illustration, in *Savage*,[6] the Court of Appeals compared the percentage of Blacks[7] in the Eastern District population (16.82%) to the percentage of Blacks represented on the qualified jury wheel (8.37%).  These numbers reflected an absolute disparity of 8.45% (16.82% - 8.37%) and a comparative disparity of 50.24% (8.45%/16.82%).  *See id*.  Considering these two

---

[5] Although the *Savage* court reiterated the importance of considering both metrics, it noted that it nevertheless has "shown some solicitude for absolute disparity" and that absolute disparity seems to be the preferred analytical method in most cases.  *Savage*, 970 F.3d at 257-58 (quoting *Weaver*, 267 F.3d at 242).  The Court of Appeals also noted that, while absolute disparities under 10% generally do not reflect unfair representation, it has not adopted a bright-line 10% threshold.  Rather, courts within this circuit must continue to consider both absolute and comparative disparities together.  *Id*.

[6] Shortly after the grand jury returned the Superseding Indictment in this case, the Court of Appeals for the Third Circuit issued the *Savage* opinion affirming the denial of a capital defendant's fair-cross-section challenge to the Eastern District of Pennsylvania's jury selection plan.  *See Savage*, 970 F.3d 217.  Like this District, the Eastern District had "long drawn its potential jurors exclusively from voter registration lists" and its jury plan prescribed a similar process to form the jury pool.  *Id.* at 253.  Asserting his Sixth Amendment rights, the defendant in *Savage* sought to strike two panels of prospective jurors and requested that the court instead draw jurors from lists maintained by the Administrative Office of Pennsylvania Courts ("AOPC"), which supplements voter registration lists with information from other sources.  *Id.* at 253-54.  Savage's argument was denied.  *See also* ECF No. 714 at 16 n. 17 ("In *Ramseur*, the Court of Appeals rejected both a fair-cross-section and equal-protection challenge to the use in Essex County, New Jersey of a source list composed of DMV drivers license records and voter registration lists.  983 F.2d at 1229-35.").

[7] The Court of Appeals in *Savage* identified "Blacks" as the cognizable group at issue in that case.  970 F.3d at 255.  In this case, as this Court has previously noted, Defendant has primarily utilized the term African-Americans.  For purposes of consistency and clarity, the Court again adopts Defendant's terminology in this Opinion.  In so doing, the Court in no way implies a material distinction between the groups for purposes of its analysis.

disparities together in conjunction with the population percentage and relevant authority, the *Savage* court concluded that the numbers failed to prove unfair and unreasonable representation of Blacks on the Eastern District's qualified wheel.  *See id.* at 259.

In this case, Defendant's expert, Jeffrey Martin, used the 2021 American Community Survey ("ACS") 5-Year Average to calculate that the relevant jury-eligible population in the Pittsburgh Division was 6.86% African-American.  *See* ECF No. 916-2 ("Martin Aff.") ¶ 27.  The government does not contest this figure, and the Court accepts it for purposes of its analysis.  ECF No. 946 at 4.

The Court next must view this general population figure against the representation of African-Americans on the relevant jury wheel, pool of names, panel, or venire.  In *Savage*, the district court determined that it was more appropriate to assess the representation of African-Americans on the qualified jury wheel than either the master wheel or the venires assembled for the defendant's trial.  *See Savage*, 970 F.3d at 255; *United States v. Savage*, Criminal Action Nos. 07–550–03, 07–550–04, 07–550–05, 07–550–06, 2013 WL 315688, at *4 (E.D. Pa. Jan. 28, 2013), *aff'd*, 970 F.3d 217 (3d Cir. 2020).  Although the defendant had presented statistics from the venires, the district court found that "it is the master and qualified wheels from which individual jury panels are drawn that would be most demonstrative of any systemic exclusionary processes inherent in sourcing names from voter registration lists."  *Savage*, 2013 WL 315688, at *4.  The Court ultimately utilized the statistics from the qualified jury wheel because, between the two wheels, the master wheel contained more limited racial data.  *See id*.  On appeal, the Court of Appeals did not revisit this issue because Savage did not contest the lower court's reliance on the qualified wheel.  *See Savage*, 970 F.3d at 255-56.  The Third Circuit noted, however, that

"[p]recedent reinforces that the qualified wheel is a valid option for assessing a fair-cross section claim." *Id.* at 256.

As in *Savage*, Defendant's expert in this case was able to use self-reported data to determine the composition of the 2020 qualified jury wheel. Using this self-reported information, Mr. Martin calculated that the qualified jury wheel consisted of 4.18% African-Americans. *See* Martin Aff. ¶ 27. The government does not dispute the use of this percentage, and notes that, when compared to the 2016 analysis, the relevant population of African-Americans in the community has slightly decreased from 6.88% in 2016 to 6.86% in 2020, and that African-American representation on the qualified jury wheel has increased from 3.89% in the 2016 qualified wheel to 4.18% in the 2020 qualified wheel. ECF No. 946 at 6 n.4. Comparison of the 4.18% representation in the 2020 qualified wheel to the agreed-upon population percentage of 6.86% African-American results in an absolute disparity of 2.68% and a comparative disparity of 39.04% for African-Americans. *See* Martin Aff. ¶ 26.[8] As noted by the Government, under both disparity analyses, African-American representation has increased between the 2016 and 2020 qualified jury wheels, and the current qualified wheel is therefore more reflective of the baseline population. Each of these statistics falls well within the ranges found acceptable by *Savage* and other precedents, as well as numerous additional similar cases cited favorably by the Court of Appeals. *See, e.g., Savage*, 970 F.3d at 256 (8.45% absolute disparity and 50.24% comparative disparity for African-Americans; population percentage 16.82%); *Weaver*, 267 F.3d at 241 (absolute disparities of 1.23% for African-Americans and 0.71% for Hispanics; comparative disparities of 40.01% for

---

[8] The absolute disparity number means that if the Court drew a venire of 100 people from the qualified wheel, it would expect about 3 fewer African-Americans than if the Court drew one hundred people from the voting-eligible population of the Pittsburgh Division at large. The comparative disparity figure indicates that African-Americans were approximately 40% percent less likely to appear in the qualified wheel as the Court would expect based on their share of the population. *See Savage*, 970 F.3d at 256; *Weaver*, 267 F.3d at 238 n.5; *Howell*, 939 F.3d at 268 n.7, n.8.

