IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

ROBERT BOWERS

Criminal No. 18-292
**[UNDER SEAL]**

## UNITED STATES' BRIEF IN SUPPORT OF
## PROPOSED EXAMINATION PROCEDURES

AND NOW comes the United States of America, by its attorneys, Troy Rivetti, Acting United States Attorney for the Western District of Pennsylvania, Soo C. Song, Eric G. Olshan, and Nicole Vasquez Schmitt, Assistant United States Attorneys for said district, Mary J. Hahn, Trial Attorney, Civil Rights Division, and Barry K. Disney, Trial Attorney, Capital Case Section, and submits this brief in support of its proposed procedures for the government's mental health examination of the defendant, Robert Bowers.[1]

## INTRODUCTION

The defendant, Robert Bowers, has provided notice under Rule 12.2(b)(2) that he intends to introduce expert evidence relating to a claimed mental disease or defect during the penalty phase trial if he is found guilty of one or more death-eligible offenses.  A letter supplementing his Rule 12.2 notice stated,

> Specifically, the defense intends to introduce evidence that Mr. Bowers is a person with schizophrenia, epilepsy, and structural and functional impairments of his brain.  These are neurodevelopmental conditions that significantly and negatively alter a person's life course, life expectancy, perceptions, beliefs, cognitive behavior, and functioning.  These conclusions are based on clinical assessment, interpretation

---

[1]     The United States is filing this motion under seal due to its citation and discussion of the defendant's supplemental letter regarding its mental health notice, which discusses his proposed mental health evidence in some detail.  This filing would not otherwise be under seal, as these are matters that have been briefed and resolved publicly.

of neuropsychological test data, and neurological and neuroimaging data (CT, MRI, PET, EEG).

Ex. A at 1 (Defense Letter Dated Feb. 23, 2023).  The letter describes the team of experts relied upon by the defendant and outlines the testing and the procedures they employed.  Importantly, the experts evaluated the defendant without any court-imposed limitations.  During the substantial period of time that has passed since October 27, 2018, defense experts presumably exercised their professional discretion regarding the optimal timing and nature of testing and evaluation of the defendant based upon training and experience.

The United States has moved for an order to permit its retained experts to examine the defendant using procedures set forth in the government's pleading, Doc. No. 1001.  To achieve the heightened reliability required in capital sentencing, the Court should adopt the recommended procedures, which will allow for a full and fair rebuttal mental health assessment and permit evaluations guided by relevant mental health training and experience.

Reliability constitutes the touchstone for decisions concerning evidence in a capital case:

> The Government's right to the opportunity for meaningful rebuttal is based upon considerations of reliability, accuracy and fairness.  These considerations are essential to a sentencing determination in a capital case.  "The Eighth Amendment imposes a heightened standard 'for reliability in the determination that death is the appropriate punishment in a specific case.'"  Simmons v. South Carolina, 512 U.S. 154, 172 (1994) (Souter, J., concurring) (quoting Woodson v. North Carolina, 428 U.S. 280, 305 (1976).  The requirement of accurate reliable information when dealing with the death penalty is promoted by providing the Government and its experts with the time and opportunity to prepare a rebuttal.

United States v. Northington, Cr. No. 07-550-05, 2012 WL 287336, at *7 (E.D. Pa. July 12, 2012).

"[T]he Supreme Court has . . . made clear that in order to achieve 'such heightened reliability,' more evidence, not less, should be admitted on the presence or absence of aggravating and mitigating factors."  United States v. Fell, 360 F.3d 135, 143 (2d Cir. 2004) (citing Gregg v. Georgia, 428 U.S. 153, 203–04 (1976)) (emphasis in original); accord United States v. Lee, 374

F.3d 637, 648 (8th Cir. 2004) (agreeing that "the admission of more rather than less evidence during the penalty phase" enhances reliability).  Thus, any ruling that forestalls the government's ability to rebut mental health evidence "would undermine the adversarial process, allowing a defendant to provide the jury, through an expert operating as proxy, with a one-sided and potentially inaccurate view of his mental state at the time of the alleged crime." Kansas v. Cheever, 571 U.S. 87, 94 (2013).

## I.      PURPOSE OF A MENTAL HEALTH EXAMINATION

"[T]he Government's ability to rebut a defendant's evidence of mental condition would be sharply curtailed, if not entirely eviscerated, if notice of a mental health defense is not required and if, thereafter, the Government is not afforded the opportunity to have the defendant examined by an independent mental health expert." United States v. Beckford, 962 F. Supp. 748, 758 (E.D. Va. 1997).  Consistent with that observation, Federal Rule of Criminal Procedure 12.2(c)(1) permits a mental health examination by government-retained experts in anticipation of rebuttal. As noted in the government's motion for a mental health examination, "[t]he basic tool of psychiatric study remains the personal interview . . . [and] [t]he Government's expert cannot meaningfully address the defense expert's conclusions unless the Government's expert is given similar access to the 'basic tool' of his or her area of expertise: an independent interview with and examination of the defendant."  Doc. No. 1001 at 3 (quoting United States v. Haworth, 942 F. Supp. 1406, 1407-08 (D.N.M. 1996)).  The independent examinations required by the foregoing authority can only meaningfully occur within the confines of the procedures previously proposed by the United States.

