IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 18-292 |
| v. | |
| ROBERT BOWERS | |

Park Dietz, M.D., M.P.H., Ph.D., declares under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1. I am a board-certified psychiatrist specializing in forensic psychiatry.

2. I write this declaration for the limited purposes of advising the Court of (1) the value and acceptance of electronic recording of forensic psychiatric examinations, (2) the areas of inquiry in such examinations when conducted in contemplation of rebuttal testimony in the penalty phase of capital cases, (3) the necessity of obtaining the Defendant's historical medical records, and (4) the environment best suited for mental health evaluations.

**Background and Qualifications**

3. I received a bachelor's degree in psychology and biology from the Cornell University College of Arts and Sciences (1970), an M.D. degree from the Johns Hopkins University School of Medicine (1975), a master's degree in public health from the Johns Hopkins School of Hygiene and Public Health (1975), and a Ph.D. in sociology from the Johns Hopkins University (1984). I completed my psychiatric residency at the Johns Hopkins Hospital (1975-77) and the Hospital of the University of Pennsylvania (1977-78), where I was Chief Fellow in Forensic Psychiatry. I have been board certified in psychiatry by the American Board of Psychiatry and Neurology since 1979.

4. I am a Clinical Professor of Psychiatry and Biobehavioral Sciences at the UCLA School of Medicine. From 1986 to 1989, I was a Professor of Law at the University of Virginia School of Law and a Professor of Behavioral Medicine and Psychiatry at the University of Virginia School of Medicine.

1

From 1982 to 1986, I was an Associate Professor of Law and of Behavioral Medicine and Psychiatry at the University of Virginia Schools of Law and Medicine. From 1978 to 1982, I was an Assistant Professor of Psychiatry at Harvard Medical School. In these positions I have taught and lectured on forensic psychiatry for diverse audiences, including law students, practicing attorneys, law enforcement officers, psychiatry residents, forensic psychiatry fellows, and practicing forensic psychiatrists and psychologists.

5. I am a Past President of the American Academy of Psychiatry and the Law, a Distinguished Life Fellow of the American Psychiatric Association, and a Fellow of the American Academy of Forensic Sciences. I have served on the editorial boards of the Bulletin of the American Academy of Psychiatry and the Law, the Journal of Forensic Sciences, Behavioral Sciences and the Law, the Journal of Threat Assessment and Management, and other professional publications. I have authored more than 100 articles and book chapters, primarily on forensic psychiatry.

6. I have conducted more than 1,000 pretrial criminal evaluations, some of which were evaluations of capital murder defendants, and have testified as an expert witness for courts, the government, and the defense in forensic psychiatry on hundreds of occasions, including testimony in criminal matters in federal courts throughout the U.S. and the trial courts of nearly every state. A few of the better-known criminal cases in which I have been retained as an expert are those involving John Hinckley (attempted assassination of President Reagan), Walter Leroy Moody, Jr. (mail bombs killing U.S. Circuit Court Judge Robert Vance of the 11th Circuit Court of Appeals in Birmingham and a civil rights lawyer in Savannah, GA), Jeffrey Dahmer (sexual serial killings in Ohio and Wisconsin), Arthur Shawcross (sexual serial killings around Rochester, New York), Joel Rifkin (serial killings around New York City and Long Island), John DuPont (killing of Olympic wrestler David Schultz), Colin Ferguson (mass murder on the Long Island Railroad), Theodore Kaczynski (the Unabomber), Heriberto Seda (the New York Zodiac serial killer), William Tager (murder of NBC stage hand outside the "Today" show),

2

Charles Ng (sexual serial murders in California), Russell E. Weston (U.S. Capitol shootings), Cary Anthony Stayner (sexual homicides of tourists in Yosemite), Paul Runge (serial murders around Chicago, IL), John Allen Muhammad and John Lee Malvo (serial sniper murders in the area of Washington, D.C., and elsewhere), Jared Loughner (murder of Judge John Roll, attempted assassination of Congresswoman Gabrielle Giffords, and other crimes in Tucson, AZ), Dzhokhar Tsarnaev (Boston Marathon Bombing mass murder), and Dylann Storm Roof (mass murder at the African Methodist Episcopal Church, Charleston, S.C.)

