IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 18-292 |
| ROBERT BOWERS | |

Park Dietz, M.D., M.P.H., Ph.D., declares under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1. I am a board-certified psychiatrist specializing in forensic psychiatry.

2. I write this declaration for the limited purposes of advising the Court of (1) the reasons that defense counsel being present in the room during mental health evaluations can interfere with the examination, (2) my current exposure to the mental health evidence regarding the defendant, and (3) the anticipated timing for preparation for examinations and preparation of reports.

### Background and Qualifications

3. I received a bachelor's degree in psychology and biology from the Cornell University College of Arts and Sciences (1970), an M.D. degree from the Johns Hopkins University School of Medicine (1975), a master's degree in Public Health from the Johns Hopkins School of Hygiene and Public Health (1975), and a Ph.D. in sociology from the Johns Hopkins University (1984). I completed my psychiatric residency at the Johns Hopkins Hospital (1975-77) and the Hospital of the University of Pennsylvania (1977-78), where I was Chief Fellow in Forensic Psychiatry. I have been board certified in psychiatry by the American Board of Psychiatry and Neurology since 1979.

4. I am a Clinical Professor of Psychiatry and Biobehavioral Sciences at the UCLA School of Medicine. From 1986 to 1989, I was a Professor of Law at the University of Virginia School of Law and a Professor of Behavioral Medicine and Psychiatry at the University of Virginia School of Medicine. From 1982 to 1986, I was an Associate Professor of Law and of Behavioral Medicine and Psychiatry at

the University of Virginia Schools of Law and Medicine. From 1978 to 1982, I was an Assistant Professor of Psychiatry at Harvard Medical School. In these positions I have taught and lectured on forensic psychiatry for diverse audiences, including law students, practicing attorneys, law enforcement officers, psychiatry residents, forensic psychiatry fellows, and practicing forensic psychiatrists and psychologists.

5. I am a Past President of the American Academy of Psychiatry and the Law, a Distinguished Life Fellow of the American Psychiatric Association, and a Fellow of the American Academy of Forensic Sciences. I have served on the editorial boards of the Bulletin of the American Academy of Psychiatry and the Law, the Journal of Forensic Sciences, Behavioral Sciences and the Law, the Journal of Threat Assessment and Management, and other professional publications. I have authored more than 100 articles and book chapters, primarily on forensic psychiatry.

6. I have conducted more than 1,000 pretrial criminal evaluations, some of which were evaluations of capital murder defendants, and have testified as an expert witness in forensic psychiatry on hundreds of occasions, including testimony in criminal matters in federal courts throughout the U.S. and the trial courts of nearly every state. A few of the better-known criminal cases in which I have been retained as an expert are those involving John Hinckley (attempted assassination of President Reagan), Walter Leroy Moody, Jr. (mail bombs killing U.S. Circuit Court Judge Robert Vance of the 11th Circuit Court of Appeals in Birmingham and a civil rights lawyer in Savannah, GA), Jeffrey Dahmer (sexual serial killings in Ohio and Wisconsin), Arthur Shawcross (sexual serial killings around Rochester, New York), Joel Rifkin (serial killings around New York City and Long Island), John DuPont (killing of Olympic wrestler David Schultz), Colin Ferguson (mass murder on the Long Island Railroad), Theodore Kaczynski (the Unabomber), Heriberto Seda (the New York Zodiac serial killer), William Tager (murder of NBC stage hand outside the "Today" show), Charles Ng (sexual serial murders in California), Russell E. Weston (U.S. Capitol shootings), Cary Anthony Stayner (sexual homicides of tourists in Yosemite),

2

Paul Runge (serial murders around Chicago, IL), John Allen Muhammad and John Lee Malvo (serial sniper murders in the area of Washington, D.C., and elsewhere), Jared Loughner (murder of Judge John Roll, attempted assassination of Congresswoman Gabrielle Giffords, and other crimes in Tucson, AZ), Dzhokhar Tsarnaev (Boston Marathon Bombing mass murder), and Dylann Storm Roof (mass murder at the African Methodist Episcopal Church, Charleston, S.C.).

