IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-292 |
| | ) | |
| ROBERT BOWERS | ) | |

**RENEWED MOTION TO DISMISS THE NOTICE OF INTENT TO SEEK
THE DEATH PENALTY BASED ON ARBITRARY DECISION
MAKING BY THE DEPARTMENT OF JUSTICE**

Robert Bowers, through counsel, moves this Court to dismiss the government's

death notice based on the arbitrary pursuit of the federal death penalty, including the

bureaucratic, arbitrary decision-making process that sought to force an unconditional

waiver of the protections of the Fifth Amendment, and appears to have precluded

Attorney General Garland from personally making the decision and thus bearing direct

responsibility for authorizing a capital prosecution in this case.[1]

This renewed motion to strike is based on facts not previously known or addressed

by the Court, which raise serious concerns about the decision to deny Mr. Bowers'

---

[1] Mr. Bowers previously filed a Motion to Strike the Notice of Intent on Eighth
Amendment grounds, arguing in part the arbitrary and irrational implementation of the
federal death penalty.  ECF 165. The Motion was denied. ECF 216. A related
supplemental motion, based on a larger review of Biden Administration decision making,
including decisions not to authorize pursuit of the death penalty, and/or to withdraw death
notices in prior cases, was filed in *United States v. Saipov*, Cr. 17-722 (S.D. N.Y.) (ECF
699). The defense incorporates the *Saipov* motion, which is attached as Exhibit A, and
the McNally Declaration, which is attached to the *Saipov* motion, and attached as Exhibit
A-1. On March 13, 2023, the jurors in *Saipov* returned a non-unanimous verdict that will
result in the imposition of multiple sentences of life in prison without the possibility of
release.

request to withdraw the death notice and permit settlement of this case, including a stipulation to imposition of multiple sentences to life in prison without the possibility of release, and waiver of post-conviction challenges.[2]  Specifically:

(1)     Mr. Bowers' case was authorized for a capital prosecution by Attorney General Barr (under a Trump Administration that sought the federal death penalty frequently and executed 13 people in the waning days of the Administration), and there has been no indication that Attorney General Garland has made any decision with regard to this case.  Rather, it appears that the decision to reject the request to withdraw the death notice in this case was made by a *committee* of unidentified rotating Department of Justice staff and field prosecutors, who also sought to obtain an unconditional waiver of Fifth Amendment and statutory protections in exchange for meaningful consideration of the request to withdraw the death notice.[3]  Thus, and in essence, unnamed, and therefore, unaccountable members of the Department of Justice – and not the confirmed Attorney General in this Administration – have now authorized a capital prosecution to go forward.

---

[2] Remarkably, government counsel now stakes out the position that 'the potential punishment for the crime is not, and never has been, the "goal" for this capital prosecution."  ECF 1089 at 3. Yet, at every turn, Mr. Bowers' offer to resolve this case with stipulated multiple sentences to life in prison without the possibility of release (conditions of which the Bureau of Prisons, an entity within the Department of Justice, sets and controls) has been rebuffed.

[3] The Capital Review Committee's generic composition and role is set forth in the "Justice Manual" at 9-10.130, and further set forth in 9-10.160 (Withdrawal of the Notice of Intention to Seek the Death Penalty).  The Committee's pressure to submit to an unconditional waiver of the Fifth Amendment and statutory protections is in conflict with clear Department of Justice policy to not seek the death penalty solely for the purpose of obtaining a more desirable negotiating position.  *See* Justice Manual, 9-10.120.

(2)     The lack of any discernible, principled basis for why the death penalty continues to be pursued in this case and at the same time a capital prosecution was not authorized to be sought (i) in the shooting at a Chabad in Poway, California, which targeted Jews and in which one person was killed and 50 or more people could have been killed except that the perpetrator's gun jammed;[4] (ii) in the shooting targeting Hispanics in El Paso, Texas that resulted in the deaths of 23 individuals;[5] and the death notice was withdrawn (iii) in a case involving the murders of at least 11 Black men on behalf of a drug gang.[6]

The legal principles are clear, have been argued in earlier briefing, and were summarized well by Justices Breyer and Ginsburg, dissenting in *Glossip v. Gross,* 576 U.S. 862, 915-916 (2015):

> The arbitrary imposition of punishment is the antithesis of the rule of law.  For that reason, Justice Potter Stewart (who supplied the critical votes of the holdings in *Furman v Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L. Ed. 2d 346 (1972) (*per curiam*), and *Gregg*) found the death penalty unconstitutional as administered in 1972:
>
>> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual.  For, of all the people convicted of [death eligible crimes], many just as reprehensible as these, the[s] petitioners are among a capriciously selected random handful upon which the sentence of death has in fact been imposed." *Furman*, 408 U.S. at 309-310, 92 S.Ct. 726 (concurring opinion).

