IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-292 |
| | ) | |
| ROBERT BOWERS | ) | |

**MOTION FOR HEARING REGARDING ADMISSIBILITY AND SCOPE OF THE
GOVERNMENT'S PROPOSED VICTIM IMPACT EVIDENCE**

Defendant Robert Bowers, through undersigned counsel, submits this Motion for Pretrial

Admissibility Hearing Regarding the Government's Victim Impact Evidence. Some victim

impact evidence is expressly permitted under the FDPA and there is no *per se* constitutional bar

to its limited use. However, due to its inherently emotional and potentially overwhelming nature,

there are constitutional and statutory limits on the type, scope, amount and form of such evidence

that may be presented. In order to ensure that those limits are enforced, the Court should hold a

hearing to review the government's proposed evidence in advance of its presentation to the jury

and to make the necessary findings regarding its admissibility.

Mr. Bowers' motion for an informational outline of aggravating factors was denied and

so he has little idea of exactly what evidence the government will attempt to admit. Even based

on the meager amount of information he does have, however, it is obvious that, left unchecked,

the government's presentation will exceed constitutional and statutory bounds in multiple

respects. Due to the nature of the charges, a significant amount of evidence of the impact of the

crime on deceased and surviving victims and the synagogue will be admitted during the

culpability and eligibility phases of the trial. The government has indicated that it will then go on

at the penalty phase to present additional victim impact evidence far more substantial than the

1

"quick glimpse" of each deceased victim's personal characteristics that is constitutionally permissible. The government has expressed its intent for witnesses to discuss each decedent's "personality" and entire "life history," and the impact of their deaths not only on their family members but also their "friends, associates, co-workers . . . community and workplace." It has also stated its intention to ask witnesses to testify on such irrelevant and unduly prejudicial topics as how they learned that their loved one had been killed.

The government also plans to introduce items of evidence that will merely exacerbate the emotional impact of the witnesses' testimony such as "photographs, and family heirlooms, such as wedding, anniversary, and reunion announcements and programs, memorial service programs and materials, and other mementoes." Introducing all of this evidence would take many days and would completely dominate and overwhelm the trial to the point that the jurors will be unable to attend to anything else.

To proceed without conducting an admissibility hearing would be to unnecessarily run a grave risk of inadmissible evidence being presented that necessitates a mistrial, or of the accumulation of evidence so overwhelming that it results in unfair prejudice to Mr. Bowers that will jeopardize the sentence on appeal. A hearing such as that requested by Mr. Bowers has been granted by a number of other courts, and this Court should follow their prudent approach. Especially in a case like this where there are a large number of victims, the Court is obligated to assess the prejudice versus probativeness of the evidence as a whole. Unless the Court knows in advance the full extent of what the government is proposing to present, it risks having to terminate the presentation midstream and deprive some victim's families from being heard at all if it becomes apparent that the cumulative effect of the testimony is threatening to render the proceedings fundamentally unfair before the presentation is even completed.

I.     **WHILE THE PRESENTATION OF VICTIM IMPACT EVIDENCE IS GENERALLY PERMITTED, THERE ARE CONSTITUTIONAL AND STATUTORY RESTRICTIONS ON THE SCOPE AND FORM OF WHAT MAY BE PRESENTED.**

In *Payne v. Tennessee*, 501 U.S. 808 (1991), the Supreme Court reversed course and held that the Eighth Amendment erects no *per se* bar to the admission of victim impact evidence in the sentencing phase of a capital trial, overruling its contrary decision in *Booth v. Maryland*, 482 U.S. 496 (1987), four years earlier. The Court nevertheless recognized that victim impact evidence that "is so unduly prejudicial that it renders the trial fundamentally unfair" violates the Due Process Clause, *Payne,* 501 U.S. at 825, and maintained the restrictions upon certain specific categories of evidence that had been put in place in *Booth*. It also declined to condone victim impact testimony that "is offered to encourage comparative worth judgments" by "permit[ting] a jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy." *Id.* at 823.

The evidence that is permitted under *Payne* is that which gives the jury "a glimpse of the life which the defendant chose to extinguish," in order to "remind[] the sentencer that . . . the victim is an individual whose death represents a unique loss to society," or that demonstrates the loss to the victim's family resulting from the homicide. *Id.* at 822, 825 (internal quotations omitted). In *Payne,* the defendant was convicted of attacking a woman and her two young children.  *Id.* at 812. The woman and her daughter were killed, while her son, though seriously injured, survived. *Id.* The victim impact evidence admitted consisted of the testimony of one witness, the woman's mother and the children's grandmother. *Id.* at 814. She was asked a single question about how her grandson had been affected by the crime, and briefly described how he cried for his mother and sister and didn't understand why they did not come home. *Id.* at 814-15.

The FDPA expressly provides for the admission of victim impact evidence at the penalty phase of a federal capital trial. By its terms, it places more stringent limits upon the evidence that may be presented than the constitutional minimum. "The [aggravating] factors . . . may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information." 18 U.S.C. § 3593(a)(2). The statute provides, however, that "information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice." 18 U.S.C. § 3593(c). This standard is more exacting than the standard for excluding evidence at an ordinary criminal trial, which requires that its probative value be "**substantially** outweighed" by the danger of unfair prejudice. Fed. R. Evid. 403 (emphasis added). It is the duty of the trial court to assess the victim impact evidence using this standard and to exclude it when necessary.

## A. The Government May Present Evidence that Affords the Jurors a Glimpse of the Individual Lives That Were Lost.

Victim impact testimony regarding the victims' personal characteristics should be strictly limited in quantity and should be focused on the victim's life around the time of his or her death, not on a complete description of him or her from early childhood on up. As noted, *Payne* permits the admission of evidence of a victim's personal characteristics to provide the jury with "a glimpse of the life" of the victim in order to "remind[] the sentencer that . . . the victim is an individual whose death represents a unique loss to society." *Id.* at 822. *See also United States v. Fields*, 516 F.3d 923, 946 (10th Cir. 2008) (noting that "case law permit[s] evidence 'giving the jury a glimpse of the victim's personality and the life he led'") (quoting *United States v. Barrett*, 496 F.3d 1079, 1098-99 (10th Cir. 2007); *United States v. Smith*, No. 3:16-cr-00086-SLG, 2020

WL 6536208 at *2 (D. Alaska Nov. 5, 2020) ("The Supreme Court has allowed the government to offer 'a quick glimpse of the life' which a defendant 'chose to extinguish'") (quoting *Payne*); *United States v. Sampson*, 335 F. Supp. 2d 166, 186 (D. Mass. 2004) ("Under *Payne*, the prosecution may offer at capital sentencing 'a quick glimpse of the life which a defendant chose to extinguish.'") (quoting *Payne*); *United States v. Glover*, 43 F. Supp. 2d 1217, 1236 (D. Kan. 1999) (holding that government may present testimony that "provides 'a quick glimpse of the life the defendant chose to extinguish'") (quoting *Payne*); *Cargle v. State*, 909 P.2d 806, 828 (Okla. Crim. App. 1995) (noting that evidence of victim's "personal characteristics should constitute a 'quick glimpse' of their life" and "be restricted to those unique characteristics which define the individual who has died"); *State v. Nesbit*, 978 S.W.2d 872, 891 (Tenn. 1998) ("Generally, victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed"); *State v. Koskovich*, 776 A.2d 144, 175 (N.J. 2001) (reiterating previous holding that "victim-impact evidence should provide only a glimpse of the murder victim's life and background").[1]

