IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT BOWERS | Criminal No. 18-292 |

### NOTICE REGARDING GOVERNMENT CAUSE CHALLENGES TO JUROR 137, JUROR 159, AND JUROR 164, AND DEFENSE CAUSE CHALLENGES TO JUROR 155, JUROR 162, AND JUROR 166

AND NOW comes the United States of America, by its attorneys, Troy Rivetti, Acting United States Attorney for the Western District of Pennsylvania, Soo C. Song, Eric G. Olshan, and Nicole Vasquez Schmitt, Assistant United States Attorneys for said district, Mary J. Hahn, Trial Attorney, Civil Rights Division, and Barry K. Disney and Aaron J. Stewart, Trial Attorneys, Capital Case Section, and respectfully submits this notice concerning (1) the government's cause challenges to Juror 137, Juror 159, and Juror 164 based on their repeated equivocation in response to questions about their ability to impose a death sentence; (2) the defendant's cause challenges to Juror 155, Juror 162, and Juror 166, each of whom stated that they would consider mitigation evidence concerning a defendant's childhood; and (3) the appropriate weighing process in determining a sentence under the FDPA.

I.  **The Court Should Grant the Government's Motions to Strike Juror 137, Juror 159, and Juror 164, Who Repeatedly Provided Equivocal Answers Regarding Their Ability to Impose a Death Sentence**

During the first week of voir dire, several prospective jurors expressed strong anti-death penalty views and provided equivocal answers concerning their ability to impose a death sentence. The government has moved to strike some of those jurors for cause—as relevant here, Juror 137, Juror 159, and Juror 164. The government specifically cited equivocal and unclear answers as the

basis for the strikes of Juror 159 and Juror 164. And while the government's stated basis for cause against Juror 137 was not strictly based on equivocal answers,[1] the record shows that she was entirely unclear and inconsistent in her responses. The Court has taken those motions under advisement.

As a general matter, a venireperson may be excluded from a capital jury panel if their views on the death penalty "prevent or substantially impair the performance of [their] duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424 (1985). It is in the trial judge's discretion to determine whether a venireperson is so impaired, and that determination will control absent an abuse of discretion. See United States v. Ortiz, 315 F.3d 873, 888 (8th Cir. 2002). To that end, a venireperson's equivocation in the face of questioning is a valid basis for the trial court to dismiss that individual from the panel. See United States v. Johnson, 495 F.3d 951, 966 (8th Cir. 2007) (finding no abuse of discretion where the district court excluded a juror for "equivocal, ambiguous, and inconsistent" answers).

In United States v. Gabrion, for example, the Sixth Circuit dealt with this issue in the context of two venirepersons who provided equivocal answers regarding their views on the death penalty. 719 F.3d 511, 526 (6th Cir. 2013). The trial court had excluded two venirepersons for their responses, and the defendant challenged those excusals on appeal. Id. The court of appeals examined the voir dire record and determined that the trial court did not abuse its discretion. Id. at 528-29.

---

[1] The United States also moved to strike Juror 137 based on her core belief that life in prison is worse than the death penalty because it is unclear whether, if after conducting the weighing and determined that the aggravating factors sufficiently outweighed the mitigating factors, she would impose a sentence of life in prison, rather than the more serious sentence of death. The United States relies on the arguments made in court with respect to this issue as an independent basis for excusing Juror 137 for cause.

The first juror was asked whether he could follow the court's instructions, to which he replied, "I'm more unsure of if [sic] I could outweigh the sentence of life imprisonment over death or vice versa." Id. at 527. The prosecution followed up on his views and the venireperson said it was a "possibility" that his moral values would interfere with his ability to determine a sentence. Id. Yet when asked by the defense counsel if he could consider a death penalty, he stated he believed he could. Id. The trial court then tried to rehabilitate the individual by asking if he could "impose either sentence if you felt the government had prevailed beyond a reasonable doubt with aggravating circumstances?" Id. The venireperson responded:

> It's—<u>I'm not sure</u>. That's what I'm trying to express, that <u>I don't know for sure</u> that I could go through the whole trial and, for instance, them prove him guilty and then go through the second part of the trial for sentencing, that I could say life imprisonment or death. I honestly don't know. That's the point that I was trying to get across. <u>Very unsure of what I could say yes or no to, either way.</u>

Id. (emphasis added). The trial court decided to exclude the venireperson, and the Sixth Circuit determined that excusal was not an abuse of discretion. Id. at 527-28.

