**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-292 |
| | ) | |
| ROBERT BOWERS | ) | |

**MEMORANDUM ORDER OF COURT**

Robert J. Colville, United States District Judge

Before the Court is the Motion for Hearing Regarding Admissibility and Scope of the Government's Proposed Victim Impact Evidence ("Motion for Hearing") (ECF No. 1156) filed by Defendant Robert Bowers. The Government filed a Response (ECF No. 1220) to the Motion for Hearing on May 12, 2023. Defendant filed a Reply (ECF No. 1256) on May 23, 2023. The Motion for Hearing has been fully briefed and is ripe for disposition.

## I.     Background

The government accuses Defendant of killing eleven individuals and injuring others at the Tree of Life Synagogue on October 27, 2018. He is charged in a 63-count indictment with violations of federal statutes prohibiting the obstruction of religious exercise, hate crimes, and the use of a firearm during a crime of violence.

The Motion for Hearing relates to the potential penalty phases of this trial, and, most specifically, a possible Sentence Selection Phase, the time wherein the Government may introduce evidence as to non-statutory aggravating factors, including "victim impact" and "injury to

surviving victims."  *See* Notice of Intent 3-5, ECF No. 86 (asserting "victim impact" and "injury

to surviving victims" as non-statutory aggravating factors); *see also* ECF No. 936 at 5 (describing

a sentence selection phase as the phase "wherein the jury would be presented with information

respecting non-statutory aggravating factors and mitigating factors[.]").  With respect to penalty

phase motions, the Court previously provided:

> The Court encourages the filing of any penalty phase motion in limine as early as
> possible.  Penalty phase motions in limine shall be filed by no later than twenty-
> four hours after the return of a guilty verdict, should one be entered.  Responses to
> any penalty phase motion in limine shall be filed the earlier of fourteen (14) days
> after the filing of the motion or seventy-two hours after the return of a guilty verdict,
> should one be entered.  Replies to any penalty phase motion in limine shall be filed
> the earlier of seven (7) days after the filing of a response to the motion or ninety-
> six hours after the return of a guilty verdict, should one be entered.

ECF No. 855 at ¶ 6.

## II.    Discussion

While Defendant acknowledges that "[s]ome victim impact evidence is expressly permitted

under the FDPA" and that "there is no per se constitutional bar to its limited use," Defendant

asserts that, "due to its inherently emotional and potentially overwhelming nature, there are

constitutional and statutory limits on the type, scope, amount and form of such evidence that may

be presented."  Mot. 1, ECF No. 1156.  Defendant requests that the Court hold a hearing to review

the Government's proposed victim impact evidence in advance of its presentation to the jury and

to make the necessary findings regarding its admissibility, arguing that the same is necessary "to

ensure that those limits are enforced."  *Id.*  Defendant argues that, because his request for an

informational outline of aggravating factors was denied, he is unaware of what victim impact

evidence the Government intends to introduce, and expresses concern that, "left unchecked, the

Government's presentation will exceed constitutional and statutory bounds in multiple respects."

*Id*.  Defendant further argues that "[t]o proceed without conducting an admissibility hearing would

be to unnecessarily run a grave risk of inadmissible evidence being presented that necessitates a mistrial, or of the accumulation of evidence so overwhelming that it results in unfair prejudice to Mr. Bowers that will jeopardize the sentence on appeal." *Id.* at 2.

The Government opposes Defendant's Motion, and, in particular, Defendant's request for a pre-sentence selection phase hearing wherein the Court and the parties would preview all of the Government's victim impact evidence. With respect to the victim impact evidence the Government intends to introduce, the Government provides:

> In contrast to the presumptuous examples the defendant cites, (*see* Doc. No. 1156 at 2, 7, 13, and 33), the government's victim impact evidence will not involve anything similar to lengthy video compilations of pictures and videos of the deceased victims' lives that other courts have found objectionable. Rather, the United States anticipates that the vast majority of the victim impact testimony will be offered by close family members, friends, or colleagues, either in person or by video, and with the aid of still pictures, short (non-compilation) videos of discrete events, and important artifacts from their lives.

Resp. 15 n.5, ECF No. 1220. The Government also notes:

> The United States has adhered to the Court's disclosure orders in this case, and has provided exhibit and witness lists, medical records, and reports of interviews and victim Jencks materials, even for potential penalty phase witnesses. The defendant is hardly at a loss for information as to the government's victim impact evidence.

*Id.* at 13.

