IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-292 |
| | ) | |
| ROBERT BOWERS | ) | |

## MOTION FOR JUDGMENT OF ACQUITTAL UNDER FED. R. CRIM. P. 29(c) AND FOR A NEW TRIAL UNDER FED. R. CRIM. P. 33

Robert Bowers, through counsel, moves the Court, under Rule 29(c) of the Federal Rules of Criminal Procedure, for a judgment of acquittal on counts 1–11, 23–33, 34–35, 38–39, 40–47, 48–51, and 52–63. He also moves the Court for a new trial under Rule 33.

The standard under Rule 29 is whether a reasonable juror could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). *Accord United States v. Fattah*, 902 F.3d 197, 268 (3d Cir. 2018). Absent sufficient evidence, a conviction also violates a federal defendant's Fifth Amendment right to due process. Under Rule 33, a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

I.    **Motion under Rule 29 for judgment of acquittal on counts 1–11, 23–33, 34–35, 38–39, 40–47, 48–51, and 52–63**

For counts 1–11, 23–33, 34–35, 38–39, 40–47, 48–51, and 52–63, there was insufficient evidence to establish that Mr. Bowers intended specifically to obstruct each victim in the enjoyment of that victim's free exercise of religious beliefs or attempted to do so. For the above-named counts, which charged offenses under 18 U.S.C. § 247(a)(2)

1

or included as an element a violation of § 247(a)(2), the government was required to prove beyond a reasonable doubt that "it was Mr. Bowers's conscious desire or purpose to obstruct" each victim in the enjoyment of that victim's free exercise of religious beliefs. Guilt Phase Jury Instructions at 32. Based on the evidence presented at trial during the guilt phase, no rational juror could have found this specific-intent element.

Even if the evidence established that Mr. Bowers intended to deter the Synagogue's congregations or outside groups or individuals from supporting the Hebrew Immigrant Aid Society or facilitating refugee resettlement generally, that would not support the convictions, both because there was insufficient evidence that he was seeking to deter the victims and because, in any event, there was insufficient evidence that such support constituted the free exercise of religious beliefs under the statute. So too if Mr. Bowers attacked the victims because of a hatred of Jews, since there was insufficient evidence that any such hatred was directed at them because they were religious or secular or were engaged in religious practices. Finally, even if facilitating refugee settlements could somehow be deemed the exercise of Jewish religious beliefs (which, again, Mr. Bowers denies satisfies the statute and denies was proven), it still would not establish the specific-intent element because there was insufficient evidence that Mr. Bowers knew that was so, as well as insufficient evidence that it was so for each victim.

It is not enough that evidence may have showed Mr. Bowers committed an act that resulted in the obstruction of each victim's free exercise of religious beliefs, *i.e.*, that the attack on each victim obstructed him or her from worshipping at the Synagogue that day as planned (or from doing so in the future). Rather, the government had to, but failed, to

prove that Mr. Bowers acted with the specific intent to so obstruct each victim in such enjoyment of his or her free exercise of religious beliefs. ECF 874 at 9. And specific intent requires more than "[m]ere knowledge that a result is substantially certain to follow from one's actions." *Pierre v. Attorney General of U.S.*, 528 F.3d 180, 189 (3d Cir. 2008).

Thus, no rational juror could have found beyond a reasonable doubt that "it was Mr. Bowers's conscious desire or purpose to obstruct" each victim in the enjoyment of that victim's free exercise of religious beliefs. Guilt Phase Jury Instructions at 32. The Court should enter a judgment of acquittal for counts 1–11, 23–33, 34–35, 38–39, 40–47, 48–51, and 52–63.

## II. Mr. Bowers' convictions under 18 U.S.C. § 249(a)(1), as well as his sentences on other convictions, should be vacated because of defects in the § 249(a)(1) charges that the Court allowed by virtue of its pretrial order.

Prior to trial, the defense challenged the constitutionality of 18 U.S.C. § 249(a)(1), arguing, *inter alia*, that it was not a valid exercise of Congress' authority under the Thirteenth Amendment. *See* ECF 239, 251. The Court denied the challenge, concluding that Congress "rationally determined" that the racially motivated violence prohibited by § 249(a)(1) constituted a "badge and incident" of slavery within the meaning of the Thirteenth Amendment. ECF 324 at 4-7.

The Court of Appeals for the Ninth Circuit recently ruled on the constitutionality of § 249(a)(1). *United States v. Hougen*, 76 F.4th 805 (9th Cir. 2023). The dissent, authored by Judge Ikuta, determined that § 249(a)(1) is an invalid exercise of Congress' authority under the Thirteenth Amendment. The defense files this motion to supplement

and augment the arguments previously made in ECF 239 and 251 to provide additional authority and to incorporate Judge Ikuta's analysis.

### A.   18 U.S.C. § 249(a)(1) is an invalid exercise of Congress' authority under the Thirteenth Amendment.

The conduct penalized by § 249(a)(1) is willfully causing bodily injury to another person because of that person's protected characteristic.[1] It criminalizes assault or battery where the perpetrator is motived by the race, color, religion, or national origin of the victim. The purported constitutional authority for the statute is the Thirteenth Amendment, which was enacted to abolish slavery and involuntary servitude.[2] Section 1 of the Thirteenth Amendment sets forth its "substantive guarantee": "that slavery or

---

[1] 18 U.S.C. § 249(a)(1) provides:

Whoever, whether or not acting under color of law, willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person--
**(A)** shall be imprisoned not more than 10 years, fined in accordance with this title, or both; and
**(B)** shall be imprisoned for any term of years or for life, fined in accordance with this title, or both, if--
**(i)** death results from the offense; or
**(ii)** the offense includes kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill.

[2] The Thirteen Amendment provides:

**Section 1.** Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.
**Section 2.** Congress shall have power to enforce this article by appropriate legislation.

involuntary servitude shall not exist in any part of the United States." *The Civil Rights Cases*, 109 U.S. 3 (1883). Section 2 of the Thirteenth Amendment provides Congress with the authority to enforce this substantive guarantee "by appropriate legislation." U.S. Const. amend. XIII.

At the time of the passage of the Thirteenth Amendment, "slavery" referred to a private economic relationship between a master and servant. *See* Kurt Lash, *Roe and the Original Meaning of the Thirteenth Amendment*, 21 Geo. J.L. & Pub. Pol'y, 131, 132 (2023). The Supreme Court later confirmed, in *United States v. Kozminski*, 487 U.S. 931, 952 (1988), that "'involuntary servitude' necessarily means a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process."

