**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-292 |
| | ) | |
| ROBERT BOWERS | ) | |

**OPINION**

Robert J. Colville, United States District Judge

     Before the Court is the Motion for Judgment of Acquittal Under Fed. R. Crim. P. 29(c) and for a New Trial Under Fed. R. Crim. P. 33 (ECF Nos. 1595 and 1596) filed by Defendant Robert Bowers ("Defendant").  The Government has filed a Response (ECF Nos. 1599 and 1600) to Defendant's Motion, and Defendant has filed a Reply (ECF No. 1609).  The Motion has been fully briefed and is ripe for disposition.

**I.     Background**

     On June 16, 2023, the Jury returned a verdict finding the Defendant guilty of each of the 63 counts set forth in the superseding indictment in this matter, which included violations of federal statutes prohibiting the obstruction of religious exercise, hate crimes, and the use of a firearm during a crime of violence.  Defendant was found guilty of killing eleven individuals and injuring others at the Tree of Life Synagogue on October 27, 2018.  With respect to the capital counts (Counts 1–11 and 23–33) the jury recommended, and the Court has imposed, a sentence of death by execution.

## II.    Legal Standards

### A.  Rule 29

With respect to post-verdict motions for judgment of acquittal brought pursuant to Fed. R.

Civ. P. 29(c), the United States Court of Appeals for the Third Circuit has explained:

> [A] district court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001).  The court is required to "draw all reasonable inferences in favor of the jury's verdict." *United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996).  Thus, a finding of insufficiency should "be confined to cases where the prosecution's failure is clear." *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984).

*United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002).

This level of review is "highly deferential" to the factual findings of the jury, and the

reviewing court "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility

and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." *United

States v. Tyler*, 956 F.3d 116, 122 (3d Cir. 2020) (quoting *United States v. Caraballo-Rodriguez*,

726 F.3d 418, 430 (3d Cir. 2013)).  The level of deference afforded to jurors' factual findings is

warranted because:

> [We] trust jurors to judge the evidence, and we instruct them as to all aspects of their decision making.  Jurors are instructed extensively as to what evidence they can consider, how to consider it, and how to assess the credibility of witnesses, as well as the relevant legal principles.  We trust that they follow these instructions.

*Caraballo-Rodriguez*, 726 F.3d at 431; *see also id.* ("Yet, in most of the cases discussed above,

we have not trusted the jurors.  Indeed, we have second-guessed them, acting not merely as the

thirteenth juror, but as the decisive vote on the jury.").

In reiterating the applicable standard, the Third Circuit in *Caraballo-Rodriguez* clarified

and explained:

> While evidence proffered at trial may be consistent with multiple possibilities, our role as a reviewing court is to uphold the jury verdict—and not to usurp the role of the jury—as long as it passes the "bare rationality" test. Reversing the jury's conclusion simply because another inference is possible—or even equally plausible—is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges, which is that "'[t]he evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt.'" *United States v. Cooper*, 567 F.2d 252, 254 (3d Cir.1977) (quoting *United States v. Allard*, 240 F.2d 840, 841 (3d Cir.1957)). It is up to the jury—not the district court judge or our Court—to examine the evidence and draw inferences. Unless the jury's conclusion is irrational, it must be upheld. In our role as reviewers, we must resist the urge to hypothetically insert ourselves into the jury room for deliberations.

*Id.* at 432.

## B. Rule 33

Rule 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Although the standard of review for a motion for a new trial is broader than that for acquittal, motions for new trials are disfavored and are only granted with great caution and at the discretion of the trial court." *United States v. Martinez*, 69 F. App'x 513, 516 (3d Cir. 2003) (citing *United States v. Allen*, 554 F.2d 398, 403 (10th Cir. 1977)). In addressing the standard of review applied to a Rule 33 motion asserting that a verdict is against the weight of the evidence, the Third Circuit has explained:

> "A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of evidence only if it 'believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994)). "Thus, '[m]otions for a new trial based on the weight of the evidence are not favored. Such motions are to be granted sparingly and only in exceptional cases.'" *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003) (alteration in original) (quoting Gov't of V.I. v. Derricks, 810 F.2d 50, 55 (3d Cir. 1987)). When evaluating a Rule 33 motion, the district court "does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *Johnson*, 302 F.3d at 150.

*United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014).  Where a defendant argues that the cumulative effect of trial errors denied the defendant a fair trial, "[a] new trial is required on this basis only when the errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial."  *United States v. Copple*, 24 F.3d 535, 547 n.17 (3d Cir. 1994) (quoting *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993) (internal quotation marks omitted)).

## III.   Discussion

Defendant raises three primary arguments in support of his Motion.  First, he argues that the Government failed to meet their burden under 18 U.S.C. § 247(a)(2) of introducing sufficient evidence to establish that Defendant specifically intended to obstruct each victim in the enjoyment of that victim's free exercise of religious beliefs or attempted to do so.  Defendant next argues that his convictions under 18 U.S.C. § 249(a)(1), as well as his sentences on other convictions, should be vacated because of defects in the § 249(a)(1) charges that the Court allowed by virtue of its pretrial order.  Third, Defendant asserts that the Court should reopen the *Batson* hearing in this matter to reconsider the Government's strikes in light of what the Defense characterizes as additional evidence of racial animus that it has collected given "adequate time."

### A.  18 U.S.C. § 247(a)(2)

With respect to Counts 1–11, 23–33, 34–35, 38–39, 40–47, 48–51, and 52–63, Defendant moves for judgment of acquittal under Rule 29.  These Counts charged offenses under 18 U.S.C. § 247(a)(2), or included as an element a violation of § 247(a)(2), and Defendant argues that:

> [T]he government was required to prove beyond a reasonable doubt that "it was [Defendant's] conscious desire or purpose to obstruct" each victim in the enjoyment of that victim's free exercise of religious beliefs.  Guilt Phase Jury Instructions at 32.  Based on the evidence presented at trial during the guilt phase, no rational juror could have found this specific-intent element.