African-Americans and 72.98% for Hispanics; population percentage 3.07% and 0.97%, respectively); *Howell v. Superintendent Rockview SCI*, 939 F.3d 260, 268 (3d Cir. 2019) (absolute disparity of 5.83% for African-Americans; comparative disparity of 54.49%; population percentage 10.7%); *United States v. Chanthadara*, 230 F.3d 1237, 1256 (10th Cir. 2000) (absolute disparities of 3.23% for African-Americans and 1.60% for Hispanics; comparative disparities of 40.89% for African-Americans and 58.39% for Hispanics; population percentage 7.9% and 2.74%, respectively).[9]

As the Court noted in its previous opinion, the fact that relatively small population percentages are at issue in this case does not alter the Court's analysis. As set forth in *Savage*, the consideration of both absolute and comparative disparities together allows for a nuanced analysis in which each method helps offset the shortcomings of the other, especially when dealing with small population sizes. *Savage*, 970 F.3d at 256-58. Indeed, the percentages in this case are very similar to those upheld in *Weaver*, in which the court of appeals affirmed the denial of a fair cross

---

[9] To the extent Defendant reasserts his argument that a third statistical calculation – standard deviation – is nevertheless indicative of unfair representation, *see* ECF No. 916 at 13, this Court again disagrees for the same reasons set forth in *Savage*. *See Savage*, 970 F.3d at 256 n.35 ("We have also used a third metric, standard deviation, to assess the reliability of sample data . . . . But no sampling occurred here. Instead, we rely on a statistic representing the entire qualified wheel."); *see also Weaver*, 267 F.3d at 238 ("Known as 'standard deviation' analysis, this calculation is only utilized where the expert has performed an analysis based on a random sample from the voter wheel."); *Howell*, 939 F.3d at 266 n.4 ("As called for in *Weaver*, reliable data requires a standard deviation calculation if the entire population is not accounted for, which 'indicates how accurately the mean represents sample data.'"). As with his previous challenge, even considering Defendant's standard deviation calculations in this case in conjunction with the plainly acceptable absolute and comparative disparity statistics, those figures are not indicative of unfair or unreasonable representation. *See United States v. Hernandez-Estrada*, 749 F.3d 1154, 1165 (9th Cir. 2014) (noting that "statistical significance" is not equivalent to "legal significance"); *Chanthadara*, 230 F.3d at 1257 ("Standard deviations are not helpful in this case. Here, such calculations merely represent a manipulation of the same numbers that we have held were not sufficient to establish a prima facie violation of the Sixth Amendment."). Consistent with the absolute and comparative disparities, the standard deviation values have gone down from the 2016 qualified wheel to the 2020 qualified wheel (15.90 standard deviations for African-Americans on 2016 qualified wheel compared to 14.45 standard deviations on 2020 qualified wheel). ECF No. 650-2 ¶ 81; Martin Aff. ¶ 26. Defendant has not established legal significance. *See United States v. Smith*, 457 F. Supp. 3d 734, 743 (D. Alaska 2020) (stating that a "challenging party must establish not only statistical significance, but also legal significance[,]" and, where the disparities calculated under both the absolute disparity method and comparative disparity method fell within the ranges upheld by the Ninth Circuit, the defense had not demonstrated that statistical deviations of 13 and 16 standard deviations were of legal significance." (quoting *Hernandez-Estrada*, 749 F.3d 1154 at 1165)); *compare Ramseur*, 983 F.2d at 1232-33 (finding standard deviation of 28.9 to be significant).

section challenge to the Western District's Jury Plan as applied in the Erie Division. *See Weaver*, 267 F.3d at 242-43 (examining and considering both absolute and comparative disparities relating to African-American and Hispanic representation on the master jury wheel "in order to obtain the most accurate picture possible").

To the extent that Defendant again attempts to shift focus from the qualified wheel to the master wheel and the source list (i.e., the voter registration list) at large,[10] his experts' findings, even if accurate, do not demonstrate unfair or unreasonable representation of African-Americans across any of these additional categories. To the contrary, the calculated disparities again fall within well-accepted parameters.[11] Further, the Court previously rejected Defendant's argument that the use of voter registration lists as the sole source list for the Jury Plan violates the fair cross section requirements of the Sixth Amendment and the JSSA, and Defendant has renewed that argument in his Motion to Stay. ECF No. 916 at 14-15. Defendant's argument relied on statistics that are materially identical to those that this Court previously found, and by way of this Opinion again finds, fall within well-accepted parameters. *See* ECF No. 650-2 ¶ 81; Martin Aff. ¶ 27. The Court again rejects Defendant's fair cross section claim related to the use of voter registration lists as the sole source list for the Jury Plan.

For all of these reasons, the Court finds that Defendant has failed to establish unfair or unreasonable representation under the second *Duren* prong. Accordingly, Defendant cannot establish a violation of his constitutional or statutory fair-cross-section rights, and consideration

---

[10] The Court again notes that self-reported racial and ethnicity information exists only beginning with the qualified jury wheel, and, thus, the experts must turn to less reliable procedures such as geocoding to estimate the racial and ethnicity demographics of the source list and the master wheel. ECF No. 714 at 15.