## II.     THE GOVERNMENT'S REQUESTED PROCEDURES

The United States has proposed procedures for the examination of the defendant in Doc. No. 1001.  See id. at 4-6.  Subsequently, the parties engaged in a "meet and confer" conference on March 13, 2023, but "[u]ltimately, the parties were unable to reach any meaningful agreement regarding such terms."  Doc. No. 1029.

The United States anticipates that defense counsel will argue that the United States' rebuttal examination must be extremely narrow in scope.  Like defendants in other cases in which mental conditions have been placed at issue, this defendant, who has placed his mental health at issue and invoked Rule 12.2(b)(2), will likely seek unreasonable restrictions upon the scope and mechanics of any government examination.  Such unreasonable restrictions would include limits upon the number of government experts who can examine and conduct testing upon the defendant; constraints upon the amount of time that government experts will have to conduct their evaluation; the permissible scope of any evaluation and array of permissible tests; and restrictions upon government expert access to materials that were assembled by the defense and relied upon by defense experts.  Further, the United States also strongly asserts that video recording of any interviews of the defendant is both clinically and legally advisable and necessary to preserve an accurate record.

Undue constraints upon the ability of government experts to conduct evaluations of the defendant could lead to superficial and incomplete assessments and would deprive the United States of a meaningful opportunity to rebut the anticipated defense assertions.

**1.  The Court should authorize the requested government testing and examinations, even if they differ from and/or extend beyond those utilized by the defense experts.**

The United States has requested permission for its experts "to examine the defendant as necessary and probative to rebut or confirm defense experts' anticipated mental health testimony."

4

Doc. No. 1001 at 4.  Specifically, the government asked that a psychiatrist conduct interviews and a forensic evaluation; that a neuropsychologist observe the psychiatric interviews, conduct additional interviews, and administer psychological and neuropsychological tests; and that a neurologist conduct an interview and a neurological examination.  Id.  The defendant intends to present as many as six mental health witnesses.

As the authorities described below affirm, the United States has an independent right to fairly investigate potential rebuttal evidence.  That investigation should involve appropriate testing, consistent with current clinical standards, to determine whether the defendant suffers from the mental defects he has alleged.  Such an investigation necessarily contemplates testing to determine if another diagnosis is more clinically appropriate or whether the defendant suffers from any mental health malady at all.  In fact, the great weight of authority supports a rebuttal investigation guided by the professional discretion of experts rather than the preferences of the defendant and his counsel.

The Federal Death Penalty Act provides that the "government and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any aggravating or mitigating factor."  18 U.S.C. § 3593(c).  Consistent with that statutory command, the Supreme Court has pronounced that so long as evidence is not unduly prejudicial, "it is desirable for the jury to have as much information before it as possible when it makes the sentencing decision."  Gregg, 428 U.S. at 204.  Consequently, § 3593(c) is a rule of inclusion, not exclusion.  See Fell, 360 F.3d at 143.

That rule of inclusion necessarily extends to the investigations and examinations that underlie the presentation of evidence.  In Cheever, the Supreme Court determined that the Fifth

Amendment does not prohibit "the government from introducing evidence from a court-ordered mental evaluation of a criminal defendant to rebut the defendant's presentation of expert testimony in support of a defense of voluntary intoxication." 571 U.S. at 89-90.  The defendant had noticed his intent to raise a defense of intoxication by methamphetamine to his capital murder charge, and the trial court ordered him to submit to an examination by the prosecution.  Id. at 90-91.  The Court held that allowing expert testimony in rebuttal was not a Fifth Amendment violation, even though the Court had ordered the defendant to be examined because "[w]hen a defendant presents evidence through a psychological expert who has examined him, the government likewise is permitted to use the only effective means of challenging that evidence: testimony from an expert who has also examined him."  Id. at 94 (citing United States v. Byers, 740 F.2d 1104, 1113 (D.C. Cir. 1984) (agreeing that rebuttal expert testimony is perhaps "the most trustworthy means of attempting to meet" the burden of proof (internal quotation marks omitted)).  The Cheever court did not articulate or imply any limitation on testing of the defendant or provide the defense with a right of refusal as to any type of evaluation.  Rather, it explained, "**admission of this rebuttal testimony harmonizes with the principle that when a defendant chooses to testify in a criminal case, the Fifth Amendment does not allow him to refuse to answer related questions on cross-examination**."  Id. at 94 (emphasis added).  Thus, the Court countenanced a rebuttal investigation even if it exceeded, in some measure, the scope of testing conducted by the defense.