### Electronic Recording of Forensic Psychiatric Examinations

7. In 1982, I was appointed Medical Director of the Institute of Law, Psychiatry and Public Policy at the University of Virginia, where my predecessors had installed video cameras in the examination room of the Forensic Psychiatry Clinic, presumably to allow videotapes to be reviewed for both teaching purposes and to enhance the quality of evaluations by allowing examiners to review videotapes of their interviews and to consult with colleagues about the content of recorded interviews. During the six years I served as Medical Director of the Institute and the Forensic Psychiatry Clinic, I discovered that reviews of examination videos by examiners and by the faculty, law students, and mental health trainees and practitioners who observed the interviews allowed for the discovery of errors and misinterpretations, improved detection of important nonverbal behaviors occurring during examinations, and allowed those so inclined to continuously improve their interviewing skills, for example, by reducing the frequency of leading questions, suggestive questions, multiple-choice questions, interrupting answers, aggressive styles, condescending tone, or other inappropriate interviewing techniques that are bad habits too often developed by clinicians because of the time-constraints encountered in clinical training.

8. Since discovering the value of electronic recording, I have advocated for the routine use of

video recording[1] in forensic mental health examinations to advance the quality of forensic mental health practice, improve the accuracy and quality of data collected for use in court, preserve evidence of what transpires during examinations, provide transparency of the methods used, and protect both examiners and examinees from false accusations.

        9.      In the 1980s and 1990s, when I was very active in the American Academy of Psychiatry and the Law and the American Academy of Forensic Sciences, I found that many forensic mental health professionals were reluctant to record their examinations and had never tried doing so, and this became the subject of discussion sufficiently often that my colleagues and I published an article[2] on the topic in 1999. In the same year, a Task Force on Videotaping Forensic Interviews (of which I was a member) of the American Academy of Psychiatry and the Law completed its six-year review of the issue and published its report[3] endorsing videotaping but stopping short of requiring that videotape be used.

        10.      The issue of whether videotaped examinations are admissible before a jury, in whole or in part, is a matter of law on which I express no opinion here.

        11.      Since approximately 1983, I have sought to videotape every pretrial interview of a criminal defendant, regardless of the purpose or scope of the interview. Both federal and state courts have repeatedly authorized me to do so. My purposes in seeking to videotape are not only to advance the quality of forensic mental health practice, improve the accuracy and quality of data collected for use in court, preserve evidence of what transpires during examinations, provide transparency of the methods used, and

---

[1] While audio recording preserves a verbatim record, it does not capture nonverbal communication. I nonetheless routinely record examinations in both video and audio so as to have a backup in the event of equipment malfunction or human error and because audio recordings are more easily transcribed.

[2] Pitt SE, Spiers EM, Dietz PE, Dvoskin JA: Preserving the integrity of the interview: The value of videotape. Journal of Forensic Sciences 44:1287-1291, 1999.

[3] Task Force on Videotaping Forensic Interviews, American Academy of Psychiatry and the Law: Videotaping of forensic psychiatric evaluations. Journal of the American Academy of Psychiatry and the Law 27:345-358, 1999.

4

protect both examiners and examinees from false accusations, but also to ensure that there is a faithful and accurate record of the examination so that it can be transcribed, so that I can concentrate on the interview rather than on taking notes, and so that any errors I make in conducting or interpreting the interview are discoverable by all parties in the interest of justice.

12. My preference is to have the video recording performed by a third party who does not remain in the room during interviewing, as that will allow me to focus on the interview.