### Presence of Counsel

7. The concern most commonly expressed by forensic mental health professionals and others, both in private conversations and in professional publications,[1] is the potentially disruptive and distracting effect of attorney presence, particularly on the establishment of rapport between examiner and examinee. Some of those setting forth this objection[2] cite *Estelle v. Smith* in which the U.S. Supreme Court noted with approval a lower court's opinion that the presence of an attorney during a forensic psychiatric examination "could contribute little and might seriously disrupt the examination."[3]

8. An experienced forensic psychiatrist who concluded that the forensic psychiatric examination should be conducted in private whenever possible wrote:

> Objectionable aspects of an attorney's presence during a forensic psychiatric examination may include leading or cuing the examinee, interfering with the free flow of the interview, altering the meaningful connectedness and emergence of psychological associations and information, and disrupting the task-specific rapport needed between examiner and examinee. The findings of the

---

[1] American Academy of Psychiatry and the Law (1999). Videotaping of forensic psychiatric evaluations. <u>Bulletin of the American Academy of Psychiatry and the Law 27</u>, 345–358; Wettstein, R. M. (2010). The forensic psychiatric examination and report. In Simon, R. I., Gold, L. H. (Eds.): <u>American Psychiatric Publishing Textbook of Forensic Psychiatry</u>, 2nd Ed. Washington, D.C.: American Psychiatric Publishing, 2010; Simon, R. I. (1996). "Three's a crowd": The presence of third parties during the forensic psychiatric examination. <u>Journal of Psychiatry & Law</u>, 24(1), 3-25; Otto, R. K., & Krauss, D. A. (2009). Contemplating the presence of third-party observers and facilitators in psychological evaluations. <u>Assessment</u>, 16(4), 362-372; Bursztajn, H. J., & Brodsky, S. L. (2018). Forensic mental health practice. In: Butcher, J. N., & Hooley, J. M. (Eds.): <u>APA Handbook of Psychopathology, Vol. 1: Psychopathology: Understanding, Assessing, and Treating Adult Mental Disorders</u>. Washington, D.C.: American Psychological Association, 751-766.

[2] Wettstein (2010), op. cit.; Simon (1996), op. cit.; Otto & Krauss (2009), op. cit.

[3] <u>Estelle v. Smith</u>, 451 US 454, 470 n.14 (1981).

psychiatric examination may be invalid under these circumstances.[4]

9. Similar concerns have been expressed by forensic psychologists studying the issue:

> In addition to affecting the examinee's responses, a third party may affect the flow of information during an assessment. For example, an examinee may be distracted by or defer to the third party; the third party might interrupt the examiner or direct the examinee to refuse to answer certain questions; or the third party may otherwise interfere with the examination.[5]

10. Other concerns expressed by forensic psychiatrists and forensic psychologists have also contributed to the preponderance of professional opinion opposing the attendance of defense counsel at evaluations:

> Generally, concerns about the presence of third parties during psychological evaluations fall into one of four categories: (a) negative effects on the examinee's responses and participation, (b) interruption of the flow of information from the examinee to the examiner, (c) threats to the validity of conclusions that can be drawn from the evaluation, and (d) threats to the security (and future utility) of psychological assessment techniques and tests.[6]

Concerns about test validity, test norms, test security, and the future utility of tests are of particular concern to those evaluators who use standardized tests with known norms and standard conditions of administration, and both the American Academy of Clinical Neuropsychology and the National Academy of Neuropsychology discourage the presence of third parties during neuropsychological evaluations.[7]

11. In what may be the only survey of its kind, 160 members of the American-Psychology Law Society completed questionnaires exploring their attitudes and beliefs regarding attorney presence during

---

[4] Simon (1996), op. cit.

[5] Otto, & Krauss (2009), op. cit.

[6] Otto & Krauss (2009), op. cit., p. 366.

[7] American Academy of Clinical Neuropsychology. (2001). Policy statement on the presence of third party observers in neuropsychological assessments. The Clinical Neuropsychologist, 15, 433–439; National Academy of Neuropsychology. (2000). Presence of third party observers during neuropsychological testing: Official statement of the National Academy of Neuropsychology. Archives of Clinical Neuropsychology, 15, 379–380.