---

[4] *United States v. Earnest*, Cr. 19-1850 (S.D. Ca.).

[5] *See United States v. Patrick Crusius*, Cr. 20-389 (W.D. Tex.).

[6] *United States v. Jordan*, Cr. 15-404 (E.D. Mo.).

*See also id.,* at 310, 92 S.Ct. 2726 ("[T]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed"); *id.,* at 313, 92 S.Ct. 2726 (White, J., concurring) ("[The penalty is exacted with great infrequency even for the most atrocious crimes and … there is no meaningful basis for distinguishing the few cases in which it is imposed from the many in which it is not").

Mr. Bowers' case was authorized for a capital prosecution in August 2019 by then Attorney General Barr, in the Trump Administration.  At the time, the authorization conflicted with the expressed views of two of the three congregations that held services and other activities in the Tree of Life Synagogue.  The worldwide pandemic, which shuttered the country in March 2020, dramatically affected the speed with which this case could be prosecuted.  As a result, it was not until September 19, 2022, that the Court tentatively set a trial date, with trial now set to begin on April 24, 2023. (ECF 788)

Over eight months ago, in July 2022, undersigned counsel submitted to the United States Attorney for the Western District of Pennsylvania a 26-page letter detailing significant events in Mr. Bowers' life history, including the results of psychiatric and neurological evaluations and multiple neuroimaging assessments.[7]  Thereafter, in September, 2022, in response to a request by the United States Attorney, undersigned counsel submitted to the prosecution copies of five reports from experts which formed the scientific basis for the letter seeking withdrawal of the death notice, and resolution of the case – by a psychiatrist, a neuropsychologist, a neurologist, and expert interpretation

---

[7] The letter sought "de-authorization" of this case – meaning a withdrawal of the Notice of Intent to seek the Death Penalty – and offered resolution of the case by way of guilty pleas to all counts in the indictment, stipulated multiple life without release sentences, and a waiver of post-conviction challenges.

of the results of PET and MRI scans and a 48-hour ambulatory EEG.  All the information

submitted to the United States Attorney establishes that Mr. Bowers is a person with a

major mental illness, schizophrenia (identified based on clinical interviews, life history,

testing and imaging), and structural and functional brain impairments (identified on the

MRI, PET, EEG, and neuropsychological testing).  Mr. Bowers also suffers from

epilepsy (identified on the EEG), which reflects the disorganization and dysfunction of

the electrical activity in his brain.[8]

Thereafter, in February 2023, again at the request of the United States Attorney,

undersigned counsel submitted some 461 life history documents including indexes, along

with the underlying imaging or testing data reviewed by experts retained by the defense.

In an ongoing attempt to side-step the federal rules and constitutional principles

which govern the government's access to a criminal defendant, counsel were advised that

someone in D.C. also requested to have access to Mr. Bowers for a government-

sponsored psychiatric evaluation.[9]  Counsel – again – responded that without any

---

[8] The prosecution's suggestion that Mr. Bowers' "regular work as a long-haul trucker and his considerable computer skills" (ECF 1089, fn. 5) somehow undermines the well supported findings that he is a person with schizophrenia and brain impairments, including epilepsy, is bizarre, and evidence of a complete lack of understanding of major mental illness and related brain impairments.

[9] The U.S. Attorney's office sought a government-sponsored evaluation of Mr. Bowers earlier in the process of reviewing the request to withdraw the death notice. The government rejected all requests from the defense for protections on the use of such an evaluation – *e.g.*, having the parties agree to an examiner and keeping the results and conclusions of an examination from the prosecutors directly involved in pursuing the death penalty – and, as a result, the defense rejected the government's request for an evaluation.

protections, counsel could not agree to a waiver of constitutional and statutory rights, particularly in the face of the substantial evidence already provided and the perceived lack of good faith negotiating on the part of the government.  Defense counsel offered to have the psychiatrist who evaluated Mr. Bowers meet with Department of Justice personnel and answer any questions they may have about Mr. Bowers' serious mental health impairments.