Thus, in *Sampson*, the court barred the government from putting into evidence a video about the victim that had been produced for a memorial service. *Id.* at 191. The video was 27 minutes long and included over 200 still photographs of the victim, documenting his life chronologically from birth to right before his death as a full-grown adult, set to evocative music. *Id.* In many of the photos the victim was depicted posing with family, friends and religious figures. *Id.* at 192. The court found that the video "would have constituted an extended emotional

---

[1] Mr. Bowers cites to relevant state court decisions throughout this pleading. Although the Court is obviously not bound by them, Mr. Bowers submits that they are instructive and persuasive. The state courts cited are applying the same constitutional principles that the Court must apply in this case, and the states have extensive experience with the admission of victim impact evidence in death penalty cases.

appeal to the jury and would have provided much more than a quick glimpse of the victim's life."
*Id.* It therefore held that "its probative value was outweighed by the danger of unfair prejudice, and created a danger of provoking undue sympathy and a verdict based on passion as opposed to reason," and excluded the evidence.

The court in *Sampson* relied heavily on the decision of the Texas Court of Appeals in the factually similar *Salazar v. State*, 118 S.W. 3d 880 (Tex. App. 2003). *Sampson*, 335 F. Supp. 2d at 191-92. In *Salazar*, the prosecution was permitted to introduce a video chronicling the entire life of the victim, who was 20 years old at the time of his death. *Salazar*, 118 S.W.3d at 882. The video was 17 minutes long, contained 140 still photos arranged in a chronological montage, and was set to evocative music. *Id.* The appellate court noted that "the implicit suggestion [of the video was] that appellant murdered this angelic infant; he killed this laughing, light-hearted child; he snuffed out the life of a first-grade soccer player and of the young boy hugging his blond puppy dog," and thus "[t]he danger of unconsciously misleading the jury [was] high." *Id.* at 884. While "the prejudicial effect [of the video was] enormous," it was "barely probative of the victim's life at the time of his death," *id.*, and the appellate court vacated the defendant's sentence.

In *Cargle*, the Oklahoma Court of Criminal Appeals found error in the admission of victim impact testimony that, while "emotionally powerful," was largely "irrelevant." 909 P.2d at 829-830. As in *Sampson* and *Salazar*, the evidence, in the form of a lengthy statement read by a victim's sister, documented almost the entirety of the 33-year-old victim's life, beginning with an anecdote about him when he was age four. *Id.* 824 n.12. It continued with a story of him getting sunburned at the age of eight, included how he used to collect worms for local fishermen as a child and supported the Special Olympics in high school, described his talents as an artist and

recounted his efforts raising money for local causes and dressing up as Santa to entertain children at Christmas. *Id.* The court noted that "portraying [the victim] as a cute child at age four in no way provides insight into the contemporaneous and prospective circumstances surrounding his death; nor does it show how circumstances surrounding his death have financially, emotionally, psychologically, and physically impacted on members of the victim's immediate family." *Id.* at 829. It therefore found that the probative value of the statement as a whole was substantially outweighed by its prejudicial effect. *Id.* at 830.

Setting out the parameters for permissible victim impact testimony in advance of trial, the District Court for the District of Alaska applied the principle that such evidence be limited to a quick glimpse of a victim's life to exclude testimony by the victims' "childhood friends and distant relatives." *Smith*, 2020 WL 6536208 at *7. The government had also proposed to admit 62 photographs of one victim and 110 photographs of the other. *Id.* at 9. The Court held that it did "not intend to allow the government to present dozens of photographs of each victim or any video or slideshow set to music." *Id.* It instructed the government to select "a reasonable number of photographs of each victim, consisting primarily of photographs of the victim as an adult close in age to the age they were when they were killed." *Id.* The court further stated that it might allow one photograph of each victim as a child, subject to defense objections after the photographs had been selected. *Id. See also United States v. McVeigh*, 153 F.3d 1166, 1221 n.47 (10th Cir. 1998) (noting that district court prohibited the introductions of victims' wedding videos and home videos).

Limiting the amount of evidence of the victim's exemplary character and benefit to the community is also necessary to reduce the risk of inviting impermissible comparative worth judgments. *See, e.g., United States v. Fell*, No. 5:01-cr-00012-GWC ECF 1100 at 20 (D. Vt. Jan

20, 2017) (victim impact evidence "is not admissible to prove that one victim matters more than another"); *Mosley v. State*, 983 S.W.2d 249, 262 (Tex. Crim. App. 1998) (limiting victim impact evidence "[w]hen the focus of the evidence shifts from humanizing the victim and illustrating the harm caused by the defendant to measuring the worth of the victim compared to other members of society, then the State exceeds the bounds of permissible testimony . . . Trial judges should exercise their sound discretion in permitting some evidence about the victim's character and impact on others' lives while limiting the amount and scope of such testimony"); *Livingston v. State*, 444 S.E. 2d 748, 751 (Ga. 1994) (noting that it would be constitutionally impermissible for a jury to base its death penalty recommendation on the victim's social status); *Koskovich*, 776 A.2d at 182 ("comparing convicted murderers with their victims is inherently prejudicial because defendants in that setting invariably will appear more reprehensible in the eyes of jurors"). *See also* Amy K. Phillips, Note, *Thou Shalt Not Kill Any Nice People: The Problem of Victim Impact Statements in Capital Sentencing*, 35 Am. Crim. L. Rev. 93, 105 (12997 ("victim impact evidence invites the jury to evaluate the victim's characteristics, such as wealth, class, and family characteristics, and to value the victim's worth accordingly"); Wayne A. Logan, *Through the Past Darkly: A Survey of the Uses and Abuses of Victim Impact Evidence in Capital Trials*, 41 Ariz. L. Rev. 143, 157-58 (1999) ("victim 'characteristics' evidence carries the even greater threat that capital jurors, privy to a stream of witnesses extolling the virtues of the victim, will be tempted to weigh the relative worth of the victim against the defendant they have just found guilty of murder").

Especially pertinent in a case like this is that, even if individual pieces of evidence may not unduly inflame jurors' emotions, if many witnesses are permitted to testify at length and in great detail the total volume of information may overwhelm the jury and cause undue prejudice

to the defendant. "Victim impact and character evidence may become unfairly prejudicial through sheer volume. Even if not technically cumulative, an undue amount of this type of evidence can result in unfair prejudice under Rule 403. Hence, we encourage trial courts to place appropriate limits upon the mound, kind, and source of victim impact and character evidence." *Mosley*, 983 S.W.2d at 263. *See also Livingston*, 444 S.E.2d at 751 ("even some legitimate victim impact evidence could inflame or unduly prejudice a jury if admitted to excess").

### B.   The Government May Also Present a Brief Factual Statement of the Scope of the Loss Suffered by the Victim's Family Members.