The trial court in <u>Gabrion</u> found the next challenged excusal to be a closer case, as that venireperson told the court that he could consider the death penalty although he stated in his jury questionnaire that he thought the death penalty was wrong. Id. at 528. But during further questioning, he admitted his views on the death penalty "might" affect his ability to determine a sentence. Id. Defense counsel attempted to rehabilitate the venireperson and engaged in the following exchange:

> Q: Now, given this, would you be able to consider all of these factors in making a determination of sentence, aggravating factors, mitigating factors, bring your own values, and consider the imposition of one of these two sentences?
>
> A: I believe it would be very difficult. <u>I would hope that I could, you know.</u> But until I'm actually in that position, it's very difficult to say.
>
> Q: Well, we understand it's difficult. We understand it's—

3

> A: Well, you want a yes or no question to something—
>
> Q: No, no.  Can you consider it is the question.
>
> A: Yes, I could consider it.
>
> Q: I have no further questions at the moment.

Id. (emphasis added).  The trial court ultimately excluded the venireperson, finding:

> Number one, he indicates he has a strong moral view against the death penalty; and number two, when asked, he equivocated on whether or not he could in fact consider it.  He would try hard, but he was unable to say that he would be able to do it.  So I think he needs to be—he should be excused for that reason in this matter.

Id.  Again, the Sixth Circuit held that the excusal was not an abuse of discretion, holding that the venireperson's "statements, viewed as a whole, were ambiguous; and 'when there is ambiguity in the prospective juror's statements, the trial court, aided as it undoubtedly is by its assessment of the venireman's demeanor, is entitled to resolve it in favor of the' government."  Id. at 528-29 (quoting Uttecht v. Brown, 551 U.S. 1, 7) (emphasis added).

The Sixth Circuit's treatment is consistent with other courts that have faced equivocating venirepersons on the question of whether they could impose the death penalty.  See, e.g., United States v. Snarr, 704 F.3d 368, 380-82 (5th Cir. 2013) (trial judge properly dismissed jurors for being unsure of their ability to overcome their personal feelings); United States v. Fields, 516 F.3d 923, 936-37 (10th Cir. 2008) (citing Uttecht in a direct appeal for the proposition that "'assurances that [the juror] would consider imposing the death penalty and would follow the law . . . d[o] not require the trial court to deny the State's motion to excuse . . .' if 'these responses were interspersed with more equivocal statements'" (emphasis added)); United States v. Webster, 162 F.3d 308, 340-41 (5th Cir. 1998) (juror properly excused after wavering on whether she could choose the death penalty if life without possibility of parole was an available sentencing option).

4

These cases clearly show that the trial court is well within its discretion to excuse venirepersons who are equivocal in their answers, seem to be unsure as to their ability to fairly consider both sentencing options, or merely offer up a "possibility" or a "hope" that they could perform their duties as jurors in a capital case as it relates to imposing a death sentence. The cases are also instructive for how the Court should view the answers provided by Jurors 137, 159, and 164.

A.  **Juror 137**

When asked about her views on the death penalty during voir dire, Juror 137 stated:

> The death penalty. I don't know. I know the importance of this is that's something the jurors would do. I don't know how comfortable I am with sentencing someone to death, regardless of what they did.

Transcript of Jury Voir Dire for April 27, 2023, at 239:17-20. The juror later had the following exchange with government counsel about imposing the death penalty:

> MR. OLSHAN: So what you are saying there is it doesn't even matter the circumstances. You are not sure that you would want to be responsible for making that decision?
>
> PROSPECTIVE JUROR: Right.
>
> MR. OLSHAN: Is that correct?
>
> PROSPECTIVE JUROR: Possibly, yeah.

Id. at 241:13-18. Government counsel then explained the trial process in greater detail and asked her if she was "the kind of person who could impose and vote in favor of the death penalty?" Id. at 241:19-243:5. Juror 137 responded:

> <u>I want to say yes. But, I mean, I don't know.</u> It's hard to give a black or white answer. For me it's hard to give a black or white answer. Like I don't know a whole lot about—<u>I don't know</u>.