In the Government's Notice of Intent to Seek the Death Penalty, it alleges the existence of several non-statutory aggravating factors, including:

> **Victim Impact**. ROBERT BOWERS caused injury, harm, and loss to J.F., R.G., R.M., J.R., C.R., D.R., B.S., S.S., D.S., M.W., and I.Y., as well as to the family, friends, and co-workers of those individuals. The injury, harm, and loss caused by ROBERT BOWERS with respect to each deceased victim is evidenced by the victim's personal characteristics and by the impact of the victim's death upon his or her family, friends, associates, and co-workers. (Counts One through Eleven and Twenty-Three through Thirty-Three).

Notice of Intent 3-4, ECF No. 86.  With respect to aggravating factors, the Federal Death Penalty

Act ("FDPA") provides that such factors:

> may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information.

18 U.S.C. § 3593(a)(2).

The United States Supreme Court has explained that victim impact evidence "is designed

to show . . . each victim's 'uniqueness as an individual human being,' whatever the jury might

think the loss to the community resulting from his [or her] death might be."  *Payne v. Tennessee*,

501 U.S. 808, 823 (1991).  "Victim impact evidence is simply another form or method of informing

the sentencing authority about the specific harm caused by the crime in question, evidence of a

general type long considered by sentencing authorities."  *Id.* at 825.  The Government "has a

legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put

in, by reminding the sentencer that just as the murderer should be considered as an individual, so

too the victim is an individual whose death represents a unique loss to society and in particular to

his family."  *Id.* (quoting *Booth v. Maryland*, 482 U.S. 496 (1987) (WHITE, J., dissenting)); *see

also id.* at 827 ("A State may legitimately conclude that evidence about the victim and about the

impact of the murder on the victim's family is relevant to the jury's decision as to whether or not

the death penalty should be imposed."); *id.* at 822 ("This misreading of precedent in *Booth* has,

we think, unfairly weighted the scales in a capital trial; while virtually no limits are placed on the

relevant mitigating evidence a capital defendant may introduce concerning his own circumstances,

the State is barred from either offering 'a quick glimpse of the life' which a defendant 'chose to

extinguish,' [*Mills v. Maryland*, 486 U.S., 367, 397 (1988) (REHNQUIST, C.J., dissenting)], or

demonstrating the loss to the victim's family and to society which has resulted from the defendant's homicide.").

The Supreme Court of Louisiana has aptly explained:

As Justice Souter noted in *Payne*, any person of basic understanding knows that every murder victim is a unique individual and that the murder will cause some emotional, physical or economic harm to some group of survivors.  Since a specific intent murderer either knew or reasonably should have foreseen some of the consequences of his victim's death, this general knowledge at the time of the crime is a fact bearing on the murderer's moral culpability and to that extent is relevant both to the circumstances of the crime and to the murderer's character and propensities.  Thus, the prosecutor, within the bounds of relevance under the statute, may introduce a limited amount of general evidence providing identity to the victim and a limited amount of general evidence demonstrating harm to the victim's survivors.

*State v. Bernard*, 608 So. 2d 966, 971 (La. 1992).

The FDPA provides, with respect to proof of aggravating and mitigating factors, that "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c); *see also United States v. Smith*, No. 3:16-CR-00086-SLG-1, 2020 WL 6536208, at *2 (D. Alaska Nov. 5, 2020) ("[E]ven though the FDPA does not expressly allow a trial court to consider cumulativeness, it is a 'bedrock' principle that 'the trial court, in a capital sentencing proceeding, remains free to consider cumulativeness in assessing evidentiary proffers.'" (quoting *United States v. Sampson*, 486 F.3d 13, 43 (1st Cir. 2007))).  Defendant accurately notes that "[t]his standard is more exacting than the standard for excluding evidence at an ordinary criminal trial, which requires that its probative value be 'substantially outweighed' by the danger of unfair prejudice[,]" Mot. 4, ECF No. 1156 (quoting Fed. R. Evid. 403), and further

notes that it is the trial court's responsibility to assess and exclude victim impact testimony under this more exacting standard where appropriate.

The Supreme Court has explained that, "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne*, 501 U.S. 808, 825; *see also United States v. Sampson*, 335 F. Supp. 2d 166, 187 (D. Mass. 2004) ("The second check is the responsibility of the court to secure the defendant's right to due process by viewing the proffered evidence in the context of all the other evidence in the case and deciding if its admission would contribute to or detract from a trial that is fundamentally fair and allows jurors to base their decisions on reason and reliable evidence rather than passion."); *United States v. McVeigh*, 153 F.3d 1166, 1217 (10th Cir. 1998) ("The evidence must not be so unduly prejudicial that its admission allows emotion to overwhelm reason.")