Accordingly, Thirteenth Amendment "'provides a substantive guarantee that slavery (a private economic relation between a master and a servant), as well as any other state of bondage where one person is forced to labor for another, are eradicated. Any legislation enacted by Congress must be at least rationally related to remedying a violation of this constitutional right.'" *Hougen*, 76 F.4th at 819 (quoting *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 204 (2003)).[3] In clarifying the scope of

---

[3] Mr. Bowers maintains his position that the proper test for what is "appropriate" under Section 2 of the Thirteenth Amendment is articulated in *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997), and *Shelby County v. Holder*, 570 U.S. 529 (2013). *See* ECF 239 at 11-14 ("*City of Boerne* and *Shelby County,* read together, establish that legislation is not 'appropriate' under the Reconstruction Amendments unless concrete evidence proves

Congress' authority under Section 2 of the Thirteenth Amendment, the Supreme Court held that "Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and incidents of slavery, and the authority to translate that determination into effective legislation." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 440 (1968). While this power is broad, it may not effect a "substantive redefinition" of the rights granted by the Thirteenth Amendment. *Nev. Dep't Hum. Res. v. Hibbs*, 538 U.S. 721 at 728 (2003).

Turning to the definition of "badges and incidents of slavery," the term "incident" has a narrow historical meaning tied to a master's property rights in a slave, including "[c]ompulsory service of the slave for the benefit of the master, restraint of his movements except by the master's will, disability to hold property, to make contracts, to have a standing in court, to be a witness against a white person, and such like burdens and incapacities." *The Civil Rights Cases*, 109 U.S. at 22. The term "badges" has a broader meaning, referring to "'indicators, physical or otherwise, of African Americans' slave or subordinate status.'" *Hougen*, 76 F.4th at 820-821 (quoting Jennifer Mason McAward, *Defining the Badges and Incidents of Slavery*, 14 U. Pa. J. Const. L. 561, 575 (2012)).

Accordingly, the badges and incidents of slavery are the denial of "those fundamental rights which appertain to the essence of citizenship, and the enjoyment or deprivation of which constitutes the essential distinction between freedom and slavery."

---

there is a 'current need,' and the legislation is a 'congruent and proportional' response to that need.").

*The Civil Rights Cases*, 109 U.S. at 22. Importantly, the Supreme Court has "most often characterized these 'fundamental rights[,] which are the essence of civil freedom,' in terms of economic and legal parity with white people—specifically, ensuring that black people have 'the same right to make and enforce contracts, to sue, be parties, give evidence, and to inherit, purchase, lease, sell, and convey property, as is enjoyed by white citizens.'" *Hougen*, at 821 (quoting *The Civil Rights Cases*, 109 U.S. at 22).

When a person uses violence to deprive another of a fundamental right of citizenship, it may be a badge or incident of slavery. As this Court noted in denying Mr. Bowers' pretrial challenge to § 249(a)(1), "master-on-slave violence was intended to enforce the social and racial superiority of the attacker and the relative powerlessness of the victim." ECF 324 at 6-7 (quoting *United States v. Hatch*, 722 F.3d 1193, 1206 (10th Cir. 2013). But that does not mean that every act of violence motivated by a person's race, religion, color, or national origin is a badge or incident of slavery. Indeed, the Supreme Court has never held that "an assault or battery—when committed **without** an intent to deprive a person of fundamental rights of citizenship—was a badge or incident of slavery, even if there is evidence that the perpetrator was motivated by animus against a person's protected characteristic." *Hougen*, 76 F.4th at 822 (emphasis added).

Even assuming the "rational basis test" applies to the analysis of the constitutionality of § 249(a)(1),[4] the critical question would be whether Congress could rationally determine that an assault or battery motivated only by the victim's race,

---

[4] *See supra*, note 3.

religion, color, or national origin is a badge or incident of slavery. This type of conduct is unlike violence motivated by an intent to deprive persons of their fundamental rights as citizens. *See, e.g.*, 42 U.S.C. § 1985(3) ("If two or more persons . . . conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . ."); 18 U.S.C. § 245(b) (criminalizing violent acts motivated by the victim's "race, color, religion, national origin," but only to protect the victim's right to engage in a wide range of "federally protected activities" pursuant to 18 U.S.C. § 245(b)(2)). The type of conduct prohibited by § 249(a)(1) is more like mere private discrimination, which the Supreme Court has held is not a badge or incident of slavery. *See, e.g.*, *The Civil Rights Cases*, 109 U.S. at 25.

Congress overstepped its authority in criminalizing this conduct for two reasons. First, § 249(a)(1) is not rationally related to the substantive guarantee of Section 1 of the Thirteenth Amendment, the eradication of slavery and involuntary servitude. "Congress could not rationally determine that private violence, which is motivated by neither a master-servant relationship between the perpetrator and victim nor a desire to deprive the victim of the fundamental rights of a free citizen, is a badge or incident of slavery." *Hougen*, 76 F.4th at 824.

Second, § 249(a)(1) is overbroad because it reaches groups that have never been enslaved or subject to involuntary servitude in the United States. As such, Congress could not rationally determine that criminalizing assault or battery committed because the

victim was a member of a group with no connection to slavery in the United States, including Jews, would somehow further the eradication of slavery. *Hougen*, 76 F.4th at 824-825.

**B.    Even if Congress had the authority to criminalize assault and battery motivated by race, that authority does not extend to assault and battery motivated by religion.**

The "religion" prong of § 249(a)(1), under which Mr. Bowers was indicted and convicted, exceeds Congress' authority under the Thirteenth Amendment both on its face and as applied. *See* ECF 44 at 4 ("On or about October 27, 2018, in the Western District of Pennsylvania, the defendant, ROBERT BOWERS, willfully caused bodily injury to each victim listed below because of that victim's actual and perceived religion . . . ."). For the same reasons discussed above, and even if the "race" prong of the statute passes constitutional muster, criminalizing assault and battery motivated by religion is even farther removed, and not rationally related, to the substantive guarantee of Section 1 of the Thirteenth Amendment, the eradication of slavery and involuntary servitude. In addition, it is overbroad because it reaches groups of people who have never been enslaved or subject to involuntary servitude in the United States. As applied here, § 249(a)(1) penalizes assault and battery motivated by the victims' Jewish faith, and it is undisputed that members of the Jewish faith have never been subjected to slavery or involuntary servitude in the United States. Moreover, even if being Black could serve as a proxy for such a prior enslaved status so as to validate the "race" prong of the statute, it is

also undisputed that virtually all members of the Jewish faith in this country were at the time the statute was enacted (and are today) not Black.