Even if the evidence established that Mr. Bowers intended to deter the Synagogue's congregations or outside groups or individuals from supporting the Hebrew Immigrant Aid Society or facilitating refugee resettlement generally, that would not support the convictions, both because there was insufficient evidence that he was seeking to deter the victims and because, in any event, there was insufficient evidence that such support constituted the free exercise of religious beliefs under the statute. So too if Mr. Bowers attacked the victims because of a hatred of Jews, since there was insufficient evidence that any such hatred was directed at them because they were religious or secular or were engaged in religious practices. Finally, even if facilitating refugee settlements could somehow be deemed the exercise of Jewish religious beliefs (which, again, Mr. Bowers denies satisfies the statute and denies was proven), it still would not establish the specific-intent element because there was insufficient evidence that Mr. Bowers knew that was so, as well as insufficient evidence that it was so for each victim.

ECF No. 1596 at 2.

As previously noted, in considering a Rule 29 motion, the Court must consider whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence. The Court reviews the record in the light most favorable to the prosecution. "While evidence proffered at trial may be consistent with multiple possibilities, our role as a reviewing court is to uphold the jury verdict—and not to usurp the role of the jury—as long as it passes the 'bare rationality' test." *Caraballo-Rodriguez*, 726 F.3d at 432.

With respect to the Counts at issue, the Court agrees with the Government that the "overwhelming trial evidence rises far above the 'bare rationality' test required for affirmance of the jury's verdict." *See* ECF No. 1600 at 34. The evidence at trial established that Defendant walked into a Jewish place of worship on a day, and at a time, that services were scheduled to be held. He then began firing an AR-15 at any worshipper he came across. Defendant planned his attack for months, espoused repugnant beliefs about Jews and Judaism on the internet, and eventually told those arresting him that "all Jews need to die." The Government has effectively summarized the evidence introduced at trial as to Defendant's intent on the day in question, and the Court will not repeat that summary herein. Even if it could be said that the evidence introduced

5

at trial could possibly have supported another, or multiple, inferences as to Defendant's intent on the day at issue, it is beyond question that the Jury was presented with sufficient evidence to support its finding beyond a reasonable doubt that Defendant specifically intended to obstruct each victim in the enjoyment of that victim's free exercise of religious beliefs on October 27, 2018. Again, Defendant, who over a prolonged period repeatedly and consistently espoused profuse disdain and hatred toward Judaism and Jews and who further expressed his support of violence against Jews, walked into a Jewish place of worship on a day of worship, knowing that services would be held that day, and opened fire on each and every Jewish worshipper he came across. These individuals were wearing yarmulkes, wrapped in prayer shawls, and holding, or sitting with, prayer books in the midst of worship.  Any argument that no rational juror could find the specific intent required by 18 U.S.C. § 247(a)(2) on the evidence presented in this case is simply, and entirely, baseless.

### B.  18 U.S.C. § 249(a)(1)

Defendant next argues that his convictions under 18 U.S.C. § 249(a)(1), as well as his sentences on other convictions, should be vacated under Rule 33 because of defects in the § 249(a)(1) charges that the Court allowed by virtue of its pretrial order.  In support of this argument, Defendant asserts: (1) "18 U.S.C. § 249(a)(1) is an invalid exercise of Congress'[s] authority under the Thirteenth Amendment"; (2) "Even if Congress had the authority to criminalize assault and battery motivated by race, that authority does not extend to assault and battery motivated by religion"; (3) "If § 249(a)(1) is limited to religious groups who were considered races at the time of the adoption of the Thirteen Amendment, it violates the Equal Protection Clause"; (4) "Even if [Defendant] could have been validly prosecuted under the 'religion' prong of § 249(a)(1) based on a theory that Jews were considered a race at the time of the adoption of the Thirteenth Amendment,

the Court still erred by removing this issue from the jury and deciding it without an evidentiary record"; (5) "Alternatively, the operative question in deciding both the reach of § 249(a)(1) and of Congress'[s] authority under the Thirteenth Amendment is not whether Jews were a race in the mid-19th century but whether they were considered a race at the time of the offense"; and (6) "The government's evidence and argument in support of the § 249(a)(1) counts pervaded the entire trial and contributed to the death verdict."[1]  ECF No. 1596 at 3-21.

Initially, the Court acknowledges the Government's argument that Defendant's Motion raising the issue of § 249(a)(1)'s constitutionality largely seeks reconsideration of Judge Ambrose's Opinion and Order at ECF No. 324, which denied Defendant's Motion to Dismiss the Counts of the Indictment Charging Offenses Under the Hate Crimes Prevention Act and the Church Arson Act (ECF No. 239), and that it otherwise raises certain arguments that could and should have been raised earlier.  Whether Defendant has actually waived any argument will ultimately be for the appellate court to decide.  With respect to jury instructions, the Court does note the Government's recitation of the lengthy, transparent, and involved process undertaken by the parties and the Court in the preparation of jury instructions.  The parties were permitted to submit multiple proposals and to object to any instruction on the record on more than one occasion. It strikes the Court that any argument not raised during the open and collaborative drafting process or during the final charging conference in this case is plainly one that could have been made earlier, and, accordingly, one that could, perhaps, fairly be deemed waived.