[11] With respect to the voter registration source list, Mr. Martin calculated an absolute disparity of 2.16% for African-Americans; and a comparative disparity of 31.48% for African-Americans. Martin Aff. ¶ 27. As to the master wheel, Mr. Martin calculated an absolute disparity of 2.05% for African-Americans; and a comparative disparity of 29.83% for African-Americans. *Id.*

of prong three of the *Duren* test – systematic exclusion, is not warranted because, if a defendant cannot establish the second *Duren* prong, his claim fails regardless of whether the third prong is met.  *See Savage*, 970 F.3d at 259 (characterizing the prong three analysis as an "alternative" argument); *Weaver*, 267 F.3d at 244 ("While we need not reach the third prong, it merits our attention because the District Court placed some degree of reliance on this aspect.").

### C.  Additional Alleged JSSA Violations

By its terms, the JSSA provides a remedy only for "substantial failures to comply" with its provisions.  *See* 28 U.S.C. § 1867(d); *United States v. Calabrese*, 942 F.2d 218, 227 (3d Cir. 1991). In determining whether a violation is substantial, any alleged violation must "be weighed against the underlying principles of the Act," which include (1) random selection of jurors and (2) determination of disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only.  *Calabrese*, 942 F.2d at 227 (citations omitted).  "If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the petit jury, the court shall stay the proceedings pending the selection of a petit jury in conformity with this title."  *Id.* at 221 (quoting 28 U.S.C. § 1867(d)).  "The party raising the challenge need not show prejudice."  *Id.*

To the extent Defendant asserts a statutory fair-cross-section claim under the JSSA, this claim is identical to his Sixth Amendment challenge, and has already been denied as set forth more fully above.  *See Savage*, 970 F.3d at 254 n.32 (noting that the *Duren* test applies to both JSSA and Sixth Amendment fair-cross-section claims).[12]  Defendant's JSSA claim likewise is denied to

---

[12] To the extent that Defendant attempts to conflate his fair cross section challenge under the JSSA with his assertion that the Clerk's interpretation of the Jury Plan constituted a de facto amendment of that Plan that resulted in the failure of the qualified wheel to have greater representation, the Court reiterates that the fair-cross-section standard is equivalent for claims under the Sixth Amendment and the JSSA, *Savage*, 970 F.3d at 254 n.32 (citing *Weaver*, 267

the extent it faults the Clerk of Court for failing to supplement the voter registration list with

additional sources of potential jurors.  As set forth above, Defendant cannot establish that use of

the voter lists at issue resulted in the unfair underrepresentation of a cognizable group.  Moreover,

the United States Court of Appeals for the Eleventh Circuit has explained:

> Section 1863(b)(2) provides that jury plans "shall prescribe some other source or
> sources of names in addition to voter lists where necessary to foster the policy and
> protect the rights secured by sections 1861 and 1862 of this title."  This vague
> language, however, does not necessarily require that voter lists be supplemented
> when they over-or under-represent certain groups.  In fact, "[t]he circuits are 'in
> complete agreement that neither the Act nor the Constitution require that a
> supplemental source of names be added to voter lists simply because an identifiable
> group votes in a proportion lower than the rest of the population.'"  *United States
> v. Orange*, 447 F.3d 792, 800 (10th Cir.2006).

*United States v. Carmichael*, 560 F.3d 1270, 1279 (11th Cir. 2009).

Defendant also asserts that the Clerk's Office has violated several procedural provisions of

the JSSA itself by purportedly de facto amending the Jury Plan, and most specifically in failing to

properly interpret the 2020 Jury Plan Amendment.  With respect to the creation of jury plans, the

JSSA provides that a plan "shall be placed into operation after approval by a reviewing panel

consisting of the members of the judicial council of the circuit and either the chief judge of the

district whose plan is being reviewed or such other active district judge of that district as the chief

judge of the district may designate."  28 U.S.C. § 1863(a).  Defendant argues that, if the Clerk

---

F.3d at 236–37), and the Court has already found that Defendant has not established unfair or unreasonable
representation in the 2020 qualified wheel.  The Court also notes that Judge Ambrose previously explained:

> [T]he pertinent fair cross section issue is whether the challenged selection method fairly and
> reasonably represented a distinctive group among potential jurors compared with that group's
> representation in the community, not whether a "superior" selection method exists or other methods
> might be more fair.  *See Savage v. United States*, 547 F.2d 212, 214–16 (3d Cir.1976) ("The
> defendant had the right to a jury 'selected at random from a fair cross section of the community.'
> However, he had no right to be tried by a particular jury which was itself 'a fair cross section of the
> community'; nor did he have a right to a jury selected at random from the fairest cross section of
> the community." (quoting *United States v. Lewis*, 472 F.2d 252, 255 (3d Cir. 1973))).

Op. 7 n.6, ECF No. 442.

misinterpreted and misapplied the 2020 Jury Plan Amendment, the same constitutes a violation of

this provision of the JSSA.   In *Bearden*, the United States District Court for the Fifth Circuit

explained:

> In sorting out the details of statutory procedures, there is perhaps a tendency to lose
> sight of the fundamental purpose of the law.  The purpose of the Act is to prevent
> discrimination, whether it be on account of "race, color, religion, sex, national
> origin, or economic status." 28 U.S.C.A. s 1862.  Where the procedural errors made
> by those in charge of selecting juries do not raise the possibility of frustrating this
> goal, a court should be hesitant to order the drastic remedy of the dismissal of
> indictments.