In accordance with that latitude, the Eleventh Circuit has held that "the purpose of rebuttal testimony is to explain, repel, counteract, or disprove the evidence of the [a]dverse party and if the defendant opens the door to the line of testimony, he cannot successfully object to the prosecution accepting the challenge and attempting to rebut the proposition asserted."  United States v. Troya, 733 F.3d 1125, 1138 (11th Cir. 2013) (quoting United States v. Delk, 586 F.2d 513, 516 (5th Cir.

1978)).  In Troya, one of the two defendants facing the death penalty for the murders of two adults and two children, 733 F.3d at 1129-30, gave notice under Rule 12.2 that he would raise a mental status defense based on his intelligence.  Id. at 1139.  At the United States' request, the Court required the defendant to submit to an expert examination.  Id.  The trial court denied a defense request to limit the expert to I.Q. testing simply because that was the scope of his intended mitigation evidence.  Id.  The Court instead permitted full testing of the defendant's mental health and status.  Id. at 1139-40.  At trial, the court permitted the United States to present rebuttal based on its experts' wider ranging inquires, as their results contradicted the defense testimony.  Id.   The Eleventh Circuit found no fault with the district court's decision to permit broader rebuttal testing and testimony.  Id. at 1140.

In fact, district courts have regularly granted mental health experts the freedom to conduct professionally appropriate examinations in pursuit of penalty phase rebuttal.  See, e.g., United States v. Wilson, 920 F. Supp. 2d 287, 298 (E.D.N.Y. 2012) (holding that because "psychiatric examination requires considerable freedom to the examiner" any perceived flaws in the examiner's choice of tests will be addressed in cross examination or briefing to the court after the examination); United States v. Hardy, 644 F. Supp. 2d 749, 751 (E.D. La. 2008) (refusing to "restrict the scope of the examination" because the court was "not in a position to know what lines of inquiry are appropriate from the standpoint of the experts," and noting that the defense could later "object to the admission of any conclusions by the government expert that i[t] found to be based on improper lines of inquiry").[2]

---

[2]      To contest this point and advocate for undue judicial control over the rebuttal investigation, the defendant may cite United States v. Williams, 731 F. Supp. 2d 1012, 1019 (D. Haw. 2010).  But Williams predates Cheever and conflicts with the Supreme Court's interpretation of "limited rebuttal purpose."  Thus, Williams is unpersuasive.  Further, its limited holding cannot support a restriction on testing: it merely holds that a defendant's assertion of a mental capacity defense does not "open the door" to a "fishing expedition" for any mental defect.  731 F. Supp. 2d at 1018-19.  The United States does not

The defendant has asserted that he suffers from "schizophrenia, epilepsy, and structural and functional impairments of his brain." Ex. A at 1. The United States has no obligation to accept these representations, and it should not labor under limitations that would thwart its ascertainment of evidence to rebut the claims. The adversarial process demands an opportunity to examine the defendant as effectively as possible—through a full psychological or psychiatric examination. See Cheever, 571 U.S. at 94. Such examinations permit the detection of evidence to "explain, repel, counteract, or disprove" assertions made by the defendant with regard to his mental health. See Troya, 733 F.3d at 1138; Delk, 586 F.2d at 516.

The Court should be guided by the district court in United States v. Tsarnaev. In Tsarnaev, the defendant submitted notice that he would introduce expert evidence regarding his mental condition in the penalty phase. See United States v. Tsarnaev, 968 F.3d 24, 76 (1st Cir. 2020) (reversed on other grounds). The defendant objected to the government's planned examinations, arguing that the government had only a "limited rebuttal right" that encompassed only the "same type of testing conducted by the defense experts." Id. at 76. The defense argued that any broader examinations would compel the defendant to testify against himself. Id.

The district court ultimately overruled the defendant's objections, finding instead that "an appropriate rebuttal . . . might be to say that the wrong tests were done or that insufficient tests were done." Id. at 77 (internal quotation marks omitted). Therefore, the judge refrained from "prevent[ing] the government experts from using tests that they in 'professional judgment' deemed 'appropriate.'" Id. The judge noted, however, that the defense could still challenge the admissibility of the examinations results later in the proceedings. Id. The defendant ultimately

---

intend, and has not proposed, a fishing expedition for any possible mental health diagnosis. Instead, its experts will inquire whether the defendant actually suffers from the defects and diseases he has claimed, and whether another diagnosis, if any, is more appropriate.

withdrew his Rule 12.2 notice and did not present mental health evidence during the penalty phase. Id.

The defendant appealed the district court's ruling and argued that by not limiting rebuttal, the district court violated his rights under the Fifth Amendment and Rule 12.2.  Id.  The First Circuit rejected that argument, holding that merely allowing the examinations would not amount to a Fifth Amendment violation.  Id. at 78.  Rather, an appreciable Fifth Amendment violation would only have arisen if "(1) [the defendant] incriminated himself during the government experts' exams, (2) he still chose to present mental-health evidence, (3) the judge let a government expert testify based on [the defendant's] self-incriminating comments, and (4) the expert's testimony was not proper rebuttal."  Id.  Because those four elements were "rank conjecture," the Court of Appeals declined to find a Fifth Amendment violation.  Id. at 78-79.