13. Federal capital cases in which Courts have authorized my use of videotape and audiotape during examinations of capital defendants on behalf of the Government include, without limitation:

United States v. Dylann Storm Roof (District of South Carolina)

United States v. Wesley Ira Purkey (Western District of Missouri)

United States v. Aquilia Marcivicci Barnette (re-sentencing, Western District of North Carolina)

United States v. Charles Hall and Wesley Paul Coonce, Jr. (Western District of Missouri)

United States v. Dennis Cyrus, Jr. (Northern District of California)

United States v. Lisa Montgomery (Western District of Missouri)

United States v. Donald Fell, Jr. (District of Vermont)

United States v. Richard Allen Jackson (Western District of North Carolina)

United States v. Walter Leroy Moody, Jr. (Middle District of Georgia[4])

**Scope of Examination**

14. Defendant's Notice of Intent to Present Expert Evidence Relating to Mental Condition on the issue of Punishment Pursuant to Fed. R. Crim. P. 12.2(b)(2) and supplemental letter give notice of

---

[4] I am uncertain of the applicable jurisdiction. At least one reported appellate opinion indicates venue in the Middle District of Georgia, and at least one online source states that the trial was presided over by Judge Edward Devitt of the District of Minnesota after all judges within the 11th Circuit were recused because one of the bombing victims was Judge Robert Vance of the 11th Circuit Court of Appeals.

5

intent to introduce expert testimony regarding broad categories of mental disorder. The defendant has given notice that at least one of his experts will confirm the existence of non-statutory and statutory mitigating factors, including impaired capacity and disturbance under 18 U.S.C. § 3592.

15. It is necessary to question Defendant in detail about the offense to support or rebut an opinion of impaired capacity or disturbance. Where, as here, Defendant claims impaired capacity or disturbance, Defendant's experts will surely question him about the offense, and Government's experts should be free to do so as well. The evaluation of impaired capacity or disturbance requires questioning Defendant about his thoughts, mood, behavior, and any symptoms he may have had before, during, and after the alleged offenses.

16. In each of the federal capital cases identified above in Paragraph 13, the Court has authorized me to question the defendant(s) about his, her, or their offenses without limitation.

17. The validity and reliability of a mental health evaluation depend in part on the completeness of the data available. These data ideally derive from multiple sources, including but not limited to examination of the defendant; witness interviews conducted by various interviewers; educational, occupational, military, medical, criminal justice, correctional, and other records; and biomedical, psychological, and neuropsychological testing where indicated.

18. Despite the diversity of desirable sources of information, the traditional focus of mental health evaluation is on the interview of the person whose mental condition or mental state is at issue. Elements of a basic mental health evaluation—whether conducted by a psychiatrist, psychologist, or other mental health professional—include interviewing the person and conducting a mental status examination.

19. The basic mental health interview is designed to elicit a sufficiently complete picture of the person to allow the interviewer to validly and reliably characterize the individual's personality,

habits, and behavior, and to diagnose any mental disorders that may be present. To accomplish these goals, the interview usually encompasses most or all of these topical areas: context and purpose of evaluation, present living circumstances, prenatal history, developmental and childhood history, multi-generational family history, social history, educational history, military history, occupational history, avocations, religious and cultural background, medical history, mental health history, sexual history, trauma history, and criminal history.

20.     The mental status examination is a semi-structured interview that elicits information about the individual's appearance, orientation, speech, attitude, motor behavior, emotions, appropriateness, perceptual disturbances, thought processes, thought content, abstract thinking, education, intelligence, concentration, attention, memory, impulse control, judgment, insight, and reliability.

21.     In both clinical and forensic psychiatry, a full diagnostic interview sufficient to confirm or rebut whether Defendant suffers from Schizophrenia, another psychotic disorder, or other mental disorders, whether he suffers from neurodevelopmental or neurocognitive impairments, and to provide for adequate differential diagnoses requires a broad range of inquiries. A complete forensic psychiatric diagnostic examination includes questions regarding Defendant's childhood history; family history; educational history; occupational history; military history; medical history; history of injury, abuse, and trauma; mental health history; substance use history; social history; sexual history; current mental status; criminal history (to the extent permitted by the Court); correctional history; and history of social and occupational achievements, impairments, and failures.