forensic mental health evaluations. In response to the item, "The presence of third parties during the pre-trial forensic evaluation of a criminal defendant may interfere with the establishment of rapport between the defendant and the examiner," 90.7% agreed, 3.7% disagreed, and 5.6% neither agreed nor disagree. In response to the item, "Defendant's attorneys may try to shape or limit a defendant's responses during a criminal forensic evaluation," 84.4% agreed, 11.3% disagreed, and 4.4% neither agreed nor disagreed. In response to the item, "If pressured to allow third party observers during a pre-trial criminal forensic evaluation, examiners should refuse to conduct the evaluation," 71.3% agreed, 10.6% disagreed, and 18.1% neither agreed nor disagreed. In response to the item, "Third party presence during criminal forensic evaluations alters the standardization of the forensic evaluation," 76.3% agreed, 6.3% disagreed, and 16.9% neither agreed nor disagreed.[8]

12. The measure most often proposed as a substitute for attorney presence that nonetheless preserves the ability of defense counsel to take measure of opposing experts, identify any interviewing errors (such as the use of leading, confusing, or ambiguous questions), and prepare for cross-examination is the creation of a verbatim record through electronic recording. Electronic recording of interviews is not without controversy or opposition, but has been recognized as an acceptable practice in forensic psychiatry.[9]

13. I have personal experience conducting forensic psychiatric interviews in states favoring or permitting the presence of defense counsel during examinations and in which I was required to permit one or more attorneys to be present. These experiences have varied between minimally disruptive and extremely disruptive, and I strongly prefer to conduct examinations without attorneys present, especially

---

[8] Shealy, C., Cramer, R. J., & Pirelli, G. (2008). Third party presence during criminal forensic evaluations: Psychologists' opinions, attitudes, and practices. Professional Psychology: Research and Practice, 39(6), 561–569.

[9] American Academy of Psychiatry and the Law (1999). Videotaping of forensic psychiatric evaluations. Bulletin of the American Academy of Psychiatry and the Law, 27, 345–358.

since I have adopted a routine practice of video recording and audio recording my interviews of defendants.

14. Since adopting video recording, I have opposed the presence of lawyers from either side in the interviewing room during my examinations. I do not recall any case in which a Federal Court authorized defense counsel to be present in the room during any court-ordered pretrial evaluation I have conducted on behalf of the Government. On those occasions when I've been preparing to conduct an examination for the Government and Defense counsel have asked to be in the room, I've proposed creating video and audio recordings as a less disruptive means of preserving a verbatim record of all that transpires during the examination. To the best of my recollection, that has either been accepted without opposition or the Court has so ordered in nearly every case; the only exceptions I recall are one case in which I was informed that the Court limited me to audio recording and one case in which the defendant would only agree to be interviewed if I did not use any recording devices despite a Court order permitting it.

15. The same concerns listed above do not apply to the presence of a colleague, such as a neuropsychologist. In that situation, the colleague and I interview the defendant sequentially, not simultaneously, and we agree in advance not to interrupt each other but rather to wait to be invited to ask questions. One of us questions as the other observes. Also, in that situation, the other individual is performing an evaluative function, and is not present in an adversarial role. Further, the presence of another mental health evaluator is more efficient, as it allows each to listen to the other's interviews and avoid duplication of questions.

## Materials Reviewed in This Case

16. The only information collected or generated by the defense that I have been provided about the defendant's mental health is correspondence, including letters dated April 15, 2019, and July 19, 2022, from defense counsel to the Department of Justice, and the defendant's supplemental letter detailing his

intended mental health presentation dated February 23, 2023.

17. I recently became aware that certain materials, including expert reports, raw data, EEG, CT, PET, and MRI scans, and other records have been provided to an expert advising the Department of Justice about a request made by the defense that falls outside of the Rule 12.2 process. I first learned that anyone associated with the Government had been sent such materials on March 22, 2023, upon receipt and review of Defendant's Opposition to Government's Motion to Examine Mr. Bowers and Proposed Examination Procedures (ECF 1001).

18. I have not at any time received any of the materials provided to that expert, nor have any of the individuals who work in our office building. I also have not been provided any information about those materials by the government or by that expert.

19. I have not spoken with the advising expert about this case.

### Timing for examinations

20. After discussing the potential examinations of Robert Bowers with my colleagues, I have determined that defense expert reports and materials should be disclosed to us at least two weeks in advance of the examinations to allow us time to prepare for the examinations to ensure they are as efficient and productive as possible.

21. Preparation of reports after the examinations will require no less than four weeks.

I declare under penalty of perjury that the foregoing is true and correct.

*Park Dietz mo*

Dated: March 27, 2023
Newport Beach, California

PARK DIETZ, M.D., M.P.H., PH.D.