Hearing received no response to the offer to make the psychiatrist available, on March 10, 2023, Federal Public Defender Lisa Freeland wrote to Deputy Attorney General Lisa Monaco, detailing the substantial information already provided, and again urging that the Attorney General withdraw the death notice and resolve this case, particularly in light of the offered pleas and stipulated sentences, the evidence of Mr. Bowers' serious mental illness, and Pennsylvania Governor Josh Shapiro's change of stance on the death penalty in general and in this case specifically. Six days later, on March 16, 2023, Ms. Freeland received an email from Richard Burns, chief of the Capital Crimes Section at the Department of Justice, declining counsels' offer to have a mental health expert meet with "the Department" and asserting that the only additional information that would be helpful "would be the opportunity to interview [Mr. Bowers]." Mr. Burns then advised that "[w]e therefore have the information necessary to make a decision."[10]  (Exhibit B).

_____

[10] The Capital Case Section (CCS) is a section within the Criminal Division, created in response to DOJ's increased involvement in capital litigation and charged with overseeing the Department's capital prosecutions. *See* www.justice.gov/criminal/capital-

Four days after the Burns email, on March 20, 2023, Ms. Freeland received a telephone call from Acting United States Attorney Troy Rivetti and Executive Assistant Stephen Kaufman advising that the request to withdraw the death notice (and resolve the case without a trial) was denied.  The very next day, March 21, 2023, counsel received a letter signed by Mr. Rivetti and Assistant Attorney General for Civil Rights, Kristen Clarke, confirming the conversation and stating that "the Department of Justice has denied [the] request to withdraw the Notice of Intent to seek the Death Penalty" and "will continue to litigate this trial as a capital prosecution." (Exhibit C).  This letter was not signed by the Attorney General, and there was no indication that the Attorney General was directly involved in the decision.

Given the communications regarding the denial of the request to withdraw the death notice, it appears that the request to withdraw the death notice was denied by a *committee* of unnamed, rotating Department of Justice staff and field prosecutors, and *not by Attorney General Merrick Garland.*[11]  This is in contrast to the Attorney General Garland having taken personal responsibility for requiring the only federal capital trial

---

*case-section.*  In essence, the jobs of those in the CCS depend on ongoing capital prosecutions.

[11] On March 24, 2023, Ms. Freeland wrote to Mr. Burns seeking information regarding who made the request for a government-sponsored examination, and who actually made the decision to deny the request to withdraw the death notice and resolve this case without the necessity of a trial. On April 4, 2023, Mr. Burns responded that the Department's policies had been followed and whether the Committee or the Attorney General makes the ultimate decision is confidential.   It may be that Attorney General Garland supports or would make the same decision – but there is no indication to date that he has taken direct or personal responsibility for the decision.

during the current Administration,[12] and what appears to his having taken personal

responsibility for declining to seek, or withdrawing the death notice in the following

recent cases involving the targeting of individuals based on race or religion, as well as

involving multiple deaths:

**United States v. John Earnest (targeting Jews).**  In August 2021, the

government filed notice of its intent *not to seek the death penalty* against John Earnest, a

white man who killed one worshipper at a Chabad in Poway, California, injured one, and

attempted to kill more than 50 individuals, all targeted because they were Jews at a place

of worship, but his gun jammed.  *United States v. John Earnest*, Cr. 19-1850 (S.D. Ca.),

ECF 110, ECF 1.

**United States v. Anthony Jordan (killing 11 Black men).**  In November 2022,

the government *withdrew a death-penalty authorization* for Anthony Jordan, a Black man

responsible for at least 11 murders of Black men on behalf of a drug gang, tied to a

Mexican cartel, that supplied cocaine throughout the Midwest. *See United States v.*

*Anthony Jordan*, No. 4:15-cr-404, ECF 1988, 1990, 3725 (E.D. Mo.).