#### 1.   Victim Impact Testimony Should be Limited to Family Members of the Deceased Victims.

In federal capital prosecutions, only testimony regarding the impact of a decedent's death on members of his or her family should be permitted as both *Payne* and the FDPA, by their terms, apply only to evidence of impact on family members. As noted above, the holding of *Payne* was that the Eighth Amendment erects no *per se* bar to admission of evidence "about the impact of the murder on the victim's **family**." *Payne*, 501 U.S. at 827 (emphasis added). Its holding was based on a finding that "the harm that a capital defendant causes a victim's **family**" is a legitimate sentencing consideration." *Id.* at 819 (emphasis added). And the facts of that case were limited to testimony by the victim's mother about the impact of her daughter and granddaughter's deaths on her grandson. *Id.* at 826.

Mirroring this language, the FDPA states that the government may present as an aggravating factor "the effect of the offense on the victim and the victim's **family**, and may include . . . a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's **family**." 18 U.S.C. § 3593(a) (emphasis added). If Congress intended to allow, and believed that *Payne* permitted, evidence of

the impact of the victim's death on individuals outside of the victim's family or on the community at large, presumably it would have said so. Victim impact evidence should therefore be limited to the impact on the decedent's family members. *See United States v. Fields*, 516 F.3d 923, 947 (10th Cir. 2008) (declining to extend scope of permissible victim impact testimony to victim's co-workers because the loss is "very far afield from the personal loss discussed in cases" since *Payne* "approv[ed] victim-impact evidence from family members"); *United States v. Shakir*, No. 3:98-00038 ECF No. 3178 at 3-4 (M.D. Tenn. Apr. 2, 2008) (precluding victim impact testimony from non-relatives or friends as "there is no reference to friends in the statute" and no compelling reason to admit same); *State v. Muhammad*, 678 A.2d 164, 181 (N.J. 1996) (holding that victim impact evidence may describe generally "the impact of the victim's death on his or her immediate family"); *State v. Nesbit*, 978 S.W.2d 872, 891 (Tenn. 1998) (limiting victim impact testimony to impact "upon members of the victim's immediate family") (citing *Payne*).

Allowing the government to present evidence of the impact of the decedent's deaths on the community at large is particularly improper:

> Including the community in the victim-impact inquiry is fraught with complication. It would involve not just the incremental extension from family to friends (and even to co-workers), but a radical change in perspective: replacing a close-in focus on persons closely or immediately connected to the victim with a wide view encompassing generalized notions of social value and loss. Even if justified in principle, such an approach would be difficult to delimit and police to make sure it stayed within proper bounds . . . Lacking clear direction from the Supreme Court, we do not approve further expansion of the inquiry to the community.

*Fields*, 516 F.3d at 947. In *State v. Young*, 196 S.W.3d 85, 109-110 (Tenn. 2006), the Tennessee Supreme Court held that it was improper for the victim's university professor to have testified about the effect of her death on everyone in his department. He described how students were unable to complete their work, professors were unable to teach their classes and the entire

department ground to a halt. *Id.* The court found that "the danger of unfair prejudice was such as to outweigh the probative value of this proof. Dr. Sandstrom's testimony was not limited to a 'brief glimpse' of the victim's life, but rather laid the debilitating grief of over one hundred people at Defendant's feet. The risk of inflaming a jury's passions with such testimony is simply too great to allow its admission." *Id.* at 110. The court further found improper testimony from the victim's friend that the victim "'had a whole army of friends out here' and that 'friends all over the world will never have her again.'" *Id.*

Such broad testimony about the impact of a victim's death on the wider community clearly and directly invites impermissible comparative worth assessments. The jury is essentially asked to impose a sentence of death because the victim was well thought of by a large number of people and must therefore have been an especially good person. *See* Phillips, *supra*, at 106 (noting that victim impact statement in *Booth* "indicated that the victims' funeral 'was the largest in the history of the Levinson Funeral Home' and that the family received 'over one thousand sympathy cards,'" testimony that "paints a picture for the jurors of . . . victims holding a prominent place in the community" and "invite[s] jurors to deem it a greater crime to kill" such a person). Evidence of such matters as the large turnout at a victim's funeral, makeshift memorials set up by the community at the death site, vigils, gofundme.com and other fundraising efforts to which large numbers of people contributed and the like must therefore be excluded.

## 2.   Evidence Should be Limited to a General Factual Profile of the Impact Upon the Decedent's Family Members

Victim impact evidence should be limited to a brief general factual description of the impact that the decedent's death has had on his or her family members, free from inflammatory statements and from purely emotional pleas. *See Glover*, 43 F. Supp. 2d at 1236 (directing that victim impact testimony regarding the loss to the victim's family "should be factual, not

emotional, and free of inflammatory comments or references"). *See also Sampson*, 335 F. Supp. 2d at 187 (testimony may not include "a 'mere emotional plea' unrelated to the impact of the crime on the victims or their families") (quoting *Hain v. Gibson*, 287 F.3d 1224, 1237-38 (10th Cir. 2002)); *Muhammad*, 678 A.2d at 181 (permitting only testimony that "describe[s] generally the impact of the victim's death on his or her immediately family" that is "factual, not emotional, and should be free of inflammatory comments or references"); *Turner v. State*, 486 S.E.2d 839, 842 (Ga. 1997) (approving victim impact statements that did not "provide[] a detailed narration of . . . emotional and economic sufferings of the victim's family") (internal quotation omitted) (alteration in original).

In *State v. Bernard*, 608 So.2d 966, 971 (La. 1992), the court held that prosecutors may introduce "a limited amount of general evidence demonstrating harm to the victim's survivors." The more detailed the evidence that is presented on this issue, the court warned, the less relevant it is to the circumstances of the crime or the character and propensities of the defendant, and "the more marginal the relevance of the victim impact evidence, the greater is the risk that an arbitrary factor will be injected into the jury's sentencing deliberations." *Id.* "The introduction of "particularized narrations of the emotional, psychological and economic sufferings of the victim's survivors, which go beyond the purpose of . . . verifying the existence of survivors reasonably expected to grieve and suffer because of the murder, treads dangerously on the possibility of reversal." *Id.* at 972.

Similarly, the Oklahoma Court of Criminal Appeals held that, while some evidence of the emotional impact of the victim's death on family members may be admitted, "a trial court runs a much greater risk of having its decision questioned on appeal," by admitting it, especially where the evidence is solely of emotional impact to the exclusion of other effects of the loss. *Cargle*,

909 P.2d at 830. "The more a jury is exposed to the emotional aspects of a victim's death, the less likely their verdict will be a reasoned moral response to the question whether a defendant deserves to die; and the greater the risk a defendant will be deprived of Due Process." *Id.* The court also excluded a photograph of the two victims together in life as clearly irrelevant because it offered no information about how their deaths were affecting their survivors. *Id.*

There is no justification for permitting testimony on subjects such as how and when a victim's family member learned the news about what had happened to their loved one or their last contacts with their loved one before they were killed. Such topics are obviously intensely emotional and offer no factual information about the impact of the loss on the surviving family member. Nor should evidence about a family member's subsequent efforts to cope with the effect of the loss of their relative be admitted, for it is the effect of the loss itself that is relevant; efforts to cope merely add an additional, unnecessary layer of emotion to the presentation.

### C.  No Opinions or Characterizations About Mr. Bowers, the Crime, the Trial Process or the Appropriate Sentence May be Introduced.