Id. at 243:6-9 (emphasis added).  Thus, Juror 137's equivocal—at best—responses to questions about her ability to impose a death sentence justify her excusal for cause.[2]

### B. Juror 159

Juror 159 was similarly equivocal in her answers, despite both parties asking her repeatedly about her ability to sentence someone to death.  When asked initially about her views on the death penalty, she stated:

> I think that I—<u>I really don't believe in the death penalty</u>, but I guess—I've never been exposed to this kind of environment or whatever.  And I don't know if I would see something that would make me change my mind.  For right now I think that I don't.  But I don't know if, you know, I saw some things that were, you know—<u>I don't know.  My opinion in life is pretty basic</u>.

Transcript of Jury Voir Dire for April 28, 2023 at 111:22-112:4 (emphasis added).  She later reiterated that belief:

> I think I—it's conflict I guess within me in some ways.  I think that I believe that—like I said, <u>I believe that no one should kill.  So if you're killing—kill is kill</u>.  Now, I know that there is war.  There is all kinds of different things.  I just think that killing is killing.  But if you're going by the law and you're going by specific things, you may have to make a choice.  <u>But overall, I think thou shalt not kill</u>.

Id. at 113:8-13 (emphasis added).  Government counsel questioned Juror 159 further about her religious beliefs and how they might inform her view on the death penalty.  Ultimately, government counsel and Juror 159 had this exchange:

> MS. SONG: I just want to understand, when you say thou shalt not kill and when you wrote that, are you talking about the laws in the Bible?
>
> PROSPECTIVE JUROR: Yes.
>
> MS. SONG: I know these are hard questions, but what we hear you to say is that you're just not sure that you could be a juror that would vote for the death penalty based on your belief that thou shalt not kill?
>
> PROSPECTIVE JUROR: Yes.

---

[2]  On her questionnaire, Juror 137 also equivocated, stating that she was "not really sure . . . if I would want to be responsible for someone's death" and asking, "[I]s that my place??  I don't know."

Id. at 123:3-11.  Defense counsel then questioned Juror 159 at length and asked whether she could "vote for the death penalty in" a situation where the government's evidence in aggravation was compelling and powerful.  Id. at 123:14-130:17.  Juror 159 responded, "I'm just saying I think I could.  I don't know.  I think I could.  I don't know."  Id. at 130:18-19 (emphasis added).  She continued to be equivocal in her answers, and only responded "yes" when asked an indirect question: "[a]t the end of the day as a citizen serving your duty, can you consider both options?"  Id. at 132:10-13.  Later, in response to the Court's questioning, Juror 159 stated multiple times that she didn't know if she could actually vote for a death sentence and ultimately stated that "I guess it's up to you guys to figure it out.  I don't know."  Id. at 133:24-137:17 (emphasis added).  These noncommittal and equivocal answers on the fundamental question of whether she was capable of rendering a death verdict in a capital trial reflect that this juror was substantially impaired and should be removed from the venire.

### C. Juror 164

Finally, Juror 164 was questioned about his views on the death penalty.  In his questionnaire, he noted he thought it should be illegal, id. at 202:16-20, and he reaffirmed that view during voir dire, stating,:

> I am—I'll say very close to absolutely opposed to the death penalty, at least in court cases.  I would have to be shown that it is beyond my doubts that it would be the best—a better option to end someone's life than to simply put them in prison for the rest of their life, to take a life rather than simply remove them from society.

Id. at 203:22-204:3.  He also stated that the death penalty "serves no purpose other than to punish people, punish them to a degree that I believe violates the Eighth Amendment."  Id. at 207:12-16

(emphasis added).³ Although Juror 164 later indicated that he might be able to set aside his personal beliefs and follow the law, id. at 208:3-210:16, when government counsel asked if he still harbored doubts that he "might not be able to sign the death verdict," the juror responded "Some, yes." Id. at 210:17-21. During defense questioning, Juror 164 responded that he could in fact follow the law and consider a death sentence. Id. at 211:1-215:25. But when the government followed up on the issue and repeated the question as to the juror's doubts, Juror 164 acknowledged again that "there is a small amount of doubt that I would be able to do that." Id. at 216:13-25. As with Juror 137 and Juror 159, this prospective juror's equivocal answers, coupled with his belief that the death penalty violates the Constitution's prohibition on cruel and unusual punishment justify striking him for cause.