With respect to the Court's role in assessing and addressing issues respecting victim impact evidence, the United States District Court for the District of Alaska has explained:

> As other federal courts have noted, a district court has considerable discretion in controlling the presentation of the information to the jury in both content and form[,] and [e]xercising this authority is essential in a capital case. Although appropriate victim-impact information is allowed, it is the most problematical of all of the aggravating factors and may present the greatest difficulty in determining the nature and scope of the information to be considered. Thus, applying [the victim-impact] rules requires a judge, inevitably, to engage in line-drawing.

*Smith*, 2020 WL 6536208, at *2 (citations, internal quotation marks, and footnotes omitted).

In describing victim impact testimony that continues to be prohibited following the Supreme Court's decision in *Payne*, the United States District Court for the District of Massachusetts has explained: "First, victim impact witnesses may not characterize or give their opinions on the crime. Second, they may not characterize or give opinions on the defendant.

Third, they may not express an opinion on the appropriate sentence." *Sampson*, 335 F. Supp. 2d at 187.

The Court notes that, while Defendant asserts that *Payne* and the FDPA limit victim impact testimony to only the victims' family members, and cites to some case law in support of that argument, the weight of the authority, including one of the cases cited by Defendant, provides that friends of victims may also provide victim impact testimony. *United States v. Fields*, 516 F.3d 923, 947 (10th Cir. 2008) (case cited by Defendant holding that "[s]imilar [victim impact] evidence from friends in this case was likewise admissible."); *see also United States v. Whitten*, 610 F.3d 168, 188 (2d Cir. 2010) ("We therefore hold that the Constitution allows evidence from non-family members about their own grief and about the loss felt by other non-family members. Other circuits are in accord." (collecting cases)); ECF No. 335 at 16-17.

As to impact on the community and coworkers, the Tenth Circuit has provided:

[*United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007)] did not involve an inquiry into the impact of the victim's death on the community at large. Indeed, we are not aware of any precedent approving such an inquiry. The same is true regarding impact on the victim's co-workers. . . .

*Barrett* supports the validity of victim-impact evidence regarding friends who (also) worked with the victim. But as to co-workers per se, a victim-impact inquiry would have a qualitatively different character. The loss of a co-worker in this sense (for example, the loss of her contribution to an office, unit, or team; the kind of loss that businesses insure with "key man" policies) is very far afield from the personal loss discussed in cases following the Supreme Court's initial approval of victim-impact evidence from family members in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Without additional guidance from the Court encouraging further expansion of the victim-impact inquiry, we are not willing to extend it to the impersonal utilitarian considerations included within the idea of a loss to co-workers.

. . . .

Including the community in the victim-impact inquiry is fraught with complication. It would involve not just the incremental extension from family to friends (and even to co-workers), but a radical change in perspective: replacing a

close-in focus on persons closely or immediately connected to the victim with a wide view encompassing generalized notions of social value and loss. Even if justified in principle, such an approach would be difficult to delimit and police to ensure it stayed within proper bounds. And there is no guidance to be gleaned from the case law, which is still on the first step of extending the victim-impact inquiry from family to friends. Lacking clear direction from the Supreme Court, we do not approve further expansion of the inquiry to the community.

*Fields*, 516 F.3d at 947; *but see Whitten*, 610 F.3d at 189 ("Whether or not we are persuaded by *Fields*, the victims' colleagues in this case testified to personal loss, even though it concerned in part loss experienced in a workplace that fosters intense loyalty and camaraderie. They did not adduce the 'impersonal utilitarian considerations' that concerned the court in *Fields* and therefore the colleagues' testimony was properly admitted."); *see also State v. Young*, 196 S.W.3d 85, 109–10 (Tenn. 2006) (explaining that "Dr. Sundstrom's testimony detailed the far-reaching effects that a single murder can have. His description of the virtual collapse of the philosophy department illustrated how interwoven a single individual's life is with many others. To that extent, his testimony had probative value. *See* [*Payne*, 501 U.S. at 825] (recognizing that the prosecution has a legitimate interest in adducing proof that '"the victim is an individual whose death represents a unique loss to society"') (quoting [*Booth*, 482 U.S. at 517)]. We are constrained to conclude, however, that the danger of unfair prejudice was such as to outweigh the probative value of this proof. Dr. Sundstrom's testimony was not limited to a 'brief glimpse' of the victim's life, but rather laid the debilitating grief of over one hundred people at Defendant's feet. The risk of inflaming a jury's passions with such testimony is simply too great to allow its admission[,]" but ultimately holding that "[n]otwithstanding the erroneous admission of this evidence, we conclude that the trial court's error in this regard did not render the proceedings fundamentally unfair or unduly prejudicial to Defendant.").