In its order denying Mr. Bowers' pretrial challenge to § 249(a)(1), the Court noted that "the protection offered under § 249(a)(1) appears to rest, not upon a religious basis *per se*, but upon an "ethnic" or "racial" basis. That Jews may have been, or may be, considered an "ethnoreligious" group does not mean that the protection offered under § 249(a)(1) stems from their religious affiliation." ECF 324 at 7, n. 5; *see* ECF 249 at 19 (government makes similar argument); ECF 251 at 4 (defense opposes that argument). However, the prong of the statute whose application the Court approved here—which is plain and unambiguous—uses the word "religion" without the Court's qualifications. Similarly, the superseding indictment simply charged Mr. Bowers with acting "because of [the victims'] actual and perceived religion," ECF 44 at 4, and the Court's jury instructions were in accord:

> To prove that Robert Bowers acted "because of" a person's actual or perceived religion, the Government must prove beyond a reasonable doubt with respect to each count that the attack that caused bodily injury to the person identified in the count would not have occurred but for the fact of the person's actual or perceived religion. This does not mean that the Government must prove that the person's actual or perceived religion was his sole or only motive for the attack. You may find Mr. Bowers is guilty even if there was more than one reason why he attacked the individuals identified in Counts 12 through 22. The Government must prove, however, that the person's actual or perceived religion played a determinative role in Mr. Bowers's decision to attack the person identified in the count.

Guilt Phase Instructions at 40; Trans. 6/15/23, at pp. 44–45.

Thus, the statute provides, the superseding indictment charged, the Court instructed, and the jury found Mr. Bowers guilty of an offense motivated *per se* by the

"religion" of the victims. To the extent § 249(a)(1) penalizes conduct motivated by religion *per se*, it is unconstitutional on its face and as applied here.

### C.    If § 249(a)(1) is limited to religious groups who were considered races at the time of the adoption of the Thirteen Amendment, it violates the Equal Protection Clause.

As explained above, § 249(a)(1) criminalizes private violence without any relationship to a federally protected interest if it is motivated by the actual or perceived color, national origin, religion, or race of another person. If, and despite its plain language, the statute only means "real or perceived religions or national origins, at least to the extent such religions or national origins were regarded as races at the time of the adoption of the 13th, 14th, and 15th amendments to the Constitution of the United States," 18 U.S.C. § 30501, it violates the Equal Protection Clause.[5]

This Court previously held:

> [T]he congressional intent behind §249(a)(1) makes clear that Congress intended to prohibit violence on the basis of real or perceived religions that "were regarded as races at the time of the adoption of the [Reconstruction] amendments." *Matthew Shepard and James Byrd, Jr. Hate Crim⁶es Prevention Act*, Pub. L. No. 111-84, 123 Stat. 2836 (2009), § 4702. I therefore find that § 249(a)(1) includes protection for Jewish people in that they were considered a distinct race when the Thirteenth Amendment was applied.

ECF 324 at 11.

---

[5] Contrary to the Court's prior statement, ECF 324 at 7, n.5, Mr. Bowers briefed this issue in his pleadings challenging the constitutionality of 249(a)(1). *See* ECF 239 at 26, ECF 251 at 4-5.

[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976) (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954)). "[I]t has long been implicit in the Supreme Court's decisions that religious classifications are treated like others traditionally subject to heightened scrutiny, such as those based on race." *Hassan v. City of New York*, 804 F.3d 277, 299 (3d Cir. 2015), *as amended* (Feb. 2, 2016) (citing *United States v. Armstrong,* 517 U.S. 456, 464 (1996) (naming "race" and "religion" as examples of "unjustifiable standard[s]" for a "decision whether to prosecute"). Thus, "intentional discrimination based on religious affiliation must survive heightened equal-protection review." *Hassan*, 804 F.3d at 301 (3d Cir. 2015).

To the extent Congress elected to protect under § 249(a)(1) only those religions that were regarded as races at the time the Thirteenth Amendment was adopted, the statute intentionally discriminates against other religions that do not meet that criterion. Under a heightened scrutiny analysis, the religiously-based classification in § 249(a)(1) must be "narrowly tailored ... [to] further [a] compelling governmental interest[ ]." *Gratz v. Bollinger,* 539 U.S. 244, 270 (2003). The burden of justification "'is demanding and ... rests entirely on the [government].'" *Hassan*, 804 F.3d at 305 (quoting *United States v. Virginia,* 518 U.S. 515, 533 (1996)).

Here, Congress' decision to enact legislation that protects only those religions that were regarded as races at the time of the adoption of the Thirteen Amendment does not serve a compelling government interest. The distinction between religious groups on this

basis, particularly where religious groups that may have been considered races were not subject to slavery or involuntary servitude then or now, makes little sense. To the extent any compelling government interest might be served, § 249(a)(1) is not narrowly tailored to further that interest.

In a footnote, this Court noted that a different section of § 249, § 249(a)(2), "incorporates religions not considered a 'race' under 19th century law." ECF 324 at 7 n.5. That section covers assaultive conduct motived by the "actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person" but only in particular circumstances. 18 U.S.C. § 249(a)(2)(A). Importantly, the government did not charge Mr. Bowers with that offense, which requires that the prosecution prove more—in effect, a nexus with interstate commerce pursuant to the Commerce Clause—than it must prove under 249(a)(1).[7] As such, that a prosecutor may

---

[7] Section 249(a)(2) provides, in pertinent part:

 **(A) In general.**--Whoever, whether or not acting under color of law, ***in any circumstance described*** in subparagraph (B) or paragraph (3), willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person-- . . . .

**(B) Circumstances described.**--For purposes of subparagraph (A), the circumstances described in this subparagraph are that--
**(i)** the conduct described in subparagraph (A) occurs during the course of, or as the result of, the travel of the defendant or the victim--
    **(I)** across a State line or national border; or
    **(II)** using a channel, facility, or instrumentality of interstate or foreign commerce;
**(ii)** the defendant uses a channel, facility, or instrumentality of interstate or foreign commerce in connection with the conduct described in subparagraph (A);

charge a different offense with additional elements under § 249(a)(2) does not save § 249(a)(1) from an equal protection challenge.

> **D.** **Even if Mr. Bowers could have been validly prosecuted under the "religion" prong of § 249(a)(1) based on a theory that Jews were considered a race at the time of the adoption of the Thirteenth Amendment, the Court still erred by removing this issue from the jury and deciding it without an evidentiary record.**

In its order denying Mr. Bowers' pretrial challenge to § 249(a)(1), the Court "look[ed] to Supreme Court cases interpreting the nineteenth century conceptions of 'race' in the context of the Thirteenth Amendment for guidance in determining which people are protected under the Thirteenth Amendment." ECF 324 at 7. The Court noted that "'[w]hile the immediate concern [of the Thirteenth Amendment] was with African slavery, the Amendment was not limited to that. It was a charter of universal freedom for all persons, whatever the race, color or estate, under the flag.'" ECF 324 at 7 (quoting *Bailey v. Alabama*, 219 U.S. 219, 240-41 (1911)). The Court then relied upon two decisions interpreting 42 U.S.C. § 1981 and § 1982, in which the Supreme Court reviewed dictionaries, encyclopedias, and the legislative history of the statutes and concluded that Jews and Arabs (and other groups) were considered races in the mid-19th century. ECF 324 at 7- 10 (citing *Saint Francis College v. Al-Khazraji*, 481 U.S. 604

---

**(iii)** in connection with the conduct described in subparagraph (A), the defendant employs a firearm, dangerous weapon, explosive or incendiary device, or other weapon that has traveled in interstate or foreign commerce; or
**(iv)** the conduct described in subparagraph (A)--
> **(I)** interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct; or
> **(II)** otherwise affects interstate or foreign commerce.