Turning to the substance of Defendant's Motion, Defendant candidly acknowledges that the issue of § 249(a)(1)'s constitutionality has already been addressed by Judge Ambrose, and

---

[1] Issues 1, 2, and 5 are, in particular, squarely and explicitly addressed in Judge Ambrose's Opinion and Order at ECF No. 324.

further provides that he has filed the present Motion to "supplement and augment" his previous arguments following the filing of a dissenting opinion in the Ninth Circuit.[2]  *See* ECF No. 1596 at 3-4.  Given that Judge Ambrose has already addressed the constitutionality of § 249(a)(1) and many of the Defendant's current arguments in her Opinion and Order at ECF No. 324, and given that all federal courts to have considered the issue have found § 249(a)(1) to be a valid exercise of Congressional power under the Thirteenth Amendment, the Court is not convinced that there is much, if any, value to adding to or reiterating what has clearly been held and explained by Judge Ambrose and the various federal courts to have previously considered the issue.  Whether characterized as a motion for reconsideration or a motion under Rule 29 or 33, Defendant has not given this Court any reason to disagree with or reconsider the well-reasoned and extensive analysis and conclusions set forth by Judge Ambrose.  It is no mystery that the issue of § 249(a)(1)'s constitutionality will likely be raised on appeal.  This Court stands by Judge Ambrose's decision and analysis at ECF No. 324, and further finds that Defendant has not advanced any argument respecting § 249(a)(1)'s constitutionality that causes the Court to find that a new trial is in the interest of justice or that acquittal is warranted.  The Court disagrees with Defendant on this issue, and, again, stands by and adopts Judge Ambrose's analysis and conclusions.

With respect to the Government's assertion that Defendant has waived any argument that § 249(a)(1) violates the Equal Protection Clause, the Court notes that Rule 12(b)(3)(B)(v) requires that any argument that the indictment fails to state an offense be raised by pretrial motion.  Judge

---

[2] The Government correctly notes that the dissenting opinion relied upon by the Defense is not binding on this, or, for that matter, any, court, and that the Ninth Circuit declined to take the issue up for en banc review.  The majority in that case had "no trouble" finding § 249(a)(1) constitutional.  *See United States v. Hougen*, 76 F.4th 805, 814 (9th Cir. 2023), *cert. denied*, No. 23-6665, 2024 WL 1348914 (U.S. Apr. 1, 2024), *and cert. denied*, No. 23-6665, 2024 WL 1348914 (U.S. Apr. 1, 2024) ("We have no trouble concluding that § 249(a)(1), and Hougen's prosecution thereunder, passes the deferential *Jones* test.  The rationality of concluding that violence (or attempted violence) perpetrated against victims on account of the victims' race is a badge or incident of slavery is well established.  Every other circuit that has addressed this issue has upheld § 249(a)(1)'s constitutionality.").

Ambrose ruled that Defendant had not sufficiently raised the equal protection issue in his prior motion.[3]  In light of the same, it certainly strikes the Court that any such argument could potentially be deemed waived.  That said, that issue will ultimately be a question for the appellate court.

In any event, the Court also finds Defendant's argument substantively meritless.  As noted by the Government, Defendant fails to cite to any case that has held or suggested that § 249(a)(1) violates the Equal Protection Clause.  Each of the Government's arguments as to this issue is well-taken by the Court, and, in particular, its assertion that all three statutory provisions, i.e., § 249(a)(1)-(3), provide exactly the same substantive protection against bias-motivated violence and that "Congress provided all religions equal treatment to the fullest extent permissible under its constitutional authority."  *See* ECF No. 1600 at 63-64; *see also id.* at 63 ("Because Congress treated all similarly situated persons (i.e., all members of any 'racial' groups that qualify for coverage under the Thirteenth Amendment) equally, the defendant's equal protection claim must fail.").  As noted by the Government, this statutory scheme serves a compelling interest, the proscription of bias-motivated violence.  Any assertion that § 249(a)(1) violates the Equal Protection Clause is baseless, and Defendant's Motion for a New Trial on this basis is denied.

Turning to Defendant's trial-specific arguments, i.e., that the Court should have submitted the question of whether Jews were considered a race at the time of the adoption of the Thirteenth Amendment to the jury and that the Government's evidence and argument in support of the § 249(a)(1) counts pervaded the entire trial and contributed to the death verdict, the Court finds that

---

[3] *See* ECF No. 324 at 7 n.5 ("The Defendant briefly 'references' an Equal Protection Challenge to § 249(a)(1) but does elaborate or adequately brief this issue.  He urges only that § 249(a)(1) 'raises serious equal protection concerns as any religion not deemed a "race" in the 19th century is simply not protected . . . .' (ECF No. 239, p. 23).  The role of the Court is not to develop arguments for the Defendant.  Therefore, I decline to rule on or entertain the issue as it has not been squarely placed before me.  I note only that the protection offered under § 249(a)(1) appears to rest, not upon a religious basis per se, but upon an 'ethnic' or 'racial' basis.  That Jews may have been, or may be, considered an 'ethnoreligious' group does not mean that the protection offered under § 249(a)(1) stems from their religious affiliation.  Further, I note that the portion of the HCPA enacted under the Commerce Clause (§ 249(a)(2)) incorporates religions not considered a 'race' under 19th century law.").

neither supports a finding that a new trial is in the interest of justice.  The first issue was addressed by Judge Ambrose at ECF No. 324 when she ruled, as a matter of law, that "§ 249(a)(1) includes protection for Jewish people in that they were considered a distinct race when the Thirteenth Amendment was-applied."  ECF No. 324 at 11.  The Court believes that this question was properly decided by Judge Ambrose.