*United States v. Bearden*, 659 F.2d 590, 609 (5th Cir. 1981).  Further, "'mere technical deviations

from the Act' that do not implicate this goal, even a number of them, are insufficient to warrant

relief."   *Carmichael*, 560 F.3d at 1277 (11th Cir. 2009) (quoting *United States v. Clay*, 159

F.Supp.2d 1357, 1365 (M.D. Ala. 2001).

Initially, the Court agrees with the Government, *see* ECF No. 946 at 11-12, that the

provisions added by the 2020 Jury Plan Amendment are not express requirements of the JSSA,

which is entirely silent as to the possible replacement of undeliverables and non/incomplete

responders through the process outlined in the 2020 Jury Plan Amendment and which further

provides for a largely discretionary process of addressing non/incomplete responders.  *See* 28

U.S.C. § 1864(a) ("In any case in which it appears that there is an omission, ambiguity, or error in

a form, the clerk or jury commission shall return the form with instructions to the person to make

such additions or corrections as may be necessary and to return the form to the clerk or jury

commission within ten days.  Any person who fails to return a completed juror qualification form

as instructed *may* be summoned by the clerk or jury commission forthwith to appear before the

clerk or jury commission to fill out a juror qualification form." (emphasis added)).  Accordingly,

Defendant cannot establish a substantial violation of the JSSA relying only on the express terms

of the JSSA itself with respect to procedures to be utilized respecting non/incomplete responders.

In its opinion denying Defendant's previous challenge, the Court explained:

> With respect to Defendant's statutory challenge to the 2020 Jury Plan Amendment
> adding a zip-code-based supplemental mailing protocol, the Court finds that this
> argument is largely premature.  Defendant contends that the 2020 Plan Amendment
> violates the JSSA's randomness requirement.  *See* ECF No. 650 at 120.   In
> considering challenges to jury plans based on violations of random selection,
> however, courts look to "the *Duren* test to determine if the lack of randomness
> resulted in impermissible discrimination."  *United States v. Scott*, 545 F.Supp.3d
> 152, 174 (S.D.N.Y. 2021) (citing *Bearden*, 659 F.2d at 602).  Because the 2020
> Plan Amendment post-dated the 2016 jury wheels at issue in this case, the Court is
> unable to undertake a randomness analysis based on the statistics before it.
> Moreover, the Plan Amendment is, at best, relevant only as to the eventual petit
> jury selection in this case.  As a general matter, however, the Court disagrees with
> Defendant to the extent he argues that the Amendment violates the JSSA simply
> because it may create a conflict within the Jury Plan itself.  *See* ECF No. 650 at 19
> n.10 (suggesting that the Amendment is in conflict with the Jury Plan's equal odds
> requirement).  Even assuming there is tension between these provisions, the Jury
> Plan provides that, in the case of any conflict between the Plan and the Act, the
> statutory provisions shall govern.  Jury Plan, preamble.  Moreover, the randomness
> principle does not "require statistical randomness but rather requires a system of
> selection that affords no room for impermissible discrimination against individuals
> or groups."  *Carmichael*, 560 F.3d at 1277.

ECF No. 714 at 21 n. 20.  Defendant now challenges the Clerk's interpretation of the 2020 Jury

Plan Amendment (and not the amendment itself), arguing that the manner in which the Clerk

interpreted and applied the 2020 Jury Plan Amendment violated both the Jury Plan and the JSSA.

As previously noted, the provision of the Jury Plan at issue provides:

> Additionally, for each juror qualification mailing returned by the Post Office as
> undeliverable and/or for each person who fails to complete and/or respond to the
> juror qualification questionnaire within 21 days of the date of mailing, the Clerk
> shall draw at random, the name of a resident whose address is in the same zip code
> to which this original juror qualification mailing had been sent.  The Clerk shall
> then mail a paper version of the juror qualification questionnaire to that resident
> and, thereafter, follow the procedures set forth in this section of the Plan with
> respect to that new prospective juror.

ECF 659-1 at 289.  The following email exchange demonstrates the primary issue Defendant takes with the Clerk's interpretation of this provision:

> Defense email to Clerk dated December 8, 2022:
>
> With respect to section v of the Court's order, "Provide the Participant Number for persons on the Master Jury Wheel who were replaced and the Participant Number for the person who replaced the original juror qualification mailing," ECF 837, the Clerk's Office stated that "Information responsive to this paragraph is reflected in the attached Excel spreadsheets."  The information in Excel spreadsheet pertains to the juror qualification mailings that were returned as "undeliverable," however, the spreadsheet does not contain information about the mailings that were not responded to.  Would you please provide this information to the parties?
>
> Clerk's responsive email to parties dated December 15, 2022:
>
> All information responsive to Paragraph (v) of Court Order #837 was provided to counsel on December 1, 2022.  I have reattached the applicable Excel file (named "Substituted Undeliverables Reports").  As you correctly note, this Excel file does not contain information about "mailings that were not responded to."  Information about such mailings, identified with the status "Questionnaire Issued," *see* Clerk of Court's August 21, 2021 Answers document, attached, at p. 3, can be found in the Excel files, attached, that were produced on March 16, 2022 and October 21, 2022 (named "Combined [Item] 5, 6, 7 Spreadsheet").  The Court's Jury Plan does not mandate that "mailings that were not responded to" be replaced.  Jury Plan, Sec. 9, at p. 8 ("…for each juror qualification mailing returned by the Post Office as undeliverable and/or for each person who fails to complete and/or respond to the juror qualification questionnaire within 21 days of the date of mailing, the Clerk shall draw at random, the name of a resident whose address is in the same zip code to which this original juror qualification mailing had been sent.")

ECF No. 916 at 3-4.