A robust rebuttal examination, similar to the type allowed by the district court in Tsarnaev, is especially necessary here, where the defendant has alleged broad and substantial mental health defects.  By his own account, the defendant's mood and organic brain disorders have purportedly "significantly" altered his "life course, life expectancy, perceptions, beliefs, cognitive behavior, and functioning."  Ex. A at 1.  To adequately address the verity of these claims and the extent of the impact of any alleged mental defects, the government's experts must necessarily undertake testing on a vast array of topics that could inform their diagnoses and testimony.  See Ex. B at 5-8 (Declaration of Park Dietz).

The defendant's claim of schizophrenia alone requires significant diagnostic examination and assessment because it requires distinguishing among delusions (if they exist) and other false or odd beliefs, including wide-spread and common beliefs maintained by those espousing anti-

Semitic views.  It also allows for the possibility of differential diagnoses (different disorders that could be diagnosed based on the same symptoms), including the following:

- Major depressive or bipolar disorder
- Schizoaffective disorder
- Schizophreniform disorder and brief psychotic disorder
- Delusional disorder
- Schizotypal personality disorder
- Obsessive-compulsive disorder and body dysmorphic disorder
- Post-traumatic stress disorder
- Autism spectrum disorder or communication disorders
- Other mental disorders associated with a psychotic episode
- Substance/medication induced psychotic disorder

American Psychiatric Association:  Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (2022) 120-21 (hereinafter "DSM-5").   Indeed, as a criterium for diagnosing schizophrenia, an expert must first rule out schizoaffective disorder and depressive or bipolar disorder with psychotic features.  Id. at 114; see also Ex. B at 7.

As for the defendant's claim of "structural and functional impairments of the brain," that claim is non-specific and encompasses numerous possible ailments.  As a "general convention," the DSM-5 allows "multiple diagnoses to be assigned for those presentations that meet criteria for more than one . . . disorder."  DSM-5-TR at 24.  Thus, the prevailing medical standards, to which this Court should defer, require a wide-ranging examination of the defendant's organic brain health.  Moore v. Texas, 581 U.S. 1, 11-20 (2017) (holding that the Court must apply prevailing clinical standards in ruling on mental health issues).   Accordingly, implementing artificial limitations on the government's investigation would upend the required professional deference, violate clinical standards, and deny the United States a full opportunity to rebut the defendant's evidence.  Id.; see Cheever, 571 U.S. at 94; Troya, 733 F.3d at 1138.

2.  **The Court should not require the government's experts to provide advance notice of their intended tests.**

The Court should not require the government to provide advance notice of the testing its experts intend to conduct before they have an opportunity to interview the defendant.  Such a procedure would hamper the experts' ability to conduct complete and effective examinations, as they may determine the need for additional testing during their interactions with the defendant.  As noted, mental health experts require flexibility to explore multiple diagnoses based upon the circumstances they encounter.  The defendant's experts have had years to assemble and assess the defendant's mental health evaluations.  A requirement for advanced notice of examination modes and techniques would deprive the government's experts of the flexibility and could preclude thorough and accurate findings.

Similarly unworkable, given the pendency of trial, the experts cannot first interview the defendant and then propose further testing for review by the Court and counsel.  The appropriateness of specific mental health testing falls outside the expertise of the law, and the Supreme Court has signaled its deference to the experts in that field on matters within their purview.  Further, for want of firewall counsel (Doc. No. 762 at 2), the government would likely have no meaningful ability to respond to defense objections.  Thus, the Court should allow the testing deemed necessary by the government's experts and then, at the appropriate time (i.e., after the finding of guilty and the defense's reassertion of the intent to present mental health evidence in the penalty phase) determine whether any resulting government expert testimony exceeds the scope of the defense's mitigation case, allowing counsel for all parties to participate and litigate that issue.  See Tsarnaev, 968 F.3d at 77 (discussing the district court's allowance of the government examinations to move forward while reserving the issue of admissibility).  This course is the only efficient and fair way to proceed.

**3.   The Court should order testing to take place at the United States Courthouse.**

This Court should permit evaluations to occur in the federal courthouse in Pittsburgh rather than at the Butler County Prison, where the defendant is presently detained.  The courthouse is preferable because the United States, with court authorization, can control the environment to assure privacy and quiet, both of which are vital to full and accurate examinations.  See Ex. B at 9.  While the prison could strive to provide quiet and privacy, it has a limited ability to assure as much in a facility populated by hundreds of prisoners, where announcements, head counts, and inmate movements are the norm.  The federal courthouse also provides easier access for the experts and their equipment.  For instance, Dr. Dietz has expressed his desire for a third party to conduct video recording.  See Ex. B at 5.  This is more readily accomplished at the U.S. Courthouse and in U.S. Attorney's Office space as opposed to the Butler County Prison.  Likewise, conducting any interviews outside the jail mitigates the possibility that the defendant would be uncomfortable or more guarded out of concern that corrections staff with whom he interacts on a daily basis would be in close proximity or otherwise privy to his contact with and communications with the government's rebuttal experts.