22.     In both clinical and forensic practice the use of multiple examiners from differing specialties is well-accepted and common. In many of the cases in which I've been involved, I have worked in tandem with other specialists, such as psychologists, neuropsychologists, neurologists, and social

workers. In my experience, it is often important for experts of differing specialties to evaluate individuals, as their insights and the results of their examinations provide a fuller picture of the individual's mental health and the possible causes of their symptoms. This is particularly true when, as here, the Defendant asserts impairments that are the focus of more than one specialty. Often the examinations of other experts allow me to provide more accurate evaluations as well.

### Importance of Medical Records

23. The validity and reliability of a psychiatric evaluation depend in part on the completeness of the data available. Both recent and past medical (including psychiatric, psychological, therapy, and counseling) records are important to understand an individual's life story and the chronological development of any psychiatric disorders and limitations. In the context of pretrial forensic psychiatric evaluations, such records often contain observations of behavior, function, and capacity that corroborate or do not support those displayed and reported by defendants, who are sometimes motivated to present themselves in an overly robust or impaired manner or to provide a biased account of their history, symptoms, function, capacity, and subjective experiences.

24. In my professional experience, past medical records are routinely sought by defense counsel, prosecutors, and courts when a defendant's mental state is put at issue, and these records are routinely provided to forensic psychiatrists and psychologists asked to evaluate mental state. This adds efficiency to the process, as each evaluating clinician would otherwise need to identify past providers from interviews of the defendant and family members, seek a release from the defendant for access to the medical records of each past provider, and, if necessary, re-examine the defendant after reviewing those records.

25. It is important to have as much documentation as possible well in advance of examinations to adequately prepare for the examination. Because medical records can reveal previous complaints,

behavior, signs, symptoms, diagnoses, and prescribed medications, reviewing those records prior to an examination helps plan the course and direction of the examination. It can also aid the reliability, validity, and efficiency of the examination by identifying dates, providers, facilities, and events that the Defendant may no longer recall.

26. "Psychiatric, Substance Abuse, and Medical Records" are one of the nine categories of written records that the American Academy of Psychiatry and the Law recommends as collateral sources of information to be reviewed in evaluating a defendant's mental state at the time of alleged crimes.[5] These records are as necessary for the evaluation of whether a defendant had impaired capacity or disturbance as they are for the evaluation of whether a defendant meets legal criteria for insanity.

### Environment for Examination and Testing

27. The setting of the interview affects the results of the interview, including its reliability and validity. Examinees arrive for the interview in varying degrees of comfort and distress, in varying mood states, and with varying levels of anxiety and fear. It is important that the environment not worsen negative emotional states. Thus, interview rooms in psychiatrists' offices and adequately funded clinics are quiet, private, comfortable, and free of interruptions and distractions. These conditions are rarely met in jails, prisons, or detention centers.

28. As the authors of one textbook wrote, "the ideal interview setting is one which provides a pleasant atmosphere and is reasonably comfortable, private, and free from outside distractions."[6]

29. In a forensic psychiatric examination, the Defendant should have access to counsel upon request, to a reasonable number of breaks, and to lunch. I generally provide short breaks every hour and

---

[5] American Academy of Psychiatry and the Law (2002). Forensic psychiatric evaluation of defendants raising the insanity defense. Journal of the American Academy of Psychiatry and the Law, 30(2), S1-S40, at S22.

[6] Tasman A, Kay J, Ursano RJ: The Psychiatric Interview: Evaluation and Diagnosis. Oxford: John Wiley & Sons, 2013,

a one hour lunch break, resulting in approximately six hours of recorded interview per day.

30. The Government experts' current plan for examination of the Defendant amounts to four contiguous days consisting of approximately six hours of interview and/or testing by myself and a neuropsychologist. Separately, neurologist Ryan Darby, M.D., would examine the Defendant for approximately a half-day. If these examinations were limited to a single day or a single examiner, the results would be less valid, less reliable, less accurate, and less complete. In addition, interviewing or testing for more than eight hours in a single day would likely result in the Defendant's fatigue, which would compromise the integrity of the results and undermine the validity of neuropsychological test performance.

I declare under penalty of perjury that the foregoing is true and correct.

*[signature]*

Dated: March 20, 2023
Newport Beach, California

PARK DIETZ, M.D., M.P.H., PH.D.