**United States v. Patrick Crusius (targeting Hispanics, killing 23).**  In January

2023, the government filed notice of its intent *not to seek the death penalty* against a

Patrick Crusius, a white man who shot to death 23 shoppers in an El Paso Walmart (and

---

[12] *See United States v. Saipov,* Cr. No. 17-722 (S.D. N.Y.), ECF 565 ("We were notified today that the Attorney General as decided to continue to seek the death penalty.").  *Saipov* also stands alone as the only pending authorized case involving alleged ties to a foreign terrorist organization, ISIS.

injured at least 22 more) for the purpose of "defending my country" from "the Hispanic

invasion of Texas." *See United States v. Patrick Crusius*, No. EP-20-CR-389, ECF 82,

254 (W.D. Tex.). The shooting was well-planned and clearly premeditated: a couple of

months before the attack, Mr. Crusius purchased his semiautomatic rifle (a variant of the

AK-47) and 1,000 rounds of ammunition, and targeted a Walmart in El Paso, nine hours

away from where he lived in Allen, Texas.[13]

When the death penalty was reinstated in 1976, the Supreme Court acknowledged

that it is (and would be) unconstitutional if "inflicted in an arbitrary and capricious

manner." *Gregg v. Georgia,* 428 U.S. 153 at 188 (joint opinion of Stewart, Powell, and

Stevens, JJ.).[14]  Here, the arbitrary nature of the federal death penalty is confirmed by the

---

[13] In addition to these three distinctly similar cases, the 111-page chart attached to the McNally Declaration is replete with examples of RICO murders, prison slayings, and other intentional killings with gruesome facts. In total, under Attorney General Garland, the government has elected not to seek the death penalty in nearly 400 cases, and Attorney General Garland has withdrawn authorization in 23 cases, for 28 defendants. Exhibit A-1 (pp. 104-111).

[14] After a two-week evidentiary hearing, a federal district court in Vermont addressed the question of whether experience has borne out the promise of a more reliable system of capital punishment, concluding that it had not:

> The record of arbitrary imposition of the death penalty through the FDPA is clear and at least some of the reason in Vermont have been identified through the testimony at the evidentiary hearing. These include the effect of the voir dire process on jury decision-making and the high rate of death penalty authorization and conviction in the few states which traditionally favor a high rate of death sentences in their state court systems. In the case of the FDPA, the arbitrary qualities of the death penalty are most clearly visible through the narrative comparison of crimes which do and those which do not receive death sentences. These crimes are indistinguishable in their severity, and neither side offers any objective measure or qualitative basis for separating one group from another.

*United States v. Fell*, 224 F. Supp. 2d 327, 358 (D. Vt. 2016).

lack of a discernible, principled basis for why the Department of Justice continues to pursue death sentences for Mr. Bowers but not in very recent comparable cases. It becomes even more arbitrary and capricious where the "death decision" is made by a *committee* of unnamed, rotating DOJ staff and field AUSAs and not the sitting Attorney General, who has expressed his own reservations about the death penalty and has reversed multiple death penalty related decisions made by the prior Administration.[15]

The facts set forth above demonstrate that DOJ is applying the death penalty arbitrarily, and on that basis, this Court should dismiss the Notice of Intent to Seek the Death Penalty in this case.

Alternatively, as noted in the *Saipov* Motion (Exhibit A), at the very least, the troubling lack of a discernible principle to the decision-making requires further inquiry, and the Court should order discovery as to the reasons for the withdrawn death notices and the "no-seeks" in the cases listed above. Discovery should be ordered as to the reasons for withdrawing the death notices as to the twenty-seven (27) other individuals, many of whom have prior violent criminal histories, and/or were alleged to be a future danger to others in prison, as well as the several hundred other capital eligible cases in which this DOJ and Attorney General have decided not to seek the death penalty.

---

[15] It is also in conflict with President Biden's stated opposition to the death penalty and campaign promise to abolish the federal death penalty.

## CONCLUSION

This Court can declare the application of the death penalty to an individual case to be arbitrary, capricious and in violation of the Constitution.  It is on the grounds set forth in this Motion, and the supporting materials in the attached Exhibits that this Court should strike the death notice in this case, or alternatively order discovery as requested above.

Respectfully submitted,

*/s/ Judy Clarke*
Judy Clarke
Clarke Johnston Thorp & Rice, PC

*/s/ Michael N. Burt*
Michael N. Burt
Law Offices of Michael Burt, PC

*/s/ Michael J. Novara*
Michael J. Novara
First Assistant Federal Public Defender

*/s/ Elisa A. Long*
Elisa A. Long
Supervisory Assistant Federal Public Defender

*/s/ Ashwin Cattamanchi*
Ashwin Cattamanchi
Assistant Federal Public Defender