The Supreme Court's opinion in *Payne* expressly left intact its holding in *Booth* that "information concerning a victim's family members' characterization of and opinion about the crime, the defendant, and the appropriate sentence" are inadmissible. *Payne*, 501 U.S. at 830 n.1 ("noting that "this case presents no challenge" to that aspect of the holding in *Booth*). The Court subsequently reaffirmed the continuing vitality of this prohibition in *Bosse v. Oklahoma*, 137 S. Ct. 1 (2016) (per curiam) ("*Payne* specifically acknowledged its holding did not affect *Booth's* prohibition on opinions about the crime, the defendant, and the appropriate punishment . . . Our decisions remain binding precedent until we see fit to reconsider them") (internal quotations omitted).

13

Additionally, victim impact testimony may not include descriptions of harm that has resulted from the trial process. *See United States v. McVeigh*, 944 F. Supp. 1478, 1491 (D. Colo. 1996) ("because victim impact evidence is relevant only to demonstrate the specific harm caused by a particular crime, it seems clear that the victims' testimony must reflect the harm caused by the criminal conduct, rather than the impact of the trial proceedings") (internal citations omitted); *Smith*, 2020 WL 6536208 at *7 (noting disinclination to find such testimony relevant). Indeed, admitting testimony on this subject would impermissibly burden a defendant's Sixth Amendment right to a trial. *Cf. Griffin v. California*, 380 U.S. 609, 614 (1965) (noting that commenting on a defendant's refusal to testify at trial "is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly").

> **D. The Government's Proposed Evidence Must be Examined Piece by Piece and as a Whole to Determine Whether its Probative Value is Outweighed by the Danger of Unfair Prejudice to Mr. Bowers and, if so, it Must be Excluded.**

As noted, the admission of victim impact evidence violates the Constitution if it "'is so unduly prejudicial that it renders the trial fundamentally unfair' in violation of a defendant's right to due process." *United States v. Sampson*, 335 F. Supp. 2d 166, 186 (D. Mass. 2004) (quoting *Payne*). "'[I]n each case there is a traditional guard against the inflammatory risk, in the trial judge's authority and responsibility to control the proceedings consistently with due process." *Id.* (quoting *Payne*, 501 U.S. at 836 (Souter, J., concurring)). "Exercising this authority is essential in a capital case for, as the Supreme Court has cautioned, '[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.'" *Id.* (quoting *Gardner v. Florida*, 430 U.S. 349, 358 (1977)); *see also Smith*, 2020 WL 6536208 at *4 (quoting *Sampson*); *Solomon*, 513 F. Supp. 2d at 540 (noting that, [u]nder the FDPA, the Court has the gatekeeping

role to exclude any evidence from the consideration of the jury that is more unfairly prejudicial than probative"); *United States v. Northington*, No. 07-55005, 2013 WL 2147947 (E.D. Pa. May 16, 2013) (noting that "scope and limit of victim impact evidence 'is a matter for the court's discretion and must be determined with consideration for the constitutional limitation that the jury must not be influenced by passion or prejudice'") (quoting *United States v. McVeigh*, 944 F. Supp. 2d 1478, 1488 (D. Colo. 1996)).

There are "two checks on potentially unfairly prejudicial victim impact evidence . . . The first check is the trial court's statutory responsibility, *see* 18 U.S.C. § 3593(c), to decide if the probative value of a particular piece of evidence is outweighed by the danger of unfair prejudice . . . The second check is the responsibility of the court to secure the defendant's right to due process by viewing the proffered evidence in the case and deciding if its admission would contribute to or detract from a trial that is fundamentally fair and allows jurors to base their decisions on reason and reliable evidence rather than passion." *Id.* at 187. *See also United States v. Con-Ui*, No. 3:13-CR-123, 2017 WL783437 (M.D. Pa. Mar. 1, 2017) (noting that a due process violation may 'arise out of a single action or piece of evidence. It could also arise from the cumulative effect of a number of pieces of evidence in combination . . . [these] concerns demand that I consider the case as a whole and assess the overall effect of all evidence which may involve the danger of unfair prejudice") (quoting *Sampson*).

### 1.   The Probative Value of Victim Impact Evidence

At the conclusion of the sentencing phase jurors are called upon to render an individualized, reasoned moral judgment as to whether a sentence of death is appropriate for the defendant based upon the character of the defendant and the circumstances of the crime. *See, e.g., Penry v. Lynaugh*, 492 U.S. 302, 328 (1989) (holding that "full consideration of evidence

that mitigates the death penalty is essential if the jury is to give a reasoned moral response to the defendant's background, character, and crime") (internal quotations omitted).  To assess the probative value of aggravating evidence sought to be admitted, including victim impact evidence, the Court must therefore first determine whether it is relevant to that judgment – i.e. whether it tends to increase the moral blameworthiness of the defendant and, if so, the extent to which it does so.

The moral blameworthiness of a capital defendant is determined based upon circumstances of the crime about which he had foreknowledge or that were reasonably foreseeable. Obviously, if a defendant was aware that the victim was the mother of two children, for example, and decided to take her life anyway, the fact that she was a mother and he would be depriving her children of their parent is directly relevant to his moral culpability. *See Nesbit*, 978 S.W.2d at 892-93 (approving testimony of impact of decedent's death on her children where defendant knew she was a single mother of five and holding that "probative value is particularly great, where the proof shows . . . that a defendant had specific knowledge about the victim's family when the crime was committed"); *Muhammad*, 678 A.2d at 172 (same); *see generally Payne*, 501 U.S. at 812-13 (decedent was a mother whose children were with her in apartment when crime occurred).

Additionally, the fact that the decedent was a unique individual and that they are likely to leave behind family members who will be negatively impacted by their loved one's death are consequences that are eminently foreseeable in any case of intentional murder. *See Bernard,* 608 So.2d at 971-72; *Muhammad*, 678 A.2d at 172.

> [A]ny person of basic understanding knows that every murder victim is a unique individual and that the murder will cause some emotional, physical or economic harm to some group of survivors. Since a specific intent murderer either knew or reasonably should have foreseen some of the consequences of his victim's death,

this general knowledge at the time of the crime is a fact bearing on the murderer's moral culpability and to that extent is relevant both to the circumstances of the crime and to the murderer's character and propensities. Thus, the prosecutor, within the bounds of relevance under the statute, may introduce a limited amount of general evidence providing identity to the victim and a limited amount of general evidence demonstrating harm to the victim's survivors.

*Bernard*, 608 So.2d at 971.

However, victim impact evidence that goes beyond "[i]nforming the jury that the victim had some identity or left some survivors" and includes extensive descriptions of the personal characteristics of the victim or the emotional and other impacts on the decedent's family members that the defendant could not have predicted is entirely lacking in relevance and merely risks encouraging the jury to decide the defendant's sentence based upon emotion rather than reason. *Id. See also* Susan Bandes, *Empathy, Narrative, and Victim Impact Statements*, 63 Univ. of Chi. L. Rev. 361, 398 (1996) (noting that capital sentencing decision for particular defendant should be based "on the harm they have caused and their moral culpability for that harm, not on irrelevant fortuities such as the social position, articulateness, and race of their victims and their victim's families"); Janice Nadler & Mary R. Rose, *Victim Impact Testimony and the Psychology of Punishment*, 88 Cornell L. Rev. 419, 422 (2003) (noting that "the emotional fallout of a crime to a victim or a victim's family is a paradigmatic example of adventitious harm" that "reflects neither the murderer's mental state nor the morality of the act itself"). Victim impact evidence must therefore be limited to general evidence of the victim's individuality and the loss to his or her family that is foreseeable and thus relevant to the issue that the jurors will be called upon to decide at the selection phase.