All three jurors were equivocal and inconsistent in their answers. They repeatedly expressed doubts as to whether they could impose a death sentence, and taken together their answers reflected that they were not fully committed to the proposition that they could follow the law in spite of their personal beliefs about the death penalty. This is true irrespective of whether, like the second juror in Gabrion, the jurors' numerous equivocations were interspersed with isolated suggestions that they could impose a death sentence.

II. **The Court Should Deny the Defendant's Motions to Strike Juror 155, Juror 162, and Juror 166, Each of Whom Affirmed His Ability to Consider Mitigation Evidence Concerning a Defendant's Childhood**

Throughout voir dire, defense counsel has asked questions about mitigation evidence in a way that is inconsistent with the law by implying that prospective jurors must assign weight to particular types of mitigation evidence. That is not what the law says. It is true that, as a general

---

³ The United States also moved for cause as to Juror 164 because "his language about the death penalty was, I think, the strongest we've seen on these questionnaires. He said, it should be illegal. So I believe that, coupled with his candor that the doubt remains, leads to a finding that this juror is substantially impaired and, therefore, cannot sit as a fair and impartial juror in this case." Id. at 219:13-25.

8

matter, jurors cannot be <u>precluded</u> from considering relevant mitigation evidence, <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 113–14, (1982), but the FDPA imposes no requirement that jurors give <u>weight</u> to any mitigating evidence.  If it did, the statute's requirement that the defendant actually prove the existence of mitigating factors by a preponderance of the evidence would be illogical. <u>See</u> 18 U.S.C. § 3593(c); <u>see also</u> <u>United States v. Rodriguez</u>, 581 F.3d 775, 799 (8th Cir. 2009) (defendant "had to prove mitigating factors; the jury should consider only those mitigating factors proved by a preponderance of the evidence.").[4]

Thus, although a capital venireperson must be able to <u>consider</u> mitigating evidence, the fact that they might not find certain mitigating evidence persuasive does not impair them such that they cannot fulfill their roles as jurors.  In <u>United States v. Johnson</u>, 495 F.3d 951, 966 (8th Cir. 2007), the Eighth Circuit reaffirmed that <u>Eddings</u>' limitation on sentencers

> is <u>not</u>, as [the defendant] appears to contend, that the sentencers cannot give a mitigating factor "no weight," or that the prosecutor cannot argue that a particular mitigating factor is entitled to "no weight."  Rather, this limitation is that the sentencers cannot give a mitigating factor 'no weight" in a particular sense, specifically, by excluding such evidence <u>from their consideration</u>.  Or the juror could afford the factor great weight.  Those are all possible ways a juror may "<u>consider</u>" mitigating evidence consistent with the FDPA and the cases interpreting it.

<u>Id.</u> (internal quotation marks and citations omitted) (emphasis added).

---

[4] The Supreme Court decisions that speak about jurors "giving effect" to mitigation have nothing to do with voir dire; instead, the opinions address the specific legal doctrine that jurors cannot be precluded <u>by an outside source</u> from giving effect to mitigation, if they so choose.  <u>See, e.g.</u>, <u>Abdul-Kabir v. Quarterman</u>, 550 U.S. 233, 264-65 (2007) ("[W]hen the jury is not permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence—because it is forbidden from doing so by statute or a judicial interpretation of a statute—the sentencing process is fatally flawed."); <u>Smith v. Texas</u>, 543 U.S. 37 (2004) (court's nullification instruction failed to allow jury to accord full weight to such evidence); <u>Penry v. Lynaugh</u>, 492 U.S. 302, 328 (1989) ("[I]n the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of [the defendant's] mental retardation and abused background by declining to impose the death penalty, . . . the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision." (citations omitted), <u>abrogated on other grounds by</u> <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002).  In other words, a statute cannot be drafted in a way that prevents a jury from giving effect to mitigation, and the judge cannot give an instruction that creates such a barrier.  But the jurors, themselves, are under no obligation to "give effect" to mitigation evidence.