That said, the United States Court of Appeals for the Fourth Circuit in *United States v. Roof*, a case that also involved an attack at a place of worship, provided:

> That some of the victim-impact evidence implicates the victims' devotion and the impact of the victims' deaths on the targeted religious community is to be expected where Roof intentionally targeted a church and selected Mother Emanuel's Bible-study group. He specifically chose as his victims individuals whose occupations, volunteer work, and daily activities naturally involved their faith and Mother Emanuel. Also relevant is the district court's instruction that the jury "must not consider . . . religious beliefs . . . of either the defendant or any victim."

*United States v. Roof*, 10 F.4th 314, 377 (4th Cir. 2021), *cert. denied*, 214 L. Ed. 2d 132, 143 S. Ct. 303 (2022).

With respect to individuals who may testify as victim impact witnesses, the Court will limit victim impact testimony to the impact of the decedent's death on close friends and family members, including "coworkers" and "associates," so long as all witnesses constitute individuals that were close to the victim, but hereby directs that such testimony should not include the "impersonal utilitarian" considerations discussed in *Fields*. The Government's Response indicates that this will not be an issue. *See* Resp. 7 n.2, ECF No. 1220 ("The United States anticipates offering victim impact evidence only from witnesses who maintained close, personal connections to the deceased victims—as opposed to 'generalized' familiarity or attenuated community connections."). The Court agrees with the Fourth Circuit's analysis in *Roof*, and will also permit the type of testimony discussed therein respecting a loss to a targeted religious community. The Court intends to provide an instruction similar to that set forth above in the quoted language from *Roof*.

Defendant also requests that victim impact testimony be limited to "a brief general factual description of the impact that the decedent's death has had on his or her family members, free from

inflammatory statements and from purely emotional pleas." Mot. 11, ECF No. 1156. More specifically, Defendant argues that:

> There is no justification for permitting testimony on subjects such as how and when a victim's family member learned the news about what had happened to their loved one or their last contacts with their loved one before they were killed. Such topics are obviously intensely emotional and offer no factual information about the impact of the loss on the surviving family member. Nor should evidence about a family member's subsequent efforts to cope with the effect of the loss of their relative be admitted, for it is the effect of the loss itself that is relevant; efforts to cope merely add an additional, unnecessary layer of emotion to the presentation.

*Id.* at 13.

Victim impact evidence cannot be divorced from all emotion, and the Supreme Court has explained that "[t]he Eighth Amendment . . . permits capital sentencing juries to consider evidence relating to the victim's personal characteristics and the *emotional impact* of the murder on the victim's family in deciding whether an eligible defendant should receive a death sentence." *Jones v. United States*, 527 U.S. 373, 395 (1999) (emphasis added). In *Whitten*, the United States Court of Appeals for the Second Circuit explained:

> The family members of Detectives Andrews and Nemorin delivered emotionally charged testimony. The anguished testimony of Detective Nemorin's widow described how her children visit the cemetery on Father's Day and other occasions, write letters to their father, and embrace his headstone. Even such testimony does not appear to exceed *(or approach)* the margins of what has been allowed. It cannot be expected that victim impact testimony will be cool and dispassionate. Some deaths cause more suffering than others. The only way to ensure against victim impacts caused by one's murder of a well-loved human being is to take care to murder no one at all.

> Courts are reluctant to conclude that the jury was unduly prejudiced by emotional testimony if the defendant presented mitigating factors that the jury found proven and if the trial court instructed the jury about not giving a verdict based on emotion. . . . We presume that juries follow instructions; and a jury diligent and dispassionate enough to find mitigating factors is unlikely to have been overmastered by emotion.

*Whitten*, 610 F.3d 190–91 (footnote and citations omitted) (emphasis added).

In addressing the emotional nature of victim impact testimony, the United States District Court for the District of Alaska in *Smith* provided:

> Victim impact testimony cannot be totally divorced from emotion, and thus, the presentation of victim impact evidence can be problematic because of the potential for emotional outbursts during the testimony of family members.  The Court expects that victim-impact witnesses will find testifying about the loss of their family member or close friend to be a difficult experience that may generate powerful emotions.  The Court intends to give reasonable leeway to victim-impact witnesses because [i]t cannot be expected that victim impact testimony will be cool and dispassionate.  However, there is a difference between the substance of victim-impact testimony being poignant and having an emotional impact and an overly emotional witness whose presentation may become unduly inflammatory.  If a witness becomes overly emotional, the Court will recess the proceedings in order to allow the witness to regain composure.  If requested, the Court may instruct the jury to disregard any inappropriate comments.  The government shall instruct its victim-impact witnesses accordingly.