(1987), and *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987)). Based upon this precedent, the Court found, as a matter of law, that "§ 249(a)(1) includes protection for Jewish people in that they were considered a distinct race when the Thirteenth Amendment was applied." ECF 324 at 11.

This finding was one for the jury, not the Court, to make. In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court addressed a New Jersey hate crime statute that provided for increased penalties if a defendant engaged in conduct "with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity," N.J. Stat. Ann. § 2C:44-3. The Supreme Court found that this was a question for the jury to decide unanimously and beyond a reasonable doubt. The *Apprendi* Cout noted that, among the "constitutional protections of surpassing importance," were the provisions of the Fourteenth Amendment that liberty can be deprived only with due process of law and the Sixth Amendment guarantee of a trial by jury, which entitles a defendant to a jury determination of guilt of every element of the crime beyond a reasonable doubt. *Apprendi*, 530 U.S. at 476. The Court cited to its earlier decision in *In re Winship*, where it stated: "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id*. at 477 (quoting *In re Winship*, 397 U.S. 358, 364 (1970)) (brackets omitted); *see Jones v. United States*, 526 U.S. 227, 232 (1999) (holding, in a federal case, that elements must be charged in the indictment, submitted to a jury, and proven by the government beyond a reasonable doubt).

In accordance with this precedent, the Court should have left it to the jury to find not only that Mr. Bowers' conduct was committed because of the victims' actual or perceived religion, but also that the victims' actual or perceived religion was considered a race in the mid-19th century when the Thirteenth Amendment was adopted. Regardless of whether this is a pure "question of fact" or "mixed question of law and fact," such questions "have typically been resolved by juries." *United States v. Gaudin*, 515 U.S. 506, 512 (1995) (citing J. Thayer, *Preliminary Treatise on Evidence at Common Law* 194, 249–250 (1898)). As noted above, the jury was simply instructed that the government had to prove beyond a reasonable doubt that "the attack that caused bodily injury to the person identified in the count would not have occurred but for the fact of the person's actual or perceived religion." Guilt Phase Instructions at 40; Trans., 7/15/2023, at 44–45. The jury was not told that the government had to prove the specific religion of each person nor that it had to prove that the specific religion was considered a race when the Thirteen Amendment was adopted.

In the alternative, even if this were properly a question for the judge, the Court's finding was still procedurally and substantively flawed in that the Court decided it based on pretrial motions papers, without any evidentiary record or an opportunity for the defense to present it with evidence on this question.

**E.  Alternatively, the operative question in deciding both the reach of § 249(a)(1) and of Congress' authority under the Thirteenth Amendment is not whether Jews were a race in the mid-19th century but whether they were considered a race at the time of the offense.**

Even if Jews were considered a race in the mid-19[th] century, and the protections of the Thirteenth Amendment applied to them at that time – and even if all of Mr. Bowers' other arguments were dismissed – still, the proper question would be whether Jews were considered a race at the time of Mr. Bowers' offense in 2018. Mr. Bowers acknowledges that the holdings of *St. Francis College v. Al-Khazraji,* 481 U.S. 604 (1987), and *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987), treat the operative time as when the statutes at issue in those cases was enacted. But those decisions involved different statutes. And, in any event, they have been undermined by subsequent Supreme Court decisions, as discussed below.

The Supreme Court itself has noted that "race" is a social or political construct that has evolved with time:

> There is a common popular understanding that there are three major human races—Caucasoid, Mongoloid, and Negroid. Many modern biologists and anthropologists, however, criticize racial classifications as arbitrary and of little use in understanding the variability of human beings. It is said that genetically homogeneous populations do not exist and traits are not discontinuous between populations; therefore, a population can only be described in terms of relative frequencies of various traits. Clear-cut categories do not exist. The particular traits which have generally been chosen to characterize races have been criticized as having little biological significance. It has been found that differences between individuals of the same race are often greater than the differences between the "average" individuals of different races. These observations and others have led some, but not all, scientists to conclude that racial classifications are for the most part sociopolitical, rather than biological, in nature. S. Molnar, Human Variation (2d ed. 1983); S. Gould, *The Mismeasure of Man* (1981); M. Banton & J. Harwood, *The Race Concept* (1975); A. Montagu, *Man's Most Dangerous Myth* (1974); A. Montagu, *Statement on Race* (3d ed. 1972); *Science and the Concept of Race* (M. Mead, T. Dobzhansky, E. Tobach, & R. Light eds. 1968); A. Montagu, *The Concept of Race* (1964); R. Benedict, *Race and Racism* (1942); Littlefield, Lieberman, & Reynolds, *Redefining Race: The Potential Demise of a Concept in Physical Anthropology*, 23

> *Current Anthropology* 641 (1982); *Biological Aspects of Race*, 17 Int'l Soc.Sci.J. 71 (1965); Washburn, *The Study of Race*, 65 American Anthropologist 521 (1963).

*St. Francis College*, 481 U.S. at 610–13, n. 4 (1987). Even if Jews were considered a race at the time of the adoption of the Thirteenth Amendment, under the modern day understanding of "race," Jews are no longer considered a separate race. Thus, they are not entitled to protection under § 249(a)(1) on that basis.

Moreover, as Mr. Bowers argued in his pretrial challenge to § 249(a)(1), *see* ECF 239 at 11-14, the test for what is "appropriate" under Section 2 of the Thirteenth Amendment is articulated in *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997), and *Shelby County v. Holder*, 570 U.S. 529 (2013). Both cases were decided after the Supreme Court's decisions in *St. Francis College* and *Shaare Tefila Congregation*. *City of Boerne* and *Shelby County,* read together, establish that legislation is not 'appropriate' under the Reconstruction Amendments (Thirteenth, Fourteenth, and Fifteenth Amendments) unless concrete evidence proves there is a 'current need,' and the legislation is a 'congruent and proportional' response to that need." Even if there were a need in the mid-19th century, that need does not exist today. And even if it did, § 249(a)(1) is not a "congruent and proportional" response to that need.