The question of whether Jews were considered a race at the time of the adoption of the Thirteenth Amendment is, necessarily, one of constitutionality, that is, whether Congress had the power to enact § 249(a)(1) as it is currently drafted.  *See* ECF No. 1600 at 69 ("Whether § 249(a)(1) validly includes Jews as a covered protected class turns solely on the constitutional question of whether Congress is authorized, under the Thirteenth Amendment, to use its enforcement power to eradicate badges and incidents of slavery to proscribe racial violence against Jews.").  This is a legal issue for the courts to resolve.  *See United States v. Horner*, 769 F. App'x 528, 536 (10th Cir. 2019) ("He did so to support his legal argument that the statute of conviction was unconstitutional. But such arguments are to be decided by the judge, not the jury.  The judge decided the constitutionality of § 1542 contrary to Horner's arguments.  Horner's remedy did not entitle him to seek a second opinion from the jury but rather to appeal to this Court, which he has done (albeit unsuccessfully)." (citations omitted)).  The Court again notes the Government's argument respecting Defendant's failure to assert, during the drafting of jury instructions and verdict forms, that the jury should have been instructed that they were required to find that Jews were considered a race at the time of the adoption of the Thirteenth Amendment in order to find Defendant guilty of a §249(a)(1) offense.  That failure, particularly in light of the comprehensive, transparent, and open and collaborative drafting process in this case, certainly supports a finding that Defendant has waived any argument that the jury should have been instructed on this issue.

Turning to Defendant's assertion that the Government's evidence and argument in support of the § 249(a)(1) counts pervaded the entire trial and contributed to the death verdict, the Court agrees with the Government that the jury was properly instructed that they were permitted to consider all admitted evidence in deliberating during the Sentence Selection Phase, and notes that the Defense did not object to that instruction. *See* ECF No. 1573 at 60:16-17 ("You may consider the evidence presented in all phases of this trial."). The jurors were also comprehensively instructed on the law and their role at every phase of this trial. Further, as aptly noted by the Government:

> In addition, this evidence was clearly relevant and admissible in the penalty phase. Among other things, the government used this evidence to prove several statutory and non-statutory aggravating factors, including that the defendant committed an intentional killing, engaged in substantial planning and premeditation, was motivated by religious animus, and targeted worshippers at the Tree of Life Synagogue to "maximize the devastation, amplify the harm of his crimes, and instill fear within the local, national, and international Jewish communities."
>
> Put simply, this evidence was also admissible and highly probative for all of the counts charged in the Superseding Indictment: (1) the § 249 counts, as evidence that the defendant acted willfully and "because of" race and that he attempted to kill the two injured congregants; (2) the § 247 counts, as evidence of the defendant's intent to obstruct the congregants' free exercise of religion, his attempt to kill the two injured congregants, and as evidence to rebut his claims that he committed the attack because of a secular opposition to HIAS and refugee resettlement; and (3) the § 924(j) counts, as evidence of malice aforethought, including premeditation and actual malice, see 18 U.S.C. § 1111(a). Thus, even if there had been some error in admitting this evidence as it related to the § 249 counts . . . , the guilt phase of the trial would have proceeded with the same exact evidence admitted as proof of the § 247 and § 924 counts.

ECF No. 1600 at 71. Defendant's Motion is denied to the extent that it argues that Defendant is entitled to a new trial due to the introduction of evidence in support of the § 249(a)(1) Counts.

### C. *Batson* Hearing

Finally, Defendant moves, pursuant to Rule 33, for an order reopening the *Batson* hearing in this matter and for reconsideration of the Government's strikes in light of what the Defense

characterizes as "additional evidence of racial animus" that it has collected "[n]ow having had adequate time to review the record."  Defendant argues that the Government's stated reasons for striking Jurors 148, 257, 290, 95, and 332 were pretextual, and that, accordingly, the Court should reopen the *Batson* hearing to receive additional evidence.[4]  ECF No. 1596 at 21-37.  The Defense further takes issue with the amount of time it was given to prepare for its *Batson* challenges and, in particular, its time to prepare to respond to the Government's proffered reasons for its peremptory strikes.  *See* ECF No. 1595 at 21 ("The defense also sought sufficient time to review the massive jury selection record to demonstrate that the government's stated reasons for the strikes were pretextual.  However, the Court allowed the defense only the 90-minute lunch break to do so.  The defense did its best to scramble to respond to government's lengthy (obviously pre-prepared) rendition of explanations for these strikes, which had gone on for 25 transcript pages and ranged across the entire jury-selection record in its citations[.]" (citations omitted)).

The Court has already ruled that the Government proffered race-neutral bases for its peremptory strikes, that those bases were credible, and that Defendant thus failed to establish pretext:

> The Court had prepared itself for anticipated motions following peremptory strikes by reviewing relevant case law, reviewing prospective jurors' questionnaires, responses and revisiting individual examinations, transcripts, closely.  The Court is now, with the benefit of counsel's arguments and references to the record.  In each instance brought to the Court's attention defendant has asserted and established a prima facie case of purposeful discrimination.  The fact that four of four black prospective jurors, the only Jewish juror and the only Hispanic prospective juror were struck by the government plainly establishes a prima facie case.

> Striking 100 percent of each such prospective jurors certainly raises an alarm in the Court's mind.  And I am personally and profoundly disappointed that this jury as

---

[4] While Defendant originally mounted a *Batson* challenge respecting the striking of Juror No. 86, the only Jewish juror in the panel of qualified jurors, and has stated in his brief that the Government "peremptorily struck all four of the qualified African-American jurors, the lone qualified Hispanic juror, and the lone qualified Jewish juror," ECF No. 1596 at 21, he has not advanced argument respecting Juror No. 86 in his present Motion.

currently composed will not seemingly or at least outwardly fully reflect the full diversity of the citizenry of our community in the Western District of Pennsylvania.

That, however, is not the question before the Court.  Rather, the question is whether the parties have engaged in purposeful discrimination.  In response to that question, that assertion, the government has proffered, frankly, more than adequate facially neutral bases for each peremptory strike.

By definition, a *Batson* challenge is not a challenge to a juror's qualifications to serve.  And I say that because I want our jurors to understand this is by no means an endorsement of any suggestion that these jurors are not competent, capable jurors, only that they are not preference to the striking party.