Defendant asserts that the Clerk's interpretation fails to comply with both the letter and purpose of the 2020 Jury Plan Amendment, and that the interpretation applied by the Clerk effectively amends the Jury Plan.  ECF No. 916 at 3.  The argument raised by Defendant turns on the Clerk's interpretation of this sentence of the 2020 Jury Plan Amendment: "Additionally, for each juror qualification mailing returned by the Post Office as undeliverable *and/or* for each person who fails to complete and/or respond to the juror qualification questionnaire within 21 days of the

16

date of mailing, the Clerk shall draw at random, the name of a resident whose address is in the same zip code to which this original juror qualification mailing had been sent." ECF 659-1 at 289 (emphasis added). For purposes of the Court's consideration of Defendant's argument, this sentence speaks to two situations the Clerk may be confronted with after sending a juror qualification mailing: (1) where a "juror qualification mailing [is] returned by the Post Office as undeliverable" ("undeliverables"); and (2) where a "person . . . fails to complete and/or respond to the juror qualification questionnaire within 21 days of the date of mailing" ("non/incomplete responders").[13]

At the core of this issue is the use of "and/or" to separate undeliverables and non/incomplete responders. Defendant asserts that the Clerk was required to interpret and apply this sentence as: "for each [undeliverable] *and* for each [non/incomplete responder], the Clerk shall draw at random, the name of a resident whose address is in the same zip code to which this original juror qualification mailing had been sent." Clearly, the Clerk interpreted the sentence, and in particular the use of "and/or" to separate undeliverables and non/incomplete responders, to provide the Clerk with discretion, and applied the sentence as follows: "for each [undeliverable] *or* for each [non/incomplete responder], *or* for both undeliverables and non/incomplete responders, the Clerk shall draw at random, the name of a resident whose address is in the same zip code to which this original juror qualification mailing had been sent." In filling the 2020 wheel, the Clerk,

---

[13] While the Court acknowledges that non-responders and incomplete responders are also arguably distinct groups of individuals, the same is immaterial to the Court's consideration herein. As the Court understands the Clerk's interpretation and Defendant's argument, the Clerk only sent out supplemental questionnaires where the first mailing was returned as undeliverable. Accordingly, the Clerk, in essence, interpreted the sentence to involve these two situations with which it might be confronted, and only sent out supplemental mailings for undeliverables. *See* Martin Aff. ¶ 33 ("Section 9 from the Jury Plan was implemented *only for juror qualification forms that were returned as undeliverable*. Juror qualification forms for which no response was received were not replaced." (emphasis added)). Thus, it is irrelevant that non-responders and incomplete responders are also arguably distinct. In any event, and as the Court will explain below, Defendant fails to establish that the Clerk de facto amended the Jury Plan and further fails to establish a substantial failure to comply with the JSSA.

presumably exercising the aforementioned discretion, elected to send supplemental mailings only with respect to undeliverables.

Defendant's Motion relies on the following statistics: 2,997 persons were marked as undeliverable, and 2,751 of these persons were replaced with another qualification form.  Martin Aff. ¶ 32.[14]  Replacement of undeliverables resulted in an increase in percentage of African-Americans in the 2020 qualified wheel from 4.07% to 4.18%.  *Id.* at ¶ 34.  Comparatively, there were 6,994 juror qualification forms for which no response was received.  *Id.* at ¶ 35.  Mr. Martin, assuming the same response and qualification rates as undeliverables, calculated that there would have been an additional 2,256 qualified individuals if there had been a replacement for non/incomplete responders, and that, utilizing a non-adjusted geocoded estimate, such replacement would have resulted in a reduction of underrepresentation of African-Americans on the 2020 qualified wheel (estimated increase in representation from 4.18% to 4.91%).  *Id.* at ¶¶ 36-37.  In his Supplemental Affidavit (ECF No. 954-1), Mr. Martin asserts that qualification forms for which no response was received constituted 16.40% of all qualification forms mailed, which is nearly 1 in 6 mailed qualification forms.  ECF No. 954-1 ¶ 14.  He further asserts:

> Using the same procedure for qualification forms for which no response was received as was used for qualification forms returned as undeliverable by the U.S. Postal Service would be estimated to reduce the percentage for which no response was received to 11.11%.  That is, a reduction in the forms mailed that did not receive a response from 1 in 6 to 1 in 9.

> The group for which no response was received is more targeted to areas with more Black or African-American persons than the group where qualification forms were returned as undeliverable.  The group for which no response was received is larger than the group where qualification forms were returned as undeliverable.

---

[14] Defendant also takes issue with the approximately 8% of undeliverables who were purportedly not replaced with another qualification form to a person in the same zip code.  ECF No. 916 at 4 n. 2.  Defendant fails to provide the Court with sufficient argument as to how the same constitutes anything more than a technical deviation, let alone a substantial violation of the JSSA.

> Because of these two factors, the reduction in the under-representation of Black or African-American persons is estimated to be larger than the reduction in the under-representation of Black or African-American persons due to the replacement of undeliverable qualification questionnaires as described in my analysis in paragraphs 35 through 37.

*Id.* at ¶¶ 15-17.

Mr. Martin further asserts that the rate of undeliverables increased from 5.83% in the previous master wheel to 7.14% in the current master wheel, and attributes the same to the Clerk's use of a postcard directing recipients to complete the juror qualification form online for the first mailing to prospective jurors. *Id.* at ¶¶ 38-41. He states that, using supplied data files, the rate of failures to respond increased from 71.08% in the previous master wheel to 76.59%, and, using information supplied by the Clerk on Form AO-12, the failure to respond rate increased from 68.03% to 77.99%. *Id.* at ¶¶ 42-43. He again attributes this change to the Clerk's utilization of a postcard for the first mailing to prospective jurors, asserting that "[t]he change to a postcard for the first mailing has increased the rate of undeliverable forms which are not all replaced and which are disproportionately sent to Black or African-American persons," and "[t]he change to a postcard for the first mailing has increased the rate of forms for which no response is received which are not replaced and which are disproportionately sent to Black or African-American persons." *Id.* at ¶¶ 44-45.