**4.   The government's experts should be allowed to question the defendant about the charged crimes and his conduct before and after their commission.**

Because the defendant has placed at issue his conduct before, during, and after the crime, the Court should allow the government's experts to include those topics in their questioning.

The Eighth Circuit recently upheld the right of government experts to inquire about a charged crime in United States v. Coonce, 932 F.3d 623, 636-37 (8th Cir. 2019).  In Coonce, the trial court ordered the defendant to submit to mental testing that included discussion of the crime.  On appeal from his conviction and death sentence, the defendant asserted "he should not have been compelled to discuss the relevant crime during his examination by the government's psychiatrist."

Id. at 636. The Eighth Circuit disagreed: "The district court's order on the scope of the interview complied with Fed. R. Crim. P. 12.2." Id. The court also held that the Rule 12.2 procedures "limit the admissibility, not the scope, of the interview." Id.; see also Tsarnaev, 968 F.3d at 76-79 (affirming the district court's decision to allow questioning about the charged criminal conduct).

Other courts have held that questions about a charged crime by rebuttal mental health experts are permissible where the defendant relies on his psychological condition as a defense to guilt, raises an offense-specific mitigating factor, or has not disclosed the mitigators he or she will allege. See United States v. Christensen, Cr. No. 17-20037-JES-JEH, 2019 WL 1793136 at *1-2 (C.D. Ill. Apr. 24, 2019) (allowing offense-specific questions where the defendant directed his own experts not to question him about the crimes but disclosed it was "likely" that he would claim he was impaired at the time of the crime due to his mental health condition); United States v. Christensen, Cr. No. 17-20037-JES-JEH, 2019 WL 1569348 at *2 (C.D. Ill. Apr. 11, 2019) (holding offense-specific questions are not precluded when the defendant has not indicated whether he will present offense-specific mitigators); United States v. Jackson, Cr. No. 2:13-00674-CAS, 2015 WL 4885997 at *4-5 (C.D. Cal. Aug. 13, 2015) (holding offense-specific questions are proper when the defendant intends to present evidence of his mental health as a defense to guilt); see also United States v. Johnson, 383 F. Supp. 2d. 1145, 1164-65 (N.D. Iowa 2005) (holding the government may request leave for offense-specific questions after the defendant presents or a defense expert "refers to mental condition evidence specifically related to her involvement in the crimes").

Here, the defendant has disclaimed an intent to present mental health evidence as a guilt defense but has provided notice that he will present it to contest whether he possessed the mental states necessary for death penalty eligibility. See 18 U.S.C. § 3591(a)(2). In the defendant's reply

brief in support of his motion to trifurcate proceedings (Doc. No. 880), he noted a plan to "present[]
evidence that will bear directly on his eligibility for the death penalty, evidence that will likely not
be admissible during the trial phase." Id. at 8.  In a footnote appended to the quoted sentence, the
defendant noted the due date for his Rule 12.2(b)(2) notice, confirming that the pertinent evidence
would relate to his mental health.  Id. at 8 n.2.  His mental health evidence therefore relates to the
charged crimes and an issue central to the defendant's statutory eligibility for the death penalty,
which will likely require offense-specific questioning by the government's experts.

      Beyond the likelihood that the defendant intends to rely on offense-specific mental health
evidence in the eligibility phase, he has not yet disclosed his proposed mitigating factors.  This
Court has ruled that he need not do so until after conviction, but the defendant has indicated his
experts will confirm the presence of statutory and non-statutory mitigators, including 18 U.S.C.
§ 3592(a)(1) ("impaired capacity") and (a)(6) ("disturbance").   These mitigators are offense-
specific and self-evidently involve the defendant's mental health.  See 18 U.S.C. § 3592(a)(1)
("Impaired capacity—The defendant's capacity to appreciate the wrongfulness of the defendant's
conduct or to conform conduct to the requirements of law was significantly impaired.");
§ 3592(a)(6) ("Disturbance—The defendant committed the offense under severe mental or
emotional disturbance.") (emphasis added); Christensen, 2019 WL 1793136 at *1 (holding
impaired-capacity and disturbance mitigators are offense-specific and observing that if "defense
experts argue Defendant suffered from impaired capacity . . . [he] will have put the matter of his
mental state during that time into dispute").  Under these circumstances, offense-specific questions
by government experts ensure the United States can "effectively rebut certain mitigating
arguments . . . without the need to re-evaluate the Defendant and cause undue delay."  Id. at 2.

The procedure respects the defendant's rights because the prosecutors will not see the mental health evidence prior to conviction, pursuant to Rule 12.2(c)(2).  Id.