### 2. The Prejudice That Victim Impact Evidence May Cause

In contrast to its very limited probative value, victim impact evidence has the potential to cause overwhelming prejudice to a defendant because of its emotional and heart-wrenching

nature. "Victim impact evidence, by its very nature, is emotionally charged material which involves the risk of injecting arbitrary factors into a capital sentencing hearing." *Bernard*, 608 So.2d at 968. *See also Smith*, 2020 WL 6536208 at * 8 ("'Victim impact testimony cannot be totally divorced from emotion,' and thus, the 'presentation of victim impact evidence can be problematic because of the potential for emotional outbursts during the testimony of family members.'") (quoting *United States v. O'Driscoll*, 203 F. Supp. 2d 334, 340 (M.D. Pa. 2002)). As one district court judge has written:

> I can say, without hesitation, that the 'victim impact' testimony presented . . . was the most forceful, emotionally powerful, and emotionally draining evidence that I have heard in any kind of proceeding in any case, civil or criminal, in my entire career as a practicing trial attorney and federal judge spanning nearly 30 years. Indeed, I cannot help but wonder if *Payne* . . . would have been decided in the same way if the Supreme Court Justices in the majority had ever sat as trial judges in a federal death penalty case and had observed first hand, rather than through review of a cold record, the unsurpassed emotional power of victim impact testimony on a jury. It has now been over four months since I heard this testimony . . . and the jurors' sobbing during the victim impact testimony still rings in my ears.

*United States v. Johnson*, 362 F. Supp. 2d 1043, 1107 (N.D. Iowa 2005). The victim impact testimony presented during the trial of Timothy McVeigh in 1997 has been described as evidence of harm "in riveting, emotional, poignant, heart-wrenching detail: that was allowed to "flood the courtroom." Richard Burr, *Litigating with Victim Impact Testimony: The Serendipity That Has Come from* Payne v. Tennessee, 88 Cornell L. Rev. 517, 521, 526 (2003). "The 'grieving process, the mourning process' . . . and the compelling emotional need for witnesses to pay homage to their loved ones and to find some way of sharing their intense pain [] rolled over everyone . . . The truth is that the emotion was so powerful that it overwhelmed all those involved in this case – jurors, counsel, and judge." *Id.*

Social science research tells us that victim impact testimony can block jurors' ability to hear and process a defendant's mitigation story and feel empathy for him.

> [Victim impact statements] evoke unreasoned, unreflective emotion that cannot be placed in any usable perspective. In evidentiary terms, victim impact statements are prejudicial and inflammatory. They overwhelm the jury with feelings of outrage toward the defendant and identification with the victim. Finally, victim impact statements diminish the jury's ability to process other relevant evidence, such as evidence in mitigation.

Bandes, *supra* at 401 (internal citations omitted). *See also* Bryan Myers & Edith Greene, *The Prejudicial Nature of Victim Impact Statements: Implications for Capital Sentencing Policy*, 10 Psychology, Public Policy, and Law 492, 493-94 (2004) (victim impact evidence "may be so emotion-laden in its content that jurors may be persuaded more by how they feel about the testimony than by the facts of the case"); Logan, *supra*, at 177:

> [Victim impact evidence] is perhaps the most compelling evidence available to the State – highly emotional, frequently tearful testimony coming directly from the hearts and mouths of survivors left behind by killings. And it arrives at the precise time when the balance is at its most delicate and the states are highest – when jurors are poised to make the visceral decision of whether the offender lives or dies – after the defendant has been convicted of the most horrendous crime possible.

Jurors, like everybody else, feel empathy most easily with people who are like them. "We all have limited perspectives and a limited ability to empathize with those who do not share our life experiences and values." *Id.* at 399. Most jurors have a "natural, instinctive connection" with the victim of a crime. *Id.* at 400. It is often extremely difficult, however, for jurors to empathize with the defendant. "Not only has the defendant been convicted of a heinous crime – a fact that by itself sets him very much apart from the jury's experience – but he may be from a radically different socioeconomic milieu as well." *Id.* Victim impact statements, and the emotions that they evoke in jurors, further interfere with the challenging task of empathizing with the defendant and comprehending his humanity by playing upon their natural empathy for the victim. *Id.* at 401-03.

Empirical evidence also shows that jurors are, in fact, improperly influenced by the perceived social value of victims, counseling extreme caution in admitting victim impact evidence that highlights and underscores that value. Mock juror studies have shown that jurors "evaluate the perpetrator's intentions less negatively when the victim is disliked." Myers & Greene, *supra*, at 499-500 (collecting studies). One study also showed that jurors' perceptions of harm to the victim's family are affected by the victim's social standing. "Mock jurors rated the family's suffering as greater when the victim was portrayed as more respectable, (e.g., successful, civic minded, a loyal husband and devoted father, a professional photographer) than when the victim was portrayed as less respectable (e.g., a loner and divorced biker)." *Id* at 500 (citing E. Greene, *The Many Guises of Victim Impact Evidence and Effects on Jurors' Judgments*, 5 Psychol., Crime, and Law 331 (1999)).

Psychological research has uncovered several ways in which emotions affect decision making. *See Nadler & Rose, supra,* at 443-48 (collecting studies). "Anger is a punitive emotion; people who are angry in reaction to hearing about a crime are motivated to call for greater punishment for that crime." *Id.* at 443. Anger also alters people's perceptions of why an event happened. *Id.* at 444. People induced to feel anger in one study were more likely to blame individuals for negative outcomes than they were to blame impersonal forces. *Id.* Anger also activates a form of confirmation bias. "Exposure to intense emotional suffering heightens decision makers' negative affect and consequently activates 'blame-validation processing.' In this state, jurors or other decision makers look for ways to hold an offender responsible, even for unforeseeable outcomes . . . In short, the anger aroused by hearing victim impact statements often induces decision makers to engage in a search for evidence to support more blame and punishment." *Id*. at 444-45.

Similarly, feelings of sympathy for the victim's family members motivate jurors to punish more harshly. *Id.* at 446-47. "A particularly intriguing aspect of the role of sympathy in punishment judgements is that the emotional intensity of witnesses giving victim impact testimony is perceived by observers as a cry for help or relief . . . In this way, the emotion expressed by the victim becomes a covert communication about the victim's, or the victim's family's, desire for retribution." *Id.* at 447. Research since *Payne* was decided thus counsels extreme caution in deciding how much emotional victim impact evidence can be admitted without rendering the trial fundamentally unfair.

### E.  The Government Should be Precluded From Presenting Any Evidence Regarding Non-Physical Impact Upon Surviving Victims.