It is therefore only in certain limited circumstances that a juror should be excused for cause based on their approach to mitigating evidence. Such situations may arise when a venireperson insists that they would not even consider a particular factor or type of evidence. This requires more than an opinion on the juror's part that certain categories of mitigating or aggravating evidence would not be persuasive. See, e.g., United States v. Sampson, Cr. No. 01-10384-LTS, 2016 WL 11726909, at *4 (D. Mass. Oct. 7, 2016) (a juror "frankly expressing her belief that she is not likely to assign substantial weight to certain types of such evidence if various aggravating factors are proven . . . is perfectly permissible for jurors to do under the FDPA"); United States v. Paul, 217 F.3d 989, 1000 (8th Cir. 2000) (no error in failure of six jurors to find the defendant's age (which was not disputed) at the time of the offense as mitigating, because a juror is not required to give mitigating effect to any factor).

Under the law, disqualification is appropriate upon a flat assurance that the juror will not consider[5] the evidence in any way. None of the challenged jurors stated that they would not <u>consider</u> mitigating evidence concerning a defendant's childhood, and the Court should therefore deny the defendant's motions to strike each of them.

---

[5] The need for this Court to carefully distinguish between "weight" and "consideration" is particularly heightened here, where the defense has asked lengthy stakeout hypotheticals that create confusion for lay jurors about whether they are being asked whether they would fairly consider the evidence or whether they will pre-commit to assigning particular weight to specific mitigation evidence. The defense's stakeout questions have required prospective jurors to pre-commit to giving weight to childhood mitigation regardless of the strength of the aggravating factors, or the weakness of the evidence of mitigating childhood circumstances. The law does not require any juror to pre-commit to giving weight to any particular factor before hearing the evidence. See, e.g., United States v. Tipton, 90 F.3d 861, 878 (4th Cir. 1996) (rejecting the argument that the district court was required to inquire whether a juror would always vote for death in a case-specific manner, i.e., in a case with intentional and pre-meditated murder, and noting that such questions created "unnecessary redundancy and possibly an imprudent risk of encouraging an opposite partiality"); United States v. Caro, 597 F.3d 608, 615 (4th Cir. 2010); Oken v. Corcoran, 220 F.3d 259 (4th Cir. 2000); United States v. McVeigh, 153 F.3d 1166, 1207-08 (10th Cir. 1998); United States v. McCullah, 76 F.3d 1087, 1114 (10th Cir. 1996); Hodges v. Colson, 727 F.3d 517, 527-29 (6th Cir. 2013) (finding that when defense counsel asks about specific aggravating or mitigating factors actually at issue, defense counsel is improperly attempting to preview how prospective jurors will vote given the specific facts of the individual case).

A. **Juror 155**

During voir dire of Juror 155, defense counsel provided the juror with an overview of the weighing process—including aggravating and mitigating evidence—and asked, "[W]ould it be fair to say you're open to listening to all of this evidence and taking it into consideration carefully and then making that decision for yourself?"  Transcript of Jury Voir Dire for April 28, 2023, at 80:16-19.  Juror 155 said he could—"Yes." Id. at 80:20.

Defense counsel then asked the juror about question 79 on his questionnaire, id. at 81, in which he indicated that, in the absence of any context, he did not think that a defendant's childhood should be "taken into account" in determining the appropriate sentence.  Juror 155 admitted some confusion about that question, stating, "I don't know if I'm answering this right or not," and then illustrated that confusion by tying consideration of the defendant's childhood to the crime itself—"I don't think they should be taken into consideration, because that person made that decision to commit that crime."  Id. at 81:24-25.  Defense counsel did not clarify with the juror that the focus of the question was the penalty determination (not simply guilt).  Nor did he ask Juror 155 whether he would <u>consider</u> childhood mitigation when reaching a penalty determination.

The government, however, did ask the direct question, and Juror 155's answer was unequivocal:

> MS. SONG: So probably one of the most important questions today is if we reach that point in the trial, would you listen to everything that's presented to you, whether it is an aggravating fact that might make a death sentence more appropriate or if it's a mitigating factor, <u>including a person's childhood</u>, that might make a life sentence more appropriate?  Could you listen to all of that?
>
> PROSPECTIVE JUROR: Yes.
>
> MS. SONG: And give it fair consideration?
>
> PROSPECTIVE JUROR: Yes.