*Smith*, 2020 WL 6536208, at *3 (citations, internal quotation marks, and footnotes omitted).  The Court agrees entirely with this analysis, and will utilize the same procedure outlined by the *Smith* court.  The Court finds no merit to the assertion that topics such as how and when a victim's family member learned the news about what had happened to their loved one or their last contacts with their loved one before they were killed offer no factual information about the impact of the loss on the surviving family member.  Such information is clearly probative of the harm alleged in this case.

With respect to photographs and videos, the Government is cautioned that the introduction of unnecessarily duplicative or numerous photographs spanning the victims' entire lives, lengthy videos, or slideshows set to poignant music has been disapproved of by courts interpreting *Payne*, and the Court is inclined to generally agree with those courts.[1]  The Government has provided

---

[1] *See Sampson*, 335 F. Supp. 2d at 191 ("For example, in *United States v. McVeigh*, 153 F.3d 1166, 1221 n. 47 (10th Cir.1998), 'the district court prohibited the introduction of wedding photographs and home videos.'"); *see also id.* at 192 (comparing the case before the court with a similar case that explained "[The] prejudicial effect [of the videotape was] enormous because the implicit suggestion is that appellant murdered this angelic infant; he killed this laughing,

some assurance that it will not wade into territory that other courts have found to be objectionable. *See* Resp. 15 n.5, ECF No. 1220 ("Rather, the United States anticipates that the vast majority of the victim impact testimony will be offered by close family members, friends, or colleagues, either in person or by video, and with the aid of still pictures, short (non-compilation) videos of discrete events, and important artifacts from their lives.").  The Court holds that a reasonable number of photos or short videos of victims at or near the age of their death will be permitted, and the Court may permit the admission of one or, possibly, upon the presentation of argument that satisfies the Court that the same is warranted, a limited number above one, photo or short video of each victim at a different time in their life, to which Defendant may raise a specific objection at the appropriate time.  *See Smith*, 2020 WL 6536208, at *4 ("The Court does not intend to allow the government to present dozens of photographs of each victim or any video or slideshow set to music.  But the government may select a reasonable number of appropriate photographs of each victim, consisting primarily of photographs of the victim as an adult close in age to the age they were when they were killed.  The Court may allow one photograph of each victim as a child.  Once these photographs are identified to the defense, the defense may raise challenges at that time." (footnotes omitted)).

Turning to "family heirlooms, such as wedding, anniversary, and reunion announcements and programs, memorial service programs and materials, and other mementoes," Mot. 2, ECF No. 1156, Defendant asserts that the introduction of such evidence "would take many days and would completely dominate and overwhelm the trial to the point that the jurors will be unable to attend to anything else."  *Id.*  The Government has stated that it intends to present "important artifacts" from the deceased victims' lives.  Resp. 15 n.5, ECF No. 1220.  The Court takes the Government's use of "important" to describe the artifacts it intends to introduce to mean that it will be genuinely

---

light-hearted child; he snuffed out the life of a first-grade soccer player and of the young boy hugging his blond puppy dog." (quoting *Salazar v. State*, 118 S.W.3d 880, 884 (Tex.App.2003))).

judicious in its introduction of such evidence, and the Court again will permit the introduction of a reasonable amount of such evidence, so long as it is probative of the uniqueness of the victims. *See Roof*, 10 F.4th at 377 ("Contrary to Roof's argument, the victims' exemplary qualities, such as their singing, preaching, and praying, are part of their 'uniqueness' that *Payne* allows a jury to consider. *See Payne*, 501 U.S. at 823. The prosecution is 'entitled to ask the jury to look at [the victims'] uniqueness and to ask the jury to consider the consequences of when a person of [the victims'] uniqueness is taken.' [*Humphries v. Ozmint*, 397 F.3d 206, 222 (4th Cir. 2005)]. And the district court in fact reminded the jury of that, instructing that 'victim testimony is limited by law to personal characteristics of the victim and the emotional impact o[n] the family. . . . [D]isregard any other statements outside that." (citation omitted)).

Turning to Defendant's argument that the Government should be precluded from presenting any evidence regarding non-physical impact upon surviving victims, Defendant argues:

> Evidence of the impact upon surviving victims of a crime, other than physical injuries, is overwhelmingly prejudicial, lacks any probative value and should be excluded in its entirety. The fact that victims were physically injured will be admitted in the culpability phase of the trial because it is an element of some of the charged offenses. There is no justification or legal basis, however, for admitting evidence of psychological, financial or emotional impact.