### F.   The government's evidence and argument in support of the § 249(a)(1) counts pervaded the entire trial and contributed to the death verdict.

Although the § 249(a)(1) counts carried a maximum sentence of life without the possibility of release, the evidence in support of those counts pervaded the entire trial, including the penalty phase, and contributed to the jury's verdict of death. Indeed, the

Court specifically instructed the jury that it was to consider all of the evidence from the prior phases in reaching its verdicts during the penalty phase. Trans. 7/12/23, at p. 12; Trans. 7/31/23, at p. 60. In addition, during the penalty phase, the government repeatedly referenced the evidence supporting the § 249(a)(1) counts. The excepts below are a few examples of this:

- "You had all of the evidence that you needed after the guilt phase to conclude that the defendant has strongly held anti-Semitic and white supremacist beliefs, beliefs that are well-worn anti-Semitic tropes that have existed for decades and even for centuries." Trans. 7/12/2023, at p. 51 (eligibility phase closing argument).

- "The defendant caused all of that harm because, in his words, he wanted to kill Jews. Plainly and simply, he hated Jews, and he wanted to kill as many as he could." Trans. 7/17/2023, at p. 29 (sentence selection phase opening statement).

- "Another extremely aggravating factor that weighs in favor of the most severe sentence under the law is that the defendant's decision to kill grew out of his hatred for Jews. You have already heard a lot about this. His hatred towards Jews was relevant to his guilt, and it's independently relevant to his sentence. You all know how he hated Jews, how he celebrated Hitler, the Holocaust and violence against Jews." Trans. 7/17/2023, at p. 39 (sentence selection phase opening statement).

- "We will ask you to give substantial weight to the fact that the defendant killed these 11 victims simply because they belonged to a particular faith." Trans. 7/17/2023, at p. 41 (sentence selection phase opening statement).

- "You have heard and seen the proof of his bigoted, white supremacist, anti-Semitic views. There is no doubt. You've heard how the defendant referred to Jews as vile and degenerate kikes. You've heard how he downplayed the Holocaust, or as it is known in Hebrew, the Shoah, the systematic extermination of six million Jews by the Nazis during World War II. The defendant claimed it didn't happen, but he wished it had." Trans. 7/31/2023, at pp. 112-113 (sentence selection phase closing argument).

- "There is so much evidence of this defendant's religious hatred; the hundreds of Gab posts, reposts and likes. The word 'kike' appeared in his Gab content over 400 times. Do not be numb to it. Remember what it means. It means that this defendant targeted people solely because of the faith that they chose to worship." Trans. 7/31/2023, at pp. 113 (sentence selection phase closing argument).

- "This defendant hated Jews, and that's why he killed them. And you know he hated Jews from his Gab posts. You know he hated Jews because when he was taken into custody after he had killed all these people, he told law enforcement, 'All these Jews need to die. I just want to kill Jews.'" Trans.7/31/2023, at p. 222 (sentence selection phase rebuttal argument).

Accordingly, the § 249(a)(1) errors discussed above in Sections II.A through II.E affected not only the jury's verdict during the guilt phase but also its verdicts during the eligibility and sentence selection phases.

**III.   This Court should reopen the *Batson* hearing to reconsider the government's strikes in light of additional evidence of racial animus that the defense has collected given adequate time.**

The government peremptorily struck all four of the qualified African-American jurors, the lone qualified Hispanic juror, and the lone qualified Jewish juror. The defense alleged that each of these six strikes was motivated by race and, in the case of the Jewish juror, religion, and thus violated Mr. Bowers' Fifth Amendment right to equal protection. Trans. 5/25/23, pp.19, 23. The defense also sought sufficient time to review the massive jury selection record to demonstrate that the government's stated reasons for the strikes were pretextual. ECF 1253, p. Trans. 3; 5/25/23, pp. 19-22, 52, 54. However, the Court allowed the defense only the 90-minute lunch break to do so. ECF 1255; Trans. 5/25/23, pp. 21-22, 31, 53-54, 55, 57. The defense did its best, Trans. 5/25/23, pp.65-73, to scramble to respond to government's lengthy (obviously pre-prepared) rendition of explanations for these strikes, which had gone on for 25 transcript pages and ranged across the entire jury-selection record in its citations, Trans. 5/25/23, pp.26-52.

Now having had adequate time to review the record, Mr. Bowers moves to reopen the *Batson* hearing for the Court to consider the additional evidence and arguments discussed below in support of his *Batson* claim.

**A.   The government's stated reasons for striking Jurors 148, 257, 290, 95 and 332 were pretextual.**

Among the qualified jurors were four African-American jurors (148, 290, 95, and 332), and one Hispanic juror (257). The government peremptorily struck all five. The numbers struck, compared with those in the qualified venire, is evidence of discrimination. Not only was the government's acceptance rate 0% for both Black and Hispanic jurors; now tallying the figures, it turns out the government accepted 74% of qualified White jurors.[8]

Further, the government's *questioning* of these five jurors reflects a disparate pattern that was likely intended to probe for a reason to strike the jurors of color. It asked the White jurors who ultimately served on the jury an average of eight questions, covering an average of four pages of transcript. As explained below, its questioning of the jurors of color whom it struck was far more extensive.

In light of these disparities, the Court should re-open the *Batson* hearing and re-examine the government's purported race-neutral reasons for these strikes in comparison to other jurors whom the government did not strike and in light of the record as it existed at the time the government exercised its strikes.

        **1.**     **The government's purported reasons for striking Juror 148, a Black woman, were pretextual**.

Juror 148 is a Black woman who resides in ▮▮▮▮▮▮▮▮▮▮▮ had served as a town councilor, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. JQ 148, pp.

---

[8] In the panel of 64 qualified jurors, 58 of them were White. The government used 15 strikes against White jurors. Thus, for purposes of selecting those who would serve on the petit jury, the government accepted 43 of 58 White jurors (43/58 = 74.1%).

4, 9.[9] She was the government's second strike, and the government claimed it struck her "first and foremost [for] her views on the death penalty." Trans. 5/25/23, p. 39.

The government initially claimed to have struck all jurors who ranked themselves as a "3" or a "4" on the questionnaire death penalty scale. Trans. 5/25/23, p.39. That was not true. The government did not strike Juror 270 – a White man who served on the jury – who also ranked himself a "4." JQ 270, p. 21.

The government then attempted to explain its inconsistent application of its "strike all 3's and 4's" rule by clarifying that Juror 148 had also selected "e" on questionnaire question 74, that she is "generally opposed" to capital punishment, but "could vote to impose the death penalty in [this] type of case" if she believed it was called for. However, Juror 270 had characterized himself only a shade different when he selected "d", that he had not definite opinions for or against the death penalty. The government characterized this shade of difference between Jurors 148 and 270 as indicating that Juror 270 "would be able to impose the death penalty," whereas Juror 148, notwithstanding her answer on the questionnaire, presumably would not.[10] Trans. 5/25/23, p. 40.