The party may not, however, pursue their preference through discriminatory exercise on peremptory challenges.  In this instance I find that the government has met its burden in the second stage.  The government's positions and arguments presented were credible.  I find the peremptories to have not been motivated in substantial part by discriminatory intention.

The defense arguments are understood and noted, but in my view do not establish pretext.  And, thus, I find that the defendant has not established purposeful discrimination.

With that, I'm denying each of the *Batson* challenge motions.

ECF No. 1277 at 75:23-77:12.

It bears noting that Defendant's Post-Trial Motions were filed, in accordance with Defendant's request for an extension of time, ninety days after the Court imposed sentence in this case, and more than five months after the jury was empaneled.  Defendant's argument respecting "adequate time" to prepare for a *Batson* challenge thus strikes this Court as a moving target of sorts, as the Defendant has now had more than five months to comb the records in an attempt to establish pretext.  While the Court does not mean to be insensitive to the difficulties presented by a complicated trial and jury selection process, the use of the phrase "[n]ow having had adequate time to review the record" in a brief filed one hundred and sixty days after the end of jury selection is revealing, as it indicates to this Court that the Defense is raising arguments it has had 160 days

to prepare.  Such a timeframe between voir dire and *Batson* challenges during jury selection at the trial court level would certainly be unrealistic and impracticable.

It further bears noting that the possibility of a *Batson* challenge during jury selection was raised by the Defense in this case in, at least, the following documents: ECF Nos. 650, 681, 738-1, 756, 780, 1060, and 1097.  Each of these documents was filed prior to the commencement of jury selection, and in several instances long before.  Of particular note is the joint submission filed at ECF No. 738-1 in June of 2022, which provides as follows at Footnote 4:

> The Court will defer final ruling on the peremptory challenges raised by the parties until the parties have an opportunity to make appropriate motions under *Batson v. Kentucky*, 476 U.S. 79 (1986) (or until the time for making such motions has elapsed).  In order for the parties to consider and raise appropriate *Batson* and related challenges, it is anticipated that the parties will be required to review the pattern of peremptory challenges raised over the course of jury selection and perform comparative juror analysis.  *Riley v. Taylor*, 277 F.3d 261, 282 (3d Cir. 2001).

ECF No. 738-1 at 2 n.4.  Any assertion that the Defense was caught off guard by the potential that they might desire to raise a *Batson* challenge during jury selection is, in this Court's estimation, insincere, and more importantly, unsupported.

 As to the Defense's assertions respecting its ability to prepare, the Court notes that, during jury selection, the parties received completed juror questionnaires and real-time and daily voir dire transcripts essentially contemporaneously.  The Government correctly notes that, "[d]uring voir dire and final jury selection, the defendant was represented by learned counsel with decades of experience in high-profile capital matters, three Assistant Federal Public Defenders, one capital case jury consultant, and another experienced attorney who specializes in capital voir dire."  ECF No. 1600 at 76.  The individual voir dire process was conducted from April 24, 2023 to May 17, 2023, a period of time embracing twenty-three days.  This represents a significant amount of time during which the parties were able to assess and prepare for anticipated *Batson* motions practice -

assessing prospective jurors on a rolling basis, identifying prospective challenges, and organizing materials to either assert or resist *Batson* challenges.  Further, there was a one-week delay between the end of individual voir dire and the peremptory strike process, which, in the Court's estimation, represented an apt and generous amount of time for members of both the Government and the Defense teams to "review the massive jury selection record" so that they might be prepared to advance argument on the day that peremptory strikes were scheduled to take place.

Further, the Court put the Defense on full notice of the procedure the Court intended to utilize for the peremptory strike process when it ruled on the parties' proposals for the same, providing as follows at ECF No. 1262 on May 24, 2023:

> Upon consideration of the Motion for Reconsideration filed by the Defense at [ECF No.] 1257, it is hereby ORDERED that the Motion is denied.  The Defense requests that the Court reconsider its decision to utilize the process proposed by the Government at Paragraph 9(a) of [ECF No.] 1253, and to not adopt the proposal raised by the Defense at Paragraph 9(b), which the Court notes was raised, for the first time, 48 hours before the peremptory strike process is scheduled to take place.  In its Motion for Reconsideration, the Defense asserts that it requires additional time to review voir dire transcripts.  The parties were provided with transcripts of the voir dire process at the conclusion of each day of individual questioning, which concluded one full week ago on 5/17/23.  The Court ruled quickly, if not summarily, on the issue presented by the Defense at [ECF No.] 1253 so that the Defense was on full, and nearly immediate, notice of the procedure the Court intends to utilize.  The Court trusts that both the Government and Defense legal teams, each composed of highly capable attorneys, are capable of adequate review of the relevant questionnaires and transcripts, which were produced nearly contemporaneously during the voir dire process, ahead of the peremptory strike process, and that all parties may be adequately prepared to present any motion they deem appropriate on 5/25/23.  The Defense cites one case in support of their request, and the quoted section of that decision reflects that the relief requested by the Defense is not at all a universal practice.  The case certainly does not stand for the proposition that the Defense's requested relief is in any way constitutionally required.  The Defense provides the Court with no adequate basis to reconsider its Order at [ECF No.] 1255, and the Motion for Reconsideration is denied.

ECF No. 1262.  It bears noting that, prior to this ruling, Defendant proposed that a timeframe of less than twenty-four hours following the conclusion of the peremptory strike process constituted

"adequate time" for the Defense to review the record.  *See* ECF No. 1253 at 5 ("Here, the defense proposes a significantly shorter time for *Batson* challenges than what the district court in *Saipov* permitted.").  The Court provided the Defense two days' notice of the procedure it would utilize. Any assertion that the Court provided the Defense with only a 90-minute lunch break to review the jury selection record is, at best, disingenuous.  The Defense cannot possibly rely on argument that it was unaware of the peremptory strike procedure the Court would utilize, and its attempts to argue that the Court unfairly constrained the Defense's ability to prepare are, at least in this Court's estimation, not supported in any way by the record.  In short, the Defendant raises new arguments five months after the jury was empaneled in this case, and his Motion can thus be deemed untimely.