The Court notes that Defendant fails entirely to explain how the use of a postcard as an initial mailing violates the JSSA or the Jury Plan outside of an assertion that it purportedly correlates with a net negative effect on the percentage of African-Americans in the qualified jury pool. *See* ECF No. 916 at 10. Essentially, his claim regarding the Jury Plan's use of a postcard mailing is identical to his Sixth Amendment challenge, and is denied for the reasons discussed above.

Turning to the "and/or" interpretation at issue, the Court notes that, in terms of looking only to the plain language of the provision at issue,[15] the Clerk's interpretation is the more supportable of the two interpretations.[16]  The use of "and/or" would be largely meaningless were Defendant correct that the term must be interpreted to mean only "and."  Again, when looking to the plain language of the 2020 Jury Plan Amendment, the Clerk's interpretation of the sentence to give her the choice either to: (1) send a supplemental mailing with respect to both undeliverables and non/incomplete responders; or (2) send a supplemental mailing with respect to either undeliverables or non/incomplete responders, but not both, is a more supportable interpretation of the provision at issue.[17]  The Court acknowledges, as it must, that, under the Clerk's interpretation,

---

[15] "It is axiomatic that when interpreting a statute, Courts should first look to the statutory language and whenever possible give that language its plain meaning."  *EH Yacht, LLC v. Egg Harbor, LLC*, 84 F. Supp. 2d 556, 566 (D.N.J. 2000)

[16] *Fraunhofer-Gesellschaft Zur Forderung Der Angewandten Forschung E.V. v. Sirius XM Radio Inc.*, No. CV 17-184-JFB-SRF, 2020 WL 549801, at *5 (D. Del. Feb. 4, 2020*), report and recommendation adopted sub nom. Fraunhofer-Gesellschaft Zur Forderung der Angewandten Forschung E.V. v. Sirius XM Radio Inc.*, No. 1:17CV184, 2020 WL 1969508 (D. Del. Apr. 24, 2020) ("The specification's repeated references to 'time and/or space diversity' illustrate the patentee's intention to leave open the option of claiming either time diversity or space diversity, without an absolute requirement that both be present.   In accordance with the ordinary meaning of 'and/or,' the specification provides that the channels may allow: (1) time diversity, (2) space diversity, or (3) time and space diversity." (citation omitted)); *see also LG Elecs., Inc. v. Quanta Computer Inc.*, No. 07-CV-361-BBC, 2008 WL 4613054, at *10 (W.D. Wis. Mar. 4, 2008) ("Believe it or not, the dispute is over the meaning of 'and/or.'  Plaintiff concedes that ordinarily the '/' in 'and/or' is a symbol for 'or' so that 'and/or' means 'and *or* or.'  In other words, 'and/or' means *either* of the two options is possible or *both* options are possible, which is consistent with defendants' proposed construction.  Under plaintiff's bizarre proposed construction, the term does not mean 'either' or 'both'; it can be both, but it cannot be either.  If it is not both, plaintiff says, it must be the first option only.").

[17] The Court also notes that undeliverables and non/incomplete responders are also noticeably distinct from one another in terms of how they can be addressed by the Clerk's Office.  Section 9 of the Jury Plan provides the Clerk with two options when confronted with an incomplete response or no response.  Per the 2020 Jury Plan Amendment, the Clerk may send a juror qualification mailing to another individual in the same zip code.  Section 9 also provides:

> A paper version of the juror qualification questionnaire form will be mailed to any person who fails to respond to the initial juror qualification mailing as instructed.  If a person fails to complete and/or respond to this second juror qualification questionnaire within 21 days of the date of mailing, such person may be summoned by the Clerk to appear and fill out such form.  Any such person who fails to appear as directed, or who appears to have willfully misrepresented a material fact on any such form to avoid service as a juror, may be ordered by the Court to appear and explain his/her failure to appear or his/her alleged misrepresentation(s).

she also had the discretion to send a supplemental mailing with respect to *both* undeliverables *and* non/incomplete responders, and further acknowledges Defendant's citation to defense counsel's notes from their inspection of all records, papers, or other documents explaining the reasoning behind the 2020 Jury Plan Amendment, *see* ECF No. 916 at 5-6.  While acknowledging the same, the Court finds that the Clerk's interpretation of the plain language of the 2020 Jury Plan Amendment is both reasonable and grammatically correct, and that it does not amend or violate the Jury Plan.  Accordingly, Defendant has not established that the Clerk or the Jury Plan failed to comply with the JSSA.

Further, even if the Court had found that the Clerk has misinterpreted the Jury Plan, the Court would find that Defendant has not established a substantial failure to comply with the JSSA, and, accordingly, has not established entitlement to relief under the JSSA.  Defendant asserts that the Clerk de facto amended the Jury Plan without following the procedures prescribed by the JSSA by misinterpreting the 2020 Jury Plan Amendment.  The Court reiterates that it does not believe that the Clerk misinterpreted the plain language of the Jury Plan.  If the Clerk's interpretation was a misinterpretation, the Court would find that any "amendment" or violation of the Jury Plan that resulted from the same would not constitute a *substantial* violation of the JSSA.  *See Bearden*, 659 F.2d at 608 ("While the clerk personnel in this case made a number of erroneous exclusions, there is no showing they were based on subjective criteria reflecting either a discriminatory intent or effect.  The errors, made in good faith, were instead the result of an occasional misinterpretation