This Court should follow a similar path here.  The proposed procedure protects the government's ability to rebut the defendant's mental health case but does not jeopardize his rights. The government will not have access to any offense-specific statement during the guilt phase.  If the defendant forgoes any offense-specific defense or mitigation theory during the penalty phase, he can challenge the admissibility of any rebuttal testimony at that time.  See Tsarnaev, 968 F.3d at 77 (discussing the district court's allowance of the government examinations to move forward while reserving the issue of admissibility).

### 5. The Court should not impose any requirement of a "live" video feed to defense counsel during the examinations.

The Court should not allow defense monitoring of government expert examinations via "live" video feed.  Doing so would provide defense counsel with unwarranted access to the government's mental health evidence, despite the existence of adequate measures to protect the defendant's rights by means of a video recording of the evaluations.

Rule 12.2(c)(2) requires sealing of the results and reports of the government's experts.  It allows for disclosure to the defendant only after conviction of a capital crime and the defendant's confirmation of an intent to offer mental health evidence at the penalty phase.  Rule 12.2 provides an additional prophylactic: "No statement made by a defendant in the course of any examination conducted under this rule (whether conducted with or without the defendant's consent), no testimony by the expert based on the statement, and no other fruits of the statement may be admitted into evidence against the defendant in any criminal proceeding except on an issue regarding mental condition."  Fed. R. Crim. Pro. 12.2(c)(4); see also United States v. Johnson, 362 F. Supp. 2d 1043, 1087 (N.D. Iowa 2005) (holding Rule 12.2(c)(4) provisions are "specifically

written to more accurately reflect the Fifth Amendment considerations at play") (quotation omitted).  Moreover, "a substantial majority of state and federal jurisdictions have held that a defendant does not have the right to counsel during a psychiatric examination." <u>United States v. Sampson</u>, 335 F. Supp. 2d 166, 247 (D. Mass. 2004) (collecting cases); <u>see</u> <u>also</u> <u>Wilson</u>, 920 F. Supp. 2d at 304-06 (rejecting capital defense counsel's request to be present for the government's examination); <u>United States v. Fell</u>, 372 F. Supp. 2d 753, 761-62 (D. Vt. 2005) (holding audio taping of an evaluation is an adequate safeguard for a defendant's rights); <u>Johnson</u>, 362 F. Supp. 2d at 1091 (same).

This Court should reject any defense requests for "live" video monitoring of the evaluations because monitoring the government experts' examinations would violate the clear dictates of Rule 12.2(c)2.  Providing defense counsel a preview of the information gathered and lines of questioning by the government's expert would effectively provide the defense a preview of the content of the government expert's evaluation well before such disclosure is authorized by Rule 12.2.

A common refrain regarding litigation in this case has been that the government is not entitled to advanced notice of the defendant's planned mental health presentation.  The defendant has repeatedly opposed the government's requests for notice of the defendant's planned mental health presentation.  <u>See</u> Doc. No. 462 at 1 (discussing various motions in which the government sought Rule 12.2 notice and the defendant objected on grounds that the notice was premature).  The defense further objected to providing disclosure of proposed mitigating factors, arguing that if the Court were to order disclosure at all, that disclosure should not occur until after the defendant is found guilty.  Doc. No. 753 at 2-10.  The Court acquiesced and ruled that penalty phase disclosures would be required 24 hours after a guilty verdict.  Doc. No. 762 at 2.  Yet the defense

now seeks to gain a tactical advantage by attempting to secure insight into the government's rebuttal evidence before even the start of the guilt phase of trial.  Viewing the examinations via live feed will allow defense counsel to preview the government's expert's examinations, affording them substantially more time to prepare to meet the rebuttal evidence than the prosecution will have to even prepare the rebuttal.  This asymmetry is contrary to this Court's Orders and the purpose of Rule 12.2—which by its express language allows for <u>simultaneous</u> disclosure of the results of the government's examinations to both the prosecution team and the defense.

Second, the United States has requested leave to record the interviews, obviating any arguable need to monitor them in real time by providing counsel with an opportunity to determine if anything objectionable occurred during the examinations and prior to the presentation of evidence.  There is little conceivable purpose to live monitoring by defense counsel other than gaining unwarranted tactical advantage or raising the prospect of defense counsel interfering with the examinations and/or seeking to intervene in the examination.  Such disruptions would significantly hamper the government's examinations and no such access was afforded to prosecution team members or experts.  It is conceivable that a defendant may respond differently, knowing that their defense counsel is simultaneously observing the interview.

Finally, for the government to develop rebuttal evidence fully and fairly, its experts must be able to examine the defendant in an appropriate environment, free from unnecessary interruptions and distraction, including vestiges of the adversarial process.  As live monitoring presents at least the possibility that counsel could object to the examinations and interrupt them, the Court should therefore bar counsel from monitoring the examinations.

**6.  The Court should adopt the government's proposed recording procedures, allow the government's psychiatrist and neuropsychologist to be present for each other's interviews, and should not limit the time for an examination.**

To protect the defendant's rights and ensure accurate evaluations, the government has proposed video-recording its experts' interviews.[3]  The United States has also proposed that its psychiatrist and neuropsychologist observe each other's interviews.  Finally, the government requests that the Court decline to impose a time limit on the experts' evaluations.