Evidence of the impact upon surviving victims of a crime, other than physical injuries, is overwhelmingly prejudicial, lacks any probative value and should be excluded in its entirety. The fact that victims were physically injured will be admitted in the culpability phase of the trial because it is an element of some of the charged offenses. There is no justification or legal basis, however, for admitting evidence of psychological, financial or emotional impact.

"It is well settled that a jury's discretion to impose the death sentence must be 'suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.'" *Booth v. Maryland,* 482 U.S. 496, 502 (1987) (quoting *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (joint opinion of Stewart, Powell and Stevens, JJ)). The job of the jurors is to "'make an **individualized** determination' whether the defendant in question should be executed, based on 'the character of the individual and the circumstances of the crime'" *Id.* (quoting *Zant v. Stephens*, 462 U.S. 862, 879 (1983) (emphasis in original)). Accordingly evidence received at the trial must have "some bearing on the defendant's 'personal responsibility and moral guilt.'" *Id.* (quoting *Enmund v. Florida*, 458 U.S. 782, 801 (1982)). If not, an unacceptable risk is created

that "a death sentence will be based on considerations that are 'constitutionally impermissible or totally irrelevant to the sentencing process.'" *Id.* (quoting *Stephens*, 428 U.S. at 885)).

In accordance with these established principles, in *Booth* the Supreme Court held that the Eighth Amendment barred the use of victim impact evidence during the penalty phase of a capital trial because it is irrelevant to the capital sentencing decision. *Id.* at 502-03.  With respect to the emotional impact of the crime on the victim's family, the Court found that such evidence "may be wholly unrelated to the blameworthiness of a particular defendant" because "the defendant often will not know the victim, and therefore will have no knowledge about the existence or characteristics of the victim's family." *Id.* at 504. Additionally, the impact of such evidence will depend upon the family members' relative articulateness and ability to describe their feelings, rather than their actual sense of loss. "The fact that the imposition of a death sentence may turn on such distinctions illustrates the danger of allowing juries to consider this information. Certainly, the degree to which a family is willing and able to express its grief is irrelevant to the decision whether a defendant who may merit the death penalty should live or die." *Id.* at 505.

Four years later, the Court reversed course and held that there is no *per se* bar to the introduction of victim impact evidence erected by the Eighth Amendment. *Payne*, 501 U.S. 808. It carved out an exception to the Eighth Amendment principles articulated in *Booth*, on the ground that "[b]y turning the victim into a faceless stranger at the penalty phase of a capital trial, *Booth* deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder." *Payne*, 501 U.S. at 825 (internal quotation omitted).

Plainly, this logic cannot support the dramatic expansion of the holding in *Payne* to permit non-physical impacts upon **surviving** victims at the penalty phase. Far from being "faceless strangers," these victims will have appeared in person before the jury to testify about the crime, what they observed and the bodily injuries they received during the culpability phase of the trial. Their testimony will undoubtedly be detailed, compelling and highly emotional, and the jurors will be left with no doubt whatsoever that each victim has been severely affected by their experiences. There is no justification, therefore, for admitting additional testimony about how they feel about what happened and its emotional impact on them. Such evidence has no additional probative value, and it suffers from both of the defects identified in *Booth*: emotional impact is by definition unforeseeable to a defendant, and the valence of the evidence turns on the expressive language skills of the particular victim. *See* Nadler & Rose, *supra*, at 442 ("unlike physical injury, the severity of emotional injury permits few reliable inferences about the act that led to the injury, because victims vary widely on how they respond and express themselves emotionally to the same crime.").

Additionally, the crimes that resulted in bodily injury to surviving victims are not capital crimes. The responsibility for sentencing on those counts rests with the Court, not the jury. "Clearly, the FDPA refers to the victims of a capital crime." *United States v. Gooch*, 2006 WL 3780781 at *42 (D.D.C. Dec. 20, 2006). The district court in *Gooch* therefore held that, while additional, noncapital crimes of murder were admissible, and the fact of their commission may be alleged as a non-statutory aggravating factor, "[t]hat does not mean, however, that the families of his other alleged victims can properly testify at the selection phase. Mr. Gooch's sentence for any noncapital crimes of which he will be found guilty will be determined by the Court. The families of any other murder victims will have the opportunity to address the Court

for that sentencing. Their losses and emotions are not relevant to whether the jury selects the death penalty for the [capital] murders . . .  and would also be more prejudicial than probative. *Id.* at *42-43; *see also United States v. Shakir*, No. 3:98-00038 ECF No. 3178 at 2-3 (M.D. Tenn. Apr. 2, 2008) (same, noting that admitting evidence in aggravation "through the family members of murder victims for which a defendant is not facing a death sentence would greatly expand the scope of victim impact testimony"); *Sampson*, 335 F. Supp. 2d at 193 (excluding victim impact testimony regarding noncapital murder as FDPA makes no express provision for such evidence and it would create too great a risk that the jurors would be unduly influenced by sympathy and passion in violation of due process). The same reasoning applies equally to noncapital crimes with surviving victims. Thus, the emotional and other non-physical impacts upon those victims should be heard by the court at sentencing for those crimes and should not be presented to the jury deciding whether to sentence a defendant to death.

The fact of the surviving victims' bodily injuries is, of course, admissible and the fact that there were physical injuries to survivors may also be alleged as a non-statutory aggravating factor, for they are a foreseeable consequence of the crime and therefore relevant to the defendant's moral blameworthiness. However, this Court should decline to expand the holding of *Payne* to allow the emotional and other non-physical impact of the crime upon survivors and should exclude all such evidence from the culpability and penalty phases of the trial.

## II. THE COURT SHOULD HOLD A HEARING IN ORDER TO CAREFULLY REVIEW THE GOVERNMENT'S PROPOSED EVIDENCE IN ADVANCE AND MAKE THE REQUIRED FINDINGS REGARDING ITS ADMISSIBILITY.

In order to fulfill its vitally important gatekeeping function to ensure that Mr. Bowers is afforded a fair trial, the Court should conduct a hearing to carefully assess the government's proposed victim impact evidence and determine its admissibility before it is placed before the

24

jury. Once heard, this inherently powerful and emotional evidence cannot be ignored and, if undue prejudice has resulted, it cannot be remedied. Furthermore, especially in a case of this magnitude with a large number of victims, the Court must assess the victim impact evidence as a whole before admitting any of it. The Court must assess whether, *in toto*, the victim impact evidence risks overwhelming the jurors with emotion and resulting in a sentencing decision based upon arbitrary factors rather than a reasoned moral decision. To proceed with presenting the evidence without first making that determination risks the Court being placed in a position of having to terminate the presentation midstream if it becomes apparent that the risk of unfair prejudice has become too great.