Id. at 83:15-24 (emphasis added); id. at 84:1-4 ("[Y]ou can commit to listening and fairly considering all of the evidence that's presented in favor of a death sentence or in favor of a life sentence? PROSPECTIVE JUROR: Yes.").

Throughout additional government questioning, Juror 155 never indicated that he would give no consideration to childhood mitigation; rather, he simply reaffirmed his view that he would likely weigh a defendant's actions as an adult "more heavily" than their childhood. Id. at 87-90. This is entirely permissible under Eddings, which simply prohibits categorical exclusion of mitigation from the juror's consideration. So long as Juror 155 was capable of considering such evidence, that is sufficient, even if, in his ultimate judgment after all of the evidence was presented, he determined that childhood mitigation was worthy of less (or no) weight.

Indeed, he reaffirmed his willingness to reserve judgment until hearing the evidence in response to the Court's additional follow up questioning on this topic. Juror 155 said he would "lean more hard" toward a death sentence, but qualified his answer by saying, "I guess I don't know how to articulate when I haven't heard the case or anything about it." Id. at 94:13-16 (emphasis added). The record therefore shows that Juror 155 is not substantially impaired as to mitigation because, when asked directly, he affirmed that he would consider mitigation evidence, including evidence of a defendant's childhood, when reaching a sentencing determination.

### A. Juror 162

The record is likewise clear that Juror 162 was capable of considering mitigation evidence. During questioning by the government, this juror affirmed without hesitation that he could consider childhood mitigation:

> MS. SONG: And, as you sit here as a potential juror, if the judge were to instruct you that personal circumstances, childhood and background are things that you must listen to and consider, you don't have to credit them, but you have to listen to

them and consider them in reaching a sentence in this case, could you and would you do that as a juror?

PROSPECTIVE JUROR: Absolutely.

Id. at 182:17-23.  For his part, defense counsel did not ask a direct question of Juror 162 regarding his ability to consider this mitigation evidence.  He did, however, ask Juror 162 why he checked "No" as to question 79 regarding childhood mitigation evidence.  In response Juror 162, provided a thoughtful and detailed answer, in which he faulted the binary nature of the question, noted the absence of a "box in the middle" between "Yes" and "No," and said he "wish[ed] there was a sliding scale on here like from 100, circle a number from 0 to 100."  Id. at 180:14-25.  (Defense counsel did not inquire as to how Juror 162 would have marked such a sliding scale.)  As such, Juror 162's answers reflect his willingness and capacity to consider mitigation evidence, including evidence related to a defendant's childhood.

### C. Juror 166

Finally, Juror 166 checked "Yes" for both question 79 and 80.  When the Court inquired along these lines, Juror 166 stated he would consider this information:

> THE COURT: . . . If you look at questions 79 and 80, that's what he's referring to. It just says, do you believe that personal circumstances, childhood and background of a defendant are relevant and should be taken into account in making a decision on an appropriate sentence?
>
> PROSPECTIVE JUROR: Yes, I do.

Id. at 261:9-16.  Notably, when defense counsel followed up, he did not ask about the juror's ability to consider this evidence.  Instead, he asked a leading question tied to how much weight the juror would assign to this type of mitigation.  Id. at 261: 22 ("RUBENSTEIN . . . these things really are not relevant?  They are not important?").

13

Juror 166 reaffirmed his willingness to consider mitigation during questioning by the government:

MR. RIVETTI: . . . Are you able to consider things that might favor a life sentence?

PROSPECTIVE JUROR: Yes, I am.

MR. RIVETTI: Are you able to keep an open mind and listen to the judge's instructions?

PROSPECTIVE JUROR: <u>My plan is to approach this whole thing with an open mind</u>.

MR. RIVETTI: To be clear, this is during the sentencing phase. The defendant has been found guilty. And if that happens, it proceeds to penalty. And it's in that final phase where the person has already been found guilty, the juror still has to be able and willing to give meaningful consideration to both aggravating and mitigating and not just automatically vote death. Are you able to give consideration to all the evidence?

PROSPECTIVE JUROR: Yes.