Mot. 21, ECF No. 1156. Defendant cites to *United States v. Gooch*, wherein the United States District Court for the District of Columbia explained that the FDPA's reference to victim impact referred specifically to victims of a capital crime, and further explained:

> Clearly, the FDPA refers to the victims of a capital crime. Whether Mr. Gooch committed additional, noncapital murders will be determined in the guilt phase by the jury and may be noted as a nonstatutory aggravating factor if the trial advances to the selection phase. That does not mean, however, that the families of his other alleged victims can properly testify at the selection phase. Mr. Gooch's sentence for any noncapital crimes of which he is found guilty will be determined by the Court. The families of any other murder victims will have the opportunity to address the Court for that sentencing. Their losses and emotions are not relevant to whether the jury selects the death penalty for the alleged murders of Mr. Cooper

and Ms. Miller and would also be more prejudicial than probative.  *See* 18 U.S.C. § 3593(c).

*United States v. Gooch*, No. CRIM.A. 04-128-23, 2006 WL 3780781, at \*22 (D.D.C. Dec. 20, 2006).

Defendant concedes that "[t]he fact of the surviving victims' bodily injuries is, of course, admissible and the fact that there were physical injuries to survivors may also be alleged as a non-statutory aggravating factor, for they are a foreseeable consequence of the crime and therefore relevant to the defendant's moral blameworthiness."  Mot. 24, ECF No. 1156.  Defendant requests that the Court "decline to expand the holding of *Payne* to allow the emotional and other non-physical impact of the crime upon survivors and should exclude all such evidence from the culpability and penalty phases of the trial."  *Id*.  The Court agrees with the Government that this argument confuses the "victim impact" non-statutory aggravating factor with the "injury to surviving victims" non-statutory aggravating factor, each of which was separately upheld by Judge Ambrose.  *See* Resp. 10, ECF No. 1220.  The Court expects that the Government will not attempt to elicit testimony with respect to the surviving victims regarding "victim impact," as the two factors are distinct.  *See* ECF No. 335 at 18 ("If anything, combining the two aggravators here would arguably broaden the surviving victims factor because, unlike the victim impact aggravator, the surviving victims aggravator as written does not extend to injury, harm, and loss to family, friends, co-workers, or associates of the surviving victims.").

With respect to the "injury to surviving victims" non-statutory aggravating factor, the Notice of Intent in this case provides:

> **Injury to Surviving Victims**.  ROBERT BOWERS caused serious physical and emotional injury, including maiming, disfigurement, permanent disability, severe psychological impacts, and grievous economic hardship to individuals who survived the offense, to include: 1) physically injured civilian survivors, D.L. and A.W.; 2) otherwise injured civilian survivors, C.B., D.D., J.C., L.F., A.G., M.G.,

14

J.M., J.P., D.R.2, A.S., J.S., S.W., and B.W.; 3) physically injured law enforcement survivors, A.B., T.M., D.M., J.P. and M.S.; and 4) otherwise injured law enforcement survivors, J.C., J.G., J.H., A.M., J.R., M.S.2, and C.T. (Counts One through Eleven and Twenty-Three through Thirty-Three).

Notice of Intent 4-5, ECF No. 86.  The United States District Court for the District of Massachusetts has explained:

> For a nonstatutory aggravating factor to be "relevant" within the meaning of the statute, it must be "sufficiently relevant to the consideration of who should live and who should die."  [*United States v. Davis*, 912 F.Supp. 938, 943 (E.D. La.1996)]; *see also United States v. Friend*, 92 F.Supp.2d 534, 541 (E.D.Va.2000); *United States v. Peoples*, 74 F.Supp.2d 930, 932 (W.D.Mo.1999).  Congress could not have intended the word "relevant" to mean anything less, given the strong Constitutional policy favoring guided and measurable jury determinations on capital punishment. *See generally Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). As the Supreme Court has held, aggravating factors in death penalty cases must be "*particularly* relevant to the sentencing decision," not merely relevant, in some generalized sense, to whether defendant might be considered a bad person.  *Gregg*, 428 U.S. at 192, 96 S.Ct. 2909 (emphasis added).

*United States v. Gilbert*, 120 F. Supp. 2d 147, 150–51 (D. Mass. 2000)

As noted, Judge Ambrose has already ruled that the injury to surviving victims factor, as drafted, is not unconstitutionally duplicative, overly broad, or vague.  ECF No. 335 at 17-19.  In so holding, Judge Ambrose explained: "Here, the 'surviving victims' aggravator has a 'core meaning' that directs the jury to the specific individuals who survived the shooting and *delineates the type of harm these individuals suffered*.  Accordingly, I find that the factor is not unconstitutionally vague or overbroad.  As the Government aptly observes in its response, '[i]f the factor "casts a wide net," as Bowers alleges, it is because his conduct caused wide-spread, *varied harm to numerous individuals and categories of victims*.'"  *Id.* at 18-19 (emphasis added).  The Court agrees with the Government's argument that, "[b]ecause the language of the FDPA is inclusive, not exclusive, this Court should reject the defendant's ad hoc, unsupported limitations on an aggravating factor this Court has already upheld."  Resp. 11, ECF No. 1220 (citing *Whitten*,

610 F.3d at 188).  In upholding the factor in the face of a defense challenge, Judge Ambrose clearly found the factor to be relevant.