Juror 148's statements in voir dire belie the government's explanation. In response to government questioning, she answered explicitly, "I am not totally against the death penalty. You can see from my answers," though she would "give th[e] individual the benefit of the doubt." Trans. 4/27/23, p. 189. Juror 148 indicated on her questionnaire that

---

[9] "J.Q." refers to the completed juror questionnaire, followed by the juror's number.

[10] Juror 148 initially selected █████████████████████.

she would not automatically vote against death, that she believed the death penalty is sought "about right," that it is "somewhat important" for the United States to have as a punishment, and it is wrong to take a life and those who do "should face punishment." By comparison, Juror 270 stated during voir dire that he felt that "making somebody live knowing what they did wrong and having to carry that burden is probably more trying than putting them to death." Trans. 5/4/23, p. 60. Similarly, Juror 414, whom the government accepted as an alternate, stated that he would not have the death penalty if he were a country's ruler and that he believes it is sought too often in the United States. Trans. 5/15/23, p. 57.

The government's disparate questioning is further evidence that its explanation for striking Juror 148 was pretextual. The government asked her more than 20 questions across eight pages of transcript, both measures more than double the average of what the government spent on White jurors who served. And whereas the government's questioning of White prospective jurors was marked by single inquiries such as "would you follow the judge's instructions" and "would you listen to the evidence" and "will you give all the evidence meaningful consideration," its questions to Juror 148 pressed repeatedly on her ability to vote for a death sentence. In fact, the government questioned her ability to vote for death five times, whereas White jurors who served only had to answer once. [11]

---

[11]  Trans. 4/27/23, p. 186 (would belief that the death penalty is final "make it difficult for you"?); p. 188 (in view of belief that the death penalty is final, "would you be able to sign verdict form"?); 189 ("if you decide the aggravating facts sufficiently outweigh any mitigating facts, [] in that circumstance, would you be able to?" and "You would be able

Next the government stated its belief that Juror 148 would have "a lot of influence in the jury room." Trans. 5/25/23, p. 44. It described her as an "older woman [who] carried herself with sort of regal elegance and grace … a gravitas…." Throughout the voir dire process, the government took pains to note, for the record, jurors' demeanor and conduct at the time of their questioning. Notably, there is nothing in the record to support the government's post hoc characterization of Juror 148. Indeed, the description is so hopelessly vague as to be completely unverifiable. And even if it were true, it is entirely illogical to infer that carrying herself with "grace" would have made Juror 148 a "leader" in the jury room or otherwise unfavorable to the prosecution. Furthermore, this stated concern for Juror 148's capacity to take on a leadership role in the jury room was equally applicable to White jurors whom the government accepted. For example, ██████ had extensive supervisory responsibilities in his current job, managing a range of different staff positions. Juror 63 was an ████████████████████████████████ ██████████████████████. The government did not strike either of these jurors out of concern that they may have influence in the jury room.

Finally, the government faulted Juror 148 for purportedly being "offended or annoyed" at the questioning about the record of criminal offenses that came up attached to her name. But the record at the time of her questioning did not reflect what the government claims her reaction was or its characterization of any reaction. And defense

---

to sign a verdict form in favor of the death penalty?"); 191 ("if you were to sit on a jury where ultimately you may be called upon to make that individual decision, would [your religious belief] weigh on you?").

counsel did not observe that Juror 148 took offense or was annoyed at the questioning. Moreover, even had she seemed annoyed, such a reaction still would not have been a credible, race-neutral reason for the strike since the government subjected her to unusually prolonged and repetitious questioning on this issue, especially when compared with accepted White jurors, as discussed above. She had already answered the Court's and the defense's questions about her answers on the questionnaire, making clear that none of her experiences would incline her in either direction on the case, that she understood the process, that she was willing to be a juror, and that she could vote for a death sentence if the facts supported it. Then the government asked her the same questions, implicitly challenging the veracity of the answers she had already given. [12] Only then at that point, after she had demonstrated fully her qualifications and willingness to serve as a juror, did the government produce the criminal record that turned out to be erroneously attached to her name. Moreover, by raising this issue, the government also cast doubt on the veracity of Juror 148's answer to question 44 on the questionnaire that she had ███████████████████████████████

---

[12] *See* Trans, 4/27/23, pp. 175 (court asks juror to explain statement "The death penalty is too final"), 186, 188 (Government asks about that statement and whether it would make it difficult or she would be "able" to vote for death); 181-82 (defense explains sentencing process), 186-87 (government explains process, asking juror whether she understands it); 184 (defense asks if she would be able to vote for life or death after hearing all the evidence – answer, "yes"), 189 (government asks twice if she would be able to sign a verdict form for a death sentence); 184 (defense asks about import of religious beliefs for perspectives on capital punishment), 190-91 (government asks if religious beliefs would interfere with voting for a death sentence).

████ .[13] Having lived ████ years, █████████████████████████████ , and served as a city council person, she nonetheless found herself having to prove to her government that she did not have a criminal record that would disqualify her from participating in the jury process as a citizen.

The cumulative indication of all of this – the government's disparate application of a reason to strike, its disparate questioning, the juror's unequivocal willingness to vote for a death sentence, and the absence of record evidence for the government's "demeanor" explanations – shows that the government's strike of Juror 148 was motivated in substantial part by racial discrimination.

### 2.   The government's reasons for striking Juror 257, a Latina woman, were pretextual.

Juror 257 is a Latina woman who █████████████████████ , earned a college degree, and is employed full time. She was the government's fourth strike. On her questionnaire, she indicated a baseline weak opposition to capital punishment ("3" on question 73), but an openness and ability to voting to impose a death sentence in a case with facts like those at issue in Mr. Bowers' ("d" on question 74). She reaffirmed those answers in response to the Court's questioning.

The government claimed to have struck Juror 257 because of her questionnaire answers about capital punishment, her professional work involving psychological research, and what it perceived to be her interest in serving as a juror. But it did not use

---

[13] As discussed below, the government accepted Juror 215 for service without ever questioning him about ██████████████████████████████████████ ████████████████████████

any of these reasons to strike White jurors who presented comparable factors. Defense counsel addressed on the day of peremptory strikes the government's acceptance of one juror who had chosen "3" on his questionnaire as well as other jurors who exhibited some hesitancy about voting for a death sentence. Trans. 5/25/23, pp. 63-64 (discussing Jurors 1 and 5).