Defendant's request to "reopen" the *Batson* Hearing also strikes this Court as unlikely to constitute an appropriate avenue of relief.  The United States Court of Appeals for the Second Circuit has explained:

> Furthermore, on several occasions we have observed that "*Batson* objections should be adjudicated and entertained during the process of jury selection."  *United States v. Biaggi*, 909 F.2d 662, 679 (2d Cir.1990), *cert. denied*, 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991).  In *Biaggi*, although the defendant's objection was raised during jury selection, the trial judge deferred considering it in order to receive full-dress written motions.  We admonished trial judges to rule on such objections during the jury selection, noting the "need to resolve a *Batson* claim at the point where prompt corrective action can be taken if the claim is successful." *Id*.  In *United States v. Alvarado*, 891 F.2d 439, 445 (2d Cir.1989), *vacated on other grounds*, 497 U.S. 543, 110 S.Ct. 2995, 111 L.Ed.2d 439 (1990) (Alvarado I ), we stated that the trial judge "should promptly take corrective action before jury selection has been completed."  And in *Roman v. Abrams*, 822 F.2d 214, 229 (2d Cir.1987), *cert. denied*, 489 U.S. 1052, 109 S.Ct. 1311, 103 L.Ed.2d 580 (1989), we stated that it is incumbent on the trial court to rule on *Batson*-type objections "during the jury selection process."

*McCrory v. Henderson*, 82 F.3d 1243, 1249 (2d Cir. 1996).  During the *Batson* Hearing, this Court noted its exhaustive preparation ahead of the final day of jury selection so that it could be prepared to address any potential *Batson* challenges, stating that it had looked to relevant case law, reviewed

prospective jurors' questionnaires and responses, and had revisited individual examinations and transcripts closely.[5]  The Court ruled on Defendant's challenges, as it was required to, before the completion of jury selection, following extensive review of the docket and with the benefit of having recently heard argument of the parties and, not insignificantly, with the benefit of a fresh recollection of the live, in-person, voir dire responses from potential jurors.  If the Court was incorrect in its determination respecting Defendant's failure to establish pretext, it seems likely that the courts of appeals are where such relief should be sought at this late juncture.  It strikes the Court that the time for "reopening" the *Batson* Hearing has long since passed.  What Defendant truly moves for, and his Reply makes this clear, is a new trial based upon *Batson* violations, relying upon arguments that could and should have been raised at the time of the *Batson* hearing.

In any event, Defendant's Motion is meritless.  Even after five months, the Court finds that Defendant has come up well short of his burden of establishing purposeful discrimination.  The United States Court of Appeals for the Third Circuit has explained:

> When determining whether there has been purposeful discrimination in the striking of a prospective juror, the district court engages in a three-step process:
>
>> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*United States v. Savage*, 970 F.3d 217, 266 (3d Cir. 2020) (quoting *Snyder v. Louisiana*, 552 U.S. 472 (2008)).  The United States Supreme Court has explained:

> *First*, what factors does the trial judge consider in evaluating whether racial discrimination occurred?  Our precedents allow criminal defendants raising *Batson* challenges to present a variety of evidence to support a claim that a prosecutor's peremptory strikes were made on the basis of race.  For example, defendants may present:

---

[5] Again, Defendant had raised the possibility of *Batson* challenges several times well before jury selection took place.

• statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;

• evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case;

• side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;

• a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;

• relevant history of the State's peremptory strikes in past cases; or

• other relevant circumstances that bear upon the issue of racial discrimination.

*Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019).

The Court has already found that Defendant established a prima facie showing with respect to the jurors at issue in this Motion, and the Defense does not assert that the Government failed to offer a race-neutral basis for striking the jurors in question. Accordingly, the only issue before the Court is whether Defendant has established that the Government's reasons for striking these jurors constituted pretext for discrimination, that is, whether the Defendant has shown purposeful discrimination. With respect to the third inquiry, the Third Circuit has explained:

> The third step requires the trial court to determine if the defendant has established purposeful discrimination. It is not until the third step that the persuasiveness of the justification becomes relevant. Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, . . . and the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge. This step requires the trial judge to decide whether the prosecutor's proffered reasons are the actual reasons, or whether the proffered reasons are pretextual and the prosecutor instead exercised peremptory strikes on the basis of race. The ultimate inquiry is whether the [government] was motivated in substantial part by discriminatory intent.

*Savage*, 970 F.3d at 267 (citation omitted) (internal quotation marks omitted).

Initially, while certainly not a replacement for individual voir dire in all instances,[6] the Court notes that each potential juror filled out a lengthy questionnaire prior to being individually questioned.  This procedure was requested by the parties.  The potential jurors were given several hours to complete the questionnaire, and each potential juror was instructed to "[p]lease take your time and answer each question fully."   ECF No. 938-1.   In the Court's estimation, the questionnaires gave both the parties and the Court a solid, if not robust, baseline from which to begin questioning, and certainly provided a helpful frame of reference for the potential jurors' views on many topics, including the death penalty.  The jurors at issue in Defendant's Motion had each answered a question on the questionnaire in a manner that could support the use of a peremptory strike.  That said, both the parties and the Court carefully asked questions in an effort to shed light on the jurors' views; but the questionnaire, as intended, served as a useful guidepost in initiating such questioning.