---

Jury Plan § 9.  Under the Jury Plan, undeliverables, for obvious reasons, do not receive a subsequent mailing and cannot be summoned or ordered to appear to complete a questionnaire, whereas non/incomplete responders can receive a second mailing and can be summoned and ordered to appear should they continue to fail to respond.  Undeliverables were entirely unaddressed in the pre-2020 Jury Plan Amendment Jury Plan.  In light of the same, it is understandable why undeliverables might be treated differently than non/incomplete responders, i.e. that subsequent mailings are mandatory as to undeliverables, but that the Clerk's Office might be afforded discretion as to non/incomplete responders.

or misapplication of technical statutory criteria.  In these circumstances, we cannot say the errors contravened the principle of objectivity or otherwise constituted a substantial violation of the Act."); *see also United States v. Cloud*, No. 1:19-CR-02032-SMJ-1, 2021 WL 7184483, at *3 (E.D. Wash. Dec. 8, 2021) (finding no violation of the JSSA where the clerk's office failed to perform a supplemental draw contrary to the relevant jury plan, and thus "did not replace non-responders with other eligible persons from the same zip code[,]" and where defendants argued the same "contributed to the systematic underrepresentation of Native Americans on the grand jury, because many of the unanswered summonses came from zip codes with higher Native American populations."); *United States v. Smith*, 457 F. Supp. 3d 734, 740 (D. Alaska 2020) (finding no substantial violation of the JSSA where clerk utilized incorrect proration formula under the jury plan when summoning grand jurors and stating: "However, Mr. Smith has not shown that the use of incorrect proration formulas was directed at a distinct group. Although 'disproportionate exclusion of a distinctive group from the venire need not be intentional to be unconstitutional,' from the Court's perspective, the use of the incorrect proration formula does not raise the same systematic concerns as the intentional exclusion of a distinctive group.  '[T]he essence of randomness is the absence of any arbitrary attempt to exclude a class of persons from the jury.'" (citations omitted) (footnotes omitted)); *United States v. Gregory*, 730 F.2d 692, 699 (11th Cir. 1984) ("The failure to prepare an alphabetical list of names drawn from the master jury wheel, the names that formed the tentative qualified jury wheel, had no impact on the names drawn from the master jury wheel.  The people whose names were selected if not exempted, excused, or disqualified, were placed on the qualified jury wheel.  Whether the qualified wheel was arranged alphabetically was immaterial to random selection, for the selection of names from that wheel to construct venires was done by computer according to a random formula."); *United States v.*

*Calabrese*, 942 F.2d 218, 227 (3d Cir. 1991) (Third Circuit describing *Bearden* as follows: "*Bearden*, like this case, involved erroneous removals from a pool of prospective jurors. In *Bearden*, the wrongful excusals were the result of mistakes that could fairly be termed 'purely technical.' For example, in determining whether potential jurors were eligible for an excusal available to those over the age of seventy, the clerk used the juror's age as of the projected trial date, not, as the local jury selection plan required, their age as of the date of their response to the juror questionnaire. Similarly, the clerk granted automatically excusals that were to be granted only on request. The court held that although these were errors, they did not amount to a substantial failure to comply with the Act"; and distinguishing the case before it as follows: "More significantly, the challenged exclusions in this case were not, as in *Bearden*, a result of the misapplication of technical criteria. The trial court created its own group, based on an impermissible inference of bias, and excluded all members of the group from the defendant's jury."); *United States v. Stile*, No. 1:11-CR-00185-JAW, 2014 WL 5465341, at *7 (D. Me. Oct. 28, 2014) (finding clerk's failure to follow jury plan requiring clerk to follow up on omissions, ambiguities, or errors in completed questionnaires to be technical violations and not substantial failures to comply); *United States v. Royal*, 174 F.3d 1, 11 (1st Cir. 1999) ("The failure to follow up on the qualification forms, enclosed with summonses, that are not completed and returned does not constitute a substantial violation of the Act in this case, where no fair cross-section violation has been established."); *Carmichael*, 560 F.3d at 1279 ("This policy [of granting two rather than one-year excusals in violation of the jury Plan], however, did not frustrate the randomness principle because the prospective jurors, including those excused for two years, were still selected at random from a group of names without regard for race.").

If it was error under the Jury Plan for the Clerk, when faced with a non/incomplete responder, to fail to send a mailing to a new individual in the same zip code, the Court would not find that such a failure violates the principles of the JSSA, specifically: (1) random selection of jurors and, (2) determination of disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only.[18]  The Clerk's purported failure to appropriately interpret and apply the Jury Plan does not implicate the objectivity principle because there is no indication that any disqualifications, excuses, exemptions, or exclusions were granted on the basis of anything other than objective criteria.  *See Carmichael*, 560 F.3d at 1279 (citing *Bearden* for the proposition that "the objectivity principle prohibits the use of subjective criteria in the *selection* of jurors.").  Further, it in no way undermines the random nature in which jurors were selected from the qualified wheel to construct venires.  This is not an instance, such as in *Clay*[19] where a jury administrator ensured that deferred jurors (where white jurors requested deferral at twice the rate of that of African–American jurors) would be placed en masse at the top of the summons list following their deferral period.  This case is, at most, more analogous to the situation presented in *Carmichael*, whereby that same jury administrator still essentially granted deferrals as a matter of course, but did not undermine the random nature in which those deferred potential jurors were eventually drawn.  *See Carmichael*, 560 F.3d at 1278-79 ("Unlike in *Clay*, however, the Jury

---

[18] The Court believes this is especially true here, considering that the Clerk's interpretation, if determined to be incorrect, is, in the Court's estimation, at the very least, a supportable reading of the plain language of the Jury Plan.