The Court should allow video-recording for three reasons.  First, recording will enhance efficiency by relieving the examiners of the obligation to take copious notes and permit them to concentrate fully on the interviews.  See Ex. B at 3-5.  Second, video recording "provides the defense with the tools necessary to act if a government evaluation intrudes upon [the defendant's] rights," United States v. Fell, Cr. No. 01-12-01, 2015 WL 13781291, at *2 (D. Vt. Oct. 9, 2015), while simultaneously shielding the examiner and examinee from false accusations.  See Ex. B at 4-5.  Third, it will provide a thorough and accurate record in the event the defendant seeks to limit the experts' testimony or challenge it in cross-examination.  The recordings will facilitate evaluations of the experts' methods, inquiries, and alleged errors, and will ensure that any statements by the defendant can be placed in their full context.

Video recording, which will be governed by the strict Protective Order which prohibits unauthorized disclosures, will protect the parties, create a more efficient and thorough examination, and aid the Court and parties in evaluating, presenting, and challenging the experts' conclusions.  The Court should therefore allow recording of the interviews as requested.

The Court should also allow the government's psychiatrist and neuropsychologist to attend one another's interviews if deemed appropriate by those experts.  This approach will be more time-efficient than separate interviews, as they can avoid duplication of questions.  Both experts intend to conduct interviews, and it is likely those interviews will overlap on certain areas if held

---

[3]    The United States does not seek to record the testing conducted by the neuropsychologist, having been advised that doing so would be contrary to appliable professional standards.

separately.  Allowing both experts to be present during the interviews will serve the interests of efficiency and limit the time needed to conduct the evaluations of the defendant.

Finally, the Court should not impose a time limit on the government's expert evaluations. The length of time needed for evaluations will depend on as yet unknown factors, like the adequacy of the testing environment and the cooperation of the defendant.  Ex. B at 9-10.  Moreover, as noted, effective testing must occur organically, evolving dynamically in response to the defendant's performance, not in accord with a timed script.  Even if the experts could accomplish their evaluation in one session—an unlikely possibility—the defendant's predictably flagging energy and attention could influence the results.  Id.

Under the government's proposal, the defendant would not be subjected to an excessive barrage of interviews or disproportionately extensive testing.  The government's expert has estimated that the planned testing could consume four and a half days.  The government should have the opportunity to fully and fairly assess the defendant's claims, consistent with prevailing professional norms, without an artificial time constraint.

### 7.  The government's experts should receive timely and comprehensive disclosure of the opinions and information relied upon by the defense experts.

The United States has proposed procedures relating to the disclosure of material provided to the defense experts or otherwise necessary for a meaningful rebuttal investigation: 1) defense disclosure to a designated government expert of all the medical, mental health, and other records of the defendant that were provided to defense mental health experts; and 2) defense disclosure of the information required by Rule 16(b)(1)(c)(iii) would be provided directly to a designated government expert and would not be shared with the trial prosecution team.

These procedures will permit government experts to provide focused and complete examinations of the defendant and to provide meaningful rebuttal evidence.  See Beckford, 962 F.

Supp. at 760 (holding that the right of rebuttal requires "notice, examination and discovery on mental health issues and conditions in order to make that rebuttal right a meaningful one").  The government's right to review and respond to a defendant's mental health evidence requires access to the same information upon which defense experts relied.  See, e.g., Fell, 372 F. Supp. 2d at 759 ("The right to offer rebuttal testimony . . . would be a hollow one indeed without discovery into the mental condition of an accused.").  Such disclosures will permit the government's experts to consider the same set of operative facts as the defense experts, parity that will enhance the value and reliability of the rebuttal evidence.

Rules 12.2 and 16 establish a basic framework for notice and disclosure of materials related to mental health, leaving details to be resolved by district courts.  See United States v. Wilson, 493 F. Supp. 2d 348, 355 (E.D.N.Y. 2006) (noting the need to fill procedural gaps under Rules 12.2 and 16); Beckford, 962 F. Supp. at 754–55 (stating that "numerous courts, including the Fourth Circuit, have recognized that the discovery provisions in Rules 12.2 and 16(b) are not exclusive and do not supplant a district court's inherent authority to order discovery outside the rules").  The commentary to Rule 12.2 explains that the provision does not provide exhaustive or exclusive procedures for the discovery of mental health evidence.  See Fed. R. Crim. P. 12.2, advisory committee notes to 2002 Amendments ("The amendment leaves to the court the determination of what procedures should be used for a court-ordered examination on the defendant's mental condition"); see also Wilson, 493 F. Supp. 2d at 355-56 (noting the court's inherent authority to grant discovery, apart from that granted by the Rules of Criminal Procedure).