The Court must therefore conduct a hearing to review the government's proposed evidence in its entirety and assess its admissibility piece by piece and as a whole. To accomplish this task in the most accurate and efficient manner, the Court should follow the procedure first implemented in *Glover*, 43 F. Supp. 2d at 1235-36, and subsequently followed by a number of federal district courts. In *Glover*, "mindful of its authority and responsibility to control the proceedings consistently with due process," the court directed the government to "submit a written statement describing the proposed testimony as to each 'victim impact witness'" in advance of the penalty phase. *Id.* at 1235 (internal quotations omitted). The court granted the defendant's request that it "weigh each specific point of the proffered testimony to ensure that its probative value is not substantially outweighed by the risk of undue prejudice and misleading the jury, and to determine the relevance of the proffered testimony." *Id.* It also agreed to instruct each witness that testimony concerning his or her characterizations and opinions about the defendant, the crime or the appropriate sentence was forbidden. *Id.*

This Court should further require the government to inform the Court and the defense in advance of the hearing if it anticipates that any of its witnesses may have difficulty controlling their emotions on the witness stand. This will allow the Court to decide whether additional measures are necessary to protect the integrity of the trial such as video recording the witness' testimony to play for the jury or having the victim's statement read by a third party. *See, e.g., United States v. Christensen*, No. 2:17-cr-20037 ECF No. 529 at 24-39 (C.D. Il. July 9, 2019) (victim impact testimony from decedent's mother videotaped and unduly prejudicial portions edited out before recording played for jury); *O'Driscoll*, 203 F.Supp.2d at 341 n.6 (noting that court "will give serious consideration" to any request that victim impact witnesses be videotaped and presented to jury in that manner to "eliminate the possibility of emotional and potentially prejudicial outbursts" before the jury).

The procedures implemented in *Glover* and requested by Mr. Bowers have been adopted by several additional federal district courts including the Middle District of Pennsylvania*, see O'Driscoll*, 203 F.Supp.2d at 340-41 (following *Glover* and requiring advance submission of written statements describing testimony of each witness); the Eastern District of Pennsylvania, *see Northington*, 2013 WL 2147947 (requiring advance production of victim impact statements or outline of specific testimony of each witness to allow defendant to make specific objections); the Eastern District of New York, *see United States v. Wilson*, 493 F. Supp. 2d 491, 505-06 (E.D.N.Y. 2007) (same); the District of Massachusetts, *see United States v. Sampson*, No. 01-cr-10384 ECF No. 2430 at 4 n.3 (D. Mass. Aug. 26, 2016) (*"Sampson II"*) (requiring pretrial proffer of entirety of anticipated testimony of victim impact witness); and the Southern District of Ohio, *see United States v. Henderson*,  485 F. Supp. 2d 831, 849-850 (S.D. Ohio 2007)

(requiring advance production of written victim impact statements for court to review and redact as needed and requiring witnesses to read those statements verbatim at trial).

A number of state courts have prescribed similar procedures in order to protect a defendant's right to a fair trial. *See, e.g., State v. Muhammad*, 678 A.2d 164, 179-181 (N.J. 1996) (requiring victim impact testimony to be reduced to writing, a pretrial hearing to conduct preliminary determination of admissibility and a limit of one witness who must read written statement); *State v. Nesbit*, 978 S.W.2d 872, 891 (Tenn. 1998) (requiring notice to court of intent to introduce victim impact evidence and hearing outside presence of jury to determine admissibility); *State v. Bernard*, 608 So.2d 966, 972-73 (La. 1992) (same); *Cargle*, 909 P.2d at 828 (state must file notice detailing victim impact evidence sought to be introduced and court must conduct in-camera hearing to determine admissibility); *Turner v. State*, 486 S.E.2d 839, 841-42 (Ga. 1997) (approving procedure requiring victim impact witnesses to prepare written statements, pretrial hearing to determine admissibility then requiring witness to read the written statement before jury).

In *United States v. Davis*, 912 F. Supp. 938, 949 n. 27 (E.D. La. 1996), the court conducted a pretrial evidentiary hearing to assess the admissibility of the government's evidence in support of non-statutory aggravating factors including victim impact. The court in *United States v. Illera Plaza*, 179 F. Supp. 2d 464, 469 (E.D. Pa. 2001), recognized its authority to conduct such a hearing but denied the defendant's request without prejudice because it lacked sufficient information regarding the evidence that the government would seek to introduce. It directed the government to submit an outline of the specific evidence that it planned to present and the defense to lodge any evidentiary objections thereto, following which it pledged to reconsider the need for an evidentiary hearing. *Id.* at 474-75.

In contrast to *Illera Plaza*, Mr. Bowers' request for an informational outline of the government's proposed victim impact evidence, ECF 157, was denied, ECF 205. It is therefore even more critical that the Court conduct a hearing on the admissibility of victim impact testimony in this case. *See also United States v. Solomon*, 513 F. Supp. 2d 520, 535, 539-540 (W.D. Pa. 2007) (finding pretrial evidentiary hearing unnecessary in light of order directing government "outline the type and scope of the devastating effect suffered by each victim, his or her family members, and other individuals as relevant, and the personal characteristics of each victim that it intends to prove"); *Smith*, 2020 WL 6536208 (D. Alaska Nov. 5, 2020) (finding it unnecessary to order government to submit victim impact witnesses' testimony in writing prior to testimony in light of informational outline already ordered and provided and order to submit updated outline the information each witness will present shortly before trial begins). It is difficult enough for a defendant to object to inadmissible evidence during victim impact testimony in real time; with no idea of what is coming, defense counsel will be incapable of protecting Mr. Bowers' constitutional rights if the requested admissibility hearing is denied.

If the Court does not establish parameters for the government's victim impact evidence **before** the penalty phase begins risks extreme and undue prejudice to Mr. Bowers. Expecting defense counsel to lodge objections during the government's victim impact case where testimony or evidence overruns the constitutional and statutory parameters puts Mr. Bowers' attorneys in the position of choosing between preserving his rights and risking the assured reprobation of the jury for having interrupted and objected to a rightfully emotionally distraught victim witness. *Shockley v. State*, 579 S.W.3d 881 (Mo. 2019) ("objecting would have made it appear as if defendant were trying to hide someone's grief, which would not have been in his best interest"); *Williams v. State*, 251 S.W.3d 290, 295 (Ark. 2007). Moreover, even were the Court to address

such an objection at sidebar, out of the jury's hearing, the witness would be left alone on the witness stand under the weight of the memories and sense of loss for the jury to observe. *United States v. Johnson*, 713 F. Supp. 2d 595, 625 (E.D. La. 2010) (during sidebar objection, victim-impact witness remained on stand and "continue[d] to cry within feet" of jurors, leaving them "totally vested in her plight" and "feel[ing] her misery unattended by counsel and the Court"). Once the government's presentation has begun, it is not easily interrupted without grave prejudice to Mr. Bowers.

The vital necessity of such a hearing is underscored by the indications  the government has given that it plans an expansive presentation of all kinds of victim impact testimony with scant regard for the principles set forth in Section I, *supra.* Before the penalty phase even begins, the jury will already have been exposed to a significant amount of evidence related to the impact of the crimes on victims admitted for other purposes during the culpability and eligibility phases. The government's proof of counts 1-11, 34-35, and 40-51, alleging violations of 18 U.S.C. § 247 by obstructing free exercise of religion, will necessarily include evidence that all 23 civilian victims were active religious worshippers of the Jewish faith who attended synagogue on October 27, 2018.

 Furthermore, the government's theory is that the building was targeted because one of the congregations housed therein, Dor Hadash, was a participant in the National Refugee Shabbat, an international event in support of the Hebrew Immigrant Aid Society ("HIAS"). HIAS is a Jewish humanitarian organization that "provides vital services to refugees and asylum seekers around the world and advocates for their fundamental rights so they can rebuild their lives." https://hias.org/who/ (last accessed Mar. 11, 2023). Thus, the jury will have learned that at least some of the victims were members of a congregation that was supporting charitable work.