MR. RIVETTI: And maybe the mitigation evidence won't win the day for you, but you are at least willing to consider it, is that true?

PROSPECTIVE JUROR: Yes. I'm willing to hear everything and make an informed decision based off of that.

Id. at 263:1-21 (emphasis added). Thus, as with Juror 155 and Juror 162, Juror 166 established clearly that he was willing to consider mitigation evidence in reaching a penalty determination, which is all the law requires.[6]

### III. Overview of the Weighing Process Under the FDPA

During voir dire, there has been substantial discussion about the weighing process by which jurors will arrive at a decision on whether to impose a death sentence or a life sentence. The United States has previously briefed the process. Doc. No. 942 at 5-7. The Court, in its sentence selection

---

[6] The defense also moved to strike Juror 175 for cause, claiming she was mitigation impaired. The government rests on its oral argument as to this juror.

14

instructions, largely adopts the government's proposed language and will instruct the jury under the heading of "Sentence of Death" that

> [i]f you unanimously determine as to Counts . . . that the aggravating factor or factors found to exist sufficiently outweigh the mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, that the aggravating factor or factors alone are sufficient to justify a sentence of death, you shall so specify in the appropriate space in Section IV of the Sentence Selection Phase Verdict Form.

Draft Sentence Selection Jury Instructions at 48. The instructions also advise the jury that "[a]ny one of you is free to decide that a death sentence should not be imposed so long as, based on the evidence and your sense of justice, properly restrained by these instructions, you conclude that the proven aggravating factors do not sufficiently outweigh the mitigating factors such that the death penalty should be imposed." Id. at 45 (emphasis added).

This language reflects that once the jury has determined that the aggravating factors sufficiently outweigh the mitigating factors, their deliberations are over and a death sentence should be imposed. And while the Court instructs the jury that it is never "required" to impose a death sentence, the Court notes that this point only means that the result of the weighing process is never foreordained. Id. In other words, it is up to each juror to decide what is "sufficient" with respect to the weighing process.

The instructions are consistent with the weight of authority. See, e.g., United States v. Lighty, 616 F.3d 321, 367 (4th Cir. 2010) (under Fourth Circuit precedent, "once the jury concludes a death sentence is justified under § 3591, it must impose the death penalty"); United States v. Ortiz, 315 F.3d 873, 901 (8th Cir. 2002) ("[U]nder § 3591(a)(2) 'a unanimous finding that death is justified requires a recommendation of a death sentence.'") (quoting United State v. Allen, 247 F.3d 741, 781 (8th Cir. 2001)); United States v. Smith, Cr. No. 3:16-00086-SLG-1, 2020 WL 5949975, at *2 (D. Alaska Oct. 7, 2020) (agreeing with the Eight Circuit that "it would

15

be inconsistent with the FDPA 'as a whole' to instruct the jury that it could determine that the weight of the aggravating factors was sufficient to justify a death sentence, but then use mercy to reject a death sentence"). Thus, if each juror concludes that the aggravating factors sufficiently outweigh the mitigating factors (or are sufficient standing alone in the absence of any proven mitigators), the appropriate sentence is death. Any argument or questioning in voir dire to the contrary should be prohibited.

        Respectfully submitted,

        TROY RIVETTI
        ACTING UNITED STATES ATTORNEY

        s/Troy Rivetti
        TROY RIVETTI
        Acting U.S. Attorney
        PA ID No. 56816

        s/Soo C. Song
        SOO C. SONG
        Assistant U.S. Attorney
        DC ID No. 457268

        s/Eric G. Olshan
        ERIC G. OLSHAN
        Assistant U.S. Attorney
        IL ID No. 6290382

        s/Nicole Vasquez Schmitt
        NICOLE VASQUEZ SCHMITT
        Assistant U.S. Attorney
        PA ID No. 320316

        s/Mary J. Hahn
        MARY J. HAHN
        Trial Attorney
        Civil Rights Division
        DC ID No. 500193

        s/Barry K. Disney
        BARRY K. DISNEY

Trial Attorney
Capital Case Section
KS ID No. 13284

s/Aaron J. Stewart
AARON J. STEWART
Trial Attorney
Capital Case Section
OK ID No. 31721