Defendant has not provided the Court with authority that specifically supports his assertion that the "injury to surviving victims" non-statutory aggravating factor must be limited only to physical injuries, and the Court will not limit the injury to surviving victims factor to only evidence of physical injury.  *See United States v. McVeigh*, 944 F. Supp. 1478, 1491 (D. Colo. 1996) (declining to strike the following non-statutory aggravating factor: "That, in committing the offense(s) charged in the indictment, the defendant caused serious physical *and emotional injury*, including maiming, disfigurement, and permanent disability, to numerous individuals." (emphasis added)).  The Court finds that evidence supporting this non-statutory aggravating factor, including evidence of non-physical injuries suffered by those victims who survived the attack, clearly will have "some bearing" on Defendant's personal responsibility and moral guilt, and the Court rejects Defendant's argument to the contrary.  *See* Reply 9, ECF No. 1256.[2]

Defendant's assertion that no opinions or characterizations about Defendant, the crime, the trial process, or the appropriate sentence may be introduced is uncontested, and supported by the case law.  The Government does not intend to elicit such testimony, Resp. 10 n.3, ECF No. 1220, and the Court does not intend to permit the admission of any such evidence.

As to Defendant's argument that the Government's proposed evidence must be examined piece by piece and as a whole to determine whether its probative value is outweighed by the danger of unfair prejudice, as well as his request for a pre-sentence selection phase hearing to allow for

---

[2] The argument that "[f]urther testimony about non-physical injuries is irrelevant to the death-worthiness of Mr. Bowers because *it was wholly unforeseeable to him*, and therefore tells jurors nothing additional about his moral blameworthiness," Reply 9, ECF No. 1256 (emphasis added), is, in this Court's estimation, illogical.  That individuals who were injured and/or present for a shooting in which eleven individuals were killed and seven others were injured might suffer an adverse psychological or economic impact from the event is undeniably and entirely foreseeable.

the same, the Court will not hold a hearing or otherwise require the Government to provide written statements describing the potential testimony of each witness with respect to the victim impact evidence that the Government intends to introduce.[3]  As this Court previously noted, *see* ECF No. 893, the information sought by Defendant is material only to a potential sentence selection phase in this case, as it constitutes evidence that the Government may introduce in support of non-statutory aggravating factors.  As this Court previously held, Defendant is not entitled to the early production of such information under the Federal Rules, the FDPA, or the Constitution.

Further, and like the court in *United States v. Lujan*, this Court will not "require the family [and friends of the victims] to repeatedly relive their loss[,]" and will not require the victims' "family members [and friends] [to] write out their testimony for preapproval, nor otherwise deliver scripted testimony."  *United States v. Lujan*, No. CR 05-924 RB, 2010 WL 11546103, at *5 (D.N.M. Nov. 30, 2010); *see also United States v. McCluskey*, No. CR 10-2734 JCH, 2013 WL 12330210, at *4 (D.N.M. June 11, 2013) ("Since the outline is sufficient, the Court also denies Defendant's request for alternative relief, including prior review of victim impact testimony outside the presence of the jury.  The Court agrees with the approach and reasoning of Judge Brack in that the Court will not require the victims to 'repeatedly relive their loss,' nor to 'write out their testimony for preapproval, nor otherwise deliver scripted testimony.'" (quoting *Lujan*)).

This Court will carefully and thoroughly consider the evidence and testimony introduced in the sentence selection phase, should one be necessary, and will, as it is required, be constantly mindful of the probative and prejudicial effect of any evidence, including victim impact evidence,

---

[3] The Court has twice rejected similar attempts by Defendant to preview the Government's penalty phase evidence. *See* ECF Nos. 205 and 893.  The Court further notes that the Government has represented that it "has already voluntarily produced interview reports for victims and other witnesses, including penalty phase witness statements related to victim impact, thereby providing the defendant with far more detailed notice of the expected testimony than what he is entitled to receive."  Resp. 2, ECF No. 1220.