The government also gave as a reason for striking Juror 257 that she had "a background in neurobiology and psychology that would give her undue influence in the jury room." Trans. 5/25/23, p. 30. However, Juror 5, a White woman who is a nurse and stated on her questionnaire that she had ███████████████████████████ ████████████████████████████████ actually served on the jury. JQ 5, p. 3. Similarly, Juror 427, a White woman whom the government accepted, not only had a master's degree in ████████████████████████████ ████████████████████████████████████████ ██████.[14] JQ 427, p. 8. This experience and education are far greater than that of Juror 257, who held only a bachelor's degree and had worked only half as long as a research associate in a psychological study. Yet the government did not strike Juror 5 or 427.

Moreover, Juror 257 was clear in her answers to questions pressed by the government that her professional experience would not affect her service as a juror, either unto herself or in the jury room:

> MS. SONG: … do you believe that professionals who study the brain can explain all human behavior?

---

[14] Juror 427 was the defense's second strike in selecting alternates.

PROSPECTIVE JUROR: Personally, I don't. …

MS. SONG:  Given your exposure -- you have a lot through your experience and your knowledge. It could be, you know -- would you agree that it could be possible that it's difficult to set that aside and focus on the evidence you would hear in this case?

PROSPECTIVE JUROR: I don't think it would be hard to separate those two. …

MS. SONG:  … given your significant experience with psychiatry and mental health, you are not -- you feel confident that you won't give that kind of evidence more weight or less weight, based on your experience?

PROSPECTIVE JUROR: Yes. That's correct.

Trans. 5/3/23 pp. 31, 32, 40. Juror 257's answers clearly indicate that her particularized knowledge of psychology would not have influenced her own or the jury's collective deliberations.

Just as significantly as what Juror 257's answers prove, the government's questioning of her, like that of Juror 148, demonstrates a pattern of looking for reasons to strike her. When questioning White jurors, the government remained focused on their capacity and willingness to vote for a death sentence, preferring closed-ended yes-or-no questions. When it questioned jurors of color, it probed other areas of their profiles, pressing them on whether there was something in those areas that would create a conflict with their serving on the jury.

Juror 257 was subjected to 23 pages of questioning by the government. It asked her about her work in psychological research and future career plans and whether these would create conflicts for her serving as a juror:

29

It looks like you supervise researchers?... It appears that you're following
sort of from pregnancy through child development? … Are there particular
types of illnesses that you're focused upon? … What sorts of opinions have
you developed based on your research and your exposure to these issues on
a daily basis?  …  Can you give us examples of resilience factors?  …  Do
you believe that professionals who study the brain can explain all behavior?
Would you agree that it could be possible that it's difficult to set that aside
and focus on the evidence you would hear in this case? … You agree that
compared to most people who do not work in a psychiatry department or
psychologist studying mental health on a daily basis, you bring quite a bit to
this case, just from your experience? … Wouldn't' a capital case, a death
penalty case, put you in a conflict with [your] aspiration to become a
physician and save lives? … Given your experience regarding mental illness
or brain development, would you still be able to do the weighing that the
Court has described? … Given your significant experience with psychiatry
and mental health [] you feel confident that you won't give that kind of
evidence more weight or less weight, based on your experience? [15]

Trans. 5/8/23, pp. 28-34. The government also asked her to prove that her religious

beliefs would not create a conflict for her to serve as a juror. *Id.* pp. 35-36.

By comparison, the government questioned Juror 427, a White non-Hispanic juror

who had vastly more experience in psychology, for only five pages. It never addressed

her studies or professional experience involving the ██████████████████████

██████████████████. The government simply asked her if she could

participate in the process of listening to aggravating and mitigating evidence and then

make a decision, whether it would be important to her to hear both sides, whether she

---

[15] The government asked this last question after Juror 257 had already said that she was
"confident that [she] could actually vote and sign" her name to a death verdict if that's
the "weighing" that she were to reach "at the end of this process." Trans. 5/8/23, pp. 35-
36.

would be open to hearing both kinds of evidence, and whether she would give both sides meaningful consideration.[16] Trans 5/15/23, pp. 236-38.

The government also questioned Juror 5, the nurse who studied ██████████ ████████████████████████████████████████████████████████ for only five pages. It never asked about any conflict that serving as a juror and voting to sentence a person to death might present given her career in health care. Trans 4/24/23, pp. 114-120.

The last reason the government gave for striking Juror 257 is that "she seemed like she very much wanted to be on the jury." Trans 5/25/23, p. 31. However, the government did not cite any answer she gave to a question on the questionnaire, any answer she gave during voir dire, or anything it observed about her demeanor that might support this vague characterization. Nor did the government explain how or why, even if true, a perceived desire to be on the jury rendered her a less favorable juror for the government.

Finally, the pretextual nature of the government's reasons for striking Juror 148, discussed above and during the *Batson* hearing, constitute further evidence that its reasons for striking Juror 257 were also pretextual (and vice-versa).

### 3. The government's reasons for striking Juror 290, a Black woman, were pretextual.

Juror 290 is an African-American woman in her ████████████████████ ████████████████████████████. She was the government's seventh strike.

---

[16] The government's first six questions to Juror 427 were about whether she remembered things that had just happened moments before in her voir dire.

The first reason the government gave for striking her was that she selected "4" and "e" on the death penalty perspective ranking on the questionnaire. As noted above, the government accepted a White male juror, Juror 270, who also chose "4."

The next reason the government gave was Juror 290's opinion that the criminal justice system is "flawed." JQ 290, p. 15. The Court and the defense inquired into this belief, and she explained that "there are some things that seem unfair when it comes to the criminal justice system." Trans. 5/8/23, p. 64. The government's decision not to question her at all on the subject is an indication that its claimed concern was pretextual.

Moreover, in line with the Court's acknowledgement that Juror 290 was "not alone" in her assessment, *id.*, it may safely be inferred that as a Black resident of ████████████████████, she – like many Black people – was attuned to the differences that color makes in the criminal justice system. Such a reason for a strike that applies generally to Black people is not race-neutral, but rather evidence of a racial motivation; alternatively, it at least deserves skepticism and heightened scrutiny.

The next reason the government gave for striking Juror 290 was her employment status. During voir dire, she explained that she had been laid off one week after she was called for jury duty, but she was collecting unemployment and meeting soon with her employer about a job opening. Trans. 5/8/23, p. 60. Her concern was accepting another position and having to take time off immediately after starting in order to serve on the jury. But the government misrepresented her account in explaining its strike, stating, "she had stated that she was concerned about her employment, but then she later said she would not be stressed about finding a job, despite the length of this trial, which seemed to

be inconsistent to us." Trans. 5/25/23, p. 47. What she actually stated was that she had "a lot of resources to help" find work so that was not her "main concern." Her comment about stress related to the nature of the trial.[17] Thus, the government distorted the record to justify its strike, which gives rise to a strong inference of racial discrimination.