The Government correctly notes that several of the jurors at issue in Defendant's Motion rated themselves as a "3" or "4" on question 73 as to their opinion on the death penalty, with "1" being most strongly opposed and "10" being most strongly in favor.  Question 74 further asked the jurors to expound upon their beliefs about the death penalty in "a case involving someone who is proven guilty of intentional, premeditated murder of multiple individuals in a single incident in a place of worship without any legal justification or excuse (for example, not in self-defense, not insane, not in the heat of passion)[,]" and several of the stricken potential jurors answered this question in a manner that might reasonably explain the use of a peremptory strike on the potential

---

[6] Though the Court notes that, upon agreement of the parties, certain jurors were struck for cause based upon their questionnaire responses alone.  *See* ECF No. 1086.

juror by the Government.[7]  That said, the Government also explained at length the bases for its strikes during the *Batson* Hearing, relying not only on the questionnaire responses, but also individual voir dire.  *See* ECF No. 1600 at 94 ("These are just a few examples from the record that demonstrate what this Court, which presided over weeks of voir dire, knows—the government questioned potential jurors fully, regardless of race, based on the jurors' questionnaire and in-person responses, their opposition or equivocation about the death penalty, and specific circumstances posed by that particular juror.").

The Court again notes, as it did when ruling on the *Batson* challenges, that a *Batson* challenge is not a challenge to a juror's qualifications to serve, and that a peremptory strike is by no means an endorsement of any suggestion that the stricken juror is not a competent, capable potential juror, only that they are not the preference of the striking party.  The Court agrees with the Government that "[t]here is nothing impermissible about the government exercising peremptory strikes against qualified jurors who may have a harder time imposing a sentence of death, or who may hold the government to a higher burden in the weighing process—or who may ultimately be unable to impose that verdict at all when faced with the solemn task of rendering that verdict."  ECF No. 1600 at 88.

---

[7] The Government struck all of the potential jurors who rated themselves as "3's" on question 73 of the questionnaire, though did not strike one juror who, during questioning and who was later peremptorily struck by the Defense, rated himself as "3a," indicating that he was strongly in favor of the death penalty in a case involving premeditated mass murder at a house of worship.  The Government further struck all potential jurors who rated themselves as "4's," with the exception of one juror, a white male, who rated himself as a "4d," which distinguishes him from Juror No. 257, who rated herself as a "4e," indicating general opposition to the death penalty as opposed to neutral feelings toward the death penalty.  The Government thus explained: "As a result of the government's strikes, the seated jury panel consisted of jurors who self-ranked as '5d' or above, with the exception of Juror 270—in other words, a jury entirely comprised of members who were either neutral or generally in favor of the death penalty in a case like this one."  ECF No. 1600 at 87; *see also id.* at 107 ("The record is clear and undisputable: the government used its peremptory strikes against every juror (Jurors 99, 136, 148, 203, 235, 290, 344)—regardless of race—who responded to Question 74 with an 'e' or lower.").

The Government aptly notes that, during the *Batson* Hearing, the Defense's arguments frequently, if not entirely, waded into the issue of whether the Government could establish that the juror at issue should be stricken for cause. That is not the standard for a *Batson* challenge. *See Batson v. Kentucky*, 476 U.S. 79, 97 (1986) ("[T]he prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause."). Rather, once the Government makes a showing of race-neutral basis for striking the juror in question, a showing no party denies the Government made with respect to each of the jurors at issue, the Defendant must establish that the Government was motivated in substantial part by discriminatory intent. That framework seemed, at times, to not be the principal focus of the Defense during the *Batson* Hearing, so it bears reiterating herein. Of course, and as noted throughout this Opinion and during the hearing, once a Defendant makes a prima facie showing that a peremptory challenge has been exercised on the basis of race, a finding this Court made for each of the jurors at issue, the Government may not rely on a basis for striking that juror that is simply pretext for discrimination.

That said, the Court has, again, thoroughly reviewed the record and finds that the Government's proffered bases for its peremptory strikes are clearly race-neutral and, moreover, credible. They are consistent with this Court's recollection of the live, in-person, individual voir dire responses of prospective jurors, the presently available record of voir dire, and the arguments presented at the time of the *Batson* Hearing. The Court reiterates its finding that the Government was credible in offering its bases for its strikes during the *Batson* Hearing. The Government asserts as follows:

> At the final selection phase, the government sought to seat fair and impartial jurors who would be open to the government's arguments in favor of guilt and, ultimately, imposition of the death penalty—regardless of the jurors' race or ethnicity. . . .
>
> The record is clear: the United States relied exclusively on neutral factors when determining which jurors to strike. The government considered several factors,

> including: (1) whether the juror was opposed to the death penalty and/or whether the juror's answers indicated the ability to actually vote in favor of a death sentence; (2) whether the juror would be fair and impartial, or would impose an undue burden of proof on the government, especially with respect to the death penalty; (3) whether the juror appeared to be someone who would reliably appear for the duration of this lengthy trial, including the juror's ability to consider emotional or graphic evidence; (4) whether the juror had specialized knowledge about or particular interest in issues that might bear on potential mitigating factors, such as adverse childhood experiences and mental illness; and (5) whether the juror raised individualized concerns given the facts and circumstances of this case. Each of these factors is unquestionably race-neutral, and the defendant does not argue otherwise.

ECF No. 1600 at 84; *see also id.* at 105 ("Thus, contrary to the defendant's suggestion, the government consistently used strikes against jurors—regardless of race—who indicated significant concerns about imposing a death verdict, even if they stated their belief that they could vote for it." (emphasis omitted)). Again, the record bears out that the Government articulated credible race-neutral reasons for striking each of the jurors at issue (as detailed during the *Batson* Hearing and at length in the Government's Brief), the Defendant failed to show that those reasons were pretextual at the *Batson* hearing, and Defendant's attempts to establish pretext five months after empanelment of the jury still come up short.