[19] *See Clay*, 159 F. Supp. 2d at 1364; 1367 (explaining that: "[t]he practice of almost always granting temporary deferrals and then, upon expiration of the deferrals, constructing venire lists in such a way as to prefer the previously deferred jurors over those who were drawn directly from the qualified wheel was a substantial violation of the JSSA[,]" and: "[i]n the instant case, the practice of arbitrarily selecting a number of disproportionately white [deferred] jurors and placing them on the summons lists in a manner that assured them positions on the final venire lists in criminal juries substantially violated the JSSA.  It was non-random selection that created the 'potential to result in discrimination among cognizable groups of prospective jurors.'").

Administrator in this case did not give previously deferred jurors a preferential position for inclusion in the venire by placing them together at the top of the summons list. . . . We also note that in this case, the Jury Administrator selected previously deferred jurors without regard to race and using only participant numbers.  Ultimately, the jurors who exceeded the 15% limit were selected randomly by the jury selection software, not manually by the Jury Administrator.  We therefore hold that although the Jury Administrator technically violated the jury plan and the JSSA, the violation did not frustrate the JSSA's overriding purpose of preventing discrimination and was not sufficiently substantial to give rise to a remedy.").  Even if it were established that the Clerk's purported misinterpretation resulted in less representation, it cannot be said that the same violated the fundamental principles of the JSSA or was implemented in a discriminatory manner.  The manner in which potential jurors were selected for summoning remains random.  At most, Defendant has asserted a technical violation on the Clerk's part.  Accordingly, Defendant cannot establish a substantial violation of the JSSA even if he is correct that the Clerk misinterpreted the Jury Plan.

Further, the Court agrees with the Government that *In re U.S.*, 426 F.3d 1 (1st Cir. 2005), on which Defendant relies, presents a materially distinct scenario to the one presented herein.  In that case, a district judge entered an order requiring the federal jury administrator, where faced with either an undeliverable or non-responder, to draw an additional name from the master wheel from the same zip code, send a qualification mailing to the newly drawn name, and merge those newly drawn individuals with the original persons drawn who had returned their questionnaires. *In re U.S.*, 426 F.3d at 4.  The jury plan at issue in that case *did not* explicitly provide for such a process, and, in entering her order, the district judge incorrectly relied on a provision allowing for a supplemental draw where there was an inadequate number of qualified jurors in a regular array.

*Id.* at 6-7.  The United States Court of Appeals for the First Circuit explained that "what the plan prescribes for a shortage of qualified jurors is supplementation by a further draw from the master jury wheel, and not a draw only from identified zip codes within the master wheel." *Id.* at 7.  The First Circuit further explained that: "[a] consequential enlargement of the bases for a new draw amounts to a de facto amendment, even if performed by an individual judge, and does not thereby escape the statute's procedural requirements; the failure formally to amend the plan by vote of the whole court is not a defense of the present order but its vice." *Id.* (footnote omitted).  Even if Defendant were correct that the Clerk misinterpreted the Jury Plan, that assertion is readily distinguishable from *In re U.S.*  If Defendant is correct, the Clerk did not add a substantive provision to the Jury Plan that was not previously present, as the district judge did by way of court order in *In re U.S.*  This is not a case where a single judge (among several) chose to amend and apply their interpretation of a jury plan in a manner inconsistent with the plain language of the jury plan and prior practice in that district.  Instead, the Clerk, at most, misinterpreted an arguably equivocal provision of the Jury Plan, but did not do so in a way that frustrated the JSSA's overriding purpose of preventing discrimination.  For all of the reasons discussed above, Defendant has not established a substantial failure to comply with the JSSA and has thus not established entitlement to a remedy under the JSSA.[20]

Defendant also argues that an evidentiary hearing is necessary with respect to his most recent challenge.  As with his previous challenge, the Court disagrees.  The Court has permitted

---

[20] In his Motion to Stay, Defendant asserted that "it is unclear from the data provided whether the Clerk also amended the Plan by failing to send paper copies of the juror qualification questionnaire to those who did not respond to the initial postcard mailing," ECF No. 916 at 6, and provided that "Counsel will follow up with the Clerk of Court to confirm whether data exists to confirm compliance with this provision," *id.* at 6 n. 6.  Defendant has not provided the Court with any further argument or data as to this issue, and the Court interprets the issue to be abandoned.  *See* ECF No. 954 at 3 (Reply providing: "But, here, the issue is not the Clerk's mailing of supplemental questionnaires or the summons process for those who fail to return a completed questionnaire.  Rather, the issue is the Clerk's mailing of original questionnaires to new potential members of the jury wheel.").  In any event, the Court believes that any such argument would likely fail for the same reasons discussed herein.

Defendant to obtain voluminous discovery from the Clerk of Court as to the issues presented by his Motion to Stay, which is fully briefed.  Defendant's citation to Section 1867(d) does not require a different result.  Section 1867(d) provides that:

> Upon motion filed under subsection (a), (b), or (c) of this section, containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title, the moving party shall be entitled to present in support of such motion the testimony of the jury commission or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, and any other relevant evidence.

28 U.S.C. § 1867(d).  Here, even accepting Defendant's factual representations as true, including the statistical data provided by his experts, those facts do not constitute a substantial failure to comply with the JSSA.  Nor has Defendant established that a hearing is necessary on any of his non-statutory claims.  In short, the Court has provided Defendant a fair opportunity to discover and prove his claims.  His request for an evidentiary hearing is denied.

## III.   Conclusion

For the reasons discussed above, the Court will deny the Motion to Stay.  An appropriate Order of Court follows.

BY THE COURT:

_/s/Robert J. Colville_____
Robert J. Colville
United States District Judge

DATED: March 14, 2023

cc: All counsel of record