Rule 16(b)(1)(C)(i) addresses a defendant's disclosure obligations with respect to expert mental health testimony noticed under rule 12.2(b), stating in relevant part,

> (i) Duty to Disclose:  At the government's request, the defendant must disclose to the government, in writing, the information required by (iii) for any testimony that

the defendant intends to use under Federal Rule of Evidence 702, 703, or 705 during the defendant's case-in- chief at trial ...

For each defense expert, the defendant must disclose:

• a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief;

• the bases and reasons in support of the expert opinions;

• the witness's qualifications, including a list of all publications authored in the previous 10 years; and,

• a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition.

Fed. R. Crim. P. 16(b)(1)(C)(iii).

The requirements of Rule 16(b) also apply to the penalty phase of a capital trial. Wilson, 493 F. Supp. 2d at 355[4]; see also United States v. Catalan Roman, 376 F. Supp. 2d 108, 113-14 (D.P.R. 2005). The requirements generally encompass opinion summaries, tests, examinations, and raw data, as those materials form the bases for the experts' opinions. See Wilson, 493 F. Supp. 2d at 356-57 (ordering the defendant to disclose opinion summaries, results of tests, reports of examinations, and raw data pursuant to Rule 16). At least by implication, the Federal Death Penalty Act likewise requires full disclosures of the data underlying expert opinions:

The government and the defendant shall be permitted to rebut any information received at the hearing, and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any aggravating or mitigating factor, and as to the appropriateness in the case of imposing a sentence of death.

18 U.S.C. § 3593(c); see also United States v. Webster, 162 F.3d 308, 339-340 (5th Cir. 1998) (holding that "[t]he government would not have a 'fair opportunity' to rebut [mental health]

---

[4]     While the Wilson court was analyzing an earlier version of Rule 16, the subsequent amendments do not affect that analysis.

testimony if it could not conduct an examination of its own").

The defendant's medical "records are important to understand [his] life story and the chronological development of any psychiatric disorders and limitations." See Ex. B at 8.  The records are critical to the rebuttal investigation when the defendant has indicated his experts have reviewed them in preparation for rendering their opinions, as occurred here.  See Ex. A at 1-3.  Those records should therefore be disclosed to the government's experts.

Rule 16(b)(1)(C)(ii) provides that the Court shall set a time for disclosure "sufficiently before trial to provide a fair opportunity for the government to meet the defendant's evidence."  Because the government will "meet the defendant's evidence" through the testimony of its own experts who have examined the defendant, disclosure should occur before the rebuttal experts undertake their examination.  Doing so will allow the experts to prepare their examinations based on the pertinent material.  See Catalan Roman, 376 F. Supp. 2d at 113–14 (holding the fair and efficient administration of justice served by Rule 16 disclosures applied equally to guilt and sentencing determinations).  Disclosure of the requested material will allow adequate preparation and ensure a more reliable sentencing determination.

The government's request that disclosures are provided directly to its experts alleviates concern about premature discovery of mental health evidence to the prosecution team in derogation of Rule 12.2(c)(2).  The strictures embodied in the rule assure the optimal assessment of the experts while insulating the defendant against the government's acquisition of court-compelled medical and mental health records during the guilt-phase of trial.

Accordingly, pursuant to Rule 12.2, Rule 16, and its inherent authority, the Court should order the defendant to disclose to a designated government expert all the medical, mental health, and other records of the defendant that were provided to his mental health experts; and, to

disclose to a designated government expert the information required by Rule 16(b)(1)(c)(iii).

Accordingly, the United States proposes that the defense disclose the requisite medical and mental health records by March 27, 2023.  Given the pendency of trial, timely, rapid disclosure of this information is necessary for the government's experts to evaluate the examinations and prepare rebuttal, if any, regarding the ultimate conclusions of the defense experts.

## CONCLUSION

Wherefore, the United States requests that the Court permit its rebuttal experts to conduct mental health examinations of the defendant, as needed and consistent with the parameters outlined above, to ensure the fairness and efficiency of the penalty phase of trial.  The United States further requests that the defendant disclose all mental health records and documentation that was relied upon by the defense experts in addition to that which is necessary for a fair and full assessment of defense expert conclusions.

<div style="margin-left:40%">

Respectfully submitted,

TROY RIVETTI
ACTING UNITED STATES ATTORNEY

s/Troy Rivetti
TROY RIVETTI
Acting U.S. Attorney
PA ID No. 56816

s/Soo C. Song
SOO C. SONG
Assistant U.S. Attorney
DC ID No. 457268

s/Eric G. Olshan
ERIC G. OLSHAN
Assistant U.S. Attorney
IL ID No. 6290382

s/Nicole Vasquez Schmitt
NICOLE VASQUEZ SCHMITT

</div>

Assistant U.S. Attorney
PA ID No. 320316

s/Mary J. Hahn
MARY J. HAHN
Trial Attorney
Civil Rights Division
DC ID No. 500193

s/ Barry K. Disney
Barry K. Disney
Trial Attorney
Capital Case Section
KS ID No. 13284