Indeed, the government has included the President and CEO of HIAS, Mark Hetfield, on its Witness List.

Counts 1-11, 34-35, and 40-51 also require the government to prove that the offenses were "in or affect[ed] interstate or foreign commerce." 18 U.S.C. §247(b). Mr. Bowers' Motion for a Bill of Particulars regarding this category of Evidence, ECF No. 152, was denied, ECF No. 200, and so he is largely in the dark about what evidence the government will seek to admit in support of this element. However, the government has suggested that it may include "the effects that [the] crimes had on the three congregations, including GoFundMe and other national and international fundraising efforts." ECF No. 175 at 7; *see also* ECF No. 249 at 33 (same). Such evidence should be excluded, *see* ECF 1092 at 31-33, but if admitted would obviously constitute additional (and improper) victim impact evidence. And documents disclosed in discovery indicate that it may also attempt to admit during the culpability phase evidence about the operations of the three affected congregations, including services provided by them both before and as a result of the crime.

The government's proof of counts 34 and 35, alleging bodily injury to two civilian victims, and counts 40-51, alleging bodily injury to five public safety officers, will no doubt include testimony from each of those individuals, all of whom are listed on in the government's recently filed Witness List, regarding the injuries they suffered and the physical effects of the crime upon them.

One of the statutory aggravating factors alleged by the government, Vulnerable Victim, asserts that six of the deceased victims were particularly vulnerable due to old age and two additional decedents were especially vulnerable due to infirmity. During the guilt or eligibility phases, therefore, it is likely that the government will introduce evidence of the ages of the six

older victims and, presumably, the effects that their advanced age had on their physical condition and corresponding ability to escape being killed. It will also likely seek to admit evidence that two of the victims were developmentally disabled and, presumably again, evidence of the effects of those disabilities on their functioning and on their vulnerability to death.

With regard to the sentence selection phase, Mr. Bowers knows very little about the additional victim impact testimony and other evidence that the government will seek to introduce because his Motion for Informative Outline of Aggravating Factors, ECF No. 157, was denied, ECF No. 205. The government has produced a Witness List which, as noted, includes the names of the seven surviving victims who received bodily injuries and, additionally, 19 surviving victims who it is alleged suffered "serious . . . emotional injury" or "severe psychological impacts and grievous economic hardship."  ECF No. 86 at 4-5. Additionally, the Witness List names 18 family members of the deceased victims, including multiple members of each family in most cases. It also includes at least six additional members of the three congregations to which the victims belonged.

In its Notice of Intent to Seek the Death Penalty the government states that, for its Victim Impact non-statutory aggravator, it intends to prove that the crime resulted in "injury, harm, and loss" to the 11 deceased victims, as well as "to the family, friends, and coworkers of those individuals." ECF No. 86 at 3-4. It further states that the injury, harm and loss will be "evidenced by the victim's personal characteristics and by the impact of the victim's death upon his or her family, friends, associates, and coworkers." *Id.* at 4. The government elaborated a little further in its Response to Mr. Bowers' Motion for Informative Outline, stating that:

> It can be reasonably anticipated based upon the Notice of Intent that presentation of [victim impact] evidence will entail calling family members, friends, associates, and co-workers of the victims. These witnesses will describe the personality of the victim to the jury, likely relying on their interactions with the victim and discussing

the victim's life history. Similarly, it is to be expected based on the Notice of Intent that discussion of the impact of the victim's death will likely include discussion of the witness's last contacts with the victim, how the witness learned of the victim's fate, their reactions to the victim's death, the impacts the victim's death had on his or her community and workplace, and their efforts to cope with the loss.

ECF No. 178 at 30-31. It also recited the outline of victim impact evidence that the government

submitted in *United States v. McCluskey*, No. 10-2734 JCH, 2013 WL 12330201 at *3 (D.N.M.

June 11, 2013):

> By killing the [victims], the Defendant caused injury, harm and loss to the victims and the victims' families and friends. The Government will present victim impact testimony from multiple family members and friends establishing the witnesses' close relationships with the victims, how they learned the victims had been killed, how their lives have been changed without the victims, and the deep psychological and emotional impact the loss of the victims has caused each of the witnesses. The Government will prove this factor through witness testimony, photographs, and family heirlooms, such as wedding, anniversary, and reunion announcements and programs, memorial service programs and materials, and other mementoes. The Government may present testimony from [a list of victim impact witnesses, which denoted the relationship of each witness to the victim].

*Id.* at 35, noting that "without limiting itself this far in advance of trial, the United States can

represent that it anticipates the victim impact witness testimony in this case would be generally

consistent with the representations made by the United States in *McCluskey*," *id.* at 36. Recently,

in its two-page Penalty Phase Exhibit List, the government disclosed that it intends to introduce

"Images and/or Artifacts of" the 11 deceased victims, the two physically injured civilian

witnesses and three of the five physically injured law enforcement officers. No further details or

description of this evidence were provided.

With respect to its Injury to Surviving Victims non-statutory aggravator, the Notice of

Intent states that Mr. Bowers "caused serious physical and emotional injury, including maiming,

disfigurement, permanent disability, severe psychological impact, and grievous economic

hardship to individuals who survived the offense," including the two physically injured civilians,

13 otherwise injured civilians, five physically injured law enforcement officers and seven otherwise injured law enforcement officers. ECF No. 86 at 4-5.[2]

Even with this meager amount of information about what the government intends to present, it is obvious that their evidence is likely to exceed constitutional and statutory bounds in multiple respects. The contemplated victim impact evidence is far more substantial than the "quick glimpse" of each deceased victim's personal characteristics that is constitutionally permissible. The government has expressed its intent for witnesses to discuss the decedents' entire "life history" and the impact of their deaths not only on their family members but also their "friends, associates, co-workers . . . community and workplace." ECF No. 178 at 3031. They intend to ask their witnesses to testify on such irrelevant and unduly prejudicial topics as how they learned that the decedent had been killed. *Id.*

They also plan on introducing items of evidence that will merely exacerbate the emotional impact of the witnesses' testimony such as "photographs, and family heirlooms, such as wedding, anniversary, and reunion announcements and programs, memorial service programs and materials, and other mementoes." *Id.* at 35. Introducing all of this evidence would take many days and would completely dominate and overwhelm the trial to the point that the jurors will be unable to attend to anything else. The Court should therefore grant the requested admissibility hearing to address the serious constitutional and statutory concerns raised by the government's proposal.

---

[2] As noted in Section I.E., *supra*, all evidence of non-physical injury to these survivors should be excluded.

Respectfully submitted,

*/s/ Judy Clarke*
Judy Clarke
Clarke Johnston Thorp & Rice, PC

*/s/ Michael N. Burt*
Michael N. Burt
Law Offices of Michael Burt, PC

*/s/ Michael J. Novara*
Michael J. Novara
First Assistant Federal Public Defender

*/s/ Elisa A. Long*
Elisa A. Long
Supervisory Assistant Federal Public Defender

*/s/ Ashwin Cattamanchi*
Ashwin Cattamanchi
Assistant Federal Public Defender