both individually and in the aggregate. While the Court understands the Defense's attempts to set limits at a pre-sentence selection phase hearing, and Defendant cites to some case law in support of his request, courts routinely reject such requests. *See   Lujan*, No. 2010 WL 11546103, at *5; *see also McCluskey*, 2013 WL 12330210, at *4; *United States v. George*, 477 F. Supp. 3d 532, 545–46 (E.D. La. 2020) ("As to testimony, the Court will not require that the government disclose an outline or draft of proposed testimony to defendants. Defendants are not entitled to review victim impact testimony in advance and offer only conclusory reasons as to why the Court should order the government to make this disclosure. . . . Gatekeeping is the Court's prerogative, . . . not defendants'. If defendants disagree with any of the Court's evidentiary determinations, then defendants may object during trial."); *United States v. Solomon*, 513 F. Supp. 2d 520, 539 (W.D. Pa. 2007) ("The Court also will deny Defendant's request for a pre-trial evidentiary hearing to rule on the sufficiency of the evidence to support all of the non-statutory aggravating factors."); *United States v. Williams*, No. S100CR.1008(NRB), 2004 WL 2980027, at *23 (S.D.N.Y. Dec. 22, 2004), *aff'd*, 506 F.3d 151 (2d Cir. 2007) (denying request that the government produce a written statement outlining its intended victim impact evidence). Defendant's citation to *United States v. Johnson*, 713 F. Supp. 2d 595 (E.D. La. 2010), a case wherein a widow provided testimony as to her opinions on the defendant himself and the crime at issue, is inapt, as this Court has already explained that the Government has confirmed that it does not intend to elicit such testimony, Resp. 10 n.3, ECF No. 1220, and the Court does not intend to permit the admission of any such evidence. In short, this Court will not hold a pre-sentence selection phase hearing to address the admissibility of victim impact evidence.

The Court acknowledges that victim impact evidence is a very sensitive and, when properly constrained, extremely relevant, area of inquiry. *McVeigh*, 153 F.3d at 1219 ("The devastating

effects that the deaths of the victims had on their families and loved ones is 'certainly part and parcel of the circumstances' of the crime properly presented to the jury at the penalty phase of trial." (quoting *Bonin v. Vasquez*, 807 F.Supp. 589, 613 (C.D.Cal.1992), *aff'd*, 59 F.3d 815 (9th Cir. 1995))).  Moreover, the number of victims and nature of the crimes in this case undeniably warrants a greater amount of victim impact testimony than may be found in a case involving fewer victims.[4]  *Id.* at 1221 ("The magnitude of the crime cannot be ignored.  It would be fundamentally unfair to shield a defendant from testimony describing the full effects of his deeds simply because he committed such an outrageous crime.  The sheer number of actual victims and the horrific things done to them necessarily allows for the introduction of a greater amount of victim impact testimony in order for the government to show the 'harm' caused by the crime.").

That said, victim impact evidence, and particularly in a capital case, requires the Court to engage in line-drawing to address both the Government's right to introduce such evidence and Defendant's rights under the Constitution and the FDPA.  *Smith*, 2020 WL 6536208, at *2.  The Court has no intention of preventing or limiting the Government's witnesses from testifying within the prescribed boundaries set forth in *Payne* and the case law interpreting and applying *Payne*.  However, the Court cautions the Government to remain cognizant of the limitations on such testimony, and to stay well clear of any testimony that might cross the line.  Victim impact witnesses may offer testimony describing the life which the Defendant chose to extinguish, should a guilty verdict be returned on a capital offense, or demonstrating loss to those close to the victims and the targeted community at issue in this case which has resulted from the crimes in question.

---

[4] *See United States v. Smith*, No. 3:16-CR-00086-SLG-1, 2020 WL 6536208, at *4 (D. Alaska Nov. 5, 2020) ("The government cites to *United States v. Dylann Roof* and *United States v. Timothy McVeigh* and notes that in those trials, 20 and 38 victim-impact witnesses testified, respectively.  However, those cases were fundamentally different than most FDPA cases due to the 'sheer number of actual victims and the horrific things done to them necessarily allow[ed] for the introduction of a greater amount of victim impact testimony in order for the government to show the 'harm' caused by the crime.'").

Such witnesses may not characterize or give their opinions on the crime, characterize or give opinions on the Defendant, and they may not express an opinion on the appropriate sentence.

The Court believes that all of the above sets forth adequate boundaries and instruction that adequately balances the Government's right to introduce victim impact evidence and the Defendant's statutory and constitutional rights.

### III.    Conclusion

For the reasons discussed above, it is hereby ORDERED that the Motion for Hearing is denied, consistent with the Court's discussion above.

BY THE COURT:

_/s/Robert J. Colville_____
Robert J. Colville
United States District Judge

DATED: June 13, 2023

cc: All counsel of record