The government then discussed Juror 290's emotionality about gun violence as a reason for its strike. But this explanation too was pretextual. Juror 290 was questioned about the 1-year anniversary of the death of her teenage cousin, who was murdered in a drive-by shooting. The government never explained how that would make her a less favorable juror for the government. Furthermore, the government did not make an issue of or ask any questions of Juror 191 – a White woman who was selected to serve – about her close relative, ███████████████████████████. The attorneys asked no questions about its effect on her, as compared to the five questions they asked Juror 290 about the killing of her cousin.[18] Trans. 5/8/23, p. 85-86.

---

[17] The government's attorney asked if not having work would distract her from the trial. Juror 290 responded, "I can't answer that. It's a very stressful situation. Like just, I mean, the case that we have is stressful." She went on to restate that her employment situation was not a stressor: "I have insurance for the foreseeable future. So if I can guarantee a position before then -- it's not something that's on my mind, outside the stress of just being here." Trans. 5/8/23, p. 60. Plainly, she was connecting stress to the nature of the case, not her employment situation.

[18] Ironically, Juror 5 withheld the fact that ████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████

Finally, the Court must consider the government's strike of Juror 290 in light of the government's discriminatory intent in its strikes of Jurors 148 and 257 (and vice-versa).

### 4.   The government's striking of Jurors 95 and 332, the only two Black men, was pretextual.

Jurors 95 and 332 are young Black men, both of whom are ███████████████ with steady work history. The government's purported reasons for striking both of them are very similar. Like all the other jurors of color whom the government struck, the reasons for striking Jurors 95 and 332 were reasons that also applied to White jurors whom the government accepted.

The government cited Jurors 95's and 332's perspectives on policing and criminal adjudication as a reason to strike them. Juror 95 had been ██████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████

████     JQ 95, p. 14. Juror 332 had ████████████████

████████████████████████████████████

███████████████████████████████[19]

The government stated that even though Juror 95's views on the criminal justice system were "limited to those in his area," the government "would prefer to have jurors

---

[19] The government asserted that a Pittsburgh police officer who was on its list of prospective witnesses had been involved ████████████████████. However, Juror 332 did not indicate that ████████████████████████.

who don't have any of those concerns." Trans. 5/25/23, p. 40. Of Juror 332, the government explained that it is "looking for jurors who can be reliable," and that the nature of ████████████████ something the government claimed was not an issue for any other juror – indicated that he would not be. Trans. 5/25/23 (closed session), p. 4. Here, again, the government's reasons were pretextual.

First, the government accepted Juror 215, who served on the jury even though he had been ████████████████████████████████████████████ ████████████████████████████████████████. Moreover, as with Jurors 148 and 290, that the government used Juror 95's and 332's rational perspectives on the court system to deny them the opportunity to serve on a jury ignores the proven reality of racialized bias in the criminal justice system that affects African-Americans, ████████ ██████████████████. Given how widely shared their perspectives are among African-Americans, far more so than among Whites, this was not a race-neutral reason but one that points toward a discriminatory motive. Alternatively, the government's proffered reasons for striking Jurors 95 and 332 at least deserve skepticism and heightened scrutiny. [20]

The government also gave the youthful age of Jurors 95 and 332 as a reason for striking them, claiming to have struck most younger jurors. Trans. 5/25/23, p. 38; *id.*

---

[20] The government attorney's efforts to bolster her own credibility, and the credibility of the proffered reasons for the government's racially and religiously disproportionate strikes, by claiming to be a "lifelong civil rights lawyer" or a "career-long civil rights lawyer" are problematic and, in any event, should not be given any weight. Trans. 5/25/23, p. 39.

(closed session), p. 3. Jurors 95 and 332 are ████ years old, respectively. But, in fact, the government did not strike Juror 191, a White woman who served (until she had to be excused), who was ██ years old. Nor did it strike Juror 5, also a White woman who served, who was ██ years old. [21]

The government also stated that the two Black men's work histories were indicators of unreliability. It pointed to the fact that Juror 95 "had three jobs in the last two years." [22] Trans. 5/25/23, p. 38. However, Juror 435, a White woman who served as an alternate, also had ████████████████████████████████████ ████████████████. Similarly, Juror 385 had ████████████████████████.

The government also stated that it struck both of these African-American men because of answers they gave in voir dire, but the government again did not fully and accurately recount the record. For example, the government claimed that Juror 332 made inconsistent statements that Mr. Bowers was "just a guy." In fact, in the context of what sentence he thought might be appropriate, Juror 332 said, "I'm not going to pre jump [sic] to a conclusion of a situation I don't know . . . . I want to see the evidence, hear the evidence and formulate my own opinion and choose the verdict myself based upon what I know. Because when I came here, all I seen was just a guy. I need to know more about

---

[21] Furthermore, in the first round of striking alternates, the government accepted Juror 385, a ██-year-old White man, whom the defense struck.

[22] It is plausible that Juror 95's work history was affected by ████████████████████ ████████████████████████████████. Here again, the government did not ask.

the guy before I could answer these type of questions to properly sentence him." Trans. 5/8/23, p. 256.

Finally, Juror 95's and 332's strikes must also be considered in light of the government's pretextual explanations for its removal of the two African-American women and one Latina woman within its first seven strikes (and vice-versa).

**B.     The Court should re-open the *Batson* hearing to receive additional evidence.**

For the foregoing reasons, the Court should re-open the *Batson* hearing and review the additional evidence that the government's strikes were substantially motivated by racially discriminatory intent. Furthermore, in determining whether the government has met its burden to present race-neutral reasons for its strikes, the Court should consider that, while multiple prosecutors were involved in the voir dire process, only one presented the justifications for the strikes. And in so doing, that prosecutor did not represent that her presentation included all of the reasons each of the prosecutors had for all of the strikes.

**CONCLUSION**

Robert Bowers, through counsel, moves the Court, under Rule 29(c) of the Federal Rules of Criminal Procedure, for a judgment of acquittal on counts 1–11, 23–33, 34–35, 38–39, 40–47, 48–51, and 52–63, and for a new trial under Rule 33.

Respectfully submitted,

*/s/ Judy Clarke*
Judy Clarke
Clarke Johnston Thorp & Rice, PC

*/s/ Michael N. Burt*
Michael N. Burt
Law Offices of Michael Burt, PC

*/s/ Michael J. Novara*
Michael J. Novara
First Assistant Federal Public Defender

*/s/ Elisa A. Long*
Elisa A. Long
Supervisory Assistant Federal Public Defender

*/s/ Ashwin Cattamanchi*
Ashwin Cattamanchi
Assistant Federal Public Defender