Again, the Government's proffered bases for the peremptory strikes at issue are consistent with the Court's recollection of contemporaneous questioning and the record in this case. Each of the jurors, whether in their questionnaire or in individual questioning, expressed or did something that could reasonably be described to give the Government pause as to whether that individual would be a favorable Government juror. The Government followed up on these topics, and not in an unduly disparate or lengthy manner, consistently focusing on the substantive topics at issue throughout voir dire. Again, the Government need not establish that any of these jurors should have been stricken for cause.

As the Government explains, Juror No. 257 rated herself as a "3," indicating strong opposition to the death penalty, and also answered on the questionnaire that, "[a]s someone that wishes to become a physician, I believe it is not my place to decide whether another person lives or dies." She also has a professional background involving neuroscience and the impact of child factors on an individual's development, topics particularly relevant to the Defense's anticipated mitigation case. The Government's attorneys believed, based upon their experience and judgment, that this educational and professional background might have presented a potential for the juror to have an undue, adverse influence on other jurors.

Juror No. 148 rated herself as a "4e," again indicating opposition to the death penalty. She made several statements during questioning that could reasonably give the Government pause as to her ability to vote for the death penalty. The Government also noted that she displayed leadership qualities based on her age, demeanor, and experiences. The Court also remembers this individual's questioning well, and agrees that this juror presented as erudite, worldly, and astute, and that the Government might be warranted in concluding that she might prove an influential figure in the jury room. Further, the Government explained that it observed frustration and irritation on the part of Juror No. 148 at a certain line of questioning, and that the same seemed to be directed towards the Government. The Court also recalls a notable reaction from Juror No. 148 to this line of questioning, with the juror immediately and very succinctly rejecting the questions asked. While perhaps not an unjustified reaction, and the juror seemingly did not rise to the level of taking unfair offense, the Court did note that the juror bristled at the questions asked in response to documents provided to the Court by the Government during questioning. The Court found that the Government was credible in offering this as a factor in its decision to strike this juror, and finds that Defendant has not established that this basis was pretext for discrimination.

Juror No. 290 also rated herself as a "4e," indicating that she is opposed to the death penalty.  She reacted emotionally when being questioned about her ability to vote for a death sentence.  *See* ECF No. 1216 at 94:11-17 (the Court explaining that "[s]he was becoming a bit emotional.  At one point, as I describe it, she was choked up when asked, can you really impose the death sentence, and that's my paraphrasing of Ms. Song's question.  The question that specifically prompted some emotional reaction was, you know, when it comes to it, can you put your name to the verdict sheet or something to that [e]ffect.").  She further expressed negative views about the criminal justice system, and gave somewhat inconsistent answers as to whether her unemployment would affect her ability to serve as a juror.  Finally, Juror No. 290 understandably reacted emotionally when discussing gun violence, justifying the Government in having some doubt as to her ability to listen to testimony and view evidence in this case involving gun violence.

With respect to Juror Nos. 95 and 332, it bears noting that the Defendant deferred to the Court, and did not present any specific argument, as to these jurors after the Government proffered its race-neutral bases for its strikes.  *See* ECF No. 1277 ("So with respect more specifically to the jurors that we have challenged, with respect to Jurors 95 and 332, we will defer to the Court, based upon the government's proffer and the prima facie case that we made with respect to the government striking of all African-Americans.  Both Juror 95 and Juror 332 are African-American men.").

Juror No. 95 failed to appear on the final day of jury selection, and the Court was unable to reach him to verify whether he intended to appear.  He was the only member of the 68-person qualified juror panel who failed to appear on the final day of selection.  The Court agrees that this basis for a peremptory strike is "eminently reasonable and clearly non-discriminatory," and further

that the same would support a conclusion that "this juror could not be deemed sufficiently reliable to appear every day for a trial that would last for months."  ECF No. 1600 at 117.  The Government also cited this juror's employment history and age as potential indicia of unreliability. The Government notes that Juror No. 95 expressed some potentially inconsistent and unique views on the death penalty, and also expressed negative views about law enforcement in his questionnaire.

Finally, the Court finds that the Government more than adequately described its bases for striking Juror No. 332 during the *Batson* hearing, including during the closed session that day.  The Government's bases are sufficiently described in its Brief at ECF No. 1600 from pages 121-122, the Court finds these bases credible, and finds that Defendant has not established that they are pretext for discrimination.

Any one of the bases discussed above is sufficient to state a race-neutral basis for a peremptory strike, but they also may be considered in conjunction as to the respective jurors. Again, the Court found, and finds, that the Government has credibly explained that these bases were the actual bases for its strikes, and not purposeful discrimination.  The Defendant has not established that these reasons are mere pretext for discrimination.

In summary, the Court does not find that the Government's peremptory strikes against Juror Nos. 257, 148, 290, 95, and 332 were motivated in substantial part by discriminatory intent. The record indicates the exact opposite, that is, the record indicates that the Government established credible race-neutral reasons for its strikes.  This Court found, and still finds, that the Government's proffered reasons for its strikes are the actual reasons.  Defendant's attempts to point to additional comparators, all of whom are readily distinguishable, come up short, and the Government's questioning of these jurors was in no way unduly disparate, lengthy, or in any way inappropriate or suggestive of discriminatory motive.  Other than the statistical evidence the

Defendant relied upon in establishing a prima facie showing, the Defendant has given the Court no adequate additional bases to question the credibility of the attorneys for the Government.  In short, Defendant has fallen well short of establishing pretext.  For these reasons, Defendant's Motion to Reopen the *Batson* Hearing is denied.

## IV.     Conclusion

For the reasons discussed above, the Court will deny Defendant's Motion for Judgment of Acquittal Under Fed. R. Crim. P. 29(c) and for a New Trial Under Fed. R. Crim. P. 33.  An appropriate Order of Court follows.

BY THE COURT:

*/s/Robert J. Colville*_____
Robert J. Colville
United States District Judge

DATED: May 17, 2024


cc: All counsel of record